**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>                *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                *Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>                *Plaintiffs*,<br><br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>                *Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>                *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                *Defendants*. | Civil Action No. 26-1151 (CJN) |

**MEMORANDUM IN SUPPORT OF**
**LULAC[1] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

[1] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association.

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................................1

I.    Issuance of the Challenged Executive Order .................................................................1

II.    Constitutional and Federal Statutory Authority to Regulate Federal Elections and Voter Registration ........................................................................................................3

    A.  The President has no constitutional power to set voter registration and election administration rules..............................................................................................3

    B.  Congress, not the President, has the power to set requirements for the administration of federal elections by States .........................................................5

III.    Factual Background ...................................................................................................8

ARGUMENT ...........................................................................................................................13

I.    LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the Executive Order ........................................................................................................13

    A.  Legal Standard ......................................................................................................13

        1.    Associational Standing..............................................................................13

        2.    Organizational Standing............................................................................13

    B.  Plaintiffs Have Standing to Challenge Section 2(a) of the Executive Order .........14

        1.    Associational Standing..............................................................................14

        2.    Organizational Standing............................................................................19

    C.  Plaintiffs Have Standing to Challenge Section 3 of the Executive Order .............20

        1.    Associational Standing..............................................................................21

        2.    Organizational Standing............................................................................22

II.    Plaintiffs Are Entitled to a Preliminary Injunction on Counts I and II ........................23

    A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims............................23

        1.  Plaintiffs are likely to succeed on their claim that Section 3(b) violates the separation of powers and is ultra vires of the President's authority (Count I).25

            a.    The President has no constitutional authority to issue the Mail-in and Absentee Participation List and Ballot Transmittal Directives in Section 3(b).................................................................................................25

b.   Section 3(b) is incompatible with the expressed will of Congress ............27

   i.      Section 3(b) is contrary to UOCAVA ............................................27

   ii.     Section 3(b) is contrary to the PRA and subsequent acts ..............28

         a.   *Section 3(b) is contrary to USPS's universal service mandate* ..................................................................................29

         b.   *Section 3(b) is contrary to USPS's antidiscrimination mandate* ..................................................................................30

         c.   *Section 3(b) is contrary to mandatory procedures for significant postal service changes* ..........................................31

         d.   *Section 3(b) is contrary to limitations on USPS's provision of non-postal services* .................................................................33

         e.   *Section 3(b) is contrary to the prohibition on disclosure of postal patron information* ......................................................33

c.   The EO cites sources of law that do not authorize Section 3(b)'s directives ...........................................................................................34

2.   Plaintiffs are likely to succeed on their claim that Section 2(a) violates the separation of powers and is *ultra vires* of the President's authority (Count II) ...................................................................................................36

   a.   The President has no constitutional authority to require the creation and transmission of State Citizenship Lists ......................................37

   b.   Section 2(a) is contrary to Congress's will as expressed in the NVRA and HAVA ................................................................................................37

B.   Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction ...............40

C.   The Balance of Equities and the Public Interest Strongly Favor Plaintiffs ...........45

CONCLUSION ...................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                                                        **Pages**

*Alliance for Retired Americans v. Bessent*, 770 F. Supp. 3d 79 (D.D.C. 2025) ...........................18

*American Federation Government Employees, AFL-CIO v. OPM*, 786 F. Supp. 3d 647 (S.D.N.Y. 2025) ................................................................................................................................42

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ..............................30, 35

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*, 220 F. Supp. 3d 27 (D.D.C. 2016) ..............................................................................................30

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ......................................39, 41

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ("*ITCA*") ...............................4

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ................................................24

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ..........................................................................7

*Biden v. Nebraska*, 600 U.S. 477 (2023) .......................................................................................37

*Bost v. Illinois Board of Elections*, 146 S. Ct. 513 (2026) ........................................................19, 23

*Buchanan v. United States Postal Service*, 508 F.2d 259 (5th Cir. 1975) .....................................31

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ...................................................9, 28, 42

*Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ..................................19

*Center for Taxpayer Rights v. IRS*, No. 25-0457-CKK, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) .......................................................................................................................................43

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ..................................................24

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........................40

*Direct Mail/Marketing Association, Inc. v. United States Postal Service*, 501 F.2d 717 (D.C. Cir. 1974) ................................................................................................30, 31

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ......................................................................................15

*Fish v. Schwab*, 957 F.3d 1105(10th Cir. 2020) ............................................................................45

*Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*") .............................................................................13, 19, 20, 23

*Foster v. Love*, 522 U.S. 67 (1997) ..................................................................................................4

*Global Health Counsel v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) ...................................................24

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988)..............................18

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .........................13

*Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018) .........................................................6

*Kobach v. U.S. Election Assistance Commission*, 772 F.3d 1183 (10th Cir. 2014) ........................6

*League of United Latin American Citizens v. Executive Office of the President*,
   780 F. Supp. 3d 135 (D.D.C. 2025) ("*LULAC I*") ................................................................9, 25

*League of United Latin American Citizens v. Executive Office of the President*, 808 F. Supp. 3d
   29 (D.D.C. 2025) ("*LULAC II*") ........................................................4, 5, 9, 13, 24, 40

*League of United Latin American Citizens v. Executive Office of the President*, No. CV 25-0946
   (CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026) ("*LULAC III*") ......................8, 9, 24, 28, 36

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)
   .......................................................................................... 14, 19, 24, 40, 43-45

*Ludewig v. Wolff*, 492 F. Supp. 1048 (S.D. Tex. 1980) ...................................................................31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .....................................................................13

*Luther v. Borden*, 48 U.S. 1 (1849) ................................................................................................35

*Mail Order Association of America v. United States Postal Service*,
   986 F.2d 509 (D.C. Cir. 1993) ..................................................................................26, 27

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999)...................................23

*National Association of Greeting Card Publishers v. United States Postal Service*,
   462 U.S. 810 (1983)...............................................................................................................27

*National Association of Postal Supervisors v. United States Postal Service*,
   26 F.4th 960 (D.C. Cir. 2022) ...............................................................................................29

*National Easter Seal Society for Crippled Child. & Adults v. United States Postal Service*,
   656 F.2d 754 (D.C. Cir. 1981) ..............................................................................................30

*New York v. Biden*, 636 F. Supp. 3d 1 (D.D.C. 2022) ....................................................................32

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ........................................................................................4

*Pacific States Telephone & Telegraph Co. v. State of Oregon*, 223 U.S. 118 (1912) ....................34

*Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833 (E.D. Pa. 2020) .......................................................32

*Protect Democracy Project, Inc. v. U.S. Department of Justice*, 498 F. Supp. 3d 132 (D.D.C. 2020) ................................................................................................................45

*Public Interest Legal Foundation v. Benson*, 136 F.4th 613 (6th Cir. 2025) ................................39

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*, 996 F.3d 257 (4th Cir. 2021) ................................................................................................10

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ...................13

*Smiley v. Holm*, 285 U.S. 355 (1932)................................................................................................4

*State v. Meadows*, 88 F.4th 1331 (11th Cir. 2023) ...................................................................5, 37

*Trump v. United States*, 603 U.S. 593 (2024) ...................................................................................5

*United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114 (1981) ................................................................................................................26

*United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015)........................................................7, 27

*United States v. Alabama*, 998 F. Supp. 2d 1283 (M.D. Ala. 2014) ................................................7

*Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) ................................................................................................................9, 37

*Williams v. Harry's Nurses Registry, Inc.*, No. 24-34-cv, 2025 WL 842041 (2d Cir. Mar. 18, 2025) ................................................................................................................42

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...................................... 23-27, 34

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) .............................................................36

**Statutes and Codes**

20 C.F.R. § 416.708(a)......................................................................................................................10

39 C.F.R. § 3055.100(b)....................................................................................................................29

39 C.F.R. § 3020.101 *et seq.*............................................................................................................32

18 U.S.C. §§ 1700–03........................................................................................................................35

18 U.S.C. § 1708................................................................................................................................35

39 U.S.C. § 101 *et seq.*................................................................................................................26, 28

39 U.S.C. § 101..............................................................................................................................26, 29

39 U.S.C. § 102(5)............................................................................................................................33

39 U.S.C. § 201................................................................................................................................27

39 U.S.C. §§ 201–205 ..........................................................................................................27

39 U.S.C. § 401 ...................................................................................................................25

39 U.S.C. § 403(a)-(b) ........................................................................................................29

39 U.S.C. § 403(b)(2) ..........................................................................................................30

39 U.S.C. § 403(c) ...............................................................................................................30

39 U.S.C. § 404(a)(1) ...........................................................................................................29

39 U.S.C. § 404(b) ...............................................................................................................30

39 U.S.C. § 404(e) ...............................................................................................................33

39 U.S.C. § 404(e)(2)-(4) .....................................................................................................33

39 U.S.C. § 412(a) ...............................................................................................................34

39 U.S.C. § 412(b) ...............................................................................................................34

39 U.S.C. §§ 3001–3018 ......................................................................................................30

39 U.S.C. § 3629 ..................................................................................................................35

39 U.S.C. § 3661(b) .............................................................................................................31

39 U.S.C. § 3661(c) .............................................................................................................31

52 U.S.C. § 10502 ..................................................................................................................4

52 U.S.C. §§ 20301–20311 ....................................................................................................7

52 U.S.C. § 20301(b)(2) ...................................................................................................8, 28

52 U.S.C. § 20301(b)(3) .......................................................................................................28

52 U.S.C. § 20302(a) ............................................................................................................28

52 U.S.C. § 20302(a)(1)-(2) .................................................................................................28

52 U.S.C. § 20302(a)(3) ........................................................................................................28

52 U.S.C. § 20302(a)(4) ...................................................................................................8, 28

52 U.S.C. § 20303 ................................................................................................................28

52 U.S.C. § 20304(b) ...........................................................................................................29

52 U.S.C. § 20304(b)(2) .......................................................................................................28

52 U.S.C. § 20310(5) ............................................................................................................27

52 U.S.C. § 20501(b) ...........................................................................................................6

52 U.S.C. § 20501(b)(1) ......................................................................................................5

52 U.S.C. § 20501(b)(3) ......................................................................................................5

52 U.S.C. § 20501(b)(4) ....................................................................................................40

52 U.S.C. §§ 20503–20506 .................................................................................................6

52 U.S.C. § 20505(a)(2) ......................................................................................................6

52 U.S.C. § 20507 .............................................................................................................38

52 U.S.C. § 20507(a)(1) ....................................................................................................15

52 U.S.C. § 20507(a)(3) ......................................................................................................6

52 U.S.C. § 20507(a)(4) .................................................................................................6, 39

52 U.S.C. § 20507(b) ...........................................................................................................6

52 U.S.C. § 20507(c) ...........................................................................................................6

52 U.S.C. § 20507(c)(1) ....................................................................................................35

52 U.S.C. § 20507(c)(2)(A) ..........................................................................................38, 39

52 U.S.C. § 20507(c)(2)(B) ...............................................................................................38

52 U.S.C. § 20507(d) ...........................................................................................................6

52 U.S.C. § 20508(b)(2) ......................................................................................................6

52 U.S.C. §§ 20510–20511 ...............................................................................................35

52 U.S.C. § 21083(a)(1) ....................................................................................................37

52 U.S.C. § 21083(a)(1)(A) .................................................................................................7

52 U.S.C. § 21083(a)(1)(A)(i) .........................................................................................7, 38

52 U.S.C. § 21083(a)(1)(A)(viii) .......................................................................................38

52 U.S.C. § 21083(a)(2) ....................................................................................................38

52 U.S.C. § 21083(a)(2)(A)(ii) ............................................................................................7

52 U.S.C. § 21083(a)(2)(B)(iii) ...........................................................................................7

52 U.S.C. § 21083(a)(4) ....................................................................................................38

52 U.S.C. § 21083(a)(4)(A) ...............................................................................................39

52 U.S.C. § 21083(a)(5)(A) ................................................................................................7, 38

52 U.S.C. § 21085 ...................................................................................................................35

52 U.S.C. §§ 20901–21145 ......................................................................................................7

**Constitutional Provisions**

U.S. Const. art. I..........................................................................................................................5

U.S. Const. art. I, § 2, cl. 1 .........................................................................................................4

U.S. Const. art. I, § 4, cl. 1 .........................................................................................................4

U.S. Const. art. I, § 7, cl. 2 .........................................................................................................5

U.S. Const. art. I, § 8 ................................................................................................................26

U.S. Const. art. II, § 1, cl. 4 .......................................................................................................4

U.S. Const. art. II, § 3 ................................................................................................................5

**Other Authorities**

*2026 State Primary Election Dates*, National Conference of State Legislatures (last updated Feb. 27, 2026), https://www.ncsl.org/elections-and-campaigns/2026-state-primary-election-dates ............................................................................................................................................2

*About the United States Postal Service*, USPS (Apr. 1, 2020), https://perma.cc/VZU4-CGZT....29

*Election Mail*, USPS, https://perma.cc/S2P7-RWR7 (last visited Apr. 17, 2026) ........................29

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025)...........................................................9

Exec. Order No. 14243, 90 Fed. Reg. 13681 (Mar. 20, 2025).........................................................9

*Get an Address List*, USPS, https://perma.cc/4XWB-6P2X...........................................................33

H.R. Rep. No. 103-66 (1993).........................................................................................................6

H.R. Rep. No. 99-765 (1986)..........................................................................................................7

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH ...................................................................................................................................9, 11

Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (Aug. 28. 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ......................12

Letter from SSA to Fair Elections Center (July 13, 2023), https://perma.cc/KS2N-U2US...........11

Press Release, Office of Public Affairs, U.S. Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/2R3L-YZ5X ........................................................................12

Pub. L. No. 103-31, 107 Stat. 77 (1993)................................................................................5

Pub. L. No. 107-252, 116 Stat. 1666 (2002) .........................................................................7

*The Universal Service Obligation and Financial Sustainability*, USPS (Jan. 2024), https://perma.cc/22M3-DTRR .........................................................................................29

*Universal Service*, USPS (2013), https://perma.cc/8VW7-ZL5S .........................................29

*USCIS Deploys Common Sense Tools to Verify Voters*, USCIS (May 22, 2025), https://perma.cc/HBZ5-RW2E .........................................................................................10

*Voter Registration and Voter List Maintenance Fact Sheet*, USCIS (updated Feb. 2, 2026), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet ...................................................................................................12

Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association ("LULAC Plaintiffs") challenge the President's unlawful attempt to usurp power over federal elections in Executive Order 14399. Contrary to the commands of the Order, the President has no power to a create a federal voter eligibility screening regime or to require the Postal Service to refuse delivery of certain mail ballots. LULAC Plaintiffs file this memorandum in support of their motion for preliminary injunction as they seek to prevent the imminent harm that the Order inflicts on their organizations and members.

## BACKGROUND

### I.     Issuance of the Challenged Executive Order

On March 31, 2026, President Trump issued Executive Order 14399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." Ex. 1, Executive Order 14399 ("EO" or "Order"). Broadly, the Order does two things. First, it requires federal agencies—namely the Department of Homeland Security ("DHS") and the Social Security Administration ("SSA")—to compile for each State a list all persons whom the federal government has "confirmed" to be U.S. citizens, who will be eighteen years or older before the next Federal election, and who purportedly reside in the subject State. That list, the "State Citizenship List," is derived from an amalgam of federal data sources and must be transmitted to State election officials at least sixty days before each federal election. Second, the Order directs the United States Postal Service ("USPS") to create its own list of approved voters, the "Mail-In and Absentee Participation List," and treat certain ballots as ineligible for USPS delivery if voters are not listed on this new, extra-statutory, federally-created list. Congress has never enacted any such requirements and has instead passed multiple laws that conflict with the Order's mandates.

1

***State Citizenship List.*** Section 2(a) of the Order directs the Secretary of the Department of Homeland Security ("DHS"), in coordination with the Social Security Administration ("SSA") Commissioner, to develop "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," deemed the "State Citizenship List." Order § 2(a). This State Citizenship List "shall be derived" from "citizenship and naturalization records, SSA records, [USCIS Systematic Alien Verification for Entitlements ("SAVE")] data, and other relevant Federal databases" without specifying what "other . . . Federal databases" are to be used. *Id.*

The requirements imposed by Section 2(a) are not limited to federal general elections. Instead, the Order requires that the "State Citizenship List shall be updated and transmitted to State election officials no fewer than 60 days before *each regularly scheduled Federal election*, or promptly upon request by a State in connection with any special Federal election." Order § 2(a) (emphasis added). Numerous states have regularly scheduled federal primary elections on dates throughout April to September 2026.[2] The Secretary of DHS must "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" by June 29, 2026, a firm and fast approaching deadline. Order § 4(c).

The text of the Order makes plain that it aims to coerce the States into limiting voter registration and access to the ballot to those present on the State Citizenship List. The express purpose of the State Citizenship List is to "assist in verifying identity and Federal election voter eligibility." Order § 1. The Order contemplates a process for individuals to correct the lists "in advance of elections," something that would be unnecessary if the lists were not used to gatekeep

---

[2] *2026 State Primary Election Dates*, Nat'l Conf. of State Legislatures (last updated Feb. 27, 2026), https://www.ncsl.org/elections-and-campaigns/2026-state-primary-election-dates.

access to elections. *Id.* § 2. And the Order directs the Attorney General to prioritize the investigation and prosecution of "State and local officials" or others who "issue Federal ballots to individuals not eligible to vote in a Federal election[.]" *Id.* § 2(a).

*Mail-In and Absentee Participation List.* Section 3 of the Order directs the creation of a federal screening regime under which the Postal Service is to withhold delivery of certain voters' mail ballots. The Order requires the Postmaster General to "initiate a proposed rulemaking" within 60 days (by May 30, 2026), and to issue a final rule within 120 days (or by July 29, 2026), that will dictate which mail ballots USPS will transmit. Order § 3(b), (d). Section 3 provides that "no fewer than 90 days prior to a Federal election, any State may choose to notify the USPS if it intends to allow for mail-in or absentee ballots to be transmitted by the USPS" and whether it intends to submit at least 60 days prior to an election "a list of voters eligible to vote in a Federal election" through the mail. Order § 3(b)(ii). The proposed rulemaking is to require that prior to each federal election, USPS will "provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State," which the Order refers to as "Mail-In and Absentee Participation List." Order § 3(b)(iv). Section 3(b) directs that the rulemaking contain provisions "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list" created by the EO. Order § 3(b)(iii). In other words, Section 3(b) directs the USPS to create a requirement under which the Postal Service will refuse to deliver mail ballots from individuals not "enrolled with USPS" and listed on a State-specific "Mail-In and Absentee Participation List."

## II. Constitutional and Federal Statutory Authority to Regulate Federal Elections and Voter Registration

### A. The President has no constitutional power to set voter registration and election administration rules.

"[O]ur Constitution entrusts Congress and the States—not the President—with the power to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025) ("*LULAC II*"). The Elections Clause provides that States shall prescribe the "Times, Places and Manner of holding" congressional elections. U.S. Const. art. I, § 4, cl. 1.[3] Under the Elections Clause, States may regulate, among other things, voter "registration" and the "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Of course, the Elections Clause also grants Congress the power to "make or alter" such regulations through federal legislation. U.S. Const. art. I, § 4, cl. 1. The Elections Clause thus gives States "responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted).

Although the power to regulate federal elections is shared between the States and Congress, the power to set voter qualifications is not jointly vested. Instead, under the Voter Qualifications Clause, U.S. Const. art. I, § 2, cl. 1, States have the power to set voter qualifications, such as citizenship, which every State requires. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16-17 (2013) ("*ITCA*"). As a result, residency requirements for voting are largely defined by State law and differ across States.[4]

While the Constitution vests the "executive Power" in the President, *Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982) (quoting U.S. Const. art. II, § 1), and entrusts him with supervisory and

---

[3] The Electors Clause likewise grants Congress the power to "determine the Time of ch[oo]sing the Electors" for President and Vice President. U.S. Const. art. II, § 1, cl. 4.

[4] *State Voting Requirements & Information*, U.S. Vote Foundation, https://www.usvotefoundation.org/state-voter-information (last visited April 16, 2026) (listing states' various residency requirements); *see also* 52 U.S.C. § 10502 (prohibiting States from residency requirement in excess of 30 days).

policy duties "of utmost discretion and sensitivity," *id.* at 750, the Presidency still exists under a framework of separated powers where Congress makes laws, U.S. Const. art. I, while the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The President's role in enacting or amending election law is limited to proposing and signing legislation, *see* U.S. Const. art. I, § 7, cl. 2; *id.* art. II, § 3, and the Constitution withholds from the President any power to set election rules. *See LULAC II*, 808 F. Supp. 3d at 45 (highlighting this "conspicuous absence" of constitutional authority), appeal docketed, No. 25-5476 (D.C. Cir. Dec. 31, 2025). As a result, "the President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections." *State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023); *accord Trump v. United States*, 603 U.S. 593, 627-28 (2024).

### B. Congress, not the President, has the power to set requirements for the administration of federal elections by States.

Congress has established certain baseline requirements for the administration of federal elections and has otherwise left their conduct to the States. Three statutes are of particular relevance here: the National Voter Registration Act ("NVRA"), the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), and the Help America Vote Act ("HAVA"). The NVRA and HAVA both place States, and not the federal government, in charge of developing and maintaining their own voter registration lists. UOCAVA mandates certain requirements regarding the transmission of mail ballots to uniformed and overseas voters.

1. Congress passed the NVRA, *see* Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified as amended at 52 U.S.C. §§ 20501 *et seq*.), to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), while also recognizing the need to protect the "integrity of the electoral process." 52 U.S.C. § 20501(b)(3). The NVRA thus reflects the choices that Congress made to balance its "two main objectives: increasing voter registration"

while also "removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see* 52 U.S.C. § 20501(b). To achieve the first objective, Congress required covered States to allow citizens to register by mail, at designated state agencies, and when applying for a driver's license. 52 U.S.C. §§ 20503–20506. As for the second objective, the NVRA requires States to conduct voter registration list maintenance that makes a reasonable effort to remove from the rolls people who have died or changed their residence out of the jurisdiction. 52 U.S.C. § 20507(a)(4). To prevent the cancellation of valid registrations and avoid requiring unnecessary re-registrations, Congress limited the circumstances in which States may remove voters, including a prohibition on systematic removals during the 90 days prior to federal elections. *See* 52 U.S.C. § 20507(a)(3), (b), (c), and (d). Finally, the NVRA requires that States inform federal applicants of voter eligibility requirements and penalties for submitting false information, and provide an attestation for the applicant, under penalty of perjury, that they meet every eligibility requirement to vote, including that they are a U.S. citizen. 52 U.S.C. §§ 20508(b)(2), 20505(a)(2). In the NVRA, Congress enacted the particular citizenship confirmation measures that it wished to require the States to employ and placed guard rails on States' ability to remove voters immediately prior to elections, when there is limited time to correct errors.[5]

---

[5] In enacting the NVRA, Congress considered—and rejected—a more onerous form of citizenship verification. "Both houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal [Mail Voter Registration] Form, and ultimately rejected such a proposal." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014). Congress determined that such a requirement was "not necessary or consistent with the purposes of this Act," and "could . . . adversely affect the administration of the other registration programs." H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.).

2. In passing HAVA, Pub. L. No. 107-252, 116 Stat. 1666, 1726 (2002) (codified as amended at 52 U.S.C. §§ 20901 *et seq*.), Congress required "each State" to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. § 21083(a)(1)(A), (a)(1)(A)(i). HAVA charges State and local officials (and not the Federal government) with "conducting a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address [or death]." *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) (citation modified); *see also* 52 U.S.C. § 21083(a)(2)(A)(ii). HAVA also requires States to ensure that "duplicate names are eliminated from the computerized list" and requires States to collect certain information from registrants such as a driver's license number or the last four digits of a Social Security number in order to verify their identity. 52 U.S.C. § 21083(a)(2)(B)(iii), (a)(5)(A). In HAVA, Congress thus specified the basic procedural requirements that States (and not the Federal government) must follow to maintain their own voter registration lists. 52 U.S.C. §§ 20901–21145.

3. Congress enacted UOCAVA, 52 U.S.C. §§ 20301–20311, "to protect the voting rights of military members, their families, and other United States citizens living overseas." *United States v. Alabama*, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), *aff'd*, 778 F.3d 926 (11th Cir. 2015). The purpose of UOCAVA is "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." H.R. Rep. No. 99-765, at 5 (1986). In passing UOCAVA, "Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights." *Alabama*, 778 F.3d at 928.

UOCAVA creates the Federal Post Card Application ("FPCA"), which qualified servicemembers and overseas citizens can use to simultaneously register to vote and request an absentee ballot. 52 U.S.C. §§ 20301(b)(2), 20302(a)(4). The FPCA requires identifying information, including date of birth, state identification or the last four digits of a Social Security number, and a signature. *See* Ex. 2. The FPCA requires a voter to swear or affirm under penalty of perjury that the information provided is accurate, that the voter is a United States citizen at least 18 years of age or older who is eligible to vote in the requested jurisdiction, that the voter is not disqualified from voting, and that the voter is not registering, requesting a ballot, or voting in any other jurisdiction in the United States. *Id.* Here again, Congress made deliberate choices regarding the verification of citizenship and eligibility. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2026 WL 252420, at *40-44 (D.D.C. Jan. 30, 2026) ("*LULAC III*").

UOCAVA also creates the Federal Write-In Absentee Ballot ("FWAB"), a write-in ballot that UOCAVA voters can use as an emergency ballot if they made a timely request for an absentee ballot from their State but did not receive it in time to vote. 52 U.S.C. § 20303. UOCAVA requires states to accept FWABs in all Federal elections. *Id.* UOCAVA contains no carve-outs that would allow USPS to refuse to deliver the ballots of military and overseas voters only if those voters' names can be found on some extra-statutory list.

### III.    Factual Background

1. This Executive Order is not the Trump Administration's first attempt at rewriting the country's election rules. In March 2025, President Trump issued another Executive Order, Ex. 3 ("March 2025 Voting EO"), that attempted to unconstitutionally set certain voting rules. The Order directed the U.S. Election Assistance Commission ("EAC") to issue a new federal voter registration form that requires registrants to provide documentary proof of citizenship ("DPOC"),

8

military and overseas voters to provide DPOC as a condition of using FPCA to register or request an absentee ballot, and to require States to alter their ballot receipt deadlines or risk being subject to unspecified Department of Justice enforcement actions. Ex. 3. Those provisions were enjoined in one or more cases filed before three separate district courts. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ("*LULAC I*"); *LULAC II*, 808 F. Supp. 3d 29 (D.D.C. 2025); *LULAC III*, 2026 WL 252420; *California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. 2025); *Washington v. Trump*, No. 2:25-CV-00602-JHC, 2026 WL 73866, at *39 (W.D. Wash. Jan. 9, 2026).

2. The March 2025 Voting EO also included provisions requiring the Secretary of Homeland Security to make available "access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote." March 2025 Voting EO § 2(b)(i). This provision refers to USCIS's SAVE System. In response to this directive and others,[6] DHS dramatically and rapidly overhauled SAVE in an attempt to transform it into a system for verifying voters' citizenship status ("Overhauled SAVE System").[7] Federal officials moved hastily, testing the Overhauled SAVE System themselves, and deploying it within two weeks.[8] These changes expanded SAVE to allow users to "input Social Security numbers" en masse to "help verify U.S.

---

[6] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025); Exec. Order No. 14243, 90 Fed. Reg. 13681 (Mar. 20, 2025).

[7] *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

[8] *Id.*

citizenship"—including of U.S.-born citizens—based on a "new partnership with the Social Security Administration."[9]

But SSA records and the SAVE System were not created to be citizenship or residence databases. To start, they do not and cannot possibly include up-to-date residency or address information. SSA maintains address information only for the relatively small subset of individuals who are receiving social security benefits, and this information is only updated if the beneficiary reports an address change. *See* 20 C.F.R. § 416.708(a). Moreover, any address information is not collected for the purpose of establishing legal residency for voting, which can be distinct from both a mailing address and temporary residence. The SAVE System likewise contains inaccurate, stale, and woefully incomplete citizenship and address data. The original SAVE System was designed for the specific use of verifying whether immigrants were eligible for certain benefits. It could not run queries of U.S.-born citizens, only accessed immigration-related records, and did not rely on any Social Security data. Ex. 4 at 2-3.

Some States nonetheless began using the SAVE System to attempt to verify the citizenship of people on their voter rolls for list maintenance purposes, but they repeatedly encountered serious accuracy problems.[10] That has not changed with the Overhauled SAVE System. Elections officials in Texas and Missouri have noted persistent misidentifications of naturalized U.S. citizens as non-

---

[9] *See USCIS Deploys Common Sense Tools to Verify Voters*, USCIS (May 22, 2025), https://perma.cc/HBZ5-RW2E.

[10] For example, the North Carolina State Board of Elections determined in its audit of the 2016 election that, "based on past experience," a "match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE." Ex. 5 at Appendix p. 2; *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021).

citizens in the Overhauled SAVE system, and USCIS officials have admitted that their system may not have the most up-to-date information for U.S. citizens not born in the United States.[11]

SSA citizenship data is similarly unreliable for the purpose of verifying citizenship. SSA captures citizenship data from an individual from a snapshot in time when they apply for a Social Security Number ("SSN"), which typically occurs before an individual naturalizes. SSA admitted in 2023 that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and thus has cautioned against relying on SSA data to verify citizenship or immigration status. SSA also lacks complete citizenship data for citizens born in the United States prior to 1981, which is the year that SSA began consistently collecting citizenship information.[12]

Finally, the data matching in the Overhauled SAVE System remains prone to errors, not only because of the unreliable underlying data, but also because DHS and SSA data do not have the same record identifiers. A Social Security number cannot be used to search the DHS databases queried by SAVE, and a DHS-issued numeric identifier cannot be used to search SSA records.[13] As a result, "information about foreign-born U.S. citizens contained in USCIS naturalization databases may not be locatable when SSA is unable to confirm" U.S. citizenship. Ex. 6 at xii. In October 2025, DHS acknowledged that there is a risk that SAVE "may share inaccurate information with registered agencies." Ex. 7 at 19 (noting problems "due to misspelling of names,

---

[11] *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

[12] Letter from SSA to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US.

[13] Letter from SSA to Fair Elections Ctr., at 2.

transposed numbers, or incomplete information"). USCIS has further acknowledged that a failure to confirm citizenship status based on a search of the voter's Social Security number "is not a final SAVE response and cannot be used to deny registration or remove someone from a voting roll."[14]

3. In the summer of 2025, the U.S. Department of Justice began a nationwide effort, purportedly to ensure that States are properly conducting list maintenance, to obtain States' completed and unredacted voter lists, and ultimately sued 30 States and the District of Columbia.[15] The United States initially claimed that there is "no national [voter] database that's being created" in a court hearing. *See* Ex. 8 at 51:5-7. But the plan for the data has come into sharper relief, including through a Memorandum of Understanding (MOU) DOJ signed with at least two states. *See* Ex. 9 (Texas MOU), Ex. 10 (Alaska MOU). The MOU describes DOJ's attempted takeover of States' authority to maintain their voter rolls, explaining that DOJ will conduct an "analysis and assessment" of voter rolls and instruct the state to remove, within 45 days, the voters DOJ identifies. DOJ's public statements confirm that its goal is not to review list maintenance procedures, but to expand federal control over elections and target voters for removal.[16]

---

[14] *Voter Registration and Voter List Maintenance Fact Sheet*, USCIS (updated Feb. 2, 2026), https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet.

[15] *See* Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 28. 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[16] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws (Dec. 12, 2025), https://perma.cc/2R3L-YZ5X. ("At this Department of Justice, we will not permit states to jeopardize the integrity and effectiveness of elections by refusing to abide by our federal elections laws. If states will not fulfill their duty to protect the integrity of the ballot, we will.")

## ARGUMENT

**I.    LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the Executive Order**

### A.  Legal Standard

To establish standing, Plaintiffs must demonstrate that they have suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992) (citation modified). Organizations may establish standing to sue in their own right, as well as associational standing on behalf of their members. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

### 1.  Associational Standing

An organization may establish associational standing by demonstrating that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

### 2.  Organizational Standing

"To have standing 'in its own right,' an organization must make 'the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision.'" *LULAC II*, 808 F. Supp. 3d at 54 (quoting *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020)). To establish organizational standing, an organization must do more than demonstrate "simply a setback to [its] abstract social interests." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("*AHM*") (quoting *Havens Realty Corp. v.*

13

*Coleman*, 455 U.S. 363, 379 (1982)). But the Supreme Court has reaffirmed that interference with an organization's "core business activities" is a constitutionally cognizable injury. *Id.* at 395. The D.C. Circuit has specifically held that "new obstacles" that "unquestionably make it more difficult for [voter registration organizations] to accomplish their primary mission of registering voters" constitutes Article III injury. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

### B. Plaintiffs Have Standing to Challenge Section 2(a) of the Executive Order

Plaintiffs have associational and organizational standing to challenge Section 2(a), which mandates that DHS, through USCIS and in coordination with SSA, create and transmit a State Citizenship List to state election officials 60 days before a federal election. This list purports to include *all* eligible voters, but it is virtually guaranteed to exclude large numbers of eligible voters, thus harming organizational Plaintiffs and their members.

#### 1. Associational Standing

Plaintiffs have associational standing to sue on behalf of their members because each organization has members likely to be incorrectly excluded from the State Citizenship List and disenfranchised as a result. *See supra* at pp. 9-11. The Order makes clear that the State Citizenship List can be used by States to "assist in verifying identity and Federal election voter eligibility," Order § 1, meaning that were States to use the list, it would leave individuals who do not appear on the List vulnerable to being impermissibly kicked off the rolls and unable to cast a ballot. Because of the staleness, incompleteness, and inaccuracies in the data underlying the State Citizenship List, this will result in the exclusion and disenfranchisement of eligible voters, including some of Plaintiffs' members. *See supra* at pp. 2-3, 9-11.

First, Plaintiffs' members are harmed by Section 2's requirement that individuals must "maintain a residence in the subject state" to be included in the State Citizenship List. The plain

14

terms of the Order require maintaining a residence in a State without recognition that there are voters who, due to various personal circumstances, are legally eligible to vote in a particular State while residing outside of it. But even putting aside the State and individual circumstance specific residency requirements, the federal datasets the Order contemplates aggregating cannot possibly accurately account for the physical residency or legal residency of all eligible American citizens. Under the NVRA, no State can have a voter registration deadline more than 30 days prior to an election, 52 U.S.C. § 20507(a)(1), and the Supreme Court long ago held durational residency requirements for voting unconstitutional, *Dunn v. Blumstein*, 405 U.S. 330, 331 (1972). Particularly for voters who move frequently, including members of Plaintiff organizations, the State Citizenship Lists will be inaccurate.

Plaintiffs SFI and ASA both have members who do not reside in or are routinely absent from their state of legal residence for voting purposes, or who will change their state of residence shortly before an election. Ex. 11, Decl. of Sarah Streyder ("Streyder Decl.") ¶¶ 18-19, 22, 24-25; Ex. 12, Decl. of Jessica Mendoza ("Mendoza Decl.") ¶¶ 10, 15, 17. This population is of particular concern to Plaintiff SFI, which has hundreds of members who are not stationed in, and therefore do not physically reside in, their state of legal residence. Streyder Decl. ¶ 19; Ex. 13, Decl. of Janessa Zucchetto ("Zucchetto Decl.") ¶¶ 3-4; Ex. 14, Decl. of Kelsi Kiper ("Kiper Decl.") ¶¶ 5-6; Ex. 15, Decl. of Brittney Haddix ("Haddix Decl.") ¶¶ 4, 6-7, 9. These SFI members are legally eligible to vote in their home state while they "maintain a residence" elsewhere to accommodate the military service of their family member. Streyder Decl. ¶¶ 18-19, 22-25; Zucchetto Decl. ¶¶ 9, 13-14; Kiper Decl. ¶¶ 10, 14; Haddix Decl. ¶¶ 7-8. This includes SFI members who do not own property in their home state and have not lived in that state for years but nonetheless maintain their voting eligibility. *See* Kiper Decl. ¶ 10; Haddix Decl. ¶¶ 5-12. Due to the nature of military service,

15

SFI members also move frequently, including in the time period shortly before elections, and are therefore at risk of being excluded from State Citizenship Lists transmitted 60 days before federal elections. Streyder Decl. ¶¶ 21-25; Zucchetto Decl. ¶¶ 7-8, 10, 12; Kiper Decl. ¶ 12; Haddix Decl. ¶¶ 12-16.

Similarly, ASA has members who reside in Arizona while attending college, but who are registered to vote in their home state. Mendoza Decl. ¶¶ 10, 17; Ex. 16, Decl. of Wyatt Perkins ("Perkins Decl.") ¶¶ 4-5, 8. These members rely on USPS to receive an absentee ballot from their home state to vote, but risk being excluded from their home State Citizen List based on their temporary residence in Arizona while in college. Mendoza Decl. ¶ 17; Perkins Decl. ¶¶ 5, 8, 10. Additionally, ASA has many members who are from out of State, but who register to vote in Arizona. Mendoza Decl. ¶¶ 10, 15; Ex. 17, Decl. of Evan Stasch ("Stasch Decl.") ¶¶ 4-5. These members, particularly those who register to vote in Arizona shortly before the deadline 29 days prior to an election, are at risk of being excluded from the State Citizenship List transmitted to Arizona at least 60 days before an election. Mendoza Decl. ¶ 15; Stasch Decl. ¶ 12. Given ASA's large voter registration effort at the start of the fall school year, a significant number of ASA members face this risk. Mendoza Decl. ¶¶ 12, 15; Stasch Decl. ¶ 12.

Second, Plaintiffs' members are likely to be inaccurately reflected or not included at all among individuals who are "confirmed to be United States citizens" on the State Citizenship List. In the Overhauled SAVE System, certain categories of eligible voters are particularly likely to be incorrectly recorded as non-citizens or potential non-citizens in databases compiled by USCIS, SSA, and other agencies. *Supra* at pp. 9-12.

All three plaintiff organizations have members who are naturalized citizens. Ex. 18, Decl. of Juan Proaño ("Proaño Decl.") ¶ 5; Ex. 19, Decl. of Gustavo Rivera ("Rivera Decl.") ¶ 2; Streyder

Decl. ¶ 31; Mendoza Decl. ¶ 16. Plaintiff LULAC, in particular, has many members who are naturalized citizens who routinely experience difficulty with their identification because federal databases rely on outdated, incorrect, or mismatched data, placing these members at significant risk of being incorrectly flagged as non-citizens and excluded from the State Citizenship List. Proaño Decl. ¶¶ 12-15; Ex. 20, Decl. of Gabriel Rosales ("Rosales Decl.") ¶ 8; Ex. 21, Decl. of Diego Jacob Sandoval ("Sandoval Decl.") ¶ 10. There is also a particularly high risk of exclusion for any members who naturalize near the time the State Citizenship List is compiled and transmitted. Proaño Decl. ¶ 13; Rivera Decl. ¶ 12; Mendoza Decl. ¶ 16.

Second, even some of Plaintiffs' members who are natural-born citizens are at risk of being excluded from the State Citizenship List because many federal databases, including those in the SAVE System, do not necessarily contain citizenship status for natural born citizens born prior to 1981. *Supra* at p. 11. Under the plain language of the EO, individuals without such data cannot be "confirmed" to be citizens and therefore will likely not appear on the State Citizenship List and could be disenfranchised. LULAC and SFI both have members who are natural born citizens born prior to 1981 who face this heightened risk of being incorrectly flagged as non-citizens and excluded from the State Citizenship List. Proaño Decl. ¶ 16; Streyder Decl. ¶ 32.

Third, some of Plaintiffs' members have multiple surnames that are often listed in various ways on different federal forms, which also puts them at higher risk of being improperly excluded from the State Citizenship List. These individuals might be listed under a last name joined by a hyphen under one federal database, but under a single last name under another federal database. When multiple databases are combined, as is required by Section 2(a), errors are likely to result. This is especially likely for a number of LULAC's members, many of whom have multiple Spanish surnames. Proaño Decl. ¶ 14; Rivera Decl. ¶ 8; Sandoval Decl. ¶ 10.

17

Finally, all three plaintiff organizations have members who are concerned about the personal data sharing that Section 2 requires. Proaño Decl. ¶ 29; Sandoval Decl. ¶ 12; Rosales Decl. ¶ 10; Rivera Decl. ¶ 11; Streyder Decl. ¶ 34; Mendoza Decl. ¶¶ 19, 21; Perkins Decl. ¶ 9; Stasch Decl. ¶ 13. Members do not want their personal information shared publicly or unnecessarily transmitted between federal agencies, States, and USPS. *Id.* For those LULAC members who are newly naturalized, live in mixed-status houses, or otherwise fear aggressive immigration enforcement actions, this widespread, unprotected sharing of personal information intrudes on their sense of security. Proaño Decl. ¶ 29; Rosales Decl. ¶ 10; Rivera Decl. ¶ 11. As individuals connected to the military and facing risks to personal safety, SFI members also have particular concerns about the security of their personal information. Streyder Decl. ¶ 34. Such unauthorized disclosure of voters' data is sufficient to establish standing. *See, e.g.*, *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79 (D.D.C. 2025) ("Plaintiffs have satisfied their burden of showing that their harm has a close relationship to the harm to privacy vindicated by the common-law tort of intrusion upon seclusion." (citing *TransUnion v. Ramirez*, 594 U.S. 413, 425 (2021)).

Plaintiffs' injuries are clearly traceable to Defendants and likely to be remedied by an injunction against the officials responsible for implementing the Executive Order. And the final two elements of the associational standing inquiry are easily satisfied. All three organizations have missions that include advocating for their members to register to vote and cast a ballot. Proaño Decl. ¶¶ 3-4, 31; Streyder Decl. ¶¶ 5, 7-14, 35; Mendoza Decl. ¶ 4. In challenging Section 2 of the Executive Order, Plaintiffs seek to protect the ability of their members to vote and do so without risking their privacy or security. This is more than sufficient to satisfy the "undemanding" germaneness inquiry that mandates only "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988).

18

Finally, the lawsuit does not require the participation of individual members because only pure questions of law are at issue and "neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

### 2. Organizational Standing

Plaintiffs also have organizational standing to challenge Section 2(a). The creation and transmission of the State Citizenship List, and the errors it is virtually certain to contain, will directly harm Plaintiffs' "core business interests" of assisting their members in successfully registering to vote and casting a ballot. *See AHM*, 602 U.S. at 395. Section 2(a) presents "new obstacles" to Plaintiffs' core "mission of registering voters," *Newby*, 838 F.3d at 9, and assisting its members in casting ballots that will count, by mandating the creation of a list that purports to aid States in vetting eligible voters but that unquestionably will exclude validly registered voters. Further, the Supreme Court has recently recognized the concrete harms unlawful changes in election rules impose on those closest to the electoral system. As organizations that place voter engagement at the center of their missions, Plaintiffs, like candidates, have a vested interest in a fair electoral process that is different in kind than the public at large. *See Bost v. Ill. Bd. of Elections*, 146 S. Ct. 513, 520 (2026). Plaintiffs, "who spend untold time and resources seeking" to engage their members in the electoral process, have a concrete and particularized interest in a lawful electoral process and public confidence in elections. *Id.* ("The counting of unlawful votes— or discarding of lawful ones—erodes public confidence that the election results reflect the people's will."). Finally, Plaintiff organizations will have to divert resources toward assisting members in ensuring they are able to register to vote and cast a ballot with the new requirements of the EO in place.

19

Plaintiffs provide direct services, including voter registration and voting assistance, to members and others in the communities they serve. Proaño Decl. ¶¶ 7-8; Streyder Decl. ¶ 37; Mendoza Decl. ¶¶ 4, 9, 11. The Order will interfere with Plaintiffs' ability to provide these services because Plaintiffs will be forced to undertake additional steps to confirm whether prospective voters are accurately included on the State Citizenship List in advance of attempting to vote. Proaño Decl. ¶ 33; Streyder Decl. ¶¶ 36, 38-39; Mendoza Decl. ¶¶ 24-26, 28. Far beyond their normal work of assisting the communities they serve in registering to vote and ensuring they are prepared to vote, the Order will require Plaintiffs to confirm the content of State Citizenship Lists and liaise with federal officials to assist prospective voters whose right to vote is at risk, including by aiding their members in navigating the DHS process for "allow[ing] individuals to access their individual records as well as to update or correct them in advance of elections." Order § 2(a); Proaño Decl. ¶ 33; Streyder Decl. ¶ 38; Mendoza Decl. ¶¶ 24-25, 28. This direct interference with a core business activity is a legally cognizable injury in fact. *AHM*, 602 U.S. at 395.

Plaintiffs have already diverted and will continue to divert staff time and resources away from these core services activities in response to the Executive Order, detracting from already-planned activities in the lead-up to the 2026 elections. Proaño Decl. ¶ 35; Streyder Decl. ¶¶ 36, 39-41; Mendoza Decl. ¶¶ 26-27. And regardless of the effort they expend, the mission of Plaintiff organizations in ensuring that the communities they serve are able to fully participate in the electoral process will be frustrated by Section 2(a), which risks disenfranchising countless eligible voters. Proaño Decl. ¶ 33; Streyder Decl. ¶ 42; Mendoza Decl. ¶¶ 28-30.

### C. Plaintiffs Have Standing to Challenge Section 3 of the Executive Order.

Plaintiffs have associational and organizational standing to challenge Sections 3(b) of the Executive Order, which prohibits USPS from transmitting absentee ballots from any individual not "enrolled" on the USPS Mail-In and Absentee Participation List.

20

### 1. Associational Standing

Plaintiffs have associational standing to sue on behalf of their members. Members of Plaintiff organizations often vote by mail—indeed, many have no other option—and will therefore be disenfranchised by USPS's failure to send or return their mail ballot if they are not accurately included on the Mail-In and Absentee Participation List. Proaño Decl. ¶¶ 22-24; Rosales Decl. ¶ 6; Rivera Decl. ¶ 7; Streyder Decl. ¶¶ 17, 20; Zucchetto Decl. ¶¶ 6, 11; Kiper Decl. ¶ 9; Haddix Decl. ¶¶ 9, 13; Mendoza Decl. ¶¶ 6-8, 17, 20; Perkins Decl. ¶ 10. In the first instance, Plaintiffs' members have already been harmed by the uncertainty and confusion surrounding their ability to vote by mail in upcoming elections. Proaño Decl. ¶¶ 22, 34; Rosales Decl. ¶ 9; Streyder Decl. ¶ 33; Mendoza Decl. ¶¶ 14, 18, 21; Perkins Decl. ¶¶ 7, 10; Stasch Decl. ¶¶ 10, 14. Additionally, many of Plaintiffs' members are at high risk of not being included on the Mail-In and Absentee Participation List. Those who are excluded from the State Citizenship List are also unlikely to be enrolled on the USPS Mail-In and Absentee Participation List, *supra* at pp. 9-12, 14-18. And even for those who are properly included on the State Citizenship List, there are a number of other reasons that members are unlikely to be "enrolled" on the Mail-In and Absentee Participation List and will be disenfranchised as a result. Plaintiff SFI's members, who move frequently due to their affiliation with the military and often move close in time (within 90 or 60 days) to a federal election, rely on voting by mail using USPS. Streyder Decl. ¶¶ 18-27; Zucchetto Decl. ¶¶ 7-8, 10, 12; Kiper Decl. ¶ 12; Haddix Decl. ¶¶ 5, 11-15. But it is likely that they will not be "enrolled" in the Mail-In and Absentee Participation List due to their late-in-time moves and therefore will not be able to vote in upcoming elections. *See* Streyder Decl. ¶¶ 18-27. SFI members also cast mail ballots in various ways, including using the Federal Post Card Application and/or Federal Write-in Absentee Ballot, in addition to their state absentee ballots; these members are also likely to be harmed by the Order, which does exempt these methods of voting from the requirements that voters

21

be listed the State Citizenship and Mail-In and Absentee Voting Lists. Streyder Decl. ¶¶ 28-30; Kiper Decl. ¶¶ 9, 11-13; Haddix Decl. ¶¶ 5, 12, 15.

Some of Plaintiffs' members also request absentee ballots through the mail very close to Election Day, as permitted under state law, making it highly unlikely that they will be enrolled in the Mail-In and Absentee Participation List in time to cast their vote by mail. Proaño Decl. ¶ 28; Sandoval Decl. ¶ 11; Mendoza Decl. ¶¶ 12, 15, 22; Perkins Decl. ¶ 5. Similarly, because ASA registers a large number of members to vote in the fall at the start of the school year, a significant number of ASA members will be very unlikely to have been enrolled in the Mail-In and Absentee Participation List in time to receive and/or return their mail ballots via USPS for the November general election. Mendoza Decl. ¶¶ 12, 15, 22; Stasch Decl. ¶ 5.

As above, the injuries of these members are traceable to the Executive Order and likely redressable by an injunction preventing the responsible officials from implementing the Order. And Plaintiffs easily satisfy the final two elements of the associational standing inquiry. All organizations' missions include promoting their members' right to vote. *Supra* at pp. 14-19. In challenging Section 3 of the Executive Order, Plaintiffs seek to protect the ability of their members to vote by mail, the only means for some members to cast a ballot. *See, e.g.*, Proaño Decl. ¶ 23; Streyder Decl. ¶ 17-20; Mendoza Decl. ¶¶ 8, 10 17, 20; Perkins Decl. ¶ 10. The litigation is clearly germane to the interests of each Plaintiff organization and does not require the participation of individual members because the dispute involves pure questions of law. *Supra* at pp. 14-19.

### 2. Organizational Standing

Plaintiffs have organizational standing to challenge Section 3 because, as with Section 2(a), it directly interferes with Plaintiffs' respective missions of assisting their members and others in the constituencies they serve in accessing voting by mail. Proaño Decl. ¶ 31; Streyder Decl. ¶¶ 35-37. As discussed above, Plaintiffs directly assist prospective voters in accessing absentee voting.

22

Proaño Decl. ¶ 8; Streyder Decl. ¶ 37; Mendoza Decl. ¶¶ 6-10. Plaintiffs serve communities and constituencies who rely on voting by mail as their only option. Proaño Decl. ¶ 8; Rivera Decl. ¶ 7; Rosales Decl. ¶ 6; Sandoval Decl. ¶ 10; Streyder Decl. ¶¶ 17, 20, 28; Mendoza Decl. ¶ 17. As such, Section 3 of the Order, which conditions the ability to vote by mail on enrollment in the Mail-In and Absentee Participation List, directly interferes with this assistance. *AHM*, 602 U.S. at 395. It also directly injures Plaintiffs' particularized interests in a fair electoral process and public confidence in elections, which are central to Plaintiffs' mission to engage their members in elections. *See Bost*, 146 S. Ct. at 520.

Responding to the Order will further require the diversion of time and resources by staff to educate members about the requirements of the Mail-In and Absentee Participation List, including how to enroll and how to confirm or update enrollment. Proaño Decl. ¶¶ 34-35; Streyder Decl. ¶¶ 35-41; Mendoza Decl. ¶¶ 24-28. Furthermore, the barriers to successful mail voting that these sections of the Order present will result in decreased voting participation by members of all Plaintiff organizations, directly harming the goal of robust voter participation shared by all three. Proaño Decl. ¶ 34; Streyder Decl. ¶ 42; Mendoza Decl. ¶ 23.

## II.    Plaintiffs Are Entitled to a Preliminary Injunction on Counts I and II

### A.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims

The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *accord Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999). Neither the Constitution nor any act of Congress confers on the President the authority to undertake the sweeping changes to election administration that he attempts to mandate in Sections 3(b) and 2(a) of the EO. "In the framework of our Constitution, the President's power to see that the laws are

23

faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587.

Executive actions, including Executive Orders issued by a President, can be challenged as *ultra vires* when they are in excess of the President's constitutional authority. *See, e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Plaintiffs bring equitable claims challenging the constitutionality of the commands in 3(b) and 2(a) of the Executive Order "that arise 'directly under the Constitution.'" *LULAC III*, 2026 WL 252420, at *26 (citation omitted). Plaintiffs do so because "the President has wrongly exercised powers that the Constitution vests in Congress and the States alone." *Id.* The crux of Plaintiffs' argument is that "the President has acted unconstitutionally, not merely that he has 'acted in excess of his statutory authority.'" *LULAC II*, 808 F. Supp. 3d at 72 (citation omitted).[17] Only the States, subject to the direction of Congress, have constitutional authority to regulate federal election procedures, and Congress has not delegated to the President any authority to issue voter registration, list maintenance, and mail balloting rules. Moreover, the rules that the President has unconstitutionally issued violate and trench on multiple federal laws.

Plaintiffs' equitable claims are ripe now. It does not matter that Section 3(b) instructs USPS to initiate a rulemaking. The Order "dictates a particular outcome and leaves no uncertainty" as to the required result of the rulemaking. *LULAC II*, 808 F. Supp. 3d at 66; *see also Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall . . . before the court will issue an

---

[17] The D.C. Circuit has made clear that *ultra vires* claims raise constitutional, not statutory claims, where "the presidential action at issue was not even contemplated by Congress." *Global Health Counsel v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) (citation modified). That is the case here. Plaintiffs' *ultra vires* claims flow directly from the constitutional separation of powers and the President's lack of power under the Elections and Postal Clauses.

injunction."). Nor does it matter that the Order states that it is to be implemented "consistent with applicable law." Order § 7(b); *see also id.* § 2(a) (stating that this provision shall be implemented "[t]o the extent feasible and consistent with applicable law"). "[E]xecutive orders, like statutes, 'cannot be held to destroy themselves through saving clauses.'" *LULAC I*, 780 F. Supp. 3d at 176 (quoting *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020)). As such, "if an executive order unambiguously commands action that a saving clause purports to negate, a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says." *Id*. (citation modified).

### 1. Plaintiffs are likely to succeed on their claim that Section 3(b) violates the separation of powers and is *ultra vires* of the President's authority (Count I)

In Section 3(b), the President the President purports to tell USPS which mail ballots it may deliver and which it may not. Order § 3(b) (instructing that Postmaster General must "initiate a proposed rulemaking" and that "[t]he notice of proposed rulemaking *shall include*, at minimum," that the USPS "shall not transmit mail-in or absentee ballots from any individual" who has not been "enrolled" with USPS on the "Mail-In and Absentee Participation List").[18] The President has no lawful authority to issue this command.

### a. The President has no constitutional authority to issue the Mail-in and Absentee Participation List and Ballot Transmittal Directives in Section 3(b)

No authority to issue the Order stems from "the Constitution itself." *Youngstown Sheet*, 343 U.S. at 585. Instead, the Constitution *forecloses* presidential power over the Order's subject matter through the Elections and Electors Clauses, which vest authority over election

---

[18] While the EO cites 39 U.S.C. § 401 as the basis for the rulemaking it commands, in that statute Congress conferred rulemaking power on the USPS—not on the President who attempts here to seize USPS's rulemaking power to implement policies of his own choosing.

administration in Congress and the States, and the Postal Clause, which vests authority over the postal service in Congress alone. *See supra* at pp. 3-5.

To state in barest form what the Executive Order requires is to make plain its unconstitutionality. In Section 3(b), the President dictates a requirement that USPS must block some voters' ability to cast a ballot in accordance with the laws of their State because they are not on a list that some person or agency in the federal government has compiled in accordance with the President's diktat. States, not the federal government, and certainly not the President, are empowered to set voter qualification requirements. Neither the Elections Clause nor any other provision of the Constitution grants the President the power to invent, out of whole cloth, an election administration program through which he can tell USPS to block the ability of some voters to cast their ballots through the creation of a program to monitor, screen, and withhold delivery of certain mail ballots. *Cf. Youngstown*, 343 U.S. at 585.

That the President is operating far outside of any lawful authority is further apparent in light of the Postal Clause, which vests authority not in the President, but in Congress to "establish Post Offices and post Roads" and "[t]o make all Laws which shall be necessary and proper" for executing this task. U.S. Const. art. I, § 8; *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981) (recognizing Congress's "broad power" extends to all aspects of the postal system). Pursuant to that grant of authority, Congress has crafted a detailed statutory scheme under the Postal Reorganization Act of 1970 (PRA), 39 U.S.C. § 101 *et seq.*, the Postal Accountability and Enhancement Act of 2006 (PAEA), and Postal Service Reform Act of 2022 (PSRA). This framework was intended to insulate the USPS from politics so that it could fulfill its fundamental duty of universal service (i.e., deliver the mail to every American household) unhindered by political pressure. 39 U.S.C. § 101; *Mail Order Ass'n of Am. v. U.S. Postal Serv.*,

26

986 F.2d 509, 519 (D.C. Cir. 1993). To that end, Congress structured the USPS as an "independent establishment of the executive branch," *id.* § 201, with a business-like governance structure free from direct presidential control, *id.* §§ 201–205; *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 822 (1983); *Mail Order Ass'n of Am.*, 986 F.2d at 512-13, 519.

By directing USPS to conduct election administration activities beyond and contrary to its congressional mandates, Section 3(b) attempts to seize powers the Constitution assigns to Congress and the States alone.

### b.    Section 3(b) is incompatible with the expressed will of Congress

Section 3(b) also contravenes Congress's expressed will as reflected in multiple statutes. When the President acts in a manner "incompatible with the expressed or implied will of Congress," the President's power is "at its lowest ebb," and the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Here, the President not only lacks inherent constitutional powers over elections and the postal service—powers held exclusively by Congress and the States—but his directives in Section 3(b) also conflict with numerous federal statutes through which Congress has exercised that authority, including UOCAVA and the PRA and its subsequent amendments.

### i.    Section 3(b) is contrary to UOCAVA

In passing "UOCAVA, and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights." *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015). UOCAVA protects the right of an absentee military or overseas voter to vote by mail if they are "qualified to vote in the last place in which [they were] domiciled before leaving the United States." 52 U.S.C. § 20310(5). States, for their part, must "accept and process

27

. . . any otherwise valid voter registration application and absentee ballot application from an absent uniformed services voter or overseas voter" and "permit absent uniformed services voters and overseas voters . . . to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1)-(2). UOCAVA also creates two forms that States are required to use to facilitate absentee voting by uniform and overseas voters: the Federal Post Card Application, 52 U.S.C. §§ 20302(a)(4), 20301(b)(2), and the Federal Write-in Absentee Ballot, 52 U.S.C. §§ 20302(a)(3), 20303. UOCAVA's only directive to USPS is that it "shall provide expedited mail delivery service for all such marked absentee ballots of absent uniformed services voters that are collected on or before the deadline" to facilitate submission of an absentee ballot under the Act. 52 U.S.C. § 20304(b)(2). UOCAVA contains no provision or carve-out that would permit refusing to transmit an absentee ballot as Section 3(b) directs. Rather, UOCAVA guarantees that absent military and overseas voters are permitted to vote by mail, creates specific forms to facilitate their ability to do so, and directs USPS to ensure that all marked ballots from military and overseas voters are duly delivered to state election authorities. 52 U.S.C. §§ 20301(b)(3), 20302(a), 20304(b)(2). As such, Section 3(b)'s directive that USPS refuse to deliver ballots for anyone not "enrolled" on a federally-created list is contrary to the absentee voting protections UOCAVA provides for uniformed and overseas civilian voters. *LULAC III*, 2026 WL 252420, at *40-43; *California v. Trump*, 786 F. Supp. 3d at 384.

### ii.    Section 3(b) is contrary to the PRA and subsequent acts

Under the comprehensive statutory framework provided by Congress, USPS's role is straightforward: collect and deliver the mail to whom it is addressed. *See generally* 39 U.S.C. § 101 *et seq*. Congress has not given USPS authority (nor the President authority to direct USPS) to verify that voters are eligible to send mail ballots, to create or to disseminate lists of voters, or

to condition mail delivery on any independent voter-qualification determination. Yet Section 3(b) directs USPS to do all of these things, in conflict with the statutory framework Congress enacted.

### a.    Section 3(b) is contrary to USPS's universal service mandate

Section 3(b) contravenes USPS's obligation to provide universal service. The opening words of the PRA provide that USPS "*shall* provide prompt, reliable, and efficient services . . . *in all areas* and shall render postal services to *all communities*." 39 U.S.C. § 101 (emphasis added).[19] USPS's principal duty is "to receive, transmit, and deliver" the mail, and it "shall serve as nearly as practicable the entire population of the United States." *Id.* § 403(a)-(b); *see also id.* § 404(a)(1).

USPS itself has long recognized these statutory commands as a "universal service obligation" that "binds the Postal Service to provide prompt, reliable, affordable, and efficient postal services to all Americans, regardless of where they live."[20] This obligation extends to the delivery of voters' mail and absentee ballots. USPS has stated that it "provides a secure, efficient and effective way for citizens to participate when policymakers choose to use the mail as part of their election systems or when voters chose to use [its] services to participate in an election."[21] USPS is also, as discussed above, required to collect and provide expedited delivery of absentee ballots on behalf of military and overseas voters under UOCAVA. *See* 52 U.S.C. § 20304(b).

---

[19] That 39 U.S.C. § 101 is titled "postal policy" does not make its directives voluntary; rather, Congress's use of the word "shall" means they are "undoubtably mandatory." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022).

[20] *The Universal Service Obligation and Financial Sustainability*, USPS (Jan. 2024), https://perma.cc/22M3-DTRR; *see also About the United States Postal Service*, USPS (Apr. 1, 2020), https://perma.cc/VZU4-CGZT; *Universal Service*, USPS (2013), https://perma.cc/8VW7-ZL5S.

[21] *Election Mail*, USPS, https://perma.cc/S2P7-RWR7 (last visited Apr. 17, 2026) (identifying election mail, including ballots mailed to or from authorized election officials, as a type of mail service USPS provides); 39 C.F.R. § 3055.100(b) (defining election mail to include ballots).

Section 3(b)'s directive that USPS refuse to deliver ballots for individuals not appearing on a USPS-maintained list is flatly incompatible with these obligations. A postal official's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902).

Mail and absentee ballots do not fall within any of the limited exceptions under which USPS may withhold mail. *See generally* 39 U.S.C. §§ 3001–3018 (outlining exceptions including mail addressed to a fictitious addressee and hazardous material). Section 3(b) would instead create an entirely new, extra-statutory basis for refusing to deliver a mail piece: whether the sender appears on the EO-created "Mail-In and Absentee Participation List" voter list. Congress's universal service mandate precludes withholding mail on this basis.

### b.    Section 3(b) is contrary to USPS's antidiscrimination mandate

Section 3(b) also violates USPS's antidiscrimination mandate. While USPS may offer different types of mail service and establish reasonable and equitable classes of mail and rates and fees for postal services, *id.* §§ 403(b)(2), 404(b), it may not, in providing services, "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user," except as "specifically authorized" by Congress. *Id.* § 403(c). In other words, USPS cannot treat certain class of mail users differently unless it justifies the disparate treatment with good reasons or identifies specific statutory authorization. *See Nat'l Easter Seal Soc'y for Crippled Child. & Adults v. U.S. Postal Serv.*, 656 F.2d 754, 759-62 (D.C. Cir. 1981); *Direct Mail/Mktg. Ass'n, Inc. v. U.S. Postal Serv.*, 501 F.2d 717, 722 (D.C. Cir. 1974); *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 31 (D.D.C. 2016).

30

But Section 3(b) directs USPS to grant preferential mail service to the class of customers "enrolled" on the Mail-In and Absentee Participation List while refusing service to the class of customers who are not. No congressional enactment authorizes USPS to discriminate in this way among its ballot mail customers. And no reasonable justification exists for this disparate treatment. This "enrollment" distinction bears no relationship to Congress's expressed will for USPS, *cf. Direct Mail/Mktg. Ass'n, Inc.*, 501 F.2d at 722, nor is it reasonably related to effectuating "pertinent objectives" of the PRA, *Ludewig v. Wolff*, 492 F. Supp. 1048, 1049 (S.D. Tex. 1980). Section 3(b) thus discriminates based only on criteria that Congress has never authorized USPS to apply in violation of § 403(c).

### c. Section 3(b) is contrary to mandatory procedures for significant postal service changes

Even if Section 3(b)'s directive to withhold ballot mail service from certain classes of voters was lawful (it is not), it cannot be implemented without first complying with procedural requirements Congress enacted in the PAEA—which the Order effectively bypasses.

Before USPS may implement "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). The Postal Regulatory Commission (PRC) may not issue an opinion until it has held a public hearing under §§ 556 and 557 of the APA, in which USPS, mail users, and a PRC officer representing the interests of the general public must have the opportunity to participate. *Id.* § 3661(c). This procedure is required when a proposed change would have (i) a "meaningful impact on service," (ii) is "in the nature of postal services," and (iii) would affect service across "[a] broad geographical area." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262-63 (5th Cir. 1975).

31

Applying this standard, courts have enjoined operational changes that would incidentally delay ballot mail service when a § 3661 review was not completed first. *See New York v. Biden*, 636 F. Supp. 3d 1, 9-11, 21-22 (D.D.C. 2022) (enjoining operational changes, such as removing sorting machines, restricting overtime, and limiting late and extra carrier trips); *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 846-55, 887 (E.D. Pa. 2020), *order clarified*, No. CV 20-4096, 2020 WL 6580462 (E.D. Pa. Oct. 9, 2020) (same).

In this case, Section 3(b) prohibits ballot delivery for eligible voters not enrolled in a USPS voter list—a sweeping change to postal service that plainly meets the conditions for mandatory § 3661 review. The directive's impact on service would be profound: Section 3(b) requires USPS to refuse to deliver the mail ballots of any voter not enrolled on a federal voter list that USPS must maintain, transforming USPS from a neutral carrier into a gatekeeper to ballot access. In 2024 alone, USPS processed more than 222 million pieces of ballot mail. Ex. 22 at 3.

Defendants may contend that Section 3(b) does not bypass § 3661 review because it merely directs the Postmaster General to "initiate a proposed rulemaking." But Section 3(b) does more than just invite USPS to consider whether a service change is warranted. It dictates the outcome, specifying "at minimum" that USPS "shall" provide States a Mail-In and Absentee Participation List and "shall not" deliver ballots from unenrolled voters. Order § 3(b), (b)(iii), (b)(iv). It also sets rulemaking deadlines—May 30, 2026 for the proposed rule and July 29, 2026 for the final rule—that are incompatible with the time USPS needs to request a § 3661 advisory opinion. *See* Order § 3(b), (d); 39 C.F.R. § 3020.101 *et seq*. Rather than allow the USPS to determine whether the required service changes should be made after the requisite PRC hearing and advisory opinion, Section 3(b) predetermines the outcome, contrary to § 3661.

32

> ### d. *Section 3(b) is contrary to limitations on USPS's provision of non-postal services*

Section 3(b) also requires USPS to provide non-postal services in violation of the PRA and PSRA. Congress has prohibited USPS from providing "non-postal services," except those expressly authorized by law or that were offered before January 1, 2026, and sustained upon review by the PRC. 39 U.S.C. § 404(e)(2)-(4). A "nonpostal service" is anything other than "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* §§ 404(e)(1), 102(5).

Section 3(b) requires USPS to provide each state with a list of individuals enrolled on a state-specific Mail-In and Absentee Participation List, along with unique identifiers, and to deny delivery of mail ballots from any unenrolled individual. This would involve a host of activities that have nothing to do with delivering the mail: building and administering an enrollment system for mail ballot voters, generating and assigning unique identifiers to individual voters, compiling and maintaining state-specific participation lists, transmitting those lists to each state on a recurring basis, and developing protocols enabling states to routinely supplement and suggest modifications to the list before any federal election. *See* Order §§ 3(b)(iii)-(v). These are non-postal election-administration functions that Congress has never authorized USPS to perform. USPS does not maintain a database of residential customers, let alone a registry of voters eligible to receive mail ballots. *See Get an Address List*, USPS, https://perma.cc/4XWB-6P2X. And USPS has itself acknowledged that its role does not include "[f]ederal, state, or local election laws or practices, or the extent to which they incorporate the mail." Ex. 22 at 4.

> ### e. *Section 3(b) is contrary to the prohibition on disclosure of postal patron information*

The PRA provides that "no officer or employee of the Postal Service shall make available to the public by any means or for any purpose any mailing or other list of names or addresses (past

33

or present) of postal patrons or other persons." 39 U.S.C. § 412(a). The statute provides only one exception for disclosure to the Secretary of Commerce for use by the Census Bureau. *Id.* § 412(b).

Section 3(b)(iv) directs USPS to provide each state with a "Mail-In and Absentee Participation List" identifying individuals in that state who have enrolled with USPS for mail or absentee ballots for that state, along with unique ballot envelope identifiers associated with each individual. In other words, USPS must transmit a "list . . . of postal patrons" who have engaged with USPS to transmit their mail ballots, with information identifying them by name and unique identifiers linked to their use of postal services. 39 U.S.C. § 412(a). Section 3(b)(iv) also requires USPS to transmit these patron lists to "each State," without identifying who within the state may be authorized to receive them. Whatever state actors are to have access to these lists, they certainly are not the Secretary of Commerce, and the transmission is not for a census purpose. *Id.* § 412(b). The EO's directive therefore falls outside the statute's sole exception and is incompatible with Congress's expressed will in § 412.

In sum, Section 3(b) conflicts with Congress's expressed will on elections and the postal system as expressed in multiple statutory commands, each of which independently places the President's asserted power in the EO at its lowest ebb. *Youngstown*, 343 U.S. at 634.

### c. The EO cites sources of law that do not authorize Section 3(b)'s directives

Despite the EO's superficial references to various constitutional and statutory provisions, no federal law authorizes the directives in Section 3(b). The Executive Order first provides a cursory reference to the Guarantee Clause, ostensibly drawing its authority from "the Federal Government's constitutional obligation to guarantee a republican form of Government to every State in the Union." Order Preamble. But as the Supreme Court has long acknowledged, it is "the province of Congress to determine when a state has ceased to be republican in form, and to enforce the guaranty of the Constitution on that subject." *Pac. States Tel. & Tel. Co. v. State of Oregon*,

34

223 U.S. 118, 133 (1912). The only role under the Guarantee Clause that courts have recognized for the President is the exercise of authority *delegated by Congress*. *Luther v. Borden*, 48 U.S. 1, 43 (1849).

Next, the Order cites both HAVA and the NVRA. HAVA does not provide the President any power to set election rules, nor does it create any mail voting requirements. Instead, HAVA sets voter registration and list maintenance standards to be administered by the States. HAVA sets general parameters for state and local officials and provides that "[t]he specific choices on the methods of complying with the [statute's] requirements" regarding list maintenance and voter registration "shall be left to the discretion of the State." 52 U.S.C. § 21085.

Likewise, Congress provided no role in the NVRA for the President in carrying out the statute's requirements. The only role assigned to USPS by Congress under the NVRA is to provide information about whether an individual may have moved, 52 U.S.C. § 20507(c)(1), and to offer state and local election officials reduced rates for any mailings the NVRA requires or authorizes, 39 U.S.C. § 3629. While the NVRA gives the Department of Justice authority to seek criminal and civil penalties against individuals who violate the Act, 52 U.S.C. §§ 20510–20511, nothing about that grant of enforcement authority (or the enforcement authority of the other criminal statutes the EO cites that protect the integrity of the mail) allows the President to create new election rules that have not been enacted by Congress (and are indeed contrary to already-existing federal law).[22]

---

[22] Indeed, federal law imposes criminal liability on postal employees who obstruct, delay, or withhold mail entrusted to them for delivery. *See* 18 U.S.C. §§ 1700–03, 1708. Section 3(b)(iii)'s directive that USPS "shall not transmit" ballots from unenrolled voters would therefore force postal employees to potentially violate criminal laws rather than help enforce them. *See Am. Sch. of Magnetic Healing*, 187 U.S. at 109.

The EO then gestures toward the Vesting and Take Care Clauses of Article II of the Constitution: stating that the "Federal Government has an unavoidable duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." Order § 1. But nothing in the text of Article II can save Section 3(b). "No matter how broadly one reads either the Executive Vesting Clause or the Take Care Clause, the President's power to supervise and control Executive Branch officials does not authorize him . . . to intrude on the exclusive powers of Congress and the States . . . to regulate federal elections." *LULAC III*, 2026 WL 252420, at *33 (internal citation and quotation marks omitted).

Because Section 3(b) is incompatible with Congress's will as expressed in not just one but several statutes governing mail and elections, it could only be sustained where the President has powers that are "both 'exclusive' and 'conclusive' on the issue." *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). But the powers the President asserts over the mail and elections here are neither exclusively nor conclusively his under the Constitution. The opposite is true: they belong exclusively and conclusively to Congress and the States. Thus, Plaintiffs have demonstrated a strong likelihood of success on their claim that Section 3(b) of the EO is *ultra vires* and violates separation of powers.

### 2. Plaintiffs are likely to succeed on their claim that Section 2(a) violates the separation of powers and is *ultra vires* of the President's authority (Count II)

The creation of such State Citizenship Lists mandated by Section 2(a) of the Order to "assist in verifying identity and Federal election voter eligibility" constitutes an entirely unauthorized executive intervention into State election administration.

36

### a. The President has no constitutional authority to require the creation and transmission of State Citizenship Lists

Again, in contrast to the express authority granted to Congress, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. Just as the requirements of Section 3(b) exceed the President's constitutional authority, the same is true with respect to Section 2(a). *See supra*. The President thus has "no authority" to interfere with "state election procedures based solely on the federal executive's own initiative." *Meadows*, 88 F.4th at 1347. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington v. Trump*, 2026 WL 73866, at *25 n.57. The President cannot "seize[] the power of the Legislature" by implementing policies that Congress has not chosen to enact. *See Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

### b. Section 2(a) is contrary to Congress's will as expressed in the NVRA and HAVA

As with the Mail-In and Absentee Participation List, Congress has not given the Executive Branch any authority to create and transmit State Citizenship Lists. Instead, Section 2(a) attempts to supplant Congress's directives that States must maintain their own lists of registered voters and refrain from systematic efforts to remove ineligible voters within 90 days of a federal election.

HAVA expressly requires that "*each State*," and not the federal government, "shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1) (emphasis added). That voter registration list is to be "*defined, maintained, and administered at the State level.*" *Id.* (emphasis added). Congress has dictated that this computerized list "shall serve as the *single system* for storing and managing the official list of registered voters throughout the State"

37

and that this HAVA-mandated "computerized list shall serve as the *official voter registration list* for the conduct of *all elections for Federal office* in the State." *Id*. §§ 21083(a)(1)(A)(i), (viii) (emphasis added). HAVA leaves no room for Section 2(a)'s shadow voter registration lists.

HAVA further mandates that State conduct certain removals in accordance with the standards set in the NVRA, *id*. § 21083(a)(2) (citing 52 U.S.C. § 20507(a)(3)-(a)(4)), and instructs that the States must institute "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id*. §§ 21083(a)(4). HAVA also provides standards for voters to verify their identity. Persons registering to vote in federal elections must provide a driver's license number, if any, or the last four digits of their Social Security number with their registration application, or else be assigned a unique State-issued identification number. *Id.* § 21083(a)(5)(A).

Likewise, the NVRA provides uniform standards for ensuring the accuracy of each State's active voter rolls, requiring each State, not the federal government, to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" because of death or change of residence. 52 U.S.C. § 20507. Furthermore, the NVRA instructs that States "*shall complete*, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A).[23] The NVRA's so-called Quiet Period Provision thus prohibits implementation of voter list maintenance programs that seek "to

---

[23] The only exceptions to the 90-day quiet period are removals for criminal convictions, death, or request of the applicant. *Id.* at (c)(2)(B).

systematically remove" names from the rolls within 90 days of a federal election. 52 U.S.C. § 20507(c)(2)(A).[24]

Through HAVA and the NVRA, Congress provided the States both with clear list maintenance and voter verification instructions and otherwise declined to displace the States' constitutional authority over voter registration. In neither statute did Congress delegate to the Executive Branch *any* authority to create shadow voter registration lists or otherwise attempt to superintend state-level list maintenance. But the Order all but expressly instructs States to cull their voter rolls on the basis of the "State Citizenship List," which will be transmitted against the backdrop of the Order's threat of prosecution of State and local officials, and the host of DOJ suits seeking unredacted voter data. Against this backdrop, State officials will have to decide whether to remove unlisted voters from the rolls or otherwise refuse to grant them ballots, or face the risk of criminal prosecution for "issu[ing] Federal ballots to individuals not eligible to vote in a Federal election." Order § 2(b). The Order unconstitutionally trenches on the States' authority to maintain their own voter rolls.[25]

Section 2(a) is thus contrary to the express will of Congress because it attempts to supplant or add to the list maintenance and voter verification requirements that Congress enacted in HAVA

---

[24] The Quiet Period Provision does not prohibit a State from removing a person on the voter rolls after an individualized determination of voter ineligibility. *See Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1346, 1348 (11th Cir. 2014).

[25] Unlike the State Citizenship List and Mail-In and Absentee Voter Lists, which attempt to make voter-by-voter eligibility determinations, the list maintenance requirements that Congress enacted in the NVRA and HAVA are fundamentally procedural. States need only conduct a "general program" of list maintenance that makes a "reasonable effort" to remove ineligible or deceased or relocated voters from the rolls. 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A). The Sixth Circuit has thus explained that a State's NVRA and HAVA voter roll maintenance program "need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026).

and the NVRA. The Order is an attempt to coerce State and local elections officials into conducting systematic removals of voters (including in the period specifically prohibited by Congress in the NVRA's Quiet Period Provision) not included on the EO-created State Citizenship List. Furthermore, given the likelihood of errors in the State Citizenship Lists, *see supra*, the EO will undermine Congress's stated intent "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Section 2(a) of the EO is thus "contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA." *LULAC II*, 808 F. Supp. 3d at 74.

## B. Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction

The D.C. Circuit has recognized that plaintiff voter registration organizations challenging as-yet unapplied documentary proof of citizenship requirements that "unquestionably make it more difficult . . . to accomplish their primary mission of registering voters" demonstrates both Article III injury and irreparable harm warranting injunctive relief. *Newby*, 838 F.3d at 9. The same "clear and present need for equitable relief to prevent irreparable harm" is present here. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). *See also Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall . . . before the court will issue an injunction.").

Section 2(a) will unquestionably make it more difficult for certain voters, including Plaintiffs' members, to vote. Section 2(a) directs that federal agencies "shall" create, and continuously make available to States, a massive database of all individuals "confirmed" to be U.S. citizens, above the age of 18 as of the next federal election, and who "maintain a residence" in the state. This language leaves no doubt that the list is a nondiscretionary duty that the agencies must carry out, and that the list will include sensitive personal information, including individuals' names, dates of birth, addresses, and citizenship status.

40

But the list will be outdated the moment it is created—and given its massive scale, it will inevitably result in the wrongful exclusion of a large number of people, based both on erroneous residency and citizenship determinations. The people who are left off of the list or whose information on the list is inaccurate are likely to include Plaintiffs' members who have recently moved; who have temporary residences distinct from their voting residence; who do not physically reside in their State of legal residence for voting purposes; who are naturalized and whose citizenship status is not reflected in federal databases; and whose citizenship information is unlikely to appear in the relevant databases at all. *Supra* at pp. 14-20. The resulting exclusions will inflict harm on Plaintiffs' members.

In assessing Article III injury, courts have recognized that the government's publishing of misleading or erroneous information to third parties in the voting context is a cognizable harm. In *Arcia v. Florida Secretary of State*, the Eleventh Circuit held that organizational plaintiffs and individual plaintiffs, including two naturalized citizens, had shown sufficient injury-in-fact to prospectively challenge the "process of matching voters across various databases [that] creates a foreseeable risk of false positives and mismatches based on user errors, problems with the data-matching process, flaws in the underlying databases, and similarities in names and birthdates." 772 F.3d 1335, 1342 (11th Cir. 2014). So too here. The State Citizenship List is guaranteed to contain and rely on inaccurate and outdated information because of the inherent flaws in the federal databases. *See supra* at pp. 9-12. Once that flawed list is transmitted to the States to determine voting eligibility, it will result in Plaintiffs' members being unable to register and vote.

In addition, the list will be shared with an untold number of "state election officials" which, in practice, encompasses not only each State's chief election officer, but also their staff and through them, the hundreds of local officials, contractors, temporary election workers, and outside vendors

41

that manage and use voter lists. Repeatedly updating and transmitting a centralized federal "citizenship list" at least 60 days before every federal election dramatically expands the number of people and systems with access to the sensitive personal information, and therefore materially increases the risk of breach, misuse, and wrongful targeting. See *Am. Fed'n Gov't Emps., AFL-CIO v. OPM*, 786 F. Supp. 3d 647, 693 (S.D.N.Y. 2025). The increased risk of "misuse of [] personal information" constitutes irreparable harm. *See Williams v. Harry's Nurses Registry, Inc.*, No. 24-34-cv, 2025 WL 842041, at *5 (2d Cir. Mar. 18, 2025).

Not only will Section 2(a) of the Order harm Plaintiffs' members, it also directly injures Plaintiff organizations. Plaintiffs provide direct services—including voter registration, education, and assistance—to their members and other community members. *Supra* at pp. 19-20. The Order will interfere with Plaintiffs' ability to provide these services. First, the high likelihood that individuals will be excluded from the State Citizenship List close to the election makes it harder for Plaintiffs to successfully register voters because they will not be able to tell which persons will later be flagged and excluded from the List, so they must spend time explaining and troubleshooting a system they do not control. *Supra* at pp. 19-21. In addition, because many eligible voters—such as naturalized citizens and those with older or mismatched records—reasonably fear being wrongly labeled as "noncitizens," these individuals will be discouraged from registering to vote through Plaintiff organizations. *Supra* at pp. 18-21.  Furthermore, staff must divert limited resources from routine registration and outreach to helping voters contest erroneous citizenship flags and navigate complicated verification processes, reducing the number of new voters they can register. *Supra* at p. 19.  And finally, because exclusions will happen on the back end, often close to Election Day, organizations cannot give clear assurances that registration will

42

be successful, undermining the trust that is essential to their work. *Supra* at pp. 18-21. *Newby*, 838 F.3d at 9.

The harm to Plaintiffs is imminent and beyond remediation. The list must be made available at least 60 days before the next federal election, which is already ongoing. Many States have registration deadlines 30 days before the election. For individuals who are wrongly flagged as noncitizens or as not maintaining residence in the State based on the list and then purged or required to provide additional documentation as a result, there will not be enough time to correct the error, register, and vote in the upcoming elections. *See Ctr. for Taxpayer Rights v. IRS*, No. 25-0457-CKK, 2025 WL 3251044, at *33 (D.D.C. Nov. 21, 2025) (noting court has "authority to issue prospective relief that prevents future unlawful disclosures of taxpayer information" in cases where IRS began disclosing confidential taxpayer data to ICE pursuant to ongoing data sharing agreement).

Section 3(b) also inflicts irreparable harm on Plaintiffs and their members. It mandates that USPS "shall not transmit mail-in or absentee ballots" to any individual unless that person is enrolled on the Mail-In and Absentee Participation List. The uncertainty and confusion regarding who will appear on that list is already harming Plaintiffs' members, and there is a very high likelihood that eligible mail voters, including Plaintiffs' members, will be excluded from this list. *Supra* at pp. 20-22. Plaintiffs have members—particularly military members—who move shortly before the election and request absentee ballots close in time to Election Day, as various state laws permit. *Supra* at pp. 21-22. The compressed timeline for States to transmit their lists to USPS and for USPS to finalize the Mail-In and Absentee Participation List will make it unlikely that these voters can request mail ballots close to the election as allowed under state law, and still be listed on the new federal list. *Supra* at pp. 21-22. Many individuals, including students who register in

43

the fall, likewise request mail-in ballots near the election; they, too, will miss the 60-day cutoff. *Supra* at p. 22. This frustrates Plaintiffs' members' ability to vote by mail and inflicts "certain and great injury" by preventing them from requesting mail ballots or registering to vote closer to the election as State law allows. Plaintiff organizations will also be irreparably harmed as they directly assist prospective voters in accessing absentee voting and serve communities and constituencies that often rely on voting by mail as their only viable means of participating in elections. *Supra* at pp. 22-23. Section 3(b) directly interferes with this assistance and makes it impossible for Plaintiffs to advise their communities with confidence. *Supra* at pp. 22-23.

This harm is imminent and beyond remediation. The Order is already sowing confusion because Plaintiffs' members do not know what to expect. In *Newby*, the court of appeals noted that "the mismatch between the Federal Form's state-specific requirements" and the challenged DPOC requirements "is very likely to confuse the public" and that "confusion will create a disincentive for citizens who would otherwise attempt to register to vote." 838 F.3d at 13. As in *Newby*, Plaintiffs' members in States that require voters to request absentee ballots are confused because, although State law still allows them to request and receive ballots close the Election Day, the Order indicates that if their names do not appear on USPS's list, USPS will not transmit their ballot. In addition, Plaintiff organizations face irreparable "programmatic harm"—they  do not know what to tell their members who ask whether they should follow State laws permitting them to request absentee ballots close to the election or what will happen if their absentee ballots are not delivered—for example, military voters who are frequently on the move, elderly voters, and voters with disabilities. As *Newby* recognized, these kinds of obstacles yield the same result: "the abridgment of the right to vote." *Id.*

44

### C. The balance of equities and the public interest strongly favor plaintiffs

"Where the federal government is the opposing party, the balance of equities and public interest factors merge." *Protect Democracy Project, Inc. v. U.S. Dep't of Justice*, 498 F. Supp. 3d 132, 137 (D.D.C. 2020). The balance here weighs decisively in favor of relief.  Plaintiffs' members and the public will face substantial, concrete burdens to exercising their right to vote if Sections 2(a) and 3(b) of the Order are implemented. "Absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present federal election cycle." *Newby*, 838 F.3d at 12. Without an injunction, Plaintiffs will face significant setbacks in facilitating their members ability to vote, including by mail, which will decrease access to the ballot. Not only is "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations,' . . . [t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Newby*, 838 F.3d at 12 (internal citations omitted).

Defendants can make no showing of harm to the government. Indeed, injunctive relief is consistent with "preserving the integrity of [the] election process," consistent with preserving the separation of powers and under the laws passed by Congress. *See also Fish v. Schwab*, 957 F.3d 1105, 1133, 1142 (10th Cir. 2020) (Defendants failed to show "that substantial numbers of noncitizens successfully registered to vote" under the NVRA's attestation procedures).

The balance of equities and the public interest strongly favor Plaintiffs.

### CONCLUSION

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and preliminarily enjoin the implementation of Sections 2 and 3 of the Executive Order.

45

Dated: April 17, 2026

Respectfully submitted,

/s/ Norman L. Eisen
Norman L. Eisen (DC Bar No. 435051)
Tianna J. Mays (DC Bar No. 90005882)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold (DC Bar No. 90010196)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

*admission to D.D.C. pending

Counsel for Plaintiffs LULAC, SFI, and ASA

/s/ Danielle Lang
Danielle Lang (DC Bar No. 1500218)
Robert Brent Ferguson (DC Bar No. 1782289)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri (NY Bar No. 5396304)*
Valencia Richardson (DC Bar No. 1739245)*
Aseem Mulji (DC Bar No. 1724971)
Heather Szilagyi (DC Bar No. 90006787)
Renata O'Donnell (DC Bar No. 1723929)
Benjamin Phillips (DC Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bphillips@campaignlegalcenter.org