# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-1151 (CJN) |

**DECLARATION OF JUAN PROAÑO**

1

I, Juan Proaño, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.    I am the Chief Executive Officer of League of United Latin American Citizens (LULAC), a position I have held since November 2023. In my role as Chief Executive Officer, I oversee the day-to-day operations at LULAC and work to amplify the organization's advocacy initiatives and action-oriented programs.

2.    LULAC is the largest and oldest Latino civil rights organization in the United States. Established in 1929 and headquartered in Washington, D.C., LULAC is a nationwide, non-profit, non-partisan, membership-based organization with more than 400 councils (local chapters) and over 570,000 members, with members in every state in the country. LULAC has a national board, president, and professional staff, as well as several issue-specific committees.

**LULAC's Mission and Activities**

3.    LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights, including their voting rights.

4.    LULAC advances the economic conditions, educational attainment, political influence, housing, health, and civil and voting rights of Hispanic Americans through community-based programs.

5.    LULAC's members include both U.S. born citizens and naturalized citizens. LULAC provides citizenship application assistance and civics and citizenship education to its members, many of whom are immigrants.

6.    LULAC's members are civically engaged. Approximately 70% are registered to vote, and nearly 80% of LULAC's registered members voted in 2020 and approximately 62% voted in 2022.

7.      Throughout the year, LULAC's councils register prospective voters and hold voter registration drives at naturalization ceremonies, schools, churches, and other community events. At these events, LULAC councils often, at the request of registrants, collect voter registration forms and return them to local election offices in accordance with state law.

8.      LULAC holds get-out-the-vote programs before elections to encourage its members to vote. Through these programs, LULAC councils educate their members and other community members about voter registration, in-person voting options, vote-by-mail applications, and vote-by-mail deadlines. Where permitted by law, LULAC encourages mail-in voting (also known as absentee voting), as many LULAC members have difficulty voting in person because they are elderly or have medical issues, live in rural areas, or do not have reliable access to transportation, among other reasons. Many LULAC members choose, state law permitting, to vote-by-mail. Where vote-by-mail is available, LULAC councils also help their members and other voters to apply for vote-by-mail ballots to the extent permitted by law.

**The Executive Order's Impact on LULAC's Members**

9.      Based on my understanding of its provisions, the President's Executive Order on mail voting will cause significant harm both to LULAC's members and to LULAC as an organization.

***Section 2(a)***

10.     I am extremely concerned about Section 2 of the Executive Order, the provision that calls for the Department of Homeland Security (DHS) to create a "State Citizenship List" for each state based on information from various federal databases, which will then be sent to state election officials in advance of federal elections. Based on statements by President Trump and other federal officials in the news regarding "noncitizen" voting, as well as the directive in the

3

Executive Order for the Attorney General to prioritize prosecution of election officials who issue federal ballots to people who are not eligible to vote, state and local officials are under significant pressure to use the State Citizenship Lists to determine whether a registered voter or voter registration applicant is a citizen and "clean" their voter rolls. I have to assume many election officials will use the State Citizenship List to do just that.

11.    One major problem is that the State Citizenship Lists are going to be compiled using several different federal databases, including federal citizenship and naturalization records, Social Security Administration records, the Systematic Alien Verification for Entitlements ("SAVE") database, and other federal databases.

12.    Based on my experience at LULAC, in leadership roles in the Latino community, in analyzing voting and other databases, and in my personal experiences navigating the immigration and naturalization process, I am very familiar with the unreliability of federal databases to determine citizenship and residency. I have heard from LULAC members and others in the Hispanic community who have encountered issues with a federal agency mischaracterizing their status. This is especially true for naturalized citizens.

13.    There are a number of reasons for this. For one, naturalized citizens have multiple identification numbers attached to their name at different stages of their immigration process—alien registration numbers, visa numbers, naturalization numbers, citizenship certificate numbers, and others. This information is not always or consistently updated across databases, creating particular vulnerabilities for those who naturalize close to the election or close to the time the State Citizenship List is being compiled. And some of these databases, like those housed within the Social Security Administration, are not even intended to be used for citizenship checks—they are supposed to be used to verify eligibility for benefits. As a result, a person who naturalized is more

likely to be flagged as a non-citizen in these databases, which could result in their removal from the voter rolls if states use the State Citizenship List to determine whether the person is a citizen. Because the State Citizenship List is compiled from databases known to contain inaccuracies, those same errors are inevitably bound to appear in the State Citizenship List.

14.    In the Latino community and among LULAC members, last names often cause problems with federal databases, too. Many of LULAC's members, including our naturalized citizen members, have multiple Spanish surnames, as is the custom in many Hispanic families. This means these individuals often have variations of their names on different documents. For instance, an individual named Maria Elena Espinoza Martinez could appear inconsistently across databases. In some, her first name may be listed as "Maria" or "Maria Elena"; in others, her last name might appear as "Martinez" or "Espinoza Martinez." Still other databases might record "Espinoza" as a middle name or "Elena" as a middle name. Hyphenations, such as "Maria-Elena" or "Espinoza-Martinez" would further complicate things. And Spanish language accents—á, é, í, ó, ú—placed over vowels complicate things even further.

15.    Based on my years of experience working with the Latino community, these kinds of issues come up often. A community member with multiple Spanish names might register with the SSA under one version of their name when applying for a social security card. However, that same person may use a slightly different variation—such as adding a hyphen—when applying for a driver's license. As a result, they might be listed under different names in different federal databases that collect and aggregate information on individuals. When these databases are merged, errors are bound to occur, i.e., an individual with multiple Spanish names would be mistakenly flagged as more than one person or have their identity questioned.

16. LULAC also has members who were born before 1981, for whom the SSA is more likely to lack citizenship data. These members are likely to have inaccurate data about their citizenship status reflected on the State Citizenship List, which will draw from SSA records.

17. If DHS combines a number of different federal databases in order to produce the State Citizenship List, as the Executive Order directs it to do, there is a huge risk of outdated data, mismatched data, and other errors. It is almost guaranteed that legitimate citizens, including some of LULAC's naturalized citizen members, will be flagged as non-citizens and incorrectly left off the State Citizenship List. Mismatches will also occur between state and federal records, causing more problems. When states use the inaccurate State Citizenship List either to match this list with their own internal state databases or directly to purge their voter rolls, these states will end up removing legitimate citizens from their rolls who are eligible to vote but have erroneously been left off the State Citizenship List. We have already seen this exact scenario in states that have begun using the SAVE database to "clean" their voter rolls, like Texas.

18. Though some of our members may use whatever procedure is provided to them to correct the mistake, prove their citizenship, register with the state again if necessary, and vote, others will be deterred by this process. Many of our members are already fearful of interacting with the government in any way. These fears have been exacerbated by the government's attacks on the Latino community. Mixed status families—those families with both citizens and non-citizen members—are especially fearful. For these individuals that justifiably fear interacting with the federal government, Section 2(a)'s procedures to allow individuals to "access their individual records and update or correct them in advance of elections" will not provide much solace. Many voters, including LULAC members, will not update or correct records, and thus will not vote, to avoid additional interaction with government officials.

19.    Because the State Citizenship List can be transmitted to state election officials as late as 60 days before a federal election, with very little time for state election officials to vet the list, validly registered voters who are left off the State Citizenship List may not even be informed that their voter status has changed until the eve of the election, if they are informed at all. And by the time they are informed, it may be too late for them to vote. These voters who find out on the eve of the election that they were flagged as non-citizens will likely be disenfranchised completely if their state's re-registration deadline has passed and they are not otherwise given the opportunity to prove their citizenship.

20.    Some states could require these voters to provide additional documentation to prove their citizenship status. This raises further complications, as many individuals lack access to the necessary documents. And even if these individuals do have access to these documents, it may not be feasible so close to the election to obtain them, particularly for those who are traveling.

21.    Others, who do not have reliable access to mail, may miss notices from county officials requesting documentary proof of citizenship within a set timeline. As a result, they risk being purged before Election Day.

### *Section 3*

22.    The provisions in Section 3 of the Executive Order also cause harm to LULAC's members who vote by mail by erecting new and unnecessary barriers to the vote-by-mail ballot process and causing confusion. LULAC has tens of thousands of members across the country who routinely cast ballots by mail (in accordance with their state absentee ballot laws) in major federal elections.

23.    LULAC members vote absentee for many different reasons, including because they are disabled, elderly, deployed domestically or abroad, medically incapacitated, lacking reliable transportation, or otherwise. LULAC members reside in universal vote-by-mail states where all

registered voters receive a mail ballot (such as California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont and Washington state), states where any voter can be on a permanent absentee ballot mailing list where they sign up once and receive a mail ballot for every election (such as Arizona, District of Columbia, Maine, Maryland, Michigan, Minnesota, Montana, New Jersey, New Mexico and Virginia), states where a person with a disability can be on permanent absentee voter list (such as Alabama, Connecticut, Delaware, Illinois, Kansas, Louisiana, Mississippi, New York, Tennessee, West Virginia and Wisconsin), and other states where voters can request mail ballots.

24.    Section 3 of the Executive Order creates two other lists that will affect LULAC members. My understanding is that the state mail voter list is a list of all the state's absentee voters that the state's election officials must send to the Postal Service within sixty days of a federal election. I also understand that the second list, called the "Mail-In and Absentee Participation List," is a preapproved roster of voters to whom the Postal Service is exclusively permitted to deliver mail-in ballots, *i.e.*, the Postal Service cannot deliver mail ballots or mail-ballot materials to anybody whose name does not appear on the Mail-In and Absentee Participation List.

25.    To add another layer of complexity, I am not sure if the State Citizenship List will be used in conjunction with these other two lists. But if states use the State Citizenship List to put together their state mail voter lists or if the USPS uses the State Citizenship List to compile its Mail-In and Absentee Participation List, that will cause huge problems. The State Citizenship is a purported list of citizens, but it may exclude naturalized citizens whose immigration status has not been updated or U.S. born citizens who are not reflected in DHS databases because they have never applied for immigration documents. If these two lists are used in conjunction, the same sorts of problems I described above are likely to occur: outdated data, mismatched data, and other errors

8

will mean voters who are eligible to vote and permitted to vote by mail may be excluded from the process. The effects of errors or outdated information in multiple of these lists cannot be understated—even a single error, multiplied across a vast system of databases and multiple lists, could snowball into a much larger problem and potentially impact hundreds of thousands of people.

26.     As with the State Citizenship List, the late date by which the state mail voter lists and the Mail-In and Absentee Participation List must be compiled make the possibility of remedying a voter's incorrect exclusion from one of these lists even more unlikely. For example, if community members who have applied for absentee ballots are omitted from the Mail-In and Absentee Participation List, through no fault of their own, they will not receive their mail ballots because the Postal Service is prohibited from delivering ballots to them.

27.     For those LULAC members who typically receive their ballots by mail (particularly in states that are universal vote by mail states like California, Colorado, Oregon, and Washington, among others), they may only realize there is a problem when their ballot fails to arrive as expected. And many of these members may not be able to find a way to get to the polls in person, and so would be left without a means to vote at all. In addition, because many LULAC members rely on vote by mail out of necessity (due to physical absence from the county on Election Day, age, or disability), they risk not being able to vote at all if they cannot vote by mail.

28.     And in many states, voters can request absentee ballots very close to Election Day. In Arizona, for example, voters can request absentee ballots in person, by mail, or online 11 days before Election Day. My understanding is that other states have similar timelines for requesting absentee ballots (Alaska, 10 days before Election Day; District of Columbia, 15 days before Election Day; Florida, 12 days before Election Day; Massachusetts, 7 days before Election Day; Texas, 11 days before Election Day; South Carolina, 11 days before Election Day). The Executive

9

Order directs states to send their state mail voter lists to the Postal Service 60 days before the election. The Postal Service must then generate a Mail-in and Absentee Participation List, which determines who receives absentee ballots through the mail. LULAC has members who vote by mail in all of these states. For these LULAC members who request absentee ballots within the 60 days before Election Day, it seems highly possible they would not appear on the state mail voter list or the Mail-in and Absentee Participation List. The practical effect would be that these individuals, despite having timely requested absentee ballots, would not receive them because their names would be absent from the Postal Service's list.

29.    LULAC members' privacy is also harmed by the creation of the State Citizenship List, the state mail voter list, and the Mail-in and Absentee Participation List, and the distribution of this data among federal agencies and between federal and state officials. LULAC's members fear what will come of the aggregation, disclosure, and potential misuse of their sensitive personal information. The State Citizenship List, on its own, could include an individual's residence, citizenship information, social security number, employment authorization history, and identifying numbers, among other potential types of data. For those members who are newly naturalized, live in mixed-status houses, or otherwise fear immigration enforcement actions, the widespread sharing of their personal information between and amongst federal agencies and state officials intrudes on their sense of security.

**The Executive Order's Impact on LULAC's Core Mission**

30.    Tackling the implications of the Executive Order will frustrate LULAC's mission and drain LULAC's scarce resources.

31.    The Order will impede LULAC's core mission work relating to voting, including LULAC's work to register voters and get out the vote through in-person voting and mail voting. LULAC's councils are trusted community organizations, and prospective voters routinely seek out

LULAC's help to register to vote, to apply to receive an absentee ballot, and to update their voter information.

32.    In the past, LULAC has been able to reassure registrants that the information collected to assist in registering them to vote, applying for a mail ballot, or updating their voter registration forms is safe and secure. But LULAC can no longer provide the same reassurance to community members. Instead, the organization is now fielding questions and concerns from community members about how their information will be used if they register to vote or if they request an absentee ballot. The Executive Order's mandated collection and distribution of voters' information—through the State Citizenship List, the state mail voter list, and the Mail-in and Absentee Participation List—frustrates LULAC's mission to register and encourage voting because the community LULAC serves is increasingly hesitant to interact with federal and state officials in any capacity.

33.    If Section 2 of the Executive Order remains in effect, LULAC will be forced to divert resources to educating voters about the new list processes created by the Order, assisting its members and the broader community if they are improperly excluded from federal lists, and attempting to assuage fears among the predominantly Latino population LULAC serves. But the effect will be that fewer LULAC members and community members will be able to successfully cast a ballot.

34.    The Executive Order's provisions on mail voting under Section 3 have also created and will continue to create chaos and confusion among LULAC's members and throughout the Latino community LULAC serves. As a result, LULAC will devote substantial time and resources to determining how best to ensure its members and community members are able to access vote by mail, including by ensuring that these individuals are included on all relevant lists

11

so that they can receive a mail ballot to begin with. For those who are excluded from the relevant lists, LULAC intends to divert resources to set up programming to assist voters with the complicated process of voting by mail under the Executive Order. And because the Executive Order's mail voting provisions will also implicate the timing of mail voting, LULAC also intends to divert resources to educate and assist members and community members about timely receiving and returning their mail ballot. Even with all these efforts, we know that some of our members and some of our community will fall through the cracks of the new system of mail voting created by the Order.

35.    To meet the resource needs and staffing required to educate and assist members navigating the implementation of the Executive Order, LULAC will have to divert significant resources from its other important initiatives. LULAC is currently devoting significant resources and staff time toward issues such as combatting aggressive immigration enforcement, fighting the dismantling of Diversity, Equity, and Inclusion initiatives, and providing economic empowerment programs to its members. These programs, as well as regional, state, and local programs, stand to suffer if LULAC must use its limited resources to combat the effects flowing from the implementation of the Order.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of April, 2026, in Washington, D.C.

_____
Juan Proaño

12