**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>   *Plaintiffs*,<br><br> v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>   *Defendants*. | Case Number  1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>   *Plaintiffs*,<br><br> v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>   *Defendants.* | Case Number  1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., and BVM CAPACITY BUILDING INSTITUTE, INC.,<br><br>   *Plaintiffs*,<br><br> v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>   *Defendants.* | Case Number  1:26-cv-01151-CJN |

**MEMORANDUM IN SUPPORT OF NAACP, COMMON CAUSE, AND BLACK VOTERS MATTER PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................3

    A.    The Constitution Allocates Authority to Regulate Elections Between Congress and the States ...................................................................................................................3

    B.    The NVRA and HAVA Allocate Election Administration Authority Between the States and Federal Agencies ........................................................................................5

    C.    The Postal Service's Statutory Structure Confirms Its Independence from Presidential Control .....................................................................................................7

    D.    President Trump's Crusade to Take Over Election Administration .........................9

    E.    The Executive Order Purports to Impose Sweeping Changes to Voter Qualification Verification and Mail-In Voting .......................................................11

ARGUMENT................................................................................................................................13

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................13

    A.    The Executive Order is *Ultra Vires*, Violates the Qualifications Clause and the Elections Clause, and Violates the Horizontal and Vertical Separation of Powers ....................................................................................................................................13

        1.    The Constitution Forbids the President From Legislating on Mail-In Voting ..........................................................................................................13

        2.    The President Lacks Authority to Direct USPS Rulemaking. ...................17

    B.    The Order Violates the Postal Statutes .................................................................19

    C.    The Order Violates the Privacy Act.......................................................................22

        1.    The Order Violates the Privacy Act's Disclosure Restrictions..................23

        2.    The Order Violates the Privacy Act's Accuracy Requirements ................26

        3.    Plaintiffs Have a Cause of Action to Assert Privacy Act Violations.........29

    D.    Plaintiffs Can Bring Their Claims Under Article III ............................................31

        1.    Plaintiffs Have Organizational Standing ..................................................31

        2.    Plaintiffs Have Associational Standing .....................................................37

3.     Plaintiffs' Claims Are Ripe........................................................................40

II.    THE REMAINING PRELIMINARY INJUNCTION FACTORS HEAVILY FAVOR AN INJUNCTION...............................................................................................................43

    A.    Plaintiffs are Suffering Irreparable Harm ...............................................................43

    B.    The Balance of Equities and Public Interest Favor Issuing an Injunction.............44

CONCLUSION...............................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967)................................................................................................30

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003)........................................................................19, 21

*Am. Anti-Vivisection Soc'y v. USDA*,
946 F.3d 615 (D.C. Cir. 2020)................................................................................31

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
786 F. Supp. 3d 647 (S.D.N.Y. 2025)................................................................22, 40

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. DOL*,
778 F. Supp. 3d 56 (D.D.C. 2025).....................................................................39, 40

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)...........................................................................................4, 5, 14

*Aviel v. Gor*,
2025 WL 1600446 (D.C. Cir. June 5, 2025)...........................................................18

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................30

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989)....................................................................................25

*California v. Trump*,
805 F. Supp. 3d 387 (D. Mass. 2025) .......................................................................1

*Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996).....................................................................13, 20, 30

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)................................................................................................18

*GameFly, Inc. v. Postal Regul. Comm'n*,
704 F.3d 145 (D.C. Cir. 2013).................................................................................21

*Georgia v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .................................................................................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)............................................................................................37

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  784 F. Supp. 3d 76 (D.D.C. 2025).......................................................................41

*League of Women Voters of N.C. v. North Carolina*,
  768 F.3d 224 (4th Cir. 2014) ..............................................................................43

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)......................................................................43, 44, 45

*LULAC v. Exec. Off. of the President*,
  2026 WL 252420 (D.D.C. Jan. 30, 2026)..................................13, 14, 24, 29, 30, 31

*LULAC v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025).....................................13, 31, 41, 42, 43, 44, 45

*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025).....................................1, 2, 5, 10, 15, 31, 33, 37

*Luther v. Borden*,
  48 U.S. 1 (1849).................................................................................................14

*Medellin v. Texas*,
  552 U.S. 491 (2008)...........................................................................................14

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 929 (D. Ariz. 2024) ..................................................................27

*Murthy v. Missouri*,
  603 U.S. 43 (2024).............................................................................................31

*NAACP v. U.S. Postal Serv.*,
  496 F. Supp. 3d 1 (D.D.C. 2020)........................................................................22

*NPR v. Trump*,
  2026 WL 877434 (D.D.C. Mar. 31, 2026).............................................................41

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ..............................................................................44

*Oregon v. Mitchell*,
  400 U.S. 112 (1970)..............................................................................................4

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  783 F. Supp. 3d 105 (D.D.C. 2025).....................................................................41

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ................................................................27

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ...................................................................................44

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................44

*Roudebush v. Hartke*,
  405 U.S. 15 (1972) ...................................................................................5

*Susman Godfrey LLP v. Exec. Off. of President*,
  789 F. Supp. 3d 15 (D.D.C. 2025) ........................................................41

*Texas v. White*,
  74 U.S. 700 (1869) .................................................................................14

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020) ........................................................44

*Townsend v. United States*,
  236 F. Supp. 3d 280 (D.D.C. 2017) ......................................................25

*United States v. Weber*,
  2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ...........................................6

*Washington v. Trump*,
  2026 WL 73866 (W.D. Wash. Jan. 9, 2026) ............................................1

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
  784 F. Supp. 3d 127 (D.D.C. 2025) ................................................41, 42

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .........................................................................13, 14

**Constitutions**

U.S. Const. Amendment XVII .....................................................................4

U.S. Const. Article I, § 2, cl. 1 ...................................................................4

U.S. Const. Article I, § 4 .............................................................................4

U.S. Const. art. I, § 8, cl. 7 .........................................................................7

**Statutes**

5 U.S.C.
§ 552a(a)(7)................................................................................................................24
§ 552a(b) ....................................................................................................................23
§ 552a(e)(5)................................................................................................................26
§ 552a(e)(6)................................................................................................................26

8 U.S.C.
§ 1373(a) ....................................................................................................................25

39 U.S.C.

§ 101(a) ................................................................................................................7, 20

§ 102(5) ....................................................................................................................20

§ 201 ......................................................................................................................7, 17

§ 202(a)(1) ............................................................................................................7, 18

§ 202(c) ................................................................................................................7, 18

§ 401(2) ................................................................................................................8, 18

§ 403(a) ................................................................................................................7, 21

§ 403(b)(1) ..............................................................................................................20

§ 403(c) ................................................................................................................8, 21

§ 404(e) ....................................................................................................................20

§ 404(e)(2) ..................................................................................................................8

§ 501 ......................................................................................................................8, 19

§ 502 ......................................................................................................................8, 19

§ 502(a) ................................................................................................................8, 19

§ 503 ......................................................................................................................8, 19

§ 504 ......................................................................................................................8, 19

§ 505 ......................................................................................................................8, 19

§ 3001 ......................................................................................................................21

§ 3002 ......................................................................................................................21

§ 3003 ......................................................................................................................21

§ 3004 ......................................................................................................................21

§ 3005 ......................................................................................................................21

§ 3007 ......................................................................................................................21

§ 3008 ......................................................................................................................21

§ 3009 ......................................................................................................................21

§ 3010 ......................................................................................................................21

§ 3011 ......................................................................................................................21

§ 3012 ......................................................................................................................21

§ 3013 ......................................................................................................................21

§ 3014 ......................................................................................................................21

§ 3015 ......................................................................................................................21

§ 3016 ......................................................................................................................21

§ 3017 ......................................................................................................................21

§ 3018 ......................................................................................................................21

§ 3622 ....................................................................................................................8, 19

§ 3661(b) ..........................................................................................................8, 19, 22

§ 3661(c) ..........................................................................................................8, 19, 22

52 U.S.C.
   § 20501................................................................................................................5
   § 20501(a)(3).......................................................................................................5
   § 20501(b)(1).......................................................................................................5
   § 20502................................................................................................................5
   § 20503................................................................................................................5
   § 20504.........................................................................................................5, 15
   § 20505.........................................................................................................5, 15
   § 20505(a)(1).......................................................................................................6
   § 20506.........................................................................................................5, 15
   § 20507.........................................................................................................5, 15
   § 20507(a)(3).....................................................................................................15
   § 20507(a)(4)..................................................................................................6, 15
   § 20507(b)(2)..................................................................................................6, 15
   § 20507(c)(2)(A)...........................................................................................15, 16
   § 20507(d).......................................................................................................6, 15
   § 20508...........................................................................................................5, 6
   § 20508(a)(2).......................................................................................................6
   § 20508(b).........................................................................................................15
   § 20509................................................................................................................5
   § 20510................................................................................................................5
   § 20511................................................................................................................5
   §§ 20901-21145 .................................................................................................6
   § 21083(a)(1)(A).............................................................................................6, 16
   § 21083(a)(1)(A)(i)...........................................................................................16
   § 21083(a)(1)(A)(viii).......................................................................................16
   § 21083(a)(5)(A)(iii).........................................................................................16
   § 21083(a)(5)(B)...............................................................................................16

Tex. Election Code § 13.043................................................................................35

**Regulations**

39 C.F.R. § 221.5(a)(3)........................................................................................18

90 Fed. Reg. 48948 (Oct. 31, 2025).....................................................................24

90 Fed. Reg. 50879 (Nov. 12, 2025).....................................................................25

Exec. Order. No. 14399, 91 Fed. Reg. 17125 (March 31, 2026)
.................................................................................................1, 11, 12, 30, 37, 42

SSA Off. Of the Inspector Gen., Cong. Resp. Rep. No. A-08-0626100, *Accuracy
of the Social Security Administration's Numident File* (Dec. 18, 2006),
https://perma.cc/5G2J-FF4V;.................................................................................28

**Legislative Materials**

H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 1970 U.S.C.C.A.N. 3649 (1970) .....................17, 18

**Other Authorities**

2 Records of the Federal Convention of 1787 (M. Farrand rev. 1966) ..........................................4

Cedar Attanasio, Julie Carr Smyth & Audrey McAvoy, *Read the Complete Transcript of Trump's 2026 State of the Union*, Associated Press (Feb. 25, 2026, 5:04 p.m.), https://perma.cc/PV4Z-LY8A ................................................................................10

Confidential Memorandum of Understanding between Civil Rights Division, U.S. Dept. of Just., and Off. of Tex. Sec'y of State (2025), https://perma.cc/PDU2-M36L........................................................................................................................................33

Daily Press Release, U.S.S. Press Gallery (Mar. 21, 2026), https://perma.cc/8Z6J-FSA2 ...................................................................................................................................10

Daily Press Release, U.S.S. Press Gallery (Mar. 26, 2026), https://perma.cc/3DCW-56UV ......................................................................................................10

DHS Privacy Impact Assessment for SAVE, DHS Ref. No. DHS/USCIS/PIA-006(d) (Oct. 31, 2025)), https://perma.cc/4YV7-24NU ..........................................................27

Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, 4:17 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254................................9

Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2025, 9:49 p.m.) https://truthsocial.com/@realDonaldTrump/posts/115120863399877029................................9

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 13, 2026, 4:35 p.m.), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644.........................9, 10

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 8, 2026, 8:22 a.m.), https://truthsocial.com/@realDonaldTrump/posts/116193527873859174.............................10

Donald J. Trump, *Remarks to the Press During Oval Office Meeting with Ukrainian President Volodymy Zelenskyy*, C-SPAN, https://www.c-span.org/clip/washington-journal/plan-to-eliminate-mail-in-ballots-and-voting-machines/5170135................................................................................................................9

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9XYRYH ..............................................................................................27

Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US ...............................................................................................28, 29

Norfolk/Newport News Naturalization, *United States District Court Eastern District of Virginia,* www.vaed.uscourts.gov/norfolknewport-news-naturalization...................................................................................................27

*Post-Election Audit Report: General Election 2016*, N.C. State Bd. of Elections (Apr. 21 2017), App., https://perma.cc/WH8U-RZ4B ........................................................26

Press Release, The White House, The SAVE America Act Is the Most Popular Election Reform in Decades (Mar. 12, 2026), https://perma.cc/HF8E-D6MA .......................10

Texas Secretary of State Elections Division, Texas Volunteer Deputy Registrar Training (2025), https://perma.cc/PP4S-3QF5 .........................................................................35

**INTRODUCTION**

On March 25, 2025, President Trump signed an Executive Order purporting to direct the Election Assistance Commission ("EAC") to require Documentary Proof of Citizenship ("DPOC") from applicants registering to vote in federal elections. In multiple challenges to the order, three courts considered "whether the President, acting unilaterally, may direct changes to federal election procedures." *LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025); *California v. Trump*, 805 F. Supp. 3d 387, 394-95 (D. Mass. 2025); *Washington v. Trump*, 2026 WL 73866, at *29-31 (W.D. Wash. Jan. 9, 2026). Each answered with a resounding no. The Constitution does not give the President that authority. *LULAC*, 808 F. Supp. at 41; *California*, 805 F. Supp. at 406-10; *Washington*, 2026 WL 73866 at *29-31.

A year later, on March 31, 2026, the President tried again with a second Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections," Exec. Order. No. 14399, 91 Fed. Reg. 17125 (March 31, 2026) (the "Order"). This time, the President purports to impose a new set of election administration rules—seeking to dictate federal procedures for mail-in voting, compilation of voter lists, and registration—displacing those established by Congress and the states. This groundhog day order presents the same question again, and the answer is *still* no. The Constitution *still* does not authorize the President to dictate federal election procedures.

Quite deliberately, the Constitution vests power over federal elections in the states and Congress. Congress has enacted no laws granting the President authority to administer federal elections. The President tried recently to persuade Congress to adopt legislation, the Safeguard American Voter Eligibility Act, to provide such power. He failed. That should have ended the Administration's effort to displace state control over elections. Unfortunately, it has not.

1

Instead, the President has again sought to achieve by fiat what he failed to achieve through legislation or the prior executive order. The latest Order directs the Secretary of the Department of Homeland Security ("DHS") to compile a "State Citizenship List" of U.S. citizens whom it deems eligible to vote in federal elections; directs the United States Postal Service ("USPS") to adopt rules restricting the delivery of mail-in and absentee ballots to voters who appear on its proprietary "Mail-in and Absentee Participation List"; and directs the Attorney General to prioritize investigating and prosecuting anyone who upsets this scheme—including civil rights organizations, like the plaintiffs here, who simply promote voter registration and turnout. The Order in essence arrogates to the Administration a veto power over who can vote and what election mail the Post Office can deliver.

The "President lacks the authority to direct such changes." *LULAC*, 808 F. Supp. 3d at 41. "Because our Constitution assigns responsibility for election regulation to the States and to Congress," *id.*, this Order is *ultra vires* and violates the vertical and horizontal separation of powers. Beyond that, the Order fails in myriad additional ways. The President lacks authority to direct prefabricated rulemaking by the Postmaster General, whose job is to deliver the mail—to everyone, without discrimination—not to regulate mail-voting procedures. Worse still, the Order commands DHS to build an unprecedented national database of purportedly eligible voters using a mishmash of data from various federal agencies—data that those agencies are not permitted to pool in DHS's hands, much less pass on to states. Each data source has significant limitations, yielding State Citizenship Lists that will inaccurately exclude millions of eligible voters "at the time of an upcoming Federal election," including 17 year-olds who plan to lawfully vote in their state's Primary Election, students, derived citizens without any documentation, and new citizens naturalizing close to or on Election Day. These lists will disadvantage people of color, many of

whom distrust the federal government's attempts to compel, compile, and disseminate their sensitive voter information and who vote by mail to avoid discrimination and harassment at polling sites. Plaintiffs count many affected people among their members.

The sham rulemaking in the Executive Order, the confusing mesh of exclusionary lists, and the coercive threats of investigation and prosecution impose irreparable harms not only on voters, but also on Plaintiffs National Association for the Advancement of Colored People ("NAACP"), Common Cause and Common Cause Education Fund (collectively "Common Cause"), and Black Voters Matter Fund Inc., and BVM Building Capacity Institute Inc. (collectively "BVM"), including their members and volunteers. To maintain their core mission of educating and assisting citizens to gain access to the ballot, Plaintiffs must gear up to help wrongfully excluded voters, bearing significant and immediate expenses to reorchestrate their voter registration, voter assistance, and turnout. And they must perform their registration, voter protection initiatives, and often last-minute assistance under the threat, emphasized repeatedly in the Order, that helping get a ballot to a person whom DHS or the USPS deems ineligible can bring down the force of federal criminal law on the organizations and their volunteers.

The President's *ultra vires* Order, in short, imposes real harm on real people. It upends our constitutional order. And it threatens our democratic system. The Court should preliminarily enjoin its implementation.

## BACKGROUND

### A.     The Constitution Allocates Authority to Regulate Elections Between Congress and the States

The U.S. Constitution allocates power over election administration to Congress and the states, assigning no role to the President. There are two key provisions. The Qualifications Clause

3

governs "*who* may vote" in federal elections; the Elections Clause governs "*how* federal elections are held." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 16 (2013).

**The Qualifications Clause.** The Qualifications Clause provides that voters for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment extends the same requirement to the election of U.S. Senators. U.S. Const. amend. XVII. These provisions give States exclusive power to prescribe voter qualifications: each State determines who may vote in its federal elections by reference to the qualifications it has established in elections to its own most numerous legislative chamber. *See Oregon v. Mitchell*, 400 U.S. 112, 124-25 (1970) (opinion of Black, J.). "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *ITCA*, 570 U.S. at 17.

Removing the federal government from setting voter qualifications was a deliberate constitutional choice. "A Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Id.* (quoting 2 Records of the Federal Convention of 1787, p. 250 (M. Farrand rev. 1966)). "At the same time, by tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided rendering too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone." *Id.* (cleaned up) (citation omitted). The substantive determination of who is eligible to vote is thus a state function, rooted in state law and administered by state officials.

**The Elections Clause.** The Elections Clause provides that the "Times, Places and Manner of holding Elections … shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4; *see*

*ITCA*, 570 U.S. at 7-8. In this two-tiered structure, the Clause vests authority to run elections "first in the States," and then "assigns Congress the power to preempt State regulations." *LULAC*, 808 F. Supp. 3d at 42. This design was also "the product of carefully considered compromises among our Constitution's Framers." *Id.* The Framers "'submitted the regulation of elections for the federal government, in the first instance,' to the States, where such regulation would 'be both more convenient and more satisfactory.' But they 'reserved to [Congress] a right to interpose' regulations of its own where the need arose." *Id.* at *45 (quoting Federalist No. 59).

As under the Qualifications Clause, the President is "conspicuous[ly] absen[t]" from the Elections Clause, even as it assigns some power to the federal government. *Id.* The Clause gives states "initial authority to regulate elections" and Congress "supervisory authority over those regulations"; the President "does not feature at all." *Id.* Instead, the Clause "empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)).

**B.     The NVRA and HAVA Allocate Election Administration Authority Between the States and Federal Agencies**

Congress has exercised its Elections Clause authority to enact federal laws that regulate election administration. The National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"), like the Clause that authorizes them, provide no role for the President.

***The NVRA.*** Congress enacted the NVRA in 1993 to establish uniform procedures for registering to vote in federal elections. 52 U.S.C. §§ 20501-20511. Colloquially known as the "motor-voter law," the Act was adopted to "increase the number of eligible citizens who register to vote in elections for Federal office." *Id.* § 20501(a)(3), (b)(1). The NVRA requires each state to establish procedures for registering voters in federal elections by mail, at motor vehicle agencies, and at other state offices. *Id.* §§ 20503-20506. States must "accept and use" a uniform federal

registration form (the "Federal Form") developed and maintained by the EAC. *Id.* §§ 20505(a)(1), 20508. The EAC, in consultation with the States, prescribes the Federal Form, including what information applicants must provide to establish their eligibility. *Id.* § 20508(a)(2).

The NVRA also makes States responsible for maintaining voter registration rolls. Section 8 requires each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or change of residence. *Id.* § 20507(a)(4). But the statute constrains how States carry out that responsibility. States may not remove a registrant from the rolls solely for failure to vote. *Id.* § 20507(b)(2). Before removing a registrant on grounds of changed residence, a State must follow a prescribed notice-and-waiting procedure: the registrant must be sent a confirmation notice and be given the opportunity to respond, and removal may not occur until the registrant fails to respond and fails to vote in two consecutive general federal elections. *Id.* § 20507(d).

**HAVA.** HAVA builds on the NVRA by establishing requirements for statewide voter registration systems. *Id.* §§ 20901-21145. HAVA was designed to overhaul the country's election machinery in response to the administrative failures that plagued the 2000 presidential election. It directs each state to implement a "single, uniform, official," statewide voter registration list that is "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). The list must contain the name and registration information of every legally registered voter in the state, assign each registrant a unique identifier, and serve as the "official voter registration list for the conduct of all elections for federal office in the State." *Id.* The list is implemented, defined, maintained, and administered by the state. And HAVA also created the EAC, "an independent bipartisan commission established with the goal of strengthening electoral resilience." *United States v. Weber*, 2026 WL 118807, at *14 (C.D. Cal. Jan. 15, 2026).

C.      **The Postal Service's Statutory Structure Confirms Its Independence from Presidential Control**

Congress has long exercised exclusive authority "[t]o establish Post Offices and post Roads" by enacting comprehensive statutes governing the Nation's postal system. U.S. Const. art. I, § 8, cl. 7. In the Postal Reorganization Act of 1970 ("PRA"), Congress fundamentally restructured that system, abolishing the cabinet-level Post Office Department and replacing it with the modern Postal Service, "an independent establishment of the executive branch." 39 U.S.C. § 201. Congress deliberately removed the postal system from direct political control and insulated decisions about nationwide mail service from presidential command.

To accomplish that goal, Congress vested USPS's authority not in the President, but in a Board of Governors. The Board consists of nine Governors appointed by the President with Senate confirmation, together with the Postmaster General and Deputy Postmaster General. *Id.* § 202(a)(1). The Governors serve staggered terms, are subject to bipartisan composition requirements, and may be removed only for cause. *Id.* The Postmaster General—the chief executive of USPS—is not appointed by the President but instead is selected and removable by the Board. *Id.* § 202(c). The statute further provides that "[t]he exercise of the power of the Postal Service shall be directed by a Board of Governors"; the Board reviews policies, and controls expenditures, while the Postmaster General exercises operational authority as directed by the Board. *Id.* § 202(a)(1). Congress thus mandated independent, not Presidential, control of USPS.

Congress also carefully specified USPS's mission and defined its authority. USPS must provide "prompt, reliable, and efficient" mail service to "all communities" and "bind the Nation together" through transmission of mail. *Id.* § 101(a). It must "serve as nearly as practicable the entire population of the United States." *Id.* § 403(a). Consistent with that universal-service mandate, Congress imposed a strict nondiscrimination rule: USPS "shall not, except as specifically

7

authorized," make "any undue or unreasonable discrimination among users of the mails." *Id.* § 403(c). Although USPS may adopt rules "necessary in the execution of its functions," *id.* § 401(2), those functions include only postal services—the collection, transportation, and delivery of mail—not regulation of external systems such as elections. Congress sharply restricted USPS's ability to provide nonpostal services, allowing such activities only where Congress has expressly authorized them. *See id.* § 404(e)(2).

Congress imposed further safeguards to prevent USPS from unilaterally implementing sweeping nationwide policy changes. Through the Postal Accountability and Enhancement Act ("PAEA"), Congress assigned regulatory oversight to a separate, independent body: the Postal Regulatory Commission ("PRC"). *Id.* §§ 501-505. The PRC is composed of presidentially appointed, Senate-confirmed Commissioners who serve fixed terms and are removable only for cause. *Id.* § 502(a). Congress charged the PRC—not USPS—with authority to review rates, classifications, and significant changes to postal services. *See id.* § 3622. Congress also required USPS, when proposing a change that would "generally affect service on a nationwide or substantially nationwide basis," to first submit that proposal to the PRC and obtain an advisory opinion after a public, on-the-record proceeding. *Id.* § 3661(b)-(c). That requirement is designed to ensure that major changes to the operation of the Nation's mail system are subject to independent review and public participation—not imposed unilaterally.

The PRA and PAEA together reflect a carefully calibrated structure. USPS is an independent establishment with powers exercised by a bipartisan Board, not the President. Its authority is limited to neutral mail delivery. And significant policy changes require independent review by the PRC through procedures Congress prescribed. Nothing in that framework authorizes

the President to direct USPS to initiate rulemaking, dictate its substance and outcome, or change nationwide postal operations.

### D.  President Trump's Crusade to Take Over Election Administration

President Trump has long sought to impose the restrictions on mail-in voting announced in the Executive Order. He has criticized mail-in voting since his first term and has escalated his calls to restrict mail-voting in his second term, including his declaration that he would regulate mail voting "whether approved by Congress or not!"[1] The President signed the Order here after failing to convince Congress to adopt his policies through the bicameral legislative process.

The President has repeatedly made inaccurate statements about mail-in voting and overstated his authority to address it. In August 2025, the President claimed that "States are merely an 'agent' for the Federal Government in counting and tabulating votes," and announced that he would be leading "a movement to get rid of MAIL-IN BALLOTS" by "signing an EXECUTIVE ORDER" to "bring HONESTY to the 2026 Midterm Elections." He even emphasized the political valence of his opposition to mail-in voting, claiming that Democrats are virtually unelectable without "using this completely disproven Mail-In SCAM."[2]

The President increased the pressure on Congress to regulate mail-in voting in connection with his February 2026 State of the Union address. Just before addressing the nation—and months after this Court invalidated his previous Executive Order because the "Constitution assigns

---

[1] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 13, 2026, 4:35 p.m.), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644.

[2] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, 4:17 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254; *see* Donald J. Trump, *Remarks to the Press During Oval Office Meeting with Ukrainian President Volodymyr Zelenskyy*, C-SPAN, https://www.c-span.org/clip/washington-journal/plan-to-eliminate-mail-in-ballots-and-voting-machines/5170135, (Aug. 19, 2025) (video at 1:21-1:32); Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2025, 9:49 p.m.) https://truthsocial.com/@realDonaldTrump/posts/115120863399877029.

responsibility for election regulation to the States and to Congress," not the President, *LULAC*, 808 F. Supp. 3d at 41—President Trump made the aforementioned promise to regulate mail voting "whether approved by Congress or not!"[3] In the State of the Union address itself, President Trump repeated his view that mail-in voting is "crooked," and called on Congress to address mail-in voting and other election administration practices by adopting the SAVE Act.[4]

After the address, on March 8, 2026, President Trump declared that he would "not sign other Bills until" the SAVE Act was passed, and encouraged Congress to "GO FOR THE GOLD" by passing a version of the bill with mail-voting prohibitions, "NOT THE WATERED DOWN VERSION."[5] On March 12, 2026, he "urgently call[ed] on Congress to pass the SAVE America Act immediately and safeguard America's elections from illegal voting," and repeated his unsubstantiated claim that "Voting by mail increases the risk of fraud."[6] Despite this pressure, Congress has not adopted the proposed legislation. The Senate took up the SAVE Act in March 2026, voting on amendments on March 21 and March 26.[7] Cloture votes failed both times. The President issued the Executive Order on March 31, 2026, just five days after the Senate refused to advance the SAVE Act for the second time in less than a week.

---

[3] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 13, 2025, 4:35 p.m.), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644.

[4] Cedar Attanasio, Julie Carr Smyth & Audrey McAvoy, *Read the Complete Transcript of Trump's 2026 State of the Union*, Associated Press (Feb. 25, 2026, 5:04 p.m.), https://perma.cc/PV4Z-LY8A.

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 8, 2026, 8:22 a.m.), https://truthsocial.com/@realDonaldTrump/posts/116193527873859174.

[6] Press Release, The White House, The SAVE America Act Is the Most Popular Election Reform in Decades (Mar. 12, 2026), https://perma.cc/HF8E-D6MA.

[7] *See* Daily Press Release, U.S.S. Press Gallery (Mar. 21, 2026), https://perma.cc/8Z6J-FSA2; Daily Press Release, U.S.S. Press Gallery (Mar. 26, 2026), https://perma.cc/3DCW-56UV.

**E.     The Executive Order Purports to Impose Sweeping Changes to Voter Qualification Verification and Mail-In Voting**

The Executive Order sets forth an elaborate federal superstructure with three interlocking components for regulating mail-in voting. Under the Order, the Executive Branch decides who is eligible to vote by mail, allows mail-in ballot delivery only to those privileged voters it has identified, and then threatens to punish states, state officials, and private organizations that distribute ballots to voters it deems ineligible to vote.

*The "State Citizenship List."* Section 2 of the Order directs DHS to compile and transmit to each State a "State Citizenship List" identifying persons it has confirmed to be U.S. citizens who will be at least 18 by "an upcoming Federal election" and who reside in that State. Exec. Order § 2(a). The Order does not define "Federal election," so it can be inclusive of federal primary and general elections. DHS is to derive the list from databases reflecting federal citizenship and naturalization, the Social Security Administration ("SSA") database, the databases comprising SAVE, and other federal databases. *Id.* DHS is supposed to update and transmit the State Citizenship List at least 60 days before each regularly scheduled federal election. DHS also must create unspecified procedures permitting individuals to access and correct their records and States to suggest modifications. The Order clarifies that inclusion on the list does not establish voter registration, and voters must satisfy state and federal law and state procedures to register.

*The "Mail-In and Absentee Participation" List.* Section 3 of the Order directs the Postmaster General to initiate rulemaking within 60 days to establish uniform standards for mail-in and absentee ballots transmitted through USPS. *Id.* § 3(b). The proposed rule must institute a process for enrolling voters in mail-in voting and the creation by USPS of a state-specific "Mail-In and Absentee Participation" list. *Id.* § 3(b)(iv). The rule must direct states to provide USPS, at least 60 days before an election, a list of eligible voters to whom it plans to issue mail-in ballots.

*Id.* § 3(b)(ii). The rule must also require outbound ballot mail to be sent in envelopes marked as official election mail, bearing a unique Intelligent Mail barcode or successor technology corresponding to each individual, and subject to USPS design review. *Id.* §3(b)(i). The rule must provide a way for states to notify USPS of their intent to use USPS for mail-in or absentee ballots, to submit lists of eligible voters to receive such ballots, and to obtain from USPS State-specific Mail-In and Absentee Participation lists and unique ballot-envelope identifiers. *Id.* § 3(b)(iv). The rule must also prohibit USPS from transmitting ballots from any individual not on USPS's State-specific Mail-In and Absentee Participation list, even if that individual is on the list generated by the State. *Id.* § 3(b)(iii). The final rule must issue within 120 days. *Id.* § 3(d). No notification or cure processes are specified for voters improperly excluded from the USPS's State-specific list.

*The Enforcement Provisions.* Three separate Sections of the Order use threats to individuals, organizations, and states to force them to comply with the new federal procedures. Section 2(b) of the Order directs the Attorney General to prioritize investigations and potential prosecutions of state and local officials, private entities, and others involved in issuing, producing, shipping, or distributing federal ballots to persons deemed ineligible to vote in federal elections. Section 4 requires DHS, SSA, the Postal Service, and the Commerce Department to coordinate implementation, directs the Attorney General to enforce the federal statutes it invokes and issue guidance, and requires DHS and SSA to build infrastructure for compiling and transmitting the State Citizenship List. Section 5 directs the Attorney General and agency heads to take all lawful steps to address asserted noncompliance, including withholding funds where independently authorized by law, referrals for possible criminal investigation, and preservation of specified federal-election participation records for five years. Even beyond the chill, these directives will impose on state election officials, the enforcement provisions potentially expose individuals and

organizations to investigation and prosecution if they help a person obtain a ballot who turns out to be ineligible to vote. Organizations and volunteers usually do not know, and in some states cannot inquire, whether a voter is eligible to receive a ballot. The ominous provisions of the Order thus have a chilling effect on First Amendment efforts of Plaintiffs, members, and volunteers.

ARGUMENT

The Executive Order is a brazen usurpation of congressional and state power that flagrantly violates the constitutional separation of powers and other provisions of federal law, and that warrants immediate injunctive relief. A preliminary injunction should issue when a plaintiff is likely to succeed on the merits, will likely suffer irreparable harm absent an injunction, the balance of equities tips in their favor, and an injunction is in the public interest. *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025). Plaintiffs may challenge the Order's implementation directly under the Constitution, postal statutes, and APA, and all four factors strongly favor Plaintiffs. *LULAC*, 2026 WL 252420, at *25-26; *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331-32 (D.C. Cir. 1996).

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Executive Order is *Ultra Vires*, Violates the Qualifications Clause and the Elections Clause, and Violates the Horizontal and Vertical Separation of Powers

#### 1.    The Constitution Forbids the President From Legislating on Mail-In Voting

The Executive Order is *ultra vires*, violates the Qualifications Clause and the Elections Clause, and violates the separation of powers because it usurps the role the Constitution vests in Congress and the States. The President's power to issue this "order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution "allows the President to execute the laws, not make them."

13

*Medellin v. Texas*, 552 U.S. 491, 532 (2008). Indeed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. The President's "power to execute the laws starts and ends with the laws Congress has enacted." *Id.* at 633 (Douglas, J., concurring). The President has no constitutional or statutory power to issue the Order's directives. Under the Qualifications Clause, States set voter qualifications. The President has no role in determining who may cast a mail-in ballot. *See ITCA*, 570 U.S. at 17. Meanwhile, the Elections Clause vests the authority to set the "Times, Places and Manner of holding Elections" in states in the first instance, with Congress holding supervisory responsibility to preempt state regulations. *Id.* at 7-8. The President "does not feature at all" in this constitutional structure. *LULAC*, 2025 WL 3042704, at *3. Nor does any federal statute assign the President authority to regulate the administration of federal elections.

The Order identifies no specific constitutional or statutory provisions that authorize its component parts. It omits any mention of the Qualifications and Elections Clauses, instead identifying only one constitutional source of authority, the Guarantee Clause, without specifying which provisions of the Order the President believes that Clause justifies. The answer is none. The Supreme Court has long recognized that the "power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress." *Texas v. White*, 74 U.S. 700, 730 (1869). Under the Guarantee Clause, it "rests with congress to decide what government is the established one in a State." *Luther v. Borden*, 48 U.S. 1, 42 (1849). The Guarantee Clause grants the President no authority to impose election regulations the Constitution explicitly assigns to other actors.

Turning from constitutional to statutory authority, the Order invokes the NVRA. But the NVRA only confirms that Congress has placed responsibility for managing federal election administration *elsewhere*. For instance, the NVRA directs states to facilitate voter registration, and

prescribes specific rules for states to maintain voter registration databases. 52 U.S.C. §§ 20504-20507. The Act delegates to the EAC responsibility for the federal mail voter registration form. 52 U.S.C. § 20508(b). And the law identifies in detail what information the EAC, working together with states, may and may not require on that form. *Id.* The NVRA thus allocates responsibility for administration of federal elections between the states and an independent federal agency. It assigns no "responsibility to the President or to any other individual in the Executive Branch with the power to act unilaterally." *LULAC*, 808 F. Supp. 3d at 73.

The NVRA's list-maintenance provisions, in particular, conflict with the Order's regime. Section 8 of the NVRA assigns maintenance of voter registration lists to states, requiring each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). The Act identifies the permissible grounds for removal: a voter's request, death, change of residence, criminal conviction, or mental incapacity. *Id.* § 20507(a)(3)-(4). It prohibits removal "solely" for failure to vote, *id.* § 20507(b)(2), requiring notice to the voter and an opportunity to respond before removal based on change of residence, *id.* § 20507(d). And it bars states from conducting systematic removal programs within 90 days of a federal election. *Id.* § 20507(c)(2)(A).

Under the Order, however, a citizen lawfully registered under state law, who has never been subject to any removal proceeding under NVRA Section 8, may nonetheless be denied a mail ballot because her name does not appear on DHS's State Citizenship List or USPS's state-specific list, whether due to a database error, an incomplete federal record, a name mismatch across agencies, or any other reason. The Order thus bypasses the NVRA's procedural protections, stripping voters of their eligibility to vote by mail despite the NVRA's protections. Moreover, the Order effectively requires states to participate in a systematic removal program less than 90 days

before an election: after states send the USPS a list of mail-in voters *60 days before the election*, the Order directs USPS to send states a state-specific eligibility list that removes certain voters' mail-voting eligibility in violation of the NVRA. § 20507(c)(2)(A). So far from finding authority in the NVRA, the Order is at war with it.

The same is true for HAVA. It requires "each State, acting through the chief State election official," to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official … statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). This state-administered list "*shall* serve as the *single* system for storing and managing the official list of registered voters throughout the State," and "*shall* serve as the *official voter registration list* for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i), (viii) (emphasis added). Although HAVA authorizes data-matching to verify voter information, the verification must occur through agreements between the state's election and motor vehicle authorities, with the Commissioner of Social Security participating only to validate applicants' driver's licenses and Social Security numbers. *Id.* § 21083(a)(5)(B). "The *State* shall determine whether the information provided by an individual is sufficient to meet the requirements" of its voter registration system. *Id.* § 21083(a)(5)(A)(iii) (emphasis added).

The Order is irreconcilable with this framework. For mail voting, the Order replaces the "single," state-administered "official voter registration list" HAVA requires with a separate federal list compiled by DHS and transmitted to states by USPS. Instead of the limited, applicant-specific data-matching HAVA authorizes, the Order directs a wholesale compilation of federal citizenship and immigration records into a mega-list of every adult citizen in each state, untethered from any individual voter's application or any state registration process. Instead of the individualized state eligibility determination HAVA requires, the Order substitutes a federal diktat imposing a

16

federally administered eligibility determination, based on a hodgepodge of federal databases and implemented by USPS. At every turn, HAVA vests the authority to build, maintain, and adjudicate the accuracy of voter registration data in state officials operating under state law—and at every turn, the Order seeks to hijack that authority.

No constitutional or statutory provision empowers the President to rewrite the rules for mail voting in federal elections—all authority is to the contrary. The Order is thus *ultra vires* and violates the constitutional separation of powers, as well as the specific constitutional provisions that assign authority over voting qualifications and processes to the states in the first instance.

### 2.      The President Lacks Authority to Direct USPS Rulemaking.

The Order suffers from a second, independent defect: the President has no authority to direct the Postmaster General—or any part of the postal system—to initiate rulemaking, predetermine its results, or adopt particular policies. Yet the Order declares: "the Postmaster General is hereby directed to initiate a proposed rulemaking pursuant to 39 U.S.C. 401," and specifies what the rulemaking must conclude. Exec. Order § 3(B). That directive is *ultra vires*.

Article I, Section 8 of the Constitution grants Congress exclusive authority over the Post Office. Breaking from the historical model in which the Postmaster General served in the President's Cabinet, 56 years ago, Congress expressly removed the Postal Service from presidential control and vested policymaking authority elsewhere. The Postal Reorganization Act of 1970 ("PRA") reconstituted the postal system as the modern Postal Service, an "independent establishment of the executive branch." 39 U.S.C. § 201. Congress's goal was to insulate postal operations from political direction and to set nationwide mail policy through independent, professionally managed processes—not presidential command. *See* H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 1970 U.S.C.C.A.N. 3649 at 3654, 3661 (1970). On this point, Congress was

unequivocal: "If the American public is to have the postal service that it expects and deserves, the Post Office must be taken out of politics and politics out of the Post Office." *Id.* at 3654.

Consistent with that purpose, Congress vested USPS's powers in its 11-member Board of Governors. "The exercise of the power of the Postal Service" is expressly "directed by a Board of Governors" that reviews USPS policies and controls its expenditures. *Id.* § 202(a)(1). The Postmaster General, in turn, exercises operational authority only "as directed by the Board." 39 C.F.R. § 221.5(a)(3). Critically, the Postmaster General is not appointed by or removable by the President, but by the Board itself. 39 U.S.C. § 202(c). The President's role is limited to appointing Governors, subject to Senate confirmation and for-cause removal. *Id.* § 202(a)(1); *see Aviel v. Gor*, 2025 WL 1600446, at *2 (D.C. Cir. June 5, 2025) (Katsas, J., and Pillard, J., concurring) (explaining that, where Congress created a similar structure in which the President appointed board members who "in turn" appointed the CEO of a government body, the President had no power to remove the CEO); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 493, 509 (2010).

This structure leaves no room for binding presidential directives to the Postmaster General. The Order's instruction that the Postmaster General "initiate a proposed rulemaking" is thus not an exercise of supervisory authority; it is an attempt to reassert a form of direct presidential control that Congress deliberately eliminated. The Order's invocation of 39 U.S.C. § 401 does not alter that conclusion. Section 401 grants USPS—not the President—authority to "adopt, amend, and repeal such rules and regulations … as may be necessary in the execution of its functions." *Id.* § 401(2). That provision simply confirms that rulemaking authority resides within USPS.

Moreover, the Order fails for the additional reason that it disregards Congress's allocation of regulatory authority to a separate, independent body: the Postal Regulatory Commission ("PRC"). Under the PRA and the Postal Accountability and Enhancement Act ("PAEA"),

18

Congress assigned the PRC—not USPS and not the President—the responsibility for overseeing rulemaking and significant changes to postal services. *Id.* §§ 501-505, 3622. That allocation is enforced through mandatory procedures. When USPS proposes a change that would "generally affect service on a nationwide or substantially nationwide basis," it must first submit that proposal to the PRC and obtain an advisory opinion following a public, on-the-record proceeding. *Id.* § 3661(b)-(c). The PRC, in turn, is an independent, bipartisan establishment composed of Commissioners appointed by the President with Senate confirmation, serving fixed terms and removable only for cause. *Id.* § 502(a). Congress thus ensured that major changes to the Nation's mail system would occur only after independent review and public participation—not imposed unilaterally by any single actor.

The Order bypasses that framework. It does not direct USPS merely to *consider* whether to propose a service change through the procedures Congress prescribed. Instead, it *commands* that USPS initiate rulemaking on a fixed timeline and specifies the substantive content that the resulting rules "shall include." Exec. Order § 3(b). In doing so, the Order effectively dictates the outcome to the PRC, nullifying Congress's required procedures and making a mockery of its rulemaking process. By purporting to dictate the outcome of the policymaking and regulatory processes that Congress assigned to the Board of Governors and the PRC, the Order overrides the structure Congress established for USPS and attempts to reclaim authority Congress entrusted elsewhere more than half a century ago. The Order is *ultra vires* for this additional reason.

### B.  The Order Violates the Postal Statutes

The Order is independently unlawful because it directs USPS to take actions that exceed—and in several respects directly contravene—the authority Congress has granted it. *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173-76 (D.C. Cir. 2003). The President has no power to direct an agency to exercise authorities Congress has not granted that

19

agency. *E.g.*, *Reich,* 74 F.3d 1322. Even if the President could direct USPS to act, which he cannot, the substance of the Order would still violate the postal statutes for at least three separate and independent reasons.

*First,* The PRA defines—and limits—USPS authority. The "basic function" of USPS is to "provide postal services to bind the Nation together through … correspondence of the people." 39 U.S.C. § 101(a). Congress charged USPS with providing "prompt, reliable, and efficient services … to all communities," *id.*, and maintaining "an efficient system of collection, sorting, and delivery of the mail nationwide." *id.* § 403(b)(1). Nothing in these provisions authorizes USPS to regulate elections, determine voter eligibility, or control access to the ballot, nor do they permit USPS to perform any nonpostal service or regulatory function outside the delivery of mail. *See id.* §§ 102(5), 404(e).

The Order nonetheless attempts to transform USPS into a de facto election administrator. It directs USPS to create a "Mail-In and Absentee Participation List" of eligible voters and to refuse to transmit ballots for any individual not included on that list. Exec. Order § 3(c)(iv). But that is not a postal function. It is a determination of voter eligibility and ballot access—functions that belong to state election officials under federal and state law. Compiling voter lists, determining eligibility to vote by mail, assigning ballot identifiers, and coordinating those determinations with state officials are not ancillary to the delivery of mail; they are regulatory functions Congress has never assigned to USPS. By compelling USPS to undertake them, the Order requires the agency to operate outside its statutory domain.

Nothing in the PRA authorizes USPS to create voter-eligibility lists, establish criteria for inclusion, or condition the delivery of mail on whether a sender or recipient satisfies those criteria. To the contrary, Congress has carefully defined the limited categories of "nonmailable matter" that

20

USPS may refuse to deliver—ballots are not among them. *See* 39 U.S.C. §§ 3001-05, 3007-3018. By directing USPS to withhold otherwise lawful election mail based on a newly invented eligibility requirement, the Order effectively creates a new category of nonmailable matter from whole cloth, a step courts have rejected as *ultra vires*. *Cf. Aid Ass'n for Lutherans*, 321 F.3d at 1175-76. The Order thus compels USPS to exercise a power Congress has not granted, and to intrude into an area Congress has assigned elsewhere.

*Second,* the Order collides with the PRA's core substantive constraints on USPS's operations. Congress required USPS to provide service to the entire population and prohibited it from making "any undue or unreasonable discrimination among users of the mails." 39 U.S.C. §§ 403(a), (c). Refusing to transmit ballots from individuals who are not included on a federally fabricated list is discrimination in its most direct form. It conditions access to postal services on a user's status with respect to a government program, here, a federal voter-eligibility list, rather than on any neutral characteristic of the mail itself. That is precisely what § 403(c) forbids. USPS's authority to differentiate among users is substantively and procedurally constrained: it may not deny service absent specific statutory authorization, and the decision to deny service flows through the PRC, not another executive agency. *See GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013). The Order identifies no such statutory authorization because none exists. Congress has never permitted USPS to deny service to individuals based on their eligibility to participate in some external regulatory regime. And it has certainly not authorized USPS to deny service based on USPS's assessment of someone's eligibility to vote. The Order therefore commands the agency to engage in conduct that the PRA and PAEA affirmatively prohibit.

*Third*, the Order is unlawful because it attempts to impose sweeping nationwide changes to postal services without complying with the procedures Congress mandated in the PAEA. As

21

explained above, Congress required that any change "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" be submitted to the PRC for an advisory opinion following a public hearing. *Id.* § 3661(b)-(c). This requirement is a critical safeguard ensuring that major service changes are subject to independent review and public participation. *See, e.g.*, *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 18 (D.D.C. 2020) ("Congress clearly intended Section 3661 to require an opportunity for public participation and for independent review before the USPS implements service changes that will have a broad effect.").

The Order's directives qualify as such a "nationwide" service change with respect to mail ballots. Yet the Order does not permit USPS to determine whether to propose such a change through the statutory process. It instead mandates that USPS initiate rulemaking on a fixed timeline with a fixed outcome, in which the President decrees the resulting rules. *See* Exec. Order § 3(b) (detailing what the "proposed rulemaking *shall include*" (emphasis added)). In doing so, the Order bypasses the PRC entirely, nullifying the procedures Congress requires.

The core function of the Postal Service is to deliver the mail. The Order demotes and diverts that function, in violation of governing statutes, in derogation of state authority, and in excess of Presidential power. It steers USPS into a political role that Congress specifically sought to avoid.

### C.    The Order Violates the Privacy Act

The Executive Order violates the Privacy Act of 1974. Enacted after the Watergate scandal exposed widespread illegal surveillance of civilians by federal agencies, the Privacy Act places guardrails on the government's increasing capacity to use computers to accumulate, cross-reference, and disseminate personal data about its own citizens. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 662 (S.D.N.Y. 2025). The Act accordingly established comprehensive and detailed requirements governing how Executive Branch agencies must manage confidential individual data. The Order tramples those protections. If allowed to

stand, it would consolidate the personal records of millions of Americans from separate federal databases into a series of lists without the knowledge or consent of anyone whose data is at stake. And it would go even further, requiring DHS to disseminate its State Citizenship List to state actors operating outside the federal government. That squarely violates the Privacy Act.

### 1.    The Order Violates the Privacy Act's Disclosure Restrictions

The Privacy Act strictly circumscribes the ability of federal agencies to disclose individual data. Under Section 552a(b), no agency may disclose any "record" contained in a "system of records" to any person or to another agency, unless the individual to whom the record pertains has provided prior written consent, or one of 13 enumerated statutory exceptions applies. 5 U.S.C. § 552a(b). The Order requires two layers of unauthorized disclosure that fall outside the exceptions.

The first layer of unauthorized disclosure occurs among federal agencies. To compile the State Citizenship Lists, the Order directs DHS, acting through USCIS and in coordination with SSA, to retrieve, compare, and combine records from multiple federal systems of records: citizenship and naturalization records, SSA records, SAVE data, and information from other relevant federal databases. Exec. Order § 2(a). Each of these data transfers—from SSA to DHS, from other agencies maintaining "relevant" databases to DHS, and from one DHS component to another—constitutes a "disclosure" of records from a system of records to "another agency" under Section 552a(b). A second layer of unauthorized disclosure occurs when the Secretary transmits the State Citizenship Lists to the chief election official of each state. *Id.* This transmission discloses federal records to state officials who are not part of the federal agency system. No one has consented to having their Social Security records, immigration records, naturalization records, or other personal data pulled from separate federal databases and merged into a consolidated nationwide dossier and then divided again into citizenship lists for distribution to DHS and to state election official. The Order does not claim otherwise.

Nor do any Privacy Act exceptions authorize these disclosures. *See LULAC*, 2026 WL 252420, at *12, *53. In particular, the "routine use" exception, which Defendants will likely invoke, authorizes agencies to share records only "for a purpose which is compatible with the purpose for which it was collected." *Id.* at *12 (quoting 5 U.S.C. § 552a(a)(7)). That purpose must have been identified via a System of Records Notice ("SORN") published in the Federal Register when the relevant system of records was established or revised, and subject to a 30-day notice and comment period. *Id.* In other words, the use not only must be consistent with the reasons the data was first collected, but the agency also "cannot invent new routine uses on the fly." *Id.*

No existing SORN authorizes the State Citizenship List. The SAVE SORN, published in October 2025, established two new routine uses: Routine Use L, which authorizes disclosures to assist SAVE user agencies in determining immigration status and citizenship when a DHS-approved agreement is in place; and Routine Use M, which authorizes disclosures to entities with legal authority to oversee programs and benefits supported by SAVE. System of Records, 90 Fed. Reg. 48948, 48954 (Oct. 31, 2025). The Order sweeps far beyond these uses. Routine Use L fails because, even to the extent DHS has entered agreements with a state that could make that state a user agency in the relevant respect, Routine Use L simply permits DHS to respond to requests querying the citizenship status of "individual" program beneficiaries. *Id.* It does not even approach the categorically broader use of compiling, maintaining, and transmitting statewide citizenship lists. Similarly, Routine Use M authorizes disclosures only for "auditing of program requirements" for programs "supported by SAVE." *Id.* Affirmatively aggregating state-by-state citizenship lists for election administration and ballot distribution far eclipses that narrow purpose.

SSA's Numident SORN is equally inapt. That SORN, published in November 2025, added Routine Use 49, which permits SSA disclosures of citizenship and immigration information to

24

DHS pursuant to 8 U.S.C. § 1373(a). System of Records, 90 Fed. Reg. 50879, 50883 (Nov. 12, 2025). The SORN makes clear, however, that SSA "use[s] information in this system to assign SSNs" and "for other claims purposes related to establishing benefit entitlement." *Id.* at 50880. That is far afield of using SSA data to underwrite a nationwide voter-eligibility database. Routine Use 49 itself applies, like Routine Use L, only to the sharing of "individual" information on "citizenship and immigration status." *Id.* at 50883. It does not permit the wholesale export of the database for use in a system of record for arbitrating mail voting eligibility. Moreover, the Numident SORN limits even the specific categories of disclosures it does permit to disclosure "[t]o DHS." *Id.* It never authorizes DHS to pass that data on to state election officials.

The SAVE and Numident SORNs also collapse under the Privacy Act's compatibility requirement. The compatibility test requires a concrete relationship between the agency's original purpose in collecting the information and the purpose of the proposed disclosure. *Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). It exists to prevent personal data collected by one agency for a stated purpose from being repurposed and distributed by another entity for unrelated ends. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989). That is precisely what the Order would do here.

The source databases here were each created and maintained for purposes that do not even contemplate the compilation of state election rolls. SAVE was designed to help agencies verify immigration status for purposes of determining eligibility for federal, state, and local benefits. Numident collects citizenship information as an incident to administering Social Security numbers and benefits. Citizenship and naturalization records are maintained to document the conferral of citizenship through the immigration process. None of these systems were designed or maintained for the purpose of generating state-by-state lists of eligible voters, and none has been used as such.

25

The Order would summon agency data to create voter eligibility lists that are anything but routine; they cannot be implemented without violating the Privacy Act's disclosure requirements.

### 2.    The Order Violates the Privacy Act's Accuracy Requirements

The Order also violates the Privacy Act's accuracy mandates. The Privacy Act requires agencies to maintain records used in making determinations about individuals with a level of accuracy, relevance, timeliness, and completeness that ensures fairness to the individual. 5 U.S.C. § 552a(e)(5). Agencies must also make reasonable efforts to ensure these standards are met before disseminating records about an individual to any person outside the agency. *Id.* § 552a(e)(6). The State Citizenship Lists cannot satisfy either of these requirements, because the source databases are profoundly unreliable for the purpose of determining who is a citizen, who is of voting age, and who resides in a given state.

The State Citizenship Lists would rely on SAVE data, which had prolific and well-documented accuracy problems. *See* Declaration of Michael, Ex. 2, at 8-10, 12-13, 15, 19, 23-24 ("McDonald Decl."). Up to hundreds of thousands of immigrant adults who derived citizenship as child through their naturalized parents likely are missing from SAVE data. *Id.* at 10. For example, the North Carolina State Board of Elections found after its 2016 election audit that a SAVE match was "not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as noncitizens in SAVE."[8] A shocking "97.6% of persons identified by the [State Department of Motor Vehicles] as noncitizens, in fact were citizens," and "about 75% of individuals who later provided proof of citizenship continued to be listed as

---

[8] *Post-Election Audit Report: General Election 2016*, N.C. State Bd. of Elections (Apr. 21 2017), App. at 2, https://perma.cc/WH8U-RZ4B.

noncitizens in the SAVE system." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021). New citizens who naturalize a few days before a federal Election Day or, in some states with same-day voter registration in 2026, on Election Day may not be reflected in SAVE data. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 955 (D. Ariz. 2024) ("USCIS also explained that SAVE may not immediately return updated naturalization records if an individual is naturalized prior to a weekend or a federal holiday" and that "one or two-day delays are possible" for reflecting a person's naturalization record after their naturalization ceremony in SAVE).[9]

Even the government recognizes the problem. The head of USCIS's verification division acknowledged that the system cannot consistently identify noncitizens: "we're giving a tool to these folks to say, 'Hey, if we can verify citizenship, great, you're good. If we can't, now it's up to you to determine whether to let this person on your voter rolls.'"[10] And DHS itself has admitted that SAVE may share inaccurate information with registered agencies due to misspelled names, transposed numbers, or incomplete information.[11]

SSA data is equally flawed for these purposes. SSA data captures citizenship information only at the moment an individual applies for a Social Security Number. *See* McDonald Decl., Ex. 2, at 18. When that interaction occurs before the person naturalizes, as it often does, SSA does not automatically update their citizenship status afterward. *See id.* As SSA itself has explained, "the

---

[9] *See also* Norfolk/Newport News Naturalization, *United States District Court Eastern District of Virginia,* www.vaed.uscourts.gov/norfolknewport-news-naturalization (indicating a naturalization ceremony will be held on Election Day, November 3, 2026).

[10] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9XYRYH.

[11] DHS Privacy Impact Assessment for SAVE, DHS Ref. No. DHS/USCIS/PIA-006(d), at 19 (Oct. 31, 2025)), https://perma.cc/4YV7-24NU.

citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA" and "SSA's records do not provide definitive information about an individual's citizenship status."[12] There "is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments," so many do not.[13] Thus, a 2006 audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as noncitizens "because the individuals had become U.S. citizens after obtaining their SSN but had not updated their records with SSA."[14]

The scope of SSA's data compounds the problem. SSA did not begin consistently collecting citizenship information until 1981, meaning it lacks citizenship data for U.S.-born citizens older than their mid-forties—nearly 150 million Americans.[15] Similarly, the SAVE system does not accurately identify derived citizens who obtained citizenship under the Child Citizenship Act of 2000, 8 U.S.C. § 1431. McDonald Decl., Ex. 2, at 10. These individuals have no reason to interact with the SSA or DHS until they apply for Social Security benefits or apply for a passport, so their SAVE or SSA records would not accurately identify their status as derived citizens. *Id.* at 10. Given these limitations, "approximately 1/4" of SSA's records "do not have an indication of

---

[12] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[13] *Id.*; *see also* McDonald Decl., Ex. 2, at 14-15.

[14] SSA Off. Of the Inspector Gen., Cong. Resp. Rep. No. A-08-0626100, *Accuracy of the Social Security Administration's Numident File* (Dec. 18, 2006), https://perma.cc/5G2J-FF4V; *see also* McDonald Decl., Ex. 2, at 18-19.

[15] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr., *supra* note 12; *see also* McDonald Decl., Ex. 2, at 7.

citizenship present."[16] The SSA databases also do not include information on members of certain religious groups, including Anabaptists, Mennonites, and the Amish, that did not provide information to SSA before 2004. McDonald Decl., Ex. 2, at 7.

Finally, even if these databases contained the right information, the Order is silent as to how DHS would resolve inconsistent records reflecting citizenship status across federal databases. *Id.* at 21-25. Even if databases were consistent with the right information, the Order's 60-day transmission requirement would still guarantee staleness. *Id.* at 16-17. The Order requires that the State Citizenship Lists be transmitted to states at least 60 days before each federal election. Exec. Order § 2(a). Citizens who naturalize, move, or change their names during this 60-day window will predictably be absent from or misidentified on the lists. *Id.* at 17. These voters will necessarily be excluded even if they are legally registered to vote by mail under applicable state law. The State Citizenship Lists are guaranteed to be plagued by garbage in, garbage out database inaccuracies because the data they rely on are known to be inaccurate, incomplete, and would be stale even in a best-case scenario. The Privacy Act prohibits the dissemination of such data for just that reason.

### 3.      Plaintiffs Have a Cause of Action to Assert Privacy Act Violations

Plaintiffs have a cause of action to assert their Privacy Act claims for three separate and independent reasons. ***First,*** Plaintiffs have a cause of action under the APA because their Privacy Act allegations are predicated on unlawful data sharing that has already taken place. As Judge Kollar-Kotelly previously explained, an APA claim can proceed to the extent that DHS and SSA have *already* "shared data across agencies" as part of their citizenship-verification efforts in the context of efforts to ascertain voter eligibility. *LULAC*, 2026 WL 252420, at *53. In *LULAC*, data

---

[16] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr., *supra* note 15; *see also* McDonald Decl., Ex. 2, at 8.

was shared when SSA "began allowing DHS to access and query a Social Security database known as 'Numident' to help 'verify individuals' citizenship and immigration status for voter verification and other authorized inquiries.'" *Id.* at *14. Judge Kollar-Kotelly concluded that such an interagency disclosure of "sensitive records … is 'final' because it clearly represents the 'consummation' of the agency's decision-making process and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* at *53 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Plaintiffs' APA claim here relates to the compilation and misuse of the same data at issue in *LULAC*, just retooled for a new use, so final agency action is already well established.

*Second,* to the extent Defendants claim the Order is somehow not predicated on the data-sharing arrangement that is already in effect, Plaintiffs have an *ultra vires* cause of action because the Order illegally directs DHS and SSA to violate the Privacy Act anew. *See Reich*, 74 F.3d at 1331-32. This is not a case where a "statute entrusts a specific decision to the President" and plaintiffs are claiming an abuse of discretion. *Id.* at 1331. Quite the opposite. The "claim instead is that the presidential action—not … contemplated by Congress—independently violates [a federal] statute that delegates no authority to the President." *Id.* at 1331-32. That supplies a non-statutory cause of action.

*Third,* and in all events, the Order's mandatory direction to DHS to create State Citizenship Lists itself amounts to final agency action under the required "pragmatic" test. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). The Order directs that DHS "*shall* take appropriate action to compile and transmit" a State Citizenship List, which "*shall* be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." Exec. Order § 2(a) (emphasis added). The Order does not direct DHS to study the pros and cons of using

various databases to develop State Citizenship Lists and prepare a suitable recommendation. It instead definitively directs DHS to create the lists, using specific databases, on a specific schedule. The practical effect of this directive is "no mystery." *LULAC*, 780 F. Supp. 3d at 184. It requires DHS to use sensitive data collected for other uses to build and maintain eligibility lists, share those lists with states, and ultimately create the infrastructure for USPS's enrollment database—all in violation of the Privacy Act for the reasons already explained. Plaintiffs thus have an APA cause of action to seek an injunction preventing DHS from putting SSA data to a new unlawful use.

### D.    Plaintiffs Can Bring Their Claims Under Article III

At the preliminary injunction stage, Plaintiffs need only demonstrate they "likely" have standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Plaintiffs exceed this requirement in two ways. First, each Plaintiff, as a nonprofit, public-interest organization, has standing "to challenge practices that directly interfere with their core activities." *LULAC*, 808 F. Supp. 3d at 55. Second, NAACP and Common Cause have associational standing on behalf of their members. *Id.* at 55-56.

### 1.    Plaintiffs Have Organizational Standing

Plaintiffs have organizational standing because the Order imposes a "concrete and demonstrable injury" on their "core activities." *LULAC*, 2026 WL 252420, at *21 (quoting *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020)).

*NAACP.* The NAACP, the nation's oldest and largest civil rights organization, has organizational standing to challenge the Order. Its core mission includes empowering Black voters and other voters of color through voter registration, education, and election protection. Declaration of Tyler Sterling ¶¶ 4, 8 ("Sterling Decl."). To accomplish that mission, the NAACP conducts voter registration drives across the country; educates voters about the registration and voting process; and assists voters navigating election procedures. *Id.* ¶¶ 8-12. Each year, the NAACP helps thousands of voters in every state register to vote, and vote by mail. *See id.* ¶¶ 6, 8-12.

31

The Order directly impairs these activities by superimposing an entirely new federal apparatus that will determine which voters receive mail ballots. Because the Order directs USPS to deliver mail ballots only to voters enrolled on a "Mail-In and Absentee Participation List," which may be informed by DHS's State Citizenship List, the NAACP's current voter education materials explaining how to request and receive a mail ballot will become inaccurate when the rulemaking takes effect. The NAACP must develop new educational materials explaining an untested and ambiguous federal eligibility-verification system, distribute those materials, and retrain its staff, volunteers, and local chapter leaders on the new process. *Id.* ¶ 16. These materials must account for each state's unique mail-in ballot laws, further straining resources. *Id.* ¶ 17. With its multiple, ambiguously linked lists, its reliance on flawed, inaccurate data, and its unrealistic deadlines that implementing agencies lack the technical capacity to meet, the Executive Order is a prescription for chaos. As organizations dedicated to helping voters, the Plaintiffs will need to navigate this chaos, explain it to voters, and enable them to vote. Because facilitating voter participation is essential to its core mission, the obstructive chaos the Executive Order engenders will force the NAACP to divert resources it would otherwise devote to its regular voter registration drives, get-out-the-vote campaigns, and election protection operations. *Id.* ¶ 16.

The NAACP also has a long history combatting discriminatory list maintenance and voter registration purges, especially when list maintenance is conducted based on incomplete, outdated, or inaccurate data. The State Citizenship Lists pose a significant threat to several communities the NAACP supports because voters' exclusions from lists will impact their registration status. *Id.* ¶¶ 20-21. States, like Alaska and Texas, that have entered into agreements to share their state voter lists with the Department of Justice, commit to "clean[ing] … by remov[al of] ineligible voters" within 45 days of notice from the DOJ of "any issues, insufficiencies, inadequacies, deficiencies,

32

anomalies, or concerns."[17] The NAACP operates in these states, Sterling Decl. ¶ 5, with members and volunteers conducting voter registration and outreach. The history of prior efforts to purge voter lists based on this federal information demonstrates the high likelihood that many NAACP members and the voters they support, will be excluded from the State Citizenship Lists. *Id.* ¶¶ 20-21. The NAACP will have to expend resources to help its members and other voters confirm their eligibility, verify their information across federal databases and the State Citizenship Lists, and obtain and provide birth certificates, passports, and other documentation, to correct misinformation obstructing their vote. *See id.* ¶¶ 16-17.

These needless impositions impede the NAACP's mission by disrupting voter registration, education, and assistance, which includes ensuring ballots are actually delivered. The Order forces the NAACP to divert resources from those programs to address the confusion and harm it creates. *Id.* ¶¶ 8, 14-21. This Court has already concluded that the NAACP had standing to challenge a related executive order because it impaired one of the organization's "core business activities: registering eligible voters." *LULAC*, 808 F. Supp. 3d at 57 (cleaned up). The same is true here.

***Common Cause.*** The Common Cause Plaintiffs likewise have organizational standing. Common Cause is a nonpartisan organization dedicated to strengthening democratic institutions and ensuring that every eligible citizen can participate in the political process. Declaration of Elena Nunez. ¶¶ 8, 11 ("Nunez Decl."). Common Cause's core activities include voter registration assistance, education, and advocacy for accessible voting systems, including mail-in voting, which Common Cause has long promoted to expand democratic participation. *Id.* ¶¶ 10, 12.

---

[17] *See* Confidential Memorandum of Understanding between Civil Rights Division, U.S. Dept. of Just., and Off. of Tex. Sec'y of State (2025), https://perma.cc/PDU2-M36L.

The Order impairs Common Cause's programs in substantially the same ways it impairs the NAACP's. Common Cause has invested significant resources in educating voters about their options for voting by mail and in advocating for state and federal policies that make mail voting accessible. *See, e.g.*, *id.* ¶¶ 14-15. Under the Order, Common Cause will be forced to overhaul its voter education materials to account for the new federal eligibility-verification system, retrain staff and volunteers, and redirect resources from its regular voter mobilization, voter assistance, and election protection activities toward educating the public about the Order's byzantine requirements and assisting voters who are affected by them. *Id.* ¶ 16. The organization will also be forced to redirect resources from promoting accessible mail voting to helping individual voters determine whether they appear on a federal eligibility list and, if not, how to correct the problem. *Id.* ¶¶ 14-16. Like the NAACP, Common Cause will face significant burdens in managing the chaos that the Order will produce and ensuring it does not impede voters' legitimate access to the ballot.

Similarly, Common Cause must expend additional resources to support voters confused or impacted by State Citizenship Lists. *Id.* ¶¶ 16, 18. Common Cause is dedicated to creating open, honest, and accountable government, and is thus principally concerned with public trust in data gathered, stored, and disseminated by the federal government. *See id.* ¶ 8. Members and voters impacted by bad data will require additional time and resources to support them through registration issues, document procurement, and data protections. *See id.* ¶¶ 18-19; Declaration of Kyle Giddings ¶ 18 ("Giddings Decl."). Many voters, e.g., incarcerated voters, *see* Declaration of Adrian Lomax ¶¶ 8-9 ("Lomax Decl."), would not learn of these issues, obtain necessary documentation, and cure problems impacting registration or mail-in ballot delivery without the support of Common Cause and similar organizations. *See* Giddings Decl. ¶¶ 13, 18.

34

Further, the Order's enforcement provisions will strain Common Cause's resources and chill its activities by threatening investigations and prosecutions of individuals and entities that engage in mail-in ballot distribution for individuals subsequently deemed ineligible by the federal government. Nunez Decl. ¶ 20. Common Cause fulfills its voter registration and voter outreach activities largely through its staff and volunteers. *Id.* ¶ 11. When individuals fill out a registration form, they attest to their own eligibility. Verifying the eligibility of every person the organizations' volunteers and staff support in the voter registration and mail-in process is not only unnecessary in the absence of rampant voter fraud, *see id.* ¶ 20, it is also infeasible for many volunteers and election officials, *see* Giddings Decl. ¶ 12. Even if volunteers and staff were hypothetically able to verify voter eligibility, that would not guarantee that the voter appears on federal lists drawn from error-filled databased, exposing volunteers and staff to the risk of erroneous investigation and prosecution. Common Cause staff and volunteers in some states are *prohibited* from assessing voter eligibility. For example, Texas criminal law bars Volunteer Deputy Registrars ("VDRs") from evaluating whether an applicant is eligible to vote, potentially placing Common Cause volunteers at risk if they attempt to comply with the Order's directives and likewise at risk if they do not.[18] Furthermore, Common Cause staff and volunteers from diverse backgrounds are more likely to be targeted for such investigations and prosecutions because of the communities they support. *See* Giddings Decl. ¶¶ 15-16 (highlighting that civic participation of individuals with criminal histories is chilled when threatened with such prosecution). The Order's enforcement provisions will chill Common Cause's efforts to recruit volunteers and support voters.

---

[18] *See also* Tex. Election Code § 13.043; Texas Secretary of State Elections Division, Texas Volunteer Deputy Registrar Training (2025), https://perma.cc/PP4S-3QF5 (instructing VDRs "not [to] attempt to determine if a person is legally allowed to vote," because "[i]t is the voter registrar's responsibility to determine if the person is or is not eligible").

These injuries undercut Common Cause's mission by forcing it to navigate a tortuous federal eligibility system; address resulting confusion, voter exclusion, and chilled volunteer activities; and expend resources adapting to an unfamiliar, underinclusive voting process.

***Black Voters Matter.*** The BVM Plaintiffs also have organizational standing. BVM's core mission focuses on voter registration, voter education, and civic engagement, including encouraging mail voting as a safe and reliable way to participate. Declaration of Clifford Albright ¶ 6-8, 13 ("Albright Decl."). Like the NAACP and Common Cause, the Order directly interferes with BVM's ability to advance its mission and engage with voters. *Id.* ¶¶ 6, 16-21. BVM must now expend significant resources to respond to the Order, specifically within Black communities and other communities of color that rely on voting by mail, including rural, college, elderly voters, and voters impacted by weather and natural disasters. *Id.* ¶ 17. Notably, BVM is already preparing to assist voters with name-matching issues to ensure that people are still able to vote if they are improperly excluded from the lists mentioned in the Order. *See id.* ¶ 18. Similarly, to meet its historical mission, BVM is increasing staff time and volunteer outreach outside of its planned programming to update its state-specific materials for voters and volunteers. *Id.* ¶ 20. The Order's enforcement provisions likewise chill BVM's activities for volunteers and staff who cannot verify voter eligibility for every voter the organization supports. *Id.* ¶ 21. BVM must expend additional resources to disentangle the Order's seemingly contradictory directive to investigate eligibility despite state prohibitions on doing so, creating significant confusion and chaos for the organization, volunteers, and voters. *Id.* ¶¶ 21-22.

These harms undermine BVM's core mission by injecting uncertainty into established mail-voting processes that BVM's constituents have come to rely on and trust. To protect the

progress they have made and continue moving forward, BVM has redirected time and resources to confront the Order and the confusion it has caused BVM and the communities it serves.

### 2. Plaintiffs Have Associational Standing

The NAACP and Common Cause also have associational standing to sue on behalf of their members. An organization may assert associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests the organization seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *LULAC*, 808 F. Supp. 3d at 55-56 (alterations omitted) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The interests Plaintiffs seek to protect here are germane to their organizational purposes for the reasons just discussed, and no individual plaintiff is needed. NAACP and Common Cause members would also have standing in their own right.

The NAACP's membership includes registered voters in all 50 states who intend to vote by mail in the 2026 elections. Sterling Decl. ¶¶ 5-6; Declaration of Alphonso Braggs ¶ 15 ("Braggs Decl."). Common Cause's membership of nearly one million extends to every state and the District of Columbia and includes many voters who rely on mail-in voting to participate in federal elections. *See* Nunez Decl. ¶¶ 5, 14-15; Declaration of Catherine Balan ¶ 8 ("Balan Decl."); Declaration of Jill Howard ¶¶ 5-9 ("Howard Decl."); Giddings Decl. ¶ 4; Declaration of Freedman ¶¶ 5-8 ("Freedman Decl."). These members face concrete and imminent injury from the Order.

Most directly, members who are registered to vote under state law and who would otherwise receive a mail ballot face the prospect of being denied one. The Order directs USPS not to deliver mail-in or absentee ballots to individuals who have not been "enrolled on a State-specific list" with USPS. Exec. Order § 3(b)(iii). NAACP and Common Cause members include mail-in ballot voters who are likely to be erroneously excluded from these USPS lists or who will register

37

to vote or requested a mail-in ballot close enough to Election Day that lists cannot be timely updated. Many swaths of their members are implicated, including first time voters, college students with recently updated addresses, overseas and military personnel, eligible incarcerated individuals, hospitalized or disabled voters, and voters experiencing inclement weather or natural disasters. *See e.g.*, Sterling Decl. ¶¶ 5, 12; Freedman Decl. ¶ 8; Balan Decl. ¶¶ 5-6; Howard Decl. ¶ 5-8.

This risk is not speculative. It is well documented that the federal databases the Order directs the USPS to rely on are not useable or reliable for verifying citizenship. McDonald Decl., Ex. 2, at 4-5. Therefore, the "State Citizenship List" contemplated by the Order would be constructed from databases that are concededly incomplete, outdated, and prone to significant error, including the systematic misidentification of U.S. citizens as noncitizens and the failure to capture large categories of citizens altogether. *Id.* Attempting to verify such a flawed State Citizenship List against state voter lists will generate compounding waves of errors and false results. *Id.* at 21-25.  For example, voters who changed their names likely have different names on state voter lists compared to federal databases. *Id.* at 13-14.  This is an issue particularly likely to impact married women who have changed their name but not updated their SSA information.

For Plaintiffs and their members, these issues are very real. Many of the NAACP and Common Cause's members are susceptible to data-matching errors within federal databases because they are either naturalized and derived citizens, young voters who are 17 years old but will be 18 years old by the federal General Election, voters who will be moving around, and voters with name-change or name mismatch issues. *See* Sterling Decl. ¶ 12; Nunez Decl. ¶¶ 9, 19; Braggs Decl. ¶¶ 8-13. And many members lack the time, physical capacity, or resources to obtain documentation to cure issues related to inaccurate data or wrongful exclusions from State

Citizenship Lists. Sterling Decl. ¶ 20; Giddings Decl. ¶ 13; Lomax Decl. ¶¶ 8-10; Braggs Decl. ¶¶ 12, 17-19; Howard Decl. ¶ 8.

Even members who ultimately do appear on the relevant lists face cognizable injury. The Order introduces a new layer of uncertainty into the voting process: members who have voted by mail for years without incident will not know, until the lists are compiled and transmitted, whether they will continue to receive and send a ballot. Braggs Decl. ¶ 16; Freeman Decl. ¶ 11. Members who discover they have been omitted must spend time and resources correcting records through procedures the Order directs DHS to establish—assuming they discover the omission in time or at all. Braggs Decl. ¶ 17-19; Freeman Decl. ¶ 12. Confused or deterred by the Order's requirements, members may forgo voting, or at least voting by mail, altogether. Balan Decl. ¶ 15.

The injury is particularly acute for members in states that conduct elections primarily or entirely by mail, where the Order's restrictions on USPS ballot delivery would affect the entire electorate. Braggs Decl. ¶ 7; Freeman Decl. ¶ 5; Balan Decl. ¶ 6; Giddings Decl. ¶ 7; *see also* Lomax Decl. ¶ 4. And the harm is imminent: the Order directs DHS to establish the infrastructure for the State Citizenship List within 90 days, and directs USPS to conduct rulemaking within 60 days, with a final rule within 120 days—a timeline that would take effect before the November 2026 midterm elections. A subset of NAACP and Common Cause members in states with universal mail voting, like Hawaii, Oregon, Washington, Colorado, will certainly be excluded from receiving mail ballots under the Order. *See* Braggs Decl. ¶ 2; Freeman Decl. ¶ 2; Giddings Decl. ¶ 4; Balan Decl. ¶ 9.

Plaintiffs' members are further injured by the Order's Privacy Act violations. As court after court has concluded, disclosing "personal information to unauthorized individuals" is "enough" to establish "a concrete, actual harm" for purposes of Article III standing. *Am. Fed'n of Lab. & Cong.*

39

*of Indus. Organizations v. DOL*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025); *see id.* at 71 (collecting cases); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 786 F. Supp. 3d 647, 678-83 (S.D.N.Y. 2025) (similar). That is because the disclosures reveal Plaintiffs' members' "sensitive personal information within the agency systems," akin to the "tort of intrusion upon seclusion." *Am. Fed'n of Lab.*, 778 F. Supp. 3d at *70. Beyond the privacy invasions, the Order's directives for how to use this information are virtually guaranteed to deprive Plaintiffs' members of their ability to vote by mail, McDonald Decl., Ex. 2, at 4-5, an injury directly related to Plaintiffs' core organizational purposes.

The Order's enforcement provisions reinforce these injuries by directing the Attorney General to prioritize prosecution of state election officials who issue ballots to individuals not on the federal eligibility lists. The central point of this directive is to coerce state officials into adopting more restrictive ballot-distribution practices—out of caution, confusion, or fear of prosecution. NAACP and Common Cause members who are eligible voters will bear the consequences of such fear-driven responses. A state election official who is uncertain whether a voter appears on the State Citizenship List has every incentive to withhold a ballot rather than risk criminal liability, and the resulting harm will fall directly on voters. Additionally, because many members are also volunteers for their organizations or serve in election staff capacities, the injury to NAACP and Common Cause members who are targeted and chilled by the Order's enforcement provisions is significant. Giddings Decl ¶¶ 15-17; *see also* Nunez Decl. ¶ 20.

### 3. Plaintiffs' Claims Are Ripe

The Order directs federal agencies to take immediate actions that are adversely impacting Plaintiffs. Section 2 requires federal agencies to compile State Citizenship Lists to verify who may receive mail ballots in federal elections. Section 3 requires the Postmaster General to engage in rulemaking that will make it the superintendent of federal mail-voting eligibility in the United

States. Sections 4 and 5 require DHS, SSA, the Postmaster General, and the Attorney General to implement and enforce the Order. Because the Order makes implementing its specific policy goals mandatory, it is ripe for review now.

*LULAC* is again instructive. Defendants there argued that the challenge to the DPOC Executive Order was speculative, that the record required further factual development, and that plaintiffs' claims were unripe. *LULAC*, 780 F. Supp. 3d at 184. Defendants contended that the DPOC Order merely suggested that the EAC require DPOC, which the EAC could adopt or reject in rulemaking, and that such rulemaking would take time and had not even begun. *Id.* The Court rejected those arguments, finding that the plain text of the executive order mandated action by the EAC ("it is hereby *ordered*… the [EAC] *shall take* appropriate action to *require*…documentary proof of citizenship on the Federal Form"), and that the EAC was required to act within a specified number of days and had to abide by certain requirements in its action. *Id*. The Court concluded that because the Order did not merely authorize the EAC to change the Federal Form, or suggest that it consider doing so, but instead purported to require the EAC to amend the Form and dictate the precise contents of the new rule, the plaintiffs' injury was "sufficiently imminent." *Id*. at 185. Courts in this District regularly adjudicate claims challenging the implementation of executive orders at similar stages. *NPR v. Trump*, 2026 WL 877434, at *17-20 (D.D.C. Mar. 31, 2026); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 40-41 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 147 (D.D.C. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 111-12 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 148-49 (D.D.C. 2025).

The ripeness requirements are readily met here for the same reasons, because the Order directs mandatory agency action and dictates specific, preordained results. Far from a mere

suggestion or authorization to act, the Order mandates that certain actions must be taken, in a specified number of days, and prescribes the processes that must be followed in carrying out those actions. The Order directs that DHS "*shall*" take appropriate action to compile and transmit a "State Citizenship List," that list "*shall*" be derived from federal records, state lists "*shall*" be updated and transmitted "no fewer than 60 days before each regulatory scheduled Federal election," and DHS "*shall*" establish procedures for updating the list. Exec. Order § 2 (emphasis added). The Order further instructs that the Postmaster General "is *hereby directed*" to initiate proposed rulemaking "*within 60 days*" to establish standards for adjudicating mail-in and absentee ballots transmitted through USPS, and prescribes what the "rulemaking *shall include*," again setting a transmission deadline of "60 days before the election," and directing that any final rule must issue within "120 days." *Id.* § 3 (emphasis added). The Order then directs that DHS, SSA, the Postmaster General, and the Secretary of Commerce "*shall* coordinate" to implement "all relevant aspects" of the Order. *Id.* § 4 (emphasis added). Finally, the Attorney General "*shall* take all lawful steps" to enforce the Order. *Id.* § 5 (emphasis added).

Plaintiffs challenge the Order here in the precise same posture as the Executive Order in *LULAC*. Like the Executive Order there, "there is no mystery about what" the Order "purports to require or whether [the Order] purports to require it." *LULAC*, 780 F. Supp. 3d at 184. The Order "dictates a particular outcome and leaves no uncertainty by prescribing the substance of [the requirement] it purports to mandate." *Id.* at 185. No further factual development or administrative process is needed to understand precisely what the Order seeks and why it violates numerous provisions of the Constitution and federal law. Plaintiffs' challenge to the Order handily satisfies the ripeness requirements. "The Court need not wait." *Wilmer*, 784 F. Supp. 3d at 147.

**II.     THE REMAINING PRELIMINARY INJUNCTION FACTORS HEAVILY FAVOR AN INJUNCTION**

### A.     Plaintiffs are Suffering Irreparable Harm

The D.C. Circuit has made clear that voter registration organizations suffer irreparable harm when the government takes action that makes it "more difficult for [them] to accomplish their primary mission of registering voters." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see LULAC*, 780 F. Supp. 3d at 200-01. The harm is irreparable because voter registration is time-bound: once the registration deadlines pass, "there can be no do over and no redress." *Id.* (quoting *League of Women Voters of N.C. v. North Carolina*, 768 F.3d 224, 247 (4th Cir. 2014)). Voter registration organizations must respond to changes in voter registration, eligibility, and vote-casting rules immediately.

The Order will make it substantially more difficult for Plaintiffs to accomplish their primary missions of registering voters, educating them about how to cast a ballot, and ensuring that the ballots they cast are delivered and counted. Plaintiffs' existing voter education programs, which explain the current process for requesting and receiving a mail ballot under state law, will be rendered inaccurate. Their volunteers are trained to help voters navigate the existing procedures and will be unable to advise voters about the new federal eligibility-verification system. Their ability to assure voters that registering to vote will result in receiving a ballot will be undermined.

All of these harms are imminent and inevitable. The Order will immediately thwart Plaintiffs' core organizational missions. Plaintiffs will be forced to immediately divert resources from planned voter registration activities to assess the Order's impact, retrain staff and volunteers, and reformulate educational materials. That is a resource-intensive task, and every hour spent on that work is an hour not spent registering voters for the 2026 midterm elections. And all of this is happening now: The Order's breakneck timeline—60 days to initiate the USPS rulemaking, 90

days to establish the citizenship list infrastructure, 120 days to finalize the USPS rule—is calibrated to take effect before November 2026. Plaintiffs cannot wait for the Order to be fully implemented before preparing for its impact; by then, registration deadlines will have passed, the eve of the election will have arrived, and their harms will be complete. This "Court can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their" organizational missions—relief is necessary now. *See LULAC*, 780 F. Supp. 3d at 201.

### B.        The Balance of Equities and Public Interest Favor Issuing an Injunction

The balance of equities and public interest tip decisively in Plaintiffs' favor. The Order is patently unlawful, stands to disenfranchise countless eligible voters, contradicts the goals of Congress expressed in the NVRA, and rests on a completely unsubstantiated foundation.

*First*, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *LULAC*, 780 F. Supp. 3d at 202 (quoting *Newby*, 838 F.3d at 12). The constitutional and statutory authorities that control this case could not be clearer in depriving the President of authority to issue the Order, giving plaintiffs an exceptionally strong likelihood of success on the merits. That weighs heavily in plaintiffs' favor on the equities because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (cleaned up). By the same token, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Id.* (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

*Second*, the "public has a 'strong interest in exercising the fundamental political right to vote,'" and "the public interest therefore favors permitting as many qualified voters to vote as possible." *Newby*, 838 F.3d at 12 (first quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); then quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *see LULAC*, 780 F. Supp.

3d at 202. The Order nonetheless threatens to disenfranchise eligible voters by conditioning mail-ballot delivery on inclusion in a federal database that was never designed for this purpose and that will inevitably contain errors. In *Newby*, the D.C. Circuit found that a documentary proof-of-citizenship requirement on the Federal Form "abridg[ed] ... the right to vote" for tens of thousands of registrants in Kansas alone. 838 F.3d at 13. This Order's restrictions on mail-ballot delivery have the potential to affect far more voters in far more states. "Because the public interest favors permitting as many qualified voters to vote as possible, this fact weighs strongly in favor of awarding an injunction." *LULAC*, 780 F. Supp. 3d at 203 (cleaned up).

*Third*, an injunction would vindicate the express goals of Congress articulated in the NVRA. The NVRA emphasized the importance of "increase[ing] the number of eligible citizens who register to vote in elections for Federal office." *Newby*, 838 F.3d at 13. Any "substantially diminished ability" of organizations like Plaintiffs to register voters and assist them in casting ballots "runs contrary to what Congress, in enacting the NVRA, declared to be the public interest." *Id.*; *see LULAC*, 780 F. Supp. 3d at 203.

*Fourth*, although there may be a general "public interest in preserving the integrity of the election process," there is "precious little record evidence" that the Order serves that interest. *LULAC*, 780 F. Supp. 3d at 203 (cleaned up). The evidence of mail-voting fraud is scant in general, undermining any claim that the existing system "permit[s] fraudulent registration by noncitizens." *Newby*, 838 F.3d at 13-14. And the Executive Order itself identifies no reason to believe otherwise. The Administration's countervailing interest is accordingly minimal.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from implementing the "Ensuring Citizenship Verification and Integrity in Federal Elections" Order.

Dated: April 17, 2026

By    /s/ John A. Freedman

John A. Freedman (Bar No. 453075)
Jeremy C. Karpatkin (Bar No. 980263)
Elisabeth S. Theodore (Bar No. 1021029)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)*
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Ave., Suite 1400
Seattle, WA 98101
Telephone: +1 206.208.0108
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
Telephone: +1 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org

46

jdavis@lawyerscommittee.org
gthomas@lawyerscommitte.org
*Attorneys for Plaintiff*

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215
Telephone: + 202.463.2940
*Attorneys for NAACP*

*\*Motion for Pro Hac Vice or Court Admission
Forthcoming*

47