**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC; DCCC; DEMOCRATIC NATIONAL COMMITTEE; DEMOCRATIC GOVERNORS ASSOCIATION; U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER; and U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES,

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; U.S. DEPARTMENT OF JUSTICE; U.S. POSTAL SERVICE; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; SOCIAL SECURITY ADMINISTRATION; U.S. DEPARTMENT OF COMMERCE; PAMELA BONDI, in her official capacity as U.S. Attorney General; DAVID STEINER, in his official capacity as U.S. Postmaster General; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; JOSEPH B. EDLOW, in his official capacity as Director of the U.S. Citizenship and Immigration Services; FRANK J. BISIGNANO, in his official capacity as Commissioner of Social Security Administration; and HOWARD LUTNICK, in his official capacity as Secretary of the Department of Commerce,

*Defendants.*

Case Number 1:26-cv-01114

**DECLARATION OF MICHAEL P. MCDONALD**

**DECLARATION OF MICHAEL P. MCDONALD**

I, Michael P. McDonald, declare and state as follows:

1. I am over the age of 18, and a United States citizen. I know the following facts of my own personal knowledge, and if called upon as a witness I could and would testify competently thereto.

2. I am a Professor of Political Science at the University of Florida. I am widely regarded as a leading expert on United States elections. I have been asked by the NAACP Plaintiffs in this case to offer expert opinions regarding the Executive Order issued March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" ("EO"). My background and experience qualify me to offer these opinions, as set out below.

3. My curriculum vitae, which summarizes my education, experience and publications is attached hereto as Exhibit 1.

4. As set forth in my curriculum vitae, I have published extensively on elections in peer-reviewed journals, and I produce what many consider to be the most reliable turnout rates – the percentage of eligible voters who cast a ballot – of the nation and the states. I have published peer-reviewed articles specifically on the reliability of voter registration files and matching algorithms as applied to voter registration files. I am co-author of a book concerning how limitations of computers to accurately store numeric data can lead to erroneous statistical analyses. I have testified widely in cases related to voter registration, documentary proof of citizenship and the use of diverse federal and state databases to assess voter registration records.

5. In my career, I have worked directly with state and local election officials in varying capacities. I led a project to audit the placement of registered voters within districts for

the Virginia Department of Elections and the Colorado Secretary of State, using a methodology published in the top political science methods journal. These projects required my team to interface with local election officials to resolve issues we identified. The Department of Defense's Voting Assistant Program hired me to interview local election officials about their procedures to process military and overseas civilian ballots. I served on a National Academy of Sciences advisory group to the U.S. Census Bureau on the Bureau's data disclosure avoidance policies. In an ongoing project, a research team I lead collected precinct boundaries from state and local election officials for every locality in the country. My team has, on occasion, created electronic precinct maps for local election officials where no electronic maps existed. These data have been used in numerous court cases, including the recent *Allen v. Milligan* case heard before the U.S. Supreme Court. In addition, I have worked for the United States Election Assistance Commission, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

6. Also as set forth in my curriculum vitae, I have testified or submitted expert reports or declarations in numerous election related cases. I was an expert witness for plaintiffs in three cases specifically related to voter registration and documentary proof of citizenship (DPOC). In 2016, I was an expert witness for plaintiffs who successfully challenged Kansas' DPOC requirements. In 2023, I was an expert witness for plaintiffs who successfully challenged, in part, Arizona's DPOC requirements; and in 2018 for plaintiffs who obtained a preliminary injunction in a challenge to Georgia's DPOC requirements. In 2026, I was an expert witness for plaintiffs challenging Virginia's mass purge of voters alleged to be non-citizens.

7. I have been an expert witness in other litigation challenging requirements related to voter registration. I was an expert witness in 2016 for plaintiffs who successfully challenged a

Georgia policy that required the names and other information supplied by prospective registrants on their voter registration applications to match exactly as it appears in other databases. In 2007, I was an expert witness for plaintiffs who successfully challenged a similar Washington State policy that required an exact match of personal identification information across databases. In 2019, I was an expert witness in plaintiffs' partially successful challenge to Georgia's voter purging practices.

8. Within the last four years, in addition to the Arizona and Virginia cases described above, I was an expert witness in litigation involving third-party voter registration organizations in Florida, and for the City of Buffalo, NY defendant in a challenge to their city council districts. These matters are all set forth in my curriculum vitae.

9. In addition, I have an extensive publishing and consulting record and experience testifying in redistricting and other election-related cases. For example, when I was employed previously at George Mason University, I consulted for Virginia Gov. Bob McDonnell's Independent Bipartisan Advisory Redistricting Commission. The Ohio Apportionment Board enlisted me to draw state legislative districts at the order from the Ohio Supreme Court. I have also served as an expert witness for plaintiffs in two redistricting lawsuits.

10. I have been asked by NAACP Plaintiffs to opine about the reliability of information available from the federal Social Security Administration ("SSA") and Department of Homeland Security's ("DHS") Systematic Alien Verification for Entitlements ("SAVE") databases, specifically the reliability of citizenship and personal identifying information recorded in these federal databases. I have been asked to opine about whether or what potential database matching issues may arise when government officials attempt to match these databases to state voter registration databases and to U.S. Postal Service databases.

11. I am being compensated at the rate of $450 per hour for my work in this case. My compensation is not contingent on the substance of my opinions or the outcome of this case.

12. As a result of my review, I conclude that the State Citizenship List the EO seeks to create rely upon incomplete and inaccurate federal databases. Accordingly, the State Citizenship Lists are likely to not include millions of U.S. citizens; to have a high error rate due to incomplete information, mis-matching of records and data errors; to exclude entire categories of U.S. citizens whose records are not included in these databases, and fail to contain up to date information on individuals' citizenship status. Matching the State Citizenship List to state voter registration lists will pose additional challenges that increase the likely errors in identifying non-citizens.

13. My preliminary report, containing a complete statement of the opinions I have reached to date, is attached as Exhibit 2 to this Declaration. Exhibit 2 (and its attachment) also contains the facts and data I considered in reaching these opinions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of April 2026 at Gainesville, Florida.

Michael McDonald

# EXHIBIT 1

# Dr. Michael P. McDonald

Professor, University of Florida
Department of Political Science
222 Anderson Hall
P.O. Box 117325
Gainesville, FL 32611

Office: 352-273-2371
Fax: 352-392-8127
Email: michael.mcdonald@ufl.edu

## Education

Post-Doctoral Fellow. Harvard University. August 1998 – August 1999.
Ph.D. Political Science. University of California, San Diego. February, 1999.
BS Economics. California Institute of Technology. June, 1989.

## Awards

Union of Concerned Scientists. 2022. Defender of Democracy.

Florida. League of Women Voters. 2022. King Democracy Award.

University of Florida Term Professorship. 2019-2020.

Brown Democracy Medal, McCourtney Institute for Democracy at Penn State University. 2018. Positive impact on democracy for the Public Mapping Project.

Tides Pizzigati Prize. 2013. Public interest software for DistrictBuilder.

Strata Innovation Award. 2012. Data Used for Social Impact for DistrictBuilder.

American Political Science Association, Information and Technology Politics Section. 2012. Software of the Year for DistrictBuilder.

*Politico*. 2011. Top Ten Political Innovations for DistrictBuilder.

GovFresh. 2011. 2nd Place, Best Use of Open Source for DistrictBuilder.

Virginia Senate. 2010. Commendation for Virginia Redistricting Competition.

American Political Science Association, Information and Technology Politics Section. 2009. Software of the Year for BARD.

# Publications

***Books***

Michael P. McDonald. 2022. *From Pandemic to Insurrection: Voting in the 2020 Presidential Election*. Berlin, Germany: De Gruyter.

Michael P. McDonald and Micah Altman. 2018. *The Public Mapping Project: How Public Participation Can Revolutionize Redistricting*. Ithaca, NY: Cornell University Press.

Michael P. McDonald and John Samples, eds. 2006. *The Marketplace of Democracy: Electoral Competition and American Politics*. Washington DC: Brookings Press.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2003. *Numerical Issues in Statistical Computing for the Social Scientist*. Hoboken, NJ: Wiley and Sons.

***Peer-Reviewed Articles***

Maxwell Clarke, Michael P. McDonald, and Daniel A. Smith. Forthcoming. "Florida's Democracy Deserts: Patterns of Contestation and Cancellation of Florida Local Elections." *Election Law Journal*. https://doi.org/10.1177/15331296251378357

Elena Puzikova and Michael P. McDonald. 2025. "No Home, No Voter Registration: A Case Study of Homeless Registration in Wake County, North Carolina." *Journal of Election Administration Research and Practice* 4(2) 52-65.

Amos, Brian, Steven Gerontakis, and Michael McDonald. 2024. "United States Precinct Boundaries and Statewide Partisan Election Results." *Scientific Data* 11, 1173. https://doi.org/10.1038/s41597-024-04024-2

Michael P. McDonald, Enrijeta Shino, Daniel Smith, Payton Lussier, and Danielle Dietz. 2024. "Campus Voting During the COVID-19 Pandemic." *American Politics Research*. Online First. https://doi.org/10.1177/1532673X241230

Michael P. McDonald, Juliana K. Mucci, Enrijeta Shino, and Daniel A. Smith. 2023. "Mail Voting and Voter Turnout." *Election Law Journal* 23(1): 1-18. https://doi.org/10.1089/elj.2022.0078.

Alejandro Trelles, Micah Altman, Eric Magar, and Michael P. McDonald. 2023. "No Accountability without Transparency and Consistency: Evaluating Mexico's Redistricting-by-Formula." *Election Law Journal* 22(1): 80-99.

Matthew DeBell, Jon A. Krosnick, Katie Gera, David Yeager, and Michael McDonald. 2020. "The Turnout Gap in Surveys: Explanations and Solutions." *Sociological Methods and Research* 49(4):1133-1162. doi:10.1177/0049124118769085.

Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

Enrijeta Shino, Michael Martinez, Michael P. McDonald, and Daniel Smith. 2020. "Verifying Voter Registration Records: Part of Special Symposium on Election Sciences." *American Politics Research* 48(6): 677-81.

Tyler Culberson, Suzanne Robbins, and Michael P. McDonald. 2019. "Small Donors in Congressional Elections." *American Politics Research* 47(5): 970-99.

Micah Altman and Michael P. McDonald. 2017. "Redistricting by Formula: The Case of Ohio." *American Politics Research* 46(1): 103-31.

Micah Altman, Eric Magar, Michael P. McDonald, and Alejandro Trelles. 2017. "Measuring Partisan Bias in a Multi-Party Setting: the Case of Mexico." *Political Geography* 57(1): 1-12.

Brian Amos, Michael P. McDonald, and Russell Watkins. 2017. "When Boundaries Collide: Constructing a Database of Election and Census Data." *Public Opinion Quarterly* 81(S1): 385-400.

Trelles, Alejandro, Micah Altman, Eric Magar, and Michael P. McDonald. 2016. "Datos abiertos, transparencia y redistritación en México." *Política y Gobierno* 23(2): 331-364.

Michael P. McDonald. 2014. "Calculating Presidential Vote for Legislative Districts." *State Politics and Policy Quarterly* 14(2): 196-204.

Micah Altman and Michael P. McDonald. 2014. "Public Participation GIS: The Case of Redistricting." *Proceedings of the 47th Annual Hawaii International Conference on System Sciences*, Computer Society Press.

Michael P. McDonald and Caroline Tolbert. 2012. "Perceptions vs. Actual Exposure to Electoral Competition and Political Participation." *Public Opinion Quarterly* 76(3): 538-54.

Michael P. McDonald and Matthew Thornburg. 2012. "Interview Mode Effects: The Case of Supplementing Exit Polls with Early Voter Phone Surveys." *Public Opinion Quarterly* 76(2): 326-63.

Micah Altman and Michael P. McDonald. 2011. "BARD: Better Automated Redistricting." *Journal of Statistical Software* 42(5): 1-28.

Michael P. McDonald. 2011. "The 2010 Election: Signs and Portents for Redistricting." *PS: Political Science and Politics* 44(2): 311-15.

Richard Engstrom and Michael P. McDonald. 2011. "The Political Scientist as Expert Witness." *PS: Political Science and Politics* 44(2): 285-89.

Michael P. McDonald. 2008. "Portable Voter Registration." *Political Behavior* 30(4): 491–501.

Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.

Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.

Michael P. McDonald. 2007. "Regulating Redistricting." *PS: Political Science and Politics* 40(4): 675-9.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2007. "Accuracy: Tools for Accurate and Reliable Statistical Computing." *Journal of Statistical Software* 21(1).

David Lublin and Michael P. McDonald. 2006. "Is It Time to Draw the Line? The Impact of Redistricting on Competition in State House Elections." *Election Law Journal* 5(2): 144-57.

Michael P. McDonald. 2006. "Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 91-94.

Michael P. McDonald. 2006. "Re-Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 99-102.

Micah Altman, Karin MacDonald, and Michael P. McDonald. 2005. "From Crayons to Computers: The Evolution of Computer Use in Redistricting." *Social Science Computing Review* 23(2): 334-46.

Michael P. McDonald. 2004. "A Comparative Analysis of U.S. State Redistricting Institutions." *State Politics and Policy Quarterly* 4(4): 371-96.

Michael P. McDonald. 2003. "On the Over-Report Bias of the National Election Study." *Political Analysis* 11(2): 180-86.

Micah Altman and Michael P. McDonald. 2003. "Replication with Attention to Numerical Accuracy." *Political Analysis* 11(3): 302-7.

Michael P. McDonald. 2002. "The Turnout Rate among Eligible Voters for U.S. States, 1980-2000." *State Politics and Policy Quarterly* 2(2): 199-212.

Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-74. Reprinted 2006 in *Classic Ideas and Current Issues in American Government*, Bose and DiIulio, eds.

Micah Altman and Michael P. McDonald. 2001. "Choosing Reliable Statistical Software." *PS: Political Science and Politics*. 43(3): 681-7.

Bernard Grofman, William Koetzel, Michael P. McDonald, and Thomas Brunell. 2000. "A New Look at Ticket Splitting: The Comparative Midpoints Model." *Journal of Politics* 62(1): 24-50.

Samuel Kernell and Michael P. McDonald. 1999. "Congress and America's Political Development: Political Strategy and the Transformation of the Post Office from Patronage to Service." *American Journal of Political Science* 43(3): 792-811.

***Law Review Articles***

Michael P. McDonald. 2019-2020. "The Predominance Test: A Judicially Manageable Compactness Standard for Redistricting." *Yale Law Review*, *Forum* 129.

Micah Altman and Michael P. McDonald. 2013. "A Half-Century of Virginia Redistricting Battles: Shifting from Rural Malapportionment to Voting Rights and Participation." *University of Richmond Law Review* 47: 771-831.

Micah Altman and Michael P. McDonald. 2012. "Redistricting Principles for the 21st Century." *Case Western Law Review* 62(4): 1179-1204.

Michael P. McDonald and Matthew Thornburg. 2010. "Registering the Youth: Preregistration Programs." *New York University Journal of Legislation and Public Policy* 13(3): 551-72.

Micah Altman and Michael P. McDonald. 2010. "The Promise and Perils of Computers in Redistricting." *Duke J. Constitutional Law and Public Policy* 5: 69-112.

Justin Levitt and Michael P. McDonald. 2007. "Taking the 'Re' out of Redistricting: State Constitutional Provisions on Redistricting Timing." *Georgetown Law Review* 95(4): 1247-86.

***Peer-Reviewed Book Chapters***

Michael P. McDonald. 2014. "Contextual Income Inequality and Political Behavior." in *Political Trust and Disenchantment with Politics: Comparative Perspectives from around the Globe*, Christina Eder, Ingvill Mochmann, Markus Quandt eds. Leiden, Netherlands: Brill Publishers.

Michael P. McDonald. 2010. "Income Inequality and Participation in the United States." in *United in Diversity? Comparing Social Models in European and America*, Jens Alber and Neil Gilbert, eds. New York, NY: Oxford University Press.

Michael P. McDonald. 2008. "Redistricting and the Decline of Competitive Congressional Districts." in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles*, Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, eds. New York, NY: Russell Sage Publications.

Michael P. McDonald. 2008. "Reforming Redistricting." in *Democracy in the States: Experiments in Elections Reform*, Bruce Cain, Todd Donovan, and Caroline Tolbert, eds. Washington, DC: Brookings Press.

Michael P. McDonald. 2006. "Who's Covered? Section 4 Coverage Formula and Bailout" in *The Future of the Voting Rights Act*, David Epstein, Richard H. Pildes, Rodolfo O. de la Garza, and Sharyn O'Halloran, eds. New York, NY: Russell Sage Publications.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2004. "A Comparison of the Numerical Properties of EI Methods" in *Ecological Inference: New Methods and Strategies*, Gary King, Ori Rosen, and Martin Tanner, eds. New York, NY: Cambridge University Press.

***Contributing Book Editor***

Michael P. McDonald, data editor, for Rich Cohen, et al. 2023 *The Almanac of American Politics*. National Journal: Washington, DC.

***Non-Peer-Reviewed Book Chapters***

Altman, Micah and Michael P. McDonald. Forthcoming. "Electoral Data in the U.S. --Uses, Operations, Requirements, and Vulnerabilities. In Michael Ritter (ed.), *Rising Above Conspiracy: Understanding Elections, Election Administration, and Democracy in America and Abroad in the 2020s*. De Gruyter.

Michael P. McDonald, Caroline Tolbert, and Kellen Gracey. 2026. "Are Partisans Akin to Sports Fans? Competition, Perception of. Competition, and Mobilizing Participation," in *Reconsidering Parties and Partisanship*, Jeremy Pope and Chris Karpowitz, eds. Ann Arbor, MI: University of Michigan Press.

Michael P. McDonald. 2020. "Redistricting and Differential Privacy." In *2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop*. Washington, DC: The National Academies Press. https://doi.org/10.17226/25978.

Michael P. McDonald. 2018. "Challenges and Opportunities in Collecting Election Administration Data" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Michael P. McDonald. 2018. "History and Promise and Blending Survey Data with Government Records on Turnout" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Micah Altman and Michael P. McDonald. 2015. "Redistricting and Polarization" in *American Gridlock: The Sources, Character, and Impact of Political Polarization*, James Thurber and Antonie Yoshinaka, eds. Cambridge.

Micah Altman and Michael P. McDonald. 2015. "Florida Congressional Redistricting." *Jigsaw Politics in the Sunshine State*, Seth McKee, ed. Gainesville, FL: University Press of Florida.

Michael P. McDonald. 2013. "State Legislative Districting." *Guide to State Politics and Policy*, Richard Niemi and Joshua Dyck, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2013. "Democracy in American Elections" in *Imperfect Democracies: The Democracy Deficit in Canada and the United States*, Richard Simeon and Patti Lenard, eds. Vancouver, BC: University of British Columbia Press.

Micah Altman and Michael P. McDonald. 2012. "Technology for Public Participation in Redistricting" in *Redistricting in the West*, Gary Moncrief, ed. Lanham, MD: Lexington Press.

Michael P. McDonald and Thomas Schaller. 2011. "Voter Mobilization in the 2008 Presidential Election" in *The Change Election: Money, Mobilization and Persuasion in the 2008 Federal Elections*, David Magleby, ed. Philadelphia, PA: Temple University Press. (previously published as a Pew Charitable Trusts monograph).

Michael P. McDonald. 2011. "Congressional Redistricting" in *Oxford Handbook of Congress*, Frances Lee and Eric Schickler, eds. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2011. "Voter Turnout: Eligibility Has Its Benefits" in *Controversies in Voting Behavior*, 2nd Edition, Richard G. Niemi, Herbert F. Weisberg, and David Kimball, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2010. "In Support of Non-Partisan Redistricting." in *Debating Reform: Conflicting Perspectives on How to Mend American Government and Politics*, Richard Ellis and Mike Nelson, eds. Washington, DC: Congressional Quarterly Press.

Michael P. McDonald. 2010. "American Voter Turnout in Historical Perspective." in *Oxford Handbook of American Elections and Political Behavior*, Jan Leighley, ed. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2009. "Mechanical Effects of Duverger's Law in the USA." in *Duverger's Law of Plurality Voting: The Logic of Party Competition in Canada, India, the United Kingdom and the United States*, Bernard Grofman, André Blais and Shaun Bowler, eds. New York, NY: Springer.

Michael P. McDonald. 2008. "United States Redistricting: A Comparative Look at the 50 States." in *Redistricting in Comparative Perspective*, Lisa Handley and Bernard Grofman, eds. Oxford, U.K.: Oxford University Press.

Michael P. McDonald and Matthew Thornburg. 2008. "State and Local Redistricting" in *Political Encyclopedia of U.S. States and Regions*, Donald Haider-Markel, ed. New York, NY: MTM Publishing.

Michael P. McDonald. 2006. "Redistricting and District Competition" in *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds. Washington, DC: Brookings Press.

Micah Altman, Karin Mac Donald, and Michael P. McDonald. 2005. "Pushbutton Gerrymanders? How Computing Has Changed Redistricting" in *Party Lines: Competition, Partisanship and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds. Washington, DC: Brookings Press.

Bruce Cain, Karin Mac Donald, and Michael P. McDonald. 2005. "From Equality to Fairness: The Path of Political Reform Since Baker v Carr" in *Party Lines: Competition, Partisanship*

*and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds. Washington, DC: Brookings Press.

Michael P. McDonald. 2005. "Validity, Data Sources" in *Encyclopedia of Social Measurement, Vol. 3.* Kimberly Kempf-Leonard, ed. San Deigo, CA: Elsevier Inc.

Michael P. McDonald. 2005. "Reporting Bias" in *Polling in America: An Encyclopedia of Public Opinion*. Benjamin Radcliff and Samuel Best, eds. Westport, CT: Greenwood Press.

***Other Non-Peer Reviewed Academic Publications (Book Reviews, Invited Articles, etc.)***

Michael P. McDonald and Thessalia Merivaki. 2015. "Voter Participation in Presidential Nomination Contests." *The Forum* 13(4).

Michael P. McDonald. 2011. "Redistricting Developments of the Last Decade—and What's on the Table in This One." *Election Law Journal* 10(3): 313-318.

Michael P. McDonald and Chrisopher Z. Mooney. 2011. "'Pracademics': Mixing an Academic Career with Practical Politics." *PS: Political Science and Politics* 44(2): 251-53.

Michael P. McDonald. 2011. "Voter Turnout in the 2010 Midterm Election." *The Forum* 8(4).

Michael P. McDonald. 2011. "*Redistricting: The Most Political Activity in America* by Charles S. Bullock III (book review)." *American Review of Politics* (Fall 2010/Spring 2011).

Michael P. McDonald. 2009. "'A Magnificent Catastrophe' Retold by Edward Larson (book review)." *The Election Law Journal* 8(3): 234-47.

Michael P. McDonald. 2008. "The Return of the Voter: Voter Turnout in the 2008 Presidential Election." *The Forum* 6(4).

Michael P. McDonald. 2006. "American Voter Turnout: An Institutional Perspective by David Hill (book review)." *Political Science Quarterly* 121(3): 516-7.

Michael P. McDonald. 2006. "Rocking the House: Competition and Turnout in the 2006 Midterm Election." *The Forum* 4(3).

Micah Altman and Michael P. McDonald. 2006. "How to Set a Random Clock (Remarks on Earnest 2006)." *PS: Political Science and Politics* 39(4): 795.

Michael P. McDonald. 2004. "Up, Up, and Away! Turnout in the 2004 Presidential Election." *The Forum* 2(4).

Michael P. McDonald. 2004. "Drawing the Line on the 2004 Congressional Elections." *Legislative Studies Section Newsletter* (Fall): 14-18.

Michael P. McDonald. 2004. "2001: A Redistricting Odyssey." *State Politics and Policy* Quarterly 4(4): 369-370.

Micah Altman and Michael P. McDonald. 1999. "Resources for Testing and Enhancement of Statistical Software" in *The Political Methodologist* 9(1).

Michael P. McDonald. 1999. "Representational Theories of the Polarization of the House of Representatives" in *Legislative Studies Section Newsletter, Extension of Remarks* 22(2): 8-10.

Michael P. McDonald. 2003. "California Recall Voting: Nuggets of California Gold for Political Behavior." The *Forum* 1(4).

***Reports***

Michael P. McDonald. 2009. "Voter Preregistration Programs." Fairfax, VA: George Mason University.

Michael P. McDonald. 2009. *Midwest Mapping Project*. Fairfax, VA: George Mason University.

Michael P. McDonald and Matthew Thornburg. 2008. "The 2008 Virginia Election Administration Survey." Fairfax, VA: George Mason University.

Kimball Brace and Michael P. McDonald. 2005. "Report to the Election Assistance Commission on the Election Day Survey." Sept. 27, 2005.

***Opinion Editorials***

Sharon Austin, Michael McDonald and Daniel Smith. "We work for the people of Florida. That's why we can't let the University of Florida silence us on a voting rights law." *The Washington Post*. Nov. 3, 2021.

Michael P. McDonald. 2020. "Trump and polarization drove record turnout. So did mail voting, which should be universal." *USA Today*. Online: Nov. 4, 2020. Print: Nov. 6, 2020, p. 7A.

Michael P. McDonald. 2020. "Record-setting early votes helped Democrats pinpoint others likely to support Biden." *Washington Post*. Nov. 3, 2020.

Michael P. McDonald. 2020. "Trump Will Drive Extraordinary Voter Turnout in 2020—If States Can Get It Together." *Newsweek*. May 20, 2020.

Michael P. McDonald. 2019. "Let 16-year-olds vote for L.A. school board." *Los Angeles Times*. May 8, 2019.

Michael P. McDonald. 2018. "I agree with Donald Trump, we should have voter ID. Here's how and why." *USA Today*. Jan. 15, 2018.

Michael P. McDonald. 2017. "The Russians are hacking. Luckily the Trump voter fraud commission isn't in charge." *USA Today*. Sept. 23, 2017.

Michael P. McDonald. 2016. "Better Hope the Election is Not Close." *USA Today*. Nov. 2, 2016.

Michael P. McDonald. 2016. "Blame Government for Voting Crisis." *USA Today*. March 24, 2016.

Michael P. McDonald, Peter Licari and Lia Merivaki. 2015. "The Big Cost of Using Big Data in Elections." *The Washington Post*. Oct. 18, 2015.

Michael P. McDonald 2013. "Truths and Uncertainties that Surround the 2014 Midterms." *The Hill*. November 5, 2013.

Michael P. McDonald. 2011. "The Shape of Things to Come: New Software May Help the Public Have a Crucial Redrawing of Voting Districts." *Sojouners*. April 2011: 11-12.

Micah Altman and Michael P. McDonald. 2011. "Computers: Redistricting Super Hero or Evil Mastermind?" *Campaigns and Elections Magazine*. January 2011.

Michael P. McDonald. 2010. "Who Voted in 2010, and Why It Matters for 2012." *AOL News*. Nov. 4, 2010.

Michael P. McDonald and Seth McKee. "The Revenge of the Moderates." *The Politico*. Oct. 10, 2010.

Michael P. McDonald and Micah Altman. 2010. "Pulling Back the Curtain on Redistricting." *The Washington Post*. July 9, 2010.

Michael P. McDonald. 2008. "This May Be the Election of the Century." *The Politico*. Sept. 9, 2008.

Michael P. McDonald. 2008. "Super Tuesday Turned into a Super Flop." *Roll Call*. Feb. 11, 2008.

Michael P. McDonald. 2006. "5 Myths About Turning Out the Vote." *The Washington Post*. Oct. 29, 2006, p. B3.

Michael P. McDonald. 2006. "Supreme Court Lets the Politicians Run Wild." *Roll Call*. June 29, 2006.

Michael P. McDonald. 2006. "Re-Redistricting Redux." *The American Prospect*. March 6, 2006.

Michael P. McDonald and Kimball Brace. "EAC Survey Sheds Light on Election Administration." *Roll Call*. Oct. 27, 2005.

Michael P. McDonald. 2004. "The Numbers Prove that 2004 May Signal More Voter Interest." *Milwaukee Journal Sentinel*. Milwaukee, WI.

Michael P. McDonald. 2004. "Democracy in America?" *La Vanguardia*. Barcelona, Spain.

Michael P. McDonald. 2003. "Enhancing Democracy in Virginia." *Connection Newspapers*. March 24.

Michael P. McDonald. 2001. "Piecing Together the Illinois Redistricting Puzzle." *Illinois Issues*. March, 2001.

Samuel Popkin and Michael P. McDonald. 2000. "Turnout's Not as Bad as You Think." *The Washington Post*. Nov. 5: B-1.

Samuel Popkin and Michael P. McDonald. 1998. "Who Votes? A Comparison of NES, CPS, and VNS Polls." *Democratic Leadership Council Bluebook*. Sept., 1998.

***Data and Software Packages***

Brian Amos, Steve Gerontakis, and Michael P. McDonald. Precinct boundaries and election results. Available at: https://dataverse.harvard.edu/dataverse/electionscience

Micah Altman, Michael P. McDonald, and Azavea. 2012. "DistrictBuilder." Open source software to enable public participation in redistricting. Source code available at Github. Project website, http://www.districtbuilder.org.

Micah Altman and Michael P. McDonald. 2007. "BARD: Better Automated Redistricting." R package available through CRAN. Source code available at Sourceforge.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2004. "Accuracy: Tools for testing and improving accuracy of statistical results." R package available through CRAN.

# Grants and Contracts

Local Election Data Collection. ($300,000). Houston Endowment. Three-year renewal of Houston Endowment grant to collect local election data.

Dow Jones Corporation. ($10,000). Provided 2022 election data for analysis by the *Wall Street Journal*.

Local Election Data Collection Pilot Study. ($83,000). Houston Endowment. Explored the feasibility of collecting local election data to compare Houston MSA turnout to other MSAs.

Columbia Books. ($12,000). Produced data and maps for inclusion in the *2022 Almanac of American Politics*.

Gainesville City Commission. ($40,000). 2021-2022. Held public hearings and assisted city in drawing city commission districts.

Florida League of Women Voters. ($20,000). 2021-2022. Produced report on potential constitutional infirmities of adopted state legislative districts.

Rejected Mail Ballots. ($4,720). Andrew Goodman Foundation. Analysis of rejected mail ballots within selected states during the 2020 general election.

Election Data Administrative Data Research Facility. ($843,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Virginia Election Data. ($6,500) Produced election data for *The Washington Post*'s 2019 Virginia state elections coverage.

Audit of Assignment of Virginia Registered Voters to Districts. ($154,000). Work for the Virginia Department of Elections to audit the assignment of registered voters to districts.

National Voter File. ($125,000) Alfred P. Sloan Foundation grant to pilot the collection of a national voter file for academic and non-partisan purposes.

Pilot Study for Election Data Administrative Data Research Facility. ($125,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Improving Integrity of Voter File Addresses. ($20,000) Colorado Secretary of State support to develop methods to improve voter file addresses.

Fabricating Precinct Boundaries. ($17,000). MIT Election Science and Data Lab support to explore fabricating precinct boundaries from geocoded voter files.

UF Informatics Post-Doc Top-Off Award. 2017. ($16,000). Funding from the UF Informatics Institute to provide additional post-doc funding in support of Hewlett Foundation grant.

U.S. Election Project. 2016. ($50,000). Hewlett Foundation support for U.S. Election Project Activities.

UF Informatics Institute Seed Fund Award. 2016. ($48,000). Project funded by the UF Informatics Institute to explore the reliability of Florida's voter registration file.

Election Forum. 2016. ($20,000). Project funded by the Pew Charitable Trusts for an election forum held at the University of Florida.

Survey of Voter File Accessibility. 2016. ($1,650). Contract from the Institute for Money in State Politics to survey costs and accessibility of states' voter files.

Florida Election Reform. 2015. ($13,000). Project funded by Democracy Fund for an election reform forum held in Tallahassee, FL. Pew Charitable Trusts independently provided travel support for some speakers.

New York Redistricting. 2011. ($379,000). Project funded by the Sloan Foundation to provide for public redistricting in New York and continued software development.

Citizen Redistricting Education, Software Supplemental. 2011. ($50,000). Project funded by Joyce Foundation to provide continued redistricting software development for use by advocacy groups in six Midwestern states.

National Redistricting Reform Coordination. 2009-10. ($100,000). With Thomas Mann and Norman Ornstein. Project funded by Joyce Foundation to support coordination of national redistricting reform efforts by the Brookings Institution and the American Enterprise Institute.

Citizen Mapping Project. 2009-10. ($124,000 & $98,000). With Micah Altman, Thomas Mann, and Norman Ornstein. Project funded by the Alfred P. Sloan Foundation. An award to George Mason University enables development of software that, essentially, permits on-line redistricting through commonly used internet mapping programs. A second award to the Brookings Institution and American Enterprise Institute provides organizational support, including the convening of an advisory board.

Citizen Redistricting Education. 2010. ($104,000). Project funded by the Joyce Foundation. Provides for redistricting education forums in five Midwestern state capitals in 2010 and other continuing education efforts.

Pre-Registration Programs. 2008-9. ($86,000). Project funded by the Pew Charitable Trusts' Make Voting Work Initiative to examine pre-registration programs (voter registration for persons under age 18) in Florida and Hawaii.

Sound Redistricting Reform. 2006-9. ($405,000). Project funded by the Joyce Foundation, conducted jointly with the Brennan Center for Justice at NYU to investigate impacts of redistricting reform in Midwestern states.

Electoral Competition Project. 2005-6. ($200,000). Project funded by The Armstrong Foundation, the Carnegie Corporation of New York, the JEHT Foundation, The Joyce Foundation, The Kerr Foundation, Inc., and anonymous donors. Jointly conducted by the Brookings Institution and Cato Institute to investigate the state of electoral competition in the United States.

George Mason University Provost Summer Research Grant. 2004. ($5,000).

ICPSR Data Document Initiative. 1999. Awarded beta test grant. Member, advisory committee on creation of electronic codebook standards.

# Academic Experience

*Courses Taught:* Election Data Science (graduate and undergraduate), Election Law and Voting Rights, Public Opinion and Voting Behavior, Parties and Campaigns (graduate and undergraduate), Comparative Electoral Institutions, Introduction to American Politics, American Politics Graduate Field Seminar, Congress, Legislative Politics, Research Methods (undergraduate), Advanced Research Methods (graduate), Freshman Seminar: Topics in Race and Gender Policies, and Legislative Staff Internship Program.

<u>University of Florida</u>

- Professor. June 2020 – Present.
- Associate Professor. August 2014 – June 2020.

<u>George Mason University</u>

- Associate Professor. May 2007 – May, 2014.
- Assistant Professor. Aug 2002 – May, 2007.

<u>The Brookings Institution</u>

- Non-Resident Senior Fellow. January 2006 – June 2016.
- Visiting Fellow. June 2004 – December 2006.

<u>University of Illinois, Springfield.</u> Assistant Professor. Aug 2000 – June 2002. Joint appointment in Political Studies Department and Legislative Studies Center.

<u>Vanderbilt University.</u> Assistant Professor. Aug 1999 – Aug 2000.

<u>Harvard-MIT Data Center.</u> Post-Doctoral Research Fellow. Sept. 1998 – Aug 1999. Developed Virtual Data Center, a web-based data sharing system for academics. Maintained Record of American Democracy (U.S. precinct-level election data).

<u>University of California-San Diego</u>

- Assistant to the Director for University of California, Washington DC program. Sept 1997 – June 1998.
- Instructor for research methods seminar for UCSD Washington interns.
- Visiting Assistant Professor. Spring Quarter 1997.
- Visiting Assistant Professor. Summer Session, Aug 1996 and Aug 1997.
- Teaching Assistant/Grader. Aug 1991 – March 1997.

# Professional Service

- *National Academy of Sciences,* Member, Program Committee for "Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations." 2019-2021.
- *Election Science Reform and Administration Conference.* 2020. Lead conference organizer.
- *Non-Profit Voter Engagement Network,* Member, Advisory Board. 2007 – present.
- *National States Geographic Information Council - Geo-Enabled Elections,* Member, Circle of Advisors. 2018 – 2022.
- *Election Sciences Conference-in-a-conference at the 207 Southern Political Science Association Conference.* Organizer. 2016.
- *Overseas Vote Foundation*, Member, Advisory Board. 2005 – 2013.
- *National Capital Area Political Science Association,* Member, Council, 2010 – 2012.
- *State Politics and Policy Quarterly*, Editorial Board Member 2004-2011.
- *Virginia Public Access Project*, Member, Board of Directors. 2004 – 2006.
- *Fairfax County School Board Adult and Community Education Advisory Committee*, Member. 2004 – 2005.
- *State Politics and Policy Quarterly*, Guest Editor. Dec 2004 issue.

# Related Professional Experience

<u>Media Consultant</u>

- Edison Media Research/Mitofsky International. Nov. 2022; Nov. 2020; Nov. 2018; Nov. 2004; Nov. 2006; Feb. 2008; Nov. 2008. Worked national exit polling organization's Decision Desk.
- Associated Press. Nov. 2016 and Nov. 2010. Worked Decision Desk.
- ABC News. Nov. 2002. Worked Decision Desk.
- NBC News. Aug 1996. Analyzed polls during the Republican National Convention.

<u>Redistricting/Elections Consultant.</u>

- *Virginia Coalition for Immigrant Rights, et al.* v. *Sean Beals*, Case No. 1:24-cv-01778 (PTG/WBP) (E.D. Va 2026)
- *Georgia Coalition for the Peoples' Agenda, Inc. et al.* v. *Brad Raffensperger*, 347 F. Supp. 3d 1251, 1263-64 (N.D. Ga. 2018); Civil Action No. 1:18-cv-04727-ELR, Dkt. No. 241 (N.D. Ga. Apr. 11, 2024).
- *Mi Familia Vota and Voto Latino* v. *Hobbs, et al.* And Consolidated Cases. Case No. 2:22-cv-00509-SRB (Lead Case) (D. Ariz.).
- *Our City Action Buffalo, Inc.*, et al. v. *Common Council of the City of Buffalo*, et al. 2022. Index No. 812652/2022.
- Independent Map Drawer. Ohio Redistricting Commission. 2022. Drew Ohio state legislative districts for Ohio Redistricting Commission, as ordered by Ohio Supreme Court.

- Expert Witness. 2021-2022. *Florida Rising* v. *Lee*. Case No. 4:21-cv-201-MW-MJF (N.D. FL)
- Consultant. 2022. New Jersey Congressional Redistricting Commission.
- Expert Witness. 2018-2021. *Georgia Coalition for the Peoples' Agenda, Inc. et. al v. Kemp*. No. 1:18-cv-04727-ELR (N.D. Ga.).
- Expert Witness. *League of Women Voters of South Carolina v. Marci Andino*. Case No. 2:20-cv-03537-JMC (South Carolina).
- Expert Witness. 2020. *Georgia Association of Latino Elected Officials* v. *Gwinnett County Board of Registration and Elections*. No. 1:20-cv-1587-WMR (N.D. Ga.).
- Expert Witness. 2019. *Fair Fight Action, Inc. et al. v. Brad Raffensperger* No. 1:18-CV-5391-SCJ (N.D. Ga.).
- Consultant. 2019. Virginia Division of Elections. Audited the assignment of registered voters to districts.
- Expert Witness. 2018. *Martin v. Kemp*. Civil Action No. 1:18-cv-04776-LMM.
- Expert Witness. 2018. *Georgia Coalition for the Peoples' Agenda, Inc. v. Kemp*. Civil Action No. 1:18-cv-04727-ELR.
- Expert Witness. 2018. *Common Cause Indiana v. Lawson*. Case No. 1:17-cv-3936-TWP-MPB (Indiana).
- Expert Witness. 2017-18. *Benisek v. Lamone*. Case No. 13-cv-3233 (Maryland).
- Expert Witness. 2016-2017. *Vesilind v. Virginia State Board of Elections*. Case No. CL15003886 (Virginia).
- Expert Witness. 2016-2017. *Fish v. Kobach*. Case No. 2:16-cv-02105 (Kansas).
- Expert Witness. 2016. *Arizona Libertarian Party v. Reagan*. Case No.: 2:16-cv-01019-DGC (Arizona).
- Expert Witness. 2016. *Georgia State Conf. of the NAACP, et al. v. Brian* Kemp. Case No. 2:16-cv-00219-WCO (Georgia).
- Consultant. Federal Voting Assistance Program. 2014-2015. Analyzed voting experience of military and overseas voters.
- Expert Witness. 2013-2014. *Page v. Virginia State Board of Elections*. No. 3:13-cv-678 (E.D.VA).
- Expert Witness. 2013-2014. *Delgado v. Galvin*. (D. MA).
- Beaumont Independent School District. 2013. Prepared response to DOJ data request.
- Federal Voting Assistance Program. 2012-13. Analyzed voting experience of military and overseas voters.
- Gerson Lehrman Group. 2012. Provided election analysis to corporate clients.
- Expert Witness. 2011-2012. *Backus* v. *South Carolina*. No. 3:11-cv-03120 (D.S.C.).
- Expert Witness. 2012. *Wilson* v. *Kasich*. No. 2012-0019 (Ohio Sup. Ct.).
- Consulting Expert. 2011-2012. Bondurant, Mixson, and Elmore, LLP. (Review of Georgia's state legislative and congressional redistricting Section 5 submission).
- Consultant. 2012. New Jersey Congressional Redistricting Commission.
- Expert Witness. 2011. *Perez v. Texas*. No. 5:11-cv-00360 (W.D. Tex.).
- Expert Witness. 2011. *Wilson v. Fallin*. No. O-109652 (Okla. Sup. Ct.).
- Consultant. 2011. United States Federal Voting Assistance Program.

- Consultant. 2011. Virginia Governor's Independent Bipartisan Advisory Redistricting Commission.
- Consultant. 2011. New Jersey State Legislative Redistricting Commission.
- Expert Witness. 2010. *Healey v. State, et al.* C.A. No. 10-316--S (USDC-RI).
- Research Triangle Institute. 2008-2009. Consultant for Election Assistance Commission, 2008 Election Day Survey.
- U.S. State Department. 2008. Briefed visiting foreign nationals on U.S. elections.
- Expert Witness. 2008. *League of Women Voters of Florida v. Browning* (08-21243-CV-ALTONAGA/BROWN)
- Pew Center for the States. 2007. Consultant for Trends to Watch project.
- Expert Witness. 2007. *Washington Association of Churches v. Reed* (CV06-0726).
- Electoral Assistance Commission. 2005. Analyzed election administration surveys.
- Arizona Independent Redistricting Commission. 2001-2003. Consultant.
- Expert Witness. 2003. *Minority Coalition for Fair Redistricting, et al. v. Arizona Independent Redistricting Commission* CV2002-004380 (2003).
- Expert Witness. 2003. *Rodriguez v. Pataki* 308 F. Supp. 2d 346 (S.D.N.Y 2004).
- Consulting Expert. 2002. *O'Lear v. Miller* No. 222 F. Supp. 2d 850 (E.D. Mich.).
- Expert Witness. 2001-2002. *In Re 2001 Redistricting Cases* (Case No. S-10504).
- Expert Witness. 2001. *United States v. Upper San Gabriel Valley Municipal Water District* (C.D. Cal. 2000).
- California State Assembly. 1991. Consultant.
- Pactech Data and Research. Research Associate. Aug 1989 - June 1991.

<u>Campaign/Political Consultant.</u>

- Ron Christian for Virginia State Senate. June – November, 2003.
- Theresa Martinez for Virginia House of Delegates. May, 2003.
- Senior Consultant. California State Assembly. Nov. – Dec 1998.
- California Assembly Democrats. June – November 1998.
- Susan Davis & Howard Wayne for CA State Assembly '96. 1996.
- Intern. June – Sept 1995. UC-San Diego, Science and Technology Policy and Projects.

<u>Polling Consultant.</u>

- Hickman-Brown. July, 2000. Analyzed national and state level exit and CPS polls for use in various campaigns. Analyzed surveys for congressional, state, and local political campaigns.
- Decision Research. Aug 1994 – Dec 1994. Conducted and analyzes surveys for congressional and statewide campaigns.
- Speaker Jose de Venecia of the Philippines. Feb, 1997.
- Joong-Ang Ilbo/RAND. Oct, 1996. Analyzed survey of Korean attitudes on national security issues.
- UCSD. Nov. 1991. Conducted and analyzed survey of student attitudes.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC; DCCC; DEMOCRATIC NATIONAL COMMITTEE; DEMOCRATIC GOVERNORS ASSOCIATION; U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER; and U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; U.S. DEPARTMENT OF JUSTICE; U.S. POSTAL SERVICE; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; SOCIAL SECURITY ADMINISTRATION; U.S. DEPARTMENT OF COMMERCE; PAMELA BONDI, in her official capacity as U.S. Attorney General; DAVID STEINER, in his official capacity as U.S. Postmaster General; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; JOSEPH B. EDLOW, in his official capacity as Director of the U.S. Citizenship and Immigration Services; FRANK J. BISIGNANO, in his official capacity as Commissioner of Social Security Administration; and HOWARD LUTNICK, in his official capacity as Secretary of the Department of Commerce,<br><br>*Defendants.* | Case Number 1:26-cv-01114 |

**EXPERT REPORT OF MICHAEL MCDONALD**

# 1. Background and Qualifications

I am Michael P. McDonald, Professor of Political Science at the University of Florida. I am widely regarded as a leading expert on United States elections. I have published extensively on elections in peer-reviewed journals and I produce what many consider to be the most reliable turnout rates – the percentage of eligible voters who cast a ballot – of the nation and the states.[1] I have published peer-reviewed articles specifically on the reliability of voter registration files[2] and matching algorithms as applied to voter registration files.[3] I am co-author of a book concerning how limitations of computers to accurately store numeric data can lead to erroneous statistical analyses.[4]

In my career, I have worked directly with state and local election officials in varying capacities. I led a project to audit the placement of registered voters within districts for the Virginia Department of Elections and the Colorado Secretary of State, using a methodology published in the top political science methods journal.[5] These projects required my team to interface with local election officials to resolve issues we identified. The Department of Defense's Voting Assistant Program hired me to interview local election officials about their procedures to process military and overseas civilian ballots. I served on a National Academy of Sciences advisory group to the U.S. Census Bureau on the Bureau's data disclosure avoidance policies. In an ongoing project, a research team I lead collected precinct boundaries from state and local election officials for every locality in the country. My team has, on occasion, created electronic precinct maps for local election officials where no electronic maps existed. These data have been used in numerous court cases, including the recent *Allen* v. *Milligan* case heard before the U.S. Supreme Court. In addition, I have worked for the United States Election Assistance Commission, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

I have testified or submitted expert reports or declarations in numerous election related cases.

I was an expert witness for plaintiffs in three cases specifically related to voter registration and documentary proof of citizenship (DPOC). In 2016, I was an expert witness for plaintiffs who

---

[1] Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-974.
[2] Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.
[3] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.
[4] Micah Altman, Jeff Gill, and Michael P. McDonald. 2003. *Numerical Issues in Statistical Computing for the Social Scientist*. Hoboken, NJ: Wiley and Sons.
[5] Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

successfully challenged Kansas' DPOC requirements.[6] In 2023, I was an expert witness for plaintiffs who successfully challenged, in part, Arizona's DPOC requirements;[7] and in 2018 for plaintiffs who obtained a preliminary injunction in a challenge to Georgia's DPOC requirements.[8] In 2026, I was an expert witness for plaintiffs challenging Virginia's mass purge of voters alleged to be non-citizens.[9]

I have been an expert witness in other litigation challenging requirements related to voter registration. I was an expert witness in 2016 for plaintiffs who successfully challenged a Georgia policy that required the names and other information supplied by prospective registrants on their voter registration applications to match exactly as it appears in other databases.[10] In 2007, I was an expert witness for plaintiffs who successfully challenged a similar Washington State policy that required an exact match of personal identification information across databases.[11] In 2019, I was an expert witness in plaintiffs' partially successful challenge to Georgia's voter purging practices.[12]

Within the last four years, in addition to the Arizona and Virginia cases described above, I was an expert witness in litigation involving third-party voter registration organizations in Florida,[13] and for the City of Buffalo, NY defendant in a challenge to their city council districts.[14]

In addition, I have an extensive publishing and consulting record and experience testifying in redistricting and other election-related cases. For example, when I was employed previously at George Mason University, I consulted for Virginia Gov. Bob McDonnell's Independent Bipartisan Advisory Redistricting Commission. While at the University of Florida I provided contractual work to the Virginia Department of Elections verifying the assignment of registered voters to districts. I have also served as an expert witness for plaintiffs in two redistricting lawsuits. Please see my curriculum vitae (served with this Report) for more information, including my published work over the last ten years and all cases where I testified as an expert over the last four years.

---

[6] *Fish v. Kobach*, No. 2:16-cv-02105 (D. Kan.).
[7] *Mi Familia Vota and Voto Latino* v. *Hobbs, et al.* and Consolidated Cases. Case No. 2:22-cv-00509-SRB (Lead Case) (D. Ariz.)
[8] *Georgia Coalition for the Peoples' Agenda, Inc. et al.* v. *Brad Raffensperger*, 347 F. Supp. 3d 1251, 1263-64 (N.D. Ga. 2018). The plaintiffs in this matter ultimately lost the case at trial. *See* Civil Action No. 1:18-cv-04727-ELR, Dkt. No. 241 (N.D. Ga. Apr. 11, 2024).
[9] *Virginia Coalition for Immigrant Rights, et al.* v. *Sean Beals*, Case No. 1:24-cv-01778 (PTG/WBP) (E.D. Va 2026)
[10] *Georgia State Conf. of the NAACP v. Kemp*, No. 2:16-cv-00219-WCO (N.D. Ga.).
[11] *Washington Association of Churches v. Reed*, No. CV06-0726 (W.D. Wash.).
[12] Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ (N.D. Ga.).
[13] *Florida Rising Together v. Lee,* Case No. 4:21-cv-201-MW-MJF (N.D. FL).
[14] *Our City Action Buffalo, Inc., et al.* v. *Common Council of the City of Buffal*o, et al. 2022. Index No. 812652/2022.

I am compensated at a rate of $450/hour for my work in this case. My compensation is not contingent on the substance of my opinions or the outcome of this case.

# 2. My Assignment

I have been asked by plaintiffs' lawyers in this case to review President Donald Trump's Executive Order of March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" ("EO"). I have been asked to opine about the reliability of information available from the federal Social Security Administration ("SSA") and Department of Homeland Security's ("DHS") U.S. Citizenship and Immigration Services ("USCIS") Systematic Alien Verification for Entitlements ("SAVE") system of databases, specifically the reliability of citizenship and personal identifying information recorded in these federal databases. I have been asked to opine about whether or what potential database matching issues may arise when government officials attempt to match these databases to state voter registration databases and to U.S. Postal Service databases.

The federal government has not promulgated implementation directives at the time of production of this declaration. My opinions are formed from existing documents that I have reviewed in previous documentary proof of citizenship cases where I provided expert opinions and other existing government and media documents in the public domain.

# 3. Data and Information Analyzed

The information I have reviewed and analyzed in this report is identified in Exhibit A.

# 4. The SSA and SAVE Federal Databases

Section 2(a) of President Trump's Executive Order dated March 31, 2026, among other instructions, directs SSA and DHS to establish and transmit a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming federal election and who maintain a residence in the subject State (State Citizenship List).[15] Section 2(a) directs the agencies to compile this list from "Federal citizenship and naturalization records, SSA records, SAVE data and other relevant Federal databases." EO at 2(a).

As of this writing, the federal government has integrated the SSA and Department of State passport databases into the SAVE system. The Department of State passport database is logically within the scope of the "other relevant Federal databases."

[15] Available at: https://www.whitehouse.gov/presidential-actions/2026/03/ensuring-citizenship-verification-and-integrity-in-federal-elections/

Section 2(a)(ii) of the EO instructs states "to routinely supplement and provide suggested modifications of their State Citizenship List transmitted thereto."

Section 3 of the EO directs the Postmaster General to initiate rulemaking which, among other things, directs that States provide the United States Postal Service (USPS) with a list of individuals (Mail-In and Absentee Participation List) to which the USPS will be permitted to transmit mail ballots. The EO does not specify if the USPS database is to be used.[16]

The EO has further directives outside the scope of my assignment.

# 5. Summary of Findings

The State Citizenship List is unsuitable for the identification of all voting-eligible United States citizens who are eligible to return mail ballots through the USPS as directed by the EO.

1. The State Citizenship List is to be an amalgamation of federal databases from the SSA and the U.S. Citizenship and Immigration Services ("USCIS") (and, as described above, likely the Department of State). This list will necessarily fail to identify millions of United States citizens. The SSA Office of Inspector General states that approximately a quarter of SSA's records of Social Security Number ("SSN") holders have no citizenship information. SSN cardholders missing citizenship status include individuals who provided information to the SSA before it required citizenship information in 1978 and consistently recorded it in 1981. Members of certain religions were exempt from social security numbers until 2004. The SAVE system as it was designed before the EO provides citizenship status of naturalized citizens only. The Department of State passport database provides citizenship only for people who obtain a passport. There is no evidence these databases when combined will produce a complete or accurate list of United States citizens.
2. No federal database provides current citizenship information for all United States citizens. These federal databases record citizenship status at a point in time when individuals interact with government agencies. This timeliness limitation exists for other personal identifying information needed to successfully match records on a massive scale, such as last name that individuals change for life events. These databases likely contain information on United States citizens that is years or even decades out of date and stale.
3. The SSA, USCIS, Department of State, and state voter registration databases share mundane data errors common to all large-scale databases. The scale of these errors is of additional concern. The SSA Office of Inspector General estimates 17.8 million SSA records contain potential errors. A survey I and colleagues conducted of Florida's voter

[16] USPS maintains an Address Management System (AMS) database that may be utilized for the EO, see: https://about.usps.com/strategic-planning/cs09/CSPO_09_026.htm

registration database found 17.7% of respondents reported inaccuracies on their voter registration records. The agencies responsible for the SAVE system and the Department of State passport databases acknowledge inaccuracies exist, even if there are no rigorous public analyses of their extent.

4. Compiling federal databases into a single State Citizenship List and matching it to state voter registration databases is deeply challenging. There is no unique identifier to ensure that records are matched without error. States' recent experiences in matching their voter registration records with the SSA and SAVE databases demonstrate serious deficiencies that will continue to exist when these federal databases are combined together into the State Citizenship List and matched to voter registration databases as directed by the EO.
5. The EO directs the State Citizenship List to include only United States citizens above the age of eighteen at the time of an upcoming federal election. The State Citizenship List excludes seventeen-year-olds who will be eighteen by the general election in nineteen states plus the District of Columbia who are eligible to vote in regularly scheduled federal primary elections. As drafted in the EO, the State Citizenship List provided to States in advance of a federal primary election would exclude these seventeen-year-olds, contrary to the laws of these states allowing seventeen-year-olds to vote in these primary elections.

Due to data coverage and reliability shortfalls and no clear means to dependably compile the federal databases into a single State Citizenship List, I concur with the Social Security Administration's Office of Inspector General's conclusion that the SSA "….provided the States with responses that may have prevented eligible individuals from registering to vote and allowed ineligible individuals to vote" (SSA OIG Report 2009, p.11).[17] Similar issues present in the SAVE system and Department of State passport databases lead me to the same conclusion. The overall effect of the EO will prevent eligible United States citizens from returning mail ballots through the USPS.

# 6. Federal Databases Have Incomplete Citizenship Coverage

The State Citizenship List will exclude large numbers of United States citizens eligible to vote. The SSA and SAVE databases do not have complete coverage of all American citizens' citizenship status, nor is there any evidence that combining these sources can resolve coverage gaps. Nor will supplementing these databases with Department of State databases address this shortfall.

---

[17] Social Security Administration Office of Inspector General. "Accuracy of the Help America Vote Verification Program Responses," June 22, 2009 ("SSA OIG Report 2009"). Available at: https://oig-files.ssa.gov/audits/full/A-03-09-29115.pdf

The fact that the EO names two separate federal agencies, SSA and DHS, to combine their citizenship databases to form a State Citizenship List indicates that neither data source alone has sufficient information regarding citizenship status of all American citizens. To my knowledge, the federal government has never determined if these databases could be combined to form a comprehensive list of United States citizens. Indeed, numerous federal government reports and documents that I describe below establish clear limitations of the SSA and SAVE databases that prevent their unification into a complete national State Citizenship List. Even though the EO does not specifically direct the State Department's passport data to be incorporated into the State Citizenship List, there is no evidence that integrating Department of State passport records resolves these shortcomings.

The EO enlists the states to rectify shortcomings of the State Citizenship List with a procedure to be established by DHS for states to routinely supplement and provide suggested modifications or amendments to it. No state-supplied supplements, modifications, and amendments would be necessary if the State Citizenship List was complete. Moreover, DHS has no expertise with voting data indicating that it has the capability to address these flaws, and my own experience working with state voter agencies suggests that state supplementation cannot correct these shortcomings.

## 6.1 SSA

The public record establishes that the SSA database is missing citizenship status for a substantial segment of the American people. Even if SSA citizenship status data was perfectly accurate (and for reasons discussed below, it is not), the State Citizenship List cannot provide citizenship status for a substantial share of United States citizens.

In 2006, the Office of the Inspector General (OIG) of the Social Security Administration issued a report to the United States Congress entitled "Accuracy of the Social Security Administration's Numident File."[18] The Numident File is the database of records "containing relevant information about the numberholder" (SSA OIG Report 2006, p. i).[19]

Further information regarding the scope and accuracy of SSA data is provided in a response letter by Social Security Administration Associate General Counsel for General Law in *Mi Familia Vota v. Fontes* (SSA Touhy Decision Letter, July 13, 2023).[20] I was an expert witness for plaintiffs in this challenge to Arizona's requirement of Documentary Proof of Citizenship (DPOC) for voter registration.

---

[18] See: https://oig-files.ssa.gov/audits/full/A-08-06-26100_0.pdf ("SSA OIG Report 2006")
[19] *Id.* at page i.
[20] See: https://fairelectionscenter.org/wp-content/uploads/2025/07/SSA-Touhy-Decision-letter.July-13-2023-signed.pdf

The SSA issues social security numbers only to individuals who request one. Any citizen who does not request an SSN will not be in the SSA database.

The OIG notes the Social Security Administration did not require SSN applicants to provide proof of age, identity, and United States citizenship before May 15, 1978 (SSA OIG Report 2006, footnote 3, p. ii). Furthermore, "SSA did not consistently maintain citizenship information until 1981" (SSA Touhy Decision Letter, p. 2).

The SSA did not require citizenship status from certain religious individuals seeking an exemption from social security taxes before Feb. 2, 2004. Members of specified religions – most notably Anabaptists, the Mennonites, and the Amish – seeking an exemption must file Internal Revenue Service ("IRS") Form 4029 with the SSA and the IRS.[21] Notably, IRS Form 4029 does not require religious exemption applicants to provide documentary proof of citizenship.[22] However, as of Feb. 2, 2004, persons filing IRS Form 4029 must obtain an SSN.[23]

I estimate the number of U.S. residents who were not required to establish their citizenship status with the SSA by analyzing the United States Census Bureau's United States July 1, 2024 population estimates.[24] This is the most-recent release of the Census Bureau's population estimates counts by single-year of age, such as age 1, 2, 3, and so on. A drawback is that these population estimates do not include citizenship status. The United States resident population of persons older than age 46 (approximately, those born before May 15, 1978 at the time of the release of the 2024 population estimates) is 135,272,929. Thus, the SSA did not require individuals to provide citizenship status in the lifetime of 50.7% of the 266,978,268 persons of age eighteen or older in 2024, the universe of persons identified in the EO.

Furthermore, in the three years between 1978 and 1981 until consistent maintenance of citizenship information there are another 12,759,850 persons between the ages 43 and 46, or an additional 4.8% of the total population age eighteen or older.

I do not estimate the number of people seeking a religious exemption who the SSA did not require to provide citizenship status until Feb. 2, 2004.

Taken together, 148,272,929 people or 55.4% of the population age eighteen or older as of 2024 were alive at a time when either the SSA did not require applicants to provide proof of citizenship or the SSA did not maintain consistent records of citizenship.

---

[21] See: https://secure.ssa.gov/apps10/poms.nsf/lnx/0104903001
[22] See: https://www.irs.gov/pub/irs-pdf/f4029.pdf
[23] See: https://secure.ssa.gov/poms.nsf/lnx/0110225035
[24] Available at https://www2.census.gov/programs-surveys/popest/tables/2020-2024/national/asrh/nc-est2024-syasexn.xlsx

People may apply for an SSN soon after they are born or later in life (I am among the former group). Even so, a substantial number of SSA records have no citizenship information, a fact verified by SSA. SSA states in an August 2020 computer matching agreement with the Department of Health and Human Services that, "approximately 1/4 of those records do not have an indication of citizenship present" (p. 16).[25] Elsewhere, the Social Security Administration states its records "do not provide definitive information on citizenship" (SSA Touhy Decision Letter, p. 2).

In summary, the SSA database is missing citizenship status for millions of American citizens, and by its own admission, the citizenship information in SSA's database is unreliable. Older persons are disproportionately missing citizenship status since SSA did not require applicants to provide United States citizenship documentation until May 15, 1978 or consistently record citizenship status until 1981. Until Feb. 2, 2004, members of certain religious orders have no SSN and have no SSA citizenship status information.

## 6.2 SAVE

The SAVE system as it historically operated prior to the EO contains information only for United States naturalized citizens and does not include citizenship information for natural-born citizens. The SAVE system's naturalized citizenship status cannot fully close gaps in citizenship status supplied by SSA.

As described by U.S. Citizenship and Immigration Services (USCIS), the SAVE system was originally an online service administered by USCIS to provide point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies.[26] SAVE verifies a benefit or license applicant's immigration status or U.S. citizenship, including naturalized, acquired, and U.S.-born citizenship. Governments accessing the SAVE system provided an USCIS-issued Alien Identification Number, Naturalization Certificate Number, or similar identification to query the SAVE system. The SAVE system is not a single database, but a network of multiple databases.

According to the United States Census Bureau's 2024 American Community Survey ("ACS") 1-year estimates there are 25,150,799 foreign-born naturalized citizens age eighteen or older.[27]

---

[25] See: "Computer Matching Agreement between the Department of Health and Human Services Centers for Medicare and Medicaid Services and Social Security Administration for Determining Enrollment or Eligibility for Insurance Affordability Programs Under the Patient Protection and Affordable Care Act." The document is digitally signed August 3, 2020. Available at: https://www.ssa.gov/privacy/cma/CMS%20SSA%20CMA%20Re-establishment.ACA%202008.Final.Signed%20by%20DIBs%209.29.20%20(002).pdf.

[26] See: https://www.uscis.gov/save/about-save/about-save

[27] See: https://data.census.gov/table/ACSDT1Y2024.B05003

These naturalized citizens represent 9.4% of the 267,181,678 total resident population age eighteen or older. (The ACS total population is slightly different than the population estimates due to dissimilar methodologies of these data sources.)

Even assuming that all naturalized citizens lack SSNs, a generous assumption since immigrants can obtain an SSN,[28] they would only constitute a portion of the SSA records missing citizenship status and the combined federal databases would have a gap of citizenship status for approximately 15% of United States residents.

In the past year USCIS integrated SSA databases into the SAVE system. On March 25, 2025, President Trump issued an executive order directing USCIS to "take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered."[29] On May 22, 2025, USCIS announced the SAVE system would permit the users to provide a social security number (SSN) for SAVE system queries.[30] On October 31, 2025, DHS announced it integrated the Department of State passport database into the SAVE system.[31]

Tellingly, an April 22, 2025 DHS press release announcing changes to the SAVE system states that the new system would be "a reliable source for verifying non-citizen status nationwide."[32]

The wording of the DHS press release does not state the reverse, that the SAVE system is a reliable source for verifying citizenship status, nor could it truthfully do so since the SSA states that approximately a quarter of SSN holders do not have a recorded citizenship status and it is unknown if DoS passports can fill the gap (see Section 6.3 below).

A USCIS factsheet last updated on Feb. 2, 2026 confirms that integrating SSA databases into the SAVE system does not produce a comprehensive national citizen database. "SAVE can only verify data it can access" and "[a]ccordingly, SAVE may not confirm citizenship status for an individual who (1) is not designated as a U.S. citizen in SSA records, (2) has not received a

---

[28] See: https://www.osasimmigration.com/how-to-apply-for-social-security-number-immigrants/. *See also* Testimony by Nancy A. Berryhill, Acting Commissioner for Social Security Administration before the House Ways and Means Subcommittee on Social Security, May 17, 2018 (provides FY2017 counts of 271,000 SSNs issued to lawful permanent residents and 106,000 SSNs issued to lawfully present noncitizens. Some of these SSN cardholders logically will become naturalized citizens): https://www.ssa.gov/legislation/testimony_051718.html
[29] Executive Order No. 14248, "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025).
[30] See https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters
[31] 90 Fed. Reg. 48948 (Oct. 31, 2025). https://www.federalregister.gov/documents/2025/10/31/2025-19735/privacy-act-of-1974-system-of-records
[32] See: https://www.dhs.gov/news/2025/04/22/dhs-uscis-doge-overhaul-systematic-alien-verification-entitlements-database

Certificate of Citizenship or Naturalization from USCIS, and (3) has never been issued evidence of U.S. citizenship by the DoS."[33]

Children of immigrants who acquire citizenship and later become of voting age are among the eighteen-year-olds who DHS has not issued citizenship documents to. A Feb. 27, 2001 Backgrounder estimated, for example, "that 70,000 to 75,000 children will automatically become citizens on February 27, 2001. In addition, U.S. citizens adopt and immigrate approximately 20,000 foreign-born children each year. The vast majority of these children will benefit from the automatic citizenship provisions of the [Child Citizenship Act]."[34] Aggregating similar yearly statistics over time yields hundreds of thousands of citizens with derived citizenship as children who do not appear in the SAVE system.

## 6.3 Department of State Passports

As noted above, on October 31, 2025, DHS announced that it integrated Department of State ("DoS") passport data into the SAVE system. DoS reports that there are 183,170,240 valid United States passports issued to U.S. citizens as of fiscal year 2025.[35] This represents 59.2% of all U.S. residents according to the 2024 U.S. Census Bureau's population estimates, the citation reported above.

The federal government has never released a public report describing the characteristics of passport holders or analyzing if all natural-born Americans' citizenship status may be acquired from SSA, passports, and the SAVE system. An Aug. 31, 2023 YouGov survey provides evidence the passports are unlikely to fill completely citizenship coverage gaps in the combined SSA and SAVE databases.[36] YouGov estimates that the lowest percentage of United States passport holders by age is among persons age 45-65 years old at 33%, which are among those for whom SSA either never required citizenship status or inconsistently recorded it when applying for a SSN. YouGov further estimates United States passport holders tend to be under age thirty (53%), college educated (64%) or a higher degree (71%), and among racial and ethnic groups are Hispanic (55%), White (42%), and Black (34%).

---

[33] See: https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet

[34] See: https://www.aila.org/library/ins-backgrounder-on-child-citizenship-act

[35] A small number of noncitizen United States nationals from America Samoa, Swains Island, and the Commonwealth of the Northern Mariana Islands are eligible for U.S. passports. See: https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Certificates-Non-Citizen-Nationality.html#:~:text=If%20a%20person%20believes%20he,facility%20in%20the%20United%20States

[36] See: https://yougov.com/en-us/articles/46028-adults-under-30-more-likely-have-us-passport

## 6.4 State Voter Registration Databases

Section 2(a)(ii) of the EO instructs states “to routinely supplement and provide suggested modifications of their State Citizenship List transmitted thereto.” Since the EO’s purpose is to regulate mail ballots, state and local election offices are tasked with matching the State Citizenship List with voter registration databases, which are the logical sources for states to provide supplemental and modified citizenship information to the State Citizenship List.

State voter registration databases do not record citizenship status since only citizens are legally permitted to register to vote in federal and state elections. (A small number of local governments allow noncitizens to vote in their local elections only, with registration lists maintained by the localities.)

One state, Arizona, currently has a separate “federal-only voter” status for registrants who do not provide documentary proof of citizenship. Relying upon the federal-only list as a source of noncitizens ineligible to vote is problematic, per the EO’s directive for states to provide supplements and suggested modifications to the State Citizenship List. The federal-only status only indicates registrants who have not presented or are unable to present documentary proof of citizenship to election officials. As of October 8, 2024 Arizona’s Attorney General had prosecuted zero individuals for noncitizen voting.[37] A Dec. 18, 2023 VoteBeat analysis found concentrations of federal-only voters at college campuses and homeless shelters, that is, among people who may not have easy access to their citizenship documentation.[38] The Arizona Attorney General’s Office is cited in this news article as reporting there are two pending cases of noncitizen voting.

State and local election officials who have used the SAVE system to verify voters’ citizenship status find exceedingly few alleged noncitizens who attempt to register to vote. These are only allegations based on database matching, which can be unreliable for reasons I describe below and is why further investigation is required. USCIS rightly notes the SAVE system as identifying only a “potential non-U.S. citizen status.”[39]

Anecdotal evidence from local election officials utilizing the upgraded SAVE system indicates that the SAVE system does not accurately identify noncitizens.

---

[37] See: https://www.azag.gov/sites/default/files/2025-05/LOG_ILLEGAL_VOTING_%26_ELECTION_CASE_DISPOSITIONS.pdf

[38] Jen Fifield and Kae Petrin, “Arizona’s federal-only voters are concentrated on college campuses, data show,” December 18, 2023. See: https://www.votebeat.org/arizona/2023/12/18/arizona-federal-only-voters-concentrated-college-campuses-proof-of-citizenship/

[39] See: https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet

1. "Denton County [Texas] election director Frank Phillips told NPR that so far out of the 84 flagged registered voters he sent notices to, 14 have proven their citizenship."[40]
2. The Texas Tribune reports "these [Texas] errors were more widespread than previously known, involving at least 87 voters across 29 counties;" and "I really find no merit in any of this," said Bobby Gonzalez, the elections administrator in Duval County in South Texas, where SAVE flagged three voters, all of whom turned out to be citizens.[41]
3. "In Missouri, 70 county clerks in December signed a letter sent to state House and Senate leadership describing the system as flawed, saying it regularly included 'individuals we know to be U.S. citizens — our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies.'"[42]

Systemic evidence of Virginia's experience with the SAVE system exists through my expert witness report in a challenge to Virginia's documentary proof of citizenship requirements.[43] State election officials produced a list of new registrants who were submitted to the SAVE system between January 20, 2025 and November 27, 2025. Election officials placed these new registrants into a suspended registration status pending a response to a mailed notice request for these applicants' citizenship status. Recipients of this notice were given fourteen days to respond. I do not know how many individuals did not receive the Virginia mailed notice in a timely manner, understood its importance, or were unable to respond within the fourteen-day deadline. "Among the 1,270 registrants in this database, 244 were registered to vote as of November 28, 2025, or 19.2%"[44]. Thus, approximately a fifth of voter registration applicants on this Virginia list that the SAVE system identified as noncitizens provided documentary proof of their citizenship within the allowed narrow response window.

## 6.5 Summary

The State Citizenship List will fail to identify millions of citizens. Even generously assuming a list of citizens can be flawlessly compiled from existing disparate federal databases there will be gaps. SSA states that approximately a quarter of SSN holders have no citizenship information. SSA acknowledges that individuals born before 1981 will not have complete or accurate citizenship information. SSA does not have citizenship information for members of certain religions, who were exempt from obtaining a social security number prior to 2004. The SAVE system does not include hundreds of thousands of adult citizens who obtained derived citizenship in childhood. There is no evidence DoS passport information and SAVE naturalized citizens data will completely fill these gaps.

---

[40] See: https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens
[41] https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/
[42] https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html
[43] Declaration of Michael McDonald, *Virginia Coalition for Immigrant Rights v. Beals,* Case No. 1:24-v-01778 (PTG/WBP) (E.D.Va. January 5, 2026).
[44] *Id.* at page 13.

## 7. 17-Year Olds Excluded from the State Citizenship List Can Vote in Regularly Scheduled Federal Primary Elections

The EO Sec. 2 presents a further coverage issue of the State Citizenship List with respect to individuals' "age of 18 at the time of an upcoming Federal election." The EO does not specify that "the upcoming Federal election" is limited to a general election. A primary election for Federal office is also an "upcoming Federal election." Further confusing the generation of the list with the timing of Federal elections, the EO permits states to request the list in advance of "any special Federal election."

Since the EO appears to be election-specific, the State Citizenship List provided to the states in advance of a primary federal election would not include individuals who are seventeen, but who will turn eighteen by the time of the next general election.

Nineteen states plus the District of Columbia permit seventeen-year-olds to vote in federal primary elections if they become age eighteen by the November general election.[45]

The EO does not direct the SSA or DHS to include such eligible United States citizens for primary elections on the State Citizenship List, potentially disenfranchising these young voters, some of whom may be accelerated college students dependent on mail ballots.

## 8. Data Timeliness

Beyond whether the federal government can create a complete and accurate State Citizenship List, there are further critical data challenges both to federal agencies compiling a comprehensive and accurate State Citizenship List as well as to states creating Mail-In and Absentee Participation Lists by cross-checking the State Citizenship List with the voter registration databases.

Among these challenges is data timeliness, the extent to which an individual's record reflects accurately their *current* characteristics. Identifying information in a federal database, such as an individual's last name, may be affected by life events such as marriage and adoption. Timeliness is a challenge common to all of the databases needed for the EO to work effectively, since individuals update their information only when they interact with government agencies.

[45] The following permit seventeen-year-olds to vote in primary elections if they will be eighteen by the general election: CT, DE, DC, IL, IN, IA, KY, ME, MD, MS, NE, NJ, NM, NC, OH, RI, SC, UT, VT, and VA. See: https://www.ncsl.org/elections-and-campaigns/voting-age-for-primary-elections

Due to timeliness limitations, the State Citizenship List will fail to include citizens who are not recorded as citizens in government databases and have not had an interaction with a government agency to update their citizenship status. This universe of people includes citizens who did not have to provide their citizenship status because they were not required to or because their citizenship information was inconsistently recorded, such as SSA cardholders prior to 1981 and citizens of certain religious orders prior to 2004. It includes naturalized citizens (see section 8.2 below) and immigrant children with derived citizenship. It includes all people who otherwise have moved into a new states or have data errors that require correction (see section 9 below).

## 8.1 SSA

The Social Security Administration described the timeliness of SSA database citizenship status in a 2021 data sharing agreement with states: "Individuals applying for SSNs report their citizenship status at the time they apply for their SSNs" (Computer Matching and Privacy Protection Act Agreement, 2021, p. 6).[46]

According to SSA, individuals are responsible for reporting changes to their citizenship status. "The claimant/beneficiary is responsible for obtaining and giving us information about changes in their U.S. citizenship or lawful presence status."[47] But most people have no reason to interact with SSA outside of employment changes and SSA does not take steps to ensure its data has current citizenship information.

The SSA database timeliness issue applies to all citizens for whom SSA does not have timely citizenship status because SSA never required or inconsistently reported it. This issue is particularly relevant to the citizenship status of naturalized citizens. Noncitizens may obtain social security numbers.[48] No federal law requires naturalized citizens to immediately update their SSA citizenship status upon naturalization. The SSA database would only be updated the next time a newly naturalized citizen interacts with SSA.

SSA data timeliness issues affect data elements other than citizenship status that are needed to match the State Citizenship List with state voter registration databases, such as names, and birthdates. Like citizenship status, SSN cardholders only update these data elements through interactions with the SSA.

Recognizing this issue, the SSA specifically instructs SSN cardholders when applying for a replacement card to, "update or correct the information we have about you in our records, such as date of birth, place of birth, one or both of your parents' names, your citizenship, or your immigration status."[49]

[46] See: https://www.ssa.gov/privacy/cma/2022%20Agreement%206000.pdf
[47] See: https://secure.ssa.gov/apps10/poms.nsf/lnx/0300204010
[48] See: https://www.ssa.gov/pubs/EN-05-10096.pdf
[49] See: https://www.ssa.gov/ssnumber/ss5doc.htm

SSA database timeliness issues thus affect the recorded citizenship status of naturalized citizens. SSA database timeliness issues further affect updates and needed corrections of personal identifying information of all citizens, which are required to match SSA records to external databases, such as the SAVE system and state voter registration databases.

## 8.2 SAVE

Timeliness issues similarly affect the SAVE system. In FY2024, USCIS reported 7.9 million naturalized citizens in the preceding decade, with 818,500 naturalizing in the preceding year.[50]

Election officials who have used the SAVE system to verify new registrants' citizenship status have practical experience in the SAVE system's shortcomings. For example, Yavapai County, Arizona recorder Matt Webber reported in 2023 that when their office registers at naturalization ceremonies, a subsequent SAVE query, "will not come back in the SAVE system even with an alien registration number very quickly because they haven't been put into the system yet".[51]

The 2025 Arizona Elections Procedures Manual specifically warns, "Often there is a delay between when a registrant becomes a U.S. citizen and when that registrant's citizenship status has been updated in SAVE".[52] Arizona recommends specific procedures for naturalized citizens whose citizenship is verified "at the last minute".[53]

USCIS has never publicly issued a report investigating the extent of data latency in the SAVE system. SAVE system timeliness issues may reasonably explain, at least in part, media reports from several state election officials, as well as my analysis of Viginia SAVE checks, producing erroneous citizenship status for people on voter registration databases.

## 8.3 Department of State Passports

Department of State passports are valid for ten years (five years for people under age sixteen).[54] Passports have similar timeliness issues as SSA and SAVE in that passport holders must proactively update personal information if it is no longer correct, such as a person changing their last name. The Department of State provides a fact page for passport holders to use to update their personal information.[55]

---

[50] https://www.uscis.gov/citizenship-resource-center/naturalization-statistics
[51] Expert Report of Michael P. McDonald, *Mi Familia Vota v. Hobbs,* Case No. 2:22-cv-0509-SRB (Lead Case), (D. Az. Sept. 14, 2023) ("McDonald Arizona Report") at 37.
[52] See: https://apps.azsos.gov/election/files/epm/2025/Election-Procedures-Manual-2025--FINAL-12-22-25.pdf at page 13.
[53] *Id.* at 14.
[54] See: https://travel.state.gov/content/travel/en/passports/have-passport/renew-online.html
[55] See: https://travel.state.gov/content/travel/en/passports/have-passport/change-correct.html

## 8.4 State Voter Registration Databases

State election officials establish new voter registration records and update old records when registrants submit voter registration applications because they are first time registrants, have recently moved within a state or across state boundaries, or update their registration information. Voter registration databases' personal identifying information will not conform with the State Citizenship List unless a registrant has provided the same information to federal and state governments (setting aside the mundane data entry errors affecting these databases).

For example, if a newlywed adopts their spouse's last name and updates their voter registration record, perhaps through an interaction with their state's Department of Motor Vehicles to obtain a new driver's license, but does not notify SSA, the last name in these databases become asynchronous. If the newlyweds buy a new home, their address may become asynchronous, a problem that may be of particular concern for the implementation of the EO if the newlyweds move to a new state, register to vote, but federal databases do not reflect their new address. These data timeliness issues may affect their eligibility to return a mail ballot when the information on a state's voter registration database does not match the State Citizenship List.

Federal law specifically contemplates the situation where a citizen attempts to vote who has previously registered but their name does not appear on the voter registration list, such as may occur with our newlywed example. Federal law (52 U.S.C. § 21082) requires states to provide the voter with a provisional ballot and election officials will subsequently adjudicate if the person is eligible to vote and their vote will be counted. For our newlywed, the voter may provide information to election officials establishing their name change, and address change as permitted under state law. Generally, election officials will count provisional ballots for any legitimate reason, including when a registrant was incorrectly cancelled from the voter registration lists.

The EO Sec. 2(a) permits individuals to access and correct their State Citizenship List records prior to an election. Based on my experience and work analyzing voter interactions with state and federal agencies, many citizens will not provide timely updates through this additional burdensome voting eligibility verification process. People particularly affected by administrative burdens are those with language issues, with limited computer access, with limited transportation, and are generally poor, especially when they may need to obtain citizenship documentation.

Voter registration timeliness issues will be most acute for citizens who submit voter registration applications after the 60-day transmission deadline of the State Citizenship List to states and on or before their state's voter registration deadline. The National Voter Registration Act (NVRA) of 1993 requires that states must allow eligible people to register to vote at least up to 30 days prior to a federal election.[56] States vary between those with a 30-day deadline and those that offer

[56] See point 35: https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

same day registration where eligible persons may register and vote. Voter registration activity peaks as a voter registration deadline nears.[57]

The mandatory timelines of Section 2 and Section 3 of the EO conflict with these State voter registration practices. The EO Sec.2(a) directs DHS, thusly: "The State Citizenship List shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." Sec. 3(b)(ii) directs states to "no fewer than 60 days before the election, a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS."

Since the EO's 60-day deadlines do not overlap with state voter registration deadlines set in compliance with the federal NVRA, any eligible citizen voter submitting a new or updated voter registration following the 60-day deadline described in the EO may not have their correct information in the State Citizenship List or in the list states are directed to provide to USPS, and therefore be ineligible to return a mail ballot through USPS.

Given these timing issues it is unclear if the EO could ever conform to existing states' laws, such as for states with same-day registration and allow registrants to pick up mail ballots at election offices. Colorado is such a state. Colorado has same-day registration at specified vote centers.[58] Colorado also allows these eligible voters at voting locations to obtain and leave with mail ballots that may be returned via USPS, colloquially known as "ballot to-go."[59] A Colorado eligible voter citizen not appearing on the State Citizenship List who appears at an election office, uses same day registration, and requests a mail ballot to fill out in the privacy of their home could not return the mail ballot via the USPS since Colorado would never have an opportunity to inform USPS the voter is eligible to return their ballot by mail.

## 8.5 Summary

No federal database can provide current citizenship information for all Americans. The record of citizenship status represented in government records is recorded only at the point of time when individuals interact with governments. The same is true of the timeliness of other personal identifying information in government data records that is needed to successfully match records on a massive scale, such as last name that individuals change for life events. Because these sources are not up to date, there is high potential that many people who are eligible to vote will not have their eligibility confirmed through matching the databases identified in the EO.

---

[57] See: James Gimpel, Joshua Dyck, and Daron Shaw. 2007. "Election-Year Stimuli and the Timing of Registration." *Party Politics* 13(3): 351-74.
[58] See CO Rev Stat § 1-2-201 (2020); https://law.justia.com/codes/colorado/2020/title-1/article-2/section-1-2-201/
[59] See: CO Rev Stat § 1-2-508 (2020), https://law.justia.com/codes/colorado/2020/title-1/article-2/section-1-2-508/

# 9. Data Accuracy

The EO requires matching of personal identifying information for the federal government to compile the State Citizenship List and for state officials to routinely supplement and provide suggested modifications or amendments to it.

For database matching to work across different systems at a massive scale, personal identifying information in these databases must be accurately recorded without error. Historical experience with these databases indicates that is not the case.

## 9.1 SSA

The SSA OIG reports the commonly known shortcoming of massive databases that, "…typographical errors and other mistakes [] generally exist within large databases" (SSA OIG Report 2009, p. 6).

At the request of the United States House of Representatives, the SSA OIG reviewed a sample of SSA records and found (SSA OIG report 2006, p.ii):

> Of the sample of 2,430 Numident records reviewed, 136 contained discrepancies in the name, date of birth, or citizenship status of the numberholder or we determined the numberholder may be deceased.

Extrapolating to 5.6 percent to the entire population of Numident records, the SSA OIG estimated "17.8 million Numident records contain discrepancies" (SSA OIG Report 2006, p. 15).

The SSA OIG Report 2006 (p. ii-iii) described at length their concerns about the accuracy of SSA information regarding the citizenship status of immigrants, in particular:

> We are particularly concerned with the extent of incorrect citizenship information in the SSA's Numident file for the foreign-born U.S. citizens and non-U.S. citizens we tested. Based on DHS information, we determined that 62 (7.7%) of the 810 foreign-born citizen Numident records we reviewed were misclassified — and the numberholders were not actually U.S. citizens. Given this exception rate, we estimate that about 616,420 of the approximate 8 million numberholders in the foreign-born U.S. citizen category are not actually U.S. citizens. Additionally, we noted that 57 (7.0 percent) of the 810 non-U.S. citizen Numident records we reviewed were currently misclassified— because the individuals had become U.S. citizens after obtaining their SSN but had not updated their records with SSA. Although SSA is not at fault for these latter misclassifications, we estimate that of the 46.5 million non-U.S. citizen records in SSA's Numident file, about 3.3 million contain out-of-date citizenship status codes.

The SSA OIG Report 2006 notes (footnote 7, p. iii) that "We believe this is a conservative estimate because DHS was only able to provide citizenship data for 506 of the 810 non-U.S. citizens in our sample."

## 9.2 SAVE

The SAVE system has similar data accuracy issues.

In particular, the SAVE system does not manage well certain types of names, leading to errors. In deposition in Arizona litigation, USCIS Acting Chief of the SAVE program; Mariah Doolittle identified several potential name entry errors (McDonald Arizona Report, p.38):

> …that the name is too long; the string of characters could be too long for the system. Because of that, with older system records, it could have been truncated, or if there was a hyphenated name, that would have caused issues in the past.

The USCIS notes in a response to the SSA OIG regarding the accuracy of other data elements in the SAVE system, "Moreover, birth dates may be incorrect or miskeyed in one system or the other" (SSA OIG Report 2006, p. 16).

## 9.3 Department of State Passports

To my knowledge there exists no publicly available analysis of the accuracy of Department of State passport holder information. These errors must commonly occur since the Department of State has established a process to correct a passport with "a data error may include an issue with your name, sex, or place of birth."[60]

## 9.4 State Voter Registration Databases

Data accuracy issues apply to voter registration databases. A 2008 National Academies of Science report (p. 8) notes regarding the accuracy of voter registration databases:[61]

> One common source of error in the data is data entry. Applicants typically submit handwritten voter registration cards that are sent to the voter registrar. The applicant can make a mistake, forget to answer a question, or not write legibly. The form or its information could be altered in transmission (a field could get

[60] See: https://travel.state.gov/content/travel/en/passports/have-passport/change-correct.html
[61] See: https://www.eac.gov/sites/default/files/document_library/files/State_Voter_Registration_Databases_-_Interim_Report.pdf

smudged in postal handling, for example). Keying errors result in mistranscriptions.

I have personal experience with voter registration database errors.

I conducted projects for the Colorado Secretary of State and Virginia Department of Elections to correct district and voter precinct assignments in their voter registration databases using a methodology I and a colleague developed.[62] I served on a National States Geographic Information Council advisory board of a program to advise state governments on how to adopt geographic information systems to implement our methodology.

In 2017, colleagues and I surveyed Florida registered voters and asked respondents to verify information on their voter registration record. We found 17.7% of respondents failed to verify at least one piece of information.

In 2007, I analyzed selected state voter registration databases to compare them with election surveys on the electorate's characteristics such as age.[63] Across the four states I analyzed, California was missing age information for 0.9% of its registered voters, the District of Columbia 4.5%, Ohio 3.1%, and Oklahoma 1.4%. A source for missing data in modern electronic databases are legacy paper voter registration records missing birth date information. These missing birth dates are often entered as an impossible date, such as January 1, 1900 or May 20, 1875. (The latter being a standard missing date value for legacy database systems programmed in COBOL).[64]

## 9.5 Summary

The SSA, USCIS, Department of State, and state voter registration databases are all characterized by mundane data errors common to all massive databases. The scale of these errors is of concern. The SSA OIG reported an estimated 17.8 million records contain potential errors. A survey I and colleagues conducted of Florida's voter registration database found 17.7% of respondents reported inaccuracies in their voter registration records. Data inaccuracies in the SAVE system and the Department of State passport databases are acknowledged to exist, even if there are no rigorous analyses. These data errors create a high potential that many people who are eligible to vote will not have their eligibility confirmed through matching the databases identified in the EO.

---

[62] Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

[63] Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.

[64] See: https://www.wired.com/story/elon-musk-doge-social-security-150-year-old-benefits/

# 10. Matching Limitations

These data issues culminate in known difficulties that governments will encounter when attempting to match records from different federal databases to compile the State Citizenship List and to match the State Citizenship List with voter registration databases. Lacking common unique identifiers across databases, The State Citizenship List will contain duplicate records of individuals when the records for the same individual in different databases do not match. Conversely, there will be records from different individuals that do match. These matching errors will occur when state officials match the State Citizenship List to voter registration databases.

Much of what is known publicly about the difficulties of matching these federal and voter registration databases arises from federal requirements for state and local election officials to match new voter registrations with SSA and SAVE databases to verify new voter registrations.

The Help America Voter Act of 2002 (52 U.S.C. § 21083(a)(5)) requires registrants to provide their driver's license number first, the last four digits of their SSN second, and permits special provisions for those without either identification. When new registrants provide the last four digits of their SSN, states are required to verify information of newly registered voters with SSA databases, which SSA implemented through the Help American Vote Verification (HAVV) program.

Some states and local governments have entered into agreements with USCIS to verify citizenship status of naturalized citizens using the SAVE system.

## 10.1 SSA

When SSA databases are matched with voter registration databases on name, birth date, and last four digits of the SSN, this information is insufficient to guarantee that a voter registration record will be matched with the SSA database or that a unique match will be found.

In a 2009 report on the accuracy of the HAVV program, the SSA OIG reported that HAVV produced a "no-match response rate of 31 percent" and that HAVV "did not provide consistent verification responses" (SSA OIG Report 2009, p. 4).

Contributing to these deficiencies is that there exists no unique identifier that can be used to match voter registration and SSA records. Federal law requires new registrants to provide only the last four digits of the SSN (if they do not supply a driver's license number or are exempt). Thus, "HAVV does not use a truly unique identifying, such as the full SSN to match information to its records" (SSA OIG Report 2009, p. 5).

As a consequence of these matching failures the SSA OIG warned, "the high no-match response rate and the inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote" (SSA OIG Report 2009, p. 4).

Because matching voter registration and SSA databases are an obstacle to states' ability to determine whether new voter registration applicants are allowed to vote, a State Citizenship List that includes SSA databases could similarly hinder States' ability to determine who is eligible to return a mail ballot through the USPS in accordance with the EO.

Furthermore, matching deficiencies between SSA and voter registration databases will only exacerbate inaccuracies in voter registration records that do not have the last for digits of the SSN. Matching on name and birth date alone will yield more multiple matches, as I have written about with respect to allegations of double voting by matching name and birth dates on voter registration databases.[65] The scope of affected citizens includes individuals who registered prior to implementation of the 2002 Help America Vote Act, those new registrants who provide the first federal option of a driver's license number, and those who are exempt because they do not have an SSN or driver's license.

This matching deficiency does not include the coverage, timeliness, and accuracy of citizenship information. The timeliness and accuracy of other personal identifying information may contribute to these matching failures.

For example, the SSA database may not be able to correctly match compound names found in voter registration databases, "In addition, HAVV does not recognize compound names that do not exactly match the Numident. For example, if a compound name is reported as Mary Jones-Smith but the Numident includes Mary Smith, HAVV would provide a no match response" (SSA OIG Report 2009, p.7).

Generally, the HAVV system, "…searches for exact matches on the full first and last name, which is problematic because it does not consider possible human error (that is, data entry errors, transpositions, and nicknames)" (SSA OIG Report 2009, p.6).

I highlight again the SSA Office of Inspector General's repeated concerns with matching criteria, since these issues are generally present for any database search (SSA OIG Report 2009, p.6):

> As stated previously, HAVV does not use a truly unique identifier, such as the full SSN to match voter information to its records. In addition, the HAVV program does not allow flexibility with matching the name and DoB to its records to

[65] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journa*l 7(2): 111-22. We apply to voter registration databases the surprising results of a statistical party trick known as the "birthday problem," which is in a group of about forty people there is about a ninety percent probability that two people share the same birthday. In the context of a single state's voter registration databases with millions of records, hundreds of voters share the same first name, last name, and exact birth date due to statistics. False matches will grow even larger when applied to hundreds of millions of citizens nationwide.

> compensate for typographical errors, other common database errors, and mistakes because it does not use the full SSN. Because of the limitations of the matching criteria established by the legislation, HAVV may be providing a high number of false negative responses to the States, which may lead to applicants having difficulty while registering to vote.

## 10.2 SAVE

The SAVE system has similar matching errors to HAVV since these issues are common across all massive databases.

In 2006, SSA attempted to match SSA data with USCIS immigration status data. In a USCIS response to a request by the SSA OIG for comment regarding the matching failures USCIS stated (SSA OIG Report 2006, p. 16):

> Past attempts to match SSA and USCIS data have shown that it is difficult to match records without a common numerical identifier between the two systems (Numident and CIS). Since SSA uses SSN and CIS is A-number driven it can be difficult to match records based solely on name and date of birth because slightly different names may be used with each agency, and names may change. Moreover, birth dates may be incorrect or miskeyed in one system or the other. Additionally, there may be more than one person with the same name and date of birth, making it impossible to know which record is the correct match.

Plainly, matching databases lacking unique identifiers produce matching failures.

The SSA OIG 2006 Report discussed matching problems between SSA and the USCIS databases when attempting to determine immigrants' citizenship status, noting "USCIS stated it could not match/locate these [304] records through computer searches because of data compatibility problems." Among the data compatibility issues are the aforementioned treatment of long and hyphenated names (*see supra* Section 9.2).

Furthermore, the SAVE system is an amalgamation of multiple internal USCIS databases, as described in a March, 2017 United States Government Accountability Office ("GAO") report to the U.S. Congress (GAO 2017, p. 8), "SAVE itself is not a database—it draws an applicant's most current immigration status information from one of numerous source systems." [66] Because of matching challenges across these databases, "SAVE officials said that the verification process was designed as a multistep process to ensure an accurate response, since not all relevant immigration records can be captured in the initial verification search" (GAO 2017, p. 10). Figure 2 on p.10 of the GAO report depicts multiple steps to verify immigrants' citizenship status,

---

[66] Immigration Status Verification for Benefits: Actions Needed to Improve Effectiveness and Oversight; GAO-17-204, March 23, 2017 (available at: https://www.gao.gov/products/gao-17-204)

including USCIS staff conducting document searches. From 2012-2016, USCIS received 14.1 million additional verification requests from states, presenting 16.3% of all SAVE system verification requests (GAO 2017, Table 1, p. 17).

## 10.3 Department of State Passports

No state has ever attempted to match their voter registration databases against the Department of State's passport databases. However, there are some lessons to be drawn from the SSA and SAVE experiences.

Foremost, there is no unique identifier with which to match voter registration databases and Department of State databases, such as an SSN or Alien Identification Number. Without a common unique identifier, the number of matching failures will be larger than those reported by SSA and USCIS when a common identifier exists.

## 10.4 Summary

DHS compiling a State Citizenship List from disparate federal agencies and states matching the State Citizenship List to their voter registration databases is deeply challenging. A primary challenge arises from the lack of a unique common identifier across all databases. Without a unique common identifier, databases must be matched on other identifying information. Identifying information, such as names, are not entered in consistent formats and contain mundane data entry errors. Matching without a common unique identifier leads to false negative matches when two records related to the same individual, but fail to match, and false positive matches when two or more records related to different individuals match. The latter occurs with surprising frequency in large databases when only names and birth dates are available to match records.

States' known difficulties matching voter registration databases to the SSA and SAVE systems provide evidence of what is likely to occur when they match their voter registration databases against the State Citizenship List.

States have the most experience matching SSA and voter registration databases utilizing the HAVV. The SSA 2009 OIG Report found a no-match response rate of 31 percent and that HAVV did not provide consistent verification responses. The SSA OIG warned the HAVV system causes difficulties in registering to vote, among the limited universe of new registrants who choose to provide states with the last four digits of their SSN.

Integrating SSA databases into a State Citizenship List will, with certainty as the 2009 SSA OIG report makes clear, create difficulties among those who provided the last four digits of their SSN and who wish to return mail ballots through the USPS.

The SSA OIG report could not address individuals who registered prior to states' implementation of the 2002 Help America Vote Act, new registrants who provided their driver's license number, and new registrants who were exempt from providing their SSN.

Lacking the last four digits of the SSN will degrade matching accuracy since reducing information to match reduces match success.

Similar deficiencies as HAVV will occur utilizing the Department of State's passport database, which does not share a unique identifier with voter registration databases and thus will match only on names and birth dates.

The SAVE system presents similar challenges. Historically, states used the SAVE system primarily to verify citizenship status of naturalized citizens registering to vote. Unlike the last four digits of the SSN, naturalized citizens provide a complete unique identifier to match against, such as the Alien Identification Number. Even using a complete identifier, the SAVE system can fail when identifying information such as names and birth dates that do not match exactly with state voter registration databases, either by mundane data entry issues or how information such as long or hyphenated names are stored. According to USCIS, there were 41.1 million requests for additional investigation, representing 16.3% of all SAVE system verification requests.

These data matching problems are endemic to all large-scale databases, so in this respect, the limitations of the SSA and SAVE system apply to the Department of State passport databases. These endemic matching issues create a high potential that many people who are eligible to vote will not have their eligibility to vote by mail confirmed through matching the databases identified in the EO.

# 11. Summary and Implications

EO Sec. 2(b) calls for criminal prosecution of election officials who issue mail ballots to citizens not appearing on the State Citizenship List.

Compiling disparate federal databases into a single State Citizenship List to verify registered voters' eligibility is deeply challenging. Multiple federal reports describe potential errors affecting millions of individuals when federal agencies cross-match their databases and when states access SSA and SAVE databases.

The data issues described in my report will chill election officials from issuing mail ballots to United States citizens. Citizens celebrating important life events occurring following the 60-day transmission of the State Citizenship List to states will not be permitted to use mail ballots, such as a native-born newlywed who changed their last name, people buying new homes, or a newly naturalized citizen. Risk-averse election officials fearful of being prosecuted will not issue a mail ballot to these citizens even when they provide documentation through the normal voter registration process establishing that they are otherwise eligible to vote.

Risk averse election officials may not issue mail ballots to citizens with data entry errors and discrepancies common in all large-scale databases, such as a citizen with a long or hyphenated

name that federal databases are known not to manage well or even a citizen such as myself with a last name that may innocuously appear with an extra space as “Mc Donald” in one database and “McDonald” in another.

The State Citizenship List will fail to include millions of citizens, particularly older citizens who SSA did not require to provide their citizenship or inconsistently recorded it, older citizens of certain religious orders who were not required to provide citizenship status, and immigrants who obtained derived citizenship from their parents.

The EO excludes all citizens age seventeen who are eligible to participate in federal primary elections.

Citizens will be burdened to correct their absence on the State Citizenship List or correct other mundane errors appearing on it. State election officials may attempt to rectify these errors where they can. Because the State Citizenship List is compiled from many data sources, it is feasible that citizens will correct mundane errors on the State Citizenship List only to have it fail to match information on the federal government primary sources and voter registration databases, creating new ambiguities.

Michael McDonald

4/17/26
Date

# EXHIBIT A

# Sources and Information Reviewed

**Executive Order**

2026 Presidential Executive Order, Ensuring Citizenship Verification and Integrity in Federal Elections, March 31, 2026

**Federal Law**

1. 52 U.S.C.A. § 21082
2. 52 U.S.C.A. § 21083

**State Statutes**

1. CO Rev Stat § 1-2-201 (2020)
2. CO Rev Stat § 1-2-508 (2020)

**Deposition Transcripts**

Deposition of U.S. Citizenship and Immigration Services, Represented by Shannon Slattery, Acting Chief of the SAVE program; Mariah Doolittle, Chief of Product Management and Delivery; Russell Filighera, Status Verification Operations Branch Chief, U.S. Citizenship and Immigration Services, August 25, 2023

Deposition of the Office of the Yavapai County Recorder, Represented by Matt Webber, Program Manager for Voter Registration and Early Voting, Yavapai County Recorder, August 16, 2023

**Social Security Administration Materials**

1. 2006 OIG - SSA - Congressional Response Report Accuracy of the Social Security Administration's Numident File(A-08-06-26100), December 2006
2. 2009 Memorandum, from Inspector General, Patrick P. O'Carroll, Jr. to The Commissioner, subject: Quick Evaluation Response: Accuracy of the Help America Vote Verification Program Responses (A-03-09-29115), June 22, 2009
3. 2011 SSA - Program Operations Manual System (POMS) - RM 10225.035 SSNs for the Amish and Mennonites (and Other Religious Exempt Communities) TN 34 (05-24), July 20, 2011

4. 2017 SSA - Program Operations Manual System (POMS), - RS 00204.010 Lawful Presence Payment Provisions, TN 15 (08-23), January 4, 2017

5. 2018 SSA - Testimony by Nancy A. Berryhill, Acting Commissioner for Social Security Administration House Ways and Means Subcommittee on Social Security, May 17, 2018

6. 2020 Computer Matching Agreement between the Department of Health and Human Services Centers for Medicare and Medicaid Services and Social Security Administration for Determining Enrollment or Eligibility for Insurance Affordability Programs Under the Patient Protection and Affordable Care Act." The document is digitally signed August 3, 2020

7. 2021 SSA - Program Operations Manual System (POMS) - RM 04903.001 Verify the Individual on the IRS Form 4029 Using the Numident TN 1 (11-21), November 4, 2021

8. 2021 Computer Matching and Privacy Protection Act Agreement, The document is digitally signed December 07, 2021

9. 2023 SSA - Touhy Decision letter, July 13 2023

10. 2024 SSA - Publication No. 05-10096, Social Security Numbers for Noncitizens, December 2024

11. SSA - Learn what documents you will need to get a Social Security Card

**United States Government Accountability Office Materials**

1. GAO Report to Congressional Committees, IMMIGRATION STATUS VERIFICATION FOR BENEFITS-Actions Needed to Improve Effectiveness and Oversight, GAO-17-204, March 23, 2017

**U.S. Citizenship and Immigration Services (USCIS) Materials**

1. 2025, USCIS - Naturalization Statistics, Last Reviewed/Updated: January 24, 2025

2. 2026, USCIS - Voter Registration and Voter List Maintenance Fact Sheet, Last Reviewed/Updated: February 2, 2026

3. 2026, USCIS - About SAVE, Last Reviewed/Updated: Marh 3, 2026

**U.S. State Department Materials**


1. 2025 US Department of State - Change or Correct a Passport, Last Updated: September 4, 2025
2. 2025 US Department of State, Certificates of Non Citizen Nationality, October 31, 2025
3. 2026 US Department of State - Renew Your Passport Online, Last Updated: March 25, 2026


**Expert Reports**


1. Expert Report of Michael P. McDonald, Mi Familia Vota v. Hobbs, Case No. 2:22-cv-0509-SRB (Lead Case), (D. Az. Sept. 14, 2023)
2. Declaration of Michael McDonald, Virginia Coalition for Immigrant Rights v. Beals, Case No. 1:24-v-01778 (PTG/WBP) (E.D.Va. - January 5, 2026)


**Other Materials**


1. 2025 Dept. of Homeland Security - DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database, April 22, 2025
2. Internal Revenue Service - Form 4029 - Application for Exemption From Social Security and Medicare Taxes and Waiver of Benefits
3. United States Census Bureau’s United States July 1, 2024 population estimates
4. Preserving and Protecting the Integrity of American Elections, 90 FR 14005
5. Privacy Act of 1974; System of Records, 90 FR 48948-01
6. United States Census Bureau’s 2024 American Community Survey
7. James Gimpel, Joshua Dyck, and Daron Shaw. 2007. “Election-Year Stimuli and the Timing of Registration.” Party Politics 13(3): 351-74.
8. National Voter Registration Act (NVRA) of 1993
9. 2002 Help America Vote Act (HAVA)
10. Ballard, J. (2023, August 31). Adults under 30 are more likely than older Americans to have a current U.S. passport. YouGov. https://yougov.com/en-us/articles/46028-adults-under-30-more-likely-have-us-passport

11. Berzon, A., & Corasaniti, N. (2026, January 14). Initial review finds no widespread illegal voting by migrants, puncturing a Trump claim - The New York Times. The New York Times. https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html

12. Fifield, J., & Petrin, K. (2024, September 20). Maps: Arizona's federal-only voters are concentrated on college campuses. Votebeat. https://www.votebeat.org/arizona/2023/12/18/arizona-federal-only-voters-concentrated-college-campuses-proof-of-citizenship/

13. Gilbert, D. (2025, February 17). No, 150-year-olds aren't collecting Social Security benefits. Wired. https://www.wired.com/story/elon-musk-doge-social-security-150-year-old-benefits/

14. Iyamu, O. (2024, December 18). How to Obtain a Social Security Number for Noncitizens in the U.S.: Social Security Number Application for Immigrants. Law Offices of Osas Iyamu, LLC. https://www.osasimmigration.com/how-to-apply-for-social-security-number-immigrants/

15. Jen Fifield, Z. D. (2026, February 13). A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.. The Texas Tribune. https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/

16. Joffe-Block, J. (2025, December 10). Trump's save tool is looking for noncitizen voters. but it's flagging U.S. citizens too. NPR. https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens

17. 2001 AILA Doc. No. 01030203 - INS Backgrounder on Child Citizenship Act, February 27, 2001. https://www.aila.org/library/ins-backgrounder-on-child-citizenship-act

18. 2024 Arizona Attorney General's Office, Criminal Division - Fraud & Special Prosecutions Section, September 6, 2024. https://www.azag.gov/sites/default/files/2025-05/LOG_ILLEGAL_VOTING_%26_ELECTION_CASE_DISPOSITIONS.pdf

19. 2024 National Conferences of State Legislatures, Voting Age for Primary

Elections, updated October 21, 2024. https://www.ncsl.org/elections-and-campaigns/voting-age-for-primary-elections

20. 2025 Arizona Secretary of State Election Procedures Manual. https://apps.azsos.gov/election/files/epm/2025/Election-Procedures-Manual-2025--FINAL-12-22-25.pdf

21. 2008 National Academies of Science report - State Voter Registration Databases, Immediate Actions and Future Improvements. https://www.eac.gov/sites/default/files/document_library/files/State_Voter_Registration_Databases_-_Interim_Report.pdf