**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**DEMOCRATIC PARTY PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.     Courts enjoined President Trump's previous attempt to regulate elections via
executive order. ........................................................................................................ 2

II.    Executive Order 14399 dictates the creation of unprecedented citizenship lists and
sweeping changes to voting by mail. ....................................................................... 3

     A.    Section 2(a) requires federal agencies to create "State Citizenship Lists"
using incomplete data from inaccurate sources. ........................................... 3

     B.    Section 3(b) prohibits the transmission of mail ballots for voters who are not
properly "enrolled" with USPS. .................................................................... 7

III.    The Executive Order would fundamentally transform the nature of voting by mail. ......... 8

IV.    Plaintiffs filed this lawsuit to protect their interests and the voting and privacy
rights of their members. ........................................................................................... 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT .................................................................................................................... 10

I.     The Democratic Party Plaintiffs have standing. ..................................................... 10

     A.    The Democratic Party Plaintiffs have standing because the Executive Order
unlawfully alters the rules in the elections in which they compete. ............. 10

     B.    The Democratic Party Plaintiffs have standing based on harm to their
electoral prospects. ...................................................................................... 11

     C.    The Democratic Party Plaintiffs have associational standing based on
harm to their members' and constituents' voting rights. ............................ 13

     D.    The Party Organizations have associational standing based on harm to
their members' and constituents' privacy rights. ....................................... 15

     E.    The Party Organizations have standing based on harm to their mission and
the need to divert resources to combat that harm. ....................................... 16

     F.    The remaining prongs of the standing inquiry are satisfied. ........................ 18

II.    Plaintiffs are likely to succeed on the merits. ....................................................... 19

i

A. The Executive Order is *ultra vires*...........................................................................19

B. The Executive Order violates the horizontal separation of powers. ......................23

C. The Executive Order violates the vertical separation of powers. .........................25

D. The Executive Order violates USPS's statutory authority....................................28

E. The Executive Order violates the Privacy Act......................................................30

  1. Plaintiffs challenge reviewable final agency action..................................31

  2. The State Citizenship Lists contravene the Privacy Act's prohibition of data-matching programs. ........................................................................35

III. The remaining preliminary injunction factors are satisfied. ............................................39

A. The Democratic Party Plaintiffs will be irreparably harmed if the E.O. is not enjoined quickly..................................................................................................39

B. The equities and public interest favor relief. ........................................................42

CONCLUSION.................................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ................................................................................. 10, 19, 21

*AFL-CIO v. DOL*,
  No. 25-cv-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) ..................................... 32–34

*AFL-CIO v. SSA*,
  771 F. Supp. 3d 717 (D. Md. 2025) .......................................................................................... 32

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
  321 F.3d 1166 (D.C. Cir. 2003) ............................................................................................... 28

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ................................................................................................ 16

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013) ...................................................................................................... 20, 22, 25, 27

*Baker v. Carr*,
  369 U.S. 186 (1962) .................................................................................................................. 21

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................................. 31

*Bond v. United States*,
  564 U.S. 211 (2011) .................................................................................................................. 23

*Bost v. Ill. State Bd. of Elections*,
  146 S. Ct. 513 (2026) ................................................................................................................ 11

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. 2025) ..................................................................................... 2, 3

*California v. Trump*,
  805 F. Supp. 3d 387 (D. Mass. 2025) ........................................................................................ 2

*Camp v. Pitts*,
  411 U.S. 138 (1973) .................................................................................................................. 34

*Chamber of Com. of U.S. v. DHS*,
  No. 25-CV-3675 (BAH), 2025 WL 3719234 (D.D.C. Dec. 23, 2025) ..................................... 31

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1332 (D.C. Cir. 1996) ....................................................................................... 22

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 42

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ....................................................................................................... 28

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ....................................................................................... 31

*Collins v. Yellen*,
594 U.S. 220 (2021) ....................................................................................................... 23

*Colorado v. DeJoy*,
No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sep. 14, 2020) ...................................... 28

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) .......................................................................................... 16

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ...................................................................................... 14

*Conte & Co. v. Stephan*,
713 F. Supp. 1382 (D. Kan. 1989) ................................................................................. 30

*Cook Cnty. Republican Party v. Pritzker*,
487 F. Supp. 3d 705 (N.D. Ill. 2020) ............................................................................. 26

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ..................................................................................... 13, 16

*\*Ctr. for Taxpayer Rts. v. IRS*,
No. 25-cv-0457, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) .................................... 32–34

*Ctr. for Taxpayer Rts. v. IRS*,
No. 25-cv-0457 (CKK), 2025 WL 2801862 (D.D.C. Oct. 1, 2025) ............................... 34

*Dalton v. Specter*,
511 U.S. 462 (1994) ....................................................................................................... 20

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ....................................................................................... 22

*Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*,
132 F.3d 1095 (5th Cir. 1998) ........................................................................................ 21

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ................................................................................................. 18

*Drs. for Am. v. OPM*,
  793 F. Supp. 3d 112 (D.D.C. 2025) ..................................................................... 32, 33

*Elec. Priv. Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ................................................................................ 10

*Ex parte Jackson*,
  96 U.S. 727 (1877) .................................................................................................. 23

*Ex parte Siebold*,
  100 U.S. 371 (1879) ............................................................................................ 20, 22

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ............................................................................... 14

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................................ 16–18

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................................. 31

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ................................................................................................. 23

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) .................................................................................... 15

*Georgia v. Meadows*,
  692 F. Supp. 3d 1310 (N.D. Ga. 2023) ..................................................................... 26

*Georgia v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) ..................................................................... 20, 21, 26

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ................................................................................ 28

*Guedes v. ATFE*,
  920 F.3d 1 (D.C. Cir. 2019) .................................................................................... 43

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) ............................................................................... 42

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................ 16, 17

v

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................................................ 13–16

*Husted v. A. Philip Randolph Inst.*,
  584 U.S. 756 (2018) ..................................................................................................... 22

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ..................................................................................................... 28

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949) ..................................................................................................... 22

*League of Women Voters of Mo. v. Ashcroft*,
  336 F. Supp. 3d 998 (W.D. Mo. 2018) ........................................................................ 40

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ....................................................................................... 40

*\*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................. *passim*

*Londrigan v. FBI*,
  670 F.2d 1164 (D.C. Cir. 1981) ................................................................................... 43

*L.A. Press Club v. Noem*,
  No. 2:25-cv-05563, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ............................... 32

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................... 19

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ..................................................................................................... 32

*\*LULAC v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ..................................................................... *passim*

*\*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ....................................................................... *passim*

*\*LULAC v. Exec. Off. of the President*,
  No. 1:25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .............................. *passim*

*McGough v. United States*,
  No. 1:23-CV-03628 (CJN), 2025 WL 2760424 (D.D.C. Sept. 29, 2025) ................. 31

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ..................................................................................................... 20

*N.Y. State Bar Ass'n v. FTC*,
  276 F. Supp. 2d 110 (D.D.C. 2003) ................................................................... 28

*Nat. L. Party of U.S. v. FEC*,
  111 F. Supp. 2d 33 (D.D.C. 2000) ..................................................................... 11

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022) ........................................................................... 28

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................................... 19

*New York v. Trump*,
  767 F. Supp. 3d 44 (S.D.N.Y. 2025) ................................................................. 32

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 10

*NFIB v. OSHA*,
  595 U.S. 109, 117 (2022) ................................................................................... 28

*People First of Ala. v. Merrill*,
  467 F. Supp. 3d 1179 (N.D. Ala. 2020) ............................................................ 14

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ........................................................................... 10

*Randolph v. ING Life Ins. & Annuity Co.*,
  973 A.2d 702 (D.C. 2009) .................................................................................. 15

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) ............................................................................ 16

*Roudebush v. Hartke*,
  405 U.S. 15 (1972) ............................................................................................. 20

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ............................................................................................. 10

*Sandusky Cnty. Democratic Party v. Blackwell*,
  387 F.3d 565 (6th Cir. 2004) ............................................................................. 14

*\*Shays v. FEC*,
  414 F.3d 76 (D.C. Cir. 2005) ....................................................................... 11, 12

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ............................................................................. 29

*Thomas More L. Ctr. v. Obama*,
651 F.3d 529 (6th Cir. 2011) ................................................................................................... 25

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ..................................................................................... 42, 43

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
761 F. Supp. 3d 97 (D.D.C. 2025) .......................................................................................... 15

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................................................ 10

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016) ................................................................................................................. 31

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*,
540 U.S. 736 (2004) ............................................................................................................ 23, 30

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
517 U.S. 544 (1996) ................................................................................................................. 15

*United States v. Oregon*,
No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ...................................... 26

*United States v. Smilowitz*,
974 F.3d 155 (2d Cir. 2020) ..................................................................................................... 25

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ........................................................................................... *passim*

*Washington v. Trump*,
No. 2:25-cv-00602, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) ................................. 2, 3, 20

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................................................................. 38

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ................................................................................................................. 38

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................................................ 39

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.C. Cir. 2025) ...................................................................................... 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................................................... 42

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .................................................................................. 20, 22

**Constitution**

U.S. Const. art. I ................................................................................................ 23

*U.S. Const. art. I, § 2, cl. 1 ........................................................................... 25

*U.S. Const. art. I, § 4, cl. 1 ........................................................................... 25

U.S. Const. art. I, § 8, cl. 7 ............................................................................. 23

U.S. Const. art. IV, § 4 .................................................................................... 21

U.S. Const. amend. X ....................................................................................... 25

U.S. Const. amend. XVII .................................................................................. 25

**Statutes**

5 U.S.C. § 552a ....................................................................................... *passim*

5 U.S.C. § 704 .................................................................................................. 31

8 U.S.C. § 1227 ................................................................................................ 45

18 U.S.C. § 1693 ................................................................................................ 9

18 U.S.C. § 611 ................................................................................................ 45

39 U.S.C. § 101 ................................................................................... 23, 24, 44

39 U.S.C. § 201 ......................................................................................... 23, 30

39 U.S.C. § 202 ................................................................................................ 24

39 U.S.C. § 3018 .............................................................................................. 29

39 U.S.C. § 3406 .............................................................................................. 30

39 U.S.C. § 401 ................................................................................................ 29

39 U.S.C. § 403 ................................................................................................ 30

39 U.S.C. § 501 ................................................................................................ 24

39 U.S.C. § 502 ................................................................................................ 24

39 U.S.C. § 503 ................................................................................................ 24

39 U.S.C. § 601 ..................................................................................................................... 9

42 U.S.C. § 1320b-7 ................................................................................................... 4, 37, 38

42 U.S.C. § 653 ................................................................................................................... 38

52 U.S.C. § 20304 ............................................................................................................... 30

52 U.S.C. § 20501 .............................................................................................................. 45

52 U.S.C. § 20507 ............................................................................................................... 27

52 U.S.C. § 20508 ............................................................................................................... 27

52 U.S.C. § 21083 ............................................................................................................... 22

52 U.S.C. § 21085 ............................................................................................................... 27

Act of Feb. 8, 1894, ch. 25, 28 Stat. 36 ............................................................................ 27

Ch. 99, § 13, 16 Stat. 433 (1871) ....................................................................................... 27

Pub. L. No. 89-110, § 7, 79 Stat. 437 (1965) ..................................................................... 27

Pub. L. No. 99-603, 100 Stat. 3359 ................................................................................... 37

Pub. L. No. 100-503, 102 Stat. 2507 ................................................................................. 36

Pub. L. No. 109-246, 120 Stat. 577 (2006) ........................................................................ 27

108 Stat. 4462 (Oct. 31, 1994) .......................................................................................... 38

110 Stat. 2168 (Aug. 22, 1996) ......................................................................................... 38

110 Stat. 3009-673 (Sept. 30, 1996) ................................................................................. 38

113 Stat. 1859 (Dec. 14, 1999) .......................................................................................... 38

113 Stat. 1911 (Dec. 17, 1999) .......................................................................................... 38

122 Stat. 1095 (May 22, 2008) .......................................................................................... 38

122 Stat. 1664 (June 18, 2008) .......................................................................................... 38

128 Stat. 815 (Feb. 7, 2014) ............................................................................................... 38

Ariz. Rev. Stat. § 16-165 ................................................................................................... 45

N.C. Gen. Stat. § 9-6.2 ....................................................................................................... 45

x

Utah Code Ann. § 20A-2-502 ............................................................................................ 45

**Regulations**

Exec. Order 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ..................................................... *passim*

39 C.F.R. § 320.6 ................................................................................................................. 9

90 Fed. Reg. 48948 (Oct. 31, 2025)...................................................................................... 4

90 Fed. Reg. 50879 (Nov. 12, 2025)................................................................................. 4, 37

**Other Authorities**

Lisa Marshall Manheim, *Presidential Control of Elections*,
   74 Vand. L. Rev. 385, 435 (2021)............................................................................... 21

*The Federalist No. 57* (James Madison) ........................................................................ 21

*The Federalist No. 59* (Alexander Hamilton) ............................................................... 20

*The Federalist No. 60* (Alexander Hamilton) ............................................................... 27

Legislative History of the Privacy Act of 1974: Source Book on Privacy 168, 217, 884
   (Sep. 1976) ................................................................................................................. 36

**INTRODUCTION**

President Trump has tried repeatedly to rewrite election rules for his own perceived partisan advantage. He believes that if he can severely restrict mail voting—a favorite scapegoat for his 2020 electoral defeat—and impose other voting restrictions, then Republicans will "never lose a race—for 50 years, we won't lose a race."[1] But our Constitution's Framers anticipated that some might seek to solidify power, even against the will of the people, and they crafted a system of government designed to protect against that threat. Among those protections are the Constitution's unequivocal mandate that authority to regulate elections sits in the first instance with the states—only to be displaced upon the agreement of both chambers of Congress—and the establishment of an independent judiciary with the duty to protect against unlawful encroachment—including by the Executive.

Accordingly, each state has carefully customized its own rules and regulations for voting, including absentee and mail-in voting, to balance the twin needs of broad access to the franchise and secure elections. Congress has declined the President's call to override state law in this area. And courts have repeatedly confirmed that the careful distribution of power set forth in the Constitution and federal law may not be revised at the President's whim—including when the President previously attempted to revise election laws via executive order. *See League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC I*"), 780 F. Supp. 3d 135 (D.D.C. 2025); *LULAC v. Exec. Off. of President* ("*LULAC II*"), 808 F. Supp. 3d 29 (D.D.C. 2025); *LULAC v. Exec. Off. of the President* ("*LULAC III*"), No. 1:25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026), *appeal docketed*, No. 26-5102 (D.C. Cir. Apr. 2, 2026); *Washington v. Trump*, No. 2:25-

---

[1] Ex. 11, Maddie Gannon, *Trump Stops in Battleground Georgia to Talk Economy, Voter ID Ahead of Midterms*, Spectrum News (Feb. 19, 2026).

cv-00602, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025), *appeal docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025); *California v. Trump*, 805 F. Supp. 3d 387 (D. Mass. 2025).

Nevertheless, on March 31, 2026, President Trump signed a new Executive Order to impose radical changes on voters' ability to cast absentee or mail-in ballots (collectively, "mail ballots") in ways that imminently threaten Plaintiffs, their members, and their constituents. As a result, the Democratic Party Plaintiffs—comprised of the Democratic Senatorial Campaign Committee (DSCC), the Democratic Congressional Campaign Committee (DCCC), the Democratic National Committee, the Democratic Governors Association (collectively, the "Party Organizations"), and the Democratic Leaders of the U.S. House and Senate, Hakeem Jeffries and Charles Schumer, respectively—seek a preliminary injunction preventing Defendants from implementing the Executive Order. The Order requires Defendants to share voters' sensitive personal information and restrict the ability to cast mail ballots in ways that are *ultra vires*, contravene the separation of powers, and conflict with numerous statutes governing election administration, mail service, and privacy. The equities strongly support preliminary relief because the serious harms threatened to Plaintiffs, their members, and the public would be irreparable, whereas Defendants would suffer no harm from being prohibited—once again—from implementing an unlawful executive order.

## BACKGROUND

**I.     Courts enjoined President Trump's previous attempt to regulate elections via executive order.**

This is not the first time President Trump has attempted to remake American elections via executive order. On March 25, 2025, President Trump issued Executive Order 14248, which (among other things) ordered agencies to share sensitive voter information, change mail voting

rules, and require documentary proof of citizenship for voter registration purposes. Judge Kollar-Kotelly of this District (the "*LULAC* Court") enjoined several sections of that executive order on the grounds that it exceeded the President's lawful authority. *See LULAC I*, 780 F. Supp. 3d at 226; *LULAC II*, 808 F. Supp. 3d at 87–88; *LULAC III*, 2026 WL 252420, at *56–57. Two other federal courts also enjoined several portions of the order, including provisions attempting to change mail balloting rules. *See Washington*, 2026 WL 73866, at *38–39; *California*, 786 F. Supp. 3d at 396–97. Parts of these decisions are on appeal.

II.    **Executive Order 14399 dictates the creation of unprecedented citizenship lists and sweeping changes to voting by mail.**

On March 31, 2026, President Trump issued Executive Order 14399, titled *Ensuring Citizenship Verification and Integrity in Federal Elections* (the "E.O." or "Order"), which again attempts to transform American elections by executive fiat. *See* Exec. Order 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026); *see also* Ex. 12, *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, The White House (Mar. 31, 2026). It does so through two unprecedented and sweeping edicts. First, Section 2(a) requires the Secretary of Homeland Security to prepare a list of every adult American citizen residing in each state and share those lists with state election officials in advance of federal elections. E.O. § 2(a). Second, Section 3(b) orders USPS to create a list of every voter "enrolled" to vote by mail, *id.* § 3(b)(iv), and prohibits USPS from delivering a ballot from any voter who is not "enrolled" on that list, *id.* § 3(b)(iii). Section 4(a) directs the implementation of the E.O. *Id.* § 4(a). These provisions are discussed further below.

A.    **Section 2(a) requires federal agencies to create "State Citizenship Lists" using incomplete data from inaccurate sources.**

Section 2(a) of the E.O. commands the creation of new "State Citizenship Lists":

> The Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services [("USCIS")] and in coordination with the Commissioner of [the Social Security Administration ("SSA")] *shall* take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List).

E.O. § 2(a) (emphasis added). These lists "*shall* be derived from Federal citizenship and naturalization records, SSA records, SAVE [("Systematic Alien Verification for Entitlements")] data, and other relevant Federal databases." *Id.* (emphasis added). The lists must be "transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election," or upon request. *Id.*

The databases the E.O. orders Defendants to use are known to have severe deficiencies. In particular, the SAVE and SSA databases are incomplete, out-of-date, and riddled with inaccuracies. *See* Ex. 10, Expert Decl. of Dr. Kenneth Mayer ("Mayer Decl.") at 1. Nor were these databases created to verify citizenship or residency. SAVE is a USCIS system created to verify the "immigration status" of applicants for federal government benefits. 42 U.S.C. § 1320b-7(d)(2)(A), (d)(3); *see* Ex. 13, *About SAVE*, USCIS (Mar. 3, 2026). It pulls data from other databases, including SSA, so that users can attempt to "match" identifying information about an individual to records containing citizenship information. Mayer Decl. at 3–4; Ex. 14, Dep't of Homeland Sec., Ref. No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the SAVE Program* (2025) ("SAVE PIA"); 90 Fed. Reg. 48948, 48949 (Oct. 31, 2025); *see also* 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025) ("SSA SORN").[2] DHS cannot verify the SSA data it uses, and it has acknowledged a "risk

---

[2] Until a significant reconfiguration last year, SAVE did not contain information about citizens born in the U.S. *See* 90 Fed. Reg. 48948 (Oct. 31, 2025) ("SAVE SORN"). But DHS and SSA failed to properly notice these changes, and their lawfulness is the subject of ongoing litigation. *See LULAC III*, 2026 WL 252420, at *54; Compl., *League of Women Voters v. DHS*, No. 25-cv-3501 (D.D.C. Sep. 30, 2025); Compl., *Bower v. SSA*, No. 25-cv-2713 (D.D.C. Aug. 18, 2025).

that [SAVE] share[s] inaccurate information," including citizenship information, with state officials. Ex. 14, SAVE PIA at 19–20; *see also, e.g.*, Ex. 15, Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026).

There are many reasons for the inaccuracies. SSA did not comprehensively collect citizenship information until 1978 and did not consistently retain it until 1981, meaning SSA data has substantial gaps for voters born or naturalized before then. *See* Mayer Decl. at 4; Ex. 16, Fair Elections Ctr., *Eligible Voters at Risk: Examining Changes to USCIS's SAVE System* 5 (2025). SSA's data is also incomplete for many—if not most—naturalized citizens, as it generally reflects citizenship at the time a person applies for a Social Security number, and that information is not updated as a matter of course when a person obtains citizenship. Mayer Decl. at 4, Ex. 16, Fair Elections Ctr., at 12. The record is updated only if an individual affirmatively alerts SSA by bringing proof of citizenship to an in-person appointment. *See* Ex. 17, *Update Citizenship or Immigration Status*, SSA (last visited Apr. 17, 2026); Mayer Decl. at 4; Ex. 16, Fair Elections Ctr., at 12. SSA has acknowledged that "SSA records . . . do not provide definitive information on U.S. citizenship," and its own "assessment of its citizenship data indicates that approximately ¼ of those records do not have an indication of citizenship present." Ex. 18, Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for SSA, to Jon Sherman, Litig. Dir. & Senior Couns. for Fair Elections Ctr. (July 13, 2023); Mayer Decl. at 4.

These problems are not theoretical. Reports confirm that when election administrators use SAVE, citizens are frequently flagged as noncitizens, with error rates as high as 80%. *See* Mayer Decl. at 5. In one Texas county, at least half of the voters SAVE identified as noncitizens were actually citizens. *See* Ex. 19, Jen Fifield, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Tex. Trib. (Feb. 13, 2026). And, in Missouri, SAVE

misidentified "individuals [officials] know to be U.S. citizens—our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies." Ex. 20, Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026).

The E.O. also mandates that these "State Citizenship Lists" include only adult citizens whose residency has been confirmed in a particular state, but SAVE and SSA lack reliable residency information. *See* Mayer Decl. at 5. In fact, there is little indication that SAVE maintains much residential data at all, and it does not use an individual's address as a matching field when attempting to confirm citizenship. *See* Mayer Decl. at 5; Ex. 21, *SAVE: Verification Process*, USCIS (May 22, 2025). It is similarly unclear whether SSA has any residency records for most Americans, let alone current and accurate records. *See* Mayer Decl. at 6. SSA does not require an address to apply for a social security card, and aside from certain current social security beneficiaries, individuals have no duty to provide SSA with updated residency information. *See id.*; Ex. 22, *FAQ: How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?*, Soc. Sec. Admin. (Sep. 20, 2024) ("If you do not receive Social Security benefits, SSI payments, or Medicare, you do not need to change your address with us.").

Other deficiencies permeate SAVE and SSA data. Both often lack information on surname changes due to marriage and divorce, an issue that disproportionately affects women by more than a 10-to-1 margin. *See* Mayer Decl. at 8. And although SSA allows an individual to update her surname, there is no requirement to do so and no systematic process that links marriage, divorce, and other surname change records with federal citizenship or SSA data. *See id.*

6

Finally, because the E.O. requires State Citizenship Lists to be provided to a state "no fewer" than 60 days before an election, the lists will omit or have inaccurate data for the hundreds of thousands of Americans who move or attain citizenship after the lists are prepared and transmitted. *See* Mayer Decl. at 5; Ex. 23, Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023); Ex. 24, *Naturalization Statistics*, USCIS (Jan. 24, 2025).

## B.    Section 3(b) prohibits the transmission of mail ballots for voters who are not properly "enrolled" with USPS.

Section 3(b) "direct[s]" the Postmaster General to "initiate a proposed rulemaking" within 60 days that "*shall* include, at minimum" the creation of a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in each state. E.O. § 3(b)(iv) (emphasis added). The Order does not specify how USPS will determine which individuals should be included on the "Mail-In and Absentee Participation List," but it is clear USPS will have control over the list. And while states may provide "suggested modifications" to the list, the E.O. does not require USPS to accept those suggestions. *Id.* § 3(b)(v).

Section 3(b)(iii) of the E.O. categorically prohibits USPS from transmitting ballots for voters who are not on its list. *See id.* § 3(b)(iii) (USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on USPS's "Mail-In and Absentee Participation List"); *see also* Ex. 12, *Fact Sheet* ("The Order requires the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List . . . .").[3]

---

[3] By its plain text, the E.O. prohibits USPS from transmitting ballots *from* voters, but not transmitting ballots *to* voters. *See* E.O. § 3(b)(iii). The White House's fact sheet, however, contends that the E.O. would also prohibit USPS from delivering ballots *to* voters in the first place. Either way, the E.O. mandates that voters would not be able to rely on USPS to transmit their ballot unless they appear on USPS's pre-approved list.

7

**III.    The Executive Order would fundamentally transform the nature of voting by mail.**

The history of mail and absentee voting in the United States stretches back to the Revolutionary War. Ex. 25, Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (Dec. 12, 2023). Today, every state offers at least some form of mail and absentee voting. *See* Ex. 26, *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives*, Nat'l Conf. of State Legislatures (Feb. 24, 2026). In nine states, elections are conducted primarily by mail. *See id.* Twenty-eight states offer absentee ballots to any voter who requests one, and another eight states plus the District of Columbia automatically mail ballots to all registered voters. *See* Ex. 27, *Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026). Even in states that do not have "no excuse" mail or absentee voting, voters may vote by mail with a qualifying reason. Permitted reasons vary, but states commonly allow voters to vote by mail when they are out of the jurisdiction during the election period, have a qualifying illness or disability, are of advanced age, have work or school conflicts, have conflicting religious practices, have jury duty, or are election workers. *See* Ex. 28, *Table 2: Excuses to Vote Absentee*, Nat'l Conf. of State Legislatures (Aug. 26, 2025).

In recent elections, voters have widely relied upon mail voting. In the 2024 general election, for example, nearly 47 million voters cast ballots by mail that were counted. Ex. 29, U.S. Election Assistance Commission, *Election Administration and Voting Survey 2024 Comprehensive Report* at ix (June 2025). Absentee voting has proven to be a safe and secure election practice: "[a]s with all forms of voter fraud, documented instances of fraud related to [mail voting] are rare." Ex. 30, M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee Voting* (Feb. 28, 2024); *see also* Mayer Decl. at 10–11 (showing lack of fraud in elections with respect to non-citizen voting). In recent elections, Democratic voters have been more likely than Republican

voters to rely on mail voting, and that trend is expected to continue. *See* Ex. 3, Decl. of Liberty Schneider ("Schneider Decl.") ¶ 22; Ex. 31, M.I.T. Election Data & Sci. Lab, *How We Voted in 2024* at 3 (July 21, 2025) (showing that 37% of Democrats cast a ballot by mail in 2024, compared to 24% of Republicans).

States use USPS to transmit ballots to voters, and 19 states and the District of Columbia specifically provide voters with prepaid USPS postage return envelopes for their ballots. *See* Ex. 32, *Table 12: States with Postage-Paid Election Mail*, Nat'l Conf. of State Legislatures (Jan. 28, 2024). There is no realistic alternative carrier for ballots. Federal law provides that only USPS can carry non-urgent letter mail, 39 C.F.R. § 320.6, unless the amount paid is at least six times higher than USPS's rate, 39 U.S.C. § 601, and only USPS can place mail in individual mailboxes, 18 U.S.C. § 1693. Even setting those restrictions aside, it would likely be logistically impossible for private mail carriers like FedEx or UPS to handle the extremely high volume of ballot-related mail required to conduct modern elections. In 2020, both FedEx and UPS rejected the notion that they could assist USPS in transmitting ballot mail. *See* Ex. 33, Lisa Baertlein, *UPS, FedEx Warn They Cannot Carry Ballots Like U.S. Postal Service*, Reuters (Aug. 16, 2020). And, indeed, the number is staggering. In the 2024 general election alone, USPS handled nearly 100 million ballots. *See* Ex. 34, *USPS Releases Report on 2024 Election*, U.S. Postal Serv. (Dec. 3, 2024).

**IV.   Plaintiffs filed this lawsuit to protect their interests and the voting and privacy rights of their members.**

On April 1, 2026—the day after President Trump signed the E.O.—the Democratic Party Plaintiffs filed a seven-count Complaint challenging the E.O.'s illegal directives. *See* Compl., ECF No. 1. At issue in this motion for preliminary injunction are Plaintiffs' claims that the E.O. is *ultra vires* (Count I), antithetical to the separation of powers and federalism (Counts II and III), contrary to USPS's statutory powers (Count IV), and irreconcilable with the Privacy Act (Count V).

9

**STANDARD OF REVIEW**

To obtain a preliminary injunction, Plaintiffs must show that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). The "first and most important factor" is whether the movants "have established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). When a preliminary injunction is sought against the government, the final two factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**I.    The Democratic Party Plaintiffs have standing.**

The Democratic Party Plaintiffs have standing to seek preliminary relief against Sections 2(a) and 3(b) of the E.O. because they are likely to show they have an "injury-in-fact" that is "traceable to the challenged conduct of the" Defendants and "likely to be redressed" by an injunction as to each claim against each provision at issue. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 356–57 (D.D.C. 2020) (citing *Elec. Priv. Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). While only "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006), here, all Plaintiffs have standing.

**A.    The Democratic Party Plaintiffs have standing because the Executive Order unlawfully alters the rules in the elections in which they compete.**

Each of the Party Plaintiffs, including their members who are candidates for election in 2026 in all 50 states, as well as Leader Schumer and Leader Jeffries, who are candidates themselves, have standing to challenge both Section 2(a) and 3(b), which force them to compete

10

in unlawfully structured elections. *See* Ex. 1, Decl. of Lillie Snyder Boss ("Snyder Decl.") ¶¶ 4, 6–7; Ex. 2, Decl. of Erik Ruselowski ("Ruselowski Decl.") ¶¶ 4–8; Schneider Decl. ¶¶ 5–7; Ex. 4, Decl. of Jillian Edelman ("Edelman Decl.") ¶¶ 4–7; Ex. 5, Decl. of Hakeem S. Jeffries ("Jeffries Decl.") ¶¶ 3, 7; Ex. 6, Decl. of Charles E. Schumer ("Schumer Decl.") ¶¶ 3, 8. Recent Supreme Court precedent establishes that "candidates . . . have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519–20 (2026). This harm exists whether the unlawful electoral changes "help, hurt, or have no effect on a candidate's electoral prospects." *Id.* at 520. Under *Bost*, because Plaintiffs or their members are candidates for election and the E.O. will dramatically alter the rules of their elections, Plaintiffs have standing to challenge the E.O.

**B.      The Democratic Party Plaintiffs have standing based on harm to their electoral prospects.**

Each of the Party Plaintiffs, including their candidate members running for election this year in all 50 states and the District of Columbia, as well as candidate-Leaders Schumer and Jeffries, have standing to challenge Sections 2(a) and 3(b) because of the harm they inflict on their electoral prospects. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 192, 209 (recognizing Plaintiffs' standing on this basis). It is well established that a threat to a political party's electoral prospects stemming from a change in election rules constitutes a concrete and particularized injury. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (holding candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . [in] winning reelection"); *Nat. L. Party of U.S. v. FEC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (same for party committees).

If Section 3(b) of the E.O. is not enjoined and the USPS is permitted to implement new barriers to mail voting, including to limit who is eligible to vote via U.S. mail, it will severely

11

undermine the Democratic Party Plaintiffs' electoral prospects. Mail voting has been a cornerstone of the Party Organizations' electoral strategy in recent years, and Democrats currently comprise the largest share of mail voters. *See* Snyder Decl. ¶¶ 11–20; Ruselowski Decl. ¶¶ 12–19; Schneider Decl. ¶¶ 13–22; Edelman Decl. ¶¶ 11–18; Ex. 31, *How We Voted in 2024* at 3. Moreover, the E.O.'s changes to mail voting will compromise the Party Organizations' existing mail ballot programs, voter turnout strategies, and planned voter education campaigns. *See* Snyder Decl. ¶¶ 8–32; Ruselowski Decl. ¶¶ 9–34; Schneider Decl. ¶¶ 9–35; Edelman Decl. ¶¶ 8–31. Indeed, the E.O. will force some of the Party Organizations to revisit whether to promote mail balloting at all. *See* Snyder Decl. ¶ 26; Schneider Decl. ¶ 26; Edelman Decl. ¶ 22. To counteract the anticipated harm to their voters, the Party Organizations will need to spend mission-critical resources assisting voters in checking whether they are "enrolled" to receive a mail ballot and assisting them in voting if they are not on USPS's "list," draining the resources available to persuade and mobilize voters. *See infra* Argument § I.E. For all of these reasons, Section 3(b) significantly "alter[s] the [electoral] environment" to the Democratic Party Plaintiffs' detriment, *Shays*, 414 F.3d at 85–86, giving them Article III standing.

Section 2(a) of the E.O. is also more likely to affect Democratic voters. Because the State Citizenship Lists and state voter rolls lack a common unique identifier across both lists, it will be difficult for officials to match all individuals across files, especially for voters who have changed their last names. *See* Mayer Decl. at 8. This reality is particularly likely to affect women, who are much more likely than men to change their names because of marriage or divorce, and who are more likely to support Democratic candidates than men. *See id.* at 8; Snyder Decl. ¶ 39; Ruselowski Decl. ¶ 41. In other words, the creation of these lists creates a serious risk that Democratic Party supporters who are in fact U.S. citizens will be erroneously omitted from such lists and face

significant—and, for some, insurmountable—burdens on their ability to vote. When fewer Democratic Party supporters vote, the Democratic Party Plaintiffs and their members' electoral prospects suffer. *See* Snyder Decl. ¶ 40; Ruselowski Decl. ¶ 42; Schneider Decl. ¶ 42; Edelman Decl. ¶ 38; Jeffries Decl. ¶ 22; Schumer Decl. ¶ 23.

**C.    The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' voting rights.**

The Party Organizations also have associational standing because Sections 2(a) and 3(b) will harm their members and constituents. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 191, 207 (recognizing Democratic Party Plaintiffs' associational standing to sue based on anticipated harm to Democratic voters). The DNC, for example, has members in all 50 states who are registered as Democrats, *see* Schneider Decl. ¶ 5, and Democratic voters are likewise the core constituents of the other Party Organizations as well, *see* Snyder Decl. ¶ 4; Ruselowski Decl. ¶ 4. DNC's, DSCC's, DCCC's, and DGA's formal members (elected officials and candidates for office) are also themselves voters in each of their respective states. *See* Schneider Decl. ¶ 5; Snyder Decl. ¶¶ 4, 14; Ruselowski Decl. ¶¶ 4, 15; Edelman Decl. ¶ 4. Leaders Jeffries and Schumer also have standing in their own right as voters to challenge the E.O.'s impositions on the voting process. *See* Jeffries Decl. ¶¶ 3, 13; Schumer Decl. ¶¶ 3, 14.

Groups like the Party Organizations may bring suit on behalf of their members when (1) their members "would otherwise have standing to sue in their own right"; (2) "the interests [they] seek[] to protect are germane to [their] purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Courts have frequently found that political parties have associational standing on behalf of their voter members when they are challenging laws that would make it more difficult for their members to engage in the political process. *See Crawford v.*

13

*Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing that "Democrats have standing to challenge the validity" of voter ID law that makes it more difficult to vote); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar).

Each of the *Hunt* factors is satisfied here. First, the Party Organizations' voter members and constituents have standing to sue in their own right to challenge the E.O.'s creation of State Citizenship Lists to verify voter eligibility in elections, as well as its mandate that a voter be "enrolled" with USPS to be entitled to transmit a ballot via U.S. mail. It is well established that a voter has standing to challenge a law that regulates how they may cast a ballot or makes it more difficult to vote, even if the voter is ultimately able to overcome the restriction. *See, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding even if voters "possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce" photo ID to cast a ballot); *Fish v. Schwab*, 957 F.3d 1105, 1119–20 (10th Cir. 2020) (holding even a voter who *could* comply with proof of citizenship law had standing to challenge it); *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) ("[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

Second, the interests that the Party Organizations seek to protect by challenging the E.O. are germane to their organizational purpose. *See Hunt*, 432 U.S. at 343. To effectively pursue their mission of electing Democratic candidates, the Party Organizations encourage and assist voters in casting ballots and ensuring those ballots count. *See* Snyder Decl. ¶ 3; Ruselowski Decl. ¶ 3; Schneider Decl. ¶ 4; Edelman Decl. ¶ 3. Third, there is no reason why the Party Organizations'

14

individual members would have to participate in this action. *See Hunt*, 432 U.S. at 343; *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996). Plaintiffs are not, for example, seeking damages that would require individualized proof. *Cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 117–28 (D.D.C. 2025).

### D. The Party Organizations have associational standing based on harm to their members' and constituents' privacy rights.

Each of the Party Organizations' members are separately and independently injured by Section 2(a)'s mandatory disclosure of their personal information from federal databases because such disclosures offend long-standing notions of privacy. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919–20 (4th Cir. 2022); *see* Snyder Decl. ¶¶ 49–50; Ruselowski Decl. ¶¶ 51–52; Schneider Decl. ¶¶ 50–51; Edelman Decl. ¶¶ 45–46 (affirming members' and constituents' privacy interests in this data); *see also* Ex. 7, Decl. of Ada Shen ("Shen Decl.") ¶¶ 16–17; Ex. 8, Decl. of Carolyn Betensky ("Betensky Decl.") ¶¶ 7–15; Ex. 9, Decl. of Danielle Litwak ("Litwak Decl.") ¶¶ 7–11 (expressing individual concerns regarding disclosures of personal data). These individual members would have standing under Article III to vindicate their privacy interests in the federal records that the E.O. mandates disclosed. *See LULAC III*, 2026 WL 252420, at *51 (finding standing on this basis). And for the same reasons that the Party Organizations' members would have individual standing to challenge Section 2(a) on their own, Plaintiffs Schumer and Jeffries have individual standing to challenge the provision given the threat to their own privacy rights. *See* Jeffries Decl. ¶ 15; Schumer Decl. ¶ 16. The Party Organizations' members' privacy interests implicated by Section 2(a) are also germane to the Party Organizations' missions because the State Citizenship Lists are being created and disseminated to purportedly verify voters' eligibility, and there is again "no need

15

for individual members' participation in [this] case[], which seek[s] only forward-looking equitable relief." *LULAC III*, 2026 WL 252420, at *51 (citing *Hunt*, 432 U.S. at 343).

> **E.    The Party Organizations have standing based on harm to their mission and the need to divert resources to combat that harm.**

Finally, the Party Organizations have organizational standing because Sections 2(a) and 3(b) will "directly interfere with their core activities"—the Party's mail ballot programs and voter turnout strategies. *LULAC I*, 780 F. Supp. 3d at 180. To mitigate that harm to their core missions, the Party Organizations will be forced to redesign existing programs and redirect critical resources to address the E.O.'s impact on their voters and campaigns. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining organizations may establish standing by showing challenged act or law "perceptibly impair[s]" their "core . . . activities" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))); *Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 397 (4th Cir. 2024) (holding party committee had standing where it diverted resources in response to alleged federal violations, impairing its mission of "organizing lawful voters and encouraging them to support Republican[s]" (citing *All. for Hippocratic Med.*, 602 U.S. at 395)). [4]

---

[4] Federal courts before and after *Alliance for Hippocratic Medicine* have routinely concluded that party committees and other groups whose missions focus on elections can establish organizational standing to challenge laws and practices that impede their core voter advocacy efforts by threatening harm on voters. *See LULAC I*, 780 F. Supp. 3d at 207; *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (explaining "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of [a] law that [harms] the organization's mission" (first alteration in original) (citations omitted)); *Crawford*, 472 F.3d at 951 (holding Democratic Party committees had standing to challenge voter ID law based on diversion of resources), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing the Democratic Party had standing)); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (holding organizations engaged in voter registration had standing to challenge program designed to remove non-citizens from the rolls because they diverted resources to addressing wrongful misidentification of noncitizens that impeded mission of getting out the vote).

First, Section 3(b)—which restricts who may cast a mail ballot using USPS—will interfere with the Party Organizations' existing programs and investments, undermining the efficacy of their "core" voter assistance and turnout programs. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 378). Given the extent to which Democratic voters vote by mail (which primarily occurs through USPS, *see supra* Background § III), the Party Organizations have invested in vote-by-mail programs and voter targeting strategies with the understanding that eligible voters who wish to vote by mail will in fact be able to cast a mail ballot; those programs take significant planning and are underway for the 2026 elections. *See* Snyder Decl. ¶¶ 11–16, 20–25; Ruselowski Decl. ¶¶ 12–16, 22–25, 30; Schneider Decl. ¶¶ 13–18, 25–31; Edelman Decl. ¶¶ 11–14, 20–21. Section 3(b) will compromise the Party Organizations' existing programs and investments, forcing them to create entirely new voter education and assistance programs. Among other things, the E.O.'s changes will require the Party Organizations to develop programs to assist voters in checking whether they are "enrolled" in USPS's "Mail-In and Absentee Participation List" and assist voters in successfully casting a ballot if they are not permitted to vote by mail. *See* Snyder Decl. ¶¶ 25–26; Ruselowski Decl. ¶¶ 26–27; Schneider Decl. ¶¶ 26, 28; Edelman Decl. ¶¶ 22–23. Working to ensure these changes do not deter voters from voting entirely will be a significant challenge. *See* Snyder Decl. ¶ 27; Ruselowski Decl. ¶ 28; Schneider Decl. ¶ 29; Edelman Decl. ¶ 24.

Collectively, the costs and resources for these new programs would come at the expense of other initiatives the Party Organizations have planned to persuade and mobilize voters. *See* Snyder Decl. ¶¶ 29–32; Ruselowski Decl. ¶¶ 31–34; Schneider Decl. ¶¶ 32–35; Edelman Decl. ¶¶ 27–30. This harm to Plaintiffs' core activities and consequent diversion of resources is sufficient to establish injury-in-fact. *See All. for Hippocratic Med.*, 602 U.S. at 395; *LULAC I*, 780

17

F. Supp. 3d at 207 (holding the Democratic Party Plaintiffs have organizational standing under *Alliance for Hippocratic Medicine* to challenge the prior E.O.'s proposed changes, which forced them to "divert resources from other time-sensitive, election-related activities").

The same is true of Section 2(a), which directs DHS to develop "State Citizenship Lists" using SAVE and SSA to identify adult citizens who are residents of each state and share those lists with state election officials. E.O. §§ 1, 2. In light of known deficiencies in those databases' ability to accurately identify citizens or confirm residency, *see* Mayer Decl. at 4–7; *supra* Background § II, Section 2(a) will force the Party Organizations to carefully monitor the development of the Lists and put programs into place to help educate Democratic voters to check whether they are on the lists and to attempt to add themselves to the lists if they are erroneously omitted. *See* Snyder Decl. ¶ 44; Ruselowski Decl. ¶ 46; Schneider Decl. ¶ 45; Edelman Decl. ¶ 41. The resources required to attempt to ensure the State Citizenship Lists do not disenfranchise the Party's voters will necessarily come at the expense of the Party's persuasion and voter mobilization programs. *See* Snyder Decl. ¶ 47; Ruselowski Decl. ¶ 49; Schneider Decl. ¶ 48; Edelman Decl. ¶ 43. For these reasons, too, the Party Organizations have shown injury-in-fact as to Section 2(a). *See All. for Hippocratic Med.*, 602 U.S. at 395; *LULAC I*, 780 F. Supp. 3d at 191.

F.  **The remaining prongs of the standing inquiry are satisfied.**

The remaining standing factors are readily satisfied. Plaintiffs' injuries are traceable to Defendants, whom the E.O. charges with enforcement. *See* E.O. §§ 2(a), 4(a), 5. Even if other officials ultimately play some role in implementing the provision, or if the injuries also partly stem from voter behavior, traceability is established because there is a clear "predictable effect of [this] Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *accord LULAC I*, 780 F. Supp. 3d at 192. Finally, there is no question that the requested declaratory and equitable relief would redress Plaintiffs' injuries by preventing them

18

altogether. *See LULAC I*, 780 F. Supp. 3d at 207 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

## II.     Plaintiffs are likely to succeed on the merits.

The E.O. is an unlawful and unconstitutional attempt by President Trump to impose his preferred election policies nationwide by commandeering USPS's statutory functions and overriding states' authority to administer their own elections. Among other illegalities, the E.O. is *ultra vires*, contravenes the horizontal and vertical separation of powers, conflicts with USPS's statutory authority, and violates the Privacy Act. Plaintiffs are thus likely to succeed on the merits, the "most important factor" to obtain a preliminary injunction. *Aamer*, 742 F.3d at 1038.[5]

### A.     The Executive Order is *ultra vires*.

Plaintiffs are likely to succeed on the merits of their claim that the E.O. is an *ultra vires* exercise of executive power. The challenged provisions purport to regulate elections, including provisions directing USPS to interfere with election-related mail and create various lists to be used in defining who may vote by mail, as well as ordering DHS and other federal officials to build lists of eligible voters. *See* E.O. §§ 2(a), 3(b)(iii)–(iv). The Order also makes its purpose of regulating elections clear: it is entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," and Section 1 announces its purported aim of ensuring that "[t]he right to vote in Federal elections" remains "exclusively for citizens of the United States." E.O. § 1.

The President lacks any authority to regulate elections through executive fiat. "The Framers created a Federal Government of limited powers . . . ." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012). Accordingly, it is "black letter law" that the President's power to issue an

---

[5] Because none of the challenged provisions can be implemented lawfully, the E.O.'s "savings clauses" do not affect this analysis. *LULAC I*, 780 F. Supp. 3d at 176 & n.27.

edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The President lacks authority to act beyond the powers allocated. *See Dalton v. Specter*, 511 U.S. 462, 472 (1994).

The Constitution contains many "provisions addressing elections, voting, or both," but "none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington*, 2026 WL 73866, at *25 n.57. Instead, the Elections Clause expressly vests authority in the states to regulate federal elections in the first instance. *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. 2, § 1, cl. 2; *The Federalist No. 59* (Alexander Hamilton) (explaining that the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations"); *LULAC II*, 808 F. Supp. 3d at 72 ("The broad scope of [the Elections Clause] empowers States to establish a comprehensive regulatory framework for federal elections."). Only "the action of Congress," not the President, may "supersede[]" contrary state election law. *Ex parte Siebold*, 100 U.S. 371, 384 (1879); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*").

In marked contrast to the express authority the Constitution conveys to the states and Congress in this area, the "Constitution vests none of these powers in the President, leaving election regulation solely to the States and to Congress." *LULAC II*, 808 F. Supp. 3d at 73. Put differently, "[t]he Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (second alteration in original) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)), *cert. denied*, 145 S. Ct. 545 (2024); *see also id.* (noting that the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections"). In addition to lacking regulatory

20

authority over elections in his own right, the President also lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections." *Id.* at 1347. As such, he has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.*

The only constitutional authority the E.O. cites is the Guarantee Clause, *see* E.O. at Preamble, but nothing in that Clause gives the President the power that he attempts to wield here. The Guarantee Clause simply requires the "United States"—not the Executive Branch or the President—to "guarantee to every State . . . a Republican Form of Government." U.S. Const. art. IV, § 4. The Clause thus requires only that states must hold elections of some kind. *See The Federalist No. 57* (James Madison) ("The elective mode of obtaining rulers is the characteristic policy of republican government."); *Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099–1100 (5th Cir. 1998) (per curiam) (noting that if a state tried to impose a "monarchy" or "military dictatorship," it might "offend the Guarantee Clause of the Constitution"). Nor does the Guarantee Clause vest the President with authority to determine whether state governments are "republican"—that power, the Supreme Court has made clear, "rests with Congress." *Baker v. Carr*, 369 U.S. 186, 220 (1962).

Because the President lacks any constitutional authority to make election regulations, he and other executive officers may regulate elections only "in relation to another branch's constitutionally authorized act"—*i.e.*, an act of Congress. *Meadows*, 88 F.4th at 1347. But Congress has enacted no statute authorizing the mandates contained in the Order. Indeed, "in the field of election administration, Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

The two statutes that the E.O. references as authority—the Help America Vote Act ("HAVA") and the National Voter Registration Act of 1993 ("NVRA")—lack any authorization for the President's mandates. *See* E.O. at Preamble. Both are exercises of Congress's authority to supervise federal elections, and that authority extends only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 371). Nothing in HAVA or the NVRA authorizes the President's exercise of authority here. Rather, both statutes require the *states* to take certain actions related to voter registration and voter rolls. *See* 52 U.S.C. § 21083(a)(1)(A) (HAVA provision requiring *states* to create a "computerized statewide voter registration list"); *id.* (stating that the list is to be "defined, maintained, and administered at the State level"); *id.* § 20507(a) (NVRA provision charging *states* with the "administration of voter registration for elections for Federal office"); *Husted v. A Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (noting that the NVRA makes *states* the custodians of voter lists). As the *LULAC* Court noted, these statutes "implicitly forbid[] any individual member of the Executive Branch from unilaterally exercising the delegated power to regulate State voter registration programs." *LULAC II*, 808 F. Supp. 3d at 74.

Because no constitutional or statutory authority supports the Order, it is blatantly *ultra vires*. Indeed, "the President's power is 'at its lowest ebb' here because his unilateral instruction[s] . . . are contrary to the manifest will of Congress, as expressed in the text, structure, and context" of HAVA and the NVRA (as well as the USPS's governing statutes, *infra* Argument § III.D). *LULAC II*, 808 F. Supp. 3d at 74 (quoting *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)). This Court must "reestablish the limits on [the President's] authority," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1332, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224

22

(D.C. Cir. 1988)), by issuing the injunctive and declaratory relief Plaintiffs request, *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

### B.    The Executive Order violates the horizontal separation of powers.

Plaintiffs are also likely to succeed on their claim that the E.O. violates the separation of powers by attempting to override Congress's authority.[6] The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as well" by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id.* at 222–23. The Order interferes with Congress's prerogatives by intruding on its authority to regulate elections, U.S. Const. art. I § 4, as discussed above, and by overriding its command that USPS shall be an "independent establishment," 39 U.S.C. § 201.[7]

Congress's constitutional authority "to establish Post Offices and post Roads," U.S. Const. art. I, § 8, cl. 7, is plenary, "embrac[ing] the regulation of the entire postal system of the country." *Ex parte Jackson*, 96 U.S. 727, 732 (1877). Congress created USPS as an "independent establishment," 39 U.S.C. § 201, and structured it to be insulated from partisan machinations in order to increase efficiency and "reduce political influences on its operations," *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004). Accordingly, Congress dedicated USPS

---

[6] The Supreme Court has long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

[7] Indeed, President Trump has stated that the very reason for this E.O. is Congress's failure to enact similar requirements by passing the SAVE America Act. *See* Ex. 12, *Fact Sheet*.

to the apolitical goal of the "expeditious collection, transportation, and delivery of important letter mail," 39 U.S.C. § 101(e); *see also id.* §§ 403(b), 501.

USPS's structure reflects its independence. The exercise of USPS's power is directed by an 11-member Board of Governors. *Id.* § 202(a)(1). No more than five Governors may be from the same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." *Id.* These Governors assume their positions only upon the advice and consent of the Senate, and they may be removed by the President only for cause. *Id.* And the Board of Governors, not the President, appoints and has the power to remove the Postmaster General. *Id.* § 202(c). Similarly, the Postal Regulatory Commission, which promulgates rules and regulations for USPS, is also an "independent establishment," *Id.* §§ 501, 503, and its "Commissioners shall be chosen [by the President and confirmed by the Senate] solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." *Id.* § 502(a).

Notwithstanding these statutes, the Order purports to override the independent judgment of USPS's leadership and commandeer its functions. Specifically, the Order declares that "the Postmaster General is hereby directed to initiate a proposed rulemaking" that:

- Sets rigid parameters for envelopes containing outbound ballot mail, § 3(b)(i);

- Specifies that "the USPS shall not transmit mail-in or absentee ballots from any individual" who has not been enrolled in a state-specific list, § 3(b)(iii); and

- Requires USPS to provide each state with a list of individuals "who are enrolled with the USPS," § 3(b)(iv); *see also* E.O. § 4(a) (directing agencies to implement this mandate).

No source of law authorizes the President to dictate commands to USPS in this way. Because the commands intrude on Congress's authority and USPS's independence, enforcement of the E.O. should be enjoined.

### C.  The Executive Order violates the vertical separation of powers.

Not only does the Order violate the "horizontal" separation of powers between branches of the federal government, it also violates the "vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). The Constitution expressly delegates to the states the power to regulate the "Times, Places and Manner of holding [federal] Elections." U.S. Const. art. I, § 4, cl. 1; *see also* U.S. Const. art. I, § 2, cl. 1 (states set the qualifications for electors to the U.S. House of Representatives); U.S. Const. amend. XVII (same for U.S. Senate). The Constitution also makes clear that all powers "not delegated to the United States by the Constitution, nor prohibited by it to the States" rest with the states. U.S. Const. amend. X. Thus, as the *LULAC* Court recently held, "the Constitution vests authority first in the States" to "regulate federal election procedures" and "determine who is qualified to vote." *LULAC III*, 2026 WL 252420, at *5.

"Because the Constitution grants to the States a broad power to regulate their election procedures, long-standing federalism principles limit [federal] infringement on state elections." *United States v. Smilowitz*, 974 F.3d 155, 159 (2d Cir. 2020) (internal quotation marks and citation omitted). This is true even of Congress: "Notwithstanding [its] express constitutional authority to regulate federal elections," "case law has made clear that Congress must not encroach on the states' authority to regulate their own electoral processes." *Id.* Moreover, a key component of states' exclusive authority over their own elections is the right to set voter qualifications, which not even Congress may not disturb. *See, e.g.*, *ITCA*, 570 U.S. at 16 (recognizing "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them");

25

*id.* at 26 (Thomas, J., dissenting) (agreeing that "Congress has no role in setting voter qualifications"). *A fortiori*, these federalism limitations apply with even greater force to the Executive, which, as noted above, has *no* constitutional or statutory authority to regulate elections. *See supra* Argument § II.A; *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1327 n.13 (N.D. Ga. 2023) (recognizing "[i]t would be inconsistent with federalism and the separation of powers, to find that activities which are delegated to the states are also within the scope of executive power"), *aff'd*, 88 F.4th 1331 (11th Cir. 2023); *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026) ("[T]he Constitution specifically left the regulation and administration of elections to the states, understanding that states are in the best position to do so."), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026).

The Order tramples on states' rights to regulate their own elections. All 50 states and the District of Columbia allow for mail-in or absentee ballots under at least some circumstances, *see supra*, Background § III, according to their "legislature[s'] judgment" about "the pros and cons of absentee voting and . . . corresponding policies," *Cook Cnty. Republican Party v. Pritzker*, 487 F. Supp. 3d 705, 721 (N.D. Ill. 2020). Many rely heavily on mail-in voting, and some conduct elections almost exclusively by mail. *See supra*, Background § III. USPS plays an indispensable role in enabling these programs. *See supra*, Background § III.

The Executive Order directly interferes with these activities in at least two ways. *First*, Section 3(b)(i) directs the Postmaster General to make rules governing "all outbound ballot mail" in each state, including the form and contents of mail-in and absentee ballots. E.O. § 3(b)(i). *Second*, Section 3(b)(iv) requires USPS to make a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State," and Section 3(b)(iii) forbids USPS from "transmit[ting] mail-in or absentee ballots from any individual unless those individuals

26

have been enrolled" in the list. Each of these provisions effectively usurps states' rights to manage their mail-in and absentee voting programs, purporting to reassign that authority to USPS. These provisions are blatantly at odds with the states' constitutional authority to "regulate federal election procedures." *LULAC III*, 2026 WL 252420, at \*5. Especially where the authority to set voter qualifications "forms no part of the power to be conferred upon the national government," *ITCA*, 570 U.S. at 17 (quoting *The Federalist No. 60*, at 371 (Alexander Hamilton)), it necessarily follows that the President has no power to set qualifications for any method of voting authorized by a state.

Congress has also made clear that authority over voter lists belongs with the states. As explained above, Congress has enacted two pieces of legislation, the NVRA and HAVA, which *expressly* delegate the responsibility for making and maintaining voter lists to the states. *See* 52 U.S.C. § 20507(a) (NVRA provision charging states with the "administration of voter registration for elections for Federal office"); *id.* § 21083(a)(1)–(2) (requiring states to create "computerized statewide voter registration list[s]" and perform "list maintenance"); *id.* § 21085 (leaving "specific choices on the methods of complying" with Title III of HAVA "to the discretion of the State").

Historical precedent also confirms that Congress knows how to authorize the federal government to make and enforce voter lists—and that the federal government has no such authority today. In 1871, Congress passed the Enforcement Act, which empowered federal judges to appoint election supervisors to compile "list[s] of the persons who may register and vote." Ch. 99, § 13, 16 Stat. 433, 438 (1871). But in 1894 Congress expressly revoked that legislation, removing the limited authority of federal officials to compile voter lists. *See* Act of Feb. 8, 1894, ch. 25, 28 Stat. 36, 36–37. Similarly, in the 1965 Voting Rights Act, Congress authorized the federal Civil Service Commission to compile "list[s] of eligible voters" and transmit those lists to state officials for inclusion "on the official voting list" for each state. Pub. L. No. 89-110, § 7, 79 Stat. 437, 440

27

(1965). But in 2006, Congress revoked that provision. Pub. L. No. 109-246, sec. 3, § 13, 120 Stat. 577, 580 (2006). Thus, Congress has twice implemented—and twice repealed—statutes authorizing federal involvement in compiling voter lists. Because "Congress knows how to" authorize federal officials to compile voter lists, "its silence is evidence that Congress did not intend" to do so. *N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 135 (D.D.C. 2003).

### D.        The Executive Order violates USPS's statutory authority.

Plaintiffs are also likely to show that the E.O. directs USPS to act in excess of its statutory authority.[8] Agencies like USPS "are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *cf. Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sep. 14, 2020) ("Although the Constitution allows *Congress* to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service—an agency of the federal executive branch."). Thus, the President's authority to direct an agency to take action is limited to "direct[ing] [his] subordinates to carry out their own lawful statutory authority"; he cannot direct agencies to "exceed[] the limitations imposed by [their governing statutes'] text." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295 (11th Cir. 2022); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979) ("[t]he pertinent inquiry," in evaluating the lawfulness of an executive order directing an agency head to engage in rulemaking,

---

[8] Although USPS is not subject to review under the APA, plaintiffs "may challenge actions by the Postal Service that are outside of the scope of its statutory authority." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1168, 1175–76 (D.C. Cir. 2003); *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972–73 (D.C. Cir. 2022).

is whether the rulemaking falls within "any of the arguable *statutory* grants of authority" to the agency).

Here, the Order is unlawful not only because it directs USPS to take action far outside its enumerated statutory powers, but also because it requires USPS to take actions that are inconsistent with its governing statute. *See Texas v. United States*, 787 F.3d 733, 743 (5th Cir. 2015) (enjoining executive order as inconsistent with immigration statutes). Congress has delegated to USPS the authority to run a national postal service:

> The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.

39 U.S.C. § 101(a). In fulfilling these functions, USPS—like other agencies—can adopt regulations, but only as needed to fulfill its delegated functions. *See id.* § 401(2).

The Order unlawfully directs USPS to exceed its statutory authority. It commands the Postmaster General to develop procedures to assemble a "list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS . . . for mail-in or absentee ballots," and to provide that list to "each State." E.O. § 3(b)(iv); *see also id.* § 4(a) (directing agencies to implement this mandate). It then requires USPS to refuse to "transmit mail-in or absentee ballots" for any individual not enrolled on the Mail-In and Absentee Participation List. E.O. § 3(b)(iii); *see also* E.O. § 4(a) (directing agencies to implement this mandate). As such, the Order directs USPS to develop a system for the "enrollment" of voters with USPS (which implicitly also requires USPS to identify criteria for voter eligibility) and then instructs USPS not to send mail-in ballots from any voter not on its lists.

The Order's directives also conflict with USPS's statutory obligations. USPS's governing statute tells USPS exactly when it is permitted not to send categories of mail. Specifically, 39

U.S.C. §§ 3001 through 3018 define specific categories of "nonmailable matter" that USPS may not process or transmit, like "hazardous material." 39 U.S.C. § 3018(b)(1). Because none of these sections suggest that mail-in ballots may be "nonmailable," the Order effectively invents a new category of "nonmailable matter" from whole cloth. But "[t]here is little doubt that the federal statutory scheme for handling, delivering and sorting the mails is comprehensive." *Conte & Co. v. Stephan*, 713 F. Supp. 1382, 1386 (D. Kan. 1989). Thus, while USPS may issue regulations concerning nonmailable matter, it may only "determine whether matter is nonmailable *under statutory guidelines*." *Id.* (emphasis added). Additionally, USPS is obligated to treat all customers similarly, and to avoid refusing service to specific classes of customers. *See* 39 U.S.C. § 403(c) (prohibiting USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails"). Yet the Order does exactly that, directing USPS to refuse to transmit mail-in ballots for some and not others. Further yet, USPS's statute *requires* it to transmit certain categories of mail-in ballot materials as defined in the Uniformed and Overseas Citizens Absentee Voting Act, *see* 39 U.S.C. § 3406(a), 52 USC § 20304(b)(2); Shen Decl. ¶ 13. The Order, however, forbids USPS from carrying out this statutory mandate for any ballots sent to individuals not on one of its lists.

The Order is ultimately inconsistent with USPS's status as an "independent establishment," 39 U.S.C. § 201, intended to be insulated from partisan politics, *U.S. Postal Serv.*, 540 U.S. at 740. The Order is clearly intended to commandeer USPS for partisan ends—so it is no surprise that its mandates direct USPS to take actions that lie far outside its statutory authority.

### E.    The Executive Order violates the Privacy Act.

The E.O.'s mandates in Sections 2(a) and 4 to create and disseminate the State Citizenship Lists also run headlong into prohibitions of the Privacy Act, and final action by DHS, USCIS, and SSA to implement those mandates in turn violates the Administrative Procedure Act ("APA").

30

### 1.    Plaintiffs challenge reviewable final agency action.

Defendants' decision to implement the directive in Sections 2(a) and 4 of the E.O. constitutes "final" agency action, bringing the Order within the ambit of APA review under D.C. Circuit precedent. 5 U.S.C. § 704; *see Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 927–31 (D.C. Cir. 2008). [9]

Action is "final" when it "mark[s] the consummation" of a "decisionmaking process" in "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The U.S. Supreme Court and D.C. Circuit have each directed courts to apply this test in a "flexible" and "pragmatic" way. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986); *see also Widakuswara v. Lake*, 779 F. Supp. 3d 10, 32 (D.C. Cir. 2025). "In determining whether an agency action is final, '[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *McGough v. United States*, No. 1:23-CV-03628 (CJN), 2025 WL 2760424, at *4 (D.D.C. Sept. 29, 2025) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Under this framework, an agency's decision to adopt even an informal policy that requires disclosing protected records constitutes reviewable "final" action because it marks the consummation of decision-making and alters the legal rights and obligations of the agency and

---

[9] Action to implement an executive order is insulated from judicial review only when a statute grants the President unbridled "discretionary authority" to make the determination(s) directed in the order and the agency plays merely a "ministerial" role in carrying out the order. *Chamber of Com. of U.S. v. DHS*, No. 25-CV-3675 (BAH), 2025 WL 3719234, at *25 (D.D.C. Dec. 23, 2025) (collecting cases describing this distinction). As explained, the President is afforded no such discretionary authority here. *Supra* Argument § II.A.

individuals whose information is used. *Venetian Casino*, 530 F.3d at 931. In other words, an agency takes "final" action when it *decides* to disclose records in an assertedly unlawful way— not when, for example, the decision is reflected in a "final" document. *Id.* That is so even if such action is taken to carry out a brand "new" executive order, as it is the agency's decision that "determines [its] obligations to perform [the order's] commands." *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 138–39 (D.D.C. 2025); *see also Ctr. for Taxpayer Rts. v. IRS*, No. 25-cv-0457, 2025 WL 3251044, at *19 (D.D.C. Nov. 21, 2025); *AFL-CIO v. DOL*, No. 25-cv-339 (JDB), 2026 WL 879518, at *14 (D.D.C. Mar. 31, 2026) (noting such decision is "no less final because it is new"). [10]

Multiple recent decisions by judges in this District recognize that APA review is appropriate where an agency has decided to carry out broad presidential commands to disclose or use records in ways that are barred by the Privacy Act. In *AFL-CIO v. DOL*, Judge Bates held that DOL's and HHS's "decisions" to adopt a "data access policy" allowing DOGE affiliates to access records pursuant to an executive order constituted final action under the APA, 2026 WL 879518, at *12. Those "decisions," which the agencies had insisted throughout the litigation did not exist in reviewable form, directed "some particular measure across the board" for subsequent "individual" actions—*i.e.*, the kind of decision the Supreme Court has explained "can of course be challenged under the APA by a person adversely affected." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) and citing *Venetian Casino*, 530 F.3d at 931). In *Center for Taxpayer Rights v. IRS*, Judge Kollar-Kotelly similarly held that the IRS's "decision" to adopt a "new policy" of "sharing tens of thousands of taxpayers' address information with ICE" pursuant

---

[10] *See also, e.g.*, *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025); *AFL-CIO v. SSA*, 771 F. Supp. 3d 717, 791 (D. Md. 2025); *LULAC III*, 2026 WL 252420, at *55; *cf. L.A. Press Club v. Noem*, No. 2:25-cv-05563, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) (decision to "adopt a policy with regards to how DHS treats the recording of its agents" is final action).

to an executive order constituted reviewable final action. No. 25-cv-0457, 2025 WL 3251044, at *19 (D.D.C. Nov. 21, 2025). A contrary conclusion in this context would "allow agencies to immunize unlawful acts by refusing to document them or denying that they took them," and "[f]rustration of the APA cannot be that easy." *AFL-CIO*, 2026 WL 879518, at *12.

Like those cases, Plaintiffs satisfy the first prong of the *Bennett* test because their claim stems from DHS's, USCIS's, and SSA's decision to "perform [the Order's] commands." *Drs. for Am.*, 793 F. Supp. 3d at 139; *see Ctr. for Taxpayer Rts.*, 2025 WL 3251044, at *19 (citing *Venetian Casino*, 530 F.3d at 931). Defendants have indicated they understand themselves to be bound by executive orders, *see* Ex. 14 (SAVE PIA) at 3–4 (noting agencies "must . . . make available . . . Federal databases" to carry out E.O. 14248), and have taken steps evidencing their decision to implement the challenged Order's directives, *e.g.*, Ex. 35, DHS, USCIS Budget Overview, FY 2026 & FY 2027. Immediately after the E.O. was issued, DHS requested increased funding for the USCIS account used for "voter verification," indicating the agencies' decision to implement the E.O. and its investments in it. *Id.* And on April 13, a DHS spokesperson publicly confirmed that agency employees are working to "implement the President's policies." Ex. 36, Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to 'Take Over' the Midterm Elections*, ProPublica (Apr. 13, 2026). This evidence demonstrates that reviewable final agency action has occurred. *See Ctr. for Taxpayer Rts.*, 2025 WL 3251044, at *20 (holding "substantial likelihood" of "final agency action" based on circumstantial evidence of "apparent investment in the [policy and] the involvement of high-level . . . officials" and defendants' inability to refute Plaintiffs' allegations).

Plaintiffs likewise satisfy *Bennett*'s second prong because Defendants' "actions" have "legal consequences." *Id.* at *18. Even at this preliminary stage it is clear that the agencies have resolved to disclose large amounts of protected records, even if the particulars of disclosures are

not chronicled in a further published policy, *see id.* at \*19 (specifics of individual disclosure decisions did not preclude finding legal consequences for members' privacy rights (citing *Venetian Casino*, 530 F.3d at 931)); *AFL-CIO v. DOL*, 2026 WL 879518, at \*12 (similar). [11] The disclosure decisions at issue here, moreover, are "accompanied by" a "threat"—plain in the text of the E.O.'s directive—that information used to make the lists will "result" in "investigation[s]" and "prosecution," as well as a further threat of data "misuse" that would not otherwise occur. *Ctr. for Taxpayer Rts.*, 2025 WL 3251044, at \*19–20, \*38; *see* E.O. § 2(b) (directing prosecution of those "involved" in "aiding" allegedly "ineligible" voters); *see also* Betensky Decl. ¶¶ 12–14; Litwak Decl. ¶¶ 7–8, 10–11; Shen Decl. ¶ 16–17. The immediate legal implications for privacy rights of Plaintiffs' members combined with the threat of investigations are more than sufficient to show the requisite "legal consequences." *Ctr. for Taxpayer Rts.*, 2025 WL 3251044, at \*19 (citing *Venetian Casino*, 530 F.3d at 927–29); *see LULAC III*, 2026 WL 252420, at \*55 (same). [12] Put

---

[11] Recent improper disclosures of federal data, including SSA records specifically, "underscore[]" the consequences that flow from agency decisions to exchange and use data in new ways without adhering to the Privacy Act's protections. *LULAC III*, 2026 WL 252420, at \*55 n.54; *see also*, e.g., Ex. 37, Eileen Sullivan, *DOGE Employees Shared Social Security Data, Court Filing Shows*, N.Y. Times (Jan. 21, 2026); Shen Decl. ¶ 17; Litwak Decl. ¶ 9.

[12] If the Court determines additional information regarding Defendants' action is needed, it should not deny the preliminary injunction motion but instead defer a decision on the merits and order Defendants to provide "additional explanation" through affidavits or procedures as the Court deems necessary. *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973). While courts in this District routinely resolve time-sensitive preliminary injunction or stay motions based on circumstantial evidence of agency action, *e.g.*, *Ctr. for Taxpayer Rts.*, 2025 WL 3251044, the Supreme Court has made clear that courts also have broad discretion to "obtain from the agency, either through affidavits or testimony, such additional explanation . . . as may prove necessary," *AFL-CIO v. DOL*, 2026 WL 879518, at \*7 (quoting *Camp*, 411 U.S. at 142–43). The Court may also order production of the administrative record pertaining to implementation of the E.O. on an expedited basis. *Cf. Ctr. for Taxpayer Rts. v. IRS*, No. 25-cv-0457 (CKK), 2025 WL 2801862, at \*1 (D.D.C. Oct. 1, 2025) (after determining plaintiffs were likely to show final agency action based on circumstantial evidence, ordering defendants to produce administrative record to aid in resolution of other merits issues). Plaintiffs also reserve the right to move to supplement the record. *See* Local Rule 65.1(c).

simply, Defendants' actions show they will carry out the E.O.'s mandates, which are legally consequential to Plaintiffs, triggering review. *See Venetian Casino*, 530 F.3d at 931.

### 2.   The State Citizenship Lists contravene the Privacy Act's prohibition of data-matching programs.

On the merits, Plaintiffs are likely to succeed in showing that the E.O.'s mandates to use federal records to create and disseminate State Citizenship Lists violate the Privacy Act.

### a.   The Privacy Act places strict limits on disclosures of records.

The Privacy Act broadly prohibits federal agencies and officers from disclosing "any" record contained in a "system of records" by "any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific circumstances not relevant here. 5 U.S.C. § 552a(b); *LULAC III*, 2026 WL 252420, at \*55. The Act further prohibits using records in "computer matching program[s]," except under strictly defined conditions not met here. 5 U.S.C. § 552a(o). It also provides that "[n]o" record "contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program" absent a written agreement between the agency and the source of any records "matched" that, among other things, identifies "the purpose and legal authority for conducting the program." *Id.* § 552a(o)(1).[13]

Specifically, federal agencies must identify the source of "legal authority" to "disclos[e]" federal records "for use" in a "matching program"; absent "authoriz[ation] by law," agencies cannot link or match federal records. Computer Matching and Privacy Protection Act of 1988,

---

[13] The law defines "matching program" as "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility" of "applicants for, recipients or beneficiaries of, participants in, or providers" of federal benefits. 5 U.S.C. § 552a(a)(8).

Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (codified at 5 U.S.C. § 552a, note). These safeguards exist to prevent precisely the type of "national data bank[s]" the E.O. attempts to create. 5 U.S.C. § 552a, note. As Congress explained, nothing in the Privacy Act "shall be construed to authorize" the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not otherwise authorized by law." *Id.*

This prohibition comports with the legislative history of the Privacy Act more broadly. In enacting it, legislators underscored that its purpose was to ensure it would be "*legally impossible* for the Federal Government . . . to put together anything resembling a '1984' personal dossier on a citizen," and "proper regard for privacy of the individual, confidentiality of data, and security of the system" would be respected. Legislative History of the Privacy Act of 1974: Source Book on Privacy 168, 217, 884 (Sep. 1976) (emphasis added) (compiled for the Senate and House Committees on Government Operations, 94th Cong., 2d Sess. (1976)).

### b.    No legal authorization permits linking or matching federal records to create or disseminate the State Citizenship Lists.

Section 2 of the E.O. contravenes the Privacy Act because it requires matching programs that wholly lack "legal authority." 5 U.S.C. § 552a(o)(1).

To start, the "databases" from which the lists must be "derived"—"citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," E.O. § 2(a)—are computerized "systems" that contain "records" covered by the Act. 5 U.S.C. § 552a(o)(1)(A). This is clear from the face of at least two SORNs issued by DHS and SSA in response to the Democratic Party Plaintiffs' claim in prior litigation that new uses of SAVE lacked proper notice. *See* 90 Fed. Reg. 48948, 48948–50 (stating SAVE is a "system of records" that can

36

be used to "match" federal records); *see also* 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025) (SSA SORN); *LULAC III*, 2026 WL 252420, at \*55 & n.54 (granting declaratory judgment and requiring strict compliance with the Privacy Act). A DHS assessment further specifies that, to facilitate incorporation of SSA records in SAVE, officials in USCIS and SSA are exchanging records containing at least the following: social security numbers, names, dates of birth, citizenship indicators, immigration status indicators, alien numbers, state/country codes, and death indicators. *See* Ex. 14 (SAVE PIA) at 3–4, 19. This is among the information used by SAVE's "matching" process to "verify" a status. *See id.* The E.O. in turn expressly requires use of SAVE to build the State Citizenship Lists. E.O. § 2(a). Because the lists are created by linking information in systems of records and comparing that information to "verify" citizenship and residency (and also because "recipient[s]"—*e.g.*, the states—are expected to compare the lists against their voter rolls), development of the lists is undeniably a "matching program." 5 U.S.C. § 552a(o).

Yet no provision of law authorizes matching records to create these State Citizenship Lists. The "authority" cited in the E.O., § 1—42 U.S.C. § 1320b-7—directs USCIS to establish a "system for the verification of immigration status" to assist states in determining if non-citizens are eligible for certain benefits. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, tit. I, §121(c)(1), 100 Stat. 3359, 3391 (codified at 42 U.S.C. § 1320b-7). But nothing in that statute authorizes any Defendant to amass or match information for American citizens for *any* purpose, much less to link or match records to assist with verifying voters' eligibility. *See* 42 U.S.C. § 1320b-7. To the contrary, that law provides only that when an "individual [who] is *not a citizen or national of the United States*" applies for benefits and "documentation . . . is presented, the State shall utilize the individual's alien file or alien admission number to verify with [USCIS] the individual's immigration status through a[] . . . system" that utilizes "name, [USCIS] file number,

37

[USCIS] admission number, or other means permitting efficient verification." *Id.* § 1320b-7(d)(2)(A), (d)(3) (emphasis added). The cited statute extends neither to American citizens nor the information that will be disclosed and has nothing to do with elections or voter eligibility.

If Congress intended this statute to permit the extensive compilation of citizenship status and current residence of *American citizens* by matching up strands of unrelated records—notwithstanding specific contrary limitations of the Privacy Act—it would have said so. *E.g.*, *West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress instead enacted a limited authorization for USCIS to create a program to verify the "immigration status" of individuals who are not citizens—only when a state asks that it do so—and it specified the records that may be compared. *See* 42 U.S.C. § 1320b-7(d)(2)(A), (d)(3). Notably, since enactment of § 552a(o) in 1988, Congress *has* specified when it permits "records" to be "matched" in new "program[s]," and it has even specified which aspects of otherwise authorized data-matching "shall not be considered a matching program" subject to the Act's specific protocols at all. *E.g. id.* § 653(j)(9). Congress has, in stark contrast, never given USCIS the vast authorization the E.O. claims, even though it has amended its authorizing statute at least eight times in the same period. *See id.* § 1320b-7. [14]

In the face of the text and history of the Privacy Act and the Immigration Reform and Control Act, it is clear that the latter does not provide the required authorization to use federal records to create and disseminate the State Citizenship Lists. And the E.O. cites no other law purporting to grant authorization to link and compile federal records into these lists as part of their

---

[14] *See* 108 Stat. 4462 (Oct. 31, 1994); 110 Stat. 2168, 2212 (Aug. 22, 1996); 110 Stat. 3009-673 (Sept. 30, 1996); 113 Stat. 1859 (Dec. 14, 1999); 113 Stat. 1911 (Dec. 17, 1999); 122 Stat. 1095, 1097 (May 22, 2008); 122 Stat. 1664, 1857, 1858 (June 18, 2008); 128 Stat. 815 (Feb. 7, 2014).

crusade to "assist[]" with voter registration. E.O. §§ 1, 2(a). Accordingly, Defendants cannot use or disclose federal records to create the E.O.'s required lists consistent with the Privacy Act. [15]

### III.    The remaining preliminary injunction factors are satisfied.

####     A.    The Democratic Party Plaintiffs will be irreparably harmed if the E.O. is not enjoined quickly.

The Democratic Party Plaintiffs are in the midst of finalizing preparations for and executing their plans for the 2026 elections. *See* Snyder Decl. ¶ 5; Ruselowski Decl. ¶ 5; Schneider Decl. ¶ 8; Edelman Decl. ¶ 6; Jeffries Decl. ¶ 11; Schumer Decl. ¶ 12. Without a swift preliminary injunction against the E.O.'s enforcement, Plaintiffs will suffer irreparable injury in multiple ways: (1) in the form of an illegally structured electoral environment for all Plaintiffs and their candidate members, (2) to the Party's electoral prospects, (3) to Plaintiffs' members' voting rights, (4) to Plaintiffs' core activities and ability to advance their missions, forcing them to revamp their education and turnout programs across the country at the expense of Plaintiffs' persuasion and mobilization programs, and (5) to Plaintiffs' members' privacy interests. *See supra* Argument § I.

It is well established that each of these harms, including those that make it more difficult for an organization to accomplish its primary mission, both satisfy Article III's injury-in-fact requirement and constitute irreparable harm. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (quoting *Newby*, 838 F.3d at 9). Where the injury arises in the electoral context, the irreparable harm is all the more acute because once

---

[15] The Democratic Party Plaintiffs also allege that actions to carry out the State Citizenship Lists violate the "procedural" and "substantive" "use" requirements of the Privacy Act. *See* Compl. ¶¶ 147–50. These violations are distinct from the one at issue here, as they turn not on the facial incompatibility of the policy of disclosing federal records for the purpose of creating and disseminating citizenship lists with federal law, *see Venetian Casino*, 530 F.3d at 931, but instead on (among other things) failures to complete notice-and-comment requirements and to ensure records are suitable for stated purposes, *see* 5 U.S.C. § 552a(e). Plaintiffs reserve the right to press these additional theories in later stages of the litigation, if necessary.

the election occurs, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted); *see also League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (recognizing likelihood of harm in electoral context and collecting cases).

Here, the irreparable harm to Plaintiffs will occur well before the election arrives by forcing them to compete under election rules that will make it harder for them to succeed electorally and by frustrating the Party Organizations' core programs. Plaintiffs have built their mail ballot and voter turnout strategies based on existing mail ballot rules, and the E.O., which fundamentally changes the rules and process for mail balloting, compromises the viability of Plaintiffs' basic field programming and voter turnout strategies. *See* Snyder Decl. ¶¶ 11–24; Ruselowski Decl. ¶¶ 12–24, 30; Schneider Decl. ¶¶ 13–25, 27, 30; Edelman Decl. ¶¶ 11–21. Because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September for the 2026 general election, and sooner for primary elections), Plaintiffs will be forced to reallocate investments and retool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on Plaintiffs' voters. *See* Snyder Decl. ¶ 25; Ruselowski Decl. ¶ 25; Schneider Decl. ¶ 31; Edelman Decl. ¶ 26. Every day and every resource that Plaintiffs must spend addressing the E.O.'s changes to mail balloting represents a lost opportunity to mobilize and persuade voters that cannot be recovered. *See* Snyder Decl. ¶¶ 30–32; Ruselowski Decl. ¶¶ 32–34; Schneider Decl. ¶¶ 33–35; Edelman Decl. ¶¶ 28–30. And once voting begins, the E.O.'s changes to mail balloting will also burden and in some cases disenfranchise Plaintiffs' members and voters who rely on USPS to cast their ballots—yet another irreparable harm that cannot be recovered once lost. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.")

As it pertains to the creation and dissemination of the State Citizenship Lists, harm to Plaintiffs' members' privacy will occur as soon as those lists are unlawfully created and disseminated, which can occur at any moment. *See, e.g.*, Shen Decl. ¶ 16–17; Litwak Decl. ¶¶ 5–8; Betensky Decl. ¶ 15. The Party Organizations will need to respond to the creation and dissemination of those lists well before the election arrives. The E.O. requires those lists to be shared with states "no fewer than 60 days before each regularly scheduled Federal election"— meaning they must be shared between now and early September *at the latest* for the general election. Once again, these voter assistance and education programs cannot be created overnight; Plaintiffs must plan for them imminently for them to be effective. *See* Snyder Decl. ¶ 45; Ruselowski Decl. ¶ 47; Schneider Decl. ¶ 46. Every day and every resource that Plaintiffs must spend first planning to implement these programs, and later helping voters attempt to ameliorate the harm caused by the E.O., represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored. *See* Snyder Decl. ¶¶ 47–48; Ruselowski Decl. ¶¶ 49–50; Schneider Decl. ¶¶ 48–49; Edelman Decl. ¶¶ 43–44. And again, any U.S. citizen voter who is erroneously omitted from these lists as a result of the inherent flaws in attempting to create such lists, *see* Mayer Decl. at 9, and who is consequently burdened or disenfranchised from voting, is irreparably injured by the E.O.

As the *LULAC* Court recognized in granting preliminary relief against E.O. 14248, through which the President similarly attempted to unlawfully regulate the election process, the harms to the Plaintiffs' electoral prospects and to Plaintiffs' core activities are irreparable. *See LULAC I*, 780 F. Supp. 3d at 201 ("[B]ecause each day presents an opportunity to recruit candidates, persuade voters, and galvanize supporters that cannot be restored once lost, the [prior E.O.'s changes to the election process] would irreparably harm the Democratic Party Plaintiffs' interests throughout the

41

country."); *id.* at 201–02 (recognizing that the court "can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns"); *see also TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020) (finding irreparable harm in light of likelihood of competitive harm to business). And, as set forth above, harm to Plaintiffs' members' voting rights unquestionably constitutes irreparable injury.

Although these harms are certain to occur if the E.O. is not enjoined quickly, to find that Plaintiffs are entitled to preliminary relief, irreparable harm need only be "likely." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The D.C. Circuit has expressly recognized that a "likely" threat of future enforcement of an election rule that will cause voting-related organizations harm constitutes "irreparable harm." *Newby*, 838 F.3d at 8–9 (finding irreparable harm likely though it was "unclear whether Alabama and Georgia are currently enforcing their proof-of-citizenship laws"). As the D.C. Circuit explained, because "a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Id.* (cleaned up). [16]

### B.      The equities and public interest favor relief.

The public interest and the equities unquestionably favor the issuance of a preliminary injunction. In considering these factors, courts "weigh[] the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024). Because here "the

---

[16] D.C. Circuit precedent pre-dating *Winter* required irreparable injury to be "certain" to occur. *See, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). But that standard is no longer good law after *Winter*, 555 U.S. at 20, which requires only that the movant is "likely to suffer irreparable harm in the absence of preliminary relief." In any event, such injury is certain here if the E.O. is not enjoined.

Government is the opposing party," the assessment of the equities and the public interest "merge." *Guedes v. ATFE*, 920 F.3d 1, 10 (D.C. Cir. 2019).

It is well established that "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *TikTok*, 490 F. Supp. 3d at 85 (citation and quotation omitted); *see also Newby,* 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). Thus, because the E.O. is unlawful, Defendants face *no* harm from an order temporarily enjoining the challenged provisions of the E.O. while this litigation proceeds.

On the other side of the scale, without a preliminary injunction the public will suffer at least two significant and irreparable harms: breaches of privacy affecting nearly every adult U.S. citizen, and substantial barriers to exercising the right to vote. Congress already decided in the Privacy Act that protecting personal information from unauthorized federal use is in the public interest. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 203 (looking to the "specific goal" that Congress sought to achieve through federal law). Further, barring a preliminary injunction, any efforts to compile the State Citizenship Lists are likely to perpetuate the incorrect citizenship information found in SAVE, SSA, and other federal databases. *See supra* at Background § II.A; Mayer Decl. at 4–7, *see also Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981) (stating that Congress enacted the Privacy Act in response to "a growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the *perpetuation of inaccuracies*") (emphasis added).

The public interest also strongly favors "permitting as many qualified voters to vote as possible," *LULAC I*, 780 F. Supp. 3d at 203 (quoting *Newby*, 838 F.3d at 12), which the challenged provisions jeopardize. In addition to the "substantial risk," *Newby*, 838 F.3d at 12, that the USPS's new Mail-In and Absentee Participation List will directly disenfranchise voters, Section 3(b)'s

43

dramatic changes to the voting process will lead to widespread "[c]onfusion" that "create[s] a disincentive for citizens who would otherwise attempt" to request or return a mail ballot, *id.* at 13; *see* Snyder Decl. ¶¶ 27–28; *see also LULAC I*, 780 F. Supp. 3d at 203 (recognizing that the public interest "weighs in favor of an injunction against any unlawful practice that may disenfranchise qualified voters"). And because Plaintiffs seek to encourage and assist their supporters who want to vote by mail, the "programmatic harm" to Plaintiffs "dovetails with the public interest." *Newby*, 838 F.3d at 13; *see supra* Argument § I.A. All of the same is true about Section 2(a), which will inevitably omit eligible U.S. citizens from State Citizenship Lists and impose practical barriers to the franchise, cause confusion, and deter voters from participating. *See* Snyder Decl. ¶¶ 33–46; Mayer Decl. at 3–10.

Moreover, just as *Newby* held that restrictions on voter registration were "contrary to what Congress, in enacting the NVRA, declared to be the public interest," 838 F.3d at 13, here Congress has passed laws delegating management of voter lists to the states, and states themselves have defined the qualifications of mail voters, *see supra* Argument § II.B. Likewise, in defining in the role of USPS, Congress decided that the American people deserve access to reliable, universal mail service unhampered by partisan machinations. 39 U.S.C. §§ 101(e). These longstanding public interests are imperiled by an E.O. that, if not enjoined, will likely lead to a "substantially diminished ability" to vote by mail. *Newby*, 838 F.3d at 13.

Finally, although there is a public interest in "preserving the integrity of [the] election process," *id.* (citation omitted), the E.O. does not further that interest. There is no evidence—whatsoever—of any material level of systemic mail voter fraud, as both election officials across the country and academics have confirmed, time and time again. *See supra* Background § III; Mayer Decl. at 10–11. And there is similarly "no credible evidence of material numbers of

44

noncitizens voting in U.S. elections." Mayer Decl. at 10. It is a crime to vote as a noncitizen, and the consequences for doing so are severe. 18 U.S.C. § 611(a)–(b). A noncitizen who violates this law faces both jail time and serious immigration consequences, including deportation. *See* 8 U.S.C. § 1227(a)(6). Moreover, Congress itself has made a judgment that a voter's affirmation that they are a citizen is sufficient. Specifically, in passing the NVRA, Congress determined that "the signature of the applicant, under penalty of perjury, certifying the applicant's eligibility to vote, without any requirement for notarization or other formal authentication, was sufficient to protect the public interest in the integrity of the electoral process." *LULAC I*, 780 F. Supp. 3d at 211–12 (citing 52 U.S.C. §§ 20501(b)(3), 20508(b)(2)(B)–(C), (b)(3)) (cleaned up). Of course, states themselves also take significant measures to ensure that only eligible individuals vote in their elections. *See, e.g.*, Ariz. Rev. Stat. § 16-165; N.C. Gen. Stat. § 9-6.2(b); Utah Code Ann. § 20A-2-502(4).

Even worse, it is abundantly clear that the E.O.'s true purpose is not election integrity, but instead to harm the President's political opponents, as the President himself has openly acknowledged. For all of these reasons, the balance of equities and public interest overwhelmingly weigh in favor of preliminary relief.

## CONCLUSION

For the reasons stated above, the Court should grant the preliminary injunction.

Dated: April 17, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Christina Ford (DC 1655542)
Max Accardi (DC 90021259)*
Kevin R. Kowalewski (NY 5946645)**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Application for admission pending
**Admitted *pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

46