# Exhibit 1

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

                Plaintiffs,

    *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Case No. 1:26-cv-01114

**DECLARATION OF LILLIE SNYDER BOSS**

I, Lillie Snyder Boss, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of DSCC. I have served in this role since March 2021. In my role, I oversee DSCC's day-to-day operations. This includes managing the Committee's staff and processes, budget, operations, and initiatives, as well as engaging with all of DSCC's activities as needed. I interact with DSCC's officers and employees at all levels. I also help candidates' campaigns from time to time on their compliance and budget needs.

3. DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. In support of its mission, DSCC works with Democratic Senate candidates and their campaigns to encourage and assist Democratic Party members and supporters in registering and successfully casting ballots, and fights to preserve the legal rights of its members and constituents.

1

4.    DSCC's members include Democratic members of the U.S. Senate, as well as Democratic candidates for U.S. Senate. DSCC currently has members in 46 States (every State except for Indiana, Missouri, Utah and North Dakota). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States.

5.    DSCC is actively preparing, budgeting, strategizing, and executing its plans for the 2026 midterm election cycle, which is already underway.

6.    In 2026, there are 35 U.S. Senate seats up for election. The States in which DSCC's members are competing for office in 2026 include: Alabama, Alaska, Arkansas, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wyoming.

7.    Both DSCC itself and DSCC's members who are candidates for office have an interest in a fair and lawful electoral process for its' members campaigns. Even if DSCC's members succeed in their campaigns, DSCC and its members are harmed by unlawful election rules, as they deprive DSCC and its candidate members of a fair process and an accurate result. That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. Senate.

I.    **The New E.O.'s Restrictions on Voting by Mail**

8.    On March 31, 2026, President Trump signed an Executive Order (E.O.) titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*." Section 3(b) of that E.O. purports to give the USPS control over which voters will be eligible to vote a mail ballot via the

U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

9.    Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

10.    Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

11.    The E.O., which fundamentally changes how mail balloting operates, including who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DSCC, DSCC's members, and DSCC's constituents who vote by mail, as well as to DSCC's basic programming and voter turnout strategies.

12.    Section 3(b) of the E.O. will require a fundamental restructuring of several of

DSCC's core programs and poses a severe risk to DSCC's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like the last one—is to harm his political opponents, including DSCC and its candidates.

13.     DSCC is heavily focused on encouraging its constituents to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DSCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to participate.

14.     For some voters, voting by mail is the only reasonable option by which they may participate in elections; this may be because they are away from home, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DSCC's members themselves (who are voters in their respective home states) have voted by mail in past elections and are likely to do so again in future elections.

15.     In recent years, DSCC has dedicated significant staff time and resources to developing a comprehensive mail voting program that encompasses voter education, voter assistance, and ballot-cure programs to ensure its constituents are able to cast mail ballots and have them counted. DSCC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. Each federal election cycle, DSCC invests millions of dollars in these programs.

16.     These programs are built based upon our expectation that voters who are eligible to vote by mail under their respective state's laws and wish to do so will in fact be able to cast a mail

4

ballot via USPS and have that ballot counted. These programs take significant planning and will soon be underway for the 2026 elections.

17.     President Trump's mandate that USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for DSCC's members and constituents to vote and potentially disenfranchising them altogether if the federal government decides that they are not eligible to cast a ballot via U.S. mail.

18.     The E.O. is especially concerning for DSCC's constituents who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, including those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail, including States like Oregon and Colorado, where the DSCC has elections this year.

19.     In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DSCC expects that trend to continue. Because the E.O. imposes new restrictions on voting by mail, the E.O. puts DSCC and DSCC's members who are running for election at a competitive disadvantage. Indeed, the E.O. is all but certain to leave some of DSCC's constituents unable to vote by mail altogether. Several of DSCC's members will compete in extremely competitive elections decided by a small number of votes, and the E.O.'s restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the E.O.—they are likely the intended result.

20.     At this point in the election cycle, DSCC is deep into preparation for the general election and has already made investments into voter education and voter targeting programs.

Those programs are, again, built upon existing mail balloting rules. The E.O., however, either wastes or significantly compromises DSCC's investments in existing programs and efforts like this.

21.     To run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, many Senate candidates have already made investments of resources in their races based on the existing rules, including that voters who are eligible to cast mail ballots will be able to do so.

22.     The E.O. fundamentally disrupts DSCC's efforts to plan for the general election and significantly disrupts the electoral playing field more broadly. It is now far more difficult for DSCC and its members to effectively complete planning and execute DSCC's mail voting strategy because, among other things, the E.O. mandates seismic changes to who may be eligible to receive and cast a ballot via the U.S. mail. The resulting fallout directly impacts DSCC's core operations, including at the most fundamental level.

23.     To give just one example, the E.O.'s changes to mail voting call into question DSCC's voter targeting plans. DSCC targets voters based on how likely DSCC believes a certain voter is likely to vote. Under the E.O., however, DSCC's existing voter targeting plans are compromised, as it is difficult to know whether someone who is a regular vote-by-mail voter will vote if they are not included on USPS's list. This type of issue—which would not exist absent the E.O.—directly frustrates DSCC's ability to make important strategic decisions as to how to operate in the 2026 midterms and compromises investments DSCC has already made for the 2026 cycle.

24.     The E.O. also undermines DSCC's current voter education strategy and DSCC's existing voter scripts. When DSCC talks to voters, DSCC tells them how they can vote in their particular state. At a minimum, the E.O. will require DSCC to change these voter scripts, and it

6

will also require changes to DSCC's basic voter education strategies.

25.    In short, DSCC has already put significant work into its existing programming and voter turnout strategies for 2026, and those plans are compromised under the E.O. DSCC cannot wait months to make changes to these programs; because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September 2026 for the 2026 general election), DSCC will be forced to re-allocate investments and re-tool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on DSCC's voters.

26.    In addition to undermining DSCC's existing programs, to counteract the harm from the E.O., DSCC will be required to develop *new* programs to assist voters in checking whether they are "enrolled" in USPS's "Mail-In and Absentee Participation List" and assisting voters in figuring out how to vote if they are no longer permitted to vote by mail via the USPS. In light of the E.O., DSCC will need to re-evaluate the extent to which it should promote its mail balloting programs. And it will be forced to make these adjustments *in the middle* of the electoral cycle, undermining and prejudicing its ability to make concrete strategic plans and implement them effectively.

27.    A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the USPS has never been a part of the mail voting process, and if the E.O. is implemented, some of the sweeping changes that it dictates will come while elections are ongoing. Teaching voters about the new requirement and working to ensure it does not deter voters from voting entirely will be a significant challenge.

28.    Inevitably, even with DSCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. For some voters, voting by another method may not be possible at all, especially for those who are not located in-state or have physical, health, or economic limitations that prevent them from voting in-person. And because voters who support Democrats are more likely to vote by mail, DSCC and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to retake control of the U.S. Senate.

29.    These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DSCC has not budgeted for such extensive new programs, DSCC will have to scale back or cut the initiatives that it currently has planned for persuading and mobilizing voters to elect Democratic candidates to the Senate.

30.    The resources DSCC has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DSCC's mission-critical planned activities and expenditures.

31.    If DSCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Party. There are only seven months until election day, and approximately only five months before mail ballots will start to be sent to voters, and there are many primary elections this spring and summer in the run up to November.

32.    Every day and every resource during this critical time that DSCC must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

II.    **The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections**

33.    DSCC, DSCC's members, and DSCC's constituents are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every confirmed U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

34.    The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DSCC and its members' expense, and just as the President likely intended.

35.    Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. This E.O. will nonetheless harm DSCC, DSCC's members, and DSCC's constituents given the near certainty some number of U.S. citizens will not be included on such lists.

36.    The E.O. specifies that "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

37.    Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and

does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

38.     Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

39.     DSCC is also particularly concerned about the effect of the State Citizenship Lists on women, who are more likely to support Democratic candidates than men, and who are more likely than men to change their names because of marriage or divorce. Both the creation of these State Citizenship Lists and the attempted matching with of those lists with state voter files will require the attempted matching of names across files. For voters whose names have changed, it may be more difficult to successfully "match" or identify such voters, resulting in their omission from either the State Citizenship Lists or any resulting list a state uses to create a list of eligible voters after those lists are sent to states.

40.     In other words, the creation of these lists using these databases create a serious risk that DSCC's members and supporters who are in fact U.S. citizens will be erroneously not included on such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer of DSCC's members and supporters are able to vote, DSCC and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

41.     Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any

given voter thus may have no way of knowing that the federal government has effectively represented to their home State that they are not eligible to vote, and no opportunity to avail themselves of any (as yet undefined) cure provisions.

42.    And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many voters do not have and both of which are expensive and difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate Democratic voters' ability to vote and in some cases will disenfranchise them.

43.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that some of DSCC's members and constituents will be burdened or disenfranchised completely as a result of these lists.

44.    To respond to Section 2(a), DSCC will need to carefully monitor the development of the State Citizenship Lists and will need to have programs in place to help educate its members and constituents as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

45.    These voter assistance and voter education programs to address the State Citizenship Lists cannot be created overnight; DSCC must start planning for them imminently for them to be effective and sufficiently resourced.

46.    Just as with the changes to mail balloting, DSCC anticipates that this part of the E.O. will also cause significant confusion for voters. These kinds of citizenship lists will be entirely

11

new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

47.    All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DSCC would not have to undertake absent the E.O., will require DSCC to expend staff time and other resources that would be dedicated to its other critical programs. These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DSCC has not budgeted for these new, widespread programs, DSCC will have to scale back or cut the initiatives it currently has planned for persuading and mobilizing voters to elect Democratic candidates to the Senate.

48.    If DSCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Democratic Party. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening throughout this year. Every day and every resource that DSCC must spend during this period planning for these voter assistance programs, as well as helping voters check State Citizenship Lists and correcting them, if necessary, represents a lost opportunity

to persuade voters and galvanize supporters that cannot be restored once lost.

49.     Additionally, DSCC is also concerned about Section 2(a)'s threat to the privacy rights of its members and constituents. This part of the E.O. guarantees improper exposure of the personal data of millions of DSCC's members and constituents.

50.     Over the last several months, Democrats have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DSCC's members and constituents, myself included, are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: 4/16/2026


*Lillie Snyder Boss*

**Lillie Snyder Boss, Chief Operating Officer
DSCC**

13