# Exhibit 2

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

                Plaintiffs,

    *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Case No. 1:26-cv-01114

---

**DECLARATION OF ERIK RUSELOWSKI**

---

I, Erik Ruselowski, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of DCCC. I first joined DCCC in September 2016. I have served as Chief Operating Officer since February 2022. In my role, I support DCCC's day-to-day operations and manage committee-level initiatives, budgeting, technology, and administration. I engage on an as-needed basis with all of DCCC's activities, and I interact with DCCC's officers and employees at all levels.

3. DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. DCCC pursues its mission by working with Democratic House candidates and campaigns to encourage and assist Democratic Party members and constituents in registering and successfully casting ballots, and by preserving the legal rights of its members and constituents.

4.    DCCC's members include all Democratic members of the U.S. House, as well as Democratic candidates for U.S. House. DCCC currently has members in all States. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters throughout the country.

5.    DCCC is actively planning, preparing, budgeting, strategizing, and executing its plans for the upcoming 2026 midterm election cycle, which is already underway. In 2026, all U.S. House seats across the United States are up for election. As of today, DCCC has members who are Democratic candidates for the U.S. House in all 50 States.[1]

6.    Through its "Frontline" program, DCCC provides Democratic members of Congress from competitive seats resources and support to execute effective reelection campaigns. For the 2026 election, DCCC is currently supporting 24 candidates in 14 states through this program, including in California, Connecticut, Indiana, Michigan, North Carolina, New Jersey, New Mexico, Nevada, New York, Ohio, Oregon, Texas, Virginia, and Washington.

7.    DCCC is also spending resources to defeat Republicans in other competitive congressional districts around the country including, for example, in states like Arizona, Iowa, Michigan, North Carolina, Pennsylvania, Tennessee, Virginia, and Wisconsin.

8.    Both DCCC itself and DCCC's members who are candidates for office have an interest in a fair and lawful electoral process for its members' campaigns. Even if DCCC's members succeed in their campaigns, DCCC and its members are harmed by unlawful election rules, as they deprive DCCC and its candidate members of a fair process and an accurate result.

---

[1] At the time of the filing of the Complaint, DCCC had members in 49 States (all but Wyoming). *See* Compl. ¶ 12. DCCC now has a member in Wyoming who is running for U.S. House in 2026.

That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. House of Representatives.

**I.        The New E.O.'s Restrictions on Voting by Mail**

9.        On March 31, 2026, President Trump signed an Executive Order (E.O.) titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*." Section 3(b) of that E.O. purports to give the U.S. Postal Service control over which voters will be eligible to vote a mail ballot via the U.S. Postal Service—an extraordinary and unprecedented attempt by the President to transform American elections.

10.        Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

11.        Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm

whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

12. The E.O., which fundamentally changes how mail balloting operates, including who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DCCC, DCCC's candidate members, and millions of DCCC's constituents who vote by mail, as well as to DCCC's basic programming and voter turnout strategies.

13. Section 3(b) of the E.O. will require a fundamental restructuring of several of DCCC's core programs and poses a severe risk to DCCC's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like his last one—is to harm his and the Republican Party's political opponents, including DCCC and its candidates.

14. DCCC is heavily focused on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to participate and have their voices heard in the elections in which they are qualified to vote.

15. For some voters, voting by mail is the only reasonable option by which they may participate in elections; this may be because they are away from home, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DCCC's members have themselves relied on voting by mail in past elections and are likely to do so again in future elections.

16. In recent years, DCCC has dedicated significant staff time and resources to developing a comprehensive education, assistance, and ballot-cure program to ensure Democratic

voters are able to cast mail ballots and have them counted. DCCC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. These programs are built based upon our expectation that voters who are eligible to vote by mail under their respective states' laws and wish to do so will in fact be able to use USPS to receive and send a mail ballot and have that ballot counted. Many of these programs are in the final stages of planning and will be soon underway for the 2026 elections.

17.     President Trump's mandate that the U.S. Postal Service not transmit a mail ballot for any voter who is not enrolled on the U.S. Postal Service's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for DCCC's members and constituents to vote and potentially disenfranchising them altogether if the U.S. Postal Service deems that voter "ineligible" to cast a ballot via U.S. mail.

18.     The E.O. is especially concerning for DCCC's constituents who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, including those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail, such as California, Colorado, Nevada, Oregon, and Washington. Those states have many competitive elections for the U.S. House in 2026.

19.     In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DCCC expects that trend to continue. For that reason, the E.O. clearly puts both DCCC and its members who are running for election at a competitive disadvantage.

20.     DCCC and its members will be disadvantaged by the extra steps the E.O. imposes on their constituents to vote using the U.S. mail, and even worse, the E.O. is all but certain to leave some of DCCC's constituents unable to vote by mail altogether.

5

21. Several of DCCC's members will compete in extremely competitive elections decided by a small number of votes, and the E.O.'s restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the E.O.—it is likely the intended result.

22. At this point in the election cycle, DCCC is in the final stages of preparation for its mail-ballot programs in multiple states. In fact, DCCC had already made critical budget decisions to about where to focus its efforts, and mail ballot programs are critical components of its strategy in many places. Moreover, in some states like New Mexico, DCCC and its candidate members have *already* implemented programs for the upcoming primary election aimed at ensuring supporters return their ballots via the mail—in part to test-run and fine-tune their programs ahead of the general election in the fall. Those programs are, again, built upon existing mail balloting rules. The E.O., however, either wastes or significantly compromises DCCC's investments in existing programs and efforts like this.

23. In the days since President Trump issued the E.O. on March 31, 2026, DCCC's leadership team has been forced to immediately start grappling with how Section 3(b) will impact the Democratic Party's outreach, assistance, and programs for the 2026 general election.

24. The E.O. fundamentally disrupts DCCC's efforts to plan for the general election and significantly disrupts the electoral playing field more broadly. It is now far more difficult for DCCC and its members to effectively complete planning and execute DCCC's mail voting strategy because, among other things, the E.O. mandates seismic changes to who may be eligible to receive and cast a ballot via the U.S. mail. The resulting fallout directly impacts DCCC's core operations, including at the most fundamental level. To give just one example, the E.O.'s changes to mail balloting compromise polling data that DCCC and its members commissioned and rely on to

determine mail voting patterns that guide its plans for 2026. This type of issue—which would not exist absent the E.O.—directly frustrates DCCC's ability to make important strategic decisions as to how to operate in the 2026 midterms and compromises investments DCCC has already made for the 2026 cycle.

25.    In short, DCCC has already put significant work into its existing programming and voter turnout strategies for 2026, and those plans are compromised under the E.O. DCCC cannot wait months to make changes to these programs; because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September 2026 for the 2026 general election), DCCC will be forced to re-allocate investments and re-tool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on DCCC's voters.

26.    In addition to undermining DCCC's existing programs, to counteract the harm from the E.O., DCCC will be forced to develop *new* programs to assist voters in checking whether they are "enrolled" in the U.S. Postal Service's "Mail-In and Absentee Participation List" and assisting voters in figuring out how to vote if they are no longer permitted to vote by mail via the U.S. Postal Service. For some voters, voting by another method may not be possible at all, especially if they are not currently located in-state or have physical, health, or economic limitations that prevent them from voting in-person.

27.    These voter assistance and voter education programs to address the changes to mail balloting cannot be created overnight; DCCC must start planning for them imminently for them to be executed effectively and sufficiently resourced.

28.    A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the U.S.

Postal Service has never been a part of the mail voting process, and, if the E.O. is implemented, some of the sweeping changes that it dictates will come while elections are *ongoing*. Teaching voters about the new requirement and working to ensure it does not deter voters from voting entirely will be a significant challenge. Inevitably, even with DCCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, DCCC and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to retake control of the House of Representatives.

29.     DCCC expects that any new programs that it must create and launch as a result of the E.O. will be particularly difficult—and expensive—to implement in states where vote by mail has become the norm and voters receive mail ballots as a matter of course. The E.O. will also cause significant confusion for voters in those States. In some states that primarily rely on mail voting, including Nevada, receiving a vote-by-mail ballot is so expected that voters must *opt out* of receiving one. The E.O., however, will turn this expectation on its head, functionally requiring voters to *confirm* that they are on USPS's list or find themselves without a way to vote at the last minute.

30.     Before any election season, DCCC also works to analyze voting patterns and anticipate whether there are sufficient early voting and in-person voting locations to support the electorate. When DCCC or its candidate members identify jurisdictions that need additional voting locations, DCCC attempts to work with local election officials to resolve the problem. This work must be done well in advance of in-person voting—jurisdictions typically determine the number and location of voting locations several months in advance of the start of voting for any particular election—and DCCC has already performed some of this analysis for 2026 based on its current

8

expectations of voting patterns. If Section 3(b) of the E.O. is not enjoined soon, DCCC will need to revisit whether states have sufficient in-person capacity to handle the anticipated shift to in-person voting, particularly in states that primarily rely on vote by mail to conduct elections. In such a scenario, DCCC and its candidate members will need to identify areas where in-person voting will become particularly congested and attempt to work with local election officials to ameliorate the problem, to the extent that is even possible.

31.    These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DCCC has not budgeted for these extensive new programs, it will have to scale back or cut the initiatives that it currently has planned for persuading voters and mobilizing our members and constituents to elect Democratic candidates to the House.

32.    The resources DCCC has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DCCC's mission-critical planned activities and expenditures.

33.    If DCCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Party. There are only seven months until election day, and approximately only five months before mail ballots will start to be sent to voters, and there are many primary elections this spring and summer in the run up to November.

34.    Every day and every resource during this critical time that DCCC must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

## II.     The E.O.'s Creation and Dissemination of State Citizenship Lists for Use in Federal Elections

35.     DCCC, DCCC's members, and DCCC's constituents are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

36.     The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DCCC and its members' expense, and just as the President likely intended.

37.     Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. The E.O. will nonetheless harm DCCC, DCCC's members, and DCCC's constituents given the near certainty that some number of U.S. citizens will not be included on such lists.

38.     The E.O. specifies that the "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

39.     Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and

does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

40.    Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

41.    DCCC is also particularly concerned about the effect of the State Citizenship Lists on women, who are more likely to support Democratic candidates than men, and who are more likely than men to change their names because of marriage or divorce. Both the creation of these State Citizenship Lists and the attempted matching with of those lists with state voter files will require the attempted matching of names across files. For voters whose names have changed, it may be more difficult to successfully "match" or identify such voters, resulting in their omission from either the State Citizenship Lists or any resulting list a state uses to create a list of eligible voters after those lists are sent to states.

42.    In other words, the creation of these lists using these databases create a serious risk that DCCC's members and supporters who are in fact U.S. citizens will be erroneously excluded from such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer of DCCC's members and supporters are able to vote, DCCC and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

43.    Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any

11

given voter thus may have no way of knowing that the federal government has represented to their home State that they are not eligible to vote, and no opportunity to avail themselves of any (as yet undefined) cure provisions.

44.    And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many voters do not have and both of which are generally expensive and difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate the ability to vote of DCCC's members and constituents and in some cases will disenfranchise them.

45.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that some of DCCC's members and constituents will be burdened or disenfranchised completely as a result of these lists.

46.    To respond to Section 2(a), DCCC will need to carefully monitor the development of the State Citizenship Lists and will need to have programs in place to help educate its members and constituents as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

47.    These voter assistance and voter education programs to address the State Citizenship Lists cannot be created overnight; DCCC must start planning for them imminently for them to be effective and sufficiently resourced.

48.    Just as with the changes to mail balloting, DCCC anticipates that this part of the E.O. will cause significant confusion for voters. These kinds of citizenship lists will be entirely

12

new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

49.    All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DCCC would not have to undertake absent the E.O., require DCCC to expend staff time and other resources that would be dedicated to its other critical programs. These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DCCC has not budgeted for these new, widespread programs, we will have to scale back or cut the initiatives we currently have planned for persuading voters and mobilizing our members and constituents to elect Democratic candidates to the U.S. House.

50.    If DCCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Democratic Party. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening all the time. Every day and every resource that DCCC must spend during this period planning for these voter assistance programs, as well as helping voters check those lists and correcting them, if necessary, represents a lost opportunity to persuade voters and

13

galvanize supporters that cannot be restored once lost.

51.     DCCC is also concerned about Section 2(a)'s threat to the privacy rights of its members and constituents. This part of the E.O. guarantees improper exposure of the personal data of millions of DCCC's members and constituents.

52.     Over the last several months, Democrats have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DCCC's members and constituents, myself included, are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/16/2026

_Erik Ruselowski_

Erik Ruselowski, Chief Operating Officer
DCCC

14