# Exhibit 4

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

               Plaintiffs,

    *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

              Defendants.

Case No. 1:26-cv-01114

---

**DECLARATION OF JILLIAN EDELMAN**

---

I, Jillian Edelman, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I oversee DGA's day-to-day operations. In particular, I handle DGA's operational planning, meaning that I make strategic decisions regarding staffing, budgeting, contracts with vendors, expenditures, and more.

3.     Plaintiff Democratic Governors Association is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse for best

1

practices and policies, including for managing, administering, and budgeting for Federal, State, and local elections.

4.    All incumbent Democratic governors currently serve as members of DGA, representing 24 States, the District of Columbia, Guam, and the U.S. Virgin Islands.[1] Each of DGA's members are also voters in their respective states.

5.    At least 11 of these incumbent Democratic governors are candidates for office in their respective States in 2026. These include Governor Hobbs of Arizona, Governor Lamont of Connecticut, Governor Green of Hawaii, Governor Pritzker of Illinois, Governor Mills of Maine, Governor Moore of Maryland, Governor Healy of Massachusetts, Governor Hochul of New York, Governor Kotek of Oregon, Governor McKee of Rhode Island, and Governor Shapiro of Pennsylvania.

6.    In all, DGA is actively planning, preparing, budgeting, and strategizing for 36 gubernatorial races up in the 2026 general election.[2]

7.    Both DGA and DGA's members who are candidates for office have an interest in

---

[1] These members include Andy Beshear (Kentucky), Muriel Bowser (Washington, D.C.), Albert Bryan, Jr. (U.S. Virgin Islands), Tony Evers (Wisconsin), Bob Ferguson (Washington), Josh Green (Hawaii), Maura Healey (Massachusetts), Katie Hobbs (Arizona), Kathy Hochul (New York), Laura Kelly (Kansas), Tina Kotek (Oregon), Ned Lamont (Connecticut), Lou Leon Guerrero (Guam), Michelle Lujan Grisham (New Mexico), Dan McKee (Rhode Island), Matt Meyer (Delaware), Janet Mills (Maine), Wes Moore (Maryland), Mikie Sherrill (New Jersey), Gavin Newsom (California), Jared Polis (Colorado), JB Pritzker (Illinois), Josh Shapiro (Pennsylvania), Josh Stein (North Carolina), Abigail Spanberger (Virginia), Tim Walz (Minnesota), and Gretchen Whitmer (Michigan).

[2] Gubernatorial races in 2026 include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin, Wyoming, the District of Columbia, Guam., Northern Mariana Islands, and the U.S. Virgin Islands.

a fair and lawful electoral process for DGA's members' campaigns. Even if DGA's members succeed in their campaigns, DGA and its members are harmed by unlawful election rules, as they deprive DGA and its candidate members of a fair process and an accurate result.

### I.    The New E.O.'s Restrictions on Voting by Mail

8.    On March 31, 2026, President Trump signed Executive Order 14399, titled *"Ensuring Citizenship Verification and Integrity in Federal Elections"* ("E.O. or "Order"). Section 3(b) of that E.O. purports to give USPS control over which voters will be eligible to vote a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

9.    Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear that the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

10.    Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm

whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

11.     The E.O., which would fundamentally change how mail balloting operates, and threatens to change who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DGA, DGA's candidate members, DGA's members who vote by mail, and millions of Democratic voters who vote by mail. Ultimately, if Section 3(b) of the EO is implemented, it would require a fundamental restructuring of several of DGA's investments and would pose a severe risk to DGA's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that the new E.O.—much like his last one—is intended to harm his and the Republican Party's political opponents, including DGA and its candidates.

12.     To advance its mission of supporting the election of Democrats to governorships across the country, DGA provides funding that is used to educate and assist Democratic voters on how to vote, including through mail ballots, and to ensure that those votes are counted. Such programs include voter education and outreach programs aimed at encouraging mail voting, and ballot cure programs to help ensure that mail ballots are counted. In the last few years, DGA has grown significantly and expanded the support it offers for these programs.

13.     DGA invests heavily in campaigns and political parties, and those campaigns and parties in turn run voter assistance programs to ensure that voters are able to cast ballots that will be counted. DGA has also provided funding for programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so.

14.     These programs are built with the understanding that voters who are eligible to vote by mail in their respective state and wish to do so will in fact be able to transmit a mail ballot via

the U.S. mail and have that ballot counted. DGA is in the process of allocating funds and making investments in these programs for the 2026 elections.

15.    President Trump's mandate that the USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for Democratic voters to vote and potentially disenfranchising them altogether if the USPS deems that voter "ineligible" to transmit a ballot via U.S. mail.

16.    The E.O. is especially concerning for Democratic voters who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, such as those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail.

17.    Because general election ballots include both federal and state races (including gubernatorial races), the E.O.'s attempt to interfere with federal elections will have the effect of interfering with state races, too, including the races of DGA's members.

18.    In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DGA expects that trend to continue. The E.O. thus puts both DGA and DGA's members who are running for election at a competitive disadvantage. DGA and DGA's members will be disadvantaged if the E.O. forces Democratic voters to take extra steps to vote using the U.S. mail or makes them unable to use that method altogether, which is all but certain if the E.O. is implemented. Several of DGA's members will compete in extremely competitive elections decided by a small number of votes, and mail ballots could be decisive in some of these races.

5

19.     To run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, DGA's members have already made investments of resources in their races based on the existing rules.

20.     In the days after President Trump issued the E.O. on March 31, 2026, DGA's leadership team has been forced to immediately start grappling with how the threatened enforcement of Section 3(b) will impact decisions about resources for the 2026 general election.

21.     At this point this far into the election cycle, DGA has already begun to make and continues to make strategic decisions about how to allocate its resources for its programs. Those decisions are jeopardized by the E.O.'s fundamental changes to who will be eligible to transmit a ballot via the U.S. mail, which has significantly disrupted the electoral playing field. Simply put, President Trump's E.O. has cast a cloud of uncertainty over the rules governing mail ballots in the 2026 election, potentially compromising our existing investments and frustrating our ability to make important strategic decisions as the 2026 midterms continue.

22.     Moreover, if Section 3(b) of the E.O. is implemented, DGA would be required to fund programs to educate voters about what those voters need to do to ensure they are "enrolled" on USPS's "Mail-In and Absentee Participation List" and assist those voters in complying with the enrollment process. In such an event, DGA would also be forced to re-evaluate the extent to which it should assist in promoting mail balloting programs. And it would be forced to make these adjustments *in the middle* of the electoral cycle, undermining and prejudicing decisions it has already made and further frustrating its ability to make concrete strategic plans and implement them effectively.

23.     In the event that Section 3(b) of the E.O. is implemented, DGA will also be forced to fund programs to assist voters in how to vote if they are no longer permitted to vote by mail via

the U.S. mail. For some voters, voting by another method may not be possible at all, especially if they are not currently located in-state or have physical, health, or economic limitations that prevent them from voting in-person.

24.    A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the USPS has never been a part of the mail voting process, and if the E.O. is implemented, some of the sweeping changes it dictates will come while elections are ongoing. Teaching voters about the new requirement, how they can comply, and working to ensure it does not deter voters from voting entirely will be a significant challenge. Inevitably, even with DGA's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, DGA and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to win elections.

25.    DGA expects that any new programs that it must create and launch as a result of the E.O. will be particularly difficult—and expensive—to implement in states where vote by mail has become the norm and voters receive mail ballots as a matter of course. In a state like California, for example, which has a gubernatorial election this year, all active voters receive a vote-by-mail ballot from the state without having to request one under the existing rules. Attempting to teach those voters that they in fact need to check to see whether they are on USPS's "list" to receive a mail ballot, and helping those voters attempt to make alternate arrangements, if necessary, would be an incredibly resource intensive and expensive effort. The same will be true in other states that primarily rely on vote by mail and that have gubernatorial elections this year, including Arizona, Colorado, Nevada, and Oregon.

26.    Given the expense and breadth of these new programs, DGA cannot wait several months to know whether these programs are necessary. If these programs need to be built—and funded—that is a decision that DGA and its candidate members need to make quickly.

27.    DGA's funding of these new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DGA has not budgeted for such extensive new programs, DGA would have to scale back its investments in persuasion and mobilization campaigns.

28.    The resources DGA has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DGA's mission-critical planned activities and expenditures.

29.    If DGA is required to deploy resources to respond to the E.O. at any point from now until election day, it will present a lost opportunity for DGA. There are only seven months until election day—and approximately only five months before mail ballots will be sent to voters—and there are many primary elections in the run up to November.

30.    Every day and every resource during this critical time that DGA must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost. The same is true for every resource DGA spends on programs and initiatives that are based on the rules as they stand today, which the E.O. threatens to change.

31.    Section 3(b) of the E.O. further harms DGA's members because it effectively usurps their authority related to elections. The Constitution leaves the regulation of elections largely to the states. A significant aspect of many of DGA's members' power and authority in their

8

states stems from their constitutional and statutory authority to influence, support, and sign state election laws. The E.O. improperly claims the ability to displace that authority, impinging on DGA's members' authority and diluting their executive authority in their states.

## II.    The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections

32.    DGA and DGA's members who are candidates for office in the 2026 elections are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every confirmed U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

33.    The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DGA and its members' expense, just as the President likely intended.

34.    Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. The E.O. will nonetheless harm DGA and DGA's members who are candidates for office given the near certainty that some number of U.S. citizens will not be included on such lists.

35.    The E.O. specifies that the "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements

9

(SAVE) program and Social Security Administration (SSA) records.

36.     Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

37.     Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

38.     In other words, the creation of these "State Citizenship Lists" using these databases create a serious risk that Democratic voters who are in fact U.S. citizens will be erroneously not included on such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer Democratic voters are able to vote, DGA and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

39.     Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any given voter thus may have no way of knowing that the federal government has represented to her home State that she is not eligible to vote, and no opportunity to avail herself of any (as yet undefined) cure provisions. And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many

10

voters do not have and may be expensive or difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate Democratic voters' ability to vote and in some cases will disenfranchise them.

40.     Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that voters who would otherwise support DGA's members in their re-election campaigns will be burdened or disenfranchised completely as a result of these lists.

41.     If Section 2(a) of the E.O. is permitted to be implemented, DGA will need to carefully monitor the development of the State Citizenship Lists and help fund programs to educate its Democratic voters as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

42.     Just as with the changes to mail balloting, DGA anticipates that this part of the E.O. will also cause significant confusion for voters. These kinds of citizenship lists will be entirely new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to attempt to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

43.     All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DGA would not have to undertake absent implementation of the E.O., would require DGA to scale back investments that would be dedicated

to critical persuasion and mobilization programs.

44.    If DGA is required to deploy resources to respond to this part of the E.O at any point from now until election day, it will present a lost opportunity for DGA. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening throughout this year. Every day and every resource that DGA must spend during this period helping voters check State Citizenship Lists and correcting them, if necessary, represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

45.    Additionally, DGA is also concerned about Section 2(a)'s threat to the privacy rights of its members and Democratic voters more generally. This part of the E.O. guarantees improper exposure of the personal data of millions of Democratic voters nationwide.

46.    Over the last several months, DGA's members have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DGA's members are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

12

Executed on: 4/8/2026 _____


*Jillian Edelman*
_____

**Jillian Edelman, Chief Operating Officer**
**DGA**

13