# Exhibit 7

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al*., <br><br>         Plaintiffs, <br><br>   *v.* <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al*., <br><br>         Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF ADA SHEN**

I, Ada Shen, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I live in Paris, France, with my family, and I am a duly registered voter in California. I am a Democrat and I typically vote for Democratic candidates.

3.     I am the Deputy Global "Get Out the Vote" ("GOTV") Officer of Democrats Abroad, the official Democratic Party arm for the millions of Americans living outside the United States. I am also the GOTV Coordinator for the EMEA (Europe, Middle East, Africa) Region for Democrats Abroad. In these capacities, I help lead global and regional efforts to assist our members as well as the wider community of Americans living abroad with registering to vote, requesting a ballot, and returning their ballots to their local election offices or officials back home. I am proud to do my part in helping fellow Americans abroad participate in our political and electoral processes.

1

4.      Democrats Abroad is recognized as a "state" party by the Democratic National Committee ("DNC") and is represented on the DNC by eight elected voting members. Democrats Abroad also sends a voting delegation to the quadrennial Democratic National Convention. Democrats Abroad has 52 official country committees throughout the world. Our country committees help keep our members and Americans abroad informed of their rights to participate in our political processes back home.

5.      Our members live in more than 190 countries around the globe and vote in every state and Congressional district in the U.S. Many of our members are U.S. Citizens who have settled abroad after serving our country, including as members of the Armed Services, the Foreign Service, or other governmental agency work, as well as those who may be studying, working, or living abroad.

6.      In 1998, I moved abroad from California to Beijing, China to work in independent journalism and to improve my Chinese language skills. To vote in the 2000 and 2004 elections, I had to fly home to California from China to cast my ballot in person. In 2007, I became involved with Democrats Abroad and served as a lead "country committee in formation" organizer. Our main activity was voter assistance for the broader American community, where many did not know they had the right to vote in American elections, did not know how to vote from abroad, and struggled to navigate the available postal services to return their election materials and ballots.

7.      While Americans abroad no longer need to fly home to vote, the obstacles to voting are still significant. A former executive for a major American company who was attempting to navigate the overseas voting process told me, "I have two PhDs, but this is hard. Help!" While in China, I organized and led numerous non-partisan voter registration drives to help enfranchise Americans living there in the 2008, 2010, 2012, 2014, and 2016 federal election cycles.

8.      In 2017, my husband and I moved to Paris where I served as Democrats Abroad France's first elected GOTV Officer and later became National Chair. Democrats Abroad France grew voter engagement and participation by more than 40% under my leadership due to expansion of our phone-banking initiatives, SMS and postcard campaigns; voter registration drives at protests, rallies, and community events; and non-partisan voter outreach on campuses and in the wider community.

9.      For military and overseas civilian voters (those eligible to be covered under UOCAVA federal law), the U.S. Postal Service ("USPS") plays a critical role in ensuring that overseas ballots cast will be counted. In some states and under certain conditions, UOCAVA voters may submit their completed Federal Post Card Application ("FPCA")—the federal form used to register to vote or request a ballot—only by postal mail to their local election officials.

10.     Critically, USPS also delivers blank absentee ballots to overseas voters who have requested to receive them, and, for roughly half the states, all their overseas civilian voters are required to return their completed ballots to election offices via postal mail—requiring use of USPS and the international postal mail relay network that USPS partners with in other countries. However, USPS, like postal mail systems in other countries, is merely a carrier network for postal mail delivery and services. USPS does not verify voter eligibility or have any role in making other determinations about who can vote. Additionally, UOCAVA voters have the right to vote in at least U.S. federal elections, and in many states they are allowed to vote in all state and local elections, based on both federal and state laws. Determining detailed and sensitive aspects of voter eligibility in accordance with applicable federal, state, and local laws and regulations is normally the responsibility of state and local election officials in our home states where we vote, a function distinctly separate from the transmission of mail.

11.    I understand that the President issued an Executive Order on March 31, 2026, directing major changes to mail voting protocols in the United States, including by directing the USPS to determine which voters will be able to vote a mail ballot via USPS. Most importantly, the Executive Order states that USPS "shall not transmit mail-in or absentee ballots from any individual" who is not "enrolled with the USPS" based on a list that USPS will provide states. Based on the limited information provided in the Executive Order, it is difficult to see how UOCAVA voters who may no longer actively reside at an address (but under UOCAVA still retain the right to vote at that address based on past ties) would be properly included on such a federally-mandated state list based only on federal government database information, even assuming that these databases were error- and name mismatch-free. It seems far more likely that UOCAVA voters would be missing from such a federally-mandated state list. I am very concerned that many UOCAVA voters would find themselves unable to receive a ballot and unable to remedy any discrepancies and inconsistencies between the proposed federal lists and a correct disposition of the voter's eligibility as properly validated by state and local election authorities.

12.    The President's Executive Order harms me personally as a California voter in multiple ways. I am an overseas voter who has relied on voting by mail through USPS services in the past, just like many thousands of other California voters who live and vote from abroad. I have a reasonable expectation that I can receive my blank ballot by mail if I ask for it, and that my voted ballot will be counted upon being returned by mail as long as I comply with California's election laws in doing so, which conform with existing federal law for overseas voters. But the new Executive Order directs USPS to refuse to handle mail ballots unless a voter appears on their federally mandated state list of mail voters. This harms my right to vote because it conditions my ability to vote by mail on inclusion on this USPS list, even though I have been deemed by my

home state to be eligible to vote by mail, and despite the fact that federal law guarantees me the right to vote by mail in federal elections. The same is true for the millions of other eligible overseas U.S. citizen voters in my shoes. This E.O. creates multiple points of bureaucratic confusion as to whose authority counts should my ballot "fail" to check out—not according to my local election officials, but according to USPS.

13.    The President's E.O. makes it such that voters who are currently deemed by their states to be eligible to vote by mail—including overseas voters like me—can no longer fully rely on USPS to deliver our ballots normally, as USPS is now supposed to gatekeep ballot transmission. This disrupts reasonable expectations of mail delivery, due to mystifying and conflicting eligibility criteria informing the federal lists, and without any clear remedy or clear authority to resolve discrepancies. It creates new and confusing bureaucratic hurdles in order to simply exercise a federally-protected right to vote. Only U.S. citizens can vote and only once they have provided detailed personal information matching their voter registration. And the ballot is only counted after a local election official has validated the voter's information against their voter registration. There is simply no need for new USPS processes or double-verification of voters as prescribed by the President's E.O.

14.    Even for those living overseas who may have access to alternative voting methods—such as receiving a ballot by email or returning it by email, online upload, or fax—the reality is that the Executive Order affects USPS delivery of ballots imposing additional, cumbersome steps and confusion on what is already a challenging and time-constrained process. These additional steps will vary by state, further increasing complexity. The current official 2026–2027 Voter Assistance Guide issued by the Federal Voting Assistance Program (FVAP), which sets forth eligibility and return rules for UOCAVA voters in every state, spans 485 pages—

5

illustrating the already significant procedural complexity voters must navigate. State laws governing alternative return methods are highly variable. For example, under California law, UOCAVA voters may request to receive a blank ballot by postal mail or email, which can mitigate delivery failures. However, completed ballots cannot be returned by email or online upload; they may be returned only by postal mail or by fax. Use of fax return is itself contingent on access to a functioning fax service and, in some cases, the execution of additional forms or waivers. California voters abroad who cannot access fax *must* rely on postal mail to return their ballots. As a result, overseas voters in the state—many of whom cannot reasonably be expected to return to the United States just to vote in person—are dependent on a limited and uneven set of transmission options. California is just one state; approximately half of all other U.S. states require that all overseas ballots be returned by postal mail only. The Executive Order's disruption of postal ballot transmission forces voters to navigate a fragmented, state-specific set of alternative procedures, increasing the likelihood of confusion, delay, and error within an already compressed election timeline. Based on my experience mobilizing overseas voters, additional procedural hurdles—such as uncertainty regarding USPS eligibility requirements or the need to identify and access compliant alternative return methods—greatly discourage participation and heighten risk of disenfranchisement.

15. The E.O.'s restrictions are especially concerning because U.S. citizens living abroad already suffer from a low voter-participation rate. Voting from abroad—even under the current system—is extremely difficult to navigate, as explained. The estimates of non-military U.S. citizens living abroad at any particular time range from 4.5 million to 9 million. But according to FVAP, a voter assistance program run by the U.S. Department of Defense, the voter turnout rate was only about 3.4% of eligible voters in 2022, and around 7.8% in 2020. Final 2024 numbers are

not yet available to my knowledge, but they are likely to be similarly low. These U.S. citizens voting from abroad include important members of our society whose voices should be represented in our democracy—for instance, students, veterans, and Americans working for international companies. They also include service members defending the country overseas, diplomats representing it, aid workers advancing the country's values, educators and researchers contributing to global knowledge, entrepreneurs building cross-border economic ties, and retirees who remain part of the American civic community even from abroad.

16.    Separately, I understand that the Executive Order directs the Department of Homeland Security, U.S. Citizenship and Immigration Services, the Social Security Administration, and other federal agencies to compile and distribute "State Citizenship Lists" derived from multiple federal data sources, to be transmitted to state election officials no fewer than 60 days before each federal election. While the Order does not clearly define all intended uses of these lists, it states that they are to assist in verifying voter eligibility.

17.    This provision harms me as an American citizen by compelling the aggregation, cross-referencing, and dissemination of my personal information across multiple federal agencies and to state officials for purposes that are not clearly limited or defined. I have a strong interest in maintaining the privacy and integrity of my personal data and in ensuring that the federal government complies with statutory protections governing its use. Federal law, including the Privacy Act of 1974, restricts the disclosure and use of personal information maintained in federal systems of records to specified purposes, subject to defined safeguards. The Executive Order, however, directs the consolidation and transmission of sensitive personal data across agencies and to third parties in a manner that, at minimum, expands access to that information and increases the number of officials who may handle it. This materially heightens the risk of unauthorized

7

disclosure, misuse, or error. That risk is not hypothetical. Federal agencies responsible for maintaining sensitive personal data have, in recent years, been found to have improperly disclosed or inadequately protected such information. Expanding the scope, circulation, and handling of these records—particularly for a newly created and not fully defined purpose—further increases the likelihood that personal data may be exposed, misused, or inaccurately recorded. For me, this constitutes a serious injury: the compelled inclusion of my personal information in a system of broad inter-agency sharing and external dissemination that I cannot meaningfully control, and that exposes me to heightened risks to my privacy and data security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  4/17/2026

**Ada Shen**

8