**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *also known as the* DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 26-1151 (CJN) |

**BRIEF *AMICUS CURIAE* OF THE SOCIETY FOR THE RULE OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

Dated April 17, 2026

Richard D. Bernstein (DC Bar No. 416427)
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
rbernsteinlaw@gmail.com

Nancy A. Temple* (IL-6205448)
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
312-663-0800
ntemple@kattentemple.com

*Pro Hac Vice Pending

*Counsel for Amicus The Society For The
Rule of Law*

**DISCLOSURE STATEMENT**

Pursuant to Local Rule of the United States District Court for the District of Columbia LCvR 7(o)(5), *Amicus* The Society for the Rule of Law and Democracy, Inc., doing business as The Society for the Rule of Law ("SRL"), has no parent corporation, and there are no publicly held corporations that own more than 10% its stock.

DATE: April 17 , 2026                                      Respectfully submitted,

                                                          */s/ Richard D. Bernstein*

                                                          Richard D. Bernstein
                                                          Attorney for *Amicus Curiae*

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT……………………………………………..    i

TABLE OF CONTENTS………………………………………………………………..    ii

TABLE OF AUTHORITIES…………………………………………………………….    iii

INTEREST OF AMICUS CURIE…………………………………………………….    1

INTRODUCTION AND SUMMARY OF ARGUMENT…………………………………    1

ARGUMENT……………………………………………………………………………    2

I.      EO 14399 Requires USPS To Provide And Administer Federal Voter Lists…………    2

II.     In 1894 And Again In 2006, Congress Repealed Prior Limited Authority For Federal Officials To Provide And Administer Voter Lists……………………………    3

III.    Neither The NVRA Or HAVA, Nor Any Current Federal Election Statute, Provides Any Federal Agency Authority To Provide Or Administer Any Voter List……………    5

IV.    The Statutory History Demonstrates That 39 U.S.C. § 401 Does Not Give The USPS Authority To Provide Or Administer Voter Lists……………………………..    9

        A.     Clear Authorization Is Required…………………………………………….    9

               1.    Federalism Principles……………………………………………….    9

               2.    The Major Questions Doctrine……………………………………..    10

        B.     39 U.S.C. § 401(2) Does Not Authorize, Much Less Clearly Authorize, Any Role For The USPS In Providing Or Administering Voter Lists………………    14

CONCLUSION…………………………………………………………………………..    18

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  570 U.S. 1 (2013) ...................................................................................................6, 9
*Biden v. Nebraska*,
  600 U.S. 477 (2023) ............................................................................................ 11, 13
*Bond v. United States*,
  572 U.S. 844 (2014) ...................................................................................................9
*Bush v. Gore*
  531 U.S. 98 (2000) . ...................................................................................................3
*Chiafalo v. Washington*,
  591 U.S. 578 (2020) ............................................................................................ 11, 13
*Ex parte Seibold*,
  100 U.S. 371 (1880) ...................................................................................................6
*Gonzales v. Oregon,*
  546 U.S. 243 (2006) .................................................................................................10
*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) .................................................................................................14
*Husted v. A. Philip Randolph Institute*,
  584 U.S. 756 (2018) ...................................................................................................3
*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 628 (2026) ........................................................................ 10, 11, 12, 16
*Moore v. Harper*,
  600 U.S. 1 (2023) ......................................................................................................3
*National Federation of Independent Business v. OSHA,*
  595 U.S. 109 (2022) .................................................................................................18
*Shelby County v. Holder,*
  570 U.S. 529 (2013) ...................................................................................................9
*United States v. Classic,*
  313 U.S. 299 (1941) .................................................................................................12
*United States v. Comstock,*
  560 U.S. 126 (2010) ...................................................................................................9
*United States v. Gradwell*
  243 U.S. 476 (1917) ................................................................................................9, 15
*United States v. Rahimi,*
  602 U.S. 680 (2024) .................................................................................................12
*West Virginia v. EPA*,
  597 U.S. 697 (2022) ........................................................................................10-13, 16

Statutes

1 Stat. 239 (1792) ............................................................................................... 18
16 Stat. 433 (1871).............................................................................................. 4
28 Stat. 36 (1894)............................................................................................... 4

56 Stat. 753 (1942)……………………………………………………………………… 18

79 Stat. 437 (1965)……………………………………………………………………… 5

100 Stat. 924 (1986) …………………………………………………………………7

100 Stat. 928 (1986) …………………………………………………………………7

116 Stat. 1666 (2002)…………………………………………………………………… 3

120 Stat. 577 (2006)……………………………………………………………… 5,15

120 Stat. 3198 (2006) ………………………………………………………………15

2 U.S.C. §§ 1-9, 381-96………………………………………………………………11

3 U.S.C. §§ 1-22 ……………………………………………………………………11

18 U.S.C. §§ 241, 611, 1015………………………………………………………17

18 U.S.C. §§ 592-611 ………………………………………………………………11

39 U.S.C. §3406…………………………………………………………………7, 9, 17

39 U.S.C. § 401………………………………………………… 2, 9, 10, 14-16, 18

39 U.S.C. § 401(2) ……………………………………………………9, 14-16, 18

39 U.S.C. § 404(e)(2) ………………………………………………………………17

39 U.S.C. §§ 3001-18………………………………………………………………16, 17

39 U.S.C. §§ 3001(a), 3003(a), 3014(a)(2) ………………………………………16

36 U.S.C. § 3629…………………………………………………………………… 6, 9

52 U.S.C. § 10302(a)………………………………………………………………8

52 U.S.C. § 10305(d) ………………………………………………………………8

52 U.S.C. § 10307……………………………………………………………………8

52 U.S.C. § 10308(d) ………………………………………………………………8

52 U.S.C. §§ 10502(c)-(e) …………………………………………………………7

52 U.S.C. § 20301(b) ………………………………………………………………7

52 U.S.C. §§ 20302-06………………………………………………………………7

52 U.S.C. §§ 20303-07………………………………………………………………6

52 U.S.C. § 20507(d) ………………………………………………………………3

52 U.S.C. § 20510(a)…………………………………………………………………8

52 U.S.C. § 20511…………………………………………………………………8, 17

52 U.S.C. §§ 20506-08………………………………………………………………6

52 U.S.C. §§ 20506(a)(1), 20507(a) ………………………………………………6

52 U.S.C. §§ 20508(a)(1)-(3) ………………………………………………………6

52 U.S.C. § 20984 (a)(1)(B)(ii)……………………………………………………… 3

52 U.S.C. § 21082……………………………………………………………………12

52 U.S.C. § 21083(a)(1)(A)…………………………………………………………6

Act of Sept. 16, 1942, ch. 561, § 9, 56 Stat. 753 (1942)……………………………18

Other Authorities

EO 14399.................................................................................... 1-3, 5-9, 12-17

H.R. 22 (2025) ....................................................................................11

H.R. 7296 (2026) ................................................................................11

H.R. 7300 (2026) ................................................................................11

H.R. 8281 (2024) ................................................................................11

Merriam-Webster Dictionary……………………………………………………… 2

National Conference of State Legislatures, Challenges to Voter Eligibility, Table 2: Challenge Processes……………………………………………………………………………………13

*The Power of Observation: The Role of Federal Observer Under the Voting Rights Act,*
13 Mich. J.  Race & L.  227 (2007)……………………………………………………..........  5

**INTEREST OF *AMICUS CURIAE***

*Amicus* The Society for the Rule of Law and Democracy, Inc., doing business as The Society for the Rule of Law  ("SRL"), is a national non-profit, non-partisan membership organization of conservative, libertarian, and center-right lawyers, and others, who are dedicated to defending the legal principles of the rule of law, separation of powers, federalism, and democracy through government by the people.[1]  SRL was originally founded as Checks & Balances in 2018 by lawyers and former jurists who served at the highest levels in previous Republican administrations.  SRL relaunched in 2023 to defend and advance these principles, including each branch's importance as a check and balance on the other branches of the federal government.  SRL has an interest in seeing that Executive Order ("EO") 14399 does not violate these principles by having the USPS provide and administer voter lists without statutory authority.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

EO 14399 is illegal in many ways.  This *amicus* brief focuses on one.  The federal statutory history concerning voter lists shows that, contrary to Section 3(b) of EO 14399, the USPS has no statutory authority to have any role in providing or administering voter lists.

Part I of this brief shows that the lists of "enrolled" voters that Section 3(b) requires the USPS to provide and administer are voter lists.  Part II shows that in 1894 and 2006, Congress repealed prior limited statutory authority given to federal officials to provide and administer voter lists in specified situations.  Part III shows that contrary to EO 14399, the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA") provide

---

[1] *Amicus* states that no counsel for any party authored this brief in whole or in part, and that no entity, aside from *amicus* and its counsel, made any monetary contribution toward the preparation or submission of this brief.  The views of SRL do not necessarily represent the views of all individual members.

that state officials shall define, maintain, and administer voter lists.  Neither the NVRA nor HAVA gives any federal agency authority to provide or administer voter lists.  EO 14399 also ignores the federal statutes that address mail-in voting.  Those federal statutes also give no federal agency authority to provide or administer voter lists.  Part IV shows that, especially in light of this history, 39 U.S.C. § 401 gives no such authority to the USPS.  Among other things, the assertion in EO 14399 that Section 401 confers such authority on the USPS contradicts both federalism principles employed in statutory interpretation and the major questions doctrine.

## ARGUMENT

### I.    EO 14399 Requires USPS To Provide And Administer Federal Voter Lists.

EO 14399 requires two things with respect to blocking people from voting by mail.  First, EO 14399 requires various lists of voters.  Under Section 2(a), DHS is to send a list to the chief election official of each State, composed of those who are citizens, 18 or older, and residents of that State.  In addition, from each state, Section 3(b)(ii) of EO 14399 says the list is "of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS."  Most important, Section 3(b)(iv) further states that the "USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS . . . for mail-in and absentee ballots provided by such state …."  Second, Section 3(b)(iii) mandates that "the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific [Mail-In and Absentee Ballot Participation List]" with the USPS.

As the word "enrolled" suggests, each proposed USPS Mail-In and Absentee Participation List to be provided to each state would be a voter registration list.  Especially in the context of a voter list, the words "enrolled" and "registered" are strong synonyms for each other.

2

*Enrolled*, Merriam-Webster, www.merriam-webster.com/dictionary/enrolled (last visited April 10, 2026); *Registered*, Merriam-Webster, https://www.merriam-webster.com/dictionary/registered (last visited April 10, 2026). Indeed, in the NVRA and HAVA, Congress described voter registration lists as "voter *rolls*." 52 U.S.C. §§ 20507(d) (emphasis added), 20984 (a)(1)(B)(ii) (emphasis added), codifying 116 Stat. 1666, 1689 (2002). The Supreme Court has also described voter lists as "voter rolls." *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 781 (2018); *see id.* at 779 ("voting rolls"), *id.* at 763, 767, 778 ("rolls").

Under EO 14399, the only difference from a traditional registration list or voter roll is that here the USPS list is applied to only one kind of voting—mail-in or absentee voting—not (yet) to in-person voting. But that distinction makes no difference. In order for the USPS's voter lists to be validly provided or used, USPS must, at a minimum, have authority from *Congress* to provide or administer a voter list for mail-in or absentee voting.

## II.    In 1894 And Again In 2006, Congress Repealed Prior Limited Authority For Federal Officials To Provide And Administer Voter Lists.

It is in our constitutional DNA that, without statutory authorization from Congress, the executive branch does not make or administer the rules for federal elections. The Constitution's Elections and Electors Clauses assign to state legislatures the authority to make a complete code of rules for federal elections. The Elections Clause for congressional elections specifies that Congress, by legislation, may supersede or alter a state's election rules. The state legislative rules empowered by the Elections and Electors Clauses "includ[e] regulations relating to . . . registration, supervision of voting, . . . counting the votes, and duties of inspectors and canvassers." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (cleaned up). Moreover, those state rules specify *who*—that is, which officials-- compile a registration list, supervise voters, count votes, and inspect ballots for compliance with various requirements, including the voter's presence on a

3

voting list.  Indeed, among the violations of the Electors Clause identified by the concurrence in *Bush v. Gore* were that the Florida Supreme Court had usurped for itself the exercise of authority regarding supervising voters, counting of votes, and deciding who won, when Florida statutes had assigned those authorities to Florida's Secretary of State.  531 U.S. 98, 113-14, 116-18 (2000).

The federal executive branch likewise lacks any authority to displace or even supplement state powers over voting unless Congress by statute gives it such authority.  In 1871, in response to the unique problems posed by Reconstruction after the Civil War, Congress enacted the Second Enforcement Act.  As pertinent here, for cities and towns with populations exceeding 20,000, that Act empowered federal judges--not the President--to appoint election supervisors in House elections.  16 Stat. 433, 434-35 (1871).  Among the duties of those supervisors was to provide a "list of persons who may register and vote," to "verify" and decide who may be on such lists, and to "scrutinize, count, and canvass, each and every ballot."  *Id.* at 433-35, 438.  In addition, the federal supervisors were to "inspect and scrutinize" the voter registration lists compiled by local officials, sign each page of every copy, and attest to the accurate correlation between the voter lists and actual votes.  *Id.* at 434-35.  Federal special deputy marshals were also "to aid and assist the [federal] supervisors of election in the verification of any list of persons made under the provisions of this act."  *Id.* at 436.  Both the federal supervisors and federal deputy marshals were also given authority "to prevent fraudulent registration."  *Id.* However, in 1894, Congress repealed *all* of these statutory provisions.  28 Stat. 36, 36-37 (1894).

In 1965, in response to many decades of odious racial voter discrimination, Congress passed the Voting Rights Act (VRA).  Sections 6 and 7 of the original VRA authorized, in certain certified jurisdictions, the federal Civil Service Commission (CSC) to appoint examiners

4

to decide whether particular persons were eligible to vote and, for those eligible, to ensure that they "shall be promptly placed on a list of eligible voters" and "transmit" that list to state officials, who were required to include persons on the examiners' list "on the official voting list." 79 Stat. 437, 440 (1965). The certifications were based on prior denials in those jurisdictions of the right to vote based on race or color. *Id.* at 437, 440. Section 9(a) of the original VRA set up a process for a CSC hearing officer to decide promptly challenges to an examiner's decisions, with appeal to a federal court of appeals. *Id.* at 441. And Section 9(b) gave the CSC authority to "prescribe[] . . . regulations" concerning the "eligibility lists" and removals therefrom. *Id.* Courts were also available for challenges to the certification of a jurisdiction and to the examiners' making and administering of voter lists. *Id.* at 438, 444. *See* J. Tucker, *The Power of Observation: The Role of Federal Observer Under the Voting Rights Act,* 13 Mich. J. Race & L. 227, 236-37 (2007). After 1983, no new voters were added to the voter rolls via the examiner provisions. *Id.* at 238.

In 2006 Congress repealed Sections 6, 7, and 9 of the original VRA. 120 Stat. 577, 580 (2006). Consequently, the VRA no longer gives any authority for any federal official to provide or administer voter lists.

### III.  Neither The NVRA Or HAVA, Nor Any Current Federal Election Statute, Provides Any Federal Agency Authority To Provide Or Administer Any Voter List.

EO 14399 ignores the history in Part II, *supra*, of Congress's enacting but then repealing a role for federal officials in the making and administering of federal voter lists. EO 14399 instead cites the NVRA and HAVA. Unlike the repealed provisions of the 1871 Enforcement Act and the original VRA, however, neither the NVRA nor HAVA give any personnel of, or directed by, the Executive Branch authority in federal elections to (a) provide or administer lists

of who may vote or (b) unilaterally prevent state election officials from counting votes based on a voting list or anything else.

In the NVRA, Congress itself required states to follow certain uniform registration rules. *See* 52 U.S.C. §§ 20303-07.  The NVRA charges *state* agencies—not federal agencies—with "the registration of voters in elections for Federal office" and "the administration of voter registration for elections for federal office."  52 U.S.C. §§ 20506(a)(1), 20507(a).  In contrast, when it came to the authority of federal agencies and personnel unilaterally to issue regulations, Congress did not authorize anything with respect to voter lists.  52 U.S.C. §§ 20508(a)(1)-(3) limit the federal authority to issue regulations under the NVRA to one agency, the Federal Election Commission, and two subjects – "a mail voter registration application form" and reports to Congress every two years assessing the impact of the NVRA and making recommendations for improvements that *Congress* might enact.  The NVRA also enacted 39 U.S.C. § 3629, which requires the USPS to make available nonprofit rates to state or local registration officials for their mailings required or authorized by the NVRA.

When Congress exercises its power to enact federal elections legislation such as the NVRA, the federal power extends only "'so far as it is exercised, and no farther.'"  *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) ("*Inter Tribal*") (quoting *Ex parte Seibold*, 100 U.S. 371, 392 (1880)).  Although EO 14399 cites the NVRA, EO 14399 does not mention 52 U.S.C. §§ 20506-08 or 39 U.S.C. § 3629, or that their grant of authority to federal agencies is narrow and carefully limited.

Congress returned in 2002 to voter registration in HAVA.  Although HAVA imposed some requirements on the States, HAVA emphasized that voter lists are "defined, maintained, and administered at the State level."  52 U.S.C. § 21083(a)(1)(A).  Indeed, HAVA mandates that

6

the "specific choices of methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." *Id.* at § 21085. As in the NVRA, HAVA did not authorize any federal agency to provide or administer voter lists.

Congress has also legislated with respect to mail-in ballots and has never given authority to any federal agency to provide or administer any voter list for mail-in voting. In the VRA Amendments of 1970, Congress created a floor requiring states to accept absentee ballots in certain circumstances in presidential elections. 52 U.S.C. §§ 10502(c)-(e). Of note, Congress barred any state from including a registration requirement that barred absentee voting. *Id.* at § 10502(f). Congress also expressly preserved the right of states to "adopt[] less restrictive voting practices than those" in the floor set by Section 10502. *Id.* at § 10502(g).

In 1986, Congress returned to absentee voting in the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). 100 Stat. 924 (1986). As amended, UOCAVA has a number of provisions that make it easier for military and overseas voters to register and vote. *See, e.g.*, 52 U.S.C. §§ 20302-06. UOCAVA requires the naming of a presidential designee, who has been the Secretary of Defense, and imposes a number of duties on that designee, including to assist registration by prescribing an official post card form for UOCAVA voters, to assist their ability to vote, and to facilitate collection and delivery of their mail-in ballots. 52 U.S.C. § 20301(b). As to other federal personnel, the head of each agency must, when requested by the presidential designee, "distribute balloting materials and otherwise cooperate in carrying out" UOCAVA. *Id.* at § 20301(c)(1).

UOCAVA also contains a provision that addresses the USPS specifically. Section 201(a) of UOCAVA, 100 Stat. 928 (1986), enacted 39 U.S.C. § 3406, which mandates that the mail-in votes of UOCAVA voters "shall be carried expeditiously and free of postage." That's it. Thus,

7

like the NVRA, HAVA, and the current VRA, nothing in UOCAVA authorizes the USPS or any other federal agency to provide or administer voting lists.

As with voter lists, nothing in the NVRA, HAVA, the VRA, UOCAVA, or any other current federal election statute grants executive branch officials any power unilaterally to block the counting of votes in a federal election. Even when Congress has enacted criminal penalties to deter those who engage in certain violations of federal election law, Congress has not given agencies authority to enact regulations that construct a prophylactic federal administrative system to prevent suspected violations, to count votes themselves, or unilaterally to block states from counting votes that federal agency officials believe are illegal. For example, Section 3(a) of EO 14399 notes that there are criminal penalties for violating 52 U.S.C. § 10307, a provision of the VRA, and 52 U.S.C. § 20511, a provision of the NVRA. But EO 14399 ignores that the only other remedies that Congress authorized an agency to pursue to prevent those violations are for the Attorney General to bring a civil action in federal court for "preventive relief," 52 U.S.C. § 10308(d), or "declaratory or injunctive relief," 52 U.S.C. § 20510(a). Congress did not authorize any agency to engage unilaterally in preventive actions against potential criminal violations in a federal election without first obtaining court authorization.

The VRA also gives the Attorney General authority to ask a federal court to appoint "Federal observers." 52 U.S.C. § 10302(a). Such federal observers, however, have the authority only to "*observ[e]* whether persons who are entitled to vote are being permitted to vote" and "*observ[e]* whether votes cast by persons entitled to vote are being properly tabulated," 52 U.S.C. § 10305(d). Federal observers may not make their own unilateral determinations whether persons are entitled to vote or unilaterally prevent, based on a voting list or otherwise, state officials from having the opportunity to count any vote.

8

IV.    **The Statutory History Demonstrates That 39 U.S.C. § 401 Does Not Give The USPS Authority To Provide Or Administer Voter Lists.**

Against all this history, EO 14399 cites only one source of regulatory authority for the USPS, 39 U.S.C. § 401.  This provision does not even come close to providing authority to reinstitute a regimen, similar to the ones authorized by the *repealed* provisions of the 1871 Second Enforcement Act or the original VRA, where federal personnel provide or administer a voting list or unilaterally prevent a vote from being counted.

A.  **Clear Authorization Is Required.**

1.  **Federalism Principles**

Unlike 39 U.S.C. §§ 3406 and 3629, 39 U.S.C. § 401 codifies legislation enacted under the Postal Clause, see *infra* at 15, *not* the Elections Clause.  It does not even mention elections, much less voting lists or counting votes.  Federalism and Tenth Amendment principles apply to "congressional" and other federal elections. *Shelby County v. Holder,* 570 U.S. 529, 543 (2013). Accordingly, 39 U.S.C. § 401 is interpreted under the standard presumption that, absent a clear statement, a federal statute does not change the usual allocation of authority between the states and the federal government. *See Bond v. United States*, 572 U.S. 844, 857-60 & n. 2 (2014).[2]  It is certainly the usual allocation that states, not federal agencies, provide and administer voting lists. *See supra*, Part III.  When Congress has changed that usual allocation, as it did in the

---

[2] There is an exception to this presumption for "Elections Clause legislation," that is, for statutes enacted "under the Elections Clause." *Inter Tribal,* 570 U.S. at 13-15 & n.6.  But 39 U.S.C. § 401(2) is enacted under the Postal Clause.  Likewise, all the criminal statutes cited by EO 14399 are enacted under the Necessary and Proper Clause, *see United States v. Comstock,* 560 U.S. 126, 135-36 (2010), not the Elections Clause.  Indeed, in ruling that a federal statute that criminalized defrauding the United States did not apply to a case about a congressional election, *United States v. Gradwell* relied on the practice of Congress that "whenever it has assumed to regulate [congressional] elections it has done so by positive and clear statutes."  243 U.S. 476, 485 (1917).

9

repealed provisions of 1871 Second Enforcement Act and the original VRA, Congress has done so in the clearest and most unmistakable terms.  *See supra*, Part II.  39 U.S.C. § 401 does not come close.

### 2. The Major Questions Doctrine

Independently, the major questions doctrine also requires "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022), before any federal agency may be found to have authority to provide or administer voting lists.  The heart of the major questions doctrine is that courts "presume that Congress intends to make major policy decisions itself, not leave these decisions to agencies." *Id.* at 723 (quotations omitted).  This reflects "both separation of powers principles and a practical understanding of legislative intent." *Id.* at 723-24.  "[A] reasonable interpreter would not expect Congress to pawn . . . a big-time policy call . . . off to another branch." *Learning Resources, Inc. v. Trump,* 146 S. Ct. 628, 641 (2026) (plurality opinion) ("*Learning Resources* Plurality") (cleaned up).  The decision as to what is a major question also reflects "constitutional structure and common sense." *Id.* at 639.[3]

Nothing could fit the major questions doctrine better than federal statutory interpretation of an election issue.  That is because federal elections control who exercises federal legislative and federal executive power.  To compare an election issue to *Learning Resources,* Congress has the power to issue tariffs, but federal elections decide who exercises that power and every other legislative and executive power, and therefore how those powers are executed.  Indeed, James

---

[3] The major questions doctrine is *not* limited to economic issues.  *West Virginia,* 597 U.S. at 722, cited *Gonzales v. Oregon,* 546 U.S. 243 (2006), as a formative case in the major questions doctrine.  *Gonzales* involved assisted suicide.  Although assisted suicide is a profound issue, it is not an economic issue.  Moreover, the major questions doctrine protects all the powers given to Congress.  As the Elections Clause makes plain, the power over federal elections is a core congressional power.  There is no basis to exempt that core power from the major questions doctrine.  "There is no major questions exception to the major question doctrine." *Learning Resources* Plurality, 146 S. Ct. at 642.

Madison explained in *Federalist* No. 39 that it was elections that made the federal government under our Constitution a republic.  Madison further explained in *Federalist* No. 51 that "[a] dependence on the people" through elections "is, no doubt, the primary control on the government."  It is through elections that "here, We the People rule."  *Chiafalo v. Washington,* 591 U.S. 578, 597 (2020).

The Elections Clause unmistakably vests the power to decide the rules and policies for elections in legislatures – first and foremost state legislatures, subject to alteration by Congress.  Congress has not been shy about exercising this power.  Not only is there the voluminous Title 52 on federal elections – covering requirements for states to maintain voter lists, floors for mail-in voting that states may exceed, and many other topics.  *See* Part III, *supra.*  There are also extensive provisions for federal elections in Titles 2, 3 and 18.  *See, e.g.,* 2 U.S.C. §§ 1-9, 381-96; 3 U.S.C. §§ 1-22; 18 U.S.C. §§ 592-611.

Moreover, Congress has considered expanding federal power concerning the making and enforcing of voter lists.  *See* SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026); Make Elections Great Again Act, H.R. 7300, 119th Cong. (2026).  That Congress has so far not adopted these bills and expanded the federal role in these areas provides further reason to apply the major questions doctrine.  *See West Virginia,* 597 U.S. at 731-32; *Biden v. Nebraska*, 600 U.S. 477, 503 & n. 8 (2023).

If the courts ever permitted the shift of the power to make election rules to the federal executive branch, the power would never be retrieved by Congress.  As Justice Gorsuch recently explained, all Presidents have a "desire for more power."  *Learning Resources,* 146 S. Ct. at 655 (Gorsuch, J., concurring).  Giving power over election rules to legislatures gives opportunity for

11

"deliberation [to] temper[] impulse, and compromise hammers disagreements into workable solutions" that "tend to endure." *Id.* at 672.  In contrast, EO 14399 asserts that the President by himself can direct the USPS to make and administer voter lists.  Giving power to "one man"– any President –to make the rules for elections "is no recipe for a republic." *Id.* at 655.[4]

At the heart of election regulation is providing and administering voter lists.  That process determines who votes.  That is why Congress has twice enacted – and twice repealed – mechanisms for federal officials to provide and administer voter lists in limited circumstances in some jurisdictions and subject to judicial supervision.  *See* Part II, *supra.*  Rather, Congress in the NVRA and HAVA has left the providing and administering of voter lists to state officials. *See* Part III, *supra*.

It further supports application of the major questions doctrine where an issue presents a policy choice and "[t]he basic and consequential trade-offs involved in such a choice are ones that Congress would likely have intended for itself." *West Virginia,* 597 U.S. at 730.  Whether the USPS should provide or administer voter lists involves numerous policy choices of the kind that Congress usually makes.  Congress has recognized that voter lists contain errors and itself required state processes to recognize and remedy such errors.  *See* 52 U.S.C. § 21082 (requiring that voters missing from voter lists have the opportunity to cast provisional ballots).  Such errors, when uncaught and unremedied, deprive eligible voters of their long-established constitutional rights to vote for members of Congress, *see United States v. Classic*, 313 U.S. 299, 314-18

---

[4] History proves that Justice Gorsuch's insight applies to elections.  One reason for the Glorious Revolution and the English Bill of Rights of 1689 was that King James II attempted to subvert elections of Parliament by exercising control of the local officials who determined who could vote. *See Harper v. Hall*, 866 S.E.3d 393, 434-37 (N.C. 2023) (reviewing history).  Both interpretation of our Constitution and the application of the major questions doctrine have relied on the Glorious Revolution and English Bill of Rights.  *See e.g., United States v. Rahimi*, 602 U.S. 680, 694 (2024); *Learning Resources*, 146 S. Ct. at 671 (Gorsuch, J., concurring).

12

(1941), and their rights to cast popular votes in presidential elections in all 50 states and D.C., *see Chiafalo*, 591 U.S. at 584-85. But EO 14399 has no provisions requiring notice to a voter that he or she is not on a USPS voter list, an administrative opportunity to challenge an omission, or an opportunity for judicial supervision. This failure falls far short of much more detailed and careful voter list provisions in the 1871 Second Enforcement Act and the original VRA that *Congress nonetheless repealed. See* Part II, *supra.*

The USPS has no expertise or history in voter list issues. *See West Virginia,* 597 U.S. at 730 (relying on an agency's lack of expertise as support for applying the major questions doctrine); *Biden*, 600 U.S. at 518 (Barrett, J., concurring) ("Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse."). Having the USPS check envelopes against voting lists also would slow down the delivery of mail-in votes, thereby causing some valid votes to be delivered after mail-in ballot receipt deadlines and not counted. This slowdown would be even longer if USPS implemented some process for voters to challenge their omission from the USPS voter lists or the mistaken application of those lists. In contrast, state voter list laws do not interfere with the timely delivery of mail-in ballots because they allow registration challenges to be resolved well before election day, or after the timely delivery of mail-in ballots, or both. *See* National Conference of State Legislatures, *Challenges to Voter Eligibility, Table 2: Challenge Processes* (last updated Feb. 19, 2026), https://www.ncsl.org/elections-and-campaigns/challenges-to-voter-eligibility.

Add to the policy choices involved in EO 14399 the uncompensated costs of the new tasks for the USPS – much less the costs of doing these tasks competently, including recognizing and correcting errors. Like everyone else, Congress is well aware of the multi-decade funding problems of the USPS.

13

But the most fundamental policy choice is political.  Our federalist election structure, designed by the Elections and Electors Clauses, fosters both the reality and appearance of election integrity by decentralizing election rules and their administration.  In our nation's history, it is rare that control of either house of Congress or the Presidency is decided by a single disputed election in one state.  Thus, stealing control would require a conspiracy involving officials in multiple states.  Stealing such control would be easier if any single federal agency, including the USPS, controlled by the President (as EO 14399 asserts that the USPS is) had power over the providing and administration of voter lists affecting voting in federal elections *in all 50 states*.

Further, a President's control over voter lists, via the USPS, could be exercised to expand as well as contract the level of voting.  "[I]n the law, what is sauce for the goose is normally sauce for the gander."  *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).  *Assuming* that EO 14399 were valid, a future President could order USPS to provide voter lists based on accepting types of proof of eligibility that a given state does not itself accept.  That President would argue that under the Supremacy Clause, the state officials could not thereafter contradict the inclusion of a person on a list of eligible voters provided by the USPS.

For all of these reasons, the major questions doctrine requires clear authorization before interpreting 39 U.S.C. § 401(2) to give the USPS authority in providing or administering voter lists.

### B.  39 U.S.C. § 401(2) Does Not Authorize, Much Less Clearly Authorize, Any Role For The USPS In Providing Or Administering Voter Lists.

EO 14399 does not quote a single word from 39 U.S.C. § 401.  So one is left to guess how the administration asserts that 39 U.S.C. § 401 confers any authority, much less clear authority, for the USPS to adopt regulations to provide or administer voter lists.  Nonetheless, 39

14

U.S.C. § 401 plainly does not provide a clear statement of, or even a reasonable basis for, such USPS authority.

39 U.S.C. § 401(2) authorizes the USPS to adopt regulations only when, "not inconsistent with this title, [and] as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." This brief will not repeat the showings in the plaintiffs' complaints of the many reasons why 39 U.S.C. § 401(2) does not authorize the USPS to provide and administer the voter lists that EO 14399 purports to require. Instead, as an additional argument, this brief shows that based on the statutory history in Parts II and III, *supra*, it is inconceivable that Congress intended 39 U.S.C. § 401(2), a postal statute, to authorize the providing or application of voter lists.

In the area of federal elections, the Supreme Court has relied on "the history" of repeal of federal statutes expressly governing a topic within federal elections as reason not to interpret a different federal statute that does not even mention federal elections as nonetheless authorizing significant regulation of the same elections topic. *United States v. Gradwell*, 243 U.S. 476, 479-85 (1917). Indeed, *Gradwell* relied on the exact same 1894 repealing statute, *see id.* at 483-84, that is discussed *supra*, at 4.

What *Gradwell* rejected is what EO 14399 attempts to do with 39 U.S.C. § 401(2). That postal statute was substantially revised in 2006 by the 109th Congress in Section 504 of the Postal Accountability and Enhancement Act. 120 Stat. 3198, 3235 (2006). In particular, Section 504 added the narrowing limitation "not inconsistent with this title" to 39 U.S.C. § 401(2). *Id.* A few months earlier, the same Congress had repealed the detailed provisions in the original VRA that allowed federal officials to provide and administer, one voter at a time, partial voter lists subject to administrative and judicial review. 120 Stat. 577, 580 (2006); *supra* at 5. It is

15

inconceivable that the same Congress that repealed those narrow VRA provisions would contemporaneously implicitly give the USPS in a postal statute the much broader authority to provide and administer voting lists to be applied for every jurisdiction in the country, and without any statutory provisions for administrative and judicial review to correct errors in time for votes to be counted.

In addition, 39 U.S.C. § 401(2) is the kind of "ancillary provision" and "gap filler" that is not sufficient to satisfy a clear statement or clear authorization rule. *West Virginia*, 597 U.S. at 724; *see also id*. at 723 ("modest words, vague terms, or subtle devices" do not suffice); *id.* at 732 ("a vague statutory grant is not close" to sufficient); *Learning Resources* Plurality, 146 S. Ct. at 642 ("delegations of core congressional powers" do not "lurk[] in ambiguous statutory text") (cleaned up). To the contrary, similar to tariffs, the history in Part II, *supra,* shows that when Congress has delegated its power to federalize providing or administering voter lists, Congress has done so in the most explicit terms, and made the delegation subject to express limits, including judicial supervision. *See Learning Resources* Plurality, 146 S. Ct. at 639 ("When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits.").

EO 14399 also contradicts the plain terms of 39 U.S.C. § 401(2) by being "inconsistent" with other sections of Title 39. One inconsistency is with 39 U.S.C. §§ 3001-18, the Title 39 sections that make certain items "nonmailable." These Title 39 sections specify items deposited in violation of certain sections of criminal law in other Titles by expressly cross-referencing in 39 U.S.C. §§ 3001(a), 3003(a), and 3014(a)(2) those criminal law sections from other Titles. Under the principle of *expressio unius est exclusio alterius*—the expression of one thing implies the exclusion of others--violations of criminal-law sections of other Titles that are *not cross-*

16

*referenced* in these Title 39 sections provide no basis for the USPS to block the delivery of mail. Omitted from the nonmailable sections of 39 U.S.C. §§ 3001-18 is any reference to the four criminal-law sections from Titles 18 and 52 that Section 1 of EO 14399 cites as the basis for barring non-citizens from registering to vote or voting.  These omitted criminal-law sections are 18 U.S.C. §§ 241, 611, 1015, and 52 U.S.C. § 20511.  Their omission from 39 U.S.C. §§ 3001-18 confirms that it is not a function of the USPS to refuse to deliver mail-in ballots of suspected non-citizens, or anyone else.  Instead, it is state election officials who have the function of not counting mail-in ballots from non-citizens.

The history in Parts II and III, *supra*, shows another inconsistency.  The providing and administering of voter lists is a distinctly "nonpostal service" and thus barred by 39 U.S.C. § 404(e)(2).  Providing and administering voter lists is a function historically undertaken by trained election officials, usually state and sometimes (but only when expressly authorized by Congress) federal.

Providing and administering voter lists is also inconsistent with 39 U.S.C. § 3406, which requires that mail-in votes by military and overseas voters "be carried expeditiously."  EO 14399 contradicts this because of the slowdown that would be necessary to check ballot envelopes against USPS mail-in voter lists for every state.  This additional inconsistency also contradicts the statutory interpretation principle of *expressio unius est exclusio alterius*.  In 39 U.S.C. § 3406, Congress expressed when it wanted election mail to be treated differently from other mail.  That excludes the broad power of the USPS that EO 14399 asserts for treating mail-in ballots much more restrictively than other mail.

Independently, the history described in Parts II and III, *supra*, shows that providing and administering voter lists is neither a function under Title 39 nor a function assigned to the USPS

17

under provisions of another Title.  To the contrary, the current provisions in Title 52 from the NVRA, HAVA, UOCAVA, and the VRA show that state officials provide and administer voter lists, not USPS or any federal agency.

Federal statutes have regulated federal elections since at least 1792, *see* 1 Stat. 239 (1792), voter lists since at least 1871, *supra* at 4, and voting by mail since at least 1942, Act of Sept. 16, 1942, ch. 561, § 9, 56 Stat. 753, 756 (1942).  The elephant of any USPS authority to provide and administer voter lists would not have been hidden for decades in the mousehole of 39 U.S.C. § 401(2).  *See National Federation of Independent Business v. OSHA,* 595 U.S. 109, 119 (2022) (*per curiam*); *id.* at 125 (Gorsuch, J., concurring).

## CONCLUSION

The Court should grant the plaintiffs' motions for a preliminary injunction.

/s/ *Richard D. Bernstein*

Richard D. Bernstein (DC Bar No. 416427)
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
rbernsteinlaw@gmail.com

Nancy A. Temple* (IL-6205448)
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
312-663-0800
ntemple@kattentemple.com

*Pro Hac Vice Application Pending

*Counsel for Amicus The Society For The Rule of Law*

18

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief *Amicus Curiae* of the Society For The Rule of Law in Support of Plaintiff's Motions for A Preliminary Injunction complies with the typeface and type-style requirements set forth in D.D.C. LCvR 5.1, because it has been prepared in a proportionally spaced typeface using Word 365 in 12-point Times New Roman font; as well as with the type-volume limitation set forth in D.D.C. LCvR 7(o)(4), because its length does not exceed twenty-five pages.

DATE: April 17, 2026                                  Respectfully submitted,

                                                                 */s/ Richard D. Bernstein*

                                                                 Richard D. Bernstein (DC Bar No. 416427)
                                                                 1875 K Street NW, Suite 100
                                                                 Washington, DC 20006
                                                                 (301) 775-2064
                                                                 rbernsteinlaw@gmail.com

                                                                 Nancy A. Temple* (IL-6205448)
                                                                 Katten & Temple, LLP
                                                                 209 S. LaSalle Street, Suite 950
                                                                 Chicago, IL 60604
                                                                 312-663-0800
                                                                 ntemple@kattentemple.com

                                                                 *Pro Hac Vice Pending

                                                                 *Counsel for Amicus The Society For The Rule of Law*

## CERTIFICATE OF SERVICE

The undersigned states that on **April 17, 2026** the foregoing **Brief Amicus Curiae Of The Society For the Rule of Law In Support of Plaintiffs' Motions for Preliminary Injunction** was served to all counsel of record via the CM/ECF system.

Esam Al-Shareffi
DOJ-CIV
1100 L Street
Room 12520
Washington, DC 20005
esam.k.al-shareffi@usdoj.gov

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
tbishop@elias.law

Norman L. Eisen
Tianna J. Mays
Pooja Chaudhuri
Sofia Fernandez Gold
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

Anna Baldwin
Danielle Lang
Robert Brent Ferguson
Sejal Jhaveri
Valencia Richardson
Aseem Mulji
Heather Szilagyi
Renata O'Donnell
Benjamin Phillips
CAMPAIGN LEGAL CENTER 1101 14th St.
NW, Suite 400
Washington, D.C. 20005
abaldwin@campaignlegalcenter.org
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org

bphillips@campaignlegalcenter.org

John A. Freedman
Jeremy C. Karpatkin
Elisabeth S. Theodore
Orion de Nevers
Nicholas Casmier Anway
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave., NW
Washington, DC 20001
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com

Sydney Lopes
ARNOLD & PORTER KAYE SCHOLER
LLP
U.S. Bank Center
1420 5th Avenue, Suite 1400
Seattle, WA 98101
sydney.lopes@arnoldporter.com

Edward G. Caspar
Robert N. Weiner
Jeffrey Blumberg
M. David Rollins-Boyd
Catherine Meza
Javon Davis
Grace Thomas
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommitte.org

/s/ Richard D. Bernstein

Richard D. Bernstein (DC Bar No. 416427)
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064

*Counsel for Amicus The Society For The Rule of Law*