**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**DSCC,** *et al.*,

      **Plaintiffs,**

          **v.**

**DONALD J. TRUMP, in his official capacity as President of the United States,** *et al.*,

      **Defendants,**

**STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,**

      **Intervener Defendants.**

 

**LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*,

      **Plaintiffs,**

          **v.**

**EXECUTIVE OFFICE OF THE PRESIDENT,** *et al.*,

      **Defendants,**

**STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,**

      **Intervener Defendants.**

|  |
|---|
| **No. 26-cv-01114-CJN** |
| **No. 26-cv-01132-CJN** |

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

    Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    Defendants,

STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,

    Intervener Defendants.

No. 26-cv-01151-CJN

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**............................................................................ 4

**INTRODUCTION**........................................................................................... 6

**ARGUMENT**.................................................................................................. 8

    I.   The Intervener States are entitled to intervention as of right under Rule 24(a)................... 9

        A.    The Intervener States' motion to intervene is timely. ................................... 9

        B.    The Intervener States have an interest in this case. ................................... 10

        C.    Disposition of this action may impair the Intervener States' ability to protect their interests. .................................................................................... 13

        D.    The existing parties do not adequately represent the Intervener States' interests. ..... 14

    II.   Alternatively, the States are entitled to permissive intervention under Rule 24(b)........ 16

**CONCLUSION** ............................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

*Amador Cnty. v. U.S. Dep't of the Interior*,
  772 F.3d 901 (D.C. Cir. 2014) ...................................................................................... 10

*Builders Ass'n of Greater Chi. v. Chicago*,
  170 F.R.D. 435 (N.D. Ill. 1996) .................................................................................... 17

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ........................................................................................................ 6

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................................... *passim*

*Eu v. San Francisco Cnty. Decomcratic Cent. Comm.*,
  489 U.S. 214 (1989) ................................................................................................. 6, 12

*Int'l Paper Co. v. Inhabitants of Town of Jay*,
  887 F.2d 338 (1st Cir. 1989) ........................................................................................ 13

*Jacobson v. Detzner*,
  No. 4:18-CV-262-MW/CAS, 2018 WL 10509488 (N.D. Fla. July 1, 2018) ............................ 18

*Lucas Cnty. Bd. of Comm'rs v. U.S. Env't Prot. Agency*,
  169 F.4th 689 (6th Cir. 2026) .................................................................................... 8, 14

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ..................................................................................... 14

*Nat. Res. Def. Council v. Costle*,
  561 F.2d 904 (D.C. Cir. 1977) ..................................................................................... 13

*Nat'l Ass'n for Advancement of Colored People v. New York*,
  413 U.S. 345 (1973) ...................................................................................................... 17

*New Jersey v. Trump*,
  131 F.4th 27 (1st Cir. 2025) .................................................................................. *passim*

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ................................................................................................. 6, 10, 13

*Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*,
  69 F.3d 1377 (7th Cir. 1995) ....................................................................................... 18

*Sierra Club v. Glickman*,
  82 F.3d 106 (5th Cir. 1996) ......................................................................................... 15

4

*Smiley v. Holm*,
   285 U.S. 355 (1932).............................................................................................................. 8

*Storer v. Brown*,
   415 U.S. 724 (1974)............................................................................................................. 6

*Thomas v. Andino*,
   335 F.R.D. 364 (D.S.C. 2020)........................................................................................... 17

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972)....................................................................................................... 14, 16

*Ungar v. Arafat*,
   634 F.3d 46 (1st Cir. 2011) ............................................................................................... 18

*United States ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*,
   777 F.3d 691 (4th Cir. 2015)............................................................................................. 12

*W. Watersheds Project v. Interior Bd. of Land Appeals*,
   No. 1:19-CV-95-TS-PMW, 2019 WL 5191244 (D. Utah Oct. 15, 2019)................................. 15

*Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*,
   41 F.4th 767 (6th Cir. 2022)........................................................................................... 8, 14

**Rules**

Fed. R. Civ. P. 24............................................................................................................ *passim*

**INTRODUCTION**

The State of Missouri, the State of Alabama, the State of Florida, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of Oklahoma, the State of South Carolina, the State of South Dakota, and the State of Texas collectively "the Intervener States," seek intervention as Defendants in this action to safeguard the integrity of their elections. States "indisputably ha[ve] a compelling interest in preserving the integrity of [their] election process[es]." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Eu v. San Francisco Cnty. Decomcratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). And "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

To assist the Intervener States in guarding their elections, the President issued Executive Order No. 14399 ("EO"), entitled *Ensuring Citizenship Verification and Integrity in Federal Elections*. 91 Fed. Reg. 17125 (Mar. 31, 2026). Plaintiffs claim the EO represents a federal intrusion on state authority over elections, but the Intervener States see things differently. *See* DSCC Compl. ¶ 125; LULAC Compl. ¶ 289; NAACP Compl. ¶ 165. The EO is an example of cooperative federalism, whereby the federal government is offering optional resources that all States can use to protect their elections. The Intervener States strongly oppose Plaintiffs' attempt to deprive them of those resources.

The President's EO will help safeguard the Intervener States' elections in at least two ways. First, Section 2 of the EO directs federal agencies to create a "State Citizenship List," and to transmit the list to "State election officials." EO § 2(a). The "State Citizenship List" is simply a list of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a

6

residence in the subject State." *Id.* The Intervener States would like to access this resource so they may verify the accuracy of their own voter-registration lists. This flow of information between federal and state agencies is a common and critical feature of our federal system.

Second, Section 3 of the EO requires the U.S. Postal Service to initiate rulemaking about mail-in and absentee ballots. These rules will enhance the security of absentee voting. And critically, the Intervener States cannot implement these measures themselves because States cannot regulate the USPS, nor can they establish effective safeguards for out-of-state mail. Thus, to the extent that these protections can be imposed at all, the States necessarily must collaborate with the federal government.

The Intervener States are entitled to intervene as of right in this case. Fed. R. Civ. P. 24(a). This case is in its infancy, so the Intervener States' motion is obviously timely. And the Intervener States have concrete and protected interests in the resources—including the list of potentially eligible citizen voters—that the EO would provide to them. The Intervener States also have a concrete interest in seeing increased security for mail ballots cast in their elections. Plaintiffs' lawsuit—if it succeeds—would impair these interests by preventing the federal government from providing election-security resources to the Intervener States. Just as States (and other litigants) have concrete interests in protecting federal resources that benefit them, the Intervener States have an interest in preventing this suit from denying them federal resources. *See Dep't of Com. v. New York*, 588 U.S. 752, 766–67 (2019) (holding that a reduction in federal resources provided to the States creates a cognizable injury); *New Jersey v. Trump*, 131 F.4th 27, 35–38 (1st Cir. 2025) (same). And the Intervener States are not adequately represented by the federal government under this case's particular circumstances. The Intervener States have a stronger interest in defending certain parts of the EO (those that provide resources) than others, and they thus are likely to adopt

7

different strategies in defending the EO.  The Intervener States also likely differ from the federal government on broader theoretical questions about the division of authority between States and the federal government over elections—a difference that again might lead to the Intervener States making different litigation choices than the existing federal defendants.  *See Lucas Cnty. Bd. of Comm'rs v. U.S. Env't Prot. Agency*, 169 F.4th 689, 698 (6th Cir. 2026) ("[A] movant who seeks the same litigation outcome as an existing party may nevertheless be inadequately represented if it can demonstrate the parties are 'animated by different, and possibly conflicting, concerns.'") (quoting *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 774 (6th Cir. 2022)).

Alternatively, the Court should grant permissive intervention.  Fed. R. Civ. P. 24(b).  The Intervener States' participation will not prejudice any existing party.  To the contrary, the Intervener States' participation would benefit the Court by providing a unique perspective not represented by any existing party.  The Intervener States believe that States wield the lion's share of authority over elections.  *See* U.S. Const. art. I, § 4, cl. 1; *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932).  But unlike Plaintiffs, the Intervener States believe the EO *enhances*—rather than weakens—state authority in this area.  The Court would benefit from hearing that perspective.

The Court should grant intervention as of right.  Alternatively, permissive intervention is warranted.

## ARGUMENT

The President promulgated Executive Order No. 14399 on March 31, 2026, and Plaintiffs challenged the EO almost immediately.  *See* DSCC Compl. (filed Apr. 1, 2026); LULAC Compl. (filed Apr. 2, 2026); NAACP Compl. (filed Apr. 3, 2026).  All three Plaintiffs then moved for a preliminary injunction on April 10, 2026, Doc. 29 (LULAC); Doc. 34 (DSCC); Doc. 37 (NAACP),

yet they did not file memoranda in support until last Friday, April 17, 2026, Doc. 53 (LULAC); Doc. 54 (NAACP); Doc. 55 (DSCC). To date, Defendants have not answered Plaintiffs' complaints, moved to dismiss, or responded to Plaintiffs' motions for preliminary injunction. With this action still in its infancy, the Intervener States now move to intervene as Defendants and attach a proposed motion to dismiss Plaintiffs' complaints. Fed. R. Civ. P. 24(c).

The Court should grant the Intervener States intervention as of right because they satisfy all four requirements of Federal Rule of Civil Procedure 24(a). This litigation will undoubtedly effect the Intervener States' election procedures, and it could deprive Intervener States of an important opportunity for cooperative federalism. At a minimum, the Court should grant permissive intervention under Rule 24(b). The Intervener States offer the unique perspective that the EO enhances state authority over elections, and this Court would benefit from having that view represented during litigation.

## I.    The Intervener States are entitled to intervention as of right under Rule 24(a).

A movant is entitled to intervene as of right if the movant (1) files a "timely motion," (2) "claims an interest" in the litigation, (3) "may as a practical matter" be "impair[ed] or impede[d]" by the disposition of the suit, and (4) is not "adequately represent[ed]" by the parties in the case. Fed. R. Civ. P. 24(a). The Intervener States meet all four requirements, and thus have a right to intervene.

### A. The Intervener States' motion to intervene is timely.

The Intervener States are moving to intervene at the outset of the case, which makes their motion indisputably timely. The test of timeliness requires consideration of "all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's

rights, and the probability of prejudice to those already parties in the case." *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014) (internal quotation omitted).

All these factors support the timeliness of the Intervener States' motion. The States served their Motion to Intervene less than three weeks after Plaintiffs filed their complaints, before any substantial litigation of the issues have commenced. To date, no discovery has taken place, and no rulings on the merits have been issued. Defendants have not even answered the complaints or responded to the motions for preliminary injunction. The Intervener States are also prepared to respond to the motions for preliminary injunction by May 1, 2026. Thus, no existing party could even conceivably claim that any delay by the Intervener States caused it "prejudice." *Amador Cnty.*, 772 F.3d at 903.

**B. The Intervener States have cognizable interests in this case.**

The Intervener States have a "compelling" interest in the subject matter of this action: obtaining *resources* from the federal government that help "preserv[e] the integrity of [the States'] election process[es]." *Purcell*, 549 U.S. at 4. For example, the Intervener States have a concrete interest in receiving the EO's promised State Citizenship List. *See Dep't of Com. v. New York*, 588 U.S. at 766–67 (States have a "concrete" interest in protecting their access to federal resources, including "federal funding"); *New Jersey v. Trump*, 131 F.4th at 35–38 (same).

Running elections is expensive and resource-intensive. *See* Charles Stewart III, *The Cost of Conducting Elections*, MIT Election Data + Science Lab, at 3 (2022) ("[T]he total cost of elections [is] in the range of $4 billion to $6 billion, in a 'normal' year, and that spending in 2020 could have reached $10 billion.").[1] States invest considerable funds to operate and maintain their voter registration lists and to protect election integrity. *Id.* at 4. Scholars have documented that

---

[1] https://electionlab.mit.edu/sites/default/files/2022-05/TheCostofConductingElections-2022.pdf.

State operated "voter registration" "systems can take tens of millions of dollars to develop and millions of dollars annually to operate." *Id.*

The EO channels resources to the Intervener States that make these tasks easier.  In particular, Section 2 of the EO instructs, to the extent feasible and consistent with applicable law, that the Department of Homeland Security "compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List)."  EO § 2(a).  "The State Citizenship List shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election . . . ."  *Id.*  States will then be able to verify their voter registration lists, and States will be able to "routinely supplement and provide suggested modifications or amendments to the State Citizenship List."  *Id.*  Individuals will likewise be able to "access their individual records as well as to update or correct them in advance of elections."  *Id.*

For Intervener States, the State Citizenship List is a *resource* that saves them time and money in pursuing election integrity.  *Cf. Dep't of Com. v. New York*, 588 U.S. at 766–67.  This list will be "derived from Federal citizenship and naturalization records, SSA[2] records, SAVE[3] data, and other relevant Federal databases."  EO § 2(a).  These databases are all superior to any other resource available to the Intervener States.  More accurate federal lists of "individuals confirmed to be United States citizens" who are eligible voters will allow the Intervener States to verify the accuracy of their own voter registration lists, to investigate inconsistencies, and to modify their lists as needed.  Information sharing of this kind between federal and state

---

[2] Referring to the "Social Security Administration."  EO § 1.
[3] Referring to the Department of Homeland Security's "Systematic Alien Verification for Entitlements program."  EO § 1.

governments serves important federalism values, and the Intervener States have an interest in receiving the benefits of this cooperation. *See United States ex rel. Wilson v. Graham Cnty. Soil & Water Conservation Dist.*, 777 F.3d 691, 698 (4th Cir. 2015) ("Cooperation—and thus the flow of information—between federal, state, and local agencies is a common and critical feature of our system of federalism."). Indeed, Intervener States see the State Citizenship List as similar to a federal grant—a resource that will help the Intervener States run their elections. And no one can reasonably dispute that a state has standing to intervene in a case that jeopardizes a federal grant that benefits that state. *See Dep't of Com. v. New York*, 588 U.S. at 766–67; *New Jersey v. Trump*, 131 F.4th at 35–38.

Additionally, the Intervener States have a concrete interest in ensuring that mail ballots cast by their voters are securely delivered and counted. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). And the EO seeks to implement "enhance[d] election integrity via the United States Mail … without unduly burdening or infringing on the rights of eligible voters," an objective shared by the Intervener States and their electorates. EO § 1. In particular, Section 3 of the EO advances the Intervener States' interest by directing the USPS to initiate rulemaking to, among other things, require absentee ballots to be mailed in an officially marked envelope that can be tracked. EO § 3(b)(i). This is a useful and important security measure that will protect mail ballots cast by Intervener States' voters. Therefore, the Intervener States have a clear interest in seeing the EO's envisioned postal reforms take effect.

All of these interests warrant intervention as of right in this case.

C. **Disposition of this action may impair the Intervener States' ability to protect their interests.**

Next, Plaintiffs' action could impair the Intervener States' interests. Rule 24(a)'s impairment inquiry is not demanding, and the Intervener States easily clear this hurdle here in light of their "compelling" interest. *Purcell*, 549 U.S. at 4.

"In the intervention area the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 910–11 (D.C. Cir. 1977) (cleaned up) (citation omitted). And "in determining whether disposition of the action will impede or impair the applicant's ability to protect his interest the question must be put in practical terms rather than in legal terms." *Int'l Paper Co. v. Inhabitants of Town of Jay*, 887 F.2d 338, 344 (1st Cir. 1989) (quoting 7C Wright & Miller, *Federal Practice and Procedure* § 1908, at 301). The requirement is satisfied whenever disposition of the present action would put the applicant at a practical disadvantage in protecting his interest. *Id.*

Here, the inquiry is straightforward. If Plaintiffs succeed in enjoining enforcement of the Executive Order, the federal government will be blocked from providing the State Citizenship List to States that want to receive it. This lawsuit could thus prevent the Intervener States from obtaining a valuable resource from the federal government. Just as litigants have standing to challenge a loss of resources from the federal government, *Dep't of Com. v. New York*, 588 U.S. at 766–67; *New Jersey v. Trump*, 131 F.4th at 35–38, the Intervener States have a right to intervene in an action that threatens the denial of a federal resource.

Additionally, this action would block proposed postal reforms that would help the Intervener States secure their elections and ensure that all legal mail votes are counted. Notably, the Intervener States lack authority—on their own—to create the procedural safeguards mandated

13

by Section 3 of the EO.  The Intervener States cannot regulate the USPS because it is a federal agency and States cannot regulate the federal government.  *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819).  States also possess limited authority to regulate and supervise absentee ballots completed by out-of-state voters and sent through interstate mail.  Even so, despite the limits on state authority, a State's interest in election integrity is still endangered by fraudulent absentee voting or mail ballots being lost in transit.  Therefore, the Intervener States have an interest in seeing the envisioned postal reforms implemented, and Plaintiffs' premature attempt to block those reforms jeopardizes the Intervener States' interests.

**D.  The existing parties do not adequately represent the Intervener States' interests.**

Rule 24(a)'s final requirement, inadequacy of representation, imposes a "minimal" burden on prospective interveners.  Movants need only show that that representation of their interests "'may be' inadequate" and "the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (citation omitted).  Even if litigants share the same ultimate goal in the case, "they may not always dictate precisely the same approach to the conduct of the litigation," causing a party's adequacy to be inadequate.  *Id.* at 539; *see also Lucas Cnty. Bd. of Comm'rs*, 169 F.4th at 698 ("[A] movant who seeks the same litigation outcome as an existing party may nevertheless be inadequately represented if it can demonstrate the parties are 'animated by different, and possibly conflicting, concerns.'" (quoting *Wineries of the Old Mission Peninsula*, 41 F.4th at 774)).

Here, the Intervener States' interests are distinct from those of the federal government, making it quite likely they would not take "precisely the same approach to the conduct of the litigation." *Trbovich*, 404 U.S. at 539.  In particular, the Intervener States have a stronger interest in defending some parts of the EO than others.  The Intervener States are largely focused on

14

defending Sections 2 and 3 of the EO—because they provide valuable resources to the States. Accordingly, the Intervener States are likely to make strategic decisions in defending the EO that focus on Sections 2 and 3, whereas the existing Defendants presumably have an obligation to vigorously defend all parts of the EO. Thus the parties are "animated by different, and possibly conflicting, concerns" in this case. *Lucas Cnty. Bd. of Comm'rs*, 41 F.4th at 774 (quotation omitted). In similar situations, "the public interest the federal government is obligated to represent may differ from the state government's interests," courts have permitted intervention. *See W. Watersheds Project v. Interior Bd. of Land Appeals*, No. 1:19-CV-95-TS-PMW, 2019 WL 5191244, at *3 (D. Utah Oct. 15, 2019); *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (reversing district court's denial of Texas's motion to intervene in litigation against the federal government, reasoning that "[t]he State of Texas has a narrower but independently vital interest in representing its residents").

Additionally, the Intervener States might make different strategic choices in defending the EO because they likely differ from the federal government on the precise division of authority between the States and the federal government over elections. Naturally enough, the Intervener States will vigorously defend state sovereignty over elections and resist federal commandeering attempts. The federal government, by contrast, is more likely to favor federal authority over elections. With respect to at least some questions about the division of elections authority, the Intervener States and the federal government are likely to disagree.

In this case, the Intervener States support the EO because they believe it enhances state authority over elections. The States are thus uniquely positioned to show how the EO is consistent with the States' robust authority in this area and intend to approach this case from that perspective. Consequently, the Intervener States and federal government are therefore unlikely to share "the

15

same approach to the conduct of the litigation," *Trbovich*, 404 U.S. at 539, and will likely be "animated by different, and possibly conflicting, concerns," *Lucas Cnty. Bd. of Comm'rs*, 41 F.4th at 774.

*Trbovich* confirms that intervention is appropriate here. *See* 404 U.S. at 538 n.10. *Trbovich* involved a motion to intervene by a voting union member in a suit filed by the Secretary of Labor to set aside a union election in which the rights of voting members had allegedly been denied. *Id.* at 529–30. Even though the Secretary sought the same goal as the intervener, the Court held the Secretary's representation was inadequate given his "duty to serve two distinct interests": to vindicate the "rights" of "individual union members" *and* "assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Id.* at 538–39. These two functions "may not always dictate precisely the same approach to the conduct of the litigation." *Id.* at 539. So "[e]ven if the Secretary is performing his duties, broadly conceived, as well as can be expected, the union member may have a valid complaint about [his] performance," which is "sufficient to warrant … intervention" as of right. *Id.*

So too here. The federal government has duties relating to its defense of the EO that differ from the interest of the States in securing federal resources and preserving their sovereignty. This gives the States sufficient grounds to intervene in this case. *Id.*

For all these reasons, the Court should grant intervention as of right.

## II.    Alternatively, the States are entitled to permissive intervention under Rule 24(b).

Even if the Court disagrees on intervention as of right, the Court should still grant permissive intervention under Rule 24(b). The Court may grant permissive intervention "[o]n timely motion" when the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Moreover, in exercising its discretion

16

under Rule 24(b), "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.* These factors all point in favor of permissive intervention here.

First, the States' motion is timely. Courts consider the same factors when assessing timeliness under Rule 24(b) as under Rule 24(a). *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. New York,* 413 U.S. 345, 365 (1973) ("Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.'"). As noted above, the States moved to intervene before Defendants answered Plaintiffs' pleadings and before the deadline for Defendants' response to the motions for preliminary injunction. Thus, no party will suffer prejudice due to the States' intervention.

Second, the States will raise defenses that share many common questions with the claims and defenses of the parties. On the merits, Plaintiffs allege that the Executive Order violates the Elections Clause of the U.S. Constitution and unlawfully commandeers state action. The States reject those allegations and intend to argue that, properly construed, Sections 2 and 3 of the Executive Order do not conflict with federal law. Indeed, the "applicants' interest in the litigation is the mirror-image" of the Plaintiffs—strongly suggesting permissive intervention is warranted. *See Builders Ass'n of Greater Chi. v. Chicago*, 170 F.R.D. 435, 441 (N.D. Ill. 1996).

Third, allowing the States to intervene will neither delay this litigation nor prejudice anyone. This case remains in its infancy, so the States' participation in it cannot prejudice any existing party or cause any delay. And to avoid any doubt, the States pledge to adhere to any briefing deadlines the Court chooses to set. *See Thomas v. Andino*, 335 F.R.D. 364, 371 (D.S.C. 2020) (finding no prejudice or delay based on such a commitment). Moreover, granting

17

intervention will further the adversarial process and promote judicial economy by avoiding piecemeal, protracted litigation, and the possibility of conflicting legal decisions. *See Jacobson v. Detzner*, No. 4:18-CV-262-MW/CAS, 2018 WL 10509488, at *1 (N.D. Fla. July 1, 2018) ("[D]enying Proposed Intervenors' motion opens the door to delaying the adjudication of this case's merits for months—if not longer"); *Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011) ("An order denying a motion to intervene as of right is immediately appealable as a collateral order.").

Finally, as a practical matter, the Intervener States will provide a critical perspective that no other party will provide: The perspective of States who *want* to cooperate with federal agencies under the EO. To uphold election integrity, Intervener States are eager to accept the federal government's invitation to collaborate. Currently, no other party in this litigation will provide this viewpoint. The Court would thus benefit from intervention, which will ensure robust factual and legal arguments contributing to a more informed judgment. Under these circumstances, the only prejudice Plaintiffs could conceivably identify is that they will have to respond to more arguments. But again, that fact would, if anything, be a beneficial addition allowing for a more informed decision by the Court. And Plaintiffs "can hardly be said to be prejudiced by having to prove a lawsuit [they] chose to initiate." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995).

## CONCLUSION

The Court should grant the motion to intervene.

Date: April 20, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff**
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

19

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
  *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
  *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant**
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov

*\* Government attorney admitted under Local Rule 83.2(e)*
*\*\* Pro hac vice forthcoming*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 20, 2026, the above was filed electronically through the Court's electronic filing system to be serve electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*