**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DSCC**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01114-CJN** |
| **DONALD J. TRUMP, in his official capacity as President of the United States**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |
| | |
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01132-CJN** |
| **EXECUTIVE OFFICE OF THE PRESIDENT**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

      Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants,

STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,

      Intervener Defendants.

No. 26-cv-01151-CJN

**MEMORANDUM IN SUPPORT OF INTERVENER STATES' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**........................................................................................... 4

**INTRODUCTION**........................................................................................................ 9

**BACKGROUND** ...................................................................................................... 10

**LEGAL STANDARD**................................................................................................11

**ARGUMENT** ............................................................................................................ 12

    I. Plaintiffs lack standing and ripeness to challenge Sections 2 and 3 of the Executive Order. 12

        A.    Plaintiffs lack standing to challenge Section 2(a)........................................ 13

            1.    Plaintiffs' alleged harm is speculative and is not fairly traceable to Section 2(a). ...... 13

            2.    Plaintiffs' alleged privacy injuries are unripe and insufficient for standing. .............. 16

            3.    Plaintiffs' alleged diversion of resources does not confer standing. .......................... 19

        B.    Plaintiffs lack standing to challenge section 2(b) of the Executive Order.................. 21

        C.    Plaintiffs lack standing and ripeness to challenge Section 3 of the Executive Order. 23

    II. Plaintiffs fail to state claims under the Administrative Procedure Act and other federal statutes.................................................................................................................... 28

        A.    The Court should dismiss Plaintiffs' APA challenges because Plaintiffs do not challenge a final agency action. .............................................................................. 28

        B.    Because the APA is inapplicable, Plaintiffs lack a cause of action to sue under any of the statutes at issue.................................................................................................. 30

**CONCLUSION** ......................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**                                                                                                              Page(s)

*Action on Smoking and Health v. Dep't of Labor*,
    28 F.3d 162 (D.C. Cir. 1994) .................................................................................... 29

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................................... 31

*Allen v. Wright*,
    468 U.S. 737 (1984) ......................................................................... 9, 12, 14, 16

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) .............................................................................. 27

*Am. Petroleum Inst. v. E.P.A.*,
    683 F.3d 382 (D.C. Cir. 2012) ....................................................................... 26, 27

*Am. Portland Cement All. v. EPA*,
    101 F.3d 772 (D.C. Cir. 1996) .............................................................................. 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 12

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp. 2d 19 (D.D.C. 2012) ...................................................................... 19

*Atl. Urological Assocs., P.A. v. Leavitt*,
    549 F.Supp.2d 20 (D.D.C. 2008) ........................................................................ 19

*Babbitt v. United Farm Workers Nat. Union*,
    442 U.S. 289 (1979) ......................................................................................... 22, 24

*Belmont Abbey Coll. v. Sebelius*,
    878 F. Supp. 2d 25 (D.D.C. 2012) ...................................................................... 14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................... 29

*Center for Democracy & Technology v. Trump*,
    507 F. Supp. 3d 213 (D.D.C. 2020) .................................................................... 30

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) .............................................................................. 31

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ............................................................................................... 29

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................. 26, 28

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
  993 F.3d 880 (D.C. Cir. 2021)............................................................................ 21

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................................... *passim*

*Comm'n v. Texas*,
  605 U.S. 665 (2025)........................................................................................... 31

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020) ...................................................................... 27

*Common Purpose USA, Inc. v. Obama*,
  227 F. Supp. 3d 21 (D.D.C. 2016) ...................................................................... 25

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
  167 F.4th 605 (2d Cir. 2026).............................................................................. 19

*Dalton v. Specter*,
  511 U.S. 462 (1994)........................................................................................... 32

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
  85 F. Supp. 3d 250 (D.D.C. 2015) ................................................................. 25, 30

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)........................................................................ 10, 16, 19, 20

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
  873 F. Supp. 2d 363 (D.D.C. 2012) .................................................................... 28

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...................................................................................... 28, 29

*In re Al-Nashiri*,
  47 F.4th 820 (D.C. Cir. 2022) ............................................................................ 26

*In re Murray Energy Corp.*,
  788 F.3d 330 (D.C. Cir. 2015)........................................................................ 29, 30

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
  45 F. Supp. 3d 14 (D.D.C. 2014) ........................................................................ 14

*Inst. for Free Speech v. Johnson*,
  148 F.4th 318 (5th Cir. 2025)............................................................................. 23

5

*KH Outdoor, L.L.C. v. Clay Cnty.*,
  482 F.3d 1299 (11th Cir. 2007) ............................................................................... 23

*Laird v. Tatum*,
  408 U.S. 1(1972) ...................................................................................................... 21

*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................. 29, 30, 31

*Morgan Drexen, Inc. v. CFPB*,
  785 F.3d 684 (D.C. Cir. 2015) ................................................................................. 12

*Nat'l Park Hosp. Ass'n v. DOI*,
  538 U.S. 803 (2003) ................................................................................................. 26

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ................................................................................................. 18

*Ord v. D.C.*,
  587 F.3d 1136 (D.C. Cir. 2009) ............................................................................... 22

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
  400 U.S. 62 (1970) ................................................................................................... 29

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ............................................................................... 15

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ....................................................................................................... 9

*Seegars v. Gonzales*,
  396 F.3d 1248 (D.C. Cir. 2005) ............................................................................... 22

*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) ............................................................................................... 9, 14

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ............................................................................................ 12, 17

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................................................... 13

*Tex. State LULAC v. Elfant*,
  52 F.4th 248 (5th Cir. 2022) ............................................................................... 21, 22

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................................. 17

*Trump v. New York,*
  592 U.S. 125 (2020)..................................................................................................... 17, 23, 24

*United States v. Chem. Found.,*
  272 U.S. 1 (1926)........................................................................................................... 27

**Statutes**

5 U.S.C. § 552a .................................................................................................................. 30

5 U.S.C. § 704.............................................................................................................. 28, 30

18 U.S.C. § 241 .................................................................................................................. 10

18 U.S.C. § 371 .................................................................................................................. 10

18 U.S.C. § 1001 ................................................................................................................ 10

18 U.S.C. § 1015 ................................................................................................................ 10

18 U.S.C. § 611 ............................................................................................................. 10, 21

39 U.S.C. § 101 ............................................................................................................. 10, 28

39 U.S.C. § 201 .................................................................................................................. 30

39 U.S.C. § 401 .................................................................................................................. 30

39 U.S.C. § 402 .................................................................................................................. 30

39 U.S.C. § 403 .................................................................................................................. 30

39 U.S.C. § 404 .................................................................................................................. 30

39 U.S.C. § 409 .................................................................................................................. 30

39 U.S.C. § 412 .................................................................................................................. 30

39 U.S.C. § 501 .................................................................................................................. 30

39 U.S.C. § 502 .................................................................................................................. 30

39 U.S.C. § 503 .................................................................................................................. 30

39 U.S.C. § 3001–3018 ...................................................................................................... 30

39 U.S.C. § 3661 ................................................................................................................ 30

39 U.S.C. § 3703–05 .......................................................................................................... 30

52 U.S.C. § 10307 ................................................................................................................. 10

52 U.S.C. § 20511 ............................................................................................................. 10, 21

52 U.S.C. § 10502 ................................................................................................................. 31

52 U.S.C. § 20508 ................................................................................................................. 18

52 U.S.C. § 21085 ................................................................................................................. 31

Mo. Rev. Stat. § 115.155 ...................................................................................................... 18

## **INTRODUCTION**

States "indisputably" have "a compelling interest" in ensuring safe and secure elections. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). To assist the States in pursuing that interest, President Trump issued Executive Order No. 14399 ("EO"), entitled *Ensuring Citizenship Verification and Integrity in Federal Elections*. The EO provides States with optional resources they can use to ensure that non-citizens do not register to vote. EO § 2. The EO also instructs the U.S. Postal Service to initiate regulatory procedures to consider reforms that would increase the security of mail voting. *Id.* § 3. Intervener States oppose Plaintiffs' efforts to stop the EO, which relies on cooperative federalism to improve the integrity of elections.

The Court should dismiss Plaintiffs' misguided claims. Fundamentally, Plaintiffs' claims are all premature. There is no final agency action in this case, and Plaintiffs therefore do not even know what they are challenging. *See, e.g.*, DSCC Compl. ¶¶ 62, 71, 73 (openly speculating how federal agencies and States will implement the EO when "[t]he Order does not explain" in detail); LULAC Compl. ¶¶ 48, 52, 60, 260 (same). That defect infects all of Plaintiffs' claims, which rest on extensive speculation about what final agency actions the EO will lead to and how those actions might be implemented by independent third parties not before the Court. *Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41 (1976)). Plaintiffs therefore lack standing—because all their alleged injuries rest on substantial speculation. The prudential ripeness doctrine also strongly counsels against considering Plaintiffs' constitutional arguments before final agency actions exist. And finally, Plaintiffs lack causes of action to pursue their claims.

Courts do not exist to resolve abstract disputes based on speculation about future events. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). But that is exactly what Plaintiffs ask the Court to do here. The Court should dismiss Plaintiffs' complaints.

## BACKGROUND

On March 31, 2026, President Trump issued Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*. The EO recognized the President's "duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1. The EO furthers these ends in two main ways.

First, Section 2 of the EO directs federal agencies to create a "State Citizenship List" and to transmit the list to "State election officials." EO § 2(a). The State Citizenship List is simply a list of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update or correct them in advance of elections." *Id.* The EO also directs the Attorney General to "prioritize the investigation" and "prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* § 2(b).

Next, Section 3 of the EO requires the U.S. Postal Service to initiate rulemaking pursuant to 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee

10

ballots.  *Id.* § 3(b).  Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail.  Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee.  Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals.  Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals . . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers."  The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements."  Section 3(b)(v) then directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law."  Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order."

Plaintiffs sued challenging the EO almost immediately after it was issued.  *See* DSCC Compl. (filed April 1, 2026); LULAC Compl. (filed April 2, 2026); NAACP Compl. (filed April 3, 2026).  On April 9, 2026, the Court consolidated this action—*DSCC v. Trump*, No. 26-cv-01114-CJN—with *LULAC v. Executive Office of the President*, No. 26-cv-01132-CJN, and *NAACP v. Trump*, No. 26-cv-01151-CJN.  Doc. 27.  To defend their interests in election integrity and cooperative federalism, Intervener States moved to intervene and now move to dismiss Plaintiffs' complaints.

## LEGAL STANDARD

Intervener States move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  "Where, as here, a case is at the pleading stage," the plaintiff bears the burden of "clearly alleg[ing] facts demonstrating" that the court has subject matter jurisdiction, including under

Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Also, to survive a motion to dismiss under Rule 12(b)(6), the plaintiff's "complaint must contain sufficient factual matter," which if accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Plaintiffs bear the burden of pleading "factual content" creating a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## **ARGUMENT**

### I. **Plaintiffs lack standing and ripeness to challenge Sections 2 and 3 of the Executive Order.**

To establish Article III standing, Plaintiffs must plausibly allege that they suffered a cognizable injury fairly traceable to Defendants and that the injury is likely to be redressed by a favorable judicial decision. *See Allen,* 468 U.S. at 751. Also, because Plaintiffs seek "forward-looking relief," they "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015) (citation omitted).

Applying these principles here, Plaintiffs lack standing to challenge Sections 2 and 3 of the EO. These provisions direct federal departments and agencies to (1) compile a list of eligible voters based on all available federal records, EO § 2(a); (2) provide that list to state election officials, *id.*; (3) exercise prosecutorial discretion to consider potential violations of existing election laws, *id.* § 2(b); and (4) initiate a proposed rulemaking concerning mail-in and absentee ballots, *id.* § 3. Plaintiffs lack standing to challenge these provisions because they have not—and cannot—identify a cognizable injury-in-fact that is traceable to these provisions. Moreover, Plaintiffs' challenges are not ripe because no final agency action exists. The Court should therefore dismiss Plaintiffs' complaints.

### A. Plaintiffs lack standing to challenge Section 2(a).

To establish standing, Plaintiffs must prove an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citations omitted). The threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013). A "reasonable likelihood" of future harm is insufficient. *Id.*

Section 2(a) directs "the Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services and in coordination with the Commissioner of the" Social Security Administration, to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List)." EO § 2(a). This direction is contingent on being "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." *Id.* Here, no cognizable injury exists that is fairly traceable to the creation and transmission of the State Citizenship List.

### 1. Plaintiffs' alleged harms to voters are speculative and not fairly traceable to Section 2(a).

The State Citizenship List does not impose any legal obligations on the States, nor does the Executive Order force States to use the List. Section 2(a) merely orders the provision of information to States, and it leaves States with the *option* to use it. Indeed, Plaintiffs even admit that "[t]he Order does not directly specify anything that states should do with the State Citizenship List that they receive." LULAC Compl. ¶ 52; *see also* DSCC Compl. ¶ 62 ("The Order does not explicitly explain the intended use of the State Citizenship List . . . .").

Plaintiffs nevertheless suggest that the creation of the State Citizenship List "increases the risk that non-U.S.-born or naturalized citizens will be kicked off of the rolls."  LULAC Compl. ¶ 162.  But this is extraordinarily speculative.  Courts routinely reject these kinds of hypothetical standing theories that speculate about how third parties will respond to government action or that involve multiple contingent links between the challenged conduct and the alleged harm.  *See Allen*, 468 U.S. at 757 (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'" (quoting *Simon*, 426 U.S. at 41)); *Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts.") (quotations and citations omitted).  "Put another way, . . . harm that is possible *or even likely* will not suffice."  *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 34 (D.D.C. 2012) (emphasis added).  Plaintiffs' allegations rely on several layers of speculation that cannot satisfy these standards.

The first layer of speculation focuses on the allegation that "naturalization records, SSA records, SAVE data, and other relevant Federal databases," EO § 2(a), used to create the State Citizenship List are "*likely* to contain significant inaccuracies."  NAACP Compl. ¶¶ 105 (emphasis added).  But an allegation of "likely" inaccuracies is inherently speculative.  *See Belmont Abbey Coll.*, 878 F. Supp. 2d at 34 (An allegation of "likely" harm "will not suffice.").  Also, Plaintiffs openly admit that "the Order does not specify what other databases" (beyond SSA and SAVE databases) will "be used to construct the State Citizenship List."  LULAC Compl. ¶ 48.  Thus, without knowing all the sources that federal agencies will use, it is completely speculative for Plaintiffs to suggest that the State Citizenship List will contain inaccurate data.  At best, Plaintiffs offer a conjectural assertion of an "increased risk" of inaccuracy, which is insufficient.  *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 25 (D.D.C.

14

2014) ("The degree by which the risk of harm has increased is irrelevant—instead, the question is whether the harm is certainly impending."); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'[I]ncreased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased." (emphases removed)). The Supreme Court has "repeatedly reiterated" that "threatened injury must be certainly impending to constitute injury in fact, and that '[a]llegations of possible future injury are not sufficient.'" *Clapper*, 568 U.S. at 409 (alteration in original) (emphasis removed) (citation omitted); *see id.* at 416 (rejecting Second Circuit's finding of injury where plaintiff's fear is not "fanciful, paranoid, or otherwise unreasonable" because such a standard "improperly waters down the fundamental requirements of Article III").

Also, even if the List does contain some errors, States may "routinely supplement and provide suggested modifications or amendments to the State Citizenship List." EO § 2(a). This is another safeguard against mistakes. Notably, the EO explicitly acknowledges that "[a]n individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State. State and Federal laws and State procedures must still be followed for an individual to be registered to vote." *Id.* Plaintiffs' claimed injury thus depends on the assumption that the federal government and States will not collaborate to produce an accurate List.

Plaintiffs' chain of speculation does not end there. Their theory of injury also assumes that States will then use the List to somehow prevent eligible voters from receiving ballots. *See* DSCC Compl. ¶¶ 62–69, 96; LULAC Compl. ¶¶ 48–52, 162–66, 184–85, 200; NAACP Compl. ¶¶ 138, 143. This is not just speculative; it is implausible. Plaintiffs offer no evidence that States would automatically exclude registered voters whose names do not appear on the initial State Citizenship

15

List.  Rather, the List will merely signal a need for verification that a given registered voter is, in fact, a U.S. Citizen and over 18 years' old.  In other words, there is no reason to think that States will remove voters from their voter registration lists without employing proper, independent verifications.

Finally, as even Plaintiffs admit, the EO does not require States to use the State Citizenship List; it is an optional resource.  LULAC Compl. ¶ 52 ("The Order does not directly specify anything that states should do with the State Citizenship List that they receive . . . .").  Plaintiffs' assumption that States will unquestioningly rely on this optional federal resource depends—at best—on rank speculation about the future actions of independent third parties not before the Court.  These assumptions are "sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action."  *Allen*, 468 U.S. at 759; *see also All. for Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs.").  Plaintiffs' attenuated theory of injury therefore does not create a case or controversy under Article III.

### 2.  Plaintiffs' alleged privacy injuries are unripe and insufficient for standing.

Plaintiffs also suggest that the transmission of the State Citizenship List to the States violates the Privacy Act of 1974 and therefore injures them.  DSCC Compl. ¶¶ 103–05; LULAC Compl. ¶ 286; NAACP Compl. ¶ 212.  This theory of injury suffers from several problems.  *First*, like the theory of inaccuracy and disenfranchisement discussed above, the alleged injury resulting from the purported violation of the Privacy Act is speculative because the Department of Homeland Security and the Social Security Administration have not yet taken any final action in response to Section 2(a) of the EO.  Also, DHS and SSA have not yet made any known

determinations about how they will create the State Citizenship List in compliance with the Privacy Act and other applicable law. Section 2(a), in fact, explicitly makes the creation of the List contingent on the List being "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a); *see Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting judicial review of presidential directive because challenge was "riddled with contingencies and speculation" where directive was qualified being "feasible" and "practicable"). In light of the EO's explicit mandate to comply with the Privacy Act, any alleged harm due to a Privacy Act violation is unlikely—and highly speculative at best.

*Second*, Plaintiffs offer no precedent suggesting that the sharing of voter information between different parts of the American government constitutes a cognizable injury. The Supreme Court held in *Spokeo, Inc. v. Robins* that central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts. 578 U.S. at 340–41. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). For standing purposes, therefore, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27. In this case, Plaintiffs allege that they would be injured by federal dissemination of a list of United States citizens to state governments. But there is no historical or common-law analogue for the notion that citizens may be injured by their own State receiving basic information from the federal government. *See id.* at 424–25. Plaintiffs have thus failed to meet their burden of pleading a cognizable injury. *See id*.

*Third*, Plaintiffs allege no cognizable privacy injury because, by registering to vote, they (or their members) already disclosed personal information and made representations to the States about their citizenship status and eligibility to vote. Of course, individuals eligible to vote must register with their State and, in doing so, must generally attest that they are United States citizens and are or will be aged 18 or older at the time of the next election. *See, e.g.*, Mo. Rev. Stat. § 115.155; *see also* 52 U.S.C. § 20508(b)(2) ("The mail voter registration form . . . shall include a statement that—(A) specifies each eligibility requirement (including citizenship); [and] (B) contains an attestation that the applicant meets each such requirement . . . ."). The EO does not inhibit these separate voting requirements. *See* EO § 2(a) ("State and Federal laws and State procedures must still be followed for an individual to be registered to vote."). Section 2(a) seeks only to provide this information to the States so that they may verify their own records. Frankly, it is hard to see how Plaintiffs can complain about citizenship status being shared with the States when they already must provide that information to States in order to vote. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (Courts estop parties from "deliberately changing positions according to the exigencies of the moment." (citation omitted)).

Finally, Plaintiffs cannot plausibly allege causation or redressability—because other, unchallenged federal programs already provide citizenship data to the States. States already receive citizenship information from the federal government through the Systematic Alien Verification for Entitlements (SAVE) program, which enables them to verify that those registering to vote are eligible. *See USCIS Enhances Voter Verification Systems* (Nov. 3, 2025).[1] The program is administered by USCIS and already must comply with the Privacy Act. Much of the information at issue here is already disclosed to the States and, therefore, even once final agency action is taken

---

[1] https://www.uscis.gov/newsroom/news-releases/uscis-enhances-voter-verification-systems

regarding the State Citizenship List, Section 2(a)'s efforts to do the same in a more streamlined fashion cannot cause the injury alleged by Plaintiffs and invalidating Section 2(a) cannot redress it. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,* 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (finding that relief from challenged agency action was not redressable where "any injuries to referring physicians that result from the opt-out requirement are caused by statutes and regulations that pre-date the agency actions plaintiffs[] challenge"), *aff'd sub nom.*, 746 F.3d 468 (D.C. Cir. 2014); *Atl. Urological Assocs., P.A. v. Leavitt*, 549 F.Supp.2d 20, 28 (D.D.C. 2008) (finding that plaintiffs could not satisfy the redressability prong of the standing analysis because their alleged injuries were caused by a previously issued rule, not the rule they were challenging: "Since the Final Order did not change anything for these Plaintiffs, invalidating it would not afford them any relief").

### 3. Plaintiffs' alleged diversion of resources does not confer standing.

Some of the organizational Plaintiffs also complain that the EO will force them "to divert resources to educating voters about these new processes, assisting them if they are improperly excluded from federal lists, and attempting to assuage their fears." LULAC Compl. ¶ 174. This does not create Article III standing.

Notably, the Supreme Court recently rejected resource-diversion standing in *Alliance for Hippocratic Medicine*. 602 U.S. at 394; *see Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "does not work to demonstrate standing" after *Alliance for Hippocratic Medicine* (quoting *All. for Hippocratic Med.*, 602 U.S. at 394)). As the Supreme Court explained, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."

*All. for Hippocratic Med.*, 602 U.S. at 394.  This outcome is consistent with the longstanding principle that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416.

Here, Plaintiffs point to expenses devoted to "educating voters" and "assuaging fears" about a policy.  LULAC Compl. ¶ 174.  But that is nearly identical to the standing allegations found insufficient by the Supreme Court in *Alliance for Hippocratic Medicine.  Compare* 602 U.S. at 394 ("The medical associations say that they have demonstrated something more here.  They claim to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions.  They say that FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks.  They contend that FDA has 'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education.  And all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities.  But . . . [a]n organization cannot manufacture its own standing in that way." (citations omitted)).  Plaintiffs' resource-diversion theory is fundamentally at odds with Supreme Court precedent.

Even if resource-diversion standing somehow survived *Alliance for Hippocratic Medicine*, Plaintiffs' alleged harms are speculative on their own terms.  As discussed above, Plaintiffs speculate that unknown individuals will be improperly excluded from the State Citizenship List. And even if a few voters are improperly excluded, it is also speculative to assume that the organizational Plaintiffs will identify and assist the few excluded individuals.  And even if Plaintiffs could identify those mistakenly excluded, it is speculative to assume that neither the

"individuals" themselves nor the "States" will "correct" the Citizenship List under Section 2(a) before the organizational Plaintiffs insert themselves to provide "assistance." The organizational Plaintiffs' injury is based on speculation upon speculation—each independently sufficient to rebut standing. Said another way, there are too many "dominoes that would have to fall" to confer organizational standing. *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022).

**B. Plaintiffs lack standing to challenge Section 2(b) of the Executive Order.**

Section 2(b) directs the Attorney General to investigate and, as appropriate, prosecute "State and local officials," "individuals," and "public or private entities" who issue ballots to individuals not eligible to vote in a Federal election. EO § 2(b). Plaintiffs cannot show any actual or imminent injury from the enforcement of unchallenged election laws. They do not dispute that, under federal and state law, only United States citizens aged 18 or older can vote and that the provision of fraudulent ballots is unlawful. *See* 18 U.S.C. § 611; 52 U.S.C. § 20511. The simple directive that the Attorney General enforce these laws does not confer standing.

The directive issued in Section 2(b) is a matter of federal prosecutorial discretion and is not subject to judicial review. *See Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 993 F.3d 880, 887 (D.C. Cir. 2021) (holding that "the FEC's exercise of prosecutorial discretion is unreviewable"). Also, even if courts could review Section 2(b), Plaintiffs claim that they "read the enforcement provisions as a chilling threat of significant adverse consequences if the organization helps a voter obtain a ballot" does not create standing. *See* NAACP Compl. ¶ 144. This is an implausible reading of an order that *supports* "the right to vote . . . for citizens" and directs investigation of those who furnish ballots to ineligible non-citizens. EO §§ 1, 2(b). But regardless of how Plaintiffs read the EO, a plaintiff's subjective and irrational fear of prosecution is simply not enough to confer standing under Article III. *See Laird v. Tatum*, 408 U.S. 1, 13–

14(1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Instead, where a plaintiff has yet to face prosecution under a law it seeks to challenge, it must "establish Article III standing by (1) 'alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and (2) demonstrating that 'there exists a credible threat of prosecution thereunder.'" *Ord v. D.C.*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). In other words, Plaintiffs must show that the threat is "both credible and imminent," which also requires showing that "[plaintiffs'] prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution." *Id.* at 1140–41 (internal quotations omitted).

The fanciful notion that Plaintiffs will be charged because of Section 2(b) depends on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Plaintiffs would have to allege an intention to violate one of the election statutes under which the President directed enforcement. That is, they would need to intentionally provide ballots to non-citizens or citizens who are under the age of 18, which they do not claim to have any intention of doing. *See Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005) (requiring a "credible statement . . . of intent to commit [the] violative acts" at issue). Also, Plaintiffs would have to prove a "credible threat of prosecution" simply for "help[ing] a voter obtain a ballot." *See id.*; NAACP Compl. ¶ 144. This is facially implausible. Again, there are too many "dominoes that would have to fall" to confer standing. *Elfant*, 52 F.4th at 257 (finding no credible threat of prosecution for violation of election law where the circumstances leading to prosecution were speculative and depended in large part on the action of third parties). Plaintiffs' alleged fear of a chilling effect is therefore insufficient.

22

In any event, Plaintiffs fail to demonstrate redressability. Even if this Court enjoins Section 2(b), existing unchallenged laws would still prohibit the provision and use of fraudulent ballots and therefore it is not a redressable injury. *See KH Outdoor, L.L.C. v. Clay Cnty.*, 482 F.3d 1299, 1301, 1303–04 (11th Cir. 2007) (holding that injury was not redressable because even if the court were to strike the challenged provision, there were other unchallenged regulations that would still have prohibited the act at issue); *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 331 (5th Cir. 2025) ("[R]edressability is undermined where an independent and unchallenged law also causes the plaintiff's injury."). Plaintiffs' challenge of Section 2(b) of the EO should therefore be dismissed for lack of standing.

### C. Plaintiffs lack standing and ripeness to challenge Section 3 of the Executive Order.

Section 3 directs the United States Postal Service to *initiate* rulemaking procedures for a rule requiring ballots to be mailed in officially marked envelopes that bear tracking codes. EO § 3(b)(i). Any forthcoming rule shall also provide for a "State-specific Mail-In and Absentee Participation List" "that the USPS shall provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State." *Id.* § 3(b)(iv). Additionally, the forthcoming rule shall provide that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. *Id.* § 3(b)(ii). Finally, under the EO, the forthcoming rule shall provide that the USPS may "not transmit" absentee ballots from unidentified individuals who are not enrolled "on a State-specific list." *Id.* § 3(b)(iii).

In order to have standing, a challenged policy must be sufficiently concrete to assess whether a threatened injury is imminent. *See Trump v. New York*, 592 U.S. at 131–32. Here, that is impossible because a notice of proposed rulemaking has not even been issued yet—much less a final rule. *Cf. id.* And Plaintiffs admit that they have little knowledge of what the final USPS rule

will provide. For example, the DSCC Plaintiffs allege that the Executive Order "does not explain how USPS will create the Mail-In and Absentee Participation List." DSCC ¶ 71. Plaintiffs also allege that they lack knowledge of "how" the States' own absentee-voter lists "will inform the USPS's Mail-in and Absentee Participation List." *Id.* ¶ 73. Plaintiffs continue: "Nor does [the EO] specify the consequences if a State declines to send [its] list [of absentee voters], *as the Order implicitly acknowledges is within a State's authority.*" *Id.* (emphasis added). Without knowledge even of the basic contours of the USPS's forthcoming rule, Plaintiffs lack standing and ripeness to challenge Section 3. *See Trump v. New York*, 592 U.S. at 131–32 (denying the plaintiffs standing because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time").

Unable to even articulate what they are challenging, Plaintiffs fail to articulate a concrete injury caused by Section 3 of the EO. Plaintiffs claim that Section 3 will prevent eligible voters from voting and will impinge State sovereignty. *See* DSCC Compl. ¶¶ 75, 124–25; LULAC Compl. ¶ 184–88, 289; NAACP ¶¶ 165–66, 191. But Section 3 simply directs to the USPS to initiate rulemaking—it does not regulate the States directly and it does not directly inhibit *anyone*'s voting rights. At any rate, Plaintiffs are not States so they lack standing to challenge supposed violations of State sovereignty. Thus, Plaintiffs' alleged injury is not sufficiently traceable to Section 3 because Plaintiffs are not regulated by the EO. *See Babbitt*, 442 U.S. at 298 (To challenge a statute prospectively, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.").

Plaintiffs' allegation of injury due to breaches of voter privacy ring hollow for similar reasons. *See* DSCC Compl. ¶¶ 103–05; LULAC Compl. ¶ 286; NAACP Compl. ¶ 212. Plaintiffs admit they have no idea: (1) how the USPS "will create the Mail-In and Absentee Participation

24

List," (2) "how" the State's own lists of absentee voters "will inform the USPS's Mail-in and Absentee Participation List," and (3) whether States will even suffer a penalty if they refuse to participate.  DSCC ¶¶ 71, 73.  Because Plaintiffs lack knowledge of how the USPS "will create the Mail-In and Absentee Participation List," *id.*, it is speculative to allege a "certainly impending" injury to voter privacy, *Clapper*, 568 U.S. at 410 (emphasis removed).  To the contrary, a privacy injury is *unlikely* because the EO requires that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements."  EO § 3(b)(iv).

Finally, the Democratic Party Plaintiffs unpersuasively try to advance a competitive standing theory to justify their challenge to Section 3.  DSCC Compl. ¶¶ 97–98.  Specifically, they claim that Democrats are more likely than Republicans to vote by mail, and so the forthcoming USPS regulation will likely put Democrats at a competitive disadvantage.  *Id.*  But once again, this theory of injury rests on far too much speculation to be sufficiently concrete.  *See Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 261–62 (D.D.C. 2015) ("It remains indispensable, however, that the increase in competition and the corresponding injury are 'imminent' and not merely 'speculative.'"); *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 26 (D.D.C. 2016) (denying an organization standing because the "alleged injury hinges on the independent choices of third parties not before the Court" (cleaned up)).  As discussed above, it is too speculative to find that *any* voters will be wrongly removed from the States' voter registration lists and mail-in ballot lists.  *See supra* at 9–12, 20.  The fact that this theory of standing hinges on the additional assumption that this hypothetical outcome will disadvantage specifically those of a particular party affiliation pulls Plaintiffs even further away from Article III's concrete and imminent injury requirement.  Also, even positing Plaintiffs' assumptions that Democrats vote

by mail more frequently and that the EO will reduce mail-in voting, Plaintiffs make a significant assumption by claiming that "fewer Democrats [will be] *able* to vote." DSCC ¶ 98 (emphasis added). Of course, just because Democrats *prefer* to vote by mail does not mean Democrats *will not* vote in person, if required. *Id.* Thus, Plaintiffs' theory of competitive standing relies on impermissible speculation.

Alternatively, even if this Court finds that Plaintiffs have standing, the Court should reject their challenges to Section 3 as prudentially unripe. *See Church v. Biden*, 573 F. Supp. 3d 118, 135 (D.D.C. 2021) ("Even if a case is 'constitutionally ripe'" under Article III standing, "there may still be prudential reasons for refusing to exercise jurisdiction." (citation omitted)). "The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (cleaned up). This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 807 (2003) (citation omitted). To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "fitness of the issues for judicial decision"; and (2) the "extent to which withholding a decision will cause hardship to the parties.'" *Church*, 573 F. Supp. at 135 (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)). Assessing whether an issue is "fit" for adjudication requires courts to consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (citation omitted).

Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here. At the outset, Section 3 provides a broad outline of what the USPS regulation will include, but the administrative process remains ongoing and the

26

processes for implementing the EO have not yet been published. *See* EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing unspecified "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List"). It would also be imprudent to review an EO directing rulemaking when Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, DSCC ¶¶ 71, 73.

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause v. Trump*, 506 F. Supp. 3d 39, 46 (D.D.C. 2020) (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45 (first alteration in original). Moreover, the EO's direction that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law" underscores the intention that said action be conducted lawfully and in accordance with the agency's regular rulemaking procedures set forth by statute. EO § 3(b)(iv)–(v). The "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of Section 3. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).

Given that USPS has not yet taken any final agency action, Plaintiffs likewise fail to show that "delayed judicial review would cause them 'immediate and significant hardship'" to satisfy the second prong for prudential ripeness.  *Church*, 573 F. Supp. 3d at 136 (quoting *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012)).  Premature adjudication of USPS's actions in the way Plaintiffs desire "denies the agency an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular rulemaking procedures.  *See Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 369 (citation omitted).  For these reasons, Plaintiffs lack standing and their challenges to Section 3 are not ripe for adjudication.

## II.   Plaintiffs fail to state claims under the Administrative Procedure Act and other federal statutes.

In any event, Plaintiffs also fail to state claims for relief under the Administrative Procedure Act and other federal statutes.  The EO is not a final agency action, so the Court must dismiss all of Plaintiffs' APA claims.  And, without the APA, Plaintiffs also lack a cause of action to enforce any of the other federal statutes they invoke.

### A.   The Court should dismiss Plaintiffs' APA challenges because Plaintiffs do not challenge a final agency action.

Plaintiffs challenge Sections 2 and 3 of the EO under the APA.  DSCC Compl. ¶¶ 140–53; LULAC Compl. ¶¶ 291–327; NAACP ¶¶ 193–214.  But the APA permits judicial review of only final agency actions.  5 U.S.C. § 704.  And neither Section 2 nor Section 3 are final agency actions under the APA.  This is for two reasons.

First, an executive order is not a final agency action because the President is not an "agency" under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 796–801 (1992).  Here, as in *Franklin*, "the final action complained of is that of the President, and the President is not an agency within the meaning of the Act.  Accordingly, there is no final agency action that may be reviewed

28

under the APA standards." *Id.* Indeed, just a few months ago, another judge of this Court applied *Franklin* to another one of Plaintiffs' challenges to an executive order—explaining that "because 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." *LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) (*Franklin*, 505 U.S. at 796). The Court should reaffirm that ruling and reject another mistaken attempt by Plaintiffs to challenge an executive order through the APA.

Second, Plaintiffs have failed to challenge any other final agency action taken under Section 2 and Section 3 of the EO. An agency action is "final" and judicially reviewable when it: (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 (1970)). Importantly, controlling precedent holds that "[p]roposed rules meet neither of the[se] two requirements for final agency action." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.); *see also Am. Portland Cement All. v. EPA*, 101 F.3d 772, 777 (D.C. Cir. 1996) ("[A] proposed regulation is still in flux," so "review is premature."); *Action on Smoking and Health v. Dep't of Labor*, 28 F.3d 162, 165 (D.C. Cir. 1994) ("Agency action is final when it 'imposes an obligation, denies a right, or fixes some legal relationship,'" and an agency's "proposed rulemaking generates no such consequences." (citation omitted)). Thus, notices of rulemaking are not final agency actions. *Id.* For example, in *Center for Democracy & Technology v. Trump*, this Court dismissed a challenge to an executive order on ripeness grounds because the order "merely direct[ed] government

29

officials to take *initial* steps in government processes that might (but may not) *eventually* lead to law governing private parties." 507 F. Supp. 3d 213, 217 (D.D.C. 2020).

Applying these standards here, the Court should dismiss all of Plaintiffs' APA claims because Plaintiffs do not challenge any final agency actions. The EO is less than a month old. And even Plaintiffs concede that it is unclear how federal agencies will implement the EO. *See, e.g.*, DSCC Compl. ¶ 71 ("The Order does not explain how USPS will create the Mail-In and Absentee Participation List."); LULAC Compl. ¶¶ 48, 60, 260 ("The Order does not specify what other databases" federal agencies should use "to construct the State Citizenship List . . . ."). Thus, Plaintiffs' own pleadings concede—as an *a fortiori* matter—that no agency has reached a final action yet. As to Section 2 specifically, it is still uncertain how and when DHS and SSA will create and transmit the State Citizenship List. *See* EO § 2; *see also* LULAC Compl. ¶ 48. Also, Section 3 simply directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, and it specifies that "any final rule" by the USPS "shall be issued no later than 120 days from the date of this order." EO § 3(d). A notice of proposed rulemaking is an "intermediate agency action," not a "final" one. 5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 U.S. at 334–35. Thus, Plaintiffs cannot prematurely sue with the deadline for the USPS's "final rule" still three-and-a-half months away. EO § 3(d). Thus, this Court should dismiss Plaintiffs' APA claims.

**B. Because the APA is inapplicable, Plaintiffs lack a cause of action to sue under any of the statutes at issue.**

Without the APA, the Court must dismiss all of Plaintiffs' statutory challenges for lack of a cause of action. *See* Fed. R. Civ. P. 12(b)(6). Indeed, Plaintiffs fail to cite a single cause of action—aside from the APA—that allows them to enforce any of the federal statutes that they claim are violated by the EO. This includes the Privacy Act, 5 U.S.C. § 552a; statutes governing the Post Office, 39 U.S.C. §§ 101, 201, 402, 403, 404, 409, 412, 501, 502, 503, 3001–3018, 3661,

3703–05; a 1970 Amendment to the Voting Rights Act, 52 U.S.C. § 10502(d); and the Help America Vote Act, 52 U.S.C. § 21085 *et seq.* Without pleading an applicable cause of action, Plaintiffs lack authority to sue under federal statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("Without [congressional authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *LULAC*, 808 F. Supp. 3d at 69 (D.D.C. 2025) (after dismissing Plaintiffs' APA claims against an executive order, holding that Plaintiffs lacked authority to enforce federal law because they possessed "'no express cause of action' under any federal statute" and equitable relief is "extremely limited" for federal statutory violations (citation omitted)).

Despite their failure to cite a statutory cause of action aside from the APA, Plaintiffs will likely claim that they can nonetheless enforce federal statutes through an *ultra vires* claim. But *ultra vires* review is "extremely limited" in scope. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quotation omitted). Moreover, an *ultra vires* claim cannot succeed when there is "alternative procedure for review of the statutory claim." *Id.* at 722; *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025) ("[U]ltra vires review is not available because [plaintiffs] had an alternative path to judicial review."). Here, that alternative procedure is the APA, which requires Plaintiffs to wait for a final agency action. Plaintiffs cannot escape the strictures of the APA merely because they want to prematurely challenge the President's directive to federal agencies. *See LULAC*, 808 F. Supp. 3d at 69 ("[U]ltra vires review is not available in this case to redress alleged statutory violations by federal agencies because, for statutory claims against federal agencies and officers, '[t]he APA provides Plaintiffs with a meaningful opportunity for judicial review.'" (alteration in original) (citation omitted)).

Finally, Plaintiffs may try to salvage their attempt to enforce federal statutes by characterizing such claims as within the scope of "a cause of action to remedy" "separation-of-powers violation[s]." *See* DSCC Compl. ¶ 120. However, the Supreme Court has rejected similar, thinly-veiled attempts to recast statutory challenges as constitutional claims. *See Dalton v. Specter*, 511 U.S. 462, 476–77 (1994) ("The claim that the President exceeded his authority under the 1990 Act is not a constitutional claim, but a statutory one."). The Court should follow Supreme Court precedent and dismiss all of Plaintiffs' other statutory claims after dismissing their APA claims.

## CONCLUSION

The Court should dismiss Plaintiffs' complaints.

Date: April 20, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff**
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

33

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez\*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan\*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II\*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga\*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett\*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate\*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

34

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant**
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov

*\* Government attorney admitted under Local Rule 83.2(e)*
*\*\* Pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I certify that on April 20, 2026, the above was filed electronically through the Court's electronic filing system to be serve electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*