# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DSCC**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01114-CJN** |
| **DONALD J. TRUMP, in his official capacity as President of the United States**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01132-CJN** |
| **EXECUTIVE OFFICE OF THE PRESIDENT**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

      Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants,

STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,

      Intervener Defendants.

No. 26-cv-01151-CJN

## MEMORANDUM IN OPPOSTION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... v

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 1

LEGAL STANDARD ..................................................................................................................... 3

ARGUMENT .................................................................................................................................. 4

    I.    Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 2(a) of the Executive Order ...................................................................................................... 4

        A.  Plaintiffs lack standing to challenge Section 2(a) .......................................................... 4

            1.  Plaintiffs' alleged harms to voters are speculative and not fairly traceable to Section 2(a). .................................................................................................................. 5

            2.  Plaintiffs' alleged diversion of resources does not confer organizational standing. .................................................................................................................. 9

            3.  Plaintiffs' alleged privacy injuries are insufficient for standing. ........................... 12

            4.  Political candidates do not have standing to challenge Section 2(a) under *Bost*. .................................................................................................................. 15

            5.  Plaintiffs do not have associational standing to challenge Section 2(a). ............... 16

        B.  Plaintiffs' challenges to Section 2(a) are not ripe. ...................................................... 17

        C.  Plaintiffs do not have a cause of action to challenge Section 2(a) under the APA ..... 18

        D.  Plaintiffs' challenge to Section 2(a) is doomed on the merits because the President has authority to gather and organize information within the Executive Branch. .................................................................................................................. 21

    II.   Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 2(b) of the Executive Order ..................................................................................................... 25

    III.  Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 3(b) of the Executive Order ..................................................................................................... 27

        A.  Plaintiffs lack standing to challenge Section 3(b) ...................................................... 27

        B.  Plaintiffs' challenges to Section 3(b) are not ripe. ...................................................... 30

        C.  Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to engage in rulemaking. .................................................................................. 32

            1.  Plaintiffs must, but cannot, identify a clear statement from Congress preventing the President from supervising USPS. ............................................... 33

2.  Any statute preventing the President from directing USPS rulemakings is unconstitutional.................................................................................................... 34

**CONCLUSION** ............................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                    Page(s)

*Alexander v. S.C. State Conference of NAACP,*
    602 U.S. 1 (2024)........................................................................................... 8

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)....................................................................................... 21

*All. for Retired Americans v. Bessent,*
    770 F. Supp. 3d 79 (D.D.C. 2025) ................................................................ 16

*Allen v. Wright,*
    468 U.S. 737 (1984)......................................................................... 1, 4, 6, 8

*Am. Fed'n of Gov't Emp., AFL-CIO v. Freeman,*
    498 F. Supp. 651 (D.D.C. 1980) ................................................................... 22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan,*
    870 F.2d 723 (D.C. Cir. 1989)....................................................................... 31

*Am. Petroleum Inst. v. E.P.A.,*
    683 F.3d 382 (D.C. Cir. 2012)................................................................. 30, 31

*Arcia v. Fla. Sec'y of State,*
    772 F.3d 1335 (11th Cir. 2014) .....................................................................11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
    901 F. Supp. 2d 19 (D.D.C. 2012) ................................................................ 15

*Atl. Urological Assocs., P.A. v. Leavitt,*
    549 F.Supp.2d 20 (D.D.C. 2008) .................................................................. 15

*Babbitt v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979)................................................................................. 26, 28

*Belmont Abbey Coll. v. Sebelius,*
    878 F. Supp. 2d 25 (D.D.C. 2012) .................................................................. 6

*Bennett v. Spear,*
    520 U.S. 154 (1997)....................................................................................... 18

*Bost v. Ill. State Bd. of Elections,*
    146 S. Ct. 513 (2026)............................................................................... 15, 16

*Carney v. Adams,*
    592 U.S. 53 (2020)......................................................................................... 17

*Center for Democracy & Technology v. Trump*,
  507 F. Supp. 3d 213 (D.D.C. 2020) ................................................................... 18

*Center for Taxpayer Rights v. IRS*,
  No. 25-cv-0457, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) .................................. 20

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)............................................................................ 4

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948)......................................................................................... 18

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................................... 30, 32

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
  993 F.3d 880 (D.C. Cir. 2021)............................................................................ 25

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................................... passim

*Clinton v. Jones*,
  520 U.S. 681 (1997)......................................................................................... 21

*Common Cause v. Trump*,
  506 F. Supp. 3d 39 (D.D.C. 2020) ...................................................................... 31

*Common Purpose USA, Inc. v. Obama*,
  227 F. Supp. 3d 21 (D.D.C. 2016) ...................................................................... 29

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
  167 F.4th 605 (2d Cir. 2026)............................................................................... 9

*Crawford v. Marion Cnty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007)...............................................................................11

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
  85 F. Supp. 3d 250 (D.D.C. 2015) ...................................................................... 29

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988).......................................................................................... 22

*DOL*,
  No. CV 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026).......................... 19

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)................................................................................... passim

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
   873 F. Supp. 2d 363 (D.D.C. 2012) ................................................................. 32

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .......................................................................... 4

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................... 18, 19, 33

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .......................................................................... 34

*Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .......................................................................... 4

*Georgia v. Meadows*,
   88 F.4th 1331 (11th Cir. 2023) .......................................................................... 23

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) .......................................................................... 35

*Hunt v. Washington State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) .......................................................................... 16

*In re Al-Nashiri*,
   47 F.4th 820 (D.C. Cir. 2022) .......................................................................... 30

*In re Murray Energy Corp.*,
   788 F.3d 330 (D.C. Cir. 2015) .......................................................................... 18

*In re Murray Energy Corp.*,
   788 U.S. .......................................................................... 32

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
   45 F. Supp. 3d 14 (D.D.C. 2014) .......................................................................... 7

*Inst. for Free Speech v. Johnson*,
   148 F.4th 318 (5th Cir. 2025) .......................................................................... 27

*Kennedy v. Braidwood Mgmt., Inc.*,
   606 U.S. 748 (2025) .......................................................................... 33, 34

*KH Outdoor, L.L.C. v. Clay Cnty.*,
   482 F.3d 1299 (11th Cir. 2007) .......................................................................... 27

*L.A. Press Club v. Noem*,
   No. 2:25-CV-05563-HDV-E, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) .......................................................................... 20

*Laird v. Tatum,*
  408 U.S. 1(1972)......................................................................................................... 25

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
  ("LULAC I"), 780 F. Supp. 3d 135 (D.D.C. 2025) ..............................................11, 19

*LULAC v. Exec. Off. of President,*
  808 F. Supp. 3d 29 (D.D.C. 2025) ................................................................... 19, 21

*Morgan Drexen, Inc. v. CFPB,*
  785 F.3d 684 (D.C. Cir. 2015)........................................................................................ 4

*Munaf v. Geren,*
  553 U.S. 674 (2008)....................................................................................................... 3

*Myers v. United States,*
  272 U.S. 52 (1926)....................................................................................... 34, 35, 36

*Nat'l Park Hosp. Ass'n v. DOI,*
  538 U.S. 803 (2003)..................................................................................................... 30

*New Hampshire v. Maine,*
  532 U.S. 742 (2001)..................................................................................................... 14

*Nixon v. Adm'r of Gen. Servs.,*
  433 U.S. 425 (1977)..................................................................................................... 22

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982)..................................................................................................... 33

*Ord v. D.C.,*
  587 F.3d 1136 (D.C. Cir. 2009)................................................................................... 26

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,*
  400 U.S. 62 (1970)....................................................................................................... 18

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007)..................................................................................... 7

*Republican Nat'l Comm. v. Aguilar,*
  No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358 (D. Nev. Oct. 18, 2024) ........................ 12

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,*
  ("RNC"), 120 F.4th 390 (4th Cir. 2024) .....................................................................11

*Sandoz, Inc. v. Food and Drug Admin.,*
  439 F. Supp. 2d 26 (D.D.C. 2006) ................................................................................ 3

*Sataki v. Broad. Bd. of Governors*,
733 F. Supp. 2d 22 (D.D.C. 2010) ................................................................................ 3

*Seegars v. Gonzales*,
396 F.3d 1248 (D.C. Cir. 2005) .................................................................................... 26

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ..................................................................................................... 35

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976) ..................................................................................................... 1, 6

*Spokeo v. Robins*,
578 U.S. ....................................................................................................................... 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ......................................................................................................... 5

*Strong Communities Found. of Arizona Inc. v. Richer*,
No. CV-24-02030-PHX-KML, 2024 WL 4475248 (D. Ariz. Oct. 11, 2024) ............ 12

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..................................................................................................... 16

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) .................................................................................. 11, 26

*Texas v. United States*,
523 U.S. 296 (1998) ..................................................................................................... 17

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............................................................................................... 13, 14

*Trump v. New York*,
592 U.S. 125 (2020) ................................................................................. 13, 17, 27, 28

*Trump v. Slaughter*,
146 S. Ct. 18 (2025) ..................................................................................................... 35

*Trump v. Thompson,*
20 F.4th 10 (D.C. Cir. 2021) ....................................................................................... 24

*Trump v. United States*,
603 U.S. 593 (2024) ..................................................................................................... 23

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*,
540 U.S. 736 (2004) ..................................................................................................... 35

*United States v. Arthrex, Inc.*,
 594 U.S. 1 (2021).................................................................................................. 34

*United States v. Chem. Found.*,
 272 U.S. 1 (1926).................................................................................................. 31

*United States v. Texas*,
 599 U.S. 670 (2023)......................................................................................... 16, 25

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990)............................................................................................ 7, 8

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)..................................................................................................... 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952).............................................................................................. 22

**U.S. Constitution**

Article II of the Constitution................................................................... 1, 21, 24, 36

U.S. Const. art. II, § 1, cl. 1 .................................................................................. 32, 34

U.S. Const. art. II, § 3 ........................................................................................... 23, 34

**Statutes**

5 U.S.C. § 704.......................................................................................................... 32

18 U.S.C. 2(a) ..................................................................................................... passim

18 U.S.C. 241............................................................................................................. 2

18 U.S.C. 371............................................................................................................. 2

18 U.S.C. 611(a) ........................................................................................................ 2

18 U.S.C. 1001........................................................................................................... 2

18 U.S.C. 1015........................................................................................................... 2

18 U.S.C. § 611 .................................................................................................... 23, 25

39 U.S.C. § 201 .......................................................................................................... 35

39 U.S.C. § 202 .......................................................................................................... 33

39 U.S.C. § 401.................................................................................................. 2, 31, 33

39 U.S.C. §§ 501–505 .................................................................................................. 33

52 U.S.C. 10307 ............................................................................................................. 2

52 U.S.C. 20511 ................................................................................................. 2, 23, 25

52 U.S.C. § 20508(b)(2) .............................................................................................. 14

52 U.S.C. § 21083(a)(1)(A) ......................................................................................... 23

Mo. Rev. Stat. § 115.155 .............................................................................................. 14

**Other Authorities**

March 31, 2026, President Trump issued,
    Executive Order No. 14399 ............................................................................. passim

**INTRODUCTION**

The Court should reject Plaintiffs' motions for a preliminary injunction. Fundamentally, Plaintiffs' claims are all premature. There is no final agency action in this case, and Plaintiffs therefore do not even know what they are challenging. *See, e.g.*, DSCC Compl. ¶¶ 62, 71, 73 (openly speculating how federal agencies and States will implement the EO when "[t]he Order does not explain" in detail); LULAC Compl. ¶¶ 48, 52, 60, 260 (same). Plaintiffs therefore lack standing and a cause of action to pursue their claims. That defect infects all of Plaintiffs' claims, which rest on extensive speculation about what final agency actions the EO will lead to and how those actions might be implemented by independent third parties not before the Court. *Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976)). The prudential ripeness doctrine also strongly counsels against considering Plaintiffs' constitutional arguments before final agency actions exist. And finally, Plaintiffs offer no viable statutory authority for their proposed injunctive relief—which would effectively bar the President from ordering a federal agency to initiate rulemaking. Even if they could, such a statute would violate Article II of the Constitution by intruding on the President's ability to supervise the Executive Branch.

**BACKGROUND**

On March 31, 2026, President Trump issued Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*. The EO recognized the President's "duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1. The EO furthers these ends in three main ways.

First, Section 2(a) of the EO directs federal agencies to create a "State Citizenship List" and to transmit the list to "State election officials." EO § 2(a). The State Citizenship List is simply a list of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update or correct them in advance of elections." *Id.*

Second, Section 2(b) of the EO directs the Attorney General to "prioritize the investigation" and "prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* § 2(b).

Third, Section 3 of the EO requires the U.S. Postal Service to initiate rulemaking under 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee ballots. *Id.* § 3(b). Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail. Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals. Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals . . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers." The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements." EO § 3(b)(iv). Section 3(b)(v)

2

then directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law." Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order." As of the date of this filing, Intervener States are not aware of proposed or final rules for implementing Sections 2 and 3 that have been published, and Plaintiffs have not produced any.

Plaintiffs sued, challenging the EO almost immediately after it was issued. *See* DSCC Compl. (filed April 1, 2026); LULAC Compl. (filed April 2, 2026); NAACP Compl. (filed April 3, 2026). On April 9, 2026, the Court consolidated this action—*DSCC v. Trump*, No. 26-cv-01114-CJN—with *LULAC v. Executive Office of the President*, No. 26-cv-01132-CJN, and *NAACP v. Trump*, No. 26-cv-01151-CJN. Doc. 27. On April 10, 2026, all Plaintiffs filed motions for preliminary injunction. Doc. 29, 34, 37. On April 17, 2026, they filed their respective memoranda in support of their motions. Doc. 53, 54, 55.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy,' … it is never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted), and "must be sparingly granted," *Sandoz, Inc. v. Food and Drug Admin.*, 439 F. Supp. 2d 26, 30 (D.D.C. 2006), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006). This "very high" standard for granting injunctive relief is "very well established." *Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22, 43–44 (D.D.C. 2010). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs must do more than merely show the possibility of prevailing on the merits; rather they must show "a substantial likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Plaintiffs also must establish irreparable harm, as failure to do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This too is a "high standard." *Id.* First, the injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted) (emphasis in original). "Second, the injury must be beyond remediation." *Id.*

## ARGUMENT

I. **Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 2(a) of the Executive Order**

A. **Plaintiffs lack standing to challenge Section 2(a).**

To establish Article III standing, Plaintiffs must plausibly allege that they suffered a cognizable injury fairly traceable to Defendants and that the injury is likely to be redressed by a favorable judicial decision. *See Allen,* 468 U.S. at 751. Also, because Plaintiffs seek "forward-looking relief," they "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015) (internal quotation omitted). Plaintiffs cannot show either of these.

4

1.  <u>Plaintiffs' alleged harms to voters are speculative and not fairly traceable to Section 2(a).</u>

To establish standing, Plaintiffs must prove an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal quotations omitted).  The threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 409–10 (2013).  A "allegations of a *possible* future injury" or a "reasonable likelihood" of future harm are insufficient.  *Id.* at 409–10 (emphasis in original) (internal quotations omitted).

Applying these principles here, Plaintiffs' challenges to Section 2(a) are a far cry from "certainly impending."  Fatal to their standing theories, Plaintiffs' PI briefing ignores the reality that any use of the State Citizenship List is *optional*.  Indeed, Section 2(a) merely orders the provision of information to States.  *See* EO § 2(a) (directing the Secretary of Homeland Security to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State").  There is nothing in Section 2(a) ordering the States to take any sort of action with respect to their voting based on the State Citizenship List.  Plaintiffs even acknowledge this in their pleadings.  *See* LULAC Compl. ¶ 52 ("The Order does not directly specify anything that states should do with the State Citizenship List that they receive."); DSCC Compl. ¶ 62 ("The Order does not explicitly explain the intended use of the State Citizenship List . . . .").

Still, Plaintiffs claim that they, or their members, will be injured by Section 2(a) on the theory that "it is virtually guaranteed to exclude large numbers of eligible voters."  Doc. 53 ("LULAC Br."), at 14; *see also* Doc. 54 ("NAACP Br."), at 2 ("State Citizenship Lists … will

5

inaccurately exclude millions of eligible voters."). They then claim that this exclusion will result in their voters being disenfranchised, "were States to use the list." *See* LULAC Br. at 14 ("[W]ere States to use the list, it would leave individuals who do not appear on the List vulnerable to being impermissibly kicked off the rolls and unable to cast a ballot."); Doc. 55 ("DSCC Br."), at 12–13 ("[T]he creation of these lists creates a serious risk that Democratic Party supporters who are in fact U.S. citizens will be erroneously omitted from such lists and face significant—and, for some, insurmountable—burdens on their ability to vote."). But this is extraordinarily speculative, and courts routinely reject standing where plaintiffs speculate about how third parties will respond to government action. *See, e.g.*, *Allen*, 468 U.S. at 757 (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'" (quoting *Simon*, 426 U.S. at 42)); *Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts.") (internal quotation omitted). "Put another way, . . . harm that is possible *or even likely* will not suffice." *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 34 (D.D.C. 2012) (emphasis added). Plaintiffs' requests for preliminary relief rely on several layers of speculation that cannot satisfy these standards.

The first layer of speculation focuses on the allegation that "naturalization records, SSA records, SAVE data, and other relevant Federal databases," EO § 2(a), used to create the State Citizenship List will contain inaccuracies. *See* LULAC Br. at 41 ("The State Citizenship List is guaranteed to contain and rely on inaccurate and outdated information because of the inherent flaws in the federal databases."); DSCC Br. at 43 ("[B]arring a preliminary injunction, any efforts to compile the State Citizenship Lists are likely to perpetuate the incorrect citizenship information found in SAVE, SSA, and other federal databases."); NAACP Br. at 2 ("Each data source has

significant limitations, yielding State Citizenship Lists that will inaccurately exclude millions of eligible voters."). However, as Plaintiffs in this case have openly admitted, "[t]he Order does not specify what other databases" (beyond SSA and SAVE databases) will "be used to construct the State Citizenship List." LULAC Compl. ¶ 48.

That problem with Plaintiffs' theory highlights a second: Without knowing all the sources that federal agencies will use, it is utterly speculative for Plaintiffs to suggest that the State Citizenship List will contain inaccurate data. At best, Plaintiffs offer a conjectural assertion of an "increased risk" of inaccuracy, which is insufficient. *See In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 25 (D.D.C. 2014) ("The degree by which the risk of harm has increased is irrelevant—instead, the question is whether the harm is certainly impending."); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'[I]ncreased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased." (emphases omitted)). The Supreme Court has "repeatedly reiterated" that "threatened injury must be certainly impending to constitute injury in fact, and that '[a]llegations of *possible* future injury are not sufficient.'" *Clapper*, 568 U.S. at 409 (alterations in original) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (collecting cases); *see id.* at 416 (rejecting Second Circuit's finding of injury where plaintiff's fear is not "'fanciful, paranoid, or otherwise unreasonable'" because such a standard "improperly waters down the fundamental requirements of Article III") (citation omitted).

Also, even if the List does contain some errors, States may "routinely supplement and provide suggested modifications or amendments to the State Citizenship List." EO § 2(a). This is another safeguard against mistakes. Notably, the EO explicitly acknowledges that "[a]n individual's identification on the State Citizenship List does not indicate that the individual has

been properly registered to vote in the State.  State and Federal laws and State procedures must still be followed for an individual to be registered to vote."  *Id.*  Plaintiffs' claimed injury thus depends on the assumption that the federal government and States will not collaborate to produce an accurate List.

Plaintiffs' chain of speculation does not end there.  Their theory of injury also assumes that States will then use the List to somehow prevent eligible voters from receiving ballots.  *See, e.g.*, LULAC Br. at 14 ("[W]ere States to use the list, it would leave individuals who do not appear on the List vulnerable to being impermissibly kicked off the rolls and unable to cast a ballot.").  This is not just speculative; it is implausible.   Plaintiffs offer no evidence that States would automatically exclude registered voters whose names do not appear on the initial State Citizenship List.  Rather, the List will merely signal a need for verification that a given registered voter is, in fact, a U.S. Citizen and over 18 years' old.  In other words, there is no reason to think that States will remove voters from their voter registration lists without employing proper, independent verifications.  *Cf. Alexander v. S.C. State Conference of NAACP*, 602 U.S. 1, 6 (2024) (discussing presumption that state legislatures "act[] in good faith").

Finally, as even Plaintiffs admit, the EO does not require States to use the State Citizenship List; it is an optional resource.  LULAC Compl. ¶ 52 ("The Order does not directly specify anything that states should do with the State Citizenship List that they receive . . .").  Plaintiffs' assumption that States will unquestioningly rely on this optional federal resource depends—at best—on rank speculation about the future actions of independent third parties not before the Court.  These assumptions are "sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action."  *Allen*, 468 U.S. at 759; *see also  FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement precludes

speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."). Plaintiffs' attenuated theory of injury therefore does not create a case or controversy under Article III.

    2. <u>Plaintiffs' alleged diversion of resources does not confer organizational standing.</u>

Organizational Plaintiffs also complain that the creation and transmission of the State Citizenship List will force them to divert resources in response. *See, e.g.*, LULAC Br. at 20 ("[T]he Order will require Plaintiffs to confirm the content of State Citizenship Lists and liaise with federal officials to assist prospective voters whose right to vote is at risk."); DSCC Br. at 18 ("In light of known deficiencies in those databases' ability to accurately identify citizens or confirm residency, Section 2(a) will force the Party Organizations to carefully monitor the development of the Lists and put programs into place."); NAACP Br. at 33 ("The Order forces the NAACP to divert resources from those programs to address the confusion and harm it creates."). This allegation does not create Article III standing.

Notably, the Supreme Court recently rejected resource-diversion standing in *Alliance for Hippocratic Medicine*, 602 U.S. at 394; *see Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "does not work to demonstrate standing" after *Alliance for Hippocratic Medicine*) (quoting *All. for Hippocratic Med.*, 602 U.S. at 394). As the Supreme Court explained, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. If that were enough, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. Accordingly,

9

"Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.  This outcome is consistent with the longstanding principle that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Here, Plaintiffs point to expenses devoted to "helping voters contest erroneous citizenship flags" (which has not happened) and "educating the public," which allegedly burdens the organizations' other priorities.  LULAC Br. at 42; NAACP Br. at 34.  But that is nearly identical to the standing allegations found insufficient by the Supreme Court in *Alliance for Hippocratic Medicine.  Compare* 602 U.S. at 394 ("The medical associations say that they have demonstrated something more here.  They claim to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions.  They say that FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks.  They contend that FDA has 'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education.  And all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities.  But . . . [a]n organization cannot manufacture its own standing in that way." (citations omitted)).  Plaintiffs' resource-diversion theory is fundamentally at odds with Supreme Court precedent.

Even if resource-diversion standing somehow survived *Alliance for Hippocratic Medicine*, Plaintiffs' alleged harms are speculative on their own terms.  As discussed above, Plaintiffs speculate that unknown individuals will be improperly excluded from the State Citizenship List.

10

And even if a few voters are improperly excluded, it is also speculative to assume that the organizational Plaintiffs will identify and assist the few excluded individuals. And even if Plaintiffs could identify those mistakenly excluded, it is speculative to assume that neither the "individuals" themselves nor the "States" will "correct" the Citizenship List under Section 2(a) before the organizational Plaintiffs insert themselves to provide "assistance." The organizational Plaintiffs' injury is based on speculation upon speculation—each independently sufficient to rebut standing. Said another way, there are too many "dominoes that would have to fall" to confer organizational standing. *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022).

None of Plaintiffs' cited authority stands for the proposition that they can overcome an otherwise insufficient speculative injury by alleging a diversion of resources, particularly in light of the Supreme Court's rejection of resource-diversion standing in *Alliance for Hippocratic Medicine*. Instead, those cases, many of which predate *Alliance for Hippocratic Medicine*, dealt with injuries that had already occurred or pertained to an additional voting requirement and therefore were not speculative or conjectural. The DSCC Brief, for instance, cites to *Republican Nat'l Comm. v. N.C. State Bd. of Elections ("RNC")*, 120 F.4th 390 (4th Cir. 2024) (cited at DSCC Br. 28), which concerned North Carolina's then presently occurring use of voter registration forms purportedly in violation of HAVA. Here, in contrast, the States have not used the State Citizenship List, States are not required to use the Lists, and the creation and transmission of the Lists do not alter any existing voting requirements. Those realities distinguish Plaintiffs' cases. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (cited at DSCC Br. at 16 n.4) (concerning eligible voters who had been excluded from voter rolls and therefore a concrete injury); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (cited at DSCC Br. at 16 n.4) (concerning an additional voting requirement); *League of United Latin Am. Citizens*

*v. Exec. Off. of the President* ("*LULAC I*"), 780 F. Supp. 3d 135, 207 (D.D.C. 2025) (cited at DSCC Br. at 16 n.4) (same).

Plaintiffs' suggestion that a challenged law or act need only "perceptibly impair" their activities with nothing more is also wrong. *See* DSCC Br. at 16 (quoting *All. For Hippocratic Med.*, 602 U.S. at 395). Read in context, that language from *Alliance for Hippocratic Medicine* refers to lawsuits similar to when a "retailer . . . sues a manufacturer for selling defective goods to the retailer." *All. For Hippocratic Med.*, 602 U.S. at 395. That is perceptible impairment because it prevents the plaintiff from continuing to perform activities it was already doing. *See id.* In contrast, the creation of the State Citizenship does not directly prevent or impair Plaintiffs from engaging in their core activities, which as relevant here, purportedly consist of voter education and mobilization programs. *See* DSCC Br. at 16; LULAC Br. at 19; NAACP Br. at 31. *Nothing* in the EO prevents Defendants from continuing to educate and mobilize voters. *Cf. Strong Communities Found. of Arizona Inc. v. Richer*, No. CV-24-02030-PHX-KML, 2024 WL 4475248, at *9 (D. Ariz. Oct. 11, 2024) (explaining that an organization "must show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action") (cleaned up) (emphasis in original); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-CV-00518-CDS-MDC, 2024 WL 4529358, at *7 (D. Nev. Oct. 18, 2024) ("[V]ague allegations of shifting resources," where plaintiff shifted "some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities," "fail[ed] to provide the court any information regarding what or which resources the organizational plaintiffs have needed to shift." (cleaned up)).

    3.  <u>Plaintiffs' alleged privacy injuries are insufficient for standing.</u>

Plaintiffs also claim that the transmission of the State Citizenship List to the States harms their privacy interests, which confers Article III standing. *See* DSCC Br. at 15; LULAC Br. at 18. This theory of injury suffers from several problems. *First*, like the theory of inaccuracy and disenfranchisement discussed above, the alleged injury resulting from the purported violation of the Privacy Act is speculative because the Department of Homeland Security and the Social Security Administration have not yet taken any final action in response to Section 2(a) of the EO. *See infra*, Section I.B. Also, DHS and SSA have not yet made any known determinations about how they will create the State Citizenship List in compliance with the Privacy Act and other applicable law. Section 2(a), in fact, explicitly makes the creation of the List contingent on the List being "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a). In light of the EO's explicit mandate to comply with the Privacy Act, any alleged harm due to a Privacy Act violation is unlikely—and highly speculative at best. *See Trump v. New York*, 592 U.S. 125, 131–32 (2020) (addressing similar situation).

*Second*, Plaintiffs offer no precedent suggesting that the sharing of voter information between different parts of the American government constitutes a cognizable injury. In *Spokeo v. Robins*, the Supreme Court held that, in assessing concreteness, courts must consider whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts. 578 U.S. at 340–41. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). For standing purposes, therefore, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27. In this case, Plaintiffs allege that they would

be injured by federal dissemination of a list of United States citizens to state governments. But there is no historical or common-law analogue for the notion that citizens may be injured by their own State receiving basic citizenship information from the federal government. *See id.* at 424–25. Plaintiffs have thus failed to meet their burden of pleading a cognizable injury. *See id*.

*Third*, Plaintiffs allege no cognizable privacy injury because, by registering to vote, they (or their members) already disclosed personal information and made representations to the States about their citizenship status and eligibility to vote. Of course, individuals eligible to vote must register with their State and, in doing so, must generally attest that they are United States citizens and are or will be aged 18 or older at the time of the next election. *See, e.g.*, Mo. Rev. Stat. § 115.155; *see also* 52 U.S.C. § 20508(b)(2) ("The mail voter registration form . . . shall include a statement that—(A) specifies each eligibility requirement (including citizenship); [and] (B) contains an attestation that the applicant meets each such requirement . . . ."). The EO does not inhibit these separate voting requirements. *See* EO § 2(a) ("State and Federal laws and State procedures must still be followed for an individual to be registered to vote."). Section 2(a) seeks only to provide this information to the States so that they may verify their own records. *See id.* It is hard to see how Plaintiffs can complain about citizenship status being shared with the States when they already must provide that information to States in order to vote. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (Courts estop parties from "deliberately changing positions according to the exigencies of the moment.") (internal quotation omitted).

*Finally*, Plaintiffs cannot plausibly allege causation or redressability—because other, unchallenged federal programs already provide citizenship data to the States. States already receive citizenship information from the federal government through the Systematic Alien Verification for Entitlements (SAVE) program, which enables them to verify that those registering

14

to vote are eligible. *See USCIS Enhances Voter Verification Systems* (Nov. 3, 2025).[1] The program

is administered by U.S. Citizenship and Immigration Services ("USCIS") and already must comply

with the Privacy Act. Much of the information at issue here is already disclosed to the States and,

therefore, even once final agency action is taken regarding the State Citizenship List, Section 2(a)'s

efforts to do the same in a more streamlined fashion cannot cause the injury alleged by Plaintiffs

and invalidating Section 2(a) cannot redress it. *See Ass'n of Am. Physicians & Surgeons, Inc. v.*

*Sebelius,* 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (finding that relief from challenged agency action

was not redressable where "any injuries to referring physicians that result from the opt-out

requirement are caused by statutes and regulations that pre-date the agency actions plaintiffs[]

challenge"), *aff'd sub nom.*, 746 F.3d 468 (D.C. Cir. 2014); *Atl. Urological Assocs., P.A. v. Leavitt*,

549 F.Supp.2d 20, 28 (D.D.C. 2008) (finding that plaintiffs could not satisfy the redressability

prong of the standing analysis because their alleged injuries were caused by a previously issued

rule, not the rule they were challenging: "Since the Final Order did not change anything for these

Plaintiffs, invalidating it would not afford them any relief").

       4.   Political candidates do not have standing to challenge Section 2(a) under *Bost*.

The DSCC Plaintiffs claim that candidates for office have standing because Section 2(a)

"unlawfully alters the rules in the elections in which they compete." DSCC Br. at 10–11. As

explained above, the creation and transmission of the State Citizenship List does not alter any

elections rules because it is merely a resource that the States may or may not use at their discretion.

The Supreme Court's recent decision in *Bost*—which clarified the law of candidate

standing—is thus inapplicable. *See id.* (citing *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513,

519–20 (2026)). There, the Supreme Court held a candidate had standing to challenge an Illinois

---

[1] https://www.uscis.gov/newsroom/news-releases/uscis-enhances-voter-verification-systems

law requiring election officials to count mail-in ballots postmarked by election day but received up to two weeks later. *Bost*, 146 S. Ct. at 519–20.  Standing existed, the Supreme Court explained, because that rule affected the counting of votes—which directly affected candidates competing for those votes. *Id.*  Here, by strong contrast, Section 2(a) does not change how votes are counted.  If Plaintiffs' contrary theory is accepted—where candidates can challenge any governmental practice that could *conceivably* affect an election—candidate standing would become boundless.  That, of course, makes Plaintiffs' theory implausible. *See United States v. Texas*, 599 U.S. 670, 681 (2023) (holding that by rejecting the plaintiffs' "expansive" and "novel standing argument," the Court "abide[d] by and reinforce[d] the proper role of the Federal Judiciary under Article III.").

5.    <u>Plaintiffs do not have associational standing to challenge Section 2(a).</u>

Plaintiffs also claim to have associational standing to bring suit on behalf of their members. DSCC Br. 13–16; LULAC Br. at 14–19; NAACP Br. at 37–40.  They do not.  An organization can only establish standing to bring suit on behalf of its members when establishes that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As part of the first requirement, Plaintiffs must identify specific members that have suffered or imminently will suffer an injury in fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009); *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 99 (D.D.C. 2025).  But Plaintiffs point to *zero* specific members who would be likely injured by the State Citizenship List—foreclosing associational standing here. *See Summers*, 555 U.S. at 497–98.  Their alleged harm to their members are the same as pled in their complaints: voting becoming more difficult, *see* DSCC Br. at 13–14; LULAC Br. at 14–17;

16

NAACP Br. at 37–39, and injury to privacy rights, *see* DSCC Br. at 15–16; LULAC Br. at 18; NAACP Br. at 39–40.  For the reasons explained above, both these alleged harms are far too speculative to confer standing.  *Clapper*, 568 U.S. at 414; *supra*, Section I.A.1, I.A.3.

### B.  Plaintiffs' challenges to Section 2(a) are not ripe.

The ripeness doctrine also precludes consideration of Plaintiffs' challenges to Section 2(a). In addition to the requirement for Plaintiffs to demonstrate "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical," *Carney v. Adams*, 592 U.S. 53, 60 (2020) (quotations omitted), they must show that the case is "ripe"— that is, not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation omitted).

This case is riddled with contingencies and speculation that impede judicial review. Crucially, it is unknown whether the State Citizenship List will even be created, let alone the how it will be done, as Section 2(a) qualifies its directive to the Secretary of Homeland Security that it shall compile and transmit the lists "[t]o the extent feasible and consistent with applicable law." EO § 2(a).  The Department of Homeland Security must therefore first assess whether it is feasible to create the State Citizenship Lists and, if it is, how it can do so in accordance with applicable law.  The Supreme Court has held that an identical condition in an executive order rendered a challenge to it unripe for judicial intervention while its implementation was still pending.  *See Trump v. New York*, 592 U.S. at 131 (rejecting judicial review of presidential where directive was qualified being "feasible" and "practicable").  Indeed, where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and take action 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time.  *Id.*  Like the executive

17

order in *Trump v. New York*, Section 2(a) "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132. Until the Secretary makes these determinations, judicial resolution of this dispute is premature.

## C. Plaintiffs do not have a cause of action to challenge Section 2(a) under the APA

Plaintiffs allege that Section 2(a) violates the Privacy Act of 1974. *See* DSCC Br. at 30–39; NAACP Br. at 22–31. However, the APA does not permit this challenge because there has been no final agency action. Plaintiffs' claims that the qualified directive in Section 2(a) itself is "final" is rebutted by the EO's express language and controlling precedent.

An agency action is "final" and judicially reviewable when it: (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 (1970)). Proposed rules ordinarily will not satisfy those two requirements. *See In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.). Thus, notices of rulemaking are not final agency actions. *See id.* For example, in *Center for Democracy & Technology v. Trump*, this Court dismissed a challenge to an executive order on ripeness grounds because the order "merely direct[ed] government officials to take *initial* steps in government processes that might (but may not) *eventually* lead to law governing private parties." 507 F. Supp. 3d 213, 217 (D.D.C. 2020). Under this framework, Section 2(a) is far from "final."

18

An executive order is also in itself not a final agency action because the President is not an "agency" under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796–801 (1992). Here, as in *Franklin*, "the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards." *Id.* Indeed, just a few months ago, another judge of this Court applied *Franklin* to another one of Plaintiffs' challenges to an executive order—explaining that "because 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." *LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) (quoting *Franklin*, 505 U.S. at 796). The Court should reaffirm that ruling and reject another mistaken attempt by Plaintiffs to challenge an executive order through the APA.

Notwithstanding this, Plaintiffs still claim that the "mandatory direction to DHS to create State Citizenship Lists itself amounts to final agency action," arguing that the use of the word "shall" prescribes only one possible outcome. NAACP Br. at 30. But Plaintiffs simultaneously ignore and omit from their argument the first phrase of Section 2(a): "To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 . . . ." EO § 2(a). By its plain terms, the State Citizenship List is not "mandatory" but rather contingent on a subsequent decision that the List being both feasible and assembled lawfully, including under the very Act that Plaintiffs claim will be violated. Critically, the Executive Order is only about one month old, and it remains to be seen if and how DHS and SSA will create and transmit the State Citizenship List. Indeed, even Plaintiffs' own pleadings acknowledge that it is unclear how federal agencies will do this, conceding that no final agency decisions has been reached yet. *See* LULAC Compl. ¶ 48 ("The Order does not specify what other databases" federal agencies should use "to

19

construct the State Citizenship List . . . .").  Section 2(a)'s qualifying language and the absence of a decision concerning whether and how the State Citizenship Lists will be created accordingly render Plaintiffs' cited authority inapposite.  *See LULAC I*, 780 F. Supp. 3d at 184 (concerning an executive order mandating specific action without any qualifiers) (cited NAACP Br. at 41–42); *AFL-CIO v. DOL*, No. CV 25-339 (JDB), 2026 WL 879518, at *12 (D.D.C. Mar. 31, 2026) (stating that "adopted and implemented" policy constitutes final agency action) (cited DSCC Br. at 32); *Center for Taxpayer Rights v. IRS*, No. 25-cv-0457, 2025 WL 3251044, at *41 (D.D.C. Nov. 21, 2025) (finding that "a final decision to adopt and implement a policy" was a final agency action) (cited DSCC Br. at 32); *L.A. Press Club v. Noem*, No. 2:25-CV-05563-HDV-E, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) (holding that plaintiffs did not plausibly allege a reviewable, "final decision or policy with respect to their challenged use of force policies. While the section of their [complaint] stating the APA cause of action alleges that Defendants have such policies, these allegations are conclusory and therefore not entitled to be taken as true.") (cited DSCC Br. at 32).

In response to this glaring problem, Plaintiffs' make the conclusory allegation that Section 2(a) is "final" because the Department of Homeland Security allegedly already decided that the State Citizenship List is feasible.  *See* DSCC Br. at 33.  But their "evidence" does not show this at all—and it does not prove entitlement to a preliminary injunction.  DSCC Plaintiffs' Exhibit 14 is a privacy impact assessment dated October 31, 2025, pertaining to a different executive order and merely noting the decision to make *existing* federal databases available to the States.  Doc. 55-16, at 5–6.  It does not indicate any decision about creating the State Citizenship Lists.  DSCC Plaintiffs' Exhibit 35 is a UCIS budget overview for fiscal year 2026 and discusses increasing funding for the SAVE program to enhance its infrastructure.  Doc. 55-37, at 14.  Again, this does not make any mention of the State Citizenship List, the Executive Order, or even election-related

20

expenditures.    Finally, Plaintiffs cite Exhibit 36, a *ProPublica* article, to argue that a DHS spokesperson's reported statement of working to "implement the President's policies," without any reference to the Executive Order or the State Citizenship List, shows that a DHS has a final decision about the List.  DSCC Br. at 33 (quoting Doc. 55-38, at 9).  But vague hearsay from third-party sources do not show even a "substantial likelihood" of final agency action.  Given that none of Plaintiffs' evidence mentions the State Citizenship List, let alone indicates a final decision on its implementation, the Court should find that no final agency action exists.

Without the APA, Plaintiffs do not have a cause of action under the Privacy Act and, in turn, cannot be granted injunctive relief.  Indeed, Plaintiffs fail to cite a single cause of action—aside from the APA—that allows them to enforce the Privacy Act and, without an applicable cause of action, Plaintiffs lack authority to sue under federal statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("Without [congressional authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *LULAC*, 808 F. Supp. 3d at 69 (D.D.C. 2025) (after dismissing Plaintiffs' APA claims against an executive order, holding that Plaintiffs lacked authority to enforce federal law because they possessed "'no express cause of action' under any federal statute" and equitable relief is "extremely limited" for federal statutory violations (citation omitted)).  Plaintiffs therefore do not have a cause of action to challenge.

### D.  Plaintiffs' challenge to Section 2(a) is doomed on the merits because the President has authority to gather and organize information within the Executive Branch.

Plaintiffs are also unlikely to succeed in challenging Section 2(a) because, fundamentally, their lawsuit fails to explain how courts can second-guess the President's ability organize information already within the Executive Branch's possession.  They cannot.  The President has

21

inherent authority to manage information within the Executive Branch's possession—especially when, as here, no statute suggests otherwise.  *See* U.S. Const. art. II.

The Constitution vests the executive power in the President alone, establishing him as "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."  *Clinton v. Jones*, 520 U.S. 681, 699 n.29 (1997).  "The President, of course, is the head of the Executive Branch, and in that capacity he has great powers with respect to its management."  *Am. Fed'n of Gov't Emp., AFL-CIO v. Freeman*, 498 F. Supp. 651, 658 (D.D.C. 1980).  This control naturally extends to personnel, resources, and materials throughout the Executive Branch.  For example, when the Supreme Court upheld the Presidential Recordings and Materials Preservation Act's rules for collecting and archiving presidential materials, the court emphasized that the Act did not infringe on separation of power principles because "the control over the materials remains in the Executive Branch."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 441 (1977).  In so doing, the Court implicitly recognized the constitutional tradition of presidential control over presidential materials and information.  *Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

Intervener States agree with Plaintiffs that the Supreme Court's framework in *Youngstown Sheet & Tube Co.* is useful.  *See* NAACP Br. at 13–14.  But Plaintiffs misapply that framework.  Given the President's inherent authority to supervise and manage the Executive Branch, this case falls in Justice Jackson's second category of presidential power, "[w]hen the President acts in absence of either a congressional grant or denial of authority."  *Youngstown Sheet & Tube Co. v.*

22

*Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring).  That means he can "rely upon his own independent powers."  *Id.*

Here, Plaintiffs cannot point to a statute that prohibits the President from compiling citizenship data already in the possession of the Executive Branch.  Under *Youngstown*, Plaintiffs' claim necessarily fails.  Plaintiffs are simply mistaken when they suggest that the President needs to point to statutory authority allowing him to compile the State Citizenship Lists.  *See id.*

Even if the President did not have inherent authority to compile citizenship information within the Executive Branch's possession, all agree he is empowered to act "'in relation to another branch's constitutionally authorized act'—*i.e.*, an act of Congress."  DSCC Br. at 21 (quoting *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023)).  Congress has made it a crime to provide a fraudulent ballot and for anyone other than eligible voters to cast ballots, *see* 18 U.S.C. § 611; 52 U.S.C. § 20511, and the Supreme Court has recognized that "the President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress."  *Trump v. United States*, 603 U.S. 593, 627 (2024) (quoting U.S. Const. art. II, § 3).  Because the State Citizenship Lists could be used to help enforce federal statutory prohibitions on non-citizen voting, Section 2(a) of the EO is valid "in relation to . . . an act of Congress."  *Meadows*, 88 F.4th at 1347.

In response, Plaintiffs suggest that Congress has *implicitly* limited the President's ability to make state-level lists of voting-age citizens by giving the States the responsibility of creating voter registration lists.  *See* DSCC Br. at 27; LULAC Br. at 37–40 (discussing 52 U.S.C. § 21083(a)(1)(A) (HAVA provision requiring the States to create a "computerized statewide voter registration list"), *and id.* § 20507(a) (NVRA provision charging the "administration of voter registration for elections for Federal office" to the States)).  But the State Citizenship Lists are *not*

meant to displace state voter registration lists—a point the EO itself makes clear. EO § 2(a). Rather, the intent is for States to use this *optional* federal resource to check their own voter registration lists for non-citizens. *Id.* Plaintiffs are thus simply mistaken when they assert that the State Citizenship Lists would "supplant or add to the list maintenance and voter verification requirements that Congress enacted." LULAC Br. at 39–40.

Plaintiffs also argue that an *ultra vires* claim should still be available to challenge Section 2(a) because the President has no constitutional authority to "interfere[] with state election procedures." DSCC Br. at 21 (quotations and citations omitted); *see also* LULAC Br. at 37 ("The President thus has no authority to interfere with state election procedures.") (quotations and citations omitted). But Section 2(a) does not interfere with election procedures at all, and Plaintiffs do not explain how the mere furnishing of the State Citizenship Lists impacts these procedures. The EO itself states that "State and Federal laws and State procedures must still be followed for an individual to be registered to vote," indicating plainly that the Lists are not meant to modify or supplant State election laws. EO § 2(a). None of the Plaintiffs identifies any authority for the proposition that the mere compiling of information already in the Executive Branch's possession runs afoul of Article II.

\*　　\*　　\*

Contrary to the apparent belief of some litigation activists, the federal courts lack authority to second-guess every conceivable choice the President makes. *See Trump v. Thompson,* 20 F.4th 10, 35 (D.C. Cir. 2021) ("Article III courts are generally ill-equipped to superintend or second guess the expert judgment of the sitting President about the current needs of the Executive Branch."). Just as courts surely could not second-guess a presidential directive to use staples instead of paperclips for multipage documents, courts do not have a roving commission to

micromanage how the President manages information already within the federal government's possession.

## II.    Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 2(b) of the Executive Order

Plaintiffs have also failed to meet their burden for an injunction to enjoin Section 2(b) because they cannot show they have standing to challenge it.  Section 2(b) directs the Attorney General to investigate and, as appropriate, prosecute "State and local officials," "individuals," and "public or private entities" who issue federal election ballots to non-citizens and other individuals not eligible to vote in a Federal election.  EO § 2(b).  Plaintiffs cannot show any actual or imminent injury from the enforcement of unchallenged election laws.  They do not dispute that, under federal and state law, only United States citizens aged 18 or older can vote and that the provision of fraudulent ballots is unlawful.  *See* 18 U.S.C. § 611; 52 U.S.C. § 20511.  The simple directive that the Attorney General enforce these laws does not confer standing.  The directive issued in Section 2(b) is also a matter of federal prosecutorial discretion and is not subject to judicial review.  *See Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 993 F.3d 880, 887 (D.C. Cir. 2021) (holding that "the FEC's exercise of prosecutorial discretion is unreviewable"); *see also United States v. Texas*, 599 U.S. at 680–81 ("[F]ederal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions. . . . Our constitutional system of separation of powers contemplates a more restricted role for Article III courts.") (internal quotation omitted).

In any event, Plaintiffs' claim that Section 2(b) "unconstitutionally trenches on the States' authority to maintain their own voter rolls" under "the risk of criminal prosecution" does not create standing.  LULAC Br. at 39.  This is an implausible reading of an order that *supports* "the right to vote . . . for citizens" and directs investigation of those who furnish ballots to ineligible non-

25

citizens.  EO §§ 1, 2(b).  But regardless of how Plaintiffs read the EO, a plaintiff's subjective and irrational fear of prosecution is simply not enough to confer standing under Article III.  *See Laird v. Tatum*, 408 U.S. 1, 13–14(1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Instead, where a plaintiff has yet to face prosecution under a law it seeks to challenge, it must "establish Article III standing by (1) 'alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and (2) demonstrating that 'there exists a credible threat of prosecution thereunder.'"  *Ord v. D.C.*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)).  In other words, Plaintiffs must show that the threat is "both credible and imminent," which also requires showing that "[plaintiffs'] prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution."  *Id.* at 1140–41 (internal quotations omitted).

The fanciful notion that Plaintiffs will be charged because of Section 2(b) depends on a "highly attenuated chain of possibilities."  *Clapper*, 568 U.S. at 410.  Plaintiffs would have to allege an intention to violate one of the election statutes under which the President directed enforcement.  That is, they would need to intentionally provide ballots to non-citizens or citizens who are under the age of 18, which they do not claim to have any intention of doing.  *See Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005) (requiring a "credible statement . . . of intent to commit [the] violative acts" at issue).  Also, Plaintiffs would have to prove a "credible threat of prosecution" simply for "help[ing] a voter obtain a ballot."  *See id.*; NAACP Compl. ¶ 144.  This is facially implausible.  Again, there are too many "dominoes that would have to fall" to confer standing.  *Elfant*, 52 F.4th at 257 (finding no credible threat of prosecution for violation of election

26

law where the circumstances leading to prosecution were speculative and depended in large part on the action of third parties). Plaintiffs' alleged fear of a chilling effect is therefore insufficient.

Finally, Plaintiffs also fail to demonstrate redressability. Even if this Court enjoins Section 2(b), existing unchallenged laws would still prohibit the provision and use of fraudulent ballots; that reality makes Plaintiffs' fear-of-prosecution injury not redressable. *See KH Outdoor, L.L.C. v. Clay Cnty.*, 482 F.3d 1299, 1301, 1303–04 (11th Cir. 2007) (holding that injury was not redressable because even if the court were to strike the challenged provision, there were other unchallenged regulations that would still have prohibited the act at issue); *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 331 (5th Cir. 2025) ("[R]edressability is undermined where an independent and unchallenged law also causes the plaintiff's injury."). Plaintiffs' request for a preliminary injunction should therefore be rejected as applied to Section 2(b) of the EO, and their challenges to it should be dismissed for lack of standing.

## III.   Plaintiffs Are Not Entitled to a Preliminary Injunction on Their Challenges to Section 3(b) of the Executive Order

### A.   Plaintiffs lack standing to challenge Section 3(b)

Section 3 directs the United States Postal Service to *initiate* rulemaking procedures for a rule requiring ballots to be mailed in officially marked envelopes that bear tracking codes. EO § 3(b)(i). Any forthcoming rule shall also provide for a "State-specific Mail-In and Absentee Participation List" "that the USPS shall provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State." *Id.* § 3(b)(iv). Additionally, the forthcoming rule shall provide that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. *Id.* § 3(b)(ii). Finally, under the EO, the forthcoming rule

27

shall provide that the USPS may "not transmit" absentee ballots from unidentified individuals who are not enrolled "on a State-specific list." *Id.* § 3(b)(iii).

To have standing, a challenged policy must be sufficiently concrete to assess whether a threatened injury is imminent. *See Trump v. New York*, 592 U.S. at 131–32. Here, that is impossible because a notice of proposed rulemaking has not even been issued yet—much less a final rule. *Cf. id*. And Plaintiffs admit that they are uncertain about what a potential USPS rule would provide for. For example, the DSCC Plaintiffs allege that the Executive Order "does not explain how USPS will create the Mail-In and Absentee Participation List." DSCC ¶ 71. Plaintiffs also allege that they lack knowledge of "how" the States' own absentee-voter lists "will inform the USPS's Mail-in and Absentee Participation List." *Id.* ¶ 73. Plaintiffs continue: "Nor does [the EO] specify the consequences if a State declines to send [its] list [of absentee voters], *as the Order implicitly acknowledges is within a State's authority*." *Id.* (emphasis added). Without knowledge even of the basic contours of the USPS's forthcoming rule, Plaintiffs lack standing and ripeness to challenge Section 3. *See Trump v. New York*, 592 U.S. at 131–32 (denying the plaintiffs standing because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time").

Unable to even articulate what they are challenging, Plaintiffs fail to articulate a concrete injury caused by Section 3 of the EO. Plaintiffs claim that Section 3 will prevent eligible voters from voting and undermine their electoral prospects. *See* DSCC Br. at 11–15; LULAC Br. at 21–22; NAACP Br. at 37–38. But Section 3 simply directs to the USPS to initiate rulemaking—it does not regulate the States directly and it does not directly inhibit *anyone*'s voting rights. Thus, Plaintiffs' alleged injury is not sufficiently traceable to Section 3 because Plaintiffs are not regulated by the EO. *See Babbitt*, 442 U.S. at 298 (To challenge a statute prospectively, Plaintiffs

28

must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.").

Plaintiffs' allegation of injury due to breaches of voter privacy ring hollow for similar reasons. *See* DSCC Compl. ¶¶ 103–05; LULAC Compl. ¶ 286; NAACP Compl. ¶ 212; DSCC Br. at 42–43. Plaintiffs admit they have no idea: (1) how the USPS "will create the Mail-In and Absentee Participation List," (2) "how" the State's own lists of absentee voters "will inform the USPS's Mail-in and Absentee Participation List," and (3) whether States will even suffer a penalty if they refuse to participate. DSCC ¶¶ 71, 73. Because Plaintiffs lack knowledge of how the USPS "will create the Mail-In and Absentee Participation List," *id.*, it is speculative to allege a "certainly impending" injury to voter privacy, *Clapper*, 568 U.S. at 410 (emphasis removed). To the contrary, a privacy injury is *unlikely* because the EO requires that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements." EO § 3(b)(iv).

Finally, the DSCC Plaintiffs unpersuasively try to advance a competitive standing theory to justify their challenge to Section 3. DSCC Br. at 11–13; DSCC Compl. ¶¶ 97–98. Specifically, they claim that Democrats are more likely than Republicans to vote by mail, and so the forthcoming USPS regulation will likely put Democrats at a competitive disadvantage. DSCC Br. at 11–13; DSCC Compl. ¶¶ 97–98.

But once again, this theory of injury rests on far too much speculation to be sufficiently concrete. *See Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 261–62 (D.D.C. 2015) ("It remains indispensable, however, that the increase in competition and the corresponding injury are 'imminent' and not merely 'speculative.'"); *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 26 (D.D.C. 2016) (denying an organization standing because the "alleged injury

hinges on the independent choices of third parties not before the Court" (cleaned up)).  As discussed above, it is too speculative to find that *any* voters will be wrongly removed from the States' voter registration lists and mail-in ballot lists.  *See supra* at Section A.1.  The fact that this theory of standing hinges on the additional assumption that this hypothetical outcome will disadvantage specifically those of a particular party affiliation pulls Plaintiffs even further away from Article III's concrete and imminent injury requirement.  Also, even positing Plaintiffs' assumptions that Democrats vote by mail more frequently and that the EO will reduce mail-in voting, Plaintiffs make a significant assumption by claiming that "fewer Democratic Party supporters [will] vote."  DSCC Br. at 11–13.  Of course, just because Democrats *prefer* to vote by mail does not mean Democrats *will not* vote in person, if required.  *Id.*  Thus, Plaintiffs' theory of competitive standing relies on impermissible speculation.

### B. Plaintiffs' challenges to Section 3(b) are not ripe.

Alternatively, even if this Court finds that Plaintiffs have standing, the Court should reject their challenges to Section 3 as prudentially unripe.  *See Church v. Biden*, 573 F. Supp. 3d 118, 135 (D.D.C. 2021) ("Even if a case is 'constitutionally ripe'" under Article III standing, "there may still be prudential reasons for refusing to exercise jurisdiction." (citation omitted)).  "The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes."  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (cleaned up).  This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 807 (2003) (citation omitted).  To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "fitness of the issues for judicial decision"; and (2) the "extent to which withholding a decision will cause hardship to the parties.'"  *Church*, 573 F. Supp. at 135 (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)).  Assessing whether an issue

is "fit" for adjudication requires courts to consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (citation omitted).

Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here. At the outset, Section 3 provides a broad outline of what the USPS regulation will include, but the administrative process remains ongoing and the processes for implementing the EO have not yet been published. *See* EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing unspecified "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List"). It would also be imprudent to review an executive order directing rulemaking when Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, DSCC ¶¶ 71, 73.

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause v. Trump*, 506 F. Supp. 3d 39, 46 (D.D.C. 2020) (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45 (first alteration in original). Moreover, the EO's direction that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law"

31

underscores the intention that said action be conducted lawfully and in accordance with the agency's regular rulemaking procedures set forth by statute. EO § 3(b)(iv)–(v). The "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of Section 3. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).

There has also not been any final agency action with respect to Section 3. Section 3 simply directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, and it specifies that "any final rule" by the USPS "shall be issued no later than 120 days from the date of this order." EO § 3(d). A notice of proposed rulemaking is an "intermediate agency action," not a "final" one. 5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 U.S. at 334–35. Thus, Plaintiffs cannot prematurely sue with the deadline for the USPS's "final rule" still three months away. EO § 3(d).

Given that USPS has not yet taken any final agency action, Plaintiffs likewise fail to show that "delayed judicial review would cause them 'immediate and significant hardship'" to satisfy the second prong for prudential ripeness. *Church*, 573 F. Supp. 3d at 136 (quoting *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012)). Premature adjudication of USPS's actions in the way Plaintiffs desire "denies the agency an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular rulemaking procedures. *See Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 369 (citation omitted). For these reasons, Plaintiffs' challenges to Section 3 are not ripe for adjudication.

### C. Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to engage in rulemaking.

In asking this Court to enjoin the President from issuing instructions to a federal agency, Plaintiffs are proposing an extraordinary intrusion on the President's constitutional authority.

DSCC Br. at 25; LULAC Br. at 27; NAACP Br. at 17.  But Plaintiffs fail to show any statute that clearly directs this extraordinary result.  And even if a statute did prevent the President from supervising USPS, such a statute would be unconstitutional.  *See* U.S. Const. art. II, § 1, cl. 1

       1. <u>Plaintiffs must, but cannot, identify a clear statement from Congress preventing the President from supervising USPS.</u>

Courts require clear statements from Congress before they will conclude Congress intended to interfere with the President's authority to supervise the executive branch.  For example, courts require a clear statement that Congress intended to limit the President's ability to freely remove executive officials.  *See, e.g.*, *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 778 (2025).  As another example, in *Franklin v. Massachusetts,* the Supreme Court held that where "[t]he President is not explicitly excluded from the APA's purview, but he is not explicitly included, either," "textual silence is not enough to subject the President to the provisions of the APA."  *Franklin*, 505 U.S. at 800–01.  Instead, "an express statement by Congress" is required.  *Id.*; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 748 n. 27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  These clear statement rules exist due to "respect for the separation of powers and the unique constitutional position of the President."  *Franklin*, 505 U.S. at 800–01.

Plaintiffs do not identify any clear statutory statements preventing the President from directing rulemaking within his own branch, specifically from USPS.  Rather, they cite statutory provisions that assign powers to others without an express exclusion of presidential authority.  For example, Plaintiffs cite to 39 U.S.C. § 202, which establishes the Board of Governors, but it does not "explicitly exclude[]" the President from exercising supervisory authority.  NAACP Br. at 18; DSCC Br. at 24.  *See Franklin*, 505 U.S. at 800–01.  The only mentions of the President in this section pertain to appointing the Governors.  Likewise, Plaintiffs point out that 39 U.S.C. § 401

33

grants USPS authority to "adopt, amend, and repeal such rules and regulations," NAACP Br. at 18, LULAC Br. at 25, but it does not prohibit the President from directing such actions. The same is true of 39 U.S.C. §§ 501–505, NAACP Br. at 18–19, DSCC Br. at 24, which authorizes the Postal Regulatory Commission to promulgate rules and regulations, but again, it does not expressly insulate the President from any supervisory role. These provisions are not the "explicit" denials of presidential authority that the Supreme Court demands. *Braidwood Management*, 606 U.S. at 778.

> 2. Any statute preventing the President from directing USPS rulemakings is unconstitutional.

Even if Plaintiffs could identify a statute clearly prohibiting the President from directing USPS rulemaking, it would be unconstitutional. The Constitution vests the entirety of the executive power in the President. U.S. Const. art. II, § 1, cl. 1. In exercising this power, the President must be able to control and supervise his subordinates in order to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010). Indeed, "the activities of executive officers may take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power, for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotations and citations omitted). Thus, the "thousands of officers [who] wield executive power" in the federal government "acquire[] [their] legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President." *Id.* at 11 (quoting *Free Enterprise Fund*, 561 U.S. at 498).

Given those constitutional rules, Congress cannot bar the President from supervising USPS. The Constitution protects the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 135 (1926).

34

Indeed, in *Myers*, the Supreme Court has already held that Congress cannot interfere with the President's ability to supervise the U.S. Postal Service.  There, the Supreme Court held that Article II prevents Congress from restricting the President's removal powers over post office officials. *See id.*  If Congress cannot prevent the President from *firing* postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials.

Nor does the Supreme Court's decision in *Humphrey's Executor v. United States* save Plaintiffs' claims.  295 U.S. 602 (1935).  The Supreme Court has already signaled its intent to overrule *Humphrey's Executor* and stayed an order preventing the removal of an FTC Commissioner.  *See Trump v. Slaughter*, 146 S. Ct. 18 (2025).  But even if *Humphrey's Executor* it is not overruled, the Supreme Court in *Humphrey's* explicitly suggested its rationale did not insulate postal officials from removal—on the rationale that such officials perform "executive functions."  295 U.S. at 627 ("The office of a postmaster is so essentially unlike the office now involved that the decision in the *Myers* Case cannot be accepted as controlling our decision here. A postmaster is an executive officer restricted to the performance of executive functions."); *see also U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 747 (2004) ("Postal Service has many powers more characteristic of Government than of private enterprise, including its state-conferred monopoly on mail delivery, the power of eminent domain, and the power to conclude international postal agreements.").

Nor could Plaintiffs analogize USPS to "financial institutions like the Second Bank and the Federal Reserve," which "can claim a special historical status" because they "have historically enjoyed some insulation from the President."  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 222 n.8 (2020).  Unlike the Federal Reserve, USPS does not share the same historical lineage of independence.  For most of the country's history, as Plaintiffs acknowledge, the

Postmaster General was a member of the President's Cabinet, and it was not until 1970 that Congress proclaimed the postal service an "independent establishment of the executive branch." NAACP Br. at 7 (quoting 39 U.S.C. § 201); *see also Flamingo Indus.*, 540 U.S. at 740 (providing historical overview).  Article II of the Constitution therefore prohibits Congress from interfering with the President's authority to supervise USPS—including by directing rulemaking.  *See Myers*, 272 U.S. at 135.

## **CONCLUSION**

The Court should deny Plaintiffs' motions for a preliminary injunction.

Date: May 1, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff**
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

37

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

38

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant**
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov

* *Government attorney admitted under Local Rule 83.2(e)*
** *Pro hac vice forthcoming*

39

## CERTIFICATE OF SERVICE

I certify that on May 1, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

_/s/ Louis J. Capozzi III_