**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01151-CJN |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTIONS TO DISMISS AND IN OPPOSITION TO PLAINTIFFS'**
**MOTIONS FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      Executive Order 14,399 ............................................................................................ 2

II.     Litigation Background .............................................................................................. 4

ARGUMENT........................................................................................................................ 7

I.      **These Suits Should be Dismissed.** ..................................................................... 8

        A.      Plaintiffs lack Article III standing............................................................ 9

        B.      Plaintiffs' claims are not ripe................................................................... 13

        C.      Plaintiffs' APA claims fail to challenge any final agency action. ......... 18

        D.      Plaintiffs fail to identify any viable cause of action for their statutory
                claims....................................................................................................... 27

        E.      Plaintiffs' claims challenging the enforcement priorities and enforcement
                discretion of the Executive Branch are independently unreviewable.......... 31

        F.      The President and the Department of Commerce should be dismissed............ 36

II.     **Plaintiffs Are Not Entitled to a Preliminary Injunction**............................................. 37

        A.      Plaintiffs have not carried their burden to demonstrate irreparable harm. .......... 37

        B.      Plaintiffs are not likely to succeed on the merits. .................................... 43

        C.      The balance of equities and the public interest disfavor injunctive relief. .......... 49

        D.      At a minimum, Plaintiffs' requested injunction is overbroad............................. 50

                1.      Any injunction should be narrowly tailored and respect the
                        Executive Order's severability clause........................................... 50

                2.      The Court should not issue any injunction against the President. ............ 51

                3.      The court should require Plaintiffs to post an injunction bond................. 53

CONCLUSION ...................................................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ............................................................................................... 13, 14

*AFL-CIO v. Dep't of Labor,*
778 F. Supp. 3d 56 (D.D.C. 2025) ............................................................................. 29

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) ................................................................................. 19

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................................................. 28, 29

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ................................................................................ 37

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025) .................................................................................... 29

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ................................................................................................... 51

*Ass'n of Flight Attendants-CWA v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015) ................................................................................... 24

*Bark v. United States Forest Serv.*,
37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................................... 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................... 18

*Beverly Health & Rehab. Servs., Inc. v. Feinstein*,
103 F.3d 151 (D.C. Cir. 1996) ...............................................................................33-34

*Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ............................................................................... 46, 48

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................... 50

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ..................................................................... 18, 24, 27

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ...................................................................................... 29, 30

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 37, 38, 41

*City & Cnty. of Denver v. N.Y. Trust Co.*,
   229 U.S. 123 (1913) ............................................................................................................ 43

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................................... 9, 10, 11

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ........................................................................................... 25

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020) ........................................................................ 10, 12, 13

*Defs. of Wildlife v. Perciasepe*,
   714 F.3d 1317 (D.C. Cir. 2013) .................................................................................... 12, 13

*Devia v. Nuclear Regul. Comm'n*,
   492 F.3d 421 (D.C. Cir. 2007) ...................................................................................... 16, 17

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988) ......................................................................................... 28

*Doe 2 v. Trump*,
   319 F. Supp. 3d 539 (D.D.C. 2018) ................................................................................ 36, 52

*DNC v. Trump*,
   No. 25-cv-587 (AHA), 2025 WL 1573181 (D.D.C. June 3, 2025) ........................................... 13

*Drake v. FAA*,
   291 F.3d 59 (D.C. Cir. 2002) ............................................................................................. 33

*Elec. Privacy Info. Ctr. ("EPIC") v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ............................................................................................ 43

*Equal Rts. Ctr. v. Uber Techs., Inc.*,
   525 F. Supp. 3d 62 (D.D.C. 2021) ...................................................................................... 12

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ..................................................................................................... 10, 13

*FDA v. Wages & White Lion Invs., LLC*,
    604 U.S. 542 (2025) ................................................................................................... 40

*FDIC v. Bank of Am., N.A.*,
    783 F. Supp. 3d 1 (D.D.C. 2025) ............................................................................. 19

*Fed. Express Corp. v. Dep't of Com.*,
    39 F. 4th 756 (D.C. Cir. 2022) ................................................................................. 29

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ......................................................................................... *passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................................... 51

*Gill v. Whitford*,
    585 U.S. 48 (2018) ..................................................................................................... 50

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
    639 F.3d 1078 (D.C. Cir. 2011) ............................................................................... 43

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) ................................................................................. 29

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................................... 51

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................ 31, 32, 33, 34

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ............................................................................... 19

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) ................................................................. 1, 19, 25, 39

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ................................................................................. 24

*J.G.G. v. Trump*,
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ..................................... 51

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ................................................................................. 37

*Latif v. Obama*,
677 F.3d 1175 (D.C. Cir. 2012) .................................................................................. 40

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
No. 25-cv-946 (CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026) ............................. 21

*League of Women Voters v. DHS*,
No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025). ................... 23, 24

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ............................................................................................. 32, 34

*Los Angeles v. Lyons*,
461 U.S. 95 (1983) ...................................................................................................... 15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ 9, 10, 35

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ............................................................................................. 16, 43

*LULAC v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................................. 27

*Maryland v. King*,
567 U.S. 1301 (2012) .................................................................................................. 49

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
103 F.4th 830 (D.C. Cir. 2024) .................................................................................. 30

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) .................................................................................................... 51

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .......................................................................... 36, 51, 52

*Mittleman v. Postal Regulatory Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) ................................................................................... 19

*Munaf v. Geren*,
553 U.S. 674 (2008) .................................................................................................... 43

*Murthy v. Missouri*,
603 U.S. 43 (2024) ...................................................................................................... 11

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ................................................................................................ 13

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ............................................................................... 52

*Nat'l Treasury Emps. Union v. Trump,*
No. 25-5157, 2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) .............................. 53

*Nat'l Urb. League v. Trump,*
783 F. Supp. 3d 61 (D.D.C. 2025) ................................................................... *passim*

*New York v. Trump,*
485 F. Supp. 3d 422 (S.D.N.Y. 2020) ..................................................................... 14

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) .............................................................................. 53

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ................................................................................................ 52

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................ 37

*Northern Air Cargo v. USPS*,
674 F.3d 852 (D.C. Cir. 2012) ................................................................................ 19

*NRC v. Texas*,
605 U.S. 665 (2025) ............................................................................................ 29, 30

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ................................................................................ 29

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) ................................................................................................ 16

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. F.E.R.C.*,
962 F.2d 27 (D.C. Cir. 1992) .................................................................................. 12

*Raines v. Byrd*,
521 U.S. 811 (1997) ................................................................................................ 34

*Reno v. Cath. Soc. Servs., Inc.*,
509 U.S. 43 (1993) .............................................................................................. 13-14

*Sec'y of Lab. v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006) ................................................................................. 33

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ................................................................................................. 49

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ................................................................................. 46

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ................................................................................................. 34

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........................................................................................... 11, 16

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ............................................................................... 28

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ................................................................................. 52

*Texas v. United States*,
523 U.S. 296 (1998) ................................................................................................. 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...................................................................................... 9, 35, 47

*Trump v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) ................................................................................. 16, 17, 40

*Trump v. New York*,
592 U.S. 125 (2020) ......................................................................................... passim

*Trump v. United States*,
603 U.S. 593 (2024) ................................................................................................. 47

*U.S. ex rel. McLennan v. Wilbur*,
283 U.S. 414 (1931) ................................................................................................. 52

*USPS v. Gregory,*
534 U.S. 1 (2001) ..................................................................................................... 40

*United Presbyterian Church in the USA v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) ............................................................................... 13

*United States v. Armstrong*,
517 U.S. 456 (1996) ................................................................................................. 33

*United States v. Nixon*,
  418 U.S. 683 (1974) ............................................................................................... 47

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................................................................... 48

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................. 8, 34, 35, 47

*Washington v. FEC*,
  993 F.3d 880 (D.C. Cir. 2021) .............................................................................. 33

*Westcott v. McHugh*,
  39 F. Supp. 3d 21 (D.D.C. 2014) .......................................................................... 29

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ......................................................................................... 10, 12

*Wilbur v. U.S. ex rel. Kadrie*,
  281 U.S. 206 (1930) ............................................................................................... 52

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 8, 37

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 37

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 .................................................................... 35, 45, 49

U.S. Const. art. II, § 3 ............................................................................. 35, 47, 49

## Statutes

5 U.S.C. § 552a ............................................................................................ 21, 28, 44

5 U.S.C. § 701 .............................................................................................. 7-8, 26, 31

5 U.S.C. § 704 .............................................................................................. 7, 18, 27, 43

18 U.S.C. § 2 ........................................................................................................... 4

18 U.S.C. § 241 ....................................................................................................... 4

18 U.S.C. § 371 ....................................................................................................... 4

18 U.S.C. § 611 ................................................................................................ 1, 4, 34

18 U.S.C. § 1001 ..................................................................................................... 4

18 U.S.C. § 1015 ..................................................................................................... 4

21 U.S.C. § 301 *et seq.* ........................................................................................ 32

39 U.S.C. § 101 ..................................................................................................... 30

39 U.S.C. § 403 ..................................................................................................... 44

39 U.S.C. § 410 ..................................................................................................... 19

39 U.S.C. § 3001 ................................................................................................... 19

52 U.S.C. § 10307 .............................................................................................. 4, 34

52 U.S.C. § 20511 .............................................................................................. 4, 34

**Rules**

Federal Rule of Civil Procedure 12 ....................................................................... 27

Federal Rule of Civil Procedure 65 ....................................................................... 53

**Regulations**

Executive Order No. 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021) ............................... 16

Executive Order 13,295, 68 Fed Reg. 17,255 (Apr. 4, 2003) ...................................... 12

Executive Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025) ...................................... 16

Executive Order 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025). ..................................... 16

Executive Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ........................... *passim*

**Other Authorities**

Sophie Nieto-Munoz, Democrat Analilia Mejia Wins Special House Election, New Jersey
    Monitor (April 16, 2026, at 8:09 pm),
    https://newjerseymonitor.com/2026/04/16/analilia-mejia-special-house-election/ ............ 38, 42

**INTRODUCTION**

The President of the United States signed Executive Order 14,399 on March 31, 2026. This Executive Order is an intra-Executive Branch directive from the President to his subordinates, which by itself changes nothing about the administration of any election. This litigation, nonetheless, began the very next day. As a result of Plaintiffs' rush to the courthouse, these three suits were each filed well before any agency had taken any steps to implement the Executive Order—and before the agency defendants even *knew* how they might try to implement the President's directions, or on what timeline. Even to this day, none of the possible future agency actions contemplated by the Executive Order have been finalized—and some have not even started.

As one particularly obvious example, although it is black-letter administrative law that courts "do not have authority to review proposed agency rules," *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.), the core of this lawsuit seeks to short-circuit future rulemaking at the United States Postal Service—not just before a final rule has been published, but before a rule has even been *proposed*. That is not how this works. Whatever concerns Plaintiffs may have about possible future agency actions that may be taken to implement the Executive Order, there is currently nothing to litigate, much less to enjoin. Both as a practical matter and a doctrinal matter, the government cannot defend—and this Court cannot opine on—the validity of agency actions that do not exist, and the critical parameters of which have not even been decided.

To be clear, all agree that U.S. citizens may vote by mail when permitted by state and federal law. And all agree that non-citizens may not vote in federal elections—by mail or otherwise. *See, e.g.*, 18 U.S.C. § 611(a). Nobody has an interest in widespread, haphazard, or unlawful disenfranchisement of eligible U.S. citizen voters. But that is not what the Executive Order aims to do, and (more importantly here) that is certainly not how agencies intend to implement it. This

Court need not (and should not) adopt the most pessimistic interpretation of how the Order *could* be implemented, as Plaintiffs do. After all, further clarity may be coming soon, and may result in different (or fewer, or narrower) questions to litigate than those raised in Plaintiffs' heated filings.

Of course, if any or all of Plaintiffs' speculative fears turn out to be real, and some agency takes some discrete action that causes some concrete injury (or is going to imminently cause such an injury), Plaintiffs can seek relief at that time. But at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (dismissing pre-implementation challenge to Presidential Memorandum on standing and ripeness grounds). Accordingly, Plaintiffs' motions for a preliminary injunction should be denied, and these premature suits should each be dismissed—without prejudice—in their entirety.

## BACKGROUND

### I.    Executive Order 14,399

On March 31, 2026, President Trump issued Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("Executive Order", "Order", or "E.O."). As relevant here, the Order does three different things.

**State Citizenship Lists.** First, the Order directs the "Secretary of Homeland Security . . . in coordination with the Commissioner of [the Social Security Administration]" to "the extent feasible and consistent with applicable law" to "compile and transmit" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." E.O. § 2(a). "The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* Additionally, "[t]he Secretary of Homeland Security shall establish procedures to (i) allow individuals to access their

individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." *Id.*

The Order also directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" "within 90 days of the date" of the Order, which is by June 29, 2026. *Id.* § 4(c). The Secretary of Homeland Security, the SSA Commissioner, and the Secretary of Commerce are charged with coordinating to implement the State Citizenship Lists. *Id.* § 4(a). The State Citizenship List "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election." *Id.* § 2(a).

The Order does not specify any particular purpose or intended use for the State Citizenship Lists, and (other than their creation by the Department of Homeland Security ("DHS") and transmission to States) does not require anyone inside or outside of the federal government to do anything with those lists. As of this filing, no such lists have been created, nor has any of the "infrastructure" contemplated by Section 4(c) of the Order. *See* Ex. 1, Decl. of M. Mayhew ("Mayhew Decl.") ¶¶ 5-8; Ex. 2, Decl. of J.B. MacBride ("MacBride Decl.") ¶¶ 4-6.

**Postal Service Rulemaking.** Second, the Order directs the United States Postal Service ("USPS" or "the Postal Service") "to initiate a proposed rulemaking" with regards to ballot mail for Federal elections to conform to certain design requirements and to develop procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]." E.O. § 3. Those lists would be distinct from the State Citizenship Lists contemplated by Section 2(a). The Order directs the Postal Service to begin the proposed rulemaking "within 60 days of" the Order, which is May 30, 2026. *Id.* § 3(b). The Order further states that "[a]ny final rule" that could result

from this rulemaking "shall be issued no later than 120 days from the date" of the Order, which is July 29, 2026. *Id.* § 3(d). The Order also identifies some proposed provisions for inclusion in the notice of proposed rulemaking, *id.* § 3(b)—though it does not say anything about whether any or all of those provisions should also appear in any final rule. As of this filing, no notice of proposed rulemaking has been issued. *See* Ex. 3, Decl. of S. Monteith ("Monteith Decl.") ¶ 4.

**Criminal Enforcement Priorities.** Third, the Order generally tasks the "Attorney General and the heads of executive departments" to "take all lawful steps to deter and address noncompliance with Federal law." E.O. § 5. The Order further directs that "[e]vidence of violations of existing Federal laws . . . may be referred to the Department of Justice for consideration of investigation or charges under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* And the Order provides that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* § 2(b).

## II     Litigation Background

Executive Order 14,399 was issued on March 31, 2026. 91 Fed. Reg. 17,125. The very next day, on April 1, 2026, the *DSCC* Plaintiffs[1] filed suit. *DSCC v. Trump*, No. 26-cv-1114

---

[1] *DSCC* was brought by the Democratic Senatorial Campaign Committee (DSCC), Democratic Congressional Campaign Committee (DCCC), Democratic National Committee, Democratic Governors Association, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House Minority Leader Hakeem S. Jeffries (collectively "*DSCC* Plaintiffs") against President Trump, the Executive Office of the President, the Department of Justice (DOJ), the Postal Service, DHS, U.S. Citizenship and Immigration Services (USCIS), SSA, the Department of Commerce, and various

(D.D.C. Apr. 1, 2026), ECF No. 1. The *DSCC* Plaintiffs challenge sections 2(a), 3(b), 4(a), and 4(c) of the Order under seven counts, invoking *ultra vires* review, the separation of powers, statutory-authority claims relating to the Postal Service, the Privacy Act, the Administrative Procedure Act ("APA"), the First and Fifth Amendments to the U.S. Constitution, and the Voting Rights Act. *Id.* ¶¶ 106-172 and at 59-60 (Prayer for Relief).

The day after that, on April 2, 2026, the *LULAC* Plaintiffs[2] filed suit. *League of United Latin American Citizens v. Exec. Off. of the President*, No. 26-cv-1132 (D.D.C. Apr. 2, 2026), ECF No. 1. The *LULAC* Plaintiffs challenge sections 2(a), 3(b)(iii), and 3(b)(iv) of the Order under five counts, invoking *ultra vires* review, the separation of powers, the APA, and Privacy Act claims. *Id.* ¶¶ 214-327 and at 72 (Prayer for Relief).

The day after that, on April 3, 2026, the *NAACP* Plaintiffs[3] filed suit. *NAACP v. Trump*, No. 26-cv-1151 (D.D.C. Apr. 3, 2026), ECF No. 1.[4] In their complaint, the *NAACP* Plaintiffs challenge sections 2(a), 3(b), 4(a), and 4(c) of the Order under six counts, invoking *ultra vires*

---

department and agency heads in their official capacities. Compl. for Declaratory & Injunctive Relief ¶¶ 11-23, ECF No. 1 ("*DSCC* Compl.").

[2] *LULAC* was brought by the League of United Latin American Citizens, the Secure Families Initiative, and the Arizona Students' Association (collectively "*LULAC* Plaintiffs") against the Executive Office of the President, the Postal Service, the Board of Governors of the United States Postal Service, DHS, USCIS, SSA, the Department of Commerce, DOJ, and various department and agency heads in their official capacities. Compl. for Declaratory & Injunctive Relief ¶¶ 9-43, *LULAC* ECF No. 1 ("*LULAC* Compl.").

[3] *NAACP* was brought by the National Association for the Advancement of Colored People ("NAACP"), Common Cause, the Common Cause Education Fund, Black Voters Matter Fund, Inc., and BVM Capacity Building Institute, Inc. (collectively "*NAACP* Plaintiffs") against President Trump, the Executive Office of the President, DOJ, the Postal Service, the Postal Service Board of Governors, DHS, USCIS, SSA, the Department of Commerce, and various department and agency heads in their official capacities. Compl. ¶¶ 17-50, *NAACP* ECF No. 1 ("*NAACP* Compl.").

[4] Citations to the docket in *DSCC* will simply reference the ECF No. (*e.g.*, ECF No. ##). Citations to the docket in *LULAC* and *NAACP* will be in the form: *LULAC* ECF No. ## and *NAACP* ECF No. ##.

review, the separation of powers, the First and Fifth Amendments, statutory-authority claims relating to the Postal Service, and the APA.  *Id.* ¶¶ 214-327 and at 67-68 (Prayer for Relief).

With their complaints, the *DSCC* and *LULAC* Plaintiffs filed related-case notices to *League of United Latin Citizens v. Exec. Off. of the President*, No. 25-cv-946, an earlier case relating to a different voting-related Executive Order, in which final judgment had already been entered by Judge Kollar-Kotelly.  Notice of Designation of Related Civil Cases, ECF No. 2; Notice of Designation of Related Civil Cases, *LULAC* ECF No. 2.  The *NAACP* Plaintiffs then filed a related-case notice to *DSCC* and *LULAC*.  Notice of Designation of Related Civil Cases, *NAACP* ECF No. 2.  Consequently, all three cases were originally assigned to Judge Kollar-Kotelly.  On April 8, 2026, Defendants filed objections to the *DSCC* and *LULAC* related-case notices under Local Rule 40.5(b)(2).  Defs.' Objection to Pls.' Notice of Related Case, ECF No. 23; Defs.' Objection to Pls.' Notice of Related Case, *LULAC* ECF No. 16.  Judge Kollar-Kotelly then issued an opinion and order agreeing that *DSCC* and *LULAC* were not related to the prior case within the meaning of the Local Rules.  Order at 8, ECF No. 26.  All three cases (*DSCC*, *LULAC*, and *NAACP*) were then reassigned to this Court.

On April 8, 2026, the *LULAC* Plaintiffs moved for expedited discovery.  *LULAC* ECF No. 17.  This Court denied that motion without prejudice.  *See* Minute Order of Apr. 12, 2026.

On April 9, 2026, this Court issued an order consolidating these cases.  Order, ECF No. 27.  Plaintiffs filed motions for preliminary injunction on April 10, 2026.  ECF No. 34; *LULAC* ECF No. 29; *NAACP* ECF No. 37.  One week later, after requesting and receiving an (unopposed) extension of time, *see LULAC* Minute Order of Apr. 9, 2026, on April 17, 2026, Plaintiffs filed memoranda of law in support of their motions for preliminary injunction.  Mem. in Supp. of *LULAC* Pls.' Mot. for Prelim. Inj., ECF No. 53 ("*LULAC* PI Br."); Mem. in Supp. of *NAACP* Pls.'

Mot. for Prelim. Inj., ECF No. 54 ("*NAACP* PI Br."); Mem. in Supp. of *DSCC* Pls.' Mot. for Prelim. Inj., ECF No. 55 ("*DSCC* PI Br.").

On April 20, 2026, a group of States moved to intervene as Defendants, ECF No. 77, which all parties opposed (in whole or in part), *see* ECF Nos. 88, 89, 90, 95, 98.  The Court denied the motion for intervention as of right, but granted the alternative request for permissive intervention. *See* Minute Order of Apr. 30, 2026.

Finally, two additional cases challenging this Executive Order were also filed in the U.S. District Court for the District of Massachusetts: *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass. Apr. 2, 2026) ("*LWVMA*") and *California v. Trump*, No. 26-cv-11581 (D. Mass. Apr. 3, 2026).  The *California* Plaintiffs have moved for summary judgment, *California* ECF No. 106, and the *LWVMA* Plaintiffs have moved for a preliminary injunction, *LWVMA* ECF No. 74.  Briefing on those motions (and Defendants' forthcoming motions to dismiss) is ongoing. An omnibus hearing on those motions is scheduled for June 2, 2026.  *LWVMA* ECF No. 57; *California* ECF No. 88.

## **ARGUMENT**

These suits should be dismissed, without prejudice, in their entirety.  Most fundamentally, that is because "[a]t present, this case is riddled with contingencies and speculation that impede judicial review," *Trump v. New York*, 592 U.S. at 131, which is fatal to the subject-matter jurisdiction of this Court under settled principles of Article III standing and ripeness.  On top of that, Plaintiffs fail to challenge any "final agency action" under the APA, 5 U.S.C. § 704, and fail to identify any other viable cause of action for their statutory claims.  In addition, Plaintiffs' challenges to policies of enforcement discretion are "committed to agency discretion by law" under 5

U.S.C. § 701(a)(2), and similarly fail to cause any Article III injury that is "traditionally redressable in federal court." *United States v. Texas*, 599 U.S. 670, 676 (2023).

Even if Plaintiffs' complaints could survive dismissal, at the very least, their motions for a preliminary injunction should be denied. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). But before any agency has implemented the Executive Order, Plaintiffs face no actual (or imminent) harm—irreparable or otherwise. For similar reasons, Plaintiffs are not likely to succeed on the merits of any facial challenge to the Executive Order itself, as agencies fully intend (and should be presumed) to interpret it lawfully, rather than unlawfully. And there is no public interest in enjoining ongoing government deliberations. Instead, the Court should "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of exercising judicial review later, if necessary, over any final agency action that causes Plaintiffs any injury.

Of course, if Plaintiffs' speculative and pessimistic predictions about how the Order *might* be implemented turn out to be right, they can sue (or even seek preliminary relief) at that time. But until then, Plaintiffs' suits should be dismissed, and their motions for a preliminary injunction should be denied.

## I.    THESE SUITS SHOULD BE DISMISSED.

This litigation—initiated one day after the President signed Executive Order 14,399—is premature. Because Plaintiffs seek relief against agency actions that do not yet exist—and that might never exist in the form that Plaintiffs speculate—Plaintiffs cannot establish standing, ripeness, or final agency action subject to review under the APA. In addition, several claims are subject to dismissal as improper efforts to manage the enforcement discretion of the Executive Branch,

which is committed to agency discretion by law. For these reasons, this suit should be dismissed, in its entirety, without prejudice. If and when the Executive Branch takes some action to implement the Executive Order, any Plaintiff who has suffered a concrete injury (or faces an imminent one) can seek relief at that time—at a time when the parties and the Court will have a better understanding of what (if anything) the government is actually *doing* to carry out the directives in Executive Order 14,399. But at least at this early stage, this lawsuit seeks nothing more than an advisory opinion about the legality of possible future agency actions—actions that might ultimately bear little resemblance to the speculative assumptions that animate Plaintiffs' filings. This is why plaintiffs ordinarily do not file lawsuits based only on (to use Plaintiffs' words) "circumstantial evidence of agency action," *DSCC* PI Br. at 34 n.12—they wait for *actual* (and final) agency action. Article III and the APA demand no less.

### A.  Plaintiffs lack Article III standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At least before the Executive Order has actually been implemented—and especially now, before the government (much less Plaintiffs) even *knows* how the Executive Order will be implemented— Plaintiffs cannot satisfy these basic prerequisites for judicial review.

To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is

certainly impending." *Id.* (emphasis omitted) (quoting *Lujan*, 504 U.S. at 564 n.2).  To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."). In addition, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (citation omitted).

Executive Order 14,399 is an intra-Executive Branch directive from the President to his subordinates—which, of its own force, does not change anything at all about elections in any State. It does not require anyone outside the government—and certainly not any of Plaintiffs—to do (or refrain from doing) anything at all.  Generally, these sorts of "intra-governmental mandates" in an Executive Order "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion")*, vacated as moot sub nom. Center for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021).  So too here.

Ultimately, Plaintiffs' real concern is not with the Executive Order, standing alone—which does not do anything other than guide possible future policymaking within the Executive Branch. Instead, Plaintiffs fear (1) the possible future creation of State Citizenship Lists by DHS (assuming creation of such a list turns out to be "feasible" and "consistent with applicable law," E.O. § 2(a));

- 10 -

(2) a possible future rule that may be issued by the Postal Service (of uncertain scope, for which neither a notice of proposed rulemaking nor a final rule has been announced); and (3) possible future criminal investigations or prosecutions.  But currently, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper*, 568 U.S. at 409—after all, it is unknown how the agencies referenced in the Order will implement it, or on what timeline, or under what parameters, or using what processes.  Indeed, the relevant agencies *themselves* are still deliberating regarding the Executive Order's possible future implementation.  *See* Monteith Decl. ¶ 3; Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  That genuine and ongoing uncertainty is fatal to any theory of standing that relies on predictions about possible future agency actions.  *See, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 82 (in denying a preliminary-injunction motion challenging an Executive Order, explaining that "uncertainty cuts against Plaintiffs here because they bear the burden of 'mak[ing] a clear showing that [they] are likely to establish each element of standing'" (alteration in original) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58, 144 (2024))).

By the same token, the sharp disconnect between Plaintiffs' complaints (which challenge the Executive Order) and their possible future injuries (which would stem, if at all, from future implementation actions) also gives rise to an independently fatal causation (or traceability) problem.  In short, "the source of any injury to the plaintiffs is the action that the [government] *might* take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).  That is also fatal to these suits, which challenge (and only could challenge) the Executive Order itself—after all, the future implementation actions that Plaintiffs fear do not even exist, at least as of the date of this filing.  And they certainly did not exist on the day this litigation began,

- 11 -

one day after issuance of the Executive Order. But "the relevant state of affairs for the purpose of determining standing to sue in the context of a motion to dismiss are facts known to the plaintiff at the time the complaint is filed, regardless of what may have transpired in the interim." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 76 (D.D.C. 2021) (K.B. Jackson, J.).

Ultimately, whether considered a problem of injury or causation, put simply, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013). That is true even where (as here) the contours of that possible future regulation are, in some way, foreshadowed by other legal documents (*i.e.*, the Executive Order), even "using a specific timeline." *Id.*; *see also Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 222 (no standing to challenge Executive Order 13,295, which directed two federal agencies to "expeditiously propose regulations" preventing online censorship by social-media companies (citation and emphasis omitted)). In the interim, Plaintiffs' rights are "not impaired by the initiation of a rulemaking" or other policymaking process—after all, they "will not be precluded from participating in the rulemaking and, if [the government] decides to issue a final rule," they are "not precluded from challenging that rule." *Perciasepe*, 714 F.3d at 1325; *see also Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)).

To be clear, this result does not foreclose the possibility of future judicial review. As agencies eventually implement the Order, "Defendants might, of course, interpret and apply the [Executive Order] in a way that creates a cognizable injury traceable to their conduct." *Nat'l Urb. League*, 783 F. Supp. 3d at 82-83. "[T]hat is when Plaintiffs would have the requisite 'personal

stake'" that supports standing. *Id.* at 81 (emphasis omitted) (quoting *All. for Hippocratic Med.*, 602 U.S. at 379). Any concretely injured Plaintiff can sue at that time—challenging whatever allegedly unlawful agency actions cause them an actual (or imminent) injury. But "[u]ntil then, Plaintiffs are at most 'concerned bystanders' to internal Executive Branch processes." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 382); *see also, e.g.*, *United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.) (no standing to challenge Executive Order on the theory that it might lead to agencies taking future adverse actions against the plaintiffs); *Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 223 ("To be sure, the government might issue regulations that CDT does not like. But it is just as possible that it will not. 'Article III standing requires more than the possibility of potentially adverse regulation.'" (emphasis omitted) (quoting *Perciasepe*, 714 F.3d at 1324-25)); *DNC v. Trump*, No. 25-cv-587 (AHA), 2025 WL 1573181, at *6 (D.D.C. June 3, 2025) ("[T]he committees' allegation of current burdens out of fear that the President or Attorney General will apply section seven of the executive order to the FEC or its Commissioners, reasonable or not, is not Article III injury.").

## B.    Plaintiffs' claims are not ripe.

Plaintiffs' claims independently fail because they are not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509

U.S. 43, 57 n.18 (1993). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). Courts typically consider both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 301 (quoting *Abbott Labs.*, 387 U.S. at 149).

Even if Plaintiffs could show standing, their claims are not ripe. The Supreme Court's decision in *Trump v. New York*—dismissing as unripe another premature challenge to a not-yet-implemented Presidential directive—is all-but-dispositive here (as a matter of standing, ripeness, or both). In that case, President Trump issued a memorandum during the 2020 decennial census that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status.'" *Trump v. New York*, 592 U.S. at 129-30 (quoting Presidential Memorandum, *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)). That directive also called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" *Id.* (quoting 85 Fed. Reg. at 44,680).

Without waiting for the President's policy to be implemented, however, a group of plaintiffs sued immediately, arguing that "the exclusion of aliens on the basis of legal status would contravene the requirement . . . that the President state the 'whole number of persons in each State' for purposes of apportionment." *Trump v. New York*, 592 U.S. at 130 (quoting *New York v. Trump*, 485 F. Supp. 3d 422, 477 (S.D.N.Y. 2020)). To show standing, they argued that "the memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect." *Id.* A three-judge court entered broad injunctive relief. *See id.*

- 14 -

The Supreme Court vacated the injunction and remanded with instructions to dismiss for lack of jurisdiction, holding that "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. In doing so, the Court acknowledged that "[t]he President, to be sure, ha[d] made clear his desire to exclude aliens without lawful status from the apportionment base." *Id.* at 131. Even so, "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. at 44,680). As a result, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture' at th[at] time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132.

So too here. Much like the Presidential Memorandum at issue in *Trump v. New York*, Executive Order 14,399 also specifies that key provisions shall be implemented only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act." E.O. § 2(a); *see also id.* § 7(b) (instructing that the Executive Order "shall be implemented consistent with applicable law."). And Section 3 of the Order requires multiple discrete implementation steps, including an as-yet-unpublished notice of proposed rulemaking and the (possible) eventual publication of a final rule, the scope of which is not dictated by the Order. *Id.* § 3. In sum, just as in *Trump v. New York*, "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." 592 U.S. at 133. By the same token, "the source of any injury to the plaintiffs is the action that the Secretary

- 15 -

or President *might* take in the future to" implement the Executive order—"not the policy itself 'in the abstract.'" *Id.* at 133-34 (quoting *Summers*, 555 U.S. at 494).

Under these circumstances, "[l]etting the Executive Branch's decisionmaking process run its course" would "bring[] 'more manageable proportions' to the scope of the parties' dispute." *Id.* at 134 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)); *see also, e.g.*, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (asking whether "consideration of the issue would benefit from a more concrete setting" (citation omitted)). "And in the meantime the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or to refrain from doing anything'" at all. *Trump v. New York*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).[5]

Justice Sotomayor recently invoked similar reasoning in litigation over another Executive Order, concurring in the grant of the government's motion for a stay. *See Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025). In that case, Executive Order 14,210 provided that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." Exec. Order 14,210, § 3(c), 90 Fed. Reg. 9,669 (Feb. 11, 2025). After a district court entered broad injunctive

---

[5] As it turns out, the Supreme Court's decision to order dismissal of *Trump v. New York* on standing and ripeness grounds was vindicated by subsequent events: the Presidential Memorandum at issue there turned out *not* to be "feasible to implement in any manner whatsoever" before the end of President Trump's first term. 592 U.S. at 132. That Presidential Memorandum was eventually revoked by President Biden, apportionment proceeded as usual, and no further litigation was necessary. *See Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census*, Exec. Order 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by* Exec. Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025). That is one benefit of adherence to the ripeness doctrine—the possibility that the parties' dispute will narrow or resolve itself without the need for judicial involvement.

relief against that Executive Order (as well as a high-level implementing memorandum from the Office of Management and Budget (OMB)), the United States sought and obtained a stay from the Supreme Court. In its stay order, the Supreme Court "express[ed] no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum." *Am. Fed'n of Gov't Emps.*, 145 S. Ct. at 2635. It didn't have to—because the injunction was improperly "based on [the district court's] view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves," which were "not before th[e] Court." *Id.* Much the same could be said of Plaintiffs' filings here.

In concurring in the grant of a stay, Justice Sotomayor emphasized her view "that the President cannot restructure federal agencies in a manner inconsistent with congressional mandates." *Id.* (Sotomayor, J., concurring). Even so, she acknowledged that "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law.'" *Id.* (citation omitted). And because "[t]he plans themselves [were] not before th[e] Court, at th[at] stage," the Supreme Court "ha[d] no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Id.*

Again, the same logic applies here. If any agency takes some final action to implement the Executive Order in a way that causes any actual (or imminent) concrete injury to Plaintiffs, they can sue then. But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. at 131. And "[f]ederal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." *Devia*, 492 F.3d at 424-25 (citation omitted); *see also, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 79 (no jurisdiction to challenge provision of an Executive Order requiring creation of a list, because the "provision does not

tell the OMB Director to do anything with the list once he gets it"). This litigation should thus be dismissed as unripe—without prejudice—in its entirety.

### C.   Plaintiffs' APA claims fail to challenge any final agency action.

Collectively, Plaintiffs challenge all of the key substantive provisions of the Executive Order under the APA. *See DSCC* Compl. at 59 (APA claims against Sections 2(a), 4(a), and 4(c)); *NAACP* Compl. at 68 ¶ 5 (same); *LULAC* Compl. at ¶¶ 291-306, 319-27 (Sections 2(a), 3(b)(iii), and 3(b)(iv)). But "[t]he APA authorizes courts to review only 'final agency action[s].'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (second alteration in original) (quoting 5 U.S.C. § 704). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (citation omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id*. (citation modified). Neither is satisfied here, for any facet of the Executive Order, or its (hypothetical, possible) future implementation. Although the Executive Order certainly *contemplates* possible future agency actions that might satisfy the final-agency-action requirement—for example, the eventual publication of a final rule by the Postal Service—Plaintiffs cannot sue until those actions are actually finalized.

**1. Section 3(b) – Postal Service Rulemaking.** The core of Plaintiffs' challenge (and all claims against the Postal Service) centers upon Section 3(b). Under that provision, the Postmaster General is directed to "initiate a proposed rulemaking" to "protect the integrity of the mail as a medium for transmitting Federal election ballots and establish uniform standards for mail-in or absentee ballot services implemented through the . . . Postal Service." E.O. § 3(b). As of this filing, however, no such proposed rulemaking has been initiated. Monteith Decl. ¶ 4. But even if

- 18 -

a proposed rule had been published—as one may be soon—a *proposed* rule (essentially, by defi-nition) would still not be a *final* agency action subject to review under the APA.[6]

This one is easy: it is black-letter administrative law that proposed rules (rather than final rules) are not final agency action subject to review under the APA.  In short, as the D.C. Circuit has squarely held more than once, courts "may review final agency rules," but "do not have authority to review proposed rules."  *In re Murray Energy*, 788 F.3d 330 at 334 (Kavanaugh, J.); *see also, e.g.*, *In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court."); *FDIC v. Bank of Am., N.A.*, 783 F. Supp. 3d 1, 24 (D.D.C. 2025) ("[P]roposed rules are not 'final agency actions' that this court has authority to review.").  After all, "a proposed rule is just a proposal."  *In re Murray Energy*, 788 F.3d at 334.  And here, Plaintiffs sued even *before* a proposed rule was published.  That is plainly impermissible under binding precedent.  That is presumably why, despite including some arguments about final agency action, *see DSCC* PI Br. at 31-34; *NAACP* PI Br. at 29-31; *none* of the Plaintiffs even addresses this subject, much less argues that a directive to initiate a proposed rule qualifies as final

---

[6] To be precise, while most final agency action is subject to APA review, Congress has exempted many actions by the Postal Service, stating that certain provisions of the APA do not apply "to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a); *see, e.g.*, *Northern Air Cargo v. USPS*, 674 F.3d 852, 858 (D.C. Cir. 2012); *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003).  In those circumstances, a form of ultra vires review may be applicable to certain Postal Service determinations.  *See Mittleman*, 757 F.3d at 305*; Aid Ass'n for Lutherans*, 321 F.3d at 1173.  Congress has also created an exception-to-the-exception for certain "proceedings concerning the mailability of matter," 39 U.S.C. § 3001(m), which *are* subject to normal APA review.  Because the Postal Service has not yet issued any proposed rule, it is not yet clear what precise form of judicial review would be available to review any final rule.  The Court need not resolve that question now, however, because (1) it is undisputed that some form of judicial review would eventually be available for any final rule, and (2) all potentially available forms of judicial review would still require a final action by the Postal Service.

agency action under the APA.  So all APA claims relating to the possible future implementation

of Section 3(b) should be dismissed for lack of final agency action.

    **2.  Section 2(a) – State Citizenship Lists.**  Section 2(a) of the Executive Order contem-

plates the eventual preparation and transmission of "State Citizenship Lists" by DHS, consisting

"of individuals confirmed to be United States citizens who will be above the age of 18 at the time

of an upcoming Federal election and who maintain a residence in the subject State."  E.O. § 2(a).

But at least at this time, no such lists have been compiled.  *See* Mayhew Decl. ¶ 7.  And the Order

leaves significant uncertainty about whether, when, and in what form those lists might be compiled

in the future.  The Order likewise says nothing at all about what (if anything) anyone will actually

*do* with any such lists.  *See* Proposed Mot. to Dismiss of Intervenor States at 13 ("The State Citi-

zenship List does not impose any legal obligations on the States, nor does the Executive Order

force States to use the List."), ECF No. 77-3l; *accord DSCC* Compl. ¶ 62 ("The Order does not

explicitly explain the intended use of the State Citizenship List . . . .").  Accordingly, the Presi-

dent's inchoate directive—currently under consideration at DHS, *see* Mayhew Decl. ¶ 5—is not

final agency action.  The legal validity of lists that may be created (in some form) in the future can

be decided (if at all) in the future, when the Court—and even the government itself—actually

*knows* what sort of lists are being constructed or sent, in what manner, and for what purpose.

    **a.**  For starters, on its face, Section 2(a) explicitly applies only "[t]o the extent feasible and

consistent with applicable law, including but not limited to the Privacy Act of 1974."  E.O. § 2(a).

DHS has not yet made any determination that preparing these lists is either "feasible" or "con-

sistent with applicable law," including (but not limited to) the Privacy Act.  *Id.*; *see* Mayhew Decl.

¶ 5; *see also* MacBride Decl. ¶ 5.  So as of this filing, it is not even clear whether or when these

lists will be created—much less in what form, based on what data, or how they might be used.

That is fatal to these claims. To illustrate why: Plaintiffs argue strenuously that the Privacy Act's routine-use exception, for example, could only be invoked to justify this sort of information-gathering *after* the government updated the relevant Systems of Record Notices ("SORNs") that govern the collection and sharing of this sort of information under the Privacy Act. *See, e.g.*, *NAACP* PI Br. at 24-26 (arguing that "[n]o existing SORN authorizes the State Citizenship List"). But again, in Section 2(a), the President directed DHS to consider those very questions. It is doing so now. *See* Mayhew Decl. ¶ 5. In heeding the President's explicit directive to consider the possible applicability of the Privacy Act, perhaps DHS will *agree* with Plaintiffs about the need for (or at least the prudence of) an amendment to the relevant SORNs to explicitly identify this as a new "routine use."

That is far from a fanciful possibility. Indeed, DHS and SSA recently took a similar approach in a related context, by publishing new SORNs to resolve any doubts as to whether certain other information-sharing related to voter-verification efforts was consistent with the Privacy Act (thus mooting some ongoing litigation on that subject). *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-946 (CKK), 2026 WL 252420, at *54 (D.D.C. Jan. 30, 2026) (dismissing "claims under the Privacy Act seeking injunctive relief against the recent changes to the SAVE and Numident systems" as "moot" because DHS and SSA "have now adopted a 'routine use' that covers the challenged uses of data" (citation omitted)). That is a process that requires public notice, and (at least) a 30-day comment period—in which Plaintiffs and others may submit their views to the agency on many of the topics addressed in their briefs. *See* 5 U.S.C. § 552a(e)(4), (e)(11). During such a comment process, perhaps the government will be persuaded by some of Plaintiffs' concerns. Perhaps not. But either way, that would resolve a significant portion of Plaintiffs' Privacy Act-related arguments. And regardless, these sorts of

- 21 -

unresolved contingencies make clear that there is currently no final agency action for this Court to review. (They also further confirm that these claims are not ripe, as they would benefit from further factual development. *See supra*, Section I.B.)

**b.** The President himself is plainly aware that further steps will be necessary before implementation of Section 2(a). Section 4(c), for example, directs DHS to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List described in section 2(a) of this order." E.O. § 4(c). As a result, until that "necessary" "infrastructure" has been erected, the State Citizenship Lists contemplated by Section 2(a) remain hypothetical and inchoate. Similarly, the President also explicitly directed DHS to "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." *Id.* § 2(a). Again, until those "procedures" have been designed and implemented, it is impossible to know whether they will mitigate or resolve some or all of Plaintiffs' concerns.

For example, Plaintiffs repeatedly express concern that "the State Citizenship Lists will be inaccurate," *LULAC* PI Br. at 15, because they will be "plagued by garbage in, garbage out database inaccuracies," *NAACP* PI Br. at 29, and compiled using "inaccurate sources," *DSCC* PI Br. at 3-7. But the Order does not resolve the question of what databases will be used to generate these lists. *See* E.O. § 2(a) ("The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases."). That determination is left to agency officials. And DHS has not yet made any final decisions on this subject. *See* Mayhew Decl. ¶ 9. That Plaintiffs profess greater confidence and certainty than the agency officials charged with implementing this order about the "relevant Federal databases" that

- 22 -

might be used for these purposes is curious.  This Court should not reach the merits of this case based on Plaintiffs' unsupported assumptions about possible future government actions.

So although Plaintiffs go on at length about all of their concerns about alleged inaccuracies in DHS's "Systematic Alien Verification for Entitlements" or "SAVE" system—concerns that are quite exaggerated, for reasons partially explained in a recent opinion from Judge Sooknanan, in denying a motion for a preliminary injunction on that precise topic, *see League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at *6-8 (D.D.C. Nov. 17, 2025)[7]—it is not even clear the extent to which SAVE data will feature in the possible future creation of these State Citizenship Lists or, if so, how it will be used.  And again, even if SAVE is one of the databases that is in some way involved in this process, the use of other (as-yet-unidentified) "other relevant federal databases" could mitigate or resolve Plaintiffs' concerns.

To that end, the *NAACP* Plaintiffs emphasize that "the Order is silent as to how DHS would resolve inconsistent records reflecting citizenship status across federal databases."  *NAACP* PI Br. at 29.  They make a fair point—which DHS may consider as it works to "establish the infrastructure necessary" to implement the President's directives.  E.O. § 4(c).  Indeed, in other related contexts, DHS has erred on the side of caution.  For example, in providing voter-verification responses to States through SAVE, DHS uses a "manual verification process" to reduce the risk that a U.S. citizen will be incorrectly flagged as non-citizen because of inaccuracies in SSA data.

---

[7] *See, e.g.*, *League of Women Voters*, 2025 WL 3198970, at *7 ("Plaintiffs ask this Court to find irreparable injury because their SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration or take other adverse actions.  This falls well short of the requisite showing of irreparable harm."); *see also id.* ("[N]othing in the current record supports the Plaintiffs' assertion that in lieu of additional verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone." (citation omitted)).

*League of Women Voters*, 2025 WL 3198970, at *7. Similar caution here could resolve many of Plaintiffs' accuracy fears. In any event, before any of these "infrastructure" decisions have been made, there is nothing for Plaintiffs to challenge (and nothing for this Court to review). That is just as fatal to Plaintiffs' theory of final agency action as it is to Article III standing or ripeness.

**c.** Finally, even if all those feasibility and legality questions are resolved, and such a list *is* created, *creation* of a list of citizens, by itself, has no legal consequences for anyone, standing alone. And whether the possible future *transmission* of such a list qualifies as final agency action would depend on whether *transmission* of that list "determine[s] 'rights or obligations,' or produce[s] 'legal consequences.'" *Centro de Trabajadores Unidos*, 167 F.4th at 1235 (quoting *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015)); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.) (citing with approval the proposition that "agency action [is] not reviewable when no legal consequences flow from the agency's conduct" and that "practical consequences . . . are insufficient to bring an agency's conduct under our purview") (cleaned up).

But what States will do (if anything) with these lists is *also* unknown and subject to significant uncertainty. Early indications suggest a far less dramatic role than Plaintiffs' filings assume. *See, e.g.*, Mem. in Support of Intervener States' Mot. To Dismiss at 13-16, ECF No. 77-3 (States explaining why it is "implausible" to assume that States will use the contemplated State Citizenship Lists "to somehow prevent eligible voters from receiving ballots" (citation omitted)). Indeed, several States are currently challenging this Executive Order in separate litigation in the District of Massachusetts, *see supra* at 7—thus making any suggestion that those States will use the potential product of this Order in a manner that harms Plaintiffs even more speculative.

- 24 -

All of this uncertainty-upon-uncertainty confirms the absence of any final agency action. After all, "if the practical effect of the agency action is not a *certain* change in the legal obligations of a party, the action is non-final for the purposes of judicial review" under the APA. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (emphasis added) (citation omitted). And here, nothing is certain about the legal effect (if any) of whatever actions (if any) the federal government will take to produce lists that do not yet exist—and that might never exist in the form that Plaintiffs assume. And even if they do, States may ignore them, or use them for purposes that are plainly lawful—such as post-election law-enforcement activity relating to unlawful voting.

**d.** Plaintiffs' filings mostly ignore these issues. But presumably recognizing these problems with the core of their case, the *DSCC* Plaintiffs move the goalposts, arguing that "Defendants' *decision* to implement the directive in Sections 2(a) and 4 of the [Order] constitutes 'final' agency action." *DSCC* PI Br. at 31 (emphasis added). But what "final" "decision" is that? They identify none. And regardless, Plaintiffs' complaints (filed immediately after issuance of the Executive Order) challenge the Executive Order—not some other unidentified "decision" by an undifferentiated group of "Defendants."

Indeed, even if such a "decision" has been made (or will be made), a decision to "implement" an Executive Order itself has no legal consequences—it is, at most, a decision to engage in interlocutory steps that may eventually culminate in a final agency action. That is why notices of proposed rulemaking are not final agency action, *In re Murray Energy Corp.*, 788 F.3d at 334, even when they propose some *future* action. And that is why Plaintiffs' self-styled labels of a purported final agency action do not control. *Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) ("Plaintiffs point to no written rules, orders, or even guidance documents of

the Forest Service that set forth the supposed policies challenged here.  Instead, Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices.  But a final agency action requires more.").

On this point, Plaintiffs offer what they call "evidence," which is limited to a single quote that an unnamed "DHS spokesperson" provided to the press, stating that government "employees" are "working to 'implement the President's policies.'"  *DSCC* PI Br. at 33.  On its face, that quote is not even specific to Executive Order 14,399.  And the fact that the government is "working to implement" a policy confirms (if anything) that it is *not* final—until that work is done, and the contours of any new policy are both defined and legally effective.  Until then, judicial review is both legally impermissible and practically impossible.

**3.  Section 2(b) – Criminal Enforcement Priorities.**  Finally, the *NAACP* Plaintiffs—but no others—challenge Section 2(b), which (in their words) "directs the Attorney General to prioritize investigating and prosecuting" certain voting-related crimes that are specified in the text of the Order.  *NAACP* PI Br. at 2; *see NAACP* ECF No. 37 (seeking preliminary relief against Section 2 in its entirety[8]).  Changes to Executive Branch enforcement priorities are classically "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), as discussed below, *infra* at 31-35.  For similar reasons, there is no "final agency action" relating to Section 2(b)—that would come (if ever) in the context of an actual criminal prosecution, which would itself provide the focal point

---

[8] By seeking relief against Section 2(b) of the Executive Order in their motion for a preliminary injunction, ECF No. 37, the *NAACP* Plaintiffs seem to seek relief that it is broader than the relief specified in their Complaint, *NAACP* Compl., which does not specify Section 2(b) in its prayer for relief.  That is an independent reason to deny preliminary relief against these portions of the Executive Order.  In any event, this request for relief is meritless for the reasons that follow, even assuming it has been properly preserved.

for any permissible judicial review.  Until then, any inchoate adjustment to the criminal investiga-
tion and enforcement priorities of the Executive Branch neither "mark[s] the 'consummation' of
the agency's decisionmaking process" nor "produce[s] legal consequences" for anyone.  *Centro
de Trabajadores*, 167 F.4th at 1235 (quotation marks and citation omitted).

*    *    *

Plaintiffs clearly believe that the issuance of Executive Order 14,399 portends some future
agency action to which they are likely to have at least some objections—whether as a matter of
policy, a matter of law, or both.  Perhaps that prediction will turn out to be correct.  Perhaps not.
Either way, under the APA, they may only challenge *actual*—and final—agency action.  This
lawsuit, however, challenges only *hypothetical* agency actions, which have not yet happened, and
might never happen in the form that Plaintiffs speculate.  Accordingly, all of Plaintiffs' APA
claims should be dismissed (under Federal Rule of Civil Procedure 12(b)(6)) for failure to chal-
lenge any "final agency action."  5 U.S.C. § 704.

**D.      Plaintiffs fail to identify any viable cause of action for their statutory claims.**

**1.** Plaintiffs generally seem to assume (without much explanation) that the APA provides
the relevant cause of action for all or most of their statutory claims.  That is incorrect (at least)
because of their failure to identify any "final agency action," 5 U.S.C. § 704, as discussed above.
In addition, with respect to their claims against the President—and thus, all of their claims chal-
lenging the Executive Order itself, rather than possible future implementation of that Order—
Plaintiffs cannot sue under the APA because "the President is not an agency within the meaning
of the" APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord LULAC v. Exec. Off.
of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency

- 27 -

within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework.") (quoting *Franklin*, 505 U.S. at 796).

Without the APA, Plaintiffs identify no other viable cause of action for their statutory claims, as is their burden to demonstrate. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." (citation omitted)).  Indeed, the *DSCC* and *LULAC* Plaintiffs don't even try to identify one.  The *NAACP* Plaintiffs do cite the Privacy Act, arguing (confusingly) that "Plaintiffs have a cause of action under the APA because their Privacy Act allegations are predicated on unlawful data sharing that has already taken place." *NAACP* PI Br. at 29.  But that garbled and conclusory factual assertion is (at best) unsupported by Plaintiffs' filing, which includes no citation to support it—not even any allegation in the complaint.  Nor would such an allegation be plausible, given the Executive Order's repeated instructions to begin with various preliminary and deliberative steps. *See* E.O. § 4(c) (calling for the creation of the relevant "infrastructure" within 90 days); *id.* § 2(a) (directing DHS to first consider what is "feasible" and "consistent with applicable law, including but not limited to the Privacy Act"); *accord* Mayhew Decl. ¶¶ 5-10; MacBride Decl. ¶¶ 5-6.

In any event, even if any of that data-sharing *had* already taken place, the Privacy Act itself creates a cause of action only for adversely affected "individuals," 5 U.S.C. § 552a(g)(1)(D), not organizations, and even then allows for injunctive relief only in narrow circumstances that are plainly inapplicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)).  In addition, generally, "a plaintiff cannot bring an APA claim to obtain relief for an alleged

- 28 -

Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175-76 (4th Cir. 2025), *abrogated on other grounds by AFL-CIO v. SSA*, 2026 WL 969670 (4th Cir. Apr. 10, 2026) (en banc).  And although some courts have held recently—and wrongly, in the government's view—that Privacy Act claims can be brought as APA claims, *see, e.g.*, *AFL-CIO v. Dep't of Labor*, 778 F. Supp. 3d 56, 81-82 (D.D.C. 2025), even that workaround cannot apply here, due to the lack of any final agency action and the President's exclusion from the APA.

Finally, Plaintiffs variously cite the Help America Vote Act (HAVA), the National Voter Registration Act (NVRA), the Uniformed and Overseas Citizens Access to Voting Act (UOCAVA), the Voting Rights Act, and the Postal Reorganization Act, for some of their merits arguments.  But they fail to identify any applicable private right of action under any of those statutes, and Defendants are aware of none.  That is fatal to any remaining statutory claims.  *See, e.g.*, *Sandoval*, 532 U.S at 286-87.

**2.**  Plaintiffs cannot solve their statutory cause-of-action problem by invoking principles of ultra vires review.  A statutory ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  "Only error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief."  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express Corp. v. Dep't of Com.*, 39 F. 4th 756, 764 (D.C. Cir. 2022)).  And "an agency violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.'"  *Id.* (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).  Even

then, "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681.

Plaintiffs point to nothing close to a statutory violation of that sort here. Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim. *Id.* at 682. For example, rather than identify any "'clear and mandatory' statutory command" that some agency has violated, *Changji*, 40 F.4th at 722, Plaintiffs argue that the Executive Order (or some hypothetical future implementation action) somehow violates the Postal service's general obligation to "provide prompt, reliable, and efficient services" and "postal services to all communities," 39 U.S.C. § 101(a); *see LULAC* PI Br. at 29-30. That is incorrect—but even if it were correct, the Postal Service has still not "disregard[ed] a specific and unambiguous statutory directive" in a way that could support an ultra vires claim. *Changji*, 40 F.4th at 722

In any event, this form of statutory "ultra vires review is not available because" Plaintiffs also have "an alternative path to judicial review" through normal channels, including the APA itself. *NRC*, 605 U.S. at 682; *see also supra at* 19 n.6 (discussing the possible applicability of a different form of ultra vires review that might govern review of certain possible future actions by the Postal Service). Any injured Plaintiff can simply wait and sue any agency that actually takes some concrete action to implement the Order—if and when that action causes that Plaintiff some actual or imminent Article III injury (and can satisfy the other usual prerequisites for judicial review). *See, e.g.*, *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 842 n.7 (D.C. Cir. 2024) ("Because we hold that Congress has provided for APA review of DMCA rules, the ultra vires claim is no longer available, and we need not address it.").

### E. Plaintiffs' claims challenging the enforcement priorities and enforcement discretion of the Executive Branch are independently unreviewable.

Although Plaintiffs' claims across these suits vary, at least some explicitly seek judicial review of the enforcement priorities and enforcement discretion of the Executive Branch. Most obviously, the *NAACP* Plaintiffs seek a preliminary injunction against Section 2(b) of the Executive Order, which provides that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under" a list of specifically identified federal criminal statutes. E.O. § 2(b); *see also NAACP* PI Br. at 2 (lamenting that the Order "directs the Attorney General to prioritize investigating and prosecuting" certain voting-related crimes); *NAACP* Compl. ¶¶ 149, 158, 166. The *NAACP* Plaintiffs also appear to take aim at Section 5, which provides that "[t]he Attorney General and the heads of executive departments and agencies (agencies) with relevant authority shall take all lawful steps to deter and address noncompliance with Federal law." E.O. § 5. And all Plaintiffs challenge Sections 2(a) and 3(b)—about creation of State Citizenship Lists and a Postal Service rulemaking concerning, *e.g.*, barcodes on mail-in ballots—all of which can facilitate possible future post-election enforcement of criminal laws relating to voting. To the extent Plaintiffs seek judicial supervision of the Executive Branch's enforcement priorities or other exercises of enforcement discretion, those claims are not reviewable—even if Plaintiffs could otherwise overcome the other threshold obstacles set forth above.

**1.** Under the APA, "before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). 5 U.S.C. § 701(a)(2) provides that APA review is unavailable to challenge "agency action" that is "committed to agency discretion by law." "Over the years," the Supreme Court has interpreted Section 701(a)(2) to apply to various

types of agency decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). The textbook example is a discretionary change in law-enforcement priorities.

*Chaney* is instructive. The Court there considered a challenge to the decision of the Food and Drug Administration ("FDA") not to enforce the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, against the "unapproved use of approved drugs" for capital punishment. *Chaney*, 470 U.S. at 824. The Court refused to subject the agency's decision to APA review. *Id.* at 831. The Court observed that "an agency's decision not to prosecute or enforce, whether through civil or criminal process," is "generally committed to an agency's absolute discretion" and "unsuitab[le] for judicial review." *Id.* It explained that an enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another" and whether enforcement in a particular scenario "best fits the agency's overall policies." *Id.* The Court noted, in addition, that when an agency declines to enforce, it "generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. And it recognized that agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* Accordingly, the Court concluded that, absent a statute "circumscribing an agency's power to discriminate among issues or cases it will pursue," the agency's "exercise of enforcement power" is "committed to agency discretion by law." *Id.* at 833, 835.

Here, the President's directives to his subordinates in Executive Order 14,399—in particular, about the investigation and enforcement of specified federal criminal statutes relating to voting—are exactly the type of enforcement prioritization that traditionally has been understood as unsuitable for judicial review and thus "committed to agency discretion" under Section 701(a)(2). Like the decision to adopt a policy of nonenforcement (as in *Chaney*), the decision to *increase* investigations, prosecutions, or other enforcement on a particular subject (here, unlawful voting) likewise "involves a complicated balancing" of factors that are "peculiarly within [the] expertise" of the Executive Branch, including determining how limited law-enforcement resources are best spent in light of the Executive Branch's overall priorities. *Chaney*, 470 U.S. at 831. Likewise, a decision to alter enforcement priorities, by itself, does not bring to bear the government's coercive power over any individual; that will occur only if any resulting enforcement or prosecution leads to an actual prosecution—which itself provides a focal point for any necessary judicial review.

The Executive Branch "retain[s] broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted). Unsurprisingly then, criminal prosecutorial discretion is regularly exercised within the Department of Justice, both within and between presidential administrations, and separation-of-powers considerations underscore why it has never been considered amenable to APA review. In short, "as *Chaney* makes clear, when prosecutorial discretion is at issue, the matter is presumptively committed to agency discretion by law." *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002); *see also, e.g.*, *Citizens for Resp. & Ethics in Washington v. FEC*, 993 F.3d 880, 884 (D.C. Cir. 2021) (reaffirming principles of "unreviewable prosecutorial discretion to determine whether to bring an enforcement action" (citation omitted)); *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006) (discussing "the traditional nonreviewability of prosecutorial charging decisions"); *Beverly Health*

- 33 -

*& Rehab. Servs., Inc. v. Feinstein,* 103 F.3d 151, 153 (D.C. Cir. 1996) (no judicial review that would "invade the realm of prosecutorial discretion"). Plaintiffs offer nothing to overcome that well-settled presumption here.

"Of course," if Congress had meaningfully "circumscribe[d] agency discretion," then the government would not be "free simply to disregard statutory responsibilities" in the name of new enforcement priorities. *Lincoln*, 508 U.S. at 193; *accord Chaney*, 470 U.S. at 833-34. But here, there is no such statutory constraint. Just the opposite: the criminal statutes cited in the Order confirm the broad discretion of the Executive Branch to enforce criminal prohibitions on unlawful voting-related activity. *See, e.g.*, 18 U.S.C. § 611(a) (providing that, generally, "[i]t shall be un-lawful for any alien to vote in any election" for federal office); 52 U.S.C § 10307(e) (criminal prohibition on "vot[ing] more than once" in a federal election); *id.* § 20511(2)(B) (criminal prohi-bition on "the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent").

**2.** For similar reasons, principles of Article III standing that are unique to the context of enforcement priorities also independently foreclose judicial review over these claims. To establish standing, the Supreme Court has "stressed that the alleged injury must be legally and judicially cognizable.'" *Texas*, 599 U.S. at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "That 'requires, among other things,' that the 'dispute is traditionally thought to be capable of resolution through the judicial process'—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* "In adhering to that core principle, the Court has examined 'history and tradition,' among other things, as 'a meaningful guide to the types of cases that Article III empow-ers federal courts to consider.'" *Id.* at 676-77 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). Ultimately, a lawsuit "may not proceed" where the "plaintiff has

not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 427.

Although it is Plaintiffs' burden to demonstrate Article III standing, *see Lujan*, 504 U.S. at 561, and although "standing is not dispensed in gross," *TransUnion*, 594 U.S. at 431, when it comes to challenging enforcement priorities, they have made no effort to identify any injury "traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 427. To the contrary, there is a well-established tradition *against* litigation over changes to Executive Branch enforcement priorities. That tradition reflects both Article II and Article III constraints. *See Texas*, 599 U.S. at 679-81. Article II vests the executive power in the President and directs him to take care that the laws are faithfully executed. U.S. Const. art. II, § 1, cl. 1; art. II, § 3. Decisions about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" thus fall "within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion*, 594 U.S. at 429. Accordingly, lawsuits challenging enforcement priorities "run up against the Executive's Article II authority to enforce federal law," *Texas*, 599 U.S. at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" of the law-enforcement, investigation, and prosecution functions of the Executive Branch. *Id.* at 679. As a result, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685.

*    *    *

Accordingly, to the extent that Plaintiffs' claims seek to challenge Executive Branch enforcement discretion—most obviously, with respect to the *NAACP* Plaintiffs' requests for relief against Sections 2(b) and 5 of the Order—those claims should be dismissed as (1) committed to agency discretion by law, or (2) for lack of any legally cognizable Article III injury.

- 35 -

### F.    The President and the Department of Commerce should be dismissed.

Even if Plaintiffs could overcome all of the threshold problems above, at a minimum, the President of the United States, the Department of Commerce, and the Secretary of Commerce (in his official capacity) should each be dismissed as Defendants in these suits.

As for the Department of Commerce and the Secretary of Commerce, their only mention in the Executive Order is in Section 4(a), which provides that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order."  E.O. § 4(a). Neither Plaintiffs' complaints, nor their preliminary-injunction motions contain any further allegations or information about what, exactly, Plaintiffs challenge relating to the Department of Commerce.  And even if the Department of Commerce plays some role in "coordination" of the implementation of this Executive Order, internal government deliberations have no legal effect, cause Plaintiffs no cognizable Article III injury, and are thus not subject to judicial review.  In any event, Plaintiffs do not even allege that the Department of Commerce has done *anything*—much less anything unlawful and injurious.  Accordingly, whether conceived of as a lack of Article III standing to sue the agency, or failure to state a claim upon which relief can be granted, the Department of Commerce (and the Secretary of Commerce in his official capacity) should be dismissed as Defendants in these suits.

As for the President, as discussed in greater detail above, he is not a proper subject of an APA challenge, *see supra* at 27-28 (citing *Franklin*, 505 U.S. at 800-01), and as discussed in greater detail below, he is also not properly subject to an injunction, *see infra* at 51-53 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)).  Accordingly, the President should also be dismissed as a Defendant.  *See, e.g.*, *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018)

- 36 -

("Given that the Court will not grant Plaintiffs the relief that they seek against the President himself, the President should be dismissed.").

## II.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 24). "A party requesting a preliminary injunction must show that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'" *Id.* (citation omitted).  The balance of equities and the public interest "merge when" "the Government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs have not carried their burden on any of these factors, so they are not entitled to the extraordinary remedy of a preliminary injunction.

### A.    Plaintiffs have not carried their burden to demonstrate irreparable harm.

Plaintiffs have failed to establish that a preliminary injunction is necessary to prevent imminent irreparable harm, which is enough to deny their motions.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").  To support a preliminary injunction, the injury at issue "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  And Plaintiffs must show that the "injury complained of is of such *imminence* that there is a clear and present need for equitable

relief to prevent irreparable harm." *Id.* (quotation marks and citations omitted).  They have not carried that burden here.

**1.**  For largely the same reasons that Plaintiffs have failed to show any actual or imminent injury in fact (*see supra*, Section I), *a fortiori* they have not shown that they will face a "certain and great," "actual and not theoretical" injury "of such *imminence* that there is a clear and present need for equitable relief."  *Id.* (quotation marks and citations omitted).

Again, this Executive Order by itself does not require Plaintiffs (or anyone outside of the Executive Branch) to do anything.  DHS, SSA, and the Department of Commerce are charged with coordinating in the possible creation of State Citizenship Lists.  E.O. §§ 2, 4.  The Postal Service is charged with publishing a proposed rule.  E.O. § 3.  And the "Attorney General and heads of executive departments" are charged with enforcement of existing criminal laws.  E.O. § 5.  But *Plaintiffs* need not do anything (or refrain from doing anything) under this Order.  Plaintiffs thus suffer no harm—let alone irreparable harm—from of the Order itself.

To further illustrate why the Executive Order itself has not (and will not) cause any irreparable harm, since the signing of the Executive Order, there has already been at least one federal election: the special election for New Jersey's 11th Congressional District, which was held on April 16, 2026.  *See, e.g.*, Sophie Nieto-Munoz, *Democrat Analilia Mejia Wins Special House Election*, NEW JERSEY MONITOR (April 16, 2026, at 8:09 pm), https://newjerseymonitor.com/2026/04/16/analilia-mejia-special-house-election/.  To Defendants' knowledge, that special election took place without incident (and certainly without harm to Plaintiffs)—underscoring the reality that Plaintiffs have not experienced (and will not experience) irreparable harm by virtue of the Executive Order alone.  What Plaintiffs really fear are possible future steps that agencies may take to *implement* the Executive Order—but none of those have happened yet, and they might

never happen in the form that Plaintiffs assume.  That reality is fatal to the notion that Plaintiffs face any irreparable harm from this Executive Order.

**2.** The text of the Executive Order further confirms that at least at this time, it cannot be the cause of any irreparable harm.  For example, there is no guarantee that any State Citizenship List will ever be compiled and transmitted, let alone in a manner that violates the Privacy Act or any other applicable law, so as to harm any Plaintiff.  The Order contemplates the creation of that list within "90 days" of the signing of the Order, provided it is "feasible and consistent with applicable law."  E.O. §§ 2(a) & 4(c).  The agencies charged with creation of the State Citizenship List have until at least June 29, 2026, to comply with the Order—or, alternatively, to conclude that creating or transmitting such a list is *not* feasible or consistent with applicable law (or even to inform the President that additional time is necessary).  Those deliberations are ongoing.  *See* Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  Plaintiffs face no actual or imminent harm in the meantime.  As of today, none of the agencies charged with compiling State Citizenship Lists have announced whether it will be feasible to do so, let alone in a form that will concretely injure Plaintiffs.  And of course, if that uncertain future event eventually comes to pass, Plaintiffs are free to sue (or even seek temporary relief) at that time—targeting real (rather than hypothetical) agency action.

Similarly, Plaintiffs' concerns about a future Postal Service rulemaking are just that—concerns—there can be no actual or imminent harm (irreparable or otherwise) from a not-yet-issued *proposed* rule.  As then-Judge Kavanaugh once put it, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334.  Even once the Postal Service takes up the President's direction to initiate a rulemaking, there is no guarantee (nor any requirement in the Executive Order) that the rulemaking actually lead to a final rule, nor that any final rule would harm any Plaintiff in the ways that they assume.  In any case, the Postal Service has "120 days" from the date of the Order,

- 39 -

or until July 29, 2026, to issue any final rule. E.O. § 3(d). Even if the Postal Service adheres strictly to that schedule, Plaintiffs are not harmed (nor subject to imminent harm) in the interim. And Plaintiffs can express their concerns directly to the Postal Service as part of the notice-and-comment process, which the agency will consider before finalizing any rule. *See* Monteith Decl. ¶ 5. And again, ultimately, if Plaintiffs do eventually face any imminent harm caused by the publication of a final rule, Plaintiffs can sue (or even seek a preliminary injunction) at that time.

Plaintiffs' assertions of imminent irreparable harm are further undermined by the well-settled principle that government agencies are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (citation omitted); *see USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of government agencies."); *Latif v. Obama*, 677 F.3d 1175, 1178-79 (D.C. Cir. 2012). The agencies charged with implementation of the Order require time to translate the President's broader policy vision into lawful and specific government actions. In the interim, Plaintiffs cannot suffer imminent irreparable harm from possible future agency action that is presumed to follow all applicable legal constraints—particularly where, as here, the President himself explicitly ordered agencies to consider those very legal constraints before acting. *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 . . . ."); § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This order shall be implemented consistent with applicable law."); *see also Am. Fed'n of Gov't Emps.*, 145 S. Ct. at 2635 (Sotomayor, J., concurring) (acknowledging that because the "the relevant Executive Order" in that case "directs agencies to plan reorganizations and reductions in force consistent with applicable law," the Court had "no occasion to consider whether

- 40 -

they can and will be carried out consistent with the constraints of law" at that stage, prior to implementation of that Executive Order).

At bottom, this Court should not endorse Plaintiffs' efforts to short-circuit the administrative process by adopting a maximalist interpretation of the Order, before the relevant agencies have implemented it at all—much less in a way that causes any "certain and great" irreparable harm. *Chaplaincy*, 454 F.3d at 297 (citations omitted).

**3.**  All of Plaintiffs' arguments to the contrary lack merit.  The *DSCC* Plaintiffs contend that they are irreparably harmed in five distinct ways: "(1) in the form of an illegally structured electoral environment for all Plaintiffs and their candidate members, (2) to the Party's electoral prospects, (3) to Plaintiffs' members' voting rights, (4) to Plaintiffs' core activities and ability to advance their missions, forcing them to revamp their education and turnout programs across the country at the expense of Plaintiffs' persuasion and mobilization programs, and (5) to Plaintiffs' members' privacy interests." *DSCC* PI Br. at 39.  The *LULAC* Plaintiffs claim imminent irreparable harm to themselves and their members stemming from the alleged added difficulty of registering to vote (or performing their mission of registering voters) and in having their mail-in ballots counted.  *LULAC* PI Br. at 40-44.  And the *NAACP* Plaintiffs similarly claim irreparable harm owing to added difficulty for Plaintiffs to accomplish their primary missions of voter registration, education, and ensuring delivery and counting of mailed-in ballots. *NAACP* PI Br. at 43-44.  None of these harms have occurred or are likely to imminently occur.

As explained further *infra*, section II.B, all of these alleged harms are predicated on Plaintiffs' speculative interpretation of the Order, and hypothetical agency implementations of the Order that may never come to pass in a way that Plaintiffs fear.  Instead, Plaintiffs' claims should be

- 41 -

viewed from the prism of presuming agency regularity in implementing the Order—or, at a minimum, in recognizing that their concerns about how the Order might be implemented are impermissibly speculative at this time.

For example, currently, Plaintiffs and their members do not face an illegally structured electoral environment, nor harm to their electoral prospects from the Executive Order. Again, this is evidenced by the apparently routine administration of the recent special election in New Jersey's 11th Congressional District, which took place on April 16, 2026—over two weeks after the Executive Order was issued. *See* Sophie Nieto-Munoz, *supra* at 38. Plaintiffs have not alleged (and Defendants are unaware of) any issues with the sending or counting of mail-in ballots in the special election of the sort that Plaintiffs express alarm about in their filings. Likewise, Plaintiffs have not asserted that any ballot was intercepted by USPS as a result of the Executive Order, nor of any incident where USPS refused to accept for delivery a mail-in or absentee ballot that a New Jersey voter attempted to mail based on non-compliance with the Order. And Plaintiffs have not asserted in their papers any impact to any voting rights or privacy interests of any of Plaintiffs or their members in connection with that election. None of this is surprising—because the Order itself does not affect the legal rights, obligations, or status of Plaintiffs' or their members.

Plaintiffs may respond that the recent special election in New Jersey occurred very shortly after issuance of the Executive Order—so shortly that it took place before any of the policy changes contemplated by the Order had taken effect. Exactly—that is the core problem with these lawsuits, which were filed even *closer* in time to the issuance of the Executive Order than the special election in New Jersey. The point of the New Jersey example is to prove that it is the possible future *implementation* of the Executive Order that would be the cause of any (currently hypothetical)

harm—not the Executive Order itself.  That is why Plaintiffs cannot show irreparable harm now, before that implementation has even happened.

**B.      Plaintiffs are not likely to succeed on the merits.**

**1.**  Most obviously, Plaintiffs are unlikely to succeed on the merits because this Court should never *reach* the merits, due to the multiple defects of jurisdiction and justiciability discussed above.  *See supra*, Section I.  For example, "[a] plaintiff unlikely to have standing is *ipso facto* unlikely to succeed." *Elec. Priv. Info. Ctr. ("EPIC") v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017).  This Court need not go any further to deny Plaintiffs' motions.  *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction 'is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it.'") (quoting *City & Cnty. of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)).  And if Plaintiffs are unlikely to succeed on the merits, "there is no need to consider the remaining factors." *EPIC*, 878 F.3d at 375 n.2 (quoting *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011)).  For similar reasons, Plaintiffs' APA claims are unlikely to succeed on the merits, as final agency action is a prerequisite for any APA claim.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."); *Lujan*, 497 U.S. at 882 ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)).

**2.** For similar reasons, as a practical matter, it is not even *possible* to litigate the merits of this case at this time, based on this record.  Deliberations regarding implementation of the Executive Order are still ongoing.  *See* Monteith Decl. ¶ 3; Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  Until those deliberations conclude and some or all of the relevant agencies actually take some real (rather than hypothetical) action, there is nothing for the parties to litigate or for this Court to enjoin.

As one example, on the merits, the *LULAC* Plaintiffs argue that, under the statutes governing the Postal Service, the agency "cannot treat certain class of mail users differently unless it justifies the disparate treatment with good reasons or identifies specific statutory authorization." *LULAC* PI Br. at 30 (citing 39 U.S.C. § 403(c)).  But before the Postal Service has issued a proposed or final rule, it can't possibly have offered any "good reasons" (or bad ones), nor "identifie[d] specific statutory authorization" (or any authorization) for actions it has not yet taken and that have not yet been decided.  What, then, is the Court supposed to review to decide whether (in Plaintiffs' words) the Postal Service offered sufficiently "good reasons" or a sufficiently "specific statutory authorization" to satisfy 39 U.S.C. § 403(c)?  They do not say.

As another example, the *NAACP* Plaintiffs argue that "[n]o existing SORN authorizes the State Citizenship List." *NAACP* PI Br. 24 (citing 5 U.S.C. § 552a(a)(7)).  But DHS and SSA are actively considering the potential applicability of the Privacy Act, *see* Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5—as specifically directed by the Executive Order itself, *see* E.O. § 2(a).  So even if it were true *today* that "[n]o existing SORN authorizes the State Citizenship List," *NAACP* PI Br. 24—a point that Defendants do not concede and that this Court need not decide—it might not be true at the time any State Citizenship List is actually created.

Even as for Plaintiffs' arguments that the President has no authority to direct the actions of the Postal Service, *see, e.g.*, *NAACP* PI Br. at 17-19, it is similarly not possible for the Court to

- 44 -

resolve that abstract legal question unless and until the Postal Service actually issues a rule that injures the Plaintiffs *and* it does so only because it was directed to by the President—rather than, for example, as an exercise of the agency's own independent judgment. On the current record, however, there is no way to evaluate the legality of that possible future rule, and no basis to conclude that Plaintiffs are likely to succeed in a challenge to that sort of hypothetical action.

Under these circumstances, the Court cannot conclude that Plaintiffs are likely to succeed on the merits of any of their claims—after all, the factual and legal landscape for those claims has not yet been settled. That uncertainty is independently fatal to Plaintiffs' preliminary-injunction motion, as it is their burden to make a "clear showing" that they are likely to succeed on the merits—not Defendants' burden to disprove the opposite. *Nat'l Urb. League*, 783 F. Supp. 3d at 82 (citation omitted).

**3.** At a broader level, even if this Court were to somehow try and address the merits at this premature stage, these cases challenge an order from the President to his own subordinates—not a directive to Plaintiffs or State election officials. Particularly with its multiple explicit caveats about feasibility and legality, that Order standing alone is not *ultra vires*, does not violate the separation of powers, and does not violate any other constitutional or statutory provision. And whatever may be said about possible future agency actions taken to *implement* the order, none of those are before the Court at this time—and might *never* be, at least in the form that Plaintiffs assume. This Court should not accept Plaintiffs' invitation to opine on the legality of actions that do not yet exist.

The "executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Accordingly, "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes

under which they act in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981).  "Those officers are duty-bound to give effect to the policies embodied in the President's direction, *to the extent allowed by the law*." *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (emphasis added).

Executive Order 14,399 fits comfortably within this tradition, as "an exercise of the President's supervisory authority over the Executive Branch." *Id.* at 33.  Like the Executive Order at issue in *Allbaugh*—which was likewise limited to implementation "[t]o the extent permitted by law"—Executive Order 14,399 is replete with similar limiting instructions to agencies (both about feasibility and legality).  *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974"); § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This order shall be implemented consistent with applicable law. . . .").  The effect of this language under D.C. Circuit precedent is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33.  In other words, the Order "is not self-executing." *Id.*  Under these precedents, "[t]he mere possibility that some agency might make a legally suspect" act does not justify an injunction against the Order itself.  *Id.*  Thus, Plaintiffs must either attack some agency's implementation of the Order—*e.g.*, a final rule promulgated by the Postal Service, if and when such a rule is issued—or instead advance a "facial challenge" to show that the Order "is without *any* valid application." *Id.* (emphasis added).

Neither option works here.  Plaintiffs cannot yet challenge any implementation of the Executive Order, for the simple reason that none of its provisions have yet been implemented via any final agency action (or anything close).  In any event, "Plaintiffs attack the executive order[] and ask for relief in ways confirming that their challenges are facial and not as-applied."  *Nat'l Urb. League*, 783 F. Supp. 3d at 88.  But Plaintiffs also cannot obtain an injunction against the Order itself, on its face—because it is subject to many lawful interpretations.

For example, one plainly valid application of the Order would be as a means for the President to manage the enforcement priorities of the Executive Branch relating to certain federal election-related crimes (identified in the Order itself).  *See* U.S. Const. art. II, § 3 (The President "shall take Care that the Laws be faithfully executed"; *Trump v. United States*, 603 U.S. 593, 597 (2024) ("The Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and [which to] prosecute, including with respect to allegations of election crime.") (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Texas*, 599 U.S at 671 (noting "the Executive's Article II authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'") (quoting *TransUnion*, 594 U.S. at 429).  The Order facilitates this core Article II function by directing the Attorney General and various agencies to deploy their resources in the investigation and enforcement of federal laws that "explicitly prohibit non-citizens from registering to vote" and to prevent "violations of Federal criminal law" in this area.  E.O. § 1.

State Citizenship Lists, for example, might be used solely to facilitate this sort of post-election law-enforcement activity—after all, the purpose of those lists is not specified in the Order.  Under that interpretation, non-inclusion on a State Citizenship List need not, for example, hinder the ability of any citizen to register to vote in their State under current procedures, nor to vote by

mail.  Even at this early stage, several States have already described the State Citizenship Lists as an "optional resource" that states can use or ignore, because the Order "does not require States to use the State Citizenship List."  ECF No. 77-3 at 16; *see also id.* at 13-16 (States explaining why it is "implausible" to assume that States will use the contemplated State Citizenship Lists "to somehow prevent eligible voters from receiving ballots.").  Because of those (and other) possible interpretations—rather than Plaintiffs' speculative and pessimistic assumptions about how the Order *might* be implemented—a facial challenge to this Order cannot succeed.  *Cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *see also Allbaugh*, 295 F.3d at 33 (extending the same principle to Executive Orders); *Nat'l Urb. League*, 783 F. Supp. 3d at 87 (a facial challenge to an Executive Order "is a big claim," and "making it 'comes at a cost'" (citation omitted)).

Another strategy to facilitate uncontroversially lawful post-election law-enforcement could involve the Postal Service promulgating a final rule that implements improved technology (*e.g.*, via "unique Intelligent Mail barcode") to enable tracking of absentee and mail-in ballots that are sent from State election officials to individual voters.  *See* E.O. § 3(b)(i)(B).  Such tracking could provide, where appropriate, federal law-enforcement agencies with useful information (aggregate or individualized) about the verified recipients of absentee and mail-in ballots issued in a particular jurisdiction.  After an election, if necessary, that data could then be compared to other data about the absentee and mail-in ballots actually cast in that jurisdiction.  Any discrepancies could be more efficiently investigated, informing the allocation of finite law-enforcement resources.  And later, the investigation and potential prosecution of any suspected voter fraud might also be facilitated

with evidence that a particular voter did (or did not) receive a verified mail-in or absentee ballot—with receipt confirmed through the tracking afforded by the unique Intelligent Mail barcode.

Ultimately, of course, the legality of these potential interpretations cannot be definitively addressed at this time—because Plaintiffs do not allege that any of the implementation actions have even been decided, much less finalized. *See* Monteith Decl. ¶¶ 4-5; Mayhew Decl. ¶¶ 8-10; MacBride Decl. ¶ 6. But even the *possibility* that the Order could be interpreted in a manner that is lawful is enough to defeat a facial challenge to the Order itself. *See Nat'l Urb. League*, 783 F. Supp. 3d at 87-91. And of course, if the Order is eventually implemented in a manner that Plaintiffs believe is both unlawful and injurious, they are free to sue (or seek injunctive relief) at that time. An injunction now, however, is both unnecessary and inappropriate.

At bottom, Plaintiffs advance a maximalist interpretation of the Order, assume—contrary to the presumption of regularity and the text of the Order itself—that it will be implemented in a manner that violates the law, and then seek the extraordinary remedy of a preliminary injunction based solely on imagined harms stemming from their own speculative and unsupported assumptions. This Court need not and should not take that approach.

### C.     The balance of equities and the public interest disfavor injunctive relief.

The balance of equities and public interest also disfavor injunctive relief. Ultimately, Plaintiffs request an injunction that would restrain the President from overseeing the Executive Branch. Such an order would harm the public interest, given the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes

- 49 -

enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).

On the other side of the balance, Plaintiffs' interest is slight. At least at this time, they merely seek

to prevent hypothesized harm based on speculation about a series of future contingencies that have

not yet come to pass and may never come to pass.

**D.      At a minimum, Plaintiffs' requested injunction is overbroad.**

Even if Plaintiffs could prevail on any of their claims, their requested relief is overbroad in

several respects, and subject to important equitable limitations.

1.      Any injunction should be narrowly tailored and respect the Executive Order's severability clause.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*,

442 U.S. 682, 702 (1979). Accordingly, any equitable relief "must be 'limited to the inadequacy

that produced [the] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted).

So, to the extent that the Court determines that any particular feature of the Order likely violates

the law, and causes particular Plaintiffs an Article III injury, any injunctive relief should be limited

to remedying that specific violation. Plaintiffs largely seem to recognize this principle, as their

requests for relief are tied to specific portions of the Order. *See, e.g.*, ECF No. 29 at 2 (*LULAC*

Plaintiffs' motion for preliminary injunction enjoining §§ 2(a) and 3(b) of the Order); ECF No. 34

at 1 (*DSCC* Plaintiffs' motion for preliminary injunction enjoining §§ 2(a), 3(b), and 4(a) of the

Order); ECF No. 37 at 1 (*NAACP* Plaintiffs' motion for preliminary injunction enjoining §§ 2,

3(b)-(d), 4, and 5 of the Order).

Any doubt on this point is resolved by the text of the Order itself, which provides expressly

that "[i]f any provision of this order, or the application of any provision to any agency, person, or

circumstance, is held to be invalid, the remainder of this order and the application of its provisions

to any other agencies, persons, or circumstances shall not be affected thereby." E.O. § 6. This Court should respect that severability clause here, if necessary. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.") (quotations and citation omitted). Because "the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," the "normal rule" is "that partial, rather than facial, invalidation is the required course." *Id.* (quotations and citations omitted); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173 (1999) (assuming without deciding that "the severability standard for statutes . . . also applies to Executive Orders.").

### 2. The Court should not issue any injunction against the President.

Even if some injunctive relief were appropriate here, it should not run against the President. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

There is no tradition of equitable relief against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, C.J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)). To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501. The Supreme

- 51 -

Court reaffirmed that principle in *Franklin v. Massachusetts*, 505 U.S. at 800-01, in declining to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive "relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.* Indeed, for the same reasons, the President should be dismissed from this case. *See supra* at 36-37 (citing *Doe 2 v. Trump*, 319 F. Supp. 3d at 541).

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court could compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the acts

- 52 -

of the President here in issuing the Order are not "ministerial."  Rather, the Order entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion—not direct the President to carry out a "ministerial" task.

Nor could Plaintiffs' (mostly unexplained) references to the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction.  The D.C. Circuit has observed that courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment).  Declaratory relief is therefore unavailable for essentially the same reasons as an injunction.

3.        The court should require Plaintiffs to post an injunction bond.

If the Court orders any injunctive relief, it should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  And the D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump,* No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam) (citing Fed. R. Civ. P. 65(c)). So, in the event the Court issues preliminary relief, it should also require Plaintiffs to post an appropriate bond, commensurate with the scope of any such order.

## **CONCLUSION**

For these reasons, this case should be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), and Plaintiffs' motions for a preliminary injunction should be denied.

Dated: May 5, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
 Senior Trial Counsel (D.C. Bar. No. 995500)
ESAM K. AL-SHAREFFI
 Trial Attorney (D.C. Bar No. 90010174)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov