**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>                    *Plaintiffs*,<br>        v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                    *Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN<br>CITIZENS, *et al.*,<br><br>                    *Plaintiffs*,<br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>*et al.*,<br><br>                    *Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE<br>ADVANCEMENT OF COLORED PEOPLE, *et<br>al.*,<br><br>                    *Plaintiffs*,<br>        v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                    *Defendants*. | Civil Action No. 26-1151 (CJN) |

**REPLY IN SUPPORT OF
LULAC[1] PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

[1] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I.      LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the

Executive Order. ......................................................................................................2

      A.  LULAC Plaintiffs Have Organizational Standing to Challenge Both Sections 2(a)

          and 3(b). ..........................................................................................................2

      B.  LULAC Plaintiffs Independently Have Standing to Challenge Sections 2(a) and

          3(b) Based on Diversion of Resources and on Behalf of Their Members. ..............7

II.     LULAC Plaintiffs Have an Equitable Cause of Action that is Ripe. ...........................8

      A.  LULAC Plaintiffs Have Established the Injury-in-Fact Required for

          Constitutional Ripeness. ...................................................................................9

      B.  LULAC Plaintiffs Have Established Prudential Ripeness....................................10

III.    LULAC Plaintiffs Are Entitled to Preliminary Injunctive Relief. ..............................15

      A. LULAC Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .............15

      B. The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor. ................24

      C. Plaintiffs' Requested Injunction is Not Overbroad. ...............................................24

      D. This Court Should Deny Defendants' Request for an Injunction Bond..................25

CONCLUSION...................................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Pages**

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)..............................................11

*Bost v. Illinois State Board of Elections*, 146 S. Ct. 513 (2026)...................................................3, 11

*Bridgeport Hospital v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024).....................................................5

*Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. 2019) ....................16

*Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020)....................4

*Chamber of Commerce of United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) .......................11

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*,
    636 F.2d 1084 (5th Cir. 1981) .................................................................................................25

*Consolidation Coal Company v. Federal Mine Safety and Health Review Commission*,
    824 F.2d 1071 (D.C. Cir. 1987)...............................................................................................10

*Consumer Energy Council of America v. Federal Energy Regulatory Commission*,
    673 F.2d 425 (D.C. Cir. 1982)................................................................................................24

*Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020)
    (Kavanaugh, J., concurring) (mem.) .......................................................................................10

*Department of Commerce v. New York*, 588 U.S. 752 (2019)...........................................................6

*Department of the Navy v. Egan*, 484 U.S. 518 (1988) .................................................................17

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ............................................................25

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)..............................................................................................................3, 7

*Fox Television Stations, Inc. v. Federal Communications Commission*,
    280 F.3d 1027 (D.C. Cir. 2002)..............................................................................................15

*Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023)...................................................................19

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025)....................................................11

*Heckler v. Chaney*, 470 U.S. 821 (1985) ......................................................................................12

*League of United Latin American Citizens v. Executive Office of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ("*LULAC I*").....................3, 4, 8, 9, 10, 12, 13, 14, 15, 25

ii

*League of United Latin American Citizens v. Executive Office of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ("*LULAC II*")...................................................3, 8

*League of United Latin American Citizens v. Executive Office of the President*, No. CV 25-0946
(CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026) ("*LULAC III*") .......................................3, 12

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ....................2, 6

*Mail Order Association of America v. United States Postal Service*,
986 F.2d 509 (D.C. Cir. 1993) .........................................................................22

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025)..............................................8

*Myers v. United States*, 272 U.S. 52 (1926).............................................................22

*National Association of Greeting Card Publishers v. United States Postal Service*,
462 U.S. 810 (1983)......................................................................................23

*National Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025) ...........................................4

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) ...............................................17

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ...............................24

*Printz v. United States*, 521 U.S. 898 (1997)..........................................................20

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).................................................10

*Trump v. New York*, 592 U.S. 125 (2020)...................................................................9

*Trump v. United States*, 603 U.S. 593 (2024)...........................................................18, 19

*Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ...............................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) (Jackson, J. concurring)..................................................17, 18, 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)...............................................21

**Statutes**

18 U.S.C. § 611.......................................................................................18

39 C.F.R. § 3020.102 .................................................................................13

39 C.F.R. § 3020.111(a), (b)..........................................................................13

39 C.F.R. § 3020.111(d) ..............................................................................13

39 U.S.C. § 101.......................................................................................12

39 U.S.C. § 101 *et seq.*..............................................................................22

39 U.S.C. § 403 ...................................................................................................................12

39 U.S.C. § 404 ...................................................................................................................12

39 U.S.C. §§ 3001-18 .........................................................................................................12

52 U.S.C. § 20511 ...............................................................................................................18

52 U.S.C. § 21083 ...............................................................................................................12

52 U.S.C. § 21085 ...............................................................................................................12

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ..................................................................................................1

U.S. Const. art. I, § 8 ...........................................................................................................1

**Other Authorities**

Akhil Reed Amar, *After Words*, 37 Constitutional Commentary 69 (2022) .................................23

Andrew T. Hill, *The First Bank of the United States*, Federal Reserve History (Dec. 4, 2015)
    https://www.federalreservehistory.org/essays/first-bank-of-the-us ........................................23

Executive Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026)..................................5, 6, 13, 14

Press Release, United States Department of Justice, Justice Department Files Help America Vote
    Act Lawsuit Against North Carolina for Inaccurate Voter List (May 27, 2025),
    https://www.justice.gov/opa/pr/justice-department-files-help-america-vote-act-lawsuit-
    against-north-carolina-inaccurate. ......................................................................................20

Press Release, United States Department of Justice, Justice Department Sues Five Additional
    States for Failure to Produce Voter Rolls (Feb. 26, 2026),
    https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-
    produce-voter-rolls............................................................................................................20

Ryan Ellis, *The Birth of the USPS and the Politics of Postal Reform*, MIT Reader (Aug. 17,
    2020), https://thereader.mitpress.mit.edu/birth-of-usps-politics-of-postal-reform/. ...............23

Smithsonian National Postal Museum, *Post Office Act of 1792*,
    https://postalmuseum.si.edu/object/npm_1984.1127.8 (last visited May 8, 2026)..................23

Scott Bomboy, *The Constitution and the Postal System*, National Constitution Center (Dec. 19,
    2024), https://constitutioncenter.org/blog/the-constitution-and-the-postal-system ................23

**INTRODUCTION**

The President has issued an Executive Order mandating the commencement of an unlawful rulemaking to require the Postal Service to refuse to deliver certain mail ballots and requiring the creation of a federal voter eligibility screening regime that is wholly unauthorized by Congress. The President has no power to issue either command. Indeed, Federal Defendants all but concede the President's lack of authority. Their memorandum opposing injunctive relief contains no merits defense of the constitutionality of these commands. That glaring absence is telling and unavoidable. The Constitution withholds from the President any power to issue the challenged commands in Sections 2(a) and 3(b) of the Executive Order. And, as LULAC Plaintiffs previously detailed, the President's power cannot stem from any congressional mandates because the challenged commands in Sections 2(a) and 3(b) are actually contrary to multiple statutes enacted by Congress. LULAC Pls.' Mem., ECF 53 at 27-34, 37-40. Federal Defendants do not meaningfully contest any of these arguments.

Instead, Defendants primarily oppose Plaintiffs' motions by arguing that it is not yet clear what other federal actors may do to implement the President's commands. Defendants try to have it both ways. They suggest hypothetical barriers against justiciability to defeat Plaintiffs' motion. Yet Federal Defendants never disclaim the ability to implement Sections 2(a) and 3(b) if this Court does not grant Plaintiffs' requested injunctive relief. And try as they might to recast the commands in the Executive Order as unclear or non-mandatory, those arguments do not withstand the plain text of the Order and well-established rules of construction.

The power to set federal elections rules belongs to the States and to Congress, and the power to regulate the Postal Service belongs to Congress. U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. I, § 8. The President's attempt to seize those powers to tell USPS which mail ballots it may

1

and may not deliver and to set up an unauthorized federal voter eligibility screening regime is patently unlawful. No further action or fact development needs to occur for this Court to properly exercise its jurisdiction and grant relief to prevent imminent injury to LULAC Plaintiffs, their members, and the voting public at large.

## I.    LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the Executive Order.

 As LULAC Plaintiffs' opening memorandum explains at length and as supported by eleven unrebutted factual declarations, Plaintiffs LULAC, Secure Families Initiative, and Arizona Students' Association (collectively, "LULAC Plaintiffs") have both organizational and associational standing. LULAC Pls.' Mem. at 13-23. In response, Intervenor State Defendants and Federal Defendants argue that Plaintiffs cannot show injury-in-fact because the requirements that Sections 2(a) and 3(b) impose are not sufficiently defined or certain to cause cognizable injury to Plaintiffs or to their members. But those arguments ignore binding case law and misapprehend both the scope and impact of the challenged provisions.

### A.    LULAC Plaintiffs Have Organizational Standing to Challenge Both Sections 2(a) and 3(b).

Neither Federal nor State Defendants cite, much less distinguish, the key D.C. Circuit precedent establishing that LULAC Plaintiffs have organizational standing to challenge Sections 2(a) and 3(b). *See generally* Fed. Defs.' Br., ECF 117-1; State Defs.' Br., ECF 105. In *League of Women Voters of United States v. Newby*, the D.C. Circuit specifically held that "new obstacles" that "unquestionably make it more difficult for [voter registration organizations] to accomplish their primary mission of registering voters" establish Article III injury and irreparable harm. 838 F.3d 1, 9 (D.C. Cir. 2016). *Newby* was the primary legal basis for the holdings that LULAC Plaintiffs had organizational standing to challenge the documentary-proof-of-citizenship requirements in the prior, unlawful voting Executive Order and it is equally applicable here. *See*

2

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 188-89

(D.D.C. 2025) ("*LULAC I*"); *League of United Latin Am. Citizens v. Exec. Off. of the President*,

808 F. Supp. 3d 29, 57 (D.D.C. 2025) ("*LULAC II*"); *League of United Latin Am. Citizens v. Exec.

Off. of the President*, No. CV 25-0946 (CKK), 2026 WL 252420, at *37-38 (D.D.C. Jan. 30, 2026)

("*LULAC III*").

Sections 2(a) and 3(b) impose the same types of irreparable, programmatic harms on

Plaintiffs in this case that the D.C. Circuit recognized in *Newby*. Starting with Section 2(a), the

creation and transmission of the State Citizenship List directly harms Plaintiffs' "core business

activities" in assisting their members to successfully register to vote and cast a ballot. *See Food &

Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*AHM*"); *Newby*, 838 F.3d

at 9. Although Section 2(a) mandates the creation of lists that purport to aid States in vetting

eligible voters, such lists unquestionably will exclude validly registered voters. *See* LULAC Pls.'

Mem. at 9-12. Section 2(a) thus creates a "new obstacle" that makes it more difficult for Plaintiffs

to ensure that the voters they register and assist will actually be able to cast a valid ballot. The

same is true with respect to Section 3(b): it directly interferes with Plaintiffs' respective missions

to assist their members and others in the constituencies they serve to access voting by mail. *See

LULAC Pls.' Mem. at 20-23. By conditioning the ability to vote by mail on enrollment in the

Mail-In and Absentee Participation List, Section 3(b) interferes with the assistance Plaintiffs

provide and makes the process of voting by mail more difficult and less sure to lead to the casting

of an effective ballot. *AHM*, 602 U.S. at 395.[2]

---

[2] In addition to these irreparable programmatic injuries, Sections 2(a) and 3(b) also injure
Plaintiffs' particularized interests in a fair electoral process and public confidence in elections. *See
Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513 (2026). Neither Federal nor State Defendants
contest LULAC Plaintiffs' assertion of their particularized electoral process harms under *Bost*.

In addition to ignoring *Newby*, Defendants rely on cases that bear no similarity to the facts here. For example, in *Center for Democracy & Technology v. Trump*, the challenged provisions "direct[ed] various government actors to 'file *a petition* for rulemaking . . . *requesting* that the FCC expeditiously *propose* regulations,' to '*review* . . . Federal spending,' to '*consider* taking action,' to '*consider* developing a report,' to 'establish a *working group*,' and to 'develop a *proposal* for Federal legislation.'" 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (alterations and emphases in original). Likewise, in *National Urban League v. Trump*, the challenged provisions merely directed "the President's subordinates to gather information and propose policy strategies." 783 F. Supp. 3d 61, 81 (D.D.C. 2025).

But Sections 2(a) and 3(b) are not inchoate suggestions that merely guide "possible future policymaking *within* the Executive Branch," Fed. Defs.' Br. at 10 (emphasis added). Instead, they are detailed and specific commands from the President that violate the separation of powers, usurping power over elections from the States and Congress and directly impacting which American citizens may be deemed eligible to vote and will be able to cast a mail-in ballot. Although Defendants argue that the scope and impact of the challenged provisions are too uncertain and speculative to support injury-in-fact, those arguments are irreconcilable with the actual text of the Order. Moreover, as Judge Kollar-Kotelly previously held, Defendants' arguments contesting injury rely "on an unworkably cramped theory of what it means to 'impair' an organization's mission that is inconsistent with precedent." *LULAC I*, 780 F. Supp. 3d at 190. "Just as the plaintiff organization in *Havens* had standing to challenge the harmful effects of racial steering on its mission of helping provide equal access to housing, so too Plaintiffs here have standing to challenge the burdens that" Sections 2(a) and 3(b) "would impose on their missions of

registering and turning out eligible voters." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

**State Citizenship Lists.** Section 2(a) mandates the creation of an entirely new federal program, never authorized by Congress, the avowed purpose of which is to provide States with a list to "assist in verifying identity and Federal election voter eligibility." Exec. Order No. 14399, § 1, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("EO" or "Order"). Section 2(a) is replete with specific instructions that the Secretary of DHS and others "*shall* take . . . to compile and transmit" the State Citizenship List "to the chief election official of each State" and how they "*shall*" create those lists. Order § 2(a) (emphasis added). These instructions are not optional; indeed "the word 'shall' generally signals a mandatory duty." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024). State Defendants nonetheless argue that more is needed: (1) because the Order does not enumerate every Federal data source that will be consulted to compile the State Citizenship Lists, and (2) because asserting that States would "automatically exclude . . . voters whose names do not appear" on the State Citizenship Lists is speculative. State Defs.' Br. at 7-8. These arguments miss the mark.

First, LULAC Plaintiffs have already explained at length why the SAVE and SSA datasets that *are* identified in Section 2(a) of the Order do not and cannot provide complete, up-to-date, and accurate sources of citizenship and residency information. LULAC Pls.' Mem. at 9-12. Defendants contest none of that evidence, including in declarations submitted by officials from SSA and USCIS. Even with the submission of agency declarations, there remains no evidence in the record of any federal data source that could correct for the known gaps and errors in SAVE and SSA data.

5

Second, no speculation is required to understand that the inevitable errors in the State Citizenship Lists will harm Plaintiffs.[3] The Supreme Court has held that "the predictable effect of Government action on the decisions of third parties" satisfies the traceability requirement for Article III standing. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). There is already unrebutted record evidence that States (including State Defendants) have removed voters based on faulty SAVE citizenship data without first conducting any further investigation of their own.[4] The "predictable effect" of providing unreliable State Citizenship Lists to state elections officials will be to make it more difficult for some eligible voters to cast a ballot, and to increase the burdens on organizations like LULAC Plaintiffs that seek to ensure that the voters they assist are actually able to participate and vote.

**Mail-In and Absentee Voting List**. Likewise, in Section 3(b), the President "direct(s)" the Postmaster General to initiate a proposed rulemaking by **May 30, 2026**, and further dictates the contents of the proposed rulemaking itself, providing in detail exactly what it "shall include," such as the requirement that USPS "shall not transmit mail-in or absentee ballots from any individual" unless the individual is "enrolled" on a State-specific Mail-In and Absentee Participation List, to be created by USPS. Order § 3(b). Section 3(b) further provides that the final

---

[3] Plaintiffs do not need to show that voters would be "automatically excluded" to establish cognizable injury. They must instead show, and have shown, that the likelihood of errors inherent to the State Citizenship Lists will burden and cause harm to the core business purposes of their organizations in assisting voters. *Newby*, 838 F.3d at 9.

[4] *See* LULAC Pls.' Mem. at 9, 11 (citing Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH (explaining that "[i]n Missouri, state officials acted on SAVE's findings before attempting to confirm them" and that in "hundreds of cases, the tool's determinations were wrong" and that Texas likewise directed counties to remove voters flagged by SAVE if the voter did not respond to a demand that they provide proof of citizenship, which resulted in the removal of U.S. citizen voters).

rule "shall be issued no later than" **July 29, 2026**. Given the specificity of the substantive requirements as well as the detailed and fast-approaching time frames set out by Section 3(b), Defendants' arguments that the requirements of Section 3(b) are not sufficiently "concrete" as to cause injury are wholly without merit. Indeed, USPS's declaration confirms that it is presently "determining how to implement the Executive Order." *See* Decl. of S. Monteith, ECF 117-4 at 2.

### B.    LULAC Plaintiffs Independently Have Standing to Challenge Sections 2(a) and 3(b) Based on Diversion of Resources and on Behalf of Their Members.

Because the imminent and irreparable programmatic injuries detailed above show standing, this Court need not address Defendants' arguments that Plaintiffs have failed to show diversion-of-resources and associational standing as well. *See* State Defs.' Br. at 9, 16. But to the extent this Court reaches these independent bases for standing, Defendants' arguments fail.

First, State Defendants are wrong in claiming that the Supreme Court has "rejected" resource-diversion organizational standing. *See* State Defs.' Br. at 9. In *AHM*, the Supreme Court held that the diversion of resources based on injury to an organization's "abstract social interests" is not sufficient to confer standing, while reaffirming that when a law or policy "directly affect[s] and interfere[s] with [the plaintiff organization's] core business activities" such that the organization must divert resources in response, that plaintiff does have standing. 602 U.S. at 394-95. Responding to the requirements of the challenged provisions will require the diversion of time and resources by Plaintiffs staff to educate members about the requirements of the State Citizenship List and the Mail-In and Absentee Participation List, including how to correct errors and how to confirm or update enrollment. *See* LULAC Pls.' Mem. at 19, 23.

Second, State Defendants err in asserting that LULAC Plaintiffs have not properly supported their associational standing to challenge Section 2(a) because, they claim, Plaintiffs do not identify specific members by name who are likely to be injured by the State Citizenship List.

7

*See* State Defs.' Br. at 16. But—as just one example—LULAC Plaintiffs have explained that all three organizations have members who are naturalized citizens, that such naturalized citizens routinely experience difficulty with their identification because federal databases rely on outdated, incorrect, or mismatched data, and that this places these members at significant risk of being incorrectly flagged as non-citizens and excluded from the State Citizenship Lists. LULAC Pls.' Mem. at 16-17. These allegations are entirely sufficient. As the court in *LULAC I* explained, "the Supreme Court has . . . recognized associational standing based on declarations from leaders of organizations describing their organizations' membership in sufficient detail to support a finding of standing." 780 F. Supp. 3d at 181 (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007)). LULAC Plaintiffs' declarations provide sufficient detail of the nature of the injuries at issue, particularly where the opposing parties do not "need to know the identity of a particular member to respond to [the organization]'s claim of injury." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025).[5]

## II.    LULAC Plaintiffs Have an Equitable Cause of Action that is Ripe.

LULAC Plaintiffs' equitable claims are both constitutionally and prudentially ripe. The Order "dictates a particular outcome and leaves no uncertainty" as to the required result of the rulemaking. *LULAC II*, 808 F. Supp. 3d at 66; *see also Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall . . . before the court will issue an injunction."). That outcome is a clear separation of powers violation that the President has already committed by exceeding his constitutional sphere of authority in attempting to dictate election rules and procedures. Because the issuance of those unlawful commands has already occurred, LULAC Plaintiffs' claims are ripe.

---

[5] Defendants do not make a similar challenge to LULAC Plaintiffs' assertion of associational standing to challenge Section 3(b).

A.    **LULAC Plaintiffs Have Established the Injury-in-Fact Required for Constitutional Ripeness.**

LULAC Plaintiffs have established constitutional ripeness by identifying definitive injury-in-fact. *See supra* Section I. "In a case like this one involving a pre-enforcement challenge to executive action, 'constitutional ripeness is subsumed into the Article III requirement of standing, which requires a plaintiff to show an injury-in-fact that is imminent or certainly impending." *LULAC I*, 780 F. Supp. 3d at 173 (quoting *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 403 (D.C. Cir. 2020)). Because LULAC Plaintiffs have established injury-in-fact, *see supra* Section I, Defendants' arguments concerning constitutional ripeness are unavailing.

Federal and State Defendants rely heavily on *Trump v. New York*, 592 U.S. 125 (2020), arguing that LULAC Plaintiffs' claims are not ripe until the relevant agencies act on the unlawful Order. Fed. Defs.' Br. at 15; State Defs.' Br. at 17-18. But *Trump v. New York* presented a *very* different presidential memorandum that, unlike the Order here, was indeed rife with uncertainty. In that case, the only "order" in the memorandum was a directive to the Commerce Secretary to "gather information" that would later allow the President to "exercise the President's *discretion*" to set a policy. 592 U.S. at 130-31. The Supreme Court stressed that determining how the President would exercise that discretion was speculative and that the evidence of injury was entirely based on "unrealistic[]" assumptions about future unspecified Presidential action. *Id.* at 133. The Court concluded that the plaintiffs lacked standing, and the case was not ripe. *Id.* at 134.

Unlike *Trump v. New York*, Plaintiffs' harms do not depend on any future discretionary action by the President but rather only on follow-through on the mandatory dictates of his order. As such, the impacts of the Order on LULAC Plaintiffs are foreseeable and not speculative. *See supra* Section I. In sum, "the Article III standing and ripeness issues in this case boil down to the same question"—whether Plaintiffs must wait for actual enforcement before challenging an action

9

that has been authorized to occur notwithstanding its patent illegality. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5, 158-59 (2014) (citation modified); *see also LULAC I*, 780 F. Supp. 3d at 173. Precedent makes clear that the answer is "no." *See Consolidation Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 824 F.2d 1071, 1081 (D.C. Cir. 1987) (for ripeness inquiry, "[i]t is enough that the petitioner show that it has suffered sufficient hardship to pass the Article III threshold").

## B.    LULAC Plaintiffs Have Established Prudential Ripeness.

LULAC Plaintiffs' claims are ripe for preliminary injunctive relief under the two-part balancing test for prudential ripeness. *See LULAC I*, 780 F. Supp. 3d at 174 (setting out test). First, "delaying review would cause hardship to" LULAC Plaintiffs, whose members have already been harmed by the uncertainty and confusion surrounding their ability to vote by mail in upcoming elections. *Id.*; *see supra* Section I. Second, there are no viable "institutional reasons for deferring review, like whether agency action is tentative and ongoing (as opposed to final) and whether further factual development is necessary." *See LULAC I*, 780 F. Supp. 3d at 174. That is so because this case challenges the legality of Presidential commands, not any particular final agency action. Moreover, given ongoing Federal primary elections and the upcoming Federal general elections in the fall, there is every reason to settle the legality of the President's commands now. As Justice Kavanaugh has explained, the Supreme Court's cases repeatedly recognize "a basic tenet of election law: [w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (mem.). The "thousands of state and local officials and volunteers" who participate "in a massive, coordinated effort to implement the lawmakers' policy choices" must have clarity about what the rules are to communicate to voters "how, when, and where they may cast their ballots," including through voting by mail. *Id.* Indeed, if this Court requires Plaintiffs to wait,

Defendants will almost certainly argue at that point that it is too late for the Court to issue orders affecting the election process. *See Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 521 (2026) ("[T]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." (internal citation omitted)).

Federal Defendants argue that LULAC Plaintiffs' claims are not prudentially ripe and that review should be deferred because LULAC Plaintiffs raise APA and statutory claims. Fed. Defs.' Br. at 18-20, 27-29. Not so. LULAC Plaintiffs *are not* seeking preliminary relief for any statutory claims now. All claims for which LULAC Plaintiffs seek preliminary injunctive relief challenge the President's authority to issue the challenged provisions in the Order, not any final agency action flowing from his commands. Thus, LULAC Plaintiffs' claims at issue now are brought directly under the Constitution, not under the APA or any other statute. LULAC Pls.' Mem. at 27-33, 36-37. LULAC Plaintiffs invoke statutes such as HAVA, the NVRA, and UOCVA only to demonstrate the severity of the President's separation of powers violation, underscoring that the President is not only acting outside of his constitutional sphere of authority but is also acting contrary to the laws Congress has passed. LULAC Pls.' Mem. at 37-40.

It is well-established that Plaintiffs have an equitable cause of action to challenge Presidential commands as *ultra vires* when they are not grounded in any proper assertion of constitutional authority. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The D.C. Circuit has made clear that *ultra vires* claims raise constitutional, not statutory claims, where "the presidential action at issue was not even contemplated by Congress." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) (citation modified). That is the case here. LULAC Plaintiffs' challenges to the President's authority to issue the commands in Sections 3(b) and 2(a)

11

of the Order "arise directly under the Constitution." *LULAC III*, 2026 WL 252420, at *26 (citation modified).

Next, Defendants argue that LULAC Plaintiffs' claims are "riddled with contingencies," Fed. Defs.' Br. at 7; State Defs.' Br. at 17, such that review should be deferred. But the Order's text "dictates a particular outcome and leaves no uncertainty by prescribing the substance of the . . . requirement[s] it purports to mandate." *LULAC I*, 780 F. Supp. 3d at 185. In Sections 2(a) and 3(b), the President usurps the power of the States and Congress and commands that agencies take actions in a manner that violates the separation of powers. *See supra* Section I (discussing the mandatory language in the Order). Thus, the unlawful commands that LULAC Plaintiffs seek to enjoin—the circumvention of the role of Congress and the States in setting election rules—have *already* been given.

Moreover, there are no relevant contingencies because USPS plainly cannot comply with the Order without violating multiple statutory obligations and constraints that Congress has imposed on the Postal Service. *See Heckler v. Chaney*, 470 U.S. 821, 833 (1985) ("Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."). HAVA provides the States, not the Postal Service or any other federal actor, with exclusive authority to administer voter lists. *See* 52 U.S.C. §§ 21083, 21085. Section 3(b)'s requirement to initiate a rulemaking creating the Mail-In and Absentee Voter List is not only incompatible with HAVA, Section 3(b)'s requirement that the USPS rulemaking delineate which mail ballots USPS will deliver and which it will not flatly violates both the Postal Reorganization Act of 1970's ("PRA") universal service obligation in 39 U.S.C. §§ 101, 403, 404, and the limits of the PRA's nonmailable provisions in 39 U.S.C. §§ 3001-18. *See* LULAC Pls.' Mem. at 27-34.

12

Neither Federal nor State Defendants muster a single line of argument attempting to show how the contents of the proposed rulemaking, as set out in Section 3(b), could possibly comply with these statutory mandates. That is because no reconciliation is possible. Section 3(b) simply commands a rulemaking that will not comply with any of these statutory requirements. These purely legal issues are ripe and can and must be addressed now.[6]

Despite "Defendants' talismanic invocation of the Executive Order's savings clause," there is nothing in the Order that renders LULAC Plaintiffs' challenges unripe. *LULAC I*, 780 F. Supp. 3d at 186; *see* Fed. Defs.' Br. at 9, 13, 18, 34; State Defs.' Br. at 17-19. First, Section 3(b) contains no particularized savings clause at all. Only Section 2(a) does, as it states that the DHS Secretary shall take the prescribed actions "to the extent feasible and consistent with applicable law."[7] But

---

[6] In addition to these irreconcilable substantive conflicts, the rulemaking as proscribed cannot be accomplished consistent with USPS's mandatory procedural obligations. USPS must request an advisory opinion from the Postal Regulatory Commission for nationwide service changes—like the one that Section 3(b) mandates—at least 90 days before implementation. 39 C.F.R. § 3020.102. Prior to requesting the advisory opinion, USPS must conduct one or more pre-filing conferences with "interested persons in the proceeding and shall make a good faith effort to address the concerns of such persons" to "identify[] relevant issues and information needed to address those issues during proceedings at the Commission." 39 C.F.R. § 3020.111(a), (b). USPS must file a notice of the pre-filing conference at least ten days before the conference occurs. 39 C.F.R. § 3020.111(d). The USPS Declaration does not state that USPS will initiate a request for an advisory opinion from the Postal Regulatory Commission 90 days prior to implementation, nor that USPS will conduct any pre-filing conferences. *See generally* Decl. of S. Monteith, ECF 117-4. Nor could it. USPS cannot comply with both the requirement to request an advisory opinion from the Commission and the Order's mandate to initiate a proposed rulemaking within 60 days of April 3—the date the President issued the Order. Order § 3(b). The Order's deadline for rulemakings therefore does not allow this mandatory regulatory review of USPS's proposed rules. The Order thus makes certain that USPS must violate its procedural obligations to comply with the Order's timing mandates. That fact alone renders LULAC Plaintiffs' challenge to Section 3(b) ripe.

[7] The Order also contains a catch-all savings clause in Section 7(b), stating that its provisions "shall be implemented consistent with applicable law and subject to the availability of appropriations." Order § 7(b). That boilerplate language does not defeat ripeness and shield the legality of the commands in the Order from direct judicial review.

13

"executive orders, like statutes, 'cannot be held to destroy themselves through saving clauses.'" *LULAC I*, 780 F. Supp. 3d at 176 (quoting *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020)). This makes sense. If the magic words "feasible and consistent with applicable law" could prohibit "a court from examining whether the Executive Order is consistent with law, judicial review [would become] a meaningless exercise, precluding resolution of the critical legal issues." *Id.* (citing *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)).[8]

Because the President has acted so clearly outside of any constitutional authority, and the challenged provisions in "the executive order cannot possibly be implemented consistent with applicable law," any "command to do so in a saving clause is meaningless." *LULAC I*, 780 F. Supp. 3d at 176. State Defendants' attempt to put daylight between this case and the court's reasoning in *LULAC I* is unavailing. State Defendants claim that *LULAC I* was different because it "concern[ed] an executive order mandating specific action without any qualifiers," State Defs.' Br. at 20, but that is also the case here. The Order mandates that DHS and USPS *shall* take particular actions. *See supra* Section I. The savings clause made no difference in *LULAC I* and should not here.

Defendants also argue that the presumption of regularity renders the Order unfit for review, but no presumption can trump the text of the Order itself, endow the President with the power to command USPS rulemaking, or provide the power to order the creation of an extra-statutory voter list maintenance "tool." Fed. Defs.' Br. at 40-41; State Defs.' Br. at 32. The presumption of

---

[8] Moreover, including the word "feasible" in Section 2(a) does not render LULAC Plaintiffs' challenge unripe. Plaintiffs challenge the President's unlawful assertion of authority, and not the implementation of his commands by any federal actor. Defendants cannot permanently shield themselves from pre-enforcement judicial review by declining to assert whether they have determined that implementation is "feasible," all the more so because the Order requires them to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" within 90 days (by June 29, 2026). Order § 4(c).

14

regularity "operates as a razor for resolving factual disputes," but it cannot reach "the underlying legality of the agency action." *LULAC I*, 780 F. Supp. 3d at 177. Instead, a reviewing court must still determine whether the government has "compl[ied] with applicable statutory and constitutional requirements.'" *Id.* (quoting *U.S. Lines, Inc. v. Fed. Marit. Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978)). Here, the President has acted not only outside of his constitutional sphere of authority but contrary to the laws Congress has passed. The presumption of regularity cannot save his unlawful Order. LULAC Pls.' Mem. at 37-40.

## III.    LULAC Plaintiffs Are Entitled to Preliminary Injunctive Relief.

### A.    LULAC Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

The limited arguments that Federal and State Defendants assert regarding the merits of Plaintiffs' claims can be easily dispatched. LULAC Plaintiffs take them in turn.

Federal Defendants, for their part, primarily rehash their ripeness arguments and claim "it is not even *possible* to litigate the merits of this case at this time, based on this record" because the relevant federal agencies have not yet taken action to implement the Order. Fed. Defs.' Br. at 44, 48. But, as discussed earlier, this misconstrues the nature of LULAC Plaintiffs' claims. At this juncture, LULAC Plaintiffs do not ask this Court to decide whether any federal agency has broken the law by creating a State Citizenship List or by implementing the directive to stop delivering mail ballots to certain voters. Rather, the crux of the case is that the President has *already* broken the law with the issuance of the Order itself, through which he improperly asserts federal executive control over election administration. *See supra* Section II.

The fact that LULAC Plaintiffs' claims raise "purely legal" questions—what Federal Defendants refer to as "abstract legal question[s]"—does not support their position that this case cannot be meaningfully reviewed on the merits. Fed. Defs.' Br. at 45; *see Fox Television Stations,*

15

*Inc. v. Fed. Commc'ns Comm'n*, 280 F.3d 1027, 1039 (D.C. Cir. 2002). No further implementation of the President's actions must occur for the legality of the President's action to be adjudicated.[9] The entire point of a constitutional *ultra vires* review grounded in separation of powers principles is that the existence of the unlawful executive action itself violates the Constitution. Thus, contrary to Federal Defendants' claim, there is no need for fact-finding on how the agencies will implement the Order, as the claims raise purely legal questions. *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 233 (D.D.C. 2019).

Indeed, Federal Defendants concede that Plaintiffs can challenge provisions in the Order that are "without *any* valid application." Fed. Defs.' Br. at 46 (quoting *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)). That is the case as to both Section 2(a) and 3(b)(iii) and (iv). Federal Defendants' examples of potentially "valid application" have nothing to do with, and are completely unimplicated by, the actual commands that Plaintiffs challenge. Thus, the President's authority to "manage the enforcement priorities of the Executive Branch," Fed. Defs.' Br. at 47, has nothing to do with any claimed authority to require not only the internal creation, but the external distribution of State Citizenship Lists to state election officials. The same is true for the mandate that the Postal Service complete a rulemaking to refuse to deliver certain mail ballots. There is no conceivable argument that such commands are related to facilitating "post-election law-enforcement." Fed. Defs.' Br. at 48.  Sections 2(a) and 3(b)(iii) and (iv) of the Order are therefore facially invalid.

---

[9] Federal Defendants' position yet again tries to have it both ways—suggesting that no challenge is ripe until an agency has acted on the President's unlawful Order, and then suggesting that at such time that an agency does act, Plaintiffs must show that the agency did so "only because it was directed to by the President—rather than, for example, as an exercise of the agency's own independent judgment." Fed. Defs.' Br. at 45. This is more jurisdictional gamesmanship to prevent any court from reviewing the legality of the President's command in and of itself, no matter how unlawful or how injurious.

State Defendants' arguments fare no better.

**Section 2(a):** State Defendants' arguments as to Section 2(a) can be readily rejected. They first contend that the President possesses inherent authority to manage the Executive Branch and that this authority encompasses "gather[ing] and organiz[ing] information" and controlling "personnel, resources, and materials throughout the Executive Branch." State Defs.' Br. at 21-22. But the President's Article II "executive Power" is not limitless. Executive orders cannot override or sidestep Congress's will when it has acted in areas the Constitution commits to Congress. Here, not only does the Privacy Act impose relevant constraints, through the NVRA and HAVA, Congress has expressly given the States clear list-maintenance and voter-verification responsibilities and has deliberately declined to displace States' constitutional authority over voter registration. *See* LULAC Pls.' Mem. at 5-7, 37-40.

State Defendants' reliance on *Nixon v. Administrator of General Services*, 433 U.S. 425, 441 (1977), and *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988), is misplaced. *Nixon* stands for the proposition that Congress may regulate presidential records without trenching on Article II. *Egan* turns on the President's specific role as Commander in Chief and his duty to protect national security information. Contrary to State Defendants' readings, nothing in *Nixon* or *Egan* recognizes inherent presidential power to direct agencies to create and distribute massive state-by-state citizenship lists.

State Defendants next argue that Section 2(a) falls within *Youngstown*'s second "zone of twilight" category, claiming that the President may rely on his inherent independent authority where there is no "congressional grant or denial of authority, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring). State Defs.' Br. at 22-23. But that argument is misguided because it assumes that Congress has been silent. In fact, the opposite is

true. As LULAC Plaintiffs have explained, Congress carefully and repeatedly addressed voter registration list maintenance and voter verification procedures in multiple federal statutes and left those functions to the States. *See* LULAC Pls.' Mem. at 5-7, 37-40 (discussing NVRA and HAVA). In elections, a field in which Congress has acted and affirmatively vested responsibility in the States, the President cannot claim to operate in a statutory vacuum. This is, at best for State Defendants, a *Youngstown* Category 3 case, where presidential power is at its "lowest ebb" and must yield to Congress's design. *Youngstown*, 343 U.S. at 636 (Jackson, J. concurring).

Unable to establish inherent authority, State Defendants pivot to the enforcement of Congress's will through the "Take Care Clause." State Defs.' Br. at 23. They assert that, because Congress has criminalized noncitizen voting and certain ballot fraud schemes, *see* 18 U.S.C. § 611; 52 U.S.C. § 20511, the President may direct the Executive Branch to compile and distribute State Citizenship Lists to help enforce those laws. *Id.* But neither statute remotely authorizes what Section 2(a) commands. Section 611 criminalizes noncitizen voting in federal elections. And Section 20511 imposes criminal penalties on any person, including an election official, who knowingly defrauds the residents of a State "*under the laws of the State* in which the election is held." (emphasis added). By its plain terms, Section 20511 reinforces that ballot fraud penalties operate within each State's legal framework and underscores that Congress chose to address fraud through state-anchored mechanisms, not federally managed citizenship lists. The existence of these criminal provisions therefore does not confer on the President authority to design or operate voter registration lists.

State Defendants further improperly invoke *Trump v. United States*, 603 U.S. 593 (2024), for the proposition that the President's duty to "take Care that the Laws be faithfully executed" encompasses not only enforcement of federal election laws but taking *any* step that could

18

theoretically assist in enforcement of federal election crimes. *Trump* concerned whether the President's conduct surrounding the 2020 election—including conversations with individuals outside the Executive Branch—constituted official or unofficial acts for purposes of criminal immunity, a question that the Court remanded for further factfinding. *Id.* at 626-27. It did not hold that the Take Care Clause authorizes the President, in the face of Congress's contrary allocation of authority, to command Executive agencies to construct state-by-state citizenship lists. The isolated sentence State Defendants quote cannot bear the weight they place on it. *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023) does not help State Defendants either. State Defs.' Br. at 23. There, Mark Meadows sought to remove to federal court his Georgia state criminal prosecution related to his alleged attempts to influence state officials regarding the results of the 2020 election. *Id.* at 1345. The Eleventh Circuit rejected removal, but more relevant to this case, it further emphasized that the Chief of Staff's role does not include supervising state election officials or altering state election outcomes. *Id.* at 1346-47. Far from supporting the States here, *Meadows* underscores that there is no authority "suggesting that the Take Care Clause empowers federal executive interference with state election procedures based solely on the federal executive's own initiative, and not in relation to another branch's constitutionally authorized act." Here, the President has acted on his own initiative. *Id.* at 1347.

State Defendants fare no better in characterizing Section 2(a) as a benign, "optional" federal resource that does not "displace state voter registration lists." State Defs.' Br. at 24. Acknowledging that even if the NVRA and HAVA give the States control over voter registration lists, State Defendants insist that the Order simply provides state officials with an additional tool. *Id.* But that argument misconstrues the practical effect and overall purpose of Section 2(a) and the context in which it was issued. The federal government has already filed more than thirty lawsuits

19

seeking confidential voter-registration information from States, purportedly to pursue alleged noncitizen voting.[10] States have expended substantial time and taxpayer resources defending those cases. The federal government also sued North Carolina for failing to "maintain accurate voter registration rolls."[11] Against that backdrop, an executive order that directs federal agencies to create State Citizenship Lists for supposedly "optional"[12] use in list maintenance is best understood as a mechanism to channel and intensify federal pressure on States to adopt federal preferences in how they maintain their rolls. When the real-world design of a federal program leaves States with no meaningful alternative but to comply—because the federal government simultaneously sues States for not engaging in federalized list maintenance efforts—the "option" is illusory. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 925 (1997) ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.)."

The seemingly "innocuous" act of compiling State Citizenship Lists for millions of voters and making those lists available to the States for use in voter-roll maintenance intrudes on the very list-maintenance responsibilities that the NVRA and HAVA reserve to the States. *See* LULAC Pls.' Mem. at 5-7, 37-40. LULAC Plaintiffs' briefing explains how those statutes establish a comprehensive scheme governing how States create, maintain, and update their voter registration lists and how they verify eligibility. Section 2(a) is designed to reshape those processes by inserting

---

[10] *See* Press Release, U.S. Dep't of Just., Justice Department Sues Five Additional States for Failure to Produce Voter Rolls (Feb. 26, 2026), https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls.

[11] *See* Press Release, U.S. Dep't of Just., Justice Department Files Help America Vote Act Lawsuit Against North Carolina for Inaccurate Voter List (May 27, 2025), https://www.justice.gov/opa/pr/justice-department-files-help-america-vote-act-lawsuit-against-north-carolina-inaccurate.

[12] The Order itself, of course, does not use the word "optional."

a "federal regulatory program" into the heart of state list maintenance decisions. By any meaningful measure, that constitutes interference with election procedures.

Finally, State Defendants suggest that the Court lacks authority to "second-guess" the President's choices in this domain, invoking cases counseling judicial caution in reviewing presidential management of the Executive Branch. State Defs.' Br. at 24-25. But LULAC Plaintiffs do not ask the Court to audit something akin to the President's office-supply preferences, as State Defendants suggest. *Id.* at 24. Plaintiffs challenge a concrete and detailed directive that regulates elections by seizing list-maintenance functions that Congress has entrusted to the States and reordering them according to the President's will alone. Courts have both the authority and the duty to review unconstitutional executive actions, including those taken by the President.

**Section 3(b):** State Defendants' arguments on Section 3(b) fare no better. The operative question before this Court is whether the President has engaged in an action that is beyond the power over elections and USPS afforded to him by the Constitution and Congress's express or implied will. The answer is that he clearly has.

In demanding that LULAC Plaintiffs identify a "clear statement" from Congress preventing the President from taking control of USPS, State Defendants misstate the question. State Defs.' Br. at 32-33. A clear statement from Congress is not needed here, where the power of the President is at its lowest ebb—a *Youngstown* Category 3 case—because his actions are incompatible with Congress's will, whether "express or implied." *Cf. Youngstown*, 343 U.S. at 635 (Jackson, J. concurring). Rather, because Section 3(b) is incompatible with Congress's will, as expressed in multiple statutes governing mail and elections, it must rely on presidential powers that are "both 'exclusive' and 'conclusive' on the issue." *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). The powers the

21

President asserts over the mail and elections here are neither exclusively nor conclusively his under the Constitution. The opposite is true: they belong exclusively and conclusively to Congress and the States, and therefore no clear statement from Congress is required to determine he cannot wrest control of USPS and order it to violate multiple statutory commands.

Stuck with no other place to go, State Defendants make the extreme argument that the President's control over USPS is boundless, and that *any limitation* on the President's authority to force USPS to issue rulemakings—even ones that are patently beyond USPS's own statutory authority and duties—would be unconstitutional. State Defs.' Br. at 34. In making this sweeping argument, State Defendants misapply relevant case law and distort the historical record. State Defendants rely on *Myers v. United States*, 272 U.S. 52, 135 (1926), but *Myers* predates Congress's carefully crafted Postal Reorganization Act of 1970, 39 U.S.C. § 101 *et seq*. *Myers* addressed the removal of certain local postmasters before Congress made the post office an independent establishment and reclassified local postmasters as civil servants rather than Appointment Clause officers. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 519 (D.C. Cir. 1993). Nor can *Myers* serve as support for the President's boundless authority to supervise the Postmaster General as under Section 3(b). The PRA reclassified the Postmaster General from the department head to an "inferior officer," whose appointment the Constitution permits to be vested in either the President alone, Courts of Law, or in the Heads of Departments. The Governors have since 1970 served collectively as the Head of USPS, and the Postmaster General serves under their direct supervision—not the President's.

Contrary to Defendants' arguments, the most relevant institutional comparator for the Post Service is the Federal Reserve. State Defs.' Br. at 35. As early as 1792, Congress "codified the

22

presumption that Congress would retain primary control over postal policy," not the President.[13] The insulated nature of the postal service changed during President Andrew Jackson's administration when he used the postal service and other agencies to institute a pervasive spoils system, which Congress codified in 1872.[14] This "spoils system" led to a full-fledged "economic and operational crisis" that ultimately compelled Congress to pass the PRA, remove the postal service operation from presidential control,[15] and re-establish USPS as a self-sustaining independent corporate entity existing within the U.S. government. *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 822 (1983). Given this history, State Defendants' flippant claim that the postmaster general has been part of the President's cabinet for "most of the country's history" is plainly wrong. State Defs.' Br. at 35.

Moreover, this history parallels that of the Second Banks and Federal Reserve.[16] Despite State Defendants' claims to the contrary, like the Federal Reserve, USPS is a "uniquely structured, quasi-private entity that follows in the distinct historical tradition of the [founding era Post Office Department]." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). This "historical lineage of independence," State Defs.' Br. at 35, further confirms the utter baselessness of State Defendants'

---

[13] Smithsonian Nat'l Postal Museum, *Post Office Act of 1792*, https://postalmuseum.si.edu/object/npm_1984.1127.8 (last visited May 8, 2026).

[14] Scott Bomboy, *The Constitution and the Postal System*, Nat'l Const. Ctr. (Dec. 19, 2024), https://constitutioncenter.org/blog/the-constitution-and-the-postal-system; Akhil Reed Amar, *After Words*, 37 Const. Comment. 69, 73 (2022) ("The federal postal system was a key component of Jackson's patronage network ('the Spoils System').").

[15] Ryan Ellis, *The Birth of the USPS and the Politics of Postal Reform*, MIT Reader (Aug. 17, 2020), https://thereader.mitpress.mit.edu/birth-of-usps-politics-of-postal-reform/.

[16] Like the Postal Service, these institutions have a parallel history of traditional independence, assertion of Jacksonian presidential control, crisis, and reestablishment of statutory independence. *See* Andrew T. Hill, *The First Bank of the U.S.*, Fed. Rsrv. Hist. (Dec. 4, 2015) https://www.federalreservehistory.org/essays/first-bank-of-the-us.

boundless argument for complete Article II control of the USPS, irrespective of the statutory mandates that Congress has enacted.

### B.      The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor.

Federal Defendants make two arguments contesting the balance of equities and the public interest. First, they argue that "Plaintiffs' interest is slight" and they "merely seek to prevent hypothesized harm" that "may never come to pass." Fed. Defs.' Br. at 50. In doing so, they wave away the substantial disenfranchisement that is likely to result if Sections 2(a) and 3(b) remain in effect. *See supra* Section I. This Court should not do the same. Second, they suggest the public interest will be harmed if an injunction were to "restrain the President from overseeing the Executive Branch." *Id.* at 49. But neither the public nor Defendants "suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). There is no public interest in the violation of the constitutional separation of powers. *Consumer Energy Council of Am. v. Fed. Energy Regul. Comm'n*, 673 F.2d 425, 471 (D.C. Cir. 1982). To the contrary, an injunction that protects and upholds the separation of powers—and the laws passed by Congress—is squarely in the public interest.

### C.      Plaintiffs' Requested Injunction is Not Overbroad.

Federal Defendants' arguments as to the scope of the injunction do not apply to LULAC Plaintiffs. For the sake of clarity, LULAC Plaintiffs offer two points. First, on the question of severability—LULAC Plaintiffs seek a narrow injunction that provides relief as to Sections 2(a) and 3(b) of the Order only, LULAC Pls.' Mem. at 2, as Federal Defendants seem to acknowledge, Fed. Defs.' Br. at 43. Second, on the question of whether the injunction should run against the President—as laid out in its motion for preliminary injunction, LULAC Plaintiffs request that 17

24

individual and agency Defendants be enjoined from implementing the Order, but neither President Trump nor the Executive Office of the President are included on that list. LULAC Pls.' Mem. at 2.

### D.  This Court Should Deny Defendants' Request for an Injunction Bond.

This Court should exercise its "broad discretion" to deny Defendants' request for an injunction bond under Federal Rule of Civil Procedure 65. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Courts in this district "have recently declined to require plaintiffs to post any bond as a condition of obtaining an injunction against agencies or officers of the federal government," as here. *LULAC I*, 780 F. Supp. 3d at 62 (collecting cases). This trend is in accordance with a longstanding exception to the security requirement in public-interest cases like this one. *See generally City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]ublic-interest litigation [constitutes] an area in which the courts have recognized an exception to the Rule 65 security requirement."); *see also* 11A C. Wright & A. Miller, Federal Practice and Procedure § 2954 nn.15-20 (3d ed. 2025) (collecting cases). And because "requiring a bond as a condition of obtaining an injunction against unlawful executive action under the circumstances presented here would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action," this Court should exercise its discretion to deny Federal Defendants' bond injunction request, or in the alternative, require a nominal bond only. *LULAC I*, 780 F. Supp. 3d at 225.

### CONCLUSION

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and preliminarily enjoin the implementation of Sections 2(a) and 3(b) of the Executive Order.

Dated: May 8, 2026                                    Respectfully submitted,

/s/ Norman L. Eisen                                   /s/ Danielle Lang
Norman L. Eisen (DC Bar No. 435051)                   Danielle Lang (DC Bar No. 1500218)
Andrew Warren (DC Bar No. 503003)*                    Anna Baldwin (DC Bar No. 998713)
Pooja Chaudhuri (DC Bar No. 888314523)                Sejal Jhaveri (NY Bar No. 5396304)
Sofia Fernandez Gold (DC Bar No.                      Valencia Richardson (DC Bar No. 1739245)
90010196)                                             Aseem Mulji (DC Bar No. 1724971)
DEMOCRACY DEFENDERS FUND                              Heather Szilagyi (DC Bar No. 90006787)
600 Pennsylvania Avenue SE #15180                     Renata O'Donnell (DC Bar No. 1723929)
Washington, D.C. 20003                                Benjamin Phillips (DC Bar No. 90005450)
(202) 601-8678                                        CAMPAIGN LEGAL CENTER
norman@democracydefenders.org                         1101 14th St. NW, Suite 400
andrew@democracydefenders.org                         Washington, D.C. 20005
pooja@democracydefenders.org                          (202) 736-2200
sofia@democracydefenders.org                          dlang@campaignlegalcenter.org
                                                      abaldwin@campaignlegalcenter.org
                                                      sjhaveri@campaignlegalcenter.org
*Pro hac vice application forthcoming                 vrichardson@campaignlegalcenter.org
                                                      amulji@campaignlegalcenter.org
                                                      hszilagyi@campaignlegalcenter.org
Counsel for Plaintiffs League of United               rodonnell@campaignlegalcenter.org
Latin American Citizens, Secure Families              bphillips@campaignlegalcenter.org
Initiative, and Arizona Students'
Association