**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

DSCC, *et al.*,

    Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    Defendants.

</td><td>

Civil Action No. 26-cv-1114 (CJN)

</td></tr>
<tr><td>

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,

    Plaintiffs,

        v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,

    Defendants.

</td><td>

Civil Action No. 26-cv-1132 (CJN)

</td></tr>
<tr><td>

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

    Plaintiffs,

        v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,

    Defendants.

</td><td>

Civil Action No. 26-cv-1151 (CJN)

</td></tr>
</table>

**DEMOCRATIC PARTY PLAINTIFFS' REPLY
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT...................................................................................................................... 2

I.     The Democratic Party Plaintiffs' claims are justiciable. ................................................ 2

     A.     All of the claims at issue are timely....................................................................... 2

           1.     The non-APA claims are ripe. .................................................................. 4

           2.     The APA claim is ripe................................................................................. 7

           3.     Prudential ripeness concerns do not militate against judicial review. ...... 12

     B.     The Democratic Party Plaintiffs have standing. ................................................... 12

           1.     The Democratic Party Plaintiffs have standing because the Executive Order unlawfully alters election rules....................................................... 13

           2.     The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' voting rights. ......................... 14

           3.     The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' privacy rights......................... 15

           4.     The Party Organizations have standing to prevent harm to their mission. 17

II.     The Democratic Party Plaintiffs are likely to succeed on the merits............................. 18

     A.     The Executive Order is *ultra vires* and violates the horizontal separation of powers. .......................................................................................................... 19

     B.     The Executive Order violates the vertical separation of powers. ......................... 20

     C.     The Executive Order violates USPS's statutory authority.................................... 22

     D.     The Executive Order violates the Privacy Act...................................................... 23

III.     The remaining preliminary injunction factors are satisfied. ........................................ 23

CONCLUSION................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ................................................................................. 18

*AFGE v. SSA*,
  172 F.4th 361 (4th Cir. 2026) .................................................................................... 16

*AFL-CIO v. Dep't of Labor*,
  No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) ........................................... 16

*All. for Retired Ams. v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025)........................................................................... 16, 17

*\*Arizona v. Inter Tribal Council of Ariz.*,
  570 U.S. 1 (2013).................................................................................................... 21

*Axon Enterp., Inc. v. FTC*,
  598 U.S. 175 (2023) .................................................................................................. 4

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................... 4, 6, 11

*\*Bost v. Ill. State Bd. of Elections*,
  146 S. Ct. 513 (2026)........................................................................................... 13, 14

*Bowsher v. Synar*,
  478 U.S. 714 (1986) .................................................................................................. 1

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002)................................................................................... 20, 22

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. 2025) ........................................................................ 3, 4

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)..................................................................................... 7

*Chi. Women in Trades v. Trump*,
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ......................................................................... 3, 4

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ................................................................................................ 22

*City & Cnty. of S.F. v. Trump*,
816 F. Supp. 3d 1017 (N.D. Cal. 2026) ...................................................................... 3, 4

*\*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...................................................................19, 20, 23

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ....................................................................................... 18

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) .................................................................................5

*\*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025) .....................................................................*passim*

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ........................................................................................4

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ...................................................................................................... 14

*Doe v. Chao*,
540 U.S. 614 (2004) ...................................................................................................... 23

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ................................................................................... 23

*El-Ganayni v. U.S. Dep't of Energy*,
591 F.3d 176 (3d Cir. 2010) .................................................................................. 2, 6, 19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ...................................................................................13, 17, 18

*Georgia v. President of the U.S.*,
46 F.4th 1283 (11th Cir. 2022) ............................................................................... 20, 22

*Humane Soc'y of U.S. v. U.S. Postal Serv.*,
609 F. Supp. 2d 85 (D.D.C. 2009)...................................................................................7

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ...................................................................................................... 23

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................3, 25

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026)..................................................................................................... 24

*Londrigan v. FBI*,
  670 F.2d 1164 (D.C. Cir. 1981) ................................................................... 17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 13, 17

*\*LULAC v. EOP*,
  780 F. Supp. 3d 135, 188 (D.D.C. 2025) ................................................*passim*

*\*LULAC v. EOP*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................ 3, 5

*\*LULAC v. EOP*,
  Nos. 25-0946, -0952, -0955, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ........................*passim*

*Medellin v. Texas*,
  552 U.S. 491 (2008) ................................................................................. 19

*Murthy v. Missouri*,
  603 U.S. 43 (2024) .................................................................................. 13

*Myers v. United States*,
  272 U.S. 52 (1926) .................................................................................. 19

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025) ............................................................... 19

*N.C. State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) .................................................................... 18

*Nat'l Assoc. of Postal Supervisors v. USPS*,
  602 F.2d 420 (D.C. Cir. 1979) ...................................................................... 7

*Nat'l Urb. League v. Trump*,
  783 F. Supp. 3d 61 (D.D.C. 2025) .................................................................. 5

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ................................................................................. 14

*NPR v. Trump*,
  No. 25-cv-1674 (RDM), 2026 WL 877434 (D.D.C. Mar. 31, 2026) .................................. 3

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) .................................................................................. 4

*People First of Ala. v. Merrill*,
  467 F. Supp. 3d 1179 (N.D. Ala. 2020) ........................................................... 15

*PFLAG, Inc. v. Trump,*
  769 F. Supp. 3d 405 (D. Md. 2025) ................................................................4, 22

*POET Biorefining v. EPA,*
  970 F.3d 392 (D.C. Cir. 2020) ...........................................................................3

*Rhode Island v. Trump,*
  810 F. Supp. 3d 283 (D.R.I. 2025) ................................................................. 19

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020) ................................................................................... 1, 4

*Shays v. FEC,*
  414 F.3d 76 (D.C. Cir. 2005) .......................................................................... 14

*Sidak v. United States Int'l Trade Comm'n,*
  No. 23-5149, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026) ................................. 12

*Stone v. Trump,*
  280 F. Supp. 3d 747 (D. Md. 2017) ...................................................................4

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................................................... 17

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................12, 13

*Susman Godfrey LLP v. Exec. Off. of President,*
  789 F. Supp. 3d 15 (D.D.C. 2025)......................................................................3

*Taylor v. Trump,*
  No. 25-3742 (TJK), 2026 WL 396844 (D.D.C. Feb. 11, 2026) .......................... 26

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) .................................................................................... 15

*Trump v. AFGE,*
  145 S. Ct. 2635 (2025) ....................................................................................5

*Trump v. New York,*
  592 U.S. 125 (2020) .................................................................................. 6, 9

*United States v. Oregon,*
  No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ................... 21

*United States v. Smilowitz,*
  974 F.3d 155 (2d Cir. 2020)............................................................................ 20

*Valero Energy Corp. v. Env't Prot. Agency*,
   927 F.3d 532 (D.C. Cir. 2019).................................................................................. 11

*Venetian Casino Resort v. EEOC*,
   409 F.3d 359 (D.C. Cir. 2005)....................................................................................8

*\*Venetian Casino Resort v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008)..........................................................................*passim*

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
   784 F. Supp. 3d 127 (D.D.C. 2025) ............................................................................3

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................... 24

## STATUTES

39 U.S.C. § 102(5)................................................................................................... 22

39 U.S.C. § 3001(m)..................................................................................................7

39 U.S.C. § 401...........................................................................................................7

39 U.S.C. § 404(e)................................................................................................... 22

5 U.S.C. § 552a(o)(1)..........................................................................................8, 23

## OTHER AUTHORITIES

Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ......................................*passim*

**INTRODUCTION**

To avoid reckoning with the Executive Order's flagrant violations of constitutional and statutory law, Defendants take the remarkable position that the Order's clear commands mean nothing. In Defendants' telling, agency leaders across the executive branch may choose to reimagine the President's explicit directives by pruning the unlawful parts or by not implementing his commands at all. But the E.O. on its face *mandates* specific, unlawful actions. *See* Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "E.O."). And absent an injunction, the Democratic Party Plaintiffs—and the privacy and voting rights of their members—are threatened with severe, irreparable harm.

The Democratic Party Plaintiffs identified five different bases for standing, each of which has been endorsed by the Supreme Court or a court in this Circuit. In response, Defendants propose that the courthouse doors are temporarily closed while they decide how to comply with the Order, so Plaintiffs must try back later. Article III says otherwise. When a challenged scheme "violates the separation of powers," as Plaintiffs have shown, "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" even before agency proceedings have concluded. *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)). There is no factual fog obscuring the legal questions at issue. Whether the President can order USPS to freeze delivery of mail ballots for certain voters and command agencies to share sensitive personal data—in violation of bedrock principles of republican government and federalism, as well as several federal statutes—are legal questions ripe for judicial resolution. No further agency action is necessary to elucidate the legal principles at stake.

The legal principles controlling those questions are elementary, which no doubt explains why Defendants make little to no effort to defend the E.O. on the merits. The President has no authority to trample the prerogatives of the States and Congress by commandeering elements of

1

election administration, and his commands to Defendants to do so collide directly with federal privacy, postal service, and election-related statutes. Because that collision will cause irreparable harm to Plaintiffs, their members, and the public, the Court should enter a preliminary injunction.

## ARGUMENT

### I.      The Democratic Party Plaintiffs' claims are justiciable.

Defendants attempt to recast the Executive Order as a mere Executive *Suggestion*, proposing that the injuries and legal violations that Plaintiffs identify may yet be avoided if agencies respond to the President's unequivocal commands by doing nothing. Article III does not require such naivete. A pre-enforcement injunction is necessary to prevent the series of harms that will follow directly from the commands of the E.O.'s plain text.

#### A.      All of the claims at issue are timely.

Defendants' arguments against the timeliness of Plaintiffs' action—repeated without meaningful distinction as challenges to standing, ripeness, and final agency action—suggest that an executive order is immune from pre-enforcement review if it requires any implementation by executive agencies. *See* F.D. Br. at 8–27; State Br. at 17–18, 30–31.[1] But an executive order *necessarily* requires implementation by executive agencies: it is "a delegation of inherently executive authority by the President to another member of the Executive Branch," who must then "implement[]" the order's directives. *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 190 n.9 (3d Cir. 2010). Courts thus routinely recognize parties' standing to bring pre-enforcement challenges to executive orders. *See LULAC v. EOP*, 780 F. Supp. 3d 135, 184, 188 (D.D.C. 2025)

---

[1] Citations to "F.D. Br." refer to Defendants' Combined Memorandum in Support of their Motion to Dismiss and Opposition to Plaintiffs' Motions for Preliminary Injunction, ECF No. 117-1. Citations to "State Br." refer to State Intervenors' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, ECF No. 105. Citations to "DPP Br." refer to Democratic Party Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction, ECF No. 55.

("*LULAC I*") (holding executive orders "dictat[ing] particular outcomes" are "subject to pre-enforcement review"); *City & Cnty. of S.F. v. Trump*, 816 F. Supp. 3d 1017, 1029–30 (N.D. Cal. 2026); *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 978 (N.D. Ill. 2025); *California v. Trump*, 786 F. Supp. 3d 359, 385 (D. Mass. 2025). That is so even where further agency action may define implementing procedures. *See Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 40–41 (D.D.C. 2025) (challenge to executive order directing agencies to provide guidance was ripe, although guidance had not yet issued and its "precise contours" had "not been set," because "the Order provides a clear preview of what [the guidance] will do"); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 147 (D.D.C. 2025) (claims were ripe despite future action because plaintiffs' "claims turn on the constitutionality of the Order *as issued*").

Under each of the doctrines Defendants invoke—standing, ripeness, and the final-agency-action requirement—this case presents a ripe controversy. To establish standing, Plaintiffs need only show a likelihood "that the Executive Order has caused, or poses an imminent threat of causing, them to suffer a cognizable injury-in-fact." *NPR v. Trump*, No. 25-cv-1674 (RDM), 2026 WL 877434, at *12 (D.D.C. Mar. 31, 2026). "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Instead, plaintiffs need show only that "[t]he implementation of [the challenged provisions] would . . . inflict[] a cognizable harm." *LULAC v. EOP*, 808 F. Supp. 3d 29, 61 (D.D.C. 2025) ("*LULAC II*"). In a "pre-enforcement challenge to executive action" like this one, *id.* at 63, ripeness "is subsumed into the Article III requirement of standing." *POET Biorefining v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020). And to show final action under the Administrative Procedure Act

3

("APA"), plaintiffs need only identify "consummation" of a "decision[] . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

None of these doctrines require Plaintiffs to incur irreparable harm before suing to prevent irreparable harm. They need not wait until private data is disseminated, mail ballots go undelivered, and elections have come and gone—when it will be too late to remedy their injuries.

### 1. The non-APA claims are ripe.

When a challenged law "violates the separation of powers," as Plaintiffs argue, "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court." *Seila Law LLC*, 591 U.S. at 212 (quotation omitted); *see also Axon Enterp., Inc. v. FTC*, 598 U.S. 175, 192 (2023) (holding plaintiffs can bring a pre-implementation challenge to a "unconstitutionally structured decisionmaking process"). Likewise, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). It is thus altogether common for courts to adjudicate challenges before a defendant agency has completed implementing the allegedly unlawful action. *See City & Cnty. of S.F.*, 816 F. Supp. 3d at 1029–30; *Chi. Women in Trades*, 778 F. Supp. 3d at 978; *California*, 786 F. Supp. 3d at 385; *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 423 (D. Md. 2025) (recognizing "ripeness cannot hinge on the actual [implementation of the Executive Order] because the *threat* of [implementation] was enough" to compel plaintiffs to alter their behavior); *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017) (holding challenge to presidential memorandum was ripe because only uncertainties were "how, not if, the policy will be implemented"); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983) (holding dispute ripe where plaintiffs had to make planning decisions that would be affected by the challenged law and requiring plaintiffs "to proceed without knowing whether the [law] is valid would impose a palpable and considerable hardship on the[m]").

4

Defendants wrongly suggest the Court should delay adjudicating this case until the agencies it commands have literally implemented the Order. This is so, they claim, because the Order itself "does not change anything at all about elections in any State," and therefore requires "future policymaking" by the agencies. F.D. Br. at 10–11. That argument might have some force if the Order could be implemented in a lawful manner. As Judge Kollar-Kotelly observed in adjudicating a challenge to the President's last elections E.O., where an order "merely state[s] a general policy aim and direct others to begin the process of formalizing that goal in an enforceable way," a challenge may be unripe. *LULAC II*, 808 F. Supp. 3d at 64.

But this is not such an order. Under its plain terms, the Order "purport[s] to create binding, enforceable obligations on [its] own" and "dictate[s] particular outcomes"—namely, the unlawful exclusion of valid mail ballots and development of State Citizenship Lists. *Id*. As Plaintiffs' almost entirely uncontested arguments on the merits show, it is *impossible* for Defendants to take those actions lawfully.[2] USPS cannot lawfully refuse to "transmit mail-in or absentee ballots from any individual" not "enrolled" on a list of voters it would create (as Sections 3(b)(iii) and 3(b)(iv) of the Order require), regardless of the precise form of its implementing rule or procedures, because to do so in any way would violate the separation of powers, federalism principles, and USPS's own statutory mandate. *Infra*, Argument § II(A)–(C).[3] And yet, the agencies *must* implement the

---

[2] Defendants' reliance on *Trump v. AFGE*, 145 S. Ct. 2635 (2025), is misplaced. There, the parties contested whether an executive order broadly directing agencies to reduce the federal workforce exercised existing executive-branch authority to make staffing decisions. *See* Appl. for Stay at 5–6, No. 24A1174 (U.S. June 2, 2025). Justice Sotomayor's acknowledgment in a four-sentence concurrence that such authority might exist *there*, *AFGE*, 145 S. Ct. at 2635 (Sotomayor, J., concurring), does not speak to the legality of the E.O. challenged *here*.

[3] This distinguishes Federal Defendants' "intra-governmental mandates" cases. *See* F.D. Br. at 10. In each of those cases—unlike here—the court found the challenged order directed agency action that was not itself unlawful or injurious. *See, e.g.*, *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d

Order, including by developing a rule dictated by the E.O. E.O. § 3(b) (mandating specific rulemaking "within 60 days"); *see also El-Ganayni*, 591 F.3d at 190 n.9 (noting that "[a]n agency head is bound by the terms of" an executive order, meaning executive orders are "immediately effective irrespective of the promulgation of [] implementing regulations"); *cf.* ECF No. 55-16 ("SAVE PIA") at 3, 17 (noting agencies "must" implement President Trump's executive orders). And any such implementation will injure Plaintiffs, *see* DPP Br. at 10–16, a fact that Defendants do not meaningfully contest.

*Trump v. New York*, 592 U.S. 125 (2020), is not to the contrary. There, the President issued a memorandum after the 2020 census directing the Secretary of Commerce to provide him with an alternate tabulation that excluded unauthorized immigrants. *Id*. at 130. The plaintiffs challenging the memorandum did not allege that the contested tabulation *itself* violated their rights, or that the President or any executive agency had concrete plans to use the tabulation for any specific purpose. *Id*. at 132–33. Here, there are no such ambiguities: the E.O. directs agencies to begin compiling Lists in violation of Plaintiffs' Privacy Act rights, *and* it directs USPS to interfere with state mail-voting programs in ways that will irreparably harm Plaintiffs' electoral rights and interests.

Defendants' suggestion that Plaintiffs need to show further evidence of final agency action to assert that the Order commands USPS to violate exceed its statutory authority is wrong. *Cf.* F.D. Br. at 18–19; State Br. at 30–32. *First*, the "final agency action" requirement applies to APA claims, *see Bennett*, 520 U.S. at 177–78, and as Defendants acknowledge, F.D. Br. at 19 n.6, claims that USPS will exceed its statutory authority are not governed by the APA, but by an equitable

---

61, 79 (D.D.C. 2025) (finding no standing to challenge creation of a "list" of fund recipients, which was not itself illegal, absent connection between list and asserted injury); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (finding no standing to challenge order that directed rulemaking that could result in lawful, non-injurious regulations).

cause of action long recognized by the D.C. Circuit. *See Nat'l Assoc. of Postal Supervisors v. USPS*, 602 F.2d 420, 429 (D.C. Cir. 1979).[4] *Second*, even if the APA's final action standard applied, an executive order's command is subject to review upon the agency's decision to perform the commands—particularly where there is no lawful way for the agency to implement those commands. *See* DPP Br. at 32–33 (collecting cases). Here, Defendants' declaration from a USPS employee *confirms* that USPS has decided to implement the Order: the declaration asserts that USPS is in receipt of the Order, is familiar with the Order's mandates, and is actively considering "how to implement the directives in the Executive Order operationally." ECF No. 117-4 (Monteith Decl.) ¶¶ 2–3. There is no question that USPS is implementing the Order, and because there is no way to implement the Order lawfully, the matter is ripe for judicial review.[5]

### 2. The APA claim is ripe.

The Democratic Party Plaintiffs' request for preliminary relief under the Privacy Act is likewise ripe. Plaintiffs seek to stop Defendants' matching of sensitive "data" and "information"

---

[4] Contrary to Defendants' suggestion, the "rulemaking" required by Section 3(b) is not a "proceeding[] concerning the mailability of matter" subject to APA review under 39 U.S.C. § 3001(m). *See* F.D. Br. at 19 n.6. *But see* E.O. § 3(b) (citing 39 U.S.C. § 401). Section 3001 governs administrative determinations by USPS about mailable material. *See Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 90 (D.D.C. 2009) (discussing "proceedings" under 39 U.S.C. § 3001(m) as administrative determinations). Here, Plaintiffs are not challenging administrative determinations; they are challenging implementation of the E.O. through the adoption of a "rule." 39 U.S.C. § 401(2); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (courts may "[r]eview [ ] the legality of Presidential action . . . in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (quotation omitted)).

[5] In the final section of their brief, State Intervenors argue Plaintiffs cannot show "that the President cannot direct USPS to engage in rulemaking." State Br. at 32–33. To be clear, even if there are some circumstances where the President can direct USPS to engage in rulemaking, he certainly cannot *require* USPS to violate the law in doing so. If the President ordered USPS to engage in rulemaking to execute a mission to the moon, that order would violate the law—not simply because the President "cannot direct USPS to engage in rulemaking," but because he cannot direct USPS to take action for which it has *no* statutory authorization.

in DHS's SAVE program to develop the State Citizenship Lists commanded by Section 2(a). SAVE PIA at 7; *see* DPP Br. at 31–40. As explained, records cannot be "matched" or "link[ed]" as the E.O. directs absent prior, specific "legal authorization," which does not exist here. DPP Br. at 36 (quoting 5 U.S.C. § 552a(o)(1)). Defendants offer no response on the merits of this claim. *Infra*, Argument § II.D. That effective concession, coupled with the declaration Defendants submit in support of their defense (discussed below), only confirms that a "decision" to implement a reviewable "disclosure policy" has occurred. *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 927–28 (D.C. Cir. 2008) ("*Venetian I*"); *see* DPP Br. at 32–35 (collecting cases).

Defendants imagine ways in which details of the "State Citizenship Lists" program might alleviate *some* privacy concerns, but they never deny that the specific APA claim pressed by the Democratic Party Plaintiffs presents a "clear-cut legal question" suitable for resolution now. *Venetian I*, 530 F.3d at 928 (quotation omitted); *see* F.D. Br. at 13–18, 20–26; State Br. at 17–18. Nor could they. This claim does not turn on any particulars about Defendants' implementation but instead on whether matching personal information contained in federal databases to create State Citizenship Lists—something Defendants do not deny will occur, *see* F.D. Br. at 22–24 (citing Mayhew Decl. ¶ 9, ECF No. 117-2)—"is inconsistent with the [Privacy Act and] the APA." *Venetian I*, 530 F.3d 925, 927–28 (quoting *Venetian Casino Resort v. EEOC*, 409 F.3d 359, 364–65 (D.C. Cir. 2005) ("*Venetian II*")); *see also* DPP Br. at 13–16, 30–35. Defendants altogether fail to address this binding Circuit precedent, which squarely held that a challenge to an impending unlawful disclosure policy is ripe before any disclosures are made. *Compare* F.D. Br. at 9–27, *with* DPP Br. at 34–35 (citing *Venetian I*, 530 F.3d at 927–28; collecting cases).

That binding precedent also explains why Plaintiffs are confronted with a hardship sufficient to render their claim ripe: "because, were review postponed, [Plaintiffs] would be unable

to prevent" Defendants from accessing and distributing their members' private information in illegal matching programs. *Venetian I*, 530 F.3d at 928; *see* DPP PI Br. at 15 (citing declarations of Plaintiffs and their members, Exs. 1–9); *see also* ECF No. 55-12 ("Mayer Decl.") (detailing how SAVE program presents a substantial risk of privacy and voting rights violations). None of the authorities Defendants cite address the ripeness of a challenge to a decision to implement an unlawful disclosure policy. *See* F.D. Br. at 16 (citing *Trump*, 592 U.S. at 134); State Br. at 20.

While Defendants repeatedly suggest in their briefing that there are unsettled details about *how* data will be shared between agencies—and even imply there may be a question about *whether* lists will be created—their declarations conspicuously lack any statement that the agencies may not implement the E.O.'s data sharing mandates at all. *See* Mayhew Decl. ¶¶ 6–9 (confirming "USCIS has been directed to develop a recommendation to DHS leadership for DHS's implementation of E.O. 14,399," and stating only that "USCIS has not yet begun" creating lists). In fact, the text of the Order offers the agencies no choice—Section 4(a) commands agency heads to "coordinate" in implementing Section 2, while Section 4(c) directs the Secretary of Homeland Security to establish the "infrastructure" to implement Section 2 by a date certain—90 days from the order's issuance. E.O. §§ 4(a), 4(c). Because the very fact of data-sharing is the source of Plaintiffs' injury, *infra* Argument § I.B.3, their claim is ripe now regardless of how that sharing occurs, *Venetian I*, 530 F.3d at 928 (rejecting arguments that implementation must occur before a decision to disclose data may be challenged under the APA).

Defendants' related argument that Plaintiffs may not suffer an injury if they take certain procedural steps before sharing private data likewise misses the point. F.D. Br. at 22. *Defendants lack the underlying authority to share data as the E.O. commands*, so no amount of purported

9

procedural compliance can moot Plaintiffs' claim. *See* DPP Br. at 35–40. And while Defendants

suggest *LULAC III* supports them here, Judge Kollar-Kotelly expressly warned otherwise:

> The Court's resolution of [Democratic Party] Plaintiffs' request for injunctive relief should not be misunderstood as an endorsement or encouragement of the manner in which the Federal Defendants have gone about implementing [data-sharing provisions] of the Executive Order. . . . **It is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a "routine use" months after it has begun**. . . . [T]he Court has serious concerns that DHS and SSA may each have been violating the Privacy Act in significant ways.

*LULAC v. EOP* ("*LULAC III*"), Nos. 25-0946, -0952, -0955, 2026 WL 252420, at *55 (D.D.C.

Jan. 30, 2026) (emphasis added).

Defendants also come up short in arguing Plaintiffs are unlikely to show "final agency

action." *See* F.D. Br. at 22–23; DPP Br. at 31–34. To start, in broadly contending that nothing

relevant has been "consummated," Defendants again fail to distinguish between procedural and

substantive illegalities. The Democratic Party Plaintiffs challenge the latter—that is, Defendants'

consummated decision to disclose confidential information, which is fundamentally "inconsistent"

with a particular provision of the Act and its statutory scheme. *Venetian I*, 530 F.3d at 931; DPP

Br. at 39 & n.15. In this context, evidence showing a decision has likely been made to implement

such a policy is sufficient to demonstrate final action. DPP Br. at 32 & n.10 (collecting cases).

Defendants' inability to deny any of the facts supporting that showing strengthens this

conclusion. *See Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 40 (D.D.C. 2025) (unanswered

factual allegations, combined with other circumstantial evidence, support a finding of final action);

*see also* Mayhew Decl. (noting only that Order leaves certain irrelevant questions unanswered, not

that program will not be implemented). Indeed, the affidavit submitted by USCIS *confirms* a high-

level official "directed" the agency to make a plan to implement Section 2(a). Mayhew Decl. ¶ 6;

10

*Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 42 (evidence of high-level "involvement" supports finding of final action). And even since Plaintiffs filed their motion, evidence has grown that DHS "continue[s]" to expand use of SAVE and other federal databases to align with the President's demand for "aggressive reviews of voter rolls for non-citizens and other ineligible voters." Ex. 38, DHS, *Attention SAVE Program User Agencies: New CSV Bulk Upload Template Required for Case Creation* (May 1, 2026) (announcing feature "enhanc[ing] [users'] ability to track cases"); Ex. 39, Tierney Sneed, *Trump and GOP Test Precedent With Aggressive Voter Roll Purges*, CNN (May 4, 2026) (reporting DHS added "150 employees" to SAVE team reviewing "matches").

Without any response to this evidence and binding precedent like *Venetian I*, *Venetian II*, and other analogous cases like *Center for Taxpayer Rights*, Defendants instead rely on carefully worded statements that agencies have "not yet begun preparation of" lists, Mayhew Decl. ¶ 7, in an attempt to manufacture "uncertainty about whether, when, and in what form those lists might be compiled," and "what (if anything) anyone will actually *do* with any such lists." *See* F.D. Br. at 20. But these are precisely the types of "uncertainties" that courts consistently conclude do *not* preclude review. *Venetian I*, 530 F.3d at 928; DPP Br. at 32 & n.10 (collecting cases).

Finally, Defendants hardly engage with the "legal consequences" prong as to Plaintiffs' Privacy Act challenge, pointing only to unrelated cases about "proposed rulemaking." *See* F.D. Br. at 24–25 (citations omitted); *Bennett*, 520 U.S. at 177–78 (final action requires "consummation" of a "decision . . . from which legal consequences will flow" (quotations omitted)); *Valero Energy Corp. v. Env't Prot. Agency*, 927 F.3d 532, 537 (D.C. Cir. 2019) (this prong looks to whether the agency decision has a "*practical* effect on regulated parties, even if [the decision itself] has no formal legal force"). For the reasons already explained in connection with ripeness and in Plaintiffs' motion, Defendants' unsupported argument that no consequences

11

flow from a decision authorizing new disclosures of sensitive data cannot be squared with *Venetian I*, 530 F.3d at 931 (recognizing overlap in "final agency action" and "ripeness" questions in analogous context); *see supra*, Argument § I.A; DPP Br. at 34–35 (discussing cases), and Defendants again do not even attempt to argue otherwise. The Court should thus proceed to the uncontested merits of the Democratic Party Plaintiffs' Privacy Act challenge.

### 3. Prudential ripeness concerns do not militate against judicial review.

The Supreme Court has indicated skepticism as to the "continuing vitality of [the prudential ripeness] doctrine," which is at odds with the "virtually unflagging" obligation of each federal court "to hear and decide cases within its jurisdiction." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quotations omitted). But assuming it retains validity, the prudential ripeness inquiry confirms the Court should consider Plaintiffs' claims because (1) the case raises exclusively "legal questions" and (2) "delay of a judicial decision would impose hardships." *Sidak v. United States Int'l Trade Comm'n*, No. 23-5149, 2026 WL 1110981, at \*4 (D.C. Cir. Apr. 24, 2026). First, Plaintiffs' challenge to the scope of presidential power presents a series of purely legal issues: Does the President have authority to commandeer election administration? Does the President have the ability to declare that some mail ballots cannot be mailed? Does the President have authority to order agencies to share private data? Each of these questions can be readily resolved now without any further factual development—the U.S. Constitution, U.S. Code, and U.S. Reports provide all that is necessary to determine that the President exceeded his authority. Because any further delay in the resolution of these issues will cause irreparable harm, *see infra*, III.A, the controversy is ripe, *LULAC I*, 780 F. Supp. 3d at 185.

### B.    The Democratic Party Plaintiffs have standing.

For the same reasons that Plaintiffs' claims are ripe, Plaintiffs are also likely to show that their injuries are "actual or imminent, not speculative—meaning that the injury must have already

occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *see also Susan B. Anthony List*, 573 U.S. at 158 n. 5; *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). As Plaintiffs have shown, they are likely to show a concrete harm that firmly fits within Article III; the other two elements of standing, traceability and redressability, are easily met because all of the injuries directly stem from the E.O. and would be resolved by an injunction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

### 1. The Democratic Party Plaintiffs have standing because the Executive Order unlawfully alters election rules.

The Democratic Party Plaintiffs have standing on behalf of their candidate members (and Plaintiffs Jeffries and Schumer have standing in their own right) to challenge Section 2(a) and 3(b)'s transformation of federal elections because candidates "have an interest in a fair process," and "suffer [cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519–20 (2026). Because Section 3(b) commands USPS to determine who is eligible to vote by mail, it necessarily and unlawfully alters "the process" for mail voting. *Id.* Defendants do not even attempt to distinguish *Bost* from Plaintiffs' challenge to Section 3(b).

Section 2(a) also inflicts the kind of injury that *Bost* recognized as sufficient for standing. State Intervenors brazenly resist the clear inference that the State Citizenship Lists will be used to cull voters from registration rolls, which they characterize as "rank speculation about the future actions of independent third parties." State Br. at 8. But the States' *own intervention* in this action was premised on their asserted interest in using the Lists to alter their own registration lists. Mem. Supp. States' Mot. to Intervene at 10–12, ECF No. 77-1 ("For Intervener States, the State Citizenship List is a *resource*" that "will allow the Intervener States to verify the accuracy of their

own voter registration lists, to investigate inconsistencies, and to modify their lists as needed.").[6] And with the States' intent to use the Lists now in the record, it is undeniable that the *Bost* injury to Plaintiffs is traceable to "the predictable effect of Government action"—that is, Section 2(a) of the E.O.—"on the decisions of third parties" such as the States. *Dep't of Com. v. New York*, 588 U.S. 752, 766–67 (2019) (holding such a theory of traceability satisfies Article III). And, again, the text of the Order belies Defendants' feigned ignorance: Section 1 announces that the Order's purpose is to prevent "non-citizens from registering to vote or voting in Federal elections." The only way to use the State Citizenship Lists to advance that goal would be as a basis for excluding registered voters—precisely what State Intervenors say they plan to do.

Finally, *Bost* recognizes standing regardless of whether the challenged rule will "help, hurt, or have no effect on a candidate's electoral prospects." 146 S. Ct. at 520. The injury is especially acute here, however, because the rules threaten to weaken Plaintiffs' electoral prospects. *See, e.g., LULAC I*, 780 F. Supp. 3d at 192, 209 (recognizing plaintiffs' standing on this basis); *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005). Plaintiffs' evidence on that score here is unrefuted. *See* ECF Nos. 55 at 11–12; 55-1 ¶¶ 11–20; 55-2 ¶¶ 12–19; 55-3 ¶¶ 13–22; 55-4 ¶¶ 11–18.

### 2. The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' voting rights.

Because the Lists required by Sections 2(a) and 3(b) will be hopelessly incomplete and inaccurate and impose new barriers that voters must overcome to cast ballots, they will burden and disenfranchise Plaintiffs' members.

First, the fact that Section 2(a) does not identify every database that may be used to build

---

[6] It is to prevent precisely this gamesmanship that courts estop parties from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation omitted).

14

the State Citizenship Lists does not deprive Plaintiffs of standing. *Contra* F.D. Br. at 22–23. The E.O.'s text commands that the Lists "shall be derived" from two specified sources: "SSA records" and "SAVE data." E.O. § 2(a). While Defendants may *compound* Plaintiffs' injury by relying on additional unreliable databases, any ambiguity about the source of such *further* harm cannot defeat standing for the harms already apparent. Defendants offer nothing to dispute Plaintiffs' evidence that SSA and SAVE are riddled with errors and are broadly deficient in their citizenship and residency data. *See* Mayer Decl. at 3–7. And State Intervenors have already averred that they intend to use this inaccurate data to cull their voter rolls, giving rise to an imminent risk that Plaintiffs' members will be falsely accused of ineligible registration or denied the right to vote altogether.

Likewise, because the Mail-in and Absentee Ballot List required by Section 3(b) unquestionably burdens the right to vote by creating a new obstacle before an otherwise eligible voter can cast a mail ballot, Democratic Party Plaintiffs have associational standing to challenge this provision. Setting aside the near-certainty that Section 3(b) will disenfranchise voters altogether, even a voter who will ultimately be able to vote by mail has standing to challenge the burden on her right to vote. *See, e.g.*, *People First of Ala. v. Merrill,* 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) ("[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

### 3. The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' privacy rights.

Plaintiffs are also likely to show associational standing based on the harm to the privacy rights of their members and Leaders Jeffries and Schumer. Plaintiffs have a "concrete" injury for purposes of standing when the injury bears "a close relationship to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quotation omitted). The disclosure of personal information between

15

federal agencies bears "a close relationship to the harm essential to an intrusion upon seclusion at common law." *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025). "[T]he essential features of intrusion upon seclusion are that the defendant intentionally intruded 'upon the solitude or seclusion of another or his private affairs or concerns' and that such intrusion 'would be highly offensive to a reasonable person.'" *Id.* at 102 (quoting Restatement (Second) of Torts § 652B (1977)). Plaintiffs in *Bessent* and several other recent cases addressing this issue were injured because their members had a "reasonable expectation" that records at issue would remain private, in large part because they were protected from disclosure by the Privacy Act, and because members submitted declarations attesting to their offense at the government's conduct. *See id.* at 101–03; *see also, e.g.*, *AFGE v. SSA*, 172 F.4th 361, 369 (4th Cir. 2026); *LULAC III*, 2026 WL 252420, at *52–53; *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 42; *AFL-CIO v. Dep't of Labor*, No. 25-339 (JDB), 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026); Min. Order, *United States v. Evans*, 1:25-cv-4403-RDM (D.D.C. Mar. 16, 2026) (finding Article III injury because "disclosure of [D.C.'s] voter-registration list" to DOJ would cause harm "analogous to . . . intrusion upon seclusion").

So too here: the wrongful disclosure of personal information in federal databases inflicts a cognizable injury. DPP Br. at 13. In arguing otherwise, State Intervenors ignore the expectation of privacy against data-sharing enshrined into federal law by the Privacy Act. Using SAVE to build the lists—as directed by the Order—grants DHS officials access to records containing sensitive information, including social security numbers, addresses, birth dates, and other identifying numbers that have been uploaded to the system by any user agency. *See* SAVE PIA at 3, 7.

Defendants also ignore that Plaintiffs have submitted numerous declarations, including from individual members and Plaintiffs Jeffries and Schumer, attesting to expectations of privacy

16

in this data, and injuries that would occur upon disclosure. *See supra*, Argument § I.B.3 (citing Exs. 1–10). Plaintiffs thus have Article III standing to vindicate these privacy interests. *LULAC III*, 2026 WL 252420, at *51 (finding standing on this basis).[7]

State Intervenors likewise argue unsuccessfully that there is no privacy right to personal information that is already disclosed to the states through voter registration applications or other federal programs. Even if state officials might hold similar information, new disclosures of sensitive information to federal agencies causes cognizable harm, as officials in *those* agencies are not expected to have such information. *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 38–39 (disclosures of addresses held by IRS to DHS satisfied Article III). Further still, the "information" to be disclosed is likely to be *inaccurate*, *see* Mayer Rep. ¶ 40, and the sharing of false information about an individual's citizenship is undoubtedly an offensive intrusion "upon the solitude or seclusion of another or his private affairs or concerns," *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (quotation omitted); *see also Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981) (explaining that the Privacy Act was enacted in part to prevent "perpetuation of inaccuracies").

### 4. The Party Organizations have standing to prevent harm to their mission.

State Intervenors' effort to defeat the Party Organization's organizational standing misstates the law. Contrary to their telling, the Supreme Court's decision in *Alliance for Hippocratic Medicine*, 602 U.S. at 394, did not reject an organization's ability to establish standing by demonstrating a diversion of resources. That decision merely held that organizations not otherwise injured cannot establish standing through expenditures in opposition to a policy. *Id.*

---

[7] Given the preliminary-injunction posture, it is not clear that Plaintiffs are required to identify specific members whose privacy interests will be injured (although Plaintiffs have nonetheless done so). *See All. for Retired Ams.*, 770 F. Supp. 3d at 99 ("[T]he manner and degree of evidence required" to establish associational standing "varies 'at the successive stages of the litigation.'" (quoting *Lujan*, 504 U.S. at 561)); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009).

Indeed, it confirmed well-established precedent that "organizations can have standing to challenge practices that directly interfere with their core activities." *LULAC I*, 780 F. Supp. 3d at 180.

Here, Party Organizations are not diverting resources "in opposition" to the E.O.: they are doing so to achieve their "core business activit[y]" of electing Democratic candidates and enfranchising their voters. *All. for Hippocratic Med.*, 602 U.S. at 395. Because Sections 2(a) and 3(b) threaten to disenfranchise their voters, the Party Organizations must reallocate resources previously intended for persuasion and voter mobilization to programs that monitor and address the impact of the State Citizenship Lists and mail ballot restrictions. *See* ECF Nos. 55-1 ¶ 44; 55-2 ¶ 46; 55-3 ¶ 45; 55-4 ¶ 41. This injury to the Party Organizations' core mission is plainly sufficient to confer standing. *See RNC v. N.C. State Bd. of Elections*, 120 F.4th 390 (4th Cir. 2024) (citing *All. for Hippocratic Med.*, 602 U.S. at 395)); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008). Defendants do not and cannot argue otherwise. Instead, they retread the same timing arguments debunked above, with the implication that the already significant disruption to Plaintiffs' electoral activities is meaningless until their supporters are actually "excluded from voter rolls." State Br. at 11. But that exclusion is exactly what the Party Organizations are trying to prevent, and Article III does not require them to lose votes before suing. *LULAC I*, 780 F. Supp. 3d at 207 (finding that Plaintiffs suffered injury-in-fact from resource diversion to address "imminent" voter registration restrictions (quotation omitted)).

## II.     The Democratic Party Plaintiffs are likely to succeed on the merits.

Defendants decline to defend the legality of the E.O. on the merits, effectively conceding the "first and most important factor" in considering whether to grant Plaintiffs' motion for preliminary injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Instead, Defendants suggest only that they may decide to ignore the E.O.'s unlawful commands altogether. *See, e.g.*, F.D. Br. at 45–48. If that were true, of course, they would have no reason to oppose an

18

injunction of those provisions. But "[a]gencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025); *El-Ganayni*, 591 F.3d at 190 n.9 (similar) (citing *Myers v. United States*, 272 U.S. 52, 132–34 (1926)); *LULAC I*, 780 F. Supp. 3d at 184 (rejecting similar arguments as inconsistent with "plain text of the Executive Order").

### A. The Executive Order is *ultra vires* and violates the horizontal separation of powers.

Defendants do not so much as suggest that the President or the federal agencies he commands to take action have the authority to regulate elections as the E.O. directs. Instead, they attempt to rehabilitate the E.O.'s many legal infirmities only by pointing to its savings clauses, but the clauses' boilerplate language cannot resuscitate a blatantly unlawful order.[8]

But Courts consistently refuse to permit executive orders "to destroy themselves through saving clauses." *LULAC I*, 780 F. Supp. 3d at 176 (citations omitted); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018) ("The Executive Order's savings clause does not and cannot override its meaning."). When "an executive order unambiguously commands an action that a saving clause purports to negate, a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says." *LULAC I*, 780 F. Supp. 3d at 176 (citations and alterations omitted). That is precisely the case here. Section 2(b) commands the sharing of personal data "derived from Federal citizenship and naturalization records, SSA records,

---

[8] Defendants vaguely suggest the E.O. is authorized by the "take care" clause, which directs the President to "take Care that the Laws be faithfully executed." *See* F.D. Br. at 40 (quoting U.S. Const. art. II, § 3); State Br. at 23 (same). But the Order does not invoke the "take care" clause as a source of authority. *See* E.O. at Preamble. And, regardless, the clause only "allows the President to execute the laws, not make them," as the E.O. attempts. *Medellin v. Texas*, 552 U.S. 491, 532 (2008). Indeed, the "take care" clause *invalidates* unlawful executive orders—it does not rescue unlawful orders. *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 308–09 (D.R.I. 2025) (concluding executive order likely violated the "take care" clause).

19

SAVE data, and other relevant Federal databases." E.O. § 2(a). But Congress has proscribed exactly such disclosures. *See* DPP Br. at 35–39; *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295 (11th Cir. 2022) (recognizing the President cannot "direct[] [his] subordinates" to "exceed[] the limitations imposed by" Congress). Section 3(b) orders "that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." *Id.* § 3(b)(iii). Again, the President has no authority to issue that command, and USPS has no authority to comply with it. *See* DPP Br. at 19–30. Because there is no lawful way to implement the President's unlawful order, the savings clause provides no saving at all. The principal authority Defendants cite to support their savings-clause argument, *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), has been repeatedly distinguished on these same bases. *See, e.g.*, *City & Cnty. of S.F.*, 897 F.3d at 1239–40 (distinguishing *Allbaugh* in a challenge to one of President Trump's previous executive orders because "[t]he Executive Order's savings clause does not and cannot override its meaning."); *LULAC I*, 780 F. Supp. 3d at 176 (similar); F.D. Br. at 46 (conceding that Plaintiffs may challenge the Order by showing it is "without *any* valid application" (citation omitted)).[9]

### B. The Executive Order violates the vertical separation of powers.

The E.O. also violates principles of federalism by "encroach[ing] on the states' authority to regulate their own electoral processes." *United States v. Smilowitz*, 974 F.3d 155, 159 (2d Cir. 2020); *see* DPP Br. at 25–28. It does so in two ways. *First*, it directs USPS to impose requirements on how states format any "outbound ballot mail," including that any such mail include a "unique Intelligent Mail barcode" and have "undergone a mail envelope design review by the USPS." E.O. § 3(b)(i). The Order thus *requires* USPS to interfere with the design and transmission of mail-in

---

[9] Defendants' savings clause argument also does not apply at all to Section 3(b), which contains no language about "lawful" implementation. *See generally* E.O. § 3.

ballots—a responsibility that the Constitution assigns to the States. *See United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026) ("[T]he Constitution specifically left the regulation and administration of elections to the states, understanding that states are in the best position to do so."). Defendants half-heartedly suggest that USPS could implement this mandate lawfully by "promulgating a final rule that implements improved technology (*e.g.*, via 'unique Intelligent Mail barcode') to enable tracking of absentee and mail-in ballots," which could provide "federal law-enforcement agencies with useful information." F.D. Br. at 48–49. But that is not what the E.O. commands. It does not simply invite USPS to use new technology for election mail. It *requires* "that all outbound ballot mail"—mail transmitted by the *states*—meets certain requirements, thus intruding on states' authority to administer their own mail-in and absentee voting programs. E.O. § 3(b)(i). And Defendants never explain how USPS could do *that* without violating basic principles of federalism.

*Second*, the Order directs USPS to make a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State," and to *refuse to transmit* ballots from any non-enrolled individual. E.O. § 3(b)(iii)–(iv). Defendants do not even address this mandate, much less attempt to explain how USPS could implement it in a lawful way. F.D. Br. at 48–49. For good reason: it is impossible to do so. The Constitution assigns States the authority to "regulate federal election procedures," *LULAC III*, 2026 WL 252420, at *5, including the power to set voter qualifications, which "forms no part of the power to be conferred upon the national government." *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013) (quoting The Federalist No. 60, at 371 (Alexander Hamilton)). The Order imposes new qualifications on all voters who wish to use mail-in ballots—enrollment with USPS, and satisfaction of any standards USPS chooses to apply—thus usurping states' rights to manage their mail-in voting programs.

21

Because the Order "unambiguously commands action" that violates the Constitution, Democratic Party Plaintiffs are likely to succeed on their vertical separation of powers claim. *Allbaugh*, 295 F.3d at 33; *see PFLAG, Inc.*, 769 F. Supp. 3d at 437 (striking down executive order that "explicitly instruct[s] the executive to develop policies that run afoul of" the Constitution).

## C.    The Executive Order violates USPS's statutory authority.

The E.O. runs afoul of federal statutes. When the President orders an executive agency to engage in rulemaking, "[t]he pertinent inquiry" is whether the rulemaking falls within "any of the arguable *statutory* grants of authority" to the agency. *Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979). The President can only direct agencies to "carry out their own lawful statutory authority," not "exceed[] the limitations imposed" by their authorizing statutes. *Georgia*, 46 F.4th at 1295. Sections 3(b)(iii) and 3(b)(iv) of the Order fall well outside USPS's statutory authority by requiring USPS to foray into election regulation. *See* DPP Br. at 29–30. Together, they require USPS to (1) develop a system for "enrollment" of voters and a list of "enrolled" voters and (2) refuse to transmit mail-in ballots from anyone not on the list. USPS's governing statute does not authorize it to do any such thing. *Any* rule the USPS could promulgate to satisfy the Order's requirements would be inconsistent with its statutory mandate, which limits it to providing "postal services." 39 U.S.C. § 102(5); *see id.* § 404(e)(1)–(2). Plus, not only would such a rule essentially create a new category of "nonmailable matter" out of whole cloth (despite the existence of a comprehensive list of such matter in USPS's governing statute), it would also violate USPS's obligations to treat all customers similarly. *See* DPP Br. at 29–30.

Defendants do not suggest otherwise. They do not even try to identify a source of authority that would enable USPS to create and enforce lists of people who can vote. The Order thus "unambiguously commands" USPS, *City & Cnty. of S.F.*, 897 F.3d at 1240, to perform actions that it "literally has no power" to perform, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

22

### D.    The Executive Order violates the Privacy Act.

Finally, Plaintiffs are likely to succeed on the merits of their Privacy Act claim because Defendants' decision to match federal databases, including SAVE, in connection with implementation of Section 2(a) exceeds statutory authorization and violates the plain terms of the Act. Because "[n]o provision of law authorizes matching records" in federal databases to build the lists, the Computer Matching and Privacy Protection Act of 1988 prohibits doing so. *See* DPP Br. at 31–38 (citing 5 U.S.C. § 552a(o)). Aside from State Intervenors' radical and unsupported assertion that the President possesses unfettered authority to centralize any information within the federal government without regard for other law, neither set of Defendants addresses the merits of this claim or even acknowledges § 552a(o). *See* F.D. Br. at 43–49; State Br. at 21–24.

Defendants do launch one last-ditch, *pro forma* argument to avoid review on the merits: that APA review is foreclosed because the Privacy Act contains some limited remedial provisions. *See* F.D. Br. at 28–29. But that argument has been repeatedly rejected by courts—including by the D.C. Circuit in one of the cases cited by Defendants—and this Court should do the same. *See LULAC III*, 2026 WL 252420, at *52 (citing *Venetian I*, 530 F.3d at 927–31); *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 41–42 (rejecting various counterarguments); *see also Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988) (explaining APA's general review provisions apply). These decisions are also consistent with broader Supreme Court precedent, which explain that the Privacy Act's remedial provisions are intended to complement—not preclude—review under the APA. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (the Act's "inattention" to "equitable relief" is "explained by the general provisions for equitable relief within the . . . APA").

### III.    The remaining preliminary injunction factors are satisfied.

As an initial matter, Defendants misstate the standard for determining irreparable injury. The D.C. Circuit's previous requirement that injury be "certain" is no longer good law after *Winter*

*v. Natural Resources Defense Council, Inc.*, which requires only that irreparable injury be "likely," 555 U.S. 7, 20 (2008). Regardless, the Democratic Party Plaintiffs satisfy even the now-abrogated standard of "certain" irreparable injury. For the same reasons that Plaintiffs' claims are ripe, irreparable harm from the E.O. is imminent. The midterm elections are mere months away, and primaries and early voting are even sooner. Without an injunction, Plaintiffs will soon be forced to retool their investments and programs to address the E.O.'s changes to mail balloting and creation of state lists. *See* ECF Nos. 55-1 ¶ 25; 55-2 ¶ 25; 55-3 ¶ 31; 55-4 ¶ 26. The E.O. will make it considerably harder for Plaintiffs to execute their electoral strategies, and every bit of time and money spent addressing the E.O. is an irrecoverable lost opportunity to mobilize and persuade voters. *See* ECF Nos. 55-1 ¶¶ 30–32; 55-2 ¶¶ 32–34; 55-3 ¶¶ 33–35; 55-4 ¶¶ 28–30.

Defendants contend that Democratic Party Plaintiffs, who are actively working to win hundreds of federal races across the country in a midterm election cycle already well underway, are not irreparably harmed because the E.O. does not order them to do anything. This says nothing about inevitable effects outside the executive branch and does not immunize the E.O. from injunctive relief. *See, e.g.*, *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026) (affirming permanent injunction of executive order). Defendants also repackage their ripeness arguments to speculate that perhaps the E.O. will ultimately not do what it says it will. This "head-in-the-sand" defense is preposterous. Under the E.O.'s unequivocal commands, Defendants are poised to create the Mail-In Ballot and Absentee and State Citizenship Lists at any moment, and Plaintiffs must plan their responsive voter assistance and education programs immediately; delaying preparation will render any response ineffective. ECF Nos. 55-1 ¶ 45; 55-2 ¶ 47; 55-3 ¶ 46. Separately, threatened disclosures of millions of Americans' sensitive data to build lists of "eligible" citizens satisfy the irreparable harm requirement. *See, e.g.*, *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 69

24

(finding irreparable harm from IRS's plan to share tens of thousands of "confidential address[es]" with DHS).

Defendants also bizarrely assert that Plaintiffs do not face irreparable harm because a recent special election "took place without incident" and "Plaintiffs have not asserted that any ballot was intercepted by USPS as a result of the Executive Order." F.D. Br. at 38, 42. But Plaintiffs do not need to show that the E.O. has *already* unlawfully disrupted voting. Plaintiffs seek a preliminary injunction *now*, precisely to prevent such irreparable harm. *See Newby*, 838 F.3d at 8–9.

Just as Defendants largely ignore the merits, they fail to articulate any public interest weighing in their favor. In response to the significant public harms articulated by the Democratic Party Plaintiffs—including an unprecedented breach of sensitive personal information and a significant risk of disenfranchisement—Defendants contend only that there is a "public interest" in the President overseeing the executive branch. But the E.O. is illegal, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby,* 838 F.3d at 12. With the government facing no harm at all, the equities sharply weigh in favor of a preliminary injunction.[10]

### CONCLUSION

The Court should grant the preliminary injunction. The Court should not require Plaintiffs to post a bond, and at most, "[g]iven the lack of representation that Defendants will sustain any monetary injury from an injunction," it should impose no more than a "nominal bond of $1.00." *Taylor v. Trump*, No. 25-3742 (TJK), 2026 WL 396844, at *17 (D.D.C. Feb. 11, 2026).

---

[10] Defendants argue some parties should be dismissed, which Democratic Party Plaintiffs will address in their response to Defendants' motions to dismiss. For purposes of their motion for a preliminary injunction, Democratic Party Plaintiffs do not seek injunctive relief against the President. Defendants also argue that the Secretary of Commerce should not be subject to an injunction, but he is expressly involved in "effectuating" the E.O. *See* Order § 4(a).

25

Dated: May 8, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Christina Ford (DC 1655542)
Max Accardi (DC 90021259)
Kevin R. Kowalewski (NY 5946645)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Admitted *pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*