**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     *Defendants*. | Case Number  1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>     *Defendants.* | Case Number  1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., and BVM CAPACITY BUILDING INSTITUTE, INC.,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     *Defendants.* | Case Number  1:26-cv-01151-CJN |

**REPLY MEMORANDUM IN SUPPORT OF NAACP, COMMON CAUSE, AND BLACK VOTERS MATTER PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................1

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................1

      A.      Defendants Identify No Source of Authority Justifying the Order and Barely
            Dispute that the Order Violates Constitutional and Statutory Limits ......................1

      B.      Defendants' Counterarguments Fail ........................................................................6

            1.      Plaintiffs Have Standing to Challenge §§ 2(a), 3(b), 4(a) and 4(c) .............6

                 a.      Plaintiffs Have Organizational Standing ........................................6

                 b.      Plaintiffs Have Associational Standing ..........................................10

                 c.      Plaintiffs' Injuries Are Traceable and Redressable .......................12

            2.      Plaintiffs' Claims Are Ripe........................................................................13

            3.      Plaintiffs Have Causes Of Action To Bring Their Constitutional And
               Statutory Claims........................................................................................18

            4.      The Scope of Plaintiffs' Requested Relief is Proper .................................21

II.     PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ..........................................23

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS ....25

CONCLUSION.......................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFLCIO v. DOL*,
778 F. Supp. 3d 56 (D.D.C. 2025) ....................................................................................19, 21

*AFSCME v. Soc. Sec. Admin.*,
771 F. Supp. 3d 717 (D. M.D. 2025) ........................................................................................21

*Biden v. Nebraska*,
600 U.S. 477 (2023) ...................................................................................................................4

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ...........................................................................................3, 4, 5

*Caicedo v. DeSantis*,
No. 6:23-cv-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ..............................................7

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .....................................................................................18, 19, 22

*Chicago Women in Trades v. Trump*,
773 F.Supp.3d 592 (2025) ........................................................................................................10

*Common Cause v. Trump*,
506 F. Supp 3d 39 (D.D.C. 2020) ............................................................................................15

*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025) .............................................................................................21

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .................................................................................................................22

*Diaz v. Brewer*,
656 F.3d 1008 (9th Cir. 2011) .................................................................................................22

*Doctor's Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996) .......................................................................................................22

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ...................................................................................................................6

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) ......................................................................................19, 20

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022)...........................................................................20

*First Choice Women's Res. Ctrs, Inc. v. Davenport*,
  No. 24-781, 2026 WL 1153029 (U.S. Apr. 29, 2026) ..........................................7

*Fox Television Stations, Inc. v. FilmOn X LLC*,
  966 F. Supp. 2d 30 (D.D.C. 2013).....................................................................22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)....................................................................................18, 21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)...........................................................................................18

*Get Loud Ark. v. Thurston*,
  748 F. Supp. 3d 630 (W.D. Ark. 2024).................................................................6

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)...............................................................................19

*Gomez v. Kelly*,
  237 F. Supp. 3d 13 (D.D.C. 2017)......................................................................24

*Harmon v. Brucker*,
  355 U.S. 579 (1958)...........................................................................................21

*Havens Realty Corporation v. Coleman*,
  455 U.S. 363 (1982).............................................................................................6

*International Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983)............................................................................13

*Jolt Initiative, Inc. v. Paxton*,
  2026 WL 297633 (W.D. Tex. Jan. 29, 2026) ........................................................9

*League of Women Voters v. DHS*,
  No. 25-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ....................................11

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)....................................................................23, 24, 25

*League of Women Voters v. North Carolina*,
  769 F. 3rd 224, 247 (4th Cir. 2014) ...................................................................24

*LULAC v. Exec. Off. of the President*,
  2026 WL 252420 (D.D.C. Jan. 30, 2026).......................................2, 4, 18, 20, 21

3

*LULAC v. Exec. Off. of the President,*
    780 F. Supp. 3d 135 (D.D.C. Apr. 24, 2025)
    ..................................................................................2, 6, 14, 15, 16, 17, 18, 19, 24, 25

*LULAC v. Exec. Off. of President,*
    808 F. Supp. 3d 29 (D.D.C. 2025)................................................12, 15, 21, 22, 25

*March for Our Lives Idaho v. McGrane,*
    749 F. Supp. 3d 1128 (D. Idaho 2024) .................................................................7

*Myers v. United States,*
    272 U.S. 52 (1926)................................................................................................4

*N.C. A. Phillip Randolph Institute v. N.C. Bd. of Elections,*
    155 F.4th 298 (4th Cir. 2025) ..............................................................................9

*Nairne v. Landry,*
    151 F.4th 666 (5th Cir. 2025) ..............................................................................6

*Nat'l Ass'n of Postal Supervisors v. USPS,*
    26 F.4th 960 (D.C. Cir. 2022)........................................................................19, 20

*Nat'l Pub. Radio, Inc. v. Trump,*
    No 25-1722, 2026 WL 877434 (D.D.C. March 31, 2026).......................................15

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.,*
    2026 WL 877779 (D.D.C. Mar. 31, 2026)...........................................................20

*New Mexico v. Musk,*
    2026 WL 799635 (D.D.C. Mar. 23, 2026)...........................................................20

*Nixon v Administrator of General Services,*
    433 U.S. 425 (1977)..............................................................................................5

*NTEU v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974)............................................................................22

*Olagues v. Russoniello,*
    770 F.2d 791 (9th Cir. 1985) ............................................................................9, 10

*PFLAG, Inc. v. Trump,*
    769 F. Supp. 3d 405 (D. Md. 2025) ....................................................................19

*POET Biorefining, LLC v. EPA,*
    970 F.3d 392 (D.C. Cir. 2020)............................................................................14

*Project Vote v. Blackwell,*
    455 F.Supp.2d 694 (N.D. Ohio 2006)...................................................................9

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
    2026 WL 1110616 (D.C. Cir. Apr. 24, 2026)..............................................................19

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025)..............................................................................19

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021)......................................................................................25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)......................................................................................................9

*Trump v. American Federation of Government Employees*,
    145 S. Ct. 2635 (2025)................................................................................................17

*Trump v. CASA*,
    606 U.S. 831 (2025)....................................................................................................22

*Trump v. New York*,
    592 U.S. 125 (2020)....................................................................................................17

*United States v. King County*,
    122 F.4th 740 (9th Cir. 2024) .....................................................................................13

*United States v. Weber*,
    816 F.Supp.3d 1168 (C.D. Cal. 2026) ........................................................................10

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988)......................................................................................................9

*VoteAmerica v. Raffensperger*,
    696 F.Supp.3d 1217 (N.D. Ga. 2023)...........................................................................9

*Voter Reference Found., LLC v. Torrez*,
    160 F.4th 1068 (10th Cir. 2025) ...................................................................................9

*Washington v. Trump*,
    814 F. Supp. 3d 1173 (W.D. Wash. 2026)...................................................................13

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health &Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020)................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 365 (2008)...............................................................................................24, 25

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).......................................................................................2, 3, 4, 6, 22

**Statutes**

5 U.S.C. § 552a .................................................................................................................10

39 U.S.C. § 201 ...........................................................................................................3, 4, 19

39 U.S.C. § 202 .................................................................................................................19

**Regulations**

Exec. Order
    14,248 § 2(a)(i)(A) ......................................................................................................14
    § 2(a) .................................................................................................5, 14, 15, 16
    § 2(b) ..........................................................................................................5, 7, 9
    § 3(a) ........................................................................................................15, 17
    § 3(b) ........................................................................................................14, 17
    § 3(b)(iv) ........................................................................................................5
    § 3(c) ..............................................................................................................16
    § 3(d) ..................................................................................................15, 16, 17
    § 4(b) ..............................................................................................................7
    § 4(c) ............................................................................................................16
    § 5 ...............................................................................................................7, 9

**Court Rules**

Fed. R. Civ. P. 65(c) .........................................................................................................22

**Other Authorities**

Alaska Memorandum of Understanding with DOJ Civil Rights Division,
    https://perma.cc/Q5CQ-LELB; .................................................................................11

Compl., *Common Cause v. Dep't of Just.*, No. 1:26-cv-01352 (D.D.C. Apr. 24,
    2026) (ECF No. 1) ..................................................................................................11

*Computer Matching Agreements and Notices*, U.S. Dep't Homeland Security
    (Dec. 18, 2025), https://perma.cc/434S-4HRU; ....................................................11

*Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and
    Voter Eligibility in Federal Elections*, White House: Fact Sheets (Mar. 31,
    2026), https://perma.cc/23JE-ZKE9 .................................................................1, 16

*SAVE Agency Search Tool*, U.S. Citizenship and Immigration,
    https://perma.cc/24QD-3KJY .................................................................................11

Texas Memorandum of Understanding with DOJ Civil Rights Division,
    https://perma.cc/2EDA-RF7H; ................................................................................11

*TRANSCRIPT: President Trump Signs an Executive Order on Elections, 3.31.26*,
Senate Democrats: Newsroom (Mar. 31, 2026), https://perma.cc/V7HK-RXR7..........1, 15, 22

**INTRODUCTION**

After multiple federal courts ruled that the Constitution does not authorize the President to unilaterally regulate federal elections, and on the *same day* another court in this District entered judgment against his prior Executive Order, President Trump issued a new Order attempting to do exactly that again. This time, the President has directed DHS to create federal voter-eligibility lists, USPS to regulate who may receive mail ballots, and DOJ to threaten election officials and private organizations that do not comply. Defendants' oppositions never overcome the fundamental problem: the President has no constitutional or statutory authority to do what he has ordered. Instead, Defendants recast the Order as merely "contingent," "uncertain," and "speculative." But the Administration itself treats the Order as mandatory and immediately operative: federal agencies "will" compile voter-eligibility lists, USPS "will" condition mail-ballot transmission on federally controlled voter rolls, and existing procedures are "all going to go away."[1] Words matter and threats have consequences. Plaintiffs are already suffering the resulting disruption to their voter-registration, voter-assistance, and vote-by-mail programs nationwide. The preliminary injunction factors decisively favor Plaintiffs, so the Court should enjoin the challenged provisions.

**ARGUMENT**

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

**A.    Defendants Identify No Source of Authority Justifying the Order and Barely Dispute that the Order Violates Constitutional and Statutory Limits**

Both the Federal and State defendants miss the critical point: the President has *no* constitutional or statutory authority to issue the challenged Order. *See* ECF No. 117-1 ("Fed.

---

[1] *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, White House: Fact Sheets (Mar. 31, 2026), https://perma.cc/23JE-ZKE9; *TRANSCRIPT: President Trump Signs an Executive Order on Elections, 3.31.26*, Senate Democrats: Newsroom (Mar. 31, 2026), https://perma.cc/V7HK-RXR7.

Opp.") 55-59; ECF No. 105 ("States Opp.") 32-33, 44-45. The "President's power, if any, to issue the order must stem from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But rather than engage with *Youngstown*, Defendants assert that "implicit" presidential powers allow the Executive Branch to impose new requirements for vote-by-mail ballots, unconstrained by constitutional and statutory provisions that place such authority exclusively with Congress and the States. *See* Fed. Opp. 55-56; States Opp. 33-34, 43-45.

Plaintiffs are overwhelmingly likely to succeed on their claims. As to Plaintiffs' *ultra vires* claims (Counts I, II, & V), Defendants cite no support for the Order from the Constitution, NVRA, HAVA, or UOCAVA. *Compare* ECF 54 ("NAACP Br.") 23-25 *with* Fed. Opp 55-59 (failing to discuss these claims) *and* States Opp. 32-33, 44-45 (asserting "independent powers" are sufficient); *see also LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 194 (D.D.C. Apr. 24, 2025); *LULAC v. Exec. Off. of the President*, 2026 WL 252420, at *33 (D.D.C. Jan. 30, 2026) (appeal pending). Defendants also do not dispute that the Constitution's Qualifications and Elections Clauses grant exclusive authority to the States and Congress to establish voter qualification and vote-by-mail procedures, leaving no room for the President to impose requirements for mail voter eligibility. *See* NAACP Br. 24-26. That places the Order firmly outside the President's authority.

And the Order's direction to USPS and its mandate for State Citizenship Lists conflict with the statutes Congress has enacted. The President's authority is at its "lowest ebb" when he acts contrary to the "express or implied will of Congress." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). The Order illegally expands USPS's authority beyond the congressionally established scope of mail service and contravenes Congress's decision to insulate the postal service from

presidential influence. NAACP Br. 28-33. In particular, Section 3 of the Order "direct[s]" USPS and the Postmaster General to start the rulemaking process and establishes "minimum" requirements for the forthcoming rule, dictates when USPS can or cannot deliver mail ballots to voters, and transforms the USPS into a federal voter registrar, creating and monitoring its own list of eligible voters. But as the State Defendants concede, Congress removed presidential control over the postal system in 1970, precluding the President from "directing" anyone in the postal service. *See* 39 U.S.C. § 201; c*ompare* NAACP Br. 28 *with* States Opp. 46-47. Defendants do not address the Order's conflicts with the postal statutes' requirements for delivering mail, or its disregard for the PRC's rulemaking procedures. *See* NAACP Br. 29-33.

Defendants do not dispute that the State Citizenship List conflicts with the Privacy Act's limits on disclosure of personal information. *But see id.* 33-44. And they fail to address the Order's direct conflicts with the HAVA and NVRA protections and express delegation of authority over voter lists to the States and the EAC. *Id.* 26-27. The President cannot unilaterally usurp or disregard the roles of Congress and the States, even if some states welcome the Order. *See Youngstown*, 343 U.S. at 585, 637 (Jackson, J., concurring).

Defendants' attempts to justify the Order with references to vague inherent or implied authority fail. The Federal Defendants' claim (at 56) that the Order fits "comfortably" within the President's general supervisory authority over the Executive Branch wrongly assumes the conclusion. While the President may "supervise and guide" executive subordinates' "construction of the statutes under which they act," Congress still must have granted such authority by statute in the first instance. *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002). The Federal Defendants fail to identify *any* statute conferring *any* authority to the President (or DHS, or the USPS) over elections or vote-by-mail ballot processes. The Take Care

Clause (discussed at Fed. Opp. 55-57, State Opp 34) does not fill this gap. While the President has some "general administrative control" in executing laws Congress enacts, *Myers v. United States*, 272 U.S. 52, 164 (1926), the Take Care Clause does not authorize the President or "his subordinates to intrude on the exclusive powers of Congress and the States, including the power to regulate federal elections." *LULAC*, 2026 WL 252420, at *33. The Take Care Clause does not abrogate limits on presidential authority. *See Allbaugh*, 295 F.3d at 32 (quoting *Youngstown*, 343 U.S. at 587).

State Defendants' similar invocation (at 44-46) of "implied" authority over the postal system runs headlong into Congress's exclusive constitutional authority over the Postal Service, which it used to insulate the postal system from direct presidential influence. *See* NAACP Br. 28-30. The statutes limit the President's role to appointing postal Governors with Senate confirmation. *See id.* at 18. State Defendants' claim (at 43) that the statute nonetheless provides the President additional authority over USPS because it does not expressly withhold such authority violates basic principles of statutory interpretation and constitutional structure. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (requiring "clear congressional authorization" of executive authority under the major questions doctrine). State Defendants' reliance (at 44-46) on the 1926 *Myers* decision ignores both that Congress purposefully divested the President of direct control over postal officials in 1970, 39 U.S.C. § 201, and that *Myers* only addressed the president's ability to fire a particular subordinate without Senate approval; it did not confer limitless power to direct USPS.

And to be clear, the Order goes beyond mere supervision. It transgresses into unconstitutional presidential "lawmak[ing]," *Youngstown*, 343 U.S. at 587, when it directs the creation of new "State Citizenship Lists" that various agencies must "compile and transmit" to each State, the creation of similar lists at the USPS, and the refusal to transmit mail ballots to those

not on the list. Exec. Order §§ 2(a), 3(b)(iv). The State Defendants assert (at 33-34) that *Youngstown*'s "second category" justifies Section 2(a), but they do not identify any constitutional grant of authority to the President.

By mandating voter lists, the Order thrusts the Executive into the realm of identifying and determining who is an "eligible voter." This is not, as Defendants contend, an innocuous "organization" of executive information or benign "supervision" of federal employees. State Opp. 32, 35-36; Fed. Opp. 56, 63. The Order inserts the Executive into the States' role of determining if a voter is "ineligible" based on membership in the List, and to "investigat[e] [and] prosecut[e]" anyone who distributes a ballot to anyone deemed "not eligible to vote in a Federal election." Exec. Order, § 2(a), (b). Additionally, the Lists are transmitted *externally* to the States, going beyond internal recordkeeping. *See id.* § 2(a). Whether the List is some "optional" State resource is beside the point—the Elections Clause, NVRA, and HAVA do not allow the President to venture into state election administration.

By contrast, the Executive Order in *Allbaugh* (discussed at Fed. Opp. 56) only directed federal agencies not to impose requirements about project labor agreements in federally funded construction projects. *See* 295 F.3d at 29-30. Unlike the Order here, that order did not affect who was eligible to bid for or obtain federal contracts, or require anyone to act, or direct prosecution of those deemed noncompliant. And State Defendants' claim (at 45-46) that statutory limits to the President's control over the USPS are unconstitutional is unsupported and irrelevant. *Nixon v. Administrator of General Services* <u>affirmed</u> Congress's ability to limit the President's authority over presidential records. *See* 433 U.S. 425, 435, 443 (1977). Like the statute in *Nixon*, the Postal Reorganization Act ("PRA") is a valid limitation on the President's control over aspects of the executive branch, a feature of the Constitution's system of checks and balances. Regardless, even

5

if the President could "direct" USPS as the Order states, he still cannot order USPS to act contrary to the authority Congress granted it in statute. *See Youngstown*, 343 U.S. at 637.  In sum, the Constitution demands that presidential authority "stem either from an act of Congress or from the Constitution itself." *Id.* at 585. The President lacks any such authority to issue the Order.

### B.     Defendants' Counterarguments Fail

#### 1.     Plaintiffs Have Standing to Challenge §§ 2(a), 3(b), 4(a), and 4(c)

##### a.     Plaintiffs Have Organizational Standing

Plaintiffs satisfy the requirements for organizational standing for the reasons set forth in the opening brief. NAACP Br. 42-51. Defendants misconstrue these requirements and the Order's direct impact on Plaintiffs' core activities.

**1.  The Order directly interferes with and impairs Plaintiffs' core activities; it imposes concrete burdens *now*.** Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367, 395 (2024), ignores *AHM*'s distinction and reaffirmation of *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 379 (1982). In *Havens*, the plaintiff's standing hinged on the defendant's actions "directly affect[ing] and interfer[ing] with [its] core business activities" of providing direct housing services; the organizations in *AHM* alleged only advocacy-related costs that were consistent with their "advocacy businesses." *AHM*, 602 U.S. at 394-95.

Like in *Havens*, Plaintiffs are national leaders in voter education and assistance services, which are core missions. *See* NAACP Br. 42-48. Where Plaintiffs "devote significant resources" to "counteract" the challenged practices at issue, they have standing to challenge the burdens that the Order imposes on their missions to encourage vote by mail and participation in elections. *Havens*, 455 U.S. at 379. Courts routinely allow civic organizations, including NAACP and BVM, to challenge similar policies that impair voting-related programming. *See, e.g.*, *LULAC*, 780 F. Supp. 3d at 188-89; *Nairne v. Landry*, 151 F.4th 666, 680-82 (5th Cir. 2025); *Get Loud Ark. v.*

*Thurston*, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024); *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1138-39 (D. Idaho 2024); *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160, at *4-5 (M.D. Fla. Nov. 8, 2024). The Order is already forcing Plaintiffs to divert resources from their ordinary voter-engagement work to revise educational materials, retrain volunteers, prepare for erroneous voter exclusions, and respond to widespread confusion surrounding mail-ballot eligibility. *See* NAACP Br. 42-51; ECF No. 54-1 ¶ 16 ("Sterling Decl."); ECF No. 54-3 ¶ 16 ("Nunez Decl."); ECF No. 54-9 ¶¶ 18-20 ("Albright Decl."). Those operational burdens are concrete present injuries under *AHM, Havens,* and *LULAC*.

**2. The chilling effect of the Order on Plaintiffs' core business activities is an independent, cognizable injury that supports Plaintiffs' standing.** The Order independently injures Plaintiffs by foreseeably chilling their voter registration and voter assistance activities. The chill is "objectively reasonable" given the Order emphasizes enforcement three times. *First Choice Women's Res. Ctrs, Inc. v. Davenport*, No. 24-781, 2026 WL 1153029, at *9 (U.S. Apr. 29, 2026).

The Order directs the Attorney General to prioritize investigations and prosecutions of persons involved in distributing ballots to individuals later deemed ineligible, while simultaneously requiring the creation of concededly error-prone federal eligibility lists. Exec. Order §§ 2(b), 4(b), 5. It orders federal officials to withhold funding from "noncompliant States and localities." *Id.* § 5. And it mandates criminal referrals of election officials, others involved in the "administration of Federal elections," and "public or private entities engaged in distribution of ballots" if they aid and abet providing ballots to ineligible persons. *Id.* §§ 4(b), 5. The Order thus targets not only any ineligible registrant, but also any person or entity—like Plaintiffs—that registers or provides such registrant a ballot, or that helps in that process.

Contrary to Federal Defendants' claim (at 36-37, 41-45) Plaintiffs do not request an injunction against the enforcement paragraphs of the Order. Irrespective of those enforcement provisions, the unlawful mandate to create the Lists harms Plaintiffs including by foreseeably chilling lawful efforts to educate and assist voters so that they can register, vote, and have their completed ballots counted. *See* Sterling Decl. ¶¶ 14, 20. The Order chills Plaintiffs' activities by flagrantly usurping state authority, generating a torrent of propaganda that grossly exaggerates the extremely rare incidence of election fraud and noncitizen voting, and requiring the creation and distribution of inaccurate lists of eligible voters as a putative tool for liability. *See* Nunez Decl. ¶ 10; ECF No. 54-4 ¶ 15 (" Giddings Decl."). These developments increase both the likelihood and the fear of wrongful prosecution.

No organization dedicated to educating and registering voters can guarantee that every person they and their volunteers assist in the voter registration or ballot access process is eligible. Plaintiffs and their volunteers cannot guarantee that every voter they assist will appear on those flawed federal lists, particularly because the laws of many states forbid volunteers from independently adjudicating voter eligibility. *See* NAACP Br. 46 (discussing prohibition in Texas). Even if such infallibility were possible, it would not guarantee that the voter appears on federal lists drawn from error-filled databases, and the omission would expose volunteers and staff to the risk of meritless investigation and prosecution.

Plaintiffs cannot avoid the chilling effect, nor can they protect themselves by relying on the Lists, which are concededly incomplete and error-prone. *See id.* at 37-40. Because Plaintiffs and other voting rights organizations cannot guarantee that every voter they register is eligible, the only way that they and their volunteers can reduce their risk is to curtail their efforts to register voters. That is a paradigmatic chilling effect. The enforcement provisions of the Order, which

direct the Attorney General to prioritize investigation and prosecution of anyone who aids and abets the registration of ineligible voters, exacerbate that chilling effect and Plaintiffs' injury. The enforcement provisions, intertwined with the substantive deficiencies of the Order, therefore bolster Plaintiffs' standing to sue, even though Plaintiffs have not sought to enjoin them as standalone provisions. *See e.g., Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) ("[Injury in fact requirement] is met here, as the law is aimed directly at plaintiffs, who if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution."); *Olagues v. Russoniello*, 770 F.2d 791, 798-99 (9th Cir. 1985) (holding that an organization has standing when a prosecutor threatened prosecution of entities for registering potential noncitizens); *N.C. A. Phillip Randolph Institute v. N.C. Bd. of Elections,* 155 F.4th 298, 307 (4th Cir. 2025) (finding that prosecutions would have a chilling effect on voter registration); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1078 (10th Cir. 2025) (finding a credible threat of prosecution chills the right to publish voter data); *Project Vote v. Blackwell*, 455 F.Supp.2d 694, 705-06 (N.D. Ohio 2006).[2]

Plaintiffs need not await actual prosecution before challenging a credible threat to their efforts to educate, assist, and register voters. *Susan B. Anthony List*, 573 U.S. at 159-61. The Order expressly directs the Attorney General to prioritize investigation and enforcement against persons involved in distributing ballots to allegedly ineligible voters. Exec. Order §§ 2(b), 5. Assistance in registering voters, some of whom turn out to be ineligible to vote, falls within the conduct

---

[2] Although it is not a prerequisite to Plaintiffs' standing, the impediment the Order imposes to Plaintiffs' programs to educate and assist voters violates the First Amendment. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–61 (2014); *Jolt Initiative, Inc. v. Paxton,* 2026 WL 297633, at *9 (W.D. Tex. Jan. 29, 2026) (enjoining the State Attorney General's effort to revoke the corporate charter of a nonprofit organization for allegedly providing and submitting false voter registrations because it chilled "quintessential First Amendment expression which the Supreme Court has described as 'core political speech.'" (citation omitted); *VoteAmerica v. Raffensperger,* 696 F.Supp.3d 1217, 1232 (N.D. Ga. 2023) (similar).

proscribed by the Order. Plaintiffs stated their intention to continue these efforts. NAACP Br. 42-51. The President's directive that the Attorney General prioritize investigation and enforcement of persons and entities that help possibly ineligible voters obtain ballots  presents an unusually strong case for a credible threat. It constitutes an explicit enforcement commitment directed at Plaintiffs' class of activity. And so Plaintiffs must "take action now to avoid adverse consequences in the near future." *Chicago Women in Trades v. Trump*, 773 F.Supp.3d 592, 603 (2025).

### b.      Plaintiffs Have Associational Standing

Plaintiffs NAACP and Common Cause have associational standing because their members face concrete and imminent injuries from the Order. NAACP Br. 48-51. The Federal Defendants do not contest associational standing, and the State Defendants address it only briefly and without support. *See* Fed Opp. 19-23 (challenging only organizational standing); States Opp. 25, 27-28.

Nonetheless, Plaintiffs NAACP and Common Cause have identified specific members who have already suffered injury and others who face imminent, non-speculative risks, including these prosecutorial threats. NAACP Br. 48-51; *see also Olagues*, 770 F.2d at 797-98. These injuries are concrete and traceable to Defendants and the Order. To start, "agencies cannot collect or maintain records regarding [Plaintiffs' members'] activities and agencies are required to follow specific procedures prior to maintaining, collecting, using or disseminating records." *See United States v. Weber*, 816 F.Supp.3d 1168, 1193 (C.D. Cal. 2026) (citing 5 U.S.C. § 552a). Any list sharing outside of the Privacy Act's narrow exceptions harms NAACP and Common Cause members— and Defendants' assertion that these privacy harms are speculative or not imminent ignores Defendants' nationwide effort to compile state voter registration lists since spring 2025, including centrally compiling state lists within one agency for independent eligibility checks, soliciting two states to engage in required list maintenance as dictated by the federal government, and entering several agencies into data-sharing agreements with DHS. The Department of Justice is a

10

counterparty to the DHS agreement for voter registration and list maintenance purposes. *See* Compl. at 24, *Common Cause v. Dep't of Just.*, No. 1:26-cv-01352 (D.D.C. Apr. 24, 2026) (ECF No. 1); Alaska Memorandum of Understanding with DOJ Civil Rights Division, at 4-7, https://perma.cc/Q5CQ-LELB; Texas Memorandum of Understanding with DOJ Civil Rights Division, at 4-7, https://perma.cc/2EDA-RF7H; *Computer Matching Agreements and Notices*, U.S. Dep't Homeland Security (Dec. 18, 2025), https://perma.cc/434S-4HRU; *SAVE Agency Search Tool*, U.S. Citizenship and Immigration, https://perma.cc/24QD-3KJY. Assurances that the government will comply with the Privacy Act are belied by these facts. The State Defendants (at 8) embrace the lists as signaling "a need for verification that a given registered voter is, in fact, a U.S. Citizen and over 18 years old," further confirming the imminent injury.

The impact on NAACP and Common Cause members likewise is not speculative. The federal databases underlying the Order's lists are not reliable for determining voter eligibility. ECF 54-10 at 5-12 ("McDonald Decl."). NAACP and Common Cause members include several categories of voters who would be excluded from citizenship and mail ballot lists. *See* Sterling Decl. ¶¶ 18-21; Nunez Decl. ¶¶ 19-20. For example, 17-year-olds who will turn 18 by the general election and are lawfully permitted to vote in federal primary elections in 19 states and the District of Columbia would be excluded. The Order directs the State Citizenship List to include only U.S. citizens who are 18 "at the time of an upcoming Federal election," thereby excluding eligible 17-year-old primary voters. McDonald Decl. 13. Additionally, many NAACP and Common Cause members—particularly those born before 1981—do not possess passports, and their citizenship will not be reflected in SSA or DHS databases. Approximately 148 million individuals were born before SSA required or consistently kept citizenship information. McDonald Decl. 7.[3] Because of

---

[3] Defendants fail to address this finding from Plaintiffs' expert in any meaningful way. *Accord League of Women Voters v. DHS*, No. 25-3501, 2025 WL 3198970, at *4 (D.D.C. Nov. 17, 2025)

Plaintiffs' large memberships, their organizations certainly include members who will be excluded from the Order's list. *See* Sterling Decl. ¶¶ 5-6, 12, 18-20; Braggs Decl. ¶¶ 11-13; Nunez ¶¶ 7, 11, 17-19. Many of Plaintiffs' members also rely on USPS to receive and transmit mail ballots. *See* Braggs Decl. ¶¶ 7, 14-15; ECF No. 54-5 ¶ 5; ECF No. 54-6 ¶¶ 9-13. Plaintiffs have associational standing.

### c.      Plaintiffs' Injuries Are Traceable and Redressable

Defendants' conclusory  traceability and redressability arguments likewise fail. The Federal Defendants (at 18, 21) offer nothing more than a statement that redressability and traceability are not met, and the State Defendants (at 16, 25-26) do little more. Confronting a similar election-law challenge, the *LULAC* court squarely rejected this argument. *LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 62-63 (D.D.C. 2025) ("Because each of the Plaintiffs' asserted injuries flows from the 'predictable effect' that a burdensome new federal requirement for voter registration will have on eligible voters' behavior, those injuries satisfy the traceability requirement."). Omissions from lists resulting in eligible voters being excluded on voter rolls or prevented from receiving mail ballots are directly traceable to the Order's mandates and Defendants' compliance. For example, a 17-year-old's eligibility would not be impaired if not for exclusion from the State Citizenship Lists. And USPS would transmit voters' mail ballots, despite any omission from an eligible voter list, if the Order did not prohibit USPS from transmitting them. Similarly, Plaintiffs would not have to expend resources refashioning their voter outreach and assistance programs, re-training staff and volunteers, updating materials nationwide, and supporting impacted voters and their members absent the Order's dictates.

---

(describing a 2006 SSA audit estimating that 3.3 million citizens were misidentified as non-citizens and reporting that "The Government does not dispute that such inaccuracies likely still exist.").

Whether "optional" or required, the State Defendants' willingness to effectuate the Order alongside the Federal Defendants is of no consequence for traceability. *See United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) ("Traceability may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there is no requirement that the Defendant's conduct comprise the last link in the chain." (quotation omitted)). That some states contract to access DHS data does not license Federal Defendants under the Order to expand its data dissemination or force it upon other states. Nor does any existing data-sharing occur in reference to mail ballots. Any data-sharing by states cannot, in any case, resolve the impacts of the widespread and undisputed erroneous identification of noncitizens in the SSA and SAVE databases. Plaintiffs and their members face imminent burdens on their ability to register and lawfully vote by mail in upcoming federal elections because of the Order's citizenship-verification and ballot-delivery directives, only redressable by an injunction against Defendants.

A preliminary injunction will prevent Defendants from implementing the challenged requirements, thereby removing the source of the threatened injury. Redressability and traceability require no more. *See International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811 (D.C. Cir. 1983) ("[Plaintiffs] need not negate every conceivable impediment to effective relief no matter how speculative," and are not required "to *prove* that granting the requested relief is certain to alleviate their injury" (quotation omitted)); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1200 (W.D. Wash. 2026) (holding that redressability is satisfied when an injunction "would eliminate the need for Plaintiffs to make changes to their voter registration systems and implement voter education campaigns, thereby eliminating their proprietary harms").

### 2.    Plaintiffs' Claims Are Ripe

As set forth in Plaintiffs' opening brief (at 51-53), their claims are ripe because the Order's directives to federal agencies are already injuring them. That is, Plaintiffs have "show[n] an injury-

in-fact that is imminent or certainly impending," *LULAC*, 780 F.Supp.3d at 173 (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020)); *see also supra* at 6-13 (describing the injuries and harms to Plaintiffs that are *already* occurring), and Plaintiffs prevail under the two-part balancing test for prudential ripeness because the Order plainly "dictate[s] particular outcomes" and delaying review will cause hardship to plaintiffs, *LULAC*, 780 F.Supp.3d at 174-75 (citation omitted); *see also* NAACP Br. at 42-51.

*LULAC* is directly on point. There, the court found that substantially identical language "state[d] [a] mandate in no uncertain terms" and "dictate[d] the precise contours of the mandated requirement." 780 F.Supp.3d at 184; *compare, e.g., id.* ("'By the authority vested in me as President ... it is hereby *ordered* [that]: ... the [agency] *shall take* appropriate action to *require* ... documentary proof of citizenship' on the Federal Form." (alterations in original) (quoting Exec. Order 14,248 § 2(a)(i)(A))), *with* Exec. Order § 2(a) ("the Secretary of Homeland Security … *shall take* appropriate action to compile and transmit [State Citizenship Lists] to the chief election official of each State."); Exec. Order § 3(b) ("[T]he Postmaster General is *hereby directed* to initiate a proposed rulemaking... within 60 days of the date of this order," which "*shall* include" the Order's "[p]roposed provisions."). The *LULAC* court found the plaintiffs' *ultra virus* claim ripe for review as such. And courts "regularly adjudicate claims challenging the implementation of executive orders at similar stages." NAACP Br. 52 (collecting cases).

Defendants' contrary arguments are meritless. First, they rely heavily on boilerplate language in the Orders directing actions "[t]o the extent feasible," § 2(a), and "consistent with applicable law," *id.*, language to claim that the Order is "riddled with contingencies and speculation that impede judicial review," Fed. Opp. 27; *see also, e.g., id.* at 20, 24-26; States Opp. 24, 28-29. But such boilerplate language does not insulate the Order from challenge—and is

14

conspicuously absent from § 3's directives to USPS. Moreover, it is well-established that executive orders "cannot be held to destroy themselves through savings clauses." *Common Cause v. Trump*, 506 F. Supp 3d 39, 53 n. 8 (D.D.C. 2020) (citation omitted); *see also LULAC,* 808 F. Supp. 3d at 78 (using a saving clause to protect the prior order from review was "unworkable because it would strain the text of Section 2(a) [of the prior order] beyond recognition"); *Nat'l Pub. Radio, Inc. v. Trump,* No 25-1722, 2026 WL 877434 at *19 (D.D.C. March 31, 2026) (similar).

Here, the Order's clear language and concrete deadlines leave no room for "speculation" about its effects. *See* Exec. Order §§ 2(a) (creation and transmission of State Citizenship Lists 60 days before the next scheduled election); 3(a) (60 days from the date of the Order for USPS to propose rulemaking); 3(d) (USPS final rule due 120 days from the date of the order). The Order's saving clause language directly conflicts with the immediate directions and actions the government must take under Order, rendering the clauses "meaningless." *LULAC*, 780 F. Supp. 3d at 176.

Defendants' own statements demonstrate that the saving clause language is performative at best. At the signing ceremony, White House Staff Secretary Will Scharf, U.S. Commerce Secretary Howard Lutnick, and the President himself made clear what the Order is "going to do": "We're going to take federal data"; "ensure that each state's election officials are provided with a comprehensive view of who the eligible voters in their jurisdiction actually are"; and "order[] the Postmaster General, the U.S. Postal Service to take bold new measures to verify that ballots, both being sent to people are being sent to people who are eligible to vote, and then the ballots being returned are being properly returned by eligible voters only." *TRANSCRIPT: President Trump Signs an Executive Order on Elections*, *supra* n. 1. Defendants emphasized that the Order predicates participation in mail voting on compliance with its unlawful scheme. *See, e.g.*, *id*. ("if [states] want to use the U.S. mail" to "run [] elections," then "they're going to get a [barcode] from

15

the US Postal Service, and they're going to put that on the envelope, and we will have one envelope per vote"; the states' regular voting process is "all going to go away").

The White House Fact Sheet published with the Order is equally unequivocal: it affirmatively and repeatedly states that the Order "directs," "requires," and "ensur[es]" that DHS, SSA, and USPS will take the actions set forth in §§ 2(a), 3(b)-(d), and 4(c). For example, it states that "President Trump is taking *decisive action*" by "*direct[ing]* the Secretary of Homeland Security, in coordination with the Social Security Administration, to compile and transmit to each State a State Citizenship List." *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, *supra* n. 1 at 9 (emphasis added). The Fact Sheet further states that "[t]he lists *will be* updated and transmitted no fewer than 60 days before each regularly scheduled Federal election." *Id.* (emphasis added). And the Fact Sheet states that "[t]he Order *directs* the Postmaster General to initiate rulemaking *to require* all mail ballots transmitted by USPS to be placed in secure ballot envelopes marked as Official Election Mail with unique Intelligent Mail barcodes that facilitate tracking," and it "*requires* the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List, *ensuring* that only eligible absentee or mail-in voters receive absentee or mail-in ballots." *Id.* (emphasis added). Any "contingencies" or "uncertainties" about the Order were noticeably absent from Defendants' comments until they appeared in court.

The government's own declarations confirm action as to the postal service is ripe. ECF. 106-4 ¶ 3 (USPS is "currently" deliberating how to implement the unlawful Order). That alone is enough. Section 3(b) of the Order unequivocally (with no savings language) directs the USPS to issue regulations that violate federal statutes in myriad ways and in contravention of statutes that insulate USPS from presidential influence. NAACP Br. at 28-33. The USPS' declaration confirms

16

it has taken actions that succumb to that prohibited influence. Anything more the USPS does would only amount to further violations. That USPS has begun engaging with these directives—in clear contravention of the Postal Service's statutory limits—further underscores that this action is ripe.

Defendants' reliance (at Fed Opp. 24-27; State Opp. 28, 39) on *Trump v. New York*, 592 U.S. 125 (2020), therefore, is not on point. There, the order at issue involved special issues in "pre-apportionment challenges," and depended on multiple layers of federal agencies' discretionary action, contingent events, and unknown methodologies for census calculations. *Id.* at 132-33. The Order here imposes concrete, mandatory directives on federal agencies with specific deadlines tied to fast-approaching election days: the agencies "shall take appropriate action," to compile State Citizenship Lists that "shall be … transmitted" to States at least 60 days "before each regularly scheduled Federal election" (§ 2(a)), and USPS is "hereby directed" to initiate rulemaking to do specified, unambiguous, unlawful things "within 60 days" of the Order's issuance and to finalize that rule within 120 days. *Id.* § 3(a), (d)). *Trump v. New York* is thus inapposite, and the government's reference to dicta from *Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025), is inapposite for the same reason.

With election and Order deadlines fast approaching, the Order is injuring Plaintiffs now. The *LULAC c*ourt, confronting a similar challenge, recognized ripeness where present compliance burdens and operational disruptions exist well before final enforcement. *See LULAC*, 780 F.Supp.3d at 184. Here, as there, Plaintiffs are currently operating and reacting as significant lead-time is necessary for their work to assist voters. *Supra* at 7. If Plaintiffs' work is to have any practical effect when the lists are created, that infrastructure must be in place long before the Order's deadline of 60 days prior to the election. Exec. Order §§ 2(a), 3(b). Federal Defendants insist (at 51) that the Order's implementation "may never come to pass in a way that Plaintiffs

17

fear." But *all* of the evidence on the record suggests the opposite: the text of and deadlines in the Order, the Fact Sheet, and Defendants' own statements about what the Order is "going to do," and how they are "currently" taking steps to implement it, leaves "no uncertainty about what it requires." *LULAC*, 780 F. Supp. 3d at 185. Plaintiffs' claims are ripe.

> **3.    Plaintiffs Have Causes Of Action To Bring Their Constitutional And Statutory Claims**

***Constitutional claims* (Counts I-III).** Defendants do not dispute that Plaintiffs have a cause of action to assert their claims under the Constitution, which is alone enough to support an injunction against each challenged provision of the Order. *Compare* NAACP Br. at 24-30 *with* Fed. Opp. (no response) & States Opp. (no response). An "aggrieved party may seek equitable relief from unconstitutional government action by proceeding 'directly under the Constitution,' regardless of whether that party has an express statutory cause of action." *LULAC*, 2026 WL 252420, at \*25 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)). That is precisely what Counts I-III allege: "that the President has overstepped the constitutional separation of powers by purporting to exercise powers vested in Congress and the States." *Id.* at \*26; *see* NAACP Compl. ¶¶ 145-69. Defendants neither dispute that Plaintiffs have a cause of action to maintain those counts, nor that these counts do not require final agency action.

***Postal Claims* (Count V).** Plaintiffs have a recognized *ultra vires* cause of action to assert that "presidential action … independently violates" the postal statutes, which "delegate[] no authority to the President." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Id.* at 1328 (alteration in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). "[C]ourts have power to compel subordinate executive officials to disobey

18

illegal Presidential commands." *Id.* (quotation omitted). A legion of cases from this District and others have done so in similar circumstances. *See, e.g.*, *LULAC*, 780 F. Supp. 3d at 171-73; *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 86-88 (D.D.C. 2025); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 76 (D.D.C. 2025), *aff'd*, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026); *AFLCIO v. DOL*, 778 F. Supp. 3d 56, 89 (D.D.C. 2025); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 425-31 (D. Md. 2025).

Federal Defendants contend (at 40) that Plaintiffs lack a cause of action because they have not identified a "clear and mandatory statutory command" that the Order violates. They are "barking up the wrong tree." *AFLCIO*, 778 F. Supp. 3d at 89. Plaintiffs do not just contend that the Order "is *exceeding* the statutory authority [the President] has been granted"; the postal statutes grant the President no power to direct USPS rulemaking "*whatsoever.*" *Id.* (emphasis added). Defendants do not identify *any* authority permitting the President to direct USPS rulemaking and all authority is to the contrary. The PRA purposefully removed the USPS from the President's control and reconstituted it as an independent agency, directed solely by its Board of Governors. 39 U.S.C. §§ 201-02. When a President subverts that congressional design, courts are "available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328. Because the President has no power to direct USPS rulemaking, Plaintiffs may challenge the Order as *ultra vires*. *Id.*

Plaintiffs also satisfy the prerequisites for a statutory *ultra vires* claim. *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The D.C. Circuit has long held (and Federal Defendants do not dispute) that judicial review is available for *ultra vires* claims under the postal statutes. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970-72 (D.C. Cir. 2022). Further, in arguing (at 40) that "[a]ny injured Plaintiff can simply wait and sue any agency that actually takes some concrete action to implement the Order," Federal Defendants effectively

19

confirm no other cause of action is available now. *New Mexico v. Musk*, 2026 WL 799635, at \*13 (D.D.C. Mar. 23, 2026) ("Defendants do not point to some other mechanism Plaintiffs could pursue to *prospectively* enjoin Defendants' actions on the basis that they lack authority to carry out such action." (emphasis added). Because most USPS actions are exempt from the APA, *ultra vires* review is the only available mechanism for challenging unlawful postal service directives. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970; *see* Fed. Opp. 29 n.6. As to the final factor, the Order directs USPS to take action "plainly beyond the bounds of" its authority and contrary to statutory prohibitions. *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 2026 WL 877779, at \*6 (D.D.C. Mar. 31, 2026) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022)). Defendants do not meaningfully respond to Plaintiffs' showing that the Order exceeds USPS's statutory authority and conflicts with the PRA, PAEA, and UOCAVA. *See* NAACP Br. 28-33. Each of those violations collides with a "'clear and specific statutory mandate' that is 'susceptible to ultra vires review.'" *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 88 (quoting *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971).

*Privacy Act Claims* **(Count IV)***.* Plaintiffs' Privacy Act claims are reviewable under the APA. While the Federal Defendants argue (at 28-37) that there has not yet been "final agency action," Plaintiffs' Privacy Act allegations are predicated on unlawful data sharing that took place in 2025 when SSA shared "Numident" data with DHS. NAACP Br. 40-42. Judge Kollar-Kotelly has already concluded that this interagency data-sharing arrangement constituted final agency action, and Defendants do not contend otherwise. *LULAC*, 2026 WL 252420, at \*53. Importantly, Defendants acknowledge the mandate in the Order that the "State Citizenship List *shall* be derived from … SSA records," Order § 2(a), *i.e.*, the Numident data that SSA previously shared with DHS. McDonald Decl. at 6, 18, 23. The government's declarations do not claim otherwise. *See generally*

20

ECF No. 106-3. The Executive Order simply directs DHS to further repurpose that data for a new use—compiling the State Citizenship List—the outcome of which "is no mystery." *LULAC*, 808 F. Supp. 3d at 65. Because the relevant data-sharing Plaintiffs seek to enjoin is the further utilization of a final agency action (impermissible data sharing) that has already taken place, "Plaintiffs may pursue injunctive relief under the APA for alleged violations of the Privacy Act in the implementation of … the [] Order." *LULAC*, 2026 WL 252420, at *53.

Contrary to Federal Defendants' contention (at 38-39) the Privacy Act does not displace APA review. As numerous courts have concluded, the limited individual remedies available under the Privacy Act allow plaintiffs "to compel disclosure unlawfully *withheld*, not to prevent disclosure imminently (and unlawfully) *threatened*." *E.g.*, *AFLCIO*, 778 F. Supp. 3d at 81 (emphasis added). These "narrow opportunities for individualized injunctive relief are inadequate to address a policy of ongoing data sharing at mass scale." *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 44 (D.D.C. 2025) (quotation omitted). State Defendants do not dispute this. And elsewhere in their brief (at 38), Federal Defendants acknowledge the Privacy Act "allows for injunctive relief only in narrow circumstances that are plainly inapplicable here." Because "injunctive relief sought by plaintiffs here is not available under the Privacy Act," Plaintiffs can proceed under the APA. *AFSCME*, 771 F. Supp. 3d at 792.

#### 4.    The Scope of Plaintiffs' Requested Relief is Proper

The Court has authority to enjoin Defendants from implementing the Order[4] and the scope of relief is not overbroad. Here, Plaintiffs seek to enjoin the unlawful provisions of the Order—

---

[4] The government is wrong in contending (at 54-56) the President has absolute immunity from suit for declaratory or injunctive relief. *See Franklin*, 505 U.S. at 802-03 ("[W]e have left open the question whether the President might be subject to a judicial injunction … [and] need not decide whether injunctive relief against the President was appropriate… the President's actions may still be reviewed for constitutionality."). "[J]udicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers," *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958), and such relief extends to the President where the President

Sections 2(a), 3(b), 4(a), and 4(c)—and concede that the Order may be severable. ECF No. 37. Although *Trump v. CASA* held that federal courts lack authority to issue universal injunctions, it reaffirmed that courts retain equitable authority to award "complete relief," including relief extending beyond named plaintiffs where narrower relief would be ineffective. 606 U.S. 831, 852 & n.12 (2025). *LULAC* addressed closely analogous circumstances, where the NAACP and other plaintiffs with missions centered on voter registration sought an injunction barring the EAC from implementing the President's directive to add a documentary proof-of-citizenship requirement to the federal voter registration form. The Court granted that relief, because the "only way to provide complete relief to Plaintiffs" was to permanently enjoin Defendants from implementing the challenged provision. *LULAC*, 808 F. Supp. 3d at 82. Here, the Order's substantive provisions cannot be selectively implemented to exclude the NAACP and Common Cause's members, but not other voters. And Plaintiffs' organizational injury does not flow from the inclusion or exclusion of particular individuals on the list—it flows from the *existence* of a federal voter eligibility list that restructures the electoral landscape in which they operate. Enjoining implementation of the challenged aspects of the Order altogether is the only way to afford complete relief to Plaintiffs.[5]

---

has exceeded his legal authority, *see, e.g.*, *Youngstown*, 343 U.S. at 589 (finding President's seizure order was unauthorized); *Dames & Moore v. Regan*, 453 U.S. 654, 668-78 (1981) (reviewing whether order exceeded the President's statutory authority); *Reich*, 74 F.3d at 1332 ("we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides those that run afoul of the Constitution or which contravene direct statutory prohibitions …."); *NTEU v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (there is "no immunity established under any case known to this Court [that] bars every suit against the President for injunctive, declaratory or mandamus relief"). Commerce Secretary Howard Lutnick is also a proper defendant. Section 4(a) instructs the Secretary of Commerce to help effectuate "all relevant aspects" of the Order's implementation. And Defendant Lutnick has been an outspoken participant in the Order's implementation to date. *See TRANSCRIPT: President Trump Signs an Executive Order on Elections*, *supra* at n.1.

[5] Because the entry of an injunction will not harm Defendants, the security required by Fed. R. Civ. P. 65(c) should be set at zero. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion as to the amount of security required, *if any*." (internal quotation marks omitted)); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("[T]he district court did not abuse its discretion in dispensing with the bond."); *Fox Television Stations,*

## II.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM

As set forth above, the Order has caused Plaintiffs to incur injury and harm that has already occurred and is continuing. The Order has materially and significantly raised "new obstacles [that] unquestionably make it more difficult for [organizational plaintiffs engaged in voter registration and engagement activities] to accomplish their primary mission" of increasing voter participation. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir 2018). Plaintiffs engage in these efforts with heightened activity in federal elections cycles. And with ongoing primaries and special elections, and the midterm elections coming in under five months, the Order has already interfered with Plaintiffs' provision of their voter registration and education programming, including promotion and facilitation of mail voting as accessible and safe options to cast one's ballot. NAACP Br. at 42-48. The Order is also currently sowing confusion and apprehension among Plaintiffs' members and constituents, who are expressing concerns about whether they will be required to reverify their citizenship or reregister to vote and the availability of mail voting in upcoming elections. *Id.* The Order's restrictions on the use of mail ballots, which uncontested evidence shows will rely on flawed and error-prone databases that identify millions of citizens as noncitizens, further impedes the ability of Plaintiffs' members to vote. *Id.* These harms are irreparable and they are happening now. *See Newby*, 838 F.3d at 9.

Further implementation of the Order's provisions will compound these harms throughout the ongoing election cycle by forcing Plaintiffs to divert significant resources to their core organizational priorities. NAACP Br. at 42-51; *supra* at 6-7, 10-13. Plaintiffs must overhaul voter-registration and mail-voting materials rendered obsolete by the Order, retrain volunteers, and

---

*Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 52 (D.D.C. 2013) ("It is well settled that Rule 65(c) gives the Court wide discretion in the matter of requiring security." (citation omitted)).

respond to widespread confusion regarding mail-ballot eligibility and citizenship verification requirements, undermining their ability to serve as trusted nonpartisan voter-education organizations. NAACP Br. 42-51. And because the Order's flawed eligibility lists will erroneously exclude eligible voters, Plaintiffs will be forced to redirect additional resources to helping members and constituents contest their exclusion and restore their ability to vote by mail. *Id.* These harms to Plaintiffs' ability to "accomplish their primary mission of registering voters," educating voters, and supporting voter turnout are precisely the kinds of harms that courts in the DC Circuit have found to be irreparable. *Newby,* 838 F.3d at 9; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health &Hum. Servs.,* 485 F. Supp. 3d 1, 56 (D.D.C. 2020); *League of Women Voters v. North Carolina,* 769 F. 3rd 224, 247 (4th Cir. 2014); *LULAC,* 780 F. Supp.3d at 200-01 (harm to the interests of voter registration organizations "is irreparable because after the registration deadlines … pass, 'there can be no do over and no redress.'" (quoting *Newby*, 838 F.3d at 9)).

Defendants assert (at 48-51) that any injury to Plaintiffs is too remote or contingent to justify a preliminary injunction. But contrary to Defendants' assertions (at 41), a preliminary injunction does not require injury that is "certain." Fed. Opp at 32. A preliminary injunction requires "only a likelihood of irreparable injury." *Newby,* 838 F. 3d at 8-9; *accord Winter*, 555 U.S. at 20; *Gomez v. Kelly,* 237 F. Supp. 3d 13, 14-15 (D.D.C. 2017). And Defendants' argument is materially indistinguishable from the argument rejected in *LULAC*. There, the government similarly argued that the challenged executive order's requirements "may never occur" and therefore could not support immediate relief. 780 F. Supp. 3d at 183-84. The court rejected that position because the order directed federal agencies to take specific actions with specified outcomes, leaving "no mystery" about what the order required. *Id.* at 184. The same is true here: the Order directs DHS and SSA to create federal citizenship lists and directs USPS to initiate

24

rulemaking establishing the exclusive list governing mail-ballot transmission, while the White House has publicly confirmed what agencies are "going to do." Moreover, Plaintiffs have proffered uncontested facts that the Order is presently impairing their core mission to register and educate voters. NAACP Br. 42-51. Indeed, not only do Defendants not contest these injuries, Defendants do not contest Plaintiffs' assertions of an extremely high error rate in the use of SSA and SAVE data. *See id.* at 49-51; McDonald Decl. 30-31. And while Defendants argue (at 48-50) that these harms are not related to the Order because it prescribes no specific actions and is merely a suggestion by the President, Defendants contemporaneous statements belie any iffiness. *Supra* at 15-16. Plaintiffs' resulting harms are thus sufficiently "imminen[t]" to establish a "clear and present need" for injunctive relief. *LULAC*, 780 F. Supp. 3d at 200.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS

Finally, Plaintiffs have met their burden to show that "the balance of equities tips in their favor" in this case. *Winter*, 555 U.S. at 20. There is "substantial public interest" in ensuring federal officials "abide by the federal laws that govern their existence." *Newby*, 838 F.3d at 12 (quotation omitted). Plaintiffs' strong likelihood of success on the merits that the Order is unlawful and invalid and the substantial public interest in "permitting as many qualified voters to vote as possible" and "preserving the integrity of [the] elections process" heavily favor injunctive relief. *LULAC*, 808 F. Supp. 3d at 83-84 (quoting *Newby*, 838 F.3d at 12-13). Injunctive relief would indeed "restrain the President" (Fed. Opp. 59) from implementing the Order, which in this case *serves* the public's interest by preventing an unlawful exercise of authority. To be sure, there is "no public interest in the perpetuation of unlawful" executive action. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Newby*, 838 F.3d at 12).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary injunction.

25

Dated: May 8, 2026                          By

     /s/ John A. Freedman
John A. Freedman (Bar No. 453075)
Elisabeth S. Theodore (Bar No. 1021029)
Jeremy C. Karpatkin (Bar No. 980263)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
john.freedman@arnoldporter.com
elisabeth.theodore@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Ave., Suite 1400
Seattle, WA 98101
Telephone: +1 206.208.0108
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
Telephone: +1 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org

26

jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommitte.org
*Attorneys for Plaintiff*

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215
Telephone: + 202.463.2940
*Attorneys for NAACP*

*Motion for Pro Hac Vice or Court
Admission Forthcoming*

27