# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

## DEMOCRATIC PARTY PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

I.     Courts previously rejected President Trump's attempt to commandeer state election administration by Executive fiat. ................................................................................... 2

II.    The new Executive Order repeats the lawless overreach that courts rejected. ................... 4

     A.     Section 2(a) requires federal agencies to create "State Citizenship Lists" using incomplete data from inaccurate sources. .............................................................. 4

     B.     Section 3(b) prohibits the transmission of mail ballots for voters who are not properly "enrolled" with USPS. ........................................................................... 6

III.   Plaintiffs filed this lawsuit to protect their interests and the voting and privacy rights of their members ........................................................................................................... 7

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

I.     The Democratic Party Plaintiffs' claims are justiciable. ...................................................... 9

     A.     This matter is properly before this Court for review now. ..................................... 9

           1.     The non-APA claims are ripe. ................................................................ 11

           2.     The APA claim is ripe............................................................................ 15

           3.     Prudential ripeness concerns do not militate against judicial review. ...... 18

     B.     The Democratic Party Plaintiffs have standing. ................................................... 19

           1.     The Democratic Party Plaintiffs have standing because the Executive Order unlawfully alters election rules........................................................ 19

           2.     The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' voting rights. ......................... 21

           3.     The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' privacy rights......................... 24

           4.     The Party Organizations have standing to prevent harm to their mission. 26

II.    The Democratic Party Plaintiffs have stated claims that the E.O. is unlawful. ................ 30

    A.    The Executive Order is *ultra vires* and violates the horizontal separation of powers. ..................................................................................................... 30

    B.    The Executive Order violates the vertical separation of powers. ......................... 32

    C.    The Executive Order violates USPS's statutory authority.................................... 34

    D.    The Executive Order violates the Privacy Act....................................................... 34

        1.    Plaintiffs have a cause of action under the APA...................................... 35

        2.    The Complaint adequately pleads Privacy Act violations. ...................... 38

III.    The President, Department of Commerce, and Secretary of Commerce should not be dismissed............................................................................................................................ 40

CONCLUSION......................................................................................................................... 42

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AFGE v. SSA*,
   172 F.4th 361 (4th Cir. 2026) ................................................................................. 24

*AFL-CIO v. Dep't of Lab.*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................................... 35

*AFL-CIO v. Dep't of Lab.*,
   No. 25-cv-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) ................................. 14, 24

*AFL-CIO v. SSA*,
   771 F. Supp. 3d 717 (D. Md. 2025)........................................................................... 37

*All. for Retired Ams. v. Bessent*,
   770 F. Supp. 3d 79 (D.D.C. 2025) ......................................................................... 24, 26

*Am. Clinical Lab'y Ass'n v. Becerra*,
   40 F.4th 616 (D.C. Cir. 2022)................................................................................. 8

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ............................................................................. 29

*Arizona v. Inter Tribal Council of Ariz.*,
   570 U.S. 1 (2013) ............................................................................................... 33

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015).................................................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................. 8

*Axon Enterp., Inc. v. FTC*,
   598 U.S. 175 (2023)............................................................................................. 11

*Baker v. Carr*,
   369 U.S. 186 (1962)............................................................................................. 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................. 8

*Bennett v. Spear*,
   520 U.S. 154 (1997)...................................................................................... 11, 14, 36, 38

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ............................................................................... 32

*\*Bost v. Ill. State Bd. of Elections*,
  607 U.S. 71 (2026) .......................................................................................19, 20

*Bowsher v. Synar*,
  478 U.S. 714 (1986)........................................................................................... 2

*Bread for the City v. U.S. Dep't of Agric.*,
  872 F.3d 622 (D.C. Cir. 2017)............................................................................ 35

*Bread for the City, Inc. v. U.S. Dep't of Agric.*,
  211 F. Supp. 3d 327 (D.D.C. 2016)..................................................................... 35

*Britt v. Naval Investigative Serv.*,
  886 F.2d 544 (3d Cir. 1989) ............................................................................... 39

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002)............................................................................. 9

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. 2025)......................................................... 3, 10, 11

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017)................................................................................ 8

*CASA de Maryland., Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018)..................................................................... 42

*Centro Presente v. United States Department of Homeland Security*,
  332 F. Supp. 3d 393 (D. Mass. 2018)................................................................... 41

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)............................................................................ 14

*Chi. Women in Trades v. Trump*,
  778 F. Supp. 3d 959 (N.D. Ill. 2025)...............................................................10, 11

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979)........................................................................................... 34

*City & Cnty. of S.F. v. Trump*,
  816 F. Supp. 3d 1017 (N.D. Cal. 2026) ...........................................................10, 11

*\*City & Cnty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ....................................................................31, 32, 34

*Coal. for Underground Expansion v. Mineta*,
333 F.3d 193 (D.C. Cir. 2003) ................................................................. 8

*Comm. on Judiciary of U.S. H.R. v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) ................................................................. 8

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) ................................................................. 29

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ............................................................. 22

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ................................................... 21, 29, 30

*Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*,
585 F. Supp. 3d 63 (D.D.C. 2022) .......................................................... 5

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) ....................................................... 12

*\*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
815 F. Supp. 3d 1 (D.D.C. 2025) ..................................................*passim*

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ............................................................... 11

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................1, 20

*Doe v. Chao*,
540 U.S. 614 (2004) ............................................................................. 36

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ............................................................ 36

*Drs. for Am. v. OPM*,
793 F. Supp. 3d 112 (D.D.C. 2025) ....................................................... 14

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ...........................................................9, 41

*El-Ganayni v. U.S. Dep't of Energy*,
591 F.3d 176 (3d Cir. 2010) ..................................................... 10, 13, 30

*\*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)...................................................................*passim*

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................................ 22

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................. 19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................. 13

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) .................................................................... 24

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ............................................................ 31, 34

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................. 27

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ................................................................... 8

*Humane Soc'y of U.S. v. U.S. Postal Serv.*,
  609 F. Supp. 2d 85 (D.D.C. 2009) ........................................................... 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ......................................................................... 21, 23, 25

*Jones v. United States Postal Serv.*,
  488 F. Supp. 3d 103 (S.D.N.Y. 2020) ....................................................... 23

*L.A. Press Club v. Noem*,
  No. 2:25-cv-05563, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ................ 37

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ................................................................................. 34

*Londrigan v. FBI*,
  670 F.2d 1164 (D.C. Cir. 1981) ............................................................... 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 8, 19, 26

*LULAC v. EOP*,
  780 F. Supp. 3d 135 (D.D.C. 2025) ...................................................*passim*

*LULAC v. EOP*,
  818 F. Supp. 3d 34 (D.D.C. 2026) ....................................................*passim*

*LULAC v. EOP,*
   808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................ 3, 10, 12

*Medellin v. Texas,*
   552 U.S. 491 (2008)........................................................................................ 31

*Mountain States Legal Found. v. Glickman,*
   92 F.3d 1228 (D.C. Cir. 1996)......................................................................... 8

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ......................................................................................... 19

*Myers v. United States,*
   272 U.S. 52 (1926) ......................................................................................... 30

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
   783 F. Supp. 3d 290 (D.D.C. 2025)................................................................ 30

*Nat'l Assoc. of Postal Supervisors v. USPS,*
   602 F.2d 420 (D.C. Cir. 1979)........................................................................ 14

*Nat'l Urb. League v. Trump,*
   783 F. Supp. 3d 61 (D.D.C. 2025) .................................................................. 12

*New Hampshire v. Maine,*
   532 U.S. 742 (2001)........................................................................................ 20

*New York v. Trump,*
   767 F. Supp. 3d 44 (S.D.N.Y. 2025) .............................................................. 37

*NPR v. Trump,*
   No. 25-cv-1674 (RDM), 2026 WL 877434 (D.D.C. Mar. 31, 2026).................... 10

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
   461 U.S. 190 (1983)........................................................................................ 11

*People First of Ala. v. Merrill,*
   467 F. Supp. 3d 1179 (N.D. Ala. 2020).......................................................22, 23

*PFLAG, Inc. v. Trump,*
   769 F. Supp. 3d 405 (D. Md. 2025)...............................................................11, 33

*POET Biorefining v. EPA,*
   970 F.3d 392 (D.C. Cir. 2020)........................................................................ 10

*R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.,*
   130 F. Supp. 3d 356 (D.D.C. 2015).................................................................. 35

*Randolph v. ING Life Ins. & Annuity Co.*,
    973 A.2d 702 (D.C. 2009) ................................................................... 24

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ........................................................ 27, 30

*Rhode Island v. Trump*,
    810 F. Supp. 3d 283 (D.R.I. 2025) ...................................................... 31

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) .................................................. 42

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) .................................................. 41

*Sandusky Cnty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ............................................................. 22

*\*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ....................................................................... 2, 11

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) ............................................................. 20

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018) .......................................................... 9, 41

*Sidak v. United States Int'l Trade Comm'n*,
    No. 23-5149, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026) ................... 18

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ..................................................... 11

*Stone v. Trump*,
    400 F. Supp. 3d 317 (D. Md. 2019) ..................................................... 42

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................... 26

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................... 18, 19

*Susman Godfrey LLP v. Exec. Off. of President*,
    789 F. Supp. 3d 15 (D.D.C. 2025) ...................................................... 10

*Townsend v. United States*,
    236 F. Supp. 3d 280 (D.D.C. 2017) ..................................................... 39

viii

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)......................................................................................... 24

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  761 F. Supp. 3d 97 (D.D.C. 2025) ................................................................... 23

*Trump v. AFGE*,
  145 S. Ct. 2635 (2025) ..................................................................................... 12

*Trump v. New York*,
  592 U.S. 125 (2020).....................................................................................13, 17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
  517 U.S. 544 (1996)......................................................................................... 23

*United States v. Oregon*,
  No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ................... 32

*United States v. Smilowitz*,
  974 F.3d 155 (2d Cir. 2020) ............................................................................. 32

*Valero Energy Corp. v. EPA*,
  927 F.3d 532 (D.C. Cir. 2019)........................................................................... 38

*Venetian Casino Resort v. EEOC*,
  409 F.3d 359 (D.C. Cir. 2005)........................................................................... 16

*\*Venetian Casino Resort v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008)................................................................*passim*

*Washington v. Trump*,
  814 F. Supp. 3d 1173 (W.D. Wash. 2026) .......................................................... 3

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 25

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
  784 F. Supp. 3d 127 (D.D.C. 2025).................................................................. 10

**STATUTES**

39 U.S.C. § 102 ................................................................................................. 34

39 U.S.C. § 3001................................................................................................ 14

39 U.S.C. § 401 ................................................................................................. 14

39 U.S.C. § 404 ................................................................................................. 34

5 U.S.C. § 552a............................................................................................................ 15, 38, 39

5 U.S.C. § 705 ..................................................................................................................... 35

**OTHER AUTHORITIES**

90 Fed. Reg. 48948 (Oct. 31, 2025)........................................................................................ 6

90 Fed. Reg. 50879 (Nov. 12, 2025)....................................................................................... 5

*Election Mail*, U.S. Postal Serv.,
    https://perma.cc/5XBX-TSWF (last visited May 15, 2026) .................................................. 33

Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026)............................................*passim*

*Remarks: Donald Trump Signs an Executive Order on Elections*,
    RollCall (Mar. 31, 2026), https://perma.cc/EDW3-WVUL.................................................... 41

Restatement (Second) of Torts § 652B (1977) ......................................................................... 24

*Trump-Ordered Citizenship Lists are Likely Unreliable, Justice Dept. Says*,
    N.Y. Times (May 15, 2026), https://www.nytimes.com/2026/05/14/us/politics/trump-
    citizenship-list-voting.html..................................................................................................... 5

x

**INTRODUCTION**

Defendants attempt to avoid review of Executive Order 14399's flagrant violations of constitutional and statutory law by arguing that nothing may yet come of it, and that the Court should accordingly dismiss because any consequential injury to Democratic Party Plaintiffs is not sufficiently imminent.[1] In constructing this implausible scenario, Defendants postulate that, despite the E.O.'s explicit and mandatory directives, agency leaders across the executive branch may ignore those orders, or reimagine them, or implement some parts but not others. But as the Complaint makes clear, the E.O. is *already* causing significant harm to the Democratic Party Plaintiffs, who must make decisions *now* about how to prepare for the 2026 elections and protect the voting rights of their members, support their candidates, and defend their competitive electoral interests. Indeed, the Plaintiffs allege facts supporting *five different bases* for standing, each of which has been endorsed by the U.S. Supreme Court or a court in this Circuit. Those factual allegations—as well as Plaintiffs' allegations about the likely effects of the Executive Order's express language, which on its face *mandates* specific, unlawful actions—must be taken as true at this stage. *See Dep't of Com. v. New York*, 588 U.S. 752, 766–67 (2019).

Defendants' arguments also fail as a matter of law. Tellingly, Defendants do not actually engage with the legal precedents that establish the Democratic Party Plaintiffs' standing—despite Plaintiffs' lengthy discussion of them in their previously-filed preliminary injunction motion. *See*

---

[1] The named Defendants filed a combined brief in support of their motion to dismiss and in opposition to Plaintiffs' motion for a preliminary injunction; Plaintiffs respond to the arguments made as to the motion to dismiss. *See* ECF No. 117-1 ("F.D. Br."). State Intervenors filed a proposed motion to dismiss with their motion to intervene, *see* ECF No. 77-3 ("State MTD"), but did not refile it after they were granted intervention, and the Court has not indicated that the proposed motion was accepted as filed on the docket. Although it is therefore unclear whether State Intervenors' motion to dismiss is properly presented, Plaintiffs address the arguments made in that motion in this response, as well.

ECF No. 55 at 10–19 ("DPP Br."). Moreover, is well settled that when a challenged scheme "violates the separation of powers," as Plaintiffs have alleged and confirmed, "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" even before agency proceedings have concluded. *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986)). The questions presented by the Complaint—whether the President can order USPS to freeze delivery of mail ballots for certain voters and command agencies to share sensitive personal data in violation of bedrock principles of republican government and federalism, and several federal statutes—are accordingly ripe for judicial resolution now.

Plaintiffs have also stated a claim for the numerous constitutional and statutory violations asserted in the Complaint, most of which Defendants do not bother to address. The President has no authority to trample the prerogatives of the states and Congress by commandeering elements of election administration, and his commands to Defendants to do so collide directly with federal privacy, postal service, and election-related statutes. Because the Complaint plausibly alleges that this collision will cognizably injure Plaintiffs, their members, and the public—and, in fact, is already doing so—the Court should deny the motions to dismiss.

## BACKGROUND

### I.    Courts previously rejected President Trump's attempt to commandeer state election administration by Executive fiat.

President Trump has made no secret of his desire to rewrite election rules in ways that he believes will benefit the Republican Party. *See* ECF No. 1 ("Compl.") ¶¶ 1, 53–56, 60, 93. Yet he has failed to pass his preferred policies through the legislative process, and this marks the second time that he has attempted to bypass Congress by executive decree. *See id*. ¶ 32.

2

His first attempt came with Executive Order 14248, issued on March 25, 2025. *Id*. Among other things, that E.O. ordered agencies to share sensitive voter information, change mail voting rules, and require documentary proof of citizenship for voter registration purposes. *Id*. But the effort was quickly defeated in court. Within days of the issuance of the order, lawsuits were filed across the country, including by the Democratic Party Plaintiffs here in this district. *See LULAC v. EOP*, No. 25-946 (D.D.C. filed Mar. 31, 2025); *DNC v. Trump*, No. 25-952 (D.D.C. filed Mar. 31, 2025); *League of Women Voters Educ. Fund v. Trump*, No. 25-955 (D.D.C. filed Apr. 1, 2025); *see also* Compl. ¶¶ 3, 34. Those cases were consolidated before Judge Kollar-Kotelly in *League of United Latin American Citizens v. Executive Office of the President. See* Mem. Op. & Order, No. 25-946 (D.D.C. Apr. 3, 2025), ECF No. 12. After carefully considering the parties' arguments, the court enjoined several sections of the order, even before they were implemented by the commanded agencies, on the grounds that they exceeded the President's lawful authority. *See LULAC v. EOP*, 780 F. Supp. 3d 135, 226 (D.D.C. 2025) ("*LULAC I*"); *LULAC v. EOP*, 808 F. Supp. 3d 29, 87–88 (D.D.C. 2025) ("*LULAC II*"); *LULAC v. EOP*, 818 F. Supp. 3d 34 (D.D.C. 2026) ("*LULAC III*"), *appeals docketed*, No. 26-5102 (D.C. Cir.); *see also* Compl. ¶¶ 3, 32. Two other federal courts also enjoined several portions of that first order, including provisions attempting to change mail balloting rules. *See Washington v. Trump*, 814 F. Supp. 3d 1173, 1227–28 (W.D. Wash. 2026); *California v. Trump*, 786 F. Supp. 3d 359, 396–97 (D. Mass. 2025); *see also* Compl. ¶ 3.

President Trump has continued his attempts to convince Congress to change the rules governing elections, championing restrictive voting bills, including most recently the "SAVE America Act." *See* Compl. ¶¶ 4, 54, 56. He has made clear that his goal is to gain an impenetrable partisan advantage. If he could simply ensure that elections are run according to his personal

3

preferences, he claims, for the next "50 years," Republicans will "never lose a race." *See id*. ¶¶ 1, 54. But the President has been unable to restrict voting through the lawmaking process, and less than a week after the SAVE America Act stalled in the Senate, President Trump issued the Executive Order now before this Court. *See id*. ¶ 56.

**II.     The new Executive Order repeats the lawless overreach that courts have rejected.**

Executive Order 14399, titled *Ensuring Citizenship Verification and Integrity in Federal Elections*, was issued on March 31, 2026. Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (hereinafter "E.O."). Through it, the President again attempts to transform American elections by executive command, without any constitutional or statutory authority. *See* Compl. ¶ 56. He does so through two unprecedented and sweeping edicts. First, Section 2(a) requires the Secretary of Homeland Security to prepare lists of every adult American citizen residing in each state and share those lists with state election officials in advance of federal elections. Second, Section 3(b) orders USPS to create a list of every voter "enrolled" to vote by mail, E.O. § 3(b)(iv), and prohibits USPS from delivering a ballot from any voter who is not included on that list, *id.* § 3(b)(iii). Section 4(a) directs the implementation of the E.O. *Id.* § 4(a). These provisions are discussed further below.

    **A.     Section 2(a) requires federal agencies to create "State Citizenship Lists" using incomplete data from inaccurate sources.**

Section 2(a) of the E.O. commands the creation of new "State Citizenship Lists":

> The Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services [("USCIS")] and in coordination with the Commissioner of [the Social Security Administration ("SSA")] *shall* take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List).

E.O. § 2(a) (emphasis added). The E.O. orders that these lists "*shall* be derived from Federal citizenship and naturalization records, SSA records, SAVE [('Systematic Alien Verification for Entitlements')] data, and other relevant Federal databases." *Id.* (emphasis added). The E.O. further orders that these lists must be "transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election," or upon request. *Id.*

The databases the E.O. orders Defendants to use are known to have severe deficiencies.[2] In particular, the SAVE and SSA databases are incomplete, out-of-date, and riddled with inaccuracies. *See* Compl. ¶¶ 68, 150; ECF No. 55-12 ("Mayer Decl.").[3] Nor were they created to verify citizenship or residency. SAVE is a USCIS system created to verify the "immigration status" of applicants for federal government benefits. 42 U.S.C. § 1320b-7(d)(2)(A), (d)(3). It pulls data from other databases, including SSA, so that users can attempt to "match" identifying information about an individual to records containing citizenship information. *See* ECF No. 55-16 (Dep't of Homeland Sec., Ref. No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the SAVE Program* (Oct. 31, 2025) ("SAVE PIA")); 90 Fed. Reg. 48948, 48949 (Oct. 31, 2025); *see also* 90

---

[2] At the preliminary injunction hearing the Court held on May 14, 2026, counsel for Defendants conceded that the State Citizen Lists are not "going to be perfect" and that "a responsible state wouldn't throw everyone who isn't on the list off the voter roll." *Trump-Ordered Citizenship Lists are Likely Unreliable, Justice Dept. Says*, N.Y. Times (May 15, 2026), https://www.nytimes.com/2026/05/14/us/politics/trump-citizenship-list-voting.html.

[3] Although Defendants challenge the Court's jurisdiction in their motions to dismiss, they do not make clear whether they intend to mount a factual or facial challenge. In a facial challenge, the Court considers only "the facts as pleaded," whereas in a factual challenge, the Court "can go beyond the pleadings," including by "consider[ing] materials outside the pleadings supplied by the plaintiff." *Ctr. for Bio. Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63 (D.D.C. 2022), *aff'd*, 77 F.4th 679 (D.C. Cir. 2023). The Complaint undoubtedly alleges a justiciable controversy, but, to ensure the Court has access to the material it needs to resolve Defendants' arguments, Plaintiffs also cite supporting material for their jurisdictional arguments.

Fed. Reg. 50879, 50880 (Nov. 12, 2025) ("SSA SORN").[4] DHS cannot verify the SSA data it uses, and it has acknowledged a "risk that [SAVE] share[s] inaccurate information," including citizenship information, with state officials. SAVE PIA at 19–20; *see also, e.g.*, ECF No. 55-17, Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026).

> **B.      Section 3(b) prohibits the transmission of mail ballots for voters who are not properly "enrolled" with USPS.**

Section 3(b) "direct[s]" the Postmaster General to "initiate a proposed rulemaking" within 60 days that "*shall* include, at minimum" the creation of a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in each state. E.O. § 3(b)(iv) (emphasis added). The Order does not specify how USPS will determine which individuals should be included on the "Mail-In and Absentee Participation List," but it is clear USPS will have control over the list. And while states may provide "suggested modifications" to the list, the E.O. does not require USPS to accept those suggestions. *Id.* § 3(b)(v).

Section 3(b)(iii) of the E.O. categorically prohibits USPS from transmitting ballots for voters who are not on its list. *See id.* § 3(b)(iii) (USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on USPS's "Mail-In and Absentee Participation List"); *see also* ECF No. 55-14 at 3 (Ex. 12, White House *Fact Sheet*) ("The Order

---

[4] Until a significant reconfiguration last year, SAVE did not contain information about citizens born in the U.S. *See* 90 Fed. Reg. 48948 (Oct. 31, 2025) ("SAVE SORN"). But DHS and SSA failed to properly notice these changes, and their lawfulness is the subject of ongoing litigation. *See LULAC III*, 2026 WL 252420, at *54; Compl., *League of Women Voters v. DHS*, No. 25-cv-3501 (D.D.C. Sep. 30, 2025); Compl., *Bower v. SSA*, No. 25-cv-2713 (D.D.C. Aug. 18, 2025).

requires the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List . . . .").[5]

### III.   Plaintiffs filed this lawsuit to protect their interests and the voting and privacy rights of their members.

On April 1, 2026, the Democratic Party Plaintiffs filed a seven-count Complaint challenging the E.O.'s illegal directives. In that Complaint, Plaintiffs alleged in detail how the E.O. threatens them, their members, their candidates, and their voters with serious and imminent harm under several independent and well recognized theories of standing endorsed by the U.S. Supreme Court and courts in this Circuit. *See* Compl. ¶¶ 83–105. Plaintiffs soon moved for a preliminary injunction, which they supported with a wide variety of affidavits, an expert report, and additional evidence, further demonstrating the ways in which they have suffered and will suffer an injury-in-fact if the E.O. is not enjoined. *See* ECF No. 55 ("DPP Br."); *see also, e.g.*, ECF Nos. 55-3, -4, -5, -6, -7, -8, -9, -10, -11, -12 (declarations introduced by Democratic Party Plaintiffs to support their standing allegations).

Two weeks later, on May 1, 2026, Defendants moved to dismiss and filed a combined memorandum of law supporting their motion and opposing Plaintiffs' motion for preliminary injunction. *See* ECF No. 106; ECF No. 117-1 ("F.D. Br."). State Intervenors also filed a proposed motion to dismiss alongside their motion to intervene. *See* ECF No. 77-2; ECF No. 77-3 ("State MTD").

---

[5] By its plain text, the E.O. prohibits USPS from transmitting ballots *from* voters, but not transmitting ballots *to* voters. *See* E.O. § 3(b)(iii). The White House's fact sheet, however, contends that the E.O. would also prohibit USPS from delivering ballots *to* voters in the first place. Either way, the E.O. mandates that voters would not be able to rely on USPS to transmit their ballot unless they appear on USPS's pre-approved list.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction. In assessing jurisdiction, including whether a plaintiff has established standing, the Court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor, as we do in reviewing dismissals for failure to state a claim." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

To establish Article III standing, a plaintiff must show "(1) a concrete and particularized 'injury-in-fact'; (2) that is fairly traceable to the challenged conduct; and (3) is likely to be redressed by a favorable decision." *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 621–22 (D.C. Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "When determining whether a plaintiff has Article III standing, the [C]ourt must assume that the [plaintiff] will prevail on the merits." *Comm. on Judiciary of U.S. H.R. v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020). If standing "can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In evaluating the

8

sufficiency of a complaint, a court must "accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can reasonably be derived from the facts alleged." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (brackets omitted)). In addition to the allegations in the complaint, a court "may consider . . . any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

### I.    The Democratic Party Plaintiffs' claims are justiciable.

Defendants attempt to avoid review of the Executive Order at the outset by recasting it as a mere Executive *Suggestion*, and on that basis arguing that Plaintiffs do not have standing because their injury is not sufficiently imminent and the matter is not yet sufficiently ripe. Both of these arguments are borne of the same theory, but they are at odds with the facts alleged throughout the Complaint—and corroborated with declarations and evidence submitted in support of the motion for a preliminary injunction—which establish both that the Democratic Party Plaintiffs have standing under several independent well-established legal theories, and that this matter is ripe for this Court's review.

### A.    This matter is properly before this Court for review now.

Defendants' arguments against the timeliness of Plaintiffs' action—repeated without meaningful distinction as challenges to standing, ripeness, and final agency action—suggest that an executive order is immune from pre-enforcement review if it requires any implementation by executive agencies. *See* F.D. Br. at 8–27; State MTD at 23–30. But an executive order *necessarily* requires implementation by executive agencies: it is "a delegation of inherently executive authority by the President to another member of the Executive Branch," who must then "implement[]" the

9

order's directives. *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 190 n.9 (3d Cir. 2010). And courts routinely recognize parties' standing to bring pre-enforcement challenges to executive orders. *See LULAC I*, 780 F. Supp. 3d at 184, 188 (holding executive orders "dictat[ing] particular outcomes" are "subject to pre-enforcement review" (quotations omitted)); *City & Cnty. of S.F. v. Trump*, 816 F. Supp. 3d 1017, 1029–30 (N.D. Cal. 2026); *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 978 (N.D. Ill. 2025); *California*, 786 F. Supp. 3d at 385. That is so even where further agency action may define implementing procedures. *See Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 40–41 (D.D.C. 2025) (challenge to executive order directing agencies to provide guidance was ripe, although guidance had not yet issued and its "precise contours" had "not been set," because "the Order provides a clear preview of what [the guidance] will do"); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 147 (D.D.C. 2025) (claims were ripe despite future action because plaintiffs' "claims turn on the constitutionality of the Order *as issued*").

Under each of the doctrines Defendants invoke—standing, ripeness, and the final-agency-action requirement—this case presents a controversy properly before this Court for judicial review. To establish standing, Plaintiffs need only plausibly allege "that the Executive Order has caused, or poses an imminent threat of causing, them to suffer a cognizable injury-in-fact." *NPR v. Trump*, No. 25-cv-1674 (RDM), 2026 WL 877434, at *12 (D.D.C. Mar. 31, 2026). In other words, Plaintiffs can carry their burden by alleging that "[t]he implementation of [the challenged provisions] would . . . inflict[] a cognizable harm." *LULAC II*, 808 F. Supp. 3d at 61. In a "pre-enforcement challenge to executive action" like this one, *id.* at 63, ripeness "is subsumed into the Article III requirement of standing." *POET Biorefining v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (quotation omitted). And to show final action under the Administrative Procedure Act ("APA"),

10

plaintiffs need only identify "consummation" of an "action . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted). Plaintiffs need not wait until private data is disseminated, mail ballots go undelivered, and elections have come and gone—they are entitled to a remedy *before* it is too late.

### 1. The non-APA claims are ripe.

When a challenged law "violates the separation of powers," as Plaintiffs argue, "it inflicts a here-and-now injury on affected third parties that can be remedied by a court." *Seila Law LLC*, 591 U.S. at 212 (quotation omitted); *see also Axon Enterp., Inc. v. FTC*, 598 U.S. 175, 192 (2023) (holding plaintiffs can bring a pre-implementation challenge to a "unconstitutionally structured decisionmaking process"). Likewise, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). It is thus altogether common for courts to adjudicate challenges before a defendant agency has completed implementing the allegedly unlawful action. *See City & Cnty. of S.F.*, 816 F. Supp. 3d at 1029–30; *Chi. Women in Trades*, 778 F. Supp. 3d at 978; *California*, 786 F. Supp. 3d at 385; *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 423 (D. Md. 2025) (recognizing "ripeness cannot hinge on the actual [implementation of the Executive Order] because the *threat* of [implementation] was enough" to compel the plaintiffs to alter their behavior); *Stone v. Trump*, 280 F. Supp. 3d 747, 767 (D. Md. 2017) (holding challenge to presidential memorandum was ripe because only uncertainties were "how, not if, the policy will be implemented"); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983) (holding dispute ripe where plaintiffs had to make planning decisions that would be affected by the challenged law and requiring plaintiffs "to proceed without knowing whether the [law] is valid would impose a palpable and considerable hardship on the[m]").

Defendants wrongly suggest the Court should delay adjudicating this case until the

11

agencies it commands have completed implementing the Order. This is so, they claim, because the Order itself "does not change anything at all about elections in any State," and therefore requires "future policymaking" by the agencies. F.D. Br. at 10–11. That argument might have some force if the Order could be implemented in a lawful manner. As Judge Kollar-Kotelly observed in adjudicating a challenge to the President's last attempt to dictate how elections are administered through an E.O., where an order "merely state[s] a general policy aim and direct others to begin the process of formalizing that goal in an enforceable way[,]" a challenge may be unripe. *LULAC II*, 808 F. Supp. 3d at 64.

But this is not such an order. Under its plain terms, the Order "purport[s] to create binding, enforceable obligations on [its] own" and "dictate[s] particular outcomes"—namely, the unlawful exclusion of valid mail ballots and development of State Citizenship Lists. *Id.* (quotation omitted). As Plaintiffs' almost entirely uncontested arguments on the merits show, it is *impossible* for Defendants to take those actions lawfully.[6] USPS cannot lawfully refuse to "transmit mail-in or absentee ballots from any individual" not "enrolled" on a list of voters it would create (as Sections 3(b)(iii) and 3(b)(iv) of the Order require), regardless of the precise form of its implementing rule or procedures, because to do so in *any* way would violate the separation of powers, federalism principles, and USPS's own statutory mandate. *Infra*, Argument § II(A)–(C).[7] And yet, the

---

[6] Defendants' reliance on *Trump v. AFGE*, 145 S. Ct. 2635 (2025), is misplaced. There, the parties contested whether an executive order broadly directing agencies to reduce the federal workforce exercised existing executive-branch authority to make staffing decisions. *See* Appl. for Stay at 5–6, No. 24A1174 (U.S. June 2, 2025). Justice Sotomayor's acknowledgment in a four-sentence concurrence that such authority might exist *there*, *AFGE*, 145 S. Ct. at 2635 (Sotomayor, J., concurring), does not speak to the legality of the E.O. challenged *here*.

[7] This distinguishes Federal Defendants' "intra-governmental mandates" cases. *See* F.D. Br. at 10. In each of those cases—unlike here—the court found the challenged order directed agency action that was not itself unlawful or injurious. *See, e.g.*, *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d

---

12

agencies *must* implement the Order, including by developing a rule whose central thrust is dictated by the E.O. *See* E.O. § 3(b) (mandating specific rulemaking "within 60 days"); *see also El-Ganayni*, 591 F.3d at 190 n.9 (noting that "[a]n agency head is bound by the terms of" an executive order, meaning executive orders are "immediately effective irrespective of the promulgation of [] implementing regulations"). Plaintiffs have explained with detailed factual allegations how any such implementation will injure them, *see* Compl. ¶¶ 83–105, allegations that Defendants do not meaningfully contest.

*Trump v. New York*, 592 U.S. 125 (2020), is not to the contrary. There, the President issued a memorandum after the 2020 census directing the Secretary of Commerce to provide him with an alternate tabulation that excluded unauthorized immigrants. *Id*. at 130. The plaintiffs challenging the memorandum did not allege that the contested tabulation *itself* violated their rights, or that the President or any executive agency had concrete plans to use the tabulation for any specific purpose. *Id*. at 132–33. "We simply do not know," the Court concluded, "whether and to what extent the President might direct the Secretary to 'reform the census' to implement his general policy with respect to apportionment." *Id*. at 132 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992)). Here, there is no need to guess how the President might instruct agencies to implement the policies expressed in the E.O., because the E.O. itself provides explicit instructions: it directs agencies to begin compiling State Citizenship Lists in violation of Plaintiffs' Privacy Act rights, *and* it directs USPS to interfere with state mail-voting programs in specific ways that will harm Plaintiffs' electoral rights and interests.

---

61, 79 (D.D.C. 2025) (finding no standing to challenge creation of a "list" of fund recipients, which was not itself illegal, absent connection between list and asserted injury); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (finding no standing to challenge order that directed rulemaking that could result in lawful, non-injurious regulations).

13

Defendants' suggestion that Plaintiffs need to allege further evidence of final agency action to assert that the Order commands USPS to violate exceed its statutory authority is wrong. *Cf.* F.D. Br. at 18–19; State MTD at 28–30. *First*, the "final agency action" requirement applies to APA claims, *see Bennett*, 520 U.S. at 177–78, and as Defendants acknowledge, F.D. Br. at 19 n.6, claims that USPS will exceed its statutory authority are not governed by the APA, but by an equitable cause of action long recognized by the D.C. Circuit, *see Nat'l Assoc. of Postal Supervisors v. USPS*, 602 F.2d 420, 429 (D.C. Cir. 1979).[8] *Second*, even if the APA's final action standard applied, an executive order's command is subject to review upon the agency's decision to perform the commands—particularly where there is no lawful way for the agency to implement those commands. *See Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 138–39 (D.D.C. 2025); *see also Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 41–42 (D.D.C. 2025); *AFL-CIO v. Dep't of Lab.*, No. 25-cv-339 (JDB), 2026 WL 879518, at \*14 (D.D.C. Mar. 31, 2026) (noting such decision is "no less final because it is new").

---

[8] Contrary to Defendants' suggestion, the "rulemaking" required by Section 3(b) is not a "proceeding[] concerning the mailability of matter" subject to APA review under 39 U.S.C. § 3001(m). *See* F.D. Br. at 19 n.6. *But see* E.O. § 3(b) (citing 39 U.S.C. § 401). Section 3001(m) provides that "proceedings concerning the mailability of matter *under this chapter* and [certain criminal statutes related to mail] shall be conducted in accordance with" the APA. 39 U.S.C. § 3001(m) (emphasis added). This case does not concern the mailability of matter under chapter 30 of title 39, nor under any statutes defining mail-related crimes: indeed, there is *no* statutory basis for declaring ballot-related mail nonmailable, as Plaintiffs explain throughout their briefing. Further, Section 3001 governs *administrative* determinations by USPS about mailable material. *See Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 90 (D.D.C. 2009) (discussing "proceedings" under 39 U.S.C. § 3001(m) as administrative determinations). Here, Plaintiffs are not challenging administrative determinations; they are challenging implementation of the E.O. through the adoption of a "rule." 39 U.S.C. § 401(2); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (courts may "[r]eview [ ] the legality of Presidential action . . . in a suit seeking to enjoin the officers who attempt to enforce the President's directive" (quotation omitted)).

As alleged in the Complaint, the E.O. "plainly instruct[s] the USPS to exceed its statutory mandate." Compl. ¶ 139. To the extent Defendants' declaration from a USPS employee is properly before the Court, *see supra*, n.3 (discussing factual and facial challenges to jurisdiction), that declaration further confirms that USPS has decided to implement the Order: the declaration asserts that USPS is in receipt of the Order, is familiar with the Order's mandates, and is actively considering "how to implement the directives in the Executive Order operationally." ECF No. 117-4 (Monteith Decl.) ¶¶ 2–3. There is no question that USPS is implementing the Order, as alleged in the Complaint and as proven by Defendants' own evidence, and because there is no way to implement the Order lawfully, the matter is ripe for judicial review. Indeed, on May 13, 2026, news reports further confirmed that numerous White House officials have orchestrated discussions among Department of Justice Officials and the Chief Executive Officer of USPS concerning the implementation of the Executive Order challenged in this case. *See* ECF No. 141-1 (Democratic Party Pls.' Ex. 40).

### 2. The APA claim is ripe.

The Democratic Party Plaintiffs' claim under the Privacy Act is likewise ripe. Plaintiffs allege that Defendants "will imminently take steps," Compl. ¶ 151, to match sensitive "data" and "information" in DHS's SAVE program to develop the State Citizenship Lists commanded by Section 2(a). SAVE PIA at 7; *see* DPP Br. at 31–40. But as Democratic Party Plaintiffs explain in their preliminary injunction brief, that matching—which Defendants will immediately take steps to undertake—is forbidden by the Privacy Act in the absence of specific "legal authorization," which does not exist here. DPP Br. at 36 (quoting 5 U.S.C. § 552a(o)(1)). By failing to respond to Plaintiffs' arguments on the merits, Defendants have effectively conceded that Plaintiffs have pleaded the elements of that claim—*i.e.*, that a "decision" to implement a reviewable "disclosure

15

policy" has occurred. *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 927–28 (D.C. Cir. 2008) ("*Venetian I*"); *see* DPP Br. at 32–35 (collecting cases).

Defendants imagine ways in which the "State Citizenship Lists" might be compiled so as to alleviate *some* privacy concerns, but they never deny that the specific APA claim pressed by the Democratic Party Plaintiffs presents a "clear-cut legal question" suitable for resolution now. *Venetian I*, 530 F.3d at 928 (quotation omitted); *see* F.D. Br. at 13–18, 20–26; State MTD at 16–17. Nor could they. This claim does not turn on any particulars about Defendants' implementation but instead on whether matching personal information contained in federal databases to create State Citizenship Lists—something Plaintiffs have alleged will occur imminently, which Defendants do not deny, *see* F.D. Br. at 22–24—"is inconsistent with the [Privacy Act and] the APA." *Venetian I*, 530 F.3d 925, 927–28 (quoting *Venetian Casino Resort v. EEOC*, 409 F.3d 359, 364–65 (D.C. Cir. 2005) ("*Venetian II*")); *see also* DPP Br. at 13–16, 30–35. Defendants altogether fail to address this binding Circuit precedent, which squarely held that a challenge to an impending unlawful disclosure policy is ripe before any disclosures are made. *Compare* F.D. Br. at 9–27, *with* DPP Br. at 34–35 (citing *Venetian I*, 530 F.3d at 927–28; collecting cases).

That binding precedent also explains why Plaintiffs are confronted with a hardship sufficient to render their claim ripe: "because, were review postponed, [Plaintiffs] would be unable to prevent" Defendants from accessing and distributing their members' private information in illegal matching programs. *Venetian I*, 530 F.3d at 928; *see also* Compl. ¶¶ 103–05, 151; DPP PI Br. at 15 (citing declarations of Plaintiffs and their members, Exs. 1–9); Mayer Decl. (detailing how SAVE program presents a substantial risk of privacy and voting rights violations). None of the authorities Defendants cite address the ripeness of a challenge to a decision to implement an

16

unlawful disclosure policy. *See* F.D. Br. at 16 (citing *Trump*, 592 U.S. at 134); State MTD at 29–30.

While Defendants repeatedly suggest that there are unsettled details about *how* data will be shared between agencies—and even imply there may be a question about *whether* lists will be created—their declarations conspicuously lack any statement that the agencies may not implement the E.O.'s data sharing mandates at all. *See* ECF No. 117-2 ¶¶ 6–9 ("Mayhew Decl.") (confirming "USCIS has been directed to develop a recommendation to DHS leadership for DHS's implementation of E.O. 14,399," and stating only that "USCIS has not yet begun" creating the State Citizenship Lists themselves). This omission is not surprising, because the text of the E.O. offers the agencies no choice—Section 4(a) commands agency heads to "coordinate" in implementing Section 2, while Section 4(c) mandates the Secretary of Homeland Security to establish the "infrastructure" to implement Section 2 by a date certain, 90 days from the order's issuance. E.O. §§ 4(a), 4(c). Because the very fact of data-sharing is the source of Plaintiffs' injury, *infra* Argument § I.B.3, their claim is ripe now regardless of how that sharing occurs, *see Venetian I*, 530 F.3d at 928 (rejecting arguments that implementation must occur before a decision to disclose data may be challenged under the APA).

Defendants' related argument that Plaintiffs may not suffer an injury if they take certain procedural steps before sharing private data likewise misses the point. F.D. Br. at 22. The Democratic Party Plaintiffs' APA claim asserts that Defendants lack the underlying legal authorization to share data as the E.O. commands altogether, so no amount of purported procedural compliance can moot Plaintiffs' claims. *See* DPP Br. at 35–40. For example, even if a SORN is ultimately issued, that will not ameliorate the host of substantive Privacy Act violations that

17

Plaintiffs have alleged. *See infra*, Argument § II.D.2. And while Defendants suggest *LULAC III* supports them here, Judge Kollar-Kotelly expressly warned otherwise:

> The Court's resolution of [Democratic Party] Plaintiffs' request for injunctive relief should not be misunderstood as an endorsement or encouragement of the manner in which the Federal Defendants have gone about implementing [data-sharing provisions] of the Executive Order. . . . **It is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a "routine use" months after it has begun**. . . . [T]he Court has serious concerns that DHS and SSA may each have been violating the Privacy Act in significant ways.

*LULAC III*, 818 F. Supp. 3d at 115–16 (emphasis added).

### 3.  Prudential ripeness concerns do not militate against judicial review.

The Supreme Court has indicated skepticism as to the "continuing vitality of [the prudential ripeness] doctrine," which is at odds with the "virtually unflagging" obligation of each federal court "to hear and decide cases within its jurisdiction." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quotations omitted). But assuming it retains validity, the prudential ripeness inquiry confirms the Court should consider Plaintiffs' claims because (1) the case raises exclusively "legal questions" and (2) "delay of a judicial decision would impose hardships." *Sidak v. United States Int'l Trade Comm'n*, No. 23-5149, 2026 WL 1110981, at *4 (D.C. Cir. Apr. 24, 2026). Plaintiffs' challenge to the scope of presidential power presents a series of purely legal issues: Does the President have authority to commandeer election administration? Does the President have the ability to declare that some mail ballots cannot be mailed? Does the President have authority to order agencies to share private data? Each of these questions can be readily resolved now without any further factual development—the U.S. Constitution, U.S. Code, and U.S. Reports provide all that is necessary to determine that the President exceeded his authority. Because any further delay in the resolution of these issues will impose hardships by violating privacy and voting rights, the controversy is ripe. *See LULAC I*, 780 F. Supp. 3d at 185.

**B.      The Democratic Party Plaintiffs have standing.**

For the same reasons that Plaintiffs' claims are ripe, Plaintiffs have also pleaded injuries that are "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *see also Susan B. Anthony List*, 573 U.S. at 158 n. 5; *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). "At the pleading stage, a plaintiff need only 'state a plausible claim' to standing." *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 26 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). As Plaintiffs have shown, they have plausibly alleged concrete harm that firmly fits within Article III; the other two elements of standing, traceability and redressability, are easily met because all of the injuries directly stem from the E.O. and would be resolved by an injunction and declaratory relief. *See Lujan*, 504 U.S. at 560.

### 1.      The Democratic Party Plaintiffs have standing because the Executive Order unlawfully alters election rules.

The Democratic Party Plaintiffs have standing on behalf of their candidate members (and Plaintiffs Jeffries and Schumer have standing in their own right) to challenge Section 2(a) and 3(b)'s transformation of federal elections because candidates "have an interest in a fair process," and "suffer [cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026). Because Section 3(b) commands USPS to determine who is eligible to vote by mail, it necessarily and unlawfully alters "the process" for mail voting. *Id.* Defendants do not even attempt to distinguish *Bost* from Plaintiffs' challenge to Section 3(b).

Section 2(a) also inflicts the kind of injury that *Bost* recognized as sufficient for standing. State Intervenors brazenly resist the clear inference that the State Citizenship Lists will be used to "remove voters from their voter registration lists," State MTD at 15–16, but their *own intervention* in this action was premised on their asserted interest in using the Lists to alter their own registration

19

lists. *See* Mem. Supp. States' Mot. to Intervene at 10–12, ECF No. 77-1 ("For Intervener States, the State Citizenship List is a *resource*" that "will allow the Intervener States to verify the accuracy of their own voter registration lists, to investigate inconsistencies, and to modify their lists as needed.").[9] And with the States' intent to use the Lists now in the record, it is undeniable that the *Bost* injury to Plaintiffs is traceable to "the predictable effect of Government action"—that is, Section 2(a) of the E.O.—"on the decisions of third parties" such as the States. *Dep't of Com.*, 588 U.S. at 766–68 (holding this satisfies Article III's traceability requirement). And, again, the text of the Order belies Defendants' feigned ignorance: Section 1 makes plain that the Order's purpose is to prevent purported "non-citizens from registering to vote or voting in Federal elections." E.O. § 1. The only way to use the State Citizenship Lists to advance that goal would be as a basis for excluding registered voters—precisely what State Intervenors say they plan to do.

Notably, *Bost* recognizes standing regardless of whether the challenged rule will "help, hurt, or have no effect on a candidate's electoral prospects." 607 U.S. at 77. The injury is especially acute here, however, because the rules threaten to weaken Plaintiffs' electoral prospects. *See, e.g., LULAC I*, 780 F. Supp. 3d at 192, 209 (recognizing plaintiffs' standing on this basis); *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005). Plaintiffs have offered detailed factual allegations that spell out the exact nature of the harm to their electoral prospects, Compl. ¶¶ 83–98, and their additional evidence on that score is unrefuted, *see* ECF Nos. 55 at 11–12; 55-1 ¶¶ 11–20; 55-2 ¶¶ 12–19; 55-3 ¶¶ 13–22; 55-4 ¶¶ 11–18. Remarkably, neither motion to dismiss so much as mentions *Bost* at all—much less provides a basis to reject this clear basis for standing.

---

[9] It is to prevent precisely this gamesmanship that courts estop parties from "deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation omitted).

**2.  The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' voting rights.**

The Party Organizations also have associational standing because the E.O. will burden their members' and constituents' ability to vote. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 191, 207 (recognizing Democratic Party Plaintiffs' associational standing to sue based on anticipated harm to Democratic voters). The DNC, for example, has members in all 50 states who are registered as Democrats, *see* ECF No. 55-5 ("Schneider Decl.") ¶ 5, and Democratic voters are likewise the core constituents of the other Party Organizations, *see* ECF No. 55-3 ("Snyder Decl.") ¶ 4; ECF No. 55-4 ("Ruselowski Decl.") ¶ 4. The DNC's, DSCC's, DCCC's, and DGA's formal members (elected officials and candidates for office) are also themselves voters in each of their respective states. *See* Schneider Decl. ¶ 5; Snyder Decl. ¶¶ 4, 14; Ruselowski Decl. ¶¶ 4, 15; ECF No. 55-6 ("Edelman Decl.") ¶ 4. Leaders Jeffries and Schumer also have standing in their own right as voters to challenge the E.O.'s impositions on the voting process. *See* ECF No. 55-7 ("Jeffries Decl.") ¶¶ 3, 13; ECF No. 55-8 ("Schumer Decl.") ¶¶ 3, 14.

Groups like the Party Organizations may bring suit on behalf of their members when (1) their members "would otherwise have standing to sue in their own right"; (2) "the interests [they] seek[] to protect are germane to [their] purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Courts have frequently found that political parties have associational standing on behalf of their voter members when they are challenging laws that would make it more difficult for their members to engage in the political process. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (holding the "Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new [photo ID] law"), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing that "Democrats have standing

to challenge the validity" of voter ID law that makes it more difficult to vote); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004) (similar).

Each of the *Hunt* factors is satisfied here. *First*, the Party Organizations' voter members and constituents have standing to sue in their own right to challenge the E.O.'s creation of State Citizenship Lists to verify voter eligibility in elections, as well as its mandate that a voter be "enrolled" with USPS to be entitled to transmit a ballot via U.S. mail. It is well established that a voter has standing to challenge a law that regulates how they may cast a ballot or makes it more difficult to vote, even if the voter is ultimately able to overcome the restriction. *See, e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding even if voters "possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce" photo ID to cast a ballot); *Fish v. Schwab*, 957 F.3d 1105, 1119–20 (10th Cir. 2020) (holding even a voter who *could* comply with proof of citizenship law had standing to challenge it); *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1198 (N.D. Ala. 2020) ("[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

The fact that Section 2(a) does not identify every single database that may be used to build the State Citizenship Lists does not negate standing. *Contra* F.D. Br. at 22–23. The E.O.'s text commands that "SSA records" and "SAVE data" *must* be used. E.O. § 2(a). That other databases may also be used does not change the fact that these databases are riddled with errors and are broadly deficient in their citizenship and residency data—facts that Plaintiffs have not only alleged but offered unrefuted evidence to support. *See, e.g.*, Compl. ¶¶ 6, 61, 66-69, 144, 150; Mayer Decl. at 3–7. And State Intervenors have already averred that they intend to use this inaccurate data to cull their voter rolls, giving rise to an imminent risk that Plaintiffs' members will be falsely accused

22

of ineligible registration or denied the right to vote altogether. Mem. Supp. States' Mot. to Intervene at 10–12, ECF No. 77-1.

Likewise, because the Mail-in and Absentee Ballot List required by Section 3(b) unquestionably burdens the right to vote by creating a new obstacle before an otherwise eligible voter can cast a mail ballot, Democratic Party Plaintiffs have plausibly alleged associational standing to challenge this provision. Setting aside the near-certainty that Section 3(b) will disenfranchise voters altogether, even a voter who will ultimately be able to vote by mail has standing to challenge the burden on her right to vote of needing to "enroll" in the mail-in and Absentee Participation List. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 206 (1962) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue."); *People First of Ala.,* 467 F. Supp. 3d at 1198 ("[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote."); *Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103, 123 (S.D.N.Y. 2020) (voters who had to vote in person rather than by mail had standing to sue).

*Second*, the interests that the Party Organizations seek to protect by challenging the E.O. are germane to their organizational purpose. *See Hunt*, 432 U.S. at 343. To effectively pursue their mission of electing Democratic candidates, the Party Organizations encourage and assist voters in casting ballots and ensuring those ballots count. *See* Snyder Decl. ¶ 3; Ruselowski Decl. ¶ 3; Schneider Decl. ¶ 4; Edelman Decl. ¶ 3. *Third*, there is no reason why the Party Organizations' individual members would have to participate in this action. *See Hunt*, 432 U.S. at 343; *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996). Plaintiffs are not, for example, seeking damages that would require individualized proof. *Cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 117–28 (D.D.C. 2025).

23

### 3. The Democratic Party Plaintiffs have associational standing based on harm to their members' and constituents' privacy rights.

Plaintiffs have also plausibly alleged associational standing based on the harm to the privacy rights of their members and Leaders Jeffries and Schumer. Plaintiffs have a "concrete" injury for purposes of standing when the injury bears "a close relationship to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quotation omitted). The disclosure of personal information between federal agencies bears "a close relationship to the harm essential to an intrusion upon seclusion at common law." *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025). "[T]he essential features of intrusion upon seclusion are that the defendant intentionally intruded 'upon the solitude or seclusion of another or his private affairs or concerns' and that such intrusion 'would be highly offensive to a reasonable person.'" *Id.* at 102 (quoting Restatement (Second) of Torts § 652B (1977)). Plaintiffs in *Bessent* and several other recent cases addressing this issue were injured because their members had a "reasonable expectation" that records at issue would remain private, in large part because they were protected from disclosure by the Privacy Act, and because members submitted declarations attesting to their offense at the government's conduct. *See id.* at 101–03; *see also, e.g.*, *AFGE v. SSA*, 172 F.4th 361, 369 (4th Cir. 2026); *LULAC III*, 818 F. Supp. 3d at 111–13; *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 42; *AFL-CIO*, 2026 WL 879518, at *10; Min. Order, *United States v. Evans*, 1:25-cv-4403-RDM (D.D.C. Mar. 16, 2026) (finding Article III injury because "disclosure of [D.C.'s] voter-registration list" to DOJ would cause harm "analogous to . . . intrusion upon seclusion").

So too here: the wrongful disclosure of personal information in federal databases inflicts a cognizable injury. *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009); *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919–20 (4th Cir. 2022). This injury afflicts both the Party

24

Organizations' members—who would have standing to challenge Section 2(a) on their own—and Plaintiffs Schumer and Jeffries in their individual capacity. *See LULAC III*, 818 F. Supp. 3d at 110–13 (finding standing on this basis). The Party Organizations' members' privacy interests implicated by Section 2(a) are also germane to the Party Organizations' missions because the State Citizenship Lists are being created and disseminated to purportedly verify voters' eligibility, and there is again "no need for individual members' participation in [this] case[], which seek[s] only forward-looking equitable relief." *LULAC III*, 818 F. Supp. 3d at 110 (citing *Hunt*, 432 U.S. at 343). Also, Defendants altogether ignore the personal privacy interests asserted by the individual Plaintiffs, Leaders Schumer and Jeffries. *See* Compl. ¶¶ 15–16. Because "[o]nly one plaintiff . . . needs standing in order for a particular claim to go forward," *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 18 (D.D.C. 2020), the individual Plaintiffs' privacy interests are alone to create a justiciable controversy.

In arguing otherwise, State Intervenors ignore the expectation of privacy against data-sharing enshrined into federal law by the Privacy Act. Using SAVE to build the lists—as directed by the Order—grants DHS officials access to records containing sensitive information, including social security numbers, addresses, birth dates, and other identifying numbers that have been uploaded to the system by any user agency. *See* SAVE PIA at 3, 7.

In addition to the allegations throughout the Complaint supporting this theory of standing, *see, e.g.*, Compl. ¶¶ 105 (alleging that the Order "violates the privacy rights of millions of Americans, including Plaintiffs' members and voters"), 103–04, 144–49 (explaining why the Order violates the Privacy Act), Defendants also ignore that Plaintiffs have submitted numerous declarations, including from individual members and Plaintiffs Jeffries and Schumer, attesting to expectations of privacy in this data, and injuries that would occur upon disclosure. *See supra*,

Argument § I.B.3 (citing Exs. 1–10). Plaintiffs thus have Article III standing to vindicate these privacy interests. *LULAC III*, 818 F. Supp. 3d at 110–13 (finding standing on this basis).[10]

State Intervenors' argument that there is no privacy right to personal information that is already disclosed to the states through voter registration applications or other federal programs is also wrong. Even if state officials might hold similar information, new disclosures of sensitive information to federal agencies causes cognizable harm, as officials in *those* agencies are not expected to have such information. *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 38–39 (disclosures of addresses held by IRS to DHS satisfied Article III). Further still, the "information" to be disclosed is likely to be *inaccurate*, *see, e.g.*, Compl. ¶¶ 6, 61, 66-69, 144, 150, and the sharing of false information about an individual's citizenship is undoubtedly an offensive intrusion "upon the solitude or seclusion of another or his private affairs or concerns," *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (quotation omitted); *see also Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981) (explaining that the Privacy Act was enacted in part to prevent "perpetuation of inaccuracies").

### 4. The Party Organizations have standing to prevent harm to their mission.

The Party Organizations have also separately and plausibly alleged organizational standing because Sections 2(a) and 3(b) will "directly interfere with their core activities"—the Party's mail ballot programs and voter turnout strategies. *LULAC I*, 780 F. Supp. 3d at 180. To mitigate that harm to their core missions, the Party Organizations will be forced to redesign existing programs and redirect critical resources to address the E.O.'s impact on their voters and campaigns. *See All.*

---

[10] Given the motion to dismiss posture, it is not clear that Plaintiffs are required to identify specific members whose privacy interests will be injured (although Plaintiffs have done so). *See All. for Retired Ams.*, 770 F. Supp. 3d at 99 ("[T]he manner and degree of evidence required" to establish associational standing "varies 'at the successive stages of the litigation.'" (quoting *Lujan*, 504 U.S. at 561)); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009).

*for Hippocratic Med.*, 602 U.S. at 395 (explaining organizations may establish standing by showing challenged act or law "perceptibly impair[s]" their "core . . . activities" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))); *Republican Nat'l Comm. v. N.C. State Bd. of Elections* ("*RNC*"), 120 F.4th 390, 397 (4th Cir. 2024) (holding party committee had standing where it diverted resources in response to alleged federal violations, impairing its mission of "organizing lawful voters and encouraging them to support Republican[s]" (citing *All. for Hippocratic Med.*, 602 U.S. at 395)).

First, Section 3(b)—which restricts who may cast a mail ballot using USPS—will interfere with the Party Organizations' existing programs and investments, undermining the efficacy of their "core" voter assistance and turnout programs. *All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 378). Given the extent to which Democratic voters vote by mail (which primarily occurs through USPS), Compl. ¶¶ 91–96, the Party Organizations have invested in vote-by-mail programs and voter targeting strategies with the understanding that eligible voters who wish to vote by mail will in fact be able to cast a mail ballot; those programs take significant planning and are already underway for the 2026 elections. *See id.* ¶¶ 99–102; Snyder Decl. ¶¶ 11–16, 20–25; Ruselowski Decl. ¶¶ 12–16, 22–25, 30; Schneider Decl. ¶¶ 13–18, 25–31; Edelman Decl. ¶¶ 11–14, 20–21. Section 3(b) will compromise the Party Organizations' existing programs and investments, forcing them to create entirely new voter education and assistance programs. Among other things, the E.O.'s changes will require the Party Organizations to develop programs to assist voters in checking whether they are "enrolled" in USPS's "Mail-In and Absentee Participation List" and assist voters in successfully casting a ballot if they are not permitted to vote by mail. *See* Compl. ¶¶ 101–102; Snyder Decl. ¶¶ 25–26; Ruselowski Decl. ¶¶ 26–27; Schneider Decl. ¶¶ 26, 28; Edelman Decl. ¶¶ 22–23. Working to ensure these changes do not deter voters

27

from voting entirely will be a significant challenge. *See* Compl. ¶¶ 100–102; Snyder Decl. ¶ 27; Ruselowski Decl. ¶ 28; Schneider Decl. ¶ 29; Edelman Decl. ¶ 24.

Collectively, the costs and resources for these new programs would come at the expense of other initiatives the Party Organizations have planned to persuade and mobilize voters. *See* Compl. ¶¶ 100–102; Snyder Decl. ¶¶ 29–32; Ruselowski Decl. ¶¶ 31–34; Schneider Decl. ¶¶ 32–35; Edelman Decl. ¶¶ 27–30. This harm to Plaintiffs' core activities and consequent diversion of resources is sufficient to establish injury-in-fact. *See All. for Hippocratic Med.*, 602 U.S. at 395; *LULAC I*, 780 F. Supp. 3d at 207 (holding the Democratic Party Plaintiffs had organizational standing under *Alliance for Hippocratic Medicine* to challenge the prior E.O.'s proposed changes, which forced them to "divert resources from other time-sensitive, election-related activities").

The same is true of Section 2(a), which directs DHS to develop "State Citizenship Lists" using SAVE and SSA to identify adult citizens who are residents of each state and share those lists with state election officials. E.O. §§ 1, 2. In light of known deficiencies in those databases' ability to accurately identify citizens or confirm residency, *see, e.g.*, Compl. ¶¶ 6, 61, 66–69, 144, 150; Mayer Decl. at 4–7, Section 2(a) will force the Party Organizations to carefully monitor the development of the Lists and put programs into place to help educate Democratic voters to check whether they are on the lists and to attempt to add themselves to the lists if they are erroneously omitted. *See* Compl. ¶ 102; Snyder Decl. ¶ 44; Ruselowski Decl. ¶ 46; Schneider Decl. ¶ 45; Edelman Decl. ¶ 41. The resources required to attempt to ensure the Lists do not disenfranchise the Party's voters will necessarily come at the expense of the Party's persuasion and voter mobilization programs. *See* Compl. ¶ 102; Snyder Decl. ¶ 47; Ruselowski Decl. ¶ 49; Schneider Decl. ¶ 48; Edelman Decl. ¶ 43. For these reasons, too, the Party Organizations have shown injury-in-fact as to Section 2(a). *See All. for Hippocratic Med.*, 602 U.S. at 395; *LULAC I*, 780 F. Supp.

3d at 191.

State Intervenors misstate the law in their opposition to the motions for preliminary injunction.[11] Contrary to their telling, the Supreme Court's decision in *Alliance for Hippocratic Medicine*, 602 U.S. at 394, did not reject an organization's ability to establish standing by demonstrating a diversion of resources. That decision merely held that organizations not otherwise injured cannot establish standing through expenditures in opposition to a policy. *Id.* Indeed, it confirmed well-established precedent that "organizations can have standing to challenge practices that directly interfere with their core activities." *LULAC I*, 780 F. Supp. 3d at 180.[12]

Here, Party Organizations are not diverting resources "in opposition" to the E.O.: they are doing so to achieve their "core business activit[y]" of electing Democratic candidates and enfranchising their voters. *All. for Hippocratic Med.*, 602 U.S. at 395. Because Sections 2(a) and 3(b) threaten to disenfranchise their voters, the Party Organizations must reallocate resources previously intended for persuasion and voter mobilization to programs that monitor and address the impact of the State Citizenship Lists and mail ballot restrictions. *See* Compl. ¶¶ 99–102; ECF Nos. 55-1 ¶ 44; 55-2 ¶ 46; 55-3 ¶ 45; 55-4 ¶ 41. This injury to the Party Organizations' core mission

---

[11] State Intervenors do not specifically address the Party Organizations' standing in this section of their motion to dismiss. *See* State MTD at 19–21.

[12] Federal courts before and after *Alliance for Hippocratic Medicine* have routinely concluded that party committees and other groups whose missions focus on elections can establish organizational standing to challenge laws and practices that impede their core voter advocacy efforts by threatening harm on voters. *See LULAC I*, 780 F. Supp. 3d at 207; *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (explaining "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of [a] law that [harms] the organization's mission" (first alteration in original) (citations omitted)); *Crawford*, 472 F.3d at 951 (holding Democratic Party committees had standing to challenge voter ID law based on diversion of resources), *aff'd*, 553 U.S. at 189 n.7 (agreeing the Democratic Party had standing)); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (holding organizations engaged in voter registration had standing to challenge program designed to remove non-citizens from the rolls because they diverted resources to addressing wrongful misidentification of noncitizens that impeded mission of getting out the vote).

is plainly sufficient to confer standing. *See RNC*, 120 F.4th at 397 (citing *All. for Hippocratic Med.*, 602 U.S. at 395)); *Crawford*, 472 F.3d at 951. State Intervenors and Defendants do not and cannot argue otherwise. Instead, State Intervenors retread the same timing arguments debunked above, with the implication that the already significant disruption to Plaintiffs' electoral activities is meaningless until their supporters are actually denied the ballot. State MTD at 15–16. But that end result is exactly what the Party Organizations are trying to prevent, and Article III does not require them to lose votes before suing. *LULAC I*, 780 F. Supp. 3d at 207 (finding that Plaintiffs suffered injury-in-fact from resource diversion to address "imminent" voter registration restrictions (quotation omitted)).

## II.    The Democratic Party Plaintiffs have stated claims that the E.O. is unlawful.

Defendants decline to defend the legality of the E.O. on the merits, effectively conceding that Plaintiffs have stated valid claims. Instead, Defendants suggest only that they may decide to ignore the E.O.'s unlawful commands altogether. *See, e.g.*, F.D. Br. at 45–48. If that were true, of course, they would have no reason to oppose litigation against those provisions. But "[a]gencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025); *El-Ganayni*, 591 F.3d at 190 n.9 (similar) (citing *Myers v. United States*, 272 U.S. 52, 132–34 (1926)); *LULAC I*, 780 F. Supp. 3d at 184 (rejecting similar arguments as inconsistent with "plain text of the Executive Order").

### A.    The Executive Order is *ultra vires* and violates the horizontal separation of powers.

Defendants do not so much as suggest that the President or the federal agencies he commands to take action have the authority to regulate elections as the E.O. directs. Instead, they

attempt to rehabilitate the E.O.'s many legal infirmities only by pointing to its savings clauses, but the clauses' boilerplate language cannot resuscitate a blatantly unlawful order.[13]

But courts consistently refuse to permit executive orders "to destroy themselves through saving clauses." *LULAC I*, 780 F. Supp. 3d at 176 (citations omitted); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018) ("The Executive Order's savings clause does not and cannot override its meaning."). When "an executive order unambiguously commands an action that a saving clause purports to negate, a reviewing court must ignore the saving clause and read the order's operative provision to mean what it says." *LULAC I*, 780 F. Supp. 3d at 176 (citations and alterations omitted). That is precisely the case here. Section 2(b) commands the sharing of personal data "derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." E.O. § 2(a). But Congress has proscribed exactly such disclosures. *See* DPP Br. at 35–39; *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295 (11th Cir. 2022) (recognizing the President cannot "direct[] [his] subordinates" to "exceed[] the limitations imposed by" Congress). Section 3(b) orders "that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." *Id.* § 3(b)(iii). Again, the President has no authority to issue that command, and USPS has no authority to comply with it. *See* DPP Br. at 19–30. Because there is no lawful way to implement the President's unlawful order, the savings clause provides no saving at all. The

---

[13] Defendants vaguely suggest the E.O. is authorized by the "take care" clause, which directs the President to "take Care that the Laws be faithfully executed." *See* F.D. Br. at 40 (quoting U.S. Const. art. II, § 3). But the Order does not invoke the "take care" clause as a source of authority. *See* E.O. at Preamble. And, regardless, the clause only "allows the President to execute the laws, not make them," as the E.O. attempts. *Medellin v. Texas*, 552 U.S. 491, 532 (2008). Indeed, the "take care" clause *invalidates* unlawful executive orders—it does not rescue them. *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 308–09 (D.R.I. 2025) (concluding executive order likely violated the "take care" clause).

principal authority Defendants cite to support their savings-clause argument, *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), has been repeatedly distinguished on these same grounds. *See, e.g.*, *City & Cnty. of S.F.*, 897 F.3d at 1239–40 (distinguishing *Allbaugh* in a challenge to one of President Trump's previous executive orders because "[t]he Executive Order's savings clause does not and cannot override its meaning."); *LULAC I*, 780 F. Supp. 3d at 176 (similar); F.D. Br. at 46 (conceding that Plaintiffs may challenge the Order by showing it is "without *any* valid application" (citation omitted)).[14]

### B.    The Executive Order violates the vertical separation of powers.

The E.O. also violates principles of federalism by "encroach[ing] on the states' authority to regulate their own electoral processes." *United States v. Smilowitz*, 974 F.3d 155, 159 (2d Cir. 2020); *see* DPP Br. at 25–28. It does so in two ways. *First*, it directs USPS to impose requirements on how states format any "outbound ballot mail," including that any such mail include a "unique Intelligent Mail barcode" and have "undergone a mail envelope design review by the USPS." E.O. § 3(b)(i). The Order thus *requires* USPS to interfere with the design and transmission of mail-in ballots—a responsibility that the Constitution assigns to the States. *See United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *13 (D. Or. Feb. 5, 2026) ("[T]he Constitution specifically left the regulation and administration of elections to the states, understanding that states are in the best position to do so."). Defendants half-heartedly suggest that USPS could implement this mandate lawfully by "promulgating a final rule that implements improved technology (*e.g.*, via 'unique Intelligent Mail barcode') to enable tracking of absentee and mail-in ballots," which could provide "federal law-enforcement agencies with useful information." F.D. Br. at 48–49. But that is not what the E.O. commands. It does not simply invite USPS to use new

---

[14] Defendants' savings clause argument also does not apply at all to Section 3(b), which contains no language about "lawful" implementation. *See generally* E.O. § 3.

technology for election mail. It *requires* "that all outbound ballot mail"—mail transmitted by the states—meets certain requirements, thus intruding on states' authority to administer their own mail-in and absentee voting programs. E.O. § 3(b)(i).[15] And Defendants never explain how USPS could do *that* without violating basic principles of federalism.

*Second*, the Order directs USPS to make a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State," and to *refuse to transmit* ballots from any non-enrolled individual. E.O. § 3(b)(iii)–(iv). Defendants do not even address this mandate, much less attempt to explain how USPS could implement it in a lawful way. F.D. Br. at 48–49. For good reason: it is impossible to do so. The Constitution assigns States the authority to "regulate federal election procedures," *LULAC III*, 818 F. Supp. 3d at 59, including the power to set voter qualifications, which "forms no part of the power to be conferred upon the national government." *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013) (quoting The Federalist No. 60, at 371 (Alexander Hamilton)). The Order imposes new qualifications on all voters who wish to use mail-in ballots—enrollment with USPS, and satisfaction of any standards USPS chooses to apply—thus usurping states' rights to manage their mail-in voting programs.

Because the Order "unambiguously commands action" that violates the Constitution, *LULAAC III*, 818 F. Supp. 3d at 86 (citation omitted), Democratic Party Plaintiffs have plausibly alleged a vertical separation of powers claim. *See also PFLAG, Inc.*, 769 F. Supp. 3d at 437 (striking down executive order that "explicitly instruct[s] the executive to develop policies that run afoul of" the Constitution).

---

[15] A comparison to USPS's existing election mail program is instructive. Consistent with principles of federalism, USPS currently maintains a set of "best practices" for election-related mail, including ballot mail—but it does not *mandate* that states conform their mail ballot programs to its preferences. *See Election Mail*, U.S. Postal Serv., https://perma.cc/5XBX-TSWF (last visited May 15, 2026).

## C.    The Executive Order violates USPS's statutory authority.

Plaintiffs have also stated a claim that the E.O. runs afoul of federal statutes. When the President orders an executive agency to engage in rulemaking, "[t]he pertinent inquiry" is whether the rulemaking falls within "any of the arguable *statutory* grants of authority" to the agency. *Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979). The President can only direct agencies to "carry out their own lawful statutory authority," not "exceed[] the limitations imposed" by their authorizing statutes. *Georgia*, 46 F.4th at 1295. Sections 3(b)(iii) and 3(b)(iv) of the Order fall well outside USPS's statutory authority by requiring USPS to foray into the regulation of registered voters. *See* DPP Br. at 29–30. Together, they require USPS to (1) develop a system for "enrollment" of voters and a list of "enrolled" voters and (2) refuse to transmit mail-in ballots from any voter not on the list. USPS's governing statute does not authorize it to do any such thing. *Any* rule the USPS could promulgate to satisfy the Order's requirements would be inconsistent with its statutory mandate, which limits it to providing "postal services." 39 U.S.C. § 102(5); *see id.* § 404(e)(1)–(2). Plus, not only would such a rule essentially create a new category of "nonmailable matter" out of whole cloth (despite the existence of a comprehensive list of such matter in USPS's governing statute), it would also violate USPS's obligations to treat all customers similarly. *See* DPP Br. at 29–30.

Defendants do not suggest otherwise. They do not even try to identify a source of authority that would enable USPS to create and enforce lists of people who can vote. The Order thus "unambiguously commands" USPS, *City & Cnty. of S.F.*, 897 F.3d at 1240, to perform actions that it "literally has no power" to perform, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

## D.    The Executive Order violates the Privacy Act.

Finally, Plaintiffs have stated claims that the directives in Sections 2(a) and 4 of the E.O. exceed Defendants' statutory authorization and violate the plain terms of the Privacy Act—and,

34

because they have or will imminently take final action to carry out the Order, Plaintiffs are entitled to declaratory and injunctive relief under the APA, Compl. ¶¶ 140–153 (citing U.S.C. §§ 704–06); *LULAC III*, 818 F. Supp. 3d at 111 ("The Democratic Party Plaintiffs may pursue injunctive relief under the APA to redress prospective violations of the Privacy Act." (first citing *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 79–81 (D.D.C. 2025); and then citing *Venetian I*, 530 F.3d at 931)).

From the start, Defendants' dismissal motions run headlong into the judicial review provisions of the APA. As courts in this district have routinely observed, it would be premature to dismiss Plaintiffs' APA claims in the absence of an administrative record. "[O]rdinarily, a motion for summary judgment, rather than a Rule 12(b)(6) motion to dismiss, is the 'proper [procedural] mechanism for deciding as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Bread for the City, Inc. v. U.S. Dep't of Agric.*, 211 F. Supp. 3d 327, 331 (D.D.C. 2016) (alteration in original) (quoting *R.J. Reynolds Tobacco Co. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 356, 369 (D.D.C. 2015)), *aff'd sub nom. Bread for the City v. U.S. Dep't of Agric.*, 872 F.3d 622 (D.C. Cir. 2017).[16] Regardless, nothing in either of dismissal motion shows that Defendants are entitled to judgment as a matter of law as to these claims.

### 1.    Plaintiffs have a cause of action under the APA.

In support of their dismissal motion, Defendants first launch a *pro forma* argument that APA review is "foreclosed" because the Privacy Act contains some limited remedial provisions.

---

[16] That does not deprive the Court of the ability to issue appropriate preliminary relief. 5 U.S.C. § 705 ("On such conditions as may be required and to the extent necessary to prevent irreparable injury," a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."); *e.g.*, *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 40 (granting "stay" and preliminary injunction of IRS's new "policy of disclosing . . . confidential address[es]" to DHS).

*See* F.D. Br. at 27–29. That argument has been repeatedly rejected by courts—including by the D.C. Circuit in one of the cases cited by Defendants—and this Court should do the same. *See LULAC III*, 818 F. Supp. 3d at 112 (citing *Venetian I*, 530 F.3d at 931); *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 41–42 (rejecting various counterarguments); *see also Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988) (explaining APA's general review provisions apply). These decisions are also consistent with broader Supreme Court precedent, which explains that the Privacy Act's remedial provisions are intended to complement—not preclude—review under the APA. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (the Privacy Act's "inattention" to "equitable relief" is "explained by the general provisions for equitable relief within the . . . APA"); *see also AFL-CIO v. Dep't of Lab.*, 778 F. Supp. at 80 ("the Supreme Court has all but said as much (albeit in dicta)").

Defendants also come up short in arguing that Plaintiffs have not identified "final agency action." *See* F.D. Br. at 22–23; DPP Br. at 31–34; *see Bennett*, 520 U.S. at 178 (finding action is final and judicially reviewable under the APA when it "mark[s] the consummation of the agency's decisionmaking process . . . by which rights or obligations have been determined, or from which legal consequences will flow" (citation modified)). To start, in broadly contending that nothing relevant has been "consummated," Defendants again fail to distinguish between procedural and substantive illegalities. *See supra* Argument § I. The Democratic Party Plaintiffs largely challenge the latter[17]—that is, Defendants' consummated decision to disclose confidential information in a

---

[17] The Democratic Party Plaintiffs also allege that actions to carry out the State Citizenship Lists violate "procedural" requirements of the Privacy Act. *See* Compl. ¶¶ 147–50. These violations turn not on the facial incompatibility of the policy of disclosing federal records for the purpose of creating and disseminating citizenship lists with federal law, *see Venetian I*, 530 F.3d at 931, but instead on (among other things) failures to complete notice-and-comment requirements and to ensure records are suitable for stated purposes, *see* 5 U.S.C. § 552a(e). Defendants do not identify a valid SORN that authorizes the lists and instead merely speculate that an amendment might

manner "inconsistent" with particular provisions of the Privacy Act. *Venetian I,* 530 F.3d at 931. In this context, a decision to implement an allegedly illegal policy is sufficient to demonstrate final action. *See, e.g., id.*; *Ctr. for Taxpayer Rts.,* 815 F. Supp. 3d at 42.[18]

Here, the Complaint sufficiently pleads that Defendants have or imminently will take final actions to implement Sections 2(a) and 4. Compl. ¶ 144 ("Defendants, as directed by the EO, have or will imminently take steps to carry out the Order that constitute 'final agency action[s] for which there is no other adequate remedy in a court." (alteration in original) (citation omitted)); *id.* ¶¶ 67–69 (alleging that Defendants must implement Sections 2(a) and 4 of E.O.); *see also LULAC III,* 818 F. Supp. 3d at 113 (explaining that an agency's failure to acknowledge a decision or policy does not insulate it from judicial review).

Without any response to this evidence and binding precedent like *Venetian I*, *Venetian II*, and other analogous cases like *Center for Taxpayer Rights*, Defendants instead step outside the boundaries of Rule 12 with carefully worded statements that agencies have "not yet begun preparation of" lists, Mayhew Decl. ¶ 7, in an attempt to manufacture "uncertainty about whether, when, and in what form those lists might be compiled," and "what (if anything) anyone will actually *do* with any such lists." *See* F.D. Br. at 20. Even if the Court could consider this evidence, these are precisely the types of "uncertainties" that courts consistently conclude do *not* preclude review. *Venetian I*, 530 F.3d at 928. And, especially when the declaration is construed favorably

---

alleviate Plaintiffs' concerns; they do not explain why *dismissal* is an appropriate response to their contention that future actions may alleviate the unlawful actions alleged in the complaint. *Cf. LULAC I*, 780 F. Supp. 3d at 205–06 (allowing Plaintiffs' Privacy Act claim to proceed for further record development); F.D. Br. at 21. Nor do they engage with the procedural allegations, thereby forfeiting any argument for dismissal on that basis.

[18] *See also, e.g.*, *New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025); *AFL-CIO v. SSA*, 771 F. Supp. 3d 717, 791 (D. Md. 2025); *LULAC III*, 818 F. Supp. 3d at 115–16; *cf. L.A. Press Club v. Noem*, No. 2:25-cv-05563, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) (decision to "adopt a policy with regards to how DHS treats the recording of its agents" is final action)

to Plaintiffs—as it must be in this posture—it only confirms that a high-level DHS official "directed" USCIS to make a plan to implement Sections 2(a) and 4, and fails to deny that implementation will occur. Mayhew Decl. ¶ 6; *see Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 42 (concluding that each of these facts strengthened finding a final action).

Finally, Defendants hardly engage with the "legal consequences" prong as to Plaintiffs' Privacy Act challenge, pointing only to unrelated cases about "proposed rulemaking." *See* F.D. Br. at 24–25 (citations omitted); *Bennett*, 520 U.S. at 177–78 (finding final action requires "consummation" of a "decision[] . . . from which legal consequences will flow" (quotations omitted)); *Valero Energy Corp. v. EPA*, 927 F.3d 532, 537 (D.C. Cir. 2019) (explaining this prong looks to whether the agency decision has a "*practical* effect on regulated parties, even if [the decision itself] has no formal legal force"). For the reasons already explained in connection with ripeness, Defendants' unsupported argument that no consequences flow from a decision authorizing new disclosures of sensitive data cannot be squared with *Venetian I*, 530 F.3d at 931 (recognizing overlap in "final agency action" and "ripeness" questions in analogous context); *see supra*, Argument § I.A; DPP Br. at 34–35 (discussing cases), and Defendants again do not even attempt to argue otherwise. The Court should thus soundly reject Defendants' attempt to dismiss the Democratic Party Plaintiffs' Privacy Act challenge.

### 2. The Complaint adequately pleads Privacy Act violations.

Plaintiffs allege three distinct claims under the Privacy Act, *see id.*, and Defendants do not show that any one of them fails as a matter of law. *First*, Plaintiffs allege that "no . . . provision of law has authorize[d] the matching of federal records" to build the lists. Compl. ¶ 146; *see* 5 U.S.C. § 552a(o); *see also* DPP Br. at 31–39. Neither set of Defendants' motions to dismiss addresses the merits of this claim or even acknowledges § 552a(o), *see* F.D. Br. at 43–49; *see generally* State MTD, and they thereby forfeit any dismissal arguments as to this claim.

38

*Second*, Plaintiffs allege that implementation of Sections 2(a) and 4 violate the Privacy Act's general prohibitions on disclosures of records to other agencies. 5 U.S.C. § 552a(b); *see also id.* § 552(a)(7); Compl. ¶¶ 147–48. As the Complaint explains, there is an exception to the prohibition on disclosure where an applicable and properly noticed "routine use" applies, *id.* § 552a(b)(3), but no existing provision of any SORN purports to authorize the use of federal data for State Citizenship Lists, either expressly or through any compatible "routine use." *See* Compl. ¶ 148 (citing SAVE SORN, 90 Fed. Reg. at 48948); *see generally* F.D. Br. 43–49. Defendants do not claim otherwise in their motion. *See generally* F.D. MTD; State MTD.

Further, DHS *cannot* justify these significant new uses of federal data through subsequent agency action: *any* disclosures of data to another agency in *any* "routine use" must *always* be "compatible with the purpose for which [the data] was collected," Compl. ¶ 147 (alteration in original) (citing 5 U.S.C. § 552a(a)(7)); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017) (for a "routine use" to satisfy this "compatib[ility]" requirement, there must be a "concrete relationship or similarity, or some meaningful degree of convergence exists between the disclosing agency's purpose in gathering the information and in its disclosure" (citation modified)); *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549–50 (3d Cir. 1989) (same). And, here, the Complaint plausibly alleges that the Lists are incompatible with the purpose for the collection of the records that the E.O. mandates Defendants use to compile the Lists. *See* Compl. ¶¶ 147–48.[19] In fact, it is implausible to think that the creation of entirely new lists of individuals

---

[19] State Intervenors' radical and unsupported assertion that the President possesses unfettered authority to centralize any information within the federal government without regard for other law is only found in their opposition to the motion for preliminary injunction and is therefore not properly before the Court as an argument for dismissal. *See* State Br. at 21–24. It is also wrong for the reasons set out in Democratic Party Plaintiffs' reply in support of their motion for a preliminary injunction. *See* ECF No. 122 at 19–20.

whom Defendants believe are eligible to vote in every state *could* be compatible with a permissible use, particularly given Congress's express rejection of precisely these kinds of databanks in the Privacy Act. Compl. ¶¶ 65, 104 (citing *Legislative History of the Privacy Act of 1974: Source Book on Privacy* 168, 217 (Sep. 1976)). And, as the Complaint further alleges, this data was collected for entirely distinct purposes—none which relate to creation of lists for federal oversight of state elections. Compl. ¶¶ 61–69; 148.

*Third*, and finally, Plaintiffs allege that Defendants' implementation of Sections 2(a) and 4 fails to satisfy the Privacy Act's mandate that any information that is to be disclosed outside the agency be accurate. 5 U.S.C. § 552a(e)(5)–(10); Compl. ¶ 150. In support of this claim, the Complaint identifies a series of reasons why the State Citizenship Lists will not satisfy this threshold, including fundamental errors and gaps in SSA and SAVE data, as well as practical reasons the Lists will become out of date almost as soon as they are compiled. Compl. ¶¶ 61–69, 150. The Court must accept these allegations, and in any event, Defendants offer no reason to believe that they are not true. *See generally* F.D. MTD; State MTD. Nor could they, as DHS publicly acknowledged some of these inaccuracies when it belatedly issued the SORN for its SAVE overhaul in response to Plaintiffs' procedural Privacy Act claims as to the President's previous election-related executive order. *See* SAVE PIA at 16–20. For all these reasons, the Court should reject Defendants' attempt to dismiss Count V under Rule 12(b)(6).

### III. The President, Department of Commerce, and Secretary of Commerce should not be dismissed.

Defendants argue that the President, Department of Commerce, and the Secretary of Commerce should be dismissed from the case. F.D. Br. at 36–37. They are incorrect.

*First*, the Department of Commerce and Secretary of Commerce are plainly proper defendants. The President has ordered the Secretary of Commerce (and by extension, the

Department) to coordinate with the "Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General . . . in effectuating all relevant aspects of the implementation" of the E.O.  E.O. § 4(a); *see* Compl. ¶ 59. These specific references to other agency heads leave no mystery about the Secretary of Commerce's role; he will coordinate with the Secretary of Homeland Security and Commissioner of SSA on the creation of the State Citizenship Lists and with the Postmaster General regarding the Mail-In and Absentee Ballot Lists. *See* Compl. ¶¶ 59, 70, 111. The text of the E.O. is confirmed by the fact that Commerce Secretary Howard Lutnick was the *only* agency head to speak at the event where the President signed the E.O. *See Remarks: Donald Trump Signs an Executive Order on Elections*, RollCall (Mar. 31, 2026), https://perma.cc/EDW3-WVUL.[20] There is therefore no basis to dismiss the Secretary or the Department. *See Sickle*, 884 F.3d at 345 (stating that courts should grant plaintiffs "the benefit of all inferences that can reasonably be derived from the facts alleged" (citation modified)).

*Second*, it is premature to decide whether the President is an appropriate defendant. Courts routinely deny requests to dismiss the President in the early stages of litigation. In *Centro Presente v. United States Department of Homeland Security*, 332 F. Supp. 3d 393, 419 (D. Mass. 2018), for example, the court denied a motion to dismiss President Trump as a Defendant because "[a] record has not yet been developed regarding, for some examples, what relief would be appropriate if Plaintiffs prevailed on their claim or whether an injunction against lower officials or declaratory relief would be sufficient." The court concluded, "[i]t is thus premature to determine whether this case has the potential to be the rare case in which such an extraordinary remedy might be justified." *Id.*; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 335 (E.D.N.Y. 2019) (concluding the President

---

[20] The Court may take judicial notice of this information. *See St. Francis Xavier Parochial Sch.*, 117 F.3d at 624.

41

remained an appropriate party at the preliminary injunction stage); *Stone v. Trump*, 400 F. Supp. 3d 317, 359–60 (D. Md. 2019) (declining to dismiss President from suit on a motion to dismiss); *CASA de Maryland., Inc. v. Trump*, 355 F. Supp. 3d 307, 329 (D. Md. 2018) (same); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018) (same). Here, too, the pleadings cannot support Defendants' assertion that the President is necessarily an improper party.

## CONCLUSION

The Court should deny the motions to dismiss.

Dated: May 15, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Christina Ford (DC 1655542)
Max Accardi (DC 90021259)
Kevin R. Kowalewski (NY 5946645)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Admitted pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*