**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>                              *Plaintiffs*,<br>          v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                              *Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN<br>CITIZENS, *et al.*,<br><br>                              *Plaintiffs*,<br>          v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>*et al.*,<br><br>                              *Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE<br>ADVANCEMENT OF COLORED PEOPLE, *et<br>al.*,<br><br>                              *Plaintiffs*,<br>          v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                              *Defendants*. | Civil Action No. 26-1151 (CJN) |

**LULAC PLAINTIFFS[1] OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

---

[1] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association.

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD..............................................................................................................1

I.     LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the Order....1

     A.  LULAC Plaintiffs Have Organizational Standing to Challenge Both Sections 2(a) and 3(b). .....................................................................................................................2

     B.  LULAC Plaintiffs Independently Have Standing to Challenge Sections 2(a) and 3(b) Based on Diversion of Resources...................................................................7

     C.  LULAC Plaintiffs Independently Have Associational Standing to Challenge Sections 2(b) and 3(a) on Behalf of Their Members. ..............................................8

II.    Plaintiffs' Claims Are Both Constitutionally and Prudentially Ripe. ..........................13

III.   Plaintiffs' Constitutional Challenges Are Ripe. ...........................................................20

IV.   Plaintiffs Allege Valid Equitable Claims Challenging the Constitutionality of Sections 2(a) and 3(b) in Counts I and II. ..................................................................................21

V.    LULAC Plaintiffs' APA Challenge to Section 2(a) Is Ripe. .......................................23

VI.   LULAC Plaintiffs Allege a Valid Cause of Action under the APA in Counts III and IV.................................................................................................................25

     A.  Plaintiffs have a viable cause of action under the APA. .......................................25

     B.  Counts III and IV plausibly allege final agency action as to the State Citizenship List. .......................................................................................................................27

VII.  Plaintiffs Do Not Seek Judicial Review of the Enforcement Priorities/Discretion of the Executive Branch. ..................................................................................................32

VIII. No Defendants Should Be Dismissed. ........................................................................33

CONCLUSION......................................................................................................................34

i

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) ....................................................1, 23

*Alliance for Retired Americans v. Bessent*, 770 F. Supp. 3d 79 (D.D.C. 2025) .............................11

*American Federation of Government Employees, AFL-CIO v. Trump*,
    782 F. Supp. 3d 793 (N.D. Cal. 2025). .................................................................................15

*American Petroleum Institute v. Environmental Protection Agency*, 683 F.3d 382
    (D.C. Cir. 2012) ..................................................................................................................16

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ........................................20, 23

*Bennett v. Spear*, 520 U.S. 154 (1997).......................................................................................25

*Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026) ......................................................3, 17

*Bridgeport Hospital v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024)....................................................5

*Center for Democracy & Technology v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020) .....................4

*Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015)..................................12

*Center for Taxpayer Rights v. Internal Revenue Service*, 815 F. Supp. 3d 1 (D.D.C. 2025) ...26, 29

*Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ...........20, 27

*Consolidation Coal Company v. Federal Mine Safety & Health Review Commission*,
    824 F.2d 1071 (D.C. Cir. 1987)...........................................................................................15

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) .................................................................21

*Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020) ...............16

*Department of Commerce v. New York*, 588 U.S. 752 (2019)..........................................................6

*Doe v. Chao*, 540 U.S. 614 (2004)..............................................................................................26

*Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) ......................................................................26

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ......................................................................................9

*Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)
    ("*AHM*")..........................................................................................................................3, 7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)....................................................................21, 23

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025)....................................................20

*Godfrey LLP v. Executive Office of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025)..................24

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...............................................................................17, 33

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988)..............................11

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ...........................8

*League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d
    135 (D.D.C. 2025) ("*LULAC I*") ................................2, 4, 5, 14, 15, 17, 18, 19, 20, 23, 24, 25

*League of United Latin American Citizens v. Executive Office of the President*, 808 F. Supp. 3d
    29 (D.D.C. 2025) ("*LULAC II*") ...................................................................................3, 13

*League of United Latin American Citizens v. Executive Office of the President*, 818 F. Supp. 3d
    34 (D.D.C. 2026) ("*LULAC III*")..................................................................3, 20, 21, 26, 31

*League of United Latin American Citizens v. Executive Office of the President*,
    No. 1:26-cv-01132 (D.D.C. Apr. 2, 2026) ...............................................................................2

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................2, 6, 13

*League of Women Voters v. U.S. Department of Homeland Security*,
    No. 25-cv-3501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .........................................28

*Martin v. Locke*, 659 F. Supp. 2d 140 (D.D.C. 2009) ....................................................................2

*McCray v. Biden*, 574 F. Supp. 3d 1 (D.D.C. 2021)......................................................................33

*McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969) ......................21

*Meina Xie v. Tillerson*, No. 1:13-cv-0606 (RJL), 2017 WL 2656648 (D.D.C. June 15, 2017) .......2

*National Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025) ............................................4

*Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) ("*NRC*") ..................................22

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ......................................................................................16

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020). .......................21

*Stewart v. National Education Association*, 471 F.3d 169 (D.C. Cir. 2006).................................28

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).............................................................15

*Susman Godfrey LLP v. Executive Office of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025)...24

*Trump v. American Federation of Government Employees*, 145 S. Ct. 2635 (2025)....................15

*Trump v. New York*, 592 U.S. 125 (2020).....................................................................................14

*United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984)...............23

iii

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024)..............................................6

*Venetian Casino Resort, LLC v. Equal Employment Opportunity Commission*, 530 F.3d 925
     (D.C. Cir. 2008) ..............................................................................................26, 29

*Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026) ................................................22

*Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017) ................................................................1

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ......................................................21

**Statues, Codes, and Rules**

39 C.F.R. § 3020.102. ...............................................................................................18

39 C.F.R. § 3020.111(a) .............................................................................................18

39 C.F.R. § 3020.111(b) .............................................................................................18

39 C.F.R. § 3020.111(d) .............................................................................................18

39 U.S.C. § 101 .....................................................................................................18

39 U.S.C. § 403 .....................................................................................................18

39 U.S.C. § 404 .....................................................................................................18

39 U.S.C. §§ 3001-18 ................................................................................................18

52 U.S.C. § 20507(a)(1) ...............................................................................................9

52 U.S.C. § 21083 ...................................................................................................17

52 U.S.C. § 21085 ...................................................................................................17

**Other Authorities**

Executive Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ...............................................15

Executive Order No. 14399, 91 Fed. Reg. 17125
     (Mar. 31, 2026) ("EO" or "Order") ............................................................5, 7, 18, 19, 24, 33

**INTRODUCTION**

Defendants' motions ask this Court to dismiss Plaintiffs' cases against Executive Order 14399 in their entirety. Remarkably, they do so without meaningfully defending the merits of the Order, instead arguing that the Order inflicts no harm at this stage, requires no particular action by agencies, and remains too uncertain for judicial review. But as Plaintiffs recite exhaustively in their Complaint, the Executive Order is already causing concrete harms to Plaintiffs, and these harms will only deepen as the election draws closer. Plaintiffs have more than adequately pled facts supporting their Article III standing and all elements of their claims. The Court should deny Defendants' motions.[2]

**LEGAL STANDARD**

A motion to dismiss must be denied if the complaint contains "'sufficient factual matter, accepted as true,' to support an inference of standing" and to state a claim for relief "that is plausible on its face." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under both Rule 12(b)(1) and Rule 12(b)(6), courts "treat the complaint's factual allegations as true and must grant the plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (citation modified).

I.      **LULAC Plaintiffs Have Standing to Challenge Sections 2(a) and 3(b) of the Order.**

LULAC Plaintiffs' complaint sets forth a detailed account—supported by eleven subsequent (and unrebutted) factual declarations—of why Plaintiffs LULAC, Secure Families Initiative, and Arizona Students' Association (collectively, "LULAC Plaintiffs") have both

---

[2] Count V sets forth an APA challenge to Section 3(b). Plaintiffs would request that this Court hold that claim in abeyance until it decides whether relief is proper under Plaintiffs' equitable cause of action also challenging Section 3(b).

organizational and associational standing. Compl. at 40-53, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:26-cv-01132 (D.D.C. Apr. 2, 2026), ECF No. 1 ("LULAC Pls.' Compl."); *see also* Prelim. Inj. Decls., ECF Nos. 53-12–22.[3] In response, Defendants argue that Plaintiffs cannot show injury-in-fact or traceability because the requirements that Sections 2(a) and 3(b) impose are not sufficiently defined or certain to cause cognizable injury to Plaintiffs or to their members. But those arguments ignore binding case law and misapprehend both the scope and impact of the challenged provisions.

### A. LULAC Plaintiffs Have Organizational Standing to Challenge Both Sections 2(a) and 3(b).

Neither Federal nor State Defendants cite, much less distinguish, the key D.C. Circuit precedent establishing that LULAC Plaintiffs have organizational standing to challenge Sections 2(a) and 3(b). *See generally* Fed. Defs.' Br. at 18-21, ECF No. 117-1; State Defs.' Br. at 19-21, 23-25, ECF No. 77-3. In *League of Women Voters of United States v. Newby*, the D.C. Circuit specifically held that "new obstacles" that "unquestionably make it more difficult for [voter registration organizations] to accomplish their primary mission of registering voters" establish Article III injury and irreparable harm. 838 F.3d 1, 9 (D.C. Cir. 2016). *Newby* was the primary legal basis for the holdings that LULAC Plaintiffs had organizational standing to challenge the documentary-proof-of-citizenship requirements in the prior, unlawful voting Executive Order, and it is equally applicable here. *See League of United Latin Am. Citizens v. Exec. Off. of the President*,

---

[3] "A district court deciding a motion to dismiss on jurisdictional grounds, such as standing, may consider evidence outside the complaint." *Meina Xie v. Tillerson*, No. 1:13-cv-0606 (RJL), 2017 WL 2656648, at *3 (D.D.C. June 15, 2017) (quoting *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015)). "If the court considers evidence outside of the pleadings, it may weigh that evidence and resolve any factual disputes, if necessary." *Martin v. Locke*, 659 F. Supp. 2d 140, 145 (D.D.C. 2009). LULAC Plaintiffs' Complaint more than plausibly pleads its injury-in-fact and the bases for its claims. The post-Complaint declarations from both Plaintiffs and Defendants that are cited throughout serve only to confirm what is already communicated in the Complaint.

780 F. Supp. 3d 135, 188-89 (D.D.C. 2025) ("*LULAC I*"); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 57 (D.D.C. 2025) ("*LULAC II*"); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 94-96 (D.D.C. 2026) ("*LULAC III*").

Sections 2(a) and 3(b) impose the same types of irreparable, programmatic harms on Plaintiffs in this case that the D.C. Circuit recognized in *Newby*. Starting with Section 2(a), the creation and transmission of the State Citizenship List directly harms Plaintiffs' "core business activities" in assisting their members to successfully register to vote and cast a ballot. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*AHM*"); *Newby*, 838 F.3d at 9. Although Section 2(a) mandates the creation of lists that purport to aid States in vetting eligible voters, such lists unquestionably will exclude validly registered voters. *See* LULAC Pls' Compl. ¶ 48. Section 2(a) thus creates a "new obstacle" that makes it more difficult for Plaintiffs to ensure that the voters they register and assist will actually be able to cast a valid ballot. *Id.* ¶¶ 161-213. The same is true with respect to Section 3(b): it directly interferes with Plaintiffs' respective missions to assist their members and others in the constituencies they serve to access voting by mail. *Id.* By conditioning the ability to vote by mail on enrollment in the Mail-In and Absentee Participation List, Section 3(b) interferes with the assistance Plaintiffs provide and makes the process of voting by mail more difficult and less sure to lead to the casting of an effective ballot. *AHM*, 602 U.S. at 395.[4]

---

[4] In addition to these irreparable programmatic injuries, Sections 2(a) and 3(b) also injure Plaintiffs' particularized interests in a fair electoral process and public confidence in elections. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. 71 (2026). Defendants do not contest LULAC Plaintiffs' assertion of their particularized electoral process harms under *Bost*.

In addition to ignoring *Newby*, Defendants rely on cases that bear no similarity to the facts here. For example, in *Center for Democracy & Technology v. Trump*, the challenged provisions "direct[ed] various government actors to 'file *a petition* for rulemaking . . . *requesting* that the FCC expeditiously *propose* regulations,' to '*review* . . . Federal spending,' to '*consider* taking action,' to '*consider* developing a report,' to 'establish a *working group*,' and to 'develop a *proposal* for Federal legislation.'" 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (alterations and emphases in original). Likewise, in *National Urban League v. Trump*, the challenged provisions merely directed "the President's subordinates to gather information and propose policy strategies." 783 F. Supp. 3d 61, 81 (D.D.C. 2025).

But Sections 2(a) and 3(b) are not inchoate suggestions that merely guide "possible future policymaking *within* the Executive Branch." Fed. Defs.' Br. at 20 (emphasis added). Instead, they are detailed and specific commands from the President that violate the separation of powers, usurping power over elections from the States and Congress and directly impacting which American citizens may be deemed eligible to vote and will be able to cast a mail-in ballot. Although Defendants argue that the scope and impact of the challenged provisions are too uncertain and speculative to support injury-in-fact, those arguments are irreconcilable with the actual text of the Order. Moreover, as Judge Kollar-Kotelly previously held, Defendants' arguments contesting injury rely "on an unworkably cramped theory of what it means to 'impair' an organization's mission that is inconsistent with precedent." *LULAC I*, 780 F. Supp. 3d at 190. "Just as the plaintiff organization in *Havens* had standing to challenge the harmful effects of racial steering on its mission of helping provide equal access to housing, so too Plaintiffs here have standing to challenge the burdens that" Sections 2(a) and 3(b) "would impose on their missions of

4

registering and turning out eligible voters." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

**State Citizenship Lists.** Section 2(a) mandates the creation of an entirely new federal program, never authorized by Congress, the avowed purpose of which is to provide States with a list to "assist in verifying identity and Federal election voter eligibility." Exec. Order No. 14399, § 1, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("EO" or "Order"). Section 2(a) is replete with specific instructions that the Secretary of DHS and others "*shall* take . . . to compile and transmit" the State Citizenship List "to the chief election official of each State" and how they "*shall*" create those lists. Order § 2(a) (emphasis added). These instructions are not optional; indeed "the word 'shall' generally signals a mandatory duty." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024). State Defendants nonetheless argue that more is needed: (1) because the Order does not enumerate every Federal data source that will be consulted to compile the State Citizenship Lists, and (2) because asserting that States would "automatically exclude . . . voters whose names do not appear" on the State Citizenship Lists is speculative. State Defs.' Br. at 14-16. These arguments miss the mark.

First, LULAC Plaintiffs' complaint outlines in great detail why the SAVE and SSA datasets that *are* identified in Section 2(a) of the Order do not and cannot provide complete, up-to-date, and accurate sources of citizenship and residency information. LULAC Pls.' Compl. ¶¶ 89-130. Defendants contest none of that evidence, including in declarations submitted by officials from SSA and USCIS. Even with the submission of agency declarations, there remains no evidence in the record of any federal data source that could correct for the known gaps and errors in SAVE and SSA data.

5

Second, no speculation is required to understand that the inevitable errors in the State Citizenship Lists will harm Plaintiffs.[5] The Supreme Court has held that "the predictable effect of Government action on the decisions of third parties" satisfies the traceability requirement for Article III standing. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). There is already unrebutted record evidence that States (including State Defendants) have removed voters based on faulty SAVE citizenship data without first conducting any further investigation of their own.[6] The "predictable effect" of providing unreliable State Citizenship Lists to state elections officials will be to make it more difficult for some eligible voters to cast a ballot, and to increase the burdens on organizations like LULAC Plaintiffs that seek to ensure that the voters they assist are actually able to participate and vote. The fact that additional actors, but certainly including the Federal Defendants themselves, will be involved in causing injury to Plaintiffs and their members (through the use of the State Citizenship Lists) does not defeat standing. "Traceability may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) (citation modified).

---

[5] Plaintiffs do not need to show that voters would be "automatically excluded" to establish cognizable injury. They must instead show, and have shown, that the likelihood of errors inherent to the State Citizenship Lists will burden and cause harm to the core business purposes of their organizations in assisting voters. *Newby*, 838 F.3d at 9.

[6] *See* LULAC Pls.' Compl. at 27, n.12 (citing Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH (explaining that "[i]n Missouri, state officials acted on SAVE's findings before attempting to confirm them" and that in "hundreds of cases, the tool's determinations were wrong" and that Texas likewise directed counties to remove voters flagged by SAVE if the voter did not respond to a demand that they provide proof of citizenship, which resulted in the removal of U.S. citizen voters).

6

**Mail-In and Absentee Participation List**. Likewise, in Section 3(b), the President "direct(s)" the Postmaster General to initiate a proposed rulemaking by **May 30, 2026**, and further dictates the contents of the proposed rulemaking itself, providing in detail exactly what it "shall include," such as the requirement that USPS "shall not transmit mail-in or absentee ballots from any individual" unless the individual is "enrolled" on a State-specific Mail-In and Absentee Participation List, to be created by USPS. Order § 3(b). Section 3(b) further provides that the final rule "shall be issued no later than" **July 29, 2026**. Given the specificity of the substantive requirements as well as the detailed and fast-approaching time frames set out by Section 3(b), Defendants' arguments that the requirements of Section 3(b) are not sufficiently "concrete" as to cause injury are wholly without merit. Indeed, USPS's declaration confirms that it is presently "determining how to implement the Executive Order." *See* Decl. of S. Monteith, ECF No. 117-4 at 2.

## B. LULAC Plaintiffs Independently Have Standing to Challenge Sections 2(a) and 3(b) Based on Diversion of Resources.

Because the imminent and irreparable programmatic injuries detailed above show standing, this Court need not address Defendants' arguments that Plaintiffs have failed to show diversion-of-resources. *See* State Defs.' Br. at 19-21. But to the extent this Court reaches this independent basis for standing, Defendants' arguments fail. That is because State Defendants are wrong in claiming that the Supreme Court has "rejected" resource-diversion organizational standing. *See* State Defs.' Br. at 19-21. In *AHM*, the Supreme Court held that the diversion of resources based on injury to an organization's "abstract social interests" is not sufficient to confer standing, while reaffirming that when a law or policy "directly affect[s] and interfere[s] with [the plaintiff organization's] core business activities" such that the organization must divert resources in response, that plaintiff does have standing. 602 U.S. at 394-95. Responding to the requirements of

7

the challenged provisions will require the diversion of time and resources by Plaintiffs' staff to educate members about the requirements of the State Citizenship List and the Mail-In and Absentee Participation List, including how to correct errors and how to confirm or update enrollment. *See* LULAC Pls.' Compl. ¶¶ 173-177 (LULAC), ¶¶ 191-198 (SFI), ¶¶ 209-213 (ASA).

### C. LULAC Plaintiffs Independently Have Associational Standing to Challenge Sections 2(b) and 3(a) on Behalf of Their Members.

Plaintiffs have associational standing to sue on behalf of their members in challenging both Section 2(a) and Section 3(b). *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Starting with Section 2(a), Plaintiffs have associational standing to sue on behalf of their members because each organization has members likely to be incorrectly excluded from the State Citizenship List and disenfranchised as a result. LULAC Pls.' Compl. ¶¶ 113-130, ¶¶ 162-172 (LULAC), ¶¶ 178-190 (SFI), ¶¶ 199-208 (ASA). The Order makes clear that the State Citizenship List can be used by States to "assist in verifying identity and Federal election voter eligibility," Order § 1, meaning that were States to use the list, it would leave individuals who do not appear on the List vulnerable to being impermissibly kicked off the rolls and unable to cast a ballot.

Because of the staleness, incompleteness, and inaccuracies in the data underlying the State Citizenship List, this will result in the exclusion and disenfranchisement of eligible voters, including some of Plaintiffs' members. LULAC Pls.' Compl. ¶¶ 113-130. First, Plaintiffs' members are harmed by Section 2's requirement that individuals must "maintain a residence in the subject state" to be included in the State Citizenship List. Order § 2(a). The plain terms of the Order require maintaining a residence in a State without recognition that there are voters who, due to various personal circumstances, are legally eligible to vote in a particular State while residing outside of it. But even putting aside the State and individual circumstance specific residency

8

requirements, the federal datasets the Order contemplates aggregating cannot possibly accurately account for the physical residency or legal residency of all eligible American citizens. Under the NVRA, no State can have a voter registration deadline more than 30 days prior to an election, 52 U.S.C. § 20507(a)(1), and the Supreme Court long ago held durational residency requirements for voting unconstitutional, *Dunn v. Blumstein*, 405 U.S. 330, 331 (1972). Particularly for voters who move frequently, including members of Plaintiff organizations, the State Citizenship Lists will be inaccurate.

Plaintiffs SFI and ASA both have members who do not reside in or are routinely absent from their state of legal residence for voting purposes, or who will change their state of residence shortly before an election. LULAC Pls.' Compl. ¶¶ 183-185, 200-204. This population is of particular concern to Plaintiff SFI, which has hundreds of members who are not stationed in, and therefore do not physically reside in, their state of legal residence. These SFI members are legally eligible to vote in their home state while they "maintain a residence" elsewhere to accommodate the military service of their family member. This includes SFI members who do not own property in their home state and have not lived in that state for years but nonetheless maintain their voting eligibility. Due to the nature of military service, SFI members also move frequently, including in the time period shortly before elections, and are therefore at risk of being excluded from State Citizenship Lists transmitted 60 days before federal elections. LULAC Pls.' Compl. ¶¶ 183-190. Similarly, ASA has members who reside in Arizona while attending college, but who are registered to vote in their home state. These members rely on USPS to receive an absentee ballot from their home state to vote, but risk being excluded from their home State Citizen List based on their temporary residence in Arizona while in college. LULAC Pls.' Compl. ¶¶ 200-204.

9

Second, Plaintiffs' members are likely to be inaccurately reflected or not included at all among individuals who are "confirmed to be United States citizens" on the State Citizenship List. In the Overhauled SAVE System, certain categories of eligible voters are particularly likely to be incorrectly recorded as non-citizens or potential non-citizens in databases compiled by USCIS, SSA, and other agencies.  LULAC Pls.' Compl. ¶¶ 183-190. All three Plaintiff organizations have members who are naturalized citizens. *See* LULAC Pls' Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 53 at 26-27 (citing declarations). Plaintiff LULAC, in particular, has many members who are naturalized citizens who routinely experience difficulties with their identification because federal databases rely on outdated, incorrect, or mismatched data, placing these members at significant risk of being incorrectly flagged as non-citizens and excluded from the State Citizenship List. LULAC Pls.' Compl. ¶¶ 162-168.

Second, even some of Plaintiffs' members who are natural-born citizens are at risk of being excluded from the State Citizenship List because many federal databases, including those in the SAVE System, do not necessarily contain citizenship status for natural-born citizens born prior to 1981. LULAC Pls.' Compl. ¶ 120. Under the plain language of the EO, individuals without such data cannot be "confirmed" to be citizens and therefore will likely not appear on the State Citizenship List and could be disenfranchised. LULAC and SFI both have members who are natural-born citizens born prior to 1981 who face this heightened risk of being incorrectly flagged as non-citizens and excluded from the State Citizenship List. See ECF No. 53 at 27 (citing declarations).

Third, some of Plaintiffs' members have multiple surnames that are often listed in various ways on different federal forms, which also puts them at higher risk of being improperly excluded from the State Citizenship List. These individuals might be listed under a last name joined by a

10

hyphen under one federal database, but under a single last name under another federal database. When multiple databases are combined, as is required by Section 2(a), errors are likely to result. This is especially likely for a number of LULAC's members, many of whom have multiple Spanish surnames. See ECF No. 53 at 27.

Finally, all three Plaintiff organizations have members who are concerned about the personal data sharing that Section 2 requires. LULAC Pls.' Compl. ¶¶ 172, 189, 207. Members do not want their personal information shared publicly or unnecessarily transmitted between federal agencies, States, and USPS. For those LULAC members who are newly naturalized, live in mixed-status houses, or otherwise fear aggressive immigration enforcement actions, this widespread, unprotected sharing of personal information intrudes on their sense of security. As individuals connected to the military and facing risks to personal safety, SFI members also have particular concerns about the security of their personal information. Such unauthorized disclosure of voters' data is sufficient to establish standing. *See, e.g.*, *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) ("Plaintiffs have satisfied their burden of showing that their harm has a close relationship to the harm to privacy vindicated by the common-law tort of intrusion upon seclusion." (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)).

Plaintiffs' injuries are clearly traceable to Defendants and likely to be remedied by an injunction against the officials responsible for implementing the Executive Order. And the final two elements of the associational standing inquiry are easily satisfied. All three organizations have missions that include advocating for their members to register to vote and cast a ballot. This is more than sufficient to satisfy the "undemanding" germaneness inquiry that mandates only "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). Finally, the lawsuit does not require the participation of

11

individual members because only pure questions of law are at issue and "neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

Plaintiffs likewise have associational standing to challenge Section 3(b). Members of Plaintiff organizations often vote by mail—indeed, many have no other option—and will therefore be disenfranchised by USPS's failure to send or return their mail ballot if they are not accurately included on the Mail-In and Absentee Participation List. LULAC Pls.' Compl. ¶¶ 170-171, 185-190, 200-208. In the first instance, Plaintiffs' members have already been harmed by the uncertainty and confusion surrounding their ability to vote by mail in upcoming elections. LULAC Pls.' Compl. ¶¶ 169-70, 190, 208. Additionally, many of Plaintiffs' members are at high risk of not being included on the Mail-In and Absentee Participation List. Those who are excluded from the State Citizenship List are also unlikely to be enrolled on the Mail-In and Absentee Participation List. And even for those who are properly included on the State Citizenship List, there are a number of other reasons that members are unlikely to be "enrolled" on the Mail-In and Absentee Participation List and will be disenfranchised as a result. Plaintiff SFI's members, who move frequently due to their affiliation with the military and often move close in time (within 90 or 60 days) to a federal election, rely on voting by mail using USPS.

But it is likely that they will not be "enrolled" in the Mail-In and Absentee Participation List due to their late-in-time moves and therefore will not be able to vote in upcoming elections. SFI members also cast mail ballots in various ways, including using the Federal Post Card Application and/or Federal Write-in Absentee Ballot, in addition to their State absentee ballots; these members are also likely to be harmed by the Order, which does exempt these methods of

voting from the requirements that voters be listed on the State Citizenship and Mail-In and Absentee Voting Lists. LULAC Pls.' Compl. ¶ 180.

Some of Plaintiffs' members also request absentee ballots through the mail very close to Election Day, as permitted under state law, making it highly unlikely that they will be enrolled in the Mail-In and Absentee Participation List in time to cast their vote by mail. Similarly, because ASA registers a large number of members to vote in the fall at the start of the school year, a significant number of ASA members will be very unlikely to have been enrolled in the Mail-In and Absentee Participation List in time to receive and/or return their mail ballots via USPS for the November general election. ECF No. 53 at 32 (citing declarations).

As above, the injuries of these members are traceable to the Executive Order and likely redressable by an injunction preventing the responsible officials from implementing the Order. And Plaintiffs easily satisfy the final two elements of the associational standing inquiry. All organizations' missions include promoting their members' right to vote. In challenging Section 3 of the Executive Order, Plaintiffs seek to protect the ability of their members to vote by mail, which is the only means for some members to cast a ballot. The litigation is clearly germane to the interests of each Plaintiff organization and does not require the participation of individual members because the dispute involves pure questions of law. LULAC Pls.' Compl. ¶¶ 173-177, 191-198, 209-213.

## II.    Plaintiffs' Claims Are Both Constitutionally and Prudentially Ripe.

LULAC Plaintiffs' equitable claims are both constitutionally and prudentially ripe. The Order "dictates a particular outcome and leaves no uncertainty" as to the required result of the rulemaking. *LULAC II*, 808 F. Supp. 3d at 66; *see also Newby*, 838 F.3d at 9 ("Damocles's sword does not have to actually fall . . . before the court will issue an injunction."). That outcome is a

clear separation of powers violation that the President has already committed by exceeding his constitutional sphere of authority in attempting to dictate election rules and procedures. Because the issuance of those unlawful commands has already occurred, LULAC Plaintiffs' claims are ripe.

LULAC Plaintiffs have established constitutional ripeness by identifying definitive injury-in-fact that is imminent or certainly impending from both Section 2(a) and Section 3(b). *See supra* Section I. "In a case like this one involving a pre-enforcement challenge to executive action, '[c]onstitutional ripeness is subsumed into the Article III requirement of standing, which requires a [plaintiff to show] an injury-in-fact that is imminent or certainly impending.'" *LULAC I*, 780 F. Supp. 3d at 173 (quoting *POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 403 (D.C. Cir. 2020)). Because LULAC Plaintiffs have established injury-in-fact, *see supra* Section I, Defendants' arguments concerning constitutional ripeness are unavailing.

Federal and State Defendants rely heavily on *Trump v. New York*, 592 U.S. 125 (2020), arguing that LULAC Plaintiffs' claims are not ripe until the relevant agencies act on the unlawful Order. Fed. Defs.' Br. at 25; State Defs.' Br. at 17, 23-24. But *Trump v. New York* presented a very different presidential memorandum that, unlike the Order here, was indeed rife with uncertainty. In that case, the only "order" in the memorandum was a directive to the Commerce Secretary to "gather information" that would later allow the President to "exercise the President's *discretion*" to set a policy. 592 U.S. at 130-31. The Supreme Court stressed that determining how the President would exercise that discretion was speculative and that the evidence of injury was entirely based on "unrealistic[]" assumptions about future unspecified Presidential action. *Id.* at 133. The Court concluded that the plaintiffs lacked standing, and the case was not ripe. *Id.* at 134.

Unlike *Trump v. New York*, Plaintiffs' harms do not depend on any future discretionary action by the President but rather only on follow-through on the mandatory dictates of his Order.

14

As such, the impacts of the Order on LULAC Plaintiffs are foreseeable and not speculative. *See supra* Section I. In sum, "the Article III standing and ripeness issues in this case boil down to the same question"—whether Plaintiffs must wait for actual enforcement before challenging an action that has been authorized to occur notwithstanding its patent illegality. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5, 158-59 (2014) (internal quotations omitted); *see also LULAC I*, 780 F. Supp. 3d at 173. Precedent makes clear that the answer is "no." *See Consolidation Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 824 F.2d 1071, 1081 (D.C. Cir. 1987) (for ripeness inquiry, "[i]t is enough that the petitioner show that it has suffered sufficient hardship to pass the Article III threshold").

Defendants' reliance on Justice Sotomayor's solo, one-paragraph concurrence in *Trump v. American Federation of Government Employees* is similarly misplaced. *See* Fed. Defs.' Br. at 26. There, an executive order mandated federal agencies "submit a plan to reduce the size of the Federal Government's workforce" by "undertak[ing] preparations to initiate large-scale reductions in force." Exec. Order No. 14210, 90 Fed. Reg. 9669, § 3(c) (Feb. 11, 2025). The Office of Management and Budget subsequently instructed federal agencies to submit documentation regarding their plans for employee reduction. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 782 F. Supp. 3d 793, 804 (N.D. Cal. 2025). The district court issued an injunction, which the Supreme Court subsequently stayed. *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025). But the Court's stay only addressed likelihood of success on the merits, not ripeness. And Justice Sotomayor's brief concurrence merely highlights how much less clear the policy at issue in that case was, with no information on which agencies would cut personnel, how many employees they would cut, or the timeframe in which those decisions would be made. *Id.* (Sotomayor, J.,

concurring). The Order in this case is of a different kind—it mandates the actions the agencies must accomplish and the deadlines by which they must act.

LULAC Plaintiffs have also established prudential ripeness. The prudential ripeness doctrine rests on a two-part balancing test, which requires the court to consider institutional reasons for deferring review, like whether agency action is tentative and ongoing (as opposed to final) and whether factual development is necessary, and whether delaying review would cause hardships to the plaintiffs. *Am. Petrol. Inst. v. Env't Prot. Agency*, 683 F.3d 382, 387 (D.C. Cir. 2012). Because this case raises exclusively "legal questions" that do not require further factual development and delay of a judicial decision would impose considerable hardship on Plaintiffs, LULAC Plaintiffs' claims are ripe.

First, as Plaintiffs outline above and in their Complaint, delaying review would cause hardship to LULAC Plaintiffs, whose members have already been harmed by the uncertainty and confusion surrounding their potential exclusion on the State Citizenship Lists and their ability to vote by mail in upcoming elections. S*ee supra* Section I.

Second, there are no viable institutional reasons for deferring review for LULAC Plaintiffs' claims. That is so first and foremost because ongoing Federal primary elections and the upcoming Federal general elections in the fall necessitate certainty as to the President's commands *now*. As Justice Kavanaugh has explained, the Supreme Court's cases repeatedly recognize "a basic tenet of election law: [w]hen an election is close at hand, the rules of the road should be clear and settled." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) (mem.); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006). The "thousands of state and local officials and volunteers" who participate "in a massive coordinated effort to implement the lawmakers' policy choices" must have clarity about what the rules are to communicate to voters

16

"how, when, and where they may cast their ballots," including through voting by mail. *Id.* Indeed, if this Court requires Plaintiffs to wait, Defendants will almost certainly argue at that point that it is too late for the Court to issue orders affecting the election process. *See Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 80 (2026) ("[T]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." (internal citation omitted)).

Defendants argue that LULAC Plaintiffs' claims are "riddled with contingencies," Fed. Defs.' Br. at 27; State Defs.' Br. at 17, such that review should be deferred. But the Order's text "dictates a particular outcome and leaves no uncertainty by prescribing the substance of the . . . requirement[s] it purports to mandate." *LULAC I*, 780 F. Supp. 3d at 185; *see generally* LULAC Pls.' Compl. ¶¶ 1-2. In Sections 2(a) and 3(b), the President usurps the power of the States and Congress and commands that agencies take actions in a manner that violates the separation of powers and multiple federal statutes. *See supra* Section I (discussing the mandatory language in the Order).

Moreover, there are no relevant contingencies because USPS plainly cannot comply with the Order without violating multiple statutory obligations and constraints that Congress has imposed on the Postal Service. *See Heckler v. Chaney*, 470 U.S. 821, 833 (1985) ("Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."). HAVA provides the States, not the Postal Service or any other federal actor, with exclusive authority to administer voter lists. *See* 52 U.S.C. §§ 21083, 21085. Section 3(b)'s requirement to initiate a rulemaking creating the Mail-In and Absentee Voter List is incompatible with HAVA, and the requirement that the USPS rulemaking delineate which mail ballots USPS

will deliver and which it will not flatly violates both the Postal Reorganization Act of 1970's ("PRA") universal service obligation in 39 U.S.C. §§ 101, 403, 404, and the limits of the PRA's nonmailable provisions in 39 U.S.C. §§ 3001-18. *See* LULAC Pls.' Mem. at 37-44.

Neither Federal nor State Defendants muster a single line of argument attempting to show how the contents of the proposed rulemaking, as set out in Section 3(b), could possibly comply with these statutory mandates. That is because no reconciliation is possible. Section 3(b) simply commands a rulemaking that will not comply with any of these statutory requirements. These purely legal issues are ripe and can and must be addressed now.[7]

Despite "Defendants' talismanic invocation of the Executive Order's savings clause," there is nothing in the Order that renders LULAC Plaintiffs' challenges unripe. *LULAC I*, 780 F. Supp. 3d at 186; *see* Fed. Defs.' Br. at 20, 24-25, 49-50. First, Section 3(b) contains no particularized savings clause at all. Only Section 2(a) does, as it states that the DHS Secretary shall take the

---

[7] In addition to these irreconcilable substantive conflicts, the rulemaking as prescribed cannot be accomplished consistent with USPS's mandatory procedural obligations. USPS must request an advisory opinion from the Postal Regulatory Commission for nationwide service changes—like the one that Section 3(b) mandates—at least 90 days before implementation. 39 C.F.R. § 3020.102. Prior to requesting the advisory opinion, USPS must conduct one or more pre-filing conferences with "interested persons in the proceeding and shall make a good faith effort to address the concerns of such persons" to "identify[] relevant issues and information needed to address those issues during proceedings at the Commission." 39 C.F.R. § 3020.111(a), (b). USPS must file a notice of the pre-filing conference at least ten days before the conference occurs. 39 C.F.R. § 3020.111(d). The USPS Declaration does not state that USPS will initiate a request for an advisory opinion from the Postal Regulatory Commission 90 days prior to implementation, nor that USPS will conduct any pre-filing conferences. *See generally* Decl. of S. Monteith, ECF 117-4. Nor could it. USPS cannot comply with both the requirement to request an advisory opinion from the Commission and the Order's mandate to initiate a proposed rulemaking within 60 days of March 31—the date the President issued the Order. Order § 3(b). The Order's deadline for rulemakings therefore does not allow this mandatory regulatory review of USPS's proposed rules. The Order thus makes certain that USPS must violate its procedural obligations to comply with the Order's timing mandates. That fact alone renders LULAC Plaintiffs' challenge to Section 3(b) ripe.

prescribed actions "to the extent feasible and consistent with applicable law."[8] But "executive orders, like statutes, 'cannot be held to destroy themselves through saving clauses.'" *LULAC I*, 780 F. Supp. 3d at 176 (quoting *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020)). This makes sense. If the magic words feasible and consistent with applicable law could prohibit "a court from examining whether the Executive Order is consistent with law, judicial review [would become] a meaningless exercise, precluding resolution of the critical legal issues." *Id.* (citing *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018)).[9]

Because the President has acted so clearly outside of any constitutional authority, and the challenged provisions in "the executive order cannot possibly be implemented consistent with applicable law," any "command to do so in a saving clause is meaningless." *LULAC I*, 780 F. Supp. 3d at 176. The Order mandates that DHS and USPS *shall* take particular actions. *See supra* Section I. The savings clause made no difference in *LULAC I* and should not here.

Defendants also argue that the presumption of regularity renders the Order unfit for review, but no presumption can trump the text of the Order itself, endow the President with the power to command USPS rulemaking, or provide the power to order the creation of an extra-statutory voter list-maintenance tool. Fed. Defs.' Br. at 40-41; State Defs.' Br. at 27. The presumption of regularity

---

[8] The Order also contains a catch-all savings clause in Section 7(b), stating that its provisions "shall be implemented consistent with applicable law and subject to the availability of appropriations." Order § 7(b). That boilerplate language does not defeat ripeness and shield the legality of the commands in the Order from direct judicial review.

[9] Moreover, including the word "feasible" in Section 2(a) does not render LULAC Plaintiffs' challenge unripe. Plaintiffs challenge the President's unlawful assertion of authority, and not the implementation of his commands by any federal actor. Defendants cannot permanently shield themselves from pre-enforcement judicial review by declining to assert whether they have determined that implementation is "feasible," all the more so because the Order requires them to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" within 90 days (by June 29, 2026). Order § 4(c).

"operates as a razor for resolving factual disputes," but it cannot reach "the underlying legality of the agency action." *LULAC I*, 780 F. Supp. 3d at 177. Instead, a reviewing court must still determine whether the government has "compl[ied] with applicable statutory and constitutional requirements.'" *Id.* (quoting *U.S. Lines, Inc. v. Fed. Marit. Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978)). Here, the President has acted not only outside of his constitutional sphere of authority but contrary to the laws Congress has passed. The presumption of regularity cannot save his unlawful Order. LULAC Pls.' Mem. at 37-40.

It is well-established that Plaintiffs have an equitable cause of action to challenge Presidential commands as ultra vires when they are not grounded in any proper assertion of constitutional authority. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The D.C. Circuit has made clear that ultra vires claims raise constitutional, not statutory claims, where "the presidential action at issue was not even contemplated by Congress." *Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) (internal quotations omitted). That is the case here. LULAC Plaintiffs' challenges to the President's authority to issue the commands in Sections 3(b) and 2(a) of the Order "arise directly under the Constitution." *LULAC III*, 818 F. Supp. 3d at 81 (citation modified).

## III.   Plaintiffs' Constitutional Challenges Are Ripe.

Neither Federal nor State Defendants make any attempt to argue that LULAC Plaintiffs' constitutional claims are unripe beyond the broad ripeness challenges that they invoke for all claims, which hold no water. *See supra* Section II. LULAC Plaintiffs' constitutional claims are ripe because LULAC Plaintiffs sufficiently allege that the Order "inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court" insofar as the claims allege that the Order

"violates the separation of powers[.]" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020). The unlawful commands that LULAC Plaintiffs seek to enjoin—the circumvention of the role of Congress and the States in setting election rules—have *already* been given. *See id.* Because LULAC Plaintiffs sufficiently allege that the "executive acts *ultra vires*, courts are [] available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).

## IV. Plaintiffs Allege Valid Equitable Claims Challenging the Constitutionality of Sections 2(a) and 3(b) in Counts I and II.

The Complaint alleges constitutional ultra vires claims. And courts have expressly said that these types of claims provide equitable causes of action. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585-589 (1952); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions may still be reviewed for constitutionality."); *LULAC III*, 818 F. Supp. 3d at 81 (noting plaintiffs "may seek equitable relief from unconstitutional Government action by proceeding 'directly under the Constitution'" (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)). Defendants misunderstand the nature of Plaintiffs' claims, which they characterize as statutory ultra vires, but Plaintiffs' claims are actually constitutional ultra vires. Fed. Defs.' Br. 34-36; State Defs.' Br. at 30-31. As a result, Defendants do not even grapple with Plaintiffs' constitutional ultra vires or separation of powers challenges.

Even though Defendants do not contest the constitutional merits, for good measure Plaintiffs address them. In Count I, which presents purely legal issues, the Complaint sufficiently alleges that the President has no inherent constitutional authority over voting by mail—a power the Elections Clause vests exclusively to the States with oversight from Congress. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809-10 (1969); LULAC Pls.' Compl. ¶¶ 218-219. It further alleges that Section 3(b) directly conflicts with Congress's will, as expressed in multiple

21

postal and voting statutes. The Complaint meticulously walks through provisions of the Postal Service Reorganization Act, the Postal Service Reform Act, the Postal Accountability and Enhancement Act, and UOCAVA—all of which make plain that the President cannot lawfully command the Postal Service to create an Absentee Participation List or withhold ballot delivery based on that list. LULAC Pls.' Compl. ¶¶ 231-276. The bottom line is clear: the President lacks inherent power over elections and the postal system—domains reserved to Congress and the States—and Section 3(b) tramples on the very federal statutes through which Congress has exercised that authority.

Count II also presents purely legal questions and alleges that the President has no authority under Section 2(a) to direct federal agencies to compile a citizenship list. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 n.57 (W.D. Wash. 2026).  HAVA and NVRA reflect the will of Congress that States conduct list maintenance and voter verification. LULAC Pls.' Compl. ¶ 285. The Complaint sets out the ways in which Section 2(a) is thus contrary to the express will of Congress because it attempts to supplant or add to the list maintenance and voter verification requirements that Congress enacted in HAVA and the NVRA.

Defendants' reliance on *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) ("*NRC*") is misplaced. Fed. Defs.' Br. at 39. That is because Plaintiffs' claims, as discussed above, are purely constitutional. In *NRC*, the Supreme Court found that the plaintiffs had "dress[ed] up" a typical statutory-authority argument as an ultra vires claim where a statutory review scheme provided aggrieved persons with an adequate opportunity for judicial review.  *See NRC*, 605 U.S. at 668-69. But that reasoning is not applicable here. Plaintiffs' claims in Counts I and II challenge

22

the Order itself as exceeding the President's constitutional authority, and no relevant statute addresses judicial review. *See Franklin*, 505 U.S. at 801 (President's actions are not reviewable under APA). And the Court has emphasized its ability to entertain ultra vires claims within its equitable powers. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-328 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

## V.    LULAC Plaintiffs' APA Challenge to Section 2(a) Is Ripe.

Defendants collapse timeliness into the merits by insisting that no APA challenge can proceed until the agencies complete every downstream implementation step. Fed. Defs.' Br. at 28-35; State Defs.' Br. 28-30. But at the motion-to-dismiss stage, Plaintiffs need only plausibly allege reviewable agency action and present injury, not prove the entire case in advance. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023).

This Court's ripeness decisions distinguish between executive orders that merely initiate open-ended processes and those that direct agencies to take concrete, non-discretionary action. *See LULAC I*, 780 F. Supp. 3d at 184-85 (collecting cases). Defendants' reliance on *Center for Democracy & Technology* and *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984), Fed. Defs.' Br. at 23, for their ripeness arguments is misplaced—those cases were found to be unripe because the orders in question "merely 'authorize[d]'" the agency to act or "suggest[ed] that it 'consider' doing so." *Id.* at 185. Here, the Executive Order unquestionably requires the agencies to carry out specific, predetermined actions. Section 2(a) says that DHS, through USCIS and in coordination with SSA, "*shall*" compile and transmit the State Citizenship List; the list "*shall*" be derived from specified federal databases; the list "*shall*" be updated and

23

transmitted no fewer than 60 days before each regularly scheduled federal election; and DHS "*shall*" establish correction procedures for individuals and supplementation procedures for States. Order § 2(a) (emphasis added). Section 3(b) is equally mandatory: the Postmaster General "*shall*" initiate rulemaking on a short timetable, and the resulting rules "*shall*" require the USPS to provide each state with the Mail-In and Absentee Participation Lists and specify that USPS "*shall*" not deliver mail-in or absentee ballots to individuals not on that list. Order § 3(b)(iii), (iv) (emphasis added). *See LULAC I*, 780 F. Supp. 3d at 184-85 (finding challenge was ripe where executive order "dictates the precise contours of the mandated requirement"); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 41 (D.D.C. 2025) (noting "while the guidance contemplated by Section 5(a) has yet to issue, the Order provides a clear preview of what it will do" and therefore challenge was ripe).

Ignoring these clear mandates, Defendants press that the Order's "future implementation" is "hypothetical, possible" though they admittedly concede that it "*certainly* contemplates possible future agency actions." Fed. Defs.' Br. at 28 (emphasis in original); *see also* State Defs.' Br. at 30. They lean heavily on provisions that instruct DHS and the Postmaster General to begin carrying out the Order, including Section 4(c), which directs DHS to "establish the [necessary] infrastructure," and Section 3(b), which directs the Postmaster General to "initiate a proposed rulemaking." Order §§ 4(c), 3(b). But those implementation provisions do nothing to undercut the mandatory language that already dictates the end result of that implementation: DHS must compile and transmit State Citizenship Lists, and USPS must refuse to deliver absentee ballots to any voter not included on its participation list.

In the closely related context of whether a challenge to the directive that the EAC amend the Federal voter-registration form to add a documentary-proof-of-citizenship requirement was

24

ripe, Judge Kollar-Kotelly rejected the defendants' argument that it was "entirely unclear what the Executive Order requires of the EAC or whether it requires anything at all." *LULAC I*, 780 F. Supp. 3d at 184. Instead, she held that Section 2(a) of Executive Order 14248 did not merely "authorize" the EAC to change the Federal Form or "consider" doing so, but "purport[ed] to require the EAC to amend the Federal Form and dictate the precise contents of the new rule." *Id.* at 185. Just as the previous executive order gave the EAC no discretion, the Order at hand contains language sufficient to defeat Defendants' contention that "future implementation" is merely "hypothetical." Fed. Defs.' Br. at 28. The Complaint adequately alleges more than a contingent possibility of future action. The Executive Order leaves the agencies *no discretion* about whether to proceed, even if some of the implementation details are yet to be resolved. For timeliness purposes, that is enough.

## VI. LULAC Plaintiffs Allege a Valid Cause of Action under the APA in Counts III and IV.

Rather than defend the Order on the merits, Defendants instead argue that LULAC Plaintiffs' APA claims must be dismissed because they have no legitimate cause of action under the APA, and they fail to allege final agency action under *Bennett v. Spear*. Defendants are wrong on both issues. Plaintiffs have alleged legitimate claims under the APA and satisfied the finality test for the purposes of a motion to dismiss by identifying the "consummation" of a "decision[] . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted).

### A. Plaintiffs have a viable cause of action under the APA.

First, Defendants fault Plaintiffs for "fail[ing] to cite a single cause of action—aside from the APA—that allows them to enforce any of the federal statutes" they reference, because Plaintiffs bring only APA claims. State Defs.' Br. at 30; *see* LULAC Pls.' Compl. at 68, 71, 73. That

25

criticism misses the mark. First, because Plaintiffs bring constitutional ultra vires claims, which proceed in equity. Second, Plaintiffs' only statutory causes of action *are* APA causes of action, and the complaint cites HAVA, the NVRA, UOCAVA, and the PRA not as independent sources of privately enforceable rights here, but as statutory background to support their allegations that the President's actions are ultra vires—both outside his constitutional authority and contrary to Congress's duly enacted scheme. The statutory citations underscore the breadth of the illegality; they are not freestanding claims under those statutes.

Next Defendants assert that Plaintiffs cannot pursue Privacy Act-based APA claims because the Privacy Act contains its own limited remedial provisions. Fed. Defs.' Br. at 37-38; State Defs.' Br. at 30-32. Not so. Courts have regularly granted injunctive relief under the APA for violations of the Privacy Act, finding that "the Privacy Act's remedial scheme does not implicitly foreclose this relief." *LULAC III*, 818 F. Supp. 3d at 111. *See also Venetian Casino Resort, LLC v. Equal Emp. Opportunity Comm'n*, 530 F.3d 925, 927-31 (D.C. Cir. 2008); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 41-42 (D.D.C. 2025); *Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988). Defendants concede as much. Fed. Defs.' Br. at 39 (citing *AFL-CIO v. Dep't of Labor*, 778 F. Supp. 3d 56, 81-82 (D.D.C. 2025)). The Supreme Court has also assumed such actions are cognizable, finding that the Privacy Act's "inattention" to equitable relief may be "explained by the general provisions for equitable relief within the [APA]." *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).

Defendants further argue that Plaintiffs' APA claims fail because the President is not an "agency" under the APA. Fed. Defs.' Br at 37; State Defs.' Br. at 28-29. But Plaintiffs do not seek APA relief against the President or the Executive Office of the President. The Complaint asks the Court to enjoin 17 agency and officer defendants charged with implementing the Order; neither

President Trump nor the Executive Office of the President is among them. Plaintiffs challenge the unlawful policies and actions of subordinate agencies, not the President directly. As the D.C. Circuit has recognized, "review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citation omitted). Even when an official "act[s] at the behest of the President," courts retain the power "to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (citing *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).

Finally, Defendants contend that Plaintiffs "cannot solve their statutory cause-of-action problem by invoking principles of ultra vires review." Fed. Defs.' Br. at 39. That argument mischaracterizes LULAC Plaintiffs' claims. As explained above, Plaintiffs do not allege any statutory ultra vires causes of action. Their ultra vires counts are constitutional separation-of-powers claims, not efforts to privately enforce HAVA, NVRA, UOCAVA, or the PRA in their own right.

### B. Counts III and IV plausibly allege final agency action as to the State Citizenship List.

Count III alleges that with the fast-approaching deadlines by which Defendants must compile and transmit the State Citizenship Lists (e.g., June 29, 2026 and September 4, 2026), Defendants have failed to follow the required Privacy Act procedures in their decision to compile and transmit the State Citizenship List and that this failure violates § 706(2) of the APA. LULAC Pls.' Compl. ¶¶ 310-316. Count IV alleges that the sharing of databases between DHS, SSA, and other agencies and the disclosure of the State Citizenship Lists to election officials also violates § 706(2) of the APA. LULAC Pls.' Compl. ¶¶ 307-318.

27

Defendants' sole objection is that no final agency action exists because neither DHS nor SSA have implemented the Order's mandates. Fed. Defs.' Br. at 28-30; State Defs.' Br. at 28-30. But that mischaracterizes what is happening here. The Complaint avers that since last March, the agencies subject to 2(a), namely DHS and SSA, have already begun implementing the policy that underlies the creation of the State Citizenship List. It alleges that DHS overhauled the SAVE database and rapidly deployed a new citizenship-verification system tied to SSA data. LULAC Pls.' Compl. ¶ 102. Only later did DHS issue a SORN establishing new routine uses to permit disclosures to SSA and outside entities for citizenship and immigration-status verification. *Id.* ¶¶ 104-107. The Complaint further avers that SSA issued a corresponding SORN authorizing disclosure of citizenship and immigration information to DHS. *Id.* ¶ 108. And separately, it alleges that DOJ spent months seeking state voter roll data, which makes the government's plan crystal clear: to build a nationwide citizenship database and foist it on states for list maintenance, particularly related to rooting out non-citizen voters. *Id.* ¶¶ 75-76. Since then, the administrative record in *League of Women Voters v. U.S. Department of Homeland Security*, No. 1:25-cv-03501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) has disclosed a new memorandum of understanding between DHS, USCIS, and DOJ's Civil Rights Division, under which DOJ can access the SAVE database to investigate and audit the U.S. citizenship and immigration status of registrants or registered voters on state voting rolls as part of states' voter-roll maintenance. Exhibit 1.[10]

---

[10] "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and *matters of which it may take judicial notice.*" *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (emphasis added). Plaintiffs attach this Memorandum of Understanding here as Exhibit 1. This document was published on or around May 8, 2026, as part of the administrative record in *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 2025 WL 3198970 (D.D.C. Nov. 17, 2025).

Together, these allegations satisfy *Bennett* at the pleading stage. First, they plausibly allege consummation of agency decision-making in two ways. The Complaint describes an Administration-wide policy choice to aggregate federal and state data into a state-by-state citizenship-verification regime. LULAC Pls.' Compl. ¶ 77. The work that remains to be done is to implement a policy already adopted, not deliberate over whether to adopt such a policy. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 21, 40 (relying on circumstantial evidence of the IRS's data-sharing activities to reject the government's assertion that "the Data Policy does not exist" and to find final agency action). The Complaint also challenges discrete, mandatory actions required by the Order: the compilation of federal citizenship lists and their transmission to the states by a date certain (no later than 60 days before the election). Because the Order leaves the responsible agencies with no discretion whether to compile and transmit those lists, those actions, too, qualify as final agency action.

Second, the Complaint plausibly alleges legal consequences. The Order obligates DHS/USCIS and SSA to reuse existing systems of records in a new way—combining citizenship, SSA, SAVE, and "other relevant Federal databases"—and share those records with state officials, which will trigger the Privacy Act's procedural and disclosure constraints. LULAC Pls.' Compl. ¶¶ 293-306, 309-318. And the Complaint amply alleges facts regarding the present legal consequences to Plaintiff organizations' operations and members. Plaintiffs' members already face the prospect that their citizenship, residence, and voter eligibility will be measured against the Federal List in upcoming elections, and Plaintiffs' organizations must immediately adjust their registration, list maintenance, and GOTV efforts in response. *Id.* ¶¶ 161-213. Because inaccuracies in that List are inevitable, the Complaint alleges Plaintiffs' eligible citizen-members may not

29

appear on it at all and thus face a concrete risk of being removed from the voter rolls, an obvious "legal consequence." *Id.* ¶¶ 163-68, 184, 209, 211.

That is exactly the sort of legal consequence that courts have treated as sufficient under *Bennett*'s second prong. *See Venetian Casino Resort, LLC*, 530 F.3d at 929-30 (finding agency disclosure policy was final where it fixed the submitter's rights and exposed it to potential civil liability); *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 40-41 (finding legal consequences where an IRS address-sharing policy allowed large-scale disclosure of taxpayer information to ICE solely for criminal investigations, thereby subjecting affected taxpayers to the risk of criminal investigation and prosecution). Just as in *Center for Taxpayer Rights*, here data sharing between federal agencies and transmission of that data to the states is specifically designed to determine individuals' citizenship for a legally significant purpose—voting. Section 2(b) of the Order further directs the Attorney General to prioritize investigation and prosecution of ineligible voting and those who assist it. For organizations with members nationwide whom they help register and remain registered, that combination of mandatory data use and an expressly announced enforcement priority changes their rights and obligations with respect to voting eligibility (for members) and potential prosecution (for organizations helping voters navigate and determine their eligibility), satisfying *Bennett*'s "legal consequences" prong at this stage.

Defendants make two points related to the final agency action piece under *Bennett*, neither of which should change this Court's calculus. First, they claim that DHS or SSA may issue a SORN at some future date that could moot out any Privacy Act claim. Fed. Defs.' Br. at 31. But Defendants have published no such SORN, and even if they had, Plaintiffs have adequately alleged other Privacy Act violations here. *See* LULAC Pls.' Compl. ¶¶ 295-305 (alleging, among other things, procedural violations for systems of records); *id.* ¶¶ 308-317 (alleging improper

interagency disclosures and disclosures to the states). Defendants contend that *LULAC III* supports them here because in that case a SORN was issued months after DHS began sharing data and the case was deemed moot. Fed. Defs.' Br. at 31. But that characterization is misleading. While it is true that the court in *LULAC III* found the Democratic Party Plaintiffs' narrow Privacy Act–based request for injunctive relief moot after the defendants issued an updated SORN, the court still granted narrow declaratory relief and emphasized that the defendants were still required to adhere to the Privacy Act's requirements. *LULAC III*, 818 F. Supp. 3d at 115. At the same time, the court admonished the defendants for their failure to follow the mandates of the Privacy act, emphasizing that its refusal to enter an injunction "should not be misunderstood as an endorsement or encouragement of the manner in which the Federal Defendants have gone about implementing . . . the Executive Order . . . [I]t is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a 'routine use' months after it has begun." *Id.* at 115-16. The same holds true here. The agencies' actions—compiling and transmitting a State Citizenship List—trigger legal consequences under the Privacy Act *now*.

Second, Defendants maintain that Plaintiffs' allegations about inevitable inaccuracies in the State Citizenship List cannot satisfy *Bennett* because DHS has "not yet made any final decisions" about which databases, if any, including SAVE, will be used to generate those lists. Fed. Defs.' Br. at 32. That argument does not pose any obstacles to Plaintiffs' Section 2(a) APA claims. And the recent opinion by Judge Sooknanan on which Federal Defendants rely does not help them. *Id.* at 33 (citing *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 2025 WL 3198970, at *6-8). There, *in addressing irreparable harm*, the court found no injury because the challenged overhaul of SAVE had already occurred between April and August of 2025, so any

31

belated notice-and-comment process would necessarily have followed the completed action. *League of Women Voters*, 2025 WL 3198970, at *6. Here, the complaint plausibly alleges that the agencies' final action—compiling and transmitting State Citizenship Lists to the states—will carry concrete legal consequences, including the risk of wrongful purges. LULAC Pls.' Compl. ¶¶ 165-167. Indeed, Texas and Missouri have already relied on SAVE data and, in the process, misidentified and removed eligible voters from the rolls, and Plaintiffs' organizational members reside in those states. *Id.* ¶¶ 129-130, 167.

Finally, contrary to Defendants' assertions, Section 4(c)'s directive to DHS to "establish the infrastructure necessary" to compile, maintain, and transmit the list does not render the agency-wide policy—of creating a state citizenship database to verify voters' immigration status—nonfinal. It instead confirms that DHS is committed to building out the infrastructure for a program whose essential features the President has already dictated: what the list is, what sources it must use, who must receive it, and when it must be transmitted. The Complaint plausibly alleges reviewable final agency action for Counts III and IV.

## VII. Plaintiffs Do Not Seek Judicial Review of the Enforcement Priorities/Discretion of the Executive Branch.

Federal Defendants contend that Plaintiffs' claims should be dismissed because they are challenging the enforcement priorities and enforcement discretion of the Executive Branch, and such challenges are unreviewable by the courts. Fed. Defs.' Br. at 41-45. Though Federal Defendants' arguments seem to be primarily directed at the NAACP Plaintiffs and their challenge to Section 2(b) of the Executive Order, they also note that "all Plaintiffs challenge Sections 2(a) and 3(b) . . . all of which can facilitate possible future post-election enforcement of criminal laws relating to voting." *Id.* at 41.

This argument fails as to LULAC Plaintiffs, who only challenge Sections 2(a) and 3(b)(iii)-(iv): Section 2(a) orders DHS to create, maintain, and transmit a State Citizenship List and Sections 3(b)(iii)-(iv) order USPS to create and transmit state-specific lists of individuals eligible to receive mail-in ballots and prohibit USPS from sending absentee or mail-in ballot materials to persons not on that list. Neither provision involves the exercise prosecutorial discretion. In contrast, *Heckler v. Chaney*, 470 U.S. 821 (1985), the lead case cited by Federal Defendants, along with every other case Federal Defendants cite, involves the specific issue of whether an agency's discretionary enforcement decisions can be challenged, not whether non-enforcement executive branch implementation activity that may later lead to enforcement of some kind can be challenged. As noted in *Chaney*, judicial non-interference with prosecutorial interference is grounded in the principle that courts are generally ill-suited to micromanage an agency's decision to prosecute or not prosecute a particular matter, and the constitutional concern that such interference transgresses the separation of powers. 470 U.S. at 831-32. But neither issue is present here; if the Court enjoins Section 2(a) and Section 3(b), it will not interfere with any agency's prosecutorial discretion in the slightest. Therefore, LULAC Plaintiffs' claims should not be dismissed on this basis.

**VIII.    No Defendants Should Be Dismissed.**

Defendants assert that the Court should dismiss the Department of Commerce and the Secretary of Commerce (in his official capacity) as proper defendants. But as Plaintiffs outline in their Complaint, Section 4(a) of the Executive Order explicitly instructs that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating *all relevant aspects of the implementation* of this order." LULAC Pls.' Compl. ¶ 61 (citing Order § 4(a)). When the President has issued an unlawful order, "the proper course is to seek to enjoin a member of the executive branch from carrying out the

executive order at issue." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021). That is precisely what Plaintiffs have done here. As such, the Department of Commerce and the Secretary of Commerce should not be dismissed.

## CONCLUSION

For the reasons outlined herein, Defendants' motions to dismiss should be denied.

Dated: May 15, 2026

/s/ Norman L. Eisen
Norman L. Eisen (DC Bar No. 435051)
Andrew Warren (DC Bar No. 503003)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold (DC Bar No. 90010196)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
andrew@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

Respectfully submitted,

/s/ Danielle Lang
Danielle Lang (DC Bar No. 1500218)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri (NY Bar No. 5396304)
Valencia Richardson (DC Bar No. 1739245)
Aseem Mulji (DC Bar No. 1724971)
Renata O'Donnell (DC Bar No. 1723929)
Benjamin Phillips (DC Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bphillips@campaignlegalcenter.org

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association*