**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>   *Plaintiffs,*<br><br> v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>   *Defendants.* | Case Number  1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>   *Plaintiffs,*<br><br> v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>   *Defendants.* | Case Number  1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., and BVM CAPACITY BUILDING INSTITUTE, INC.,<br><br>   *Plaintiffs,*<br><br> v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>   *Defendants.* | Case Number  1:26-cv-01151-CJN |

**NAACP, COMMON CAUSE, AND BLACK VOTERS MATTER
PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.      The Constitution Allocates Authority to Regulate Elections Between Congress and the States ......................................................................................................................2

II.     The NVRA and HAVA Allocate Election Administration Authority Between the States and Federal Agencies ................................................................................................4

III.    The Postal Service's Statutory Structure Confirms Its Independence from Presidential Control ..................................................................................................................5

IV.     President Trump's Crusade to Take Over Election Administration ...................................7

V.      The Executive Order Purports to Impose Sweeping Changes to Voter Qualification Verification and Mail-In Voting ..................................................................................8

STANDARD OF REVIEW ..................................................................................................11

ARGUMENT........................................................................................................................11

VI.     The Court Should Deny Defendants' Motions Under Rule 12(b)(1) ................................11

        A.      Plaintiffs Have Standing to Challenge §§ 2(a), 3(b), 4(a), and 4(c) ......................11

                1.      Plaintiffs Have Adequately Pled Organizational Standing.........................11

                2.      Plaintiffs Have Likewise Pled Associational Standing...............................15

                3.      Plaintiffs' Injuries Are Traceable and Redressable ...................................16

        B.      Plaintiffs' Claims Are Ripe...................................................................................17

        C.      Plaintiffs' Claims Are Not Barred by Finality or Reviewability Principles ..........22

VII.    The Court Should Deny Defendants' Motions Under Rule 12(b)(6) ................................24

        A.      Plaintiffs Have Plausibly Stated Their Constitutional Claims (Counts I-III). .......24

        B.      Plaintiffs Have Plausibly Stated Their *Anderson-Burdick* Claim (Count IV) .......27

        C.      Plaintiffs Have Plausibly Stated Their Postal Claim (Count V). ..........................29

        D.      Plaintiffs Have Plausibly Stated Their Privacy Act Claims (Count VI). ...............36

        E.      Plaintiffs Have Alleged a Sufficient Nexus to Sue Each Named Defendant.........44

**F.**      The Scope of Plaintiffs' Requested Relief is Proper ...............................................44

CONCLUSION...............................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFLCIO v. DOL*,
 778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................................30, 35, 43

*AFSCME v. Soc. Sec. Admin*,
 771 F. Supp. 3d 717 (D. M.D. 2025) ...........................................................................................43

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
 321 F.3d 1166 (D.C. Cir. 2003) ............................................................................................32, 33

*Ala. St. Conf. of the NAACP v. Marshall*,
 746 F. Supp. 3d 1203 (N.D. Ala. 2024) ......................................................................................28

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
 786 F. Supp. 3d 647 (S.D.N.Y. 2025) ........................................................................................36

*Am. Freedom L. Ctr. v. Obama*,
 821 F.3d 44 (D.C. Cir. 2016) .......................................................................................................11

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
 570 U.S. 1 (2013) ...........................................................................................................................3

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .....................................................................................................................11

*Autor v. Pritzker*,
 740 F.3d 176 (D.C. Cir. 2014) .....................................................................................................11

*Aviel v. Gor*,
 No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) .........................................................30

*Babbitt v. Farm Workers*,
 442 U.S. 289 (1979)......................................................................................................................14

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)......................................................................................................................11

*Bennett v. Spear*,
 520 U.S. 154 (1997)......................................................................................................................23

*Britt v. Naval Investigative Serv.*,
 886 F.2d 544 (3d Cir. 1989).........................................................................................................39

*Caicedo v. DeSantis*,
   No. 6:23-cv-2303, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024)............................................13

*California v. Trump*,
   805 F. Supp. 3d 387 (D. Mass. 2025) ........................................................................................1

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996).................................................................23, 29, 32, 35, 43, 44

*Common Cause v. Trump*,
   506 F. Supp 3d 39 (D.D.C. 2020).............................................................................................18

*Count Us In v. Morales*,
   No. 1:25-cv-00864, 2025 WL 4710017 (S.D. Ind. 2025).........................................................28

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008)..................................................................................................................27

*Ctr. for Taxpayer Rts. v. IRS*,
   815 F. Supp. 3d 1 (D.D.C. 2025)..............................................................................................43

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)..................................................................................................................44

*Dem. Party of Va. v. Brink*,
   599 F. Supp. 3d 346 (E.D. Va. 2022) .......................................................................................28

*Democracy N.C. v. Hirsch*,
   No. 1:23-cv-878, 2024 WL 1415113 (M.D. N.C. Apr. 2, 2024)..............................................28

*El-Ganayni v. U.S. Dep't of Energy*,
   591 F.3d 176 (3rd Cir. 2010) ...................................................................................................14

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)............................................................................................................12, 14

*Fed. Educ. Ass'n v. Trump*,
   795 F. Supp. 3d 74 (D.D.C. 2025) ......................................................................................29, 36

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022)...................................................................................................36

*Fla. St. Conf. of NAACP v. Lee*,
   566 F. Supp. 3d 1262 (N.D. Fla. 2021).....................................................................................28

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) (Scalia, J., concurring) ......................................................................29, 44

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010)............................................................................................................31

*GameFly, Inc. v. Postal Regul. Comm'n*,
  704 F.3d 145 (D.C. Cir. 2013) ...........................................................................................34

*Georgia v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) .............................................................................................4

*Get Loud Ark. v. Thurston*,
  748 F. Supp. 3d 630 (W.D. Ark. 2024)...............................................................................13

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)...............................................................................................35

*Harmon v. Brucker*,
  355 U.S. 579 (1958)............................................................................................................44

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)............................................................................................................12

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)............................................................................................................15

*International Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983)............................................................................................17

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  784 F. Supp. 3d 76 (D.D.C. 2025)......................................................................................18

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)................................................................................................13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................................11

*LULAC v. Exec. Off. of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025)........................................11, 13, 17, 18, 19, 21, 22, 23, 29

*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025)..........................................1, 3, 4, 15, 16, 18, 25, 45

*LULAC v. Exec. Off. of the President*,
  No. 25-0952, 2026 WL 252420 (D.D.C. Jan. 30, 2026)........................................11, 23, 27, 38

*Luther v. Borden*,
  48 U.S. 1 (1849)..................................................................................................................24

v

*March for Our Lives Idaho v. McGrane*,
749 F. Supp. 3d 1128 (D. Idaho 2024) ...................................................................13

*Medellin v. Texas*,
552 U.S. 491 (2008).................................................................................................24

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024) .....................................................................41

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015).................................................................................22

*Myers v. United States*,
272 U.S. 52 (1926)...................................................................................................14

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....................................................................1, 14

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025) .................................................................................13

*Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv.*,
496 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................12, 34

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022)............................................................................35, 36

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
2026 WL 877779 (D.D.C. Mar. 31, 2026)...............................................................36

*New Mexico v. Musk*,
No. 25-CV-429 (TSC), 2026 WL 799635 (D.D.C. Mar. 23, 2026) ....................11, 36

*NPR v. Trump*,
2026 WL 877434 (D.D.C. Mar. 31, 2026)..........................................................18, 19

*NTEU v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974)................................................................................44

*Oregon v. Mitchell*,
400 U.S. 112 (1970)...................................................................................................3

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025).........................................................................18

*PFLAG, Inc. v. Trump*,
769 F. Supp. 3d 405 (D. Md. 2025).........................................................................30

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) ................................................................................17

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) ..................................................................................41

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*,
  2026 WL 1110616 (D.C. Cir. Apr. 24, 2026).........................................................30

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
  793 F. Supp. 3d 19 (D.D.C. 2025) ..........................................................................29

*Roudebush v. Hartke*,
  405 U.S. 15 (1972)......................................................................................................4

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..................................................................................................15

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..................................................................................................14

*Susman Godfrey LLP v. Exec. Off. of President*,
  789 F. Supp. 3d 15 (D.D.C. 2025) ..........................................................................18

*Texas v. White*,
  74 U.S. 700 (1868)....................................................................................................24

*Townsend v. United States*,
  236 F. Supp. 3d 280 (D.D.C. 2017) .........................................................................39

*Trump v. CASA*,
  606 U.S. 831 (2025)............................................................................................44, 45

*Trump v. New York*,
  592 U.S. 125 (2020)..................................................................................................21

*United States v. King County*,
  122 F.4th 740 (9th Cir. 2024) ..................................................................................16

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026)........................................................5

*Vote Forward v. DeJoy*,
  490 F. Supp. 3d 110 (D.D.C. 2020) ...................................................................27, 29

*Washington v. Trump*,
  814 F. Supp. 3d 1173 (W.D. Wash. Jan. 9, 2026) ...............................................1, 17

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
   784 F. Supp. 3d 127 (D.D.C. 2025) ...................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...............................................................................23, 24, 44

**Constitutions**

U.S. Const. amend. XVII ........................................................................................3

U.S. Const. Article I, § 2, cl. 1 ..............................................................................3

U.S. Const. Article I, § 4 ........................................................................................3

U.S. Const. art. I, § 8, cl. 7 ....................................................................................5

**Statutes**

5 U.S.C.
   § 552a(a)(7) ........................................................................................................38
   § 552a(b) ............................................................................................................37
   § 552a(e)(5) ........................................................................................................40
   § 552a(e)(6) ........................................................................................................40

39 U.S.C.
   § 101(a) ...........................................................................................................6, 32
   § 102(5) ...............................................................................................................33
   § 201 .......................................................................................................6, 30, 35
   § 202 ....................................................................................................................35
   § 202(a)(1) ........................................................................................................6, 30
   § 202(c) ............................................................................................................6, 30
   § 221.5(a)(3) .......................................................................................................30
   § 401(2) ............................................................................................................6, 31
   § 403(a) ............................................................................................................6, 33
   § 403(b)(1) ..........................................................................................................32
   § 403(c) ............................................................................................................6, 33
   § 404(e) ...............................................................................................................33
   § 404(e)(2) ............................................................................................................6
   § 501 .................................................................................................................7, 31
   § 502 .................................................................................................................7, 31
   § 502(a) ............................................................................................................7, 31
   § 503 .................................................................................................................7, 31
   § 504 .................................................................................................................7, 31
   § 505 .................................................................................................................7, 31
   § 3001 ..................................................................................................................33
   § 3002 ..................................................................................................................33
   § 3003 ..................................................................................................................33
   § 3004 ..................................................................................................................33

§ 3005.................................................................................................................33
§ 3006.................................................................................................................33
§ 3007.................................................................................................................33
§ 3008.................................................................................................................33
§ 3009.................................................................................................................33
§ 3010.................................................................................................................33
§ 3011.................................................................................................................33
§ 3012.................................................................................................................33
§ 3013.................................................................................................................33
§ 3014.................................................................................................................33
§ 3015.................................................................................................................33
§ 3016.................................................................................................................33
§ 3017.................................................................................................................33
§ 3018.................................................................................................................33
§ 3622.............................................................................................................7, 31
§ 3661(b).....................................................................................................7, 31, 34
§ 3661(c)...........................................................................................................34

52 U.S.C.
§ 20501(a)(3) ......................................................................................................4
§ 20501(b)(1) .....................................................................................................4
§ 20503...............................................................................................................4
§ 20504..........................................................................................................4, 25
§ 20505..........................................................................................................4, 25
§ 20505(a)(1) ......................................................................................................4
§ 20506..........................................................................................................4, 25
§ 20507.............................................................................................................25
§ 20507(a)(3) ....................................................................................................25
§ 20507(a)(4) .................................................................................................5, 25
§ 20507(b)(2) ......................................................................................................5
§ 20507(c)(2)(A)...........................................................................................25, 26
§ 20507(d) .....................................................................................................5, 25
§ 20508...............................................................................................................4
§ 20508(a)(2) ......................................................................................................4
§ 20508(b).........................................................................................................25
§ 20901...............................................................................................................5
§ 21083(a)(1)(A)............................................................................................5, 26
§ 21083(a)(1)(A)(i)............................................................................................26
§ 21083(a)(1)(A)(viii).......................................................................................26
§ 21083(a)(5)(B) ...............................................................................................26
§ 21145...............................................................................................................5

## Regulations

90 Fed. Reg. 48,948 (Oct. 31, 2025)...........................................................38, 39

90 Fed. Reg. 50,879 (Nov. 12, 2025)................................................................39

Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections," Exec. Order No. 14399, 91 Fed. Reg. 17,125 (Apr. 3, 2026) .......................................................................1, 9, 10, 13, 14, 15, 18, 19, 21, 22, 32, 33, 35, 37

**Court Rules**

LCvR 7(n)(1) ...............................................................................................................23

**Legislative Materials**

H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 1970 U.S.C.C.A.N. 3649 (1970) ............................30

**Other Authorities**

Adam Sella, *Postal Service, Already Under Pressure, Now Faces Trump's Mail Ballot Order*, N.Y. Times (Apr. 11, 2026), https://www.nytimes.com/2026/04/11/us/politics/postal-service-budget-mail-ballots.html.................................................................................................................21

U.S. Dep't of Homeland Sec., Privacy Impact Assessment for SAVE, DHS Ref. No. DHS/USCIS/PIA-006(d) (Oct. 31, 2025), https://perma.cc/4YV7-24NU........................41

**INTRODUCTION**

On March 25, 2025, President Trump signed an Executive Order directing the Election Assistance Commission ("EAC") to require Documentary Proof of Citizenship ("DPOC") from applicants registering to vote in federal elections. In multiple challenges to the order, three courts considered "whether the President, acting unilaterally, may direct changes to federal election procedures." *LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025); *California v. Trump*, 805 F. Supp. 3d 387, 394-95, 406-10 (D. Mass. 2025); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1215-17 (W.D. Wash. Jan. 9, 2026). Each answered with a resounding no. The Constitution does not give the President that authority. *See, e.g.*, *LULAC*, 808 F. Supp. at 41.

A year later, on March 31, 2026, the President tried again with a second Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections," Exec. Order No. 14399, 91 Fed. Reg. 17125 (Apr. 3, 2026) (the "Order"). This time, the President purports to impose new federal election administration rules for mail voting and the compilation of so-called eligible voter lists—displacing those established by Congress and the states. But the constitutional defect is unchanged. The Elections Clause, the Qualifications Clause, the National Voter Registration Act ("NVRA"), and Help America Vote Act ("HAVA") all assign authority over federal election administration to Congress and the States—*not* to the President acting alone.

Defendants ask this Court to dismiss Plaintiffs' claims under Rule 12 by recasting the Order as merely aspirational and insufficiently concrete to injure anyone. *See* ECF No. 117-1 ("Fed. MTD"); ECF No. 77-3 ("States MTD"). But they ignore that "[a]gencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025). And the Order itself forecloses Defendants' characterization. In unequivocal terms, it directs the U.S. Department

of Homeland Security ("DHS") to compile and transmit federal voter-eligibility lists, directs the

U.S. Postal Service ("USPS") to establish federally controlled mail-ballot participation lists, and

makes the Postal Service the arbiter of who may receive and cast a mail ballot in federal elections.

The Order uses the word "shall" 21 times to mandate those outcomes. Defendants' public

statements also cast the Order as mandatory and immediately operative: federal agencies "will"

compile voter-eligibility lists, USPS "will" condition mail-ballot transmission on federally

controlled voter rolls, and existing procedures are "all going to go away."[1] Only in this litigation

have Defendants' counsel recast the Order as "contingent," "uncertain," and "speculative."

Meanwhile, Plaintiffs are suffering concrete injuries to their core organizational activities.

The Order is forcing them to overhaul their voter-assistance and vote-by-mail programs, including

revising their educational materials, retraining volunteers, preparing to assist an unprecedented

magnitude of wrongly excluded voters, and addressing the widespread confusion the Order's new

voting regime has created. Those operational burdens directly impair Plaintiffs' core missions.

Accepting Plaintiffs' allegations as true—as the Court must at this stage—Defendants' efforts to

characterize the Order's sweeping assertion of presidential authority as merely hypothetical fail.

The motions to dismiss under Rules 12(b)(1) and 12(b)(6) should therefore be denied.

## BACKGROUND

**I.      The Constitution Allocates Authority to Regulate Elections Between Congress and the States**

In two key provisions, the U.S. Constitution allocates power over election administration

to Congress and the states, assigning no role to the President. The Qualifications Clause governs

---

[1] ECF No. 123 at 9 (citing *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, White House: Fact Sheets (Mar. 31, 2026), https://perma.cc/23JE-ZKE9; *TRANSCRIPT: President Trump Signs an Executive Order on Elections, 3.31.26*, Senate Democrats: Newsroom (Mar. 31, 2026), https://perma.cc/V7HK-RXR7.)

"*who* may vote" in federal elections; the Elections Clause governs "*how* federal elections are held." *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 16 (2013).

*The Qualifications Clause.* The Qualifications Clause and the Seventeenth Amendment of the Constitution give States exclusive power to prescribe voter qualifications. *See* U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII. Each State determines who may vote in its federal elections based on the qualifications it has established in elections to its own most numerous legislative chamber. *See Oregon v. Mitchell*, 400 U.S. 112, 124-25 (1970) (opinion of Black, J.). "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *ITCA*, 570 U.S. at 17.

Removing the federal government from setting voter qualifications was a deliberate constitutional choice. "A Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Id.* (quoting 2 Records of the Federal Convention of 1787, p. 250 (M. Farrand rev. 1966)). "At the same time, by tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided rendering too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone." *Id.* (cleaned up) (citation omitted). The substantive determination of who is eligible to vote is thus a state function, rooted in state law and administered by state officials.

*The Elections Clause*. The Elections Clause empowers state legislatures to establish the "Times, Places and Manner of holding Elections," subject to Congress's ability to "make or alter such Regulations." U.S. Const. art. I, § 4; *see ITCA*, 570 U.S. at 7-8. In this two-tiered structure, the Clause vests authority to run elections "first in the States," and then "assigns Congress the power to preempt State regulations." *LULAC*, 808 F. Supp. 3d at 42. This design was also "the

3

product of carefully considered compromises among our Constitution's Framers." *Id.* at 44. The Framers "'submitted the regulation of elections for the federal government, in the first instance,' to the States, where it would 'be both more convenient and more satisfactory.' But they 'reserved to [Congress] a right to interpose' regulations of its own where the need arose." *Id.* at \*45 (quoting Federalist No. 59).

The President is "conspicuous[ly] absen[t]" from both the Qualifications and Elections Clauses. *Id.* The Clauses give states "initial authority to regulate elections" and Congress "supervisory authority over those regulations"; the President "does not feature at all." *Id.* Instead, the Clause "empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)).

## II.     The NVRA and HAVA Allocate Election Administration Authority Between the States and Federal Agencies

Congress has exercised its Elections Clause authority to enact federal laws that regulate election administration: the NVRA and HAVA. Neither Act provides any role for the President.

***The NVRA.*** Congress enacted the NVRA to establish uniform procedures for registering to vote in federal elections and to "increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(a)(3), (b)(1). The Act requires each state to establish procedures for registering voters in federal elections by mail, at motor vehicle agencies, and at other state offices. *Id.* §§ 20503-20506. States must "accept and use" a uniform federal registration form (the "Federal Form") developed and maintained by the EAC. *Id.* §§ 20505(a)(1), 20508. The EAC, in consultation with the States, prescribes the Federal Form, including what information applicants must provide to establish their eligibility. *Id.* § 20508(a)(2).

The NVRA also makes States responsible for maintaining voter registration rolls. Section 8 requires each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or change of residence. *Id.* § 20507(a)(4). But the statute constrains how States may do so. States may not remove a registrant from the rolls solely for failure to vote. *Id.* § 20507(b)(2). Before removing a registrant on grounds of changed residence, a State must follow a prescribed notice-and-waiting procedure: the registrant must be sent a confirmation notice and be given the opportunity to respond, and removal may not occur until the registrant fails to respond and fails to vote in two consecutive general federal elections. *Id.* § 20507(d).

***HAVA.*** HAVA builds on the NVRA by establishing requirements for statewide voter registration systems. *Id.* §§ 20901-21145. HAVA directs each state to implement a "single, uniform, official," statewide voter registration list that is "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). The list must contain the name and registration information of every legally registered voter in the state, assign each registrant a unique identifier, and serve as the "official voter registration list for the conduct of all elections for federal office in the State." *Id.* The states implement, define, maintain, and administer the lists. HAVA also created the EAC, "an independent bipartisan commission established with the goal of strengthening electoral resilience." *United States v. Weber*, 816 F. Supp. 3d 1168, 1190 (C.D. Cal. Jan. 15, 2026).

III. **The Postal Service's Statutory Structure Confirms Its Independence from Presidential Control**

Congress has long exercised exclusive authority "[t]o establish Post Offices and post Roads" by enacting comprehensive statutes governing the Nation's postal system. U.S. Const. art. I, § 8, cl. 7. In the Postal Reorganization Act of 1970 ("PRA"), Congress fundamentally restructured that system, abolishing the cabinet-level Post Office Department and replacing it with

the modern Postal Service, "an independent establishment of the executive branch." 39 U.S.C. § 201. Congress deliberately removed the postal system from direct political control and insulated decisions about nationwide mail service from presidential command.

To accomplish that goal, Congress vested USPS's authority in a Board of Governors, *not* the President. The Board consists of nine Governors appointed by the President with Senate confirmation, together with the Postmaster General and Deputy Postmaster General. *Id.* § 202(a)(1). The Governors serve staggered terms, are subject to bipartisan composition requirements, and may be removed only for cause. *Id.* The Board appoints the Postmaster General, the chief executive of USPS. *Id.* § 202(c). The statute further provides that the Board "[shall] exercise of the power of the Postal Service"; the Board reviews policies, and controls expenditures, while the Postmaster General exercises operational authority as directed by the Board. *Id.* § 202(a)(1). Congress thus mandated independent, not Presidential, control of USPS.

Congress also specified USPS's mission and defined its authority. USPS must provide "prompt, reliable, and efficient" mail service to "all communities" and "bind the Nation together" through transmission of mail. *Id.* § 101(a). It must "serve as nearly as practicable the entire population of the United States." *Id.* § 403(a). And consistent with that universal-service mandate, Congress imposed a strict nondiscrimination rule: USPS "shall not, except as specifically authorized," make "any undue or unreasonable discrimination among users of the mails." *Id.* § 403(c). Although USPS may adopt rules "necessary in the execution of its functions," *id.* § 401(2), those functions include only the collection, transportation, and delivery of mail—not the regulation of elections. Indeed, Congress *restricted* USPS's ability to provide nonpostal services, allowing such activities only where *Congress* has expressly authorized them. *See id.* § 404(e)(2).

Congress imposed further safeguards to prevent USPS from unilaterally implementing sweeping nationwide policy changes. The Postal Accountability and Enhancement Act ("PAEA") assigns regulatory oversight to a separate, independent body: the Postal Regulatory Commission ("PRC"). *Id.* §§ 501-505. The PRC is composed of presidentially appointed, Senate-confirmed Commissioners who serve fixed terms and are removable only for cause. *Id.* § 502(a). Congress charged the PRC—not USPS—with authority to review rates, classifications, and significant changes to postal services. *See id.* § 3622. Congress also required USPS, when proposing a change that would "generally affect service on a nationwide or substantially nationwide basis," to first submit that proposal to the PRC and obtain an advisory opinion after a public, on-the-record proceeding. *Id.* § 3661(b)-(c). That requirement is designed to ensure that major changes to the operation of the Nation's mail system are subject to independent review and public participation.

Congress established the USPS as an independent establishment with powers exercised by a bipartisan Board, not the President. *See* Compl. ¶¶ 73-76, *NAACP v. Trump*, Case No. 1:26-cv-01151-CJN (ECF No. 1) ("Compl."). Its authority is limited to neutral mail delivery. And significant policy changes require independent PRC review through procedures Congress prescribed. *Id.* ¶¶ 77-79. Nothing in that framework authorizes the President to direct USPS rulemaking, dictate its substance and outcome, or change nationwide postal operations.

## IV.     President Trump's Crusade to Take Over Election Administration

President Trump has long sought to impose the restrictions on mail-in voting announced in the Order. He has criticized mail voting since his first term, Compl. ¶¶ 90-91, and has escalated his calls to restrict mail voting in his second term, including his declaration that he would regulate mail voting "whether approved by Congress or not!" *id.* ¶ 96. The President signed the Order after failing to convince Congress to adopt legislation imposing his policies. *Id.* ¶¶ 98-101.

7

The President has repeatedly made inaccurate statements about mail voting and overstated his authority to address it. In August 2025, the President claimed that "States are merely an 'agent' for the Federal Government in counting and tabulating votes," and announced that he would be leading "a movement to get rid of MAIL-IN BALLOTS" by "signing an EXECUTIVE ORDER" to "bring HONESTY to the 2026 Midterm Elections." *Id.* ¶ 93. He even emphasized the political valence of his opposition to mail voting, claiming that Democrats are virtually unelectable without "using this completely disproven Mail-In SCAM." *Id.*

The President increased the pressure on Congress to regulate mail-in voting. In his February 2026 State of the Union address, President Trump repeated his view that mail voting is "crooked," and called on Congress to address mail voting and other election administration practices by adopting the SAVE Act. *Id.* ¶¶ 96-97. Then, on March 8, 2026, President Trump declared that he would "not sign other Bills until" the SAVE Act was passed, and encouraged Congress to "GO FOR THE GOLD" by passing a version of the bill with mail-voting prohibitions, "NOT THE WATERED DOWN VERSION." *Id.* ¶ 98. On March 12, 2026, he "urgently call[ed] on Congress to pass the SAVE America Act immediately and safeguard America's elections from illegal voting," and repeated his unsubstantiated claim that "Voting by mail increases the risk of fraud." *Id.* ¶ 99. Despite this pressure, Congress has not adopted the proposed legislation. *See id.* ¶ 100. The President issued the Executive Order on March 31, 2026, just five days after the Senate, for the second time in less than a week, refused to advance the SAVE Act. *Id.* ¶ 101.

## V.    The Executive Order Purports to Impose Sweeping Changes to Voter Qualification Verification and Mail-In Voting

The Order sets forth an elaborate federal superstructure with three interlocking components for regulating mail voting. Under the Order, and contrary to the Constitution, the Executive Branch decides who is eligible to vote by mail, allows mail-in ballot delivery only to those privileged

voters it has anointed, and then threatens to punish states, state and local election officials, and private organizations that distribute ballots to voters it deems ineligible to vote.

The *"State Citizenship List."* Section 2 of the Order directs DHS to compile and transmit to each State a "State Citizenship List" identifying persons it has determined to be U.S. citizens who will be at least 18 by "an upcoming Federal election" and who reside in that State. Compl. ¶¶ 105, 107;  Order § 2(a). DHS is to derive the list from databases reflecting federal citizenship and naturalization, Social Security Administration ("SSA") records, the databases comprising SAVE, and other federal databases.  Order § 2(a). DHS must to update and transmit the State Citizenship List at least 60 days before each regularly scheduled federal election. DHS also must create unspecified procedures permitting individuals to access and correct their records and States to suggest modifications. *Id.* The Order clarifies that, due to other state and federal requirements, inclusion on the list does not establish voter registration. *Id.*

The *"Mail-In and Absentee Participation" List.* Section 3 of the Order directs the Postmaster General to initiate rulemaking within 60 days (*i.e.*, by May 30, 2026) to establish uniform standards for mail-in and absentee ballots transmitted through USPS. Compl. ¶¶ 110-11; Order § 3(b). The proposed rule must institute a process for enrolling voters in mail voting and requires USPS to create state-specific "Mail-In and Absentee Participation" lists.  Order § 3(b)(iv). The rule must direct states to provide USPS, at least 60 days before an election, a list of eligible voters to whom it plans to issue mail ballots. *Id.* § 3(b)(ii). The rule must also require outbound ballot mail to be sent in envelopes marked as official election mail, bearing a unique Intelligent Mail barcode or successor technology corresponding to each individual, and subject to USPS design review. *Id.* § 3(b)(i). The rule must provide a way for states to notify USPS of their intent to use USPS for mail-in or absentee ballots, to submit lists of eligible voters to receive such ballots,

and to obtain from USPS State-specific Mail-In and Absentee Participation lists and unique ballot-envelope identifiers. *Id.* § 3(b)(iv). The rule must prohibit USPS from transmitting ballots from anyone not on USPS's State-specific Mail-In and Absentee Participation list, even if they are on the list generated by the State. *Id.* § 3(b)(iii). The final rule must issue within 120 days (*i.e.*, by July 29, 2026)*. Id.* § 3(d). No notification or cure processes are specified for voters improperly excluded from the USPS's State-specific list.

*The Enforcement Provisions.* Three separate Sections of the Order use threats to individuals, organizations, and states to force them to comply with the new federal procedures. Section 2(b) of the Order directs the Attorney General ("AG") to prioritize investigations and potential prosecutions of state and local officials, private entities, and others involved in issuing, producing, shipping, or distributing federal ballots to persons deemed ineligible to vote in federal elections. Compl. ¶ 108. Section 4 requires DHS, SSA, USPS, and the Commerce Department to coordinate implementation, directs the AG to enforce the federal statutes it invokes and issue guidance, and requires DHS and SSA to build infrastructure for compiling and transmitting the State Citizenship List. *Id.* ¶ 112. Section 5 directs the AG and agency heads to take all lawful steps to address asserted noncompliance, including withholding of funds where independently authorized by law and referrals for possible criminal investigation. *Id.* ¶ 14. Even beyond the chill these directives will impose on state and local election officials, *see* ECF No. 54-10 at 51-52 (McDonald Dec.), the enforcement provisions potentially expose individuals and organizations to investigation and prosecution if they help a person obtain a ballot who turns out to be ineligible to vote based on the federal lists. *See id.* ¶¶ 21, 35, 142, 144. Organizations and volunteers usually do not know, and in some states cannot inquire, whether a voter is eligible to receive a ballot. *See, e.g.*, ECF 54-4 ¶ 12 ("Giddings Decl."); ECF 54-9 ¶¶ 17, 21 ("Albright Decl.").

**STANDARD OF REVIEW**

**Rule 12(b)(1).** A motion to dismiss for lack of subject-matter jurisdiction is reviewed under Rule 12(b)(1). Plaintiffs bear the burden of establishing jurisdiction. *New Mexico v. Musk*, No. 25-CV-429 (TSC), 2026 WL 799635, at *2 (D.D.C. Mar. 23, 2026). In determining whether Plaintiffs have met that burden at the pleading stage, "the court is 'required to accept as true all of the factual allegations contained in the complaint.'" *Id.* (quoting *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016)); *see also LULAC*, 780 F. Supp. 3d at 171-72.

**Rule 12(b)(6).** To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, too, the Court must "accept[] as true all of the factual allegations contained in the complaint and draw[] all inferences in favor of the nonmoving party." *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014).

**ARGUMENT**

**VI.     The Court Should Deny Defendants' Motions Under Rule 12(b)(1)**

    **A.     Plaintiffs Have Standing to Challenge §§ 2(a), 3(b), 4(a), and 4(c)**

Article III standing requires Plaintiffs to plausibly allege "'injury in fact' that is 'concrete and particularized,' 'actual or imminent,' and 'fairly … trace[able] to the challenged action of the defendant,' which 'likely' will be 'redressed by a favorable decision.'" *LULAC*, 780 F. Supp. 3d at 178 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561.

    **1.     Plaintiffs Have Adequately Pled Organizational Standing**

Plaintiffs have organizational standing when challenging conduct that "directly interfere[s] with their core activities, such as direct services programs." *LULAC v. Exec. Off. of the President*,

No. 25-0952, 2026 WL 252420, at *21 (D.D.C. Jan. 30, 2026) (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394-96 (2024)). The need to "drain [] the organization's resources" to "counteract" the defendants' unlawful conduct is a "concrete and demonstrable injury" sufficient for standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Plaintiffs have plausibly alleged organizational standing in two ways. First, the Order is imposing concrete burdens that interfere with several of their core activities. *See* Compl. ¶¶ 17-23 (NAACP), 24-29 (Common Cause); 30-35 (BVM). Each organization's core activities include voter registration, facilitating mail voting, and providing voter assistance, as well as voter education regarding state-based voter eligibility and voter protection initiatives. *See id.* ¶¶ 18-19, 23, 26, 28, 30-33. Plaintiffs assist many members and voters who rely on mail ballots to be able to vote at all. *See id.* ¶¶ 19, 28, 33. These mail ballot programs range in every jurisdiction from peer-to-peer educational campaigns, to providing mail ballot request forms to voters at their request in long-term care facilities, correctional facilities, and on college campuses, to requesting and transmitting emergency ballots, to the direct ballot assistance to mail-in voters, to transporting voters to ballot boxes. *See* ECF 54-1 ¶ 12 ("Sterling Decl."); ECF No. 54-3 ¶ 16 ("Nunez Decl."); Albright Decl. ¶ 12. For NAACP, this latter version of mail-in ballot programs specifically responded to prior USPS policies impacting 2020 mail ballots and remains an active part of its program today. *See Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 12 (D.D.C. 2020); Declaration of Carmen Watkins at ¶¶ 8-11, *Nat'l Assoc. for the Advancement of Colored People v. United States Postal Serv.*, No. 1:20-cv-02295 (D.D.C. Sept. 1, 2020), ECF 8-2 (discussing programs in Georgia, Florida, and Ohio).

As long as the Order is in effect, Plaintiffs must prepare for the upcoming elections under its specter and plan for massive disruption to their mail voting programs, and respond to greater

demand for their voter assistance programs. For example, the Order mandates creation of State Citizenship and USPS Mail-In and Absentee Voting Lists that directly affect voters' ability to vote by mail. Order §§ 2(a), 3(b)(iii)-(iv). The NAACP already is diverting resources from other activities in order to update its mail voting informational materials, educate voters on their privacy rights and the Order's new mail voting requirements, and prepare to help voters determine whether they have been wrongly excluded from the new federal lists the Order mandates (*see* Order §§ 2(a), 3). *See* Compl. ¶ 20; Sterling Decl. ¶ 16. To maintain its level of service to voters, Common Cause is responding similarly by directing resources to develop new trainings and voter education materials about voters' options if they are excluded from the new federal lists. *See* Compl. ¶ 29; Nunez Decl. ¶ 16. BVM is already working to increase its volunteer base and develop resources for mail voters as they field questions from voters about their eligibility and ability to vote by mail under the Order. *See* Albright Decl. ¶¶ 18-19. These are precisely the kinds of core-mission impacts that courts across the country have held establish standing. *See, e.g.*, *LULAC*, 780 F. Supp. 3d at 188-89; *Nairne v. Landry*, 151 F.4th 666, 680-82 (5th Cir. 2025); *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024); *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1138-39 (D. Idaho 2024); *Caicedo v. DeSantis*, No. 6:23-cv-2303, 2024 WL 4729160, at *4-5 (M.D. Fla. Nov. 8, 2024). Indeed, the Order has already made it materially more difficult for Plaintiffs to accomplish their core missions of educating voters about vote-by-mail procedures, supporting voter participation, and assisting voters in upcoming elections. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

State Defendants' assertion that *Alliance for Hippocratic Medicine* compels a contrary conclusion (States MTD at 19-21) is simply incorrect. That case held that injury to "abstract social interests" could not confer standing but upheld the well-established doctrine of *Havens Realty* that

impacts to an organization's core service-related activities constitutes an injury for standing purposes. *AHM,* 602 U.S. 394-395. Plaintiffs' injuries here are quintessential *Havens* injuries: direct disruption to Plaintiffs' core services of voter assistance and education.

Second, the Order's threat of prosecution imposes a serious chilling effect on Plaintiffs' activities. The Order directs the AG to prioritize investigations and prosecutions of "private entities" who "aid and abet" the "distribution of ballots" to people deemed ineligible to vote. Order §§ 2(b), 5. Plaintiffs' core missions include assisting mail voters, who may be wrongfully deemed "ineligible" to vote due to inaccurate federal data. *See* Compl. ¶¶ 19, 27, 119-38. The Order's broad enforcement mandate puts Plaintiffs in the crosshairs even for legal conduct, significantly chilling volunteer participation, voter registration, and voter assistance efforts. *Id.* ¶¶ 21, 35, 142; *see also* Nunez Decl. ¶ 20; Giddings Decl. ¶¶ 15-17. Plaintiffs are not required to wait for criminal prosecution to establish standing to challenge it. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Plaintiffs' injuries are neither speculative nor remote. "Agencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." *N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 310; *El-Ganayni*, 591 F.3d at 190 n.9 (similar) (citing *Myers v. United States*, 272 U.S. 52, 132–34 (1926)). The Order is already sowing confusion among Plaintiffs' members regarding citizenship verification, continued voter eligibility, and the availability of vote-by-mail procedures. *See* Compl. ¶¶ 142, 169, 172; Sterling Decl. ¶ 14; Nunez Decl. ¶ 16; ECF 54-5 ¶¶ 9-10 ("Lomax Decl."); ECF 54-7 ¶¶ 12-13, 15 ("Balan Decl."); ECF 54-8 ¶¶ 11-12 ("Freeman Decl."). And because the Order's new eligibility lists will rely on fundamentally flawed and inaccurate federal databases that omit millions from the list of citizens and misclassify citizens as noncitizens, Plaintiffs must immediately divert additional resources to

14

preparing to assist voters who will be wrongly excluded from the federal lists. *See, e.g.*, Compl. ¶¶ 5, 20, 29, 105, 134-35; Sterling Decl. ¶ 16; Nunez Decl. ¶¶ 13, 16; Giddings Decl. ¶ 18; Albright Decl. ¶¶ 18, 20-21.

### 2.     Plaintiffs Have Likewise Pled Associational Standing

Associational standing is "always available to a 'voluntary membership organization with identifiable members' that 'represents [its members] in good faith.'" *LULAC*, 808 F. Supp. 3d at 55 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)). Plaintiff organizations can establish associational standing by showing "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization[s'] purpose; and (c) neither the claim asserted nor the relief requested requires" individual members to participate in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs NAACP and Common Cause are voluntary membership organizations with identifiable members. *See* Compl. ¶¶ 17, 27; Sterling Decl. ¶¶ 5-6; Nunez Decl. ¶¶ 4-5. Many of their members who rely on mail voting face the harm of being denied mail ballots based on erroneous (and likely) exclusion from the Order's mandated voter eligibility lists for the upcoming elections, leaving them disenfranchised. *See* Order, § 2(a), 3(b)(iii)-(iv); Compl. ¶¶ 19, 28; Balan Decl. ¶¶ 2, 5-8, 10-15; Freeman Decl. ¶¶ 4-6, 8, 11-15; ECF 54-2 ¶¶ 4, 7, 11-20 ("Braggs Decl."); ECF 54-6 ¶¶ 5-9, 11, 14-16 ("Howard Decl."). As discussed, voter assistance and registration are NAACP's and Common Cause's core activities, and the organizations are well-equipped to represent their members who will be affected in similar fashion.

Additionally, these members suffer injury from Privacy Act violations based on the unconsented use and sharing of their personal information. *See* Compl. ¶ 116; Howard Decl. ¶¶ 18-19; Balan Decl. ¶¶ 17-18; Freeman Decl. ¶¶ 10, 13, 16. These injuries relate directly to Plaintiffs'

core voter protection and assistance activities. *See, e.g.*, Giddings Decl. ¶ 20. Plaintiffs have thus pled associational standing.

### 3.    Plaintiffs' Injuries Are Traceable and Redressable

Defendants' cursory traceability and redressability arguments fail. The Federal Defendants (at 18, 21) offer nothing more than a statement that redressability and traceability are not met, and the State Defendants (at 13-16, 18-19, 23) do little more. Confronting a similar challenge, the *LULAC* court squarely rejected this argument. *LULAC*, 808 F. Supp. 3d at 62-63 ("Because each of the Plaintiffs' asserted injuries flows from the 'predictable effect' that a burdensome new federal requirement for voter registration will have on eligible voters' behavior, those injuries satisfy the traceability requirement."). Omissions from lists resulting in eligible voters being excluded from voter rolls or prevented from receiving mail ballots are directly traceable to the Order's mandates. For example, USPS would transmit voters' mail ballots, regardless of inclusion on the federal list, if the Order did not prohibit USPS from transmitting them. *See* Compl. ¶¶ 4, 111, 140. Similarly, Plaintiffs would not have to expend resources refashioning their voter outreach and assistance programs, re-training staff and volunteers, updating materials nationwide, and supporting impacted voters and their members absent the Order's directives. *See id.* ¶¶ 20, 23, 29, 141; Sterling Decl. ¶¶ 16-17; Nunez ¶ 16; Albright Decl. ¶¶ 18-21.

Whether "optional" or required, the State Defendants' willingness to effectuate the Order alongside the Federal Defendants is of no consequence for traceability. *See United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) ("Traceability may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." (quotation omitted)). That some states contract to access DHS data does not license Federal Defendants under the Order to expand its data dissemination or force it upon other states. Nor does any existing data-

sharing occur in reference to mail ballots. Any data-sharing by states cannot, in any case, resolve the impacts of the widespread, undisputed omissions of citizenship status and erroneous identification of noncitizens in the SSA and SAVE databases. *See* Compl. ¶¶ 5, 105, 133-38. Defendants do not meaningfully dispute Plaintiffs' evidence that the federal databases underlying the Order's mandated eligibility lists contain omissions and widespread inaccuracies that will predictably exclude eligible voters from voting by mail.

An injunction preventing implementation of the challenged provisions would eliminate the source of Plaintiffs' injuries. Redressability and traceability require no more. *See International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 811 (D.C. Cir. 1983) ("[Plaintiffs] need not negate every conceivable impediment to effective relief no matter how speculative," and are not required "to *prove* that granting the requested relief is certain to alleviate their injury" (quotation omitted)); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1200 (W.D. Wash. 2026) (holding that redressability is satisfied when an injunction "would eliminate the need for Plaintiffs to make changes to their voter registration systems and implement voter education campaigns, thereby eliminating their proprietary harms").

## B.    Plaintiffs' Claims Are Ripe

Plaintiffs' claims are ripe because the Order's directives are already causing them injury. *See LULAC*, 780 F. Supp. 3d at 173 (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020)); *see also supra* at Section VI(A)(1)-(2) (describing the present injuries to Plaintiffs). Plaintiffs also prevail under the two-part balancing test for prudential ripeness because the Order plainly "dictate[s] particular outcomes" and delaying review will cause hardship to plaintiffs. *LULAC*, 780 F. Supp. 3d at 174-75 (citation omitted).

*LULAC* is directly on point. There, the court ruled that the claims were ripe due to substantially identical language from the prior executive order "state[d] [a] mandate in no

uncertain terms" and "dictate[d] the precise contours of the mandated requirement." 780 F. Supp. 3d at 184. The order in *LULAC* stated that "it is hereby *ordered* [that]: ... the [agency] *shall* take appropriate action to *require* ... documentary proof of citizenship' on the Federal Form." *Id.* (quoting  Order 14,248 § 2(a)(i)(A)). The Order here likewise states that the DHS Secretary "*shall* take appropriate action to compile and transmit [State Citizenship Lists] to the chief election official of each State," and the Postmaster General "is *hereby directed* to initiate a proposed rulemaking ... within 60 days of the date of this order," which "*shall* include" the Order's "[p]roposed provisions."  Order §§ 2(a), 3(b); Compl. ¶¶ 119, 187. The *LULAC* court found the plaintiffs' *ultra vires* claim ripe for review as such. *See* 780 F. Supp. 3d at 185-86. Courts regularly adjudicate claims challenging the implementation of executive orders at similar stages. *See NPR v. Trump*, 2026 WL 877434, at *17-20 (D.D.C. Mar. 31, 2026); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 40-41 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 147 (D.D.C. 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 111-12 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 148-49 (D.D.C. 2025).

Defendants' contrary arguments rely heavily on boilerplate language directing actions "[t]o the extent feasible," § 2(a), and "consistent with applicable law," *id.*, claiming that the Order is "riddled with contingencies and speculation that impede judicial review," Fed. MTD 27; *see also, e.g.*, *id.* at 20, 24-26; States MTD 24, 28-29. That language does not insulate the Order from challenge—and it is conspicuously absent from § 3's directives to USPS. Moreover, it is well-established that executive orders "cannot be held to destroy themselves through savings clauses." *Common Cause v. Trump*, 506 F. Supp 3d 39, 53 n. 8 (D.D.C. 2020) (citation omitted); *see also LULAC,* 808 F. Supp. 3d at 78 (using a saving clause to protect the prior order from review was

"unworkable because it would strain the text of Section 2(a) [of the prior order] beyond recognition"); *Nat'l Pub. Radio, Inc. v. Trump,* No 25-1722, 2026 WL 877434, at *19 (D.D.C. March 31, 2026) (similar).

Here, the Order's clear language and concrete deadlines leave "no mystery" as to its effects. *LULAC,* 780 F. Supp. 3d at 184; *see* Order §§ 2(a) (creation and transmission of State Citizenship Lists 60 days before the next scheduled election); 3(a) (60 days from the date of the Order for USPS to propose rulemaking); 3(d) (USPS final rule due 120 days from the date of the order). The Order's saving clause conflicts with the immediate directions and actions the government must take under Order, rendering the clauses "meaningless." *LULAC*, 780 F. Supp. 3d at 176.

Defendants' own statements demonstrate that the saving clause language is performative at best. At the signing ceremony, White House Staff Secretary Will Scharf, Defendant Lutnick, and the President made clear what the Order is "going to do": "We're going to take federal data"; "ensure that each state's election officials are provided with a comprehensive view of who the eligible voters in their jurisdiction actually are"; and "order[] the Postmaster General, the U.S. Postal Service to take bold new measures to verify that ballots, both being sent to people are being sent to people who are eligible to vote, and then the ballots being returned are being properly returned by eligible voters only." ECF No. 123 at 9 (citing *TRANSCRIPT: President Trump Signs an Executive Order on Elections, 3.31.26*, Senate Democrats: Newsroom (Mar. 31, 2026), https://perma.cc/V7HK-RXR7.). Defendants emphasized that the Order predicates participation in mail voting on compliance with its unlawful scheme. *See, e.g.*, *id*. ("if [states] want to use the U.S. mail" to "run [] elections," then "they're going to get a [barcode] from the US Postal Service, and they're going to put that on the envelope, and we will have one envelope per vote"; the states' regular voting process is "all going to go away").

The White House Fact Sheet published with the Order is equally unequivocal: it repeatedly states that the Order "directs," "requires," and "ensur[es]" that DHS, SSA, and USPS will take the actions set forth in §§ 2(a), 3(b)-(d), and 4(c). For example, it states that "President Trump is taking *decisive action*" by "*direct[ing]* the Secretary of Homeland Security, in coordination with the Social Security Administration, to compile and transmit to each State a State Citizenship List." ECF No. 123 at 9 (emphasis added) (citing *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, White House: Fact Sheets (Mar. 31, 2026), https://perma.cc/23JE-ZKE9). The Fact Sheet further states that "[t]he lists *will be* updated and transmitted no fewer than 60 days before each regularly scheduled Federal election." *Id.* (emphasis added). And according to the Fact Sheet, "[t]he Order *directs* the Postmaster General to initiate rulemaking *to require* all mail ballots transmitted by USPS to be placed in secure ballot envelopes marked as Official Election Mail with unique Intelligent Mail barcodes that facilitate tracking," and it "*requires* the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List, *ensuring* that only eligible absentee or mail-in voters receive absentee or mail-in ballots." *Id.* (emphasis added). Any "contingencies" or "uncertainties" about the Order appear to have arisen only after Defendants appeared in court.

The government's own declarations submitted in opposition to the preliminary injunction confirm challenges to Section 3 of the Order are ripe. ECF. 106-4 ¶ 3 ("Monteith Decl.") (USPS is "currently" deliberating how to implement the unlawful Order). That alone is enough. Section 3(b) of the Order unequivocally (with no savings language) directs the USPS to issue regulations that violate federal statutes in myriad ways and in contravention of statutes that insulate USPS from presidential influence. The USPS' declaration confirms it has taken actions that succumb to

that prohibited influence. *See* ECF No. 106-3 ¶¶ 3-5 ("MacBride Decl."). Anything more the USPS does would only amount to further violations. That USPS has begun engaging with these directives—in clear contravention of the Postal Service's statutory limits—further underscores that this action is ripe.[2]

Defendants' reliance (at Fed. MTD 24-27; States MTD. 23-24) on *Trump v. New York*, 592 U.S. 125 (2020), therefore, is not on point. There, the order involved special issues arising from "pre-apportionment challenges," and depended on multiple layers of federal agencies' discretionary action, contingent events, and unknown methodologies for census calculations. *Id.* at 132-33. The Order here imposes concrete, mandatory directives on federal agencies with specific deadlines, including actions directed outside the federal government, tied to fast-approaching election days: the agencies "shall take appropriate action," to compile State Citizenship Lists that "shall be … transmitted" to States at least 60 days "before each regularly scheduled Federal election" (§ 2(a)), and USPS is "hereby directed" to initiate rulemaking to do specified, unambiguous, unlawful things "within 60 days" of the Order's issuance and to finalize that rule within 120 days. *Id.* § 3(a), (d). *Trump v. New York* is thus inapposite.

With election and Order deadlines fast approaching, the Order is injuring Plaintiffs now. The *LULAC c*ourt, confronting a similar challenge, recognized ripeness where present compliance burdens and operational disruptions exist well before final enforcement. *See LULAC*, 780 F. Supp. 3d at 184. Here, as there, Plaintiffs are currently operating and reacting as significant lead-time is

---

[2] Furthermore, Postmaster General David Steiner has confirmed in at least one interview that USPS intends to comply with the Order until or unless it is directed otherwise by the courts. *See* Adam Sella, *Postal Service, Already Under Pressure, Now Faces Trump's Mail Ballot Order*, N.Y. Times (Apr. 11, 2026), https://www.nytimes.com/2026/04/11/us/politics/postal-service-budget-mail-ballots.html ("'We deliver mail,' the postmaster general said, speaking in his office at the Postal Service headquarters in downtown Washington, 'so you want to tell us what the law means, we'll follow that.'"). This assertion directly rebuts Defendants' argument that the USPS may conclude it lacks legal authority to do so. *See* Fed. MTD 15; States MTD at 26-27.

necessary for their work to assist voters. *Supra* at 7. If Plaintiffs' work is to have any practical effect when the lists are created, that infrastructure must be in place long before the Order's deadline of 60 days prior to the election.  Order §§ 2(a), 3(b). The Order's text and deadlines, and Defendants' own admissions that they are "currently" taking steps to implement, it leave "no uncertainty about what it requires." *LULAC*, 780 F. Supp. 3d at 185. Plaintiffs' claims are ripe.

### C.      Plaintiffs' Claims Are Not Barred by Finality or Reviewability Principles

Defendants argue that Plaintiffs' claims are barred because the challenged Executive Order does not constitute final agency action, so no reviewable implementation has occurred. Fed. MTD 15-39; States MTD 28-32. Not so.

At the outset, five out of six of Plaintiffs' claims are not brought under the Administrative Procedure Act, and are not subject to establishing a final agency action. Defendants' reliance on *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015), is therefore misplaced. *Murray* involved a challenge to a proposed EPA rule that did not yet impose legal obligations and remained subject to change through the ordinary notice-and-comment process. *Id.* at 334-35. The D.C. Circuit repeatedly emphasized that the petitioners sought unprecedented judicial review of "a proposed rule," which was "still in flux," and whose contents had not yet been finalized. *Id.* at 334-35. This case is fundamentally different. Plaintiffs challenge neither a mere proposal nor speculative future agency action. They challenge the legality of the Executive Order itself—an immediately operative *presidential* directive that commands agencies to take specified actions, use specified databases, create specified voter-eligibility lists, transmit and receive voter eligibility lists to States, and implement specified election-administration procedures on fixed timelines. Unlike the proposed rule in *Murray*, the Order here "dictate[s] the precise contours of the mandated requirement." *LULAC*, 780 F. Supp. 3d at 184. *Murray* did not involve *ultra vires* claims, did not address whether an executive order that itself directs allegedly unlawful governmental action is

22

reviewable, and did nothing to displace the longstanding rule that it is. *See, e.g.*, *Youngstown*, 343 U.S. at 585; *LULAC*, 780 F. Supp. 3d at 171-73; *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332, 1338 (D.C. Cir. 1996).

Moreover, with regard to Plaintiffs' sole APA claim (Count VI), reviewable agency action has already occurred because Plaintiffs' Privacy Act allegations are predicated on unlawful interagency data sharing that has already taken place. An APA claim may proceed where DHS and SSA have *already* "shared data across agencies" as part of citizenship-verification efforts relating to voter eligibility. 2026 WL 252420, at *53. In *LULAC*, data were shared when SSA "began allowing DHS to access and query a Social Security database known as 'Numident' to help 'verify individuals' citizenship and immigration status for voter verification and other authorized inquiries.'" *Id.* at *14. Judge Kollar-Kotelly found such interagency disclosure of "sensitive records … 'final' because it clearly represents the 'consummation' of the agency's decision-making process and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* at *53 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Plaintiffs' challenge here likewise concerns the continued compilation, sharing, and repurposing of the same data as in *LULAC*, used now to create the State Citizenship List. Because the relevant data-sharing Plaintiffs seek to enjoin further uses a final agency action (impermissible data sharing) that has already taken place, their claims are not barred by finality or reviewability principles.[3] *See LULAC*, 2026 WL 252420, at *53.

---

[3] Federal Defendants have not filed the certified list of the contents of the administrative record required by Local Civil Rule 7(n)(1). That omission matters here because Plaintiffs' Privacy Act claim challenges not only future implementation of the Order but also prior agency action involving SSA's disclosure of Numident data to DHS. To the extent Federal Defendants seek dismissal on the ground that no reviewable agency action has occurred, the administrative record concerning these data transfers should have been filed "simultaneously with the filing of a dispositive motion." LCvR 7(n)(1). At minimum, the absence of that record provides another reason to reject Federal Defendants' premature finality argument at this stage.

**VII.    The Court Should Deny Defendants' Motions Under Rule 12(b)(6)**

**A.    Plaintiffs Have Plausibly Stated Their Constitutional Claims (Counts I-III).**

Plaintiffs have plausibly alleged that the Order is *ultra vires* (Count I), violates the Qualifications Clause and the Elections Clause (Count II), and violates the separation of powers (Count III) because it usurps the role the Constitution vests in Congress and the States. The President's power to issue this "order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution "allows the President to execute the laws, not make them." *Medellin v. Texas*, 552 U.S. 491, 532 (2008). Indeed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587. The President's "power to execute the laws starts and ends with the laws Congress has enacted." *Id.* at 633 (Douglas, J., concurring).

Here, Plaintiffs allege that the President has no constitutional or statutory power to issue the Order's directives. *See* Compl. ¶¶ 55-81, 113-18, 145-69; *see also supra* at Sections I & II. The Complaint's allegations describes the Order's lack of constitutional or statutory basis. *See id.* ¶¶ 1-16, 55-81, 104-18, 145-69. The Order omits any mention of the Qualifications and Elections Clauses, instead identifying only the Guarantee Clause without specifying which provisions of the Order that Clause purportedly justifies. The answer is none. The Supreme Court has long recognized that the "power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress." *Texas v. White*, 74 U.S. 700, 730 (1868). Under the Guarantee Clause, it "rests with congress to decide what government is the established one in a State." *Luther v. Borden*, 48 U.S. 1, 42 (1849). The Guarantee Clause grants the President no authority to impose election regulations the Constitution explicitly assigns to other actors. *See* Compl. ¶¶ 58-64, 147-49, 145-69.

As for statutory authority, the Order invokes the NVRA. But as the Complaint avers, the NVRA confirms that Congress placed responsibility for managing federal election administration *elsewhere. See* Compl. ¶¶ 65-71. For instance, the NVRA directs states to facilitate voter registration, and prescribes rules for states to maintain voter registration databases. 52 U.S.C. §§ 20504-20507. The Act makes the EAC responsible for the Federal Form. 52 U.S.C. § 20508(b). And the law identifies what information the EAC, working with states, may require on the Form. *Id.* The NVRA assigns no "responsibility … to the President or to any other individual in the Executive Branch with the power to act unilaterally," and thus cannot support the Order. *LULAC*, 808 F. Supp. 3d at 73; *see* Compl. ¶¶ 65-71, 151, 156.

The NVRA's list-maintenance provisions, in particular, conflict with the Order's regime. Compl. ¶¶ 67-71, 104-12, 156, 165-69. Section 8 of the NVRA assigns maintenance of voter registration lists to states, requiring each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). The Act identifies the permissible grounds for removal: a voter's request, death, change of residence, criminal conviction, or mental incapacity. *Id.* § 20507(a)(3)-(4). It requires notice to the voter and an opportunity to respond before removal based on change of residence. *Id.* § 20507(d). And it bars states from conducting systematic removal programs within 90 days of a federal election. *Id.* § 20507(c)(2)(A).

Under the Order, however, a citizen lawfully registered under state law, who has never been subject to any removal proceeding under NVRA Section 8, may nonetheless be denied a mail ballot because her name does not appear on DHS's State Citizenship List or USPS's state-specific list, whether due to a database error, an incomplete federal record, a name mismatch across agencies, or any other reason. *See* Compl. ¶¶ 5-13, 105-12, 119-44, 174-79, 203-12. The Complaint

explains that the Order bypasses the NVRA's procedural protections, stripping voters of their eligibility to vote by mail despite the NVRA's protections. *See* Compl. ¶¶ 107-12, 139-44, 165-69, 174-80. Moreover, the Order effectively requires states to participate in a systematic removal program less than 90 days before an election: after states send the USPS a list of mail-in voters *60 days before the election*, the Order directs USPS to send states a state-specific eligibility list that removes certain voters' mail-voting eligibility in violation of the NVRA. § 20507(c)(2)(A). The Order cannot claim support in the NVRA while waging war with its provisions.

The same is true for HAVA. *See* Compl. ¶¶ 67-69, 104-12, 156-59. The Order requires "each State, acting through the chief State election official," to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official … statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). This state-administered list "*shall* serve as the *single* system for storing and managing the official list of registered voters throughout the State," and "*shall* serve as the *official voter registration list* for the conduct of all elections for Federal office in the State." *Id.* § 21083(a)(1)(A)(i), (viii) (emphasis added). Although HAVA authorizes data-matching to verify voter information, the verification must occur through agreements between the state's election and motor vehicle authorities, with the Commissioner of Social Security participating only to validate applicants' driver's licenses and Social Security numbers. *Id.* § 21083(a)(5)(B).

The Order is irreconcilable with this framework. *See* Compl. ¶¶ 104-12, 119-44, 165-69, 174-80. For mail voting, the Order replaces HAVA's requirements of a "single," state-administered "official voter registration list" with separate federal lists compiled by DHS and transmitted to states by USPS. Instead of the limited, applicant-specific data-matching HAVA authorizes, the Order directs a wholesale compilation of federal citizenship and immigration

26

records into a mega-list of every adult citizen in each state, untethered from any individual voter's application or any state registration process. *Id.* ¶¶ 4-14, 67-69, 105-12, 119-44. Instead of the individualized state eligibility determination HAVA requires, the Order substitutes a federal diktat imposing a federally administered eligibility determination, based on a hodgepodge of federal databases and implemented by USPS. *See id.* ¶¶ 104-12, 119-44. At every turn, HAVA vests the authority to build, maintain, and adjudicate the accuracy of voter registration data in state officials operating under state law—and at every turn, the Order hijacks that authority.

No constitutional or statutory provision empowers the President to rewrite the rules for mail voting in federal elections—all authority is to the contrary. *See* Compl. ¶¶ 55-81, 113-18, 145-69. The Order is thus *ultra vires* and violates the constitutional separation of powers, as well as the specific constitutional provisions that assign authority over voting qualifications and processes to the states in the first instance. *See* Compl. ¶¶ 145-69. Defendants do not dispute that Plaintiffs have a cause of action to assert their claims under the Constitution. That is precisely what Counts I-III allege: "that the President has overstepped the constitutional separation of powers by purporting to exercise powers vested in Congress and the States." *LULAC*, 2026 WL 252420, at *26; *see* Compl. ¶¶ 145-69.

### B.      Plaintiffs Have Plausibly Stated Their *Anderson-Burdick* Claim (Count IV)

Plaintiffs sufficiently allege that the Order places burdensome restrictions on their constitutional right to vote. Courts assess these burdens under the *Anderson-Burdick* balancing test, "weigh[ing] the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (quoting *Burdick*, 504 U.S. at 434). *Anderson-Burdick* applies to federal policies that interfere with voters' ability to cast mail ballots. *See Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 123-24 (D.D.C. 2020). Section 3(b) directs USPS to initiate

27

rulemaking where "USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific" participation list. Its unambiguous, mandatory language evidences the President's goal: burden mail voters' right to vote by mail by excluding them from lists that the Order seeks to implement. Compl. ¶¶ 173-74.

*Anderson-Burdick* claims are fact-intensive inquiries that generally are not ripe for disposition at the motion to dismiss stage unless such claims may fail as a matter of law. *See Fla. St. Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021) ("[*Anderson-Burdick* test] is particularly difficult to apply at the motion to dismiss stage."); *Ala. St. Conf. of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1235 n.9 (N.D. Ala. 2024); *Dem. Party of Va. v. Brink*, 599 F. Supp. 3d 346, 360 (E.D. Va. 2022) (denying dismissal when plaintiffs' *Anderson-Burdick* claim alleged that fear of disclosing a full social security number due to identify theft burdened their right to vote); *Democracy N.C. v. Hirsch*, No. 1:23-cv-878, 2024 WL 1415113, at *9 (M.D. N.C. Apr. 2, 2024) (denying a motion to dismiss an *Anderson-Burdick* claim over a substantially similar undeliverable mail provision); *Count Us In v. Morales*, No. 1:25-cv-00864, 2025 WL 4710017, at *5 (S.D. Ind. 2025) (explaining that dismissing an *Anderson-Burdick* claim requires the court to "ignore [plaintiffs'] allegations explaining why those [voting] alternatives are more difficult for [a class of voters] to obtain").

Federal Defendants neither address nor seek dismissal of Plaintiffs' *Anderson-Burdick* claims. Plaintiffs have plausibly alleged that the voter eligibility lists will exclude eligible voters, including NAACP and Common Cause members, because of omissions, inaccuracies, and inherent limitations in the federal databases. *See* Compl. ¶¶ 19-20, 28, 82-83, 139-141, 175. These organizations and their members heavily rely on USPS for mail-in voting. *Id.* ¶¶ 19, 29, 32-34, 85-88. For them, "the postal service 'is literally the method by which the election is conducted.' [Such

28

a] USPS policy thus directly impacts and controls the ability of millions of citizens to have their vote counted." *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 123 (D.D.C. 2020) (citations omitted). Voter confusion will also be rampant because of these provisions, further burdening voters and already diverting Plaintiffs' resources to address those burdens. *Id.* ¶ 176.

And importantly, Section 3(b) seeks USPS interference with voters' ballots or that some voters will be omitted. "For tens of millions of voters this year, the postal service 'is literally the method by which the election is conducted.' [Such a] USPS policy thus directly impacts and controls the ability of millions of citizens to have their vote counted." *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 123 (D.D.C. 2020) (citations omitted). As intended, USPS is already deliberating on how—not if—to implement the Order. ECF 117-4 ("Monteith Decl.") ¶¶ 3-5. Enjoining Defendants from implementing the Order will prevent USPS from prohibiting the transmission of ballots. Compl. Prayer for Relief.  Defendants' vague claims of election integrity cannot and do not outweigh the severe burden the Order places on voters, and the dearth of evidence to support Defendants' proffered "purpose" for the Order should give this Court serious pause.

### C.        Plaintiffs Have Plausibly Stated Their Postal Claim (Count V).

Plaintiffs have a recognized *ultra vires* cause of action to assert that "presidential action … independently violates" the postal statutes, which "delegate[] no authority to the President." *Reich*, 74 F.3d at 1332. It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Id.* at 1328 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring)). "[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (quotation omitted). A legion of cases from this District and others have done so in similar circumstances. *See, e.g.*, *LULAC*, 780 F. Supp. 3d at 171-73; *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 86-88 (D.D.C. 2025); *Refugee & Immigrant Ctr. for Educ. &*

29

*Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 76 (D.D.C. 2025), *aff'd*, 2026 WL 1110616 (D.C. Cir. Apr. 24, 2026); *AFLCIO v. DOL*, 778 F. Supp. 3d 56, 89 (D.D.C. 2025); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 425-31 (D. Md. 2025).

Plaintiffs have adequately alleged that § 3(b) of the order is an unlawful *ultra vires* directive to the USPS (Count V). *See* Compl. ¶¶ 72-81, 181-92. Article I, Section 8 of the Constitution grants Congress exclusive authority over the Post Office. *See id.* Congress removed the Postal Service from presidential control and vested policymaking authority elsewhere. The PRA reconstituted the postal system as the modern Postal Service, an "independent establishment of the executive branch." 39 U.S.C. § 201. Congress's goal was to insulate postal operations from political direction and to set mail policy through independent, professionally managed processes—not presidential command. *See* H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 1970 U.S.C.C.A.N. 3649, 3654, 3661 (1970). Congress was unequivocal: "If the American public is to have the postal service that it expects and deserves, the Post Office must be taken out of politics and politics out of the Post Office." *Id.* at 3654.

Consistent with that purpose, Congress vested USPS's powers in its 11-member Board of Governors. *See* Compl. ¶¶ 72-81, 181-92. "The exercise of the power of the Postal Service" is expressly "directed by a Board of Governors" that reviews USPS policies and controls its expenditures. 39 U.S.C. § 202(a)(1). The Postmaster General, in turn, exercises operational authority only "as directed by the Board." *Id.* § 221.5(a)(3). Critically, the Postmaster General is not appointed by or removable by the President, but by the Board itself. *Id.* § 202(c). The President's role is limited to appointing Governors, subject to Senate confirmation and for-cause removal. *Id.* § 202(a)(1); *see Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *2 (D.C. Cir. June 5, 2025) (Katsas, J., and Pillard, J., concurring) (explaining that, where Congress created a similar

structure in which the President appointed board members who "in turn" appointed the CEO of a government body, the President had no power to remove the CEO); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 493, 509 (2010).

As the Complaint makes clear, this structure leaves no room for presidential directives to the Postmaster General. *See* Compl. ¶¶ 72-81, 181-92. The Order's instruction that the Postmaster General "initiate a proposed rulemaking" is thus not an exercise of supervisory authority; it is an attempt to reassert direct presidential control that Congress deliberately eliminated. *See id.* The Order's invocation of 39 U.S.C. § 401 does not alter that conclusion. Section 401 grants USPS—not the President—authority to "adopt, amend, and repeal such rules and regulations ... as may be necessary in the execution of its functions." *Id.* § 401(2). That provision simply confirms that rulemaking authority resides within USPS.

The Order fails for the additional reason that it disregards Congress's allocation of regulatory authority to a separate, independent body: the PRC. *See* Compl. ¶¶ 72-81, 181-92. Congress assigned the PRC—not USPS and not the President—the responsibility for overseeing rulemaking and significant changes to postal services. 39 U.S.C. §§ 501-505, 3622. When USPS proposes a change that would "generally affect service on a nationwide or substantially nationwide basis," it must first submit that proposal to the PRC and obtain an advisory opinion following a public, on-the-record proceeding. *Id.* § 3661(b)-(c). The PRC, in turn, is an independent, bipartisan establishment composed of Commissioners appointed by the President with Senate confirmation, serving fixed terms and removable only for cause. *Id.* § 502(a). Congress ensured that major changes to the Nation's mail system would occur only after independent review and public participation—not imposed unilaterally by any single actor. *See* Compl. ¶¶ 72-81, 181-92.

Plaintiffs plausibly allege that Order bypasses the limitations inherent in that framework. *See id.* It does not direct USPS merely to *consider* whether to propose a service change through the PRC: it *commands* that USPS initiate rulemaking on a fixed timeline while specifying the substantive content that the resulting rules "shall include." Order § 3(b); Compl. ¶¶ 11-13, 72-81, 181-92. In doing so, the Order effectively dictates the outcome to the PRC, nullifying Congress's required procedures and trivializing its rulemaking process. By dictating the outcome of the policymaking and regulatory processes that Congress assigned to the Board of Governors and the PRC, the Order overrides the structure Congress established for USPS and attempts to reclaim authority Congress removed from the President more than half a century ago. The Order is *ultra vires* for this additional reason. *See* Compl. ¶¶ 72-81, 181-92.

The Complaint also alleges that the Order is independently unlawful because it directs USPS to take actions that exceed and contravene the authority Congress has granted. *See* Compl. ¶¶ 72-81, 181-92; *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173-76 (D.C. Cir. 2003). The President has no power to direct an agency to exercise authority Congress has not granted it. *E.g.*, *Chamber of Com. of U.S. v. Reich,* 74 F.3d 1322 (D.C. Cir. 1996). Even if the President could direct USPS to act, which he cannot, the substance of the Order would still violate the postal statutes for at least three separate and independent reasons, as the Complaint describes.

***First,*** The PRA defines and limits USPS authority. *See* Compl. ¶¶ 72-81, 181-92. The "basic function" of USPS is to "provide postal services to bind the Nation together through … correspondence of the people." 39 U.S.C. § 101(a). Congress charged USPS with providing "prompt, reliable, and efficient services … to all communities," *id.*, and maintaining "an efficient system of collection, sorting, and delivery of the mail nationwide," *id.* § 403(b)(1). Nothing in these provisions authorizes USPS to regulate elections, determine voter eligibility, or control

access to the ballot, nor do they permit USPS to perform any nonpostal service or regulatory function outside the delivery of mail. *See id.* §§ 102(5), 404(e).

The Order nonetheless attempts to transform USPS into a de facto election administrator. *See* Compl. ¶¶ 72-81, 181-92. It directs USPS to create a "Mail-In and Absentee Participation List" of eligible voters, determine mail voter eligibility, coordinate those determinations with states, assign ballot identifiers, and to refuse to transmit ballots for any individual not included on that list.  Order § 3(c)(iv). But those are not postal functions. Rather, they are regulatory functions Congress has never assigned to USPS. Nothing in the PRA authorizes USPS to create voter-eligibility lists, establish criteria for inclusion, or condition delivery of mail on whether a sender or recipient satisfies those criteria. To the contrary, Congress has carefully defined the limited categories of "nonmailable matter" that USPS may refuse to deliver—ballots are not among them. *See* 39 U.S.C. §§ 3001-05, 3007-3018. By directing USPS to withhold otherwise lawful election mail based on this novel eligibility requirement, the Order creates a new category of nonmailable matter from whole cloth, a step courts have rejected as *ultra vires*. *Cf. Aid Ass'n for Lutherans*, 321 F.3d at 1175-76. The Order thus compels USPS to exercise a power Congress has not granted, and to intrude into an area Congress has assigned elsewhere. *See* Compl. ¶¶ 72-81, 181-92. Thus, Plaintiffs have adequately alleged that by compelling USPS to undertake them, the Order requires the agency to operate outside its statutory authority. *See* Compl. ¶¶ 72-81, 181-92.

***Second,*** the Order collides with the PRA's core substantive constraints on USPS's operations. *See id.* Congress required USPS to provide service to the entire population and prohibited it from making "any undue or unreasonable discrimination among users of the mails." 39 U.S.C. §§ 403(a), (c). Refusing to transmit ballots from individuals who are not included on a federally fabricated list is discrimination in its most direct form. It conditions access to postal

services on a user's status with respect to a federal voter-eligibility list, rather than on any neutral characteristic of the mail itself. That is precisely what § 403(c) forbids. USPS may not lawfully deny service absent specific statutory authorization, and the decision to deny service flows through the PRC, not the President or some other executive agency. *See GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013). The Order identifies no such statutory authorization because none exists. *See* Compl. ¶¶ 72-81, 181-92. Congress has never permitted USPS to deny service to individuals based on their eligibility to participate in some external regulatory regime. And it has certainly not authorized USPS to deny service based on USPS's assessment of someone's eligibility to vote. The Order therefore commands the agency to engage in conduct that the PRA and PAEA affirmatively prohibit.

*Third*, the Order is unlawful because it attempts to impose sweeping nationwide changes to postal services without complying with the procedures Congress mandated in the PAEA. *See id.* As explained, Congress requires any change "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" be submitted to the PRC for an advisory opinion following a public hearing. 39 U.S.C. § 3661(b)-(c). This requirement ensures that major service changes are subject to independent review and public participation. *See, e.g.*, *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 18 (D.D.C. 2020) (Section 3661 "require[s] an opportunity for public participation and for independent review before the USPS implements service changes that will have a broad effect.").

The Order's directives qualify as such a "nationwide" service change with respect to mail ballots. *See* Compl. ¶¶ 72-81, 181-92. Yet the Order does not permit USPS to determine whether to propose such a change through the statutory process. It instead mandates that USPS initiate rulemaking on a fixed timeline with a fixed outcome, in which the President decrees the resulting

34

rules. *See* Order § 3(b) (detailing what the "proposed rulemaking *shall include*" (emphasis added)). In doing so, the Order bypasses the PRC, nullifying the procedures Congress requires. *See* Compl. ¶¶ 72-81, 181-92.

The core function of the Postal Service is to deliver the mail, as Plaintiffs have alleged. *See id.* The Order demotes and diverts that function, in violation of governing statutes, in derogation of state authority, and in excess of Presidential power. It steers USPS into a political role that Congress specifically acted to avoid.

Federal Defendants contend (at 39) that Plaintiffs lack a cause of action because they have not identified a "clear and mandatory statutory command" that the Order violates. They are "barking up the wrong tree." *AFLCIO*, 778 F. Supp. 3d at 89. Plaintiffs do not just contend that the Order "is *exceeding* the statutory authority [the President] has been granted"; they are alleging that the postal statutes grant the President no power to direct USPS rulemaking "*whatsoever.*" *Id.* (emphasis added); *see also* Compl. ¶¶ 72-81, 181-92. Defendants do not identify *any* authority permitting the President to direct USPS rulemaking and all authority is to the contrary. The PRA purposefully removed the USPS from the President's control and reconstituted it as an independent agency, directed solely by its Board of Governors. 39 U.S.C. §§ 201-02. When a President subverts that congressional design, courts are "available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328. Because the President has no power to direct USPS rulemaking, Plaintiffs have properly pled their challenge to the Order as *ultra vires*. *Id.*; Compl. ¶¶ 181-92.

Plaintiffs also satisfy the prerequisites for a statutory *ultra vires* claim. *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025); *see* Compl. ¶¶ 181-92. The D.C. Circuit has long held (and Federal Defendants do not dispute) that judicial review is available for *ultra vires* claims under the postal statutes. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960,

970-72 (D.C. Cir. 2022). Further, in arguing (at 40) that "[a]ny injured Plaintiff can simply wait and sue any agency that actually takes some concrete action to implement the Order," Federal Defendants effectively confirm no other cause of action is available now. *Musk*, 2026 WL 799635, at *13 ("Defendants do not point to some other mechanism Plaintiffs could pursue to *prospectively* enjoin Defendants' actions on the basis that they lack authority to carry out such action." (emphasis added)). Because most USPS actions are exempt from the APA, *ultra vires* review is the only available mechanism for challenging unlawful postal service directives. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970. As to the final factor, the Order directs USPS to take action "plainly beyond the bounds of" its authority and contrary to statutory prohibitions. *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 2026 WL 877779, at *6 (D.D.C. Mar. 31, 2026) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022)). Defendants do not meaningfully respond to Plaintiffs' alleging that the Order exceeds USPS's statutory authority and conflicts with the PRA and PAEA. Each of those violations collides with a "'clear and specific statutory mandate' that is 'susceptible to ultra vires review.'" *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 88 (quoting *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971).

### D.    Plaintiffs Have Plausibly Stated Their Privacy Act Claims (Count VI).

Plaintiffs have stated a plausible claim that the Order violates the Privacy Act of 1974. *See* Compl. ¶¶ 193-214. Enacted after the Watergate scandal exposed widespread illegal surveillance of civilians by federal agencies, the Privacy Act places guardrails on the government's increasing capacity to use computers to accumulate, cross-reference, and disseminate personal data about its own citizens. *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 662 (S.D.N.Y. 2025). The Act accordingly established comprehensive and detailed requirements governing how Executive Branch agencies must manage confidential individual data. The Order tramples those protections. *See* Compl. ¶¶ 116, 193-214. If allowed to stand, it

36

would consolidate the personal records of millions of Americans from separate federal databases into a series of lists without the knowledge or consent of anyone whose data is at stake. *See id.* ¶¶ 4-6, 105-07, 119-21, 203-12. And it would go even further, requiring DHS to disseminate its State Citizenship List to state actors operating outside the federal government. *See id.* ¶¶ 107, 203-06. Plaintiffs plausibly allege that the Order violates the Privacy Act in two independent ways.

*First*, the Privacy Act strictly circumscribes the ability of federal agencies to disclose individual data. *See id.* ¶¶ 195-200, 203-08. Under Section 552a(b), no agency may disclose any "record" contained in a "system of records" to any person or to another agency, unless the individual to whom the record pertains has provided prior written consent, or one of 13 enumerated statutory exceptions applies. 5 U.S.C. § 552a(b). The Order requires two layers of unauthorized disclosure that fall outside the exceptions.

The first layer of unauthorized disclosure occurs among federal agencies. To compile the State Citizenship Lists, the Order directs DHS, acting through USCIS and in coordination with SSA, to retrieve, compare, and combine records from multiple federal systems of records: citizenship and naturalization records, SSA records, SAVE data, and information from other relevant federal databases.  Order § 2(a); Compl. ¶¶ 105, 119-21, 203-06. Each of these data transfers—from SSA to DHS, from other agencies maintaining "relevant" databases to DHS, and from one DHS component to another—constitutes a "disclosure" of records from a system of records to "another agency" under Section 552a(b). *See id.* ¶¶ 195-98, 203-06. A second layer of unauthorized disclosure occurs when the Secretary transmits State Citizenship Lists to the chief election official of each state. *Id.* This transmission discloses federal records to state officials who are not part of the federal agency system. No one has consented to having their Social Security records, immigration records, naturalization records, or other personal data pulled from separate

federal databases and merged into a consolidated nationwide dossier and then divided again into citizenship lists for distribution to DHS and to state election officials. *See* Compl. ¶¶ 106, 116, 203-08, 212; Howard Decl. ¶¶ 17-19; Balan Decl. ¶¶ 14-18; Freeman Decl. ¶¶ 13-16. The Order does not claim otherwise.

Nor do any Privacy Act exceptions authorize these disclosures. *See LULAC*, 2026 WL 252420, at *12, *53; Compl. ¶¶ 207-08. In particular, the "routine use" exception (Fed. MTD 30-31) authorizes agencies to share records only "for a purpose which is compatible with the purpose for which it was collected." *Id.* at *12 (quoting 5 U.S.C. § 552a(a)(7)). That purpose must have been identified via a System of Records Notice ("SORN") published in the Federal Register when the relevant system of records was established or revised, and subject to a 30-day notice and comment period. *Id.* In other words, the use not only must be consistent with the reasons the data were first collected, but the agency also "cannot invent new routine uses on the fly." *Id.; see also* Compl. ¶¶ 199-200, 207-09.

No existing SORN authorizes the State Citizenship List. *See* Compl. ¶¶ 207-09. The SAVE SORN, published in October 2025, established two new routine uses: Routine Use L, which authorizes disclosures to assist SAVE user agencies in determining immigration status and citizenship when a DHS-approved agreement is in place; and Routine Use M, which authorizes disclosures to entities with legal authority to oversee programs and benefits supported by SAVE. System of Records, 90 Fed. Reg. 48,948, 48,954 (Oct. 31, 2025). The Order sweeps far beyond these uses. Routine Use L fails because, even to the extent DHS has entered agreements with a state that could make that state a user agency in the relevant respect, Routine Use L simply permits DHS to respond to requests querying the citizenship status of "individual" program beneficiaries. *Id.* It does not even approach the categorically broader use of compiling, maintaining, and

transmitting statewide citizenship lists. Similarly, Routine Use M authorizes disclosures only for "auditing of program requirements" for programs "supported by SAVE." *Id.* Affirmatively aggregating state-by-state citizenship lists for election administration and ballot distribution far eclipses that narrow purpose. Compl. ¶¶ 203-09.

SSA's Numident SORN is equally inapt. *See* Compl. ¶¶ 130-38, 207-10. That SORN, published in November 2025, added Routine Use 49, which permits SSA disclosures of citizenship and immigration information to DHS pursuant to 8 U.S.C. § 1373(a). System of Records, 90 Fed. Reg. 50,879, 50,883 (Nov. 12, 2025). The SORN makes clear, however, that SSA "use[s] information in this system to assign SSNs" and "for other claims purposes related to establishing benefit entitlement." *Id.* at 50,880. That is far afield of using SSA data to underwrite a nationwide voter-eligibility database. Routine Use 49 itself applies, like Routine Use L, only to the sharing of "individual" information on "citizenship and immigration status." *Id.* at 50,883. It does not permit wholesale export of the database for use in a system of records for determining eligibility to vote by mail. Moreover, even for the specific categories of disclosures the Numident SORN permits, it limits the disclosures "[t]o DHS." *Id.* It never authorizes DHS to pass that data on to state election officials. *See* Compl. ¶¶ 203-09.

The SAVE and Numident SORNs also collapse under the Privacy Act's compatibility requirement. *See* Compl. ¶¶ 199, 207-09. The compatibility test requires a concrete relationship between the agency's original purpose in collecting the information and the purpose of the proposed disclosure. *Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). It exists to prevent personal data collected by one agency for a stated purpose from being repurposed and distributed by another entity for unrelated ends. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989). That is precisely what Plaintiffs claim the Order does. *See* Compl. ¶¶ 203-09.

39

The source databases here were each created and maintained for purposes that do not even contemplate the compilation of state election rolls. *See* Compl. ¶¶ 122-38, 203-10. SAVE was designed to help agencies verify immigration status for purposes of determining eligibility for federal, state, and local benefits. Compl. ¶¶ 122-24. Numident collects citizenship information as an incident to administering Social Security numbers and benefits. *Id.* ¶¶ 130-38. Citizenship and naturalization records are maintained to document the conferral of citizenship through the immigration process. None of these systems were designed or maintained for the purpose of generating state-by-state lists of eligible voters, and none has been used as such. *Id.* ¶¶ 121-38, 203-10. The Order would summon agency data to create voter eligibility lists that are anything but routine; they cannot be implemented without violating the Privacy Act's disclosure requirements.

***Second***, the Order violates the Privacy Act's accuracy mandates. *See* Compl. ¶¶ 201-02, 210-12. The Privacy Act requires agencies to maintain records used in making determinations about individuals with a level of accuracy, relevance, timeliness, and completeness that ensures fairness to the individual. 5 U.S.C. § 552a(e)(5). Agencies must also make reasonable efforts to meet these standards before disseminating records about an individual to any person outside the agency. *Id.* § 552a(e)(6). The State Citizenship Lists cannot satisfy either of these requirements, because the source databases are profoundly unreliable for the purpose of determining who is a citizen, who is of voting age, and who resides in a given state. *See* Compl. ¶¶ 119-38, 210-12.

The State Citizenship Lists would rely on SAVE data, which has prolific and well-documented accuracy problems. *See* Compl. ¶¶ 121-29, 138, 210. Defendants brush aside these allegations without addressing why, when taken as true, they should be dismissed. *See* Fed. MTD at 31-34; States MTD at 14-18. For example, the Complaint discusses the North Carolina State Board of Elections findings after its 2016 election audit that a SAVE match was "not a reliable

indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as noncitizens in SAVE." Compl. ¶ 125. But as the Fourth Circuit found, "[a] shocking 97.6% of persons identified by the [State Department of Motor Vehicles] as noncitizens, in fact were citizens," and "about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system." *Id.* (quoting *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021)) . New citizens who naturalize a few days before a federal Election Day or, in some states with same-day voter registration in 2026, on Election Day may not be reflected in SAVE data. *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 955 (D. Ariz. 2024) ("USCIS also explained that SAVE may not immediately return updated naturalization records if an individual is naturalized prior to a weekend or a federal holiday" and that "one or two-day delays are possible" for reflecting a person's naturalization record after their naturalization ceremony in SAVE).

Even the government recognizes the problem. The head of USCIS's verification division acknowledged that the system cannot consistently identify noncitizens: "we're giving a tool to these folks to say, 'Hey, if we can verify citizenship, great, you're good. If we can't, now it's up to you to determine whether to let this person on your voter rolls.'" Compl. ¶ 127. And DHS itself has admitted that SAVE may share inaccurate information with registered agencies due to misspelled names, transposed numbers, or incomplete information.[4]

SSA data is equally flawed for these purposes. *See* Compl. ¶¶ 130-38, 143, 210. SSA data captures citizenship information only at the moment an individual applies for a Social Security

---

[4] U.S. Dep't of Homeland Sec., Privacy Impact Assessment for SAVE, DHS Ref. No. DHS/USCIS/PIA-006(d), at 19 (Oct. 31, 2025), https://perma.cc/4YV7-24NU.

Number. When that interaction occurs before the person naturalizes, as it often does, SSA does not automatically update their citizenship status afterward. As SSA itself has explained, "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA" and "SSA's records do not provide definitive information about an individual's citizenship status." Compl. ¶ 132. There "is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments," so many do not. *Id.* ¶ 131. Unsurprisingly, a 2006 audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as noncitizens "because the individuals had become U.S. citizens after obtaining their SSN but had not updated their records with SSA." *Id.* ¶ 134.

The scope of SSA's data compounds the problem. *See* Compl. ¶¶ 135-38, 143, 210. SSA did not begin consistently collecting citizenship information until 1981, meaning it lacks citizenship data for U.S.-born citizens older than their mid-forties—nearly 150 million Americans. *Id.* ¶ 135. Similarly, the SAVE system does not accurately identify derived citizens who have no reason to interact with the SSA or DHS until they apply for Social Security benefits or apply for a passport. *Id.* ¶ 136. Given these limitations, "approximately 1/4" of SSA's records "do not have an indication of citizenship present." *Id.* ¶ 137.

Furthermore, even if these databases contained the right information, it is unclear how DHS would resolve inconsistent records reflecting citizenship status across federal databases or avoid stale information. *See id.* ¶¶ 138, 210. Plaintiffs have provided more than enough factual support for their claims that the State Citizenship Lists are guaranteed to be plagued by garbage in, garbage out database inaccuracies because the data they rely on are known to be inaccurate, incomplete,

and would be stale even in a best-case scenario. Plaintiffs maintain that the Privacy Act prohibits the dissemination of such data for just that reason. *See id.* ¶¶ 201-02, 210-12.

Finally, contrary to Federal Defendants' contention (at 38-39) the Privacy Act does not displace APA review. As numerous courts have concluded, the limited individual remedies available under the Privacy Act allow plaintiffs "to compel disclosure unlawfully *withheld*, not to prevent disclosure imminently (and unlawfully) *threatened*." *E.g.*, *AFLCIO*, 778 F. Supp. 3d at 81 (emphasis added). These "narrow opportunities for individualized injunctive relief are inadequate to address a policy of ongoing data sharing at mass scale." *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 44 (D.D.C. 2025) (quotation omitted). State Defendants do not dispute this. And elsewhere in their brief (at 38), Federal Defendants acknowledge the Privacy Act "allows for injunctive relief only in narrow circumstances that are plainly inapplicable here." Because "injunctive relief sought by plaintiffs here is not available under the Privacy Act," Plaintiffs can proceed under the APA. *AFSCME v. Soc. Sec. Admin*, 771 F. Supp. 3d 717, 792 (D. M.D. 2025).

To the extent Defendants claim the Order is not predicated on the data-sharing arrangement already in effect, Plaintiffs have an *ultra vires* cause of action because the Order illegally directs DHS and SSA to violate the Privacy Act anew. *See Reich*, 74 F.3d at 1331-32. This is not a case where a "statute entrusts a discrete specific decision to the President," and plaintiffs claim abuse of discretion. *Id.* at 1331. Quite the opposite. The "claim instead is that the presidential action—not … contemplated by Congress—independently violates [a federal] statute that delegates no authority to the President." *Id.* at 1331-32. That supplies a non-statutory cause of action.

Accordingly, Plaintiffs have plausibly alleged that the Order violates the Privacy Act, that APA review remains available, and that equitable relief may prevent the continued unlawful disclosure and repurposing of protected federal records.

43

**E.      Plaintiffs Have Alleged a Sufficient Nexus to Sue Each Named Defendant**

The government is wrong in contending (at 61-63) the President is immune from suit for declaratory or injunctive relief. *See Franklin*, 505 U.S. at 801-03 ("[W]e have left open the question whether the President might be subject to a judicial injunction … [and] need not decide whether injunctive relief against the President was appropriate… the President's actions may still be reviewed for constitutionality."). "[J]udicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958). Such relief extends to the President where the President has exceeded his legal authority, *see, e.g.*, *Youngstown*, 343 U.S. at 589 (finding President's seizure order was unauthorized); *Dames & Moore v. Regan*, 453 U.S. 654, 666-78 (1981) (reviewing whether order exceeded the President's statutory authority); *Reich*, 74 F.3d at 1332 ("we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides those that run afoul of the Constitution or which contravene direct statutory prohibitions …."); *NTEU v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) (there is "no immunity established under any case known to this Court [that] bars every suit against the President for injunctive, declaratory or mandamus relief"). And contrary to the Defendants' argument (at 46) Commerce Secretary Howard Lutnick is also a proper defendant. Section 4(a) instructs the Secretary of Commerce to "coordinate" in "effectuating all relevant aspects" of the Order's implementation.

**F.      The Scope of Plaintiffs' Requested Relief is Proper**

The Court has authority to enjoin Defendants from implementing the Order and the scope of relief is not overbroad. Here, Plaintiffs seek to enjoin the unlawful provisions of the Order—Sections 2(a), 3(b), 4(a), and 4(c)—and concede that the Order may be severable. ECF No. 37. Although *Trump v. CASA* held that federal courts lack authority to issue universal injunctions, it

reaffirmed that courts retain equitable authority to award "complete relief," including relief extending beyond named plaintiffs where narrower relief would be ineffective. 606 U.S. 831, 852 & n.12 (2025). *LULAC* addressed closely analogous circumstances, where the NAACP and other plaintiffs with missions centered on voter registration sought an injunction barring the EAC from implementing the President's directive to require documentary proof-of-citizenship on the federal voter registration form. The Court granted that relief, because the "only way to provide complete relief to Plaintiffs" was to permanently enjoin Defendants from implementing the challenged provision. *LULAC*, 808 F. Supp. 3d at 82. Here, the Order's substantive provisions cannot be selectively implemented to exclude the NAACP and Common Cause's members, but not other voters. And Plaintiffs' organizational injury does not flow from the inclusion or exclusion of particular individuals on the list, but from the *existence* of a federal voter eligibility list that restructures the electoral landscape without any constitutional or statutory basis. Enjoining implementation of the challenged aspects of the Order altogether is the only way to afford complete relief to Plaintiffs.

## CONCLUSION

For these reasons, the Court should deny the motions to dismiss.

Dated: May 15, 2026                     By

    /s/ John A. Freedman
John A. Freedman (Bar No. 453075)
Elisabeth S. Theodore (Bar No. 1021029)
Jeremy C. Karpatkin (Bar No. 980263)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001

45

Telephone: +1 202.942.5000
Fax: +1 202.942.5999
john.freedman@arnoldporter.com
elisabeth.theodore@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)
ARNOLD & PORTER KAYE SCHOLER
LLP
U.S. Bank Center
1420 5th Ave., Suite 1400
Seattle, WA 98101
Telephone: +1 206.208.0108
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No.
90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
Telephone: +1 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommitte.org
*Attorneys for Plaintiff*

46

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215
Telephone: + 202.463.2940
*Attorneys for NAACP*

*Motion for Pro Hac Vice or Court
Admission Forthcoming*