## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DSCC, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>        Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        Defendants. | Case No. 1:26-cv-01151-CJN |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION......................................................................................................................... 1

ARUGMENT.................................................................................................................................. 3

I.      Plaintiffs lack Article III standing..................................................................................... 3

II.     Plaintiffs' claims are not ripe........................................................................................... 11

III.    Plaintiffs' APA claims fail to challenge any final agency action. .................................... 19

IV.     Plaintiffs fail to identify any viable cause of action for their statutory claims. ................ 25

V.      Plaintiffs' claims challenging the enforcement priorities and enforcement discretion
        of the Executive Branch are independently unreviewable................................................ 29

VI.     The President and the Department of Commerce should be dismissed............................. 30

CONCLUSION ............................................................................................................................ 33

## TABLE OF AUTHORITIES

**CASES**

*Alexander v. Sandoval,*
532 U.S. 275 (2001)...............................................................................................29

*Am. Fed'n of Tchrs. v. Bessent,*
152 F.4th 162 (4th Cir. 2025), *abrogated on other grounds by*
*Am. Fed'n of State, Cnty. & Mun. Emps. v. SSA*, 172 F.4th 361 (4th Cir. 2026) ............... 26, 27

*Bell v. New Jersey,*
461 U.S. 773 (1983)...............................................................................................20

*Bennett v. Spear,*
520 U.S. 154 (1997).................................................................................... 19, 22, 23

*Bost v. Ill. State Bd. of Elections,*
607 U.S. 71 (2026)................................................................................................ 1, 6

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28  (D.C. Cir. 2002)........................................................................... 12, 16

*California v. Trump,*
786 F. Supp. 3d 359 (D. Mass. 2025) ................................................................ 14, 15

*Centro de Trabajadores Unidos v. Bessent,*
167 F.4th 1218 (D.C. Cir. 2026)....................................................................... 19, 23

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022)........................................................................... 28, 29

*City & Cnty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) .......................................................................... 12, 14

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).......................................................................................... 3, 5, 10

*Common Cause v. Trump,*
506 F. Supp. 3d 39 (D.D.C. 2020) ............................................................... 13, 14, 16

*Ctr. for Democracy & Tech. v. Trump,*
507 F. Supp. 3d 213 (D.D.C. 2020)......................................................................... 3

*Ctr. for Democracy & Tech. v. Biden,*
No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021).......................................... 3

*Ctr. for Taxpayer Rts. v. IRS*,
    815 F. Supp. 3d 1 (D.D.C. 2025) .................................................................................... 27

*Defs. of Wildlife v. Perciasepe*,
    714 F.3d 1317 (D.C. Cir. 2013) ....................................................................................... 3

*Doe v. Chao*,
    540 U.S. 614 (2004) ...................................................................................................... 27

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ............................................................................... 26, 27

*El-Ganayni v. U.S. Dep't of Energy*,
    591 F.3d 176 (3d Cir. 2010) .......................................................................................... 16

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ...................................................................................................... 10

*FDIC v. Bank of Am., N.A.*,
    783 F. Supp. 3d 1 (D.D.C. 2025) .................................................................................. 20

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F. 4th 756 (D.C. Cir. 2022) ...................................................................................... 28

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................ 26, 32, 33

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................................... 10

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) .................................................................................... 20

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) .................................................................................. 1, 20

*J.G.G. v. Trump*,
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ......................................... 32

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ...................................................................................... 4

*League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC I")*,
    780 F. Supp. 3d 135 (D.D.C. 2025) .............................................................................. 15

*League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC II")*,
 808 F. Supp. 3d 29 (D.D.C. 2025) ................................................................ 13, 14, 25

*League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC III")*,
 818 F. Supp. 3d 34 (D.D.C. 2026),
 *judgment entered*,
 Nos. 25-cv-0946, 25-cv-0952, 25-cv-0955, 2026 WL 880056 (D.D.C. Mar. 31, 2026),
 *appeals filed*,
 No. 26-5099 (D.C. Cir. Mar. 31, 2026), & No. 26-5102 (D.C. Cir. Apr. 2, 2026) ...... 15, 26, 27

*League of Women Voters of United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 7

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
 Civ. A. No. 25-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ........................... 8

*Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ........................................................................................ 12

*Mercy Gen. Hosp. v. Becerra*,
 643 F. Supp. 3d 16 (D.D.C. 2022) ................................................................... 4

*Nat'l Urb. League v. Trump*,
 783 F. Supp. 3d 61 (D.D.C. 2025) ................................................................. 3, 6

*Newdow v. Roberts*,
 603 F.3d 1002 (D.C. Cir. 2010) ..................................................................... 32

*NRC v. Texas*,
 605 U.S. 665 (2025) ...................................................................................... 28

*Nyunt v. Chairman, Broad. Bd. of Governors*,
 589 F.3d 445 (D.C. Cir. 2009) ....................................................................... 28

*Off. of Commc'n of United Church of Christ v. FCC*,
 826 F.2d 101 (D.C. Cir. 1987) ....................................................................... 14

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ................................................................................... 4, 10

*Sussman v. U.S. Marshals Serv.*,
 494 F.3d 1106 (D.C. Cir. 2007) ..................................................................... 26

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ................................................................................. 10, 30

*Trump v. New York*,
592 U.S. 125 (2020) ............................................................................................ *passim*

*Trump v. United States*,
603 U.S. 593 (2024) ................................................................................................ 9, 30

*United States v. Armstrong*,
517 U.S. 456 (1996) ................................................................................................... 30

*United States v. Nixon*,
418 U.S. 683 (1974) .............................................................................................. 10, 30

*United States v. Texas*,
599 U.S. 670 (2023) ........................................................................................... 9, 10, 30

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ....................................................................... 18, 23, 24

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) ............................................................................. 26

**CONSTITUTION**

U.S. Const. art. II, § 2, cl. 1 ...................................................................................... 31

**STATUTES**

5 U.S.C. § 552a .................................................................................................... 26, 27

5 U.S.C. § 701 ............................................................................................................. 9

5 U.S.C. § 704 ..................................................................................................... 19, 25

39 U.S.C. § 102 ......................................................................................................... 29

39 U.S.C. § 404 ......................................................................................................... 29

**RULES**

Fed. R. Civ. P. 12 ..................................................................................................... 33

**REGULATIONS**

*Access to Classified Information*,
Exec. Order No. 12,968, 60 Fed. Reg. 40,245 (Aug. 2, 1995) ................................................ 16

*Ensuring Citizenship Verification and Integrity in Federal Elections*,
("E.O." or "the Executive Order" or "the Order")
Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026).........................................*passim*

*Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*,
85 Fed. Reg. 44,679 (July 21, 2020)...................................................................................... 12

*Preserving and Protecting the Integrity of American Elecctions*,
Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025)................................................ 15

**INTRODUCTION**

Plaintiffs' opposition briefs include an extraordinary amount of material that is both undisputed and irrelevant to the resolution of Defendants' motions to dismiss—arguing, for example, that active congressional candidates running for office would have standing to challenge a "transformation of federal elections." *DSCC* MTD Opp'n at 19, ECF No. 132 (citing *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026)). But no such transformation is before the Court. On the core legal issues that govern this sort of pre-implementation challenge to a non-self-executing Executive Order—which, on its own, changes nothing about the rules of any election—Plaintiffs have very little to say. And what little they do say fails to refute Defendants' core submission: that at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). That is because, as explained by Defendants' now-undisputed declarations, deliberations within the Executive Branch are ongoing regarding implementation of every major component of the Order—including questions of feasibility and legality that might narrow or resolve at least some of the parties' possible future disagreements before they ever cause any cognizable injury.

For example, as for Section 3(b)—which calls for the Postal Service "to initiate a *proposed* rulemaking," but says nothing about the contents of any final rule, *Ensuring Citizenship Verification and Integrity in Federal Elections*, Exec. Order No. 14,399 ("E.O." or "the Executive Order" or "the Order") § 3(b), 91 Fed. Reg. 17,125 (Mar. 31, 2026) (emphasis added)—"the Postal Service is still in the deliberation phase of determining how to implement the Executive Order," and has "not yet published a proposed rule." Decl. of S. Monteith ("Monteith Decl.") ¶ 4, ECF No. 117-4. In any event, courts "do not have authority to review proposed agency rules," *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.)—so judicial review of action by the

- 1 -

Postal Service rule must await a *final* rule, if any. Those claims are thus (at least as of this filing) doubly premature, in the absence of any proposal from the Postal Service.

As for Section 2(a), which contemplates the creation of State Citizenship Lists—though only to the extent "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," E.O. § 2(a)—it is likewise undisputed that "deliberations are currently on-going within DHS and USCIS," that "USCIS has not yet begun preparation of any 'State Citizen-ship List,'" and that DHS has not yet made "final decisions regarding the 'State Citizenship Lists' discussed in E.O. 14,399," Ex. 1, Supp. Decl. of M. Mayhew ("Supp. Mayhew Decl.") ¶¶ 5, 7, 8[1]; *see also* Decl. of J.B. MacBride, ("MacBride Decl.") ¶¶ 5-6, ECF No. 117-3 (similar statements from SSA). Accordingly, much remains uncertain—even within the Executive Branch—about what those lists (if any) will look like, how they will be compiled, using what data sources, and what (if anything) they will be used for.

Under these circumstances, Article III requires the Court to "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of exercising judicial review later, if necessary, over any final agency action that causes Plaintiffs any actual or imminent injury. Accordingly, the Court should dismiss this case, in its entirety, without prejudice.

---

[1] As explained in the Supplemental Mayhew Declaration, Mr. Mayhew "previously pro-vided a declaration in the above-captioned matters, signed on May 1, 2026." Supp. Mayhew Decl. ¶ 1. The Supplemental Mayhew Declaration (signed today) is being submitted to "updat[e] [his] previous declaration with information accurate as of today." *Id.* Although none of the factual developments described in the Supplemental Mayhew Declaration are material to any of the legal arguments that are currently before the Court, Defendants have nonetheless prepared an updated declaration out of an abundance of caution. *Cf.* May 14, 2026 Hr'g Tr. at 104:7-11 (explaining the Court's expectation that, "in the event that before [a preliminary-injunction] opinion comes out, that if there is anything even approaching a material change in the factual scenario on the government side, that the government would so notify me").

## ARGUMENT

### I.    Plaintiffs lack Article III standing.

**a.**  As Defendants have explained, Executive Order 14,399 is an intra-Executive Branch directive—which, of its own force, does not change anything at all about elections in any State.  It does not require anyone outside the government—and certainly not any of Plaintiffs—to do (or refrain from doing) anything at all.  Generally, these sorts of "intra-governmental mandates" in an Executive Order "do not inflict on Plaintiffs an injury in fact."  *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion"), *vacated as moot sub nom. Ctr. for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021).  That is the case here.

Ultimately, Plaintiffs' real concern is not with the Executive Order itself—it is that agencies may *implement* the Order in a way that (unlike the Order itself) actually *does* affect Plaintiffs' interests in some concrete way (whether it be privacy interests, voting-related interests, or something else).  That is why much of the relief they seek purports to run against future agency implementation of the Order.  *See, e.g.*, *DSCC* Compl. at 60, Prayer for Relief ¶¶ G-I.  But "Article III standing requires more than the possibility of potentially adverse regulation."  *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013).  And so, at least at this time, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)—after all, it is currently unknown how the agencies referenced in the Order will implement it, or on what time-

line, or under what parameters, or using what processes.  That uncertainty extends to the government itself: as explained in several undisputed declarations, the relevant agencies *themselves* are still deliberating about the contours of the Executive Order's possible future implementation.  *See* Monteith Decl. ¶ 3; Supp. Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.[2]  Plaintiffs have thus failed to carry their burden to show any concrete, particularized, actual or imminent Article III injury.

Even if Plaintiffs could show injury, the disconnect between Plaintiffs' complaints (which challenge the Executive Order) and their possible future injuries (which would stem, if at all, from its future implementation) also gives rise to an independently fatal causation (or traceability) problem.  In short, that is because "the source of any injury to the plaintiffs is the action that the [government] might take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'"  *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).  That disconnect independently warrants dismissal for lack of standing.

**b.**  In large part, Plaintiffs' briefs are non-responsive to those core arguments—that is, that their suits are premature, because they challenge an Executive Order that does not itself change the rules of any election, nor require Plaintiffs to do (or refrain from doing) anything.  Instead of refuting that argument, Plaintiffs spend most of their briefs trying to establish various other tangentially related propositions—at least some of which may ultimately be undisputed—that are largely irrelevant to this case, at least at this time.

For example, the *DSCC* Plaintiffs argue, citing only out-of-circuit cases, that "a voter has standing to challenge a law that regulates how they may cast a ballot or makes it more difficult to

---

[2] "[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also, e.g.*, *Mercy Gen. Hosp. v. Becerra*, 643 F. Supp. 3d 16, 24 (D.D.C. 2022) (collecting cases).

vote, even if the voter is ultimately able to overcome the restriction." *DSCC* MTD Opp'n at 22. Perhaps that is right, at least in some circumstances. But this Executive Order neither "regulates how" anyone "may cast a ballot," nor does it "make[] it more difficult to vote," by mail or otherwise. *Id.* What Plaintiffs really fear is that a future Postal Service rule—not yet issued or even proposed—might "make it more difficult to vote" by mail. *Id.* But the standing questions raised by that sort of possible future rule would look very different. And the only action that is currently before the Court—that is, the Executive Order itself—does not affect anyone's legal or practical ability to vote. That remains dispositive of the standing questions in this case, at least at this time.

The *DSCC* Plaintiffs argue next that the "wrongful disclosure of personal information in federal databases inflicts a cognizable injury." *DSCC* MTD Opp'n at 24; *see also NAACP* MTD Opp'n at 15, ECF No. 134 (claiming "injury from Privacy Act violations based on the unconsented use and sharing of their personal information"). Again, at least in some circumstances, that may be right. But here, what disclosure are we talking about, exactly? The Executive Order does not contemplate the disclosure of any sensitive personal information—only the future, potential disclosure of whether or not someone is a United States citizen, whether or not they are at least 18 years old, and whether or not they live in a particular State. *See* E.O. § 2(a). And whatever disclosure Plaintiffs have in mind, it cannot be a disclosure made by the Executive Order itself—as Plaintiffs do not allege (nor could they) that any such disclosure has happened. *See generally* Supp. Mayhew Decl.; MacBride Decl. Again, what Plaintiffs really fear are possible *future* disclosures, which they speculate will be made by agencies implementing the Executive Order. But those sorts of "conjectural" and "hypothetical" possible future injuries do not suffice for standing. *Clapper*, 568 U.S. at 416.

To continue the theme, in their opposition brief, the *DSCC* Plaintiffs' lead standing argument is that they have standing because "the Executive Order unlawfully alters election rules." *DSCC* MTD Opp'n at 19. But it does not. The Executive Order, on its own, does not alter the rules of any election, in any way. It at most reflects a series of "intra-governmental mandates" that "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League*, 783 F. Supp. 3d at 77. So, for example, there is nothing for this Court to say (at least at this time) about the Supreme Court's decision in *Bost*, or whether it should be extended (as Plaintiffs seem to argue) beyond the context of a "candidate" challenging "the rules that govern the counting of votes in his election." *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76 (2026). Those arguments can be addressed (if necessary) if some agency actually takes some action that (at least arguably) changes the rules of some election. But until then, large swaths of Plaintiffs' briefs are not going to be useful to the Court in deciding Defendants' current motions to dismiss.

The *DSCC* Plaintiffs similarly assert that "Section 3(b) commands USPS to determine who is eligible to vote by mail," but that too is wrong. Section 3(b) instead directs USPS to "initiate a proposed rulemaking," E.O. § 3(b)—which has, in any event, not even happened yet—about the use of the federal mails for mail-in and absentee voting. So, not only does the Executive Order not "alter[] election rules," *DSCC* MTD Opp'n at 19, it doesn't even alter *Postal Service* rules—that would only happen, if ever, from the consummation of a future rulemaking that has not yet begun. *See* Monteith Decl. Of course, if the Postal Service issues a *final* rule that (to use Plaintiffs' words) "alters election rules," *DSCC* MTD Opp'n at 19, that would have significant implications for the standing arguments in this case. But no election rules have been altered *by the Executive Order* itself, and the Executive Order is all that Plaintiffs challenge here—indeed, this litigation began literally the day after its issuance. Regardless, this Court should not exercise judicial review

over an imagined version of the Executive Order that goes beyond even the Executive Branch's arguments about the President's legal authority.  To be clear, counsel for the United States is not asking this Court to hold that the President can "alter election rules" by Executive Order—that question is simply not presented here.

The *LULAC* Plaintiffs make the same sort of errors.  For example, they argue that Defendants do not "cite, much less distinguish, the key D.C. Circuit precedent establishing that LULAC Plaintiffs have organizational standing," which they believe is *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also NAACP* MTD Opp'n at 13 (also relying heavily on *Newby*).  According to Plaintiffs, *Newby* stands for the proposition that a "new obstacle" that "unquestionably make[s] it more difficult for [voter registration organizations] to accomplish their primary mission of registering voters" is enough for standing.  *LULAC* MTD Opp'n at 2, ECF No. 133, (quoting *Newby*, 838 F.3d at 9).  Again, that may be right in some circumstances—but here, what "new obstacle" do they have in mind?  In *Newby*, it was a requirement to provide documentary proof of citizenship when registering to vote.  Lawful or unlawful, that sort of requirement could arguably be characterized as a "new obstacle" to voter registration.  But here, no such obstacle exists—voter-registration requirements are wholly unchanged by the Executive Order.  And they never *will* be changed *by the Executive Order* itself—any new regulatory requirements would come from future implementation by the Postal Service, DHS, or other agencies.

Several Plaintiffs also continue to express alarm about imperfections in databases that they speculate will be used to create State Citizenship Lists.  But whether for purposes of standing or the merits, it is not Defendants' burden to show that any particular database *is* perfect.  And that is certainly not Defendants' burden before the relevant agencies even *know* what databases will be used, and how.  *See* Supp. Mayhew Decl. ¶¶ 7-8.  In any event, Defendants already explained why

those concerns are exaggerated. Defs.' Combined Mem. of Law in Supp. of Their Mots. to Dismiss & in Opp'n to Pls.' Mot. for a Prelim. Inj., ("Defs.' Br.") at 23 & n.7, ECF No. 117-1. Judge Sooknanan recently came to a similar conclusion in denying a motion for a preliminary injunction on a similar theory of "hypothetical injury." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, Civ. A. No. 25-3501, 2025 WL 3198970, at *7 (D.D.C. Nov. 17, 2025); *see also id.* ("Plaintiffs ask this Court to find irreparable injury because their SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration or take other adverse actions. This falls well short of the requisite showing of irreparable harm.").

Plaintiffs also fail to explain how an imperfect data set would be an impediment to constructing a list of "individuals *confirmed* to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." E.O. § 2(a) (emphasis added). Even if some individuals cannot be definitively "confirmed" to fit those categories, that doesn't mean that any such list would be inaccurate, or unlawful, or injurious—it could still include all individuals who *were* fully "confirmed" to be citizens of the relevant age and residency. Nothing in the Executive Order suggests that omission from a State Citizenship List by itself confirms *non*-citizenship, or ineligibility to vote under State or federal law. And, in any event, the mere *existence* of any Section 2 list itself causes no legal consequences—before it matters to anyone, recipient States would have to take action that is based on that list and itself injures Plaintiffs. That makes Plaintiffs' accuracy-related concerns even more speculative than the voting-related harms that failed to suffice in *League of Women Voters*. *See* 2025 WL 3198970, at *7 ("[N]othing in the current record supports the Plaintiffs' assertion that in lieu of additional

verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone." (citation omitted)).

**c.** The *NAACP* Plaintiffs say that "the Order's threat of prosecution imposes a serious chilling effect on Plaintiffs' activities," and that "Plaintiffs are not required to wait for criminal prosecution to establish standing to challenge it." *NAACP* MTD Opp'n at 14. To the extent the *NAACP* Plaintiffs now seek to revive some challenge to the provisions of the Executive Order about the possible future exercise of criminal enforcement discretion,[3] *see, e.g.*, *id.* at 10, 14, they fail to refute Defendants' extensive arguments that such a challenge would be unreviewable—both as "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and for failure to challenge any Article III injury that is "traditionally redressable in federal court," *United States v. Texas*, 599 U.S. 670, 676 (2023). What they miss is that nobody will be prosecuted for violating the Executive Order—any criminal investigation or prosecution (if it ever happens, an extraordinarily speculative and far-off possibility) would be for violation of existing federal criminal laws, already on the books. Plaintiffs do not challenge those laws. And there is nothing unlawful or injurious about "threatening" to enforce existing federal criminal laws—such a "threat" (if it can even be called a "threat") is always present in a nation governed by law.

That is especially true in this context, as "the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting

---

[3] Any such argument would be very hard to square with a concession in the *NAACP* Plaintiffs' preliminary-injunction reply, in which they stated (in response to Defendants' arguments about the non-reviewability of policies of enforcement discretion, *see* Defs.' Br. at 31-35), that they "do not request an injunction against the enforcement paragraphs of the Order." Reply in Supp. of *NAACP* Mot. for Prelim. Inj. ("*NAACP* PI Reply") at 8, ECF No. 123. That concession is likely why neither the parties nor the Court spent any time discussing criminal enforcement priorities at the recent preliminary-injunction hearing in the case.

*United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also Texas*, 599 U.S. at 678-79 ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)). So the Order cannot be challenged on that basis.

    **d.** Plaintiffs also continue to allege (often explicitly citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)) that they have diverted resources in response to publication of the Executive Order, *but see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024) (discussing *Havens*); and that they have spent money to prepare for the possibility that agencies may implement the Executive Order in a way that causes them harm, *but see Clapper*, 568 U.S. at 416. None of those theories work, either. In short, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* That is so even if their "fear" could fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable." *Id.* Such "fear[s]," reasonable or not, do not support a case or controversy under Article III.

    **e.** As for traceability, the *NAACP* Plaintiffs say that Defendants "offer nothing more than a statement that redressability and traceability are not met." *NAACP* MTD Opp'n at 16. But the something "more" that Plaintiffs ignore is a square holding of the Supreme Court: that "the source of any injury to the plaintiffs is the action that the [agencies] "might take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers*, 555 U.S. at 494) (dismissing pre-implementation challenge to a non-self-executing Presidential Memorandum). The simplicity of that logic and the straightforward applicability of that holding are points in Defendants' favor, not Plaintiffs'.

Finally, the *LULAC* Plaintiffs insist that "States (including State Defendants) have removed voters based on faulty SAVE citizenship data without first conducting any further investigation of their own." *LULAC* MTD Opp'n at 6.  Even if true, it is not at all clear how that argument helps them sue the federal government, much less over this Executive Order.  If anything, that argument *undermines* their ability to show causation and redressability.  If States are taking the actions that cause Plaintiffs' injuries—and if they were already taking those actions before issuance of the Executive Order—then it is not even clear what is to be gained by this litigation.  This argument suggests (at most) that Plaintiffs should be suing the States, not the federal government—and for something other than the issuance of this Executive Order.

## II.     Plaintiffs' claims are not ripe.

**a.** Defendants' opening brief emphasized—just as the Supreme Court did in *Trump v. New York*—that this Executive Order is replete with explicit textual limitations to ensure that it is implemented in a way that is both "feasible" and "consistent with applicable law."  Section 2(a) explicitly calls for the creation of State Citizenship Lists only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974."  Section 3(b)(iv) provides that the Postal Service's proposed rule should make clear that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements."  Section 4(c) specifies that SSA's provision of data in support of the implementation of this Executive Order must be "consistent with applicable law, the Privacy Act, and all applicable use agreements."  Section 5 directs the Attorney General to "take all lawful steps" to enforce federal laws on these subjects.  And Section 7(b) provides the Order overall, in its entirety, "shall be implemented consistent with applicable law."

Because of those limitations, "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). In other words, the Order "is not self executing." *Id.* Due to those genuine constraints of feasibility and legality, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Trump v. New York*, 592 U.S. at 131 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)) (dismissing analogous pre-implementation challenge to a Presidential Memorandum on this basis). That is a ripeness problem.

In response, Plaintiffs rely heavily on the Ninth Circuit's 2018 decision in *City & County of San Francisco v. Trump*, in which the Ninth Circuit exercised review over an Executive Order (in part) because of its view that that "Executive Order's savings clause does not and cannot override its meaning." 897 F.3d 1225, 1240 (9th Cir. 2018). But this Court cannot take its guidance from Ninth Circuit opinions from 2018 that are inconsistent with Supreme Court opinions from 2020. And *Trump v. New York* explicitly rejects this very reasoning—placing nearly dispositive weight on materially indistinguishable language to order dismissal on grounds of both standing and ripeness. *See, e.g.*, 592 U.S. at 131 (emphasizing that "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible'" (quoting *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)).

Plaintiffs' (quite limited) responses to Defendants' arguments about *Trump v. New York* are revealing. The *NAACP* Plaintiffs, for example, argue that the Presidential Memorandum at issue in that case "depended on multiple layers of federal agencies' discretionary action, contingent

events, and unknown methodologies." *NAACP* MTD Opp'n at 21. But that is no distinction at all—it is a perfect description of *this* Executive Order, too. DHS, for example, has substantial discretion in deciding what will or will not be "feasible and consistent with applicable law" in generating State Citizenship Lists. E.O. § 2(a); *see also* Supp. Mayhew Decl. ¶ 5. The Postal Service will go through "multiple layers" of procedural and substantive decision-making before any final rule is published, including by considering and responding to comments in a manner that is not dictated in any way by the Executive Order. *See* Monteith Decl. ¶ 5 (describing these steps). And DHS would be using currently "unknown methodologies" to carry out the Executive Order—which does not itself dictate any particular methodology, the subject of which is actively under discussion within the Executive Branch. *See* Supp. Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.

Plaintiffs also repeatedly cite footnote eight of *Common Cause v. Trump*, which states in passing that "laws (or executive orders) cannot be held to destroy themselves through saving clauses." 506 F. Supp. 3d 39, 53 n.8 (D.D.C. 2020) (citation omitted). But overall, that decision, if anything, supports Defendants' position. Indeed, Plaintiffs seem to have found a footnote that they liked and then ignored the rest of the opinion. Ultimately, that opinion holds—over a dissent that reads thematically quite similarly to Plaintiffs' briefs in these cases, *see id.* at 56-61 (Cooper, J., dissenting)—that judicial review was premature in the context of a pre-implementation challenge to the same Presidential Memorandum that the Supreme Court eventually addressed in *Trump v. New York*. In short, "the *Common Cause* court relied on the challenged executive order's saving clause to conclude that judicial review was premature." *League of United Latin Am. Citizens v. Exec. Off. of President* ("*LULAC II*"), 808 F. Supp. 3d 29, 67 (D.D.C. 2025).

To justify that result, the court explained that, "[l]ike the Executive Branch," the courts also "have a substantial interest in postponing review" of a pre-implementation challenge to a non-

self-executing Presidential directive. *Common Cause*, 506 F. Supp. 3d at 53. And it reasoned that, "[a]lthough we 'are not faced with a serious doubt as to whether the [memorandum] will ever translate into action at all,' we have 'doubts about *how* the [Secretary and President] may make that translation.'" *Id.* (quoting *Off. of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987) (citation modified)) (emphasis added). That uncertainty was important to the court as a matter of ripeness, because "how they do so"—that is, how agencies actually implement the President's policy goals—"will substantially shape the important legal questions that the plaintiffs would have us decide in the abstract." *Id.* So too here—even accepting (as the court did in *Common Cause*) that there is no "serious doubt" that at least some portions of the Executive Order will be implemented in some fashion. Ultimately, the approach of the three-judge court in *Common Cause* was vindicated by the Supreme Court in *Trump v. New York*. And the approach of the courts that came out the other way—discussed in Plaintiffs' preferred footnote—was rejected.

Defendants recognize that (unlike the Ninth Circuit decision on which they each rely) the district-court opinions in *LULAC II*, 808 F. Supp. 3d 29 (D.D.C. 2025), and *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025), *do* post-date the Supreme Court's decisions in *Trump v. New York*. But this Court should not rely on those decisions, for at least three reasons. First, respectfully, those courts made the same mistake that Plaintiffs do in their briefs, by relying on *San Francisco* and footnote eight of *Common Cause* to support a proposition that is inconsistent with the Supreme Court's subsequent decision in *Trump v. New York*. This Court need not and should not embrace the flawed reasoning in those decisions, which are currently on appeal. Instead, this Court should decide this case consistently with the (binding) opinion in *Trump v. New York*—which found it not only relevant, but effectively dispositive that the Presidential Memorandum at issue

- 14 -

in that case called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" 592 U.S. at 130 (quoting 85 Fed. Reg. at 44,680).

Second, even setting aside the significance of the feasibility and legality constraints in the text of this Executive Order, the Order at issue in this case is materially different from the one at issue in *LULAC* and *California* (at least, as that Order was interpreted by those courts).  For example, those courts believed that Executive Order 14,248 "dictate[d] the precise contents of the new rule" and "mandate[d] that the [Election Assistance Commission] take action to require documentary proof of citizenship on the Federal Form." *LULAC v. Exec. Off. Of President* ("*LULAC I*"), 780 F. Supp. 3d 135, 184-85 (D.D.C. 2025); *California*, 786 F. Supp. 3d at 378-79.  Whether that is a correct interpretation of *that* Executive Order is a subject more appropriately addressed in the (ongoing) appeals in those cases.  But it would certainly not be the right interpretation of *this* Executive Order, which does not directly decide the contents of any final rule (at most, a proposed rule), nor "mandate" any particular final agency action at all.  Instead, this Executive Order leaves meaningful and genuine discretion for the President's subordinates, who are currently deliberating regarding its implementation (and, at least in the case of the Postal Service, will be seeking and considering public comment before issuing any final rule).  *See* Monteith Decl. ¶ 3; Supp. Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  So, even if those opinions were binding here, and even in the absence of *Trump v. New York*, the result in this case should be different.

Third, the most recent opinion in *LULAC* itself correctly ruled in the *government*'s favor on at least some claims that are broadly analogous to the claims at issue here.  *See, e.g., League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC III*"), 818 F. Supp. 3d 34, 105 (D.D.C. 2026) ("[B]ecause the Court must assume that the Attorney General will heed the 'requirement of lawful implementation,' it cannot conclude that implementation of Section 7(a) will

- 15 -

imminently harm Plaintiffs in a manner redressable by a favorable decision in this case.") (citing that Executive Order's savings clause; *Common Cause*, 506 F. Supp. 3d at 49; and *Allbaugh*, 295 F.3d at 34). Those same legal principles support the government's jurisdictional arguments—not Plaintiffs'—even if the government respectfully disagrees with Judge Kollar-Kotelly's interpretation of the Executive Order at issue in those cases.

As for the *DSCC* Plaintiffs, it is telling that their primary authority on ripeness seems to be a footnote from a 16-year-old Third Circuit decision. *See El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 190 n.9 (3d Cir. 2010). In any event, they seem to misunderstand that footnote, which is about a materially different Executive Order. There, Executive Order 12,968—about access to classified information—reflected "a delegation of inherently executive authority by the President to another member of the Executive Branch." *Id.* Plaintiffs (and the Third Circuit) are correct that that order was "effective immediately," but that was not because of some special principle that applies to all Executive Orders—it was because *that* particular Executive Order expressly said so: "This order is effective immediately." Exec. Order 12,968, § 7.2(f), *Access to Classified Information*, 60 Fed. Reg. 40,245 (Aug. 2, 1995). *This* Executive Order, by contrast, says nothing about being "effective immediately," and instead contemplates, on its face, significant deliberations by the relevant agencies before any legally significant action is taken. *See Allbaugh*, 295 F.3d at 33 (discussing what it means for an Executive Order to be "not self-executing"). The *DSCC* Plaintiffs' primary authority thus undermines their position, not supports it.

Next, the *NAACP* Plaintiffs rely heavily on snippets from remarks to the press and a "Fact Sheet" posted on the White House's website. *NAACP* MTD Opp'n at 19-20. But the agency officials who are currently deliberating about implementation of this Order are doing so based on the Order itself—not decontextualized statements to the press or marketing materials divorced

from their context.  Contrary to Plaintiffs' assertion that "[a]ny 'contingencies' or 'uncertainties' about the Order appear to have arisen only after Defendants appeared in court," *id.* at 20, all of Defendants' arguments are based on the text of the Order itself.  The Court should likewise interpret that text—not fact sheets or press statements that (unsurprisingly) are often drafted without including all the same legal nuance.

Remarkably, the *NAACP* Plaintiffs seem to take the position that even *discussing* the Executive Order is unlawful.  *See NAACP* MTD Opp'n at 20-21 (arguing that deliberations about the Executive Order amount to the Postal Service "succumb[ing] to" a "prohibited influence" and that "[a]nything more the USPS does would only amount to further violations" (citation omitted)).  Plaintiffs cite nothing for that ambitious proposition, which is in any event based on a material mischaracterization of the Order: if it were really true that (as the *NAACP* Plaintiffs say) "the Order unequivocally (with no savings language) directs the USPS to issue regulations that violate federal statutes in myriad ways," *id.* at 20, the ripeness questions in this case might be different.  But that conclusory caricature of the Order is impossible to square with its actual text.  In reality, Section 3(b) of the Order contemplates issuance only of a "notice of proposed rulemaking," does not dictate the contents of any final rule, and contains significant and specific "savings language" in multiple places.  Plaintiffs cannot solve their jurisdictional problems by wishing away the language in the Order that is inconsistent with their position.

The *DSCC* Plaintiffs include a long footnote stating their view that "[t]his case does not concern the mailability of matter under chapter 30 of title 39," *DSCC* MTD Opp'n at 14 n.8, which (if true) might be relevant to the question of whether normal principles of APA review (rather than ultra vires review) governed any future judicial review of a final rule by the Postal Service.  *See* Defs.' Br. at 19 n.6 (discussing ultra vires review of certain Postal Service actions).  But, how do

- 17 -

Plaintiffs know that to be true?  Again, the Postal Service has not even published a proposed rule, much less a final rule.  So neither Plaintiffs, nor the Court, nor even the government can say definitively what source of statutory authority the Postal Service will invoke in any future proposed (let alone final) rule.  Plaintiffs' unsupported assumptions about the justification for a not-yet-issued proposed rule, if anything, confirm that this case is not ripe.

The *DSCC* Plaintiffs argue next that Defendants' "declarations conspicuously lack any statement that the agencies may not implement the E.O.'s data sharing mandates at all.  *Id.* at 17 (citation omitted).  But no such statement is necessary, for at least two reasons.  One, the Executive Order itself confirms that there are no such "data sharing mandates" to violate the Privacy Act— just the opposite, the Executive Order explicitly commands *compliance* with the Privacy Act, in multiple places.  *See* E.O. §§ 2(a), 3(b)(iv), 4(c), 7(b).  Defendants' declarations confirm that the agencies are now considering those very questions.  *See* Supp. Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  Plaintiffs cannot reasonably demand more, at least at this early stage.  Second, even if the agencies do eventually create State Citizenship Lists, exactly how those lists are created, using what data, shared with whom, for what purpose, and using what procedures, are all relevant to the questions of whether (or to what extent) the agency has complied with the Privacy Act.  So Plaintiffs are simply incorrect to say that "the specific APA claim pressed by the Democratic Party Plaintiffs presents a 'clear-cut legal question' suitable for resolution now."  *DSCC* MTD Opp'n at 16 (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)).  Instead, it is impossible to address those questions in the abstract, before agencies (much less the Court) know how the Executive Order will be implemented, and what steps will be taken to address the potential applicability of the Privacy Act.

*    *    *

- 18 -

Ultimately, whether considered as a problem of standing, ripeness, or both, the fatal flaw of these lawsuits—at least as currently constructed—remains the same. In short, at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump*, 592 U.S. at 131. Accordingly, Plaintiffs' claims should be dismissed, in their entirety, for lack of subject-matter jurisdiction. That dismissal would be without prejudice to the future exercise of judicial review over any final agency action that causes Plaintiffs an actual or imminent Article III injury.

### III.    Plaintiffs' APA claims fail to challenge any final agency action.

Even if they could show standing and ripeness, all of Plaintiffs' APA claims fail for lack of final agency action. It is axiomatic that APA claims may only challenge final agency action. 5 U.S.C. § 704; *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) ("The APA authorizes courts to review only 'final agency action[s].'") (alteration in the original) (quoting 5 U.S.C. § 704). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (citation omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id.* (citation modified).

In their opposition briefs, Plaintiffs continue to assert that final agency action has occurred, but neither *Bennett* requirement has been satisfied. *DSCC* MTD Opp'n at 15-18, 36-38; *LULAC* MTD Opp'n at 23-27; *NAACP* MTD Opp'n at 22-23.

**Section 3(b) – Postal Service Rulemaking.** As to Section 3(b) of the Order, in which the Postmaster General is directed to "initiate a proposed rulemaking" and "establish uniform standards for mail-in or absentee ballots," USPS has not issued a proposed rule. It has certainly not

issued a final rule.  E.O. § 3(b); Monteith Decl. ¶ 4.  Courts "do not have authority to review proposed rules." *In re Murray Energy*, 788 F.3d at 334; *see also, e.g.*, *In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court.") (citation omitted); *FDIC v. Bank of Am., N.A.*, 783 F. Supp. 3d 1, 24 (D.D.C. 2025) ("[P]roposed rules are not 'final agency actions' that this court has authority to review."). After all, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334.  Plaintiffs offer no meaningful response to this straightforward basis for dismissal of all APA claims relating to the Postal Service.[4]

The *DSCC* Plaintiffs' sole APA claim does not challenge Section 3(b) of the Order.  *See DSCC* MTD Opp'n at 15-18, 36-38.  Similarly, the *NAACP* Plaintiffs' sole APA claim does not challenge Section 3(b) of the Order.  *See NAACP* MTD Opp'n at 23 (discussing APA claim in context of State Citizenship Lists only and referring to *NAACP* Plaintiffs' Complaint in Count VI, *NAACP* Compl. ¶¶ 193-214, which relates solely to the State Citizenship Lists).  Only *LULAC* Plaintiffs specifically argue that Section 3(b) of the Order is itself reviewable final agency action, because "Section 3(b)" contains "mandatory language that already dictates the end result" that "USPS must refuse to deliver absentee ballots to any voter not included on its participation list." *LULAC* MTD Opp'n at 24.  But contrary to *LULAC* Plaintiffs' assertions, the Executive Order does not dictate that "end result." *Id.*

---

[4] As explained in greater detail in Defendants' motion to dismiss, APA review is not necessarily available with respect to the Postal Service's determinations.  *See* Defs.' Br. at 19 n.6 (discussing a form of ultra vires review that governs review of certain actions by the Postal service).  Regardless, any potential form of judicial review would still require a final action by the Postal Service.  *See Bell v. New Jersey*, 461 U.S. 773, 777-79 (1983) (even outside the context of APA review, explaining that "[t]he strong presumption is that judicial review will be available only when agency action becomes final").

Again, the Order states: "the Postmaster General is hereby directed to initiate a proposed rulemaking" and that "[a]*ny* final rule pursuant to this section shall be issued no later than 120 days from the date of this order." E.O. § 3(b), (d) (emphasis added). Section 3 is further limited by Section 7(b), which states: "This order shall be implemented consistent with applicable law." *Id.* § 7(b). Nothing in the Order compels the Postal Service to issue a final rule, let alone a final rule that includes all the provisions to be included in the *proposed* rule. And of course, the Postal Service has not even issued a proposed rule. Monteith Decl. ¶ 4. In order for USPS to implement Section 3(b) of the Order, it will issue a proposed rule, deliberate on how best to carry out the provisions in the proposed rule consistent with applicable law and the agency's statutory authority (including by inviting and responding to public comment on the proposed rule), and then issue a final rule. Only any final rule would be final agency action. The Executive Order only directs that a proposed rule be issued "within 60 days of the date of this order" (by May 29, 2026). E.O. § 3(b). It is undisputed that USPS will not refuse to accept for delivery nor sequester any ballot or election mail until and unless a final rule is issued with a provision mandating USPS to do so. Nor does the Order dictate an end result—if it had, the Order could have stated, for instance, that a final rule must be issued, and that final rule must include all the provisions directed to be included in the proposed rule. The Order does not do so.

In short, no final agency action has taken place with respect to Section 3(b) of the Order.

**Section 2(a) – State Citizenship Lists.** Section 2(a) of the Order contemplates, "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," the creation of State Citizenship Lists consisting "of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* § 2(a). But no such lists have been compiled.

*See* Supp. Mayhew Decl. ¶ 7.  And no such lists have been transmitted.  *Id*.  Should such lists be compiled and transmitted, the Order does not instruct or mandate states or their officials to use the lists, let alone instruct or mandate that individuals not appearing on the list must be culled from voter rolls.  *See* E.O. § 2(a).  Any contrary interpretation is inconsistent with the text of the Order.  *See id.* ("An individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State.  State and Federal laws and State procedures must still be followed for an individual to be registered to vote.").

Accordingly, final agency action has not occurred.  *First*, on its face, the Order explicitly applies only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974."  *Id.*  Deliberations within DHS are ongoing, which includes consideration of (as required by the Order) what is "feasible" and "consistent with applicable law," including (but not limited to) the Privacy Act.  *Id.*; *see* Supp. Mayhew Decl. ¶ 5; *see also* MacBride Decl. ¶ 5.  As of this filing, it is not even clear whether or when these lists will be created—much less in what form, based on what data, or how they might be used.  There is thus no final agency decision, as is required under the first *Bennett* requirement.  *Bennett*, 520 U.S. at 177-78.

*Second*, the Order contains further directives to "establish the infrastructure necessary to compile, maintain, and transmit" the State Citizenship Lists and to "establish procedures" to allow individuals to "update or correct" their records and for states to "suggest[] modifications or amendments" to the State Citizenship Lists.  E.O. §§ 4(c), 2(a).  Neither the infrastructure to compile, maintain, and transmit the lists, nor the procedures to amend and update the lists have been finalized.  *See* Supp. Mayhew Decl. ¶¶ 7-8.  In other words, DHS has not yet consummated its decisionmaking process, with respect to the first *Bennett* requirement.

- 22 -

*Third*, even if and when the State Citizenship Lists are compiled, the mere creation of the lists does not implicate the second *Bennett* requirement, that "rights or obligations" have been determined, or "legal consequences" have been produced. *Bessent*, 167 F.4th at 1235 (citation omitted). The mere compilation of State Citizenship Lists within the federal government, without more, has no impact on any voting rights. For instance, the confirmation of someone's citizenship status, or whether they are over 18 years old, from SSA to DHS—especially if it is done consistent with the Privacy Act and other applicable law (as the Order directs)—produces no legal conse-quences for that person. Since both *Bennett* requirements must be met for final agency action to occur, and since no lists have been transmitted, final agency action has not taken place.

Plaintiffs contend that their APA challenges to Section 2(a) appropriately challenge final agency action. *See DSCC* MTD Opp'n at 15-18, 36-38; *LULAC* MTD Opp'n at 23-27; *NAACP* MTD Opp'n at 22-23. They are mistaken.

*DSCC* Plaintiffs rely heavily on *Venetian Casino Resort v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), especially for the proposition that "'were review postponed, [Plaintiffs] would be unable to prevent' Defendants from accessing and distributing their members' private information in illegal matching programs." *DSCC* MTD Opp'n at 16 (quoting *Venetian*, 530 F.3d at 928). But that case is inapposite, as the dispute in *Venetian* was materially different. That case concerned the EEOC's potential disclosure of Venetian's confidential commercial information to third parties without prior notification to Venetian pursuant to the EEOC's Compliance Manual § 83.1, which conflicted with the EEOC's own disclosure policies under the Freedom of Information Act. The latter dis-closure policy required notice to Venetian of a request for the release of confidential commercial information, as well as an opportunity to object to the release of such information to third parties

and provision of a written statement from EEOC explaining why such objection is not sustained, so that Venetian could seek a court injunction if it disagreed. *Venetian*, 530 F.3d at 934-935.

Here, the Court is not faced with a legal decision on which one of two disclosure policies is applicable. Instead, *DSCC* Plaintiffs challenge whether the creation of State Citizenship Lists violates the Privacy Act. But that challenge arises (1) before the relevant agencies have even completed internal review and deliberations, including a consideration of feasibility and consistency with applicable law (including specifically the Privacy Act) to create these lists; (2) before final decisions regarding the necessary infrastructure and correction procedures that precede the compilation of the lists has been constructed; and (3) before any such lists are actually compiled *or* transmitted to state officials. In other words, in *Venetian*, the dispute was a legal question as to whether the Compliance Manual or Freedom of Information Act policy applied to govern the disclosure of confidential commercial information already in the EEOC's possession. All relevant facts had been perfected. But here, no final determination has even been made as to whether DHS can feasibly and consistent with applicable law create State Citizenship Lists, let alone build any necessary infrastructure to sort and combine data from various databases across federal agencies to compile and transmit State Citizenship Lists. Contrary to *DSCC* Plaintiffs' assertions, timing judicial review until final agency action has occurred will not prevent them from effectively challenging the compilation and transmission of State Citizenship Lists.

*LULAC* Plaintiffs focus again on the "shall" language in Section 2(a) of the Order. *See LULAC* MTD Opp'n at 23-25. They argue that in the ripeness analysis, there is a distinction between cases that merely authorize agency action (or suggest the agency consider some action) versus this Order which "unquestionably requires the agencies to carry out specific, predetermined actions." *Id.* But the *LULAC* Plaintiffs ignore the explicit instructions in the very same Section

2(a) of the Order, which command the relevant agencies to take action only to the "extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." E.O. § 2(a). *LULAC* Plaintiffs do not explain why the word "shall" must be given exclusive weight, while simultaneously ignoring the President's corresponding (and overarching) commands to take action only to the extent it is feasible and consistent with applicable law, contained in the very same section. That fundamental disconnect lies at the heart of the lack of final agency action that dooms Plaintiffs' premature challenge of Section 2(a).

Finally, the *NAACP* Plaintiffs emphasize what they call "unlawful interagency data sharing that has already taken place." *NAACP* MTD Opp'n at 23. But *NAACP* Plaintiffs do not plausibly allege anything of the sort in their Complaint, and that assertion is, in any event, contradicted by the government's declarations. *See* MacBride Decl. ¶ 6 ("SSA has not yet made any final decisions about its role in implementation of the Executive Order."); Supp. Mayhew Decl. ¶ 7 ("USCIS has not yet begun preparation of any 'State Citizenship List' as contemplated by E.O. 14,399."). And to the extent that *NAACP* Plaintiffs mean to challenge some *other* interagency data sharing that preceded this Order, they should challenge *that* data-sharing (as others have done in other cases[5]), not Section 2(a) of this Executive Order.

## IV.    Plaintiffs fail to identify any viable cause of action for their statutory claims.

To the extent that Plaintiffs continue to assume the APA provides the relevant cause of action for all or most of their statutory claims, that is incorrect (at least) because of their failure to identify any "final agency action," 5 U.S.C. § 704, as discussed *supra*, Section III. In addition,

---

[5] *See, e.g., League of Women Voters v. DHS*, No. 25-cv-3501 (D.D.C. Sep. 30, 2025); *LULAC v. Exec. Off. of President* ("*LULAC II*"), 808 F. Supp. 3d 29 (D.D.C. 2025).

with respect to their claims against the President—and thus, all of their statutory claims challenging the Executive Order itself, rather than possible future implementation of that Order—Plaintiffs cannot sue under the APA because "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord LULAC II*, 808 F. Supp. 3d at 69 ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." (quoting *Franklin*, 505 U.S. at 796)), *appeals filed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025), & No. 25-5478 (D.C. Cir. Dec. 31, 2025).

**Privacy Act.** Plaintiffs invoke the Privacy Act's statutory cause of action. But the Privacy Act itself creates a cause of action only for adversely affected "individual[s]," 5 U.S.C. § 552a(g)(1)(D), not organizations, and only for injunctive relief only in narrow circumstances that are plainly inapplicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)). That much seems to be undisputed. In addition, generally, "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175-76 (4th Cir. 2025), *abrogated on other grounds by Am. Fed'n of State, Cnty. & Mun. Emps. v. SSA*, 172 F.4th 361 (4th Cir. 2026) (en banc).

*DSCC* Plaintiffs insist that Defendants' "argument that APA review is 'foreclosed'" has been "repeatedly rejected by courts." *DSCC* MTD Opp'n at 35-36. *LULAC* and *NAACP* Plaintiffs cite essentially the same cases under the same reasoning. *LULAC* MTD Opp'n at 26; *NAACP* MTD Opp'n at 43. But whether injunctive relief for alleged violations of 5 U.S.C. § 552a(g)(1)(C)

& (D) (the Privacy Act violations alleged here) can be sought when the Privacy Act itself only provides for monetary relief is available is not strongly supported by the cases *DSCC* Plaintiffs cite. First, *DSCC* Plaintiffs cite to *LULAC v. Exec. Off. of President* ("*LULAC III*"), 818 F. Supp. 3d 34 (D.D.C. 2026), *judgment entered*, Nos. 25-cv-0946, 25-cv-0952, 25-cv-0955, 2026 WL 880056 (D.D.C. Mar. 31, 2026), *appeals filed*, No. 26-5099 (D.C. Cir. Mar. 31, 2026), & No. 26-5102 (D.C. Cir. Apr. 2, 2026), but even that case acknowledges "that the availability of injunctive relief under the APA in circumstances similar to those presented here is an unsettled question with which other courts are actively wrestling." *Id.* at 111-12 (citing *Bessent*, 152 F.4th at 175-76). *DSCC* Plaintiffs next cite *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 41-42 (D.D.C. 2025), but the cited pages appear to discuss final agency action, not whether injunctive relief under the APA is available for Privacy Act violations where the Privacy Act statute provides only for monetary relief.[6]

At best, Plaintiffs point to favorable district court opinions in *LULAC III* and *Ctr. for Taxpayer Rts.*, but even those opinions come with significant reservations. Respectfully, the reasoning in *Bessent*, particularly that Congress explicitly provided for only monetary penalties for 5 U.S.C. § 552a(g)(1)(C) & (D) Privacy Act violations, is more persuasive and precludes injunctive relief

---

[6] The *DSCC* Plaintiffs (at 35-36) also cite *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), and *Doe v. Stephens*, 851 F.2d 1457, 1460-61 (D.C. Cir. 1988), but neither resolves this question presented here. *Chao* contains one sentence of unexplained dicta on this subject, and even that ultimately only offers a speculative and ambiguous pondering about what Congress "may" have intended. *See Bessent*, 152 F.4th at 176. And in *Doe v. Stephens*, this remedial argument was seemingly not raised by the government—presumably because the plaintiff there did not even assert an equitable APA claim. *See* 851 F.2d at 1465 n.8 ("Strictly speaking, Doe does not premise his claim for equitable relief on the APA."). The D.C. Circuit instead seems to have construed the plaintiff's complaint to raise such a claim, in order to vindicate the "more important principle" of avoiding the need to resolve a difficult (and unrelated) Fourth Amendment question. *See id.* (citation omitted). Ultimately, neither case is an obstacle to this Court faithfully interpreting the remedial provisions of the Privacy Act, in a case in which this remedial argument is squarely raised by the government and briefed by the parties.

under the APA for any Privacy Act claims.  Ultimately, if Plaintiffs' approach were correct, it is hard to understand why Congress went to such great lengths to specify what remedies are (and are not) available to vindicate rights under the Privacy Act.

**Ultra Vires.**  To the extent Plaintiffs assert statutory ultra vires claims, these cannot succeed for two main reasons.  First, such claims apply only to situations of an extreme statutory error "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F. 4th 756, 764 (D.C. Cir. 2022)).  These "Hail Mary pass" claims "rarely succeed[]." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  Here, there is no such asserted statutory violation.  Second, statutory ultra vires review is unavailable where "an alternative path to judicial review" exists.  *NRC*, 605 U.S. at 682; s*ee also* Defs.' Br. at 19 n.6 (discussing the possible applicability of a different form of ultra vires review that might govern review of certain possible future actions by the Postal Service).  Plaintiffs can access just such an alternative path by waiting for final agency action to take place and then sue, whether under the APA, under the Privacy Act (*e.g.*, for monetary relief to an individual who suffers actual damages), or under the other statutory provisions that some Plaintiffs cite, addressed below, provided they can cite a valid cause of action.

But Plaintiffs point to nothing close to a statutory violation of that sort here.  Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim. *NRC*, 605 U.S. at 682.  For example, rather than identify any "'clear and mandatory' statutory command" that some agency has violated, *Changji*, 40 F.4th at 722 (citation omitted), Plaintiffs simply argue that the "postal statutes grant the President no power to direct

USPS rulemaking" at all. *NAACP* MTD Opp'n at 35. That is incorrect—but even if it were correct, the Postal Service has still not "disregard[ed] a specific and unambiguous statutory directive" in a way that could support an ultra vires claim. *Changji*, 40 F.4th at 722 (citation omitted).

**Other Statutory Claims.** Setting aside Plaintiffs' Privacy Act claims (that rely on the APA) and statutory ultra vires claims, already addressed above, some Plaintiffs reference other statutes. But "[w]ithout [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (citation omitted). Those Plaintiffs fail to identify a private right of action to invoke for their statutory claims that do not involve the Privacy Act and thus those challenges are without merit.

*LULAC* Plaintiffs acknowledge that their "only statutory causes of action *are* APA causes of action." *LULAC* MTD Opp'n at 26. *DSCC* Plaintiffs, however, appear to invoke USPS's statutory authority. *See DSCC* MTD Opp'n at 34. But conspicuously absent from *DSCC* Plaintiffs' references to USPS's statutory authority, *e.g.*, 39 U.S.C. § 102(5) or § 404(e)(1)-(2), is a private right of action to bring forth such claims, as required by *Sandoval*. *DSCC* Plaintiffs do not (and cannot) point to any such private right of action. In any event, USPS has not yet proposed a rule, let alone promulgated a final rule, to implement Section 3 of the Order. If and when it does so, USPS will provide statutory authority for any final rule it seeks to implement, and at that time any plaintiff who contends to be harmed by such a final rule could then challenge it, including on the grounds that USPS lacks statutory authority to issue the final rule.

## V.    Plaintiffs' claims challenging the enforcement priorities and enforcement discretion of the Executive Branch are independently unreviewable.

*DSCC* and *LULAC* Plaintiffs do not appear to challenge parts of the Order which pertain to the enforcement priorities of the Executive Branch, *e.g.*, E.O. §§ 2(b), 4(b), and 5. To the extent

that *NAACP* Plaintiffs continue to challenge these provisions, *see NAACP* MTD Opp'n at 10, 14; *see also supra* at 9 n.3 (discussing a concession in their preliminary-injunction reply), such challenges are without merit as they seek to improperly intrude upon the Executive's "broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted). Decisions about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" thus fall "within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Accordingly, lawsuits challenging enforcement priorities "run up against the Executive's Article II authority to enforce federal law," *United States v. Texas*, 599 U.S. 670, 678 (2023), and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" of the law-enforcement, investigation, and prosecution functions of the Executive Branch. *Id.* at 679. The Supreme Court has specifically and recently emphasized that point in this very context, explaining that "the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. at 620 (quoting *Nixon*, 418 U.S. at 693. As a result, "federal courts lack Article III jurisdiction over . . . suit[s]" that challenge the Executive's enforcement decisions. *Id.* at 685.

## VI.     The President and the Department of Commerce should be dismissed.

Even if Plaintiffs could overcome all of the threshold problems above, at a minimum, the President of the United States, the Department of Commerce, and the Secretary of Commerce (in his official capacity) should be dismissed as Defendants in these suits.

**Department of Commerce.** As for the Department of Commerce and the Secretary of Commerce (in his official capacity), their only mention in the Order is in Section 4(a), which

provides that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order." E.O. § 4(a). Any "coordination" role for the Department of Commerce would reflect internal government deliberations only and thus has no legal effect and causes no cognizable Article III injury subject to judicial review.

*DSCC* Plaintiffs point out that the Secretary of Commerce spoke at the White House event where President Trump signed Executive Order 14,399. *See DSCC* MTD Opp'n at 41. So what? The President can invite anyone to appear at a White House event, but whether that official is an appropriate defendant in a federal lawsuit must stem from their role, if any, in taking some allegedly unlawful action that causes Plaintiffs an Article III injury. And here, it is undisputed that Secretary Lutnick's role is limited only to coordination with other agency heads. The Order does not charge the Department of Commerce with providing data to DHS for use in the State Citizenship Lists. The Order does not charge the Department of Commerce with conducting any rulemaking or prioritizing any prosecutions of federal voting-related crimes. *DSCC* Plaintiffs do not allege that the Department of Commerce or its Secretary acting in his official capacity have done or will imminently do anything to injure any plaintiff. Neither do *LULAC* Plaintiffs, *see LULAC* MTD Opp'n at 33-34 (limiting arguments to Section 4(a)'s "coordinat[ing]" role only), nor *NAACP* Plaintiffs, *see NAACP* MTD Opp'n at 44 (same). And a court order preventing one cabinet secretary from talking to another cabinet secretary would raise serious separation of powers problems. *Cf.* U.S. Const. art. II, § 2, cl. 1 ("[The President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices"). Therefore, the Department of Commerce and Secretary Lutnick should be dismissed, either as a matter of standing or failure to state a claim.

- 31 -

**President Trump**.  As addressed *supra*, section III, the President is not a proper subject of an APA challenge.  The President is also not properly subject to an injunction as there is no tradition of equitable relief against the President.  *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, C.J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (omission in original) (citations omitted)).  Nor could Plaintiffs' references to the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction.  The D.C. Circuit has observed that courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment).  Declaratory relief is therefore unavailable for essentially the same reasons as an injunction.

*DSCC* Plaintiffs cite out-of-circuit district court cases for the proposition that "it is premature to decide whether the President is an appropriate defendant."  *DSCC* MTD Opp'n at 41-42.  *NAACP* Plaintiffs assert that the President is subject to injunctive and declaratory relief.  *See NAACP* MTD Opp'n at 44.  Plaintiffs' arguments are unavailing.

As to *DSCC* Plaintiffs' arguments, it is not premature to dismiss the President as a defendant because any necessary relief could be effectuated by injunction and declaratory relief against lower-level officials, such as the agency heads tasked with implementation of the Order.  Plaintiffs do not need to enjoin (or seek a declaration) against the President to obtain complete relief (were

such relief warranted). This Court should not upset longstanding historical tradition and fundamental separation of power principles by entertaining the notion that the President can be enjoined in the performance of his official duties, particularly in a case where such extraordinary relief is unnecessary.

As to *NAACP* Plaintiffs' arguments, their citations miss the mark. *NAACP* Plaintiffs cite *Franklin*, but the very pages cited state: "While injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, the District Court's grant of injunctive relief against the President himself is extraordinary and should have raised judicial eyebrows." *Franklin*, 505 U.S. at 802 (citation omitted). *Franklin* goes on to acknowledge that the Supreme Court has "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* (citation omitted). *NAACP* Plaintiffs cannot fit the relief they seek within the very narrow confines of a possibly viable judicial injunction to perform a purely ministerial duty. There is no such ministerial duty at issue here. Indeed, *Franklin* states: "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* at 802-03 (citation omitted). *NAACP* Plaintiffs' additional citations are out of the proper context, and in any case, predate *Franklin*.

## CONCLUSION

For these reasons, these cases should be dismissed, without prejudice, under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).

Dated: May 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
 Chief Litigation Counsel (D.C. Bar. 995500)
ESAM K. AL-SHAREFFI
 Trial Attorney (D.C. Bar 90010174)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov

- 34 -