**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DSCC**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01114-CJN** |
| **DONALD J. TRUMP, in his official capacity as President of the United States**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |
| | |
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **No. 26-cv-01132-CJN** |
| **EXECUTIVE OFFICE OF THE PRESIDENT**, *et al.*, | |
| **Defendants,** | |
| **STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,** | |
| **Intervener Defendants.** | |

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

      Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Defendants,

STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, and STATE OF TEXAS,

      Intervener Defendants.

No. 26-cv-01151-CJN

## REPLY IN SUPPORT OF INTERVENER STATES' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.   Plaintiffs Lack Organizational and Associational Standing to Challenge Sections 2 and 3 of the Executive Order ........................................................................ 1

        A.   Section 2(a) ........................................................................................... 1

        B.   Section 2(b) ........................................................................................... 6

        C.   Section 3 ................................................................................................. 7

    II.  Plaintiffs' Claims Are Not Ripe ............................................................................. 8

    III. Plaintiffs Do Not Have A Viable Cause of Action Under the APA ................................. 15

CONCLUSION ................................................................................................................ 17

CERTIFICATE OF SERVICE ............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**                                                                                                      Page(s)

*Ass'n of Am. Physicians & Surgeons, Inc.v. Sebelius,*
   *746* F.3d 468 (D.C. Cir. 2014).................................................................................... 6

*Action on Smoking and Health v. Dep't of Labor*,
   28 F.3d 162 (D.C. Cir. 1994).................................................................................... 15

*Allen v. Wright*,
   468 U.S. 737 (1984).................................................................................................. 2

*Am. Petrol. Inst. v. Env't Prot. Agency*,
   683 F.3d 382 (D.C. Cir. 2012)................................................................................. 14

*Am. Portland Cement All. v. EPA*,
   101 F.3d 772 (D.C. Cir. 1996).................................................................................. 15

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
   901 F. Supp. 2d 19 (D.D.C. 2012) ............................................................................ 6

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979).................................................................................................. 6

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002).................................................................................... 12

*Bost v. Ill. State Bd. of Elections*,
   607 U.S. 71 (2026)............................................................................................... 5, 8

*Bridgeport Hosp. v. Becerra*,
   108 F.4th 882 (D.C. Cir. 2024) ................................................................................ 8

*Church v. Biden*,
   573 F. Supp. 3d 118 (D.D.C. 2021) ......................................................................... 14

*City & Cnty. of S.F. v. Trump*,
   897 F.3d 1225 (9th Cir. 2018).................................................................................. 13

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
   993 F.3d 880 (D.C. Cir. 2021).................................................................................. 6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)......................................................................................... 2, 6, 8

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. 2020) ....................................................................... 9, 13

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
    167 F.4th 605 (2d Cir. 2026) ................................................................................ 3

*Ctr. for Taxpayer Rts.*,
    815 F. Supp. 3d 1 (D.C.C 2025) ......................................................................... 16

Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census,
    85 Fed. Reg. 44,679 (July 21, 2020) .................................................................. 10

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................ 3, 4

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
    873 F. Supp. 2d 363 (D.D.C. 2012) .................................................................... 12

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .......................................................................................... 17

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................ 4

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) ................................................................ 12, 15, 17

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    (*LULAC I*), 780 F. Supp. 3d 135 (D.D.C. 2025) ...................................... 3, 9, 13, 14

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
    No. 25-cv-03501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ....................... 10

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 3

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................................................................. 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 2

*Nat'l Pub. Radio, Inc. v. Trump*,
    25-cv-1674 (RDM), 2026 WL 877434 (D.D.C. Mar. 31, 2026) ........................... 13

*Ord v. District of Columbia*,
    587 F.3d 1136 (D.C. Cir. 2009) ........................................................................... 6

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ............................................................................................ 12

*Reno v. Flores*,
   507 U.S. 292 (1993).............................................................................................. 13

*Sidak v. United States Int'l Trade Comm'n*,
   No. 23-5149, 2026 WL 1110981 (D.C. Cir. Apr. 24, 2026)...................................... 14

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976)................................................................................................. 2

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)............................................................................................... 5

*Tex. State LULAC v. Elfant*,
   52 F.4th 248 (5th Cir. 2022).............................................................................. 2, 7

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)............................................................................................... 5

*Trump v. New York*,
   592 U.S. 125 (2020)..................................................................................... 7, 9, 10

*United States v. Texas*,
   599 U.S. 670 (2023)............................................................................................... 5

**Statutes**

5 U.S.C. 552a ....................................................................................................... 17

5 U.S.C. § 704............................................................................................... 12, 17

39 U.S.C. 401 ....................................................................................................... 12

**Other Authorities**

Executive Order No. 14399 ("EO")................................................................... *passim*

U.S. Citizenship & Immigration Services, *SAVE* (last accessed May 22, 2026)......................... 16

U.S. Citizenship & Immigration Services, *USCIS Enhances Voter Verification Systems* (Nov.
   3, 2025) ............................................................................................................. 6

**INTRODUCTION**

Plaintiffs push the same theories of injury in their May 15, 2026 memoranda as they did on April 17, 2026. They were speculative then and remain speculative today. The status of Executive Order No. 14399 ("EO") is the same today as it was when Plaintiffs filed their complaint – no proposed rulemaking has been published, and no decision has been made concerning if and how the State Citizenship Lists will be compiled. Plaintiffs' claim that the EO will prevent them from carrying out their voter-engagement activities and prevent their members from voting is therefore riddled with contingencies and multiple layers of speculation. Without knowing the exact rules they are challenging, Plaintiffs' lawsuit is premature and Article III requires dismissal. The lack of final agency action also precludes Plaintiffs' causes of action under the Privacy Act and the Administrative Procedure Act. Accordingly, the Court should dismiss their claims.

**ARGUMENT**

I.  **Plaintiffs Lack Organizational and Associational Standing to Challenge Sections 2 and 3 of the Executive Order**

Despite the EO not yet being implemented, Plaintiffs somehow claim that it is currently inflicting ongoing or imminent harm. *See, e.g.*, Doc. ("LULAC Br.") at 14. But none of Plaintiffs' standing theories withstand scrutiny.

A.  **Section 2(a)**

Any conjured injury resulting from Section 2(a)'s directive to create the State Citizenship Lists to the extent "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974" is speculative. Fatal to Plaintiffs' standing, any injury is contingent on multiple layers of speculation—including that the State Citizenship List will be inaccurate, that the federal government and States will not collaborate to produce accurate lists, and that States will then use the State Citizenship Lists to somehow prevent eligible voters from receiving ballots,

1

even though Section 2(a) does not require the States to use the lists at all.  Doc. 77-3 ("Intervener State Br.") at 13–16; s*ee also* EO § 2(a) (ordering the provision of information to States without requiring any action from the States).  Plaintiffs' opposition briefs fail to identify any concrete organizational injuries stemming from the mere transmission of the State Citizenship Lists.  Their claim to standing is instead based on the unbacked assumption that all of the above is "certain" to occur, but there are simply too many "dominoes that would have to fall" to confer organizational standing.  *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022).  The Court should reject such conjecture.

Plaintiffs also claim that the Lists "directly harm Plaintiffs' 'core business activities' in assisting their members to successfully register to vote and cast a ballot" because "such lists unquestionably will exclude validly registered voters."  LULAC Br. at 3 (citations omitted); *see also* Doc. 132 ("DSCC Br.") at 26–27 ("Sections 2(a) and 3(b) will 'directly interfere with their core activities.'" (citation omitted)).  This too is extraordinarily speculative and rests on, among other major moving parts, guessing as to how third parties will respond to government action.  Intervener State Br. at 14.  Indeed, it is a textbook example of an alleged "injury" that the Supreme Court has stated time and time again is too attenuated to confer Article III standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)); *Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976))).  Plaintiffs' caselaw does not support stretching Article III so widely because these cases, including *League of Women Voters of United States v. Newby*

2

(cited LULAC Br. at 2–3), concerned additional voting requirements that made it more difficult for organizational plaintiffs to register voters. 838 F.3d 1, 9 (D.C. Cir. 2016) (concerning requirement that registration applicants to prove citizenship); *see also League of United Latin Am. Citizens v. Exec. Off. of the President* (*LULAC I*), 780 F. Supp. 3d 135, 188–89 (D.D.C. 2025) (cited LULAC Br. at 4) (concerning executive order requiring Election Assistance Commission (EAC) to take action to require documentary proof of citizenship on federal mail voter registration form). The mere compiling of information without any further instruction does not inflict that injury.

Plaintiffs also point to diversion of resources to address voter confusion. Doc. 134 ("NAACP Br.") at 13; DSCC Br. at 28–29; LULAC Br. at 7–8. Even putting aside the enormous speculation inherent in this standing theory, Plaintiffs' cannot "spend [their] way into standing." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). The Supreme Court has rejected resource-diversion standing in *Alliance for Hippocratic Medicine*. *Id.*; *see Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "'does not work to demonstrate standing'" after *Alliance for Hippocratic Medicine* (quoting *All. for Hippocratic Med.*, 602 U.S. at 394)).

Plaintiffs try to distinguish *Alliance for Hippocratic Medicine* by pointing to their voluntary decisions to expend resources to "monitor and address the impact of the State Citizenship Lists and mail ballot restrictions." DSCC Br. at 29; *see also* LULAC Br. at 7–8 ("Responding to the requirements of the challenged provisions will require the diversion of time and resources by Plaintiffs' staff to educate members about the requirements of the State Citizenship List and the Mail-In and Absentee Participation List . . . ."). But the Alliance for Hippocratic Medicine also alleged that the defendants' actions forced it to divert resources from

other projects to gather information and educate people about the challenged actions.  *All. for Hippocratic Med.*, 602 U.S. at 390, 394.  That theory of standing failed in *Alliance for Hippocratic Medicine*, and it must fail here too.

Resisting this point, Plaintiffs cite the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  NAACP Br. at 14.  But in *Alliance for Hippocratic Medicine*, the Supreme Court clarified that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context."  602 U.S. at 396.  The Supreme Court explained that standing existed in *Havens* because the defendant's provision of false information about apartment availability impaired the organization's "ability to provide counseling and referral services for low-and moderate-income homeseekers," *Havens Realty Corp. v. Coleman*, 455 U.S. at 379, "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."  *All. for Hippocratic Med*, 602 U.S. at 395.  This narrow scenario has no bearing here, as the EO does not directly prevent or impair Plaintiffs from engaging in their core activities, which purportedly consist of voter education and mobilization programs.  Plaintiffs remain just as free to educate voters about mail-in voting as they were before the EO was announced.

The DSCC Plaintiffs additionally claim that their candidates for office have standing under *Bost v. Illinois State Board of Elections* because of the EO's "transformation of federal elections." DSCC Br. at 19–20.  But again, the creation and transmission of the State Citizenship List does not alter any election rules because it is merely a resource that the States may or may not use at their discretion.  As explained in Intervener States' opposition to Plaintiffs' motion for preliminary injunction, the Supreme Court's recent decision in *Bost*—which clarified the law of candidate standing—is therefore inapplicable.  Doc. 105 ("Intervener State PI Opp'n Br.") at 15–16.  In *Bost*, the Supreme Court held a candidate had standing to challenge an Illinois law requiring election

4

officials to count mail-in ballots postmarked by election day but received up to two weeks later. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76–77 (2026). The Supreme Court explained that standing existed because that rule regulated the counting of votes—which directly affected candidates competing for those votes. *Id.* Here, by strong contrast, Section 2(a) does not change how votes are counted. If Plaintiffs' contrary theory is accepted—where candidates can challenge any governmental practice that could conceivably affect an election—candidate standing would become boundless. That, of course, makes Plaintiffs' theory implausible. See *United States v. Texas*, 599 U.S. 670, 681 (2023) (holding that by rejecting the plaintiffs' "expansive" and "novel" standing argument," the Court "abide[d] by and reinforce[d] the proper role of the Federal Judiciary under Article III").

Finally, Plaintiffs' alleged privacy injury based on the potential disclosure of their citizenship information is not cognizable or redressable. To start, the alleged injury resulting from the purported violation of the Privacy Act is also speculative because DHS and SSA have not yet made any known determinations about how they will create the State Citizenship List in compliance with the Privacy Act and other applicable law. Additionally, Plaintiffs have not met their burden of proving this injury—different parts of the American government sharing citizenship information—has "a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016) (explaining that, in assessing concreteness, courts must consider whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts).

Even if Plaintiffs did identify a cognizable injury, they could not show causation or redressability because the only information the State Citizenship Lists would contain is citizenship

and age—information already available in other federal databases which is routinely shared with States.  *See* U.S. Citizenship & Immigration Services, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025);[1] *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (finding that relief from challenged agency action was not redressable where "any injuries to referring physicians that result from the opt-out requirement are caused by statutes and regulations that pre-date the agency actions plaintiffs[] challenge"), *aff'd*, 746 F.3d 468 (D.C. Cir. 2014).  And, once again, because everyone must attest to being a citizen and being age-eligible when registering to vote, it is hard to see how Plaintiffs could be injured by the disclosure of information they already provided.  Intervener State Br. at 18.

## B.  Section 2(b)

Plaintiffs also cannot show any actual or imminent injury from Section 2(b) of the EO, which merely instructs the Attorney General to enforce unchallenged election laws.  As explained in Intervener States' opening brief, the directive issued in Section 2(b) is a matter of federal prosecutorial discretion and is not subject to judicial review.  Intervener State Br. at 21; *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 993 F.3d 880, 887 (D.C. Cir. 2021) (holding that "the FEC's exercise of prosecutorial discretion is unreviewable").  Fatal to Plaintiffs' claimed "chilling effect on [their] activities," NAACP Br. at 14, they do not allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" or "a credible threat of prosecution," *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  To do so would depend on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, namely (1) the intention to violate one of the election statutes under which the President directed

---

[1] https://www.uscis.gov/newsroom/news-releases/uscis-enhances-voter-verification-systems

enforcement by providing ballots to non-citizens or citizens who are under the age of 18, (2) a prosecutor determining Plaintiffs intentionally violated federal election law, and (3) the prosecutor exercising discretion to bring charges against Plaintiffs.  As Plaintiffs do not plausibly allege any of the above, their fear of prosecution is not fairly traceable to the EO.  *See* Intervener State Br. at 21–22; *Elfant*, 52 F.4th at 257 (finding no credible threat of prosecution for violation of election law where the circumstances leading to prosecution were speculative and depended in large part on the action of third parties).  Even if it were enough, Plaintiffs could not demonstrate redressability because existing unchallenged laws would still prohibit the provision and use of fraudulent ballots notwithstanding Section 2(b).  Intervener State Br. at 23.

### C.  Section 3

The challenge to Section 3 is not sufficiently concrete to assess whether a threatened injury is imminent because neither a final rule nor a notice of proposed rulemaking has been issued. Plaintiffs in fact have conceded a lack of knowledge as to what the ultimate rule will be.  *See, e.g.*, DSCC Compl. ¶ 71 ("The Order does not explain how USPS will create the Mail-In and Absentee Participation List . . . . Nor does it explain how a voter becomes 'enrolled' on the List.  The Order also does not clarify how the USPS's Mail-In and Absentee Participation List is connected to the State Citizenship List . . . ." (citations omitted)).  These are crucial questions for how the EO will be implemented and Plaintiffs' (and everyone else's) lack of clarity on them prevents any litigant from articulating a concrete injury caused by Section 3 before the rule is finalized.  *See* Intervener State Br. at 23–24; *Trump v. New York*, 592 U.S. 125, 131–32 (2020) (denying the plaintiffs standing because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983))).

Moreover, for the reasons discussed above, Plaintiffs' appeals to resource-diversion standing and candidate standing do not work with respect to Section 3.  DSCC Br. at 27–28; LULAC Br. at 7–8; NAACP Br. at 13–14.  As with Section 2(a), nothing in Section 3 prevents Plaintiffs from engaging in their "core" activity of educating and registering voters, distinguishing this case from *Havens*.  It also does not "govern the counting of votes in [their] election[s]," which was the basis for the Supreme Court's ruling of *Bost*, but instead governs security over mail-in ballot delivery prior to votes being casted and counted.  *Bost*, 607 U.S. at 83.  Plaintiffs therefore do not have standing to challenge Section 3.

## II.    Plaintiffs' Claims Are Not Ripe

Whether considered as a matter of Article III standing or prudential ripeness, Plaintiffs lack standing because their alleged harms are contingent on speculation about future events.  Intervener State Br. at 16–17; *Clapper*, 568 U.S. at 409–10, 414 n.5.

*First*, Plaintiffs' challenge to Section 2(a) is impermissibly based on multiple contingencies and layers of speculation.  Intervener State Br. at 14.  Even assuming the State Citizenship Lists are created, Plaintiffs do not know *how* this will be done.  Intervener State Br. at 16–17.  For example, Plaintiffs speculate that the State Citizenship Lists will violate the Privacy Act, *see, e.g.*, DSCC Compl. ¶¶ 140–153; LULAC Compl. ¶¶ 307–18; NAACP Compl. ¶¶ 193–214, even though the EO expressly says that the Lists should only be created "to the extent feasible and consistent with applicable law."  EO § 2(a).  Plaintiffs' selective quoting of the EO to argue that the State Citizenships are mandatory because Section 2(a) contains that word "shall" is therefore misleading, DSCC Br. at 4–5; LULAC Br. at 5; NAACP Br. at 18, and Plaintiffs' cited caselaw on this point carries no weight.  *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) (cited LULAC Br. at 5) (concerning a statute prescribing a mandatory duty without similar

8

qualifiers).  Notably, Judge Kollar-Kotelly declined to preliminary enjoin a similar executive order that mandated the creation of citizenship lists based on speculation that the lists would violate the Privacy Act—precisely because the government *could* create such lists consistent with the Privacy Act.  *LULAC I*, 780 F. Supp. 3d at 206.

Plaintiffs' extensive speculation dooms their case.  Intervener State Br. at 13–16.  The Supreme Court in *Trump v. New York* rejected judicial review of a presidential directive where it included the exact caveat.  *See* 592 U.S. at 131–32 (explaining that where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and take action 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" and the order "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here"); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) (holding presidential memorandum challenge was unripe where the order included qualifiers that any action taken be only "to the extent feasible" and "to the extent practicable").

Plaintiffs argue that *Trump v. New York* is inapposite because, in that case, the order at issue "would later allow the President to 'exercise the President's *discretion*' to set a policy."  LULAC Br. at 14 (quoting *New York*, 592 U.S. at 130) (emphasis not in original);[2] *see also* DSCC Br. at 13; NAACP Br. at 21.  But the Court made clear that its ripeness decision rested on the requirements of practicality and feasibility, which left open too many questions to warrant judicial review.  *See New York*, 592 U.S. at 131 ("The President, to be sure, has made clear his desire to

---

[2] For the sake of clarity, the Supreme Court in *Trump v. New York* did not emphasize "discretion" as suggested in the LULAC Plaintiffs' brief.  *See* 592 U.S. at 130.

9

exclude aliens without lawful status from the apportionment base.  But the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" (quoting Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020))). The Court in fact states that the President "has made clear" what he would do with the information he ordered.  *Id.*  That aside, whether and how the State Citizenships Lists will be compiled depends on "future discretionary action," namely by DHS, which Plaintiffs wrongly say distinguishes this case from *Trump v. New York*.  *See* LULAC Br. at 14–15.  Plaintiffs are also wrong when they suggest that the 2020 executive order is less concrete than Section 2(a).  In fact, the directives are nearly identical – like Section 2(a)'s instruction to gather information for the State Citizenship Lists, the 2020 order "instructed executive departments and agencies to share information with the Department of Commerce, to the extent permissible and consistent with law, to allow the Secretary to obtain accurate data on [citizens and noncitizens]."  85 Fed. Reg. 44,680.  Section 2(a) is therefore no riper than the 2020 order and *Trump v. New York* accordingly mandates dismissal of Plaintiffs' challenge.

The only evidence Plaintiffs can produce to suggest that DHS has determined whether and how it will compile the State Citizenship Lists is an exhibit filed in *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-03501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025). LULAC Br. at 28; Doc. 133-1.  Plaintiffs do not cite a specific page or quote in the 542-page document but represent that "[t]his document was published on or around May 8, 2026" and "disclose[s] a new memorandum of understanding between DHS, USCIS, and DOJ's Civil Rights Division, under which DOJ can access the SAVE database to investigate and audit the U.S. citizenship and immigration status of registrants or registered voters on state voting rolls as part of

10

states' voter-roll maintenance." LULAC Br. at 28 & n.10. The LULAC Plaintiffs, however, fail to mention that this memorandum was signed in January 2026, over two months before the EO was signed, and provides no information about if and how the State Citizenship Lists will be compiled. Doc 133-1 at 67. The memorandum pertains to SAVE, only one of the databases the EO lists to compile citizenship information and provides that SAVE will receive "the necessary information in the manner SAVE requires to respond to User Agency requests for verification of immigration status or U.S. citizenship information." *Id.* at 60. It does not suggest that any decision have been made concerning the State Citizenship Lists.[3] And if anything, this exhibit should alleviate Plaintiffs' concerns about the completeness and accuracy of the SAVE database.

*Second*, Plaintiffs' challenge to Section 3 of the EO is also too speculative to proceed. Intervener State Br. at 26–28. USPS has not even issued a *proposed* rule—let alone a final one. As previously explained, the EO contains only a broad outline of the proposed USPS regulations— which means Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)).

---

[3] The DSCC Plaintiffs filed a transcript of Acting Attorney General Todd Blanche's May 19, 2026 congressional testimony in further support of their motion for preliminary injunction, claiming that it "further confirmation that this case is ripe for adjudication." Doc. 137. Replying to a question about the EO, the Acting Attorney General stated vaguely that DOJ's role is "working with other agencies within the administration to implement the goals." Doc. 137-1 at 3. He did not provide any testimony concerning any final decision-making from the Department of Homeland Security, United States Citizenship and Immigration Services, or Social Security Administration, which are charged with compiling and transmitting the State Citizenship Lists under the EO. *See* EO § 2(a). And officials from USCIS and SSA provided this Court with sworn written statements stating that those agencies have not yet made any recommendation or final decisions regarding implementation of the EO. *See* Doc. 107-1 ¶¶ 8–9; Doc. 107-2 ¶ 6. DSCC Plaintiff's Exhibit 41 therefore does not ripen their claims.

Litigants cannot even challenge *proposed rules* before they are finalized.  *See* 5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.).  The reason why is obvious:  A proposed rule can change during rulemaking.  Here, USPS has committed not to implement any of the proposals from Section 3 before completing notice-and-comment rulemaking.  Doc. 107-3 (Decl. of S. Monteith) ¶ 5.  That means USPS will be legally required to accept and consider ideas submitted in comments.  *Id.*  Agencies *must* consider changes suggested by commenters, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015), so there is no reason to assume the final rule will look exactly as outlined in Section 3 of the EO.  Moreover,  like Section 2(a), Section 3 directs that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law," which will require USPS to make discretionary decisions about, among other things, how the Mail-In and Absentee Participation Lists will be compiled and how the enrollment process will work.  EO § 3(b)(iv)–(v).  Plaintiffs' claim that Section 3 cannot possibly be implemented lawfully is mere conjecture and should be rejected.  Additionally, premature adjudication of USPS's actions in the way Plaintiffs desire "denies the agency an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular rulemaking procedures.  *See Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 369 (D.D.C. 2012) (citation omitted).

Plaintiffs' suggestion that Section 3's qualifiers can be ignored at a whim is also wrong. The requirement that agencies act lawfully in carrying out an executive order is not meaningless. Indeed, "[t]he mere possibility that some agency might make a legally suspect decision" and ignore a saving clause's command to follow the law when implementing an executive order "does not justify an injunction against enforcement" of that order.  *Bldg. & Const. Trades Dep't, AFL-CIO*

12

*v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *see also Reno v. Flores*, 507 U.S. 292, 301 (1993) (to prevail in facial attack, complainant "must establish that no set of circumstances exists under which the regulation would be valid" (cleaned up)).  Instead, "if an executive order containing a saving clause directs a subordinate to achieve some goal, and that goal could be achieved in multiple ways—some of which would be legal and some of which would be illegal—a reviewing court will interpret the order in light of the saving clause to direct only permissible action." *LULAC I*, 780 F. Supp. 3d at 176 (citing *Common Cause*, 506 F. Supp. 3d at 49–50, 53 n.8 and *New York*, 592 U.S. at 131).

The "savings clause" caselaw relied on by Plaintiffs is also inapposite.  In *City & Cnty. of S.F. v. Trump* (cited at DSCC Br. at 31), the Ninth Circuit held that a challenge to an executive order unambiguously directing that sanctuary jurisdictions not receive federal grants was ripe where Plaintiffs showed a "history of past prosecution or enforcement."  897 F.3d 1225, 1238 (9th Cir. 2018).  Those circumstances are not present here.  In *LULAC I* (cited at DSCC Br. at 31; LULAC Br. at 19), the court afforded little force to an executive order's qualifiers because, in that case, no further factual development was needed because, unlike here, there was no uncertainty of the outcome.  780 F. Supp. 3d at 185. The same is true of *Nat'l Pub. Radio, Inc. v. Trump* (cited NAACP Br. at 19), where the order instructing federal agencies to deny certain funding was unambiguous and mandated one specific outcome.  No. 25-cv-1674 (RDM), 2026 WL 877434, at *19 (D.D.C. Mar. 31, 2026).  Here, in contrast and as described above, many of the significant contours of both Sections 2 and 3 are yet to be determined and the agencies will need to make substantive decisions during the rulemaking process.  It is therefore too soon to challenge the EO on the merits, and the Court should not rush to judgment when the necessary details will soon be known.

13

Even if the Court were to find that Plaintiffs' challenges to Section 3 are constitutionally ripe, it should reject their challenges as prudentially unripe because (1) there is no concrete legal dispute fit for adjudication and (2) no harm would come to Plaintiffs by simply waiting for USPS's final rule. Intervener State Br. at 26–28; *Church v. Biden*, 573 F. Supp. 3d 118, 135–36 (D.D.C. 2021). Plaintiffs fail to establish the first prong for prudential ripeness because, as discussed above, the administrative process remains ongoing and the processes for implementing the EO have not yet been published. Given the need for further factual development, Plaintiffs' argument that their claims present "exclusively 'legal questions'" should be rejected. DSCC Br. at 18; LULAC Br. at 16. Their cited caselaw in support of prudential ripeness is also inapposite for this precise reason. *See Sidak v. United States Int'l Trade Comm'n*, No. 23-5149, 2026 WL 1110981, at *4 (D.C. Cir. Apr. 24, 2026) (cited DSCC Br. at 18) (finding prudential ripeness where suit "presents purely legal questions" and "further factual development would significantly advance our ability to deal with the legal issues presented" (quotations and citations omitted)); *Am. Petrol. Inst. v. Env't Prot. Agency*, 683 F.3d 382, 387 (D.C. Cir. 2012) (cited LULAC Br. at 16) (same). *LULAC I*, 780 F. Supp. 3d at 185 (cited NAACP Br. at 17–18) (same). Acknowledging that the EO "does not explain how USPS will create the Mail-In and Absentee Participation List" and conceding lack of knowledge as to "how" the States' own absentee-voter lists "will inform the USPS's Mail-in and Absentee Participation List," DSCC Compl. ¶¶ 71, 73, Plaintiffs' own pleadings show that it would be imprudent to review an executive order directing rulemaking without knowing what the ultimate rule will provide.

Plaintiffs also argue that they satisfy the second prong for prudential ripeness because "any further delay in the resolution of these issues will impose hardships by violating privacy and voting rights." DSCC Br. at 18; *see also* LULAC Br. at 16 ("[D]elaying review would cause hardship to

14

LULAC Plaintiffs, whose members have already been harmed by the uncertainty and confusion surrounding their potential exclusion on the State Citizenship Lists and their ability to vote by mail in upcoming elections."). But for the reasons stated above, these "hardships" are speculative and insufficient to confer standing. In any event, even if they were concrete, they could not materialize until USPS takes final agency action.

The Court should dismiss Plaintiffs' claims for lack of standing and ripeness.

### III.    Plaintiffs Do Not Have A Viable Cause of Action Under the APA

Courts can only review final agency actions under the APA. Neither Section 2 nor Section 3 qualify, barring Plaintiffs from bringing their APA causes of actions. *See* DSCC Compl. ¶¶ 140–53; LULAC Compl. ¶¶ 291–327; NAACP ¶¶ 193–214; Intervener State Br. at 28–30. As discussed in Intervener States' opening brief (at 29), controlling precedent holds that "[p]roposed rules meet neither of the two requirements for final agency action." *In re Murray Energy Corp.*, 788 F.3d at 334 (Kavanaugh, J.); *see also Am. Portland Cement All. v. EPA*, 101 F.3d 772, 777 (D.C. Cir. 1996) ("[A] proposed regulation is still in 'flux,'" so "review is premature."); *Action on Smoking and Health v. Dep't of Labor*, 28 F.3d 162, 165 (D.C. Cir. 1994) ("Agency action is final when it 'imposes an obligation, denies a right, or fixes some legal relationship,'" and an agency's "proposed rulemaking generates no such consequences." (citation omitted)).

Plaintiffs argue that final agency action has taken place concerning the State Citizenship Lists under Section 2(a) because the agency defendants began implementing the EO before it even existed. LULAC Br. at 28. As discussed above, Plaintiff's evidence of this, a January 2026 Memorandum of Understanding between DHS, USCIS, and DOJ's Civil Rights Division, is not relevant to this case. Indeed, it does even not mention State Citizenship Lists, let alone the then-nonexistent EO. *See* Doc 133-1 at 57–67. The memorandum simply facilitates the use of SAVE

15

to respond to requests for verification of immigration status or U.S. citizenship information, *id.* at 60, which is the routine function of the SAVE database.[4]   Even accepting as true Plaintiffs' allegation that "DHS overhauled the SAVE database and rapidly deployed a new citizenship-verification system tied to SSA data" in 2025, LULAC Br. at 28 (citing LULAC Compl. ¶ 102), this in no way shows final agency action with respect to the separate issue of creating the State Citizenship Lists through the use of other (some unknown) federal databases, ordered the following year.  The caselaw Plaintiffs rely on to argue the contrary is inapposite.  *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d 1, 21, 40 (D.C.C 2025) (cited LULAC Br. at 29) (relying on agency action taken *after* the conduct at issue to find final agency action).  Plaintiffs do not meaningfully dispute that it is still uncertain how and when DHS and SSA will create and transmit the State Citizenship Lists.  *See* LULAC Compl. ¶¶ 48, 60, 260 ("The Order does not specify what other databases" federal agencies should use "to construct the State Citizenship List . . . .").  And fatal to Plaintiffs' APA causes of action with respect to Section 2(a), the compilation and transmission of the Lists is not "mandatory" but contingent on numerous subsequent agency decisions that have not yet taken place, including whether doing so is both feasible and lawful.  *See* EO § 2(a).

Plaintiffs' argument that "the Order leaves the responsible agencies with no discretion whether to compile and transmit those lists" is rebuked by the EO's plain text.  LULAC Br. at 29. Plaintiffs' unsupported claim that data has already been shared for purposes of creating the State Citizenship Lists should also be rejected.  NAACP Br. at 23.   Federal Defendants' sworn declaration states that DHS and USCIS are still deliberating implementation of the EO, including

---

[4]  U.S. Citizenship & Immigration Services, *SAVE* (last accessed May 22, 2026), https://www.uscis.gov/save ("SAVE is an online service for registered federal, state, territorial, tribal, and local government agencies to verify immigration status and U.S. citizenship of applicants seeking benefits or licenses.")

"consideration of feasibility and consistency with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. 552a)."  Doc. 107-1 ¶ 5.  USCIS has also "not yet made any recommendations or final decisions regarding what federal databases might be used in preparation of the 'State Citizenship Lists' that are contemplated by the E.O."  *Id.* ¶ 9; *see also* Doc. 107-2 ¶ 6 ("SSA has not yet made any final decisions about its role in implementation of the Executive Order.").  At this point, no final agency action has taken place.

The same is true of Section 3.  Section 3 is not in itself a final agency action because it simply directs the USPS to initiate rulemaking about mail-in and absentee ballots, and it specifies that "any final rule" by the USPS "shall be issued no later than 120 days from the date of this order."  EO § 3(d).  A notice of proposed rulemaking is an "intermediate agency action," not a "final" one.  5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 U.S. at 334–35 (Kavanaugh, J.).  USPS's "final rule" is still months away.  Until that happens, Plaintiffs cannot bring suit under the APA.  Moreover, Plaintiffs concede that the APA does not afford a statutory right to direct judicial relief from a Presidential executive order.  *See* LULAC Br. at 23 ("President's actions are not reviewable under APA." (citing *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992))).

## CONCLUSION

For the foregoing reasons, the Court should grant Intervener States' Motion to dismiss.

17

Date: May 22, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff**
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

18

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov


**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

19

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn*
 *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant**
 *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov


*\* Government attorney admitted under Local Rule 83.2(e)*
*\*\* Pro hac vice forthcoming*

20

## CERTIFICATE OF SERVICE

I certify that on May 22, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*