**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        *Defendants*.

Civil Action No. 26-cv-01114 (CJN)

---

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS, *et al.*,

        *Plaintiffs*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

        *Defendants*.

Civil Action No. 26-cv-01132 (CJN)

---

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

        *Defendants*.

Civil Action No. 26-cv-01151 (CJN)

1

**<u>MEMORANDUM OPINION</u>**

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026), which states that it is intended to "prevent[] violations of Federal criminal law and maintain[] public confidence in election outcomes." Order § 1. Plaintiffs in these consolidated cases challenge the Executive Order on various grounds and, as relevant here, seek a preliminary injunction directed principally at two provisions.

The first is Section 3(a), which directs the United States Postal Service to issue within 60 days a "notice of proposed rulemaking" that would require mail-in ballots for federal elections to conform to certain design requirements (i.e., unique Intelligent Mail barcode and designated markings) and that would include a process for individuals to be enrolled on a "State-specific Mail-In and Absentee Participation List." *Id.* § 3(b)(i)–(iv). The Order also directs that the Postal Service must issue a final rule within 120 days. *Id.* § 3(d). But the Postal Service has not yet issued a notice of proposed rulemaking or responded to comments it might receive, let alone adopted a final rule. Until then, Plaintiffs' claims are not ripe, and they cannot establish that they would suffer harm that is both imminent and irreparable absent preliminary injunctive relief. As the Court of Appeals has put it, "the issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983).

The second provision is Section 2(a), which directs the Secretary of Homeland Security, in coordination with the Commissioner of the Social Security Administration, to compile and transmit to each State a list of individuals in that State who are "confirmed to be United States

citizens[,] who will be above the age of 18 at the time of an upcoming Federal election[,] and who maintain a residence in the subject State." Order § 2(a). The Order also directs the Secretary of Homeland Security to establish "infrastructure . . . to compile, maintain, and transmit the" Lists, *id.* § 4(c), and to develop procedures that allow individuals to access, and if necessary, update or correct, their personal records ahead of elections, *id.* § 2(a). But the Order does not mandate any action by a State once a List has been transmitted to it, and in any event, no infrastructure for compilation or transmission of the Lists has been established; no List has been created or transmitted; and no State has taken any action with respect to any List. *See id.* In these circumstances, and as discussed below, Plaintiffs have failed to show that they are likely to have Article III standing or that they will suffer imminent and irreparable harm absent an injunction.

The Court recognizes that the Postal Service may ultimately issue a final rule that directly affects Plaintiffs or their members, or that the Government may develop State Citizenship Lists that omit specific individuals due to particularized flaws. Plaintiffs may, of course, renew their motions if and when those future actions occur. Until then, however, Plaintiffs cannot show that preliminary injunctive relief is warranted.

For those reasons, discussed in more detail below, Plaintiffs' motions are denied.

## I.   BACKGROUND

### A.   Factual Background

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026). As noted above, the Order states that it seeks to "prevent[] violations of Federal criminal law and maintain[] public confidence in election outcomes." Order § 1.

This litigation principally concerns two provisions of the Executive Order.  *First*, Section 2(a) directs the Secretary of Homeland Security, in coordination with the Commissioner of the Social Security Administration, to compile a list of individuals in each State who are "confirmed to be United States citizens[,] who will be above the age of 18 at the time of an upcoming Federal election[,] and who maintain a residence in the subject State."  *Id.* § 2(a).  The Order calls these "State Citizenship List[s]," and provides that, "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," these Lists "shall be derived from Federal citizenship and naturalization records, SSA records, [USCIS Systematic Alien Verification for Entitlements ("SAVE")] data, and other relevant Federal databases."  *Id.*  The Order directs the Secretary of Homeland Security to establish procedures that allow individuals to access, and if necessary, update or correct, their personal records ahead of elections.  *Id.*

Section 2(a) of the Order further states that the "State Citizenship List[s] shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election."  *Id.*  The Order directs the Secretary of Homeland Security to establish within 90 days the needed "infrastructure . . . to compile, maintain, and transmit the State Citizenship List."  *Id.* § 4(c).  The Order also requires the implementation of procedures to "enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List[s]."  *Id.* § 2(a).  The Order does not mandate any action by a State once a List has been transmitted to it.  At this time, no such Lists have been created, nor has any of the "infrastructure" for compilation or transmission of the Lists been established.  *See* ECF 117-2, Decl. of M. Mayhew ("Mayhew Decl.") ¶¶ 5–8; ECF 117-3, Decl. of J.B. MacBride ("MacBride Decl.") ¶¶ 4–6.

*Second*, Section 3 directs the United States Postal Service to initiate a proposed rulemaking to address certain issues concerning absentee and mail-in voting.  Order § 3(b).  In particular, the Order requires the Postal Service to issue within 60 days a "notice of proposed rulemaking" that would include, at a minimum, provisions (1) to require mail-in ballots for federal elections to conform to certain design requirements (i.e., unique Intelligent Mail barcode and designated markings) and (2) to develop a process for individuals to be enrolled on a "State-specific Mail-In and Absentee Participation List." *Id.* § 3(b)(i)–(iv).[1]  The Order also directs that the Postal Service must issue a final rule within 120 days.  *Id.* § 3(d).  Like Section 2, Section 3 provides that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements." *Id.* § 3(b)(iv).  And at this time, the Postal Service has not yet issued a notice of proposed rulemaking.  *See* ECF 117-4, Decl. of S. Monteith ¶ 4.[2]

## B.      Procedural History

In the three days following the issuance of the Executive Order, Plaintiffs in these now-consolidated actions filed Complaints challenging it.  *See* ECF 1 ¶¶ 11–23; *League of United Latin American Citizens("LULAC") v. Exec. Off. of the President*, No. 26-cv-1132 (D.D.C. Apr. 2,

---

[1] The "Mail-In and Absentee Participation List" would be distinct from the State Citizenship Lists contemplated by Section 2(a).

[2] Other provisions that Plaintiffs seek to enjoin, but on which they do not focus much attention, are Sections 2(b), 4, and 5.  Section 2(b) directs the Attorney General to "prioritize [ ] investigation[s]" and "prosecution[s] of State and local officials or any others involved in administering Federal elections who issue Federal ballots to individuals not eligible to vote" in those elections.  Order § 2(b).  Section 4 directs the implementation of the Order, tasks the Attorney General with enforcing compliance with federal statutes referenced in the Order, and commands the Secretary of Homeland Security to establish the necessary infrastructure to execute the State Citizenship List Provision.  *Id.* § 4(a)–(c).  And Section 5 charges the Attorney General and executive officials with relevant authority to deter and address noncompliance with federal election laws.  *Id.* § 5.

2026), ECF 1; *NAACP v. Trump*, No. 26-cv-1151 (D.D.C. Apr. 3, 2026), ECF 1 ¶¶ 17–50.[3] Although the Complaints were filed by differently situated plaintiffs (discussed in more detail below) and differ in certain particulars, together they challenge the Executive Order on a number of grounds, including that it is *ultra vires*; violates the separation of powers and the First and Fifth Amendments to the U.S. Constitution; and is inconsistent with the Administrative Procedure Act, the Privacy Act, various statutes relating to the Postal Service, and the Voting Rights Act.  *See, e.g.*, ECF 1 ¶¶ 106–172; *LULAC* ECF 1 ¶¶ 214–327; *NAACP* ECF 1 ¶¶ 214–327.[4]

The following week, Plaintiffs filed motions for preliminary injunction, ECF 29; ECF 34; ECF 37, and subsequently filed memoranda of law in support of their motions, ECF 53 ("LULAC Br."); ECF 54 ("NAACP Br."); ECF 55 ("DSCC Br.").  They argue that the Executive Order exceeds the President's constitutional and statutory authority by directing federal agencies to implement changes to voter registration and mail-ballot processes in conflict with federal law.  *See generally* LULAC Br.; NAACP Br.; DSCC Br.  They further contend that the Order will disrupt established election procedures, causing harm to voters, candidates, and organizations; that those harms are sufficiently imminent to permit pre-implementation or pre-enforcement review; and that they will suffer imminent and irreparable harm without injunctive relief.

---

[3] Citations to the LULAC and NAACP dockets are in the form: *LULAC* ECF No. ## and *NAACP* ECF No. ##.

[4] As a result of consolidation, there are three groups of Plaintiffs in this case:  the DSCC Plaintiffs, the NAACP Plaintiffs, and the LULAC Plaintiffs.  The DSCC Plaintiffs include the Democratic Senatorial Campaign Committee ("DSCC"), Democratic Congressional Campaign Committee, Democratic National Committee, Democratic Governors Association, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House Minority Leader Hakeem S. Jeffries.  The NAACP Plaintiffs include the National Association for the Advancement of Colored People ("NAACP"), Common Cause, the Common Cause Education Fund, Black Voters Matter Fund, and BVM Capacity Building Institute, Inc.  And the LULAC Plaintiffs include the League of United Latin American Citizens, the Secure Families Initiative, and the Arizona Students' Association.

Thereafter, the Court granted certain States' motion to intervene as defendants, Min. Order of April 30, 2026, and the Parties completed briefing on Plaintiffs' motions. *See* ECF 105 ("States' Br."); ECF 117-1 ("Gov. Br."); ECF 121 ("LULAC Reply Br."); ECF 122 ("DSCC Reply Br."); ECF 123 ("NAACP Reply Br."). On May 14, 2026, the Court heard oral argument on those motions.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To obtain that remedy, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance-of-equities and public-interest factors merge where the government is a party "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

"[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Two factors, however, are key to the analysis: likelihood of success on the merits and irreparable harm. "When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). And "failure to show a likelihood of irreparable harm [is], standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,

7

297 (D.C. Cir. 2006) (explaining that "failure to show any irreparable harm" alone is reason enough to deny a preliminary injunction).

### III.    ANALYSIS

### A.    Plaintiffs Have Failed to Show They Are Likely to Succeed on the Merits

To "establish[] a likelihood of success on the merits, [Plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020). As the Court of Appeals has put it, "[t]he affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *See Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (alteration adopted) (citation and internal quotation marks omitted). "In the context of a preliminary injunction motion," courts "require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation and internal quotation marks omitted). The Court accordingly begins with whether Plaintiffs have established to the requisite likelihood that the Court has jurisdiction.

### 1.    Plaintiffs Have Not Shown that the Court Likely Has Jurisdiction

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). "At the preliminary-injunction stage," a plaintiff "must make a clear showing that

she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation and internal quotation marks omitted).

"A concrete injury is direct, real, and palpable—not abstract." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (citation and internal quotation marks omitted). "A particularized injury is personal, individual, distinct, and differentiated." *Id.* (citation and internal quotation marks omitted). And "[a]n actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural or hypothetical." *Id.* (citation and internal quotation marks omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and internal quotation marks omitted). Thus, the Supreme Court has repeatedly said that "allegations of *possible* future injury" are not sufficient to establish injury in fact. *Id.* (alteration adopted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). In sum, these requirements "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A related doctrine requires that a case be "ripe," meaning it cannot rely on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).

The causation and redressability requirements "are often 'flip sides of the same coin.'" *All. for Hippocratic Med.*, 602 U.S. at 380 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). If a plaintiff can establish that her "injury likely was caused or likely will be caused by [a] defendant's [action]," *id.* at 382, "enjoining the action or awarding damages for

the action will typically redress [her] injury," *id.* at 381.  At least, that is the case where a government regulation "require[s] or forbid[s] some action by the plaintiff." *Id.* at 382.  But "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *All. for Hippocratic Med.*, 602 U.S. at 382.

When a plaintiff is not the object of the challenged governmental action, causation typically depends "on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562.  The Supreme Court has made clear, however, that "[t]he causation requirement precludes speculative links— that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383; *see Allen*, 468 U.S. at 757–759; *Clapper*, 568 U.S. at 415 n.5.  Like the injury-in-fact requirement, causation is essential and "screens out plaintiffs who were not injured by the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 383.

Different types of plaintiffs may, of course, have Article III standing for different reasons. Organizations, in particular, "may have standing 'to sue on their own behalf for injuries they have sustained.'" *Id.* at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). Or they can sue on behalf of their members—provided that the organization can "demonstrate [that] 'its members would otherwise have standing to sue in their own right.'" *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.,*

10

*Inc.*, 528 U.S. 167, 181 (2000)).[5]  That is, an organization must identify at least one member who has suffered an injury in fact.  *See Chamber of Commerce v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011) (explaining that, to successfully allege associational standing, a plaintiff organization "must specifically identify members who have suffered the requisite harm"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations" must "make specific allegations establishing that at least one identified member had suffered or would suffer harm.").

Finally, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion*, 594 U.S. at 431.

### a.    Plaintiffs Have Failed To Establish They Presently Have Standing to Challenge Section 2(a).

Plaintiffs seek to preliminarily enjoin the implementation of Section 2(a) of the Executive Order.  Again, that Provision directs the Secretary of Homeland Security—to the extent doing so is "feasible and consistent with applicable law"—to "compile and transmit" to state election officials a List of United States citizens who will be 18 years or older at the time of an upcoming federal election and who maintain a residence in the subject State.  Order § 2(a).  But it "requires nothing from Plaintiffs—no compliance, no changed behavior, nothing at all—because it is not aimed at them but instead tells only the agencies to do something."  *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 79 (D.D.C. 2025) (citation and internal quotation marks omitted).

*Harm to Members as Voters*.  The Plaintiff Organizations nevertheless contend that they have associational standing based on harm to their members' "voting rights." ECF 53 ("LULAC Br.") at 14–19; ECF 54 ("NAACP Br.") at 37–50; ECF 55 ("DSCC Br.") at 13–16.  They contend

---

[5] An organization must also show that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Sierra Club*, 926 F.3d at 848 (internal quotation marks omitted) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 181).

that Section 2(a) will make it more difficult, or even impossible, for some of their members to vote because the federal records that will be used to create the State Citizenship Lists are "virtually guaranteed" to contain inaccuracies, LULAC Br. at 14; that those inaccuracies will remain uncorrected (even though the Order directs States to "routinely supplement and provide suggested modifications or amendments to" the List, Order § 2(a)); and that at least certain States will use the Lists to keep otherwise eligible voters from casting ballots.

This "highly attenuated chain of possibilities," however, "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410; *see also Summers*, 555 U.S. at 496.  The Government has not yet established the infrastructure to compile the Lists, nor has it determined what information will be used to compile them (or how doing so would be lawful).  As a result, it remains speculative whether the State Citizenship Lists, if and when they are initially compiled, will contain inaccuracies.[6]  Even if they contain initial inaccuracies, the Executive Order requires the adoption of procedures that will allow individuals to access and, if necessary, update or correct their information in the Lists.  *See* Order § 2(a).  It thus remains speculative whether that process will be ineffective at resolving all or most inaccuracies.  And whether the Lists continue to contain inaccuracies or not, nothing in the Executive Order requires any State to use its List in any way—let alone to prevent otherwise qualified persons from

---

[6] The DSCC Plaintiffs argue that the Executive Order requires the federal government to use databases—namely, the SAVE and SSA databases—that are "incomplete, out-of-date, and riddled with inaccuracies" and it is therefore certain that the Lists will contain errors.  DSCC Br. at 4 (citing ECF No. 55-12, Decl. of Dr. Kenneth Mayer, at 1).  While it is conceivable these Lists may have some flaws, at least initially, it is impossible to be sure when the agencies have not yet determined what databases they will use or if they can perfect them ahead of use.  And even if the Lists as initially compiled contain some flaws, that would mark only the first step in an attenuated chain of speculation.  *Cf. Clapper*, 568 U.S. at 412 (explaining that "even if respondents could demonstrate" that their first speculation was true, their injury was still speculative because of others in the chain).  In any event, Plaintiffs can renew their motions as to Section 2(a) when more particular and concrete information about the Lists is available.

registering to vote. Because Plaintiffs "can only speculate as to whether any (asserted)" voter-registration difficulties or disenfranchisement could result from Section 2(a), *Clapper*, 568 U.S. at 413, they cannot show that their threatened injury is "*certainly* impending," *id.* at 409 (internal citation and quotation marks omitted).

Even if Plaintiffs could show that it is likely that their members will imminently be excluded from certain States' voter registration rolls, they cannot demonstrate that that injury is fairly traceable to Section 2(a). Again, nothing in Section 2(a) (or any other part of the Order) purports to require any State to do anything with the State Citizenship List it is provided, let alone to remove otherwise eligible individuals on State voter registration lists. Plaintiffs assume that certain States *will* rely on these Lists (and the Court recognizes that some States are more likely to do so than others), but it remains highly speculative *how* they will do so—and if they will do so in a manner consistent with federal and state law. "[W]here it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs," the causation requirement has not been met. *All. for Hippocratic Med.*, 602 U.S. at 383.

*Harm to Members' Privacy Rights.* The Plaintiff Organizations also contend that they have associational standing based on alleged harms to their members' privacy interests. LULAC Br. at 18; NAACP Br. at 39; DSCC Br. at 15. They variously contend that Section 2(a)'s disclosure requirements "offend long-standing notions of privacy," DSCC Br. at 15; "intrude[] on [members'] sense of security," LULAC Br. at 18; and compel unauthorized disclosure of sensitive personal information, NAACP Br. at 40. Plaintiffs argue that their members will be harmed by the transmission of their personal information to the States, *see* DSCC Br. at 15; LULAC Br. at 18, but that injury is currently too speculative. *See Clapper*, 568 U.S. at 416. After all, DHS has not yet concluded that doing so is "feasible and consistent with applicable law, including but not

13

limited to the Privacy Act of 1974," Order § 2(a); has not yet created the "infrastructure . . . to compile, maintain, and transmit the State Citizenship List," *id.* § 4(c); and thus has neither compiled the Lists nor begun to transmit them to the States, *see* Mayhew Decl. ¶¶ 5–8; MacBride Decl. ¶¶ 4–6.

Plaintiffs also argue that it would violate the Privacy Act for the federal government to compile a list of individuals who are citizens and over the age of 18, even if no information is ever transmitted to any State—that is, if a purely *intra-federal government* list is created.  But Plaintiffs fail to demonstrate that such action—that is, the sharing of name, age, and residence information between and among government agencies, if already known to the federal government—would cause a harm sufficient to establish Article III standing.  "Article III standing requires a concrete injury even in the context of a statutory violation."  *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016).  To determine whether a harm is sufficiently concrete, courts "ask[] whether plaintiffs have identified a close historical or common-law analogue for their asserted injury."  *TransUnion*, 594 U.S. at 424.  Here, Plaintiffs have not identified a historical or common-law analogue for the asserted injury their members face—the sharing of non-sensitive personal data (name, citizenship status, and age) between and among different federal agencies.[7]

---

[7] Two of the Plaintiff groups argue that the inter-agency sharing of non-sensitive personal data bears a close relationship to the harm underlying the common-law tort of intrusion upon seclusion. *See* NAACP Br. at 40; DSCC Reply Br. at 16.  That tort makes liable anyone "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B.  But the inter-agency sharing of non-sensitive personal information (such as one's name, citizenship status, and age) is not the type of "intrusion" that a "reasonable person" would find "highly offensive."  Even if correctly decided, the cases Plaintiffs cite in support of this argument do not hold otherwise.  *See, e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F. Supp. 3d 56, 71–72 (D.D.C. 2025) (finding intrusion upon seclusion to be a sufficient common law analog when unauthorized personnel viewed sensitive personal information held by federal agencies); *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) ("Plaintiffs' alleged injury—the *disclosure of their private information*

*Organizational Harm.*  The Plaintiff Organizations do not rely solely on injuries to their members.  They also contend that they have organizational standing to challenge Section 2(a) because it interferes with their missions and forces them to divert resources to counteract its effects.  *See, e.g.*, LULAC Br. at 20; DSCC Br. at 18; NAACP Br. at 33.[8]  Plaintiffs contend that, because of Section 2(a), they must redesign their existing educational programs, retrain staff members, distribute new informational materials, monitor List development to see if their members are on the Lists, and assist those who are erroneously omitted.  *See* LULAC Br. at 19–20; DSCC Br. at 18; NAACP Br. at 32–36.

The Supreme Court recently addressed the question of organizational standing in *Alliance for Hippocratic Medicine*.  *See* 602 U.S. at 393–97.  There, the Court explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *Id.* at 394.  The Court accordingly held that the organizational plaintiffs lacked standing even though the challenged governmental action had caused them "to conduct their own studies on [a drug] so that the[y] [could] better inform their members and the public

---

*to third parties without a lawful right to access it*—bears a close relationship to the harm essential to an intrusion upon seclusion at common law." (emphasis added)).

[8] Plaintiffs are not always precise when describing the cause of their organizational injuries.  At times, it seems that they are alleging that their injuries will occur in the future once the State Citizenship Lists are created. *See, e.g.*, LULAC Br. at 20 ("[T]he Order will require Plaintiffs to confirm the content of State Citizenship Lists and liaise with federal officials to assist prospective voters whose right to vote is at risk.").  However, in their reply briefs and at oral argument, Plaintiffs argue that they are presently harmed by the Executive Order itself.  *See, e.g.*, NAACP Reply Br. at 13 (Plaintiffs' "claims are ripe because the Order's directives to federal agencies are already injuring them.").  Because any allegations about future State Citizenship Lists have ripeness problems, *see Texas*, 523 U.S. at 300 (explaining that a case cannot depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation and internal quotation marks omitted)), the Court focuses here on how the Executive Order may currently cause harm to them as organizations.

about [the drug]'s risks" and "to expend considerable time, energy, and resources drafting citizen petitions to [the agency], as well as engaging in public advocacy and public education." *Id.* (citation and internal quotation marks omitted).[9]

The Organizational Plaintiffs' alleged injuries here are similar. They contend that Section 2(a) has caused them to expend time and resources educating the public on the potentially forthcoming State Citizenship Lists, creating new educational materials on the topic, and monitoring the Lists' development. *See, e.g.*, NAACP Br. at 32; DSCC Br. at 18. But those efforts are very similar, if not identical, to "conduct[ing] their own studies . . . so that the[y] can better inform their members and the public," and "expend[ing] considerable time, energy, and resources drafting citizen petitions, as well as engaging in public advocacy and public education." *All. for Hippocratic Med.*, 602 U.S. at 394 (citation and internal quotation marks omitted).

To be sure, the Supreme Court has not completely foreclosed organizational standing. But to establish it, an organization must "suffer[] a concrete injury caused by a defendant's action." *Id.*; *see also id.* at 395 (not overturning *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), because in that case, the defendant's "actions directly affected and interfered with [the organization's] core business activities"). The Organizational Plaintiffs here have failed to demonstrate that the Executive Order has "directly affected and interfered" with their core missions. *Id.* at 395. While it is unrebutted that those Plaintiffs have expended and diverted resources in response to the Executive Order, *see* NAACP Br. at 36 ("BVM is already preparing to assist voters with name-matching issues to ensure that people are still able to vote if they are

---

[9] The Court of Appeals has since recognized that *Alliance for Hippocratic Medicine* casts doubt on "the foundation of [its] organizational injury precedents." *Ctr. for Biological Diversity*, 144 F.4th at 315; *accord Coal. for Humane Immigrant Rts. v. DHS*, 780 F. Supp. 3d 79, 89 n.2 (D.D.C. 2025).

improperly excluded from the lists mentioned in the Order."), the Order itself has not imposed any impediment to their voter registration and education operations. *Cf. All. for Hippocratic Med.*, 602 U.S. at 395 ("Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer . . . . FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses."). The Organizational Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at 416, nor can they allege a sufficient injury in fact when a defendant has not directly impaired their core services, *see All. for Hippocratic Med.*, 602 U.S. at 395. Of course, those Plaintiffs may eventually suffer harms that are sufficiently concrete to satisfy Article III when additional information about the Lists is developed. *See supra* at 12–13. But, at least right now, they have not established that the Court has jurisdiction over their claims.

*Harm to Candidates.* Finally, the DSCC Plaintiffs argue that political candidates (some of whom are plaintiffs here and others of whom are members of the DSCC)[10] have standing to challenge Section 2(a) because it "unlawfully alters the rules in the elections in which they compete." DSCC Br. at 10–11 (relying on *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76–78 (2026)). But Section 2(a) does not purport to alter the rules of any State election. In fact, Section 2(a) does not order the States to do anything with the State Citizenship Lists once they are transmitted—much less direct the States to amend their election procedures. These Plaintiffs thus

---

[10] Two of the DSCC Plaintiffs are candidates themselves: Chuck Schumer and Hakeem Jeffries. Because the injury-in-fact analysis is the same for members of Plaintiffs' organizations that are candidates and the two named candidates in the complaint, the Court will only address standing for the Plaintiffs' candidate members.

17

cannot establish a sufficient causal link between States' future, hypothetical decision to amend their election procedures and the creation and transmission of State Citizenship Lists pursuant to the Executive Order. *Cf. Lujan*, 504 U.S. at 560–61 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." (cleaned up) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976))).

Alternatively, the DSCC Plaintiffs contend that political candidates have standing based on harm to their electoral prospects. DSCC Br. at 11. They contend that Section 2(a) creates a serious risk that Democratic Party supporters—more so than Republican Party supporters—will be erroneously left off the State Citizenship Lists and therefore face burdens on their ability to vote. *Id.* at 11–13. But this claimed injury again rests "on a highly attenuated chain of possibilities" that fails to "satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. For Section 2(a) to *cause* (in the Article III sense) Democratic Party candidates' electoral prospects to suffer, something like the following would need to happen: Federal officials must determine that they can lawfully compile and transmit a State Citizenship List to the States; the Secretary of Homeland Security must then compile and transmit Lists containing significant errors to the States; even though the Executive Order expressly requires procedures to correct such errors, those errors would need to remain uncorrected; State election officials must then nevertheless decide to rely on the Lists; and State election officials must then decide to use the erroneous State Citizenship Lists to remove eligible voters from the States' voter rolls (or otherwise make it more difficult for those individuals to vote). "Such speculation upon speculation does not suffice to support Article III standing,"

18

*Endeley v. U.S. Dep't of Def.*, 268 F. Supp. 3d 166, 175 (D.D.C. 2017) (citation and internal quotation marks omitted), especially when it depends on the independent actions of third parties—and especially when (if these events were to transpire in any particular State), affected voters and candidates could challenge those States' decisions under federal and state voting laws.

   **b.**  **Plaintiffs Have Failed To Establish They Presently Have Standing to Challenge Section 3(b)**

   Returning to Section 3(b) of the Executive Order, recall that it directs the Postal Service to initiate rulemaking procedures for a rule that would address two primary topics. First, the rule would require that all mail-in ballots be mailed in officially marked envelopes bearing unique barcodes to facilitate tracking. *See* Order § 3(b)(i). Second, the rule would establish procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]," which would be used by the Postal Service to determine which mail-in or absentee ballots it "shall not transmit." *Id.* § 3(b)(iii)–(iv).

   Plaintiffs argue that Section 3(b) interferes with their mission-driven work, disenfranchises their voting members, and electorally harms their candidate-members by preventing eligible voters from casting mail-in and absentee ballots. *See, e.g.*, DSCC Br. at 11–15; LULAC Br. at 21–22; NAACP Br. at 37–38. But the effects of Section 3(b) are even further removed from any concrete injury in fact than Section 2(a). Unlike Section 2(a)—which does require the agencies to assess whether they can compile and then transmit to the States certain information—Section 3(b) directs only that the Postal Service initiate and then complete a rulemaking. Any injury therefore depends on a series of contingencies: whether the Postal Service issues a notice of proposed rulemaking, what that proposed rule says, what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs. *Cf. Clapper*, 568 U.S. at 409–410. Plaintiffs' claims therefore run directly into the bedrock (and commonsense) rule that

even "the issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced." *Ctr. for Auto Safety*, 710 F.2d at 846; *see Bristol-Myers Co. v. FTC*, 424 F.2d 935, 940 (D.C. Cir. 1970) (holding that Bristol-Myers's claim seeking to enjoin the FTC from continuing rulemaking proceedings was "not yet ripe for adjudication" because the "Commission ha[d] merely proposed a rule"). "Because several speculative contingencies must occur before Plaintiffs suffer any concrete harm," they have failed to establish standing to challenge Section 3(b). *Nat'l Urb. League*, 783 F. Supp. 3d at 81 (citation and internal quotation marks omitted).

Plaintiffs argue that they have standing, regardless of what any final rule may look like, because they have immediately had to "divert resources from planned voter registration activities to assess the Order's impact, retrain staff and volunteers, and reformulate educational materials." NAACP Br. at 43. "But that argument runs headlong into the Supreme Court's decision in *Clapper*, in which the Court rejected as 'unavailing' the plaintiffs' 'contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm.'" *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (quoting *Clapper*, 568 U.S. at 416). "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *Clapper*, 568 U.S. at 416).

Plaintiffs' challenge to Section 3(b) also suffers from a significant causation issue. Again, to establish Article III standing, an injury must be "fairly traceable to the challenged action." *Clapper*, 568 U.S. at 409 (citation and internal quotation marks omitted). But here, the primary "source of any injury to the [P]laintiffs is the action that the [Postal Service] *might* take in the

20

future to" implement Section 3(b), not Section 3(b) itself. *Trump v. New York*, 592 U.S. 125, 133–34 (2020). And because "[a]ny prediction how the Executive Branch might eventually implement" Section 3(b) is "no more than conjecture at this time," *id.* at 131 (citation and internal quotation marks omitted), "Plaintiffs have also failed to show that their challenge to this provision is likely ripe," *Nat'l Urb. League*, 783 F. Supp. 3d at 83.

Ultimately, whether framed as an injury, causation, or ripeness problem, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013). Thus, it is unsurprising that Plaintiffs likely lack standing to challenge Section 3(b). All that provision does is direct the Postal Service to initiate a rulemaking process and consider potential regulatory changes. *Cf. Nat'l Urb. League*, 783 F. Supp. 3d at 81. To be sure, the Postal Service may eventually issue a final rule that directly affects Plaintiffs or their members and that Plaintiffs believe is unlawful. "But *that* is when Plaintiffs would have the requisite 'personal stake'" that supports Article III standing. *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 379). "Until then, Plaintiffs are at most 'concerned bystanders' to internal Executive Branch processes." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 382); *see also United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (Scalia, J.) (holding that Plaintiffs lacked standing to challenge an Executive Order that "set[] forth no standards governing their conduct"); *cf. Perciasepe*, 714 F.3d at 1324–25 (holding that an intervenor lacked standing to challenge a consent decree that did "not require EPA to promulgate a new, stricter rule" but only "require[d] that EPA conduct a rulemaking and then decide whether to promulgate a new rule").

* * * * *

In sum, Plaintiffs have not shown that they are currently suffering a concrete and imminent injury traceable to Sections 2 or 3 of Executive Order 14,399 and thus have not established a likelihood of Article III standing or that their claims as to those provisions are ripe.[11]

### 2. Plaintiffs Fail to Show That They Are Likely to Succeed on Their *Ultra Vires* Claims

Because Plaintiffs have failed to establish that they likely have standing, they are "*ipso facto* unlikely to succeed*" on the merits. *Elec. Priv. Info. Ctr.*, 878 F.3d at 375 n.2. In any event, the Court briefly addresses Plaintiffs' facial challenge to the Executive Order.

Plaintiffs argue that the President has no authority to issue the Executive Order because the executive branch cannot lawfully fulfill its requirements. LULAC Br. at 25, 36; DSCC Br. at 19–23; NAACP Br. at 13. In this sense, Plaintiffs essentially eschew any challenge to future agency action (such as the possible adoption of a final rule by the Postal Service) and direct their challenge at the Order itself. But the Order is not self-executing. It does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted; rather, it directs executive branch officials to take certain actions, subject to the limits of existing laws. That is a key distinction. While the President may not have the authority to change the design of mail-in ballots or remove individuals from states' voter registration lists, he does have the authority to supervise and direct the actions

---

[11] As mentioned above, although they devote little attention to them, certain Plaintiffs challenge additional parts of the Executive Order—namely Sections 2(b), 4, and 5. *See* ECF 34; ECF 37. Plaintiffs have failed to demonstrate that they have standing to challenge Section 4(c), which directs the Secretary of Homeland Security to establish the State Citizenship List infrastructure, because (as explained above) any injury arising from the Lists is, at this stage, too speculative. Plaintiffs likewise have not demonstrated they have standing to challenge the remaining provisions directing the Attorney General to prioritize enforcement of certain federal laws, as "challenges to the Executive Branch's exercise of enforcement discretion" are "not the kind[s] [of suits] redressable by a federal court." *United States v. Texas*, 599 U.S. 670, 677–78 (2023).

of executive branch agencies.  *See* U.S. Const. art. II, § 1, cl. 1 (The "executive Power shall be vested in a President of the United States of America."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution."); *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses general administrative control of those executing the laws, throughout the Executive Branch of government, of which he is the head." (internal quotation marks omitted) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926))).  And an executive order that operates solely as an internal directive—particularly one expressly conditioned on feasibility and compliance with applicable law—does not, standing alone, exceed Presidential authority or violate the separation of powers.  *See Allbaugh*, 295 F.3d at 33 (holding that the President acted within his constitutional authority in issuing an executive order that was "not selfexecuting" and required compliance with existing laws).

While the Order does require agencies and executive branch officials to take certain actions, it also states in various places that they must do so in a manner consistent with governing statutes and other legal requirements.  *See* Order § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974"); *id.* § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); *id.* § 3(b) ("initiate a proposed rulemaking pursuant to 39 U.S.C. 401 and other applicable authority").  As a result, whether the government's actions under the Order are lawful or unlawful will depend on how those agencies decide to implement the Order, not on the Order itself.  *See Allbaugh*, 295 F.3d at 33 ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration.").

23

The Court recognizes that the agencies may implement the Order in ways that Plaintiffs will contend are unlawful; for example, the Postal Service may adopt a rule concerning absentee ballots that, Plaintiffs may argue, exceeds the Postal Service's authority or is otherwise inconsistent with federal law.  But it is not until such actions are taken that Plaintiffs' claims might be ripe for judicial review.  *See, e.g.*, *Bristol-Myers Co.*, 424 F.2d at 940 (Challenging an agency's *proposed* rule was "not yet ripe for adjudication.").

**B.    Irreparable Harm**

To warrant injunctive relief, Plaintiffs must also establish that, absent such relief, they are likely to suffer an imminent and irreparable injury.  *See Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) ("[A] movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." (cleaned up) (quoting *Chaplaincy*, 454 F.3d at 297)).[12]

The standard for "irreparable" harm is "high."  *Chaplaincy*, 454 F.3d at 297.  A plaintiff must establish that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Id.* (alteration adopted) (citation and internal quotation marks omitted).  In other words, the "injury must be both certain and great."  *Clevinger*, 134 F.4th at 1234 (citation and internal quotation marks omitted).  Further, "the movant must show that the alleged harm will *directly result* from the action which the movant seeks to enjoin."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added).

---

[12] Where a court determines that plaintiffs fail to show irreparable harm, it need not evaluate the remaining preliminary injunction factors.  *See Clevinger*, 134 F.4th at 1236 ("[T]he district court did not err in declining to evaluate the remaining preliminary injunction factors" after finding no irreparable harm.).

Plaintiffs assert a variety of irreparable injuries:  The DSCC Plaintiffs claim that, without an injunction against the Order's enforcement, they "will suffer irreparable injury in multiple ways: (1) in the form of an illegally structured electoral environment for all Plaintiffs and their candidate members, (2) to the Party's electoral prospects, (3) to Plaintiffs' members' voting rights, (4) to Plaintiffs' core activities and ability to advance their missions, forcing them to revamp their education and turnout programs across the country at the expense of Plaintiffs' persuasion and mobilization programs, and (5) to Plaintiffs' members' privacy interests."  DSCC Br. at 39.  The LULAC Plaintiffs contend that the added difficulties to voter registration, performance of their voter-registration mission, and voting by mail constitute imminent and irreparable harm.  LULAC Br. at 40–44.  And the NAACP Plaintiffs claim that the Order irreparably harms them because it interferes with their primary mission of voter registration, education, and ensuring access to voting by mail.  NAACP Br. at 43–44.

But as discussed above, *see supra* Section I, Plaintiffs have failed to show that they presently have Article III standing.  And "[t]he irreparable-harm standard requires a more significant showing than the injury-in-fact standard."  *Air Transp. Ass'n of Am. v. Export–Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012); *see Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013) (Where plaintiff "has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a preliminary injunction.").  Because Plaintiffs "have failed to carry their burden with respect to establishing that they have a substantial likelihood of standing based on [their alleged] injur[ies]," they have also failed to show that those injuries are "certain enough and great enough to warrant preliminary injunctive relief."  *Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234, 2025 WL 513268, at *4 (D.D.C. Feb. 17, 2025) (citations and internal quotation marks omitted).  In any event, given that the

Executive Order does not command Plaintiffs to do anything, and that no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs, they have not suffered any harm at present, much less harm that is "certain," "great," and imminent.  *Wis. Gas Co.*, 758 F.2d at 674.[13]

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motions for a Preliminary Injunction, ECF 29, ECF 34, ECF 37.  The Court will issue an order contemporaneously with this decision.

DATE:  May 28, 2026

CARL J. NICHOLS
United States District Judge

---

[13] Although not dispositive, the other two preliminary injunction factors—the balance of equities and the public interest—do not cut substantially in favor of preliminary relief.  "When a private party seeks injunctive relief against the government," those factors "generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined."  *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019).  The government argues that an injunction would impede the President's ability to oversee the Executive Branch, *see* Gov. Br. at 49 (citing U.S. Const. art. II, § 1, cl. 1), while Plaintiffs emphasize the public interest in ensuring compliance with federal law, *see* NAACP Reply Br. at 25; DSCC Reply Br. at 25.  Plaintiffs have failed to demonstrate that these factors cut significantly in favor of injunctive relief.  *Cf. LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025) ("The public interest is harmed when an injunction wrongfully insulates the President's Executive Branch appointees from his oversight. Such injunctions sever a key constitutional link between the People and their elected President.").