# Exhibit 2

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DSCC,
120 Maryland Avenue NE
Washington, DC 20002;

DCCC,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC NATIONAL COMMITTEE,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC GOVERNORS ASSOCIATION,
1225 Eye Street NW, Suite 1100
Washington, DC 20005;

U.S. SENATE MINORITY LEADER CHARLES E. SCHUMER,
Notice of address ~~to be~~ filed under seal pursuant to LCvR 5.1(c);

*and*

U.S. HOUSE OF REPRESENTATIVES MINORITY LEADER HAKEEM S. JEFFRIES,
Notice of address ~~to be~~ filed under seal pursuant to LCvR 5.1(c);

Plaintiffs,

*v.*

DONALD J. TRUMP, in his official capacity as President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

EXECUTIVE OFFICE OF THE PRESIDENT,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW

Case No. 1:26-cv-01114

Washington, DC 20530;

U.S. POSTAL SERVICE,
475 L'Enfant Plaza SW
Washington, DC 20260;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, 5900 Capital Gateway Drive, Prince George's County, Camp Springs, MD 20746;

SOCIAL SECURITY ADMINISTRATION,
6401 Security Boulevard
Baltimore, MD 21235;

U.S. DEPARTMENT OF COMMERCE
1401 Constitution Ave NW
Washington, DC 20230;

~~PAMELA BONDI~~U.S. DEPARTMENT OF STATE
2201 C Street NW
Washington, DC 20520;

TODD BLANCHE, in ~~her~~his official capacity as U.S. Attorney General,
950 Pennsylvania Avenue NW
Washington, DC 20530;

DAVID STEINER, in his official capacity as U.S. Postmaster General,
475 L'Enfant Plaza SW
Washington, DC 20260;

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

JOSEPH B. EDLOW, in his official capacity as Director of the U.S. Citizenship and Immigration Services, 5900 Capital Gateway Drive, Prince George's County, Camp Springs, MD 20746;

FRANK J. BISIGNANO, in his official capacity as Commissioner of the Social Security Administration, 6401 Security Boulevard Baltimore, MD 21235;

~~and~~

HOWARD LUTNICK, in his official capacity as Secretary of the Department of Commerce, 1401 Constitution Ave NW Washington, DC 20230; and

MARCO RUBIO, in his official capacity as Secretary of State, 2201 C St NW, Washington, DC 20520,

Defendants.

**[PROPOSED] SUPPLEMENTAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
**BY THE DEMOCRATIC PARTY PLAINTIFFS**

## INTRODUCTION

1. President Trump has tried again and again to rewrite election rules for his own perceived partisan advantage. If only he could ban mail voting—a favorite scapegoat for his 2020 electoral defeat—and impose other voting restrictions, he has proclaimed, Republicans will "never lose a race—for 50 years."

2. Our Constitution's Framers anticipated this kind of desire for absolute power. They recognized the menace it would pose to ordered liberty and the ways in which it would corrode self-government like an acid. And so to preserve the People's own sovereignty, they crafted a system of government to resist that threat. They left most election authority with the States, permitted state regulations to be displaced only upon the agreement of both chambers of Congress, and established an independent judiciary to repel threats to individual rights.

3. That careful division of authority has held fast against President Trump's attacks. Each State has customized its own rules and regulations for voting, including absentee and mail-in voting, that balance the twin needs of broad access to the franchise and secure elections. Congress has rebuffed the President's call to override state law in this area. And federal courts have repeatedly confirmed that this distribution of power may not be manipulated at the President's discretion. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 226 (D.D.C. 2025) ("*LULAC I*"); ~~*LULAC*~~*League of United Latin Am. Citizens v. Exec. Off. of President*, ~~No. 1:25-cv-0946, 2025 WL 3042704, at *38~~808 F. Supp. 3d 29, 87–88 (D.D.C. ~~Oct. 31,~~ 2025) ("*LULAC II*"); ~~*LULAC*~~*League of United Latin Am. Citizens v. Exec. Off. of the President*, ~~No. 1:25-cv-0946, 2026 WL 252420, at *56–57~~818 F. Supp. 3d 34, 116–17 (D.D.C. ~~Jan. 30,~~ 2026) ("*LULAC III*"); *Washington v. Trump*, ~~No. 2:25-cv-00602, 2026 WL 73866, at *38–39~~814 F.

Supp. 3d 1173, 1229–30 (W.D. Wash. ~~Jan. 9,~~ 2026); *California v. Trump*, 786 F. Supp. 3d 359, 396–97 (D. Mass. 2025); *California v. Trump*, 805 F. Supp. 3d 387 (D. Mass. 2025).

4. Undeterred by this consistent authority—and his own continued failures to convince Congress to adopt his self-aggrandizing election policies—President Trump has yet again taken matters into his own hands. Just days after it became clear Congress would fail to pass the President's SAVE America Act, he signed a new Executive Order titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*." ~~*See generally* Exhibit A.~~*See generally* Exec. Order 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "Executive Order," "Order," or "E.O."). This Executive Order seeks to impose radical changes to the manner and conditions under which citizens may cast absentee or mail-in ballots (collectively, "mail ballots")—changes that imminently threaten to disenfranchise lawful voters and plainly exceed the President's lawful authority.

5. The Executive Order's provisions are convoluted and confusing. What is clear is that it dramatically restricts the ability of Americans to vote by mail, impinging on traditional state authority. It achieves this principally by directing the Postal Service to take actions unrelated to the agency's statutory mandate that run roughshod over established protections for voters who rely on the mail to exercise their fundamental right to vote. Because the Executive Order does not "stem either from an act of Congress or from the Constitution itself"—and further threatens to unjustifiably disenfranchise eligible voters across the country—it is an unlawful exercise of authority that must be declared invalid. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Order, in fact, runs headlong into myriad other guarantees provided by the Constitution, the States, and Congress—authorities that *do* regulate elections.

6. Among them are the Administrative Procedure Act and the Privacy Act, which require agencies to comply with governing law and strictly prohibit use of federal records absent prior authorization under federal law. 5 U.S.C. §§ 552a, 706(2). The Order drops the veil on a months-long campaign to amass a national citizenship registry—now formally mandating that Defendants create wholly unauthorized "State Citizenship Lists" and share those lists with States within 60 days of every federal election. Even as this Court recently expressed "grave concern" over disclosures related to the same databases the Order directs Defendants to use in amassing this "List," *LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*55 &~~115–16, 115 n.54 (granting judgment requiring compliance with Privacy Act, noting "important risk" of "false, incomplete, outdated, or otherwise unreliable information" and "threat of misuse"), ~~yesterday's Order~~the E.O. even more flagrantly directs violations of the Privacy Act and other federal laws.

7. As detailed below, Defendants have taken swift action to implement the President's commands. The Department of Homeland Security ("DHS") and United States Customs and Immigration Service ("USCIS") have taken steps to develop a mechanism whereby states can access sensitive voter data compiled from numerous federal agencies and databases, threatening imminent (if not ongoing) privacy-related injuries. And the United States Postal Service ("USPS" or the "Postal Service") has promulgated a final rule that will profoundly and unlawfully disrupt mail voting in every state.

~~7.~~8. Plaintiffs—the Democratic Senatorial Campaign Committee (DSCC), the Democratic Congressional Campaign Committee (DCCC), the Democratic National Committee, the Democratic Governors Association~~,~~ (collectively the "Party Plaintiffs"), and the Democratic leaders of the U.S. House and Senate—are again severely harmed by the President's unlawful attempts to upturn the electoral playing field in his own favor and against his political rivals. Tens

of millions of Plaintiffs' members and supporters are likewise injured by ~~the Order's directives~~Defendants' actions that erect obstacles for casting ballots that will be counted, frustrate the fair administration of federal elections, and mandate unlawful disclosures of protected information.

~~8.~~9. In view of the rapidly approaching—and in some cases already completed—federal elections and the short timeframes imposed by President Trump's Order, Plaintiffs respectfully request urgent equitable and declaratory relief as set forth in more detail below.

**JURISDICTION AND VENUE**

~~9.~~10. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal law claims, including but not limited to claims arising under the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 702–06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. The Court also has jurisdiction under 39 U.S.C. § 409(a) and 28 U.S.C. § 1339 because Plaintiffs assert claims against and related to the U.S. Postal Service.

~~10.~~11. Venue is proper under 28 U.S.C. § 1391 because nearly all Defendants, including President Donald J. Trump, reside within this district and carry out their official duties within this district. Furthermore, a substantial part of the events giving rise to the claims occurred within this district, including the President's issuance of the Executive Order~~.~~ and executive agencies' efforts to implement the Order's commands.

**PARTIES**

~~11.~~12. Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. Like its fellow federal Democratic Party

committees, DSCC pursues its mission by working with Democratic Senate candidates to encourage and assist Democratic Party members and supporters in successfully casting ballots, including by preserving the legal rights of its members and voters. DSCC's members include Democratic members of the U.S. Senate, as well as Democratic candidates for U.S. Senate. DSCC currently has members in 46 States (every State except for Indiana, Missouri, Utah and North Dakota). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States. Both DSCC itself and DSCC's members—including its members who are Democratic candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. DSCC's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Kirsten Gillibrand, U.S. Senator from New York, serves as Chair of DSCC.

~~12.~~13. Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. Like its fellow Democratic Party committees, DCCC pursues its mission by working with Democratic congressional candidates and their campaigns to encourage and assist supporters of the Democratic Party in successfully casting ballots and to preserve the legal rights of its members and voters. DCCC's members include Democratic members of the U.S. House, as well as Democratic candidates for U.S. House. DCCC currently has members in ~~49~~all 50 States ~~(every State except for Wyoming).~~. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters, whose voting rights it seeks to protect. Both DCCC itself and DCCC's members—including its members who are candidates for office—are directly impacted

by the Order, which purports to alter the rules governing their elections. DCCC's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Suzan DelBene, U.S. Representative from Washington's First Congressional District, serves as Chair of DCCC.

~~13.~~14. Plaintiff Democratic National Committee ("DNC") is the oldest continuing party committee in the United States and is the Democratic Party's national committee as defined by 52 U.S.C. § 30101(14). The DNC is dedicated to electing Democratic candidates in federal, state, and local elections across the country. In support of its mission, the DNC seeks to encourage and assist Democratic Party members and supporters in successfully casting ballots and to preserve the legal rights of its members and voters. The DNC has approximately 450 formal members nationwide, including State Party leaders, elected officials, and Democratic voters. These formal members come from all 50 States, Washington D.C., and the five U.S. territories. In fact, 200 of DNC's formal members are elected from those jurisdictions across the country. The DNC also considers any registered Democrat to be a member of the DNC and the Democratic Party, because Democratic voters influence and ultimately determine the DNC's strategic and political direction by electing certain DNC members and Democratic candidates to local, state, and federal offices. Both the DNC itself and the DNC's members—including its members who are candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. The DNC's voter members are also harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Ken Martin serves as Chair of the DNC.

~~14.~~15. Plaintiff Democratic Governors Association ("DGA") is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. The DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal voting rights of its voters. The DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices and policies, including for managing, administering, and budgeting for Federal, State, and local elections. All incumbent Democratic governors currently serve as members of the DGA, representing 24 States, the District of Columbia, Guam, and the U.S. Virgin Islands. At least 11 of these incumbent Democratic governors are candidates for office in their respective States in the 2026 general election. Both the DGA itself and the DGA's members—including its members who are candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. The DGA's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Kentucky Governor Andy Beshear serves as Chair of the DGA.

~~15.~~16. Plaintiff Charles E. "Chuck" Schumer is the senior U.S. Senator from New York and the leader of the Senate Democratic Caucus, presently serving as Senate Minority Leader. Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Senate Democratic Caucus, as the caucus's ability to pass and influence legislation depends in significant part upon the size of its membership. Increasing the size of the Senate Democratic Caucus, both by electing new Democratic senators and reelecting incumbent Democratic senators, is therefore an essential

part of Leader Schumer's mission and duties. Leader Schumer is often directly involved in campaigns across the country to elect Democratic senators, including in competitive battleground States. Relatedly, Leader Schumer works closely with DSCC and its leadership to help elect Democratic Senate candidates. Leader Schumer has been elected to the U.S. Senate five times and to the U.S. House of Representatives nine times prior to that. He is a candidate for the U.S. Senate in 2028 and is directly impacted by the Order in his own capacity as a candidate for office. As a voter himself in New York State, Senator Schumer is eligible to vote by mail for any reason and is consequently separately harmed by the Order, which purports to impose new requirements to vote by mail. And as a voter himself, Senator Schumer is also harmed by the Order's infringement on his privacy rights.

~~16.~~17. Plaintiff Hakeem S. Jeffries is a member of the U.S. House of Representatives from the Eighth Congressional District of New York. He is the leader of the House Democratic Caucus and presently serves as House Minority Leader. Leader Jeffries is responsible for helping to elect Democratic Party candidates in congressional elections across the country. This responsibility is critical to Leader Jeffries' ability to serve as an effective leader of the House Democratic Caucus, as increasing the size of the Caucus is central to improving its ability to pass and influence legislation, and its ability to pursue the mission and platform of the Democratic Party. To that end, Leader Jeffries is directly involved in helping Democratic congressional candidates to campaign in races across the country, including in key battleground districts that often resolve which party controls the House of Representatives. He also works closely with DCCC and its leadership to help elect Democratic congressional candidates. Leader Jeffries has been elected seven times to the U.S. House of Representatives. He is up for reelection in the upcoming 2026 midterm elections and is therefore also directly impacted by the Order in his own capacity as a candidate for office.

As a voter himself in New York State, Leader Jeffries is eligible to vote by mail for any reason and is consequently separately harmed by the Order, which purports to impose new requirements to vote by mail. And as a voter himself, Leader Jeffries is also harmed by the Order's infringement on his privacy rights.

~~17.~~18. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. The President carries out many of his duties through Defendant Executive Office of the President ("EOP"), an agency headquartered in Washington, D.C. On March 31, 2026, President Trump issued the Executive Order, *Ensuring Citizenship Verification and Integrity in Federal Elections*, which requires the U.S. Postal Service to make changes to—and in some cases refuse altogether—transmission and delivery of election mail. *See id.* § 3.

~~18.~~19. The U.S. Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C. Defendant ~~Pamela Bondi~~Todd Blanche is the U.S. Attorney General and is sued in ~~her~~his official capacity.

~~19.~~20. The U.S. Postal Service ("USPS" or "Postal Service") is a federal "independent establishment" headquartered in Washington, D.C. *See* 39 U.S.C. § 201. Defendant David Steiner is the U.S. Postmaster General and is sued in his official capacity.

~~20.~~21. The U.S. Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

~~21.~~22. U.S. Citizenship and Immigration Services ("USCIS") is a federal agency within DHS headquartered in Camp Springs, Maryland. Defendant Edlow is the Director of USCIS and is sued in his official capacity.

~~22.~~23. The Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland. Defendant Frank J. Bisignano is the Commissioner of SSA and is sued in his official capacity.

~~23.~~24. The U.S. Department of Commerce is a federal agency headquartered in Washington, D.C. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

25. The U.S. Department of State is a federal department headquartered in Washington, D.C. Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

## STATEMENT OF LAW AND FACTS

### I. The Constitution vests the power to regulate elections in the States and in Congress, not the President.

~~24.~~26. The President's power to issue executive orders "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

~~25.~~27. But "[o]ur Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." *LULAC I*, 780 F. Supp. 3d at 155. This delegation of authority is especially clear in two respects.

~~26.~~28. First, "the Constitution empowers the States to decide who is qualified to vote in federal elections." *Id.* at 156 (first citing U.S. Const. art. I, § 2, cl. 1; then citing U.S. Const. amend. XII; and then citing U.S. Const. art. II, § 1, cl. 2). States' ability to impose voter qualifications are, of course, also limited by the Constitution itself, but the Executive Branch maintains no control over such qualifications. *See id.*[1]

[1] For example, the Seventeenth Amendment requires that States hold elections for U.S. Senators, *see* U.S. Const. amend. XVII, and the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth

~~27.~~29. Second, "the Constitution grants the States broad regulatory authority over the conduct of federal elections but reserves final, supervisory authority to Congress." *Id.* at 157. Specifically, the Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of choosing Senators." U.S. Const. art. I, § 4, cl. 1.

~~28.~~30. Under the Clause's plain language, the broad discretion conferred on the States has just one narrow limitation: "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

~~29.~~31. "The Constitution's allocation of authority over federal elections between Congress and the States . . . is no accident. Instead, this design was the product of carefully considered compromises among our Constitution's Framers." *LULAC I*, 780 F. Supp. 3d at 158. Under that framework, "[t]he States have initial authority to regulate elections," "Congress has supervisory authority over those regulations," and "[t]he President does not feature at all." *Id.* at 159. "In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *Id.*

~~30.~~32. Though the Constitution extends to the Executive certain enumerated powers, the regulation of elections is not one of them. The President lacks any "direct control" over "the

Amendments prohibit abridging the right to vote based on race, sex, poll tax or age, *see id.*, amends. XV, XIX, XXIV, XXVI. Likewise, constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments establish a federal constitutional right to vote free from excessive burdens. *See id.*, amends. I, XIV; *see also, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Because the Constitution places authority in the hands of the Legislature rather than the Executive, the President may not "seiz[e] the power of the Legislature" by enacting policy "that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

~~31.~~33. When the President "takes measures incompatible with the expressed or implied will of Congress," his authority is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). That includes when the President ignores congressionally established procedures and acts in "a different and inconsistent way of his own." *Id.* at 639.

~~32.~~34. Ignoring these constraints, one year ago, in March 2025, President Trump signed Executive Order 14,248, entitled, "Preserving and Protecting the Integrity of American Elections." Courts across the country—including this one—soon invalidated much of that executive order and its purported attempt to regulate elections as a violation of the separation of powers. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 154 (entering preliminary injunction against the attempt to order the U.S. Election Assistance Commission to amend the federal voter registration form to require documentary proof of U.S. citizenship and to require agencies to "assess" citizenship of individuals who receive public assistance before providing them a registration form as violations of the separation of powers); *LULAC II*, ~~2025 WL 3042704,~~808 F. Supp. 3d at ~~*38~~87–88 (entering a permanent injunction against the same); *LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*35~~92F (issuing permanent injunction and declaratory relief ~~against additional provisions of the executive~~

~~order~~); *California*, 786 F. Supp. 3d at 396–97 (enjoining parts of executive order); *Washington*, ~~2026 WL 73866,~~814 F. Supp. 3d at ~~*38–39~~1229–30 (same).[2]

## II. The States and Congress have exercised their constitutional authority to provide for absentee and mail voting that the Executive Order purports to displace.

~~33.~~35. Voting by mail has a long and well-established pedigree in the United States, dating to before the nation's founding. During the Revolutionary War, some American colonies allowed voting away from usual polling places, often to ensure the military conflict did not disenfranchise eligible voters. *See* Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (updated Dec. 12, 2023), https://bit.ly/49WqDxZ.

~~34.~~36. During the Civil War, States experimented with absentee voting on an even larger scale to ensure that soldiers away from home could still vote. *See id.* Following the Civil War, States began to expand absentee voting beyond members of the military. In 1896, "Vermont became the first State to accord absentee voting privileges to civilians," and States "have continued to provide for and expand absentee voting since." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001).

~~35.~~37. In the early 20th century, States adopted a variety of models of non-military absentee voting, consistent with the States' "constitutional duty to craft the rules governing federal elections" wherever Congress has not acted to displace them. *Moore v. Harper*, 600 U.S. 1, 29 (2023).

~~36.~~38. In 1978, "California became the first state to allow voters to apply for an absentee ballot without having to provide an excuse," and the majority of States have since followed suit. *See* Waxman, *supra*, ¶ ~~33~~35. Today, 28 States offer absentee ballots to any voter who requests

[2] The Trump Administration has appealed parts of these orders.

one, without having to provide an excuse, and another eight States (California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont and Washington) plus the District of Columbia automatically mail ballots to all registered voters. *See Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legs. (updated Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.

~~37.~~39. Even in States that do not permit all voters to vote absentee, voters are able to do so if they have a qualifying "excuse." Permitted excuses can range widely, including being out of the jurisdiction during the election period, illness or disability, advanced age, work or school conflicts, religious beliefs or practices, jury duty, or being an election worker. *See Table 2: Excuses to Vote Absentee*, Nat'l Conf. of State Legs., (updated ~~Aug. 26, 2025~~June 3, 2026), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee.

~~38.~~40. As States have exercised their prerogative to expand mail voting options under their Elections Clause authority, the use of mail voting has expanded significantly in federal elections. In the 2020 general election, nearly 70 million voters cast their ballots by mail. The National Association of State Election Directors later declared that election "the most secure in American history." Press Release, *Joint Statement from Elections Infrastructure Government Coordinating Council and Sector Coordinating Council Executive Committees*, Nat'l Ass'n of State Election Directors (Nov. 12, 2020), https://www.nased.org/news/jointstatement111220. This conclusion accords with reams of other studies about the absence of widespread voter fraud, including mail voter fraud. Researchers have confirmed that~~, "[a]s with all forms of voter fraud, documented~~ "[d]ocumented instances of fraud related to [mail voting] are rare~~."~~ and research finds no reason to believe that fraud is more common in [mail voting] states.", M.I.T. Election Data & Sci. Lab,

*Voting by mail and absentee voting* (last updated ~~Feb. 28, 2024~~June 24, 2026), https://electionlab.mit.edu/research/voting-mail-and-absentee-voting.[3]

~~39.~~41. President Trump is among those who have relied on absentee ballots to cast his vote. Despite criticizing mail voting, President Trump acknowledged that he voted absentee by mail in New York in 2018 and in Florida in 2020. *See* Stephanie Saul & Reid J. Epstein, *Trump Is Pushing a False Argument on Vote-by-Mail Fraud. Here Are the Facts*, N.Y. Times (Sep. 28, 2020), https://www.nytimes.com/article/mail-in-voting-explained.html. And just last month President Trump again voted by mail in Palm Beach County. Erica L. Green, *Trump, Who Calls Mail-in Voting 'Cheating,' Just Voted by Mail*, N.Y. Times (Mar. 24, 2026), https://www.nytimes.com/2026/03/24/us/politics/trump-mail-in-voting-florida.html.

~~40.~~42. Although the rate of absentee voting has decreased from its 2020 peak, in 2024, approximately 30 percent of all voters—roughly 47 million people—still cast ballots by mail. *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 35 (June 2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (Overview Table 1: Mail Voting in the 2024 General Election). That year, mail ballots accounted for at least 75% of the votes cast in seven States—Arizona, California, Colorado, Hawaii, Oregon, Utah, and Washington—and in four of those states, mail ballots accounted for more than 90% of the votes. *Id*. at 34–35.

[3] *See also* Jonathan Auerbach & Steve Pierson, *Does voting by mail increase fraud? Estimating the change in reported voter fraud when states switch to elections by mail*, Am. Stat. Ass'n, Off. of Sci. Pol'y (Oct. 26, 2020), www.amstat.org/docs/default-source/amstat-documents/pol-vote-by-mail.pdf (comparing the number of voter fraud cases in vote by mail States to the number of cases in non-vote by mail States and finding "no evidence that voting by mail increases the risk of voter fraud overall").

~~41.~~43. Congress has consistently permitted these States' practices. As courts have recognized, there is a "long history of congressional tolerance" of absentee balloting, and in modern times Congress has "required, not just allowed, states to provide for absentee voting in federal elections." *Keisling*, 259 F.3d at 1175; *see also Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776–77 (5th Cir. 2000) (recognizing Congress "enacted at least three statutes authorizing absentee balloting," including the 1970 Amendments to the Voting Rights Act, the 1984 Voting Accessibility for the Elderly and Handicapped Act, and the Uniformed and Overseas Citizens Absentee Voting Act of 1986).

~~42.~~44. In the 1970 Amendments to the Voting Rights Act, Congress mandated that "each State *shall* provide by law for the casting of absentee ballots" in Presidential elections. 52 U.S.C. § 10502(d) (emphasis added). The congressional findings for the statute recognized that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections," deny citizens "equality of civil rights, . . . due process[,] and equal protection of the laws." *Id.* § 10502(a).

**III. The Postal Service is structured to operate independently of partisan politics.**

~~43.~~45. Article I, Section 8, Clause 7 of the Constitution vests Congress with the power to "establish Post Offices and post Roads." Pursuant to that authority, Congress established the Post Office Department in 1792 and established the U.S. Postal Service (hereinafter, the "Postal Service" or "USPS"), as the successor entity to the Post Office Department in 1971. The Postal Service is "a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a).

~~44.~~46. Congress created the Postal Service as an "independent establishment" meant to be isolated from partisan politics. *Id.* § 201. That independence is built into its structure. The Postal Service is directed by a Board of Governors, which comprises eleven members: the Postmaster General, Deputy Postmaster General, and nine other Governors, the latter of which are appointed by the President after bipartisan consultation with the Speaker of the House, the minority leader of the House, the majority leader of the Senate, and the minority leader of the Senate. *Id.* § 202(a)(1). No more than five Governors may be from the same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." *Id.* Governors may be removed by the President only for cause. *Id.*

~~45.~~47. The Board of Governors, rather than the President, appoints and has the power to remove the Postmaster General. *Id.* § 202(c). The Postmaster General is the "chief executive officer" of the Postal Service. *Id.* § 203.

~~46.~~48. The Postal Regulatory Commission~~,~~ ("PRC"), another "independent establishment," sets rules and regulations governing the Postal Service. *Id.* §§ 501, 503. The Commission is composed of five members, appointed by the President with the advice and consent of the Senate. *Id.* § 502(a). "The Commissioners shall be chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." *Id.*

~~47.~~49. The Postal Service is subject to both substantive and procedural statutory obligations.

~~48.~~50. The role of the Postal Service is defined by statute and limited to the function of providing postal service to all Americans. Congress has mandated that the Postal Service "provide prompt, reliable, and efficient services to patrons in all areas" and "render postal services to all communities." *Id.* § 101(a). It is also "the responsibility" of the Postal Service "to maintain an efficient system of collection, sorting, and delivery of the mail nationwide"; "to provide types of mail service to meet the needs of different categories of mail and mail users"; and "to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." *Id.* § 403(b). In fulfilling those responsibilities, the Postal Service may not "make any undue or unreasonable discrimination among users of the mails." *Id.* § 403(c). And in setting any policy, it must give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e).

~~49.~~51. To further the Postal Service's primary obligation to "develop and promote adequate and efficient postal services," Congress has also imposed several procedural requirements on the Postal Service. *Id.* § 3661(a). As relevant to this action, 39 U.S.C. § 3661(b) mandates that:

> When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

Subsection (c) of the same provision further mandates that "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedures Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." The PRC is

also afforded 90 days to issue an advisory opinion on the proposed change. 39 C.F.R. § 3020.102(a).

~~50.~~52. As a general matter, the Postal Service's authority to reject mailpieces is defined by statute. Congress has listed specific, defined categories of "nonmailable matter" that the Postal Service may "dispose[] of" rather than transmitting to its designated address. 39 U.S.C. §§ 3001 *et seq.* None of these provisions permit the categorical disposal of state-issued mail ballot envelopes.

53. ~~The Postal Service~~Indeed, the Postal Service's ability to take action outside its designated role of "provid[ing] for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1), is highly limited. The statutory provision governing the Postal Service's "[s]pecific powers" expressly states that "[n]othing in this section shall be considered to permit or require that the Postal Service provide *any* nonpostal service." *Id.* § 404(e)(1)–(2) (emphasis added).

~~51.~~54. The Postal Service thus simply has no independent authority to regulate elections. "Although the Constitution allows *Congress* to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service — an agency of the federal executive branch." *Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020).

~~52.~~55. The Postal Service is indispensable for voting by mail. According to its post-election report, in 2024 the Postal Service delivered over 222 million pieces of ballot mail, including nearly 100 million ballots for the November general election.[4] And more broadly, it

[4] U.S. Postal Serv., *2024 Post-Election Analysis Report* 3 (Dec. 12, 2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

delivered over 3 billion total pieces of political and election mail in 2024.[5] As it had in the past, the Postal Service took "extraordinary measures" for the 2024 general election to ensure the timely delivery of election mail, including extra deliveries and collections, special pick-ups, specialized sorting plans at processing facilities to expedite delivery and local handling and transportation of ballots.[6] Ultimately, the Postal Service determined that it had "ample capacity to handle the nation's Election Mail," which comprised only 0.72% of its total mail volume between January 1 and November 15, 2024.

### IV. The Executive Order follows Congress's refusal to pass legislation that restricts mail voting despite President Trump's urging.

~~53.~~56. President Trump has peddled false claims about American elections for the better part of a decade. Those lies culminated in the "Big Lie," in 2020, in which President Trump falsely claimed that cheating and fraudulent ballots cost him the 2020 election. In particular, President Trump has said that in 2020, "Democrats attempted the most brazen and outrageous election theft" in American history through the "scam of mail-in ballots."[7] Hours after he made that statement, thousands of President Trump's supporters launched a violent attack on the U.S. Capitol Building,

---

[5] The Postal Service defines "election mail" as any items sent to or from election officials that enable citizens to participate in the voting process, including balloting materials, voter registration cards, absentee applications, and polling place notifications. U.S. Postal Serv., *2024 Post-Election Analysis Report* 7 (Dec. 12, 2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

[6] The Postal Service is also subject to a settlement agreement for the 2026 and 2028 election cycles under which it must, among other things, publicly post guidance documents reflecting the Postal Service's "good faith efforts to prioritize monitoring and timely delivery of Election Mail." *See* Stipulation of Settlement & Proposed Order, ~~*N.A.A.C.P.*~~*NAACP v. U.S. Postal Serv.*, No. 1:20-cv-2295-EGS (D.D.C. Dec. 17, 2021), ECF No. ~~170.~~170, *enforced*, 2026 WL 1893762 (D.D.C. July 1, 2026), *appeal docketed*, No. 26-5257 (D.C. Cir. July 9, 2026).

[7] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

delaying certification of the 2020 presidential election. The Final Report of the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol subsequently detailed the "blizzard of lies" President Trump made to "delegitimiz[e] mail-in-voting in the middle of a deadly pandemic."[8]

~~54.~~57. Following his return to office in 2025, President Trump continued to repeat these false claims, as well as his call for radically reshaping American elections. In particular, President Trump has continued to falsely contend that non-citizens are "brought to our country to vote, and they vote illegally," urging the Republican Party to "take over" and "nationalize the voting."[9] At President Trump's urging, Congress has repeatedly considered bills to restrict voting, including the "SAVE America Act," which contains provisions that would make it significantly more difficult to register to vote and cast a ballot. Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 24, 2026), https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html. President Trump has openly admitted that the goal of adding these barriers to the voting process is to ensure that for the next "50 years," Republicans will "never lose a race." Maddie Ganon, *Trump stops in battleground Georgia to talk economy, voter ID ahead of midterms*, Spectrum News (updated Feb. 19, 2026), ~~Spectrum News~~ https://spectrumlocalnews.com/us/snplus/politics/2026/02/19/trump-visit-georgia.

~~55.~~58. President Trump has repeatedly maligned mail voting in particular and sought to convince Congress to pass voting legislation that meets his mandate of "NO MAIL-IN BALLOTS

[8] H.R. Rep. No. 117-663, at 201–02, 117th Cong, 2d Sess. (2022).

[9] Miles Parks, *Trump says he wants Republicans to 'nationalize' elections,* NPR (Feb. 3, 2026), https://www.npr.org/2026/02/03/nx-s1-5698095/trump-says-he-wants-republicans-to-nationalize-elections

(EXCEPT FOR ILLNESS, DISABILITY, MILITARY, OR TRAVEL!)." ~~*See, e*~~*E.g.*, Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 6, 2026, at 4:12 PM), https://truthsocial.com/@realDonaldTrump/posts/116178624373752275.

~~56.~~59. But President Trump has been unable to pass his antidemocratic agenda through Congress. Just this past week, the SAVE America Act stalled in the Senate after failing to gain sufficient support, including from key Republican Senators. Unwilling to accept his failure in the legislature, President Trump issued the challenged Order ~~yesterday,~~on March 31. Entitled *Ensuring Citizenship Verification and Integrity in Federal Elections*, the Order seeks to accomplish many of the SAVE America Act's objectives by burdening and disenfranchising vulnerable voters. To this end, it dictates the creation of unprecedented lists of American citizens, purportedly for the purpose of identifying eligible voters. And it mandates sweeping changes to mail voting across the country, effectively shifting the determination of eligibility for voting from the State to an array of federal agencies, including the Postal Service, without any grant of constitutional or statutory authority. The Order has two main components to accomplish this scheme.

~~57.~~60. *First*, Section 2(a) orders Defendants to amass state-specific lists of every American citizen over the age of 18 from federal records contained in certain specified databases and other unspecified databases. The Order also mandates that Defendants provide each State the list of its citizens 60 days ahead of federal elections, presumably in support of the Order's "Purpose" of "assist[ing] in verifying identity and Federal election voter eligibility." E.O. § 1.

~~58.~~61. *Second*, Section 3(b) transforms the Postal Service into an election administration agency, purporting to grant the Postal Service unilateral authority to determine who is eligible to vote by mail based on the criteria specified in the Order. *Id.* § 3(b).

~~59.~~62. Section 4(a), in turn, requires the Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General to coordinate with the Secretary of Commerce to effectuate "all relevant aspects of the implementation of this order."

~~60.~~63. For months, President Trump threatened that he would issue an executive order purporting to restrict mail voting in the 2026 general elections. He made clear that he would do so by fiat if Congress would not act as he demanded, expressing his view that States "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."[10] But President Trump possesses no such authority to order such a sweeping change to American elections.

### A. The Executive Order unlawfully directs the creation of unprecedented lists of American citizens.

~~61.~~64. Section 2(a) of the Order directs the Secretary of Homeland Security, "through the Director of United States Citizenship and Immigration Services and in coordination with the Commissioner of [Social Security Administration]," to compile for each State a list of every U.S. citizen above the age of 18 by an upcoming federal election who resides in that State. *See* E.O. § 2(a). This so-called "State Citizenship List" is to be derived from an array of disparate federal citizenship and naturalization records, including Social Security Administration records, the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) program, as well as unnamed "other relevant Federal databases." *Id.*

[10] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 7:17 AM), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254

~~1. tttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt tttttttttttttt~~

~~62.~~65. Once compiled, the Order requires the Secretary of Homeland Security to transmit the lists to the chief election official of each State "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* The Order explicitly disclaims that the lists will identify whether an individual is properly registered to vote. *Id.* It instead advises that an individual is only registered if she has followed the relevant state and federal procedures for voter registration. *Id.* The Order does not explicitly explain the intended use of the State Citizenship List, but the Order's stated purpose is to assist in verifying voter eligibility.

~~63.~~66. While the Order contains boilerplate language purporting to require compliance with applicable law alongside its otherwise mandatory provisions, its plain language directs a breathtaking set of actions that implicate federal records that are heavily regulated by a "web" of post-Watergate restrictions meant to protect Americans from such intrusions, including the Privacy Act. *Whalen v. Roe*, 429 U.S. 589 (1977).

~~64.~~67. The Privacy Act strictly prohibits the use of federal records absent specific authorization in federal law—including procedural requirements that dictate when and how an agency can use federal data, as well as substantive provisions that impose requirements on the kinds of data that may be used and disclosed by agencies for legally authorized and otherwise appropriate purposes. *See* 5 U.S.C. § 552a; *see also LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*12, 54~~65–66, 113–14.

~~65.~~68. Indeed, in enacting amendments that tightened restrictions specifically on "computerized matching programs," Congress underscored that its purpose was to ensure that it would be "*legally impossible* for the Federal Government . . . to put together anything resembling

a '1984' personal dossier on a citizen," and that "proper regard for privacy of the individual, confidentiality of data, and security of the system" would be respected. *Legislative History of the Privacy Act of 1974: Source Book on Privacy* 168, 217 (Sep. 1976) (hereinafter "Source Book on Privacy") (emphasis added) (compiled for the Senate and House Committees on Government Operations, 94th Cong., 2d Sess. (1976)).

~~66.~~69. Yet the Order purports to direct Defendants to make good on President Trump's repeated claims that the federal government should take charge of who is "eligibl[e]" to vote, E.O. § 1, precisely by amassing such a database. And it does so by directing the use of databases that are already riddled with significant flaws that are guaranteed to harm eligible voters—databases that are already subject to litigation in this Court. *See generally League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025); *see also LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*12, 55~~ 116 & n.54.

~~67.~~70. Specifically, the Order directs each~~-~~ State Citizenship List to be compiled from SAVE, SSA records, and other unspecified "databases," and in turn directs Defendants to transmit such lists of purportedly eligible voters to each State "no fewer than 60 days before each regularly scheduled Federal election." E.O. § 2(a).

~~68.~~71. SAVE suffers from known, significant, and harmful errors and inaccuracies. A recent review found that the database was incorrect as to *35%* of individuals whose information was checked through the database in one county in Missouri—and substantial error rates have been reported in other locations. Indeed, reporting from earlier this year suggests that the SAVE database persistently flags eligible voters as potential noncitizens.[11] SSA's database, known as

[11] *See* Jen Fifeld & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Tex. Trib. (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

"Numident," also suffers from serious flaws. The SSA has itself represented that "SSA records . . . do not provide definitive information on U.S. citizenship."[12]

~~69.~~72. Further still, the timing of the Order's mandate to provide the State Citizenship List to the States poses a significant problem in and of itself for at least two reasons. *First*, residence information for some voters will certainly be inaccurate, because the voters will have moved during the 60-day period between transmission of the list and the election. According to Census data, 8.2 million people move between States each year—averaging to about 680,000 per month, or 1.36 million during the 60-day period. *See* Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://www.census.gov/library/stories/2023/11/state-to-state-migration.html. *Second*, citizenship information for some voters will certainly be inaccurate, because many people will become naturalized citizens during the 60-day period. According to the USCIS, about 800,000 people become naturalized citizens each year, or over 65,000 per month. *See* "Naturalization Statistics," USCIS, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last visited Apr. 1, 2026).

### B. The Executive Order gives the Postal Service unauthorized control over voter eligibility for mail voting.

~~70.~~73. Section 3(b) of the Order requires the Postmaster General to initiate a proposed rulemaking that defines the Postal Service as the nationwide arbiter of eligibility to vote by mail. E.O. § 3(b). It specifies that the USPS shall provide each State with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee

[12] *See* Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Counsel for Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

ballots" in such State. *Id.* § 3(b)(iv). The Order further commands that the USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the USPS's "Mail-In and Absentee Participation List" sent to a State. *Id.* § 3(b)(iii). In other words, Subsections 3(b)(iii) and 3(b)(iv) of the Order transform USPS from an independent agency that simply delivers the mail into an election administration agency that must determine every single voter's eligibility to vote by mail—even though such determinations are solely the province of the States under the Elections Clause's distribution of authority for voting administration and federal law.

~~71.~~74. The Order does not explain how USPS will create the Mail-In and Absentee Participation List. Rather, Subsection 3(b)(iv) says that USPS will use "a process specified in the rulemaking directed by this subsection." *Id.* § 3(b)(iv). Nor does it explain how a voter becomes "enrolled" on the List. *Id.* The Order also does not clarify how the USPS's Mail-In and Absentee Participation List is connected to the State Citizenship List; presumably, the latter will be used to help develop the former, but the Order never says so, nor does the Order otherwise establish any legitimate criteria or process for the USPS to use in determining who is eligible to vote.

~~72.~~75. Further, Section 3(b)(1) of the Order directs the Postal Service to issue rigid design specifications for envelopes for "all outbound ballot mail," including that every envelope must be "marked as Official Election Mail," be "automation-compatible and bear a unique Intelligent Mail barcode," and have "undergone a mail envelope design review by the USPS." *Id.* § 3(b)(i).

~~73.~~76. The Order usurps the States' authority over voting by mail and voter eligibility and places these subjects firmly in the control of the USPS. The Order says that no fewer than 90 days before a federal election, a State "may choose to notify the USPS if it intends to allow for mail-in or absentee ballots to be transmitted by the USPS." *Id.* § 3(b)(ii). Alongside that notification, the

State "should further indicate" whether it intends to submit to USPS, no fewer than 60 days before the election, a list of eligible voters to whom the State intends to send a mail-in ballot. *Id.* The Order does not, however, explain how that list will inform the USPS's Mail-in and Absentee Participation List, which purports to control who is *actually* eligible to vote by mail. Nor does it specify the consequences if a State declines to send the list, as the Order implicitly acknowledges is within a State's authority.

~~74.~~77. Likewise, although the Order directs development of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List," *id.* § 3(b)(iv), these procedures are undefined, and by their own terms, confine the States' role to offering "suggested" changes to a list that remains in USPS's unilateral control, *id.*

~~75.~~78. In short, under the Order, even when a voter is eligible to vote by mail under state law, a State sends the voter a mail ballot, and the voter completes the ballot and attempts to mail it to the State's election officials, USPS must refuse to deliver the ballot unless the voter appears on USPS's own Mail-In and Absentee Participation List. As a result, the Order will unlawfully disenfranchise qualified voters.

## V. The Executive Order fails to identify any legitimate source of authority for the President's dramatic and unilateral actions to control federal elections.

~~76.~~79. The Order identifies three purported sources of authority for the President's actions: the Help America Vote Act ("HAVA"), the National Voter Registration Act of 1993 ("NVRA"), and Article IV, § 4 of the U.S. Constitution, which requires the "United States [to] guarantee to every State in th[e] Union a Republican Form of Government" (the "Guarantee Clause"). *See* Order at Preamble. None of these sources provide the President with the sweeping authority that

he has invoked, and each make clear that neither the Constitution nor federal law has conferred any power to the President to regulate federal elections.

~~77.~~80. Congress enacted HAVA in the wake of the 2000 elections to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017) (internal citation omitted). HAVA regulates how States maintain their voter rolls, but leaves the maintenance of those rolls to the States themselves, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). It also requires States to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2)(A). HAVA is clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Further, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085.

~~78.~~81. While HAVA contemplates that the executive branch may enforce its dictates, it confers no unilateral power to the President to regulate elections.

~~79.~~82. Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. *This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001) (emphases added). Thus, HAVA in no way supports the President's unilateral power-grab—it is a Congressional act that imposes certain obligations on the States, but leaves election supervision in their hands.

~~80.~~83. Congress enacted the NVRA in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). The NVRA charges States—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.* § 20507(c)–(g). It similarly makes States the custodians of voter lists. *See Husted*, 584 U.S. at 761. Like HAVA, the NVRA leaves election administration to the States—and does not authorize the unilateral exercise of presidential authority in this area.

~~81.~~84. Thus, both HAVA and the NVRA provide a highly limited role for the federal government in state election administration—and no unilateral role for the President. Both statutes instead "reflect[] a careful allocation of regulatory power to a bipartisan panel [(i.e., the Election Assistance Commission)], accompanied by a requirement for consultation with the States." *LULAC I*, 808 F. Supp. 3d at 74. "This careful allocation implicitly forbids any individual member of the Executive Branch from unilaterally exercising the delegated power to regulate State voter registration programs"—much less unilaterally take sweeping and unrelated action regarding elections writ large. *Id.*

~~82.~~85. The Order's reliance on the Guarantee Clause fares no better. The requirement that the federal government "guarantee" a "republican form of government" simply means that States must hold elections of some kind. *See* The Federalist No. 57 (James Madison) ("The elective mode of obtaining rulers is the characteristic policy of republican government."). Thus, while "a monarchy" or "military dictatorship" might "offend the Guarantee Clause of the Constitution," *Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099–1100 (5th Cir.

1998), there is no suggestion that any State is refusing to hold elections or descending into autocracy, so the Guarantee Clause cannot justify the President's blatant overreach.

## VI. The Defendants have taken final action to implement the Executive Order's commands.

86. Agency officials have quickly taken action to implement the E.O.'s directives. As explained below, Defendants have taken action to implement Section 2(a) by, among other things, developing a mechanism to allow states to access a portal containing protected voter data. Defendants have also fully implemented Section 3(b): pursuant to President Trump's directives, USPS proposed and finalized a rule that alters the availability of mail ballots as outlined in the Order-.

### A. Defendants have taken action to implement Section 2(a) of the E.O.

87. Defendant agencies have already begun exchanging protected information contained in the databases identified in the E.O. to carry out Sections 2(a) and 4(c). And on information and belief, they will imminently allow actors outside the federal government to access such sensitive voter data—if they have not already done so.

88. On June 8, 2026, Defendants filed a notice indicating that DHS "Secretary Mullin has approved a technological approach toward implementing the infrastructure" for creating State Citizenship Lists as contemplated in Section 2(a). ECF No. 150 at 2. The notice indicates that "USCIS, in coordination with the Social Security Administration and the Department of State ["DOS"], would deliver by June 30, 2026, a mechanism for States to receive secure, state-focused citizenship-related information from each agency." *Id*. It further indicates that "citizen-facing portal capabilities would be developed and implemented later in 2026." *Id*.

89. Defendants subsequently filed Secretary Mullin's internal memorandum describing these developments, which provides additional details about Defendants' actions to implement

Section 2(a). *See* ECF Nos. 151, 151-1. The memorandum explains that DHS is working on developing a "technological mechanism that should be delivered on or around June 30, 2026," containing "citizenship list information from USCIS, SSA, and DOS." ECF No. 151-1 at 2. This information, according to the memorandum, will be available via a "digital portal mechanism" that "state election officials" can use to "download . . . citizenship related data elements, such as name, date of birth, and relevant agency identifiers." *Id.*

90. The memorandum further indicates that "USCIS is . . . on track to deliver the core digital portal infrastructure needed for state access on or around June 30, 2026," including "user authentication and mechanisms for each agency to generate, package, and transmit state specific reports for download." *Id*. at 3.

91. The memorandum also provides that USCIS will provide States with the citizenship lists and that "later in 2026," USCIS will "focus on designing and implementing [a] citizen-facing portal" that individual voters can use to access data. *Id.*

92. Defendants have not filed any subsequent updates indicating that DHS adopted a different course or decided not to make the "portal" available to state election officials.

93. On July 17, 2026, the day after the President parroted false claims in a national address that non-citizen voting and mail ballots are threatening the 2026 elections, Secretary Mullin confirmed at his own press conference that DHS continues to take action to carry out the Order at "President Trump's direction." Referencing the President's directives, the Secretary stated that for any "states that choose not to participate with the state program . . . we will make sure that we make those states a priority to look at who voted in their states and hold then the election officials accountable. If the election officials, once we gave them the information they need to secure their elections and they chose not to, then those individuals can also be held accountable by

fines, by penalties, and even depending on how far it goes, prison time." *See* Vasili Varlamos, *Can the Trump Administration Force Oregon Election Changes?*, KPIC (July 17, 2026), https://kpic.com/news/local/can-the-trump-administration-force-oregon-election-changes-fraud-national-midterms-politics-lies-reoublican-democrat-congress-impeach-rights-voters.

**B. Defendants have implemented Section 3(b) of the E.O.**

94. USPS has also fully implemented Section 3(b) of the E.O.

95. Pursuant to the Order's directive that USPS "initiate a proposed rulemaking" governing mail voting, *see* E.O. § 3(b), on June 2, 2026, USPS issued a Notice of Proposed Rulemaking ("NPRM") concerning the transmission of mail ballots for federal elections. *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111). On August 21, 2026, USPS issued a final rule that is, for all intents and purposes, identical to the rule proposed in the NPRM. *See* Ballot Mail for Federal Elections, 39 C.F.R. Part 111 (Aug. 21, 2026) (the "Ballot Mail Rule"), https://www.federalregister.gov/public-inspection/2026-17238/ballot-mail-for-federal-elections.

96. The Ballot Mail Rule obediently implements the E.O.'s unlawful commands by modifying sections of the Domestic Mail Manual ("DMM"), USPS's compendium of regulations, to make several key changes to mail voting.

97. *First*, implementing Section 3(b)(i) of the EO, the Ballot Mail Rule modifies Section 24.3 of the DMM to require all outbound and return ballot mail for federal elections to be mailed in envelopes that meet rigid design requirements.

98. *Second*, implementing Section 3(b)(iii)–(iv) of the EO, the Ballot Mail Rule amends Section 24.4 of the DMM to require state election officers to submit "Mail-In and Absentee Participation Lists" of voters via an online portal, including barcodes corresponding to each piece

of ballot mail associated with each voter. According to the Rule, USPS will then provide a list of all "enrolled" individuals within each state.

99. *Third,* the Ballot Mail Rule also includes a draconian enforcement mechanism. Specifically, it amends Section 24.5 of the DMM to include a "verification" step for mail ballots, and requires USPS to refuse to transmit ballot mail in "noncomplian[t]" envelopes and to non-"enrolled" voters.

100. The Ballot Mail Rule is accompanied by a concurrently effective system of records notice ("SORN"), which confirms that USPS created a portal to house the Mail-In and Absentee Participation Lists. Privacy Act of 1974; System of Records, 91 Fed. Reg. 44880, 44881 (July 17, 2026). Both the Rule and SORN purport to authorize USPS to further disclose information from the Lists to "law enforcement." *Id.*

**~~VI.~~VII. The Executive Order—and the actions Defendants have taken to implement it—severely ~~harms~~harm Plaintiffs, their members, and the voters Plaintiffs represent.**

~~83.~~101. In view of its extraordinary breadth and unprecedented nature, the Executive Order harms Plaintiffs, the Party Plaintiffs' members and supporters, and the voters Plaintiffs represent.—as do the actions Defendants have taken to implement it. Specifically, the Order ~~harms~~and the actions Defendants have taken to implement it harm each Plaintiff by altering the rules for the elections in which they and their members compete, undermining their ability to participate in lawful and fair elections, by burdening and likely disenfranchising Democratic voters, by harming Plaintiffs' electoral prospects, by forcing Plaintiffs to divert money and resources to ameliorate ~~the Order's effects~~Defendants' actions, and by threatening the privacy rights of Plaintiffs' members and voters.

~~84.~~102. These injuries are not mere idle concerns for a future day—they come while the 2026 midterm elections are well underway, as well as with the 2028 general election impending, for which Plaintiffs will begin preparing shortly after the 2026 elections.

~~85. Moreover, the Order threatens to disrupt and confuse ongoing election activities, including in the upcoming 2026 primary elections. On its face, the Order's provisions appear to apply immediately, thus changing the rules for mail-in voting during ongoing primary elections. Moreover, many of the Order's provisions are impossible to implement in view of state election administration responsibilities. Section 2(a), for example, calls for the distribution of the State Citizenship Lists "no fewer than 60 days" before any federal election—but many States are already fewer than 60 days from their federal primary elections. E.O. § 2(a). Section 3(b)(ii) asks States to "notify the USPS" if they intend to allow for mail-in voting, and submit to the USPS "no fewer than 60 days before the election" lists of eligible voters. E.O. § 3(b)(ii). Sections 3(b)(iii) and 3(b)(iv) require the USPS to compile a list of voters it believes are eligible for mail-in voting (based on completely unspecified criteria), provide that list to each State, and then refuse to transmit mail-in ballots.~~

~~86.~~103. As the Supreme Court has repeatedly emphasized, a "bedrock tenet of election law" is that "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in the grant of a stay pending appeal). This is because last-minute changes may "work[] a needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citation omitted). That is precisely the effect that the Order and Defendants' actions will have—~~it imposes~~they impose novel and obligations on States and their election workers, to say nothing of ~~its~~their catastrophic effects on voters, in the midst of an active ~~primary~~election season.

### A. The Order harmsand Defendants' actions harm Plaintiffs by unlawfully altering the rules in the elections in which they compete.

87.104. The Order harms, and Defendants' actions to effectuate it, harm the Party Plaintiffs directly, including their members who are candidates in upcoming elections in all 50 States, as well as Leader Schumer and Leader Jeffries (who are candidates themselves)—by forcing them to compete in unlawfully structured elections.

88.105. The Supreme Court has recognized that "candidates [] . . . have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 146 607 U.S. Ct. 513, 519 2071, 77 (2026). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Id.* at 52078.

89.106. The OrderDefendants have unlawfully altersaltered election rules in ways that "deprive the candidate[s] of a fair process and an accurate result." *Bost*, 146 S. Ct.*Id.* at 52077.. In particular, the Ballot Mail Rule completely alters the landscape of mail voting throughout the country, disrupting all 50 states' mail voting programs. That concrete injury is compounded by the damage to Plaintiffs' reputational interests, which depend on public confidence in election integrity.

### B. The Order harmsand Defendants' actions harm Plaintiffs by burdening the ability of Democratic voters to cast effective ballots.

90.107. The Order harmsand Defendants' actions to effectuate it harm the Party Plaintiffs' members and supporters, which include registered Democrats and Democratic voters, by imposing new requirements to cast a mail ballot, thereby making it harder for them to vote and potentially disenfranchising them altogether. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of

its members who will be prevented from voting by the [voter ID] law."), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing that "Democrats have standing to challenge the validity" of voter ID law that makes it more difficult to vote).

~~91.~~108. Democratic voters use mail ballots at higher rates than their Republican counterparts in many States.[13]

~~92.~~109. Many of Plaintiffs' constituents, supporters, and members rely on voting by mail because they find voting in-person to be unduly burdensome for any number of reasons: many voters have work schedules which prevent them from reaching the polls on Election Day, or lack access to convenient and reliable transportation to their polling place, or have health conditions or disabilities which make it unsafe for them to vote in person.

~~93.~~110. By purporting to impose new requirements to cast a mail ballot—including that the voter be "enrolled" with the USPS to be entitled to receive such a ballot—the Order and Mail Ballot Rule will burden or even disenfranchise many of these disproportionately Democratic voters. And if there was any doubt as to the intended effect of ~~the Order~~these new strictures, President Trump has frequently and vocally attacked voting by mail because of his belief that it helps Democratic candidates win elections. *See supra* § IV.

111. The Ballot Mail Rule is also likely to result in significant delays and disruptions to mail voting. Under the Rule, USPS will need to conduct a potentially time- and error-intensive "verification" process for the millions of mail ballots that Americans cast in each election. This is highly likely to result in administrative errors—voters may be erroneously omitted from USPS's

[13] Pew Rsch. Ctr., *Voters' and Nonvoters' Experiences With the 2024 Election* (Dec. 4, 2024), https://perma.cc/BXR3-L2GJ (showing that in the 2024 general election 44 percent of Democratic candidates' voters voted by mail or absentee ballot compared to 26 percent of Republican candidates' voters).

lists of eligible mail voters, or a USPS worker may mistakenly determine that a voter is not on one of the lists. And even if USPS performs the verification step perfectly as to each voter, the resulting delay will likely prevent mail ballots from reaching the relevant state officials in time to be counted.

~~94.~~112. The harm is particularly acute for the Party Plaintiffs' members and voters in States where voting by mail is the norm. *See supra* § II. Indeed, voting by mail is the most common means of voting in many States—and some States now automatically send mail ballots to *all* registered voters. *See, e.g.*, Nev. Rev. Stat. § 293.269911; Cal. Elec. Code § 3000.5.

~~95.~~113. Even those Democratic voters who are able to vote in person can anticipate being burdened by the Order and the Ballot Mail Rule, which may require them to travel long distances or wait in substantial lines to vote in person.

~~96.~~114. The Order's requirement that the federal government compile State Citizenship Lists—as reflected in DHS's ongoing efforts to make sensitive voter data available to state election officials and individual citizens—also stands to burden and disenfranchise Democratic voters. As explained, such a list is likely to be incomplete and inaccurate, omitting newly naturalized citizens and failing to properly include other citizens. *See supra* § IV.A. Even if the Order gives voters the right to "update or correct" their records with DHS, voters may not know their information is inaccurate, or may not learn they have been omitted from the list until it is too late.

### C. The Order ~~harms~~and Defendants' actions harm Plaintiffs' electoral and competitive prospects.

~~97.~~115. The Order and Defendants' actions to effectuate it separately ~~harms~~harm Plaintiffs because the risk of disenfranchising or burdening large numbers of Democratic-leaning voters injures Plaintiffs' electoral and competitive prospects. Courts have routinely held that any

threat to the electoral prospects of a political party's candidates—or to an individual candidate—stemming from a change in election rules constitutes a concrete and particularized injury for purposes of Article III.[14] Plaintiffs thus have direct standing to challenge the Order and Defendants' actions to effectuate it, including the Ballot Mail Rule, on these grounds. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (candidates had standing to challenge regulation that would "alter the environment in which rival parties defend their concrete interests . . . in winning reelection") (cleaned up); *Nat. L. Party of U.S. v. F.E.C.*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (holding the "party affiliate" of active candidates for political office may also have political competitor standing); *LULAC I,* 780 F. Supp. 3d at 192 (holding that active candidates and party affiliates had shown substantial likelihood of political competitor standing); *LULAC II*, 808 F. Supp. 3d at 61 (holding that active candidates and party affiliates had shown political competitor standing); *LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*30~~111 (same as *LULAC II*).

116. The Ballot Mail Rule is likely to have devastating effects on mail voting throughout the country, including because it introduces multiple complex procedural steps that could result in confusion and disruption. For example, it requires Postal Service employees to undertake a "verification" of each piece of ballot mail—which comprise, collectively, many millions of mailpieces, *see supra* § II—to determine whether the piece is in a "noncomplian[t] envelope" or is being sent to a non-"enrolled" user. *See* DMM § 24.5.3 (as amended by the Ballot Mail Rule). It also requires States to compile, and then update, lists of voters authorized to vote by mail and to

[14] *E.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (regulations that "make[] the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation[s] were declared unlawful" inflict cognizable harm); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (similar, collecting "[v]oluminous persuasive authority"); *Nelson v. Warner*, 472 F. Supp. 3d 297, 306–07 (S.D. W. Va. 2020) (collecting cases from "[s]everal circuits" finding individual candidate and party committee standing).

turn those lists over to USPS in advance of each election. *See* DMM § 24.4.1 (as amended by the Ballot Mail Rule). At each of these steps, voters are at risk of wrongful disenfranchisement, either because they erroneously do not appear on a State list of authorized voters, or because USPS fails to correctly process the list on which they appear, or because USPS wrongfully declines to "verif[y]" their mail ballot. These changes will inevitably lead to widespread "[c]onfusion" that "create[s] a disincentive for citizens who would otherwise attempt" to vote by mail. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016).

~~98.~~117. As explained, Democrats are more likely than Republican voters to vote by mail. *See supra* § VI.B. When fewer Democrats are able to vote, Plaintiffs' electoral prospects necessarily suffer, since Plaintiffs are all Democratic Party members or affiliated organizations. *See Crawford,* 472 F.3d at 951 (holding Democratic Party entities had standing to challenge voter ID law when impacted voters were "more likely to vote for Democratic than Republican candidates").

### D. The Order ~~harms~~and Defendants' actions harm the Party Plaintiffs by forcing them to divert resources to ameliorate the destructive effects of the Order's provisions.

~~99.~~118. The Order and Defendants' actions to effectuate it separately ~~harms~~harm the Party Plaintiffs ~~because it requires~~by requiring them to ~~divert~~attempt to offset the destructive effects by diverting resources from other mission critical activities ~~to attempting to offset the destructive effects of the Order~~. *See Crawford*, 472 F.3d at 951 (finding voter ID law "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"); *see also Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016) (finding Democratic Party entity had standing to challenge Virginia voter ID law based on "diversion of time, talent,

and resources to educate their voters and implement the requirements" of the law), *aff'd*, 843 F.3d 592 (4th Cir. 2016).

~~100.~~119. The Party Plaintiffs have invested heavily in encouraging their members and supporters to vote by mail. They have done so by providing funds to vendors for this purpose and by investing in their own education and outreach programs that promote mail voting. And they have developed increasingly comprehensive outreach, assistance, and ballot-cure programs to ensure their voters are able to cast mail ballots and have them counted. Plaintiffs have already begun to plan and execute similar programs in upcoming elections. These programs are, of course, built on the premise that those voters will be entitled to cast mail ballots and those mail ballots will be counted.

~~101.~~120. The Order, and Defendants' actions to effectuate it, will force the Party Plaintiffs to divert resources to reformulate these programs and/or develop new programs to ensure that their voters, supporters, and constituents are able to cast ballots that will be counted. For example, Plaintiffs will need to develop new voter education programs, including but not limited to social media and direct outreach campaigns to assist voters in complying with the ~~Order~~Ballot Mail Rule to be eligible to vote by mail for upcoming and future elections, and to assist voters to vote by other means if they are no longer able to vote by mail~~ under the Order.~~. These new and altered programs, which will need to be implemented across the country, come at significant economic cost. Because planning and campaigning for the 2026 election cycle is already well underway, Plaintiffs will therefore have to restructure longstanding mail-voter programs to account for ~~the President's~~Defendants' unlawful ~~Order~~actions. Specifically, Plaintiffs will replace existing mail-voter assistance and outreach programs with programs aimed at ensuring that voters know how they can vote by mail~~ under the Order~~, helping alleviate voter confusion in light of ~~the~~

~~Order~~Defendants' actions, and assisting those voters who can no longer vote by mail to vote in person on or before election day.

~~102.~~121. The Order will also force the Party Plaintiffs to divert resources to ameliorate inevitable confusion from the Order's creation of State Citizenship ~~lists~~Lists, and attempt to educate and help voters who have been mistakenly omitted from such lists to update or correct their information with DHS. The Party Plaintiffs have no existing program to do this kind of work; it will need to be created entirely from scratch, with an election fast-approaching. This new program, which will need to be implemented across the country, will come at significant economic cost.

122. DHS's actions to implement Section 2(a) and corresponding public statements further demonstrate that state voter rolls are likely to be updated based on inaccurate information from SAVE, SSA, Department of State, and other databases that is being compiled for the State Citizenship Lists and disclosed to the States. The Party Plaintiffs thus must ensure their members and voters are registered to vote and able to cast their ballots.

123. Despite the flawed nature of this data, several states are nonetheless eager to use the data underlying the State Citizenship Lists. Several states have intervened in this litigation to defend the E.O.'s mandates, and those states have confirmed in their filings that they intend to use the Lists to modify their voter rolls. *See* ECF No. 77-1 at 11–12.

**E. The Order ~~harms~~and Defendants' actions harm the Party Plaintiffs' members and voters by violating their privacy rights.**

~~103.~~124. By ordering the creation of State Citizenship Lists, and by instructing USPS to compile data on how voters exercise their First Amendment right to vote, the Order also harms the Plaintiffs' voters and members by threatening their privacy rights.

~~104.~~125. A key goal of the Privacy Act was to prevent the government from creating de facto national data banks—precisely as the Order aims to do—by making it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." Source Book on Privacy at 168, 217.

~~105.~~126. The Privacy Act authorizes the compilation and sharing of information of American citizens only under strict circumstances that are not met here. ~~The Executive Order thus violates~~In following the Order's commands, Defendants have violated those provisions, including by actually or imminently making voter data available to state election officials via an online portal, and by directing USPS to compile databases of voter behavior. *Supra* § VI. The Order and Defendants' efforts to implement it thus violate the privacy rights of millions of Americans, including Plaintiffs' members and voters.

## CLAIMS FOR RELIEF

### COUNT I: *ULTRA VIRES* PRESIDENTIAL ACTION

### (All Defendants)

~~106.~~127. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~107.~~128. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) ("*NFIB*"). Accordingly, it is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quotation omitted); *see Youngstown*, 343 U.S. at 585. The President lacks *any*

authority to act "unconstitutionally *or* beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n. 11 (1949)). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied,* 144 S. Ct. 1110 (2024).

~~108.~~129. In the realm of elections for federal, state, and local office, the President's constitutional and statutory authority is purposefully limited. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington* ~~*v. Trump*, 2026 WL 73866,~~, 814 F. Supp. 3d at ~~*25~~1214 n.57. Instead, the Constitution "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. ~~2~~II, § 1, cl. 2. As Alexander Hamilton explained, the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations." The Federalist No. 59 (Alexander Hamilton).

~~109.~~130. The Constitution makes clear that it only "empowers *Congress* to pre-empt state regulations governing" federal elections, not the President. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*") (emphasis added). It is only "the action of *Congress*," not the President, that may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. at 384 (emphasis added). Even then, Congress's authority goes only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 371).

~~110.~~131. In contrast to Congress's express authority to regulate elections, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* (alteration in original) (quoting *Roudebush*, 405 U.S. at 24). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.* at 1347. Instead, the President and other executive officers may only act "in relation to another branch's constitutionally authorized act." *Id.* "Perhaps tellingly, in the field of election administration, Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

~~111.~~132. President Trump's Order dramatically exceeds his highly limited constitutional and statutory authority when it comes to regulating elections. No source of legal authority exists for the President to:

- Direct the Secretary of the Department of Homeland Security, the Director of the United States Citizenship and Immigration Services, and the Commissioner of the Social Security Administration, to "compile and transmit to the chief election official of each State a list of individuals confirmed to be [U.S.] Citizens" who are eligible to vote. E.O. § 2(a).

- Direct the Postmaster General of the USPS to make rules governing "all outbound ballot mail" in every State. E.O. § 3(b)(i).

- Direct the Postmaster General of the USPS to create a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State." E.O. § 3(b)(iv).

- Direct the Postmaster General to make rules stating that "the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." E.O. § 3(b)(iii); *see also* E.O. § 4(a) (directing agencies to implement this mandate).

- Direct the Secretary for the Department of Homeland Security to implement the other provisions of the order, including the "infrastructure necessary" for each "State Citizenship List." E.O. § 4(c).

~~112.~~133. Each of these commands interferes with state election procedures by purporting to require the USPS to make arbitrary rules governing which mail-in ballots it will transmit, by purporting to direct the USPS to provide States with lists of voters whom the USPS believes are eligible to vote by mail, and by purporting to require USPS to refuse to deliver mail-in or absentee ballots from voters whom the USPS has not included on that list. E.O. §§ 2(a), 3(b).

~~113.~~134. Further, each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them. None of the sources of authority identified in the Order confer any of the powers the President has claimed for himself in the Order—indeed, as explained above, they reaffirm that election governance is an area of traditional state governance, subject only to review by Congress. *Supra* § V.

~~114.~~135. Accordingly, this Court must "reestablish the limits on [the President's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)), by issuing injunctive and declaratory relief against each provision of the Executive Order identified above, *see also Larson*, 337 U.S. at 689.

**COUNT II: -VIOLATION OF THE SEPARATION OF POWERS – UNLAWFUL INTRUSION UPON CONGRESSIONAL AUTHORITY**

**(All Defendants~~ Trump, Steiner, EOP, USPS~~)**

~~115.~~136. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~116.~~137. The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as

well," including by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id.* at 222–23.

~~117.~~138. "[U]nder our Constitution, the power to regulate federal election procedures rests exclusively with the States and with Congress." *LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*43~~101. President Trump's Order intrudes upon Congress's prerogatives by overriding its command that USPS shall be an "independent establishment," 39 U.S.C. ~~§§§~~ 201, insulated from partisan machinations and dedicated to the apolitical goal of the "expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e); *see also id.* §§ 403(b), 501.

~~118.~~139. The Postal Service's structure reflects its independence. No more than five Governors may be from the same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." 39 U.S.C. § 202(a). Governors may be removed by the President only for cause. *Id.* And the Board of Governors, not the President, appoints and has the power to remove the Postmaster General. 39 U.S.C. § 202(c). Similarly, the Postal Regulatory Commission is also an "independent establishment," 39 U.S.C. §§ 501, 503, where the "Commissioners shall be chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." 39 U.S.C. § 502(a).

~~119.~~140. Notwithstanding these edicts, the Order purports to override the independent judgment of the USPS's leadership and micromanage its internal affairs. Specifically, the Order declares that "the Postmaster General is hereby directed to initiate a proposed rulemaking" that, among other requirements:

- Sets rigid parameters for envelopes containing outbound ballot mail, § 3(b)(i);
- Specifies that "the USPS shall not transmit mail-in or absentee ballots from any individual" who has not properly enrolled in a State-specific list, § 3(b)(iii); and
- Requires USPS to provide each State with a list of individuals "who are enrolled with the USPS," § 3(b)(iv); *see also* E.O. § 4(a) (directing agencies to implement this mandate).

141. As explained above, USPS has also taken concrete action to implement these dictates. The Ballot Mail Rule modifies Section 24.3 of the DMM to require all outbound and return ballot mail for federal elections to be mailed in envelopes that meet rigid design requirements. *See* DMM § 24.3 (as amended by the Ballot Mail Rule) Congress has not authorized USPS to interfere in state-run ballot mail programs in this fashion.

142. The Ballot Mail Rule also amends Section 24.4 of the DMM to require state election officials to "enroll" their voters by submitting "Mail-In and Absentee Participation Lists" of voters, including barcodes corresponding to each piece of ballot mail associated with each voter. *See* DMM § 24.4.1 (as amended by the Ballot Mail Rule). USPS will then provide a list of "enrolled" individuals within each state. *Id.* § 24.4.2. Congress has not authorized USPS to compile compendia of authorized voters.

143. The Ballot Mail Rule enforces these strictures by amending Section 24.5 of the DMM to require USPS employees to "verif[y]" mail ballots, and refuse to transmit ballot mail in "noncomplian[t]" envelopes or ballots sent to non-"enrolled" voters. *See* DMM § 24.5 (as amended by the Ballot Mail Rule). Congress has not authorized USPS to refuse to send otherwise duly transmitted mailpieces based on the sender or recipient's status as an "enrolled" voter or the design of the envelope.

144. For many of the same reasons, Section 2(a) of the E.O., and Defendants' actions to enforce that rule, also violate the horizontal separation of powers.

145. "[T]he power to regulate federal election procedures rests exclusively with the States and with Congress." *LULAC III*, 818 F. Supp. 3d at 101. It does not rest with the President, much less with the Department of Homeland Security, the United States Customs and Immigration Service, the Social Security Administration, the Department of Commerce, or the Department of State. By directing these agencies to take action that regulates federal elections, Section 2(a) of the E.O. unlawfully intrudes on Congress's constitutionally assigned authority.

~~120.~~146. Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

~~121.~~147. Consistent with the Supreme Court's practice, the proper remedy is to enjoin operation of those portions of the Order that offend the separation of powers, consistent with the Order's severability clause~~.~~, and enjoin USPS from implementing or enforcing the Ballot Mail Rule. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 734 (1986); *Seila L. LLC v. CFPB*, 591 U.S. 197, 212, 233–34 (2020) (plurality opinion); *see also* E.O. § 6 (severability provision).

**COUNT III: VIOLATION OF THE SEPARATION OF POWERS – UNLAWFUL INTRUSION UPON STATE AUTHORITY**

**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend X**

**(All Defendants)**

~~122.~~148. In addition to the "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers

between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's reservation "to the States" of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. It is further reflected in the Constitution's express reservation of certain rights to the States, at least where Congress has not acted in a contrary manner. *See id.* art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

~~123.~~149. This is especially true in the election context. As the Court recently noted,

> The Constitution addresses two types of power over federal elections: first, the power to determine who is qualified to vote, and second, the power to regulate federal election procedures. In both spheres, the Constitution vests authority first in the States.

*LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*5~~59. Thus, "considerations of federalism and the vertical separation of powers" are especially salient where an executive order intrudes on a traditional domain of state authority. *Id.* at ~~*42~~100.

~~124.~~150. The Order violates the vertical separation of powers between the federal government and the States by requiring executive officials to take actions that intrude upon matters the Constitution leaves to the States, and where Congress has taken no contrary action. Most notably, the Order requires:

- The Postmaster General of the USPS to make rules governing "all outbound ballot mail" in every State. E.O. § 3(b)(i).
- The Postmaster General of the USPS to create a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State." E.O. § 3(b)(iv).
- The Postmaster General to make rules stating that "the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." E.O. § 3(b)(iii).

151. The Ballot Mail Rule effectuates these directives in USPS regulations. As explained above, it requires USPS to force states to submit their ballot mail envelopes for review and

mandates that the envelopes themselves meet rigid design requirements. *See* DMM § 24.3 (as amended by the Ballot Mail Rule).

152. The Rule also requires USPS to create "Mail-In and Absentee Participation Lists" of voters, along with each piece of ballot mail associated with each voter, based on State submissions. *See* DMM § 24.4.1 (as amended by the Ballot Mail Rule).

153. Importantly, under the Rule, States *must* comply with these strictures or risk a complete collapse of their mail voting programs—disenfranchising voters along the way. Under the Rule, any piece of ballot mail that does not meet USPS's envelope standards or is intended for a non-"enrolled" voter will simply not be transmitted at all. *See* DMM § 24.5.3 (as amended by the Ballot Mail Rule).

125.154. These requirements are profoundly inconsistent with the traditional delegation of election management to the States. In particular, many States—consistent with their delegated constitutional authority—maintain procedures for mail-in and absentee voting that rely on USPS services to transmit ballots. The Order, and the Rule implementing it, effectively conditionscondition the States' ability to effectuate these procedures on their compliance with the USPS's "State-specific list[s]"lists of supposedly eligibleenrolled voters. E.O. § 3(b)(ii)–(iii). It); DMM § 24.4.2 (as amended by the Ballot Mail Rule). The Order and Rule also allowsallow the USPS to decide which "outbound ballot mail" to send or not send, interfering with state procedures for providing their residents with access to mail-in ballots. E.O. § 3(b)(i); *see also id.* § 4(a) (directing agencies to implement this mandate).); DMM § 24.5.3 (as amended by the Ballot Mail Rule). These provisions are blatantly at odds with the States' reserved authority to "determine who is qualified to vote" and "regulate federal election procedures." *LULAC III*, 2026 WL 252420,818 F. Supp. 3d at *559.

~~126.~~155. Although the Order purports to identify sources of legislative and constitutional authority for its edicts, those sources do not support the President's claimed powers or the exercise of those powers through USPS—as explained above, they reaffirm that election governance is an area of traditional state governance, and thus reinforce the principles of federalism that the Order subverts. *Supra* § V.

~~127.~~156. Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

~~128.~~157. Consistent with the Supreme Court's practice, the proper remedy is to enjoin operation of those portions of the Order that offend the separation of powers, consistent with the Order's severability clause~~.~~, along with the Ballot Mail Rule. *See, e.g.*, *Bowsher*, 478 U.S. at 734; *Seila L. LLC* 591 U.S. at 212, 233–34 (plurality opinion); *see also* E.O. § 6 (severability provision).

**COUNT IV: VIOLATION OF THE USPS'S STATUTORY AUTHORITY**

**39 U.S.C. §§ 101, 402**

**(~~All~~ Defendants~~)~~ Trump, Steiner, EOP, USPS**

~~129.~~158. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~130.~~159. Although the President can use executive orders to direct federal agencies to act or make regulations, his power is limited to "direct[ing] subordinates to carry out their own lawful statutory authority"—he cannot direct them to "exceed[] the limitations imposed by the[ir governing statute's] text." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295 (11th Cir. 2022) (striking down executive order directing agencies to take actions not authorized by statute); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979) (applying a similar analysis); *California ~~v. Trump~~*, 786 F. Supp. 3d ~~359,~~at 388–89 ~~(D. Mass. 2025)~~ (striking down executive order that directed an agency to take action not authorized by statute), *appeal docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025).

160. Further, agencies like USPS are also "are creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus v. Dep't of Lab, Occupational Safety & Health Admin*, 595 U.S. 109, 117 (2022) (per curiam). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

~~131.~~161. In examining whether an agency act is authorized by statute, the Court must analyze the text of the statute at issue to determine whether Congress has delegated to the agency the power it seeks to exercise. In doing so, the Court must be mindful that it "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (internal quotation marks and citation omitted). Further, "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to

confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks and citation omitted).

162. The Order directs the Postmaster General and USPS to take actions that are far afield from any legitimate domain of statutory authority. Because agency action by USPS is not subject to review under the Administrative Procedures Act ("APA"), courts have long recognized an equitable cause of action for plaintiffs to "challenge actions by the Postal Service that are outside of the scope of its statutory authority." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1168, 1175–76 (D.C. Cir. 2003); *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972–73 (D.C. Cir. 2022).

132.163. The USPS, according to its governing statute,

> shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities

39 U.S.C. § 101(a).

133.164. Like other federal agencies, the USPS has limited authority to adopt regulations to fulfill its statutory purpose. Specifically, under 39 U.S.C. § 401(2), the USPS may "adopt, amend, and repeal such rules and regulations, not inconsistent with this title, *as may be necessary in the execution of its functions under this title*." Thus, the USPS's authority to make rules is directly tied to its performance of its core, statutorily authorized functions. And courts have repeatedly struck down USPS regulations that were unsupported by a specific statutory directive. *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*,, 321 F.3d 1166,at 1175–76 (D.C. Cir.

2003);; *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,, 26 F.4th 960, at 972–73 (D.C. Cir. 2022)..

134. The Order is replete with directives to the USPS that have nothing to do with its statutorily defined powers.

165. For example, the Order directs the USPS to impose requirements on any "outbound ballot mail," including by specifying that any such mail must be "marked as Official Election Mail," "automation-compatible and bear[ing] a unique Intelligent Mail barcode," and have "undergone a mail envelope design review by the USPS." E.O. § 3(b)(i); *see also id.* § 4(a) (directing agencies to implement this mandate). These directives require the USPSImportantly, USPS's governing statute makes clear that its designated role is to provide "postal services"—*i.e.*, "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail." *See* 39 U.S.C. § 404(a)(1). The statute does not authorize USPS to perform "any nonpostal service." *Id.* § 404(e)(1)–(2).

166. USPS's Ballot Mail Rule—which was implemented pursuant to, and directly follows the mandates of, the Order—flagrantly exceeds USPS's statutory authority.

135.167. The Rule, following Section 3(b)(i) of the Order, modifies Section 24.3 of the DMM to require all outbound and return federal ballot mail for federal elections to undergo a design review with USPS and meet specific, rigidly defined design requirements. *See* DMM § 24.3 (as amended by the Ballot Mail Rule); E.O. §§ 3(b)(i), 4(a). Thus, the Rule purports to impose obligations on state election mail. Nothing in the USPS's statute authorizes such interference with state election procedures.

136.168. The Order directs the USPS to assemble a "list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in

the rulemaking directed in this subsection, for mail-in or absentee ballots," and to provide that list to "each State." E.O. § 3(b)(iv); *see also id.* § 4(a) (directing agencies to implement this mandate). This provision necessarily requires the USPS to develop some procedure for the "enrollment" of voters. But nothingFollowing Section 3(b)(iii)–(iv) of the Order, the Ballot Mail Rule also requires state election officials to submit voter information, including barcodes corresponding to each piece of ballot mail associated with each voter, to USPS. *See* DMM § 24.4.2 (as amended by the Ballot Mail Rule). It then directs USPS to create "Mail-In and Absentee Participation Lists," of all "enrolled" individuals within that state. *See* DMM § 24.4.3 (as amended by the Ballot Mail Rule); *see also* E.O. §§ 3(b)(iii)–(iv), 4(a). Nothing in the USPS's statute authorizes the USPS to develop a procedure for enrolling an eligible voter, to compile a list of qualified voters, or to communicate any such list to the States. Indeed, the compilation and transmission of voter lists is plainly a "nonpostal service," which USPS is forbidden from offering absent explicit statutory authorization. 39 U.S.C. § 404(e)(1)–(2).

137.169. Moreover,And, following Section 3(b)(iii) of the Order requires, the Ballot Mail Rule enforces its provisions by threatening to completely disenfranchise voters and upend state mail voting programs. Under the amended Section 24.5 of the DMM, USPS to must conduct a "verification" step for all mail ballots, and must refuse to "transmit ballot mail- that is either in a "noncomplian[t]" envelope, or absentee ballots" from any individual not is being sent to a non-"enrolled on the Mail-In and Absentee Participation List. *See also* E.O. § 4(a) (directing agencies to implement this mandate)." voter. Nothing in the USPS's statute authorizes the USPS to refuse to carry mail on the basis that the sender or recipient is not on a new, statutorily unauthorized list. To the contrary, 39 U.S.C. § 403(c) expressly forbids such actions by prohibiting the USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails."

~~138.~~170. The Ballot Mail Rule (and Section 3(b)(iii) of the Order) is further at odds with specific statutory directives to the USPS concerning the mail it may not send. 39 U.S.C. §§ 3001 through 3018 define specific, clearly delineated categories of "nonmailable matter" that the USPS may not process or transmit—for example, "hazardous material." *See* 39 U.S.C. § 3018(b)(1). These statutes do not suggest that the USPS may refuse to transmit election-related mail because the sender or recipient is not on a list of eligible voters maintained by USPS. Thus, ~~Section 3(b)(iii)~~the Ballot Mail Rule effectively creates a new category of "nonmailable matter" from whole cloth—one entirely disjoined from the statutory definition. An agency may not promulgate rules or regulations that are "inconsistent with the statute," but the ~~Order directs the USPS to do~~Mail Ballot Rule does just that by ignoring the Congressionally prescribed definitions of "nonmailable matter." *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 643–44 (D.C. Cir. 2019).Both Section 3(b) of the Order and the Ballot Mail Rule plainly exceed USPS's statutory mandate. The Court should therefore enjoin Section 3(b) and enforcement of the Ballot Mail Rule.

~~139. The Order's provisions directed to the USPS thus plainly instruct the USPS to exceed its statutory mandate. The Court must therefore enjoin each provision of the Order directed to the USPS.~~

**COUNT V: ~~AGENCY ACTION CONTRARY TO THE PRIVACY ACT;~~ AGENCY ACTION CONTRARY TO THE PRIVACY ACT;**
**AGENCY ACTION IN EXCESS OF STATUTORY AUTHORIZATION;**
**ARBITRARY AND CAPRICIOUS AGENCY ACTION**

**5 U.S.C. §§ 552A, 706(2)**

**(Defendants DHS, USCIS, SSA, DOS, Mullin, Edlow, Bisignano, Rubio)**

~~140.~~171. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~141.~~172. The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

~~142.~~173. The Privacy Act generally prohibits federal agencies and officers from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific limited circumstances. 5 U.S.C. § 552a(b); *see also* Source Book on Privacy at 168, 217 (explaining that Congress sought to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system").[15]

~~143.~~174. The Privacy Act also specifically prohibits the use of "computer matching programs," except under strictly defined conditions. *See* 5 U.S.C. § 552a(o). Such a "matching program" is "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility" of "applicants for, recipients or beneficiaries of, participants in, or providers" of federal benefits. *Id.* § 552a(a)(8). Section 522a(o) provides that "[*n*]*o*" federal record "contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a

[15] A federal "record" is defined as "any item, collection, or grouping of information about an individual" that includes identifying information and is maintained by an agency. *See id.* § 552a(a)(4).

computer matching program" absent a written agreement that, among other things, identifies "the purpose and legal authority for conducting the program." *Id.* § 552a(o)(1) (emphasis added).[16]

~~144.~~175. As this Court recently explained in ordering the Trump Administration—including most Defendants here—to "strictly comply" with the Privacy Act in implementing the President's *last* executive order affecting federal elections, Defendants' own recent admissions to unlawful disclosures of federal records "underscores" precisely why all disclosures—and especially those that "centralize" information—*must* satisfy the procedural *and* substantive safeguards of the Act. *LULAC III*, ~~2026 WL 252420,~~818 F. Supp. 3d at ~~*55~~115 n.54. "One such risk is the increased threat of misuse that arises when agencies centralize data and make it accessible to greater numbers of users, as DHS and SSA have done through their changes to SAVE and Numident. Another important risk when agencies centralize data is the possibility that false, incomplete, outdated, or otherwise unreliable information will be imported from one system into another." *Id.* (internal citation omitted). Those are the same databases the E.O. mandates the State Citizenship Lists be "derived" from, *see* E.O. § 2(a), yet the Order's mandate directs multiple plain violations of the Privacy Act.

~~145.~~176. The State Citizenship Lists directed by Sections 2(a) and 4 of the Order—and that Defendants are in the process of compiling and making available to the States, *see supra* § VI.A—violate the Privacy Act because they are a computerized matching program that wholly lacks "legal authority." 5 U.S.C. § 552a(o)(1)(A). The federal "databases" from which the List

[16] In enacting this provision of the Privacy Act, Congress further codified the prohibition, noting that nothing in the Act "shall be construed to authorize" the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not *otherwise authorized by law*." Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (codified at 5 U.S.C. § 552a, note) (emphasis added).

must be "derived"—"citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases"—are each computerized "systems of records" that contain federal "records" covered by the Act. *See* Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 48948, 48949–50 (Oct. 31, 2025) ("SAVE SORN"); Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025) ("SSA Numident SORN"); *see also, e.g.*, *LULAC I*, 780 F. Supp. 3d at 186–88. And because the State Citizenship Lists are—as directed by Sections 2(a) and 4 of the EO— to be created and "maintained" by "linking information on individuals maintained in systems of records by other Federal agencies" and comparing and compiling information from those systems, their development is a "matching program" within the meaning of the Privacy Act. 5 U.S.C. § 552a(o).

146.177. Yet no constitutional, statutory, or other provision of law has authorized the matching of federal records to create the State Citizenship Lists. The sole authority cited in the EO, 42 U.S.C. § 1320b-7, directs DHS to establish a "system for the verification of immigration status" to assist states in determining whether non-citizens (or "aliens") are eligible for benefits. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (codified at 42 U.S.C. § 1320b-7). Neither that statute nor any other authorizes any of the Defendants to amass citizenship and residence information for *all* citizens for *any* purpose, much less conduct matching of federal records in an effort to broadly distribute information that will purportedly "assist[]" with voter registration—a core responsibility of the States. E.O. § 2(a). If Congress intended to permit such an extraordinary compilation of federal data notwithstanding the specific contrary limitations of the Privacy Act, it would have done so clearly, but it did not. *E.g.*, *West Virginia*, 597 U.S. at 724; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

~~147.~~178. The State Citizenship Lists directed by Sections 2(a) and 4 of the Order, and as Defendants say they are in the process of compiling and making available, *supra* § VI.A, further violate the Privacy Act's general prohibition on the disclosure of federal data because they fall far outside the scope of permissible "uses" as defined by the Act. There is a narrow exception to the Act's general prohibition on the disclosure of federal data where an applicable and properly noticed "routine use" applies, *id.* § 552a(b)(3), and the Act in turn defines "routine use" as one that is "compatible with the purpose for which [the data] was collected," *id.* § 552a(a)(7).[17] For a "routine use" to satisfy this "compatib[ility]" requirement, "[t]here must be a . . . concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549–50 (3d Cir. 1989); *see Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). The requirement prevents "personal data collected by one [agency] for a stated purpose" from being "used and traded by another organization" for unrelated purposes. *Britt*, 886 F.2d at 550 (quoting 120 Cong. Rec. 36,894 (1974) (statement of Sen. Percy)).

~~148.~~179. Here, no existing provision of any SORN purports to authorize the use of federal data for the creation or distribution of State Citizenship Lists, either expressly or through

[17] Under the Act, an agency must "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days before using the system in new ways. 5 U.S.C. § 552a(e)(11). Similarly, at least 30 days before establishing or revising a "matching program," an agency must "publish in the Federal Register notice of such establishment or revision." *Id.* § 552a(e)(12). To ensure congressional oversight, any time an agency "proposes to establish or make a significant change in a system of records or a matching program," it must "provide adequate advance notice of any such proposal" to Congress and the Office of Management and Budget (OMB) "to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r); *see also* OMB Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 7 & 12 (2016); 5 U.S.C. § 552a(v)(1) (authorizing OMB to issue Privacy Act guidance that is binding on the agencies).

any compatible "routine use." *See generally* SAVE SORN, 90 Fed. Reg. at 48948; SSA Numident SORN, 90 Fed. Reg. at 50879. The State Citizenship Lists accordingly violate the "use" provisions of the Privacy Act.

~~149.~~180. ~~Finally, the~~The State Citizenship Lists directed by Sections 2(a) and 4 of the Order violate the substantive provisions of the Privacy Act and are arbitrary and capricious because the federal data from which they are derived is fundamentally flawed for the very purpose the List purports to serve. The Privacy Act expressly requires agencies that create, maintain, or use federal data to ensure that the records are accurate, relevant, up-to-date, secure, and appropriate for the specific uses for which they are employed—and further requires agencies to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." 5 U.S.C. § 552a(e)(5)–(10).

~~150.~~181. The State Citizenship Lists, are, however, derived from a patchwork of sources that *guarantee* inaccuracies, outdated information, and unfairness to citizens on whom information is maintained. The E.O. directs Defendants to share the List with state officials 60 days prior to each federal election, for example, but citizens frequently move at all times of year—guaranteeing that at least some residence information disclosed through the database will be inaccurate, and that information about residents of one State will be inappropriately given to another State. Similarly, individuals who are currently not citizens will become naturalized citizens within that same period—guaranteeing inaccuracies with respect to the "citizenship" information provided by each "Citizenship List." Finally, SAVE—DHS's system of records that serves as a primary data source for the State Citizenship Lists, E.O. § 2(a)—itself suffers from known, significant, and harmful errors and inaccuracies. As noted above, a review found that the database

was incorrect as to *35%* of individuals' whose information was checked through the database recently in one county in Missouri, and substantial error rates have been reported in other locations.

182. On information and belief, Defendants~~, as directed by the EO,~~ have ~~or will imminently take~~taken concrete steps ~~to carry out~~toward implementation of Section 2(a) of the Order that constitute "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704. At a minimum, Defendants' filings indicate that they have "adopt[ed] a policy" of permitting States to access voter data via an online portal via Secretary Mullins's memorandum on the implementation of Section 2(a), a policy that is "surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the information holder's] rights [and the agency's] obligations have been determined.'" *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (second alteration in original); *see also AFL-CIO v. Dep't of Lab.*, 2026 WL 879518, at *12–13 (D.D.C. Mar. 31, 2026) (same). An agency head's "approv[al]" of a written "policy"—as Secretary Mullin has given here—is final action for APA purposes. *Supra* § VI.A; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–600 (2016).

~~151.~~183. By taking such final action contrary to the Privacy Act, Defendants are in violation of the APA.

~~152.~~184. Defendants' actions in violation of the Privacy Act inflict direct and irreparable harm on Plaintiffs, their members, and their supporters by disclosing and threatening to disclose their personal information. As federal courts have long recognized, Plaintiffs and their members have fundamental interests in protecting personal or identifying information from disclosure to the extent possible, and the Privacy Act itself reflects this by prohibiting all disclosures that are not authorized by federal law. *Am. Fed'n of Gov't Emps. v. OPM*, 786 F. Supp.

3d 647, 662 (S.D.N.Y. 2025) (first citing Pub. L. No. 93-579 ("Privacy Act"), § 2(a)(4), 88 Stat. 1896 (1974); and then *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting))). The Privacy Act's stricter regulation of computerized matching programs recognizes that use of federal records in such programs substantially *heightens* these fundamental interests, as such uses are capable of amassing strands of information rapidly and unbeknownst to the individual. *See, e.g.*, *Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*, 966 F.2d 747, 754 (3d Cir. 1992) ("A 'web of federal statutory and regulatory provisions,' including the Privacy Act, and supplemented by state laws, that restrict rap sheet dissemination and other compiled computerized information serve[] to bolster the individual's privacy interest." (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 764–65 (1989)).

~~153.~~185. Plaintiffs are entitled to declaratory and injunctive relief pursuant to the APA and the Privacy Act enjoining all agency action to implement the State Citizenship Lists.

**COUNT VI:~~-~~ VIOLATION OF THE FIRST AND FIFTH AMENDMENTS**

**U.S. Const. amends. I, V**

**(All Defendants)**

~~154.~~186. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~155.~~187. The Supreme Court has long recognized that constitutional principles of free speech, free association, equal protection, and due process establish a federal constitutional right to vote free from excessive burdens. *See, e.g.*, *Anderson*, 460 U.S. at 793; *Burdick*, 504 U.S. at 433. In evaluating the constitutionality of an election regulation, courts weigh "the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the

burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

~~156.~~188. Where an election regulation "impos[es] severe burdens on plaintiffs' rights" it "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Even more modest burdens "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks omitted).

~~157.~~189. The Executive Order unlawfully burdens the right to vote by threatening millions of Americans with arbitrary disenfranchisement and requiring every American to undertake additional and unspecified efforts to vote by mail or absentee. This burden manifests in numerous ways.

~~158.~~190. *First*, § 2(a) of the Order requires the Secretary of the Department of Homeland Security "to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who" meet the Order's definition of voter eligibility. E.O. § 2(a). This "State Citizenship List," according to the Order, will be derived from "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," and will be transmitted to the States "no fewer than 60 days before each regularly scheduled Federal election." *Id.*; *see also* § 4(c) (directing DHS to implement this mandate).

~~159.~~191. The "State Citizenship List," however, is guaranteed to be incomplete and inaccurate. Most obviously, it will exclude individuals who become U.S. citizens within 60 days

of an election—who are eligible to vote, but will not be on the list at the time the Order mandates its transmission to the States. The list will also exclude individuals whose information is erroneously reported in the "SAVE" database and other "Federal databases" from which it is compiled. *See supra* § IV.A (discussing potential sources of error in the State Citizenship List). Thus, the Order essentially mandates the provision of an erroneous list of voters, thereby threatening the rights of those voters wrongly omitted from the list. And although the Order directs the Secretary of the Department of Homeland Security to establish procedures for individuals and States to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. A given voter thus may have no way of knowing that the federal government has represented to her home State that she is not eligible to vote, and no opportunity to avail herself of any (as yet undefined) cure provisions.

192. Defendants' actions to implement Section 2(a) further compound these harms. As noted above, Defendants say they are in the process of providing State election officials access to the undoubtedly inaccurate "citizenship" information contemplated in Section 2(a). *Supra* § VI.A. This creates an unacceptable risk that States will use this information to exclude eligible voters from voting—a risk heightened by the fact that, according to DHS's plan for implementing Section 2(a), individual voters currently have no way to identify or correct errors in the information pertaining to their eligibility. *See generally* ECF No. 151-1.

193. *Second*, §§ 3(b)(iii) and 3(b)(iv)), and the Ballot Mail Rule implementing these sections, all but guarantee the disenfranchisement of innumerable voters who rely on mail-in or absentee ballots to participate in the democratic process. Section (3)(b)(iv) requires the Postmaster General to implement rules "specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to

a process specified in the rulemaking directed by this submission, for mail-in or absentee ballots provided by each State." E.O. § 3(b)(iv). The Order says nothing about how the USPS may compile the "Mail-In and Absentee Participation List," or what "enrollment" procedures for voters the USPS must develop. The Order thus appears to give the USPS unbridled discretion to exclude any voter from the "Mail-In and Absentee Participation List." It also appears to allow the USPS to define the procedure for voters to "enroll" in the Mail-In and Absentee Participation List. Section 3(b)(iii), in turn, requires the Postmaster General to enact rules "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list described in subsection (b)(iv)." E.O. § 3(b)(iii). Thus, for an individual voter excluded from the Mail-In and Absentee Participation List, the consequences are severe: that individual will not be able to cast a ballot by mail at all. Moreover, the Order does not require anyThe Ballot Mail Rule requires USPS to assemble and transmit lists of voters eligible to vote by mail, pursuant to Section (3)(b)(iv)'s dictates, and to impose strictures on state ballot envelope design, pursuant to Section 3(b)(i). *See* DMM §§ 24.3–24.4 (as amended by the Ballot Mail Rule). It further authorizes USPS to refuse to transmit ballots that do not comply with these requirements. *Id*. § 24.5 (as amended by the Ballot Mail Rule).

194. Under the Rule, whether a voter's ballot is transmitted depends on whether USPS determines that any given ballot complies with the rule's new requirements. *See* Ballot Mail Rule at 29, 70–72 (acknowledging that such ballots will be rejected, refusing to adopt "less restrictive" alternatives). The Rule creates an unacceptable risk that large numbers of voters will be disenfranchised—and significant uncertainty for each individual voter as to whether he or she will be able to effectively vote by mail. *See Newby*, 838 F.3d at 13 (highlighting the burden of

government actions that create a risk of "confusion," and thereby a "disincentive for citizens who would otherwise attempt" to vote).

160.195. Moreover, neither the Order nor the Ballot Mail Rule provides for any form of notice to voters that the USPS has refused to deliver their ballot, potentially leaving them disenfranchised without their knowledge or any opportunity to ensure their vote is counted. *See also* E.O. § 4(a) (directing agencies to implement this mandate).

161. This is a substantial and unjustified burden. To vote by mail, a voter must first comply with whatever "enrollment" procedure the USPS enacts to secure her place in the Mail-In and Absentee Participation List. The USPS may then determine – based on completely undefined criteria – whether to place the voter on the List. If she is not on the List and attempts to cast her ballot by mail, the USPS will not "transmit" it. E.O. § 3(b)(iii).

162.196. Thus, at a bare minimum, the Order requiresand the Ballot Mail Rule subject all voters who wish to vote by mail to comply with a new procedure – which alone may be a to significant burden. But this procedure is also highly likely to exclude numerousand unpredictable uncertainty about whether they will be able to vote by mail at all, and they create a significant risk that many voters from the processwill be disenfranchised entirely. *See Fla. Democratic Party v. Detzner*, No. 4:16-cv-607–, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."); *Richardson v. Tex. Sec'y of State*, No. SA-19-CV-00963-OLG, 2019 WL 10945422, at *11 (W.D. Tex. Dec. 23, 2019) (similar).

163.197. This hefty burden makes the Ballot Mail Rule and the Order all but impossible to justify, even if there were weighty government interests to support itthem. But there are not. TheNeither the Order's requirements, nor the agency actions that directly implement those

requirements, are in noany way narrowly tailored to advance any compelling governmental interest.

164.198. The only interest identified by the Order is the federal government's "duty" to enforce federal statutes that require citizenship to vote in federal elections. *See* E.O. § 1 (citing statutes). But that purported interest fails to justify the burdens because the federal government has no lawful authority to set voter qualifications. *See, e.g.*, *ITCA*, 570 U.S. at 16 (recognizing "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them"); *id.* at 26 (Thomas, J., dissenting) (agreeing that "Congress has no role in setting voter qualifications"). While States are free to regulate voting rights of U.S. citizens, the Constitution does not recognize any federal interest in enforcing those limitations. To the contrary, "[a] Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Id.* at 17 (majority op.) (quoting 2 Records of the Federal Convention of 1787, at 250 (M. Farrand rev. ed. 1966)).

165.199. Besides, even if the President did have a permissible interest in enforcing prevention of non-citizen voting, courts have found that instances of non-citizen voting are exceedingly rare. *E.g.*, *Mi Familia Vota*, 719 F. Supp. 3d at 966–67. And, given President Trump's own public statements, it is evident that this purported rationale is mere pretext. President Trump has openly admitted that the true "governmental interest" motivating the Order is to ensure that for the next "50 years," Republicans will "never lose a race." *See supra* ¶ 5457. Attempting to disenfranchise voters for partisan advantage is not a legitimate—let alone compelling—governmental interest.

~~166.~~200. Because the Order and Defendants' actions to implement it severely ~~burdens~~burden voters without any offsetting justification, ~~it is~~they are unconstitutional and may not be enforced.

**COUNT VII: VIOLATION OF THE VOTING RIGHTS ACT**

**52 U.S.C. § 10502(d)**

**(All Defendants)**

~~167.~~201. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

~~168.~~202. In 1970, Congress amended the Voting Rights Act to require that "each State shall provide by law for the casting of absentee ballots for . . . President and Vice President . . . by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election." 52 U.S.C. § 10502(d); *see also* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 314, 316–17.

~~169.~~203. By enacting this amendment, "Congress provided uniform national rules for absentee voting in presidential and vice-presidential elections" in order to "insure a fully effective voice to all citizens in national elections." *Oregon v. Mitchell*, 400 U.S. 112, 134 (1970); *see also Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 367 (D.N.J. 2020) (noting "Congress's requirement that states permit some form of absentee voting").

~~170.~~204. The Executive Order ~~yanks away~~and the Ballot Mail Rule violate the federal right to vote by mail in presidential elections by prohibiting USPS from transmitting ballots from any individuals not "enrolled" with USPS. *See* DMM § 24.5 (as amended by the Ballot Mail Rule); E.O. ~~§§~~§ 3(b)(iii~~); *see id.*~~), § 4(a) (directing agencies to enforce this mandate).

~~171.~~205. No State, however, has provided by law that absentee voting is contingent on USPS enrollment.

~~172.~~206. Nor does the Voting Rights Act recognize USPS enrollment as a condition precedent to the right to vote absentee. Any voter who i) is duly qualified to vote under State law, ii) is absent from their election district on Election Day, iii) applied to vote absentee at least seven days before the election, and iv) returned their ballot by the close of polls on Election Day is entitled to have their vote counted in presidential elections, regardless of whether they are enrolled with USPS. *See* 52 U.S.C. § 10502(d). The Executive Order ~~is thus unlawful~~and Ballot Mail Rule therefore violate the Voting Rights Act.

**COUNT VIII: VIOLATION OF THE PRIVACY ACT**

**5 U.S.C. § 552a(e)(7)**

**(Defendants Trump, Steiner, EOP, USPS)**

207. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

208. The Privacy Act forbids federal government agencies, including USPS, from maintaining information about how individuals exercise their First Amendment rights. Specifically, under 5 U.S.C. § 552a(e)(7), each agency must "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."

209. The relevant provision of the Privacy Act also defines "records" broadly to include "any item, collection, or grouping of information about an individual that is maintained by an agency." *Id.* § 552a(a)(4).

210. The Ballot Mail Rule requires USPS to violate this provision. Specifically, it amends the DMM to require States to submit lists of voters authorized to vote by mail to USPS. DMM § 24.4 (as amended by the Ballot Mail Rule). These lists would include identifying information about specific individuals, including their names, addresses, and barcodes corresponding to their ballot mail—thus qualifying as "records" under the Privacy Act's definition. *See id.*; 5 U.S.C. § 552a(a)(4). The lists would also include information about individuals' "exercise[] [of their] rights guaranteed by the First Amendment," *see* 5 U.S.C. § 552a(e)(7), namely the right to vote by mail, which is protected by the First Amendment. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1193 (C.D. Cal. 2026).

211. The Ballot Mail Rule also requires USPS to "maintain" these records for some period of time. Under the Rule, after receiving a list of voter information from a State, USPS must provide lists of "enrolled" individuals back to the State, *see* DMM § 24.4.3 (as amended by the Ballot Mail Rule), meaning that USPS will be required to "maintain" the relevant records for at least the period of time between when it receives them and when it transmits the lists of "enrolled" individuals to each State. This is confirmed by the corresponding SORN published by USPS, which states that the agency developed a "system of records" to house this information. See 91 Fed. Reg. 44881 (stating that the system will house information regarding "individuals to whom a mail-in or absentee ballot is sent for a federal election, each individual's address, the unique Intelligent Mail barcode printed on the outbound and return ballot envelopes containing the mail-in or absentee ballot that was sent to each individual, and the issuing state of such ballot provided by a state's chief election official"). The SORN is effective with the Rule. *Id.*

212. Moreover, neither of § 552a(e)(7)'s two exceptions apply. The Ballot Mail Rule is not "expressly authorized by statute," *id.*—to the contrary, as explained above, it violates USPS's

statutory prerogatives. The Rule says nothing about seeking authorization from "the individual[s] about whom the record[s] [are] maintained," *i.e.*, the voters. *Id*. Nor does the Rule relate to any "authorized law enforcement activity," which refers to an "authorized criminal, intelligence, or administrative investigation," *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004). Neither the E.O. nor the Rule cites anything to suggest that the voters about whose First Amendment activities USPS proposes to collect data are the subject of an "authorized criminal, intelligence, or administrative investigation," so this exception cannot apply.

213. On information and belief, USPS has or imminently will further violate the Privacy Act by sharing these and related records to DHS for purposes that are not "compatible" with USPS's original purpose in collecting the information, 5 U.S.C. § 552a(a)(7); *see also id.* § 552a(b), as reflected in Secretary's June 8 memo regarding implementation of the Order, ECF No. 151-1 at 3 ("In coordination with the Postmaster General, USCIS is also exploring a concept that . . . could allow DHS to leverage USPS data related to mail-in and absentee ballot participation lists.").

214. Plaintiffs have an equitable cause of action to challenge unlawful USPS action. *See Aid Ass'n for Lutherans*, 321 F.3d at 1168; *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 972–73; *see also Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv*., 604 F. Supp. 2d 665, 672–73 (S.D.N.Y. 2009) (plaintiff stated a plausible *ultra vires* claim against USPS based on violations of the Privacy Act).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court exercise its equitable authority to grant the following relief:

A. Declare that E.O. §§ 2(a), 3(b), 4(a), and 4(c) are *ultra vires* and legally void;

B. Declare that E.O. §§ 3(b) and 4(a) violate the constitutional separation of powers and are not enforceable;

C. Declare that E.O. §§ 3(b) and 4(a) violate the vertical separation of powers and the Tenth Amendment to the U.S. Constitution and are not enforceable;

D. Declare that E.O. §§ 2(a), 4(a), and 4(c) violate the Administrative Procedure Act and are "not in accordance with law" and are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B)-(C);

E. Declare that E.O. §§ 3(b) and 4(a) violate the Voting Rights Act, 52 U.S.C. § 10502(d), and are not enforceable;

F. Declare that E.O. §§ 2(a), 3(b), 4(a), and 4(c) violate the First and Fifth Amendments to the U.S. Constitution and are not enforceable;

G. Preliminarily and permanently enjoin Defendants Trump, EOP, Mullin, DHS, Edlow, USCIS, Bisignano, and SSA from taking any action to implement E.O. ~~§~~§§ 2(a) and 4(c);

H. Preliminarily and permanently enjoin Defendants Trump, EOP, Steiner, and USPS from taking any action to implement E.O. § 3(b);

I. Preliminarily and permanently enjoin Defendants Trump, EOP, Mullin, DHS, Bisignano, SSA, Steiner, USPS, Lutnick, and DOC from taking any action to implement E.O. § 4(a);

J. Declare that the Ballot Mail Rule violates the constitutional separation of powers and is unenforceable;

K. Declare that the Ballot Mail Rule violates the vertical separation of powers and the Tenth Amendment to the U.S. Constitution and is unenforceable;

L. Declare that the Ballot Mail Rule is *ultra vires* and in violation of USPS's statutory authority and is unenforceable;

M. Declare that the Ballot Mail Rule violates the First and Fifth Amendments to the U.S. Constitution and is unenforceable;

N. Declare that the Ballot Mail Rule violates the Voting Rights Act, 52 U.S.C. § 10502(d), and is unenforceable;

O. Declare that the Ballot Mail Rule violates the Privacy Act and is unenforceable;

P. Preliminarily and permanently enjoin Defendants Trump, EOP, Steiner, and USPS from taking any action to implement the Ballot Mail Rule;

~~J.~~Q. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

~~K.~~R. Grant such other relief as the Court deems just and proper.

Dated: ~~April 1~~August 25, 2026

Respectfully submitted,

*/s/ ~~Marc E. Elias~~Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
~~Christina Ford (DC 1655542)~~
Max Accardi (DC 90021259~~)**~~)
Kevin R. Kowalewski (~~NY 5946645)*~~DC 90045467)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) ~~968-4490~~948-1135
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
~~cford@elias.law~~
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

~~**Pro hac vice* application forthcoming~~
~~**Application for admission forthcoming~~

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*