# Exhibit 2

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al*.,<br><br>Plaintiffs,<br><br>*v*.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,<br><br>Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF LILLIE SNYDER BOSS**

I, Lillie Snyder Boss, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of DSCC. I have served in this role since March 2021. I oversee DSCC's day-to-day operations. This includes managing the Committee's staff and processes, budget, operations, and initiatives, as well as engaging with all of DSCC's activities as needed. I interact with DSCC's officers and employees at all levels. I also help candidates' campaigns from time to time on their compliance and budget needs.

3. DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. In support of its mission, DSCC works with Democratic Senate candidates and their campaigns to successfully execute their campaigns, including by encouraging and assisting Democratic Party members and supporters in registering and successfully casting ballots, and fighting to preserve the legal rights of its members and voters.

4. DSCC's members include Democratic members of the U.S. Senate, as well as Democratic candidates for U.S. Senate. DSCC currently has members in 44 States (every State except for Nebraska, Indiana, Missouri, Utah, South Dakota, and North Dakota). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States.

5. With just 70 days until election day, DSCC is actively preparing, budgeting, strategizing, and executing its plans for the 2026 midterm election cycle.

6. DSCC's candidate members rely on DSCC's resources to help win their campaigns, including direct financial support from DSCC, insight from DSCC strategy, and coordination with DSCC's communications and voter mobilization programs. In other words, DSCC's interests and resources are deeply intertwined with those of its candidate members.

7. In 2026, there are 35 U.S. Senate seats up for election. The States in which DSCC's members are competing for office in 2026 include: Alabama, Alaska, Arkansas, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wyoming.

8. Both DSCC itself and DSCC's members who are candidates for office have an interest in a fair and lawful electoral process for its members' campaigns. Even if DSCC's members succeed in their campaigns, DSCC and its members are harmed by unlawful election rules, as they deprive DSCC and its candidate members of a fair process and an accurate result. That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. Senate.

## I. The Postal Service's New Restrictions on Voting by Mail

9. On March 31, 2026, President Trump signed Executive Order 14399, titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*" ("E.O." or "Order"). Section 3(b) of the Order purports to give USPS ultimate control over which voters may receive and return a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

10. On August 21, 2026, USPS promulgated a final rule implementing Section 3(b) of the E.O., effective immediately, titled *Ballot Mail for Federal Elections* (the "Ballot Mail Rule").

11. The E.O. and Ballot Mail Rule inflict severe and immediate harm on DSCC and its candidate members. They do so by erecting unlawful barriers to voters' ability to successfully cast a mail ballot, by interfering with DSCC's planning and programming, including for its candidate members, by forcing DSCC and its candidate members to compete on an unlawfully structured playing field, and by damaging their electoral prospects.

12. The Ballot Mail Rule significantly changes the transmission of mail-in and absentee ballots. First, the Ballot Mail Rule requires that States design all mail-in ballot envelopes to meet several new standards, including having new USPS-mandated "Intelligent Mail barcodes" ("IMb") on both outbound and return envelopes. Second, the Ballot Mail Rule requires that, before USPS will transmit a ballot for any voter, the voter must be enrolled on USPS's Mail-In and Absentee Participation List. To enroll voters, a State must enter each voter's personal information on a USPS website, including IMbs for the outgoing and return ballot envelopes for each voter. USPS will not accept ballot mail intended for voters who are not enrolled on its list or whose ballots do not pass USPS's verification processes. Voters, campaigns, or political parties will not be able to check that a voter is enrolled with the USPS, nor can they enroll an omitted voter; only States can do that.

Third, USPS will only deliver ballots from voters if those voters return their mail ballots in a USPS-mandated outer envelope that complies with the Ballot Mail Rule.

13. The Ballot Mail Rule will lead to significant disruptions in the transmission of mail ballots and inevitably disenfranchise voters. Any attempt to implement these restrictions for the very first time, with just days before mail ballots are set to start being sent out on September 4, will inevitably lead to widespread delays and errors. Because of the new steps mandated by the Ballot Mail Rule, there is a serious risk that some ballots will not arrive to voters with enough time for them to return their ballots, ultimately resulting in their disenfranchisement. There are *already* widespread and worsening delays in mail delivery from ongoing USPS changes to its mail delivery and postmark practices, causing election officials in some States to urge voters to mail their ballots up to two weeks before election day. There is also a serious risk that USPS will be unable to meet the Ballot Mail Rule's new, onerous obligations, leaving millions of mail voters without their ballots and at risk of disenfranchisement—a risk that is even greater in States that conduct their elections primarily by mail.

14. When ballots are rejected by USPS for transmission, voters face an even higher risk of disenfranchisement. At the very least, when USPS rejects a ballot for transmission, State and local election officials must scramble to correct any purported errors for each ballot mail piece. This process will not be simple. State and local officials will have to (1) be timely informed by USPS of rejections, (2) quickly review each individual ballot and confirm whether USPS correctly identified that the individual being sent the ballot does not appear on the USPS list, (3) identify any other reason that could have caused USPS to reject the ballot, and (4) immediately make a new submission to the USPS portal, which may require States to print ballot envelopes with new unique IMbs. They will then again have to provide the ballots to USPS, only to start the process

all over again with no guarantee that USPS will accept and transmit the ballot. These steps will considerably delay delivery of the ballots, inevitably leading to voters not timely receiving their ballots and being disenfranchised.

15. In addition, DSCC is aware that election officials are already executing an array of tasks and responsibilities to ensure elections proceed smoothly and voters are able to cast their ballots, even before the additional burdens imposed by the Ballot Mail Rule. Each of the steps required by the Ballot Mail Rule takes time and resources that many election officials simply do not have. While USPS says that the Ballot Mail Rule will require election officials to spend *hours* at USPS locations while outbound ballot mail is verified for acceptance, this figure is likely a significant underestimate. By USPS's own projections, the time that States will need to complete the verification process will be exponentially longer.

16. For example, Colorado has a U.S. Senate race this year. It sends mail ballots to each of its approximately 4,000,000 registered voters. USPS asserts that each individual piece of ballot mail will take "less than a minute" to verify. Even if one were to assume that it will ultimately take half that time—30 seconds—to scan and verify each ballot for compliance with USPS's list, it would take roughly *33,000 hours,* or *1,388 days'* worth of time to complete the verification process for the ballot mail in just that one State. There are not even that many days between now and Election Day, making this process likely impossible. This obviously imposes an enormous burden on election officials. Even in States that send out fewer mail ballots, the burdens will still be severe, and come at a time when the States, campaigns, party committees, and voters have extremely little

bandwidth to determine how to successfully bear them. This issue will be the case across the country, in every State where DSCC has a U.S. Senate race.

17. And because voters—and DSCC—have no way to check if they are even on USPS's list or make corrections to that list, voters may not even be aware that their mail ballots are delayed or canceled, potentially leaving them disenfranchised altogether. There are many voters who depend on mail ballots to vote for a variety of reasons, including (for example) due to disabilities or health conditions that make it difficult or impossible to vote in person or because they are away from home for school, work, or service. For voters who cannot realistically vote in person, if their ballots are unduly delayed or canceled, they will be unable to vote at all. Even election officials will not receive their State's list until on or around, or even *after*, election day—meaning that for the entire period when election officials will be attempting to send mail ballots to voters, they cannot know whether USPS's list accurately reflects State submissions to the Portal. And once received, the List at best repeats the same information a State already submitted through the Portal, and if it is inaccurate, it will be too late for a State to make corrections or enable its voters to cast mail ballots.

18. The E.O. and the corresponding Ballot Mail Rule, which fundamentally change how mail balloting operates, including who can ultimately receive and send a ballot through the U.S. mail, pose a direct and severe threat to DSCC, DSCC's candidate members, and DSCC's voters who vote by mail, as well as to DSCC's and its candidate members' basic voter education and turnout strategies.

19. The E.O. and the Ballot Mail Rule require a fundamental restructuring of several of DSCC's core programs and pose a severe risk to DSCC and its candidate members' success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack

on mail voting that a significant motivation for the new E.O.—much like the last one—is to harm his political opponents, including DSCC and its candidate members. Because of the E.O. and the Ballot Mail Rule, DSCC and its candidate members' campaigns are currently being adversely affected by the ordered instability and uncertainty of the field on which they are competing. Simply put, President Trump's E.O. and the Ballot Mail Rule have compromised the DSCC's and its candidate members' significant existing investments and frustrated its ability to make incredibly time-sensitive and important strategic decisions as the 2026 midterm elections rapidly approach.

20. For the 2026 elections, DSCC and its candidate members are heavily focused on encouraging their voters to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DSCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to exercise their right to the franchise and participate in elections.

21. As noted above, for some voters, voting by mail is the only option by which they may successfully vote; this may be because they are away from home, they are ill or disabled, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DSCC's members themselves (who are voters in their respective home States) have voted by mail in past elections and are likely to do so again in future elections. The impact will also fall particularly hard on voters in States where elections are conducted primarily by mail, including States like Oregon and Colorado, where the DSCC has U.S. Senate elections this year.

22. In the last several election cycles, Democratic voters have been more likely to vote by mail than Republican voters, and DSCC expects that trend to continue. Because the Ballot Mail

Rule imposes new restrictions on voting by mail, it puts DSCC and DSCC's candidate members at a competitive disadvantage. Indeed, the Ballot Mail Rule is all but certain to leave some of DSCC's members and voters unable to vote altogether, threatening their candidate members' ultimate success in elections for U.S Senate, as well as DSCC's success in obtaining its overarching goal of Democrats retaking the Senate. Several of DSCC's candidate members are competing in extremely competitive elections that may well be decided by a small number of votes, and the Ballot Mail Rule's restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the Ballot Mail Rule—they are likely the intended result.

23. In recent years, DSCC has dedicated significant staff time and resources to developing a comprehensive mail voting program that encompasses voter education, voter assistance, and ballot-cure programs to ensure its voters are able to cast mail ballots and have them counted. DSCC also funds programs that identify and contact mail voters who have not yet returned their ballots as election day approaches to encourage them to do so. Each federal election cycle, DSCC invests millions of dollars in these programs. It has already invested significant amounts of money in these efforts for the 2026 election cycle and anticipates its overall spending to be in the millions.

24. These programs are built based upon DSCC's and its candidate members' expectation that voters who are eligible to vote by mail under their State's laws and wish to do so will in fact be able to cast a mail ballot via USPS and have that ballot counted. At this point in the election cycle, with just 70 days until election day, DSCC and its candidate members' are deep into preparation and execution of targeted programs and allocation of resources for mail balloting for the general election and DSCC and its candidate members have already made substantial

investments into voter education and voter targeting programs. Those investments are undermined by the Ballot Mail Rule's fundamental changes to who will be eligible to transmit a ballot via the U.S. mail, and the Rule has directly and significantly disrupted the electoral playing field.

25. Likewise, to run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, many of DSCC's candidate members have already made investments of resources in their races based on the rules as they existed prior to the E.O. and Ballot Mail Rule. These investments are wasted and compromised by the E.O. and Ballot Mail Rule.

26. In light of the Ballot Mail Rule, DSCC and its candidate members must re-configure their mail balloting programs. And DSCC and its candidate members are forced to make these adjustments just days before voting for the 2026 general election begins on September 4 when North Carolina, a key state for DSCC this cycle, begins sending mail ballots, undermining and prejudicing their ability to make concrete strategic plans and implement them effectively. In fact, DSCC and its candidate members are forced to revise plans that they are already executing, and with voting starting in mere days, there is simply not enough time to fully complete these revisions. Any change to programming at this stage also requires taking resources from other much needed programs. The resulting fallout directly impacts DSCC's core operations at the most fundamental level.

27. To give just one example, the Ballot Mail Rule's changes to mail voting call into question DSCC's voter outreach plans. DSCC has already made significant investments in voter outreach and education plans that are designed to maximize the total number of lawful Democratic votes. These plans were developed based on the accessibility of each method of voting in a given State and the disenfranchisement risks associated with each method and a voter's preferred method

of voting. Under the Ballot Mail Rule, however, the assumptions on which the DSCC has built its existing voter outreach and education plans are severely compromised, as brand new restrictions have been placed on voting by mail. The Ballot Mail Rule will necessarily introduce confusion and uncertainty into the mail voting process. And the Ballot Mail Rule's changes come with significant risks of disruptions to the process of distributing, returning and counting mail ballots. Further, it is difficult for the DSCC to know whether someone who is a regular vote-by-mail voter will still be able to vote by mail, or whether they will still vote but by other means, if they are not included on USPS's list. Nor will DSCC even be able to confirm if voters are included on the list. These considerations radically transform the playing field upon which the DSCC and its candidate members have built their voter outreach and education plans. Thus, the Ballot Mail Rule compromises investments DSCC and its candidate members have already made for the 2026 cycle and introduces serious barriers to the successful execution of the DSCC's voter education and turnout plans.

28. As another specific example, the E.O. and the Ballot Mail Rule undermine DSCC's existing voter education programming. DSCC funds significant voter education programming designed to tell voters how they can vote in their particular State. At a minimum, the Ballot Mail Rule requires DSCC to implement responsive changes (which, again, has a detrimental cost to how many resources DSCC can expend on other critical activity) to this programing to guarantee that its voters can cast their ballots.

29. In short, DSCC has already put significant work into existing voter education programming and voter turnout strategies for 2026, and those plans are compromised under the Ballot Mail Rule. DSCC and its candidate members are harmed by the need to implement responses to the new Ballot Mail Rule—and will be forced to re-allocate investments and re-tool

existing programs to address the significant changes it makes to mail balloting, and the effect those changes will have on DSCC's programs, candidates (both in terms of resources and electoral competitiveness), and voters.

30. In addition to undermining DSCC's existing plans and programs, to counteract the harm from the E.O. and the Ballot Mail Rule, DSCC will have to develop *new* programs. For one, because the Ballot Mail Rule imposes significant burdens on each State to meet new envelope design requirements, enroll every voter who intends to vote by mail on USPS's "Mail-In and Absentee Participation List[s]," and ensure that USPS has accepted every ballot for every eligible voter, DSCC must closely monitor every battleground State's efforts to comply with these requirements. These programs in battleground States must include, for example, active outreach and coordination to ensure that election officials are timely and accurately enrolling voters and are ensuring the USPS timely transmits ballots for all eligible voters. And DSCC cannot simply adopt a national approach; it must tailor its efforts State-by-State, increasing the resources that DSCC must divert to these efforts. In fact, DSCC's efforts must be even more granular, as many elections are run at the county level.

31. Relatedly, because the Ballot Mail Rule provides no way for voters—nor DSCC or its candidate members—to check whether voters are "enrolled" on USPS's list and will receive a mail ballot, DSCC will need to spend significant resources to assist voters in either adjusting their planned method of voting to eliminate the risk of disenfranchisement or help voters confirm whether they are properly enrolled and will receive a mail ballot.

32. DSCC expends significant resources to help ensure its voters who have requested a mail ballot properly and timely cast their ballot. The Ballot Mail Rule's new requirements for returning their ballots via USPS will require a substantial change to this program—voters must

now return their completed ballots in the outer envelopes mandated by the Ballot Mail Rule. This shift is sure to confuse voters and will require significant new messaging and communication efforts to ensure voters use the proper envelopes. Indeed, because voters may misplace those outer envelopes, DSCC will also need to instruct and assist voters with obtaining USPS-compliant replacements. And as with DSCC's other efforts, DSCC must tailor its programming to each State. These new programs to ensure that DSCC's voters are not disenfranchised would be entirely unnecessary without the Ballot Mail Rule.

33. The Ballot Mail Rule's return envelope requirements also imperil DSCC's ballot curing programs. States have requirements for how a voter should return their ballot, including specific and detailed instructions on which envelopes a voter must include and how a ballot should be enclosed in one or more envelopes. DSCC runs programming that identifies and assists voters who need to "cure" mail ballots that may not have initially complied with these State instructions. The new return envelope requirement imposed by the Ballot Mail Rule will significantly disrupt the curing process by adding new requirements that will interact differently with different State ballot return policies. DSCC, in turn, will need to significantly revise its existing cure programming to address USPS's new requirements. Moreover, the new outer envelope requirement will likely confuse voters, lead to more mistakes, and require expanded cure efforts.

34. Another significant part of these new DSCC programs in response to the Ballot Mail Rule will be oriented towards ameliorating the inevitable confusion that the Rule will cause voters. Enrollment with the USPS and the new ballot return requirements have never previously been a part of the mail voting process, and the Rule's sweeping changes will come while elections are ongoing. Teaching voters about the new requirements and working to ensure that they comply with those requirements and are not deterred from voting as a result will be a significant and

resource-intensive challenge. Inevitably, even with DSCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised.

35. Adding to the confusion—and the resources that must be spent to address it—is the fact that the Ballot Mail Rule does not apply to primary elections. In the States where primary elections have not yet occurred, including four with U.S. Senate races, voters will inevitably wonder whether the Ballot Mail Rule applies to their primary mail ballots and may be discouraged from voting. And with general elections following soon after primaries, voters who cast mail ballots just weeks or even days prior will be faced with brand-new requirements for voting by mail, causing further confusion. And while the Ballot Mail Rule purportedly excludes UOCAVA voters, the chaos it will lead to will create confusion for these voters, including members of the military, their families, and other voters who live abroad.

36. The new education and voter assistance programs DSCC will have to implement, which would be wholly unnecessary absent the E.O. and Ballot Mail Rule, will come at a significant cost. Because DSCC's approximate budget for the year did not originally anticipate such extensive new programs, with the Ballot Mail Rule enacted, DSCC will have to scale back or cut the initiatives that it has planned, or is already executing, for persuading and mobilizing voters to elect Democratic candidates to the Senate.

37. The resources DSCC has to elect its candidate members are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those demanded in President Trump's E.O. and implemented in the Ballot Mail Rule necessarily come at the cost of other of DSCC's mission-critical planned activities and expenditures.

38. Deploying these resources at any point from now until election day will present a lost opportunity for the DSCC. There are just over two months until election day, and there are

just days before mail ballots will start to be sent to voters. Every day and every resource during this critical time that DSCC and its candidate members must spend addressing the changes to mail balloting from the Ballot Mail Rule represents a lost opportunity for DSCC and its candidate members to persuade voters and galvanize supporters that cannot be restored once lost.

39. Finally, DSCC is concerned by the threat posed by Section 3(b) (as implemented in the Ballot Mail Rule) to the privacy rights of its members and Democratic voters more generally. DSCC's members and voters are worried and highly offended by the USPS's efforts to gather data on every individual who votes by mail, including because it allows USPS to retain highly sensitive lists of those who exercised core political and civil rights. This data gathering effort puts voters' personal information in the hands of unauthorized federal agencies and deters voters from signing up to vote by mail or absentee and from casting ballots, which in turn poses a threat to DSCC's candidate members' election efforts and DSCC's mission of electing Democrats to the Senate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/25/2026

Lillie Snyder Boss

**Lillie Snyder Boss, Chief Operating Officer**
**DSCC**