# Exhibit 3

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al*.,<br><br>Plaintiffs,<br><br>*v*.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,<br><br>Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF CAITLIN REMMEL**

I, Caitlin Remmel, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Voter Protection Director at DCCC. I first joined DCCC in August 2023, and I have served as Voter Protection Director since February 2025. In my role, I oversee DCCC's strategies and day-to-day efforts to protect the rights of voters through communication, education, and on the ground programming. In my voter protection role, I interact with DCCC's officers and employees at all levels.

3. DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. DCCC pursues its mission by working with Democratic House candidates and campaigns to successfully execute their campaigns, including by encouraging and assisting Democratic Party members and voters in registering and successfully casting ballots, and by preserving the legal rights of its members and

voters.

4. DCCC's members include all Democratic members of the U.S. House, as well as Democratic candidates for U.S. House. DCCC currently has members in all States. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters throughout the country.

5. DCCC is actively planning, preparing, budgeting, strategizing, and executing its plans for the upcoming 2026 midterm election cycle, which is already underway. In 2026, all U.S. House seats across the United States are up for election. As of today, DCCC has members who are Democratic candidates for the U.S. House in all 50 States.

6. DCCC's candidate members rely on DCCC's resources to help win their campaigns, including direct financial support from DCCC, insight from DCCC strategy, and coordination with DCCC's communications and voter mobilization programs. In other words, DCCC's interests and resources are deeply intertwined with those of its candidate members.

7. DCCC provides Democratic members of Congress from competitive districts resources and support to execute effective reelection campaigns. DCCC is also spending resources to defeat Republicans in many other competitive congressional districts around the country. For the 2026 election, DCCC is currently supporting more than 50 candidates in 26 States who are running to flip critical districts from Republican to Democratic control, including in Arizona, California, Florida, Kentucky, Iowa, Michigan, Montana, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin.

8. Both DCCC itself and DCCC's members who are candidates for office have an interest in a fair and lawful electoral process for its members' campaigns. Even if DCCC's members succeed in their campaigns, DCCC and its members are harmed by unlawful election

rules, as they deprive DCCC and its candidate members of a fair process and an accurate result. That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. House of Representatives.

## I. <u>The Postal Service's New Restrictions on Voting by Mail</u>

9. On March 31, 2026, President Trump signed Executive Order 14399, titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*" ("E.O." or "Order"). Section 3(b) of the Order purports to give USPS ultimate control over which voters may receive and return a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

10. On August 21, 2026, USPS promulgated a final rule implementing Section 3(b) of the E.O., effective immediately, titled *Ballot Mail for Federal Elections* (the "Ballot Mail Rule").

11. The E.O. and Ballot Mail Rule inflict severe and immediate harm on DCCC and its candidate members. They do so by erecting unlawful barriers to voters' ability to successfully cast a mail ballot, by interfering with DCCC's planning and programming for Democratic House campaigns, including for its candidate members, by forcing DCCC and its candidate members to compete on an unlawfully structured playing field, and damaging their electoral prospects.

12. The Ballot Mail Rule significantly changes the transmission of mail-in and absentee ballots. First, the Ballot Mail Rule requires that States design all mail-in ballot envelopes to meet several new standards, including having new USPS-mandated "Intelligent Mail barcodes" ("IMb") on both outbound and return envelopes. Second, the Ballot Mail Rule requires that before USPS will transmit a ballot for any voter, the voter must be enrolled on USPS's Mail-In and Absentee Participation List. To enroll voters, a State must enter each voter's personal information on a USPS website, including IMbs for the outgoing and return ballot envelopes for each voter. USPS will not

accept ballot mail intended for voters who are not enrolled on its list or whose ballots do not pass USPS's verification processes. Voters, campaigns, or political parties will not be able to check that a voter is enrolled with the USPS, nor can they enroll an omitted voter; only States can do that. Third, USPS will only deliver ballots from voters if those voters return their mail ballots in a USPS-mandated outer envelope that complies with the Ballot Mail Rule.

13. The Ballot Mail Rule will lead to significant disruptions in the transmission of mail ballots and inevitably disenfranchise voters. Any attempt to implement these restrictions for the very first time, with just days before mail ballots are set to be sent out on September 4 in at least one state, will inevitably lead to widespread delays and errors. Because of the new steps mandated by the Ballot Mail Rule, there is a serious risk that some ballots will not arrive to voters with enough time for them to return their ballots, ultimately resulting in their disenfranchisement. There are *already* widespread and worsening delays in mail delivery from ongoing USPS changes to its mail delivery and postmark practices, causing election officials in some States to urge voters to mail their ballots up to two weeks before election day. There is also a serious risk USPS will be unable to meet the Ballot Mail Rule's new, onerous obligations, leaving millions of mail voters without their ballots and at risk of disenfranchisement—a risk that is even greater in States that conduct their elections primarily by mail.

14. When ballots are rejected by USPS for transmission, voters face an even higher risk of disenfranchisement. At the very least, when USPS rejects a ballot for transmission, State and local election officials must scramble to correct any purported errors for each ballot mail piece. This process will not be simple. State and local officials will have to (1) be timely informed by USPS of rejections, (2) review each individual ballot mail piece and confirm whether USPS correctly identified that the individual being sent the ballot does not appear on the USPS list, (3)

identify any other reason that could have caused USPS to reject the ballot, and (4) immediately make a new submission to the USPS portal, which may require States to print ballot envelopes with new unique IMbs. They will then again have to provide the ballots to USPS, only to start the process all over again with no guarantee that USPS will accept and transmit the ballot. These steps will considerably delay delivery of the ballots, inevitably leading to voters not timely receiving their ballots and being disenfranchised.

15. In addition, DCCC is aware that election officials are already executing an array of tasks and responsibilities to ensure elections proceed smoothly and voters are able to cast their ballots, even before the additional burdens imposed by the Ballot Mail Rule. Each of the new steps required by the Ballot Mail Rule takes time and resources that many election officials simply do not have. While USPS says that the Ballot Mail Rule will require election officials to spend *hours* at USPS locations while outbound ballot mail is verified for acceptance, this figure is likely a significant underestimate. By USPS's own projections, the time that States will need to complete the verification process will be exponentially longer.

16. For example, California has 52 congressional districts, all of which will hold elections this year, and California sends mail ballots to each of its registered voters. California's 48th congressional district alone has approximately 462,000 registered voters. USPS asserts that each individual piece of ballot mail will take "less than a minute" to verify. Even if one were to assume that it will ultimately take half that time—30 seconds—to scan and verify each ballot for compliance with USPS's list, it would take *3,850 hours*, or *160 days'* worth of time to complete the verification process for the ballot mail in just that one congressional district. There are not even that many days between now and Election Day, making this completely infeasible. And, this process obviously imposes an enormous burden on election officials that will exist in the many

more districts across the country where DCCC is also supporting candidate members in highly competitive elections. Even in States that send out fewer mail ballots, the burdens will still be severe, and come at a time when the States, campaigns, party committees, and voters have extremely little bandwidth to determine how to successfully bear them. This issue will be the case across the country, in every State and every congressional district where DCCC and its candidate members are competing.

17. And because voters—and DCCC—have no way to check if they are even on USPS's list or make corrections to that list, voters may not even be aware that their mail ballots are delayed or cancelled, potentially leaving them disenfranchised altogether. There are many voters who depend on mail ballots to vote for a variety of reasons, including (for example) due to disabilities or health conditions that make it difficult or impossible to vote in person or because they are away from home for school, work, or service. For voters who cannot realistically vote in person, if their ballots are unduly delayed or canceled, they will be unable to vote at all. Even election officials will not receive their State's list until on or around, or even *after*, election day—meaning that for the entire period when election officials will be attempting to send mail ballots to voters, they cannot know whether USPS's list accurately reflects State submissions to the Portal. And once received, the List at best repeats the same information a State already submitted through the Portal, and if it is inaccurate, it will be too late for a State to make corrections or enable its voters to cast mail ballots.

18. The E.O., and the corresponding Ballot Mail Rule, which fundamentally change how mail balloting operates, including who can ultimately receive and send a ballot through the U.S. mail, pose a direct and severe threat to DCCC, DCCC's candidate members, and millions of

DCCC's voter members who vote by mail, as well as to DCCC's basic programming and voter turnout strategies.

19. The E.O. and the Ballot Mail Rule will require a fundamental restructuring of several of DCCC's core programs and pose a severe risk to DCCC's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like his last one—is to harm his political opponents, including DCCC and its candidate members. Because of the E.O. and the Ballot Mail Rule, DCCC and its candidate members' campaigns are currently being adversely affected by the ordered instability and uncertainty of the field on which they are competing.

20. For the 2026 elections, DCCC and its candidate members are heavily focused on encouraging their voters to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to exercise their right to the franchise and participate in elections.

21. As noted above, for some voters, voting by mail is the only option by which they may successfully vote because they are away from home, they are ill or disabled, they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DCCC's members have themselves relied on voting by mail in past elections and are likely to do so again in future elections.

22. In the last several election cycles, Democratic voters have been more likely to vote by mail than Republican voters, and DCCC expects that trend to continue. For that reason, the Ballot Mail Rule puts both DCCC and its members who are running for election at a competitive

disadvantage. Indeed, the Ballot Mail Rule is all but certain to leave some of DCCC's voters unable to vote altogether, threatening DCCC's candidate members' ultimate success in elections for U.S. House, as well as DCCC's success in obtaining its overarching goal of Democrats retaking the House of Representatives. Several of DCCC's candidate members will compete in extremely competitive elections that may well be decided by a small number of votes, and the Ballot Mail Rule's restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the Ballot Mail Rule—they are likely the intended result.

23. In recent years, DCCC has dedicated significant staff time and resources to developing a comprehensive education, assistance, and ballot-cure program to ensure Democratic voters are able to cast mail ballots and have them counted. DCCC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. These programs are built based upon DCCC's expectation that voters who are eligible to vote by mail under their State's laws and wish to do so will in fact be able to use USPS to receive and send a mail ballot and have that ballot counted. Each federal election cycle, DCCC invests millions of dollars in these programs, and it has already invested millions for the 2026 election cycle.

24. At this point in the election cycle, with just 70 days until election day, my team at DCCC and DCCC's candidate members are deep into preparation and execution of DCCC's voter protection programs and allocation of resources for the general election—indeed, in the majority of States, primaries have already occurred. DCCC has already made critical budget decisions about where to focus its efforts, and mail ballot programs are critical components of its strategy in many places. Moreover, in some States like New Mexico, Michigan, New York, Pennsylvania, Alaska,

Iowa, Ohio, and North Carolina, DCCC and its candidate members implemented programs in primary elections aimed at ensuring supporters return their ballots via the mail—in part to test-run and fine-tune our and their programs ahead of the general election in the fall, with the assumption that the lessons learned would be useful as the same rules would apply. DCCC's and its candidate members' programs are, again, built upon States' existing mail balloting rules.

25. In light of the Ballot Mail Rule, my team must re-configure DCCC's programs. Moreover, DCCC and its candidate members are being forced to make these adjustments just weeks before voting for the 2026 general election begins, undermining and prejudicing our ability to make concrete strategic plans and implement them effectively. In fact, we are forced to revise plans that we are already executing. With voting starting in just weeks, there is simply not enough time to fully complete these revisions. Any change to programming at this stage also requires taking resources from other much needed programs. The resulting fallout directly impacts DCCC's core operations, including at the most fundamental level.

26. In short, my team has already put significant work into DCCC's existing programming for 2026, and those plans are compromised under the Ballot Mail Rule. DCCC and its candidate members are harmed by the need to implement responses to the new Ballot Mail Rule and will be forced to re-allocate investments and re-tool existing programs to address the significant changes it makes to mail balloting, and the effect those changes will have on DCCC's programs, candidates (both in terms of resources and electoral competitiveness), and voters.

27. In addition to undermining DCCC's existing programs, to counteract the harm from the E.O. and the Ballot Mail Rule, DCCC and its candidate members are forced to develop *new* programs. For one, because the Ballot Mail Rule imposes significant burdens on each State to meet new envelope design requirements, enroll every voter who intends to vote by mail on USPS's

"Mail-In and Absentee Participation List[s]," and ensure that USPS has accepted every ballot for every eligible voter, DCCC must closely monitor States' efforts to comply with these requirements, especially in those States with highly competitive House races. These programs must include, for example, active outreach and coordination to ensure that election officials are timely and accurately enrolling voters and are ensuring the USPS timely transmits ballots for all eligible voters. And DCCC cannot simply adopt a national approach; it must tailor its efforts State-by-State, increasing the resources that DCCC must divert to these efforts. In fact, DCCC's efforts must be even more granular, as most elections are run at the county level.

28. Relatedly, because the Ballot Mail Rule provides no way for voters—nor DCCC or its candidate members—to check whether specific voters are "enrolled" on USPS's list and will receive a mail ballot, DCCC will need to spend significant resources to assist voters in confirming whether they are properly enrolled and will receive a mail ballot. To do so, DCCC must develop brand-new, costly, and time-consuming programs dedicated to helping voters ensure they are on USPS's list. DCCC will also need to assist voters in figuring out how to vote if they are not permitted to vote by mail via USPS. And in many cases, voters might not even be aware they were excluded by USPS until it is too late to cast a mail ballot or otherwise vote.

29. DCCC and its candidate members will also need to spend significant resources to ensure voters comply with the Ballot Mail Rule's new requirements for returning their ballots via USPS—voters must now return their completed ballots in the outer envelopes mandated by the Ballot Mail Rule. This unprecedented requirement imposed by USPS will require significant new messaging and communication efforts to ensure voters use the proper envelopes. Indeed, because voters may misplace those outer envelopes, DCCC will also need to instruct and assist voters with obtaining USPS-compliant replacements. And, as with DCCC's other efforts, DCCC must tailor

its programming to each State. These new programs to ensure that DCCC's voters are not disenfranchised would be entirely unnecessary without the Ballot Mail Rule.

30. The Ballot Mail Rule's return envelope requirements also imperil DCCC's ballot curing programs. States have requirements for how a voter should return their ballot, including specific and detailed instructions on which envelopes a voter must include and how a ballot should be enclosed in one or more envelopes. DCCC runs programming that identifies and assists voters who need to "cure" mail ballots that did not initially comply with these State instructions. The new return envelope requirement imposed by the Ballot Mail Rule will significantly disrupt the curing process by adding new requirements that will interact differently with different State ballot return policies. DCCC, in turn, will need to significantly revise its existing cure programming to address USPS's new requirements.

31. Another significant part of new DCCC programs in response to the Ballot Mail Rule will be oriented towards ameliorating the inevitable confusion that the Rule will cause voters. Enrollment with USPS and the new ballot return requirements have never previously been a part of the mail voting process, and the Rule's sweeping changes will come while elections are *ongoing*. Teaching voters about the new requirements and working to ensure that they comply with those requirements and are not deterred from voting will be a significant and resource-intensive challenge. Inevitably, even with DCCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised.

32. Adding to the confusion—and the resources that must be spent to address it—is the fact that the Ballot Mail Rule does not apply to primary elections. In the States where primary elections have not yet occurred, voters will inevitably wonder whether the Ballot Mail Rule applies to their primary mail ballots and may be discouraged from voting. And with general elections

following soon after primaries, voters who cast mail ballots just weeks or even days prior will be faced with a brand-new requirement for voting, causing further confusion. And while the Ballot Mail Rule purportedly excludes UOCAVA voters, the chaos it will lead to will create confusion for these voters, including members of the military, their families, and other voters who live abroad.

33. DCCC expects that the changes to existing programs and the development of new programs it must create and launch as a result of the Ballot Mail Rule will be particularly difficult and expensive to implement in States where vote by mail has become the norm and voters receive mail ballots as a matter of course. The Ballot Mail Rule will also cause significant confusion for voters in those States. In some States that primarily rely on mail voting, receiving a vote-by-mail ballot is so expected that voters must *opt out* of receiving one. The Ballot Mail Rule, however, will turn this expectation on its head, functionally requiring voters to find a way to *confirm* that they are on USPS's list or find themselves without a way to vote at the last minute.

34. Before any election cycle, DCCC also works to analyze voting patterns of its voters and anticipate whether there are sufficient early voting and in-person voting locations to support the electorate. When DCCC or its candidate members identify jurisdictions that need additional voting locations, DCCC attempts to work with local partners to expand voter access. This work must be done well in advance of in-person voting—jurisdictions typically determine the number and location of voting locations several months in advance of the start of voting for any particular election—and DCCC has already completed most of this analysis for 2026 based on its current expectations of voting patterns. Because of the Ballot Mail Rule, DCCC must analyze whether States will have sufficient in-person capacity to handle the anticipated shift to in-person voting, particularly in States that primarily rely on vote by mail to conduct elections. DCCC and its

candidate members must now identify areas where in-person voting will become particularly congested and attempt to work with in-state partners to ameliorate the problem, to the extent that is even possible: at this point, the window is effectively closed nearly everywhere to advocate for more early voting sites. Additionally, in some States, DCCC may ultimately decide to pivot away from encouraging voting by mail as a strategy, with communications and messaging that instead encourage voters to vote in person, if at all possible. This shift is a dramatic one, changing from DCCC's prior approaches, and it necessarily hurts the effectiveness of DCCC's turnout efforts.

35. The changes to existing programs and the new education and voter assistance programs DCCC and its candidate members will have to implement, which would be wholly unnecessary absent the E.O. and Ballot Mail Rule, will come at a significant cost. Because DCCC's approximate budget for the year did not originally anticipate such extensive new programs, with the Ballot Mail Rule enacted, DCCC will have to scale back or cut the initiatives that it has planned to adjust to the new reality.

36. DCCC has already devoted significant staff time to attempting to mitigate the impact of the E.O. The resources DCCC has to elect its candidate members are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in the Ballot Mail Rule necessarily come at the cost of other of DCCC's mission-critical planned activities and expenditures.

37. Deploying these resources at any point from now until election day will present a lost opportunity for the DCCC and its candidate members. There are just over two months until election day, and there are just days before mail ballots will start to be sent to voters. Every day and every resource during this critical time that DCCC and its candidate members must spend addressing the changes to mail balloting from the Ballot Mail Rule represents a lost opportunity

for DCCC and its candidate members to persuade voters and galvanize supporters that cannot be restored once lost.

38. Finally, DCCC is concerned about the threat imposed by Section 3(b), as implemented in the Ballot Mail Rule, to the privacy rights of its members and Democratic voters more generally. DCCC's members and voters are worried and highly offended by USPS's efforts to gather data on every individual who votes by mail, including because it allows USPS to retain highly sensitive lists of those who exercised core political and civil rights. This data gathering effort puts voters' personal information in the hands of unauthorized federal agencies and deters voters from signing up to vote by mail or absentee and from casting ballots, which in turn poses a threat to DCCC's candidate members' election efforts and DCCC's mission of electing Democrats to the House of Representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/24/2026

Caitlin Remmel

**Caitlin Remmel, Voter Protection Director**
**DCCC**