# Exhibit 5

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al*.,<br><br>Plaintiffs,<br><br>*v*.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,<br><br>Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF JILLIAN EDELMAN**

I, Jillian Edelman, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I oversee DGA's day-to-day operations. In particular, I handle DGA's operational planning, meaning that I make strategic decisions regarding staffing, budgeting, contracts with vendors, expenditures, and more.

3. Plaintiff Democratic Governors Association is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate, communicate with and mobilize Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse

for best practices and policies, including on managing, administering, and budgeting for Federal, State, and local elections.

4. All incumbent Democratic governors currently serve as members of DGA, representing 24 States, the District of Columbia, Guam, and the U.S. Virgin Islands.[1] Each of DGA's members are also voters in their respective States.

5. At least 10 of DGA's incumbent Democratic governor members are candidates for office in their respective States in 2026. These include Governor Hobbs of Arizona, Governor Lamont of Connecticut, Governor Green of Hawaii, Governor Pritzker of Illinois, Governor Moore of Maryland, Governor Healey of Massachusetts, Governor Hochul of New York, Governor Kotek of Oregon, Governor McKee of Rhode Island, and Governor Shapiro of Pennsylvania.

6. In all, DGA is actively planning, preparing, budgeting, and strategizing for 36 gubernatorial races in the 2026 general election.[2]

7. DGA's candidate members rely on DGA's resources to help win their campaigns. These resources include direct financial support from DGA, insight from DGA on strategy, and

[1] These members include Andy Beshear (Kentucky), Muriel Bowser (Washington, D.C.), Albert Bryan, Jr. (U.S. Virgin Islands), Tony Evers (Wisconsin), Bob Ferguson (Washington), Josh Green (Hawaii), Maura Healey (Massachusetts), Katie Hobbs (Arizona), Kathy Hochul (New York), Laura Kelly (Kansas), Tina Kotek (Oregon), Ned Lamont (Connecticut), Lou Leon Guerrero (Guam), Michelle Lujan Grisham (New Mexico), Dan McKee (Rhode Island), Matt Meyer (Delaware), Janet Mills (Maine), Wes Moore (Maryland), Mikie Sherrill (New Jersey), Gavin Newsom (California), Jared Polis (Colorado), JB Pritzker (Illinois), Josh Shapiro (Pennsylvania), Josh Stein (North Carolina), Abigail Spanberger (Virginia), Tim Walz (Minnesota), and Gretchen Whitmer (Michigan).

[2] Gubernatorial races in 2026 include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin, Wyoming, the District of Columbia, Guam, Northern Mariana Islands, and the U.S. Virgin Islands.

coordination with DGA communications and political teams and voter mobilization programs. In other words, DGA's interests and resources are deeply intertwined with those of its candidate members.

8. Both DGA and DGA's members who are candidates for office have an interest in a fair and lawful electoral process for DGA's members' campaigns. Even if DGA's candidate members win their elections, DGA and its candidate members are harmed by unlawful election rules, as they deprive DGA and its candidate members of a fair process and an accurate result.

## I. **The Postal Service's New Restrictions on Voting by Mail**

9. On March 31, 2026, President Trump signed Executive Order 14399, titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*" ("E.O." or "Order"). Section 3(b) of the Order purports to give USPS ultimate control over which voters may receive and return a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

10. On August 21, 2026, USPS promulgated a final rule implementing Section 3(b) of the E.O., effective immediately, titled *Ballot Mail for Federal Elections* (the "Ballot Mail Rule").

11. The E.O. and Ballot Mail Rule inflict severe and immediate harm on DGA and its candidate members. They do so by erecting unlawful barriers to voters' ability to successfully cast a mail ballot and by interfering with DGA's planning and programming for Democratic gubernatorial campaigns, including those for its candidate members, by forcing DGA and its candidate members to compete on an unlawfully structured playing field, and by damaging their electoral prospects.

12. The Ballot Mail Rule significantly changes the transmission of mail-in and absentee ballots.

13. First, the Ballot Mail Rule requires that States design all mail-in ballot envelopes to meet several new standards, including having new USPS-mandated "Intelligent Mail barcodes" ("IMb") on both outbound and return envelopes.

14. Second, the Ballot Mail Rule requires that before USPS will transmit a ballot for any voter, the voter must be enrolled on USPS's Mail-In and Absentee Participation List. To enroll voters, a State must enter each voter's personal information on a USPS website, including IMbs for the outgoing and return ballot envelopes for each voter. USPS will not accept ballot mail intended for voters who are not enrolled on its list or whose ballots do not pass USPS's verification processes. Voters, campaigns, or political parties will not be able to check that a voter is enrolled with the USPS, nor can they enroll an omitted voter; only States can do that. Third, USPS will only deliver ballots from voters if those voters return their mail ballots in a USPS-mandated outer envelope that complies with the Ballot Mail Rule.

15. The Ballot Mail Rule will lead to significant disruptions in the transmission of mail ballots and inevitably disenfranchise voters. Any attempt to implement these restrictions for the very first time, with just days before mail ballots are set to be sent out, will inevitably lead to widespread delays and errors. And because of the new steps mandated by the Ballot Mail Rule, there is a serious risk that some ballots will not be delivered to voters with enough time for them to return their ballots, ultimately resulting in their disenfranchisement. There are *already* widespread and worsening delays in mail delivery from ongoing USPS changes to its mail delivery and postmark practices, causing election officials in some States to urge voters to mail their ballots up to two weeks before election day. There is also a serious risk that USPS will be unable to meet

the Ballot Mail Rule's new, onerous obligations, leaving millions of mail voters without their ballots and at risk of disenfranchisement—a risk that is even greater in States that conduct their elections primarily by mail.

16. When ballots are rejected by USPS for transmission, voters face an even higher risk of disenfranchisement. At the very least, when USPS rejects a ballot for transmission, State and local election officials must scramble to correct any purported errors for each ballot mail piece. This process will not be simple. State and local officials will have to (1) be timely informed by USPS of rejections, (2) quickly review each individual ballot and confirm whether USPS correctly identified that the individual being sent the ballot does not appear on the USPS list, (3) identify any other reason that could have caused USPS to reject the ballot, and (4) immediately make a new submission to the USPS portal, which may require States to print ballot envelopes with new unique IMbs. They will then again have to provide the ballots to USPS, only to start the process all over again with no guarantee that USPS will accept and transmit the ballot. These steps will considerably delay delivery of the ballots, inevitably leading to voters not timely receiving their ballots and being disenfranchised.

17. In addition, DGA is aware that election officials are already executing an array of tasks and responsibilities to ensure elections proceed smoothly and voters are able to cast their ballots, even before the additional burdens imposed by the Ballot Mail Rule. Each of the steps required by the Ballot Mail Rule takes time and resources that many election officials simply do not have. Although USPS acknowledges that the Ballot Mail Rule will require election officials to spend *hours* at USPS locations while outbound ballot mail is verified for acceptance, this figure is

likely a significant underestimate. By USPS's own projections, the time that States will need to complete the verification process will be exponentially longer.

18. In just one example, California has a governor's race this year. California sends mail ballots to each of its approximately 23,155,000 registered voters. USPS asserts that each individual piece of ballot mail will take "less than a minute" to verify. Even if one were to assume that it will ultimately take half that time—30 seconds—to scan and verify each ballot for compliance with USPS's list, it would take over *192,000 hours*, or *8,000 days*' worth of time to complete the verification process for the ballot mail in just that one State. There are not even that many days between now and Election Day, making this completely impossible. And, this process obviously imposes an enormous burden on election officials that will exist in the States across the country where DGA is supporting candidates in highly competitive elections. Even in States that send out fewer mail ballots, moreover, the burdens will still be severe, and come at a time when the States, campaigns, party committees, and voters have extremely little bandwidth to determine how to successfully bear them. This issue will be the case across the country, in every State where DGA has a governor's race.

19. And because voters have no way to check if they are even on USPS's list or make corrections to that list, voters may not even be aware that their mail ballots are delayed or cancelled, potentially leaving them disenfranchised altogether. There are many voters who depend on mail ballots to vote for a variety of reasons, including (for example) due to disabilities or health conditions that make it difficult or impossible to vote in person or because they are away from

home for school, work, or service. For voters who cannot realistically vote in person, if their ballots are unduly delayed or canceled, they will be unable to vote at all.

20. Even election officials will not receive their State's list until on or around or even *after*, election day—meaning that for the entire period when election officials will be attempting to send mail ballots to voters, they cannot know whether USPS's list accurately reflects State submissions to the Portal. And once received, the List at best repeats the same information a State already submitted through the Portal, and if it is inaccurate, it will be too late for a State to make corrections or enable its voters to cast mail ballots.

21. The E.O. and the corresponding Ballot Mail Rule fundamentally change how mail balloting operates, including who can ultimately receive and send a ballot through the U.S. mail. These changes pose a direct and severe threat to DGA, DGA's candidate members, DGA's members who vote by mail, and millions of Democratic voters who vote by mail. Because of the E.O. and the Ballot Mail Rule, DGA and its candidate members' campaigns are currently being adversely affected by the ordered instability and uncertainty of the field on which they are competing.

22. The Ballot Mail Rule requires a fundamental reallocation of DGA's budget and resources. To advance its mission of supporting the election of Democrats to governorships across the country, DGA provides funding and other support that is used to educate and assist Democratic voters on how to vote, including through mail ballots, and to ensure that those votes are counted. Such programs include voter education and outreach programs aimed at encouraging mail voting, and ballot cure programs to help ensure that mail ballots are counted. In the last few years, DGA has significantly expanded the support it offers for these programs.

23. DGA invests resources in campaigns and political parties to help support voter

assistance programs to ensure that voters are able to cast ballots that will be counted. DGA has also provided funding for programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so.

24. These programs are built with DGA and its candidate members' understanding that voters who are eligible to vote by mail in their State and wish to do so will in fact be able to transmit a mail ballot via the U.S. mail and have that ballot counted. DGA has already made significant decisions on how to allocate funds and resources for these programs for the 2026 elections, and continues to do so.

25. The Ballot Mail Rule is especially concerning for Democratic voters who rely on voting by mail, such as those who are ill or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in States where elections are conducted primarily by mail, including California, Oregon, Nevada and other States with gubernatorial elections this year.

26. In the last several election cycles, Democratic voters have been more likely to vote by mail than Republican voters, and DGA expects that trend to continue. Because the Ballot Mail Rule imposes new restrictions on voting by mail, it puts DGA and DGA's candidate members who are running for election at a competitive disadvantage. Indeed, the Ballot Mail Rule is all but certain to leave some of DGA's voters unable to vote altogether, threatening their candidate members' ultimate success in their elections, as well as DGA's success in obtaining its overarching goal of winning gubernatorial elections for Democrats. Several of DGA's candidate members are competing in extremely competitive elections that may ultimately be decided by a small number of votes; indeed, mail ballots could ultimately be decisive in some of these races.

27. Although the Ballot Mail Rule purportedly applies only to federal elections, general

election ballots in every State include both federal and State races (including gubernatorial races). Accordingly, the Rule's interference with federal elections will have the effect of interfering with State races, too, including the races of DGA's candidate members.

28. At this point in the election cycle, with just 70 days until election day, DGA is deep into preparation and execution of its programs and allocation of resources for mail balloting for the general election, including investments into campaigns and State parties to support voter education and voter targeting programs. Those decisions are jeopardized by the Ballot Mail Rule's fundamental changes to who will be eligible to transmit a ballot via the U.S. mail, and the Rule has directly and significantly disrupted the electoral playing field. Simply put, President Trump's E.O. and the Ballot Mail Rule have cast a cloud of uncertainty over the rules governing mail ballots in the 2026 election, compromising DGA's existing investments and frustrating DGA's and its candidates' ability to make important strategic decisions as the 2026 midterms continue.

29. To run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, many of DGA's candidate members have already made investments of resources in their races based on the rules as they existed prior to the E.O. and Ballot Mail Rule, including that voters who are eligible to cast mail ballots will be able to do so. These investments are wasted and compromised by the E.O. and Ballot Mail Rule.

30. In light of the Ballot Mail Rule, DGA's candidate members will need to decide how to re-configure their mail balloting programs, including those candidates and their programs that DGA supports. And DGA and its candidate members will need to make these adjustments just weeks before voting for the 2026 general election begins, undermining and prejudicing their ability to make concrete strategic plans and implement them effectively. In fact, DGA and its candidate members are forced to revise plans that they are already executing, and with voting starting in just

weeks, there is simply not enough time to fully complete these revisions. Any change to programming, and DGA's funding decisions, at this stage also requires taking resources from other much needed programs. The resulting fallout directly impacts DGA's core operations at the most fundamental level.

31. In addition to undermining programs supported by DGA, with the Ballot Mail Rule in place, DGA will be required to help to create and support *new* programs. For one, because the Ballot Mail Rule imposes significant burdens on each State to meet new envelope design requirements, enroll every voter who intends to vote by mail on USPS's list, and ensure that USPS has accepted every ballot for every eligible voter, DGA will be required to closely monitor efforts to comply with these requirements in key States with a gubernatorial election this year.

32. Relatedly, because the Ballot Mail Rule provides no way for voters to check whether specific voters are "enrolled" on USPS's list and will receive a mail ballot, DGA will need to invest significant resources in programs that assist voters in confirming whether they are properly enrolled and will receive a mail ballot. To do so, DGA will be forced to help support brand-new, costly, and time-consuming programs dedicated to helping voters attempt to ensure they are on USPS's list. DGA will also need to put resources toward assisting voters in figuring out how to vote if they are not able to vote by mail via USPS. And in many cases, voters might not even be aware they were excluded by USPS until it is too late to cast a mail ballot or otherwise vote.

33. DGA will also need to support programs that ensure voters comply with the Ballot Mail Rule's new requirements for returning their ballots via USPS—voters must now return their completed ballots in the outer envelopes mandated by the Ballot Mail Rule. This unprecedented requirement imposed by USPS will require significant new messaging and communication efforts

to ensure voters use the proper envelopes. Because voters may misplace those outer envelopes, DGA will also need to invest in efforts to instruct and assist voters with obtaining USPS-compliant replacements. And as with DGA's other investments, these efforts and their programs must be tailored to each State. These new investments to ensure that DGA's voters are not disenfranchised would be entirely unnecessary without the Ballot Mail Rule.

34. The Ballot Mail Rule's return envelope requirements also imperil DGA's support for ballot curing programs. States have requirements for how a voter should return their ballot, including specific and detailed instructions on which envelopes a voter must include and how a ballot should be enclosed in one or more envelopes. The new return envelope requirement imposed by the Ballot Mail Rule will significantly disrupt the curing process by adding new requirements that will interact differently with different State ballot return policies. DGA-supported ballot curing programs, in turn, will need to significantly revise their existing cure programming to address USPS's new requirements.

35. Another significant part of new programs supported by DGA in response to the Ballot Mail Rule will have to be oriented towards ameliorating the inevitable confusion that the Rule will cause voters. Enrollment with the USPS and the new ballot return requirements have never previously been a part of the mail voting process, and the sweeping changes the Ballot Mail Rule dictates come while elections are ongoing. Teaching voters about the new requirements and working to ensure that they comply with those requirements and are not deterred from voting as a result will be a significant and resource-intensive challenge. Inevitably, even with best efforts, voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, DGA and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting

to make it harder for the Democratic Party to win elections.

36. Adding to the confusion—and the resources that DGA will be forced to spend address the new Rule—is the fact that the Ballot Mail Rule does not apply to primary elections. In the States where primary elections have not yet occurred, including three States with gubernatorial elections, voters will inevitably wonder whether the Ballot Mail Rule applies to their primary mail ballots and may be discouraged from voting. And with general elections following soon after primaries, voters who cast mail ballots just weeks or even days prior will be faced with a brand-new requirement for voting, causing further confusion. And while the Ballot Mail Rule purportedly excludes UOCAVA voters, the chaos it will lead to will create confusion for these voters, including members of the military, their families, and other voters who live abroad.

37. DGA expects that the changes to existing investments and the development of new programs its candidate members will be forced to create and launch—and which DGA will need to help support through staff time providing guidance and expertise, and through financial resources—as a result of the Ballot Mail Rule will be particularly difficult and expensive to implement in States where vote by mail has become the norm. In a State like California, for example, which has a gubernatorial election this year, all active voters receive a vote-by-mail ballot from the State without having to request one under the existing rules. Attempting to teach those voters that a ballot may not arrive unless they are on USPS's list and helping those voters attempt to make alternate arrangements, if necessary, will be an incredibly resource intensive and expensive effort. The same is true in other States where voters primarily vote by mail and that have gubernatorial elections this year, including Arizona, Colorado, Nevada, and Oregon.

38. DGA's support for these new education and voter assistance programs, and changes to existing programs, which would be wholly unnecessary absent the E.O. and Ballot Mail Rule,

will come at a significant cost. Because DGA's approximate budget for the year did not originally anticipate such extensive new programs, with the Ballot Mail Rule enacted, DGA will have to scale back its investments in persuasion and mobilization campaigns that it has planned, or is already executing, to elect Democratic Governors. DGA has already devoted staff time to attempting to mitigate the impact of the E.O.

39. The resources DGA has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those demanded in President Trump's E.O. and implemented in the Ballot Mail Rule necessarily come at the cost of other of DGA's mission-critical planned expenditures.

40. Deploying resources to respond to the E.O. at any point from now until election day will present a lost opportunity for DGA. There are just over two months until election day—and just days before mail ballots will start to be sent to voters.

41. Every day and every resource during this critical time that DGA and its candidate members must spend addressing the changes to mail balloting from the Ballot Mail Rule represents a lost opportunity for DGA and its candidate members to persuade voters and galvanize supporters that cannot be restored once lost.

42. Section 3(b) of the E.O. and the Ballot Mail Rule further harm DGA's members because it effectively usurps their authority related to elections. The Constitution leaves the regulation of elections largely to the States. A significant aspect of many of DGA's members' power and authority in their States stems from their constitutional and statutory authority to influence, support, and sign into law State election legislation. The Ballot Mail Rule improperly claims the ability to displace that authority, impinging on DGA's members' authority and diluting their executive authority in their States.

43. Finally, DGA is concerned about the threat imposed by Section 3(b) (as implemented in the Ballot Mail Rule) to the privacy rights of its members and Democratic voters more generally. DGA's members and constituents are worried and highly offended by the USPS's efforts to gather data on every individual who votes by mail, including because it allows USPS to retain highly sensitive lists of those who exercised core political and civil rights. This data-gathering effort puts voters' personal information in the hands of unauthorized federal agencies and discourages voters from registering for mail or absentee ballots and from voting at all. That poses a threat to DGA's candidate members' election efforts and undermines DGA's mission of electing Democratic governors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/25/2026

Jillian Edelman

**Jillian Edelman, Chief Operating Officer**
**DGA**