**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants*.

Civil Action No. 26-1114 (CJN)

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,

*Plaintiffs*,

v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

*Defendants*.

Civil Action No. 26-1132 (CJN)

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants*.

Civil Action No. 26-1151 (CJN)

**LULAC PLAINTIFFS[1] [PROPOSED] SUPPLEMENTAL COMPLAINT**

[1] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, the City of Madison, Wisconsin, Travis County, Texas and Travis County Clerk, in her official capacity.

Existing Plaintiffs League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, and as joined by additional Plaintiffs City of Madison, Wisconsin; Dyana Limon-Mercado, in her official capacity as the Clerk of Travis County, Texas; and Travis County, Texas ("LULAC Plaintiffs" or "Plaintiffs"), by and through their attorneys, supplement their original complaint as follows:

1. As detailed in Plaintiffs' initial complaint, in March 2026 President Trump issued an Executive Order, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," which requires sweeping and wholly unlawful changes to procedures for mail and absentee voting throughout the country. *See* Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "EO" or "Order").[2]

2. As relevant here, the EO instructed the United States Postal Service ("USPS") to issue a Rule under which USPS will refuse to transmit mail ballots if those mail ballots do not comply with requirements newly imposed—not by States or Congress—but by USPS in its rulemaking.

3. The Rule requires USPS to compile "Mail-In and Absentee Participation List[s]" through a new online "Federal Ballot Mail Portal," ("Portal") which States and local election jurisdictions must use to submit the names of all individuals receiving a mail or absentee ballot, along with a unique barcode for each such voter. If USPS is unable to match the barcode on an outgoing mail ballot envelope to a voter on a list provided to USPS by state or local election officials, the Rule requires USPS to refuse to accept and deliver the mailing.

[2] Throughout this Supplemental Complaint, mail-in and absentee voting and ballots are referred to as mail voting and ballots.

4. USPS issued a Final Rule with an effective date of August 21, 2026. That Rule will be published in the Federal Register on August 26, 2026, and is attached as Exhibit A. Ex. A, Postal Serv., Ballot Mail for Federal Elections, 39 C.F.R. pt. 111 (Aug. 21, 2026) ("Final Rule" or "Rule").

5. The Final Rule unlawfully transforms the Postal Service from a common carrier, as Congress intended, into a national gatekeeper for mail voting in federal elections. But neither the Constitution nor Congress has given USPS any power to prescribe the rules around mail voting. Instead, consistent with the allocation of power in the Constitution, Congress has largely left the regulation of mail voting to the States.[3] Since the advent of modern mail and absentee voting as we know it, States have established the governing rules, and local jurisdictions have implemented them in coordination with state election officials. Absent express congressional authorization, no federal agency—including the Postal Service—has, to Plaintiffs' knowledge, ever attempted to dictate the mechanics of mail voting.

6. The Rule does exactly that. The Rule empowers the Postal Service, an entity with neither expertise nor the ability to administer elections, to *shut down* any State's mail ballot program for failure to satisfy federal voting requirements that neither Congress nor any State legislated. The Rule is thus a shocking and unprecedented assertion of power the Postal Service is neither permitted nor equipped to wield.

7. Moreover, during the rulemaking process, numerous commentors, including certain Plaintiffs here, informed USPS that implementation of the Rule for the November 2026 election would wreak havoc on mail voting throughout the country and result in the disfranchisement of large numbers of eligible voters.

---

[3] Karen L. Shanton, Cong. Rsch. Serv., R45549, The State and Local Role in Election Administration: Duties and Structures (Mar. 4, 2019), https://www.congress.gov/crs_external_products/R/PDF/R45549/R45549.1.pdf.

8. USPS brushed aside those grave concerns without meaningfully contesting any of them. USPS instead chose to issue a Rule a short time before the first jurisdictions must begin mailing ballots for the November 2026 election.

9. The Rule is unconstitutional and unlawful both in substance and in procedure. USPS had no lawful authority to promulgate the Rule, nor does it have any lawful authority to implement it for the November 2026 or any other Federal election.

10. The Rule is and will continue to cause irreparable harm to Plaintiffs so long as it remains in place. If this Court does not halt the Rule, States will be foreclosed from administering the upcoming election under their existing mail balloting schemes which differ substantially from the Rule. This will place insurmountable burdens on local election officials, organizations assisting voters, and mail voters themselves—all of whom have relied on the assurance that compliance with existing State law is all that is required to vote by mail.

**SUPPLEMENTAL PARTY ALLEGATIONS**

11. PLAINTIFF CITY OF MADISON is a municipal corporation organized under the laws of the State of Wisconsin.

12. The City's administrative offices are located at 210 Martin Luther King Jr. Blvd., Madison, WI 53703.

13. Madison is the second-largest municipality by population in the state of Wisconsin. As of April 2026, the City had more than 189,000 registered voters.

14. The Madison City Clerk is responsible for administering all aspects of elections for Madison's voters, including: processing voter registrations; maintaining and updating Madison's voter rolls in the statewide WisVote system that is administered by the Wisconsin Elections Commission; conducting all aspects of absentee voting, including determining voter eligibility

under state and federal law and issuing and mailing ballots to qualified voters; locating, managing, and securing facilities for all polling places for both in-person absentee voting and Election Day voting; recruiting, coordinating, and managing more than 100 temporary staff to conduct in-person absentee voting and 2,500-3,000 election inspectors for Election Day; ensuring all aspects of the voting process are compliant with all federal, state, and local laws; and more.

15. PLAINTIFF DYANA LIMON-MERCADO has served as the Travis County Clerk since January 2023. She joins this complaint in her official capacity as the Clerk of Travis County, Texas.

16. The County Clerk's Elections Department is located at 5501 Airport Blvd., Austin, TX 78751.

17. As the Travis County Clerk, Limon-Mercado is responsible for conducting all aspects of in-person and by mail early voting, as well as Election Day voting.

18. These duties include issuing and mailing ballots to qualified voters; locating, managing, and securing facilities for all polling places for both in-person Early Voting and Election Day voting; recruiting, coordinating, training, and managing thousands of poll workers to conduct in-person Early Voting and voting on Election Day; reporting elections results; ensuring all aspects of the voting process are compliant with all federal, state, and local laws; and more.

19. The Clerk's office is responsible for printing mail ballots, sourcing outgoing and incoming ballot envelopes, inserting ballots and other materials into the envelopes, mailing out the full by-mail ballot package, and receiving and processing ballots returned by mail, facilitating the Early Voting Ballot Board's review of mail ballots for acceptance and rejection, and facilitating the Central Counting Station's counting of ballots.

20. PLAINTIFF TRAVIS COUNTY is a political subdivision of Texas organized under the laws of the State of Texas.

21. The County's administrative offices are located at 700 Lavaca St., Austin, TX 78701.

22. Travis County is the fifth-largest county by population in the state of Texas. As of March 2026, the County had more than 920,000 registered voters.

23. Pursuant to the Texas Election Code, Travis County, through its designated officials—the county clerk, voter registrar, and Commissioners Court—is responsible for a broad range of election functions and funding including voter registration and maintenance of voter registration records, processing mail-in ballot applications and delivering mail-in ballots, setting polling-place locations, training and recruiting election workers, maintaining election records, and various other duties assigned by state law.

**JURISDICTION**

24. This Court has jurisdiction to hear this case under 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, as well as under 28 U.S.C. §§ 1651, 2201, and 2202, and 39 U.S.C. § 409.

25. The Administrative Procedure Act further authorizes the Court to grant temporary and permanent relief from certain unlawful final agency actions. 5 U.S.C. §§ 705-706.

26. Venue is proper in this district under 28 U.S.C. § 1391(b) because at least one Defendant resides in this district.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### I. The President's Executive Order Mandates USPS's Rulemaking.

27. On March 31, 2026, the President issued an Executive Order entitled "Ensuring Citizenship Verification and Integrity in Federal Elections."

28. In relevant part, the EO purports to "enhance election integrity via the United States Mail," EO § 1, but in fact directs the U.S. Postal Service to engage in functions it has not been authorized or equipped by Congress to conduct, and indeed that Congress has prohibited. Issued as a result of the EO, the Rule unconstitutionally seizes the power to regulate the mail that the Constitution reserves to Congress.

29. Plaintiffs filed their initial complaint challenging the Executive Order on April 2, 2026, and filed a motion for preliminary injunction seeking to enjoin implementation of the EO on April 10, 2026. *See* ECF No. 29. This Court denied all motions for preliminary injunction, holding that Plaintiffs' claims would not be ripe until USPS adopted a final rule. *See* ECF No. 143 at 2.

30. The day after this Court denied the motions for preliminary injunction, Defendants informed the Court that USPS had sent a notice of proposed rulemaking to the Federal Register for formal publication on June 2, 2026. ECF No. 145.

31. Counsel for Plaintiffs submitted comments in opposition to the Proposed Rulemaking in July 2026, outlining the Rule's substantive and procedural unlawfulness as well as the profound harms that immediate implementation of the Rule would cause to voters, organizations that promote voter participation, and municipal election officials. In total, more than 200,000 comments were submitted in response to the Proposed Rulemaking. USPS made no significant changes to the Rule in response to the comments.

32. LULAC Plaintiffs also submitted a complaint to the Postal Regulatory Commission ("PRC") on August 4, 2026, regarding USPS's failure to seek an advisory opinion from the PRC before undertaking the rulemaking in violation of 39 U.S.C. § 3661(b), and discriminating, through the Rule, among mail users in violation of 39 U.S.C. § 403(c). Proceedings in the PRC are ongoing, and USPS has taken no action to remedy the issues raised in Plaintiffs' PRC complaint.[4]

33. On August 21, 2026, Defendants filed a Notice before this Court stating that the Final Rule had been sent to the Office of the Federal Register that day and was available for inspection prior to formal publication. ECF No. 161. USPS has provided an effective date for the Final Rule of August 21, 2026, purportedly because "[d]elaying the effective date would jeopardize implementation of this rule in time for the 2026 general election, which will be held on November 3, 2026." Rule, Preface at 2. The Rule states that the immediate effective date "promotes states' and political subdivisions' ability to successfully implement the rule prior to the 2026 general election," as

> [g]iven that mail-in ballots subject to this rule are generally mailed in September or thereafter, an immediate effective date ensures the maximum possible time for election officials to adjust their ballot mail envelopes to meet the new preparation standards if necessary, and to prepare to submit data to the Portal once it becomes active.

Rule, Preface at 71.

34. Despite its effective date of August 21, the Final Rule will appear in the Federal Register on August 26, 2026.

---

[4] *See* Compl. of LULAC *et al.* re Proposed Rule for Ballot Mail, Postal Regul. Comm'n, Dkt. C2026-27, *available at* https://prc.arkcase.com/portal/dockets/11558.

## II. Contents of the Rule

35. The Final Rule amends the Mailing Standards in the Domestic Mail Manual ("DMM") by adding DMM § 705.24, "Ballot Mail for Federal Elections," which USPS promulgated to implement the EO's ballot-mail provisions, including Section 3(b).

36. First, the Rule conditions acceptance and delivery of ballot mail on new envelope requirements, mandating that both outbound and return envelopes bear an official Election Mail logo, carry a unique serialized Intelligent Mail barcode ("IMb"), and have undergone Postal Service mailpiece design and barcode placement review. DMM §§ 24.3.1 and 24.3.2.

37. These are design elements the Postal Service to date has encouraged,[5] but the Rule now requires States to certify that all their ballot mailings meet these design specifications, or else USPS will not accept them for delivery. DMM §§ 24.3.1, 24.3.2, 24.4.2(f), 24.5.1, 24.5.3.

38. Second, the Rule requires USPS to compile and maintain, for each State, a Mail-In and Absentee Participation List ("Participation List") of individuals "enrolled" to vote by mail, populated by mandatory State voter-data submissions. DMM §§ 24.4.2(a)-(c).

39. This requires USPS to create a new Federal Ballot Mail Portal ("the Portal") into which State and local election officials must enroll individual voters before those voters may receive a mail-in or absentee ballot by mail. DMM § 24.4.1.

40. The Rule leaves States no choice: any State that "intends to receive" mail-in ballots from voters through the Postal Service "*must* ensure that such individuals have been enrolled" on the List before those voters may be mailed their mail or absentee ballot. DMM § 24.4.2(a) (emphasis added). If a State or jurisdiction has not complied with the voter enrollment

---

[5] *See* U.S. Postal Serv., *2026-2027 Official Election Mail Guide, Kit 600*, at 4-5 (Feb. 2026), https://perma.cc/862E-B9RL.

requirements, their outgoing ballot mail, *i.e.*, ballots being sent to each voter, "will not be accepted and will be returned" to the jurisdiction. DMM § 24.5.3(a).

41. To "enroll[]" a voter, a State must supply, among other things, the voter's name, the voter's address, the originating election office, a unique IMb on the outbound envelope (the envelope the jurisdiction mails to the absentee voter), a separate unique IMb on the return envelope (the envelope the voter uses to send a completed absentee ballot back to the jurisdiction). DMM § 24.4.2(b). This information cannot be submitted in any format the States choose, but must conform to unspecified "technical specifications" for the Ballot Portal. DMM § 24.4.2(e).

42. States must designate "Ballot Mail Portal Users"[6] to submit this data "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." DMM § 24.4.2(d). States may continue enrolling individuals or modifying prior submissions until the last date ballots may be mailed under state law, but "[a] separate submission is required in connection with each Outbound Federal Ballot mailing,[7] regardless of the number of mailpieces in the mailing." DMM § 24.4.2(d). Thus, a state or local election office that mails ballots in successive batches—a practice of virtually every jurisdiction that administers mail voting—must complete a discrete data submission for each mailing.

[6] A "Ballot Mail Portal User" is the State's chief election official and anyone they authorize to submit information through the Portal, including "an election official of that state or a political subdivision thereof." DMM § 24.1(b). Every "Ballot Mail Portal User" must first register an account, and registration "must be completed no later than two business days before an Outbound Federal Ballot mailing." DMM § 24.4.1.

[7] "Outbound Federal Ballot Mail" is any mailpiece containing a ballot sent by an election office to a voter. DMM § 24.1(d). "Return Federal Ballot Mail" is any mailpiece containing a ballot sent by a voter to an election office. *Id.* § 24.1(e).

43. The Rule also provides that the Postal Service will "[o]n or about the date of the federal election . . . provide a state-specific Mail-In and Absentee Participant List to each state's chief election official that contains the name and address of each individual in that state who was enrolled [on the Portal], along with the unique IMb associated with the Outbound and Return Federal Ballot Mail sent to each such individual." DMM § 24.4.3.

44. Third, the Rule requires USPS employees to review every Outbound Federal Ballot mailing to verify that it meets the new envelope design standards and is being sent to individuals enrolled on the appropriate state's Participation List. DMM §§ 24.5.1, 24.5.2.

45. USPS employees are required to refuse acceptance of Outbound Federal Ballot Mail that does not comply with these new requirements. DMM § 24.5.3.

46. Election officials are permitted to "request further review by the Postal Service if Outbound Federal Ballot Mail is not accepted," DMM § 24.5.3(b), but the Rule does not specify how or where this review is conducted, on what timeline the review takes place, who at USPS is responsible for the review, the standards for conducting or resolving such review, nor what the responsible official is required or permitted to consider.

47. This verification must be conducted every time a mailing is "presented for acceptance" by an election office at a USPS business mail facility or retail counter. DMM § 24.5.2. The Rule requires USPS to conduct pre-acceptance verification of Outbound Federal Ballot Mail and provides that USPS's acceptance of a mailing does not constitute verified compliance. DMM §§ 24.5.1-.3. A mailing may contain thousands or millions of mailpieces. Larger mailings will take significant (indeed, likely prohibitive, *see infra* ¶¶ 103-107) time to verify, yet the Rule disclaims any responsibility on the part of USPS for the ballots while they sit in its custody awaiting

verification or for any resulting delays in delivering those ballots to their noted recipients. DMM § 24.5.3(c).

48. Additionally, because the Rule requires verification at the level of a "mailing," a single nonconforming mailpiece within a mailing can result in rejection or delay of an entire batch. For example, if one ballot in a mailing is directed to a voter the State has not yet disclosed on the Ballot Portal or whose data does not match the USPS's undisclosed technical specifications, the rule requires USPS to refuse and return the whole mailing. *See* DMM §§ 24.5.1, 24.5.3, 24.4.2(d).

49. Nor does the Rule provide any assurance that a verified ballot will be delivered to its intended recipient after it has been accepted, as the Rule further disclaims that "acceptance . . . constitute[s] verified compliance." DMM § 24.5.2. Thus, a mailing that clears verification by one USPS employee may still be pulled from the mailstream, delayed, or returned if another employee later claims to identify a defect.[8]

## III. Effects of the Rule on Administration of the 2026 and Future Elections

### A. The Rule fails to account for the realities of election administration.

50. The Rule's federal one-size-fits-all approach to mail voting fails to account for the fact that mail voting is governed by more than fifty distinct legal and administrative regimes, across the States, the District of Columbia, and the U.S. territories.

51. Each state determines by its own law who is permitted to vote by mail, when mail voting is available, how a voter requests a mail ballot, when and by what means election officials deliver mail ballots to eligible voters, the circumstances under which a voter may obtain a

[8] The explanation of the Rule portrays this provision as a mere "recognition of the fact that, despite the Postal Service's best efforts, some Outbound Federal Mail may enter the mailstream that does not meet the preparation or data standards set forth in the rule." Rule, Preface at 59. However, by the Rule's operative terms, noncompliant mailings "will be returned to the authorized ballot mailer," DMM § 24.5.3(a), so this reassurance rings hollow.

replacement ballot, how ballot envelopes are designed, and the manner and deadline by which a voter must return their mail ballot.

52. The Rule also fails to account for significant variation in election administration *within* States, where authority is divided and shared among election offices at the state, county, and the municipal or township level.

53. Some States have more top-down administration, where the state's chief election administrator largely directs the activities of local election offices. Other States are more bottom-up, where local election offices exercise independent authority and discretion over the conduct of elections in their jurisdiction.

54. The functions most directly affected by the Rule—receiving and processing mail ballot applications, preparing and transmitting mail ballots to voters, and receiving mail ballots from voters—are almost always performed at the local level.

55. There are more than 10,000 local election offices in the United States.

56. Local election offices vary widely in scale, staffing, and resources. Some serve hundreds of thousands, or even millions, of voters with professional staff and dedicated budgets, while others are administered by a single official serving mere hundreds of voters, operating on shoestring budgets and performing most tasks in-house and/or by hand.

57. No matter their size or scope, local election offices across the country operate with limited funding and staff.

58. Since the 2020 general election, many local election offices have experienced substantial turnover among election officials and staff.

59. At the same time, the demands of administering elections have grown, particularly with respect to mail voting. Approximately three-quarters of Americans now live in States in which

every eligible voter may vote by mail.[9] The duty of local election offices to meet growing demand for mail voting exists on top of the already-intensive responsibility of managing in-person voting early and on Election Day.

60. Any change in the treatment of mail ballots imposes costs on state and local election offices, including updating election management systems, revising ballot materials and voter instructions, adjusting internal deadlines, adjusting budgets, and hiring or retraining staff and temporary workers.

### B. The Rule cannot be implemented in the 2026 election.

61. The Final Rule states that it is effective as of August 21, 2026, leaving election offices just 74 calendar days and 50 working days before the November 3, 2026 general election.

62. This leaves USPS and election offices too little time to implement the Rule in the 2026 election without risking catastrophic election administration failures and disenfranchisement.

63. Election offices across the country are already actively preparing for the 2026 general election while finishing administration of recent or ongoing primary elections. This work requires a constant stream of critical, time-sensitive tasks.

64. USPS has not publicly provided a date as to when the Portal will even become active. The commentary to the Rule states that the Portal will become active once the publication for the system of records required by the Privacy Act and governing the portal occurs. USPS published a proposed System of Records Notice ("SORN") on July 17, 2026, and stated that the SORN could not go into effect until after "the publication date of the Postal Service's responses to comments received" in response to the proposed notice. Privacy Act of 1874; System of Records,

[9] *See* Nat'l Vote at Home Inst., *Vote at Home Policy and Research Guide*, at 3 (Feb. 2024), https://perma.cc/9QBV-YAAK.

91 Fed. Reg. 44880, 44880 (July 17, 2026). Counsel for Plaintiffs submitted a comment regarding the SORN on August 14, 2026, to which there has still been no response, meaning that the SORN cannot yet be effective, such that the Portal cannot lawfully become active.

65. Even without an active Portal, North Carolina must, under state law, begin mailing their ballots to voters on September 4.[10] Other States must begin mailing ballots to voters between September 4 and October 16, 2026.

66. State and local budgets for the 2026 election cycle are already set. The Rule nonetheless requires additional staffing, training, public education campaigns, and, for many jurisdictions, new technology and vendors. The Rule funds none of this.

67. Most jurisdictions cannot adjust their budgets and purchase new equipment or software on the Rule's timeline. Many are constrained by procurement laws requiring local and/or state legislative approval, competitive bidding, and/or various forms of IT, cybersecurity, and certification review before new systems or vendors may be used. The Rule does not take seriously the actual complexity of implementing the requirements that it imposes.

### C. USPS lacks the financial and operational capacity to implement the Rule.

68. The Rule represents an about-face for USPS, which has long recognized that its role in elections is to process, transport, and deliver ballot mail—not to second-guess ballot mail recipients, verify them against a federal registry, or determine if or when they may receive their ballot.

69. In 2022, USPS declared: "The role of the USPS in American elections is clear and well defined: to process, transport and deliver the nation's Election Mail, including ballots. We

[10] N.C. Gen. Stat. § 163-230.1.

have *no role* in determining the extent to which mail is used for participating in elections, the design of ballots or return envelopes, or whether or how ballots are counted."[11]

70. For decades, election offices and USPS have operated as partners on this understanding: election offices determine eligibility to receive ballot mail, and USPS delivers it.

71. USPS is not equipped to reverse decades of consistent practice under existing ballot mail policies in the weeks remaining before the 2026 election—if ever in the foreseeable future.

72. USPS is in financial crisis. It lost $9 billion in fiscal year 2025 and has lost approximately $31 billion since fiscal year 2021. The Postmaster General testified to Congress *this year* that USPS is running out of operating cash, has suspended required employee pension payments, and endures "a growing mismatch between the services we are required to provide and the revenues available to support them."[12]

73. USPS service has also deteriorated. For instance, even though USPS lowered its service standards for First-Class Mail[13] from a 1-to-3-day delivery window to a 1-to-5-day window in 2022, on-time delivery of First-Class Mail *still* declined from 91% to about 86% from fiscal year 2022 to 2025.[14]

---

[11] U.S. Postal Serv., *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections*, at 3 (2022), https://perma.cc/4S84-R37S (emphasis added).

[12] *Reforming the U.S. Postal Service's Broken Business Model: Hearing Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 119th Cong., 2d Sess., at 7 (June 24, 2026) (statement of David P. Steiner, Postmaster Gen. and Chief Exec. Officer, USPS), https://perma.cc/J5TC-7YAT.

[13] USPS treats all return ballots as First-Class Mail.

[14] U.S. Gov't Accountability Off., GAO-26-109008, U.S. Postal Service: Urgent Action Needed to Fix Unsustainable Business Model and Improve Service Performance (Mar. 17, 2026), https://perma.cc/83DN-CL9C.

74. Against this backdrop, the Rule *adds* new non-postal, election administration functions to the services offered by its already burdened workforce: imposing mandatory Mailpiece Design Analyst ("MDA") review for every state's ballot envelopes (previously optional), building and maintaining a federal registry of mail voters, and conducting a new, time-intensive review and scanning of every outbound ballot mailing presented at Business Mail Entry Units (BMEUs) and retail windows nationwide.

75. The Rule requires USPS to retrain tens of thousands of clerks and supervisors at more than 9,600 BMEUs and at retail post offices nationwide—employees who have been trained for decades to identify ballot mail and expedite it, not to hold or refuse to accept it. USPS's own election mail guidance, Kit 600, most recently published in February 2026, makes no mention of the Rule's requirements, and many employees have already completed this cycle's training under existing procedures. *See supra* note 5.

76. USPS normally conducts year-round preparations in order to timely and securely deliver ballot mail every election year. Designing, publishing, and delivering new trainings for practices that depart so dramatically from past practice would take at least several months to do adequately across the organization. This cannot be accomplished before the 2026 election.

77. USPS also likely lacks sufficient MDAs to review the redesigned ballot envelopes for thousands of jurisdictions or technical staff to field the questions and technical issues a new nationwide mail voter list will generate. USPS employs approximately 40 MDAs nationwide to serve all postal customers.

78. USPS also likely lacks sufficient staff to answer questions from local election officials about the Portal. Even a single question from each of the more than 10,000 local election

offices would likely overwhelm USPS capacity, and unanswered questions in this context risk disenfranchising voters.

79. The likely effect of enforcing the Rule in the upcoming election is a massive delay in ballot mail service and mail service writ large by creating multiple bottlenecks prior to and at the point of accepting outbound ballots into the mailstream.

80. Another likely result of imposing these changes on this timeline is inconsistent application: USPS employees at some BMEU or retail windows may rigidly reject mailings, while others may decline to enforce the Rule and accept noncompliant mailings or may interpret the Rule as permitting them to accept mailings minus any noncompliant individual ballots, meaning voters in different States or even neighboring areas within States will have variable access to mail ballots through no fault of their own.

### D. The Rule's ballot envelope requirements cannot be met before the 2026 election.

81. The Rule's ballot envelope requirements impose significant burdens on election offices across the country and cannot be met before the 2026 election.

82. State and local election offices have already designed, approved, and in many cases ordered or printed their mail ballot envelopes for the 2026 general election, at significant cost. Plaintiff City of Madison, for example, has already ordered its 2026 general election ballot envelopes at a cost of more than $10,000. Similarly, Travis County has already purchased all its absentee ballot outbound carrier envelopes and return envelopes for the November 2026 election, at a cost of approximately $21,349. Many election offices also rely on remaining envelope inventory from prior elections to reduce costs.

83. Redesigning and reordering envelopes at this stage is a practical impossibility for election offices. In some States, envelopes are designed and procured by the state, and local

election offices must await state action. In other States, envelopes are designed and ordered by local election offices. And in some States, return ballot envelope contents are prescribed by law, and redesign may require legislative action, attorney general guidance, or administrative approval by state and/or local boards. In Wisconsin, for example, the outbound and return ballot envelopes are designed by the Wisconsin Elections Commission and municipalities have no authority to use different envelopes, but municipalities are responsible for their own procurement. Similarly, in Texas, the Secretary of State prescribes the standards and wording of the Carrier Envelope, and the counties, which are responsible for procuring their own envelopes, do not have authority to use envelopes that do not conform with the Secretary's requirements.

84. Envelope redesign is labor-intensive, requiring specialized software and several steps, which may include user testing, scanner testing, extraction equipment testing, sorter calibration, signature verification workflow testing, staff retraining, and revision of procedure. For these reasons, election officials ordinarily undertake redesign in off-years, not weeks before a general election.

85. There are only a small number of mail service providers and printers specializing in election mail. A simultaneous, last-minute surge of orders from thousands of jurisdictions would likely exceed their capacity, and there may not be sufficient envelope stock manufactured to meet the sudden demand.

86. Furthermore, many jurisdictions do not currently use the "unique" IMbs the Rule requires for both outbound and return ballot envelopes. Some jurisdictions do not use IMbs for ballot mail at all. Others place unique IMbs only on outbound but not return envelopes. And many jurisdictions that do have IMbs on return envelopes use generic IMbs identifying only the destination election office.

87. Printing return ballot envelopes with unique IMbs is costly and technically complex. Generating, tracking, and printing ballots with unique IMbs requires specialized software and vendor services that many jurisdictions—especially small and rural offices that affix labels by hand—do not have and cannot acquire in time for the 2026 general election.

88. IMb tracking is also unreliable. USPS often fails to scan mailpieces as they travel through the mailstream, either due to machine or human error. As King County, Washington reported in its comment opposing the Rule, the county spent over $30,000 piloting unique IMbs on return envelopes for a recent special election countywide but found little "return on investment" as USPS often failed to scan IMbs for return ballots as they moved through the mailstream.[15] Despite being a relatively well-resourced election office with high volumes of mail voting, King County discontinued the practice given a lack of funding and USPS's ill-performance.

89. The Rule's condition of mandatory MDA review also likely cannot be met before the 2026 election. MDA review is presently optional. While some election offices submit their ballot envelopes to USPS for MDA review, others do not. MDA review can also take significant time. With budgets and administrative timelines already carefully calibrated for the 2026 general election, election offices cannot build in time for a new or repeated review at this late stage without significant disruption and cost.

[15] King Cnty., *King County Elections Public Comment on Proposed Rule, "Ballot Mail for Federal Elections", 39 CFR Part 111, Federal Register Document No. 2026-10968* (July 2, 2026), https://kingcounty.gov/en/dept/elections/about-us/news-and-media-resources/news-releases/july-2-2026 (finding that in a 2025 special election, county data showed that only 26% of ballots delivered had received an outbound scan, only 22% of ballots an "in transit" scan and only 4% of ballots a delivery scan).

### E. The Participation List and Ballot Portal requirements are unworkable.

90. The Rule requires USPS to build a nationwide Ballot Portal from scratch and requires state and local election officials to upload and continuously update lists of tens of millions of mail voters.

91. USPS has provided no firm timeline for launching the Portal, instead stating only that it will become active "at the time of the publication of the system of records ("SOR") governing the Portal," which in turn will "occur on or after August 17, 2026 (pending the Postal Service's separate consideration of the comments on that SOR proposal)." Rule, Preface at 2. At least two States require or allow ballots to be mailed beginning on September 4, 2026, meaning that, at best, they will have to use a brand new, untested portal just days before their statutory deadlines to begin mailing ballots. This would mean launching without the months of user testing and load testing that a system of this scale requires. A Portal crash or malfunction during ballot mailing season—virtually guaranteed without sufficient time for testing—would lead to serious cascading delays, putting election offices at risk of violating state ballot mailing deadlines and voters at risk of not receiving their ballots in time to cast their vote.

92. Mandatory voter list submissions to the Portal will duplicate parts of the secure voter registration systems that state and local election officials already maintain. It requires States to develop systems for documenting IMbs and MDA status in a manner compatible with their election management systems, many of which do not support tracking such information. It could require duplicate data entry, cross checking, and verification—all of this during the most intensive period of the election calendar.

93. The Rule's 30-day disclosure deadline for list submission does not align with the realities of state mail voting laws. Many state laws allow voters to request a mail ballot well after

that date, and statutory deadlines for absentee ballot requests vary widely. Seventeen States, Puerto Rico, and the Virgin Islands set application deadlines more than seven days before the election, seven States set deadlines exactly seven days before, and eighteen States set deadlines fewer than seven days before Election Day.[16] In some States, voters may request an emergency mail ballot even after the ordinary deadline. *See, e.g.*, 25 Pa. Cons. Stat. § 3146.2a.

94. Furthermore, ballots are not just mailed once. Election offices generally mail ballots in waves—large initial drops followed by regular daily mailings, including for replacement ballots, new registrations, new mail ballot applicants, and address changes. The Rule's requirement of a separate Portal submission for every mailing by every election office imposes an enormous cumulative burden.

95. Mail-ballot participation can also spike in the final days before Election Day, intensifying the data submission burden on election offices at the highest-pressure time.

96. The Rule charges each state's chief election official with ensuring the necessary data submissions. But in many States, local election officials, not the state, maintain the operative mail or absentee voter lists. This is also the case in States that maintain permanent absentee or mail ballot lists.[17]

97. The Rule also assumes that state and local voters lists can be readily converted into a single centralized Participation List. Not so. The Portal will not be interoperable with every state's voter registration system. Each state's system uses different data fields, identifiers, and

[16] Nat'l Conf. of State Legislatures, *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives* (updated Feb. 24, 2026), https://www.ncsl.org/elections-and-campaigns/table-5-applying-for-an-absentee-ballot.

[17] Nat'l Conf. of State Legislatures, *Table 3: States with Permanent Absentee Voting Lists* (updated July 20, 2026), https://www.ncsl.org/elections-and-campaigns/table-3-states-with-permanent-absenteevoting-lists.

formats, which even within a state may not be standardized across its local election offices. Some local election offices have sophisticated local databases, while others use spreadsheets or more dated infrastructure, while some small offices maintain lists primarily by hand. Translating these disparate records into electronic data submissions—in some cases by manual entry—is a complex, time-intensive task that carries a high risk of error.

98. The Participation List Requirement will require state and local election offices to decipher USPS's technical requirements for uploading, supplementing, and modifying lists, identify staff time for making Portal submissions, provide necessary trainings and guidance, and educate voters. These among election offices' numerous other necessary tasks cannot feasibly be completed in time for the 2026 election.

99. The Portal also creates serious security and privacy risks. It would link voter names and addresses to unique barcodes, creating a large federal dataset of voters and an attractive target for hostile actors. And it would be maintained by an agency with a documented history of cybersecurity failures. Following one such incident, the USPS Office of Inspector General noted: "Postal Service leadership had not emphasized cybersecurity, as evidenced by its undertrained employees, lack of accountability for risk acceptance decisions, ineffective collaboration among cybersecurity teams, and continued operations of unsupported systems."[18]

100. Moreover, USPS has not committed to use login.gov, the federal government's existing secure authentication system for receiving data from state and local actors. The Rule does not state how many and which agencies or officials within the federal government will have access to the Participation Lists.

---

[18] Off. of Inspector Gen., U.S. Postal Serv., U.S. Postal Service Cybersecurity Functions, Audit Report No. IT-AR-15-008, at 1 (July 17, 2015), https://perma.cc/27YS-XS54.

101. The Rule also puts state and local election officials at risk of violating state laws restricting disclosure of voter registration data,[19] as well as the Address Confidentiality Programs that 46 States and the District of Columbia maintain for survivors of domestic violence, sexual assault, stalking, and trafficking.[20] The Rule's preface claims that the Portal would require only "that the name and address used on the outside of a ballot envelope be submitted" and would "not require that confidential information known only to the state be provided," and that USPS has taken "appropriate cybersecurity measures." Rule, Preface at 85. However, nothing in the Rule's operative language provides any such protections to voters in this situation.

### F. The Rule's verification procedures are undefined and will delay and block ballot mail from reaching voters.

102. The Rule requires USPS employees to verify every outbound ballot mailing before acceptance but specifies no standard, method, or time limit for that review.

103. The Rule's prefatory materials state that USPS will "rely[] on existing scanning technology and devices," which may refer to automated scanning machines or handheld scanners that require manual sifting through each mailpiece. Rule, Preface at 57.

104. USPS also dramatically and recklessly understates how long this verification is likely to take. The prefatory materials state that "scanning a barcode generally takes less than a minute per mailpiece" and claims that "[d]epending on how many barcodes are scanned, the verification process should take no more than a few hours for larger mailings, and potentially only a few minutes for smaller mailings." Rule, Preface at 57. It goes on to state that local election

---

[19] Election Assistance Comm'n, *Voter Roll Privacy* (Dec. 23, 2025), https://perma.cc/MP4U-F2LS.

[20] Nat'l Ass'n of Confidential Address Programs, *Address Confidentiality Programs by State* (June 18, 2025), https://perma.cc/N7DQ-UCVH.

officials, as the Authorized Ballot Mailers, "should remain at the BMEU or postal retail location during the verification process." *Id.*

105. Maricopa County, Arizona is expected to mail more than 2.6 million outbound mailpieces as part of its first mailing of ballots for the 2026 general election.

106. If it takes USPS one minute to scan each of the 2.6 million mailpieces, the Maricopa County Recorder will have to remain at the BMEU continuously for nearly 5 years. If 30 seconds per mail piece, 2.5 years. If one second, 30 days. And if a tenth of a second, 72 hours.

107. The City of Madison's first ballot mailing typically includes 20,000 ballots for a midterm election. At one ballot per minute, it would take more than 13 days for these ballots to be scanned in by USPS.

108. USPS has not confirmed that all BMEU and retail counters have the necessary technology. Nor does the Rule specify what will happen if a BMEU or retail counter is presented with an outbound ballot mailing but lacks the necessary technology to review it.

109. The Rule's acceptance provisions thus create concerning gaps in ballot chain of custody. USPS must review mailings for compliance "prior to acceptance," but acceptance "does not constitute verified compliance." DMM §§ 24.5.1, 24.5.2. Outbound ballots may sit in an undefined pre-acceptance limbo with no review timeline, subject to rejection and return to sender even after acceptance. At the same time, the Rule disclaims all USPS responsibility for ballots awaiting acceptance and for resulting service delays. DMM § 24.5.3(c).

110. The rejection of a ballot mailing at the point of acceptance could impose extreme burdens on election offices. Election officials would need to review and correct the mailing, which may include generating and assigning new IMbs, updating or resubmitting voter data to the Portal,

reprinting envelopes, recreating ballot packets and/or rescheduling mailing pickup and delivery. These steps would have to be completed under tight statutory mailing deadlines.

111. The Rule provides election offices only a vague right to "request further review" of a rejection, with no timeline, no identified deciding official, and no commitment to prioritize ballot mail appeals. DMM § 24.5.3(b). The Rule affords voters no notice or recourse for rejected or delayed mailings, with the explanatory materials remarkably claiming that "the ability to cure rests not with the voter, as the franchise is not impacted." Rule, Preface at 58.

112. The Rule's channeling of ballot mailings to BMEUs or retail offices is also a burden on election offices—especially smaller and rural offices—that transmit low-volume ballot mailings directly with their postal carriers. These offices are now forced to transport outbound ballots over longer distances to reach the nearest retail office or BMEU. This will become increasingly burdensome amid anticipated post office closures and processing facility consolidations.[21]

113. Multiplied across thousands of USPS facilities and more than 10,000 election offices, these verification requirements will create bottlenecks that slow ballot mail, and mail service generally, nationwide.

**G. The Rule will delay ballots, sow confusion, and disenfranchise voters.**

114. The Rule puts tens of millions of voters at risk of disenfranchisement through no fault of their own.

[21] U.S. Postal Serv., *Remarks by Postmaster General David Steiner at the Aug. 7, 2026, USPS Board of Governors Meeting* (Aug. 7, 2026), https://perma.cc/9JME-NRB9.

115. The Rule will cause needless delays in accepting and delivering ballots that cascade into delays in voters receiving and returning ballots. Given the compressed statutory windows for mail voting across states, even short disruptions can prevent voters from casting timely ballots.

116. When a state or local election office cannot (or, on principle, does not), comply with the Rule's requirements, its voters are penalized with no apparent avenue for recourse under the Rule. The Rule itself provides that "responsibility [for correcting errors that prevent mailing] lies exclusively with election officials and their authorized MSPs." Rule, Preface at 50.

117. The harms will be most acutely felt by voters who depend on mail voting: voters with disabilities, who vote by mail at higher rates and other voters and for whom mail voting is the only accessible means of participation; older voters, for whom mail ballots accounted for roughly 40% of votes cast in 2024; military and overseas voters; voters with nontraditional addresses, including residents of tribal lands; and voters temporarily living out of state, including students attending college or university.

118. The Rule's carve-out for UOCAVA voters may create implementation difficulties for both election offices and the USPS. Election offices routinely send UOCAVA ballots in the same mailings as other ballots. All States must begin mailing UOCAVA ballots by September 19, 2026. At least 20 States send out ballots to all voters with a request on file at or very shortly before the federal UOCAVA mailing deadline, such that UOCAVA ballots are mixed in with regular ballots.[22] Indeed, a UOCAVA ballot addressed to a voter who need not and does not appear on the Participation List could mistakenly cause USPS employees to refuse an entire mailing.

[22] Nat'l Conf. of State Legislatures, *Table 7: When States Mail Our Absentee/Mail Ballots* (updated Oct. 3, 2024), https://www.ncsl.org/elections-and-campaigns/table-7-when-states-mail-out-absentee-mail-ballots.

119. The Rule's instruction that election officials should separate out UOCAVA ballots from other ballots is likely to create confusion and compliance difficulties.

120. Furthermore, although the Rule states that it applies only to federal elections, most States conduct federal, state, and local elections on consolidated ballots delivered in a single envelope. By authorizing USPS to refuse to deliver those ballots, the Rule also burdens the right to vote in state and local elections.

121. The compressed implementation timeline for the Rule is also likely to generate widespread confusion among voters about whether they will receive and will be able to return their ballots by mail at all.

### H. The Rule is unnecessary and serves no legitimate purpose.

122. The notices proposing the Rule and adopting it as final identified one main purpose: to facilitate enforcement of federal laws prohibiting voter fraud and crimes in the use of mail. *See* Rule, Preface at 1-2. But no law enforcement purpose calls for the Rule, and the Rule does not serve any law enforcement purpose.

123. Fraud in mail voting is vanishingly rare, according to multiple studies of elections over the last twenty years, due in part to the sophisticated systems state and local election officials have created to ensure the integrity and accuracy of their election systems and voter rolls.[23]

[23] Samara Angel, Jonathan Katz & Randi Wright, *Mail voting in the US: Data points to very low fraud and significant benefits to voters*, Brookings (Nov. 6, 2025), https://perma.cc/4CQP-84YL (noting that an analysis of The Heritage Foundation's database "found that only about 0.00006% of total votes cast were fraudulent mail votes over the preceding 20 years," that universal vote-by-mail states have "essentially zero fraud," and that the American Statistical Association found "no evidence that voting by mail increases the risk of voter fraud overall"); Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, Brennan Ctr. for Just. (Apr. 10, 2020), https://perma.cc/5G96-6YWU.

124. USPS cites no evidence, study, or analysis that election officials send ballots to individuals not on their voter lists, or that the Rule's requirements would make mail more efficient or secure.

125. Rather, USPS's own post-election reports from 2020,[24] 2022,[25] and 2024[26] all tout its success in delivering growing volumes of ballot mail under existing procedures. At its last public meeting on August 7, 2026, the USPS Board of Governors noted the USPS Office of Inspector General's initial review of election mail processing in 2026 primary elections finding overall effectiveness in election mail operations.[27]

126. Election officials already reconcile the number of mail ballots issued against mail ballots returned as part of established tracking protocols. The Participation Lists maintained by USPS would be duplicative, more likely to contain data-transfer errors, and will not produce any necessary information election offices in every jurisdiction do not already maintain at a higher level of accuracy.

127. Comparisons of the Participation List to the number of ballots returned by mail are unlikely to reveal any useful information. Voters lawfully return mail ballots in person, at drop boxes, and by fax or email for overseas and military voters, and voters may receive replacement or reissued ballots. In some jurisdictions, voters can pick up replacement mail ballots in person

---

[24] U.S. Postal Serv., *2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year* (Jan. 19, 2021), https://perma.cc/F9EN-LPAH.

[25] U.S. Postal Serv., *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections* (Jan. 9, 2023), https://perma.cc/H745-JD72.

[26] U.S. Postal Serv., *2024 Post-Election Analysis Report: Delivering the Nation's Election Mail Securely and Effectively* (Dec. 2, 2024), https://perma.cc/3CGF-FAPG.

[27] U.S. Postal Serv., *About: Leadership: Board of Governors*, https://about.usps.com/who/leadership/board-governors/?video=bgs260807 (last visited Aug. 25, 2026).

and then return them by mail. A duplicative federal list maintained with lower accuracy than existing state systems would generate false flags and consume rather than supplement law enforcement resources.

128. Indeed, USPS even concedes the point that the Participation List is, at best, entirely duplicative, stating that the rule "require[s] USPS to provide the state with the List that contained the same information that the state provided to USPS." Rule, Preface at 61.

129. Far from supporting law enforcement, the Rule directs USPS employees and invite State and local election officials to *violate* federal and State election laws. For instance, the Rule directs USPS employees to refuse to deliver ballots sent by State and local election offices to individuals entitled to vote under state law in violation of Section 11(a) of the Voting Rights Act. *See infra*. The Rule would also place USPS employees and State and local election officials directly at risk of violating State laws protecting voters' right to receive their ballots by mail. Wisconsin, for example, makes it crime to "[w]illfully or negligently fail to deliver, after having undertaken to do so, official ballots prepared for an election to the proper person, or prevent their delivery within the required time." Wis. Stat. § 12.13(3)(c).

## IV. Harms that the Rule Imposes on Plaintiffs

### A. LULAC

#### i. Harms to LULAC's Members

130. LULAC has tens of thousands of members in virtually every State who regularly vote by mail. Its members include voters in jurisdictions with widely differing election administration systems.

131. LULAC has members in Madison, Wisconsin and in Travis County, Texas, two jurisdictions that have identified substantial burdens and harms associated with compliance and warned that the Rule could result in denying voters their fundamental right to vote.

132. LULAC members rely on vote by mail for many reasons. Some are older adults, voters with disabilities, medically incapacitated voters, voters who are members of armed forces or others deployed domestically or abroad, or voters without reliable transportation. Others vote by mail simply because their states conduct their elections primarily by mail or permit no-excuse absentee voting.

133. Many LULAC members also reside in states that allow voters to request mail ballots close to Election Day. In Arizona, for example, voters can request absentee ballots in person, by mail, or online 11 days before Election Day. Other states impose similar timelines, including: Alaska, 10 days before Election Day; District of Columbia, 15 days before Election Day; Florida, 12 days before Election Day; Massachusetts, 7 days before Election Day; Texas, 11 days before Election Day; South Carolina, 11 days before Election Day. LULAC has members who vote by mail in each of these states.

134. For LULAC members who timely request absentee ballots, there is a substantial risk that they will not be enrolled in the Participation List. That is because LULAC members live in jurisdictions that cannot comply with the technicalities required to gather and format the data for the portal, including generating two unique IMbs. For example, Travis County does not currently use unique IMbs on both outbound and return mail-in ballot envelopes. If Travis County cannot comply, the Rule requires the Postal Service to refuse to accept ballot envelopes without the proper design elements, and that would prevent LULAC members from receiving mail ballots or returning completed ballots.

135. The predictable result, not just limited to Travis County, is that LULAC members who request absentee ballots under state law will not receive those ballots because they were not enrolled in the Participation List, even though they followed state law in requesting the ballots.

136. Many LULAC members live in small or rural jurisdictions that lack the technology and finances to generate, print, track, and use unique IMbs for each mail ballot envelope. Compliance with the Rule requires specialized software, printing capabilities, and often outside vendor services.

137. Small election offices, including offices that prepare or affix mailing labels by hand, do not have access to those systems or will be unable to deploy them before the 2026 election. The resulting failure of the jurisdiction's inability to comply or any mistakes the jurisdiction makes from attempting to comply in such a short time frame would directly burden and very likely disenfranchise LULAC members.

138. LULAC members also reside in larger jurisdictions including Madison, Wisconsin, which distributes tens of thousands of ballots in its initial mailing and, under the Rule, must present mailings at BMEUs or retail postal counters. But there is no guarantee that BMEUs and retail postal counters have the necessary equipment, capacity, or expertise to scan large volumes of mail ballots. Delays or failures in processing these mail ballots threaten to prevent LULAC members from receiving or timely returning their mail ballots, risking the loss of their votes.

139. The harm is already occurring because LULAC members are confused about whether voting by mail is a reliable option for the November 2026 election. That confusion and uncertainty is especially harmful to LULAC members who depend on voting by mail. Without clear and reliable information, LULAC members will be unable to make an informed and timely plan to cast a ballot with the greatest likelihood of it being counted.

140. LULAC has been forced to divert limited organizational resources, including staff time and capacity, to respond to questions from State presidents and members in its more than 420 Councils nationwide regarding the Rule's potential effects in their respective States.

141. That work is State- and locality-specific. Absentee and mail-in ballot rules are different in each State, and on top of that, local jurisdictions use different procedures to administer mail voting (for example, some rely on third party mail vendors and others do not).

142. To respond to its members, LULAC has had to research applicable State laws and contact election officials in particular jurisdictions to determine how they will comply with the Rule so that LULAC can advise its members who live in those jurisdictions.

143. LULAC has also received numerous questions from individual voters asking whether they should vote by mail and whether their mail ballots will be counted. It is currently spending approximately between four and twenty staff hours a week to determine what guidance it can responsibly provide to its State presidents and members.

144. The uncertainty around mail-in voting directly impairs one of LULAC's core functions: providing accurate voting information and encouraging civic participation. LULAC has long encouraged its members to vote through all lawful and available methods, including vote by mail. But the uncertainty around the Rule's requirements and application to various States and localities prevents LULAC from giving clear, reliable, and tailored advice on whether and how to vote by mail and ensure that the ballot is counted.

145. If LULAC did not have to spend substantial staff time and resources deciphering and attempting to explain the impacts of the Rule to its State councils and thousands of members, it would devote these limited resources to its ordinary voter engagement work. That work has

historically spanned registering eligible voters under state law, disseminating accurate information about voting options, encouraging participation, and undertaking get-out-the-vote efforts.

146. Instead, LULAC must expend staff time investigating whether particular jurisdictions will use compliant envelopes, assign IMbs to outbound and return mail-ballot envelopes, or otherwise be able to satisfy the Rule. And even then, LULAC cannot, with certainty, provide accurate information to members who live in those jurisdictions and vote by mail on how and whether they should, in fact, vote by mail.

147. These demands reduce LULAC's capacity to carry out voter registration, voter education, and mobilization work and hamper its ability to reach and encourage as many voters as it otherwise would.

**B. SFI**

**i. Harms to SFI's Members**

148. SFI's members will be harmed by the Final Rule.

149. SFI's members and constituencies include military families voting absentee, both abroad and within in the United States. Many military families vote absentee using their State's own process, rather than requesting an absentee ballot through UOCAVA's Federal Post Card Application or using the back-up ballot of last resort provided by UOCAVA, the Federal Write-In Absentee Ballot. As a result, the Rule's purported exemption of UOCAVA ballots is not effective in actually exempting military and overseas voters from the Rule's onerous requirements and ensuring that military voters timely receive their ballots.

150. The military and overseas voters that SFI serves and counts as members already face onerous burdens in casting their mail ballots. In 2020, out of active-duty military who did not

vote, 43 percent of those covered by UOCAVA's protections wanted to or tried to vote but were unable to do so.[28]

151. SFI represents military-connected families serving abroad in at least sixteen different countries. SFI members are also posted to military bases within the United States. A portion of SFI's membership are also families living abroad who have transitioned out of military service. SFI's most recent records indicate that SFI has members residing in all 50 States, as well as the District of Columbia, and registered to vote from out-of-state in 49 States (all but Hawaii) and the District of Columbia.

152. SFI's many members who rely on absentee voting are harmed by the Final Rule because the Rule makes it far more likely that they will never receive their absentee ballots or will receive them too late to cast an effective ballot because of the increased complications and compliance difficulties that the Rule imposes on State and local officials, as well as postal workers.

153. In order to accommodate the military service of their family members, SFI members often move frequently and physically reside in a jurisdiction other than their place of legal residency.

154. SFI has hundreds of members who are stationed, and thus physically "reside," in a state other than the state of their legal residence for the purposes of exercising their right to vote. Still other SFI members are stationed and thus physically reside outside of the United States entirely.

155. SFI members absent from their place of residency generally must receive their ballots by mail and return their ballots by mail to their state of legal residence. Delays in receiving

---

[28] Fed. Voting Assistance Program, *Post-Election Voting Survey: Active Duty Military: Technical Report 2020*, at 2, 37, 39 (2021), https://perma.cc/TVD6-DHD6.

a ballot because of the Rule can seriously impair the ability of SFI members to timely return their ballots. While some States allow email or online portal return of absentee ballots for UOCAVA voters, these States do not include many of the top States for military recruitment with large numbers of SFI members, including California, Texas, Florida, Georgia, and New York. Indeed, most military voters use the mail to receive and return their UOCAVA ballots.

156. SFI members also move frequently because of their status as military dependents. This includes frequent moves that often occur as part of the permanent change of station (PCS) process during the summer months, which takes place in the weeks leading up to and during federal primary and general elections, known as PCS Season. SFI members relocate frequently, and often multiple times, during the PCS season.

157. SFI is aware of at least one member who is in the process of moving or will be moving ahead of the November elections and will thus have to request an absentee ballot close to Election Day. Such members face imminent harm of delays in receiving their mail ballots or never receiving them at all due to the new obstacles that the Rule inserts into the mail balloting process.

158. The Rule itself recognizes that if election officials fail to separate out UOCAVA ballots from the rest of their mailing, such "[c]o-mingling . . . may impact the verification process and could prevent or delay proper acceptance of mailings." Rule, Preface at 56.

**ii. Harms to SFI as an Organization**

159. The Final Rule has and will cause SFI to divert significant resources to ensure that their members and their constituencies are not disenfranchised for failure to appear on the Mail In and Absentee Participation List.

160. SFI creates and runs military voter education programs to further SFI's mission of closing the voter participation gap between the military and civilian communities. SFI also runs

educational programming related to their other issue areas, including national security and the civil rights of military families at home and abroad.

161. SFI has planned programming in the fall, which was dedicated to other areas of focus for the organization, including education policy. SFI will now devote time to educating its constituencies about the effects of the Final Rule on registered voters among military families.

162. SFI also provides robust online resources to help military families become "voter ready." SFI's toolkit and website address issues specific to military life, including confirming voter registration status; finding polling places; researching local ballot information using reliable, nonpartisan resources; registering to vote; and providing guidance related to casting a ballot through the mail, including some state-specific rules about envelopes and ID numbers and a reminder to use expedited military bar codes when mailing from overseas. As a result of the Final Rule, SFI will have to divert resources updating their toolkit to ensure it reflects the requirements of the Final Rule and its effects on military families.

163. SFI also regularly counsels their members and other members of the military community in voting absentee. In SFI's experience, many military voters are unaware of the Federal Postcard Application and vote via their respective State's absentee ballot process. As a result of the Rule, SFI will be forced to expend additional time and staff resources to counsel voters about either using the UOCAVA options with which they are unaware or verifying their address information, following up with election officials, and tracking their ballots to ensure that their ballot will be counted.

### C. Arizona Students' Association

#### i. Harms to ASA's Members

164. ASA members will be harmed by the Final Rule.

165. Large numbers of ASA members vote by mail. The inevitable delays in USPS delivering ballots caused by the inability of election jurisdictions both in and outside of Arizona to efficiently or fully comply with the requirements in the Final Rule will directly harm ASA members. ASA members who vote by mail will receive their ballots later than they otherwise would, giving them less time to research the candidates and issues and cast an informed vote. ASA members voting by mail will also risk their vote not being counted at all if they never receive their ballot in the mail or if mail delays cause it to not be returned to election authorities in time. In Arizona, mail ballots must be received by election officials by 7 p.m. on Election Day, not just postmarked, to be counted.

166. Some ASA members who will be especially harmed include those who are from out of state and who recently registered to vote in Arizona or who will do so before the November election. Many ASA members are from out of state, including large numbers from California, Texas, Washington, and many others. Many out of state students will register to vote in Arizona in late September 2026 during ASA's large voter registration effort at the beginning of the school year. These students will register before Arizona's registration deadline of 29 days prior to the election. However, under the Final Rule, the state will begin sharing data with USPS regarding mail voters the day before Arizona's voter registration deadline, which will likely lead to errors, delays, and confusion.

167. Additionally, the deadline to request a mail ballot under Arizona law is 11 days before Election Day. Any ASA member who requests a mail ballot by this deadline under state law but after the date on which the initial mail voter data is transmitted to USPS by Arizona will face a similar risk of errors, delays, and confusion.

168. Some ASA members from out of state choose to remain registered in their home state, rather than in Arizona, when their home state's law permits them to do so. These ASA members rely on mailed absentee ballots from their home state in order to participate in their home state elections while they are students in Arizona. These students will be directly harmed by the Final Rule because of increased barriers to mail voting including delays and errors and by the risk that they will not be able to vote by mail at all, which would completely disenfranchise them.

169. Voting is an important way for ASA members to participate and be heard. The Final Rule causes confusion and uncertainty for ASA members who have read or heard about it and are worried that they may not be able to vote by mail as they have planned on doing. The confusing requirements in the Final Rule for "enrollment" with the USPS on the Mail-In and Absentee Participation List have a chilling effect on students, creating barriers to their participation and risking them being dissuaded from registering or signing up to receive a mail ballot at all.

**ii. Harm to ASA as an Organization**

170. The Final Rule will harm ASA as an organization.

171. ASA's goal is to effectively register as many Arizona students to vote as possible and have them participate in elections. The Final Rule will frustrate this goal by making it more difficult to vote by mail. Mail delays or failures to transmit ballots to and from properly registered voters will impair ASA's goal of facilitating active election participation by Arizona students.

172. ASA will also be harmed because it will need to spend time and money trying to help students whose right to vote is threatened by the Final Rule. ASA will need to spend time training staff and making organizational plans about how to inform students about the new requirements under the Final Rule, help students check or correct their status on the Mail-In and Absentee Participation List required by the Final Rule, and explain alternative voting options if

students are unable to vote by mail or do not receive their mail ballot as a result of Final Rule implementation errors by state or local officials, or Postal workers.

173. Because of the high likelihood of implementation errors and problems with the Final Rule, ASA staff will have to spend additional time and resources educating staff and volunteers to be able to properly inform students about the Rule's requirements and how it affects the mail voting process.

174. The time and money ASA spends responding to the Final Rule will be diverted from other core parts of ASA's work. ASA funds and organizes several large events in the late summer and fall, and responding to the Final Rule will require ASA to devote less time and money to planning and executing these events, including, in particular making, plans to adjust messaging and events related to mail voting.

175. Like its members, ASA is harmed by the confusion the Final Rule has created. ASA is unsure what steps voters can or should take to ensure their information is correct on the Mail-In and Absentee Participation List. ASA has serious concerns that incorrect information transmitted by election officials to USPS may prevent validly registered ASA members from receiving and returning their ballots. This concern is particularly heightened in the context of the Final Rule and the high likelihood that at least some jurisdictions will not be able to fully meet their requirements, resulting in delays and errors that would prevent ASA members who vote by mail from receiving or returning their ballots. Because of this, ASA is unable to adequately plan its voter registration and education activities, and to properly advise its members and others about what they must do to ensure they are properly registered and will be able to receive and return their mail ballots and fully participate in upcoming elections.

**D. City of Madison**

176. The City of Madison and its voters will be harmed by the Rule.

177. Compliance with the Rule is very likely to cause delays and errors that could disenfranchise Madison voters and cause additional administrative burdens that could overwhelm City Clerk staff. Compliance with the Rule is certain to require the City Clerk to expend additional resources that it does not have the budget or staffing for.

178. There is also no benefit to the Rule. Wisconsin state law already contains multiple overlapping checks to ensure that only eligible voters who have provided documentary proof of residence as well as photo identification will receive absentee ballots. State law also contains checks to ensure that only the eligible voter can cast that ballot and that they can only cast a single ballot. The Rule would not provide any additional security for Madison's voting system, but would introduce the possibility of errors that could disenfranchise eligible voters.

179. The Rule requires unique IMbs on both outgoing and return ballot envelopes. Currently, in Wisconsin, only the outgoing carrier envelope contains an IMb. These are generated via the WisVote system, which is the statewide voter database administered by the Wisconsin Elections Commission (WEC).

180. Adding a unique IMb to the return envelopes would require WEC to redesign the certificate envelopes, a process that takes significant time, resources, and testing, and would be further complicated in Wisconsin because under state law, the return envelope also serves as the voter's certification, which must be signed by a witness. That means that a redesign of the envelope would have to make space for an IMb and still maintain enough space for all of the statutorily required text to be readable and to leave enough space for the voter and their witness to complete the certifications.

181. In addition, adding a unique IMb to the return envelope would require WEC to reprogram the WisVote system to add this capability.

182. The City of Madison has no authority or ability to redesign the absentee ballot return envelopes.

183. The City of Madison also has no authority or ability to reprogram or add new capabilities to the WisVote system.

184. The Madison City Clerk's office has already purchased all of the absentee ballot outbound carrier envelopes and return certificate envelopes that it will use for the November 2026 election.

185. If the City Clerk had to repurchase envelopes for the November 2026 election, it would cost more than $10,000 and would waste $10,000 the city has already spent on envelopes that it would no longer be able to use.

186. Because the absentee ballot envelopes are specialized products, ordering them requires months of lead time. Even if the city budget could handle the additional expenditure, it is unlikely that the envelope supplier would be able to provide that many new envelopes in time to meet the September 17, 2026 deadline to mail out ballots for the upcoming November 3, 2026 election. The City Clerk typically orders such ballots envelopes three to nine months in advance.

187. In the experience of City Clerk staff, any time the Postal Service changes its systems and processes, there are technical issues that cause significant delays and create extra work for the Clerk's office. Rolling out an entirely new, complicated Federal Ballot Mail Portal would be plagued with widespread issues, and in the case of absentee voting, which occurs on a tight timeline, these issues could result in Madison voters being disenfranchised.

188. For example, prior to the August 2026 Partisan Primary mail-out in June, the Postal Service changed its process for tagging for Extended Managed Mail (EMM) trays. This relatively minor change resulted in multiple trips and phone calls between the Clerk's Office and USPS to clarify requirements. Most USPS personnel were unsure as to the layout of the consumer side of the online Postal Wizard. This led to long call times and confusion as to how to create the tags. Implementing a brand new Federal Ballot Mail Portal is a change many orders of magnitude more complicated than changing the tag printing process for EMM trays.

189. City Clerk staff's experience also raises concerns that Postal Service facilities are not equipped to individually scan each ballot when City Clerk staff bring them for acceptance. The City Clerk runs regular checks on outbound ballots' IMbs as a doublecheck to make sure each batch of ballots made it to the Postal Service and into the mail stream to prevent any ballots from being misplaced at the City Clerk's warehouse. Clerk staff regularly see that individual ballots may not receive their first tracking scan until a week or more after they are accepted by the Postal Service. Clerk staff also regularly see individual ballots that never even get an "acceptance" scan; these ballots may only be first scanned when they are "out for delivery."

190. In the current system, the Postal Service's failure to conduct an "acceptance" scan is an annoyance but does not endanger anyone's right to vote. However, under the Rule—which mandates and allows the Postal Service to decide whether or not to accept outgoing election mail—the failure to scan a ballot and the myriad other ways the new system could introduce human error are certain to result in voter disfranchisement given the tight timeline for implementation with no meaningful time at all for training or testing.

191. If each ballot must be scanned to check it against the Mail-In and Absentee Participation List prior to being accepted by the Postal Service, this could significantly delay

ballots entering the mail stream and ultimately being delivered to voters. These delays risk disenfranchising voters because, under Wisconsin State law, any ballot received by the City Clerk after 8 p.m. on Election Day cannot be counted.

192. Furthermore, requiring the City Clerk to upload the Mail-In and Absentee Participation List to the Portal would be time-consuming and introduce a significant risk of errors.

193. Because the Portal has not been launched to date and its technical specifications have not been released, there is no basis to assume that it will be seamlessly interoperable with WisVote.

194. Any time two databases not designed to work together have to interact, errors can be introduced. And even without system error, the many individuals who must use the systems must be trained.

195. Madison election officials have received no training on this new Federal Ballot Mail Portal nor can they appropriately plan to adjust their own training schedules because they have no idea when the Portal will be launched and what training resources USPS will or will not choose to make available to local jurisdictions.

196. The Final Rule requires election administrators to upload only the voter's name, address, originating election jurisdiction, and unique IMbs for outbound and return. But WisVote contains additional identifying details, such as driver's license numbers or partial Social Security numbers; this data ensures that the City Clerk can properly identify individual voters who may share a name and/or address or whose chosen name does not match their legal name, such as people who use a nickname or go by their middle name. WisVote is not currently programmed to track return IMbs, because there is no requirement to use them in Wisconsin. The WisVote system is designed to account for these variations and ensure that all eligible voters—and only eligible

voters—are able to vote, whereas the Portal may not account for these variations. Thus, the Portal could mistakenly flag someone as not being on the Mail-In and Absentee Participation List or as having received multiple ballots. These errors risk voters having their ballots delayed or denied, which will disenfranchise those voters.

197. Moreover, the City Clerk's office—which is one of the best-resourced municipal clerk offices in Wisconsin—does not have the staff time or resources to devote every day from mid-September until 5 days before Election Day to uploading supplemental Mail-In Absentee and Participation Lists, troubleshooting errors, and reconciling mismatches between the systems. This would be a labor-intensive process, and the City Clerk would have to divert staff who are engaged on other important election matters to deal with these issues. This risks harming other aspects of the City Clerk's administration of elections for the City of Madison.

198. The City Clerk's office fields hundreds of calls from Madison voters each election with questions about voting procedures and voter eligibility. Many of those calls already concern whether delays in the mail will put their ballot at risk.

199. The adoption of a vast new federal system would generate hundreds or thousands of additional calls from voters who would have questions or concerns about whether their ballot would be delayed or refused by the Postal Service. The City Clerk does not have the staff resources to field all of these additional calls without diverting staff from other critical responsibilities.

### E. Clerk of Travis County

200. The Clerk of Travis County and her office will be harmed by the Rule.

201. Compliance with the Rule is very likely to cause delays and errors that could disenfranchise Travis County's mail ballot voters and cause additional administrative burdens that would overwhelm the Travis County Clerk and her staff. Compliance with the Rule is certain to

require the County Clerk to expend additional resources that it does not have the budget or staffing for.

202. There is also no benefit to the Rule. Texas State law already contains multiple safeguards to ensure that only eligible voters will receive absentee ballots. Through the Secretary of State's TEAM System, the Clerk verifies that each applicant is validly registered and verifies that a voter's absentee application to vote by mail meets all State law requirements. If an application is incomplete or does not match the identification in the TEAM System, the Clerk sends the voter a rejection letter explaining what additional is needed before an absentee ballot can issue.

203. The Rule nevertheless requires unique IMbs on both outbound and return envelopes, presumably to verify voters' identities. But Texas does not currently require either envelope to contain an IMb.

204. Rather, the return envelope (sent out in the outgoing envelope) includes one mailing label which itself includes a voter's name, their VUID, *a barcode that is specific to the voter*, the date of the election, and the voter's ballot style. This voter unique barcode is not IMb compatible.

205. To add a unique IMb to the return envelopes would require the Texas Secretary of State to redesign the certificate envelopes. The current envelope format does not have enough space to accommodate an IMb along with the information required by Texas law.

206. Redesigning absentee ballot envelopes at this juncture so close to the election is impossible given the preparation, testing, training, and technology required to pre-print IMb barcodes on new ballot envelopes.

207. In addition, adding a unique IMb to the return envelope would require integrating the IMb into Texas's TEAM system that is used to process mail ballots (such that the IMb is tied

to a specific voter) and will require design changes, testing, and training of election offices. The TEAM system has been plagued with issues over the last year and adding this new requirement will exacerbate the existing issues the Clerk's office already faces in using TEAM. The Clerk has no authority or ability to redesign the absentee ballot return envelope. The Clerk also has no authority or ability to unilaterally create compatibility between TEAM and the Portal.

208. The Clerk's office has already purchased all outbound carrier envelopes and return certificate envelopes that it plans to use in the November 2026 election. And its existing envelope stock cannot satisfy the Rule's IMb requirement.

209. Repurchasing envelopes for the November 2026 election would cost more than $21,000 and would waste $21,349 the city has already spent on envelopes.

210. Because the absentee ballot envelopes are specialized products, they require months of lead time. Even if the County budget could handle the additional expenditure (which, to be clear, it cannot), it is unlikely that the envelope supplier would be able to provide that many new envelopes in time to meet the October 4, 2026, deadline to mail out ballots for the upcoming November 3, 2026 election. Travis County's envelope vendor recently quoted an 8-12-week turnaround for providing any new envelopes, which is weeks beyond the current deadline.

211. Moreover, the County Clerk's barcode scanners cannot scan two dimensional IMbs. The Clerk would need to purchase new barcode scanners to read the IMb barcodes, integrate them into existing operations, and train employees to use them, all while undertaking the herculean task of administering an ongoing election.

212. The Rule's Portal requirement will independently burden the Clerk's office. Uploading the Participation List to the Portal will be labor intensive and will create a substantial risk of mistakes. The Portal has not yet launched, and Defendants have not released technical

specifications. There is therefore no basis to conclude that the Portal will be interoperable with TEAM. When two databases not designed to communicate with one another must exchange data, mismatches and errors are likely; employees must also be trained to identify and resolve those mismatches. Travis County election officials have received no training on the Portal.

213. The Clerk's Office does not have the staff time or resources to devote every day from mid-September until 5 days before Election Day to uploading Participation Lists, troubleshooting errors, and reconciling mismatches between the systems. Meeting those demands would require the Clerk to divert personnel from other essential election administration responsibilities. The diversion of resources that the Rule calls for will impair other aspects of election administration for more than 80 jurisdictions within Travis County that have indicated they are joining the election this November.

214. Moreover, there are myriad situations in which voters legitimately need to receive more than one ballot, or receive the same ballot by mail multiple times, during the course of an election cycle. The Portal is not designed to accommodate these routine circumstances where a voter lawfully needs more than one ballot. For instance, a voter who has accidentally ruined their ballot by spilling coffee on it or marking it incorrectly is entitled under state law to spoil that ballot and receive up to two replacement ballots. A voter who spoils their ballot and needs a replacement would be issued a new by-mail ballot. Nothing in the Rule indicates that the Portal can recognize this circumstance. If the Portal records that the voter has already received a ballot, the Postal Service could very well reject or delay a replacement ballot because the Portal is not updated and shows that the voter has already received their ballot.

215. The County Clerk's office fields thousands of calls from Travis County voters each election with questions about voting procedures and voter eligibility. Many of those calls already concern whether delays in the mail would put their ballot at risk.

216. Finally, the Clerk's office fields thousands of calls each election regarding voting procedures and voter eligibility. The Rule's vast, new, and uncertain federal system will predictably generate hundreds or thousands of additional inquiries from voters who are concerned that their ballot will be delayed or refused by the Postal Service. Even as one of Texas's better resourced election offices, the Travis County Clerk's office does not have the staff resources to handle all those additional calls without diverting staff from other critical responsibilities.

217. The Rule also threatens substantial reputational harm to the Clerk. Voters reasonably look to the Clerk's office as the responsible and authoritative source of information about how to obtain, receive, and return a mail ballot. If ballots are delayed, rejected, or not delivered because of the Rule's new federal requirements, voters are likely to attribute those failures to the Clerk's office—even where the Clerk lacks authority.

**F. Travis County**

218. Travis County will suffer substantial financial and administrative harms from the Rule. The County funds the Clerk's election administration operations, but the Rule imposes costs that are unfunded, *e.g.*, costs for replacing envelopes, buying new scanning equipment, ensuring that systems (TEAM, Ballot Portal, and other databases relied upon by the Clerk and her staff) are integrated, training employees, and budgeting staff time to communicate with voters.

219. As discussed above, the County has already spent $21,349 on envelopes. Those envelopes are noncompliant with the Rule and replacing them would cost more than $21,000. To

comply with the Rule, the County will also have to incur additional costs for scanners, technical changes to the systems, Portal-related work, training, and staffing.

220. Those expenses are especially harmful because the County has not budgeted for them and it cannot control principal elements of compliance which are delegated to the State. The County does not have the authority to reconfigure the TEAM system or establish Portal specifications. And yet the County would bear the financial, operational, and voter consequences if those systems fail, which is bound to happen because the materials required cannot be obtained in time. Ultimately, the County will be responsible for voters' ballots that are delayed or rejected.

221. The resulting strain threatens the County's ability to administer the November 2026 election efficiently and reliably for Travis County voters and for the numerous participating jurisdictions in the County.

222. The Rule threatens the County's reputation as a reliable administrator of public services including elections. Travis County voters, participating local jurisdictions, and the broader public are bound to view the delayed, rejected, or unavailable mail ballots as a failure by the County, regardless of whether the underlying cause is a federal requirement or a statewide system over which the County has no control.

223. Damage to the County's reputation will severely erode public trust in its election administration, impair its relationships with the more than 80 jurisdictions participating in the November 2026 election, and make it more difficult for the County to assure voters that it can provide accessible and dependable voting procedures.

## CLAIMS

## COUNT I
**Constitutional Ultra Vires: Separation of Powers**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

224. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

225. The separation-of-powers doctrine is a critical structural safeguard that preserves the Constitution's allocation of authority among the branches of government, the States, and the people.

226. The separation of powers is a "structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified" and serves as "a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). The challenged Rule violates this essential constitutional safeguard.

227. The Elections Clause empowers States to establish the "Times, Places and Manner" of holding federal elections, subject only to a superseding act of Congress. U.S. Const. art. I, § 4.

228. Pursuant to the Elections Clause, States have the power to regulate voting by mail, including the power to determine which voters are eligible to receive and cast their ballots by mail. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809-10 (1969).

229. The States also have final and exclusive authority to prescribe the qualifications for elections. U.S. Const. art. I, § 2, cl. 1; art. II, § 1, cl. 2; amend. XVII; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

230. The Postal Clause in Article I, Section 8 of the U.S. Constitution gives Congress the authority "[t]o establish Post Offices and post Roads" and "[t]o make all Laws which shall be necessary and proper" for executing this task. U.S. Const. art. I, § 8; *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981).

231. Congress has passed no law that provides the Postal Service with any authority to refuse to deliver mail ballots that do not comply with the dictates of the challenged Rule. This is essential, because a postal official's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902).

232. Congress has the exclusive and broad authority to regulate the Postal Service and has passed no statute permitting the Postal Service to refuse to "transmit mail-in or absentee ballots" for entire categories of voters. The Rule thus usurps Congress's role in legislating rules for federal elections and the specific responsibilities of the Postal Service itself.

233. In stark contrast to the Rule, Congress has enacted legislation to ensure that the Postal Service provides non-discriminatory postal services to all Americans and to ensure that States, not the federal government, administer elections.

234. Congress has repeatedly used this power to structure the Postal Service throughout its history, most recently through the Postal Reorganization Act of 1970 (PRA), 39 U.S.C. § 101 *et seq. See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004).

235. In the extensive statutory framework governing the Postal Service, Congress has conferred no power on it to administer or regulate elections in the manner contemplated by the

Rule. To the contrary, the Rule expressly conflicts with Congress's mandate that the Postal Service provide universal and non-discriminatory service in delivering the mail.

236. Under the comprehensive statutory framework provided by Congress, the Postal Service's role is straightforward: it must collect and deliver the mail to whom it is addressed, providing universal and non-discriminatory service. *See generally* 39 U.S.C. § 101 *et seq*. Congress has not given the Postal Service authority to condition delivery of ballots on whether States send a list of intended mail voters to the Postal Service beforehand or on the Postal Service's independent determination that a ballot recipient appears on such a list.

237. Nor has Congress ever authorized the Postal Service to mandate a particular ballot envelope design and refuse to deliver ballots if States fail to comply in any way. To the contrary, the Postal Service's principal duty is to "receive, transmit, and deliver" the mail, and it "shall serve as nearly as practicable the entire population of the United States." *Id.* § 403(a); *see also id.* §§ 403(b), 404(a)(1).

238. Congress has enacted a detailed scheme which sets restrictions on what types of matter can be deemed nonmailable. Throughout 39 U.S.C. § 3001-3018, Congress has defined specific categories of "nonmailable matter" that USPS may not transmit, such as "hazardous material." 39 U.S.C. § 3018(b)(1). While USPS may issue regulations concerning categories of nonmailable matter that Congress itself has defined, it has no power to create new categories of nonmailable material.

239. Because mail-in ballots bear no resemblance to the categories of matter that Congress has deemed nonmailable, the Rule is entirely outside of the Postal Service's statutory and constitutionally-granted authority.

240. When Congress has had a specific role in mind for the Postal Service in relation to federal elections, it has defined the role clearly. Two statutes are of particular relevance here are the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA").

241. The NVRA and HAVA both recognize that States, and not the federal government, are responsible for developing and maintaining their own voter registration lists and administering elections.

242. Congress passed the NVRA, see Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified as amended at 52 U.S.C. §§ 20501 *et seq.*), to "increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), while also recognizing the need to protect the "integrity of the electoral process." *Id.* § 20501(b)(3).

243. The only role assigned to the Postal Service by Congress under the NVRA is to provide state and local election officials with information about whether an individual may have moved, 52 U.S.C. § 20507(c)(1), and to offer State and local election officials reduced rates for any mailings the NVRA requires or authorizes, 39 U.S.C. § 3629. These limited instructions in the NVRA certainly do not authorize the Rule's wide-ranging role for the Postal Service in gatekeeping mail voting.

244. In passing HAVA, Pub. L. No. 107-252, 116 Stat. 1666, 1726 (2002) (codified as amended at 52 U.S.C. §§ 20901 *et seq.*), Congress required "each State" to create a "centralized, interactive computerized statewide voter registration list," 52 U.S.C. §§ 21083(a)(1)(A), (a)(1)(A)(i), and to "conduct[] a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address [or death]," *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019); *see also* 52 U.S.C. § 21083(a)(2)(A)(ii).

245. HAVA further sets general parameters for State and local officials and provides that "[t]he specific choices on the methods of complying with the [statute's] requirements" regarding list maintenance and voter registration "shall be left to the discretion of the State." 52 U.S.C. § 21085.

246. Critically, Congress provided no role in HAVA for the Postal Service in determining who may vote by mail.

247. The Rule thus usurps election administration from the States in a manner that violates the NVRA and HAVA.

248. The Rule also violates the Major Questions Doctrine. Through the Rule, USPS asserts a power of enormous practical significance that is reserved to the States and Congress. But Congress did not authorize USPS to take this power and usurp States' roles in administering elections. USPS has never exercised power to determine which ballots can be mailed and which cannot. Exercising this power has massive nationwide consequences for mail-in voting.

249. All plaintiffs are and will continue to be irreparably harmed by these violations of the separation of powers.

**COUNT II**
**Constitutional Ultra Vires: Federalism**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members

250. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

251. Federalism is a central structural feature of the Constitution that protects individual liberty. *See New York v. United States*, 505 U.S. 144, 181 (1992). The Constitution divides authority between federal and state governments so that "a healthy balance of power between the States and

the Federal Government will reduce the risk of tyranny and abuse." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

252. The Tenth Amendment enshrines these values, providing that that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

253. The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to Congress's authority to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Thus, in accordance with the Elections Clause, the Constitution entrusts power over federal elections to "state legislatures 'primarily' and [to] Congress 'ultimately.'" *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2170 (2026).

254. "Historically, elections in [the U.S.] have been administered at the state and local level." H.R. Rep. No. 107-329, pt. 1, at 31 (2001). This "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." *Id.* at 32.

255. The Constitution also entrusts States to set the qualifications for electors in the State. Under Article I, Section 2, "[t]he Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." As such, the Constitution empowers States to define voter qualifications, subject to constitutional limits.

256. The United States Postal Service has no authority to usurp the power assigned by the Constitution to the States and Congress to set rules for mail voting and to determine who is a qualified voter.

257. Nor does the Postal Service have the power to coerce States into surrendering their sovereign authority by threatening not to deliver their citizens mail-in ballots unless States alter their election procedures in accordance with the challenged Rule.

258. The federal government may not "conscript state governments" into acting in areas where Congress has not acted by passing legislation that "regulate[s] . . . directly." *New York v. United States*, 505 U.S. 144, 178 (1992).

259. Because the Rule seeks to coerce States into altering their election laws and procedures related to mail-in voting, it violates the Tenth Amendment, the Elections and Qualifications Clauses, and the Constitution's federal structure.

260. All plaintiffs are and will continue to be irreparably harmed by these violations of federalism.

**COUNT III**
**Violation of the APA, 5 U.S.C. § 706(2)(A), (C), (D) (Agency Action Contrary to Law and Procedure)**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

261. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

262. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

263. "[P]roceedings concerning the mailability of matter" are subject to review under the APA. 39 U.S.C. § 3001(m).

264. USPS's authority to reject mailpieces is defined by statute. 39 U.S.C. § 3001 *et seq.*

265. USPS's Rule requires USPS to classify certain mail-in ballot envelopes as nonmailable even though that material is not categorized as nonmailable under statute. *See* 39 U.S.C. §§ 3001-18.

266. The Rule's mailability determinations are contrary to law, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, or limitations, including 39 U.S.C. §§ 3001-18.

267. All plaintiffs are and will continue to be irreparably harmed by these violations of the APA.

## COUNT IV
## Violation of the PRA, 39 U.S.C. § 101 *et seq.*, Failure to Obtain an Advisory Opinion (statutory ultra vires review)

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

268. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

269. The Rule violates the PRA because Defendants failed to obtain an advisory opinion prior to initiating rulemaking.

270. Under the PRA, when contemplating a service change "which will generally affect service on a nationwide or substantially nationwide basis," the Postal Service must seek an advisory opinion from the Postal Regulatory Commission (PRC) at least 90 days before implementation. 39 U.S.C. § 3661(b); 39 C.F.R. § 3020.102.

271. Following submission, the Commission must conduct a hearing on the record and allow for public participation prior to issuing a written advisory opinion. 39 U.S.C. § 3661(c).

272. USPS did not seek an advisory opinion from the PRC before issuing either the Proposed Rule, the Final Rule, or at any time as of the filing of this Supplemental Complaint.

273. USPS's failure to seek an advisory opinion prior to implementation inflicts an informational injury on Plaintiffs. The public is entitled to an advisory opinion from the PRC. Such an opinion would allow Plaintiffs to educate voters and would assist Plaintiffs in navigating the USPS Rule to allow people to vote.

274. Even before requesting the advisory opinion, the Postal Service must conduct one or more pre-filing conferences with "interested persons in the proceeding and shall make a good faith effort to address the concerns of such persons" to "identify[] relevant issues and information needed to address those issues during proceedings at the Commission." 39 C.F.R. § 3020.111(a), (b).

275. The Postal Service must file a notice of the pre-filing conference at least ten days before the conference occurs. *Id.* § 3020.111(d).

276. Although USPS has rulemaking authority, that authority is subject to the PRA's requirement that significant nationwide changes go through Section 3661's advisory-opinion procedure. This understanding is consistent with Postal Service practice: when the Postal Service has previously noticed a proposed rule in the Federal Register for public comment entailing significant service changes nationwide, it has requested an advisory opinion from the Commission *before* doing so and obtained the advisory opinion *before* promulgating the final rule and implementing it.

277. Section 3661 proceedings are especially essential where ballot mail is concerned, because as the Commission has stated:

> Obtaining the views of Postal Service customers is vitally important where the Postal Service's monopoly First-Class Mail product is concerned. The privilege of a governmentally established monopoly status includes the responsibility to hear and consider the needs of the constituency that must function under the constraints of that monopoly. Actions that are, or are perceived to be unilateral in nature may disenfranchise users to the ultimate detriment of the monopoly product.

*Commission Report Complaint on Sunday and Holiday Collections*, Dkt. No. C2001-1, at 2 (Postal Rate Comm'n Nov. 5, 2002), https://perma.cc/XZ8U-YKTA.

278. The Rule includes changes that will cause delays and disruptions to millions of Postal Service customers nationwide. As such, the Rule is a "change" that has a meaningful impact on service "in the nature of postal services," on a nationwide basis. The Rule therefore must be reviewed by the PRC.

279. Because USPS failed to seek PRC review prior to initiating, as well as completing the rulemaking, the Rule violates the PRA.

280. Plaintiffs filed a complaint before the PRC regarding this failure to seek an advisory opinion on August 3, 2026 and have received no relief as a result, nor has the PRC taken any action in response as of the time of filing of this Supplemental Complaint.

281. The PRC has no power to issue injunctive relief that binds the Postal Service. After the Commission has adjudicated a complaint, aggrieved parties may petition for review in the D.C. Circuit. 39 U.S.C. § 3663.

282. While Congress has provided the PRC with up to 90 days to adjudicate complaints filed before it, 39 U.S.C. § 3662(a)-(b), in this case that review timeline would deprive Plaintiffs of all meaningful judicial review of this asserted violation of the PRA in advance of the 2026 election.

283. As such, Plaintiffs may properly assert this claim at this time and before this Court as regards the 2026 election because the "here-and-now" injuries that they face "impossible to remedy" if judicial review is deferred until after the PRC process has run its course. *See New York v. Trump*, 181 F. 4th 132, 140 n.3 (D.C. Cir. 2026) (quoting *Axon Enters., Inc v. FTC*, 598 U.S. 175, 191 (2023)).

284. All plaintiffs are and will continue to be irreparably harmed by these violations of the PRA.

**COUNT V**
**Violation of the Universal Service Mandate Under the PRA, 39 U.S.C. § 101**
**(statutory ultra vires review)**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

285. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

286. The PRA mandates that USPS "shall be operated as a basic and fundamental service provided to the people by the Government . . . authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). This obligation is intended "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.* The USPS must "provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." *Id.*

287. USPS must provide "*prompt, reliable, and efficient* services to patrons *in all areas* and shall render postal services *to all communities*. . . . In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for *the most expeditious* collection, transportation, and delivery of important letter mail." *See* 39 U.S.C. § 101(a), (e) (emphasis added).

288. The Postal Service's universal service mandate extends to delivery of voters' mail and absentee ballots.

289. The Rule erects roadblocks that will make ballot mail slower, unreliable, and inefficient and deny some postal services altogether to many individuals.

290. The Rule does not consider the most expeditious manner of collecting ballot mail.

291. The Rule is fundamentally incompatible with the expressed will of Congress.

292. The D.C. Circuit has held that claims that the Postal Service "exceeded its statutory authority" in issuing a challenged regulation "clearly admit of judicial review." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). Such statutory *ultra vires* claims do not depend on whether review is available under the Administrative Procedure Act. *Id.*; *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

293. All plaintiffs are and will continue to be irreparably harmed by these ultra vires actions.

**COUNT VI**

**Violation of the Prohibition on Non-Postal Services Under the PRA, 39 U.S.C. § 404(e)**
**(statutory ultra vires review)**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

294. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

295. The Postal Service may not provide non-postal services, except for those expressly authorized by law or that were offered before January 1, 2006 and sustained upon review and approval of the PRC. 39 U.S.C. § 404(e).

296. A non-postal service is anything other than "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* §§ 404(e)(1), 102(5).

297. The Rule requires the Postal Service to compile and provide each State with a Mail-In and Absentee Participation List of individuals who have enrolled with the Postal Service for mail-in or absentee ballots, along with unique identifiers, and refrain from transmitting mail in or absentee ballots from any unenrolled individual.

298. The Rule requires the Postal Service to build and administer an enrollment system for mail ballot participants, generate and assign unique identifiers to individual voters, compile and maintain state-specific participation lists, and transmit those lists to each state on a recurring basis.

299. The Postal Service is also required to conduct sophisticated data matching before transmitting a ballot from an individual to confirm they are enrolled or otherwise to reject their mail piece.

300. These directives require the Postal Service to provide one or more non-postal service within the meaning of 39 U.S.C. §§ 404(e)(1) and 102(5).

301. The compilation, maintenance, and transmission of Mail-In and Absentee Participation Lists to States, the administration of an enrollment program for voters seeking to vote by mail, and the data analysis required to fulfill a directive to refuse ballot mail service to unenrolled individuals is not "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). These are election-administration services that Congress has never authorized the Postal Service to provide.

302. Notwithstanding Section 404(e), the Postal Service may provide non-postal services to an agency of a State government under 39 U.S.C. § 3703, but only through a program that satisfies each of the following statutory conditions: (i) the non-postal services must provide enhanced value to the public; (ii) the non-postal services must not interfere with or detract from the value of postal services; (iii) the agreements must provide a net contribution to the Postal Service, defined as reimbursement covering at least 100% of the costs attributable to the services provided in each year; (iv) the Governors of the Postal Service must approve the program by a

recorded vote, made available on its website, with a majority of Governors then in office voting for approval; and (v) within 90 days after offering the service, the Postal Service must make available to the public the agreement with the agency and a business plan describing the service, the enhanced value to the public, and terms of reimbursement. 39 U.S.C. § 3703(a)-(c).

303. The Rule requires the Postal Service to provide non-postal services to States without satisfying any of Section 3703's statutory conditions. No determination has been made that the service provides enhanced value to the public without detracting from postal services—indeed, the opposite is true. No provision has been made for reimbursement of the Postal Service to cover the costs attributable to this new service. The Governors have not approved the program by recorded vote posted on the Postal Service website. Upon information and belief, no agreement has been executed to provide these services to any State. And no business plan has been made publicly available.

304. The Postal Service is also required to submit annual reports to the PRC analyzing costs, revenues, rates, and quality of service for non-postal services provided under Sections 3703 and 3704. 39 U.S.C. § 3705(a)-(b). The PRC must make determinations of the Postal Service's compliance with Chapter 37 of Title 39 regarding the non-postal service and may order discontinuance of persistently noncompliant services. *Id.* § 3705(e).

305. The Rule bypasses every procedural safeguard Congress has established for the Postal Service's provision of non-postal services. The Rule is incompatible with the express will of Congress limiting the USPS's non-postal services as articulated in 39 U.S.C. §§ 404(e), 3703, 3704, and 3705.

306. As a result, the Rule is contrary to the express will of Congress and the statutory ban on non-postal services.

307. The D.C. Circuit has held that claims that the Postal Service "exceeded its statutory authority" in issuing a challenged regulation "clearly admit of judicial review." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). Such statutory *ultra vires* claims are not predicated on and do not require reviewability under the Administrative Procedure Act. *Id.*; *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

308. All plaintiffs are and will continue to be irreparably harmed by these ultra vires actions.

**<u>COUNT VII</u>**

**Undue Discrimination Under the PRA, 39 U.S.C. § 403(c) (statutory ultra vires review)**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, USPS Governors Board Members, Department of Commerce, Commerce Secretary Lutnick

309. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

310. The PRA mandates that USPS "shall be operated as a basic and fundamental service provided to the people by the Government . . . authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). This obligation is intended "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.* The USPS must "provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." *Id.*

311. The Postal Service has a responsibility to "provide types of mail service to meet the needs of different categories of mail and mail users." *Id.* § 403(b)(2). And to that end, the Postal Service may establish reasonable and equitable classes of mail and rates and fees for postal services. *Id.* § 404(b).

312. In providing different kinds of services, including ballot mail service, the Postal Service may not, except as specifically authorized by the PRA, "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user." *Id.* § 403(c).

313. In other words, the Postal Service cannot treat similarly situated users of the mail differently unless it justifies that disparate treatment with good reasons or identifies specific statutory authorization. See *Nat'l Easter Seal Soc'y for Crippled Child. & Adults v. U.S. Postal Serv.*, 656 F.2d 754, 759-62 (D.C. Cir. 1981); *Direct Mail/Mktg. Ass'n, Inc. v. U.S. Postal Serv.*, 501 F.2d 717, 722 (D.C. Cir. 1974); *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 31 (D.D.C. 2016).

314. The Postal Service's universal service mandate extends to delivery of voters' mail and absentee ballots.

315. No act of Congress permits the Postal Service to refuse to deliver an individual's mail or absentee ballot because the individual does not appear or has not been enrolled on one or more government lists.

316. Yet this is precisely what the Rule requires the Postal Service to do, in direct contravention of Congress's universal service mandate.

317. The Rule sorts similarly situated users of mail into those who will receive timely ballot mail service and those who will not without any rational or legitimate basis in two distinct ways: (1) it discriminates among local election offices that present ballot mail for delivery, and (2) it discriminates among the voters who are entitled to receive ballots through the mail.

318. The Rule has a discriminatory effect on local election offices when they present ballots for delivery. The Rule offers them markedly different services, depending on their capacity

to satisfy the new administrative preconditions on acceptance and delivery of ballot mail. The Postal Service will accept and deliver the ballot mailings of an office that is prepared to conform its envelopes to the Rule's design standards, including inclusion of an IMb on both the outgoing and enclosed ballot return envelope, and prepare and submit to the Postal Service lists of its voters who are entitled to receive mail ballots by the prescribed deadlines. But it will altogether refuse entire mailings of an election office that is not prepared to satisfy these conditions, even where the ballots are properly addressed and fully postage paid.

319. The Rule also has a discriminatory effect on voters entitled to receive ballots by mail under state election laws. Voters whose election office has satisfied the Rule's unconstitutional conditions are more likely to receive their mail ballots on time, while voters whose election office is either unwilling or incapable of complying (or has tried to comply but erred or has been deemed noncompliant by a Postal Service employee) will have their ballots rejected and returned to their election office.

320. These voters are all similarly situated, each entitled under the laws of their State to receive a mail ballot. The sole distinction is whether their election offices are willing and able to clear the administrative hurdles erected by the Rule, a matter entirely beyond the voters' control. And the consequence is not simply a lesser grade of service, but the risk of disenfranchisement, especially for Organizational Plaintiffs' members who rely on mail voting to cast their ballots.

321. The Rule's discriminatory line drawing does not have rational or legitimate basis and is not specifically authorized by law. The Rule is fundamentally incompatible with the expressed will of Congress.

322. Plaintiffs raised this undue discrimination violation in their August 8, 2026 complaint to the PRC, which remains pending and unremedied. The "here-and-now" injuries that

Plaintiffs face with respect to the 2026 election will be "impossible to remedy" if judicial review is deferred until after the PRC process has run its course. *See New York v. Trump*, 181 F. 4th 132, 140 n.3 (D.C. Cir. 2026) (quoting *Axon Enters., Inc v. FTC*, 598 U.S. 175, 191 (2023)). As such, this claim is properly heard before this Court now.

323. All plaintiffs are and will continue to be irreparably harmed by these ultra vires actions.

**<u>COUNT VIII</u>**

**Violation of the Voting Rights Act, Section 11(a), 52 U.S.C. § 10307(a)**

All Plaintiffs Against Defendants USPS, Postmaster General Steiner, USPS Board of Governors, and USPS Governors Board Members

324. Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

325. Section 11(a) of the Voting Rights Act mandates that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote . . . or is otherwise qualified to vote." 52 U.S.C. § 10307(a). This provision "prohibits public officials from denying any qualified person the right to vote or from willfully failing or refusing to tabulate, count, and report such person's vote." *United States v. Post*, 297 F. Supp. 46, 50 (W.D. La. 1969).

326. The Rule requires the Postal Service to maintain a "Mail-In Absentee Participation List" of individuals "enrolled" to vote by mail based on mandatory State data submissions. The Rule further requires the Postal Service to refuse to accept or deliver any mail ballots to persons not included on such a list. And the Rule requires that the Postal Service refuse to accept and deliver ballots in envelopes that do not bear an Intelligent Mail Barcode.

327. The Rule will prevent eligible voters, including Plaintiffs' members, from casting their ballot based on their absence from the Mail-In and Absentee Participation List. For some of

these members—such a military voters and their family members stationed away from home, as well as college students and those with disabilities—the Rule will deny them the ability to cast their ballot altogether. For many voters, voting by mail is the only means for casting their ballot, so the Final Rule will constitute a failure "to permit any person to vote who is entitled to vote." 52 U.S.C. § 10307(a).

328. The Rule imposes further burdens on the Organizational Plaintiffs as they must adapt their voter education materials and resources to address the confusion that their members will suffer from seeking to learn whether they have been properly enrolled on the Mail-In Absentee Participation List and how to correct errors and still receive a ballot if they are not properly listed.

329. Because the USPS Defendants are public officials who will be refusing to permit eligible voters who are not listed on the Mail-in Absentee Participation List or whose ballot envelope does not include an Intelligent Mail barcode to receive a ballot to which they are lawfully entitled, the Rule violates Section 11(a) of the Voting Rights Act and will subject Plaintiffs and their members to irreparable harm.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, declare that the Final Rule is unconstitutional or otherwise unlawful, retain jurisdiction to render any and all further orders that this Court may deem necessary, exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate relief pending final review, award Plaintiffs their attorneys' costs and fees pursuant to statute, and award any other relief that the Court deems necessary and just, including using its equitable powers to enter interim, preliminary, and permanent orders:

A. Declaring that the Final Rule is unconstitutional and void as ultra vires, as well as not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations;

B. Staying, vacating, holding unlawful, and setting aside the Final Rule under the APA;

C. Enjoining Defendants from implementing or giving effect to the Final Rule;

D. Directing Defendants to rescind any and all guidance or direction that has already been issued that relates to implementing or enforcing the Final Rule; and

E. Directing Defendants to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of the Final Rule.

F. Awarding Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and

G. Granting such other relief as this Court may deem just and proper.

Dated: August 25, 2026

Respectfully submitted,

/s/ Norman L. Eisen
Norman L. Eisen (DC Bar No. 435051)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold (DC Bar No. 90010196)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

/s/ Danielle Lang
Danielle Lang (DC Bar No. 1500218)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri (NY Bar No. 5396304)
David Kronig (DC Bar No. 1030649)
Valencia Richardson (DC Bar No. 1739245)
Aseem Mulji (DC Bar No. 1724971)
Renata O'Donnell (DC Bar No. 1723929)
Benjamin Phillips (DC Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
dkronig@campaignlegalcenter.org

vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bphillips@campaignlegalcenter.org

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, City of Madison, Wisconsin, Travis County, Texas and Travis County Clerk, in her official capacity.*