# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Drive
Baltimore, MD 21215

COMMON CAUSE
805 15th St., NW, Ste. 800
Washington, DC 20005;

COMMON CAUSE EDUCATION FUND
805 15th St., NW, Ste. 800
Washington, DC 20005;

BLACK VOTERS MATTER FUND, INC.
3645 Marketplace Blvd., Ste. 130-236
Atlanta, GA 30344;

*and*

BVM CAPACITY BUILDING INSTITUTE, INC.,
4751 Best Rd., Ste. 200
Atlanta, Georgia 30337,

*Plaintiffs,*

v.

DONALD J. TRUMP,
In his official capacity as President of the United States
The White House
1600 Pennsylvania Ave., NW
Washington, DC 20500

EXECUTIVE OFFICE OF THE PRESIDENT,
1600 Pennsylvania Ave., NW
Washington, DC 20500;

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave., NW
Washington, DC 20530;

U.S. POSTAL SERVICE
475 L'Enfant Plaza, SW
Washington, DC 20260;

Case Number 1:26-cv-01114 (CJN)

U.S. POSTAL SERVICE BOARD OF GOVERNORS
475 L'Enfant Plaza, SW
Washington, DC 20260;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Ave., SE
Washington, DC 20528;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
5900 Capital Gateway Dr.
Prince George's County, Camp Springs, MD 20746;

SOCIAL SECURITY ADMINISTRATION,
6401 Security Blvd.
Baltimore, MD 21235;

U.S. DEPARTMENT OF COMMERCE
1401 Constitution Ave., NW
Washington, DC 20230;

TODD BLANCHE,
In his official capacity as Attorney General of the United States
950 Pennsylvania Ave., NW
Washington, DC 20530;

MARKWAYNE MULLIN,
In his capacity as Secretary of the U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave., SE
Washington, DC 20528;

DAVID STEINER,
In his official capacity as U.S. Postmaster General
475 L'Enfant Plaza, SW
Washington, DC 20260;

JOSEPH B. EDLOW,
In his official capacity as Director of U.S. Citizenship and Immigration Services
5900 Capital Gateway Dr.
Camp Springs, MD 20746;

FRANK J. BISIGNANO,
In his official capacity as Commissioner of Social Security Administration
6401 Security Blvd.
Baltimore, MD 21235;

HOWARD LUTNICK,
In his official capacity as Secretary of U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230,

*and*

MARCO RUBIO,
In his official capacity as Secretary of U.S. Department of State,
2201 C St NW, Washington, DC 20520,

*Defendants.*

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., AND BVM CAPACITY BUILDING INSTITUTE, INC.'S [PROPOSED] SUPPLEMENTAL COMPLAINT**

1. The President's Executive Order of March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "Executive Order" or "Order"), attempts to wrest control over federal elections from the States and Congress to the Executive Branch. It directs the U.S. Department of Homeland Security ("DHS") to create federal citizenship information to be used by state election officials; directs the U.S. Postal Service ("USPS" or "Postal Service") to condition the transmission of ballot mail to registered voters on a state's compliance with federal election procedures; and instructs the U.S. Department of Justice ("DOJ") to prosecute state and local election officials who permit mail voting by individuals not included on DHS's lists.

2. DHS and USPS have taken concrete action to implement those directives. DHS approved a definitive policy for providing state election officials access to federal citizenship information and generating state-specific citizenship lists. USPS has promulgated a final rule establishing a nationwide federal regime for ballot mail. Plaintiffs submit this Supplemental Complaint under Federal Rule of Civil Procedure 15(d) to challenge those agency actions and set out the material events that have occurred since Plaintiffs filed their original Complaint on April 3, 2026.

3. On August 21, 2026, USPS adopted a final rule governing ballot mail in general, special, and runoff elections for federal office. *Ballot Mail for Federal Elections*, Final Rule, Doc. No. 2026-17238 (Aug. 21, 2026) ("Final Rule"). The Final Rule was published in the Federal Register on August 26, 2026. The Final Rule requires state election officials to ensure that ballot envelopes satisfy new design requirements, assign each voter unique barcodes for the voter's outbound and return envelopes, and upload the voter's name, address, and barcode information to a new federal portal before presenting the outbound ballot mailing to USPS.

4. The Final Rule inserts the USPS as an additional and final gatekeeper between eligible voters and the ballots their state election officials have determined voters should receive. The Final Rule provides that, before accepting an outbound ballot mailing, USPS will scan the envelopes and compare them against the information submitted through its portal, and that if the USPS determines that a mailing does not satisfy the Rule's enrollment, data-submission, envelope-design, and barcode requirements, USPS "will not" accept it and will return it to the election official or authorized mailer. The delivery of an otherwise valid ballot thus turns on USPS's unilateral determination of whether a mail ballot satisfies its novel rule. Individuals who would otherwise be eligible to vote and to have complied with all election statutes and procedures will

have their mail ballots effectively discarded by postal employees rather than delivered. There is no process by which affected voters are notified of, or may appeal, USPS's decision not to deliver their ballots.

5. The Final Rule also provides that USPS will establish a federal repository of voter and ballot-envelope information. USPS will retain each enrolled voter's name, address, originating State, and unique outbound and return barcodes for five years. It will compile that information into state-specific Mail-In and Absentee Participation Lists and make the records available for purposes that include determining compliance with federal law and facilitating law-enforcement activities. Voters cannot inspect or correct the information submitted about them through the portal, yet to receive and return ballots through USPS, they must acquiesce to this federal data-collection regime.

6. DHS has taken parallel action. On June 8, 2026, Secretary Mullin approved DHS's current implementation policy and supplied the Secretary-level authorization required for U.S. Citizenship and Immigration Services ("USCIS") to proceed. Mullin Mem. 1-5, ECF No. 151-1. The policy states that DHS will provide access to state election officials to receive downloadable files containing "information under the control of USCIS, the Social Security Administration [], and the Department of State," including "citizenship-related information" and "relevant agency identifiers" from "each agency." *Id.* at 1-2, 5. DHS has also committed to work toward consolidated lists of adult citizens residing in each State for transmission before federal elections. Additionally, the memo stated that at the "conclusion of USPS's pending rulemaking," DHS would determine whether it could "leverage USPS data related to mail-in and absentee ballot participation lists." *Id.* at 3.

7. DHS approved that election-related use and dissemination of federal records even though the underlying databases were created for decisions regarding immigration, benefits, Social Security, and passport-administration—not to determine voter eligibility. Those records are neither comprehensive nor sufficiently accurate for that new purpose.

8. These actions directly impair Plaintiffs' established voter-assistance services and burden Plaintiffs' members. Plaintiffs' services include registering voters, helping registered voters stay on the voting rolls by verifying and correcting their records, assisting with mail-ballot applications, ensuring voters who request mail ballots receive them, assisting voters who cast mail ballots to have those ballots counted, operating voter-protection programs, and working with election officials to resolve barriers encountered by individual voters. The new federal systems introduce requirements and records that neither Plaintiffs nor the affected voters can access or correct directly. Plaintiffs must devote additional staff time and resources to determining why ballots have not arrived, investigating discrepancies in federal records, helping voters obtain documentation, communicating with election officials, identifying alternative means of voting, and arranging transportation for voters to go to the polls. That additional work reduces Plaintiffs' capacity to provide their existing registration, voter-assistance, and community programs.

9. These developments eliminate the contingencies that previously surrounded implementation of the Executive Order. This Court denied preliminary relief in part because USPS had not issued a final rule and DHS had not settled on the infrastructure or policy through which it would provide citizenship information to the States. The Supreme Court likewise reasoned that any cognizable injury from the Executive Order would arise from DHS's "downstream action" or a USPS final rule. *Trump v. California*, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026) (per curiam). DHS and USPS have now taken these concrete actions to implement the Order.

10. The agencies' actions are unlawful. Congress has not authorized USPS to compel election officials to disclose voter-level information, maintain a federal database linking voters to their ballot-envelope barcodes, or refuse otherwise valid ballot mail because state officials have not complied with federally imposed election procedures. Nor has Congress authorized DHS to repurpose records used for immigration, benefits, Social Security, and passport administration into a federal citizenship-screening system for election administration. The general postal powers, immigration-verification provisions, and information-sharing statutes invoked by the agencies confer no such authority. The actions also contravene the statutory protections Congress imposed on the postal system and on use and disclosure of federal records and carry into effect the Executive Order's unconstitutional intrusion on the authority of the States and Congress.

11. Plaintiffs accordingly seek declaratory and injunctive relief against the Executive Order and the USPS Final Rule, vacatur of DHS's approved policy, and an injunction preventing Defendants from implementing the unlawful federal election-administration systems those actions establish.

## PARTIES

12. Plaintiff the National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the largest and oldest civil rights organization in the United States. Its mission is to ensure educational, social, and economic equality for all persons and to eliminate race-based discrimination. The NAACP has over two million supporters, including voters throughout the United States. It has state and regional conferences representing 48 states, with nearly 2,200 units across the United States. NAACP units include approximately 200,000 members nationwide, many of whom are Black adults and eligible voters who cast ballots by mail

and plan to receive and send ballots by mail in the upcoming 2026 federal elections. The NAACP has a presence in all 50 states.

13. Consistent with its mission, the NAACP has long worked to remove all barriers of racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws related to voter registration and the equal exercise of the right to vote. The NAACP conducts robust nonpartisan voter registration and education efforts nationwide, which are a core part of its mission. As one part of these efforts, the NAACP offers registration and mail-ballot assistance to voters nationwide. The NAACP has also brought landmark voting rights and other civil rights cases over its 117-year history and has served as amicus in many such cases. Those landmark voting rights cases include the successful defense against the disclosure of its members, constituents, and the Black community at large from legal retaliation and a recent legal settlement against the USPS to prevent mail-ballot delays. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); Stipulation of Settlement and Proposed Order, *National Association for the Advancement of Colored People v. U.S. Postal Service*, No. 20-cv-02295 (D.D.C. Dec. 17, 2021), ECF No. 170.

14. The NAACP, its members, and supporters rely on mail service by the Postal Service, a longstanding method for accessing the ballot which will be significantly curtailed by the EO and the USPS Final Rule. Many members, including eligible incarcerated members amongst NAACP's membership, solely rely on mail service by the Postal Service to participate in elections. NAACP members include people with disabilities, college students, incarcerated individuals and people with criminal histories, first responders in their communities, including emergency personnel, people without access to vehicles or public transportation, people who live in remote and rural areas without easily accessible in-person voting opportunities, and active-duty

enlisted U.S. military personnel, who make up 20 percent of the servicemember sector. While many states do not require voters to have a reason to vote by mail, this variety of reasons—including health conditions, advanced age, attending higher education institutions outside of voters' county of residence, living in rural areas far away from in-person polling opportunities, incarceration, and traveling during the voting period—underscore NAACP members' dependence on their states' mail-in ballot system. NAACP members register to vote, request mail ballots, or update their mailing addresses close to election deadlines, with many members updating their information within the few days or weeks before Election Day.

15. The NAACP expends significant resources educating its members and the public regarding the state-based rules concerning voter registration and mail voting across the country. Because the Executive Order and the agency actions taken pursuant to the Order threaten to share member information across agencies and outside of the federal government, prohibit the USPS transmission of some members' mail-in ballots, and threaten prosecutions of members assisting voters deemed to be ineligible, the NAACP must dedicate additional resources to educate voters, its members, and volunteers about mail ballot changes, the EO's and the USPS Final Rule's impacts on voters' registration status and privacy interests, to help voters determine whether they have been wrongly deemed ineligible and why, and assist eligible voters in challenging wrongful exclusions and the denial of absentee ballots.

16. The Order threatens investigation and prosecution of individuals and entities that purportedly aid and abet "distribution of ballots to individuals who are not eligible to vote in a Federal election." Exec. Order § 2(b). As an entity that assists voters in registering to vote and in addressing the mechanics of voting, including voting by mail-in or absentee ballot, this provision

chills voter and voter assistance participation—a threat of significant adverse consequences if an organization helps a voter, who is later deemed ineligible, obtain a mail-in ballot.

17. NAACP members include individuals who are and will continue to be directly affected by the Order and the agency actions taken pursuant to the Order. The NAACP, for example, has many members older than 45 or have changed their name due to marital status and are citizens and eligible to vote. When DHS consults the SSA database to determine whether such a voter is a citizen, there is a substantial risk they will not be able to verify citizenship.

18. The Order and the agency actions taken pursuant to the Order will also harm the NAACP's mission of eliminating race-based discrimination through voter registration, mobilization, and education. The NAACP would have to take time and resources away from other organizational activities and priorities to retrain volunteers, run extensive voter education campaigns related to mail ballots and privacy rights, and frontload voter mobilization and outreach efforts earlier for the election cycle.

19. Plaintiff Common Cause is a nonprofit grassroots organization organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia. Common Cause is a nonpartisan democracy organization with nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. It has members in every congressional district. Since its founding by John Gardner 50 years ago, Common Cause has been dedicated to making government at all levels more representative, open, and responsive to the interests of ordinary people.

20. Plaintiff Common Cause Education Fund ("CCEF") was formed in 2000 as a nonprofit under the laws of the State of Delaware. CCEF provides education, engagement, and research to Common Cause members, constituents, partner organizations, and the public about

voter registration and the electoral process. CCEF works to foster public engagement on democracy issues and promote effective citizen participation, which are critical for a healthy and robust democratic society. Common Cause and CCEF (together "Common Cause") bring this action jointly.

21. As part of its core mission, Common Cause works on a nonpartisan basis to expand and protect equal access to voting for all citizens on multiple fronts, including (a) partnering with other community organizations to assist voters with registration, disseminate voter education materials, and provide education and training to on-the-ground voting rights advocates nationwide; (b) advocating for nonpartisan election reforms, including, but not limited to, allowing no-excuse absentee voting, extending deadlines for submitting mail-in ballots, increasing the number of voting locations, and ensuring fair, nonpartisan redistricting processes; (c) working collaboratively with state and local election officials to address and remedy—in advance of elections—election administration problems; and (d) leading Election Protection coalitions at the national and state level that field calls from voters facing barriers in exercising their fundamental right to vote, track problems at voting sites during early voting and on Election Day, and provide assistance to such voters by engaging with local election officials and/or facilitating voters' access to counsel. Common Cause staff and volunteers dedicate significant time and effort to educating and supporting voters close to election deadlines, including registration deadlines, mail-in ballot request deadlines, and mail-in ballot return deadlines so that voters are registered and can cast their ballot by mail in time.

22. Common Cause has nearly one million members nationwide and in every congressional district. All members have an interest in protecting their sensitive data that the Order seeks to unlawfully compile and share across state and federal agencies, which DHS's adopted

policy is pursuing. Many members—such as those who have changed their names or become naturalized citizens—have reason to fear that errors in government databases used to compile the lists required by the Executive Order and DHS's adopted policy will lead to their wrongful purging from state voter rolls.

23. Common Cause's membership also includes members who regularly vote by mail in accordance with their state's laws, either because they choose to do so or because they cannot vote in person. Many Common Cause members vote by mail because of health, advanced age, school attendance, transportation issues to in-person polling locations, residency in rural areas far from them, and other reasons. For many of these members, changes in their voter registration or mailing address close to state deadlines would prevent them from receiving their ballot. Additionally, many Common Cause members support other voters who rely primarily or solely on mail-in voting, including elderly, hospitalized, college students, and incarcerated voters. Defendants' actions are likely to deprive many members and the voters they support of their fundamental right to vote, by creating obstacles to, or prohibiting, the delivery of their mail-in ballots.

24. Common Cause has a relatively small number of employees and a limited budget. The organization relies on its member volunteers for many activities. It must make difficult choices about how to use and allocate its limited resources. As a result of the Executive Order and the agency actions taken pursuant to the Order, Common Cause must expend additional resources training or retraining its volunteers about the options available to voters who fear that they have been or may be wrongfully deemed ineligible to vote; that their privacy rights have been or will be invaded from the data disclosures that the Order requires; that the USPS will refuse noncompliant outbound federal-ballot mailings; or that they may experience prosecution for mail

ballot voter assistance. The time and resources spent on such training is diverted from other activities Common Cause would undertake to advance its mission. The Order and the resulting agency actions will make it necessary for some voters to correct errors in federal databases—on extremely abbreviated timelines without notice of errors and without clear procedural means—to prove their citizenship, eligibility to vote, and eligibility to vote by mail before USPS will mail their ballots. In doing so, the Order and the agency actions taken pursuant to the Order harm Common Cause's mission of reducing barriers to voting and imposes additional burdens on Common Cause to educate and assist voters to recognize and deal with the new obstacles. The burdens take time and resources away from efforts on other issues, including, but not limited to, direct voter assistance, Election Protection coordination, ensuring the safety and proper administration of in-person polling places, and advocating for expanded access to early voting, and no-excuse absentee voting.

25. Plaintiffs Black Voters Matter Fund and Black Voters Matter Capacity Building Institute (together "BVM"), formed under Section 501(c)(4) and Section 501(c)(3) of the Internal Revenue Code respectively, are nonpartisan civic organizations whose goals are to increase power in communities of color. Effective voting allows a community to determine its own destiny. Communities of color often face barriers to voting that other communities do not, so Plaintiff focuses on removing those barriers. BVM works on increasing voter registration and turnout, and advocating for policies to expand voting rights and access. BVM is particularly active in the rural American South, where voters of color tend to be the most neglected and face higher rates of poverty.

26. As part of its core mission, BVM works to ensure that voters of color are informed, engaged, and able to exercise their right to vote effectively, recognizing that civic participation enables communities of color to determine their own futures.

27. BVM is active year-round, frequently hosting voter education programming, voter registration drives, and get-out-the-vote efforts. BVM also engages in policy advocacy to expand and protect access to the ballot, including advocating for expanded access to absentee voting in the southern states.

28. Confusion regarding, or the reduction in access to, voting by mail would directly impair BVM's ability to carry out its core mission of building political power in marginalized communities in rural areas. BVM's work emphasizes informed participation, voter education, and the removal of structural barriers that prevent voters facing economic or logistical obstacles from consistently and effectively exercising their right to vote.

29. As BVM works to ensure access to expanded voting options, uncertainty or diminished availability of vote-by-mail would undermine their voter education efforts, reduce meaningful participation among the voters it serves, and frustrate its advocacy for equitable and accessible election systems. The Order and the agency actions taken pursuant to the Order weaken BVM's broader strategy of empowering communities to determine their own political destinies and ensuring their ability to vote using the most accessible method.

30. The Order threatens investigation and prosecution of individuals and entities that purportedly aid and abet "distribution of ballots to individuals who are not eligible to vote in a Federal election." Exec. Order § 2(b). As an entity that assists voters in registering to vote and in addressing the mechanics of voting, including voting by mail-in or absentee ballot, BVM reads

this provision as a chilling threat of significant adverse consequences if the organization helps a voter obtain a ballot who is later deemed ineligible.

31. Defendant Donald J. Trump is the President of the United States. He is named in his official capacity.

32. Defendant Executive Office of the President ("EOP"), is an agency headquartered in Washington, D.C., through which the President carries out many of his official actions.

33. Defendant Todd Blanche is the Attorney General of the United States. He is named in his official capacity.

34. Defendant U.S. Department of Justice is an agency of the federal government headquartered in Washington, D.C.

35. Defendant Markwayne Mullin is the Secretary of the U.S. Department of Homeland Security. He is named in his official capacity.

36. Defendant U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C.

37. Defendant David Steiner is the Postmaster General of the United States. The Postmaster General is the chief executive officer of USPS and actively manages the day-to-day operations of USPS. *See* 39 U.S.C. § 203. He is named in his official capacity.

38. Defendant U.S. Postal Service is a federal "independent establishment" headquartered in Washington, D.C. *See* 39 U.S.C. § 201.

39. Defendant Board of Governors of USPS is responsible for directing and controlling the expenditures, reviewing the practices and policies of the USPS, and performing other legal duties. 39 U.S.C. § 205(a).

40. Defendant Joseph B. Edlow is the Director of the U.S. Citizenship and Immigration Services. He is named in his official capacity.

41. Defendant U.S. Citizenship and Immigration Services is a federal agency within DHS headquartered in Camp Springs, Maryland.

42. Defendant Frank J. Bisignano is the Commissioner of the U.S. Social Security Administration. He is named in his official capacity.

43. Defendant U.S Social Security Administration is a federal agency headquartered in Baltimore, Maryland.

44. Defendant Howard Lutnick is the Secretary of the U.S. Department of Commerce. He is named in his official capacity.

45. Defendant U.S. Department of Commerce is a federal agency headquartered in Washington, D.C.

46. Defendant Marco Rubio is the Secretary of the U.S. Department of State. He is named in his official capacity.

## JURISDICTION AND VENUE

47. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1346 (civil actions against the United States) because this action arises under the Constitution and laws of the United States and the Defendants in this action are the President and various U.S. officers in their official capacities.

48. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(A) because the Defendants are officers or employees of the United States acting in their official capacity or under color of legal authority, and at least one of them resides in this District. Venue is also proper under

Section 1391(e)(1)(C) because Plaintiffs NAACP and Common Cause reside in this District and no real property is involved in the action.

49. This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

50. Sovereign immunity for nonmonetary relief is waived by 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### I. FEDERAL LAW VESTS THE POWER TO REGULATE ELECTIONS EXCLUSIVELY IN THE STATES AND IN CONGRESS—NOT THE PRESIDENT.

#### A. The Constitution Gives No Authority to the President to Regulate Federal Elections

51. The President "has no legislative power," save the veto power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring). Therefore, the President's authority to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Id.* at 585.

52. When the President acts in a manner "incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). The President may not "seiz[e] the power of the Legislature" by enacting a policy via an executive order that "Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

53. The President's order attempts to control state voter rolls, give power to the USPS to deny ballots, and dictate how states conduct absentee and mail-in voting, but neither the Constitution nor Congress has extended that power to the President. Rather, the regulation of elections is a power of the States and Congress.

54. The Elections Clause of the U.S. Constitution establishes lawmaking powers of Congress and the States with respect to *how* federal elections are run. It unequivocally and clearly provides that "[t]he Times, Places and Manner of holding [federal] Elections ... shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4; *see also Arizona v. Inter Tribal Council of Ariz., Inc. (ITCA)*, 570 U.S. 1, 7-8 (2013).

55. The Qualifications Clause allocates power to the States to determine *who* may vote in federal elections. It provides that voters for the House of Representatives "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment extends the same requirement to the election of U.S. Senators. U.S. Const. amend. XVII. Under these provisions, the power to prescribe voter qualifications belongs exclusively to the States: each State determines who may vote in its federal elections by reference to the qualifications it has established for voters in elections to its own most numerous legislative chamber. *See Oregon v. Mitchell*, 400 U.S. 112, 124-25 (1970) (opinion of Black, J.). "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government.'" *ITCA*, 570 U.S. at 17.

56. Other provisions in the Constitution place additional requirements and limitations on the regulation of elections. The Seventeenth Amendment also requires that States hold elections for U.S. Senators, *see* U.S. Const. amend. XVII, and the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments prohibit abridging the right to vote based on sex, age, race, or a poll tax requirement, *see id.*, amends. XV, XIX, XXIV, XXVI. And constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments establish a federal constitutional right to vote free from excessive

burdens. *See id.*, amends. I, XIV; *see, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

57. Neither the Elections Clause nor any other clause of the Constitution grants the President *any* control over the conduct of elections. *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024). "The Constitution [thus] empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* at 1346 (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)).

58. The Constitution's allocation of authority over federal elections between Congress and the States "is no accident." *League of United Latin Am. Citizens v. Exec. Off. of the President,* 808 F. Supp. 3d 29, 44 (D.D.C. 2025) ("*LULAC II*"). "[T]his design was the product of carefully considered compromises among our Constitution's Framers." *Id.*

59. Through the Elections Clause, the Framers "'submitted the regulation of elections for the federal government, in the first instance,' to the States, where such regulation would 'be both more convenient and more satisfactory.' But they 'reserved to [Congress] a right to interpose' regulations of its own where the need arose." *Id.* at *4 (quoting Federalist No. 59). "In short, as they so often did, the Framers chose balance." *Id.*

60. The President is "conspicuous[ly] absen[t]" from this historical context. *Id.* The Framers bestowed upon the States the "initial authority to regulate elections" and "supervisory authority over those regulations" to Congress. *Id.* But the President "does not feature at all." *Id.*

### B. Congress's Statutory Pronouncements Give No Authority to the President to Regulate Federal Elections

61. Pursuant to its supervisory constitutional authority, Congress has exercised its legislative power directly by determining the rules for federal elections by statute, and indirectly by delegating to an independent federal agency the limited power to set rules within the narrow

areas prescribed by Congress. Throughout our nation's history and pursuant to the Constitution, where Congress has not legislated or delegated, the States have set the election rules—including those governing federal elections — themselves.

62. Congress has exercised its Elections Clause authority to establish a uniform nationwide date for federal elections; prohibit discrimination in the administration of elections; safeguard the rights of overseas and military voters; establish uniform methods of voter registration in federal elections and regulate maintenance of state voter rolls; require states to provide provisional ballots; establish federal standards for election administration, including voting systems, provisional voting, and voter registration databases; and provide federal funding for state compliance. *See, e.g.*, 52 U.S.C. §§ 10101(a)(2), 10301; 52 U.S.C. §§ 20501-20511 (National Voter Registration Act); 52 U.S.C. §§ 20901-21145 (Help America Vote Act); 52 U.S.C. §§ 20301-20311 (Uniformed and Overseas Citizens Absentee Voting Act); 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1.

63. Particularly relevant here, Congress has assigned the responsibility to manage voter registration to the States and a federal agency, the Election Assistance Commission, through the NVRA and HAVA. The NVRA requires each state to establish procedures for registering voters in federal elections by mail, at motor vehicle agencies, and at other designated state offices. 52 U.S.C. §§ 20503-20506. States must "accept and use" a uniform federal registration form—the Federal Form—that is developed and maintained by the Election Assistance Commission ("EAC"). *Id.* §§ 20505(a)(1), 20508. The EAC, in consultation with the States, prescribes the contents of the Federal Form, including what information applicants must provide to establish their eligibility. *Id.* § 20508(a)(2). The NVRA likewise assigns States the responsibility of maintaining voter registration rolls through a set of compressive and carefully limited instructions.

64. HAVA builds on the NVRA's framework by establishing requirements for statewide voter registration systems. *Id.* §§ 20901-21145. HAVA directs each state to implement a "single, uniform, official," statewide voter registration list that is "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). The list must contain the name and registration information of every legally registered voter in the state, assign each registrant a unique identifier, and serve as the "official voter registration list for the conduct of all elections for federal office in the State." *Id.* § 21083(a)(1)(A). The list is implemented by the state, defined by the state, maintained by the state, and administered at the state level.

65. The NVRA and HAVA do not allocate "any responsibility" for administering federal elections "to the President or to any other individual in the Executive Branch with the power to act unilaterally." *See LULAC II*, 808 F. Supp. 3d at 73.

66. Exercising their constitutional authority, States have long enacted laws concerning every aspect of the administration of their elections including—voter eligibility; registration; the time, place, and manner of casting and receiving ballots, including mail-in and absentee ballots; the tabulation of ballots; and the certification of results.

67. The President's unlawful Order represents an extraordinary intrusion on these congressional and State policy choices—choices the Constitution firmly assigns to those actors, not the Executive Branch.

### C. Congress Established a Comprehensive Statutory Framework Governing the Postal Service Independent of Presidential Control

68. The Postal Clause, art. I, § 8, cl. 7, of the U.S. Constitution provides that "Congress shall have Power ... To establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7.

69. Until 1970, the Postmaster General was a member of the President's Cabinet. But pursuant to its constitutional authority, Congress passed the Postal Reorganization Act of 1970,

which dismantled the cabinet-level Post Office Department and reconstituted the postal system as the modern Postal Service. *See* 39 U.S.C. § 101 *et seq.* From the outset, Congress structured the Postal Service as an "*independent* establishment of the executive branch of the government of the United States." *See* 39 U.S.C. § 201 (emphasis added).

70. Congress reinforced that independence by creating both an internal Board of Governors to oversee Postal Service operations and an external Postal Rate Commission to review proposed rates and classifications, thereby creating "an invaluable buffer between the management of the Postal Service and the possible influence of partisan politics." H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 3660 (1970); *see also Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 414-15 (D.C. Cir. 1993). These institutional features reflected Congress's intent to take the Post Office "completely [out of the] President's Cabinet and out of politics" and to "recast[] it in the form of an independent establishment within the executive branch of the government." H.R. Rep. No. 1104, 91st Cong., 2d Sess. 6, 3654 (1970). On this point, Congress was unequivocal: "If the American public is to have the postal service that it expects and deserves, the Post Office must be taken out of politics and politics out of the Post Office." *Id.*

71. Congress reaffirmed and strengthened its commitment to an independent Postal Service in the Postal Accountability and Enhancement Act of 2006 (PAEA), which renamed the Postal Rate Commission as the Postal Regulatory Commission (PRC) and expanded its authority from an advisory body into a regulator with binding oversight over rates, classifications, and compliance. *See* Postal Accountability and Enhancement Act, Pub. L. No. 109-435, 120 Stat. 3198 (2006); *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 890 F.3d 1053, 1055 (D.C. Cir. 2018). Through the PAEA, Congress preserved the Postal Service's operational independence while

strengthening external regulatory review, further entrenching a statutory design that isolates management from political direction and regulatory oversight from direct presidential control.

72. Today, the Board of Governors and the PRC continue to operate pursuant to Congress's structural-independence framework. The Board directs, "[t]he exercise of the power of the Postal Service." 39 U.S.C. § 202(a)(1). It consists of nine Governors appointed by the President, by and with the advice and consent of the Senate, and serve staggered, seven-year terms together with the Postmaster General and Deputy Postmaster General. *Id.* §§ 202(a)-(d). Congress designed the Board to be bipartisan: no more than five Governors may be members of the same political party and the Governors are removable by the President only for cause. *Id.* § 202(a). The PRC is similarly composed of five Commissioners appointed by the President, by and with the advice and consent of the Senate, for six-year terms. *Id.* § 502(a), (f). Congress also created the PRC as a bipartisan body—no more than three of the Commissioners may be members of the same political party, and Commissioners likewise may be removed by the President only for cause. *See* 39 U.S.C. § 502(a), (f).

73. Congress requires the Postal Service to "develop and promote adequate and efficient postal services." 39 U.S.C. § 3661(a). When proposed changes to these services will "generally affect service on a nationwide or substantially nationwide basis," the Postal Service must itself formulate a proposal and submit it to the PRC, which is required to conduct a public, on-the-record hearing and issue an advisory opinion before such changes may be implemented. *Id.* § 3661(b)-(c). Although the Postal Service is generally exempt from the Administrative Procedure Act ("APA"), *see* 39 U.S.C. § 410(a), the PRC is not. Congress incorporated the APA's formal adjudication procedures into the PRC's review of such proposals by requiring hearings "on the record" pursuant to 5 U.S.C. §§ 556-557. 39 U.S.C. § 3661(c). This process assigns primary

responsibility for policy development to the Postal Service, subject to independent review by the PRC.

74. In turn, the PRC exercises its own independent regulatory authority through rulemakings and adjudications governing rates, classifications, and compliance. *See* 39 U.S.C. §§ 503, 3662-3663. When performing these functions, the PRC is expressly subject to the APA, including its notice-and-comment rulemaking requirements. *See* 39 U.S.C. § 503; 5 U.S.C. § 553. Accordingly, any regulatory action by the PRC must proceed through these statutorily prescribed procedures and reflect the Commission's independent judgment, rather than the direction of the President or any other branch.

75. In sum, Congress established two distinct and independent processes for the development and regulation of postal policy: policy changes must originate with the Postal Service and, where applicable, proceed through the PRC's advisory review under § 3661, while the PRC's own regulatory actions must be undertaken through APA-governed rulemaking and adjudication.

76. Yet in his second term, President Trump has indicated an intent to encroach on the Postal Service's independence through executive action. For example, on February 21, 2025 following the swearing-in of Commerce Secretary Lutnick, President Trump announced "a form of a merger" of the Postal Service with the Department of Commerce.[1] Nothing in the PRA or PAEA authorizes the President to change the structure or coordination of the Postal Service through the Department of Commerce, nor can the President direct the outcome of mail processes or substitute his judgment for that of the Postal Service or the PRC.

[1] Nandita Bose & David Shepardson, *Trump says he is considering merging U.S. Postal Service with Commerce Department*, Reuters (Feb. 21, 2025 5:53 PM), https://www.reuters.com/world/us/trump-says-he-is-considering-merging-us-postal-service-with-commerce-department-2025-02-21/.

77. No statute authorizes the President to direct the outcome of mail processes or to substitute his judgment for that of the Postal Service or the PRC.

## II. MILLIONS OF VOTERS RELY ON USPS EVERY FEDERAL ELECTION CYCLE TO CAST THEIR BALLOTS.

78. Every state provides voters with the ability to cast ballots via a unique mail-in voting process. Whether voters must qualify for a ballot by mail, can request a mail-in ballot without qualification, or will receive a mail-in ballot automatically varies by state. The deadlines for when voters must register to vote, request a mail-in ballot, and return a mail-in ballot also vary by state. All states allow qualifying voters to request mail-in ballots within 60 days of a federal election, with many states authorizing requests to be received within one to two weeks before Election Day.

79. Because of these state mail-in balloting opportunities, millions of voters use the mail-in voting process each federal election cycle. According to the USPS, a significant portion of mailed ballots are transported after the 60-day deadline contemplated by the Executive Order's mail-in ballot and absentee voter list. For example, at least 99.22 million ballots were received and delivered by the USPS for the 2024 General Election between September 1, 2024, and November 15, 2024.[2] In the full election year, 222.39 million pieces of ballot mail were processed.[3] The sixtieth day before the 2024 election was September 6,2024, so nearly three-quarters of all mailed ballots in 2024 were delivered within 60 days of Election Day.

80. Many voters register to vote and request, receive, and send their mail-in ballots within 60 days of Election Day because, every month, hundreds of thousands of people move

---

[2] U.S. Postal Service, 2024 Post-Election Analysis 1 (2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

[3] *Id.* at 3.

within the United States, become eligible to vote, or must update their mailing address for a variety of reasons.[4]

81. Compared to the number of in-person voters, mail-in voters are not an anomaly. One report gathering data from the EAC's 2024 Election Administration and Voting Survey reveals that nearly one in three voters cast a ballot by mail in the last federal election.[5]

82. That same report indicates that racial minorities heavily rely on mail-in voting. Roughly 18 percent of African American voters, one-third of Hispanic voters, and half of Asian American voters cast ballots by mail in the 2024 election.[6]

83. Despite frequent use of the mail-in voting process, racial minorities experience a disproportionate amount of systemic mail-in ballot barriers and ballot rejections compared to White voters. In recent elections, like the 2018 North Carolina general Election, Black voters were twice as likely as White voters to have their mail-in ballots rejected.[7] Similar results were observed in the state of Washington, where Black voters' rejection rates were about 50 percent higher than White voters'.[8]

---

[4] *See* Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://www.census.gov/library/stories/2023/11/state-to-state-migration.html.

[5] *Nearly 1 in 3 Americans Voter by Mail in 2024*, States United Democracy Center (Sept 4, 2025), https://statesunited.org/resources/americans-vote-by-mail-2024/#section-1.

[6] *Id.*

[7] Sophie Chou & Tyler Dukes, *In North Carolina, Black Voters' Mail-In Ballots Much More Likely to Be Rejected Than Those From Any Other Race*, ProPublica (Sept. 23, 2020 2:30 PM), https://www.propublica.org/article/in-north-carolina-black-voters-mail-in-ballots-much-more-likely-to-be-rejected-than-those-from-any-other-race.

[8] Allard et al., *Understanding Patterns and Trends in Rejected Mailed Ballots in Washington State* 23 (2023), https://waelectiondata.csde.washington.edu/waelectiondata/files/rejected_ballots_project_report.pdf.

84. Perceptions of the mail-in voting system also reflect severe distrust by Black voters in USPS's ability to timely deliver mail. For instance, 32 percent of Black California voters and 29 percent of Hispanic voters said that they did not trust USPS to safely and timely deliver their ballots in the 2016 General Election, compared to 21 percent of White voters.[9] Large-scale policies that introduce opportunities for more delay exacerbate the distrust many racial minority voters have in USPS delivery services, even if they still must rely on those services to vote. The Order reaches far beyond the perception that ballots might not be delivered timely by mandating that the Postal Service ignore a state's judgment and intentionally refuse to deliver some ballots regardless of whether they could have been delivered timely.

## III. THE ADMINISTRATION UNLAWFULLY ATTEMPTS TO REGULATE FEDERAL ELECTIONS.

### A. President Trump Telegraphs His Plan to Unilaterally Regulate Elections Absent Congressional Action

85. Insofar as there is an administrative record for the Executive Order, it consists of President Trump's own statements. President Trump has long trumpeted his intent to leverage executive power to unilaterally alter state voting practices with respect to mail-in voting, beginning in his first term in office and escalating in his second. The President's own statements make clear that the Executive Order is an effort to unilaterally legislate in the arena of election administration by executive fiat based on his long-standing and unsubstantiated view that mail-in voting begets voter fraud, especially after Congress's rejection of his preferred policies. The Order is predicated

[9] "The California Voter Experience Study: A Statewide Survey on Voter Perspectives on Vote-By-Mail and Vote Centers," California Civic Engagement Project 2 (Sept. 3, 2017), https://static1.squarespace.com/static/.../UCDavisCCEPIssueBrief3VoteCenterStatewideSurveyBrief.pdf.

on the false premise that voting by noncitizens is more than an infinitesimal problem in this country.

86. President Trump's pronouncements in this area predate the 2020 Presidential Election when he issued a series of Twitter statements expressing his claim, without basis or evidence, that mail-in voting is fraudulent:[10]




87. He cast doubt on the integrity of mail ballot systems in social media posts throughout the days leading up to the election being called for Joe Biden on November 7, 2020.[11]

[10] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 5:17 a.m.), https://x.com/realDonaldTrump/status/1265255835124539392, archived at https://perma.cc/9L7U-WDNH; *see also id.*, Twitter (July 30, 2020, 5:46 a.m.), https://x.com/realDonaldTrump/status/1288818160389558273, archived at https://perma.cc/B3SR-YSEK (claiming that "Universal Mail-In Voting" in 2020 … "will be the most INACCURATE & FRAUDULENT Election in history").

[11] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 5, 2020, 8:22 a.m.), https://x.com/realDonaldTrump/status/1324386685858287616, archived at https://perma.cc/46SX-LRWC; *see also id.* (Nov. 5, 2020, 7:09 a.m.), https://x.com/realDonaldTrump/status/1324368202139357186, archived at https://perma.cc/WA4X-F6M7 (claiming that "ANY VOTE THAT CAME IN AFTER ELECTION DAY WILL NOT BE COUNTED!"); *id.* (Nov. 5, 2020, 9:21 a.m.), https://x.com/realDonaldTrump/status/1324401527663058944, archived at https://perma.cc/4NZ2-Q274 (exclaiming "STOP THE FRAUD!").


Donald J. Trump
@realDonaldTrump
Follow

Some or all of the content shared in this Post is disputed and might be misleading about an election or other civic process. Learn more

All of the recent Biden claimed States will be legally challenged by us for Voter Fraud and State Election Fraud. Plenty of proof - just check out the Media. WE WILL WIN! America First!

8:22 AM · Nov 5, 2020

88. President Trump has continued attacking the propriety of mail-in voting in his second term. As the 2026 midterm election cycle has gotten underway, he explicitly signaled that he would assert executive power to secure his policy objectives where Congress had declined to act.

89. On August 18, 2025, President Trump floated his first legal theory for regulating state mail ballots by executive order. He posted that he would "lead a movement to get rid of MAIL-IN BALLOTS," emphasized that "[s]tates are merely an 'agent' for the Federal Government in counting and tabulating the votes," and signaled that he planned to "sign[] an EXECUTIVE ORDER" to "bring HONESTY to the 2026 Midterm Elections."[12]

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, 4:17 a.m.), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254, archived at https://perma.cc/BH5D-KLAQ.

Donald J. Trump
@realDonaldTrump

I am going to lead a movement to get rid of MAIL-IN BALLOTS, and also, while we're at it, Highly "Inaccurate," Very Expensive, and Seriously Controversial VOTING MACHINES, which cost Ten Times more than accurate and sophisticated Watermark Paper, which is faster, and leaves NO DOUBT, at the end of the evening, as to who WON, and who LOST, the Election. We are now the only Country in the World that uses Mail-In Voting. All others gave it up because of the MASSIVE VOTER FRAUD ENCOUNTERED. WE WILL BEGIN THIS EFFORT, WHICH WILL BE STRONGLY OPPOSED BY THE DEMOCRATS BECAUSE THEY CHEAT AT LEVELS NEVER SEEN BEFORE, by signing an EXECUTIVE ORDER to help bring HONESTY to the 2026 Midterm Elections. Remember, the States are merely an "agent" for the Federal Government in counting and tabulating the votes. They must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do. With their HORRIBLE Radical Left policies, like Open Borders, Men Playing in Women's Sports, Transgender and "WOKE" for everyone, and so much more, Democrats are virtually Unelectable without using this completely disproven Mail-In SCAM. ELECTIONS CAN NEVER BE HONEST WITH MAIL IN BALLOTS/VOTING, and everybody, IN PARTICULAR THE DEMOCRATS, KNOWS THIS. I, AND THE REPUBLICAN PARTY, WILL FIGHT LIKE HELL TO BRING HONESTY AND INTEGRITY BACK TO OUR ELECTIONS. THE MAIL-IN BALLOT HOAX, USING VOTING MACHINES THAT ARE A COMPLETE AND TOTAL DISASTER, MUST END, NOW!!! REMEMBER, WITHOUT FAIR AND HONEST ELECTIONS, AND STRONG AND POWERFUL BORDERS, YOU DON'T HAVE EVEN A SEMBLANCE OF A COUNTRY. THANK YOU FOR YOUR ATTENTION TO THIS MATTER!!! DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES OF AMERICA

**19.3k** ReTruths **68.6k** Likes Aug 18, 2025, 4:17 AM

90. The President reiterated this plan later that day, announcing that, "We're going to start with an executive order that's being written right now by the best lawyers in the country to end mail-in ballots because they're corrupt."[13]

91. He kept up the drumbeat on Truth Social in the weeks that followed, confirming that he would be issuing an executive order to restrict mail-in voting.[14]

---

[13] *See* Donald J. Trump, *Remarks to the Press During Oval Office Meeting with Ukrainian President Volodymyr Zelenskyy*, C-SPAN, https://www.c-span.org/clip/washington-journal/plan-to-eliminate-mail-in-ballots-and-voting-machines/5170135, (Aug. 18, 2025) (video at 1:21-1:32).

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2025, 6:49 p.m.), https://truthsocial.com/@realDonaldTrump/posts/115120863399877029, archived at https://perma.cc/35R2-B3PR.

> **Donald J. Trump**
> @realDonaldTrump
>
> Voter I.D. Must Be Part of Every Single Vote. NO EXCEPTIONS! I Will Be Doing An Executive Order To That End!!! Also, No Mail-In Voting, Except For Those That Are Very Ill, And The Far Away Military. USE PAPER BALLOTS ONLY!!! President DJT
>
> **8.08k** ReTruths **31k** Likes Aug 30, 2025, 9:49 PM

92. Just before his 2026 the State of the Union address, President Trump again made clear that he would act to regulate mail-in voting—"whether approved by Congress or not."[15]

> **Donald J. Trump**
> @realDonaldTrump
>
> The Democrats refuse to vote for Voter I.D., or Citizenship. The reason is very simple — They want to continue to cheat in Elections. This was not what our Founders desired. I have searched the depths of Legal Arguments not yet articulated or vetted on this subject, and will be presenting an irrefutable one in the very near future. There will be Voter I.D. for the Midterm Elections, whether approved by Congress or not! Also, the People of our Country are insisting on Citizenship, and No Mail-In Ballots, with exceptions for Military, Disability, Illness, or Travel. Thank you for your attention to this matter! PRESIDENT DONALD J. TRUMP
>
> **9.36k** ReTruths **31.4k** Likes Feb 13, 2026, 4:35 PM

93. In his February 24, 2026 State of the Union address, President Trump highlighted his policy views on mail-in voting, characterizing it as "crooked," while offering no evidence to

---

[15] Donald J. Trump (@realDonaldTrump), Truth Social, (Feb. 13, 2026, 1:35 p.m.), https://truthsocial.com/@realDonaldTrump/posts/116065471857020644, archived at https://perma.cc/C6BE-HQRB.

support this claim, and calling on Congress to address it and other aspects of the electoral process through the SAVE America Act.[16]

94. On March 8, 2026, the President announced that he would "not sign other Bills until" the SAVE Act was passed, and called on Congress to "GO FOR THE GOLD" by passing a version of the bill that contained restrictions like mail-in voting prohibitions, "NOT THE WATERED DOWN VERSION."[17]


Donald J. Trump
@realDonaldTrump

Great Job by hard working Scott Pressler on Fox & Friends talking about using the Filibuster, or Talking Filibuster, in order to pass THE SAVE AMERICA ACT, an 88% issue with ALL VOTERS. It must be done immediately. It supersedes everything else. MUST GO TO THE FRONT OF THE LINE. I, as President, will not sign other Bills until this is passed, AND NOT THE WATERED DOWN VERSION - GO FOR THE GOLD: MUST SHOW VOTER I.D. & PROOF OF CITIZENSHIP: NO MAIL-IN BALLOTS EXCEPT FOR MILITARY - ILLNESS, DISABILITY, TRAVEL: NO MEN IN WOMEN'S SPORTS: NO TRANSGENDER MUTILIZATION FOR CHILDREN! DO NOT FAIL!!! President DONALD J. TRUMP

**13.5k** ReTruths **49.7k** Likes Mar 08, 2026, 8:22 AM

95. The President repeated this sentiment in a March 12, 2026 statement, "urgently calling on Congress to pass the SAVE America Act immediately and safeguard America's

[16] Associated Press, *Read the Complete Transcript of Trump's 2026 State of the Union*, AP News (Feb. 25, 2026), archived at https://perma.cc/DH4P-TKEC.

[17] Donald J. Trump (@realDonaldTrump), Truth Social (March 8, 2026, 5:22 a.m.), https://truthsocial.com/@realDonaldTrump/posts/116193527873859174, archived at https://perma.cc/6VC2-8W7G.

elections from illegal voting."[18] The release repeated the President's claim, with no substantiating evidence, that "Voting by mail increases the risk of fraud."

96. The Senate has nonetheless repeatedly rejected the SAVE Act. The body declined to invoke cloture on amendments to the bill on March 21, 2026 and March 26, 2026.[19]

97. The President issued this Executive Order on March 31, 2026, just days after the Senate's latest failure to advance the SAVE Act. The timing of the Executive Order is also convenient for its data-sharing provisions. The Order lumps in interagency and third-party data-sharing provisions after courts reject the Executive Branch's efforts to amass national databases of voter rolls. *United States v. Weber*, 2026 WL 118807 at *17-19 (C.D. Cal. Jan. 15, 2026); *United States v. Benson*, 2026 WL 362789, at *11 (W.D. Mich. Feb. 10, 2026); *United States v. Oregon*, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

98. The claims of fraud in the Executive Order and the President's wholesale restrictions on well-established state voting practices are not based on any specific findings of fact by the Trump administration nor on any recent developments warranting executive action, but are instead solely based on his unsubstantiated and counterfactual grievances with the 2020 election results, where President Trump alleges widespread fraud.[20]

---

[18] The SAVE America Act Is the Most Popular Election Reform in Decades, The White House (March 12, 2026), https://www.whitehouse.gov/releases/2026/03/the-save-america-act-is-the-most-popular-election-reform-in-decades/.

[19] U.S. Senate Daily Press, Saturday, March 21, 2026, https://www.dailypress.senate.gov/saturday-march-21-2026/; U.S. Senate Daily Press, Thursday, March 26, 2026, https://www.dailypress.senate.gov/thursday-march-26-2026/.

[20] President Trump's election grievances alleged widespread fraud in the voting process. *See e.g.,* @realDonaldTrump, X (November 4, 2020 7:04 a.m.), https://perma.cc/Y6PS-Z4V3 (claiming that his electoral lead "magically disappear[ed]" as "surprise ballot dumps were counted"); *Id.* (November 5, 2020, 8:22 a.m.), https://perma.cc/F4Z8-YLQY (claiming that he will challenge all Biden-won states for voter fraud and state election fraud).

99. The President's claims of fraud have been uniformly rejected on both factual and legal grounds by federal courts across the nation. *See, e.g.*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 706 (D. Ariz. 2020) (dismissing plaintiff's action seeking to set aside the results of the 2020 election due to claims that the electoral process was "so riddled with fraud, illegality, and statistical impossibility" in part because the "complaint's allegations were "sorely wanting of relevant or reliable evidence"); *see also Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa.), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020) (dismissing Plaintiffs' action seeking in relevant part to challenge Pennsylvania's notice and cure procedure for defective mail-in ballots with prejudice due to "strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence" which "cannot justify the disenfranchisement of a single voter, let alone all the voters of its sixth most populated state."). Those claims do not provide any appropriate or valid basis to overhaul privacy protections, the state administration of list maintenance, or state mail ballot systems.

### B. The Administration Makes Sweeping and Unlawful Changes to Federal and State Election Laws and Practices

100. The Executive Order calls for numerous unlawful changes to current voting practices in violation of the U.S. Constitution and federal statutes, which DHS and USPS have now implemented.

101. Section 2(a) of the Order requires the Secretary of DHS, acting through the Director of the USCIS and in coordination with the Commissioner of the SSA, to compile a list of all U.S. citizens who will be at least 18 by the date of the next federal election for each state. *See* Exec. Order § 2(a). The lists are to be generated using data from several federal agencies, including the SSA, DHS's Systematic Alien Verification for Entitlements program, and other federal databases.

*See id*. Given the sources of the underlying data, these lists are likely to contain significant inaccuracies and will result in infringements upon statutorily and constitutionally protected rights.

102. Despite a weak reference to the Privacy Act of 1974, Section 2(a) does not provide any mechanism to satisfy statutory privacy safeguards. Any assurances within the Order that Defendants will not violate the Privacy Act fall flat. The federal government has repeatedly mishandled private information. Two courts dismissed as pretextual the DOJ's explanation of what it intends to do with unredacted voter rolls it has demanded from virtually every state. *See Weber*, 2026 WL 118807, at *17-19; *Oregon*, 2026 WL 318402, at *11.

103. The Order also directs the Secretary of DHS to disseminate the State Citizenship List to the chief election officer in each state "no fewer than 60 days before each regularly scheduled Federal election." Exec. Order § 4(c). To the extent that this list will be used for voter registration and list maintenance purposes, especially absent the request of states, the President lacks authority to dictate the administration of voter lists at the state and local levels.

104. Section 2(b) of the Order instructs the Attorney General to prioritize investigations and prosecutions of state and local officials, as well as others, alleged to have provided mail-in ballots to individuals that the Administration has deemed ineligible. *See* Exec. Order § 2(b). The Order then instructs the Attorney General to prioritize the investigations and prosecutions of individuals and entities that are "engaged in, or aiding and abetting, the printing, production, shipment, or distribution of ballots to individuals who are not eligible to vote," despite many individuals and organizations engaging in the protected activities to widely encourage others to participate in elections.

105. The provisions of Section 3 of the Order would have the USPS, which is not under the control of the President, determine nationwide who can vote by mail and interfere with states' management and lawful transmission of mail-in or absentee ballots.

106. Section 3 of the Order directs the Postmaster General to initiate a proposed rulemaking within 60 days to establish new requirements for mail-in and absentee ballots. Pursuant to Section 3(b)(i), the USPS rules must include provisions requiring that all outbound ballot mail must be in envelopes that are marked as Official Election Mail and include a unique Intelligent Mail barcode for tracking.

107. Section 3(b)(iv) directs the USPS to generate a "Mail-In and Absentee Participation List" for each state, identifying individuals who are "enrolled with the USPS" to vote by mail or absentee ballot. Further, Section 3(b)(iii) of the Order prohibits the USPS from delivering any mail-in or absentee ballots to individuals not included on the "Mail-In and Absentee Participation List." That is, even if a voter is fully eligible and registered under state law, unless the voter also appears on the internal Mail-In and Absentee Participation List generated by the USPS, the Order mandates that USPS refuse to deliver a ballot. In effect, the Order blocks the delivery of valid mail-in or absentee ballots.

108. Section 4(a) requires the Secretary of DHS, the Commissioner of the SSA, and the Postmaster General to coordinate implementation of the Order with the Secretary of Commerce.

### C. The Administration Relies on Unlawful Enforcement Mechanisms Beyond the President's Authority

109. The Administration has no authority to impose these sweeping and unlawful changes to federal and state election practices.

110. First, provisions in the Order that require states to alter their election administration policies and procedures, including their voter registration and mail-in and absentee voting

procedures, exceed the Administration's authority because the Constitution assigns regulation of election procedures to the States and Congress, not the Executive. *ITCA*, 570 U.S. at 8-9; U.S. Const. art. I, § 4, cl. 1; *LULAC II*, 808 F. Supp. 3d at 45 ("The States have initial authority to regulate elections. Congress has supervisory authority over those regulations. The President does not feature at all."); *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.").

111. Second, the Order includes several provisions directing the USPS and Postmaster General to interfere with the transmission of mail-in and absentee ballots. The President has no constitutional or statutory authority to compel the USPS or the Postmaster General to initiate rulemaking, or to dictate USPS policy. The USPS is "an independent establishment of the executive branch," removed from the President's Cabinet and governed by a Board of Governors. 39 U.S.C. §§ 201, 202; 39 C.F.R. § 221.5(a)(3).

112. Third, the Order's directive that the Secretary of the SSA provide citizenship and "identity data" to DHS for the compilation and transmission of citizenship and personally identifying information also violates federal law. The Privacy Act prohibits the use of federal records, including records indicating citizenship and personally identifying information, without specific authorization. *See* 5 U.S.C. § 552a. The President does not have the authority to mandate the SSA to share personally identifying information with DHS and cannot circumvent congressional safeguards within the Privacy Act to compile and transmit citizen information.

113. Fourth, the Order directs the Attorney General and the heads of executive departments and agencies to withhold federal funds from "noncompliant States and localities."

Federal funding requirements are determined by statute—the President has no authority to unilaterally change statutory funding conditions.

114. Finally, the Order demands states and localities to preserve all records and materials of voter participation in a federal election for a five-year period, beyond the congressionally mandated election record retention requirement of 22 months under 52 U.S.C. § 20701 and two years under 52 U.S.C. § 20507(i)(1). The President has no authority to unilaterally change statutory record retention requirements.

### D. The Administration's Implementation of the Executive Order Relies on Inaccurate and Flawed Databases

115. As discussed, Section 2 of the Order requires the Director of the USCIS and the Commissioner of the SSA to "compile and transmit to the chief election officer of each state a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State. (State Citizenship List)." Section 4 also requires this collaboration across agencies for interagency data sharing.

116. Section 2 of the Order further states that "The State Citizenship List shall be derived from Federal Citizen and naturalization records, SSA records, SAVE data, and other relevant federal databases." The Mullin Memorandum confirms that the State Citizenship Lists will include information from USCIS, SSA, and the State Department.

117. In addition to the federal privacy encroachments involved in creating the State Citizenship List, the databases that the Order purports to rely upon are flawed, prone to error, and not reliable for the purpose of verifying citizenship.

### 1. USCIS' SAVE System is an Inaccurate and Flawed Database

118. The SAVE system was created in 1986 to allow government agencies to verify whether noncitizens are eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, §§ 121(a)(1)(C) & 121(c)(1).

119. The original SAVE system was not designed or intended to identify U.S. citizens.[21]

120. SAVE searches required DHS-assigned immigration numbers and only accessed immigration-related records.[22] SAVE searches could only be conducted for one individual at a time.

121. The SAVE system was documented to have significant error rates. For example, the North Carolina State Board of Elections found in a 2016 audit that "a match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[23] The North Carolina State Board of Elections further found "that 97.6% of persons identified by the [State Department of Motor Vehicles] as noncitizens, in fact were citizens, and that about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. Of Elections,* 996 F.3d 257, 261 (4th Cir. 2021).

---

[21] *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. N. DHS/USCIS/PIA-006(c),* DEPT. OF HOMELAND SEC., 2-3 (June 30, 2020), https://perma.cc/HU2M-NTL8 ("2020 SAVE PIA").

[22] *Id.* at 2.

[23] *Post Election Audit Report: General Election 2016,* N.C. STATE BD. OF ELECTIONS (Apr. 21 2017), https://perma.cc/WH8U-RZ4B.

122. Executive Order 14248 recently expanded the use of the SAVE system to allow queries to the SAVE system using Social Security numbers and allowing queries of more than one case at a time.

123. This data-matching between SAVE and DHS is prone to errors, as has been acknowledged by DHS officials.[24] Brian Broderick, who leads the verification division of USCIS, stated that SAVE is a tool to provide to users that may or may not work. “So we’re giving a tool to these folks to say, ‘Hey, if we can verify citizenship, great, you’re good. If we can’t, now it’s up to you to determine whether to let this person on your voter rolls.’”[25]

124. A recent review found that the SAVE database had numerous significant inaccuracies in numerous Missouri counties.[26]

125. Even the DOJ represented to the U.S. District Court of Rhode Island that the SAVE system, despite recent changes, is still prone to errors for failing to include U.S. citizens in its list. Transcript of Motion to Compel and Motion to Dismiss Hearing at 52, *United States v. Amore*, No. 25-cv-639 (D. R.I. March 26, 2026), ECF No. 47. Eric Neff, the Acting Chief of the Voting Section within the Civil Rights Division of the DOJ described the DHS’s SAVE citizenship verification process as having “holes in the process,” specifically for derived citizens whose parents naturalize when they are minors and who automatically become U.S. citizens without any additional documentation to prove citizenship. *Id.*

---

[24] Jen Fifield & Zach Despart, *“Not Ready for Prime Time.” A Federal Tool to Check Voter Citizenship Keeps Making Mistakes,* PROPUBLICA (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

[25] *Id.*

[26] *See* Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas,* THE TEX. TRIB. (Feb 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

### 2. The SSA Database is Not Reliable for Establishing State Citizenship Lists

126. The SSA database is not suitable for confirming U.S. citizenship for multiple reasons.

127. First, SSA citizenship data captures a citizen's status at the specific moment in time when an individual applies for a Social Security Number (SSN). If that application occurs prior to naturalization, which is typical, the SSA does not automatically update the individual's citizenship status after naturalization. As the SSA has recently asserted, "there is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments."[27]

128. SSA has itself stated that "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA" and "SSA's records do not provide definitive information about an individual's citizenship status."[28]

129. SSA has explained that "SSA is not the agency responsible for making citizenship determinations and SSA is not the custodian of U.S. citizenship records."[29]

130. A 2006 audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as noncitizens "because the individuals had become U.S. citizens after obtaining their SSN but had not updated their records with SSA."[30]

---

[27] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[28] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[29] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[30] SSA Off. Of the Inspector Gen., Cong. Resp. Rep. No. A-08-0626100, *Accuracy of the Social Security Administration's Numident File* (Dec. 18, 2006), https://perma.cc/5G2J-FF4V.

131. Second, SSA lacks complete citizenship data for citizens born in the United States prior to 1981. SSA has stated that "SSA did not begin to consistently maintain citizenship information until 1981 … Accordingly, SSA does not have citizenship information for all individuals who have been issued an SSN."[31]

132. Third, SSA citizenship data typically does not accurately identify derived citizens, which are citizens born outside of the United States and derive citizenship as children when their parents naturalize. These individuals have no reason to interact with the SSA until they apply for Social Security benefits, so their SSA records would not accurately identify their status as derived citizens.

133. According to one assessment cited by SSA, "approximately 1/4" of SSA's records "do not have an indication of citizenship present."[32]

134. Therefore, the "State Citizenship List" contemplated by the Executive Order would be constructed from databases that are concededly incomplete, outdated, and prone to significant error, including the systematic misidentification of U.S. citizens as noncitizens and the failure to capture large categories of citizens altogether. By directing federal agencies and States to rely on these flawed data sources to determine voter eligibility and the transmission of election-related mail, the Executive Order rests on unreliable and inaccurate information that is incapable of supporting the determinations it purports to mandate. The Order's reliance on these defective databases will foreseeably result in the erroneous exclusion or disenfranchisement of eligible voters, thereby causing concrete and particularized injury to Plaintiffs and their members.

---

[31] Letter from SSA Off. Of Gen. Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

[32] Letter from SSA Off. Of Gen . Counsel to Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

## IV. DHS AND USPS HAVE TAKEN UNLAWFUL ACTIONS TO IMPLEMENT THE EXECUTIVE ORDER'S DIRECTIVES

135. Both DHS and USPS have taken final agency actions (the "Agency Actions") to implement the Executive Order's directives.

### A. DHS Adopts a Policy Implementing the Executive Order

136. Secretary Mullin signed a memorandum ("Mullin Memorandum") approving DHS's policy for implementing Section 2(a) of the Executive Order on June 8, 2026. Mullin Mem., ECF No. 151-1. The memorandum rescinded and superseded a prior implementation plan that DHS had approved the previous week. Defendants have informed this Court that the Mullin Memorandum "more accurately reflects the current policy of the Administration with respect to the implementation of" the Executive Order. Notice at 2, ECF No. 150.

137. The approved memorandum directs USCIS to implement a technological system for providing state election officials access to federal citizenship information. The memorandum explains that, because the Executive Order assigns DHS responsibility for compiling, maintaining, and transmitting State Citizenship Lists, Secretary-level approval was "required to authorize USCIS to proceed" with the approved approach. Mullin Mem. 4, ECF No. 151-1. Secretary Mullin provided that approval on June 8. *Id.* at 5.

138. Under the approved policy, USCIS, in coordination with SSA and the Department of State, will provide state election officials access to "citizenship list information" maintained by those agencies. *Id.* at 1-2. DHS selected a "digital portal mechanism" through which state election officials may access that information using Login.gov. *Id.* at 2. Although the underlying records will remain in each agency's existing system, state officials will be able to access and download agency-generated outputs through the DHS portal. *Id.*

139. The portal will provide separate outputs from USCIS, SSA, and the Department of State. Those downloadable files will contain "citizenship related data elements, such as name, date of birth, and relevant agency identifiers." *Id.* The approved policy permits state officials to determine how to use the information they obtain. *Id.*

140. The approved policy also states that DHS will create consolidated State Citizenship Lists to provide to state election officials. In particular, the memorandum states that DHS "will continue to work to generate" a consolidated list of United States citizens residing in each State and will provide those lists to state election officials no fewer than 60 days before each regularly scheduled federal election. *Id.* at 3. For the November 3, 2026 election, that deadline is September 4, 2026.

141. DHS approved the state-facing portal and the transmission of citizenship information before creating a process through which affected individuals can view or correct the records being used. The memorandum states that a citizen-facing correction portal was not feasible by June 30 and would instead be developed during subsequent phases "later in 2026." *Id.* at 3, 5. The approved sequencing therefore permits state election officials to receive citizenship information before individuals have access to the contemplated centralized mechanism for identifying and correcting errors.

142. The memorandum asserts that existing immigration statutes authorize the approved policy. It states that 8 U.S.C. § 1373 authorizes DHS to send, receive, maintain, and exchange information concerning citizenship and immigration status with federal, state, and local governmental entities. *Id.* at 2. It also invokes the Immigration Reform and Control Act of 1986, which required the creation of an electronic system for verifying the immigration status of applicants for and recipients of certain federally funded benefits, and the Illegal Immigration

Reform and Immigrant Responsibility Act of 1996, which requires DHS to respond to governmental inquiries seeking to verify an individual's citizenship or immigration status for a purpose authorized by law. *Id.* The memorandum identifies no statute specifically authorizing DHS or USCIS to create and disseminate state-specific lists of adult citizens for use in election administration. On July 17, 2026, Secretary Mullin confirmed that for any "states that choose not to participate with the state program ... we will make sure that we make those states a priority to look at who voted in their states and hold the election officials accountable. If the election officials, once we gave them the information they need to secure their elections and they chose not to, then those individuals can also be held accountable by fines, by penalties, and even, depending on how far it goes, prison time."[33]

**B. USPS Finalized a Rule Implementing the Executive Order**

143. On June 2, 2026, the Postal Service published a proposed rule to amend the Domestic Mail Manual governing the transmission of mail-in and absentee ballots in federal elections. *Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026). The Postal Service explained that it had developed the proposal following the President's issuance of Executive Order 14399 and an interagency review process conducted through the Office of Management and Budget. *Id.* at 32,915. The Rule would effectively condition a State's ability to conduct mail voting in federal elections on the State's submission of voter-specific "Mail-In and Absentee Participation List" data to USPS.

---

[33] *See* Jennifer Bowers Bahney, *Mullin Threatens 'Prison Time' For State Officials Not Cooperating with Trump Admin on Elections*, Yahoo!News (July 17, 2026), https://www.yahoo.com/news/politics/articles/just-mullin-threatens-prison-time-155914957.html.

144. Shortly after the NPRM was issued, on June 24, 2026, Postmaster General David Steiner testified before the Senate Committee on Homeland Security and Governmental Affairs.[34] When asked if USPS would mail a state's ballots if the "state refuses to turn their absentee voter list over to the federal government," he responded: "[u]nder our proposed regulation, no."[35]

145. USPS received more than 200,000 responses to the NPRM, including more than 250 letters from organizations, elected officials, election administrators, postal unions, and voting-rights organizations. Final Rule at 3. Commenters argued, among other things, that the Postal Service lacked authority to adopt the proposed requirements; the requirements would impose substantial costs and operational burdens shortly before the 2026 election; and administrative or data errors could cause lawful ballot mailings to be rejected or delayed. *Id.* at 5-6.

146. On August 21, 2026, the Postal Service issued a final rule adopting new Section 705.24 of the Domestic Mail Manual. *Id.* at 88. The Final Rule was made available for public inspection on August 21 and published in the Federal Register on August 26. *Id.* at 1. The Rule declared itself effective on August 21. *Id.* at 1-2.

147. The Final Rule invokes the Postal Service's authority under 39 U.S.C. §§ 401 and 404 and applies to mail-in and absentee ballots used in general, special, and runoff elections for federal office. *Id.* at 21-22, 89. It does not apply to primary elections or to certain ballots transmitted under existing provisions governing military and overseas voters. *Id.* at 82-83, 89-90.

148. The Final Rule imposes mandatory design requirements on both outbound ballot envelopes sent to voters and return ballot envelopes provided for voters to send completed ballots

---

[34] *See* Adam Sella, *Postmaster General Confirms Plan to Hold Back Mail Ballots Under Proposed Rule*, N.Y. Times (June 24, 2026), https://www.nytimes.com/2026/06/24/us/politics/postmaster-mail-ballot-rule-trump-elections.html.

[35] *Id.*

to election officials. *Id.* at 91. Each envelope must display the Official Election Mail logo, be automation compatible, and bear a voter-specific Intelligent Mail barcode containing specified information. *Id.* Election officials or their authorized mailers must create the barcodes, design and print the envelopes, and submit the envelope designs to the Postal Service for review during each election cycle. *Id.* at 48-49, 90-91.

149. The Final Rule also establishes a new Federal Ballot Mail Portal. *Id.* at 92. Each State's chief election official must authorize the individuals, local election officials, contractors, or mail-service providers permitted to submit information through the Portal. *Id.* at 50, 92. Each authorized user must register for a Portal account no later than two business days before presenting an outbound federal-ballot mailing to the Postal Service. *Id.* at 92.

150. For each voter to whom a State or local election official intends to mail a federal ballot, an authorized Portal user must submit the voter's name and address, the unique barcode printed on the outbound ballot envelope, the unique barcode printed on the return ballot envelope, and the originating State. *Id.* at 92. The Rule instructs Portal users to make initial submissions at least 30 days before the election, "to the extent practicable," or by the date on which ballots may begin to be mailed under state law. *Id.* at 52, 93. It permits supplemental submissions through the final date on which ballots may be sent under state law, but requires the information associated with each particular mailing to be uploaded before that mailing is presented to the Postal Service. *Id.* at 53, 92-93.

151. The Final Rule requires compliance with the foregoing requirements for the Postal Service to accept outbound federal-ballot mailings. *Id.* at 50, 94. The Rule provides that any State intending to receive completed mail-in or absentee ballots through the Postal Service "must

ensure" that the affected voters have been enrolled through the Portal for inclusion on the State's Mail-In and Absentee Participation List. *Id.* at 92.

152. Before accepting an outbound federal-ballot mailing, Postal Service employees will scan the barcodes on the envelopes and use the Portal to determine whether the required data have been submitted and the voters have been enrolled. *Id.* at 94. The Rule mandates that a mailing that does not satisfy the Rule's preparation, data-submission, and enrollment requirements "will not be accepted" and will be returned to the election official or authorized mailer. *Id.* The identified errors must be corrected before the mailing may be resubmitted, and the Postal Service disclaims responsibility for delays resulting from noncompliance. *Id.* at 58-60, 94-95.

153. The Final Rule clarifies that this pre-acceptance verification process applies to outbound mailings from election officials, rather than completed ballots returned by individual voters. *Id.* at 58, 86, 95. But voters must still use return envelopes satisfying the Rule's new design and barcode requirements. *Id.* at 91. If an election official fails to provide a compliant return envelope, or if a voter loses that envelope, the Rule instructs the voter to obtain a compliant replacement from the election official unless the Postal Service establishes another approved means of transmitting the ballot. *Id.* at 86-87.

154. The Rule further provides that on or about Election Day, the Postal Service will generate and transmit to each State's chief election official a Mail-In and Absentee Participation List containing the name, address, and outbound and return barcodes associated with every voter enrolled through that State's Portal submissions. *Id.* at 60, 93-94. The Final Rule states that these Lists are intended to assist election officials and federal law-enforcement authorities in identifying matters for potential investigation. *Id.* at 60-61. The Final Rule explicitly asserts its primacy over state election systems: "The Postal Service is not constitutionally obliged to defer to ... a given

state's decision not to use barcodes." *Id.* at 13. The Final Rule goes further and states that "if states do use the mail" for their elections, they must comply with the requirements of the Final Rule. *Id.*

155. The Final Rule states that the Postal Service will not implement the Rule for the November 2026 election unless the government obtains relief from injunctions entered in *State of California v. Trump*, No. 1:26-cv-11581 (D. Mass.), and *League of Women Voters of Massachusetts v. Trump*, No. 1:26-cv-11549 (D. Mass.). It further states, however, that if those injunctions are lifted, the Postal Service intends to begin implementation "immediately thereafter" so that the Rule may govern the November 2026 election. *Id.* at 2.

156. On August 24, 2026, the Supreme Court stayed the injunction entered in *California*. *Trump v. California*, 2026 WL 2473573, at *1 (per curiam). The Court rested its decision on the absence of a final implementing action when the States filed suit and emphasized that "[f]ederal courts review final rules," that parties harmed by a Postal Service final rule may challenge that rule, and that its disposition did not establish that any measure implementing the Executive Order would be lawful. *Id.* at 4-5. The Court's decision did not address the separate preliminary injunction entered in *League of Women Voters of Massachusetts*.

157. On August 26, 2026, the District of Massachusetts followed suit in that case: the court issued a Memorandum & Order holding that "while Plaintiff Organizations have substantial arguments ..., this court is compelled by the Supreme Court's ruling to ... vacate the preliminary injunction obtained by the Plaintiff Organizations." Mem. & Order at 2, *League of Women Voters of Massachusetts v. Trump*, No. 1:26-cv-11549 (D. Mass. Aug. 26, 2026) (ECF No. 204) (footnote and citation omitted). Accordingly, both injunctions barring the Final Rule have been lifted.

158. The Final Rule leaves additional user guidance, technical specifications, employee training, and certain barcode identifiers to be completed as part of implementation. Final Rule at

55-57. It states that the Portal and the associated verification process will become operational when the Postal Service activates the system of records governing the Portal. *Id.* at 2.

159. Ultimately, under the Final Rule, "the Postal Service will generally not accept Outbound Federal Ballot mailings unless compliance with the rule's new standards has been verified," *id.* at 44—"it is true that outbound mail-in ballots may be rejected from the mailstream as a consequence of noncompliance with the rule's requirements," *id.* at 29.

### C. The Statutory Provisions the DHS and USPS Actions Rely on Do Not Authorize Either Action

160. Federal agencies possess only the authority Congress has conferred upon them. *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Neither an executive order nor an agency's invocation of general statutory powers can expand the authority Congress granted. The statutes invoked by DHS and USPS do not authorize the election-administration regimes those agencies have adopted.

161. The USPS Final Rule principally invokes 39 U.S.C. §§ 401 and 404 as authority to impose its envelope-design, data-reporting, enrollment, verification, and rejection requirements, and it also invokes federal election statutes codified at 52 U.S.C. §§ 10307 and 20511. Final Rule at 20-30. None of those provisions assign USPS authority to administer elections, regulate voter eligibility, collect comprehensive voter-participation information for election-law enforcement, to refuse to deliver ballots, or to discriminate between which ballots it will deliver.

162. Sections 401 and 404 grant USPS authority to operate the postal system. Section 401 permits USPS to adopt rules "necessary in the execution of its functions" and to exercise powers "incidental, necessary, or appropriate" to carrying out those functions. 39 U.S.C. § 401(2), (10). Section 404(a)(1) authorizes USPS to provide for the "collection, handling, transportation, delivery, forwarding, returning, and holding of mail." Those provisions allow USPS to establish

ordinary mail-preparation and handling requirements. *See U.S. Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 123 (1981). But their breadth remains confined to the postal functions Congress assigned. They do not authorize USPS to compel States to disclose voter-level election information, enroll voters in a federal system, condition the transmission of otherwise valid ballots on compliance with federally imposed election procedures, or to distinguish or discriminate between mail ballots.

163. The law-enforcement provisions USPS invokes do not supply the missing authority. Section 404(a)(6) authorizes USPS "to investigate postal offenses and civil matters relating to the Postal Service." 39 U.S.C. § 404(a)(6). Section 3061(b) authorizes designated postal officers to investigate offenses involving Postal Service property, property in its custody, the use of the mails, and other offenses when authorized by agreement with the Attorney General. 18 U.S.C. § 3061(b). Neither provision authorizes USPS to collect and retain information concerning every citizen sent a mail ballot merely because the information might later prove useful to law enforcement. And 52 U.S.C. §§ 10307 and 20511 define election-related offenses without assigning USPS authority to enforce those statutes or regulate state election administration.

164. Whatever authority USPS may possess to prescribe ordinary envelope and barcode standards, that authority does not extend to the sweeping changes in mail voting challenged here. The Final Rule requires States to provide the names, addresses, and outbound and return ballot-envelope barcodes of mail voters; directs USPS to discriminate between and refuse otherwise valid ballot mailings when state officials have not complied with the federal enrollment and data-reporting requirements; and is accompanied by a proposed system of records that would retain the data for five years and permit law-enforcement-related uses. Those measures regulate the

administration of mail voting and the collection of election-participation information, not merely the physical preparation and efficient delivery of mail.

165. Congress instructed USPS to provide "prompt, reliable, and efficient services" and to operate the postal system "as a basic and fundamental service provided to the people." 39 U.S.C. § 101(a). It did not authorize USPS to subordinate that obligation to an election-law-enforcement regime or make eligible voters' access to their ballots depend on state officials' submission of personal information to a federal database. The Final Rule therefore exceeds the statutory authority Congress conferred upon USPS.

166. For its part, the June 8 DHS memorandum principally invokes the Immigration Reform and Control Act of 1986 ("IRCA") and 8 U.S.C. § 1373 as authority for DHS's policy. Mullin Mem. 2, ECF No. 151-1. Neither statute authorizes DHS to compile and disseminate state-specific citizenship information for use in election administration.

167. IRCA amended the Social Security Act to require verification of the immigration status of applicants for and recipients of specified public benefits. 42 U.S.C. § 1320b-7(d). Those provisions govern eligibility for designated benefit programs, not voter eligibility. They authorize verification of the immigration status of noncitizen benefit applicants using their alien file or admission numbers; they do not authorize DHS to create lists of adult United States citizens, combine records maintained by multiple federal agencies, or provide those records to state election officials. Congress instead expressly required that the verification system established under those provisions protect individual privacy "to the maximum degree possible." *Id.* § 1320b-7(d)(3)(B). *See League of Women Voters*, 2026 WL 178429, at *31.

168. Sections 1373(a) and (b) likewise supply no authority for DHS's policy. Those provisions prohibit governmental entities from restricting specified communications concerning

citizenship or immigration status. 8 U.S.C. § 1373(a)-(b). Such prohibitory language does not constitute an affirmative grant of agency power. *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982). Section 1373(c) imposes a narrower, request-based obligation: DHS must respond to a governmental agency's inquiry seeking to verify or ascertain the citizenship or immigration status of an individual within that agency's jurisdiction for a purpose authorized by law. 8 U.S.C. § 1373(c). It does not authorize DHS to proactively construct comprehensive lists of adult citizens, provide bulk access to federal records, or disclose information beyond the requested citizenship or immigration-status verification.

169. Nor does § 1373 authorize SSA or the Department of State to provide state election officials separate downloadable outputs containing names, dates of birth, agency identifiers, and other information maintained in their respective systems. Congress has enacted specific statutes governing when and how those agencies may disclose their records. Section 1373 neither displaces those limitations nor authorizes DHS to combine records collected for immigration, benefits, and passport-administration purposes into a new federal election database. *See League of Women Voters,* 2026 WL 178429, at *32-33. Congress has instead required official voter-registration lists to be "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A).

## V. THE EXECUTIVE ORDER CAUSES IRREPARABLE AND SUBSTANTIAL HARM TO PLAINTIFFS AND THEIR MEMBERS.

170. The Executive Order and the Agency Actions taken pursuant to the Order threaten immediate, concrete, and irreparable harm to Plaintiffs and their core missions. For NAACP and Common Cause, it also threatens such harm to their individual members by unduly burdening their right to vote. The Order's provisions and the agency actions will make it harder for otherwise eligible members to vote with mailed ballots, bar otherwise eligible members from receiving their

ballots or having their outbound ballots returned, and directly impair Plaintiffs' core activities and the voting services they offer their members and members of the public.

171. Each Plaintiff operates programs that provide direct services to voters. Those services include registering voters; helping voters verify and update their registration records; assisting voters with mail-ballot and emergency-ballot applications; operating voter-protection programs; responding to individual voters who encounter barriers to voting; communicating with election officials to resolve those barriers; helping voters get to the polls; and connecting voters with legal assistance when necessary. Plaintiffs have provided these services for years, independently of the Executive Order and the Agency Actions challenged here.

172. The Order and the Agency Actions taken pursuant to the Order will impose substantial burdens on Plaintiffs NAACP, BVM, and Common Cause by forcing a diversion of limited resources away from their planned activities in a federal election year and beyond. The new burdens imposed by the Order and Agency Actions will require Plaintiffs, in addition to the current work they do to fulfill their mandate on educating and assisting voters to exercise the franchise, to revise and update educational and outreach materials, respond to increased inquiries and concerns from members, and conduct additional training for staff and volunteers to address the resulting confusion and compliance issues related to the voter lists. Continuing to fulfill their longstanding mission will require Plaintiffs to undertake significant additional work. These unplanned demands will consume time, labor, and financial resources, disrupt preexisting programmatic goals, and substantially impair the organizations' ability to carry out their intended activities.

173. Plaintiffs NAACP, BVM, and Common Cause will also need to expand volunteer recruitment and retention efforts to educate volunteers concerned about potential federal

investigations and prosecutions for assisting with voter registration and mail-in voting. The Order's threats of investigation and prosecution against individuals and entities that "aid and abet" voting by an ineligible person is sufficiently vague that they create concerns about potential attacks by the administration on the voter education and support that these organizations provide.

174. These fears of retaliation are not speculative. For example, the Texas Attorney General in 2024 issued investigative demand requests to an organization performing voter registration services in primarily young Latino communities. *See Jolt Initiative, Inc. v. Paxton*, 2026 WL 297633, at *1 (W.D. Tex. Jan. 29, 2026). While a district court recently enjoined the enforcement of the demand because it amounted to voter intimidation, *see id.* at *12, the state Attorney General first pursued the request under empty allegations that the organization's volunteers were helping individuals who were not citizens register to vote. *Id.* *2-3. Plaintiffs must dedicate additional time and resources to combat this fear of retaliation. Similarly, the members of NAACP and Common Cause will be directly and adversely impacted by the Order and the corresponding Agency Actions. Members of both encourage and provide guidance on mail-in voting and rely on USPS to cast their ballots. The Order and Agency Actions have already created confusion, uncertainty, and fear regarding the rights and obligations of their members. Given this, members will experience reduced access to accurate information, timely assistance, and support from the organizations. Further, the heightened risk of legal scrutiny and prosecution may chill lawful participation and discourage members from exercising protected rights.

175. Moreover, on information and belief, the memberships of NAACP and Common Cause include citizens who are naturalized or derived who may not be accurately identified in the SAVE system. Plaintiff organizations also include members who may lack citizenship information on their records in the SSA data system. Accordingly, use of these systems to compile State

Citizenship Lists, as required by Sections 2 and 4 of the Order and under DHS's adopted policy, will harm Plaintiffs' members by causing them to undertake numerous timely and costly steps to prove that they are eligible to vote, which will cause Plaintiff organizations to divert resources to educate members regarding how to ensure they are eligible to vote notwithstanding erroneous information on State Citizenship Lists.

176. As entities that assist voters with registering to vote and addressing the mechanics of voting, including voting by mail or absentee voting, NAACP, BVM, and Common Cause read the enforcement provisions as a chilling threat of significant adverse consequences if the organization helps a voter obtain a ballot and federal citizenship data later deems that voter ineligible based on flawed data. *See* Exec. Order § 2(b); *id.* § 5.

177. The USPS Final Rule and DHS's approved citizenship-information policy directly alter the governmental processes through which Plaintiffs provide their services. Those actions require Plaintiffs to perform additional work for the voters they already serve, increase the time and complexity of each instance of voter assistance, and reduce the number of voters Plaintiffs can assist with their existing personnel and resources.

### A. The USPS Final Rule Impairs Plaintiffs' Mail-Voting and Election-Protection Services

178. Before the Final Rule, Plaintiffs could assist a voter by determining the applicable state requirements, helping the voter register or update a registration record, helping the voter submit a timely mail-ballot application when one was required, and assisting the voter with state-law procedures for tracking or correcting problems with the ballot. Plaintiffs' voter-assistance programs, training materials, technological tools, and field operations were structured around those established processes.

179. The Final Rule adds a separate federal condition that Plaintiffs' existing services cannot satisfy. Even when a voter is properly registered and entitled to receive a mail ballot under state law, USPS will refuse an outbound ballot mailing unless the responsible election office has timely submitted the required information through the Federal Ballot Mail Portal and the mailing complies with the Final Rule's barcode requirements. Compliance therefore depends on information entered and actions taken by election officials, government contractors, and USPS—rather than on any step the voter or Plaintiffs can complete through the ordinary voter-registration or mail-ballot-application process.

180. Neither voters nor Plaintiffs have access to the Federal Ballot Mail Portal. They cannot inspect the voter information uploaded to the Portal, determine whether an election office has omitted qualified mail voters from the list, made errors in listing the mail voters, associated the correct barcode with a particular voter, corrected an error in the Portal, or directed USPS to accept a mailing that its system has rejected. The Final Rule also does not require USPS to notify the affected voter when USPS refuses an outbound mailing and returns it to the election office.

181. The Final Rule consequently impairs Plaintiffs' ability to carry out their core mission to provide effective mail-voting assistance. A voter who has completed every step Plaintiffs previously advised the voter to take may nevertheless fail to receive a ballot. When that occurs, Plaintiffs cannot determine from the voter's records whether the problem resulted from the voter's registration, the voter's ballot request, an election office's Portal submission, the assignment or printing of the barcode, USPS's verification process, or some other failure in the transmission process.

182. To continue providing the direct assistance their programs are designed to provide, Plaintiffs must now undertake additional individualized work. That work includes determining

whether the election office issued the voter a ballot; contacting election officials to determine whether the voter's information was uploaded (and uploaded accurately) to the Portal; investigating whether an outbound mailing was rejected; seeking the prompt issuance of a replacement ballot; identifying alternative means of receiving or casting a ballot; and helping the voter complete those alternatives before the applicable election deadlines. Those tasks were not part of Plaintiffs' ordinary mail-ballot-assistance process before the Final Rule.

183. This additional work must be performed on an election-specific and voter-specific basis. The Portal requirements operate alongside fifty different bodies of state election law and thousands of local election offices and vendors. A solution that applies to one voter, jurisdiction, or election may not apply to another. Plaintiffs therefore cannot address the Final Rule's interference with their services through a single public statement, general educational campaign, or uniform revision to their existing materials.

184. The additional work must be performed within compressed election deadlines. A voter ordinarily will not seek assistance concerning a missing ballot until they become aware that the ballot should have arrived, but did not. Plaintiffs must then identify the source of the problem, communicate with the relevant election office, secure a replacement or alternative voting method, and assist the voter before it is too late to cast a ballot. Those individualized interventions require substantially more staff or volunteer time than the voter-assistance services Plaintiffs previously provided.

185. Because Plaintiffs have finite personnel and programmatic resources, spending additional time on each voter affected by the Final Rule reduces the number of other voters they can register, assist, or protect. Plaintiffs must either reduce the number of voters served through their existing programs, provide a lower level of service to each voter, or redirect personnel and

funds from other established programs. The Final Rule therefore impairs the quantity and quality of the direct voter services Plaintiffs can provide.

**B. DHS's Policy Impairs Plaintiffs' Voter Assistance Services**

186. DHS's approved policy independently interferes with Plaintiffs' existing voter-registration and voter-assistance programs. Those programs regularly assist voters in verifying and updating their registration records, responding to eligibility questions, obtaining necessary documentation, and communicating with election officials when a voter's registration is questioned.

187. DHS's policy creates a new federal information system outside the state registration systems through which Plaintiffs previously provided those services. It makes separate, downloadable outputs from USCIS, SSA, and the Department of State available to state election officials; calls for DHS to generate consolidated state-specific citizenship lists; and permits state officials to determine how to use the information. The selected systems were created for different purposes, use different data fields and identifiers, and may contain inconsistent information about the same person.

188. Plaintiffs cannot resolve discrepancies within that system through their existing voter-registration services. Plaintiffs do not have access to the state-facing portal, cannot inspect the agency outputs provided to a particular State, cannot determine which federal record produced a discrepancy, and without such information have no opportunity to correct errors. DHS has approved the distribution of the information to State recipients before completing the centralized citizen-facing process through which individuals may view and correct information used by DHS.

189. Voters have already contacted Plaintiffs and their partner organizations with questions about whether federal records identify them as citizens, whether their information will appear in the files provided to state election officials, and how they can identify and correct a

discrepancy. Plaintiffs cannot answer those questions by examining the voter's state registration record or by using their existing registration-verification tools. Nor can Plaintiffs direct those voters to the contemplated DHS correction portal because that portal is not yet available.

190. To provide meaningful assistance, Plaintiffs must instead investigate which federal agency may possess the relevant record, help the voter obtain and compare records from multiple agencies, identify differences among those records and the voter-registration record, assist the voter in obtaining supporting documents, communicate with federal and state officials, and monitor whether any correction is reflected in subsequent agency outputs. Those tasks are substantially more time-consuming than the registration verification and correction assistance Plaintiffs ordinarily provide.

191. The absence of a centralized, operational correction process further increases the burden on Plaintiffs' direct-service programs. Without such a process, Plaintiffs must develop an individualized response based on the voter's particular records, the federal agency involved, the jurisdiction in which the voter is registered, and the manner in which state officials have used the federal information. Plaintiffs must perform that work during the period immediately preceding the November 2026 election, when their registration, voter-mobilization, and election-protection programs face their greatest demands.

192. The resulting injury exists independently of whether any particular voter is ultimately removed from a registration list or denied a ballot. DHS's policy introduces a separate set of federal records into the registration and election-administration processes that Plaintiffs' direct services address, while withholding from voters and Plaintiffs the centralized means of viewing or correcting those records. Plaintiffs must devote additional programmatic resources to

each affected voter to provide the same registration and voter-protection services they provided before DHS adopted the policy.

### C. Injury to the NAACP's Operations

193. Voter registration, voter mobilization, and direct voter assistance are longstanding operations of the NAACP. Through more than two thousand state conferences, local branches, college chapters, prison chapters, and youth councils, the NAACP conducts voter-registration drives, door-to-door canvassing, direct voter contact, digital mobilization, and election-protection activities. In advance of the 2024 elections, the NAACP recruited more than 100,000 volunteers to conduct this work.

194. The NAACP also provides individualized assistance to voters. Its members and volunteers help voters register, verify their registration status, complete mail-ballot and emergency-ballot applications, and resolve barriers to voting. The NAACP provides those services to communities that frequently depend on mail voting, including elderly and disabled voters, residents of long-term-care facilities, students, naturalized citizens, incarcerated voters, rural voters, military families, and voters without reliable transportation.

195. The challenged Agency Actions directly impair those services. Even after helping a voter complete a valid registration or mail-ballot application, an NAACP volunteer cannot determine whether the State or its authorized mailer has enrolled that voter in USPS's Portal, submitted the required voter-specific data, and satisfied the independent design, certification, and entry requirements that determine whether USPS will accept the State's outbound ballot mailing. An NAACP volunteer assisting a voter with a federal-record discrepancy likewise cannot identify the agency output at issue or use a centralized DHS process to correct it. The NAACP must therefore extend its assistance beyond its established registration and ballot-application services and undertake the additional individualized interventions described above.

196. Those interventions require more volunteer and staff time for each voter. They also require coordination among the NAACP's national office, state conferences, local units, and the election officials responsible for each affected voter. Because election rules and administrative practices vary by jurisdiction, the NAACP cannot centralize that work within a single national program or resolve the impairment through general public education.

197. The NAACP has dedicated staff and programmatic resources to performing that additional work. Because DHS approved its policy and USPS promulgated the Final Rule, the NAACP has included disclaimers in its voter education materials about mail-in ballots to ensure the steps they must take to ensure their ballot is successfully cast, as well as updated its year-round voter materials used in its voter education initiatives. Although these printed and digital materials were prepared starting in January 2026 for the November 3, 2026 General Election, NAACP staff, members, and volunteers have been forced to update materials to reflect changes to mail-in ballot and voter registration processes as a result of these new policies. These new policies have also required year-round volunteer trainings to be updated close to the General Election so that volunteers and voters are aware of the new policies and any associated risks. In response to these policies, the NAACP has also developed new and expanded existing voter campaigns to address issues experienced by voters whose voter registrations are inaccurately flagged for voter eligibility deficiencies or whose ballots are delayed or undelivered. Such programs include expanded volunteer services and resource investments in Ride to Poll programs for voters who cannot successfully vote by mail or do not trust the USPS to handle their ballot. These programs are launching nationwide in many states in advance of the 2026 General Election, including in Georgia, New Jersey, North Carolina, and Tennessee. These activities have required significant

time and resources from NAACP staff and volunteers, which was originally budgeted for traditional get-out-the vote activities and voter registration drives.

198. Despite its best efforts, the NAACP cannot perform the additional work required to assist numerous voters as they navigate the new rules without reducing its other services. The staff and volunteers assigned to investigate federal-record discrepancies and outbound-ballot failures would otherwise register voters, conduct direct voter contacts, operate election-protection programs, or provide established forms of voter assistance. As a result of the challenged actions, the NAACP and its members will take time and resources away from local events and shift staffing away from its other programs, such as annual conference planning in the fall.

**D. Injury to Common Cause's Operations**

199. Common Cause provides direct registration, registration-verification, voter-assistance, and election-protection services throughout the country. Its website allows voters to register and verify their registration status; nearly 6,000 voters used its tools to register in 2024, and nearly 40,000 used them to verify their registration. Common Cause's state organizations also conduct direct voter-registration outreach.

200. Common Cause further operates and participates in election-protection programs that field communications from voters encountering barriers to voting. Its staff and volunteers provide individualized assistance, communicate with election officials to resolve problems, and facilitate access to counsel when necessary. Common Cause has long provided those services to voters who use mail voting because of disability, age, caregiving responsibilities, work schedules, school attendance, rural residence, incarceration, or lack of transportation.

201. The challenged Agency Actions increase the time and complexity of each instance of assistance. Common Cause's existing tools can tell a voter whether the voter is registered and can help the voter update the state registration record. They cannot determine whether the election

office accurately uploaded the voter's information to the Federal Ballot Mail Portal, whether USPS rejected the election office's outbound mailing, whether a federal citizenship output contains inconsistent information, or how to correct the underlying federal record before DHS's centralized correction process becomes available.

202. Common Cause must therefore add new steps to the services it provides. Its staff and election-protection volunteers must conduct individualized follow-up with election offices, investigate failures in ballot transmission, identify the federal records implicated in a citizenship discrepancy, assist voters in obtaining supporting records, and help voters secure replacement ballots or alternative voting methods within the applicable deadlines.

203. That work reduces Common Cause's service capacity. Each staff member or volunteer who spends additional time resolving a Portal, barcode, ballot-delivery, or federal-record problem is unavailable to respond to another voter. The challenged actions therefore require Common Cause either to assist fewer voters through its election-protection operations or to provide less assistance to each voter.

204. Since the challenged policies became definitive, Common Cause staff have already spent more than 100 hours of staff time on understanding the new USPS rule, identifying impacted counties by communicating with election administrators and coalition partners, obtaining information about the impact of the rule on voters to assist members, voters, and coalition partners who have asked for guidance. Because Common Cause has limited staff and resources, these activities have caused Common Cause to redirect its focus from its other mission-critical activity. Common Cause expects the demands from its members to increase as election offices begin transmitting ballots for the November 2026 election.

### E. Injury to Black Voters Matter's Operations

205. BVM operates direct voter-registration and get-out-the-vote programs and provides grants, training, technical assistance, and operational support to grassroots organizations serving Black communities. In 2024, BVM distributed more than $9 million to approximately 700 grassroots partners conducting programmatic work in 225 counties across 25 States. These programs include phone and text banks, letter and postcard campaigns, door-to-door canvassing, campus programs, direct registration assistance, and support for voters using mail ballots.

206. BVM's service model depends on trusted local organizations that can give voters reliable, individualized assistance. BVM trains and funds those partners to help voters complete registration and mail-ballot applications, understand the applicable voting procedures, and address problems that could prevent their ballots from being cast and counted.

207. The USPS Final Rule impairs those services because BVM and its partners cannot ensure ballot delivery by helping a voter satisfy the state-law registration and ballot-application requirements. DHS's policy likewise impairs their ability to resolve registration and eligibility problems through the state processes on which their programs were designed. BVM and its partners must now undertake additional case-specific work involving federal systems that neither they nor the voter can access directly.

208. BVM has already experienced a significant increase in inquiries from voters and partner organizations concerning voter eligibility, mail-ballot access, data matching, and the use of voter information. BVM has responded by increasing staff time, expanding volunteer outreach, committing unplanned financial resources, and training staff and partners to assist voters confronting data-matching and ballot-delivery problems.

209. Those expenditures support BVM's direct voter-assistance operations. BVM's staff and partners must now devote additional time to each voter whose ballot does not arrive or whose

records contain an apparent discrepancy. They must communicate with election officials, help obtain documents, investigate the source of the problem, and identify an alternative method of voting. This additional casework reduces the number of voters BVM and its partners can register, contact, and assist.

210. BVM's resources were committed before the challenged actions to specific voter-registration, GOTV, grantmaking, and community-service programs. To address the additional demands created by the USPS and DHS policies, BVM has reallocated funding and staff time away from its planned programming, limiting its ability to provide voter registration services to hard-to-reach voters whom BVM engages in the normal course of its work. These operational losses impair BVM's established programs and the services available through its grassroots partners.

### F. The Challenged Agency Actions Directly Burden Plaintiffs' Members

211. Many NAACP and Common Cause members vote by mail and plan to use USPS services to receive and cast their ballots in upcoming federal elections. Amongst NAACP and Common Cause's membership are eligible voters who submit voter registration forms and absentee or mail ballot request forms close to election deadlines mandated by state law, some of whom live in states that have all mail elections. These members include elderly, disabled, college, rural, incarcerated, and traveling voters who rely on USPS to vote. Common Cause also has members in counties that do not currently use unique Intelligent Mail barcodes on both outbound and return mail-in ballot envelopes, which would prevent Common Cause members from receiving mail ballots or returning completed ballots. These state-imposed election deadlines are much closer in time to Election Day than the 30 days that the USPS final rule contemplates for the creation of its USPS mailed ballot list. These members' ability to vote would be impaired by the Order's and the USPS rule's effective mandate that USPS may "not transmit mail-in or absentee ballots from

any individual unless those individuals have been enrolled on a State-specific list." Exec. Order § 3(C)(ii).

212. The challenged Agency Actions impose concrete burdens on Plaintiffs' members who have definite plans to vote by mail in the November 3, 2026 federal election. Under the Final Rule, these voters cannot receive their ballots through USPS unless their election officials first enroll them in USPS's federal system by transmitting their names, addresses, and unique outbound- and return-envelope barcodes. USPS will maintain those records in a new federal system of records for five years, retrieve them by voters' names and addresses, and make them available for uses that include determining compliance with federal law and facilitating law-enforcement activities.

213. The affected voters have no control over that enrollment process. The Final Rule expressly assigns responsibility for supplying, verifying, and correcting the required information to election officials and their service providers—not to voters. Plaintiffs' members cannot inspect the information submitted about them through the USPS portal, verify that their names, addresses, and ballot-envelope barcodes have been entered correctly, or correct an error themselves. Nevertheless, USPS will determine whether to accept their outbound ballot mail by comparing the mailing against those federally maintained records.

214. The resulting injury does not depend on whether USPS ultimately rejects a particular ballot mailing. The Final Rule presently conditions Plaintiffs' members' use of the mails to vote on the collection and five-year federal retention of personally identifiable records linking each voter to the unique barcodes assigned to that voter's outbound and return ballot envelopes. These members must submit to that federal data-collection regime to use the voting method they

have chosen and, in several instances, the only voting method practically or physically available to them.

215. In addition, Plaintiffs' members are injured because the Final Rule affords no notice or recourse for rejected or delayed mailing when a state or local election office cannot or does not comply with the Final Rule's requirement.

216. Plaintiff Common Cause member Jill Howard is a 73-year-old registered Washington voter who intends to vote by mail in November 2026, as she has done in prior elections. She lives in a mountainous rural area approximately fifty miles from her county elections office. Winter weather can make the roads dangerous or impassable, and her chronic medical conditions make extended travel difficult. Voting in person or personally delivering a ballot is not a practical substitute for receiving and returning her ballot through USPS. The Final Rule thus requires the disclosure and federal retention of her voter and ballot-envelope information as a condition of using the voting method on which she relies. Ms. Howard objects to the federal government collecting and sharing her personal information for this election-related purpose.

217. Plaintiff Common Cause member Catherine Balan lives in a remote area of California's Sierra Nevada foothills, lacks access to public transportation, and must travel approximately one mile merely to reach her mailbox. The nearest potential polling location is approximately ten miles away over mountain roads that are affected by severe weather and wildfires. Ms. Balan has voted almost exclusively by mail for approximately twenty-five years and intends to do so in the November 2026 election. She expressly objects to the federal government obtaining and disseminating her personal and voter information. The Final Rule leaves her unable to use the voting method on which she has long relied without subjecting that information to USPS's new federal system.

218. Plaintiff Common Cause member Brian James Freeman is an 85-year-old registered Oregon voter who has resided at the same address for more than fifty years. He votes exclusively by mail and intends to do so in the November 2026 election. Mr. Freeman has health and mobility limitations and serves as the primary caregiver for his homebound wife. Traveling to a polling location, ballot drop box, election office, or postal facility is not a feasible alternative. The Final Rule therefore conditions Mr. Freeman's only practical method of voting on federal collection and retention of his personal and ballot-envelope information, to which he has not consented.

219. DHS's approved policy imposes an additional and distinct burden on Plaintiff NAACP member Alphonso Braggs. Mr. Braggs was born in 1960 and is a United States citizen, military veteran, registered Hawaii voter, and regular mail voter who intends to vote by mail in the November 2026 election. The federal and state records that DHS has chosen to use already contain materially inconsistent identifying information about him. Mr. Braggs's birth certificate, hospital records, and Social Security Administration records identify him as "Alphonzo Bragg." His Hawaii voter-registration record, driver's license, military records, tax records, employment records, and financial records identify him by the name he has used throughout his adult life: "Alphonso Braggs."

220. Mr. Braggs previously attempted to correct his Social Security record, but SSA refused to change it without documentation establishing a legal name change. To address the problem for Medicare purposes, he was required to petition the Hawaii Lieutenant Governor, pay associated fees, and wait approximately two months for an official alias or name-change document. Correcting his North Carolina birth certificate would require obtaining a certified copy, securing a court order, paying application and court fees, and completing administrative processes that take additional months.

221. DHS's approved policy directs the agency to use information from SSA, USCIS, and the Department of State to produce state-facing citizenship information and consolidated State Citizenship Lists for election officials. Thus, the federal and state records that DHS's policy is designed to associate already disagree about Mr. Braggs's identity. DHS has approved the dissemination of citizenship information to state election officials before establishing the contemplated voter-facing portal through which individuals can inspect and seek correction of that information. Mr. Braggs therefore has no means to determine how DHS has associated his conflicting records, what information DHS will provide to Hawaii election officials about him, or whether DHS has attributed those records to the correct registered voter before the scheduled dissemination.

222. The DHS policy also subjects Plaintiffs' other members to a new use of federal records they supplied for purposes unrelated to voting. Ms. Howard, Ms. Balan, and Mr. Freeman are United States citizens and registered voters within the population DHS's policy is designed to identify. Each has expressly objected to the federal government repurposing or disseminating personal information for election administration. DHS's approved policy eliminates their ability to keep citizenship-related records maintained by federal benefits, immigration, and passport agencies from being compiled for and disclosed to state election officials for that different purpose.

223. These DHS-related injuries exist independently of any prediction that a particular voter will ultimately be removed from a voter-registration list or denied a ballot. The Final Rule presently makes federal collection and retention of voters' personal and ballot-envelope information a condition of using USPS to vote by mail. DHS has definitively selected the federal databases it will use, authorized the dissemination of information derived from those databases to state election officials, and deferred the voter-facing correction process until after implementation

has begun. And, for Mr. Braggs, the records selected by DHS already contain a documented conflict that he cannot inspect or correct through DHS's election-related system before dissemination.

### G. Plaintiffs' Injuries Are Caused by the Challenged Agency Actions and Will Be Redressed by the Requested Relief

224. Plaintiffs' injuries are directly traceable to the Agency Actions challenged in this Supplemental Complaint. Those injuries no longer depend on how DHS or USPS might implement the Executive Order. DHS has approved a definitive policy governing the compilation and dissemination of federal citizenship information, and USPS has promulgated a Final Rule governing the transmission of ballot mail. Those final Agency Actions themselves impose the burdens described above.

225. The USPS Final Rule directly impairs Plaintiffs' voter-assistance services. It establishes new conditions that voters and election officials must satisfy to transmit ballot mail through USPS, including enrollment in the USPS portal, submission of specified voter and ballot-envelope information, and use of unique outbound and return barcodes. It also requires USPS to verify outbound ballot mail against the information submitted through the portal and to refuse and return noncompliant mailings. Those federally imposed requirements have changed the information Plaintiffs must provide, the questions they must answer, and the assistance they must furnish to voters seeking to obtain and cast mail ballots. They have thereby interfered with Plaintiffs' existing voter-assistance services and caused the operational burdens, increased demand, and diversion of personnel and resources alleged above.

226. Those injuries are attributable to the Final Rule itself, rather than to an independent decision by a State. For any State that continues to use USPS to transmit mail ballots, the Final Rule dictates the information that must be submitted, the procedures that must be followed, and

the consequence of noncompliance. State and local election officials have no authority to waive those federal requirements or require USPS to accept a mailing that USPS has determined does not comply. And if a State declines or is unable to satisfy the Final Rule, the resulting inability to use USPS to transmit covered ballot mail follows from the condition USPS has imposed on access to the national postal system. Whether a State attempts to comply with the Final Rule or forgoes USPS ballot service, the Final Rule disrupts the established mail-voting processes on which Plaintiffs' services depend.

227. The Final Rule also directly burdens Plaintiffs' members. Ms. Howard, Ms. Balan, Mr. Freeman, and other identified members have definite plans to vote by mail in the November 2026 election, and their ballots are transmitted through USPS under their jurisdictions' existing election procedures. The Final Rule conditions that planned use of USPS on their enrollment in the federal portal and the submission, verification, and five-year retention of their names, addresses, and unique ballot-envelope barcodes. Those conditions apply by force of the Final Rule. They do not depend on a future discretionary decision by a state official to burden these voters or on a prediction that USPS will reject a particular voter's ballot mailing.

228. DHS's approved policy separately and directly causes the injuries arising from the use and dissemination of federal citizenship records. Secretary Mullin's approval authorizes USCIS and DHS to establish the state-facing portal, provide state election officials with downloadable information from USCIS, SSA, and the Department of State, and generate and transmit consolidated State Citizenship Lists. The policy therefore authorizes the precise compilation, repurposing, and disclosure of federal records that impair Plaintiffs' voter-assistance activities and require them to assist voters in understanding and addressing federal citizenship information used for election-related purposes.

229. Plaintiffs are presently injured by DHS's policy independent of whether a State ultimately removes a voter from its registration list, rejects a ballot, or otherwise acts on the information DHS provides. Plaintiffs must respond to the federal information system that DHS itself has created: a system that disseminates citizenship information to state election officials, draws from databases not created or maintained to determine voter eligibility, and begins operating before DHS provides voters a centralized means to inspect and seek correction of the information disseminated about them. The resulting interference with Plaintiffs' existing assistance services is caused by DHS's decision to create and operate that system.

230. The requested relief would redress Plaintiffs' USPS-related injuries. An order declaring the Final Rule unlawful and enjoining USPS and the USPS Defendants from implementing or enforcing it would eliminate the federal enrollment, data-submission, barcode-verification, and mailing-acceptance requirements that are impairing Plaintiffs' voter-assistance services. It would permit Plaintiffs to provide those services under the established mail-voting procedures for which their programs, educational materials, staff, and volunteers were designed. It would also permit Plaintiffs' members to receive ballot mail through USPS without submitting to the challenged federal enrollment and verification regime.

231. Vacatur and injunctive relief would redress the injuries caused by the DHS policy as well. An order setting aside Secretary Mullin's approval and enjoining DHS, USCIS, and the responsible officials from implementing the approved policy would prevent them from providing state election officials access to the challenged federal outputs, compiling and transmitting State Citizenship Lists under that policy, and continuing the election-related use of the records at issue. That relief would remove the federal information system that is impairing Plaintiffs' existing services and generating the need for the additional assistance described above.

232. The Court can provide this relief directly against the agency Defendants responsible for the challenged actions. No order against a State, state election official, or other third party is necessary to vacate the Final Rule, set aside the DHS policy, prevent the federal collection and dissemination of the records at issue, or eliminate the resulting impediments to Plaintiffs' voter-assistance services. Plaintiffs' injuries are therefore both fairly traceable to the challenged Agency Actions and redressable by a favorable decision.

## CLAIMS FOR RELIEF

### COUNT I:
### Ultra Vires Presidential Action
### (U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2)
### (All Defendants)

233. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

234. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) (*NFIB*). Accordingly, it is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173, 188-89 (1999) (quotation omitted); *see Youngstown*, 343 U.S. at 585. The President lacks any authority to act "unconstitutionally or beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 691 n. 11 (1949)). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied*, 144 S. Ct. 1110 (2024).

235. In the realm of elections, the President's constitutional and statutory authority is purposefully limited. The Constitution itself grants the President no direct authority over elections. Instead, the Constitution "invests the States with responsibility for the mechanics of congressional elections." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. 2, § 1, cl. 2.

236. In contrast to Congress's express authority to regulate elections, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* (quoting *Roudebush*, 405 U.S. at 24). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id*. at 1347. Instead, the President and other executive officers may only act "in relation to another branch's constitutionally authorized act." *Id*.

237. The Executive Order dramatically exceeds his highly limited constitutional and statutory authority when it comes to regulating elections. The Order identifies no source of legal authority—and none exists—for the President to compile and disseminate state-by-state lists of purportedly eligible voters derived from federal databases, *see* Exec. Order §§ 2(a), 4(c); direct federal enforcement actions against state and local officials and private actors involved in the administration and facilitation of voting, *see id.* § 2(b); require federal agencies to coordinate and share election-related data across—and, indeed, beyond—the executive branch, *see id.* § 4(a); and mandate that the Postal Service initiate rulemaking and impose nationwide conditions on the

transmission and delivery of mail-in and absentee ballots, including by restricting delivery to voters identified on federally prescribed lists, *see id.* § 3.

238. Each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them. And each command harms Plaintiffs and their members and supporters by making it more difficult to register voters, to maintain the registrations of existing voters, and to successfully cast ballots, including by mail, and to have such votes counted in fairly administered elections.

239. Specifically, the President lacks authority under the Constitution and Congress's election-related statutes—including the Elections Clause, U.S. Const. art. I, § 4, cl. 1, the Qualifications Clause, U.S. Const. art. I, § 2, cl. 1, the Electors Clause, U.S. Const. art. II, § 1, cl. 2, and statutes such as the National Voter Registration Act, the Help America Vote Act, and the Uniformed and Overseas Citizens Absentee Voting Act—to regulate voter eligibility, prescribe the manner in which ballots are cast or transmitted, compel state officials to alter their election procedures, or direct independent federal entities to impose nationwide conditions on the delivery and counting of mail ballots.

240. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful to the extent it purports to direct *ultra vires* actions.

**COUNT II:**
**Violation of Separation of Powers — Unlawful Intrusion on Congressional Authority and Violation of Federalism**
**(U.S. Const. art. I § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2)**
**(All Defendants)**

241. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

242. The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327

(2015). The claim "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

243. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress. *Id*. at 637 (Jackson, J., concurring). The President cannot enact, amend, or repeal statutes. *Clinton v. City of New York,* 524 U.S. 417, 438 (1998). "The President must 'point to clear congressional authorization' to justify" such extraordinary assertions of authority with respect to election administration via executive order. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 641-42 (2026) (quoting *Nebraska*, 600 U.S. at 506) (rejecting Presidential power to order tariffs without congressional authorization). The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as well," including by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id*. at 222-23.

244. The Executive Order intrudes upon Congress's prerogatives in several respects. Most fundamentally, the Constitution assigns to Congress and the States—not the President—the authority to regulate federal elections. *See* U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. Congress has exercised that authority by enacting a comprehensive statutory framework governing voter registration, voter list maintenance, absentee and mail voting, and the administration of federal elections, including through the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*, and the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et seq*. These statutes assign

primary responsibility for election administration to the States, subject to limited federal standards enacted by Congress. The Constitution assigns no comparable authority to the President. Moreover, in recently rejecting the SAVE Act, Congress has indicated an unwillingness to adopt the President's preferred election administration policies, further reducing the President's authority to regulate elections. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

245. Congress has likewise exercised its authority under the Postal Clause to establish and govern the operations of the Postal Service as an independent establishment, and to prescribe both the substantive obligations and procedural mechanisms governing its operations. *See* 39 U.S.C. §§ 101, 201, 3661. Congress has required that the Postal Service operate as a neutral, nondiscriminatory carrier of the mail, *id.* §§ 101(a), 403(c), and has specified the processes by which nationwide changes to postal services may be adopted, including through § 3661 proceedings subject to independent review by the Postal Regulatory Commission. Congress has not authorized the President to direct USPS rulemaking, to impose substantive requirements on the handling or delivery of election mail, or to condition the transmission of mail on voter eligibility determinations.

246. The Executive Order violates the Constitution's separation of powers by purporting to exercise regulatory authority that the Constitution assigns to Congress and that Congress has exercised through statute. Among other things, the Order purports to (a) impose new nationwide conditions on the transmission and delivery of mail-in and absentee ballots, including requirements that voters be included on federally derived lists, *see* Exec. Order § 3(b); (b) mandate that the Postal Service initiate and complete rulemaking of specified substantive content on a fixed timetable determined by the President, *id.* § 3(b), (d); (c) create and disseminate federal "State Citizenship Lists" for use in connection with voter

eligibility and election administration, *id.* § 2(a), § 4(c); and (d) prioritize federal investigations and enforcement actions against state and local officials and private actors engaged in election administration, *id.* § 2(b). These directives attempt to establish new federal election rules and displace the statutory framework Congress has enacted.

247. In doing so, the Executive Order usurps Congress's legislative authority and overrides the careful allocation of power that Congress has established. The President cannot "seize[] the power of the Legislature" by implementing policies that Congress has not enacted and, in many respects, has declined to enact. *See Nebraska*, 600 U.S. at 503. Nor may the President direct independent entities, including the Postal Service, to exercise their statutory authority in a manner inconsistent with Congress's design. Because the Executive Order attempts to substitute presidential directives for the statutory framework governing elections and postal operations, it violates the Constitution's separation of powers.

248. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful and enjoined because the Order alters the rules governing federal elections, burdens the ability of Plaintiffs and their members to register voters and facilitate voting, and threatens the disenfranchisement of eligible voters through unlawful federal interference with ballot transmission and election administration.

**COUNT III:**
**Violation of Separation of Powers — Unlawful Intrusion on State Authority**
**(U.S. Const. art. I § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend X)**
**(All Defendants)**

249. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

250. The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong*, 575 U.S. at 327. The claim "is the creation of

courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.*

251. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The President acts at the "lowest ebb" of his power if he acts contrary to the expressed or implied will of Congress. *Id*. at 637 (Jackson, J., concurring). The President may not enact, amend, or repeal statutes. *Clinton,* 524 U.S. at 438. "The President must 'point to clear congressional authorization' to justify" such extraordinary assertions of authority with respect to election administration via executive order. *See Learning Res., Inc.,* 146 S. Ct. at 641-42 (quoting *Nebraska*, 600 U.S. at 506) (rejecting Presidential power to order tariffs without congressional authorization).

252. The Constitution establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). As relevant to this case, this separation is reflected in both the Constitution's assignment to State Legislatures the power to set the "Times, Places, and Manner" of federal elections, U.S. Const. art. I, § 4, as well as the Tenth Amendment's "reserve[ation] to the States" all "powers not delegated to the United States by the Constitution."

253. The Executive Order violates the Constitution's separation of powers between the federal government and the States by requiring executive officials to take actions that intrude upon matters the Constitution leaves to the States. The Elections Clause assigns to state legislatures the authority to regulate the "Times, Places, and Manner" of federal elections, subject only to Congress's authority to alter such regulations. U.S. Const. art. I, § 4, cl. 1. The Executive Order nonetheless purports to override state election laws by imposing federal conditions on the casting and transmission of mail-in and absentee ballots, including by requiring States to conform to

federally prescribed timelines, ballot-handling procedures, and voter eligibility verification mechanisms. *See* Exec. Order §§ 2(a), 3(b), 4(c).

254. In particular, the Executive Order attempts to compel or coerce States to alter their election procedures by (a) conditioning the transmission and delivery of mail-in and absentee ballots in compliance with federally imposed requirements, including the provision of voter lists and the use of specified ballot envelope formats, *see id.* § 3(b)(i)-(ii); (b) interposing federal eligibility determinations—through the "State Citizenship List" and USPS-controlled participation lists—into state voter registration and ballot distribution processes, *see id.* §§ 2(a), 3(b)(iii)-(iv); and (c) leveraging federal enforcement authority to potentially investigate or prosecute—and at the very least, chill—state and local officials who administer elections in accordance with state law but contrary to the Executive Order's directives, *see id.* § 2(b). These provisions collectively operate to displace state authority over election administration and substitute federal executive control.

255. The Executive Branch may not require States to administer their own laws in accordance with federal directives, whether through direct commands or through indirect pressure. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471-72 (2018); *New York v. United States*, 505 U.S. 144, 166 (1992). These limits reflect the Constitution's allocation of authority between the federal government and the States, which protects individual liberty by preventing the concentration of power in a single branch or level of government. *See Bond*, 564 U.S. at 221-23. In the specific context of federal elections, that allocation places primary responsibility for regulating election procedures with the States, subject to congressional—not presidential — oversight. *See ITCA*, 570 U.S. at 8-9; *Moore v. Harper*, 600 U.S. 1, 29 (2023). The Executive Order departs from these principles by using federal authority over the mail and federal

enforcement mechanisms to pressure States to modify their election systems, a form of indirect control that the Constitution does not permit. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024); *cf.* League of United Latin Am. Citizens *v. Exec. Office of the President*, 2026 WL 252420, at *42 (D.D.C. Jan. 30, 2026) ("*LULAC III*"). By conditioning the transmission and delivery of ballots in compliance with federal requirements, the Order effectively compels States to conform their election practices to presidential directives, in violation of the Tenth Amendment and the Elections Clause.

256. The Executive Order, therefore, usurps the States' constitutional authority and violates the Constitution's separation of powers. Its provisions would interfere with States' established systems for voter registration, absentee and mail voting, ballot transmission, and election administration, and would impose federally dictated conditions that many States neither require nor authorize under their own laws.

257. Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful and enjoined because the Order will disrupt state election systems, create confusion among voters and election officials, burden Plaintiffs' efforts to assist voters in navigating state election laws, and result in the disenfranchisement of eligible voters whose ballots are delayed, rejected, or never transmitted due to unlawful federal interference.

**COUNT IV**
**Constitutional Right to Vote (U.S. Const., amends. I & V)**
**(All Defendants)**

258. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

259. The First and Fifth Amendments to the U.S. Constitution guarantee the fundamental right to vote free from excessive burdens. *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434.

260. In evaluating election regulations, courts weigh "the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justification for the burden imposed by its rule" considering "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789.)

261. Voting restrictions that impose severe burdens on a plaintiff's right to vote "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). Even laws that impose less severe restrictions "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation omitted). The Order imposes unjustifiable burdens on the right to vote by threatening to arbitrarily disenfranchise voters whose names are omitted from a federally managed eligibility list and by imposing additional burdens on any voter who wishes to lawfully vote by mail in federal elections.

262. Section 3(b) of the Executive Order directs the Postmaster General to initiate a rulemaking that would restrict the Postal Service from delivering mail-in ballots to voters who do not appear on a federally compiled "Mail-In and Absentee Participation List." Defendants implemented Section 3(b) by issuing the USPS Final Rule,

263. For eligible registered voters who do not appear on the Mail-In and Absentee Participation List, whether because of data-entry errors, name mismatches, database gaps, or the failure of federal records to capture native-born citizens who have never interacted with the immigration system, the Order's and the Final Rule's effect is to prevent them from receiving a ballot through the mail.

264. The burden the Order and the Final Rule imposes is not limited to the denial or delay of individual ballots. The Order's and the Final Rule's creation of a new, untested federal eligibility-verification layer will generate confusion and uncertainty among voters, including Plaintiffs and—for Common Cause and NAACP—also their members, about whether they are eligible to receive a mail ballot, whether their ballot will be delivered, and what steps they must take to ensure their vote is counted. This confusion will deter eligible voters, including Common Cause and NAACP's members, from participating in the electoral process.

265. Under the *Anderson-Burdick* framework, burdens of this character and magnitude are subject to strict scrutiny. Defendants cannot satisfy that standard. The stated justification for the Executive Order is the prevention of voting by noncitizens—a practice that is already illegal under federal law, 18 U.S.C. § 611, and that multiple federal and state investigations have found to be exceedingly rare. The Order and the Final Rule do not purport to identify any instances of such violations, much less violations that the Order's directives or the Final Rule would have prevented.

266. Even if preventing noncitizen voting were a compelling interest sufficient to justify some regulation of the mail-voting process, neither the Order nor the Final Rule are narrowly tailored to advance that interest. The Order's mechanism—conditioning ballot delivery on inclusion in a federal database compiled from records not designed for this purpose—is both overinclusive, because it will sweep in large numbers of eligible citizens, and underinclusive, because it does nothing to address noncitizen voting through in-person channels.

267. Even under a lesser standard of scrutiny, the Order and the Final Rule fail. The burdens the Order and the Final Rule impose on the right to vote are not reasonable and are not justified by the government's regulatory interests. The government has no legitimate interest in

constructing a federal voter eligibility-verification system that displaces state authority over voter qualifications and interposes federal databases with known error rates between eligible registered voters and their ballots.

268. The Executive Order and the Final Rule violate the First and Fifth Amendments to the U.S. Constitution.

**COUNT V: VIOLATION OF THE USPS'S STATUTORY AUTHORITY**
**39 U.S.C. §§ 101, 401**
**(All Defendants)**

269. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

270. The Order is unlawful because it exceeds and intrudes upon the purpose, powers, and processes that Congress has set for the USPS. According to its governing statute, the USPS:

> shall be operated as a basic and fundamental service provided to the people by the government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.

271. 39 U.S.C. § 101(a). And section 401(2) provides that the USPS may "adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title."

272. Moreover, Congress established the Postal Service as "an independent establishment of the executive branch," removed from the President's Cabinet and governed by a Board of Governors. 39 U.S.C. §§ 201, 202. The Board of Governors directs "[t]he exercise of the power of the Postal Service," *id.* § 202(a)(1), and the Postmaster General exercises operational authority only "as directed by the Board," not the President, 39 C.F.R. § 221.5(a)(3).

273. This governance structure reflects Congress's deliberate decision to insulate postal operations from direct presidential control and to vest policymaking authority in an independent, bipartisan body. *See* H.R. Rep. No. 91-1104, at 2-4, 11 (1970).

274. Consistent with that structure, Congress established a comprehensive statutory framework governing the development and regulation of postal policy. Policy changes that "generally affect service on a nationwide or substantially nationwide basis" must originate with the Postal Service and be submitted to the Postal Regulatory Commission (PRC) for independent review through a public, on-the-record proceeding. 39 U.S.C. § 3661(b)-(c). And the PRC separately exercises independent regulatory authority through rulemakings and adjudications governed by statute and the APA. *See* 39 U.S.C. § 503; 5 U.S.C. §§ 553, 701-706. The Postal Service's rulemaking authority is limited to actions necessary to carry out its core, statutorily assigned functions, and courts have invalidated USPS regulations that lack a grounding in specific statutory authority. *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1175-76 (D.C. Cir. 2003); *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972-73 (D.C. Cir. 2022).

275. The Order tosses aside Congress's scheme and contravenes the USPS's statutory authority on multiple fronts. Section 3(b) of the Order provides, in relevant part, that "the Postmaster General is hereby directed to initiate a proposed rulemaking pursuant to 39 U.S.C. § 401 and other applicable authority within 60 days" and further directs the "proposed rulemaking shall include, at a minimum," policies:

- governing how "all outbound ballot mail must be mailed";
- requiring that, "no fewer than 90 days prior to a Federal election," a State must notify the Postal Service if it intends to use the mail for absentee or mail-in ballots and indicate whether it will provide "no fewer than 60 days before the election," a list of voters "eligible to vote" who will receive such ballots;

- specifying that the Postal Service "shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list";
- mandating that the Postal Service "shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State"; and
- "enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election." Exec. Order § 3(b).

276. The Order does not merely direct a rulemaking in the general subject area of election integrity; it explicitly commands the Postmaster General to reach specific policy conclusions. Like the rejected Executive Order on documentary proof of citizenship ("DPOC"), "there is no mystery about what [the Order] purports to require or whether [the Order] purports to require it." League of United Latin Am. Citizens v. Exec. Off. Of the President, 780 F. Supp. 3d 135, 184 (D.D.C. 2025) ("*LULAC I*"). Like the DPOC Executive Order, the Order here "purports to ... dictate the precise contents of the new rule." *Id.* The Order "leaves no uncertainty about what it requires" from the Postmaster General. *Id.*

277. Section 3 of the Order violates Congress's design by purporting to direct the Postmaster General to initiate rulemaking and to implement specified policies governing election-related mail. Not only does the President lack authority to compel the Postal Service to initiate rulemaking or dictate the substance of postal policy, but the Postmaster General, the Postal Service, nor the PRC can take any action that exceeds the scope of their constitutional or statutory authority. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 291 (2013) ("Both [agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*."); *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 357 ("[A]n agency literally has no power to act ... unless and until

Congress confers power upon it."). By directing the Postmaster General to take such actions, the Executive Order bypasses the statutory processes set forth in 39 U.S.C. § 3661, displaces the independent judgment of the Board of Governors, and effectively predetermines the outcome of any required proceedings before the PRC.

278. The Executive Order is also unlawful because it relies on 39 U.S.C. § 401 as a source of authority for the contemplated rulemaking, but that provision does not authorize the Postal Service to impose eligibility-based conditions on the delivery of mail. Section 401 grants general operational authority to provide postal services and adopt the rules necessary to carry out those functions, not to regulate voter eligibility or condition delivery in compliance with federal verification requirements. To the contrary, the Postal Service is prohibited from making "any undue or unreasonable discrimination among users of the mails" or granting "any undue or unreasonable preferences." 39 U.S.C. § 403(c). Conditioning the transmission of mail-in ballots on an individual's inclusion on a federally prescribed eligibility list would constitute precisely the kind of discrimination the statute forbids.

279. Plaintiffs will suffer irreparable injury if Section 3 is not declared unlawful and enjoined, because Section 3 will undermine and disrupt mail voting, a method of voting on which Plaintiffs, including Common Cause and NAACP and their members, rely, and threatens the disenfranchisement of eligible voters through unlawful federal interference with ballot transmission and election administration.

280. Because Section 3 of the Executive Order purports to control the development and substance of postal policy, direct the actions of an independent agency, and require actions beyond the Postal Service's statutory authority, it is *ultra vires* and unlawful.

**COUNT VI: ULTRA VIRES AGENCY ACTION**
**39 U.S.C. §§ 101, 102(5), 401, 403, 404, 410, 412, 3001-3018, 3701-3705**
**(Defendants USPS, USPS Board of Governors, Steiner)**

281. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

282. Congress generally exempted the exercise of USPS's powers from chapters 5 and 7 of Title 5, including the Administrative Procedure Act's provisions for judicial review. 39 U.S.C. § 410(a); *N. Air Cargo v. U.S. Postal Service*, 674 F.3d 852, 858 (D.C. Cir. 2012). Courts nevertheless retain authority to determine whether USPS has acted ultra vires by exceeding its statutory powers or contravening the clear commands of Title 39. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970-72; *Aid Ass'n for Lutherans*, 321 F.3d at 1173-75; *N. Air Cargo*, 674 F.3d at 858. That review encompasses both "positive statutory commands" and provisions that "plainly delineate[] the outer limits" of USPS's authority. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 972.

283. USPS's Final Rule, Ballot Mail for Federal Elections, adds § 705.24 to the Domestic Mail Manual and conditions USPS's acceptance of outbound federal-ballot mail on compliance with a new federal election-data program. The Rule requires state and local election officials to submit each ballot recipient's name, address, originating State, and outbound and return-envelope barcodes through a USPS portal; directs USPS to compile and provide State-specific Participation Lists; and requires USPS to reject and return outbound ballot mail that does not satisfy the Rule's enrollment, data-submission, certification, design, and entry requirements. Final Rule at 89-95; *Mailing Standards of the United States Postal Service, Domestic Mail Manual* ("DMM") § 705.24.4-5.

284. Despite requiring USPS to return noncompliant outbound ballot mail to the State's chief election official, the Final Rule establishes no procedure requiring USPS to notify the affected voter that the voter's ballot was rejected and returned. *See* DMM § 705.24.5.3. A voter

therefore may not learn that USPS has refused to deliver the ballot until after the deadline for requesting another ballot or voting through another available method. The Final Rule exceeds USPS's rulemaking authority. Section 401(2) authorizes USPS to adopt only those regulations that are "not inconsistent with" Title 39 and are "necessary in the execution of its functions" under that title or other functions assigned to USPS by law. 39 U.S.C. § 401(2). Congress has not assigned USPS responsibility for determining who may receive a federal ballot, regulating state ballot-distribution procedures, collecting individualized election-participation data, or conditioning access to the mails on a State's compliance with a federal election-administration program. Those actions therefore are not necessary to the exercise of USPS's functions, and USPS cannot use § 401(2)'s general rulemaking provision to create power for itself. *See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374.

285. The Executive Order supplies no missing authority. Section 401(2) recognizes functions assigned to USPS by a "provision[] of law," but an executive order cannot enlarge the powers Congress granted USPS or assign the agency functions that federal law does not authorize. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). USPS's statutory authority therefore remains the same whether it acted on its own initiative or in response to the President's directive.

286. USPS's specific mail-handling and investigative powers likewise do not authorize the Rule. Section 404(a)(1) permits USPS to provide for the collection, handling, transportation, delivery, forwarding, return, and holding of mail. Section 404(a)(6) permits USPS to investigate postal offenses and civil matters relating to USPS. Neither provision authorizes USPS to regulate voter eligibility or state election administration, construct a nationwide database of ballot recipients, or withhold postal service to compel the submission of voter-specific information.

287. Congress has also enacted a detailed statutory scheme governing "nonmailable matter." *See* 39 U.S.C. §§ 3001-3018. That scheme identifies specified grounds on which matter may be excluded from the mails and grants USPS corresponding enforcement authority. Nothing in Chapter 30, the provisions of Title 18 incorporated by § 3001(a), or any other statute renders federal-ballot mail nonmailable because a State has not enrolled ballot recipients with USPS or submitted voter-specific election data. The Final Rule nevertheless requires USPS to reject and return otherwise lawful ballot mail solely because the State or its authorized mailer has not complied with that external election-administration regime. Final Rule, ECF No. 161-1, at 94-95; DMM § 705.24.5.3. In doing so, USPS has asserted authority to exclude from the mails a category of matter that Congress did not make nonmailable and has violated its statutory duties to receive, transmit, and deliver the mail.

288. The Portal's election-administration functions and USPS's creation and distribution of Participation Lists also exceed Congress's limits on nonpostal services. A "postal service" consists of "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). Collecting voter-specific election data, determining compliance with federal election requirements, maintaining a federal election-participation database, and providing government officials lists of ballot recipients are not postal services or functions ancillary to the delivery of mail.

289. Section 404(e)(2) expressly provides that "[n]othing in this section shall be considered to permit or require that the Postal Service provide any nonpostal service," except for services lawfully offered as of January 1, 2006 or products and services authorized by Chapter 37. 39 U.S.C. § 404(e)(2). The services created by the Final Rule were not offered before 2006. Nor

did USPS establish them through the arrangements Congress prescribed in Chapter 37. Section 3703 authorizes USPS to provide nonpostal services on behalf of state or local agencies only through agreements satisfying specified public-value and reimbursement requirements, and only after approval by a publicly disclosed recorded vote of the Governors. *Id.* §§ 3703(a), (c). The Final Rule instead establishes a compulsory nationwide program, requires no qualifying agreements or reimbursement, and identifies no recorded vote approving a program under § 3703. Because § 401(2) authorizes only rules "not inconsistent with" Title 39, USPS cannot invoke its general rulemaking power to circumvent § 404(e)'s express limitation.

290. The Final Rule also directs USPS to compile and provide each State a Participation List containing the names and addresses of ballot recipients, together with the unique barcodes associated with their outbound and return ballot envelopes. DMM § 705.24.4.3; Final Rule, ECF No. 161-1, at 93-94. But Section 412 prohibits USPS officers and employees, absent specific authorization in another law, from making available to the public "any mailing or other list of names or addresses" of postal patrons or other persons. 39 U.S.C. § 412(a). No law specifically authorizes USPS to generate and distribute the ballot-recipient lists required by the Final Rule. USPS cannot create an exception to § 412 through its own regulation.

291. USPS's publication of a system-of-records notice for USPS 820.225 does not confer substantive authority that Congress withheld. That system exists to operate the Portal, retain individualized ballot-recipient and ballot-envelope information for five years, and support the uses and disclosures contemplated by the Final Rule. 91 Fed. Reg. 44,880-82. The SORN invokes only 39 U.S.C. §§ 401 and 404 as authority. *Id.* at 44,881. A notice issued under the Privacy Act cannot expand those provisions or independently authorize USPS to operate an election-participation database, perform election-law verification, or distribute Participation Lists. USPS's

establishment, maintenance, use, and disclosure of records through USPS 820.225 are therefore ultra vires for the same reasons as the Final Rule.

292. The Rule also conflicts with Congress's affirmative commands governing postal service. USPS must provide "prompt, reliable, and efficient services" throughout the Nation, 39 U.S.C. § 101(a); must "receive, transmit, and deliver" written and printed matter throughout the United States, *id.* § 403(a); and must give "the highest consideration" to "the most expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e). Federal ballots are important letter mail. A rule requiring USPS to reject and return otherwise mailable ballots because a State has not satisfied an unauthorized election-data regime contravenes those statutory duties.

293. The Rule independently violates § 403(c), which prohibits USPS from making "undue or unreasonable discrimination among users of the mails" or granting an "undue or unreasonable preference" except as specifically authorized by Title 39. The Rule denies postal service to States, election officials, and voters based on their participation in and compliance with a voter-data program unrelated to postage, physical mailability, or any other condition Congress authorized USPS to impose. It thereby discriminates among users of the mails on a ground that Title 39 neither recognizes nor permits.

294. Finally, USPS's interpretation of its general postal powers would give the agency consequential authority over state administration of federal elections—an area far removed from its assigned expertise and traditional functions. Congress does not confer such extraordinary authority through general or ancillary statutory language. *See West Virginia v. EPA*, 597 U.S. 697, 721, 723-24 (2022). Nor should general postal provisions be read to alter the federal-state balance in election administration without a clear statement from Congress. *See Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). No such statement appears in Title 39 or any other law.

295. The Final Rule's election-data, Participation List, pre-acceptance verification, and rejection requirements, together with USPS's establishment, maintenance, use, and disclosure of records through USPS 820.225 to implement those requirements, exceed USPS's statutory authority and contravene the limitations and commands Congress imposed in Title 39. Those actions are ultra vires. Plaintiffs are entitled to declaratory and injunctive relief barring Defendants from implementing or enforcing DMM § 705.24 and from operating USPS 820.225 to carry out the challenged federal-ballot-mail program.

**COUNT VII: AGENCY ACTION CONTRARY TO THE PRIVACY ACT**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**(Defendants DHS, USCIS, SSA, Mullin, Edlow, Bisignano, Rubio)**

296. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

297. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

298. The Privacy Act governs federal agencies' collection, maintenance, use, and dissemination of records about individuals. 5 U.S.C. § 552a.

299. The Privacy Act generally prohibits an agency from disclosing "any record which is contained in a system of records" to "any person, or to another agency," absent "a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a statutory exception applies. 5 U.S.C. § 552a(b). One such exception is for a "routine use." 5 U.S.C. § 552a(b)(3).

300. A "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

301. The Privacy Act defines a "record" broadly to mean "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(4).

302. The Privacy Act defines "routine use" narrowly to mean, "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7).

303. When an agency establishes or revises a system of records, the Privacy Act requires publication in the Federal Register of a system-of-records notice, or "SORN," describing, among other things, the categories of individuals and records in the system and "each routine use of the records contained in the system, including the categories of users and the purpose of such use." *Id.* § 552a(e)(4).

304. The Privacy Act requires each agency maintaining a system of records to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

305. The Privacy Act likewise requires each agency, "prior to disseminating any record about an individual to any person other than an agency," to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6). The Act requires advance notice of "any new use or intended use of the information in the system." *Id.* § 552a(e)(11).

306. The Executive Order directs DHS, acting through USCIS and in coordination with SSA, to compile, maintain, and transmit to each State's chief election official a "State Citizenship List" of persons purportedly confirmed to be United States citizens, at least eighteen years old by the time of an upcoming federal election, and resident in the relevant State. The Order directs that the list be derived from federal citizenship and naturalization records, SSA records, SAVE data, and other relevant federal databases, and that SSA provide the citizenship and identity data necessary to support this effort.

307. Implementing the Order requires Defendants to retrieve records from multiple existing federal systems of records, compare and combine those records for a new election-related purpose, compile a state-specific list of individuals purportedly eligible to vote, maintain that list, and then disclose that list to state election officials.

308. The interagency disclosures required to compile the State Citizenship Lists and the external disclosures of those Lists to state election officials fall within the Privacy Act's general prohibition on disclosure.

309. The Order directs Defendants to disclose those records to other agencies and to state election officials without the request or consent of the individuals whose records are being used and disclosed.

310. No existing published routine use authorizes DHS, USCIS, SSA, or other agencies maintaining the component records to disclose those records for the purpose of creating and transmitting state-specific citizenship lists for use in state election administration.

311. Nor could the routine-use exception apply. Using immigration, naturalization, Social Security, and related federal records to generate and send state-specific citizenship lists to state election officials for use in connection with voter eligibility and ballot access is not "for a

purpose which is compatible with the purpose for which [the record] was collected." 5 U.S.C. § 552a(a)(7). Records collected for administering immigration status, naturalization, Social Security numbers, and Social Security benefits are not collected for the purpose of creating and transmitting election-related citizenship lists to state election officials.

312. The Order also requires DHS to establish or revise a system of records, so Defendants may not proceed without complying with the Privacy Act's notice and publication requirements. But no SORN has been published for the new system of records, nor has any required publication been made in the Federal Register regarding the intended or routine uses of the information in that new system.

313. The State Citizenship List further violates the Privacy Act's accuracy requirements. As alleged above, the source data specified in the Executive Order is incomplete, outdated, and error-prone for determining present citizenship and present state residence for voting purposes. SSA did not consistently maintain citizenship information for many older citizens, does not automatically update citizenship status after naturalization, and does not maintain definitive citizenship data. SAVE likewise contains known inaccuracies and omissions and is not a comprehensive list of currently eligible citizen voters in each State. And because the Executive Order requires disclosure of State Citizenship Lists at least 60 days before federal elections, the Lists will predictably contain stale residence and citizenship information for individuals who move or naturalize in the interim.

314. For all these reasons, Defendants' actions to compile, maintain, use, and transmit the State Citizenship Lists are "not in accordance with law," are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and are "without observance of procedure required by law." 5 U.S.C. § 706(2).

315. This unlawful compilation, maintenance, use, and dissemination of State Citizenship Lists injures Plaintiffs and their members by invading protected privacy interests, increasing the risk that eligible voters will be wrongly excluded from voter rolls or ballot-distribution processes, and forcing Plaintiffs to divert resources to educate voters, assist voters in correcting federal records, and respond to the consequences of Defendants' unlawful conduct.

316. The Order explicitly commands Defendants to undertake specific actions and to reach specific policy conclusions. Like the rejected Executive Order on documentary proof of citizenship ("DPOC"), "there is no mystery about what [the Order] purports to require or whether [the Order] purports to require it." *LULAC*, 780 F. Supp. 3d at 184. Like the DPOC Executive Order, the Order here "purports to ... dictate the precise contents of the new rule." *Id.* The Order "leaves no uncertainty about what it requires" from Defendants. *Id.*

317. Plaintiffs are entitled to declaratory and injunctive relief under the APA, including an order declaring unlawful and setting aside agency action implementing the Executive Order and enjoining Defendants from compiling, maintaining, using, disclosing, or transmitting the State Citizenship Lists it contemplates.

## COUNT VIII: AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY
**Administrative Procedure Act, 5 U.S.C. §§ 704, 706(2)(A), (C)**
**(Defendants DHS, USCIS, SSA, Mullin, Edlow, Bisignano, Rubio)**

318. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

319. The APA requires courts to hold unlawful and set aside final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency has no power to act unless Congress has conferred that power upon it. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374.

320. Plaintiffs challenge Secretary Mullin's June 8, 2026 approval of DHS's policy for establishing the State Citizenship Portal and generating and transmitting State Citizenship Lists,

together with DHS's and USCIS's implementation of that approved policy (collectively, the "DHS Policy").

321. The DHS Policy constitutes final agency action. The Mullin Memorandum rescinded DHS's prior implementation plan, established DHS's current policy, and supplied the Secretary-level approval required for USCIS to proceed. It authorizes DHS and USCIS to create the State Citizenship Portal, assemble State Citizenship Lists, and disclose those Lists to state officials according to a prescribed schedule. The Policy therefore represents the consummation of DHS's decisionmaking process and determines the conduct DHS and USCIS will undertake. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 930-31 (D.C. Cir. 2008).

322. The Mullin Memorandum asserts that the approved policy rests on 8 U.S.C. § 1373, the IRCA, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. None of those statutes authorizes the policy DHS approved.

323. The IRCA amended the Social Security Act to require verification of the immigration status of applicants for and recipients of specified public benefits. 42 U.S.C. § 1320b-7(b), (d). Those provisions govern eligibility for designated benefit programs, not voter eligibility or election administration. They do not authorize DHS to compile state-specific lists of adult citizens, provide federal citizenship records to state election officials, or combine and repurpose records maintained by USCIS, SSA, and the Department of State for election-related purposes.

324. Sections 1373(a) and (b) likewise provide no authority for the approved policy. Those provisions prohibit governmental entities and officials from restricting specified communications concerning citizenship or immigration status. Their prohibitory language is not an affirmative delegation authorizing DHS to create and disseminate a new information system.

*See New England Power Co.*, 455 U.S. at 341; *League of Women Voters v. DHS*, 2026 WL 1784297, at *33 (D.D.C. June 22, 2026).

325. Section 1373(c) also supplies no authority for the policy. That provision directs DHS to respond to an inquiry from a federal, state, or local government agency seeking to verify or ascertain the citizenship or immigration status of an individual within that agency's jurisdiction for a purpose authorized by law. 8 U.S.C. § 1373(c). It does not authorize DHS to proactively construct and transmit comprehensive lists of a State's adult citizen residents, permit bulk downloads of federal records, or disclose information beyond the requested verification or status information.

326. The approved policy exceeds those limits. It provides state election officials with separate outputs from USCIS, SSA, and the Department of State; includes names, dates of birth, agency identifiers, residence information, and other data beyond citizenship or immigration status; permits States to determine how they will use the information; and commits DHS to continue working to generate and provide consolidated state-specific lists without any particularized inquiry of the kind contemplated by § 1373(c).

327. Section 1373 also supplies no authority for SSA or the Department of State to provide agency-specific outputs directly to state election officials. Nor does it authorize DHS to circumvent the substantive and procedural limitations that Congress imposed through the Privacy Act, the Social Security Act, and other federal laws governing the component records. *See League of Women Voters*, 2026 WL 1784297, at *30-31.

328. Congress has elsewhere assigned responsibility for official voter-registration lists to the States and has prescribed the circumstances and safeguards governing voter-list maintenance. *See*, *e.g.*, 52 U.S.C. §§ 20507, 21083(a). Congress has not assigned DHS or USCIS

authority to create a parallel federal registry of citizens for use in voter eligibility determinations or election administration.

329. Accordingly, Secretary Mullin's June 8, 2026 approval of the State Citizenship Portal and State Citizenship List policy, and DHS's and USCIS's implementation of that policy, are "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

330. The challenged agency action injures Plaintiffs and their members by authorizing the compilation and imminent disclosure of their personal records for an unauthorized election-related purpose, exposing eligible voters to erroneous federal citizenship determinations, and interfering with Plaintiffs' core missions.

331. Plaintiffs are entitled to an order declaring the challenged agency action unlawful, vacating and setting aside the June 8 policy and its implementation, and enjoining Defendants from generating or transmitting State Citizenship Lists or providing state election officials access to the State Citizenship Portal under that policy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

1. Declare that the President's directives in Executive Order §§ 2(a), 3(b), 4(a), and 4(c) are ultra vires and legally void;

2. Declare that the President's directives in Executive Order §§ 3(b) and 4(a) violate the constitutional separation of powers and are not enforceable;

3. Declare that the President's directives in Executive Order §§ 3(b) and 4(a) violate the vertical separation of powers and the Tenth Amendment to the U.S. Constitution and are not enforceable;

4. Declare that the President's directives in Executive Order §§ 2(a), 3(b), 4(a), and 4(c), and the challenged Agency Actions implementing those directives, violate the First and Fifth Amendments to the U.S. Constitution and are not enforceable;

5. Declare that DHS's, USCIS's, and SSA's actions implementing Executive Order §§ 2(a), 4(a), and 4(c) violate the Privacy Act and are "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (C), (D);

6. Declare that Secretary Mullin's June 8, 2026 approval of the State Citizenship Portal and State Citizenship List policy, and the implementation of that policy by DHS, USCIS, SSA, and the Department of State, are contrary to law and in excess of statutory authority under 5 U.S.C. § 706(2)(A) and (C);

7. Vacate and set aside Secretary Mullin's June 8, 2026 policy and DHS's and USCIS's implementation of that policy;

8. Declare that USPS's Final Rule, DMM § 705.24, and USPS's establishment, maintenance, use, and disclosure of records through USPS 820.225 exceed USPS's statutory authority and are ultra vires;

9. Preliminarily and permanently enjoin the federal agency and officer Defendants from implementing or enforcing the challenged provisions of the Executive Order;

10. Preliminarily and permanently enjoin the DHS, USCIS, SSA, and State Department Defendants from implementing the June 8, 2026 policy, generating or transmitting

State Citizenship Lists under that policy, or providing state election officials access to the State Citizenship Portal;

11. Preliminarily and permanently enjoin the USPS Defendants from implementing or enforcing the Final Rule or DMM § 705.24, or from establishing, maintaining, using, or disclosing records through USPS 820.225 to carry out the challenged federal-ballot-mail program;

12. Award attorneys' fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable laws; and

13. Grant all other and further relief as the Court may deem just and proper.

Dated: August 26, 2026

By: */s/ John A. Freedman*

John A. Freedman (Bar No. 453075)
Jeremy C. Karpatkin (Bar No. 980263)
Elisabeth S. Theodore (Bar No. 1021029)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Avenue, Suite 1400
Seattle, WA 98101
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)
Catherine Meza (Bar No. 1045688)
Javon Davis (Bar No. 90017436)
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
+1 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommittee.org
*Attorneys for Plaintiff*

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt Hope Drive
Baltimore, MD 21215
Tel: (202) 463-2940
*Attorneys for NAACP*

Deanna Kitamura (*pro hac vice*)
Kimberly Leung (*pro hac vice*)
ASIAN LAW CAUCUS
55 Columbus Ave.
San Francisco, CA 94111
Tel: (415) 896-1701
Deannak@asianlawcaucus.org
Kimberlyl@asianlawcaucus.org
**Motion for Pro Hac Vice or Court Admission Forthcoming*

*Counsel for Plaintiffs National Association for the Advancement of Colored People, Common Cause, Common Cause Education Fund, Black Voters Matter Fund, Inc., and BVM Capacity Building Institute, Inc.*