**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1151 (CJN) |

**LULAC PLAINTIFFS[1] MEMORANDUM IN SUPPORT OF THEIR SECOND MOTION FOR PRELIMINARY INJUNCTION**

[1] Plaintiffs League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, the City of Madison, Wisconsin, Travis County, Texas and Travis County Clerk, in her official capacity.

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I. State and Congressional Authority Over Mail Voting ....................................................2

II. The President's Executive Order Mandates USPS's Unlawful Rulemaking. ................3

III. Contents of The Final Rule ....................................................................................3

IV. Attempting to Implement the Rule for the 2026 Election Will Throw Election Administration into Chaos and Disenfranchise Voters. ................................................6

A. The Rule fails to account for the realities of decentralized election administration. ....................................................................................5

B. Implementing the Rule will deepen USPS's well-documented financial woes and operational shortfalls. ....................................................................7

C. The Rule's requirement to redesign ballot envelopes is unworkably time-consuming, costly, and logistically impossible at this stage. ............................9

D. The Participation List and Ballot Portal requirements are unworkable. ..........10

E. The Rule's verification procedures are catastrophically cumbersome and ill-defined. ....................................................................................11

F. The Rule will delay ballots, sow confusion, and disenfranchise voters. .........13

ARGUMENT ....................................................................................................14

I. The Court Has Jurisdiction Because Plaintiffs' Challenges to the Final Rule Are Ripe. ....................................................................................14

II. Plaintiffs Have Standing to Challenge Issuance and Enforcement of USPS's Final Rule. ....................................................................................15

A. Organizational Plaintiffs have standing to challenge the Final Rule. ..............16

1. Associational Standing ....................................................................16

2. Organizational Standing ....................................................................18

B. The Election Official Plaintiffs have standing to challenge the Final Rule. .....20

III. Plaintiffs Have a Strong Likelihood of Success on the Merits. ..................................22

A. The Final Rule is unconstitutional (Claims I and II). ....................................22

B. The Final Rule unlawfully creates an unauthorized category of nonmailable matter (Claim III). ....................................26

C. The Final Rule was issued in violation of USPS's statutory obligation to seek Postal Regulatory Commission review (Claim IV). ....................................31

D. The Final Rule violates the PRA's Universal Service Requirement and its prohibitions on Provision of Non-Postal Services and Undue Discrimination (Claims V-VII). ....................................34

IV. Plaintiffs Have a Cause of Action for Each of Their Claims and No Channeling to the PRC is Required for Preliminary Relief as to the 2026 Election. ....................................36

V. Plaintiffs Will be Irreparably Harmed Absent a Preliminary Injunction and/or Section 705 Stay. ....................................38

A. The Rule irreparably harms Plaintiff Organizations' members. ....................................38

B. The Rule irreparably harms Plaintiff Organizations. ....................................40

C. The Rule Irreparably Harms the Election Official Plaintiffs ....................................42

D. The Balance of Equities and the Public Interest Strongly Favor Plaintiffs. ....44

CONCLUSION ....................................45

## TABLE OF AUTHORITIES

**Cases** **Pages**

*American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ............................23, 27

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*, 220 F. Supp. 3d 27 (D.D.C. 2016) ........................................................................................35

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).............................................22

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019)..........................................................................24

*Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026) .....................................19, 25, 44, 45

*Bowie v. Williams*, 351 F. Supp. 628 (E.D. Pa. 1972) ...................................................................27

*Buchanan v. United States Postal Service*, 508 F.2d 259 (5th Cir. 1975)...............................32, 33

*Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015)..................................18

*Center for Taxpayer Rights v. Internal Revenue Service*, 815 F. Supp. 3d 1 (D.D.C. 2025) .........41

*Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sep. 14, 2020)......................22

*Columbia Broadcasting System v. United States*, 316 U.S. 407 (1942)........................................27

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ..............................................................20

*Democratic National Committee v. Wisconsin State Legislature*, 592 U.S. 1039 (2020) .......43, 44

*Department of Homeland Security Regents of the University of California*, 591 U.S. 1 (2020)..........................................................................................................28, 31

*Direct Mail/Marketing Association v. United States Postal Service*, 501 F.2d 717 (D.C. Cir. 1974) ..................................................................................................................35

*District of Columbia v. U.S. Department of Agriculture*, 444 F. Supp. 3d 1 (D.D.C. 2020).........42

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025)....................................................................................42

*DSCC v. Trump*, No. 26-cv-01114 (CJN), 2026 WL 1487833 (D.D.C. May 28, 2026) ....15, 16, 38

*DSCC v. Trump*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) ........................26, 37

*Energy Future Coalition v. EPA*, 793 F.3d 141 (D.C. Cir. 2015) ........................................... 14-15

*Ex parte Jackson*, 96 U.S. 727 (1877) ....................................................................................22, 26

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ..........................................................................43

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ("*AHM*") .........................................................................................16, 18

*Foster v. Love*, 522 U.S. 67 (1997) ...............................................................................................2

*Friends of Earth US v. Export-Import Bank of United States*, No. 1:25-cv-02235 (CJN),
2025 WL 3516161 (D.D.C. Oct. 10, 2025)...................................................................................39

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)......................................................................................26

*Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946) ..........................................................................26

*Hines Immigration Law, PLLC v. Executive Office for Immigration Review*,
No. 1:26-cv-01018 (CJN), 2026 WL 969020 (D.D.C. Apr. 10, 2026) ........................16, 18, 19

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988)..............................18

*Humane Society of United States v. United States Postal Service*,
609 F. Supp. 2d 85 (D.D.C. 2009) ..........................................................................................37

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ..........................15

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) .............................................43

*League of United Latin American Citizens v. Executive Office of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ("*LULAC I*") .....................................................22, 40, 41

*League of United Latin American Citizens v. Executive Office of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ("*LULAC II*") ........................................................................2

*League of United Latin American Citizens v. Executive Office of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ("*LULAC III*")...........................................................16, 36

*League of Women Voters of Massachusetts v. Trump*, No. 1:26-cv-11549,
2026 WL 2322705 (D. Mass. Aug. 11, 2026) ...............................................................................43

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).....14, 16, 18, 41, 44, 45

*Learning Resources, Inc. v. Trump*, 607 U.S. 229, 243 (2026)....................................................25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).....................................................................15

*Massachusetts v. Department of Education*, 828 F. Supp. 3d 198 (1st Cir. 2026)........................42

*McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969).......................22

*Moore v. Harper*, 600 U.S. 1 (2023)................................................................................................22

*Motor Vehicle Manufacturers Associations of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)......................................................................28

*National Association for Advancement of Colored People v. United States Postal Service*, 496 F. Supp. 3d 1 (D.D.C. 2020)..........................................................................................32, 33

*National Association of Postal Supervisors v. United States Postal Service*, 26 F.4th 960 (D.C. Cir. 2022)..................................................................................................37

*National Easter Seal Society for Crippled Children & Adults v. United States Postal Service*, 656 F.2d 754 (D.C. Cir. 1981)..................................................................................................35

*National Parks Conservation Association v. Semonite*, 282 F. Supp. 3d 284 (D.D.C. 2017)..38, 39

*National Treasury Employees Union v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006).........................14

*New York v. Biden*, 636 F. Supp. 3d 1 (D.D.C. 2022)...........................................................32, 33

*New York v. Trump*, 181 F.4th 132 (D.C. Cir. 2026).........................................................32, 37, 38

*New York v. Trump*, 490 F. Supp. 3d 225 (D.D.C. 2020)......................................................32, 33

*Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012).......................................................44

*Omnipoint Corp. v. Federal Communications Commission*, 78 F.3d 620 (D.C. Cir. 1996)..........31

*Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833 (E.D. Pa. 2020).......................................................33

*Pennsylvania v. DeVos*, 480 F. Supp. 3d 47 (D.D.C. 2020)..........................................................42

*Printz v. United States*, 521 U.S. 898 (1997).................................................................................26

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ....................44

*Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ....................44

*Republican National Committee v. Democratic National Committee*, 589 U.S. 423 (2020) (per curiam) ....................45

*Robert F. Kennedy Human Rights v. Department of State*, No. CV 25-1774 (JEB), 2026 WL 820811 (D.D.C. Mar. 25, 2026) .................... 16-18

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................15

*Sears, Roebuck & Co. v. United States Postal Service*, 844 F.3d 260 (D.C. Cir. 2016) ....................37

*Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) ....................14

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ....................29

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) ....................3, 15, 38, 39

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ....................20, 21

*Trump v. Cook*, 146 S. Ct. 2234 (2026) ....................36

*United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114 (1981) ....................2, 22

*Utility Air Regulatory Group v. Environmental Protection Agency*, 573 U.S. 302 (2014) ....................26

*Watson v. Republican National Committee*, 146 S. Ct. 2165 (2026) ....................22

*West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) ....................25

*Wisconsin Gas Co. v. Federal Energy Regulatory Commission*, 758 F.2d 669 (D.C. Cir. 1985) ....................42

**Constitutional Provisions**

U.S. Const. amend. XVII ....................22

U.S. Const. art. I, § 2, cl. 1 ....................22

U.S. Const. art. I, § 4 ....................22, 25

U.S. Const. art. I, § 4, cl. 1 ....................2

U.S. Const. art. I, § 8 ....................22

U.S. Const. art. I, § 8, cl. 7 ....................2, 26

U.S. Const. art. II, § 1 ....................22

U.S. Const. art. II, § 1, cl. 2 ....................22

**Statutes**

5 U.S.C. § 553(d) ....................31

5 U.S.C. § 705 ....................1

5 U.S.C. § 706(2)(A) ....................28

5 U.S.C. § 706(2)(C) ....................28

5 U.S.C. § 706(2)(D) ....................28

18 U.S.C. § 3061 ....................24

39 U.S.C. § 101 *et seq.* ....................23

39 U.S.C. § 101(a) ....................2, 34

39 U.S.C. § 102(5) ....................35

39 U.S.C. § 401 ....................24

39 U.S.C. § 401(2) ....................24

39 U.S.C. § 403(a) ....................23

39 U.S.C. § 403(b) ....................23

39 U.S.C. § 403(c) ....................35

39 U.S.C. § 404(a) ....................24

39 U.S.C. § 404(a)(1) ....................23

39 U.S.C. § 404(e) ....................34

39 U.S.C. § 404(e)(1) ....................35

39 U.S.C. § 410(a) ....................36

39 U.S.C. § 3001 *et seq.* ....................26

39 U.S.C. § 3001(b) ....................27

39 U.S.C. § 3001(c)(2) ....................28

39 U.S.C. § 3001(m) ....................26, 37

39 U.S.C. § 3001(n)(1) ....................28

39 U.S.C. §§ 3001-3018 ....................26

39 U.S.C. § 3002 ....................28

39 U.S.C. § 3003 ....................28

39 U.S.C. § 3004 ....................28

39 U.S.C. § 3629 ....................23

39 U.S.C. § 3661(b) ....................32

39 U.S.C. § 3661(c) ....................32

39 U.S.C. § 3662(a) ....................37

39 U.S.C. § 3662(b) ....................37

39 U.S.C. § 3662(c) ....................37

39 U.S.C. § 3663 ....................32

39 U.S.C. § 3703 ....................35

39 U.S.C. § 3705 ....................35

52 U.S.C. § 20507(c)(1) ....................23

52 U.S.C. § 21083(a)(1)(A) ....................23

52 U.S.C. § 21083(a)(1)(A)(i) ....................23

52 U.S.C. § 21083(a)(2)(A)(ii) ....................24

52 U.S.C. § 21085 .....24

**Codes**

39 C.F.R. §§ 3010.150-3010.170 .....37

39 C.F.R. § 3020.111(a) .....32

39 C.F.R. § 3020.111(b) .....32

39 C.F.R. § 3020.112 .....32

39 C.F.R. §§ 3022.1-3022.30 .....37

39 C.F.R. § 3022.50 .....37

Tex. Elec. Code § 86.004(a) .....21

**Domestic Mail Manual**

DMM § 705.24.1(b) .....5

DMM § 705.24.1(e) .....5

DMM § 705.24.3.1 .....4

DMM § 705.24.3.2 .....4

DMM § 705.24.4.1 .....4, 5

DMM § 705.24.4.1(a) .....27

DMM § 705.24.4.1(d)-(e) .....27

DMM § 705.24.4.2(a) .....4

DMM § 705.24.4.2(a)-(c) .....4

DMM § 705.24.4.2(b) .....4, 28

DMM § 705.24.4.2(d) .....5, 6

DMM § 705.24.4.2(e) .....5

DMM § 705.24.4.2(f) .....4

DMM § 705.24.4.3 .......... 5

DMM § 705.24.5.1 .......... 4, 5, 6

DMM § 705.24.5.2 .......... 5, 6

DMM § 705.24.5.3 .......... 4, 5, 6

DMM § 705.24.5.3(a) .......... 4, 6

DMM § 705.24.5.3(b) .......... 13

DMM § 705.24.5.3(c) .......... 6

DMM § 705.101 .......... 27

DMM § 705.102 .......... 27

DMM § 705.201 .......... 27

DMM § 705.202 .......... 27

DMM § 705.203 .......... 27

DMM § 705.204 .......... 27

**Other Authorities**

*Advisory Opinion on Service Changes Associated with First-Class Mail and Periodicals*, Dkt. No. N2021-1 (July 20, 2021), https://prc.arkcase.com/api/prc-dockets/filing/downloadFile?fileId=154736&inline=true. .......... 33

*Advisory Opinion on the Operational and Service Standard Changes Related to the Delivering America Plan*, Dkt. No. N2024-1 (Jan. 31, 2025), https://perma.cc/37X3-U2PQ. .......... 33

*Advisory Opinion on the Service Standard Changes Associated with First-Class Package Service*, Dkt. No. N2021-2 (Sep. 29, 2021), https://prc.arkcase.com/api/prc-dockets/filing/downloadFile?fileId=129284&inline=true. .......... 33

Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111) .......... 3, 5, 12, 13, 14, 15, 24, 27, 28, 29, 31, 34

BPC Public Comment on USPS Proposed Rule (July 2, 2026), https://perma.cc/MD29-NUUJ. .......... 29

Comment of California *et al.* in Opposition to Proposed Rule (July 2, 2026), https://perma.cc/W4DW-EY7K. ....................29

Comment of Jefferson County, Colorado on Proposed Rule (June 18, 2026), https://perma.cc/4PY4-FJGJ. ....................29

Comment on Behalf of Local Election Officials on Notice of Proposed Rulemaking (July 2, 2026), https://perma.cc/7WFW-TDMT. ....................29

Complaint of LULAC *et al.* re Proposed Rule for Ballot Mail, Postal Regulatory Commission, Dkt. C2026-27, https://prc.arkcase.com/portal/dockets/11558 (last visited Aug. 27, 2026) ...37

Declarations in Support of Motion for Temporary Restraining Order, *California v. United States Postal Service*, No. 1:26-cv-13917 (D. Mass. Aug. 26, 2026), Dkt. Nos. 4-1–4-26 ...............39

Executive Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026)....................3

King County Elections Public Comment on Proposed Rule (July 2, 2026), https://kingcounty.gov/en/dept/elections/about-us/news-and-media-resources/news-releases/july-2-2026. ....................29

Memorandum and Order, *League of Women Voters of Massachusetts v. Trump*, No. 1:26-11549 (D. Mass. Aug. 27, 2026), Dkt. No. 218....................3

National Conference of State Legislatures, *Table 18: States With Mostly Mail Elections* (updated Aug. 7, 2026), https://www.ncsl.org/elections-and-campaigns/table-18-states-with-all-mail-elections. ....................39

*Nearly 1 in 3 Americans Voted by Mail in 2024*, States United Democracy Center (updated Apr. 13, 2026), https://perma.cc/7MAU-BCJQ. ....................33

*Reforming the U.S. Postal Service's Broken Business Model: Hearing Before the Senate Committee on Homeland Security and Governmental Affairs*, 119th Congress, 2d Session (2026) (statement of David P. Steiner, Postmaster General and Chief Executive Officer, USPS), https://perma.cc/J5TC-7YAT....................7

Samara Angel, Jonathan Katz & Randi Wright, *Mail voting in the US: Data points to very low fraud and significant benefits to voters*, Brookings (Nov. 6, 2025), https://perma.cc/4CQP-84YL. ....................30

United States Government Accountability Office, GAO-26-109008, United States Postal Service: Urgent Action Needed to Fix Unsustainable Business Model and Improve Service Performance (Mar. 17, 2026), https://perma.cc/83DN-CL9C. ....................8

United States Postal Service, *2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year* (Jan. 19, 2021), https://perma.cc/F9EN-LPAH. ............................30

United States Postal Service, *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections* (Jan. 9, 2023), https://perma.cc/H745-JD72. ......................................................................................2, 30

United States Postal Service, *2024 Post-Election Analysis Report: Delivering the Nation's Election Mail Securely and Effectively* (Dec. 2, 2024), https://perma.cc/3CGF-FAPG. ...30, 33

United States Postal Service, *2026-2027 Official Election Mail Guide, Kit 600* (Feb. 2026), https://perma.cc/862E-B9RL. ......................................................................................4

United States Postal Service, *About: Leadership: Board of Governors*, https://about.usps.com/who/leadership/board-governors/?video=bgs260807 (last visited Aug. 25, 2026). ......................................................................................................30

United States Postal Service, *Remarks by Postmaster General David Steiner at the Aug. 7, 2026, USPS Board of Governors Meeting* (Aug. 7, 2026), https://perma.cc/9JME-NRB9...............13

**INTRODUCTION**

Voting by mail for the 2026 Federal election begins in some States in a matter of days. The constitutional framework enabling States, in the first instance, to determine when and how their voters will receive ballots remains unchanged since the Founding. States and Congress, and not the Executive Branch, set those rules. But on August 26, 2026, the United States Postal Service ("USPS") published a Final Rule (with an effective date five days prior) violating the separation of powers and arrogating sweeping authority to USPS. The Rule allows USPS to decide—irrespective of State law—who can and cannot vote by mail in Federal elections, including in the November 2026 election. The Final Rule unlawfully transforms the Postal Service from a common carrier, as Congress intended, into a national gatekeeper for mail voting. The Rule empowers the Postal Service, an entity with neither the expertise nor the ability to administer elections, to *shut down* any State's mail ballot program for failure to satisfy federal voting requirements that neither Congress nor any State has legislated. No statute passed by Congress gives USPS this power. The Rule is a shocking and unprecedented assertion of power by USPS that it is neither permitted nor equipped to wield.

Enforcement of the Rule for the 2026 Federal election will place insurmountable burdens on local election officials, organizations assisting voters, and voters themselves. Because LULAC Plaintiffs are likely to succeed on their claims that the Rule is unconstitutional, contrary to statute, and ultra vires; because the immediate effectiveness of the Rule will cause catastrophic breakdowns in election administration and impose severe burdens on election officials, civic participation organizations, and voters, large numbers of whom are likely to suffer disfranchisement; and because the public interest and the equities favor relief, this Court should enter relief as to the 2026 election staying the effective date of the Rule (5 U.S.C. § 705) and preliminarily enjoining its enforcement.

## BACKGROUND

### I. State and Congressional Authority Over Mail Voting

The Elections Clause provides that States shall prescribe the "Times, Places and Manner of holding" congressional elections. U.S. Const. art. I, § 4, cl. 1. "[O]ur Constitution entrusts Congress and the States—not the President—with the power to regulate federal elections." *LULAC v. EOP*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025) ("*LULAC II*"). Congress also has the power to "make or alter" such regulations through federal legislation. U.S. Const. art. I, § 4, cl. 1. The Elections Clause thus gives States "responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citation omitted). The Constitution withholds from the President any power to set election rules. *See LULAC II*, 808 F. Supp. 3d at 45 (highlighting this "conspicuous absence" of constitutional authority), *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025).

This Constitutional framework provides no authority for USPS to create election rules that supersede State law. In 2022, USPS declared: "We have no role in determining the extent to which mail is used for participating in elections, the design of ballots or return envelopes, or whether or how ballots are counted."[2] That prior understanding accords with USPS's actual constitutional and statutory role. The Constitution grants Congress the power to "establish Post Offices and post Roads," U.S. Const. art. I, § 8, cl. 7, which Congress has exercised to "establish[] a detailed statutory and regulatory scheme to govern this country's vast postal system," *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122, 126 (1981). The Rule here exceeds and violates the statutory scheme that Congress created for the operation of an independent postal service in the Postal Reorganization Act of 1970 ("PRA"). 39 U.S.C. § 101(a).

[2] USPS, *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections*, at 3 (2022), https://perma.cc/4S84-R37S.

## II. The President's Executive Order Mandates USPS's Unlawful Rulemaking.

On March 31, 2026, President Trump issued Executive Order 14399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." *See* Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "EO" or "Order"). The Order, among other things, directed USPS to create a list of approved voters, the "Mail-In and Absentee Participation List," and treat certain ballots as ineligible for USPS delivery if voters are not listed on this new, extra-statutory list. On June, 2, 2026, USPS issued a proposed rule that carried out Section 3 of the Executive Order. ECF No. 145. More than 200,000 comments were submitted in response to the Proposed Rulemaking. *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 54966, 54966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111) ("Final Rule" or "Rule"). However, USPS made no significant changes to the Rule in response to the comments when it issued a final rule. *Id.*

## III. Contents of The Final Rule

On August 21, 2026, USPS posted its Final Rule for public inspection with an effective date of that same day, although the Rule would not be published in the Federal Register until August 26, 2026. LULAC Pls.' Suppl. Compl. ¶ 33, ECF No. 164-1 ("Suppl. Compl.").[3] The Final Rule amends the Mailing Standards in the Domestic Mail Manual ("DMM") by adding DMM § 705.24, "Ballot Mail for Federal Elections." It has three key prongs.

[3] On August 27, 2026, the court in *League of Women Voters of Massachusetts v. Trump*, No. 1:26-11549 (D. Mass. Aug. 27, 2026), Dkt. No. 218, entered a temporary restraining order enjoining for 14 days the implementation or enforcement of the Rule to the extent it: makes mandatory the ballot envelope standards, registration with the Portal, and voter enrollment in the Portal; requires verification of ballot mailings; and requires rejection of noncompliant mailings. That one court has temporarily enjoined the Rule, however, is no bar to relief here. *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020) ("Plaintiffs therefore need not wait for 'Damocles's sword to actually fall on' them 'before the court will issue an injunction.' In similar situations, 'courts routinely grant follow-on injunctions against the Government,' even when 'an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.'") (citation modified).

*First*, the Rule conditions acceptance and delivery of ballot mail on new envelope requirements, mandating that both outbound and return envelopes bear an Election Mail logo, carry a unique serialized Intelligent Mail barcode ("IMb"), and undergo Postal Service mailpiece design review. DMM §§ 24.3.1, 24.3.2. These are design elements the Postal Service to date has encouraged,[4] but the Rule now requires States to certify that ballot mailings meet these specifications, or USPS will not deliver them. DMM §§ 24.3.1, 24.3.2, 24.4.2(f), 24.5.1, 24.5.3.

*Second*, the Rule conditions acceptance and delivery of ballot mail on whether voters are "enrolled" to vote by mail on the newly-created Mail-In and Absentee Participation List ("Participation List"), populated by mandatory State voter-data submissions. DMM § 24.4.2(a)-(c). This requires USPS to create a new Federal Ballot Mail Portal ("the Portal") and requires State and local election officials to enroll individual voters as a precondition to being able to send those voters a mail-in or absentee ballot by mail. DMM §§ 24.4.1, 24.4.2(a). No jurisdiction can even begin enrolling individual voters into the portal until *after* their ballot mailers have been reviewed and approved by USPS for compliance with the new federal ballot mail standards. DMM § 24.4.2(f). If a State or jurisdiction has not complied with the voter enrollment requirements, their outgoing ballot mail, *i.e.*, ballots being sent to each voter, "will not be accepted and will be returned" to the jurisdiction. DMM § 24.5.3(a).

To "enroll[]" a voter, election officials must upload to the Portal information about each voter receiving a mail ballot, including the voter's name and address, the originating election office, and two unique IMbs for each voter—one for the outbound envelope and one for the return. DMM § 24.4.2(b). The uploads must conform to unspecified "technical specifications" for the

[4] *See* USPS, *2026-2027 Official Election Mail Guide, Kit 600*, at 4-5 (2026), https://perma.cc/862E-B9RL.

Ballot Portal. DMM § 24.4.2(e). States must designate "Ballot Mail Portal Users"[5] to submit this data "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." DMM § 24.4.2(d). States may continue enrolling individuals or modifying prior submissions until the last date ballots may be mailed under state law, but "[a] separate submission is required in connection with each Outbound Federal Ballot mailing,[6] regardless of the number of mailpieces in the mailing." DMM § 24.4.2(d). An election office that mails ballots in successive batches—which nearly every jurisdiction does—must complete a discrete data submission for each mailing. The Rule also provides that, around Election Day, the Postal Service will return a state-specific version of the Mail-In and Absentee Participant List to each state's chief election official, containing the same information previously provided by that state's election officials. *See* DMM § 24.4.3.

*Third*, the Rule requires USPS employees to review every Outbound Federal Ballot mailing and individually scan each ballot to verify that (1) the envelopes meet the new design standards, and (2) each ballot is going to an individual enrolled on the Participation List. DMM §§ 24.5.1, 24.5.2; Rule at 54981. USPS employees must refuse acceptance of mailings deemed noncompliant, and every mailing "presented for acceptance" must go through verification. DMM §§ 24.5.2-.3.

As discussed below, a mailing may contain thousands or millions of mailpieces. Larger mailings will take significant (indeed, likely prohibitive) time to verify, yet USPS also disclaims

[5] A "Ballot Mail Portal User" is the State's chief election official and anyone they authorize to submit information through the Portal, including "an election official of that state or a political subdivision thereof." DMM § 24.1(b). Every "Ballot Mail Portal User" must first register an account, and registration "must be completed no later than two business days before an Outbound Federal Ballot mailing." DMM § 24.4.1.

[6] "Outbound Federal Ballot Mail" is any mailpiece containing a ballot sent by an election office to a voter. DMM § 24.1(d). "Return Federal Ballot Mail" is any mailpiece containing a ballot sent by a voter to an election office. *Id.* § 24.1(e).

any responsibility for the ballots while they sit in its custody awaiting verification or for any resulting delays in delivering those ballots to voters. DMM § 24.5.3(c). Additionally, because the Rule requires verification at the level of a "mailing," a single nonconforming mailpiece within a mailing can result in rejection or delay of an entire batch. *See* DMM §§ 24.5.1, 24.5.3, 24.4.2(d). The Rule's operative language states that "acceptance . . . does not constitute verified compliance," DMM § 24.5.2, and, without putting a timeframe on when this must occur, requires that noncompliant mailings "be returned to the authorized ballot mailer," DMM § 24.5.3(a).

## IV. Attempting to Implement the Rule for the 2026 Election Will Throw Election Administration into Chaos and Disenfranchise Voters.

The Rule's effective date of August 21, 2026 foists massive changes on state and local election officials less than 10 weeks and 47 working days before the 2026 general election, and a mere 14 days before North Carolina's September 4 deadline to mail its first ballots. *See* Ex. 1 ¶ 36, Declaration of Tammy Patrick, CERA ("Patrick Decl."). This vanishingly short timeframe for implementation risks catastrophic election administration failures that will disenfranchise voters across the country. *See id.* ¶¶ 18-20.

### A. The Rule fails to account for the realities of decentralized election administration.

The Rule's one-size-fits-all approach to mail voting ignores the fact that mail voting is governed by more than fifty distinct legal and administrative regimes, across the States, the District of Columbia, and the U.S. territories. Each State determines according to its own laws who is permitted to vote by mail, when mail voting is available, how a voter requests a mail ballot, when election officials deliver mail ballots to eligible voters, the circumstances under which a voter may obtain a replacement ballot, the design of ballot envelopes, and the manner and deadline by which a voter must return their mail ballot. Indeed, there is considerable variance *within* states on some

practices, as State law often assigns significant responsibility and discretion to local election administrators. *See* Patrick Decl. ¶¶ 25, 30.

Local election offices, of which there are more than 10,000 nationwide, vary widely in scale, staffing, and resources and serve anywhere from hundreds of voters to millions. *Id.* ¶ 25. Almost all operate under substantial resource constraints, and many have experienced significant turnover of personnel since 2020. *Id.* ¶¶ 25-29. These underfunded local offices are generally responsible for most functions affected by the Rule, including processing absentee ballot requests and mailing ballots. *Id.* ¶ 31. The Rule imposes costs on election administrators that they lack resources to bear, including updating election management systems, revising and repurchasing ballot envelopes, adjusting internal deadlines, and hiring or retraining staff and temporary workers to handle the additional workload. *See id.* ¶¶ 38-41.

### B. Implementing the Rule will deepen USPS's well-documented financial woes and operational shortfalls.

USPS lacks the resources to implement the Rule for the 2026 election without causing systemic failures because it is in a financial crisis and its service is already on the decline. *See* Patrick Decl. ¶ 37. Yet the Rule *adds* (unfunded and non-revenue-generating) non-postal, election administration functions to the responsibilities of its already burdened workforce: (1) imposing mandatory Mailpiece Design Analyst ("MDA") review for every state's ballot envelopes, (2) building and maintaining a federal registry of mail voters, and (3) scanning every outbound ballot presented at Business Mail Entry Units ("BMEUs") and retail windows nationwide.

USPS is in financial crisis. It lost $9 billion in fiscal year fiscal year (FY) 2025 and has lost $31 billion since FY 2021.[7] Service has also deteriorated. For instance, even though USPS lowered

[7] The Postmaster General testified to Congress *this year* that USPS is running out of operating cash, has suspended required employee pension payments, and endures "a growing mismatch between the services we are required to provide and the revenues available to support them." *See*

its service standards for First-Class Mail from a 1-to-3-day delivery window to a 1-to-5-day window in 2022, on-time delivery *still* declined from 91% to 86% from FY 2022 to 2025.[8]

Against this backdrop, USPS will now have to retrain tens of thousands of clerks and supervisors at more than 9,600 BMEUs and at retail post offices nationwide, on new and very different ballot verification procedures that depart dramatically from past practice. Training USPS's 640,000 workers in handling election mail has already begun for the 2026 election, and there is no time to rework all training materials and adequately retrain the thousands of workers who handle ballots. Patrick Decl. ¶¶ 35, 37, 68. USPS also lacks capacity to conduct the required MDA review of new ballot envelopes. USPS currently employs 40 MDAs, and the turnaround time to review and approve mailpieces is approximately two days. *Id.* ¶¶ 78-79. The backlog of new envelope designs for hundreds of jurisdictions would take weeks to get through, *id.*, which will likely cause election administrators to miss State law-imposed deadlines for ballot mailing.

USPS likewise lacks the capacity to answer the massive influx of questions that will flow from the more than 10,000 election jurisdictions about the Portal and verification process. Even a single question from each jurisdiction would overwhelm USPS's support capabilities, and unanswered questions in this context risk disenfranchising voters. Patrick Decl. ¶¶ 39, 86, 99.

Lastly, as discussed *infra* at pp. 11-13, the ballot scanning and verification process will overwhelm both USPS and election administrator capacity, delay the mailing of ballots, and disenfranchise potentially millions of voters during the upcoming 2026 election.

---

*Reforming the U.S. Postal Service's Broken Business Model: Hearing Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 119th Cong., 2d Sess., at 7 (2026) (statement of David P. Steiner, Postmaster Gen. and Chief Exec. Officer, USPS), https://perma.cc/J5TC-7YAT.

[8] U.S. Gov't Accountability Off., GAO-26-109008, U.S. Postal Service: Urgent Action Needed to Fix Unsustainable Business Model and Improve Service Performance (Mar. 17, 2026), https://perma.cc/83DN-CL9C.

### C. The Rule's requirement to redesign ballot envelopes is unworkably time-consuming, costly, and logistically impossible at this stage.

The Rule's ballot envelope requirements impose significant burdens on election offices across the country and are impossible to meet for the 2026 election.

In some states, envelope design is set by law or conducted by Statewide election authorities, and local election officials do not even have the legal authority to design their own envelopes or deviate from the state-approved design. Patrick Decl. ¶ 84. In Wisconsin, for example, the outbound and return ballot envelopes are designed by the Wisconsin Elections Commission ("WEC"); municipalities have no authority to use different envelopes but are responsible for their own procurement. Ex. 2 ¶¶ 11, 20, Declaration of Lydia McComas ("McComas Decl.").

Furthermore, many jurisdictions do not currently use unique IMbs on both outbound and return ballot envelopes and cannot add such capability in time for this year's election. *See* Patrick Decl. ¶¶ 48-58. In Wisconsin, for example, municipal clerks rely on the statewide WisVote system administered by WEC to manage the absentee voting process, including generating absentee ballot envelope labels and the unique IMb on outbound ballot envelopes. McComas Decl. ¶ 9. However, WisVote does not have the capability to generate unique IMbs for return ballots and would need to be reengineered by WEC to do so. McComas Decl. ¶¶ 19-21. In Texas, neither the outbound nor return ballot envelopes are required to have unique IMbs, and the return envelope would need to be redesigned to accommodate a unique IMb because the current envelope format does not have enough space for an IMb along with the information required by Texas law. Ex. 3 ¶ 18, Declaration of Dyana Limon-Mercado ("Limon-Mercado Decl."). Moreover, ballot design is time intensive and complex, and is typically conducted in odd-numbered years, off-cycle from federal elections, to allow sufficient time to iterate, revise, and test new designs. *See* Patrick Decl. ¶ 85.

State and local election offices have already designed, approved, and ordered and received or printed their ballot envelopes for the 2026 general election, at significant cost. *Id.* ¶ 80. Plaintiff City of Madison, for example, has already spent more than $10,000 for its 2026 general election ballot envelopes. McComas Decl. ¶ 22. Travis County has already purchased all its outbound and return envelopes, at a cost of $21,349. Limon-Mercado Decl. ¶ 22. Many election offices rely on envelope inventory from prior elections to reduce costs, and almost none have funds to replace their envelopes at this stage. Patrick Decl. ¶ 87; McComas Decl. ¶ 22; Limon-Mercado Decl. ¶ 22.

Lastly, even if the relevant election authorities could redesign envelopes in record time, rework systems to generate unique IMbs, and local election officials could find unallocated dollars in their budgets, there is not enough time for new envelopes to be printed and shipped. Madison, for example, typically orders its ballot envelopes three to nine months before an election. McComas Decl. ¶ 23. There are few ballot envelope vendors, and, depending on how many jurisdictions need to reorder envelopes, producing sufficient stock could take 12-16 weeks. Patrick Decl. ¶ 86. With less than 10 weeks until the election and less than 3 weeks until more than 20 states start mailing out their ballots, this timeline is untenable. *See* Patrick Decl. ¶¶ 36, 40.

### D. The Participation List and Ballot Portal requirements are unworkable.

The Rule requires USPS to bring online a brand-new nationwide Ballot Portal and requires State and local election officials to upload and continuously update lists of tens of millions of mail voters. Patrick Decl. ¶¶ 87, 93-94. But as of this filing, the Portal is not yet even active or available to election administrators, USPS has provided no time certain by which it will be, and it will necessarily launch without the thorough testing a system of this scale requires. *Id.* ¶¶ 37, 107. States will begin sending ballots to voters starting with North Carolina on September 4, 2026, meaning that, at best, they will have to use this untested portal just days before their deadlines to begin mailing ballots. *Id.* ¶ 40. Before that, they will have to obtain MDA approval of ballot mailers

and register election-official users of the Portal two business days prior to any mailing. *Id.* ¶¶ 72, 77, 93, 101. A Portal crash or malfunction during ballot mailing season—virtually guaranteed with a system that has not been sufficiently tested—will lead to cascading delays, force election officials to violate state ballot mailing deadlines, and disenfranchise voters by delaying their ballots. *See id.* ¶¶ 96, 104-07.

The Rule also assumes that state and local voter lists can be readily converted into a centralized Participation List. Not so. The Portal will not be interoperable with every State's voter registration system: these systems vary considerably across and even within states, and they do not always include real-time absentee or mail voting data. *Id.* ¶¶ 30, 95-96, 100. Some election offices have sophisticated databases, while others use spreadsheets, Word documents, or even handwritten lists. *Id.* ¶¶ 95, 97. Translating these disparate records into electronic data submissions is a complex, time-intensive task that election officials will not have time for before November. *Id.* ¶¶ 100-04. The Participation List will require election offices to decipher USPS's technical requirements for uploading, supplementing, and modifying lists, develop necessary training and guidance, and devote staff time for making Portal submissions. *Id.* ¶¶ 38-39, 101-03. These, among election officials' numerous other necessary tasks, cannot feasibly be completed in time for the 2026 election.

### E. The Rule's verification procedures are catastrophically cumbersome and ill-defined.

By the Rule's own estimate, the process of individually scanning and verifying each mail ballot prior to accepting a ballot mailing will cause untenable delays that will disenfranchise countless voters.

The Rule's preface states that USPS will "rely[] on existing scanning technology and devices," which may refer to automated scanning machines or handheld scanners that require

manual sifting through each mailpiece. Rule at 54981. But USPS recklessly understates how long this verification will take, because, although USPS does process large volumes of mail every day, it does not individually validate each mailpiece against a separate list. *See* Patrick Decl. ¶¶ 108-12. The Rule's preface claims that "scanning a barcode generally takes less than a minute per mailpiece" and that "[d]epending on how many barcodes are scanned, the verification process should take no more than a few hours for larger mailings, and potentially only a few minutes for smaller mailings." Rule at 54981. It goes on to state that local election officials, as the Authorized Ballot Mailers, "should remain at the BMEU or postal retail location during the verification process." *Id.*

By this estimate, scanning and verifying Outbound Federal Ballot mailings could take days, months, or years. For example, Maricopa County, Arizona is expected to mail more than 2.6 million outbound mailpieces as part of its first mailing of ballots for the 2026 general election. Patrick Decl. ¶ 113. If it takes USPS one minute to scan each of the 2.6 million mailpieces, the Maricopa County Recorder will have to remain at the BMEU continuously for nearly 5 years. If 30 seconds per mail piece, 2.5 years. If one second, 30 days. And if a tenth of a second, it would still take 72 hours. The City of Madison's first ballot mailing in mid-September typically includes 20,000 ballots for a midterm election like this year's. McComas Decl. ¶ 12. At one ballot per minute, it would take more than 13 days for these ballots to be scanned in by USPS. These delays threaten secure ballot chain of custody because even though USPS officials must take possession of ballots to conduct this potentially endless review, USPS "assumes no responsibility for any outbound ballot mailing presented" during this time and does not consider ballots "in its custody . . . until [they] have been accepted." Patrick Decl. ¶¶ 116-17 (citing Rule).

The rejection of a ballot mailing at the point of acceptance would impose significant burdens on election offices. Election officials would need to review and correct the mailing, which may include generating and assigning new IMbs, updating or resubmitting voter data to the Portal, reprinting envelopes, recreating ballot packets, and/or rescheduling mailing pickup and delivery. *Id.* ¶ 120. These steps would have to be completed under tight statutory mailing deadlines. And if an election official believes that USPS's determination that a ballot mailing is noncompliant is erroneous, the Rule provides election offices only a vague right to "request further review" of a rejection, with no timeline, no identified deciding official, and no commitment to prioritize ballot mail appeals. *See* DMM § 24.5.3(b). The Rule affords *voters* no notice or recourse for rejected or delayed mailings, with the explanatory materials remarkably claiming that "the ability to cure rests not with the voter, *as the franchise itself is not impacted*." Rule at 54981 (emphasis added).

The Rule's channeling of ballot mailings to BMEUs or retail offices is also a burden on smaller and more rural election offices that transmit low-volume ballot mailings directly with their postal carriers. Patrick Decl. ¶¶ 109-11. These offices are now forced to transport outbound ballots over longer distances to reach the nearest retail office or BMEU. *Id.* This will become increasingly burdensome amid anticipated post office closures and processing facility consolidations.[9]

Multiplied across thousands of USPS facilities and more than 10,000 election offices, these verification requirements will slow ballot mail, and mail service generally, nationwide.

### F. The Rule will delay ballots, sow confusion, and disenfranchise voters.

The Rule puts tens of millions of voters at risk of disenfranchisement through no fault of their own. Given the compressed statutory windows for mail voting across States, even short disruptions can prevent voters from casting timely ballots. And when a state or local election office

---

[9] USPS, *Remarks by Postmaster General David Steiner at the Aug. 7, 2026, USPS Board of Governors Meeting* (Aug. 7, 2026), https://perma.cc/9JME-NRB9.

cannot (or, on principle, does not) comply with the Rule's requirements, its voters are penalized with no apparent avenue for recourse under the Rule. The Rule itself provides that "responsibility [for correcting errors that prevent mailing] lies exclusively with election officials and their authorized MSPs." Rule at 54979.

The harms caused by the Rule will be most acutely felt by voters who depend on mail voting: voters with disabilities, who vote by mail at higher rates and other voters and for whom mail voting is the only accessible means of participation; older voters, for whom mail ballots accounted for roughly 40% of votes cast in 2024; military and overseas voters who do not rely on UOCAVA-specific ballots, as many such voters do not; voters with nontraditional addresses, including residents of tribal lands; and voters temporarily living out of state, including students attending college or university.

## ARGUMENT

Plaintiffs meet each of the factors entitling them to preliminary relief to prevent the grave injuries that enforcement of the USPS Final Rule for the 2026 election will cause. Plaintiffs are: (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the run up to the 2026 election in the absence of preliminary relief; (3) the balance of equities weighs in their favor; and (4) as does the public interest. *See LWVUS v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). Courts apply the same standards to requests for preliminary relief under 5 U.S.C. § 705. *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (collecting cases).

### I. The Court Has Jurisdiction Because Plaintiffs' Challenges to the Final Rule Are Ripe.

Plaintiffs' challenges to USPS's Final Rule are ripe. The Final Rule is a final agency action, the challenges require no additional factual development, and no additional administrative action is needed to further clarify USPS's assertion of regulatory authority. *See Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006). Therefore, "it is unnecessary to wait" any

longer "to determine [the Rule's] legality." *Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015). USPS's Final Rule has already taken effect and is currently harming Plaintiffs. *See* Rule at 54966 ("Effective August 21, 2026.").[10] No further action need take place for this Court to review and grant preliminary relief for the 2026 election on Plaintiff's purely legal claims.

## II. Plaintiffs Have Standing to Challenge Issuance and Enforcement of USPS's Final Rule.

Plaintiffs have standing when they have suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992) (citation modified); *see also DSCC v. Trump*, No. 26-cv-01114 (CJN), 2026 WL 1487833, at *4 (D.D.C. May 28, 2026). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

An organization has associational standing to sue on its members' behalf by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also DSCC*, 2026 WL 1487833, at *5.

"To have standing in its own right, an organization must make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *LULAC II*, 808 F. Supp. 3d at 54 (quotation omitted). While "simply a setback to [its] abstract social interests"

[10] This action and the harms it seeks to redress will remain ripe for review even if another district court issues preliminary relief as to the Rule before this Court addresses the motions pending before it. *See TikTok*, 507 F. Supp. 3d at 114.

is insufficient, interference with an organization's "core business activities" is a constitutionally cognizable injury. *FDA v. AHM*, 602 U.S. 367, 394-95 (2024) ("*AHM*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also DSCC*, 2026 WL 1487833, at *8. "[N]ew obstacles" that "unquestionably make it more difficult for [voter registration organizations] to accomplish their primary mission of registering voters" constitutes Article III injury. *Newby*, 838 F.3d at 9; *accord. LULAC v. EOP*, 818 F. Supp. 3d 34, 95 (D.D.C. 2026) ("*LULAC III*") (citing *AHM*, 602 U.S. at 394) (internal quotation marks omitted); *Hines Immigr. L., PLLC v. Exec. Off. for Immigr. Rev.*, No. 1:26-cv-01018 (CJN), 2026 WL 969020, at *4 (D.D.C. Apr. 10, 2026).

**A. Organizational Plaintiffs have standing to challenge the Final Rule.**

Organizational Plaintiffs —LULAC, SFI, and ASA—have standing to challenge the Final Rule. These organizations have both associational standing on behalf of their members and organizational standing.

**1. Associational Standing**

Organizational Plaintiffs have associational standing to sue on their members' behalf. Organizational Plaintiffs' members often vote by mail—indeed, many have no other option—and will be disenfranchised by USPS's failure to transmit their mail ballot if their election officials are not able to comply with the Rule's requirements or the members are not accurately included on the Participation Lists for the 2026 election. Ex. 4 ¶¶ 14-16, Declaration of Juan Proaño ("Proaño Decl."); Ex. 5 ¶¶ 25-31, Declaration of Sarah Streyder ("Streyder Decl."); Ex. 6 ¶¶ 8-9, Declaration of Jessica Mendoza ("Mendoza Decl."). Plaintiff Organizations' members have already been harmed by the uncertainty and confusion surrounding their ability to vote by mail in the November election. Proaño Decl. ¶¶ 14-15; Streyder Decl. ¶¶ 35-39; Mendoza Decl. ¶¶ 15, 17-18, 20, 22.

In *Robert F. Kennedy Human Rights v. Department of State*, the court held that the first *Hunt* prong was satisfied where agency action imposed a "direct interference with the members'

ability to carry out" constitutional rights. No. CV 25-1774 (JEB), 2026 WL 820811, at *12 (D.D.C. Mar. 25, 2026). Here, Organizational Plaintiffs have members in jurisdictions that cannot comply with the Rule's ballot envelope requirements. Proaño Decl. ¶¶ 2, 18-20; Streyder Decl. ¶¶ 6, 23. Members who vote by mail in these jurisdictions will be harmed when their ballots are delayed or never sent at all. Proaño Decl. ¶¶ 2, 20; Streyder Decl. ¶¶ 6, 23; Mendoza Decl. ¶¶ 15-19. Members who (validly under state law) request absentee ballots close to Election Day are at particular risk. Proaño Decl. ¶ 17; Streyder Decl. ¶¶ 26-28; Mendoza Decl. ¶¶ 15-19.

Plaintiff Organizations' members will be disenfranchised when the Rule delays or prevents ballots from being mailed. This includes older voters and those with disabilities, Proaño Decl. ¶ 15, military members and their families stationed away from their home state, Proaño Decl. ¶ 15; Streyder Decl. ¶¶ 26-29; ECF No. 53-14 ¶ 12, Declaration of Janessa Zucchetto; out of state university students, Mendoza Decl. ¶ 19; ECF No. 53-17 ¶¶ 4-5, Declaration of Wyatt Perkins; and others who rely on mail voting. Proaño Decl. ¶ 15. Moreover, because many military families vote using their State's own absentee voting process rather than UOCAVA's Federal Post Card Application, the Rule's purported exemption of UOCAVA ballots may not protect military and overseas voters—including SFI members. Streyder Decl. ¶¶ 20-21. Delayed receipt of ballots lessens the time to research candidates, cast an informed vote, and ensure that the ballot will be returned in time. Mendoza Decl. ¶¶ 16, 19.

Given the certainty of implementation problems in the 2026 election, Plaintiffs' members will be harmed because of the time and effort that they must spend to attempt to receive and cast ballots they are fully entitled to vote under State law with no guarantee of success. Proaño Decl. ¶¶ 7, 14-17; Streyder Decl. ¶¶ 30-35; Mendoza Decl. ¶¶ 12-16.

The final two *Hunt* factors are easily satisfied. All three organizations' missions include advocating for their members to exercise their right to vote. Proaño Decl. ¶¶ 3,23; Streyder Decl. ¶ 5; Mendoza Decl. ¶ 4. Plaintiff Organizations seek to protect their members' ability to vote by mail, the only means for many to cast a ballot. This more than satisfies the "undemanding" germaneness inquiry that mandates "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). Finally, individual members need not participate because only questions of law are at issue and "neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member . . . ." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). "And because Plaintiffs seek vacatur rather than damages, their claims do not require individual member participation." *Robert F. Kennedy Hum. Rts.*, 2026 WL 820811, at *11.

### 2. Organizational Standing

Organizational Plaintiffs have organizational standing to challenge the Final Rule. The Final Rule's requirements, and the inevitable delays and problems that will result as election jurisdictions attempt but fail to comply, will directly harm Organizational Plaintiffs' "core business activities" of assisting their members in successfully registering to vote and casting a ballot. *See AHM*, 602 U.S. at 395. As this Court recently explained,

> Determining whether a plaintiff can establish organizational standing requires asking, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm. . . . That framework gives content to the familiar requirements of injury and concreteness as they apply to organizational plaintiffs . . . .

*Hines*, 2026 WL 969020, at *4 (citation modified). The Rule has injured Organizational Plaintiffs' interests by presenting "new obstacles" to Organizational Plaintiffs' core "mission of registering voters," *Newby*, 838 F.3d at 9, and assisting their members in casting ballots that will count.

Specifically, Organizational Plaintiffs serve communities that rely on mail voting, often as their only option. Proaño Decl. ¶¶ 14-16; Streyder Decl. ¶¶ 25-31; Mendoza Decl. ¶¶ 8-9. The Rule "genuinely impair[s]" their voter education, engagement, and assistance efforts. The barriers to successful mail voting created by the Rule will result in decreased voting participation by members of all Plaintiff Organizations, directly undermining their services aimed at enabling and ensuring robust voter participation. Proaño Decl. ¶ 15, 17-20; Streyder Decl. ¶¶ 36-39; Mendoza Decl. ¶ 19.

In all cases, Organizational Plaintiffs have or will "use[] [their] resources to counteract that harm." *Hines*, 2026 WL 969020, at *4. Each Organizational Plaintiff is currently devoting resources during the pre-election period to mitigating the effects of the Rule on its members, ensuring that they are educated on the Rule's impact, and able to timely receive their ballots—time and effort that would other spend on other initiatives. Proaño Decl. ¶¶ 22-30; Streyder Decl. ¶¶ 35-46; Mendoza Decl. ¶¶ 24-31. This "diversion of resources from existing programs to counteract ongoing and challenged actions also suffices to establish organizational standing." *Hines*, 2026 WL 969020, at *5 (internal quotation marks omitted).

Ultimately, civic engagement organizations such as Plaintiff Organizations are, like candidates, "not 'mere bystanders'" in elections and have a "stake in how [election results are] determined and regarded." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78-79 (2026). Like candidates, Plaintiff organizations' reputations and legitimacy rely on public confidence in elections. *Id.* As such, "[d]epartures from the preordained rules," particularly departures as substantial and chaotic as those imposed by the Rule, "cause them particularized and concrete harm." *Id.*

**B. The Election Official Plaintiffs have standing to challenge the Final Rule.**

The Election Official Plaintiffs—the City of Madison, Travis County Clerk Dyana Limon-Mercado, in her official capacity as the Travis County Clerk, and Travis County—have standing to challenge the Final Rule.

*First*, at this late stage of the election cycle, the Election Official Plaintiffs have already invested significant financial resources into administering the November 3, 2026 election. However, the Rule will impose substantial, additional costs. For example, the Rule's new IMb requirements for outgoing and return ballot envelopes will force the Election Official Plaintiffs to repurchase tens of thousands of envelopes. The City of Madison has already purchased all of the ballot envelopes that it will use for the upcoming election. McComas Decl. ¶ 22. Wisconsin's outbound envelopes have IMbs generated by the WisVote system, but its return envelopes do not. McComas Decl. ¶ 19. Consequently, to comply with the Rule, Madison must spend more than $10,000 to purchase new return envelopes. McComas Decl. ¶ 22. Travis County and the Travis County Clerk likewise ordered envelopes for the November election months ago, at a cost of $21,349. Limon-Mercado Decl. ¶ 22. Neither the outgoing nor the return envelopes in Travis County have IMbs, and the Clerk lacks the funds to purchase new envelopes. Limon-Mercado Decl. ¶¶ 17, 22. Further, the Travis County Clerk's office must purchase new barcode scanners because its existing scanners cannot scan two-dimensional IMbs. Limon-Mercado Decl. ¶ 21. The Election Official Plaintiffs face other resource costs, as well, including: integrating new equipment and systems into existing operations, retraining election staff to generate compliant mailings and use the Portal, and dedicating significant time to preparing and uploading compliant voter lists into the Portal. McComas Decl. ¶¶ 30-33; Limon-Mercado Decl. ¶¶ 26-28. These costs flow directly from the Rule's changes to election administration and constitute a concrete injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("monetary injury" constitutes injury in

fact); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

*Second*, the Election Official Plaintiffs have standing because delays and errors resulting from the Final Rule unlawfully burden their administration of elections and threaten to disenfranchise the voters the Election Official Plaintiffs serve. Based on the limitations of their vendors, the Election Official Plaintiffs cannot obtain IMb-compliant envelopes in time. Limon-Mercado Decl. ¶¶ 18, 26-28; Tex. Elec. Code § 86.004(a); McComas Decl. ¶ 23. Moreover, even if they could, the Rule creates a substantial risk of ballot-delivery delays and rejections because of the potential for systemwide errors in the new Portal, incomplete voter lists, and Postal Service compliance issues. McComas Decl. ¶¶ 17, 24, 30; Limon-Mercado Decl. ¶¶ 15, 24-27.

Lastly, the Rule threatens reputational harms to the Election Official Plaintiffs. *TransUnion*, 594 U.S. at 414. Voters look to the Election Official Plaintiffs as an authoritative source of information concerning how to obtain, receive, and return mail ballots. Limon-Mercado Decl. ¶ 28. For example, in Travis County if ballots are delayed, rejected, or not delivered because of the Rule's requirements, voters will attribute those failures to the Clerk even where she lacks authority over USPS systems and processes or statewide systems. Limon-Mercado Decl. ¶ 30. Delayed, rejected, or unavailable mail ballots may be perceived by voters, participating jurisdictions, and the broader public as failures by the County, regardless of whether the underlying cause lies with USPS. *Id.* And in the experience of Election Official Plaintiffs, voters concerned about whether their ballot will be properly handled and counted or who are confused about eligibility and procedures are less likely to exercise their right to vote. McComas Decl. ¶ 34; Limon-Mercado Decl. ¶ 29. This undermines voters' goodwill and the Election Official Plaintiffs' reputations for administering free and fair elections.

**III. Plaintiffs Have a Strong Likelihood of Success on the Merits.**

**A. The Final Rule is unconstitutional (Claims I and II).**

USPS's Final Rule violates the Constitution's allocation of power regarding elections and the separation of powers. The Elections and Electors Clauses confer all regulatory authority relating to federal elections on the States, unless and until Congress by statute provides differently. U.S. Const. art. I, § 4; art. II, § 1. Thus, States have the power to regulate voting by mail, including the power to determine *which* voters are eligible to vote by mail. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809-10 (1969). States also have final and exclusive authority to prescribe the voter qualifications for elections. U.S. Const. art. I, § 2, cl. 1; art. II, § 1, cl. 2; amend. XVII; *see also Arizona v. ITCA*, 570 U.S. 1, 17 (2013). Neither the President nor USPS is assigned any role. *LULAC v. EOP*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025) ("*LULAC I*"); *see also Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sep. 14, 2020) (the Constitution provides no "authority to the Postal Service" to override state election administration). Absent congressional action, only States may prescribe "everything from the date[s] on which voters will go to the polls to the dimensions and font of individual ballots . . . , including regulations relating to . . . registration, supervision of voting, . . . prevention of fraud and corrupt practices, counting of votes, [and] duties of inspectors." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (internal quotations omitted). "[E]very State lets at least some residents vote absentee" by means of mail ballots. *Watson v. RNC*, 146 S. Ct. 2165, 2171 (2026).

Congress also has sole and exclusive authority to regulate USPS and to authorize regulatory action by USPS. The Constitution's Postal Clause gives Congress the authority "[t]o establish Post Offices and post Roads" and "[t]o make all Laws which shall be necessary and proper" for executing this task. U.S. Const. art. I, § 8; *Council of Greenburgh Civic Ass'ns*, 453 U.S. at 121; *see also Ex parte Jackson*, 96 U.S. 727, 732 (1877). This is essential, because a postal official's

"right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902).

The statutory framework set by Congress in Title 39 is clear about USPS's role: it must collect and deliver the mail to whom it is addressed, providing universal and non-discriminatory service. *See generally* 39 U.S.C. § 101 *et seq.* Congress has given the Postal Service no authority to condition acceptance and delivery of ballots on whether States submit a list of intended mail voters to USPS beforehand nor on USPS's determination that a ballot recipient appears on such a list. Nor has Congress authorized USPS to mandate ballot envelope design or refuse to deliver ballots in noncompliant envelopes. To the contrary, the Postal Service's principal duty is to "receive, transmit, and deliver" the mail, and it "shall serve as nearly as practicable the entire population of the United States." *Id.* § 403(a); *see also id.* §§ 403(b), 404(a)(1).

When Congress envisions a specific role for USPS to play in federal elections, it defines the role clearly. Two statutes of particular relevance here are the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). Both statutes recognize that States, not the federal government, are responsible for developing and maintaining their voter registration lists and administering elections. The only role assigned to USPS under the NVRA is to provide state and local election officials with information about whether an individual may have moved, 52 U.S.C. § 20507(c)(1), and to offer State and local election officials reduced rates for any mailings the NVRA requires or authorizes, 39 U.S.C. § 3629. These limited instructions in the NVRA do not authorize the Rule's wide-ranging role for the Postal Service to gatekeep mail voting.

HAVA requires "each State" to create a "centralized, interactive computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1)(A), (a)(1)(A)(i), and to "conduct[] a general

program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address [or death].” *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019); *see also* 52 U.S.C. § 21083(a)(2)(A)(ii). HAVA explicitly provides that “[t]he specific choices on the methods of complying with the [statute’s] requirements” regarding list maintenance and voter registration “shall be left to the discretion of the State.” 52 U.S.C. § 21085. Critically, Congress provided no role in HAVA for the Postal Service in determining who may vote by mail.

USPS claims that the statutory enumeration of its powers, its rulemaking authority, and its narrow law enforcement responsibility authorize the Rule. *See* Rule at 54967-72 (citing 39 U.S.C. §§ 401, 404; 18 U.S.C. § 3061). But that is not so. USPS’s enumerated powers say nothing about ballots, voter lists, election law enforcement, overriding State law as to who may cast ballots by mail, or conditioning mail receipt on a State’s compliance with list submission requirements or envelope design. *See* 39 U.S.C. §§ 401, 404(a); 18 U.S.C. § 3061. USPS’s rulemaking authority is also inapposite. USPS may only adopt regulations that are “not inconsistent with” Title 39 and that “may be necessary in the execution” of its lawful functions. 39 U.S.C. § 401(2). The authority to issue Rules “not inconsistent with” Title 39, *id.* at § 401(2), is not a free-floating grant of authority to issue rules never envisioned by Congress in enacting Title 39. To the contrary, that authority must also be “necessary in the execution of” USPS’s assigned functions. USPS has no lawful function in creating and administering election rules that not only lack congressional authorization, but conflict with Congressional enactments. USPS attempts to argue that the Rule is within its authority because it governs standards for mail. But it is no answer that USPS is using

its control over delivery of mail (which is within its core functions) to implement what are fundamentally election rules that supersede State mail voting laws.[11]

Moreover, the Supreme Court instructs courts to "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). That presumption is particularly apt here because "the electoral process" is "of the most fundamental significance under our constitutional structure." *Bost*, 607 U.S. at 77. USPS's position is thus at odds with "constitutional structure and common sense." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243 (2026) (plurality opinion) (citation omitted). USPS's core assertion is that Congress has given it heretofore unnoted and unexercised *elections* powers sufficient to override State law in an area where the Executive Branch has no independent constitutional authority. That is simply not so. *See id.* at 231 ("[A] reasonable interpreter would not expect Congress to pawn . . . a big-time policy call . . . off to another branch.") (citation modified).

The Rule is thus unconstitutional for multiple reasons. ***First*,** the Executive Branch has no power to unilaterally dictate election rules through agency rulemaking, so USPS has exceeded the Executive Branch's power. ***Second*,** the Rule unconstitutionally trespasses on Congress's power to "make or alter" election regulations under the Elections Clause. *See* U.S. Const. art. I, § 4. The Rule unconstitutionally violates the separation of powers by seizing the power to regulate elections in a manner inconsistent with federal statutes (such as the NVRA and HAVA). ***Third*,** while

[11] If there were any doubt that the purpose and function of the Rule is to govern, impact, and oversee elections—rather than, say, improve efficiency in the delivery of ballots simply because of their status as a particularized form of mail—the Rule's exemptions of primary elections and state and local elections answers it. If the Rule was necessary to best deliver ballots rather than police election administration, it would have no reason to focus only on federal general and special elections and exempt equivalent (from a mail delivery perspective) primary, state, and local ballots.

Congress is expected to "clearly" authorize momentous regulations, it has never done so for the Rule. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The Rule upsets the "usual constitutional balance between the States and the Federal Government" regarding election regulation. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). ***Fourth***, by claiming for USPS the power to enact rules that have no statutory basis, the Rule usurps Congress's exclusive constitutional power to enact laws governing "the entire postal system of the country." *Ex parte Jackson*, 96 U.S. at 732; *see* U.S. Const. art. I, § 8, cl. 7. And ***fifth***, USPS commandeers State and local resources and officials to implement and enforce the Rule, in violation of the principles of federalism and the Tenth Amendment, including those officials' constitutional role in setting their own mail voting rules. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

**B. The Final Rule unlawfully creates an unauthorized category of nonmailable matter (Claim III).**

Plaintiffs are likely to succeed on their claim that USPS violated its statutory obligations limiting the categories of non-mailable matter. "[P]roceedings concerning the mailability of matter" are subject to review under the Administrative Procedure Act. 39 U.S.C. § 3001(m). Here, the D.C. Circuit emphasized the availability of APA review as to mailability of matter claims. *See DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *2 n.6 (D.C. Cir. July 28, 2026) (per curiam).

USPS's authority to reject mailpieces is defined by statute. 39 U.S.C. § 3001 *et seq.* "The postal laws make a clear-cut division between mailable and nonmailable material." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152 (1946). 39 U.S.C. §§ 3001-3018 specify *all* the categories of matter that are "nonmailable." The "power" to make non-mailability rules "has been zealously watched and *strictly confined*" by Congress. *Id.* at 156 n. 18 (emphasis added). Congress has carefully defined the categories of "nonmailable matter," 39 U.S.C. §§ 3001-3018—including hazardous materials and certain solicitations—and has specified that such matter "shall be

disposed of as [USPS] direct[s].” *Id.* § 3001(b). But USPS “must deliver the mail unless an item is ‘nonmailable’ within the definition[s] of 39 U.S.C. § 3001.” *Bowie v. Williams*, 351 F. Supp. 628, 634 (E.D. Pa. 1972). If Congress has passed no law permitting USPS to refuse delivery, it has no power to “exclude or refuse to deliver” particular mailings. *See McAnnulty*, 187 U.S. at 109.

Ballots and ballot envelopes appear nowhere in Sections 3001-3018. Nothing in Title 39 authorizes USPS to create a new category of “refusable” mail or to condition mailability on a mailer’s compliance with USPS’s data disclosure requirements. Yet that is what the Rule does. It renders nonmailable every ballot mailing from a State or jurisdiction that does not or cannot submit its lists of participating mail voters to USPS in advance, every mailing with mailpieces addressed to voters not on a pre-submitted list, and every mailing that has not undergone MDA review.

USPS’s answer in the rulemaking is semantic: that the Rule imposes only Section 401 “preparation standards” and that “conditions on the acceptance of mailable matter are distinct from a determination that the matter is nonmailable.” Rule at 54973-74. But this elevates label over substance. An agency’s authority is measured by what a rule does, not by what the agency calls it or the provision of law it invokes. *See Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942) (“[I]t is the substance of what the [agency] has purported to do and has done which is decisive.”). Every other existing DMM acceptance standard is based on physical features of the mailpiece itself, defects on its face that can be cured by altering it, or documentation and preparation requirements for pricing and handling.[12] The Rule instead mandates refusal based on information extrinsic to and unnecessary for delivering or pricing a mailpiece—its contents (a federal ballot), DMM § 24.4.1(d)-(e); the identify of its sender (an election official), *id.* § 24.4.1(a);

[12] *See, e.g.*, DMM §§ 101, 102, 201 (physical dimensions, machinability), 202 (address, marking, address placement), 203 (documentation, preparation), 204 (barcodes).

and the identify of its recipient (an enrolled voter), *id.* § 24.4.2(b). These are the kinds of distinctions Congress has strictly reserved for itself in defining nonmailable matter. *See, e.g.*, 39 U.S.C. §§ 3002 (contents), 3003 (sender), 3004 (recipient). Nor is rejection merely "temporary[]" because "errors may be corrected." Rule at 54974. An election office that declines to submit voter lists to USPS has no "mailpiece error" to correct, yet its mailpiece will be returned to sender, and its intended recipient will be permanently barred from using the mail to vote in that election.

USPS's analogy to "cremated human and animal remains" and "replica explosives," Rule at 54974, fails for the same reason. Of course, ballot mail bears no resemblance to those items. But more fundamentally, those rules prescribe only packaging and mode of entry, apply to every mailer, and operate alongside explicit congressional authorization to regulate the transmission of hazardous and perishable materials. *See* 39 U.S.C. § 3001(c)(2) (Matter which is "perishable within the period required for . . . delivery is nonmailable."); *id.* § 3001(n)(1) ("[H]azardous material is nonmailable.").

USPS's categorization of some mail ballots as nonmailable thus fails APA review. The APA prohibits final agency action that is arbitrary, capricious, or an abuse of discretion, 5 U.S.C. § 706(2)(A), such as when an agency fails "to consider an important aspect of the problem," when its explanation "runs counter to the evidence," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or when it fails to adequately consider "reliance interests." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). The APA also prohibits agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). The Rule fails all of these standards.

In promulgating the Rule and its immediate effectiveness date, USPS arbitrarily dismissed the "legitimate reliance" interests of voters, civic participation organizations, and election jurisdictions on USPS's existing practices. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). USPS dismissed out of hand concerns about whether the Rule could be implemented for the upcoming November election. USPS acknowledged that it had received many comments raising "logistical or financial difficulties states may face complying with the rule, including some claims that immediate implementation would prove impossible." Rule at 54985.[13] In response, USPS did not contest the seriousness or factual basis of these concerns, but simply declared that "the visibility and law-enforcement benefits of the rule, including for this election cycle, are such that there is no compelling reason for any delay." *Id.* USPS gave no meaningful consideration to the facts that the Rule and its immediate effectiveness will result in: (1) redesign of many ballot envelopes; (2) review of all redesigned envelopes by a limited number of USPS officials on an uncertain timeline; (3) the reordering and reprinting of potentially millions of ballot envelopes; (4) the entry of tens of millions of pieces of data by election officials, many of whom have no experience with IMb generation and printing; (6) creation of an entirely new Portal that is to receive inputs from thousands of jurisdictions with no time for sufficient test runs or trainings; (6) predictable problems with interoperability of the ballot Portal and State and local voter data systems; (7) USPS's bandwidth and resources to field questions from thousands of election officials who have received no training on use of the Portal; (8) that USPS, election jurisdictions,

---

[13] Comment of California *et al.* in Opposition to Proposed Rule (July 2, 2026), https://perma.cc/W4DW-EY7K; Comment on Behalf of Local Election Officials on Notice of Proposed Rulemaking (July 2, 2026), https://perma.cc/7WFW-TDMT; King County Elections Public Comment on Proposed Rule (July 2, 2026), https://kingcounty.gov/en/dept/elections/about-us/news-and-media-resources/news-releases/july-2-2026; Comment of Jefferson County, Colorado on Proposed Rule, at 4 (June 18, 2026), https://perma.cc/4PY4-FJGJ; BPC Public Comment on USPS Proposed Rule (July 2, 2026), https://perma.cc/MD29-NUUJ.

voters, and civic organizations are not and cannot become prepared on the present timeline to mitigate the impact of the predictable delays and increases in ballot processing time at mail facilities; and (9) resulting voter confusion.

The purported law enforcement benefits of the Rule are purely illusory. To start, fraud in mail voting is vanishingly rare, according to multiple studies of elections over the last twenty years, due in part to the sophisticated systems State and local election officials have created to ensure the integrity and accuracy of their election systems and voter rolls.[14] USPS cites no evidence, study, or analysis to suggest that mail voting fraud is a real issue or that the Rule would make mail voting more efficient or secure. Rather, USPS's own post-election reports from 2020,[15] 2022,[16] and 2024[17] all tout its success in delivering growing volumes of ballot mail under existing procedures. At its last public meeting on August 7, 2026, the USPS Board of Governors noted the USPS Office of Inspector General's initial review of election mail processing in 2026 primary elections, finding overall effectiveness in election mail operations.[18]

---

[14] Samara Angel, Jonathan Katz & Randi Wright, *Mail voting in the US: Data points to very low fraud and significant benefits to voters*, Brookings (Nov. 6, 2025), https://perma.cc/4CQP-84YL (an analysis of The Heritage Foundation's database "found that only about 0.00006% of total votes cast were fraudulent mail votes over the preceding 20 years," that universal vote-by-mail states have "essentially zero fraud," and that the American Statistical Association found "no evidence that voting by mail increases the risk of voter fraud overall").

[15] USPS, *2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year* (Jan. 19, 2021), https://perma.cc/F9EN-LPAH.

[16] USPS, *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections* (Jan. 9, 2023), https://perma.cc/H745-JD72.

[17] USPS, *2024 Post-Election Analysis Report: Delivering the Nation's Election Mail Securely and Effectively* (Dec. 2, 2024), https://perma.cc/3CGF-FAPG.

[18] USPS, *About: Leadership: Board of Governors*, https://about.usps.com/who/leadership/board-governors/?video=bgs260807 (last visited Aug. 25, 2026).

Contrary to USPS's asserted benefits of the Rule, election officials already reconcile the number of mail ballots issued against mail ballots returned as part of established tracking protocols. *See, e.g.*, McComas Decl. ¶ 18. The Participation Lists maintained by USPS would be duplicative, likely to contain data-transfer errors, and will contain no information election offices in every jurisdiction do not already maintain at a higher level of accuracy. A duplicative, less-accurate federal list would generate false flags and consume rather than supplement law enforcement resources. Indeed, USPS all but concedes that the Participation List is, at best, entirely duplicative, stating that the rule "require[s] USPS to provide the state with the List that contained the same information that the state provided to USPS." Rule at 54982 (quotation omitted). The Rule thus violates the APA as exceeding USPS's statutory authority, and as arbitrary and capricious, including for dismissing the widely held and entirely "legitimate reliance" interests in maintaining the current availability of voting by mail for voters eligible in accordance with the laws of each State. *See Regents of the Univ. of Cal.*, 591 U.S. at 33.

Finally, the Rule violates the APA's procedural requirements by setting an immediate effectiveness date (indeed, a date 5 days *in advance* of formal publication in the Federal Register). *See* 5 U.S.C. § 553(d) (requiring publication of a final rule "not less than 30 days before its effective date"). The purpose of "the thirty-day waiting period" prescribed by Section 553(d) "is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996). USPS has violated nearly every guardrail in issuing the Rule generally, and specifically as to the 2026 election.

### C. The Final Rule was issued in violation of USPS's statutory obligation to seek Postal Regulatory Commission review (Claim IV).

The Rule is further unlawful because USPS failed to obtain a required advisory opinion from the Postal Regulatory Commission ("PRC") prior to undertaking the rulemaking. The Postal

Reorganization Act requires USPS to seek an advisory opinion from the PRC before making any "change in the nature of postal services" that will "generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). USPS must submit its proposal to the PRC "within a reasonable time" *before* the changes take effect. *Id.*; *see* 39 C.F.R. § 3020.112 (advisory opinion request must be filed "not less than 90 days before the proposed effective date" of the change). The PRC must hold a formal hearing and issue a written opinion, 39 U.S.C. § 3661(c), which the D.C. Circuit can review, *id.* § 3663. Moreover, even before requesting the advisory opinion, the Postal Service must conduct one or more pre-filing conferences with "interested persons in the proceeding and shall make a good faith effort to address the concerns of such persons" to "identify[] relevant issues and information needed to address those issues during proceedings at the Commission." 39 C.F.R. § 3020.111(a), (b).

USPS must seek a PRC advisory opinion when a proposed change: (1) makes a "change" that has "some meaningful," rather than "minor" impact on service; (2) the change is "in the nature of postal services," meaning it alters the manner in which postal services are available to users; and (3) the change affects service "on a nationwide or substantially nationwide basis"—*i.e.*, over a "broad geographical area." *Buchanan v. USPS*, 508 F.2d 259, 262-63 (5th Cir. 1975); *see also New York v. Trump*, 490 F. Supp. 3d 225, 241 (D.D.C. 2020); *New York v. Biden*, 636 F. Supp. 3d 1, 21 (D.D.C. 2022), *vacated on other grounds sub nom. New York v. Trump*, 181 F.4th 132 (D.C. Cir. 2026); *NAACP v. USPS*, 496 F. Supp. 3d 1, 16-17 (D.D.C. 2020). The Rule meets each element.

***First***, the volume of mail impacted is enormous. In 2024, the Postal Service delivered at least 99.22 million ballots to or from voters—a significant percentage of all Postal Service

customers—and nearly one in three Americans who voted did so by mail.[19] The Rule changes the preparation, acceptance, and delivery of that entire ballot-mail stream.

***Second***, these changes are in the nature of postal services. This factor "involves a qualitative examination of the manner in which postal services available to the user will be altered." *Buchanan*, 508 F.2d at 263. The Commission has emphasized that "[i]t is the experience of the individual postal consumer, the recipient of the complex of services provided by the Postal Service and the intended beneficiary of the policies incorporated by § 3661, that must be assayed." *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 885 (E.D. Pa. 2020) (citing PRC Advisory Op. Dkt. No. N75-1 at 21).

Courts have repeatedly held that changes threatening systemic delays in the delivery of ballots to postal users are changes "in the nature of postal services." *See NAACP*, 496 F. Supp. 3d at 17 (holding nationwide delays caused by Postal Service changes were "in the nature of postal services") (citation omitted); *New York v. Trump*, 490 F. Supp. 3d at 242 (same); *New York v. Biden*, 636 F. Supp. 3d at 22 (same). And, consistent with that understanding, the Postal Service routinely seeks advisory opinions before implementing policy changes that risk delayed service systemwide or for specific types or classes of mail.[20] Ballot delivery is an essential postal service. For the millions of Americans who cannot vote in person, the mail is the only means by which

---

[19] *See supra* note 17 at 1; *see also Nearly 1 in 3 Americans Voted by Mail in 2024*, States United Democracy Ctr. (updated Apr. 13, 2026), https://perma.cc/7MAU-BCJQ.

[20] *See, e.g.*, *Advisory Op. on the Operational and Service Standard Changes Related to the Delivering America Plan*, Dkt. No. N2024-1 (Jan. 31, 2025), https://perma.cc/37X3-U2PQ; *Advisory Op. on Service Changes Associated with First-Class Mail and Periodicals*, Dkt. No. N2021-1 (July 20, 2021), https://prc.arkcase.com/api/prc-dockets/filing/downloadFile?fileId=154736&inline=true; *Advisory Op. on the Service Standard Changes Associated with First-Class Package Service*, Dkt. No. N2021-2 (Sep. 29, 2021), https://prc.arkcase.com/api/prc-dockets/filing/downloadFile?fileId=129284&inline=true.

they exercise the franchise. A change that risks withholding or delaying their ballot strikes at the core of the consumer experience Section 3661 was designed to protect.

And ***third***, the Rule will affect service on a nationwide basis. By its terms, the Rule applies "uniform standards," Rule at 54975, for the mailing of absentee ballots to and from voters without any geographic limitation. It applies to all States where ballots are mailed to voters—that is, all States. And all States must choose whether to comply with the Rule's conditions or effectively eliminate their entire vote-by-mail programs.

### D. The Final Rule violates the PRA's Universal Service Requirement and its prohibitions on Provision of Non-Postal Services and Undue Discrimination (Claims V-VII).

In addition to the non-mailability and PRC review requirements, Plaintiffs are likely to succeed on their claims that the Rule violates other provisions of the Postal Reorganization Act.

***Universal Service Mandate***. The PRA mandates that USPS "shall be operated as a basic and fundamental service provided to the people by the Government . . . authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). This obligation is intended "to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.* The USPS must "*provide prompt, reliable, and efficient services* to patrons in all areas and shall render postal services to *all communities*." *Id.* (emphasis added). The Rule is irreconcilable with this mandate: it erects roadblocks that will make ballot mail slower, unreliable, and inefficient, and will deny ballot mail service altogether to individuals in jurisdictions that cannot or do not comply with the Rule.

***Prohibition on Non-Postal Services***. USPS may not provide non-postal services, except for those expressly authorized by law or that were offered before January 1, 2006, and sustained upon review and approval of the PRC. 39 U.S.C. § 404(e). A non-postal service is anything other than "the delivery of letters, printed matter, or mailable packages, including acceptance, collection,

sorting, transportation, or other functions ancillary thereto." *Id.* §§ 404(e)(1), 102(5). The compilation, maintenance, and transmission of Participation Lists, the administration of an enrollment program for voters seeking to vote by mail, and the creation of a Portal to "enroll" voters and make them eligible to receive ballot mail is not "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5). These are election-administration services that Congress has never authorized USPS to provide. Nor has USPS followed the required procedural steps that would allow it to provide new, non-postal services. *See* 39 U.S.C. §§ 3703, 3705.

***Undue or Unreasonable Discrimination***. Congress has prohibited USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails" or "grant[ing] any undue or unreasonable preferences to any such user" unless "specifically authorized." 39 U.S.C. § 403(c). In other words, USPS cannot treat similarly situated users of the mail differently unless it justifies that disparate treatment with good reasons or identifies specific statutory authorization. *See Nat'l Easter Seal Soc'y for Crippled Child. & Adults v. USPS*, 656 F.2d 754, 759-62 (D.C. Cir. 1981); *Direct Mail/Mktg. Ass'n v. USPS*, 501 F.2d 717, 722 (D.C. Cir. 1974); *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 220 F. Supp. 3d 27, 31 (D.D.C. 2016). The Rule violates that requirement.

*First*, the Rule discriminates between local election offices when they present ballots for delivery. The Rule offers them markedly different services depending on their capacity to satisfy the new preconditions on acceptance and delivery of ballot mail. USPS will accept and deliver the ballot mailings of an office that is prepared to conform its envelopes to the Rule's design standards, including inclusion of a unique IMb on both the outgoing and return ballot envelopes, and prepare and submit lists of its voters who are entitled to receive mail ballots. But it will altogether refuse

to mail a single ballot from election offices that is not prepared to satisfy these conditions, even where the ballot is properly addressed and postage fully paid.

*Second*, the Rule imposes undue discrimination on voters. Those voters whose election office has satisfied the Rule's unconstitutional conditions are more likely to receive their mail ballots on time, while voters whose election office is unwilling or incapable of complying (or has tried to comply but nonetheless been deemed noncompliant by a USPS employee) will have their ballots rejected and returned to their election office. These voters are similarly situated, each entitled under their State's law to receive a mail ballot. The sole distinction is whether their election offices have cleared the Rule's administrative hurdles, a matter entirely beyond the voters' control.

The Rule's discriminatory line-drawing has no rational or legitimate basis and is not authorized by law. The Rule is thus incompatible with the express requirements of Section 403(c).

**IV. Plaintiffs Have a Cause of Action for Each of Their Claims and No Channeling to the PRC is Required for Preliminary Relief as to the 2026 Election.**

LULAC Plaintiffs have a cause of action for each claim. "[P]laintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious act by a public officer.'" *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). That is the case here. As to Plaintiffs' constitutional ultra vires claims, the law is clear that "an aggrieved party may seek equitable relief from unconstitutional Government action by proceeding 'directly under the Constitution.'" *LULAC III*, 818 F. Supp. 3d at 81 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)).

LULAC Plaintiffs' claim that the Rule's treatment of ballots as nonmailable exceeds USPS's statutory authority, and is arbitrary and capricious, is reviewable under the APA. Although USPS is generally exempt from the APA, *see* 39 U.S.C. § 410(a), Congress explicitly subjected

USPS "proceedings concerning the mailability of matter" to APA standards, including judicial review pursuant to "chapter[] . . . 7 of title 5," 39 U.S.C. § 3001(m). Such review is supported by precedent in this circuit. *See DSCC v. Trump*, 2026 WL 2168617, at *2 n.6; *Humane Soc'y of U.S. v. USPS*, 609 F. Supp. 2d 85, 94-97 (D.D.C. 2009) (applying APA review).

LULAC Plaintiffs also have equitable causes of action to challenge USPS action that is contrary to statute, as in Counts IV through VII. Here too, Plaintiffs' equitable causes of action are well-established in this circuit. *See, e.g.*, *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970-72 (D.C. Cir. 2022) (claims that USPS exceeded its statutory authority are judicially reviewable); *Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016) (discussing scope of "non-APA review" of USPS actions).

Finally, Defendants are likely to assert that only the PRC has jurisdiction over their claims of undue discrimination and failure to obtain a PRC advisory opinion. *See* 39 U.S.C. § 3662(a). In *New York v. Trump*, the D.C. Circuit explicitly declined to hold that PRC channeling would apply to relief needed "only months before" an election where waiting for PRC proceedings would "foreclose[] all meaningful judicial review." 181 F.4th at 140 n.3.

LULAC Plaintiffs have raised these claims before the PRC, in a complaint filed on August 6, 2026.[21] The statutes and regulations governing PRC review provide 90 days to the PRC just to "begin proceedings." 39 U.S.C. § 3662(b). The PRC has neither procedures for emergency motions nor the power to order interim injunctive relief. *See id.* § 3662(c); 39 C.F.R. §§ 3010.150-.170, 3022.1-.30, 3022.50. The "here-and-now" injuries that Plaintiffs face with respect to the 2026 election will be "impossible to remedy" if judicial review is deferred until after the PRC process

---

[21] *See* Compl. of LULAC *et al.* re Proposed Rule for Ballot Mail, Postal Regul. Comm'n, Dkt. C2026-27, https://prc.arkcase.com/portal/dockets/11558 (last visited Aug. 27, 2026).

has run its course. *See New York v. Trump*, 181 F.4th at 140 n.3 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023)). As such, this Court can and must resolve Plaintiffs' claims seeking preliminary relief as to the 2026 election (and only as to the 2026 election).

## V. Plaintiffs Will be Irreparably Harmed Absent a Preliminary Injunction and/or Section 705 Stay.

The standard in this Circuit for irreparable harm is "high." *DSCC v. Trump*, 2026 WL 1487833, at *12. A plaintiff must demonstrate an injury "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," and the injury must be "beyond remediation." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 287-88 (D.D.C. 2017). But, as this Court has explained, to be "certain" and "great," an injury need not have already occurred, but exists also when harm is certain to occur in the near future. *TikTok*, 507 F. Supp. 3d at 112-13. Plaintiffs satisfy this demanding standard. Unless the Court enjoins the Rule or issues a Rule 705 stay halting its implementation in advance of the November 2026 election, Plaintiffs will suffer irreparable harm beyond remediation.

### A. The Rule irreparably harms Plaintiff Organizations' members.

Plaintiff and Declarant Organizations have thousands of members in all fifty states and abroad who depend on voting by mail because they are elderly, disabled, are in the armed forces deployed domestically or abroad, lack reliable transportation, reside far from home like college students, and more. Proaño Decl. ¶¶ 14-15; Streyder Decl. ¶¶ 26-28; Mendoza Decl. ¶¶ 15-19; Ex. 7 ¶¶ 6-8, Declaration of Janessa Goldbeck ("Goldbeck Decl."). For these voters, mail voting is often not merely a convenience, but the *only* way they can vote. Proaño Decl. ¶¶ 14-16; Streyder Decl. ¶¶ 25-31; Mendoza Decl. ¶¶ 8-9, Goldbeck Decl. ¶¶ 6-7. Likewise, Plaintiff organizations

have members in states that run their elections primarily or nearly exclusively by mail and therefore offer much more limited opportunities for in-person voting.[22]

The harms to members are twofold. First, members face imminent harm because many election officials cannot comply with the Rule's new requirements. Limon-Mercado Decl. ¶¶ 15, 24-27; McComas Decl. ¶¶ 17, 24-27; Proaño Decl. ¶¶ 18-20; Streyder Decl. ¶¶ 21-22; *see also* Decls. in Supp. of Mot. for TRO, *California v. USPS*, No. 1:26-cv-13917 (D. Mass. Aug. 26, 2026), Dkt. Nos. 4-1–4-26 (declarations from each plaintiff State documenting the impossibility of compliance with the Rule). The consequence of not complying with the Rule is categorical: USPS will not accept noncompliant ballot mailings, meaning that all of Plaintiffs' members who live in noncompliant jurisdictions will not receive their ballots.

The harm of future disenfranchisement is no less imminent because USPS has yet to reject ballots. Absent relief, the harm is *certain* to happen, and now, on an accelerated timeline. *See Friends of Earth US v. Exp.-Imp. Bank of U.S.*, No. 1:25-cv-02235 (CJN), 2025 WL 3516161, at *14 (D.D.C. Oct. 10, 2025) (Even though it was "unknown exactly when Total will access the loan," sufficient evidence exists "to conclude that Total will likely withdraw the funds at a time before the Court would rule on the merits in the ordinary course of litigation."); *TikTok*, 507 F. Supp. 3d at 113 (shutting down TikTok in the future "would, of course, have the immediate and direct effect of driving all existing and potential users to alternative platforms and eroding TikTok's competitive position"); *Nat'l Parks Conservation Ass'n*, 282 F. Supp. 3d at 288-89 ("The standard is not that irreparable harm will occur at some point in the future, but that plaintiffs suffer irreparable harm before a decision on the merits can be reached."). Here, ample evidence exists to

[22] *See* Nat'l Conf. of State Legislatures, *Table 18: States With Mostly Mail Elections* (updated Aug. 7, 2026), https://www.ncsl.org/elections-and-campaigns/table-18-states-with-all-mail-elections.

conclude that the Rule will disenfranchise Plaintiffs' members before the Court can reach the merits because it is undisputed that members live in jurisdictions that cannot comply with the Rule in the next 68 days. Proaño Decl. ¶¶ 18-20; Streyder Decl. ¶ 24.

Second, the Rule has already harmed Plaintiffs' members by creating substantial uncertainty and confusion about whether mail ballots are a reliable means of voting under state law. Proaño Decl. ¶¶ 14-15; Streyder Decl. ¶¶ 35-39; Mendoza Decl. ¶¶ 15, 17-18, 20, 22. That uncertainty is particularly pronounced for voters who have no practical alternative to voting by mail. Proaño Decl. ¶¶ 14-16; Streyder Decl. ¶¶ 35-46; Mendoza Decl. ¶¶ 17-21; Goldbeck Decl. ¶ 24. The *Newby* court recognized this type of harm when it found that permitting three states to add documentary proof of citizenship requirements to the Federal Form would confuse voters in two of the three states that were not, in fact, enforcing those requirements. *Newby*, 838 F.3d at 12-13. The court explained that this mismatch would cause confusion and in turn, that "[c]onfusion will create a disincentive for citizens who would otherwise attempt to register to vote." *Id.* at 13; *see also LULAC I*, 780 F. Supp. 3d at 201 (finding documentary proof of citizenship requirement on federal form would create "impending irreparable harm" for nonprofit that uses that form to register voters because voters need not provide DPOC and the sudden change would increase "voter confusion").

**B. The Rule irreparably harms Plaintiff Organizations.**

The Rule is already harming Plaintiff Organizations' core voter engagement activities. First, it interferes with their core work of providing accurate information about how to vote. Proaño Decl. ¶¶ 24-25, 31. In fact, it "render[s] obsolete" substantial portions of Plaintiffs' existing educational material. *LULAC I*, 780 F. Supp. 3d at 189. Before the Rule, Plaintiffs could educate members and constituents about the state-specific procedures for requesting, receiving, and returning mail ballots. *See* Proaño Decl. ¶¶ 24-25; Goldbeck Decl. ¶ 26; Mendoza Decl. ¶¶ 8-9.

But this alone is no longer enough because the Rule adds new federal conditions that determine whether USPS delivers a ballot. Plaintiffs therefore cannot reliably tell voters that following their state's mail voting rules will ensure that they receive their ballot. *See* Proaño Decl. ¶¶ 24-25; Goldbeck Decl. ¶ 26; Streyder Decl. ¶¶ 37-39; Mendoza Decl. ¶ 31. Interference with Plaintiffs' voter education work was the same "programmatic harm" recognized in *Newby*, where the challenged action "substantially diminished ability of the Leagues to use the Federal Form in voter registration drives." *Newby*, 838 F.3d at 13.

Second, the Rule harms Plaintiffs' reputations as trusted sources of voter information, impairing their missions of attracting members and encouraging voter participation. Proaño Decl. ¶ 31 (LULAC's struggles to provide "accurate guidance . . . undermines LULAC's credibility"); Goldbeck Decl. ¶ 26 ("[T]he Final Rule injects uncertainty into how to provide accurate information regarding mail voting."); Proaño Decl. ¶¶ 22-30; Streyder Decl. ¶¶ 35-46; Mendoza Decl. ¶¶ 24-31. *See Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 59 (D.D.C. 2025) (sharing confidential tax information with DHS irreparably harmed organization because taxpayers' loss of trust in tax system also caused loss of trust in organization—an injury "difficult to replace or measure" that the organization "should not be expected to suffer"). Here, too, the Rule will erode Plaintiffs' members' trust both in the electoral system and in Plaintiffs as trusted sources of voting information.

Third, the Rule is forcing Plaintiff Organizations to divert limited resources from their ordinary voter registration, voter education, and get out the vote activities. *See LULAC I*, 780 F. Supp. 3d at 201 (irreparable harm where organizations "actively planning and preparing for upcoming elections . . . will be forced to divert resources from their other electoral efforts to counteract the provision's effects on their voter-registration and mobilization efforts"). Plaintiff

Organizations are already fielding members' questions about the Rule, contacting local election officials to determine whether their jurisdictions can comply, and trying to determine whether members can safely rely on mail voting. Proaño Decl. ¶¶ 26, 28, 30; Goldbeck Decl. ¶¶ 26, 27; Streyder Decl. ¶¶ 41-44; Mendoza Decl. ¶¶ 26-30. These efforts to counteract the Rule's effects have strained Plaintiffs' limited organizational resources, causing irreparable harm. Proaño Decl. ¶¶ 22-30; Streyder Decl. ¶¶ 35-46; Mendoza Decl. ¶¶ 24-31.

**C. The Rule Irreparably Harms the Election Official Plaintiffs**

The Rule's effects on Election Official Plaintiffs are disastrous, and the administrative upheaval it causes—on less than 70 days' notice before an election—independently constitutes irreparable harm. *See Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *petition for cert. filed sub nom. Trump v. Doe*, No. 25-899 (U.S. Jan. 30, 2026) (recognizing irreparable harm to States forced to absorb increased administrative burdens to comply with federal directive); *Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 221 (D. Mass. 2026) (cognizable harm where compressed compliance period required States to "restructure[] their data-collection systems and divert[] resources" from essential functions). The scale of the administrative upheaval here warrants immediate relief. *See* Limon-Mercado Decl. ¶¶ 24-30; McComas Decl. ¶¶ 24-30.

Although administrative and compliance costs are generally considered "economic injuries" in this Circuit—and ordinary economic injuries are usually insufficient to require injunctive relief— such losses may constitute irreparable harm when they are "serious in terms of [their] effect on the plaintiff." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 67 (D.D.C. 2020); *see also Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 39 (D.D.C. 2020) (finding that State plaintiffs had shown "immediate, irreparable injury in the form of significant regulatory and administrative burdens," including the costs of "training new and existing staff"); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

The injuries here are not merely financial, though the financial costs alone are staggering. Limon-Mercado Decl. ¶ 22 (the clerk has purchased all envelopes and "we do not have funds to repurchase new envelopes"). The injuries are serious because the Rule requires an immediate overhaul of systems on which Plaintiffs' election officials have relied for decades. Limon-Mercado Decl. ¶ 8; McComas Decl. ¶ 8; Patrick Decl ¶¶ 12-13. Plaintiffs must devote scarce pre-election resources to deciphering a complicated regulatory scheme; redesigning ballot envelopes, at substantial expense and on an unworkable timeline; accessing and enrolling thousands of voters in the Portal with no margin for error; and training staff who are already fully occupied with preparation for the ongoing election. Limon-Mercado Decl. ¶¶ 24-30; McComas Decl. ¶¶ 24-30; Patrick Decl. ¶¶ 17-20. And if they do not do all of this, eligible voters will not receive their ballots, and the resulting injury cannot be remedied after Election Day: "there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016); *see also LWV of Mass. v. Trump*, No. 1:26-cv-11549, 2026 WL 2322705, at *12 (D. Mass. Aug. 11, 2026) ("[E]nfranchisement heavily outweighs the executive's attempt to unconstitutionally insert itself into the domain of election regulation.").

The Rule's resulting chaos also threatens the Election Official Plaintiffs' reputations as responsible custodians of the electoral process. *Jones v. Dist. of Columbia*, 177 F. Supp. 3d 542, 547-48 (D.D.C. 2016) (noting injury to "reputation and goodwill," when "concrete and corroborated, not merely speculative," is often irreparable because it is not "easily measured in monetary terms"). Election administrators have a compelling interest in conducting orderly and efficient elections and in giving citizens confidence in their fairness. *See DNC v. Wis. State Legislature*, 592 U.S. 1039, 1043-44 (2020) (mem.) (Kavanaugh, J. concurring). Yet the Rule imposes "late-breaking" changes to election administration that will confuse and discourage

voters, eroding public confidence in elections conducted in the Election Official Plaintiffs' jurisdictions and damaging those officials' reputations for running elections competently and fairly. *See Bost*, 607 U.S. at 78; Limon-Mercado Decl. ¶¶ 29-30; McComas Decl. ¶¶ 33-34.

**D. The Balance of Equities and the Public Interest Strongly Favor Plaintiffs.**

Where the federal government is the opposing party, the balance of the equities and the public interest factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Plaintiffs satisfy those factors because the public interest weighs heavily in favor of relief.

First, an injunction or stay under Section 705 would protect the public's "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks omitted). Absent relief, "there is a substantial risk that citizens will be disenfranchised in the present federal election cycle." *Newby*, 838 F.3d at 12. Plaintiff Election Officials cannot comply with the Rule's new envelope design and Ballot Portal requirements in time for the 2026 general election. McComas Decl. ¶¶ 19-23; Limon-Mercado Decl. ¶¶ 17-23. And if they cannot comply, USPS will reject their ballot mailings, preventing Organizational Plaintiffs' members from receiving or returning mail ballots. *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

Second, an injunction would serve the public interest in "preserving the integrity of [the] election process, *Newby*, 838 F.3d at 13, and in "running an orderly, efficient election and in giving citizens . . . confidence in the fairness of the election," *Wis. State Legislature*, 592 U.S. at 1044 (Kavanaugh, J., concurring) (citing *Purcell*, 549 U.S. at 4-5). Those concerns are at their zenith here. The Rule requires election officials to overhaul established mail ballot practices days before ballots are set to be mailed and weeks before the general election, and the consequence of noncompliance is potentially hundreds of thousands of mail ballots not being delivered. The

predictable result is confusion and disruption—conditions that "will create a disincentive for citizens who would otherwise attempt to" vote by mail, *Newby*, 838 F.3d at 13, the very conditions that led the Supreme Court to caution against last minute changes to election rules. *See, e.g.*, *RNC v. DNC*, 589 U.S. 423, 424 (2020) (per curiam); *Bost*, 607 U.S. at 80.

Third, an injunction would further the substantial interest in ensuring that federal agencies follow the laws that govern their authority and operations. *Newby*, 838 F.3d at 12. The Postal Service lacks not only the authority, but the expertise to impose these new substantive conditions on mail ballot procedures across the country.

Defendants, meanwhile, cannot point to any clear harm, let alone public interest that would be impacted simply by requiring that the Federal government allow States and local officials to administer elections in accordance with their own laws governing mail voting.

**CONCLUSION**

For the reasons outlined herein, Plaintiffs respectfully request that the Court grant the motion for a preliminary injunction or stay.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen (DC Bar No. 435051)
Tianna Mays (DC Bar No. 90005882)
Pooja Chaudhuri (DC Bar No. 888314523)
Sofia Fernandez Gold
(DC Bar No. 90010196)
Beauregard Patterson
(Wis. Bar No. 1102842)*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
(202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
sofia@democracydefenders.org

*/s/ Danielle Lang*
Danielle Lang (DC Bar No. 1500218)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri (DC Bar No. 90043488)
David Kronig (DC Bar No. 1030649)
Valencia Richardson (DC Bar No. 1739245)
Aseem Mulji (DC Bar No. 1724971)
Renata O'Donnell (DC Bar No. 1723929)
Benjamin Phillips (DC Bar No. 90005450)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
dkronig@campaignlegalcenter.org

beauregard@democracydefenders.org

*pro hac vice application forthcoming.*

vrichardson@campaignlegalcenter.org
amulji@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
bphillips@campaignlegalcenter.org

*Counsel for Plaintiffs League of United Latin American Citizens, Secure Families Initiative, Arizona Students' Association, City of Madison, Wisconsin, Travis County, Texas and Travis County Clerk, in her official capacity.*