# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-1151 (CJN) |

**DECLARATION OF LYDIA MCCOMAS**

I, Lydia McComas, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a resident of the State of Wisconsin. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with relevant staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the City Clerk for the City of Madison, Wisconsin. In this role, I am responsible for conducting and overseeing all the work of the Office of the City Clerk, which includes both election and non-election responsibilities.

3. The City Clerk's non-election responsibilities include: serving as the city's custodian of records for boards, commissions, committees, and the Common Council as a body politic; liquor licensing and other food and entertainment operator licensing; transit and paratransit licensing; clerking the city's common council meetings; preparing and sending required reports to the state Department of Revenue; and more.

4. Those responsibilities, while significant, represent just 20-25% of the City Clerk's overall workload, the majority of which is to oversee all aspects of elections for the City of Madison. This includes: processing voter registrations; maintaining and updating Madison's voter rolls in the statewide WisVote system; conducting all aspects of absentee voting, including determining voter eligibility under state and federal law and issuing and mailing ballots to qualified voters; locating, managing, and securing facilities for all polling places for both in-person absentee voting and Election Day voting; recruiting, coordinating, and managing more than 100 temporary staff to conduct in-person absentee voting and 2,500-3,000 election inspectors for Election Day;

ensuring all aspects of the voting process are compliant with all federal, state, and local laws; and more.

5. Through the above-described responsibilities, I am familiar with Wisconsin's voter registration requirements, absentee voting requirements, list maintenance procedures, the operation of the statewide WisVote system that is administered by the Wisconsin Elections Commission and is used to manage all aspects of voter registration and voter participation, absentee voting, and to record voter participation. I am also familiar with the state's comprehensive and legally-mandated systems of checks that ensure that only individuals who are eligible to vote under state and federal law can receive and vote ballots and that ensure that each qualified voter votes only one ballot.

6. I have been the Madison City Clerk since September 2025. Prior to assuming this position, since 2018, I worked in a variety of election roles in Hennepin County, Minnesota, a jurisdiction with more than 700,000 registered voters. These roles included as a poll worker, a general election administrator, and the voter engagement division manager.

7. While working for Hennepin County, I also pursued and received a graduate certificate in election administration from the University of Minnesota's Humphrey School of Public Affairs.

8. One of the most important parts of running elections for the City of Madison is overseeing our absentee voting program, which includes absentee by mail as well as residential care facility voting and in-person absentee voting, Wisconsin's method of early voting, which the City Clerk's office typically conducts at more than 20 geographically-dispersed locations across city.

9. The points below summarize the steps that City Clerk staff go through to process a request for an absentee ballot to vote by mail:

a. We verify that the voter is validly registered and has provided the proof of residence and photo identification as required by state law. If they do not have the necessary documentation on file already, we attempt to contact the voter by email or phone to inform them that they need to submit additional documentation to receive an absentee ballot.

b. After verifying the voter is validly registered, we enter the absentee ballot application into WisVote.

c. Once absentee ballots have been printed, the City Clerk receives them, and we are required to send them out by the applicable state or federal deadline. In WisVote we run batches daily of any applications received and export that data.

d. We upload the exported WisVote batch to our mail inserter machine, which prints the appropriate outbound carrier envelope and certificate (return) envelope[1] for each voter and inserts the correct ballot and any necessary instructions for each voter. The carrier envelope has an Intelligent Mail Barcode (IMb). The certificate envelope does not.

[1] In Wisconsin, the envelope a voter uses to mail their absentee ballot back to their municipal clerk also serves as their certification that they followed the absentee voting procedure required by state law. An absent elector in Wisconsin must certify that they filled out their ballot in the presence of a witness who is over the age of 18 and not a candidate on the ballot. The voter must sign the certificate envelope, and their witness must also sign and provide their address. All of the required certification language and the fields that the voter and their witness must fill out are on the exterior of the return envelope. For purposes of this declaration, I will refer to "certificate envelope" to refer to the envelope a voter returns their ballot to their clerk in.

e. Once a batch is ready, we take it to the appropriate postal location to be mailed out. For batches smaller than 200 mail pieces, we take them to a county facility that meters the postage and takes it to the Post Office along with the rest of the mail provided to them from various city and county agencies. For batches larger than 200 mail pieces, we take them to the Postal Service facility at 3902 Milwaukee Street, Madison WI 53714, which is equipped to handle bulk mail.

f. Batches brought to Milwaukee Street are not individually scanned at the time the Postal Service accepts the Extended Managed Mail (EMM) tray or trays of ballots; rather, each tray is scanned as a whole, and ballots are individually scanned only if the ballot will be delivered locally. Otherwise, they are scanned only once they reach Milwaukee's USPS facility.

10. In Wisconsin, the county clerks are responsible for printing ballots and delivering them to all municipalities within the county. Madison receives its ballots from the Dane County Clerk.

11. However, the City Clerk is responsible for purchasing the carrier and certificate envelopes, as are the municipal clerks for each of the 60 municipalities within Dane County (and the 1850 clerks statewide).

12. For a November general election, by state law, ballots are required to be mailed out to all voters with a valid request on file 47 days before the election, which also ensures compliance with the federal UOCAVA deadline. For Madison, this initial batch of ballots that gets mailed out is typically around 20,000 ballots for a November midterm and 30,000 ballots for a November presidential election. Preparing this initial batch of ballots typically takes up to seven people working full time for a week. Sometimes ballots are delayed from the Dane County Clerk, and to

meet the UOCAVA deadline, City Clerk staff will work overtime and weekends to ensure that we meet the UOCAVA deadline.

13. The City of Madison is fortunate to own a mail inserter machine, which saves a great deal of time and labor-intensive work. Prior to our purchase of this machine, the initial large batch of ballots that goes out at the UOCAVA deadline would require 200 temporary staff working in shifts of 20 people at a time, multiple shifts a day, for a week and a half to prepare all of the envelopes for mailing. To my knowledge, the City of Madison is the only municipality in Wisconsin that owns this type of machine.

14. After this large initial batch, we run new batches of applications each business day for all newly-received absentee ballot requests. This ensures that, in general, ballots are mailed to voters within one business day of the receipt of their request, provided that the application is from a validly-registered voter who has provided all required documentation.

15. In a typical November federal election, we receive hundreds of requests for absentee ballots that are missing the photo identification required by state law or have included a form of ID that is not acceptable voter ID under state law (e.g., an out of state driver's license or a Wisconsin license that has been expired for longer than state law allows). Each such request requires personal outreach by a member of the City Clerk staff to inform the voter that they need to resubmit their request with proper ID. This outreach is a time-intensive process.

16. I am familiar with the March 31, 2026, Executive Order, titled "Ensuring Citizenship Verification and Integrity in Federal Elections." Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026), and the Postal Service's Final Rule titled Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (codified at 39 C.F.R. pt. 111) ("Final Rule").

17. Based on my experience as the City Clerk for Madison, my prior experience as an elections administrator in Hennepin County, and my conversations with other staff in the City Clerk's office who are knowledgeable about administering the city's absentee voting program, I believe that compliance with the Final Rule is very likely to risk delays and errors that would disenfranchise voters and cause additional administrative burdens that would overwhelm City Clerk staff. Compliance with the Final Rule is certain to require the City Clerk to expend additional money that we do not have in the budget.

18. I also believe that the Final Rule would have no positive impact in ensuring election integrity because state law already contains multiple overlapping checks to ensure that only eligible voters who have provided documentary proof of residence as well as photo ID will receive an absentee ballot. State law also contains checks to ensure that only the eligible voter can cast that ballot and that they can only cast a single ballot. The Final Rule would not provide any additional security for our voting system, but would introduce a likelihood of errors that could disenfranchise eligible voters.

**The Rule Requires Expenditure of Resources the City Does Not Have**

19. As an initial matter, the Rule would require unique intelligent mail barcodes (IMbs) on both outgoing and return ballot envelopes. Currently, in Wisconsin, only the outgoing carrier envelope contains an IMb. We generate these outgoing IMbs from the WisVote system.

20. Adding a unique IMb to the return envelopes would require the Wisconsin Elections Commission to redesign the certificate envelopes, a process that takes significant time, resources, and testing, and would be especially complicated in Wisconsin because under state law, the return envelope also serves as the voter's certification, which must be signed by a witness. That means that a redesign of the envelope would have to make space for an IMb and still maintain enough

space for all of the statutorily-required text to be readable and to leave enough space for the voter and their witness to complete the certifications.

21. In addition, adding a unique IMb to the return envelope would require WEC to reprogram the WisVote system to add this capability.

22. The City Clerk has already purchased all of our absentee ballot outbound carrier envelopes and return certificate envelopes that we will use for the November 2026 election, at a cost of more than $10,000. We do not have funds to repurchase new envelopes or to waste the $10,000 already expended on envelopes we would no longer be able to use.

23. Moreover, because the absentee ballot envelopes are specialized products, ordering them requires months of lead time. Even if our budget could handle the additional expenditure and the envelope was redesigned by the Wisconsin Election Commission in time, it is unlikely that our supplier would be able to provide that many new envelopes in time for us to meet the September 17, 2026, deadline to mail out ballots for the upcoming November 3, 2026 election. We typically order such ballots envelopes three to nine months in advance.

**<u>There Is No Time to Ensure that the Federal Ballot Mail Portal Works.</u>**

24. In my experience and the experience of my staff, any time the Postal Service changes its systems and processes, there are technical issues that cause significant delays and create extra work for our office. I am gravely concerned that rolling out an entirely new, complicated Federal Ballot Mail Portal will be plagued with widespread issues, and in the case of absentee voting, which occurs on a tight timeline, these issues will result in Madison voters being disenfranchised.

25. For example, prior to the August Partisan Primary mail-out in June, the Postal Service changed its process for tagging for EMM trays. This relatively minor change resulted in

multiple trips and phone calls between the Clerk's Office and USPS to clarify requirements. Most USPS personnel were unsure as to the layout of the consumer side of the online Postal Wizard. This led to long call times and a maze of codes, digits, and dropdown menus to create the tags. Implementing a brand new Federal Ballot Mail Portal is a change that is orders of magnitude more complicated than changing the tag printing process for EMM trays.

26. In addition, based on my experience, I do not believe that Postal Service facilities are equipped to individually scan each ballot when City Clerk staff bring them for acceptance. We run regular checks on outbound ballots' IMbs as a doublecheck to make sure each batch of ballots made it to the Postal Service and into the mail stream to prevent any ballots from being misplaced at our warehouse. We regularly see that individual ballots may not receive their first tracking scan until a week or more after they are accepted by the Postal Service. We also regularly see individual ballots that never even get an "acceptance" scan; these ballots may only be first scanned when they are "out for delivery." In other words, even with a far more simplified system, I have already seen firsthand that there are delays and errors in the Postal Service's tracking system for election mail using the smart barcodes that are on our outbound mail.

27. In the current system, the Postal Service's failure to conduct an "acceptance" scan is an annoyance but does not endanger someone's right to vote. However, I have grave concerns that errors with this new system—which mandates and allows the Postal Service to decide whether or not to accept outgoing election mail—the failure to scan a ballot and the myriad other ways the new system could introduce human error are certain to result in voter disfranchisement given the incredibly tight timeline for implementation with no meaningful time at all for training or testing.

28. Based on my extensive experience, I am certain that the Rule's requirement that each ballot must be scanned to check it against the Mail-In and Absentee Participation List prior to being accepted by the Postal Service will significantly delay ballots entering the mail stream, and ultimately delivered to voters. These delays risk disenfranchising voters because, under state law, any ballot received by the City Clerk after 8 p.m on Election Day cannot be counted.

29. The Rule's estimate that a ballot can be scanned in "less than a minute" would mean that it will take weeks to scan all of the absentee ballots Madison sends out. For example, in a midterm election when we typically send out 20,000 ballots in mid-September, a scan rate of one ballot per minute would mean that it would take more than 13 days for all these ballots to be scanned. In a Presidential election, when we typically send out 30,000 ballots in mid-September, it would take more than 20 days. Even if a single ballot scan only took ten seconds (a fraction of the USPS's own estimate), scanning would take over 55 continuous hours.

30. I am also concerned that requiring the City Clerk to upload the Mail-In and Absentee Participation List to the Federal Ballot Mail Portal ("Portal") would be time-consuming and introduce a significant risk of errors. The Portal is not yet accessible to election officials, to the best of my knowledge, and is not going to be seamlessly interoperable with WisVote. Any time two databases not designed to work together have to interact, errors can be introduced. And even without system error, the many individuals who must use the systems must be trained. We have no training or visibility into this new Federal Ballot Mail Portal, nor instructions or ideas of who to call if we encounter difficulties or errors. This is entirely unlike the standardized training that we receive in advance in order to become capable and confident in using WisVote. This sharp learning curve, with the certainty of errors between systems, will almost certainly disenfranchise voters by denying them timely access to an absentee ballot.

31. For example, the Final Rule requires election administrators to upload only the voter's name, address, originating election jurisdiction, and unique IMbs for outbound and return. But WisVote is not currently configured to contain information about unique IMbs for return mail, because we do not currently use unique IMbs for return mail. Therefore, WisVote would either need to be modified to contain that field or we would need another system for uploading that additional data to the portal. WisVote also contains additional identifying details, such as driver's license numbers or partial Social Security numbers; this data ensures we can properly identify individual voters who may share a name and/or address or whose chosen name does not match their legal name, such as people who use a nickname or go by their middle name. The WisVote system is designed to account for these variations and ensure that all eligible voters—and only eligible voters—are able to vote, whereas the Portal may not account for these variations at all and almost certainly will not do so in an identical manner to WisVote. Thus, the Portal could mistakenly flag someone as not being on the Mail-In and Absentee Participation List or as having received multiple ballots. These errors risk voters having their ballots delayed or denied, which will disenfranchise those voters.

32. Moreover, my office—which is one of the best-resourced municipal clerk offices in Wisconsin—does not have the staff time or resources to devote every day from mid-September until 5 days before Election Day to uploading supplemental Mail-In Absentee and Participation Lists, troubleshooting errors, and reconciling mismatches between the systems. This will be a labor-intensive process, and we will have to divert staff who are engaged on other important election matters to deal with these issues. This will harm other aspects of our administration of elections for the City of Madison.

33. The City Clerk's office fields hundreds of calls from Madison voters each election with questions about voting procedures and voter eligibility. Many of those calls already concern whether delays in the mail would put their ballot at risk. The adoption of a vast new federal system will generate hundreds or thousands of additional calls from voters who would have questions or concerns about whether their ballot would be delayed or refused by the Postal Service. The City Clerk does not have the staff resources to field all of these additional calls without diverting staff from other critical responsibilities.

34. In my experience administering elections, voters who have concerns about whether their ballot will be properly handled and counted or who are confused about eligibility and procedures may be less likely to vote. I believe that implementing the Final Rule in advance of the November 2026 elections will create this kind of concern and confusion that could deter people from exercising their constitutional right to vote.

**There Are Valid, Legal Reasons Voters Have to Mail Multiple Ballots. The Federal Ballot Mail Portal Is Not Equipped For This, and That Failure Will Disenfranchise Voters.**

35. There are myriad situations in which voters legitimately need to receive more than one ballot, or receive the same ballot by mail multiple times, during the course of an election cycle, and the Portal is not designed to account for this fact and could prevent voters from receiving their ballot.

36. For instance, a voter who has accidentally ruined their ballot by spilling coffee on it or marking it incorrectly is entitled under state law to spoil that ballot and receive up to two replacement ballots. A voter who spoils their ballot and needs a replacement would be issued a new absentee ballot, which WisVote would assign a different IMb to signify that it is a new ballot. Nothing in the Final Rule indicates that the Portal is set up to account for this scenario, which risks

USPS rejecting the replacement ballot because the Portal shows that voter having already received their (spoiled) ballot.

37. As another example, voters who submit their absentee ballot with an error on the certificate envelope, such as a missing witness address or signature, are entitled under state law to correct such deficiencies until 8 p.m. on Election Day. As long as there is sufficient time for a ballot to get back to the voter before Election Day, the City Clerk sends back these ballots to the voter by mail to allow them to cure the errors. When we do so, we reissue a carrier envelope with the same IMb as when we sent the ballot originally, because it is the same ballot. The Portal may reject these ballots sent back for correction because it will have logged that voter's outbound IMb as having already been delivered. This could disenfranchise the dozens or hundreds of voters in my jurisdiction alone each election who have to correct certification errors.

38. In addition, residents of certain residential care facilities like nursing homes vote absentee using special procedures with the assistance of elections staff called Special Voting Deputies (SVDs). Under Wisconsin law, in qualifying facilities in municipalities that have adopted SVD procedures, residents of these facilities cannot vote by a regular mail absentee ballot unless SVDs have visited the facility twice and failed to reach a voter with an absentee request on file. It is not uncommon that SVDs are unable to reach a voter in a residential care facility because they are in the middle of medical treatments or other necessary care that cannot be rearranged. For those voters, the outbound carrier envelope does not include an IMb. The Final Rule will disenfranchise this vulnerable population of voters, who may have no other option than to vote by mail.

39. Under Wisconsin state law, once a voter has placed their completed ballot in the mail, they are considered to have "returned" it and are prohibited from voting in person, even if their ballot never reaches their municipal clerk. Any delay by the Postal Service or decision by the Postal Service not to accept a voter's returned ballot because of a mismatch on the List or a valid reason for that voter to be mailing a second ballot or re-mailing their first ballot that the Federal Ballot Mail Portal is not equipped to account for will disenfranchise voters through no fault of their own.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of August, 2026, in Madison, Wisconsin.

Lydia McComas (Aug 27, 2026 09:48:32 CDT)