**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case Number 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>*Defendants.* | Case Number 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., and BVM CAPACITY BUILDING INSTITUTE, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants.* | Case Number 1:26-cv-01151-CJN |

**MEMORANDUM IN SUPPORT OF NAACP, COMMON CAUSE, AND BLACK VOTERS MATTER PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

**A.** The President Issues an Executive Order Purporting to Regulate Election Administration ....................................................3

**B.** This Court Postpones Review of the Executive Order ....................6

**C.** USPS Issues a Final Rule Implementing the Order .........................7

ARGUMENT ....................................................................................................10

**I.** PLAINTIFFS' CLAIMS ARE JUSTICIABLE ....................................................10

**A.** Plaintiffs Have Standing ............................................................10

**1.** Plaintiffs Are Suffering Organizational Injuries .......................................11

**2.** NAACP and Common Cause's Members Are Suffering Injuries .............20

**3.** The Final Rule is Causing Plaintiffs' Organizational and Associational Injuries .........................................................................25

**4.** Plaintiffs' Injuries Are Redressable by This Court ...................................27

**B.** Plaintiffs' Claims are Ripe ..........................................................27

**II.** PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................29

**A.** The Final Rule Exceeds USPS's Statutory Authority....................29

**1.** The Final Rule Contravenes the Limits on USPS's Authority ..................30

**2.** USPS Identifies No Statutory Basis Authorizing the Rule........................34

**B.** The Final Rule Violates the Separation of Powers ........................39

**III.** THE REMAINING PRELIMINARY INJUNCTION FACTORS ARE SATISFIED......41

**A.** Plaintiffs are Suffering Irreparable Harm .....................................41

**B.** The equities and public interest strongly favor Plaintiffs .............43

CONCLUSION....................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) .......... 31, 35, 37-38

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .......... 40

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 39

*Caicedo v. DeSantis*,
2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) .......... 12

*California v. Trump*,
2026 WL 1826490 (D. Mass. June 25, 2026) .......... 4, 27

*California v. Trump*,
183 F.4th 52 (1st Cir. 2026) .......... 4, 43-44

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) .......... 21, 24-25

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) .......... 12

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008) .......... 20

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 26

*DSCC v. Trump*,
2026 WL 1487833 (D.D.C. May 28, 2026) .......... 2, 6, 27-28

*DSCC v. Trump*,
2026 WL 2168617 (D.C. Cir. July 28, 2026) .......... 2, 7, 10, 29, 40, 44-45

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .......... 21, 24

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 11, 16-17

*Get Loud Ark. v. Thurston*,
748 F. Supp. 3d 630 (W.D. Ark. 2024) ........ 12

*Hannegan v. Esquire, Inc.*,
327 U.S. 146 (1946) ........ 32

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........ 11-12, 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 20

*League of Women Voters of Mass. v. Trump*,
2026 WL 2322705 (D. Mass. Aug. 11, 2026) ........ 4

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549, ECF No. 201 (D. Mass. Aug. 25, 2026) ........ 5

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549, ECF No. 204 (D. Mass. Aug. 26, 2026) ........ 5

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549, ECF No. 218 (D. Mass. Aug. 27, 2026) ........ 5, 13-14, 20-21, 26-27, 29, 45

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........ 43

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 12, 29, 41-45

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........ 29

*LULAC v. Exec. Off. of President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ........ 12, 45

*LULAC v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ........ 12, 26

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ........ 11-12, 16, 27

*March for Our Lives Idaho v. McGrane*,
749 F. Supp. 3d 1128 (D. Idaho 2024) ........ 12

*Medellín v. Texas*,
552 U.S. 491 (2008) ........ 39

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................11, 21

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025), vacated on other grounds, 2026 WL 1255781 (5th Cir. May 7, 2026)....................12

*Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*,
496 F. Supp. 3d 1 (D.D.C. 2020)....................17

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022)....................29

*Nat'l Treasury Emps. Union v. Trump*,
780 F. Supp. 3d 237 (D.D.C. 2025)....................44

*Nken v. Holder*,
556 U.S. 418 (2009)....................43

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021)....................45

*Sidak v. ITC*,
174 F.4th 151 (D.C. Cir. 2026)....................27-28

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................11

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020)....................44

*Trump v. California*,
2026 WL 2473573 (U.S. Aug. 24, 2026)....................3-5, 27

*Trump v. New York*,
592 U.S. 125 (2020)....................28

*United States v. King Cnty.*,
122 F.4th 740 (9th Cir. 2024)....................26

*USPS v. Council of Greenburgh Civic Ass'ns*,
453 U.S. 114 (1981)....................35-36

*Warth v. Seldin*,
422 U.S. 490 (1975)....................11

*Watson v. Republican Nat'l Committee*,
146 S. Ct. 2165 (2026)....................40

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................39

**Constitutions**

U.S. Const. art. I, § 4, cl. 1....................40

U.S. Const. art. II, § 1, cl. 2....................40

**Statutes**

18 U.S.C.
§ 1725....................36

§ 3061....................38

39 U.S.C.
§ 101(a)....................1, 30-31

§ 102(5)....................30-31

§ 201....................39

§ 202(a)(1)....................39

§ 401(2)....................29, 31, 34-35, 37-38

§ 401(10)....................29, 31, 34, 38

§ 403(a)....................1-2, 31-32

§ 403(b)(1)....................30

§ 403(c)....................2, 32

§ 404(a)(1)....................30, 34, 38

§ 404(e)....................1, 30, 35

§ 3001....................2, 32-33

§ 3002....................2, 32-33

§ 3003....................2, 32

§ 3004....................2, 32

§ 3005 .....2, 32

§ 3006 .....2, 32

§ 3007 .....2, 32

§ 3008 .....2, 32

§ 3009 .....2, 32

§ 3010 .....2, 32-33

§ 3011 .....2, 32

§ 3012 .....2, 32

§ 3013 .....2, 32

§ 3014 .....2, 32-33

§ 3015 .....2, 32

§ 3016 .....2, 32

§ 3017 .....2, 32

§ 3018 .....2, 32-33

§ 3406(a) .....33

§ 3626(j)(1)(B) .....37

§ 3629 .....33

52 U.S.C.
§ 10307 .....37-38

§ 20511 .....37-38

§ 20701 .....34

§ 20921 .....34

§ 20922 .....34

§ 21083(a)(1)(A) .....33

Me. Rev. Stat. Ann. tit. 21-A, § 112(14) .....23

N.C. Gen. Stat. § 163-230.1(c) .....15

**Regulations**

Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026) ....................................7, 29

Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026) ......................................................................2, 7-10, 13-14, 21-26, 28-29, 31-38, 40-43

Domestic Mail Manual § 705.24 ..............................................................30-31, 33, 40-42

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026).......................................3-4, 38-40

Privacy Act of 1974; System of Records, 91 Fed. Reg. 44,880 (July 17, 2026).............................9

**Other Authorities**

Will Doran & Caroline Yaffa, What Trump's Mail-In Voting Win at the Supreme Court Means for NC Voters, WRAL News (Aug. 25, 2026) .................................................26

The Federalist No. 59 (C. Rossiter ed. 1961) ....................................................................40

Comment of Justin Levitt on Proposed Rule, Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (July 2, 2026)..........................................................................................29

Derek T. Muller, When Might a Supreme Court Order in Trump v. California Be Coming?, Election Law Blog (Aug. 7, 2026) ...........................................................................29

N.C. State Bd. of Elections, Absentee Voting Begins: November 2026 General Election...........15

## INTRODUCTION

Congress created the Postal Service to carry the Nation's mail, not to supervise and police the Nation's elections. Nevertheless, just as ballots are set to enter the mail and election infrastructure put to the test—and after election officials have spent months preparing under a different set of rules—USPS has assumed the role of the Nation's mail-voting registrar. In its newly minted Final Rule, USPS arrogates to itself an opaque and effectively unreviewable power to deny requested mail ballots to lawfully registered voters and condition transmission of those ballots on the submission of voter-specific data at a breathtaking scale. Under USPS's newly issued Final Rule, an omission from its nascent database, a barcode error in its novel system, an election official's inability to comply with bar code requirements, or any number of other obstacles will cause USPS to reject ballot mail, preventing an eligible voter's ballot from ever being delivered. And under the Rule, the denied voter receives no notice that their requested ballot has been rejected nor any explanation for the rejection, leaving the voter unable to identify or correct the problem. The Rule threatens broad disenfranchisement through no fault of the voter precisely at the point in the election cycle when there is least time to prevent it, and makes voters' access to mail voting depend on enrollment in a federal system that records and retains their voter-specific ballot information. Nothing in the statutes governing USPS permits that extraordinary result.

Far from authorizing the Final Rule, the Postal Reorganization Act prohibits it. Congress defined USPS's "basic function" as providing postal services, 39 U.S.C. § 101(a), directed it to receive and deliver mail throughout the Nation, *id.* § 403(a), and affirmatively forbade it from offering new "nonpostal services," *id.* § 404(e). The Final Rule departs dramatically from those functions. It establishes new nonpostal services in the form of a voter-enrollment and election-recordkeeping system. It coerces state officials to populate that system with voter-level data. It

uses the threatened disenfranchisement of mail voters to enforce compliance. And it preserves the resulting records to facilitate federal election law enforcement, statutes USPS was never empowered to enforce. All that is equally contrary to USPS's universal service mandate, *id.* § 403(a), nondiscrimination mandate, *id.* § 403(c), and obligation to treat only a narrow category of material as nonmailable matter. *Id.* §§ 3001-3018. The Constitution assigns federal election administration to the States and Congress, and Congress has never assigned it to USPS. There is no authority for USPS to answer this major question with a rule that upends election administration across the country.

USPS may not unilaterally convert its authority to transport mail into authority to govern activities conducted through the mails, and the Executive Order cannot supply the missing power. The Constitution entrusts regulation of federal election procedures to Congress and the States, while the President has "no express authority over the conduct of elections." *DSCC v. Trump*, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026). The Rule nevertheless implements the exact regime the President unlawfully prescribed: federally mandated ballot envelopes and barcodes, state submission of voter information, enrollment of intended ballot recipients with USPS, and rejection of ballots requested by eligible voters that fail those requirements. *Ballot Mail for Fed. Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026) ("Final Rule"). The President may not enlarge USPS's limited statutory jurisdiction by executive directive.

The time for judicial review has now arrived. This Court previously declined to review Section 3 because USPS had not proposed a rule, notice and comment had not occurred, the contents of any final rule remained unknown, and its effects on Plaintiffs and voters could not yet be determined. *DSCC v. Trump*, 2026 WL 1487833, at *10 (D.D.C. May 28, 2026). Each of those contingencies has been resolved with USPS's publication of the Final Rule and declaration that it

is effective immediately. Plaintiffs are suffering the consequences: the Rule has impaired their core voter-assistance services and forced them to redesign those programs around an untested federal ballot-mail system. This Court invited Plaintiffs to renew their challenge "if and when" these events occurred, *id*. at *1, and the Supreme Court likewise confirmed that plaintiffs harmed by USPS's final rule "may challenge that rule," *Trump v. California*, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). Plaintiffs do so now. Because the Rule exceeds USPS's authority, violates the separation of powers, and threatens irreparable harm as voting in the November election begins, the Court should preliminarily enjoin its implementation.

## BACKGROUND

### A. The President Issues an Executive Order Purporting to Regulate Election Administration

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("Executive Order," "Order," or "Exec. Order"). The Order directed three interlocking components for federal oversight of state election administration. The Department of Homeland Security must compile and transmit state-specific lists of adults identified as United States citizens. *Id*. at 17,125. The Postal Service must establish a federal system governing the transmission of mail-in and absentee ballots. *Id.* at 17,126-27. And the Attorney General must prioritize investigations and prosecutions of officials, organizations, and individuals involved in providing ballots to persons deemed ineligible to vote. *Id.* at 17,126.

As relevant here, the Order directed the Postmaster General to initiate rulemaking within 60 days and provided that the proposed rule "shall include, at minimum," specified requirements governing ballot mail. *Id.* at 17,126. Those requirements included requiring outbound ballot envelopes to display official election-mail markings, bear voter-specific Intelligent Mail barcodes,

and undergo USPS design review. *Id.* States would be forced to provide USPS with lists of voters to whom they intended to send mail ballots, and USPS would create a corresponding Mail-In and Absentee Participation List for each State. *Id.* Most consequentially, the Executive Order mandated that USPS refuse to "transmit mail-in or absentee ballots from any individual" unless the individual had been enrolled on the relevant State-specific list. *Id.* In short, the Order directed USPS not to do the one thing it unquestionably is charged with doing—delivering the mail. It required USPS to issue a final rule within 120 days. *Id.* at 17,127.

Plaintiffs here sued to block the Order, as did other plaintiffs in Massachusetts, where the district court swiftly recognized its illegality. In *California v. Trump*, 2026 WL 1826490 (D. Mass. June 25, 2026), the court held Sections 2 and 3 of the Order unconstitutional and entered judgment enjoining their implementation as to the plaintiff States through the November 2026 election. As to Section 3, the court explained that the Order intruded upon the States' authority to determine voter eligibility, that Congress had not authorized USPS to regulate mail voting, and that the Order's schedule violated the statutorily required process for nationwide changes in postal services. *Id.* at *15-16. The First Circuit unanimously denied the Government's motion for a stay with respect to Section 3. *California v. Trump*, 2026 WL 2144084 (1st Cir. July 25, 2026). On August 24, the Supreme Court stayed the *California* injunction without addressing the merits of the Executive Order, explaining that "[f]ederal courts review final rules," and that if the "Postal Service's final rule harms the [plaintiffs], they may challenge that rule." *Trump v. California*, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026).

Separately, the district court in Massachusetts also preliminarily enjoined implementation of Section 3 in *League of Women Voters of Massachusetts v. Trump*, 2026 WL 2322705 (D. Mass. Aug. 11, 2026). When USPS nevertheless issued the Final Rule on August 21, that court ruled that

USPS had violated the preliminary injunction by completing the rulemaking, but declined to impose additional relief. Order, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass. Aug. 25, 2026) (ECF No. 201). The next day, the court vacated the preliminary injunction in light of the Supreme Court's decision in *Trump v. California*. Order, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass. Aug. 26, 2026) (ECF No. 204). The court emphasized that the organizational plaintiffs would have "substantial arguments that might persuade the Supreme Court to reach a different result" given the developments after the complaint was filed in *California*, but that under the Supreme Court's ruling in *Trump*, the plaintiffs could not "prevail as to ripeness without amending their complaint to reflect the fact that a Final Rule has now issued." *Id.* at 2, 9.

The Massachusetts organizational plaintiffs promptly supplemented their complaint, and the plaintiff States filed a new action. On August 27, 2026, the court granted in part their consolidated motions for a temporary restraining order. Order, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549, at 2, 4-5 (D. Mass. Aug. 27, 2026) (ECF No. 218) ("*LWV TRO Order*"). The court concluded that the challenges were now ripe and that the plaintiffs were likely to establish standing based on the Rule's immediate demands on States and the "substantial confusion" and risk of disenfranchisement it imposed on Plaintiffs' members. *Id.* at 7. The court found the plaintiffs likely to succeed on the merits because USPS lacked authority to issue the Rule and because the Rule unconstitutionally imposed election-administration requirements on the States. *Id.* at 7-8. Finding compliance "practically impossible" before the midterms and the resulting risk of disenfranchisement "grave," the court stayed for fourteen days the Rule's mandatory envelope, Portal-registration, voter-enrollment, and ballot-nonacceptance provisions as

to elections occurring through November 3, 2026, and took the preliminary-injunction motions under advisement. *Id.* at 8-11.

**B. This Court Postpones Review of the Executive Order**

Plaintiffs filed this action on April 3, 2026, three days after the President issued the Order. The following week, Plaintiffs moved for a preliminary injunction barring implementation of the Order's citizenship-list and ballot-mail directives. ECF No. 37; ECF No. 54. The Court considered that motion together with motions filed by the plaintiffs in two related actions.

On May 28, the Court denied the motions because the challenged directives had not yet been implemented. *DSCC v. Trump*, 2026 WL 1487833 (D.D.C. May 28, 2026). DHS had not established the infrastructure needed to compile or transmit the State Citizenship Lists, created any such List, or transmitted a List to any State. *Id.* at *1. USPS had not yet issued a proposed rule. *Id.* The Court therefore reasoned that any injury from Section 3 depended on "a series of contingencies": whether USPS would propose a rule, what that proposal would say, what changes would result from notice and comment, whether USPS would issue a final rule, and how any final rule would affect Plaintiffs and voters. *Id.* at *10.

The Court did not decide whether USPS could lawfully adopt the ballot-mail regime contemplated by the Order. It instead distinguished between the Order's direction to conduct rulemaking and the agency action that might eventually result. The "source of any injury" to Plaintiffs, the Court explained, would be "the action that the [Postal Service] might take in the future to implement Section 3(b), not Section 3(b) itself." *Id.* The Court expressly recognized that USPS might ultimately adopt a rule that exceeded its authority or otherwise violated federal law. *Id.* If USPS issued a final rule directly affecting Plaintiffs or their members, that was "when Plaintiffs would have the requisite 'personal stake'" to challenge it. *Id.* The Court accordingly invited Plaintiffs to renew their request for injunctive relief "if and when" those future agency

actions occurred. *Id.* at *1. When plaintiffs in one of the other actions appealed, the D.C. Circuit affirmed on similar grounds. *DSCC v. Trump*, 2026 WL 2168617 (D.C. Cir. July 28, 2026).

### C. USPS Issues a Final Rule Implementing the Order

On June 2, 2026, the Postal Service issued a proposed rule governing mail-in and absentee ballots in federal elections. *Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026). The Postal Service explained that it had developed the proposal to implement the Executive Order after an interagency review conducted through the Office of Management and Budget. *Id.* at 32,915. The Postal Service received more than 200,000 comments, including numerous letters from election officials, elected representatives, postal unions, voting-rights organizations, and other organizations. Final Rule at 54,966-68. On August 21, the Postal Service issued the Final Rule, made it effective immediately, and adopted a new Section 705.24 of the Domestic Mail Manual. *Id.* at 54,966-67, 54,990-92. On August 26, the Rule was published in the Federal Register. The Rule applies to mail-in and absentee ballots used in general, special, and runoff elections for federal office. *Id.* at 54,976.

As called for in the Executive Order, the Final Rule arrogates to USPS the role of dictating to States how they must conduct elections. The Rule imposes certain mandatory requirements on the envelopes used to send ballots to voters and the envelopes provided for voters to return completed ballots. In particular, the Rule specifies that both envelopes must display the Official Election Mail logo, be compatible with automated processing, and bear a unique Intelligent Mail barcode assigned to the individual voter. *Id.* at 54,990-91. The Rule further provides that "Outbound Federal Ballot Mail envelopes must be submitted to the Postal Service for mailpiece design review and feedback," but it does not specify any criteria for that review, timetable for review to be completed, process for feedback to be resolved, or appeal from an unfavorable decision. *Id.* at 54,990.

The Rule also establishes a mechanism called for in the Executive Order, the "Federal Ballot Mail Portal," through which state and local election officials and their authorized vendors must submit voter-level information to the Postal Service to "enroll" the voter "with the Postal Service." *Id*. at 54,991. The Rule provides that for each voter the State seeks to enroll for a mail ballot, the State must provide the voter's name and address, the "originating election office State" (an undefined term), and the unique barcodes applied on the voter's outbound and return envelopes. *Id.* Although the Rule provides that once this information is provided, an individual will be "deemed enrolled," it does not specify any of the criteria for a voter to be definitively enrolled, nor does it specify the timing on which the USPS will make such decision. *Id.*

Notably, the Rule contemplates additional measures a State must take for its data to be accepted, including meeting unspecified "technical specifications for the Federal Ballot Mail Portal," and providing a certification that its ballots "have been submitted for review and that they have received feedback." *Id.* at 54,991. The Rule does not specify what other, additional, nondisclosed measures the USPS will or might take to reject ballots in furtherance of the Rule's purpose "to help ensure election integrity" and "fraud prevention." *Id.* at 55,984. The information for each mailing must be uploaded before that mailing is presented to the Postal Service. *Id.* at 55,016-19, 55,058. Voters cannot enroll themselves or correct information through the Portal; those responsibilities rest exclusively with election officials and their authorized vendors. *Id.* at 54,979-80. Moreover, there is no provision by which voters are notified of what information about them is loaded into the Portal, so voters cannot know whether any such information is correct or missing.

The Postal Service will use the Portal as the Executive Order provided: to determine whether to accept each outbound ballot mailing. It will not deliver ballots to a voter who has not

been enrolled. When a mailing is transmitted to USPS, Postal Service employees are directed to scan the barcodes on the envelopes and confirm that the required information has been submitted and that the ballot is addressed to a voter who has been enrolled through the Portal. Final Rule at 54,981. Each mailing that fails this verification "will not be accepted." *Id.* at 54,991. The Rule prescribes no timetable under which such verification is to occur, provides for no notice to the voter if their ballot has been rejected, and creates no process for voters to address their rejection. The Postal Service disclaims responsibility for resulting delays. *Id.* at 54,991. Although this pre-acceptance verification applies only to outbound mailings, voters returning completed ballots must still use envelopes satisfying the Rule's design and barcode requirements. *Id.* at 54,990-91.

The Rule also establishes a federal repository of information identifying voters who receive federal ballots through the mail. The Rule provides that, on or about Election Day, the Postal Service will compile each State's Portal submissions into a Mail-In and Absentee Participation List containing each voter's name and address and the barcodes assigned to the voter's outbound and return envelopes. Final Rule at 54,969-70, 54,982. The Postal Service will transmit that List to the State's chief election official. *Id*. at 54,982. The Rule asserts that the Lists are intended to assist election officials and law-enforcement authorities in identifying matters for potential investigation. *Id.* at 54,985. The accompanying proposed system of records, USPS 820.225, authorizes the Postal Service to maintain the same voter and barcode information for five years for purposes that include "determin[ing] adherence to federal law" and "facilitat[ing] law enforcement efforts." *Privacy Act of 1974; System of Records*, 91 Fed. Reg. 44,880, 44,881-82 (July 17, 2026).

This Final Rule is, by definition, final. It is published and effective. The Postal Service stated that it would refrain from implementing the Rule for the November 2026 election while the Massachusetts injunctions remained in force, but that if the Government obtained relief from that

injunction, it would begin implementation "immediately thereafter" so that the Rule could govern the November election. Final Rule at 54,966. The *California* and *League* injunctions are no longer operative, and the Rule has been stayed for only 14 days, through September 10, 2026. Plaintiffs have therefore supplemented their Complaint to challenge the Final Rule and now seek a preliminary injunction preventing its implementation.

## ARGUMENT

Plaintiffs readily satisfy the preliminary injunction factors. Plaintiffs' claims are now justiciable because the contingencies that previously delayed review have been resolved: USPS has issued a final, effective Rule that is already inflicting organizational injuries and threatens to prevent Plaintiffs' members from receiving mail ballots through no fault of their own. The Final Rule exceeds USPS's statutory authority by conditioning the transmission of lawful ballot mail on compliance with a federal voter-enrollment and recordkeeping regime Congress never authorized, conflicts with Congress' direction to USPS concerning nondeliverable mail, and violates the separation of powers by implementing an election-administration regime ordered by presidential directive rather than congressional action. The Rule thwarts Plaintiffs' core missions at the height of election season, imposes irreparable injury, and upends the "existing electoral status quo" without serving any cognizable governmental interest that could outweigh those harms. *DSCC*, 2026 WL 2168617, at *6. The motion for preliminary injunction should be granted.

## I. PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A. Plaintiffs Have Standing

At this preliminary stage, Plaintiffs need only show they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). An organization may make that showing by identifying an organizational injury "in its own right," or by asserting associational standing "solely as the representative of its members." *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Plaintiffs all have organizational standing, and the NAACP and Common Cause have associational standing.

**1. Plaintiffs Are Suffering Organizational Injuries**

Organizations have standing "to sue on their own behalf for injuries they have sustained," if they "satisfy the usual standards for injury in fact, causation, and redressability." *Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 393-94 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19 (1982)). That standard is met where government action "directly affect[s] and interfere[s] with" an organization's "core" mission and activities, *AHM*, 602 U.S. at 395, including its "direct services programs," *LULAC v. Exec. Off. of the President* ("*LULAC III*"), 818 F. Supp. 3d 34, 76 (D.D.C. 2026).

The Final Rule inflicts precisely that injury. Consistent with their missions, each Plaintiff operates longstanding voter-registration, voter-assistance, mail-voting, and election-protection programs. ECF No. 54-1 ¶¶ 7-12 ("Sterling 1st Decl."); ECF No. 54-3 ¶¶ 8-14 ("Nunez 1st Decl."), 15-16; ECF No. 54-9 ¶¶ 5-12 ("Albright 1st Decl.").[1] Those programs help voters register and maintain accurate registration records; obtain mail ballots, including through emergency applications; and overcome barriers to voting or having their votes counted. Sterling 1st Decl. ¶¶

[1] NAACP's mission "is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Sterling 1st Decl. ¶ 4. Common Cause's mission "is to uphold the core values of American democracy by creating an open, honest, and accountable government that serves the public interest, promotes equal rights, opportunity, and representation for all, and empowers people to make their voices heard in the political process. Nunez 1st Decl. ¶ 8. BVM's mission is "to strengthen Black political power and uplift communities of color through civic participation." Albright 1st Decl. ¶ 4. Each organization advances its missions through "core" voter-service activities. *See* Sterling 1st Decl. ¶¶ 7-12; Nunez 1st Decl. ¶¶ 9-13, 15-16; Albright Decl. ¶¶ 6-12.

7-12; Nunez 1st Decl. ¶¶ 9-14; Albright 1st Decl. ¶¶ 9-13. As detailed below, the Final Rule has upended these programs, imposing chaos on Plaintiffs' election planning, and creating a need to "drain [] the organization's resources" to "counteract" USPS's unlawful conduct. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). That is a "concrete and demonstrable injury." *Id.* Indeed, courts frequently hold that voter service organizations—including the NAACP, Common Cause, and BVM—have standing to challenge conduct that impairs their mission-critical functions.[2]

Before the Final Rule, Plaintiffs could assist a voter by helping them complete the applicable state registration and mail-ballot process and, when necessary, resolve problems through established state procedures. Plaintiffs' training materials, voter-assistance tools, and field operations were built around those established State processes. Second Declaration of Tyler Sterling ¶¶ 14-18 ("Sterling 2d Decl."); Second Declaration of Elena Nunez ¶¶ 16, 19-20 ("Nunez 2d Decl."); Second Declaration of Clifford Albright ¶¶ 5-6, 9 ("Albright 2d Decl."). But Plaintiffs no longer know whether or when any particular jurisdiction will apply to have their mail-ballot process approved, nor do they know whether or when they will be approved by USPS. *See* Sterling 2d Decl. ¶¶ 15-18; Nunez 2d Decl. ¶¶ 18-19; Albright 2d Decl. ¶¶ 5-7, 13. The States in the Massachusetts litigation submitted "unrebutted declarations that compliance with the Final Rule at this late date is impossible." *LWV TRO Order* at 9. Plaintiffs must therefore redesign their voter

---

[2] *See, e.g.*, *LULAC v. Exec. Off. of President* ("*LULAC I*"), 780 F. Supp. 3d 135, 188-190 (D.D.C. 2025); *LULAC v. Exec. Off. of President* ("*LULAC II*"), 808 F. Supp. 3d 29, 57-59 (D.D.C. 2025); *LULAC III*, 818 F. Supp. 3d at 95; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016); *Nairne v. Landry*, 151 F.4th 666, 680-82 (5th Cir. 2025), *vacated on other grounds*, 2026 WL 1255781 (5th Cir. May 7, 2026); *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024); *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1137-39 (D. Idaho 2024); *Caicedo v. DeSantis*, 2024 WL 4729160, at *4-5 (M.D. Fla. Nov. 8, 2024); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 951-57 (7th Cir. 2019).

registration and get-out-the-vote services to accommodate a spectrum of competing possibilities: voter-specific failures at best (a scenario that would interfere with Plaintiffs' core missions); the complete unavailability of mail voting at worst (a scenario that would render Plaintiffs' core missions unachievable). Sterling 2d Decl. ¶¶ 15, 17-18, 23-24; Nunez 2d Decl. ¶¶ 16-21; Albright 2d Decl. ¶¶ 5, 20.

Even if the mail-ballot program for particular states is approved, the Final Rule adds a separate federal condition that Plaintiffs' existing services cannot satisfy or address. *See* Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶ 17. For each properly registered voter who is entitled to receive a mail ballot, USPS will refuse the election official's outbound ballot mailing unless the responsible election office has timely submitted the voter's name, address, and ballot-envelope barcodes through the Federal Ballot Mail Portal, and the mailing satisfies USPS's independent verification requirements. Final Rule at 54,990-91. Plaintiffs, NAACP and Common Cause members, and voters have no access to that Portal. Plaintiffs cannot inspect the information submitted about a voter, determine whether an election official associated the correct barcode with that voter, determine whether the election official has the ability to comply with bar coding requirements, identify an omission or error, or direct USPS to accept a rejected mailing. Nor will voters receive notice if USPS rejects their ballot, or have any ability to correct an error that led to the ballot rejection. Indeed, the USPS Final Rule confirms that "the ability to cure rests not with the voter," but with the officials and mailers responsible for preparing the envelope and entering the Portal data.[3] Final Rule at 54,981.

[3] USPS rejected commenters' requests to provide notice to voters, to provide voters with visibility into the accuracy of election officials' submission or their Postal Service record, or to create a voter appeal process; rather, the USPS expressly disclaimed responsibility for service delays. *Id.* at 54,981-82.

The Final Rule thus directly impairs Plaintiffs' ability to provide effective mail-voting assistance. Plaintiffs do not have access to the Federal Ballot Mail Portal to assist voters with issues. Sterling 2d Decl. ¶ 24, Nunez 2d Decl. ¶ 17. A voter who has completed every step to receive a mail ballot before the Final Rule was published may nevertheless fail to receive a ballot. Sterling 2d Decl. ¶¶ 21, 24; Nunez 2d Decl. ¶ 17-18; Albright 2d Decl. ¶ 6. When that occurs, Plaintiffs cannot determine from the voter's registration or ballot-request records alone whether transmission problems arose from the voter's own records, the election office's Portal submission, barcode assignment or printing, USPS's verification process, or another failure in the ballot-transmission process. Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶ 17; Albright 2d Decl. ¶¶ 5-7. To continue providing this and other direct voter-assistance services, Plaintiffs must undertake additional voter-specific work across dozens of states: communicating with election officials and vendors, investigating rejected or delayed ballot mail, seeking a replacement ballot, and helping the voter identify and complete an alternative means of voting before the applicable deadline. Sterling 2d Decl. ¶¶ 17-18, 22-24; Nunez 2d Decl. ¶ 17-19; Albright 2d Decl. ¶¶ 17-18; *see also LWV TRO Order* at 8-9 (finding that states lack the time and funds to order and design new mail ballots, obtain approvals, update election systems, train officials, and upload data before the midterms).

Those burdens are compounded by the compressed timeline between the Final Rule's publication and the fast-approaching November 2026 election deadlines. Distribution of mail ballots in certain states starts in early September. *See, e.g.*, N.C. Gen. Stat. § 163-230.1(c).[4] Plaintiffs' voter-assistance programs were designed, funded, and implemented across multiple

[4] *See also Absentee Voting Begins: November 2026 General Election*, N.C. State Bd. of Elections, https://www.ncsbe.gov/news/events/absentee-voting-begins-november-2026-general-election ("Starting Friday, Sep. 4, 2026, county boards of elections begin sending absentee ballots to voters who requested them for the November general election.").

election cycles under the mail-voting rules set by individual States that predated the Final Rule. Sterling 2d Decl. ¶¶ 17-18; Nunez 2d Decl. ¶ 20; Albright 2d Decl. ¶¶ 5, 18. Unless the Rule is enjoined, Plaintiffs must immediately revise those programs and reallocate resources away from other "core" activities to address its new requirements. Sterling 2d Decl. ¶¶ 17-18; Nunez 2d Decl. ¶ 21-27; Albright 2d Decl. ¶¶ 17-19. Moreover, this work is necessarily voter- and jurisdiction-specific. The Portal requirements operate alongside distinct state election laws and local election practices, so a solution for one voter or jurisdiction may not resolve another's problem. Plaintiffs cannot remedy the Rule's interference with their services through a single public statement, general educational campaign, or uniform revision to their existing materials. Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶ 21-27; Albright 2d Decl. ¶¶ 6, 17.

Each additional hour Plaintiffs spend identifying and resolving a ballot-delivery problem is an hour unavailable for their ordinary registration, turnout, and election-protection work. *See* Sterling 2d Decl. ¶¶ 15, 17; Nunez 2d Decl. ¶ 16, 20; Albright 2d Decl. ¶ 20. And because Plaintiffs have finite personnel and programmatic resources, the additional time required to resolve Rule-related problems prevents Plaintiffs from reaching and supporting as many voters during their traditional election activities. *See* Sterling 2d Decl. ¶¶ 18, 24; Nunez 2d Decl. ¶ 16, 20; Albright 2d Decl. ¶¶ 14-15. Plaintiffs must either serve fewer voters through their existing programs, provide less assistance to each voter, or redirect personnel and funds from other core established activities. *See* Sterling 2d Decl. ¶¶ 15, 17-18; Nunez 2d Decl. ¶¶ 16, 20-21; Albright 2d Decl. ¶¶ 14-15.

That diversion is especially consequential because voters ordinarily will seek Plaintiffs' assistance only after a ballot that should have arrived has not done so, leaving Plaintiffs little time to identify the problem, coordinate with the responsible election officials, and help the voter obtain

and cast a replacement ballot before the applicable deadline. *See* Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶ 17-19; Albright 2d Decl. ¶¶ 17, 21. Plaintiffs have already reallocated substantial staff time to prepare for the Rule, and those expenditures are merely a preview of the far greater demands that will compound as election officials begin sending ballots. *See* Sterling 2d Decl. ¶¶ 10, 15, 17-18 (explaining that the Rule has created a "significant diversion of resources" from NAACP's planned GOTV activities and that NAACP "will continue expending considerable resources" to address its effects); Nunez 2d Decl. ¶ 20 (stating that Common Cause staff have already spent "more than 100 hours" understanding the Rule and identifying noncompliant counties, and that the resulting demands will increase "as election offices begin transmitting ballots"); Albright 2d Decl. ¶¶ 4, 7, 9, 18-21 (explaining that BVM has "redirect[ed] and increase[d] financial resources" in response to the Rule and expects demands on its staff and resources to "increase significantly once election officials begin transmitting ballots").

The Rule thus changes the government-administered processes through which Plaintiffs provide preexisting direct services that are "core" to their mission—while withholding the information necessary to identify and address the resulting problems. *AHM*, 602 U.S. at 394-95; *see Havens Realty*, 455 U.S. at 379; *LULAC III*, 818 F. Supp. 3d at 95-96.

***NAACP.*** Voter registration, mobilization, and direct voter assistance are longstanding NAACP operations central to the organization's mission. Sterling 2d Decl. ¶¶ 3, 8-11. Its network of state conferences, local branches, college chapters, prison chapters, and youth councils conducts voter-registration drives, canvassing, voter contact, and election-protection work; the NAACP recruited more than 100,000 volunteers for that work before the 2024 election and launched a $20 million Get Out The Vote campaign to mobilize 6.5 million Black voters across 14 states in 2026. *Id.* ¶¶ 4, 9-11. Its staff and volunteers assist voters in registering, verifying their registration status,

completing mail-ballot and emergency-ballot applications, and addressing barriers to voting, including voters who depend on mail voting because of disability, age, rural residence, incarceration, military service, or lack of transportation. *Id.* ¶¶ 6, 11, 16, 24.

The Final Rule requires the NAACP to extend those services beyond its established registration and ballot-application assistance in its Get Out The Vote campaign. Its staff and volunteers must revise voter-education materials and trainings,[5] provide individualized assistance when ballots do not arrive, communicate with the responsible election officials, help secure replacement ballots or alternative voting methods, and coordinate those efforts across the NAACP's national, state conference, and local units. Sterling 2d Decl. ¶¶ 14-18, 24. The NAACP has already completed revision of some of its voter materials and volunteer trainings prepared for the November 2026 election, expanded individualized voter-assistance efforts, and devoted additional staff and volunteer resources to programs—including Ride to the Polls initiatives—for voters who cannot successfully vote by mail. *Id.* ¶¶ 14-18, 24. The Final Rule requires the NAACP to plan for contingencies, such as particular states or jurisdictions being unable or unwilling to apply, being rejected by USPS, or USPS rejecting large numbers of ballots, forcing the NAACP to expand and place emphasis on such initiatives such as the Ride to the Polls programs. In multiple states, NAACP staff and units have been required to launch programs earlier, recruit more

[5] The NAACP's voter-education services are distinct from the "advoca[cy] against" government action at issue in *AHM*. 602 U.S. 367, 394. These services are an integral part of the NAACP's assistance to voters, equipping its volunteers to advise voters how to complete the concrete steps necessary to register, obtain, and cast a ballot—and to ensure it is counted. *See, e.g.*, Sterling 2d Decl. ¶ 11 ("The NAACP [] provides direct voter registration support and information, including an online voter protection hub that offers tools to register to vote, confirm voter registration status, and locate voters' specific polling places."). Simply put, the NAACP educates voters about *how to vote*—not how to "oppos[e] [the government's] policies" on voting. *AHM*. 602 U.S. at 395; *see also Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv*., 496 F. Supp. 3d 1, 12 (D.D.C. 2020) ("Plaintiff's provision of services through its civic engagement program demonstrates that it does not engage solely in 'pure issue-advocacy.'"). The same is true of Common Cause and BVM.

volunteers earlier, and steer organizational efforts away from traditional GOTV activities and other organizational priorities that the NAACP normally would be conducting before the General Election. *Id.* ¶¶ 15-16. These activities in response to the Final Rule impede the NAACP's large campaign, launched with traditional GOTV activities in mind. *Id.* ¶¶ 15-16.

***Common Cause.*** Common Cause likewise provides direct registration, registration-verification, voter-assistance, and election-protection services nationwide. Nunez 2d Decl. ¶ 11. Its voter tools helped nearly 6,000 voters register and nearly 40,000 voters verify their registration in 2024, and its staff and volunteers help voters who encounter obstacles to voting, including mail voters. *Id.* ¶¶ 10-12. Its members include voters who rely on mail voting because of age, disability, caregiving responsibilities, work and school schedules, rural residence, or lack of transportation. *Id.* ¶ 12.

Common Cause also has had to plan for the contingency that particular States or jurisdictions will not apply or will not have their mail-ballot programs approved by USPS, including identifying jurisdictions that lack the technological ability to comply with the new USPS requirements. Nunez 2d Decl. ¶¶ 18-20. Common Cause's existing tools and procedures help voters verify or update a state registration record; they cannot show whether the voter's information was accurately entered in USPS's Portal, whether USPS rejected the election office's outbound mailing, or how to correct a Portal or barcode error. *Id.* ¶¶ 16-18. Common Cause must therefore conduct individualized follow-up with election offices, investigate ballot-transmission failures, assist affected voters in obtaining replacement ballots or alternative voting methods, and update its trainings and materials. *Id.* ¶¶ 16-17, 19. Since the Final Rule became available for public inspection on August 21, Common Cause staff have already spent more than 100 hours understanding the Rule, communicating with election administrators and coalition partners to

identify affected jurisdictions—that do not have the technology to comply with the new USPS standards—and responding to requests for guidance from voters, members, and partners. *Id.* ¶ 20. Common Cause expects the demand for this individualized assistance to increase significantly once election offices begin transmitting ballots for the November 2026 election. *Id.*

***BVM.*** BVM's core programs include direct voter registration and turnout work, as well as grants, training, technical assistance, and operational support for grassroots organizations serving Black communities. Albright 1st Decl. ¶ 6. In 2024, BVM distributed more than $9 million to approximately 700 partners conducting programmatic work in 225 counties across 25 states. *Id.* ¶¶ 6-12. Those partners help voters register, apply for mail ballots, understand governing procedures, and address problems that could prevent their ballots from being cast and counted. Albright 2d Decl. ¶ 12.

The Final Rule impairs those services because BVM and its partners can no longer ensure ballot delivery merely by helping a voter satisfy state registration and ballot application requirements. Jurisdictions where BVM works may not apply or may not have their mail-ballot programs approved by USPS. Albright 2d Decl. ¶ 6. And even if a particular state's program is approved, BVM must respond to voter-specific problems involving a federal system to which neither BVM nor the voter has access. *Id.* ¶ 6. BVM has already received increased inquiries from voters and partner organizations concerning mail-ballot access and voter information. *Id.* ¶13. It has responded by increasing staff time and volunteer outreach, committing unplanned resources, and training staff and partners to help voters confronting ballot-delivery problems. Albright 1st Decl. ¶¶ 18-21; Albright 2d Decl. ¶¶ 4, 7, 9. Those expenditures drain resources from BVM's other "core" activities—voter registration, turnout, grantmaking, and community-service

programs—reducing its capacity to serve hard-to-reach voters through its ordinary operations. Albright 2d Decl. ¶¶ 4, 19.

### 2. NAACP and Common Cause's Members Are Suffering Injuries

NAACP and Common Cause also have associational standing. An organization may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The requisite showing of injury is modest, and an organization may invoke the injuries of members affected by an election restriction. *See Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). The latter two requirements are plainly met: protecting members' ability to vote and to receive mail ballots is central to NAACP's and Common Cause's missions, Sterling 2d Decl. ¶¶ 5-6, 9-15; Nunez 1st Decl. ¶¶ 8-12; Nunez 2d Decl. ¶¶ 6, 13, 16-19, and Plaintiffs seek prospective declaratory and injunctive relief. And the first requirement is met too: The Massachusetts court found the organizational plaintiffs have standing due to the Rule's effect on their members, which accorded with the government's representation that, "when the final rule is implemented, if it affects an individual voter's ability to vote, then they certainly have standing to challenge that final rule." *LWV TRO Order* at 5 & n.7, 7 (quoting Aug. 7, 2026 Hr'g Tr. 16:14-21).

NAACP's and Common Cause's members face a substantial risk that the Final Rule will prevent them from voting by mail in the November election. The Rule requires USPS to reject outbound ballot mailings unless election officials first satisfy its new envelope-design, barcode, Portal-registration, certification, and voter-enrollment requirements. 91 Fed. Reg. at 54,990-91. That threat is concrete. State election officials have submitted unrebutted declarations that many

jurisdictions cannot satisfy those requirements on the necessary timeline, and the Massachusetts court found compliance "practically impossible," noncompliance "unavoidable given the timeframe," and the resulting risk to voters "grave." *LWV TRO Order* at 8-9. NAACP and Common Cause have identified members who intend to vote by mail in the November election and rely on that method because of age, disability, incarceration, caregiving responsibilities, rural residence, and lack of transportation. Sterling 2d Decl. ¶¶ 6, 15, 21; Nunez 2d Decl. ¶¶ 6, 13; ECF No. 54-8 ¶¶ 5, 8-12 (Declaration of Brian James Freeman); ECF No. 54-6 ¶¶ 4-5 (Declaration of Jill Howard); ECF No. 54-7 ¶¶ 5-8 (Declaration of Catherine Balan). Because USPS must reject the mailings containing those members' ballots if their election officials cannot comply, the Rule creates a "substantial risk" that those members will be unable to vote by mail. *Murthy*, 603 U.S. at 58.

A voter need not wait for USPS to reject a particular ballot mailing to challenge a rule that changes the terms on which he or she may vote. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009); *Fish v. Schwab*, 957 F.3d 1105, 1119-20 (10th Cir. 2020). The Final Rule conditions NAACP and Common Cause members' planned use of mail voting on States' ability to submit their mail program for USPS's approval, and enrollment of voters in USPS's federal system, the officials' ability to meet the Rule's technological and logistical requirements, and the submission, verification, and five-year retention of voter-specific records linking their names and addresses to the unique barcodes on their outbound and return ballot envelopes. Members cannot verify that the required information has been submitted or entered accurately, Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶ 17, and USPS has confirmed that the voter cannot cure a rejected outbound mailing. Final Rule at 54,981.

***NAACP.*** NAACP's approximately 200,000 dues-paying members include registered voters throughout the country, many of whom are mail voters or assist other members of their communities with voter registration and mail voting. Sterling 2d Decl. ¶¶ 5-6. Those members include voters who rely on mail voting because of disability, age, rural residence, incarceration, military service, or lack of transportation. *Id.* ¶¶ 6, 15, 21. They therefore face a concrete and imminent injury from the Final Rule: even after satisfying the State-law requirements to register and request a mail ballot, their planned use of USPS to receive that ballot is subject to a new federal process over which they have no control. Sterling 2d Decl. ¶ 19-24.

NAACP member Alphonso Braggs illustrates the Final Rule's concrete burden on a voter who relies on mail voting. He is a registered Hawaii voter, a longtime NAACP member, and a retired Navy servicemember. ECF No. 54-2 ¶¶ 1-4 ("Braggs Decl."). Hawaii automatically sends registered voters their ballots by mail, and Mr. Braggs receives and returns his ballot through USPS. *Id.* ¶¶ 7, 14-15. Voting by mail is his preferred method of voting, and he intends to use it in upcoming federal elections. *Id.* But the Final Rule now places a new federal condition between Mr. Braggs and the ballot Hawaii otherwise would send him: before USPS will accept the outbound mailing, Hawaii must submit his voter-specific information and ballot-envelope barcode through the Portal and satisfy USPS's verification requirements. Final Rule at 54,991.

This new requirement is of particular concern to Mr. Braggs because federal government databases, including Social Security Administration ("SSA") and Medicare, spell his name incorrectly and inconsistently. His SSA records reflect the spelling "Alphonzo Bragg," while his Hawaii driver's-license and voter-registration records use "Alphonso Braggs." Braggs Decl. ¶¶ 9-10. Mr. Braggs has repeatedly tried to correct the SSA record, but SSA required formal name-change documentation before it would update its records or permit him to proceed with SSA

services. *Id.* ¶ 12. When he applied for Medicare, that requirement required him to obtain a Hawaii name-change order, pay the associated fees, and wait approximately two months for processing. *Id.* Because his name appears differently across government databases, Mr. Braggs stands a substantial likelihood of exclusion from the Federal Ballot Mail Portal. *Id.* ¶¶ 13, 16. Mr. Braggs has no way to inspect his State's submission of his information to the USPS or the record USPS will create for him, nor does he have any way to correct any error that might have been submitted, nor will he receive notice if his ballot is rejected. *See* Final Rule at 54,991. And USPS confirms that the ability to cure a rejected mailing "rests not with the voter." *Id.* at 54,981.

Other NAACP members will also experience significant hardships as a result of the Final Rule. The NAACP is aware of hundreds of incarcerated members who are eligible voters and rely solely on mail-in ballots transmitted by USPS because of their incarceration. Sterling 2d Decl. ¶ 21; *see, e.g.*, Me. Rev. Stat. Ann. tit. 21-A, § 112(14) (incarcerated Mainers may not vote in the municipality in which they are incarcerated unless they previously resided there, necessitating mail voting). One of these incarcerated voters is member Foster Bates of the Maine State Prison Branch. Sterling 2d Decl. ¶ 21. Many of these voters not only cannot access portals to identify or verify ballot transmission, but they also cannot easily obtain access to necessary documentation or communications with election officials to cure any voter registration or mail-in ballot issues. *Id.* The Final Rule only exacerbates issues for these NAACP members and would prevent them from participating in the 2026 General Election. *Id.*

That is a concrete, present injury to Mr. Braggs's and Mr. Bates's planned exercise of the franchise. A voter "need not have the franchise wholly denied to suffer injury"; a requirement that a registered voter satisfy a new condition in order to cast a ballot is itself sufficient. *Billups*, 554 F.3d at 1351-52 (citation omitted). Even apparently modest new voting requirements may impose

real burdens and deter participation. *See, e.g.*, *Fish*, 957 F.3d at 1119-20 (holding that enforcement of a documentary-proof-of-citizenship regime caused a concrete voting injury). The Final Rule similarly makes Mr. Braggs's ability to receive his mail ballot depend on compliance with a new federal process over which he has no control and no voter-accessible means to cure an error. Final Rule at 54,981, 54,991.

***Common Cause.*** Common Cause's membership likewise includes voters who regularly vote by mail under State law, including voters who rely on that method because of health, advanced age, disability, caregiving responsibilities, school attendance, work schedules, rural residence, or transportation barriers. Nunez 1st Decl. ¶¶ 12, 15, 17; Nunez 2d Decl. ¶¶ 6, 13. Common Cause members Jill Howard, Catherine Balan, and Brian Freeman illustrate those concrete burdens.

Ms. Howard is a 73-year-old Washington voter who relies on mail voting because she lives roughly fifty miles from her county election office in a mountainous area and has chronic medical conditions that make the trip difficult. ECF No. 54-6 ¶¶ 1-11 ("Howard Decl."). Ms. Balan is a California voter who has voted by mail for approximately 25 years; she lives in a remote mountainous area without public transportation, where weather and wildfire conditions can make travel to a polling place or ballot drop box unsafe or impossible. ECF No. 54-7 ¶¶ 1-9 ("Balan Decl."). Mr. Freeman is an 85-year-old Oregon voter who has voted by mail for decades and relies on that method because of his health and his responsibilities as the primary caregiver for his homebound wife. ECF No. 54-8 ¶¶ 1-8 ("Freeman Decl."). Each is a Common Cause member and intends to vote by mail in the November 2026 election. Howard Decl. ¶¶ 11, 14; Balan Decl. ¶¶ 2, 7; Freeman Decl. ¶¶ 4, 6.

The Rule burdens these members by subjecting their planned use of mail voting to voter-specific Portal and barcode requirements that neither they nor Common Cause can inspect; they

cannot correct any errors and will receive no notice if USPS rejects their ballot. Nunez 2d Decl. ¶¶ 17-19. That present burden is cognizable even if they ultimately receive and cast their ballots. *See Billups*, 554 F.3d at 1351-52. And USPS confirms that the ability to cure a rejected mailing "rests not with the voter." Final Rule at 54,981. The absence of a voter-accessible cure process presents a serious risk of a late-discovered ballot-delivery failure. Ms. Balan has specifically explained that, if USPS failed to deliver her ballot because of a federal-list requirement, she might receive no notice and lack time to correct the problem. Balan Decl. ¶ 12; *see also* Freeman Decl. ¶¶ 11-12. Put simply, the Final Rule will "create chaos" for Common Cause "members who may be precluded from voting by mail and our staff tasked with assisting and mobilizing voters on election day." Nunez 2d Decl. ¶ 19.

### 3. The Final Rule is Causing Plaintiffs' Organizational and Associational Injuries

Plaintiffs' organizational and associational injuries are directly traceable to the Final Rule. The Rule itself requires election officials to submit voter-level information to USPS, requires USPS to compare outbound ballot mail against those submissions, and directs USPS to reject and return noncompliant outbound mailings. Final Rule at 54,991. USPS's decision to insert itself into this process has caused chaotic uncertainty, as it is unclear whether and when particular States' mail-ballot programs will be approved; even for approved mail programs, the Final Rule will lead to rejection (without notice or opportunity to cure) of mail ballots to voters otherwise eligible to vote by mail. *See* Final Rule at 54,981-82, 54,991; Sterling 2d Decl. ¶¶ 17-18, 24; Nunez 2d Decl. ¶¶ 17-20; Albright 2d Decl. ¶¶ 5-7, 18-19.[6] That uncertainty is the predictable consequence of the

---

[6] *See* Will Doran & Caroline Yaffa, *What Trump's Mail-In Voting Win at the Supreme Court Means for NC Voters*, WRAL News (Aug. 25, 2026), https://www.wral.com/news/nccapitol/supreme-court-mail-in-voting-deliver-ballots-trump-order-usps-nc-north-carolina-2026-elections/ (quoting one North Carolina election-law professor's

Rule, not an independent choice by state officials. USPS made the Rule immediately effective after election preparations were already underway, conditioned ballot transmission on affirmative action by state and local officials, and adopted no timetable for completing the required review. Based on "unrebutted declarations" from state election officials, the Massachusetts court found that "compliance with the Final Rule at this late date is impossible," making States' inability to comply "unavoidable given the timeframe." *LWV TRO Order* at 9; *cf. Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

That conclusion does not change because States, election officials, or authorized vendors must take the actions the Final Rule requires. The predictable effects of a new federal election requirement satisfy traceability even when the requirement operates through third parties. *See LULAC v. Exec. Off. of the President* ("*LULAC II*"), 808 F. Supp. 3d 29, 62-63 (D.D.C. 2025) (holding that injuries flowing from the "predictable effect" of a burdensome new federal voter-registration requirement satisfied traceability); *Dep't of Com.*, 588 U.S. at 768 (holding that plaintiffs established traceability based on the "predictable effect" of a challenged census question on third parties' behavior). And a defendant need not be the final link in the causal chain: traceability may exist even where "multiple links" connect the challenged federal action to the plaintiff's injury. *United States v. King Cnty.*, 122 F.4th 740, 751 (9th Cir. 2024) (citation omitted). Here, State officials have no authority to waive USPS's Portal, barcode, or pre-acceptance-verification requirements, or to require USPS to accept a mailing USPS has rejected.

assessment that the imminent changes were likely creating "pure chaos" for election officials behind the scenes).

#### 4. Plaintiffs' Injuries Are Redressable by This Court

The requested relief would redress those injuries. An injunction preventing USPS from implementing or enforcing the Final Rule would eliminate the federal enrollment, data-submission, barcode-verification, and mailing-acceptance requirements, and in so doing, eliminate the uncertainty regarding whether and when the mail-ballot programs of particular States will pass muster, as well as rejection of mail ballots from eligible voters, that are disrupting Plaintiffs' services. It would restore the pre-Rule system under which States could transmit ballot mail through USPS under established State procedures, rather than compel States or USPS to adopt any new procedure for the November 2026 election. And it would permit Plaintiffs to provide voter assistance under the systems for which their programs, materials, and volunteer trainings were designed. *See California v. Trump*, 2026 WL 1826490, at *8 (D. Mass. June 25, 2026) (concluding that an injunction against implementation of the challenged ballot-mail directives would redress the plaintiff States' election-administration injuries).

### B. Plaintiffs' Claims Are Ripe

As the Massachusetts district court concluded, the challenge to the Final Rule is now ripe. *LWV TRO Order* at 7. Plaintiffs' challenge to the Final Rule is constitutionally ripe for the same reasons they have standing, *LULAC III*, 818 F. Supp. 3d at 78, and prudentially ripe because their challenge presents legal questions fit for resolution and withholding review would impose substantial hardship, *Sidak v. ITC*, 174 F.4th 151, 157 & n.5 (D.C. Cir. 2026). The Court's prior opinion emphasized that USPS had not yet promulgated a final rule but underscored that Plaintiffs could renew their motions when USPS "issue[d] a final rule." *DSCC*, 2026 WL 1487833, at *10; *see id.* at *6 n.6. The Supreme Court likewise concluded that "[i]f the Postal Service's final rule harms" plaintiffs, "they may challenge that rule." *Trump*, 2026 WL 2473573, at *4. The Final Rule has now been issued, published, and its effective date has passed. This motion therefore turns on

completed agency action—not any "contingent future events." *Sidak*, 174 F.4th at 157 (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)).

The Final Rule completes USPS's decisionmaking process. Notice and comment have concluded; USPS has selected the requirements it will impose; the Rule's effective date has passed, and USPS has stated that implementation would begin "immediately" once the Massachusetts injunctions were lifted. 91 Fed. Reg. at 54,966. This motion raises the purely legal questions of whether USPS has statutory and constitutional authority to issue the Rule. Those questions are resolvable from the Final Rule and USPS's governing statutes without any need for further factual development. This Court's previous ruling underscores the point. The Court denied Plaintiffs' motion as to Section 3(b) because "whether the Postal Service issues a notice of proposed rulemaking, what that proposed rule says, what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs" remained to be seen. *DSCC*, 2026 WL 1487833, at *10. All that has now taken place.

Withholding review would also impose immediate and substantial hardship. The Final Rule requires Plaintiffs to take action now to reassess and recalibrate their voter registration and get-out-the-vote services—which are heavily directed at facilitating mail voting—to the Rule's requirements, while at the same time revising voter-education materials, retraining volunteers, redirecting voter-assistance resources, and helping voters navigate the Rule. Sterling 2d Decl. ¶¶ 16-18, 24; Nunez 2d Decl. ¶¶ 16-20; Albright 2d Decl. ¶¶ 5-7, 15-19. Given that States' inability to comply with the Final Rule is "unavoidable given the timeframe," Plaintiffs now need to develop plans to address the contingencies that certain States or jurisdictions will not submit their mail-ballot programs to USPS for approval, or that they will not be approved, as well as for the contingency that significant numbers of eligible voters will have their mail ballots rejected. *LWV*

*TRO Order* at 9. NAACP and Common Cause members, meanwhile, are now subject to a new condition on mail-in voting under which USPS may reject their mail ballot through no fault of their own, without providing notice or any ability for the voter or their advocate to cure the problem. Final Rule at 54,981. Those harms are the direct consequences of a binding rule that has been adopted, published, and that is set to govern imminent federal elections. "Damocles's sword" has already swung. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Final Rule Exceeds USPS's Statutory Authority

The Final Rule dramatically exceeds the limited authority Congress conferred on USPS, and violates statutory prohibitions on exceeding assigned authority. Like every administrative agency, USPS may exercise only the powers delegated to it by statute. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Postal Reorganization Act limits USPS to adopting rules "necessary in the execution of its functions" and exercising powers "incidental, necessary, or appropriate" to carrying out its assigned functions. 39 U.S.C. §§ 401(2), (10). When the USPS transgresses those limits, its actions may be challenged directly as *ultra vires*. *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970-71 (D.C. Cir. 2022). The D.C. Circuit previously recognized the "serious questions concerning the lawfulness" of USPS's proposed action, *DSCC*, 2026 WL 2168617, at *1, and the first court to consider the Final Rule has now agreed it is in fact unlawful, *LWV TRO Order*.[7] Those courts were right: The Rule is lawless.

[7] Leading election law scholars have reached the same conclusion. *See, e.g.*, Derek T. Muller, *When Might a Supreme Court Order in Trump v. California Be Coming?*, Election Law Blog (Aug. 7, 2026), https://bit.ly/3UocUwL (describing the contemplated USPS action as "pretty clearly ultra vires"); *Comment of Justin Levitt on Proposed Rule*, Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (July 2, 2026), https://bit.ly/3Umsuck (explaining that "[m]any legal questions are complicated and nuanced" but USPS's authority to implement the Final Rule is not).

### 1. The Final Rule Contravenes the Limits on USPS's Authority

The Postal Reorganization Act ("PRA") defines—and limits—USPS's mission in postal terms. Its "basic function" is to "provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people," 39 U.S.C. § 101(a), and Congress directed it to maintain "an efficient system of collection, sorting, and delivery of the mail nationwide," *id.* § 403(b)(1). Consistent with that mission, "postal service" is defined as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." *Id.* § 102(5); *see id.* § 404(a)(1). These provisions authorize USPS to operate the national mail system. They do not authorize USPS to have any role in elections, nor do they authorize USPS to act as the nation's mail voting registrar or to decide whose ballots to reject.

The Final Rule asserts that USPS has the power to require state election officials to enroll voters in a federal system, maintain voter-specific election records, and withhold mail service to enforce that system. Specifically:

- Any State that intends to send mail-in ballots through USPS must "ensure" that each intended recipient is "enrolled with the Postal Service" for inclusion on a State-specific Participation List. DMM § 705.24.4.2.a.
- Enrollment requires an authorized State user to provide USPS with the voter's name and address and the unique barcodes printed on that voter's outbound and return ballot envelopes. *Id.* § 705.24.4.2.b.
- USPS then compiles a State-specific list connecting each named voter with both envelopes and uses those data to determine whether to accept the State's outbound ballot mailing. *Id.* §§ 705.24.4.3, 705.24.5.1.
- Any ballot mailing that fails that review "will not be accepted." *Id.* § 705.24.5.3.a.

Those are election administration and data-collection functions Congress never assigned to USPS.

To the contrary, Congress forbade USPS from rendering "nonpostal services," which the Rule's election administration functions plainly are. 39 U.S.C. § 404(e). The Rule goes far beyond

the simple "delivery of letters." 39 U.S.C. § 102(5). Instead, it superimposes a federal checkpoint on the election administration process and makes compliance with federally prescribed enrollment and recordkeeping requirements a prerequisite to distributing ballots through the mail. The Rule turns entirely on electoral considerations: the Rule expressly covers ballots used in federal general, special, and runoff elections while exempting ballots with the same postal characteristics when used in primary or state-only elections (or that are not election-related at all). DMM §§ 705.24.1.c, 24.1.f. And USPS identifies the Rule's objectives as facilitating enforcement of federal law, reducing fraud, and protecting the integrity of federal elections, none of which fall within its postal mission. Final Rule at 54,966, 54,969.

For related reasons, the resulting denial of service conflicts with USPS's universal-service mandate. Congress required USPS to provide "prompt, reliable, and efficient services to patrons in all areas," 39 U.S.C. § 101(a), to "receive, transmit, and deliver" mail throughout the Nation, and to "serve as nearly as practicable the entire population," *id.* § 403(a). USPS's rulemaking authority is tied to those statutory duties: USPS may adopt only rules "not inconsistent with" its mandate and "necessary in the execution of its functions," and may exercise incidental powers only in carrying out its assigned functions and specific powers. *See* 39 U.S.C. § 401(2), (10); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1174-76 (D.C. Cir. 2003). The Final Rule nonetheless permits USPS to reject ballot mail solely to compel election officials to participate in an external regulatory program that has an explicitly electoral purpose. And in asserting this authority, USPS only highlights that it is contrary to its universal service mandate, contending that such discrimination is permissible because "states do not have to use the U.S. mail to conduct their elections." Final Rule at 54,969. The new USPS review program has nothing to do with the "prompt, reliable, and efficient" delivery of mail to "the entire population." 39 U.S.C. §§ 101(a),

403(a). Instead, it would inevitably *deny* mail ballots to many voters through no fault of their own. That is flatly contrary to USPS's universal service mandate.

The PRA's nondiscrimination mandate reinforces the point. In providing postal services, USPS "shall not" make "any undue or unreasonable discrimination among users of the mails" or grant any user "undue or unreasonable preferences." 39 U.S.C. § 403(c). The Final Rule nevertheless affords less favorable service to election officials tendering covered federal ballots than to anyone else presenting ordinary mail: the former must satisfy the Rule's enrollment and data-reporting requirements or have their mail rejected, *see* Final Rule at 54,991, while the latter receive service without those conditions. The same is true even within the election context. The Final Rule subjects ballots used in covered federal general, special, and runoff elections to less favorable treatment than physically identical ballots used in primary or state-only elections. *Id.* at 54,990. Likewise, voters in States that comply with the USPS requirement receive ballots, while voters in States that are unable to or opt not to do not. Those distinctions rest solely on USPS's election-enforcement objectives, rather than any difference relevant to its postal functions. Congress nowhere authorized USPS to burden election mail on that basis.

Congress's treatment of nonmailable matter provides yet more confirmation. The Supreme Court has recognized that "[t]he postal laws make a clear-cut division between mailable and nonmailable material" and that Congress has "zealously watched and strictly confined" the authority to draw that line. *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152, 156 n.18 (1946). Congress has accordingly specified the types of matter USPS may exclude from the mails with remarkable specificity. *See* 39 U.S.C. §§ 3001-18. Those specifications include the obvious, like hazardous materials, *id.* § 3018, but also extend to the more exotic, like delineated categories of plants, *id.* §§ 3014-15, and the more mundane, like motor vehicle master keys, *id.* § 3002. The

Final Rule would nonetheless add a new extra-statutory category of material nowhere permitted by law: ballots transmitted by a State that declined to enroll in the USPS program or furnish the required election data, as well as ballots USPS deems to be unenrolled. DMM §§ 705.24.5.1, 24.5.3.a.

The same statutory design governs conditions on otherwise mailable matter. Congress has repeatedly identified the conditions particular categories of material must satisfy to remain mailable. *See, e.g.*, 39 U.S.C. §§ 3001(d)(2), (g)(2), (h)(1)(B), (i)(1)(B), 3002(b), 3010(a), 3014(c), 3018(a)-(b)(1). None of those provisions authorizes USPS to condition the carriage of election mail on compliance with an enrollment and data-reporting regime. To the contrary, the statutory provisions that do address election mail only facilitate the unburdened use of the mail system: Title 39 requires the expeditious, postage-free carriage of Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") balloting materials, and provides reduced rates for qualifying voter-registration mail. *Id.* §§ 3406(a), 3629. Reading Section 401's general grants to authorize the Rule's nonpostal conditions would negate Congress's specification on non-mailability, and has no apparent stopping point: USPS's theory would apparently permit the Postal Service to refuse ballot mail unless the envelope bore proof of citizenship, a witness signature, or a federally approved excuse for voting by mail—turning authority over the mail system into authority over the rules of mail voting.

Nor has Congress left the authority to regulate mail voting up for grabs. Congress specifically assigned voter-list management, federal election-information, and recordkeeping functions to other entities. In particular, the Help America Vote Act of 2002 ("HAVA") directs "each State" to maintain the single official statewide voter-registration list, which must be "defined, maintained, and administered at the State level" and assign a unique identifier to every

registered voter. 52 U.S.C. § 21083(a)(1)(A). Congress separately created the Election Assistance Commission to serve as the national clearinghouse for compiling information and reviewing procedures concerning federal-election administration. *Id.* §§ 20921-22. And Congress made state and local election officials the keepers of federal-election records. *Id.* § 20701. Congress knows how to assign authority to collect voter-specific election records. It gave USPS none.

Finally, the major questions doctrine hammers still another nail in the coffin. The Final Rule claims novel and consequential authority to impose nationwide conditions on States' distribution of federal mail ballots and to create voter-level election records for federal enforcement purposes. That authority implicates matters of exceptional political significance, alters the traditional allocation of responsibility for election administration between the federal government and the States, and lies far outside USPS's traditional mail-carrying role. When an agency asserts such an "unheralded power" representing a "transformative expansion" of its regulatory authority, it must identify "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (citation omitted). USPS has not identified any such source, and it cannot come close. Congress did not embed authority to establish a nationwide election-administration regime in general provisions allowing USPS to execute its postal functions.

### 2. USPS Identifies No Statutory Basis Authorizing the Rule

The statutory provisions USPS cites in the Final Rule do not supply the missing authority. *See* Final Rule at 54,971-72. The Final Rule principally grounds its authority in 39 U.S.C. §§ 401(2), 401(10), and 404(a)(1). *Id.* But those provisions limit USPS to promulgating rules "necessary" to "the execution of its functions," 39 U.S.C. § 401(2), and exercising authority "incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers," *id.* § 401(10), which include "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," *id.* § 404(a)(1). They do not confer any freestanding

authority to regulate in areas outside USPS's statutorily defined domain, including those enumerated in the Final Rule: facilitating enforcement of federal law, reducing fraud, and protecting the integrity of federal elections. Final Rule at 54,966, 54,969.

USPS attempts to justify the Rule as "[s]etting preparation and data-reporting standards for a defined category of mail." *Id.* at 54,971. But the Rule does far more than prescribe how ballot envelopes must be prepared or what information USPS needs to process them. It establishes a federal enrollment and recordkeeping system, requires state officials to populate that system with voter-and-ballot data, compiles the resulting records into Participation Lists, and enforces compliance by rejecting and not delivering noncompliant mail. *See id.* at 54,991. USPS's rejection of noncompliant mail is the means by which it enforces that regulatory regime, not an independent postal function that justifies the regime itself. And a Postal Service requirement does not become necessary or incidental to a postal function merely because it applies at the time mail is "prepared." Otherwise, USPS could regulate any activity dependent on mail simply by making compliance with its preferred regulatory regime a condition of acceptance—rendering Section 401's repeated reference to USPS's "functions" meaningless and swallowing Congress's express prohibition on new nonpostal services whole. *See Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1174-76 (D.C. Cir. 2003). In all events, even a genuine data-reporting requirement must be necessary or incidental to USPS's performance of its assigned functions, but the Rule never explains how developing a roster of intended ballot recipients, associating each named voter with two ballot envelopes, or compiling those associations into Participation Lists could possibly be necessary to processing or delivering mail.

Rather than justifying the sweeping power the USPS claims, the authorities the Rule cites only confirm the narrow and defined scope of USPS's authority. *USPS v. Council of Greenburgh*

*Civic Associations* observed that USPS possesses broad rulemaking authority "designed to accomplish" its statutory postal directives. 453 U.S. 114, 123 (1981). The regulations there governed the size, shape, dimensions, and use of mail receptacles—an "essential part" of the nationwide system for receiving and delivering mail—and implemented a statute enacted by Congress prohibiting the deposit of unstamped matter in those receptacles. *Id.* at 123-25, 128-29; *see* 18 U.S.C. § 1725. The other cases cited likewise involved mail-receptacle standards, private deposits into postal mailboxes, or rules governing where mail addressed to particular recipients would be delivered. Final Rule at 54,971-72. Each authority concerned the physical system by which USPS receives, processes, and delivers mail, each of which directly involved a Postal function. None of the cited authority upheld the imposition of a sweeping information-gathering program backed by the threatened denial of mail services to enforce requirements unrelated to postal operations.

Meanwhile, USPS's operational analogies expose just how far outside USPS's authority the Rule is. The Rule analogizes handling ballot mail to handling "cremated human and animal remains" and "replica explosives." *Id.* at 54,974. But those regulations address articles that require special handling during transportation and processing to prevent loss or operational disruption. *Id.* at 54,974. Indeed, USPS acknowledges that "ballot mail does not present precisely the same operational issues." *Id.* To the contrary, it has for decades successfully delivered ballot mail without special handling, mailer-approval, or recipient enrollment. USPS identifies no postal need to associate a named voter with both an outbound envelope and a separate return envelope, compile those associations into a Participation List, or reject a ballot because the corresponding database record is incomplete. The Rule instead repeatedly explains that those requirements are for federal election-law enforcement, *id.* at 54,972-74, without citing any legal authority granting USPS

powers with respect to such laws. USPS cannot bootstrap that nonpostal program onto its authority to prescribe standards that facilitate the handling and delivery of mail.

The D.C. Circuit has already rejected an analogous assertion of authority by USPS. In *Aid Association for Lutherans v. USPS*, Congress had provided that insurance-related nonprofit mail could receive reduced rates when "the coverage provided by the policy" was not generally commercially available. 321 F.3d 1166, 1168-70 (D.C. Cir. 2003) (quoting 39 U.S.C. § 3626(j)(1)(B)). Invoking the same § 401(2) authority it relies on here, USPS issued a rule to treat broad types of insurance as commercially available regardless of the particular coverage offered, thereby rendering virtually all nonprofit insurance mailings ineligible. *Id.* The court held the rule *ultra vires* because the statute focused on the specific coverage provided by the particular policy. *Id.* at 1175-78. It rejected as "entirely untenable" USPS's contention that the restriction was permissible because Congress had not expressly foreclosed it: Presuming "a delegation of power absent an express withholding" would afford agencies "virtually limitless hegemony." *Id.* at 1174-75 (citation and emphasis omitted). The same reasoning applies with greater force here. Congress's detailed mailability provisions contain no election-enrollment or voter-data condition, and if § 401(2) could not sustain the narrower restriction in *Aid Association*, it certainly cannot empower USPS to deny carriage of otherwise mailable ballots based on conditions Congress never imposed.

Unable to locate a postal function justifying the Rule, USPS turns to criminal ones. That also fails. The statutes USPS cites in the Final Rule prohibit specified election-related misconduct, but the cited provisions do not mention USPS, assign it any investigative or enforcement function, confer rulemaking authority, or authorize it to compel election officials to produce voter-level records. 52 U.S.C. §§ 10307, 20511. The Final Rule underscores the point: it acknowledges that decisions "of whether to investigate, refer, charge, or prosecute" remain with the entities to which

Congress assigned those functions. Final Rule at 54,972. But absent actual "congressionally delegated authority," Sections 401 and 404 do not authorize USPS to promulgate rules for enforcing external statutes. *See Aid Association*, 321 F.3d at 1175-78. Indeed, USPS reasons only that the Rule's records could prove useful to other entities. Final Rule at 54,972. But even assuming USPS may lawfully disclose existing postal records to law enforcement in some circumstances, that does not permit USPS to compel third parties to create new records for possible use in enforcing laws USPS does not administer.

The limited investigative power of Postal Service workers further undermines USPS's claimed authority. That law defines the powers designated Postal Inspectors may exercise in criminal investigations—serving process, making arrests, carrying firearms, and seizing property—and limits those powers to enforcing laws concerning postal property, "the use of the mails," and other postal offenses. 18 U.S.C. § 3061(a), (b)(1). Those powers include nothing like compelling nationwide, prospective data collection concerning every person sent a federal ballot and refusing to deliver ballots to voters in States that do not comply. The criminal statutes the Rule cites are general criminal prohibitions on election-related misconduct, 52 U.S.C. §§ 10307, 20511, not laws concerning "the use of the mails." And more, the Postal Inspectors' legal authority is to enforce other federal laws only pursuant to (i) an agreement with the Attorney General and (ii) a determination that violations detrimentally affect USPS operations—neither of which the Rule identifies. *Id.* § 3061(b)(2).

Finally, neither the Executive Order nor the Take Care Clause cures the lack of statutory authority. The Final Rule invokes the Order's emphasis on the Executive Branch's obligation to execute federal law and asserts that USPS may take measures it deems necessary to fulfill that obligation. Final Rule at 54,968-69. But the President's authority "must stem either from an act of

Congress or from the Constitution itself," and the Take Care Clause "refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 587 (1952). Even where the President may direct executive officials in exercising authority Congress has conferred, his direction cannot enlarge an agency's statutory jurisdiction. *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (explaining that an executive order may direct agencies to implement presidential policy only insofar as statutory law permits). And in the USPS context, the President entirely lacks authority to direct Postal Service rulemaking. 39 U.S.C. §§ 201, 202(a)(1). The Executive Order therefore could not properly direct USPS rulemaking at all, and certainly not rulemaking in excess of USPS's congressionally defined authority. The Executive Order's policy objectives cannot make the Rule "necessary" to the execution of functions Congress never assigned the Postal Service.

### B. The Final Rule Violates the Separation of Powers

The Final Rule violates the separation of powers because it implements an election-administration regime ordered by presidential directive rather than by congressional action. The President's power, if any, "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The Constitution "allows the President to execute the laws, not make them," *Medellín v. Texas*, 552 U.S. 491, 526 (2008), and his authority to execute those laws "starts and ends with the laws Congress has enacted," *Youngstown*, 343 U.S. at 633 (Douglas, J., concurring); 39 U.S.C. § 201 (establishing USPS as "an independent establishment of the executive branch" (emphasis added)). Congress assigned USPS specified postal functions—it did not authorize it to impose nationwide conditions on the administration of mail voting. The President may not supply that missing authority through executive fiat.

The Constitution expressly assigns authority over federal election procedures to Congress and the States. The Elections Clause provides that the "Times, Places and Manner" of

congressional elections "shall be prescribed in each State by the Legislature thereof," subject to Congress's authority "by Law" to "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1; *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013). The Electors Clause likewise provides that each State shall appoint presidential electors "in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. These provisions entrust authority over federal elections to state legislatures "primarily" and Congress "ultimately." *Watson v. Republican Nat'l Committee*, 146 S. Ct. 2165, 2170 (2026) (quoting The Federalist No. 59, p. 362 (C. Rossiter ed. 1961)). They confer no independent regulatory authority on the President, whom the D.C. Circuit has already recognized in this litigation has "no express authority over the conduct of elections." *DSCC*, 2026 WL 2168617, at *5.

The Final Rule is the product of that presidential direction. Section 3 "directed" the Postmaster General to initiate a rulemaking, prescribed provisions that the proposal "shall include, at minimum," and required USPS to complete the rulemaking on the President's timetable. Exec. Order § 3(b), (d). The Final Rule cites the Order as its genesis, invokes the Order's assertion that the Executive Branch must enforce federal election law, and acknowledges that the Order "began the deliberative process" resulting in the Rule. Final Rule at 54,966, 54,968-69, 54,976. Its operative provisions then adopt the Order's design: federally prescribed ballot envelopes and voter-specific barcodes, state submission of voter information, enrollment of intended ballot recipients with USPS, and USPS rejection of mailings that fail those requirements. *Compare* Final Rule at 54,990-92 (adopting DMM §§ 705.24.3-.5), *with* Exec. Order § 3(b)(i)-(iv). The Rule repeatedly explains those provisions in the Order's terms, describing its purpose as assisting the "faithful execution and enforcement of federal law," making ballot information available to law

enforcement, and "help[ing] achieve the goals articulated by the Order." Final Rule at 54,970, 54,972, 54,976, 54,984.

The result is a Presidentially-mandated regime that governs election administration. The Rule coerces States that distribute federal ballots by mail to enroll each intended recipient with USPS, provide voter-specific information, and use federally prescribed ballot envelopes. *Id.* at 54,990-91 (adopting DMM §§ 705.24.3-.4). USPS then determines whether the State's mail ballot program qualifies, and if it does, whether each ballot satisfies its conditions, and rejects nonconforming mailings, even when the intended recipient is eligible to receive a ballot under state law. *Id.* at 54,991 (adopting DMM §§ 705.24.5). Those requirements govern the manner in which States conduct mail voting and determine whether the ballots of eligible voters will be rejected. Yet Congress enacted none of them and conferred no authority on USPS to impose them.

The separation of powers forbids that power grab. Congress did not enact this election-administration regime or authorize USPS to impose it, and the President has no independent constitutional authority over the conduct of elections. The Executive Branch may not use postal rulemaking to assume authority the Constitution assigns to Congress and the States. The Final Rule therefore violates the separation of powers.

## III. THE REMAINING PRELIMINARY INJUNCTION FACTORS ARE SATISFIED

### A. Plaintiffs Are Suffering Irreparable Harm

Plaintiffs are suffering irreparable harm for the same reasons they have standing. *See Newby*, 838 F.3d at 9 (observing that because government actions "unquestionably make it more difficult for the [organizational plaintiffs] to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm"). The substantial risk that many jurisdictions will be unable to conduct mail voting; the "chaos" resulting from USPS injecting itself into the decision as to whether or not a State's ballots can be mailed, Nunez 2d

Decl. ¶ 19; the uncertainty regarding the timing, standards, and circumstances under which USPS will make such decisions; and the lack of notice or a procedure to cure are core deficiencies in the Final Rule—each of which is already forcing Plaintiffs to retool their services to accommodate each of the Rule's contingencies and sacrifice staff, volunteer, and financial resources from their planned voter-registration, turnout, and election-protection activities in the critical period before the November election. Sterling 2d Decl. ¶¶ 15-18**;** Nunez 2d Decl. ¶¶ 16-20; Albright 2d Decl. ¶¶ 7, 16-19. Those diversions impair Plaintiffs' established voter services precisely when their programs face their greatest election-year demands. *See Newby*, 838 F.3d at 9. And this harm will only intensify as the election proceeds. *See* Sterling 2d Decl. ¶ 18**;** Nunez 2d Decl. ¶ 20; Albright 2d Decl. ¶ 20-21.

The Rule also threatens immediate and irreparable harm to NAACP's and Common Cause's members. It authorizes USPS to reject a State's mail program wholesale, and even if approved, authorizes USPS to refuse an election official's outbound ballot mailing when the official or mailer has not satisfied the Rule's Portal, barcode, and verification requirements. Final Rule at 54,990-92 (adopting DMM §§ 705.24.4-.5). USPS does not provide affected voters access to the Portal or an avenue to cure a rejected mailing; instead, it acknowledges that cure rests with election officials and mailers, and it assumes no responsibility for delays before acceptance. *Id.* at 54,981-82. As Ms. Balan explained, a voter may thus learn only after an expected ballot does not arrive that a federal process beyond the voter's control has prevented its transmission, leaving little time to obtain and cast a replacement ballot. Balan Decl. ¶ 12; *see* Sterling 2d Decl. ¶¶ 21, 24; Nunez 2d Decl. ¶¶ 17-19; Freeman Decl. ¶¶ 11-12. And those risks are especially acute for voters, such as Ms. Howard, Ms. Balan, and Mr. Freeman, who rely on mail voting because in-person voting is not a practical alternative. Howard Decl. ¶¶ 4-11; Balan Decl. ¶¶ 4-11; Freeman Decl. ¶¶

5-12; *see also* Sterling 2d Decl. ¶¶ 5-6; Nunez 2d Decl. ¶ 13. The loss or impairment of the opportunity to vote is irreparable. *Newby*, 838 F.3d at 8-9; *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).

"Damocles's sword does not have to actually fall on all [plaintiffs] before the court will issue an injunction." *Newby*, 838 F.3d at 9. But here it already has: USPS made the Rule effective immediately because delaying implementation would jeopardize its application to the November 2026 election. Final Rule at 54,966-67. Plaintiffs must therefore respond now, during the period in which their registration, voter-mobilization, and election-protection programs are already underway, or forfeit the opportunity to prevent the Rule's effects on this election. *See* Sterling 2d Decl. ¶¶ 15-18; Nunez 2d Decl. ¶¶ 19-20; Albright 2d Decl. ¶¶ 19-21. An injunction is necessary to preserve the pre-Rule status quo and prevent irreparable injury to Plaintiffs and their members.

### B. The equities and public interest strongly favor Plaintiffs

The balance of equities and public interest heavily favor an injunction. Those factors merge where, as here, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). An injunction would preserve the longstanding system under which USPS transmits lawful ballot mail without conditioning its transmission on election officials' compliance with a new and unlawful set of Postal Service requirements that would "sow confusion and threaten disenfranchisement of many eligible voters" in the upcoming election. *California v. Trump*, 183 F.4th 52, 73 (1st Cir. 2026). Meanwhile, Defendants have put forth no evidence of any imminent harm from adhering to the current set of USPS requirements for the 2026 election cycle.

***First***, Plaintiffs' strong likelihood of success is itself "a strong indicator that a preliminary injunction would serve the public interest." *Newby*, 838 F.3d at 12 (quotation omitted). "There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020)

(cleaned up). That interest is especially weighty where the challenged action exceeds an agency's statutory authority and implements presidential policy that Congress never authorized USPS to carry out. *See Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 267 (D.D.C. 2025).

***Second***, the public has a "strong interest in exercising the fundamental political right to vote," and the public interest therefore favors "permitting as many qualified voters to vote as possible." *Newby*, 838 F.3d at 12 (cleaned up). The Final Rule directly threatens that interest. The Rule plunges the election system into chaos as it imperils States' ability to conduct mail voting and threatens to disenfranchise eligible voters by conditioning mail-ballot delivery on inclusion in a novel federal database that will inevitably contain errors that deny mail ballots to eligible voters. At the same time, confusion over compliance with the Order abounds, *California*, 183 F.4th at 73, "creat[ing] a disincentive for citizens who would otherwise attempt to register to vote" and cast their ballots, *Newby*, 838 F.3d at 13. These harms are particularly acute for the many voters who rely on mail voting to participate in elections. And this confusion is largely due to the Defendants' rush to implement "massive changes on the States' voting systems on the threshold of the upcoming election," allowing no time for state election officials or voters to understand the Rule's requirements and develop systems to allow voters to correct the inevitable errors and mishaps the Final Rule will create. *DSCC*, 2026 WL 2168617, at *6. There is a strong public interest in granting preliminary relief to avoid "such late-breaking disruption on the States' conduct of the 2026 elections." *Id.*

***Third***, Defendants have no cognizable interest in implementing the Rule's unlawful requirements. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021). Moreover, although there may be a general "public interest in preserving the integrity of the election process," there is "precious little record evidence" that the Rule serves that interest here. *LULAC*, 780 F.

Supp. 3d at 203 (cleaned up); *see LWV TRO Order* at 10. Evidence of mail-voting fraud and noncitizen mail voting is scant in general, rebutting any presumption that the existing system "permit[s] fraudulent registration by non-citizens," and the Rule provides no evidence to the contrary or that, even if there were evidence of such a threat, the Rule would do anything to mitigate it. *See Newby*, 838 F.3d at 13-14. Preliminary injunctive relief is especially appropriate here since an injunction "would preserve the States' existing electoral status quo," while allowing further consideration of the issues in this case for future elections. *DSCC*, 2026 WL 2168617, at *6. The equities overwhelmingly favor Plaintiffs.

**CONCLUSION**

The Postal Service's duty is to deliver the Nation's mail; it does not extend to erecting a federal checkpoint between eligible voters and their ballots. Congress never enacted the Rule's election-administration regime, and the President cannot create it by fiat. With voting about to begin and the Rule already impairing Plaintiffs' core services, the Court should preliminarily enjoin its implementation.

Dated: August 28, 2026 By *<u>/s/ John A. Freedman</u>*

John A. Freedman (Bar No. 453075)
Jeremy C. Karpatkin (Bar No. 980263)
Elisabeth S. Theodore (Bar No. 1021029)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
Connor Morgan (Bar No. 90038559)*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000

Fax: (202) 942-5999
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com
*Attorneys for Plaintiffs*

Sydney Lopes (Bar No. 61389)
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Ave., Suite 1400
Seattle, WA 98101
Telephone: (206) 208-0108
sydney.lopes@arnoldporter.com
*Attorney for Plaintiffs*

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommittee.org
*Attorneys for Plaintiff*

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215
Telephone: (202) 463-2940
*Attorneys for NAACP*

Deanna Kitamura (*pro hac vice*)
Kimberly Leung (*pro hac vice*)
ASIAN LAW CAUCUS
55 Columbus Ave.
San Francisco, CA 94111
Tel: (415) 896-1701
Deannak@asianlawcaucus.org
Kimberlyl@asianlawcaucus.org

**Motion for Pro Hac Vice or Court Admission Forthcoming*

*Counsel for Plaintiffs National Association for the Advancement of Colored People, Common Cause, Common Cause Education Fund, Black Voters Matter Fund, Inc., and BVM Capacity Building Institute, Inc.*