RAND PAUL, KENTUCKY, CHAIRMAN

RON JOHNSON, WISCONSIN
JAMES LANKFORD, OKLAHOMA
RICK SCOTT, FLORIDA
JOSH HAWLEY, MISSOURI
BERNIE MORENO, OHIO
JONI ERNST, IOWA
ASHLEY MOODY, FLORIDA

GARY C. PETERS, MICHIGAN
MARGARET WOOD HASSAN, NEW HAMPSHIRE
RICHARD BLUMENTHAL, CONNECTICUT
JOHN FETTERMAN, PENNSYLVANIA
ANDY KIM, NEW JERSEY
RUBEN GALLEGO, ARIZONA
ELISSA SLOTKIN, MICHIGAN

# United States Senate

COMMITTEE ON
HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

WASHINGTON, DC 20510–6250

August 31, 2026

**VIA ELECTRONIC MAIL**
David Steiner
Postmaster General and Chief Executive Officer
United States Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

Dear Postmaster General Steiner,

My office is in receipt of an alarming whistleblower disclosure (the "Disclosure") outlining the United States Postal Service's ("USPS") perilously rushed and potentially unlawful implementation of President Trump's Executive Order seeking to restrict mail-in voting.[1] The whistleblower's allegations make clear that USPS lacks the technical or operational capability needed to effectively implement the EO's provisions in a way that safeguards every citizen's right to vote in the upcoming midterm elections. Despite this, the Trump Administration appears intent on USPS moving forward with its flawed plans, no matter the chaos they may create.[2] The whistleblower's allegations also provide disturbing information suggesting that USPS may have violated a court order by continuing to implement the EO despite being ordered to cease all such work. We urge you to abandon this ill-conceived, unconscionable plan and ensure that all Americans can exercise their constitutional right to vote, including by mail, without interference by USPS.

Historically, although USPS has issued guidance on various issues related to election ballots sent through the mail, like recommendations for ballot envelope design, it has not imposed specific rules or procedures that state election officials were required to follow in order to have USPS deliver ballot mail to voters. Under a new final rule issued on August 26, 2026 (the "Rule"), USPS will, for the first time, play a gatekeeping function and be in a position to refuse to mail ballots that state election officials have determined should be sent out.[3] This change is a marked and deeply troubling departure from USPS's traditionally restrained role as a mail carrier.

The whistleblower's Disclosure describes an unprecedented process that allows USPS to decide whether ballots issued by state election officials should be mailed. To do so, USPS is building an entirely new online system, the USPS Federal Ballot Mail Portal and related IT

---

[1] Executive Order No. 14399, 91 FR 17125, (2026).
[2] *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111);
[3] *Id.*

systems (the "Portal"), which will be used to screen ballots submitted by state election officials prior to USPS agreeing to mail them to voters. The Disclosure identifies problems at every stage of USPS's development of the Portal, demonstrating deeply flawed plans for implementation.

According to the whistleblower, USPS's effort to develop and deploy the Portal has been "rushed," "risky and haphazard" because leadership has demanded an impossible timeframe.[4] In an effort to meet impossible deadlines, USPS has eliminated standard and needed testing, thereby creating substantial risk of a "catastrophic failure" of the system that could "derail the midterm elections."[5]

USPS began work building the Portal on or around June 15, 2026 just three months before the date USPS planned to launch the system and just five months before the November 2026 midterm elections.[6] On or about June 25, 2026, USPS ordered work on the Portal to cease due to a court order enjoining implementation of the EO.[7] That work stoppage persisted for approximately a month, further reducing the time that USPS had to build the new system.[8] According to the whistleblower, building the information technology infrastructure necessary to complete the Portal could take a year or more.[9] Yet, USPS leadership demanded that the Portal be completed for a launch date of September 1, 2026, less than six months after the EO was issued.[10] As a result of this rushed process, USPS has been unable to conduct tests of the Portal to ensure its proper functioning, troubleshoot problems, or distribute instructions on use to state election officials. According to the whistleblower, the Portal "violates standard principles of testing and debugging new software before launch."[11] Normal procedures at USPS for such systems include internal testing, customer acceptance testing, and a final development stage before release to public facing users.[12] The Portal has gone through none of these basic checks.

Not only is this system astonishingly untested, USPS has simultaneously implemented an impracticable zero percent failure rate.[13] When ballots are submitted to USPS in large-volume batches, if any one ballot in the batch cannot be verified against the Portal, *all* ballots in that batch will be rejected. For example, if a state election official brings a batch of 10,000 ballots to USPS and USPS is unable to match just one of those ballots against the Portal – because, for example, someone has recently changed their name after marriage or they've moved – then USPS would refuse to mail the remaining 9,999 ballots as well. As the whistleblower notes,

---

[4] Disclosure Letter to Senator Blumenthal from Anonymous Whistleblower Re: USPS Rushed Implementation of New and Untested IT Systems Threatens U.S. Ballot Mail Delivery, (Aug. 29, 2026), 4.
[5] *Id.*
[6] *Id.*at 16.
[7] *Id.* at 12.
[8] *Id.* at 13.
[9] *Id.* at 6.
[10] *Id.* at 7.
[11] *Id.* at 7.
[12] *Id.* at 7.
[13] *Id.* at 9-12.

"USPS expects the state to take back the entire batch to cure the issue with the single ballot…"[14] Should the slapdash Portal mistakenly mark a ballot as unverified, there is no clear process by which state election officials or voters themselves can challenge the rejection. The Rule simply vaguely states that they "will be informed of the escalation procedures should they decide to challenge a rejection."[15] Voters intending to cast ballots by mail may not even be aware that their ballots have been rejected, or were part of a rejected batch, until it is too late to secure an alternative ballot or vote in person. Expecting a well-built, thoughtful Portal to return an accurate result 100 percent of the time is already a stretch—expecting a "rushed," "risky and haphazard" Portal to do the same is a recipe for disaster.

These risks are compounded by other revelations in the Disclosure. USPS leadership has shown an incredible lack of effective management while building the Portal including siloed work streams, changing requirements, competing understandings of work output, and multiple actors having ownership of the same unique tasks. For example, there was little or no communication among teams working on the project to such an extent that "when elements were brought together, the teams were unaware of various developments, creating more work."[16] Shockingly, there are also "no clear written requirements" for the information technology and infrastructure of the Portal, leaving workers to "glean requirements from opaque comments at meetings."[17] As late as August 21, 2026, workers were still receiving new requirements for the project.[18] Without clear guidance, "[d]ifferent team members continued to have different understandings of how the system is supposed to function which caused ongoing and greater confusion among the group," substantially increasing the risk that the system will fail and, ultimately, disenfranchise voters.[19]

Each of these problems: rushed development; a zero percent failure rate; and poor management are cause for concern on their own. Taken together they present a clear picture of a fatally flawed process that cannot and will not protect American voters. Put plainly: this process will likely lead to chaos, confusion, and the inability of many Americans to have their vote counted.

Finally, in addition to these significant concerns about the impact of the EO on Americans' right to vote, I am troubled by allegations that USPS continued work on the Portal despite numerous court orders enjoining it from doing so. On June 25, 2026, the U.S. District Court for the District of Massachusetts enjoined USPS, among other executive branch agencies, from implementing Section 3 of the EO as to the twenty-three states and the District of Columbia

---

[14] *Id.* at 10.
[15] Ballot Mail for Federal Elections, *supra* note 2, at 58.
[16] Disclosure Letter to Senator Blumenthal, *supra* note 1, at 18.
[17] *Id.* at 17.
[18] *Id.* at 19.
[19] *Id*. at 17.

that had challenged the order.[20] The U.S. Court of Appeals for the First Circuit affirmed the district court's ruling on July 25, 2026.[21] USPS was also enjoined from "implementing, giving effect to, or enforcing Section 3" of the E.O. nationwide pursuant to the U.S. District Court for the District of Massachusetts August 11, 2026 order.[22] It was not until August 24, 2026, that the Supreme Court stayed the June 25, 2026 injunction imposed on USPS by the U.S. District Court for the District of Massachusetts,[23] and August 26, 2026 when the August 11, 2026 order was lifted.[24] Based on this timeline, USPS should have ceased all work on the Portal on June 25, 2026, with the earliest conceivable date to resume being August 26, 2026. The whistleblower allegations demonstrate that was not the case, with USPS directing work to continue on the Portal after the first court order to cease work and prior to the recent court decisions allowing USPS to proceed.[25] This pattern of defiance of court orders is particularly concerning in light of the Temporary Restraining Order issued on August 27, 2026, that has again halted USPS from performing any work on the Portal for 14 days.[26]

Every eligible American citizen must be able to exercise their right to vote, unencumbered by unlawful obstacles this Administration and USPS seem intent on putting in their way. Given the rapidly approaching election and to determine whether USPS's actions may impede that fundamental right, please provide the following information immediately, and in no case later than September 4, 2026:

1. Please state whether USPS has halted work to implement the Executive Order, in compliance with the August 27, 2026 TRO.

2. Please provide the date on which USPS instructed its employees and/or its contractors to begin work implementing the new Rule including the development of the Portal;

    a. Please list the individuals and their respective titles involved in issuing instructions to USPS employees and/or contractors on developing the Portal;

    b. Please list the position titles of all individuals involved in developing the Portal;

---

[20] *California v. Trump*, No. 26-cv-11581 (D. Mass. June 25, 2026).
[21] *California v. Trump*, No. 26-1774 (1st Cir. July 25, 2026).
[22] *League of Women Voters of Massachusetts v. Trump*, No. 26-cv-11549 (D. Mass. Aug. 11, 2026).
[23] *Alabama et. al, v. California et al.*, No. 26A139, (U.S. Aug. 24, 2026).
[24] *League of Women Voters of Massachusetts v. Trump*, *supra* note 22.
[25] Disclosure Letter to Senator Blumenthal, *supra* note 1, at 12.
[26] *League of Women Voters of Massachusetts v. Trump*, *supra* note 22.

c. Please name any and all entities USPS has contracted with to develop the Portal;

3. Please indicate whether USPS will perform beta testing on Portal;

   a. If so, when will such testing begin?

4. Are there procedures in place under the Portal to identify and remedy false positives, whereby the verification system incorrectly deems a voter as unverified and fails to transmit a ballot?

   a. What is the timeframe to rectify such false positives?

5. Please indicate when USPS anticipates launching the Portal for useby state election officials;

6. Has USPS engaged with any state officials on the development or use of the Portal?

   a. If so, please list the names and positions of those state officials are

7. Please list the dates on which USPS or its contractors worked on the Portal.

   a. Did USPS or its contractors continue development of the Portal at any time when a court order was in place enjoining the implementation of Section 3 of the EO?

      i. If so, please provide the specific dates on which those activities occurred;
      ii. If so, please provide the rationale behind USPS's decision to continue work in defiance of a court order

Please also provide the following records[27] by September 8, 2026:

[27] "Records" include any written, recorded, or graphic material of any kind, including letters, memoranda, reports, notes, electronic data (emails, email attachments, and any other electronically-created or stored information), calendar entries, inter-office communications, meeting minutes, phone/voice mail or recordings/records of verbal communications, and drafts (whether or not they resulted in final documents).

1. All records or communications regarding the original plans for and development of the Portal and any initial estimates of the amount of time that would be necessary to develop the system;

2. All records or communications regarding the date on which the Portal would need to be completed and ready for use;

3. All records or communications regarding the Portal's potential flaws or vulnerabilities;

4. All records or communications regarding a zero percent failure rate requirement for the Portal; and

5. All legal opinions or other communications regarding the legal permissibility of USPS developing the Portal while federal court orders enjoining implementation of Section 3 of the EO are in place.

Sincerely,

Richard Blumenthal
Ranking Member
Permanent Subcommittee on Investigations

cc: The Honorable Ron Johnson
Chairman

Tammy Hull
Inspector General
Office of Inspector General, United States Postal Service
735 N. Lynn Street
Arlington, VA 22209-2020.

WHISTLEBLOWER AID
*Report government and corporate lawbreaking.*
*Without breaking the law.*

**—ANONYMOUS WHISTLEBLOWER DISCLOSURE—**

**August 30, 2026**

**Via email**

The Honorable Richard Blumenthal
Ranking Member, Permanent Subcommittee on Investigations
U.S. Senate Committee on Homeland Security and Governmental Affairs
503 Hart Senate Office Building
Washington, DC 20510

**Re: USPS Rushed Implementation of New and Untested IT Systems Threatens U.S. Ballot Mail Delivery**

Senator Blumenthal:

1. Whistleblower Aid represents an anonymous federal official (hereinafter "Client" or "Whistleblower") with direct knowledge of potentially catastrophic problems in the development of the United States Postal Service's ("USPS" or "Postal Service") new system for handling federal election ballot mail ("ballot mail"). The Whistleblower came forward with significant concerns about the USPS's secretive, rushed, chaotic, and fundamentally flawed process for the creation and implementation of an entirely *new and untested* set of IT systems, including the "Federal Ballot Mail Portal" or "Portal". The new IT systems and corresponding protocols will govern the delivery of ballots to voters as soon as the 2026 mid-term federal elections and beyond.

2. The Whistleblower also raises grave concerns that the administration has hidden the high likelihood that the new ballot mail verification processes will result in major disruptions in mail ballots ever getting delivered to voters. As presently designed, if even one bar code on one single ballot in a bulk-mailing of 10,000 ballots fails to properly scan during the verification process, the entire batch is rejected and sent

back to the state - effectively stopping the ballots from being mailed to voters. Even under ordinary circumstances this would be problematic because of predictable errors in any barcode scanning process. The Whistleblower is particularly concerned that the Portal (where the bar codes are stored) will almost certainly have significant operating problems when released to the public, due to the rushed IT development; this will contribute to failures in the verification process.

3. There are three core changes to ballot mail processing that this disclosure will speak about. In the past, election officials would design compliant ballot mailers and bring ballot mail to the USPS. That past process simply involved uploading the mail ballot details like barcode number and mailing address information into legacy bulk mail digital systems, where there would be some verification focused on confirming cost and mailing type details.[1] Under this new system, Election officials will be responsible for reconciling issues with three new components USPS is adding to the election ballot mail system

    a. The new Portal for entering voter names and ballot barcodes, a system where elections officials will need to sort out errors with uploading new information into a new system.

    b. A new manifest verification process, where mail ballot batch manifests are compared to the information in the Portal. Here election officials will need to resolve errors between their batch manifest information and the Portal information.

    c. A new physical barcode sampling verification standard, with a zero percent failure rate, where Postal Service clerks will scan a sample of the ballot mail batch to confirm the physical ballot mail information matches the information in the Portal. Election officials will be responsible for resolving any errors purportedly identified in the scan, and for resubmitting the batch manifest - USPS will refuse to accept the ballot batch until the errors are resolved. (Batches can be tens of thousands of ballots or more.)

[1] Infra. ¶ 9.

4. The Whistleblower believes on or about June 2026 work began in earnest on the USPS election ballot mail IT project, just three months (which reportedly includes a one month period when work was paused) before the date USPS is currently working toward to launch that system.

5. Notwithstanding an injunction in the 1st Circuit,[2] enjoining USPS from "implementing, giving effect to, or enforcing Section 3 of Executive Order No. 14399…." After an initial pause of approximately one month, USPS leadership ordered employees to resume development of the election ballot mail IT systems on or about a month ago, while the injunction was in effect.[3] Specifically, work on the Portal and related ballot mail IT systems continued, despite the August 27, 2026 Temporary Restraining Order issued in the 1st Circuit, demanding that USPS ". . .take no further preparatory steps or implement in any way for elections occurring before or on November 3, 2026 . . ." on various sections of new USPS ballot mail rule.[4]

6. Given that we are keeping the Whistleblower's identity anonymous, our objective is to provide as much information as possible for investigators to locate and gather evidence in order to initiate a formal investigation, while balancing our client's concerns and need for anonymity. Accordingly, if there are any questions following your review of this disclosure, please contact the undersigned so that the requested information can be timely provided, to the extent possible.

7. Although the undersigned have prepared this disclosure, our client has reviewed its contents and the positions espoused herein should be considered as their own. Thus, where a factual statement is asserted and does not include a citation to a supporting document, the source is our anonymous client.

---

[2] League of Women Voters of Mass. v. Trump, No. 1:26-cv-11549-IT, Dkt. 183 (D. Mass. Aug. 11, 2026), https://www.brennancenter.org/sites/default/files/2026-08/183-order-granting-lwv-plaintiffs-renewed-pi-motion.pdf?inline=1.

[3] *Id*. at 27.

[4] League of Women Voters of Mass. v. Trump, No. 1:26-cv-11549-IT, Dkt. 218 at 10 (D. Mass. Aug. 27, 2026), https://storage.courtlistener.com/recap/gov.uscourts.mad.298449/gov.uscourts.mad.298449.218.0_1.pdf

**Election ballot mail IT system development marked by rushed implementation, unclear requirements, and no meaningful testing is poised to derail the midterm elections**

8. The apparently sloppy and rushed manner in which the Federal Ballot Mail Portal and supporting IT systems are being built poses significant risk. Potentially millions of American voters may not receive their mail-in ballot this election cycle in a timely manner, or at all. The Whistleblower's assessment and recitation of the facts around the risky and haphazard development of the project is a compelling warning of catastrophic failure which could derail the midterm elections.

9. The new Federal Ballot Mail Portal and updates to related legacy[5] bulk mail systems[6] and processes are being built to implement provisions of President Trump's Executive Order (EO) 14399 of March 31, 2026.[7] Section 3 of EO 14399 pertains to the delivery of all "outbound ballot mail" by the USPS: meaning every ballot (and return envelope) that the States need to mail to each of the estimated tens of millions of US voters[8] who would have the option to vote by mail in the 2026 midterm elections. The USPS spelled out the process for regulating the delivery of "outbound ballot mail" in its June 2026 Proposed Rule[9] and a Final Rule published

[5] These systems are described as legacy because they are known systems built for USPS bulk mailing needs, where election officials mailing ballots likely already have accounts for shipping ballot mails in past elections.
[6] These legacy bulk mail systems include existing USPS systems like PostalOne! or Postal Wizard. *See* United States Postal Service, *Postal Wizard*, PostalPro™ (Aug. 20, 2024), https://postalpro.usps.com/node/10802; United States Postal Service, *PostalOne!* (2026), https://www.usps.com/postalone/.
[7] Executive Order 14,399, entitled *Ensuring Citizenship Verification and Integrity in Federal Elections*. 91 Fed. Reg. 17125 (Mar. 31, 2026) (hereinafter the "EO"), https://www.govinfo.gov/content/pkg/FR-2026-04-03/pdf/2026-06601.pdf.
[8] In the 2022 midterm election, over 61 million ballots were mailed to voters by the states, and of that, 36.6 million voters returned ballots to the states. Fors Marsh, *Election Administration and Voting Survey 2022 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 118th Congress,* U.S. Election Assistance Commission (June 2023), at 12, https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.
[9] The USPS issued a notice of proposed rulemaking (NPRM) to amend USPS processes for handling the mailing of ballots for federal elections. *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (June 2, 2026) (to be codified at 39 C.F.R. pt. 111), https://www.govinfo.gov/content/pkg/FR-2026-06-02/pdf/2026-10968.pdf.

on August 26, 2026.[10] The Final Rule, is ultimately an amendment to the USPS mail standards as spelled out in the Domestic Mail Manual ("DMM").[11]

10. Prior to this rule, as in past elections, election ballot mail was essentially handled like other bulk First-Class Mail mailings. Nothing close to the extent and severity of this new USPS system and attendant processes seems to have existed before. In the past, for these mailings of ballot mail that were brought to a BMEU ("Business Mail Entry Unit"), the mailer would enter the information into a digital system like PostalOne!, which would generate a manifest-like document.[12] While the Postal Service has subjected large mailings to validation processes before they were accepted, those processes appeared generally to be focused on collecting proper postage rates. Such processes appeared designed not to stop mailing, but instead allow the Postal Service to properly bill the mailer at the appropriate rate.[13] And of those processes reviewed, some like Bundle Verification allowed for a 20% failure rate.[14] We found no evidence in reviewing the processes for a zero percent failure rate for individual pieces of mail, or for the creation of a manifest to be checked against some sort of other mailer generated document (akin to the list that election officials are required to enter into the Portal), or any published failure rate for election ballot mail.

---

[10] The Final Rule talks about other changing elements of the ballot mail processes such as the design of external envelopes are not discussed in this disclosure. See "Ballot Mail for Federal Elections." 91, Fed. Reg. 54966 (August 26, 2026). https://www.govinfo.gov/content/pkg/FR-2026-08-26/pdf/2026-17238.pdf.

[11] *Mailing Standards of the U.S. Postal Service, Domestic Mail Manual* (DMM) (2026), https://pe.usps.com/text/dmm300/welcome.htm.

[12] *See* USPS, *United States Postal Service Election Mail & Political Mail Guidebook 2024*, https://naps.org/files/galleries/USPS_Published_USPS_Election_Mail_Political_Mail_Guidebook_2024_Nicholson_03152024.pdf; USPS, *Your 2024 Election Mail and Political Mail Guide*, PB22648, (Apr. 18, 2024) https://about.usps.com/postal-bulletin/2024/pb22642/html/cover_001.htm#ep1399618 (In September 2024, USPS election mail guide tells election officials to submit commercial-mail postage statements electronically through PostalOne!, as USPS had eliminated most hard-copy domestic commercial postage statements as of January 28, 2024); USPS, *Publication for Streamlined Mail Acceptance for Letters and Flats*, PB685, at 6-2.7.1.4 - 6-2.7.2.3.5, https://about.usps.com/publications/pub685/pub685ch6_009.htm

[13] See for example, 73 FR 36136 (2008) at section 3.3.1 ("Start-the-Clock"). https://www.federalregister.gov/documents/2008/06/25/E8-14396/administrative-practice-and-procedure-postal-service.

[14] USPS, *PostalOne! Online Manual*, Bundle Verification, https://www.uspspostalone.com/postal1/helpfiles/bmeu_um/pbv_webhelp/verification_viewer.htm#use_matrix.htm.

11. Specifically, in its rulemaking, the USPS details how state election officials will now be required to enter information into this newly created Federal Ballot Mail Portal for each of the states' registered voters receiving a mail-in ballot, to create a statewide "Mail-In and Absentee Participation List" ("Statewide List").[15] Separately, election officials will need to upload a manifest into a parallel system (a legacy bulk mailing system) for each batch of ballots a state submits to be mailed. At this stage USPS will perform its first verification to confirm that the Intelligent Mail barcodes ("IMbs" or "barcodes") in the batch manifest match the ones in the statewide list.

12. If the first verification succeeds[16] then election officials will be permitted to bring the batch of ballots to the USPS facility for acceptance.

13. When ballots are brought to a USPS facility, they will be subject to a second verification. Postal Service employees will manually scan a sampling of barcodes within the batch to confirm that the barcodes being scanned match those on the Statewide List, as uploaded in the Portal.[17] Verification will be accomplished by sampling a portion of each batch of ballots brought to USPS.[18] If this second verification succeeds the USPS will accept the batch of ballots and mail them.

14. The Whistleblower paints a dire picture of a slapdash software development process as the USPS attempted to create this complex IT system, with multiple points of ballot review, in a matter of weeks. The very manner in which the project is being developed deviates dangerously from even the most basic software development best practices. Including, critically, that the project requirements have never been sufficiently defined.[19] According to the Whistleblower, an ordinary process for an effort of this complexity, magnitude, and importance could take nine months to a year or more. They are aware that other USPS IT projects currently under development, related to standard software patches or price changes, have more reasonable time lines of around eight months. These timelines reflect a number of additional standard steps not included in the development of the election ballot mail IT system project, including sufficient testing timelines. A member of the

---

[15] Ballot Mail for Federal Elections at 54967.
[16] i.e. if there is a 100% match between each barcode in the manifest and those in the Portal.
[17] *Id*. at 54981.
[18] The Whistleblower is aware that verification will occur by sampling; sampling may be implied, but is not specifically stated in the Final Rule.
[19] *See* Appendix A.

Postal Regulatory Commission, Tom Day, recently commented that the ordinary process for an effort of this complexity, magnitude, and importance could take a year or more.[20] USPS leadership, it appears, has discarded all best practices as they speed the project to be ready for a September 1 implementation - raising questions about whether catastrophic failure would be a feature rather than a bug.

15. The Whistleblower believes that there has been insufficient internal testing of the system; such testing is critical to determine whether it will work on September 1, when states could be expected to start using it. The Whistleblower is aware of significant concern, among those whose job it is to build this software, that the project violates standard principles of testing and debugging new software *before* launch. It is simple common sense that a system cannot be definitively tested unless all parts are operational as a whole. In this case, election ballot mail IT systems were escalated to testing environments *even before* all the sections were sufficiently developed and tested separately, rendering meaningful testing of the project impossible.[21]

16. The Whistleblower does not believe individual parts have been sufficiently tested, let alone the entire system. Normally, for example, there should be fairly robust internal testing of the parts of the system *before* it goes into the USPS Customer Acceptance Testing ("CAT"), the customer testing environment and a final development stage before a public facing USPS system is released publicly for all users.[22] Yet, the Whistleblower understands that the USPS only compiled the complete version of the final IT system on or about the week of August 24, 2026 in the CAT environment, without sufficient testing of individual parts.

---

[20] Eric Katz, *Postal Officials Say Trump's Mail-Ballot Push Will Create Widespread Errors*, NOTUS, (Aug. 27, 2026) https://www.notus.org/policy/postal-officials-ballot-errors (explaining that "The Postal Service typically would spend at least a year rolling out a new system like the one that will be required for ballot screening, hold a conference for all impacted jurisdictions and provide training to 8,000 election boards around the country").

[21] In a standard software development process, the software is built in parts. The parts are tested separately and then combined and tested again. Proper testing of the software system requires that each part is close enough to completion to actually test how it works. The testing occurs in so-called *testing environments*.

[22] CAT allows commercial mailers and developers to test electronic documentation (eDoc), XML files, and PostalOne! integrations prior to production. Access requires obtaining test credentials and setting up a Business Customer Gateway (BCG) account. *See* United States Postal Service, *Informed Delivery Mailer Onboarding Guide*, PostalPro™ (June 28, 2022), https://postalpro.usps.com/node/7029.

17. To meet the September 1 deadline, there would be less than a week of testing the new election ballot mail IT systems, well short of best practice. For example, another Postal Service IT project that the Whistleblower is aware of set aside 47 working days for testing, nearly seven times longer than the election ballot mail IT system project.

18. The Whistleblower is aware that individual parts of the technological build have been “siloed” meaning teams of developers are working independently without any effort towards interoperability with the other parts of the same project. When different work streams have been brought together the systems do not work together, because of the complete lack of coordination. For example, the new IT system was intended to have one overriding toggle, which would allow the entire new ballot mail verification processes to be turned on or off. By the final week of development before September 1, the Whistleblower learned that two teams had each developed their own toggle for different parts of the system. When the problem was discovered, the IT development team felt it was too late to correct this oversight, so two toggles, both of which are now necessary to turn off the entire system, were left in the final build.

19. In the final days before the planned September 1 launch date, the Whistleblower is aware of multiple USPS officials describing the election ballot mail IT system development process as “a shit show.”

20. Throughout the development process, the Whistleblower and other IT workers are concerned that one central aspect of the system has not been properly designed to avoid foreseeable human error.

21. We provide a more detailed list of concerns that arose during the development process in Appendix A, attached herein.

**The administration is hiding the truth about the likelihood of failure in the new ballot mail verification processes, including the "zero percent" failure rate during a secondary verification phase, which will potentially prevent vast numbers of ballots from being delivered**

22. The Whistleblower has identified two verification processes in the new USPS ballot mail systems, both of which are designed to verify whether barcodes/IMbs match the statewide lists uploaded into the Portal. These processes are significant potential points of failure for election officials trying to manage the new requirements and IT systems. These points of failure are diagrammed in Appendix B, attached herein.

23. When an election worker uploads a ballot mail batch manifest into the legacy bulk mail systems, USPS will run the first ballot mail verification process which could delay election officials and ballot delivery. This new automated verification process will compare the IMb details in the batch manifest against the Statewide List provided in the Portal. Additionally, the manifest verification process will confirm if the proper federal or state/local ballot indicators are included. If manifest data is complete and the IMbs match those found in the Portal, the State is authorized to bring the ballots to a USPS location which can receive and mail the ballots.[23] If the manifest verification fails, election officials will not be authorized to bring their ballot mail to the Postal Service. This is the first point of failure where state ballot mail can be held up.

24. As detailed herein, the election ballot mail IT systems were rapidly built and minimally tested. Accordingly, the opportunity for error and other failure with this new IT system comparing a batch manifest with the new statewide list is high.

25. The Final Rule on Ballot Mail for Federal Elections speaks only generally about the second verification process, a new section to be added to the DMM at 705.24.5:

> Verification under 705.24.5 will be performed at a BMEU or Post Office retail counter when an Outbound Federal Ballot mailing is presented for acceptance.
>
> …. The verification process is straightforward. … Relying on existing scanning technology and devices, the Postal Service will confirm the presence of scanned

[23] Ballot Mail for Federal Elections at 54981.

barcodes in the Federal Ballot Mail Portal. … This process can be completed promptly. Scanning a barcode generally takes less than a minute per mailpiece. Depending on how many barcodes are scanned, the verification process should take no more than a few hours for larger mailings, and potentially only a few minutes for smaller mailings. Authorized Ballot Mailers should remain at the BMEU or postal retail location during the verification process. If the Outbound Federal Ballot mailing meets the verification standards, it will be accepted by the Postal Service. No further action is needed by election officials or voters under the rule. (Ballot Mail for Federal Elections, 2026-17238 at 54981.)

26. The Whistleblower is aware of three critical aspects that USPS fails to mention in its Final Rule, which make the second barcode scanning verification another potential point of failure for ballot mail:

    a. that the USPS is adopting a zero-percent failure policy;

    b. that a zero-percent failure policy means that if a barcode scanner fails to correctly read one barcode in a batch, the entire batch is rejected and returned to the state; and

    c. that even in the week before the new system is meant to be ready, USPS does not have a clear policy as to how many ballots will be sampled in ballot mail batches.

27. Given states often deliver ballots to the USPS in large ballot batches, a zero percent failure rate during verification can derail vast numbers of ballots. The new scanning verification process is designed so that after a *single* failed bar code verification, USPS will stop the sample scanning and refuse to accept the entire batch of ballots.

28. Instead, as best as the Whistleblower understands, when a scanned ballot IMb is not found in the statewide list, USPS expects the state to take back the entire batch to cure the issue with the single ballot that failed verification. Only after a state cures the problem ballot, are they permitted to restart the process by uploading a new batch manifest to start the automated barcode verification over again. As designed, the process is entirely unforgiving. It could delay ballots by the thousands in repeated verification cycles - and thus prevent states from mailing enormous

numbers of ballots. These issues would only be compounded if potential IT failures identified herein were added to the mix.

29. USPS has not adopted such strict verification regimes with other large mailing contexts.[24]

30. Even under ordinary circumstances, a zero percent failure rate when spot checking in a batch of thousands or tens of thousands of mailings would be problematic. Based on information provided by the Whistleblower it is unclear whether other errors that occur during the barcode scanning verification could result in the verification to fail and the batch to be rejected.

31. Of course such technical issues are predictable - and likely. In 2017 the USPS Office of Inspector General ("OIG") audited mail scanning problems finding that for package tracking specifically, scanner problems were caused by GPS signal obstruction.[25] Another scanner issue, redacted from the report, contributed to errors in 5% of the audited scans.[26] Information made available to the Whistleblower also seems to allude to apparent concerns about potential limitations of scanners used to validate samples of ballots, such that not all sampling can occur in real time due to connectivity and cradling needs for certain scanners at mail acceptance facilities.

32. Information made available to the Whistleblower, indicates that the number of ballots sampled during scanning verification will vary depending on the type of USPS drop off location and the number of ballots mailed. At Post Offices and retail USPS locations, clerks are expected to scan each piece of mail. At a larger Business Mail Entry Unit ("BMEU") facility, clerks will spot check a certain number of ballots in each batch, as follows:

- Under 1000, sample 15
- 1,000 to 10,000, sample 350
- Over 10,000, sample 400

---

[24] *Supra* ¶ 9.
[25] United States Postal Service Office of Inspector General, Audit Report No. DR-AR-18-001, *Package Delivery Scanning-Nationwide* (Oct. 27, 2017), at 12, https://www.uspsoig.gov/sites/default/files/reports/2023-01/DR-AR-18-001.pdf.
[26] *Id*. at 13 - 14.

Most glaringly problematic with this range is that in mailings of just over 1000 ballots, an extraordinarily high sample percentage, as much as a third of the ballots, could be checked.

33. In the week before the planned September 1, 2026 launch, internal teams continued to discuss a likely reduction in the planned number of ballots sampled in each batch mailing to lessen delays due to sampling. Nevertheless, such a critical, late-stage change to basic system requirements underscores the internal confusion and process breakdown.

34. There is *no mention* of the foreseeable scanning failures anywhere in the Rulemaking process. In fact, in the Final Rule, the Postal Service expressly declined to provide additional information about ballot verification, including specifically, the "anticipated ballot-rejection rate."[27] This key omission by the Administration means that the audience of the rulemaking process are unable to factor in the likely consequence of the new ballot verification process.

35. Thus the secondary verification process as designed will be a significant ballot mail point of failure. It seems to the Whistleblower that a single scanning verification error will be treated as a failure that forces a state to: (1) pack up an entire batch of ballot mail; (2) take the entire batch back to their facilities, or a third party facility; (3) try to address the error and (4) resubmit the entire batch again.

**Violation of Court Orders**

36. On June 25, 2026, the U.S. District Court for the District of Massachusetts enjoined the USPS from implementing the EO, including Section 3 (regarding election ballot mail) with respect to the November 2026 mid-term elections, "or any earlier federal election in the Plaintiff States."[28]

37. Our client was initially informed that the project was stopped due to a court order and an injunction on or about June 25, 2026. However, just a few weeks later, on or around July 29, 2026, the project was suddenly resumed without explanation of what authority permitted USPS to ignore the court order. The Whistleblower was

[27] "The Postal Service declines to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal." Ballot Mail for Federal Elections at 54988.
[28] *See California v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490, at *17 (D. Mass. June 25, 2026).

not made aware of any court ruling that had lifted the injunction and allowed the Federal Ballot Mail Portal work to resume around July 29, 2026 (unlike when work was stopped when this first injunction was issued).

38. More alarming are the Administration's false statements that after the issuance of the injunction they ceased work directed by section 3 of EO 14399 - even as the work on the Federal Ballot Mail Portal continued in earnest.[29]

39. The Whistleblower further notes that the ongoing work on the Federal Ballot Mail Portal system seemed inconsistent with the USPS representations in the Final Rule: "Given injunctions currently in place in *State of California v. Trump*, No. 26-cv-11581 (D. Mass. June 25, 2026), and *League of Women Voters of Massachusetts v. Trump*, No. 26-cv-11549 (D. Mass. Aug. 11, 2026), the Postal Service will not take actions to implement the rule specifically for the 2026 election unless and until the government obtains relief from those injunctions."[30] The last of these injunctions was not lifted until August 26, 2026, after weeks of work were done on the new election ballot mail IT systems.[31] It's difficult to see such a blatant denial of work continuing at a breakneck speed to make the Portal ready to be used in the upcoming midterm elections, while those injunctions were in place. The Whistleblower reports that work continued even after the August 27, 2026 Temporary Restraining Order barring USPS from implementing several parts of the Final Rule for Ballot Mail.[32]

---

[29] John Hanna, *Trump's attacks on mail balloting and concerns over delays turn midterms spotlight on Postal Service*, AP News, (July 29, 2026), https://apnews.com/article/mail-ballots-postal-service-trump-midterms-b6eff42e8bd33e6b99468489f9f889aa (reporting that "In a letter to Democratic senators earlier this month, the heads of the Postal Service said they were abiding by the court rulings that had halted the executive order.").

[30] Ballot Mail for Federal Elections at 549662; *But see, Trump v. California*, 609 U.S. ___, No. 26A124 (Aug. 24, 2026) (per curiam) (granting the Trump administration's application for a stay of the lower court's injunction in *California v. Trump)*.

[31] League of Women Voters of Mass. v. Trump, No. 1:26-cv-11549-IT, Dkt. 204, at 9 (D. Mass. Aug. 26, 2026).

[32] League of Women Voters of Mass. v. Trump, No. 1:26-cv-11549-IT, Dkt. 218 at 10 (D. Mass. Aug. 27, 2026), https://storage.courtlistener.com/recap/gov.uscourts.mad.298449/gov.uscourts.mad.298449.218.0_1.pdf

## Conclusion

40. Our client, a lawful anonymous whistleblower, has come forward to flag a foreseeable catastrophic disruption to our coming nationwide elections based on the reckless pursuit of readying a new, insufficiently tested, poorly planned mail-in ballot screening system. As of the date of this disclosure, the USPS is aiming to have this system ready for public release on September 1, 2026. Our client's concern that the new election ballot mail IT systems will crash the USPS processing of mail ballots in the upcoming election cycle is only heightened by the *repeated failures of its components during the compressed development process*. Moreover, the Whistleblower fears that work to develop the Portal and related election ballot mail IT systems violated the injunction and subsequent TRO while issued and active in *League of Women Voters of Massachusetts v. Trump*.[33]

41. Our client is understandably concerned about reprisal by Administration officials should their identity become known. As such we ask that reasonable steps be taken to maintain their anonymity throughout the whistleblowing process.

42. We respectfully submit this disclosure for inquiry and investigation into the development and implementation of the new election ballot mail IT systems. Specifically, we request referral of these materials to the USPS Office of Inspector General ("OIG"). The Whistleblower is approaching Congress *for this express purpose* due to their fear that OIG processes across the federal government have been rendered unsafe for employees to avail themselves of directly. The Whistleblower welcomes referral of the matter to any other oversight bodies with relevant authority and jurisdiction.

*<signatures on next page>*

[33] *See* League of Women Voters, Dkt. 183, at 27; League of Women Voters, Dkt. 218 at 10.

Sincerely,

David Kligerman, Esq.
Senior Vice President and Special Counsel
David.Kligerman@WhistleblowerAid.org

Kyle Gardiner, Esq.
Senior Counsel
Kyle.Gardiner@WhistleblowerAid.org

Enclosures: As stated.

## APPENDIX A

### Specific concerns related to development of the election ballot mail IT system

The Whistleblower became aware of the following concerns shared amongst the individuals building the "Federal Ballot Mail Portal":

a. The Whistleblower became aware that key IT development personnel, comprising a cross-section of the all teams required to build the election ballot mail IT systems began regular meetings on or about June 15, 2026.

b. From the outset of the IT development of and around the Federal Ballot Mail Portal technical requirements were constantly changing. workers on the project were shown constantly changing flowcharts spelling out processes that looked drastically different from one work day to the next.

c. The general approach by the leadership involved in regular meetings was simply to throw more resources at a problem, even as, in many cases, the problems were undefined requirements, and adding new workers to the team usually slowed things down.

d. Workers on the project found it futile to ask questions, because leadership and others in the regular meetings did not have sufficient authority to fix any problems or lacked sufficient information to provide a reliable answer, if an answer was provided at all. The collective wisdom became that IT workers were best off just doing the best they could with the limited information that they had.

e. Workers on the project expressed concerns about the requirements as they were asked to build the software and portal. One worker was told that the "requirements don't seem well thought out" and "rushed." A number of workers familiar with the IT process believed that the entire process seemed to be a "mess." Another opined that their main take away from the development of the project was serious "concern about it all."

f. A notable issue throughout the process, up to and including the final days available for testing in advance of the September 1st deadline, continued to be how "confused" workers seem to be about all aspects of project and work.

g. A senior USPS official's response to a team member's honest concern about the lack of testing and the quality of the code that could be produced in such a short timeframe was merely that, "We cannot fail." Without any offer of additional information or guidance, the official went on to say words to the effect that "everything had to work perfectly and there was no other choice."

h. In August the confusion and concern about the viability of the project grew.

i. The Whistleblower believes that IT teams felt pressured to come up with solutions to achieve big picture goals, and that leadership could not be bothered to provide workers the types of details that are usually critical to software solutions.

j. Throughout the development of the project, those giving guidance to tech developers lacked understanding of project parameters. Different team members continued to have different understandings of how the system is supposed to function which caused ongoing and greater confusion among the group.

k. While there continued to be **no clear written requirements for the software and IT system**, those developing the new election ballot mail IT system were placed in the position of trying to glean requirements from opaque comments at meetings. It continued to be clear that those giving directions did not understand exactly what was to be built. There was a growing concern that many were grasping at straws, trying to do their best to decipher cryptic instructions, and likely missing important details. Elements as basic to the project as whether a validation issue was a "warning" or an "error" continued to be unclear as leadership provided inaccurate information about these issues. To clarify, a warning allows a ballot to continue through the process while an error stops it. These occurrences reinforced the need for written requirements and the ongoing failures in communication.

l. On or about August 6, the IT team was informed about a changing deadline. USPS leadership directed the development team to have a final version of the Portal ready to launch, and be usable by state ballot mailers on September 1.

m. Around this time at least one senior USPS official seemed to up the stakes by becoming a more active voice pushing for project completion on the new

deadline. For example, when IT workers expressed concerns about the quality of the product under USPS leadership's compressed timeline, the senior official stated that they (the official) "were not trying to stop anyone from getting their ballots and what is the problem?" Employees went on to reiterate concerns that many teams were still missing details of how systems were supposed to work and that written requirements could ensure that everyone was on the same page. The senior official was dismissive of these concerns. The conversation continued with others repeating the need for clear requirements; while leadership insisted that it was easy to understand what was needed and also that there was no time to write down the requirements. The contradiction was obvious that it should not take a great deal of time to write down something that is easily understood.

n. Concern continued to grow and the Whistleblower became aware that IT teams referred to the largely oral requirements as a "moving target."

o. By the third week in August "user stories" – short, plain-language descriptions of a software feature written from the perspective of an end-user (focused on what a user wants to achieve and why) – were described as unusable "garbage". User stories that had been generated had incorrect information and needed to be updated.

p. Throughout this project, the Whistleblower understood that IT teams were siloed and not communicating with one another. Teams had so little understanding what other teams were working on such that when elements were brought together, the teams were unaware of various developments, creating more work to utilize even the completed portions of the work.

q. By August 20, there was a massive rush as teams tried to get "everything committed" – in order to meet the goal of getting the ballot mail systems ready for customer testing on August 24. The resulting chaos caused work to be overwritten. By this point IT workers were resigned that even if they could get the portal put together and working in the internal development environment, there would not be enough time to test and fix any issue that would inevitably arise in customer testing.

r. By August 21, teams continued to rush to complete the project. More problems

arose as mistakes were made and systems broke when new code was added. Simultaneously, teams were still receiving new requirements that day, so the project stayed in the development environment, until all new and broken elements were functional.

s. On August 22, it became clear **that there would not be a reasonable amount of time to test the system** if leadership wanted the portal to be usable by customers on September 1st. Workers felt that if the Portal were released that day it would completely crash.

t. By August 24 the expectation was that if somehow everything was accomplished on Monday the 24th, the code would end up in internal testing on Tuesday, August 25, then move to customer testing on Wednesday, August 26 - allowing only four work days to test. **For a system that manages something as important as handling voting and ballots, 4 days of user testing is entirely unreasonable.** Only leadership seemed to express hope that the September 1 deadline was viable. If a problem was found during testing, which was almost certain, the IT workers would need to fix it and that fix would need to move back to internal testing and then into customer testing again. If a problem wasn't found in the first 2 days, the fix could not make it back to the customer testing environment in time to meet the deadline.

u. In just the week prior to September 1, 2026, the Whistleblower learned that IT workers have described the election ballot mail development process as "a shit show."

## Appendix B

## Federal Ballot Mail Diagram

