**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01151-CJN |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **2**

I. Regulatory Background .......... 2

II. Litigation Background .......... 5

**ARGUMENT** .......... **7**

**I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS** .......... **8**

A. Many Plaintiffs lack Article III standing. .......... 8

B. The Final Rule is lawful. .......... 11

1. The Final Rule is authorized by statute. .......... 12

2. The Final Rule is consistent with the Constitution. .......... 19

3. Plaintiffs' remaining claims lack merit. .......... 21

**II. THE EQUITABLE FACTORS DISFAVOR INJUNCTIVE RELIEF.** .......... **28**

**III. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.** .......... **32**

**CONCLUSION** .......... **34**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) ... 12, 16

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) ... 27

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ... 11

*Associated Third Class Mail Users v USPS*,
600 F.2d 824 (D.C. Cir. 1979) ... 13

*Axon Enterprises v. FTC*,
598 U.S. 175 (2023) ... 24

*Biden v. Nebraska*,
600 U.S. 477 (2023) ... 17

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) ... 8

*Buchanan v. USPS*,
508 F.2d 259 (5th Cir. 1975) ... 25, 26

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ... 33

*Chamber of Com. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) ... 10

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ... 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 11

*Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*,
No. 21-cv-853 (JDB), 2022 WL 951271 (D.D.C. Mar. 30, 2022) ... 11

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ... 29

*Dalton v. Specter*,
511 U.S. 462 (1994) ..... 21

*DSCC v. Trump*,
No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) ..... 5, 6, 7

*DSCC v. Trump*,
No. 26-cv-1114 (CJN), --- F. Supp. 3d ----, 2026 WL 1487833 (D.D.C. May 28, 2026) .... 7, 30

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ..... 8

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019) ..... 10

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..... 9, 10

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ..... 10

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir.), *reh'g en banc denied*, 2025 WL 2709437
(D.C. Cir. Aug. 28, 2025) ..... 21

*Hall v. Hall*,
584 U.S. 59 (2018) ..... 8

*Heritage Found. v. DOJ*,
2026 WL 1766549 (D.D.C. June 19, 2026) ..... 27

*Jones v. District of Columbia*,
177 F. Supp. 3d 542 (D.D.C. 2016) ..... 31

*Lackey v. Stinnie*,
604 U.S. 192 (2025) ..... 16

*League of Women Voters of Mass. v. Trump*,
1:26-cv-11549-IT, 2026 WL 2539946 (D. Mass. Aug. 27, 2026) ..... 6, 18

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..... 9

*Learning Res., Inc. v. Trump,*
607 U.S. 229 (2026) ..... 17

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 8

*LULAC v. EOP*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 19

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 29

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) .......... 30

*Mittleman v. Postal Regul. Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) .......... 12, 33

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 8

*NAACP v. USPS*,
No. 20-cv-2295 (EGS), 2026 WL 1893762 (D.D.C. July 1, 2026) .......... 17, 20

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) .......... 12

*New York v. Trump*,
181 F.4th 132 (D.C. Cir. 2026) .......... 23, 24, 25

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 28

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 12, 13

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) .......... 7

*Pennsylvania v. DeJoy,*
490 F. Supp. 3d 833 (E.D. Pa. 2020) .......... 26

*Postal Police Officers Ass'n v. USPS*,
502 F. Supp. 3d 411 (D.D.C. 2020) .......... 26

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ........ 7

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ........ 8

*Sibley v. Alexander*,
916 F. Supp. 2d 58 (D.D.C. 2013) ........ 30

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 8

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ........ 10

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ........ 27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 8

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ........ 2, 6, 29

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 33

*Twin Rivers Paper Co. v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) ........ 11

*USPS v. Council of Greenburgh Civic Ass'ns*,
453 U.S. 114 (1981) ........ 13

*USPS v. Postal Regul. Comm'n*,
599 F.3d 705 (D.C. Cir. 2010) ........ 23

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) ........ 30

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006) ........ 24

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ........ 31

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 28

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 7, 8, 28, 29

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 30, 31

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ........ 19, 20

U.S. Const. art. I, § 8, cl. 7 ........ 20

**Statutes**

5 U.S.C. § 552a ........ 27

5 U.S.C. § 705 ........ 33

39 U.S.C. § 102 ........ 23, 24

39 U.S.C. § 401 ........ *passim*

39 U.S.C. § 402 ........ 13

39 U.S.C. § 403 ........ 23, 24

39 U.S.C. § 404 ........ 2, 13, 23

39 U.S.C. § 410 ........ 27, 33

39 U.S.C. § 3001 ........ 15, 21, 22, 33

39 U.S.C. § 3002 ........ 22

39 U.S.C. § 3002a ........ 22

39 U.S.C. § 3005 ........ 21, 33

39 U.S.C. § 3007 ........ 21, 33

39 U.S.C. § 3012 ........ 21, 33

39 U.S.C. § 3661 ........ 25, 26

39 U.S.C. § 3662 ........ 23, 25

39 U.S.C. § 3663 ........ 23, 25

**Regulations**

75 Fed. Reg. 282 (Jan. 5, 2010) ........ 14

90 Fed. Reg. 9843 (Feb 19, 2025) ........ 14

91 Fed. Reg. 54,966 (Aug. 26, 2026)........ *passim*

Executive Order 14,399, 91 Fed. Reg. 17,125 (Apr. 3, 2026) ........ 4, 5

**Other Authorities**

Domestic Mail Manual 703.8.0 ("DMM"), https://pe.usps.com/text/dmm300/703.htm#ep1174014 ........ 4

Jen Rice, Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it, Democracy Docket (Aug. 27, 2026), https://perma.cc/SFB6-PAVD ........ 31

U.S. Korean War & Vietnam War M26 Fragmentation Grenade, EnemyMilitaria.com, https://perma.cc/F9CH-LYX4 ........ 15

U.S. Postal Service, Kit 600: Official Election Mail Guide (''Kit 600''), https://about.usps.com/kits/kit600.pdf ........ 4, 18

U.S. Postal Service, Postal Operations Manual § 171.3, https://perma.cc/HY9N-TJ6Q ........ 18, 20

# INTRODUCTION

These lawsuits, in their current form, are largely premised on the theory that the United States Postal Service (USPS) intends to seize control of the administration of federal elections. It does not. Plaintiffs' contrary narrative was seemingly formed months before the Final Rule was ever published, and it is impossible to square with the actual text of the actual Rule—which differs in material respects from the doomsday assumptions that animated Plaintiffs' earlier filings.

The Final Rule imposes modest informational requirements on senders of outbound federal ballot mailings. It creates standardized design and review requirements for federal ballot envelopes that have long been recommended by the Postal Service, and some of which are already in use in many States. It requires uploading the name-and-address information of intended recipients of ballot mail in an online portal—information that all election officials sending ballot mail necessarily already possess (or they couldn't send that mail in the first place), along with unique barcodes for these recipients. And critically, the Final Rule allows States—not the Postal Service—to identify which voters should receive ballots by mail, and makes no changes whatsoever to the roster of State residents who are or are not permitted to vote by mail. USPS will not scrutinize those decisions or alter that information in any way—instead leaving it entirely up to the States to accurately and lawfully identify its residents who are eligible to vote by mail. The Postal Service will not determine voter eligibility, ballot content, mailing or receipt deadlines, or ballot-counting procedures. The Rule does not displace a single State election law. And it need not and should not prevent a single voter from voting by mail.

These improvements and modernizations of the Postal Service's infrastructure for supporting this particularly sensitive category of mail are fully consistent with USPS's statutory and con-

stitutional authority. The Postal Service has long taken election-specific actions surrounding envelope design and processing, such as priority processing for ballot mail bearing the election mail logo. And the Postal Service has likewise relied on the same statutory authorities at issue here to adopt special handling and conditions on acceptance for other types of mail that are similarly sensitive yet non-dangerous, raising unique operational concerns—such as cremated remains or replica explosives. There is no material distinction between those prior actions and this one with respect to the legal authority of the Postal Service. Accordingly, Plaintiffs are unlikely to succeed on the merits, and their preliminary-injunction motions should be denied.

Even if Plaintiffs could show a likelihood of success, the equities weigh against their request for extraordinary preliminary-injunctive relief. For one thing, the Supreme Court held last week that, because appellate review in the ordinary course "would come too late for the 2026 midterms," an erroneous injunction would necessarily cause irreparable harm to the government. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). And although Plaintiffs' filings emphasize their fears of last-minute confusion and chaos, they ignore the mirror-image problems that are likely to result from the *granting* of their motions—especially on the heels of the Supreme Court's stay and the subsequent vacatur of the previous court orders that had erroneously constrained the Postal Service's authority.

Plaintiffs' motions for a preliminary injunction should be denied.

## <u>BACKGROUND</u>

### I. Regulatory Background

On August 26, 2026, the Postal Service published the Final Rule in the Federal Register. *See* USPS, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). USPS issued the Rule under its rulemaking and operational authority in 39 U.S.C. §§ 401 and 404(a)(1). *See*

*id.* at 54,971. Specifically, Congress empowered USPS "to adopt . . . such rules and regulations . . . as may be necessary in the execution of its functions and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress also provided the Postal Service "all other powers incidental, necessary or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). One of those specific powers is "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

In accordance with authority delegated by Congress, the Final Rule amends USPS's Domestic Mail Manual to impose modest reporting and design requirements on federal ballot mail envelopes. The Rule requires federal ballots transmitted through the U.S. Mail to be mailed in envelopes that include the official Election Mail logo, are automation compatible,[1] and use unique barcodes. *See* 91 Fed. Reg. at 54,990-91. State and local election officials must submit their envelope designs for review to ensure compliance with those requirements, and provide the Postal Service with certain delivery-related information about the federal ballot mail they intend to send. *Id.* at 54,991. Specifically, the unique barcodes applied to each ballot mail envelope, along with the name and address of the recipient and the State sending the ballot, must be uploaded to an online portal prior to presenting an outbound ballot mailing. *Id.* at 54,990. Election officials may continually update this information as many times as necessary. *Id.* at 54,991. When outbound federal ballot mail is presented for mailing, the Postal Service will match the sampled barcode data to the portal data, to ensure compliance with the Rule. *Id.* at 54,990-91. All mailings that comply

[1] Automation compatibility ensures that mail can be processed by the Postal Service's high-speed mail processing equipment, ensuring fast and accurate delivery. Mail that is not automation compatible can require hand processing by postal workers, which may result in slower delivery. *See* USPS, *Business Mail 101: Automation*, available at https://perma.cc/RY48-FWT9.

with these requirements will be accepted; those that do not will be "returned to the authorized ballot mailer" who may then "address the error(s)" and "resubmit[] the mailing." *Id.* at 54,991.

USPS will not perform any verification of voter eligibility; its role is limited to ensuring that envelopes comply with the rule's design requirements—as the rule emphasizes, "[e]ligible voters will therefore be listed [in the Portal] by and at the discretion of election officials, and the Postal Service will not second-guess the states' submissions. State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail." *Id.* at 54,969. Plaintiffs likewise need not worry about the "level of accuracy" of any records maintained by the federal government in any federal database, *LULAC* Supp. Compl. ¶ 126—these lists will consist entirely of information provided *by the States*, and the States alone.[2] On or near the date of the election, the Postal Service will also provide each State that used the U.S. Mail to transport ballots with a single list containing all the state's submissions for the ballots it intended to send. 91 Fed. Reg. at 54,993-94.

Several features of this Rule are not new: for years, the Postal Service has recommended that federal ballot mail envelopes use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing. *See* U.S. Postal Service, Kit 600: *Official Election Mail Guide* (''Kit 600''), https://about.usps.com/kits/kit600.pdf; *Domestic Mail Manual* 703.8.0 ("DMM"),

[2] This is a material departure from Plaintiffs' original, mistaken assumptions about how Executive Order 14,399 would be implemented. *See, e.g.*, Mem. in Supp. of NAACP Pls.' First Mot. for Prelim. Inj. at 37-38 ("NAACP and Common Cause members include mail-in ballot voters who are likely to be erroneously excluded from these USPS lists. . . . It is well documented that the federal databases the Order directs the USPS to rely on are not useable or reliable for verifying citizenship."), ECF No. 54. Indeed, as recently as earlier today, the *DSCC* Plaintiffs made a filing in this Court asserting that the "the Rule requires" the Postal Service to "refuse delivery to voters it deems not entitled to vote by mail." ECF No. 182 at 2. Plaintiffs are materially mistaken, as is clear from the text of the Rule itself.

https://pe.usps.com/text/dmm300/703.htm#ep1174014. This Rule simply turns "these longstanding recommendations"—which many States have already adopted, at least in part, and some have long advocated for—into requirements. 91 Fed. Reg. at 54,986; *see id.* at 54,978. These requirements are only a baseline; "nothing in the [R]ule prevents or discourages election officials from including envelope design elements required by state law," nor will the Rule "create a single, uniform ballot envelope design across all states[.]" *Id.* at 54,978. And most importantly, the Rule "leav[es] the administration of elections firmly in the hands of the [S]tates," *id.* at 54,970; "the Postal Service will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots," *id.* at 54,978.

The Final Rule explains that these requirements "will afford significantly enhanced visibility into the sending of Federal Ballot Mail, and this will in turn facilitate law enforcement efforts by enabling law enforcement to better detect potential issues meriting further investigation." 91 Fed. Reg. at 54,969. Ultimately, "[w]hether or not voter fraud is common or uncommon," the Rule is intended "to facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal elections," *id.*—at least with respect to the narrow but important role played by the Postal Service, in States that choose to use the U.S. mail to send ballots.

## II. Litigation Background

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification & Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Apr. 3, 2026). "That Executive Order directs the Department of Homeland Security, the United States Postal Service, and other agencies to begin developing new rules and procedures for mail voting in the upcoming midterm and future elections." *DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *1 (D.C. Cir. July 28, 2026) (per curiam). "The day after the Executive Order issued, and before any of those

agencies acted, Plaintiffs . . . sued in" this Court. *Id.* After extensive briefing and oral argument, this Court "subsequently denied preliminary relief." *Id.* The D.C. Circuit affirmed on ripeness grounds. *See id.* The Supreme Court subsequently reached the same result (on grounds of both standing and ripeness) in parallel litigation in the District of Massachusetts, staying another district-court injunction pending appeal. *See Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) ("Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule.").

On the morning of August 26, 2026, the Postal Service published the Final Rule in the Federal Register. *See* U.S. Postal Service, *Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). The next day, August 27, 2026, the U.S. District Court for the District of Massachusetts entered a 14-day temporary restraining order against some (though not all) implementation of the Final Rule with respect to the November 3, 2026 elections. *See League of Women Voters of Mass. v. Trump*, No. 1:26-cv-11549-IT, 2026 WL 2539946, at *1 (D. Mass. Aug. 27, 2026) (Talwani, J.); *see also* Defs.' Notice of Compliance, *League of Women Voters of Mass. v. Trump*, No. 1:26-cv-11549-IT ("*LWVMA*"), ECF No. 227 (D. Mass. Aug. 28, 2026); Defs.' Notice of Compliance, *California v. USPS*, 1:26-cv-13917-IT ("*California II*") ECF No. 57 (D. Mass. Aug. 28, 2026). The United States appealed the entry of a temporary restraining order to the First Circuit, and also sought a stay pending appeal. That stay request (after denial by the district court) remains pending before the First Circuit, as of this filing. *See League of Women Voters of Mass. v. Trump*, No. 26-1988 (1st Cir.); *California v. U.S. Postal Service*, No. 26-1987 (1st Cir.). The United States has also sought relief from the Supreme Court, a request that also remains pending as of this filing. *See U.S. Postal Service v. California*, No. 26A927 (U.S. Sep. 3, 2026).

Earlier this evening, the U.S. District Court for the District of Massachusetts entered a preliminary injunction. *See* Op. & Order (Sep. 4, 2026), *LWVMA* ECF No. 285, *California II* ECF No. 156. In that same order, the court also dissolved the temporary restraining order and denied the government's request for a stay of pending appeal. *See id.* at 46-47. The United States has now appealed that order to the First Circuit. *See California v. USPS*, No. 26-2031 (1st Cir.).

Meanwhile, in this Court, all three groups of Plaintiffs filed supplemental complaints challenging the Postal Service's Final Rule. *See* ECF Nos. 175, 176, 177. All three groups of Plaintiffs also filed new motions for a preliminary injunction. *See* ECF Nos. 163, 171, 172. Defendants now oppose those motions.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "To obtain that remedy, a plaintiff must show 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *DSCC v. Trump*, No. 26-cv-1114 (CJN), --- F. Supp. 3d ----, 2026 WL 1487833, at *3-4 (D.D.C. May 28, 2026) (quoting *Winter,* 555 U.S. at 20), *aff'd*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) (per curiam). "The balance-of-equities and public-interest factors merge where the government is a party 'because the government's interest *is* the public interest.'" *Id.* (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Id.* (quoting *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014)). Because Plaintiffs have not carried this burden, the Court should deny their motions for a preliminary injunction.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A. Many Plaintiffs lack Article III standing.

"At the preliminary injunction stage," Plaintiffs "must make a 'clear showing' that" they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). That means Plaintiffs "must set forth by affidavit or other evidence specific facts," *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation omitted), showing they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Although Defendants do not dispute standing for the *DSCC* Plaintiffs,[3] "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). The *LULAC* and *NAACP* Plaintiffs cannot piggyback upon the standing of a *DSCC* Plaintiff. Though the cases may have been consolidated for the Court's convenience under Rule 42, each case "retains its independent character." *Hall v. Hall*, 584 U.S. 59, 66 (2018); *see id.* at 70. In other words, consolidation "leaves the parties' legal . . . duties intact," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010), chief among which is the burden of the *LULAC* and *NAACP* Plaintiffs, as distinct parties "invoking federal jurisdiction," to establish Article III standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The League of United Latin American Citizens;

[3] Specifically, Defendants do not dispute the associational standing of the Democratic Party Organizations—DSCC, DCCC, Democratic National Committee, and Democratic Governors Association—or the individual standing of House Minority Leader Jeffries and Senate Minority Leader Schumer in their capacity as candidates for office. *See Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76 (2026).

Secure Families Initiative; Arizona Students' Association; National Association for the Advancement of Colored People; Common Cause; Common Cause Education Fund; Black Voters Matter Fund, Inc.; and, BVM Capacity Building Institute, Inc. all fail this test.[4]

The organizational Plaintiffs may "sue on their own behalf" only if they show "injury in fact, causation, and redressability." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citation omitted). They contend the Final Rule makes their goals of increased voter registration and participation harder to achieve. *See LULAC* PI Br. at 18, ECF No. 171-1; *NAACP* PI Br. at 11–12, ECF No. 172-1. That does not suffice. "A plaintiff must show far more than simply a setback to the organization's abstract social interests," "no matter how longstanding the interest and no matter how qualified the organization" or the strength of its "opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (citation omitted).[5]

Otherwise, the organizational Plaintiffs attempt to show standing through the expenditure of time, effort, or money adapting their voter assistance efforts to account for the Final Rule. *See LULAC* PI Br. at 18-19; *NAACP* PI Br. at 12–19. But the Supreme Court has been clear that an "organization cannot manufacture its own standing in that way," *i.e.*, by "engaging in public advocacy and public education" in response to a governmental action. *All. for Hippocratic Med.*, 602 U.S. at 394. To accept "that theory would mean that all the organizations in America would

[4] Defendants likewise do not dispute the standing of the City of Madison, Wisconsin; Travis County, Texas; or the Travis County Clerk (in her official capacity), as political subdivisions of States with election administration responsibilities that are directly regulated by the Rule.

[5] Given the Supreme Court's more recent standing decisions, Plaintiffs' heavy reliance on *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), is misplaced, *see LULAC* PI Br. at 19. After *Alliance for Hippocratic Medicine*, an organizational plaintiff *cannot* show "injury for purposes both of standing and irreparable" just because a new government action "make[s] it more difficult for the [organization] to accomplish [its] primary mission of registering voters." *Newby*, 838 F.3d at 9.

have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

The NAACP, Common Cause, and the Black Votes Matter Fund claim their "voter-education services are distinct from the 'advoca[cy] against' government action at issue in" *Alliance for Hippocratic Medicine*. *NAACP* PI Br. at 17 n.5. But the Supreme Court's opinion is not so readily distinguished. The "medical associations" in *Alliance* allegedly "spen[t] 'considerable resources' to the detriment of other spending priorities" to "better inform their members and the public about" a particular drug and to "engag[e] in public advocacy and public education." 602 U.S. at 394. Those activities are materially indistinguishable from the NAACP expending resources "educat[ing] voters about how to vote" in light of the Rule. *NAACP* PI Br. at 17 n.5. So the Supreme Court's conclusion applies equally here: the NAACP, Common Cause, and the Black Votes Matter Fund "cannot manufacture [their] own standing" through efforts "to gather information and advocate" about the Rule. 602 U.S. at 394.

The organizational Plaintiffs fare no better at "assert[ing] the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Associational standing requires, among other things, "that at least one of [the group's] members has standing." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019). So at the very least, each organizational Plaintiff must "establish[] that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498. Because LULAC (ECF No. 171-6 ¶¶ 14–21) and Secure Families Initiative (ECF No. 171-7 ¶¶ 16–32) have "not identified a single member who was or would be injured by" the Final Rule, they "lack[] standing to raise this challenge." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011); *see FW/PBS, Inc. v. City of Dallas*, 493 U.S.

215, 235 (1990) (affidavit that "fails to identify the individuals" personally injured by challenged action cannot establish standing); *Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*, No. 21-cv-853 (JDB), 2022 WL 951271, at *4 (D.D.C. Mar. 30, 2022) ("[T]he D.C. Circuit held that an organization failed to establish standing when it had 'failed to submit any member affidavits with its opening brief,' did not 'identify any individual members' in its own affidavit, and 'fail[ed] to identify individual members' in its brief.") (quoting *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019)).

Although the Arizona Students' Association (ECF No. 171-8 ¶ 21), the NAACP (*NAACP* PI Br. at 22-23), and Common Cause (*NAACP* PI Br. at 24) discuss the risk that particular members will not be able to vote in the November 2026 election, the alleged "potential future" injury does not suffice to establish that the members own standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Their injury is neither actual nor imminent; rather, it rests on a "speculative chain of possibilities" involving "the decisions of independent actors," *id.*—that is, their respective state governments' unwillingness or inability to facilitate mail-in voting in accordance with the Final Rule. Thus, the Court should "reject as overly speculative" the alleged future injury to the identified members of the Arizona Students' Association, the NAACP, and Common Cause. *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).

**B. The Final Rule is lawful.**

On the merits, the Final Rule is ultimately a regulation of the U.S. mail, and a modest one at that—not a federal takeover of elections by the Postal Service. That reality undermines virtually all of Plaintiffs' claims and illustrates why they are unlikely to succeed on the merits.

**1. The Final Rule is authorized by statute.**

**a.** As a threshold matter, although federal-court litigation challenging significant government policies has become the norm in recent years, the Final Rule at issue here is not subject to the same form of review as most of those cases. That is because "the Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (citing 39 U.S.C. § 410(a)).

To be sure, "the absence of a cause of action for judicial review under the APA does not necessarily foreclose all judicial review." *Id.* at 307. "But while such review may be available, it is quite narrow," *id.*, in at least two ways. One, "[i]t is available only to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Id.* (quoting *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)) (and citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (asking whether the agency's action was "in excess of its delegated powers and contrary to a specific prohibition in the Act [that] is clear and mandatory"). And two, that sort of non-statutory ultra vires claim requires identification of an agency violation of "a specific prohibition" in a statute that "is clear and mandatory." *Leedom*, 358 U.S. at 188; *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("The Postal Service is correct that a challenged action must contravene a clear and specific statutory mandate to be susceptible to ultra vires review."). In other words, as the Supreme Court put it last year, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). So too here.

For the most part, Plaintiffs do not even try to identify any "specific" or "mandatory" statutory provision that the Final Rule violates. Instead, they "basically dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. But even if the Court "disagree[s] with the

[Postal Service's] conclusion" in the Final Rule about the reach of its authority, that sort of routine "statutory argument falls well shy of a meritorious *Leedom v. Kyne* claim." *Id.* That alone is enough to reject Plaintiffs' statutory-authority claims.

**b.** Whatever the appropriate standard of review, Congress authorized the Postal Service "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress further granted the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). Those specific powers include the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

Interpreting these provisions, the Supreme Court has stated that, "under 39 U.S.C. § 401 the Postal Service is broadly empowered to adopt rules and regulations designed to" maintain an efficient system for collecting, sorting, and delivering mail nationwide. *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 123 (1981); *see Associated Third Class Mail Users v USPS*, 600 F.2d 824, 826 n.5 (D.C. Cir. 1979) ("[T]he Service is authorized under 39 U.S.C. § 401(2) (1976) to promulgate regulations to further the objectives of Title 39."). Under these authorities and precedents, the Postal Service's general rulemaking powers include authority to impose reasonable requirements for envelope design and labeling and to require that mailers provide basic information regarding particularly sensitive items. *See* 39 U.S.C. §§ 401-404.[6]

[6] Zeroing in on the word "necessary," the *DSCC* Plaintiffs note that some of these statutory authorities have been amended, in minor respects, since some of the cases cited in the Final Rule

As explained in the Final Rule, *see* 91 Fed. Reg. at 54,974, the Postal Service has invoked these authorities before—including where, as here, the type of mail in question is sensitive but non-dangerous. For example, cremated human and animal remains must be transported through specific types of USPS-provided boxes, and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb 19, 2025) (implementing rules concerning the sending of cremated remains in specific types of USPS-provided boxes because the Postal Service understands such remains are "sensitive matter and believes this will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, also require special handling to prevent operational disruptions based on the misperception that they are actual explosives—rather than being prohibited from the mail altogether, must be mailed in certain ways, which include in-person presentation to a retail counter and shipment via Registered Mail. *See Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282, 283 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process"). This Rule functions similarly, and for similar reasons—although ballot mail does not present the same operational issues as cremated remains or replica explosives, it is sensitive mail that raises unique operational considerations. Namely, it creates an opportunity for the mails themselves to be used to facilitate serious criminal activity, *see* 91 Fed. Reg. at 54,969—and the Postal Service must have

---

were decided. *DSCC* PI Br. at 17 (citing 91 Fed. Reg. at 54,971-72). But they quote the Final Rule out of context to suggest, incorrectly, that the Postal Service was somehow unaware of those legislative changes. *See id.* (quoting only the words "broad" and "necessary"). In any event, as the other Plaintiffs seem not to dispute, *see, e.g.*, *NAACP* PI Br. at 34-35, the current statutes authorize the issuance of regulations "as *may* be necessary in the execution of [the Postal Service's] functions," 39 U.S.C. § 401(2) (emphasis added), and also delegate "all other powers incidental, necessary, *or* appropriate to the carrying on of its functions or the exercise of its specific powers," *id.* § 401(10) (emphasis added). So nothing turns on those minor legislative edits here, nor on Congress' use of the word "necessary" in particular.

at least as much authority to prevent that sort of harm as it does to ensure that mortal remains are not lost or delayed in the mail.

Plaintiffs respond to these examples by suggesting that "those regulations were based on the possibility" that "an explosive package could injure employees and damage infrastructure or other mailpieces." *DSCC* PI Br. at 20, ECF No. 163-1. They seem to misunderstand the regulations. Of course, neither cremated remains nor *replica* explosives—*e.g.*, a historical replica of a grenade, sold as a novelty collector's item[7]—could ever "injure employees" or "damage infrastructure." *Id.* So Plaintiffs' observation that separate statutory authority regulates the mailing of "hazardous material," *LULAC* PI Br. at 30 (citing 39 U.S.C. § 3001), if anything, makes *Defendants*' point—which is that, contrary to the rhetoric in Plaintiffs' filings, the Postal Service has previously relied on the same statutory authorities as here, in order to place analogous restrictions on the mailing of sensitive but non-dangerous items that raise specific operational concerns. Obviously, ballot mail and toy grenades do not raise *the same* operational concerns—but that distinction has nothing to do with the legal question before the Court, about the Postal Service's statutory authority more generally.

Nor is the Postal Service legally obligated to turn a blind eye to the use of the mail to facilitate specific *types* of fraud. Consider, for example, a scenario in which retirement communities are repeatedly targeted for elder-abuse mail scams: there is no evident reason why the Postal Service could not impose special design and registration rules for envelopes used to send solicitations to such locations. This Rule follows the same basic form, by acknowledging the indisputable reality that election-related mail is particularly sensitive, and that crimes relating to election mail

[7] *See, e.g.*, U.S. Korean War & Vietnam War M26 Fragmentation Grenade, ENEMYMILITARIA.COM, https://perma.cc/F9CH-LYX4.

are particularly important. And so, "[w]hether or not voter fraud is common or uncommon, the Postal Service has the legal authority to take the measures in this rule to facilitate enforcement of federal law[.]" 91 Fed. Reg. at 54,969.[8]

**c.** In the face of these broad grants of statutory authority over "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," 39 U.S.C. § 404(a)(1)—and the Postal Service's obvious authority to adopt modest design requirements to reduce the risk that the mail is used to commit fraud—Plaintiffs try to shift the focus away from the text, and instead to the context of elections. And so, Plaintiffs' arguments that the Postal Service lacks statutory authority here are largely premised on their repeated assertions that USPS doesn't have the power to regulate *elections*. But that argument fails to grapple with the very limited nature of the rule—which does not regulate elections at all.

Under the Rule, States can continue to mail ballots to whomever they wish; the rule does not regulate the form or content of the ballots themselves, the timeline for transmission of ballots, voter eligibility, vote-by-mail eligibility, or anything similar. It regulates only the process by which the States design, label, and send those envelopes through the U.S. mail (should they elect to use the U.S. mail to send ballots). As the Rule itself makes clear, "[t]he Postal Service does not purport to alter the eligibility of any individual to vote under state or federal law." 91 Fed. Reg.

[8] The *NAACP* Plaintiffs alone suggest that "[t]he D.C. Circuit has already rejected an analogous assertion of authority by USPS," referring to *Aid Association for Lutherans v. USPS*, 321 F.3d 1166, 1168-70 (D.C. Cir. 2003). *NAACP* PI Br. at 37. But there is no sound analogy: that case was simply a statutory-interpretation dispute about different statutory text, which has little bearing on the statutory question before this Court. And the D.C. Circuit's methodology in that case—including a lengthy discussion of *Chevron*, *see id.* at 1173-75, and explicit and extensive reliance on legislative history, *id.* at 1176-78—is not likely to be helpful to this Court in conducting a more modern, text-based statutory-interpretation analysis. *See, e.g.*, *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025) ("When interpreting a statute, we begin with the text.").

at 54,991. Both before and after this Rule, "[t]he Postal Service does not have any legal responsibility for management of state voter rolls or administration of federal elections within each state." *Id.* In other words, this is a regulation of the U.S. mail—not a regulation of elections.

That reality is also fatal to Plaintiffs' invocation of the major-questions doctrine, through which courts often consider the "economic and political significance'' of the authority at issue. *Learning Res., Inc. v. Trump,* 607 U.S. 229, 246 (2026). "[A]lthough actual changes to eligibility of voters to vote by mail might fairly be described as having political significance in some sense, this rule makes no such changes—it instead leaves voter-eligibility unchanged, requiring only certain modest envelope design and data reporting standards." 91 Fed. Reg. at 54,973. And the "economic significance" of the rule is not remotely comparable to any prior major-questions case. *See, e.g.*, *Learning Resources*, 607 U.S. at 246 ("could be worth $15 trillion"); *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) ("between $496 billion and $519 billion"). Ultimately, requiring conditions on the sending of certain types of mail that raise particular sensitivities or operational concerns is hardly some "unheralded power representing a transformative expansion of [USPS's] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (internal quotations and citation omitted). To the contrary, USPS has invoked these same statutory authorities in the past, to accomplish similar goals. *See supra* at 14-15; *see also* 91 Fed. Reg. at 54,974 (same). The major-questions doctrine does not authorize States to exempt their election mail from the Postal Service's regulation of mail delivery.

In any event, Plaintiffs cannot seriously contend that the Postal Service is disabled from adopting *any* election-mail-specific rules, as their co-counsel and co-Plaintiffs have long advocated for and benefited from specific ballot-mail envelope design elements and the prioritization of such mail. *See NAACP v. USPS*, No. 20-cv-2295 (EGS), 2026 WL 1893762, at *1 (D.D.C. July

1, 2026), *appeal filed*, No 26-5257 (D.C. Cir. July 9, 2026); Kit 600 at 4. Indeed, the Postal Service has long had election-specific rules and practices that have never been justified by reference to any election-specific statutory language—for example, the Postal Operations Manual provides that, even if a mailer does not affix the necessary postage, "absentee balloting materials must not be detained or treated as unpaid mail," and must instead "be promptly dispatched and delivered to the addressees." U.S. Postal Service, *Postal Operations Manual* § 171.3, *available at* https://perma.cc/HY9N-TJ6Q. If the Postal Service has *no* legal authority to make any rules specific to election-related mail—as seems to be Plaintiffs' theory—it is hard to understand how those longstanding efforts would be lawful. And when it comes to the Postal Service's legal authority, it is no answer that those prior efforts were focused on reducing the risk of disenfranchisement, rather than (as here) to "reduce the risk of fraud, and help protect the integrity of federal elections." 91 Fed. Reg. at 54,969. Those are policy distinctions, not legal distinctions.

**d.** The recent orders issued in the District of Massachusetts, in granting only certain forms of injunctive relief, seem to rely implicitly on a distinction between permissive and mandatory rules—and thus continue to allow certain provisions of the Rule to remain in effect for the upcoming elections, as long as those provisions are treated as voluntary. *See League of Women Voters of Mass.*, 2026 WL 2539946, at *5; Op. & Order (Sep. 4, 2026) at 47-48; *see also* Defs.' Notice of Compliance, *California II* ECF No. 57, *LWVMA* ECF No. 227. But Defendants are aware of no textual basis in any potentially relevant statutory text for that distinction. And the prior regulatory examples (about cremated remains and replica explosives) cited above, *see supra* at 14-15, and in the Final Rule, *see* 91 Fed. Reg. at 54,974, are likewise mandatory, not permissive.[9]

[9] The *DSCC* Plaintiffs partially quote from a colloquy between this Court and undersigned counsel at the May 24, 2026 hearing in this case, in which, at that very preliminary stage, counsel

**2. The Final Rule is consistent with the Constitution.**

Under the Elections Clause, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Plaintiffs thus rely heavily on the argument that the "Constitution entrusts Congress and the States—not the President—with the power to regulate federal elections." *LULAC v. EOP*, 808 F. Supp. 3d 29, 41 (D.D.C. 2025). These arguments attack a strawman.

The Final Rule "leav[es] the administration of elections firmly in the hands of the [S]tates." 91 Fed. Reg. at 54,970. "Eligibility for mail-in and absentee voting will continue to be governed by state law; state and local election officials will still determine which individuals are eligible under these laws; and state and local election officials will determine whether completed ballots are eligible to be counted." *Id.* at 54,978. "[T]he Postal Service will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots." *Id.* The Final Rule is thus a modest exercise of the Postal Service's own judgment about how "to exercise *its* statutory authority"—granted by Congress—"to faithfully execute federal law and also to advance the Postal Service's operational interests[.]" *Id.* at 54,976 (emphasis added).

Similarly, Plaintiffs' filings argue repeatedly that the President does not have any constitutional authority to directly regulate elections, on his own. But the Rule was issued by the Postal

---

expressed a "hesi[tation] to just sort of canvas the U.S. Code for how . . . the Postal Service [could] do such a thing." *DSCC* PI Br. at 16 (quoting Hr'g Tr. at 83:9-10). That hesitation was warranted at that time, before the Postal Service had actually taken any action—as explained in the preceding sentence, which Plaintiffs omit from their brief: "I think the answer to that question would depend on exactly what the Postal Service is doing, what statutory authority they invoke to take that action, and it's just not the kind of thing that we can address in the abstract." Hr'g Tr. at 83:3-7. This Court, the D.C. Circuit, and the Supreme Court have all since agreed with that approach.

Service, not the President. Moreover, it is undisputed that *Congress* does have the authority to regulate in this area—whether the Rule is conceived as a regulation of the U.S. Mail, or even if framed (incorrectly, in the government's view) as a regulation of elections. After all, however one might characterize this Rule, all parties agree that *Congress* can directly regulate the manner of elections, U.S. Const. art. I, § 4, cl. 1 (Elections Clause), as well as the U.S. mail, U.S. Const. art. I, § 8, cl. 7 (the Postal Clause). So Plaintiffs' constitutional claims add nothing to this case. If the Postal Service's rule is unauthorized by Congress, *but see supra* at 12-18, then it is unlawful (without the need to address the Constitution at all). And if the Postal Service's rule is authorized by Congress, then that necessarily means there is no Elections Clause (or Postal Clause) problem. Indeed, Plaintiffs do not even argue that Congress has unlawfully delegated its authority to the Postal Service—nor could they.

In any event, Plaintiffs' constitutional-authority objection proves far too much. Again, the Postal Service has long used election-specific rules and practices. *See supra* at 18 (citing *Postal Operations Manual* § 171.3 (even without postage, "absentee balloting materials must not be detained or treated as unpaid mail" and instead must "be promptly dispatched and delivered to the addressees"). And these Plaintiffs' co-counsel and co-Plaintiffs have even filed lawsuits arguing that the Postal Service had not gone far *enough* in prioritizing election mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1. But if *any* election-specific regulation of the U.S. Mail violates the Constitution, all those prioritization efforts would have been equally unconstitutional—an implausible result that illustrates the untenable nature of Plaintiffs' theory.

Finally, Plaintiffs cannot repackage their statutory-authority arguments under the rubric of a "separation of powers" claim, as some of them try to do. *See, e.g*, *DSCC* PI Br. at 22-24 ("Because the Ballot Mail Rule lacks any congressional authorization, it also violates separation of

powers principles."); *see also NAACP* PI Br. at 39-41 (similar). Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The D.C. Circuit recently reaffirmed that principle. *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir.) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."), *reh'g en banc denied*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). So reframing their statutory-authority claims as "separation-of-powers" claims gets Plaintiffs no closer to relief.

**3. Plaintiffs' remaining claims lack merit.**

**a. Mailability.** Plaintiffs claim that the Rule impermissibly creates a new class of "nonmailable" material unauthorized by Congress and is therefore subject to APA review under 39 U.S.C. § 3001(m). *See DSCC* PI Br. at 19–20. But the Rule is not a qualifying "proceeding[] concerning the mailability of matter," 39 U.S.C. § 3001(m), and so is not subject to the APA. Most obviously, the Postal Service expressly disclaimed "creat[ing] a new category of 'nonmailable matter' into which Federal Ballot Mail as a class may generally fall." 91 Fed. Reg. at 54,973. Nor does the Rule constitute one of the types of proceedings covered by 39 U.S.C. § 3001(m). *See id.* 39 U.S.C. §§ 3005, 3007, 3012(c) (examples of proceedings).

Even if APA review of this claim were permissible, Plaintiffs are wrong on the merits. Plaintiffs suggest that the Postal Service is precluded from setting conditions for delivery of certain material through rulemaking because Congress has designated certain material as nonmailable, either categorically or conditionally (*i.e.*, material cannot be mailed unless certain conditions are

met). *See, e.g.,* 39 U.S.C. §§ 3001, 3002, 3002a. *See DSCC* PI Br. at 19–20. But none of those statutory provisions say that they are the *exclusive* categories of "nonmailable matter." Instead, Congress has granted the Postal Service broad discretion to adopt regulations that "may be necessary in the execution of its functions," and "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." 39 U.S.C. § 401(2), (10).

In any event, this is not a mailability rule; the Rule does not create any new category of "nonmailable matter" into which Ballot Mail as a class generally falls. To the contrary, USPS intends to process and deliver as many ballots as the States wish to send, no more and no less—and the Rule need not prohibit *any* ballots from being mailed. All outbound federal ballot mail that meets the Rule's requirements will be accepted, processed, and delivered as before.

The Rule does, of course, place certain conditions on acceptance of federal ballot mailings—but that alone is not enough to create a new category of non-mailable matter. After all, the Postal Service could refuse to mail a heavy package if the customer failed to pay sufficient postage, but that does not mean that heavy packages are "nonmailable" in the relevant sense. Similarly, if the Postal Service refused to deliver election mail from States that was sent without any postage, that would not render unstamped election mail "nonmailable" or otherwise violate the statutory rules governing creation of categories of nonmailable matter. The same logic applies here.

**b. Non-Postal Services.** Plaintiffs next claim that the Rule "violates statutory limits on USPS's authority to provide 'nonpostal service[s].'" *DSCC* PI Br. at 18–19 (quoting 39 U.S.C. § 404(e)). As an initial matter, the standards and procedures set forth in the Rule are not "services" within the meaning of 39 U.S.C. § 404(e). As the Postal Regulatory Commission has explained (in an interpretation that the D.C. Circuit has upheld), "services" for purposes of 39 U.S.C. § 404(e)

refers to ongoing commercial activities offered to the public for the purpose of financial gain. *USPS v. Postal Regul. Comm'n*, 599 F.3d 705, 708 (D.C. Cir. 2010). This is nothing of the sort.

Even if the Rule's standards and procedures could fairly be characterized as "services," the Rule does not require or permit the Postal Service to do anything "nonpostal." *DSCC* PI Br. at 17–18; 39 U.S.C. § 404(e). "[P]ostal service[s]" are "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5). The Rule, on its face, could thus pertain *only* to postal services: it places conditions on the "delivery of . . . printed matter," including its acceptance into the mail-stream. 91 Fed. Reg. at 54,975. Merely calling these measures "nonpostal" does not make them so; reducing the risk of a particularly salient form of mail fraud is necessarily a "postal" activity. Indeed, the Rule takes pains to distinguish its mailpiece design and data reporting standards from the complete control States retain over election administration—including decisions about who is eligible to vote by mail and the extent to which the State uses the Postal Service in their elections.

**c. Discrimination.** Plaintiffs argue that the Rule unduly and unreasonably discriminates among users of the mail in violation of 39 U.S.C. § 403(c). *See LULAC* PI Br. at 34–36. This Court lacks jurisdiction over this claim, which Congress channeled to the Postal Regulatory Commission with subsequent judicial review in the D.C. Circuit. *See* 39 U.S.C. §§ 3662(a), 3663; *New York v. Trump*, 181 F.4th 132, 137-42 (D.C. Cir. 2026). The *LULAC* plaintiffs' attempt to distinguish *New York v. Trump*—on the ground that the election is too close to pursue proceedings before the Commission—is meritless. Although the D.C. Circuit did not fully resolve that question, *see id.* at 140 n.3, it did "decline to adopt a general 'irreparable harm' exception by which parties can evade jurisdictional channeling provisions," *id.* at 140. Instead, as the D.C. Circuit observed, "[w]hen Congress channels claims to a particular forum, it imposes the constraints of that forum

on the channeled claims," even when they impose "significant burdens" on litigants. *Id.* (citation omitted). And this is not the sort of case in which Plaintiffs allege a "here-and-now" injury that is definitionally "impossible to remedy once the proceeding is over," *Axon Enterprises v. FTC*, 598 U.S. 175, 191 (2023)—after all, the D.C. Circuit could vacate the rule after Plaintiffs proceed through the administrative channels provided by Congress. Ultimately, federal subject-matter jurisdiction cannot expand or contract based on "convenience" to the plaintiff. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). Congress explicitly directed that all claims of violations of 39 U.S.C. § 403(c) be presented first to the Postal Regulatory Commission, so to that body Plaintiffs must go. And to the extent there is time-sensitivity, that is an argument Plaintiffs may make to the Postal Regulatory Commission (and, if necessary, the D.C. Circuit). That is the only path that Congress provided for review of a claim like this.

In any event, this argument would also fail on the merits. Section 403(c) prohibits discrimination in "providing services and in establishing classifications, rates, and fees." 39 U.S.C. § 403(c). The Federal Ballot Mail design and data-entry standards in the Final Rule are not "services" within the meaning of section 403(c). *See supra* at 22-23. They are acceptance preconditions to facilitate the enforcement of federal law and to implement best practices for Postal Service operations regarding ballot mail. Nor are they rates: the Rule has nothing to do with "fees for postal services," *id.* § 102(7). So § 403(c) does not apply here.

Even if it did, the Rule does not discriminate among users of the mail. The Rule applies equally to anyone, in any state, sending federal ballot mail through the Postal Service; it thus applies a uniform national standard. 91 Fed Reg. at 54,971. To the extent that anyone receives less favorable service, it would stem not from any effect of the rule, but from their jurisdiction's failure to comply with Rule's provisions.

Plaintiffs contend that the Rule "creates a system under which USPS . . . [can] refuse[] to transmit nonconforming ballot mail." *DSCC* PI Br. at 23. But Plaintiffs' use of "nonconforming" could be applied to *any* condition attached to the Postal Service's acceptance of any mailpiece, and it misses the point. Ultimately, Section 403(c) forbids discrimination between *users of the mails*, not between mailpieces; the Rule permits any user to send their ballot through the mail if its conditions are satisfied.

**d. Advisory Opinion.** Plaintiffs argue that the Postal Service needed to seek an advisory opinion from the Postal Regulatory Commission under 39 U.S.C. § 3661 before adopting the Rule. *See LULAC* PI Br. at 31–34. Again, this Court lacks jurisdiction over this claim, which Plaintiffs must bring before the Postal Regulatory Commission and then (if necessary) to the D.C. Circuit. *See* 39 U.S.C. §§ 3662(a), 3663; *New York*, 181 F.4th at 137-42. Indeed, the *LULAC* Plaintiffs come close to acknowledging this point, in describing the administrative process that Congress designed. *See LULAC* PI Br. at 32 ("The PRC must hold a formal hearing and issue a written opinion, 39 U.S.C. § 3661(c), which the D.C. Circuit can review, *id.* § 3663.").

Regardless, the Postal Service had no duty under 39 U.S.C. § 3661(b) to seek an advisory opinion here. That obligation applies only when (1) the change has a "meaningful impact on service," (2) the change is "in the nature of postal services," and (3) the change affects service "on a nationwide or substantially nationwide basis." *Buchanan v. USPS*, 508 F.2d 259, 262-63 (5th Cir. 1975). As to the first prong, the Rule does not create a quantitatively "meaningful" change, rather than a "minor" or minimal effect, on the general class of mail users. *Id.* at 262. It applies "only to Federal Ballot Mail"—a subset of ballot mail, which is itself a subset of election mail, which is itself a minuscule subset of all mail—"and only in connection with federal general, special, or

runoff elections (and not state elections or primary elections)." 91 Fed. Reg. at 54,976. By contrast, "in 2020 the Postal Service delivered roughly 400 million pieces of mail per day, and election mail in the 2020 general election accounted for only a small fraction of a percentage (roughly 0.1%) of that total mail volume." *Id.*; *see also Postal Police Officers Ass'n v. USPS*, 502 F. Supp. 3d 411, 423 (D.D.C. 2020) (dismissing a § 3661(b) claim for failing to allege that the subject change "is of sufficient scale and scope to have more than a *de minimis* effect of the nature of postal services available to the ordinary USPS users.").

Under "a qualitative examination of the manner in which postal services available to the users will be altered," the Rule also does not change the "nature of postal services" within the meaning of § 3661(b). *Buchanan*, 508 F.2d at 262-63. The Rule "do[es] not directly affect the provision of postal services"; rather, it "encompass[es] preparation and documentation requirements that are within the control of the states and, if adhered to, will not disturb the acceptance, processing, transmission or delivery of Federal Ballot Mail." 91 Fed. Reg. at 54,976. Put simply, there will be no impact for "the experience of the individual postal consumer," who is the relevant "intended beneficiary of the policies incorporated by § 3661." *Pennsylvania v. DeJoy,* 490 F. Supp. 3d 833, 885 (E.D. Pa. 2020).

**e. Privacy Act.** Finally, Plaintiffs argue that the Postal Service has violated the Privacy Act. *DSCC* PI Br. at 24–26. But injunctive relief is generally unavailable under the Privacy Act, except in limited circumstances that Plaintiffs do not even argue are applicable here. *See, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs."). And organizations (rather than individuals) are not entitled to *any* relief under the Privacy

Act. *See* 5 U.S.C. § 552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence.").

To be sure, in recent years, litigants have often tried (and sometimes succeeded) in evading these limitations by bringing APA claims predicated on alleged violations of the Privacy Act. *See, e.g.*, *Heritage Found. v. DOJ*, 2026 WL 1766549, at *3 (D.D.C. June 19, 2026) (noting that "the availability of injunctive relief under the APA" to remedy a Privacy Act violation "is an unsettled question with which other courts are actively wrestling" (citation omitted)), *appeal filed*, No. 26-5235 (D.C. Cir. June 23, 2026). The government's longstanding position is that this maneuver is inconsistent with Congress's judgments in the Privacy Act itself. *See, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026). Regardless, that workaround is plainly inapplicable in this case, because the Postal Service is not subject to APA litigation in the first place. *See* 39 U.S.C. § 410(a). Plaintiffs' Privacy Act claims fail on threshold grounds.

On the merits, the Final Rule does not allow "USPS officials to 'access' . . . 'private information' and further disclose it to law-enforcement without permission," *DSCC* PI Br. at 15 (citation omitted)—any authority for that sort of (entirely hypothetical) future disclosure would not stem from this Rule. And the Rule is not about collecting information on how individuals exercise their First Amendment rights at all. *See id.* at 24-25. So Plaintiffs' Privacy Act claims would also fail for that reason.

## II. THE EQUITABLE FACTORS DISFAVOR INJUNCTIVE RELIEF.

Plaintiffs' motions should also be denied because the balance of equities and the public interest disfavor enjoining USPS from implementing modest informational requirements on senders of outbound federal ballot mailings. "In exercising [its] sound discretion," the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Here, both "the balance of equities and consideration of the overall public interest in this case tip strongly in favor of" USPS. *Id.* at 26; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (harm to others and public interest factors "merge when the Government is the opposing party").

"Ballot mail presents unique considerations" for the Postal Service. 91 Fed. Reg. at 54,968. "From an operational standpoint, the Postal Service deploys special practices on a nationwide basis for the processing and delivery of ballot mail," including "the use of extraordinary measures during the period surrounding federal general elections to accelerate the delivery of return ballot mail beyond the Postal Service's typical operations when its employees are able to identify a mailpiece as a ballot." *Id.* "The use of the U.S. Mail to vote also implicates federal interests regarding whether the postal system is being used in a manner that is consistent with federal law, including those laws governing who is allowed to vote in federal elections." *Id.* Thus, the Postal Service should be allowed to implement the "actions deemed necessary to ensure the faithful execution of federal law and enhance the efficiency of postal operations." *Id.* at 54,968–69.

For example, the Rule converts "several of the Postal Service's longstanding mailpiece design preparation recommendations"—such as "the Official Election Mail logo, automation-compatible envelope design, uniquely serialized IMbs on outbound and return envelopes, and mailpiece design review"—into "required elements for Federal Ballot Mail." *Id.* at 54,978. By

"mak[ing] these proven measures a consistent baseline for every jurisdiction that mails federal ballots," the Postal Service will "clos[e] the patchwork that today inhibits mailpiece visibility and can make it more difficult to process and deliver ballot mail." *Id.* In short, these "design requirements help to ensure timely processing and delivery of Federal Ballot Mail." *Id.*

Additionally, the Final Rule's "data reporting and mail-preparation requirements" will place "law enforcement in a better position to identify any potential issues regarding compliance with federal law that may merit further investigation," *id.* at 54,985, and "strengthen public confidence" in voting by mail, *id.* at 54,986. Indeed, the Postal Service found the "visibility and law-enforcement benefits" so significant, "including for" the November 2026 "election cycle, are such that there [wa]s no compelling reason for any delay" in the Rule's effective date. *Id.* at 54,985. To thwart the Postal Service from uniformly implementing these beneficial practices, as Plaintiffs want, necessarily harms the interests furthered by the Final Rule. *Cf. California*, 2026 WL 2473573, at *5 (recognizing irreparable "harm" to the government when an "injunction meddles in the workings of the Executive Branch" and "prevent[s] it from even trying to lawfully implement the Order"); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (discussing the importance of "public confidence in the integrity of the electoral process").

On the other side of the ledger, Plaintiffs have not clearly shown they will suffer immediate, irreparable harm unless the Court grants extraordinary relief. *See Winter*, 555 U.S. at 20; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Such injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation

modified). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

The *NAACP* Plaintiffs argue "irreparable harm for the same reasons they have standing." *NAACP* PI Br. at 41. But as shown above, none of the *NAACP* Plaintiffs carried their burden to establish standing either on behalf of themselves or their members. Nor, in *LULAC*, did the League of United Latin American Citizens, Secure Families Initiative, and Arizona Students' Association. So necessarily, these Plaintiffs "also failed to demonstrate irreparable harm warranting a preliminary injunction." *Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013); *see DSCC*, 2026 WL 1487833, at *13.

Even considering the merits of Plaintiffs' theories of irreparable harm, none satisfy the D.C. Circuit's "high standard." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Plaintiffs contend they must divert or expend resources to "revamp their voter education and turnout programs." *DSCC* PI Br. at 27; *see LULAC* PI Br. at 41; *NAACP* PI Br. at 42. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a [preliminary injunction], are not enough." *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiffs fare no better by claiming "the Rule harms Plaintiffs' reputations as trusted sources of voter information." *LULAC* PI Br. at 41. Plaintiffs only speculate about how (if at all) the public's perception of them might change. Thus, they "have not demonstrated that they will suffer any great, concrete, corroborated and certain reputational injuries absent the injunctive relief." *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 548 (D.D.C. 2016).

Equally baseless is the suggestion of "competitive harm to" the *DSCC* Plaintiffs' "electoral prospects." *DSCC* PI Br. at 28. Conjecture about "what is likely to occur" in the results of independent elections months away "are of no value." *Wis. Gas*, 758 F.2d at 674. And "[t]he mere existence of competition"—whether in business, politics, or any other endeavor—"is not irreparable harm." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.3 (D.C. Cir. 1977). Nor does the Final Rule tip any electoral scales. "[T]he rule is neutral on its face and uniform in application." 91 Fed. Reg. at 54,971. It "appl[ies] to all states equally" and to all ballot mail "without distinction." *Id.*

Speculation also mars the claims that the organizational Plaintiffs' members risk "future disenfranchisement." *LULAC* PI Br. at 39; *see DSCC* PI Br. at 28; *NAACP* PI Br. at 42–43. It is far from "certain" that each member's respective state government will prove unwilling or unable to facilitate mail-in voting in accordance with the Final Rule. *Wis. Gas*, 758 F.2d at 674. Indeed, the State with the earliest deadline for sending out mail ballots—and thus the least amount of time to come into compliance—apparently has no concerns. In a public statement made last this week (before entry of the temporary restraining order in the District of Massachusetts), the North Carolina State Board of Elections announced that the State had begun taking steps to comply with the Rule, and that it "is confident that the county boards of elections plan to send out absentee ballots to North Carolina voters who have requested them for this election, starting September 4, as required by state law, will happen flawlessly and smoothly." Jen Rice, *Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it*, DEMOCRACY DOCKET (Aug. 27, 2026), https://perma.cc/SFB6-PAVD.

Finally, as to the City of Madison and Travis County, *see LULAC* PI Br. at 42, the Final Rule does not irreparably harm their ability to administer elections in accordance with State law.

"[S]tates will retain control over the manner of their elections, unaltered by the" Final Rule. 91 Fed. Reg. at 54,985. "The [R]ule requires merely that [S]tates that choose to use the U.S. mail as part of their elections adhere to certain standard mailpiece design and data reporting standards when sending Federal Ballot Mail." *Id.*; *see also id.* at 54,969. And "establishing a standardized set of mailpiece design requirements for" a category of mail "lies within the Postal Service's authority." *Id.* at 54,969. Plus, "the Postal Service will make available considerable educational and other support resources . . . to assist election officials with implementation and help facilitate timely compliance." *Id.* at 54,985; *see also id.* at 54,974 ("[A]mple resources are available to assist states with ballot mail envelope design, should such assistance be required."). Given all that, the City of Madison and Travis County have not established irreparable harm.

Finally, the equities favor continued steps toward compliance with the Rule. A preliminary injunction risks deterring States from voluntary compliance, which could well end up causing additional harm if an appellate court later stays or vacates the order, at which point the Rule's requirements could again become mandatory with even less time to comply—a worse outcome for the Postal Service, State and local election administrators, and the American people. And at least as of this filing, there are already two preliminary injunctions in effect from the District of Massachusetts, which provide universal relief—including for the benefit of these Plaintiffs.

## III. PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

If the Court finds Plaintiffs have carried their burden for interim relief, it should still decline to enter the sweeping injunction proposed by Plaintiffs. Consistent with "the party-specific principles . . . of equity," any injunction must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 844, 861 (2025). Thus,

for all those Plaintiffs who lack standing, any preliminary injunction should not address them, their interests, or their members.

Plaintiffs would receive complete relief from an injunction against the operation of Domestic Mail Manual 705.24.5.3, which precludes USPS from accepting mailings that do not comply with DMM 705.24.5.1 and 705.24.5.2. That would fully resolve the ultimate concern that the Postal Service will not accept or deliver a State's ballot mail if that State cannot or does not comply with the Final Rule. Under such an injunction, the Rule could otherwise go into effect, but such mail still would be accepted and delivered by USPS regardless of compliance with the Rule.

A bar on implementation of any other portions of the Final Rule would be "more burdensome to the [government] than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). For instance, some States may wish to comply voluntarily with other portions of the Rule. There is no reason for the Court to prohibit the Postal Service from assisting those States, such as by operating the Federal Ballot Mail Portal or reviewing ballot envelope designs. Those voluntary compliance efforts inflict no injury on the Plaintiffs and thus need not be enjoined by the Court. And those efforts could ultimately prove beneficial to all, including Plaintiffs, if any preliminary injunction is ultimately stayed or reversed on appeal.

Finally, the *LULAC* Plaintiffs wrongly suggest this Court could stay the Rule's effective date under the APA, 5 U.S.C. § 705. *LULAC* PI Br. at 44. Again, Postal Service actions are "exempt from review under the Administrative Procedure Act," *Mittleman*, 757 F.3d at 305 (citing 39 U.S.C. § 410(a)), except for certain "proceedings concerning the mailability of matter," 39 U.S.C. § 3001(m). As explained above, the Rule is not such a proceeding. *See id.* §§ 3005, 3007, 3012(c) (examples of proceedings). Thus, there is no basis for the Court to review, much less stay, the Rule under the APA—and certainly not on any theory other than Plaintiffs' mailability theory.

## CONCLUSION

For these reasons, Plaintiffs' motions for a preliminary injunction should be denied.

Dated: September 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Chief Litigation Counsel (DC Bar 995500)
MICHAEL S. POLITO
Trial Attorney (DC Bar 90041172)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov