**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case Number 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>*Defendants.* | Case Number 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., and BVM CAPACITY BUILDING INSTITUTE, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>*Defendants.* | Case Number 1:26-cv-01151-CJN |

**REPLY IN SUPPORT OF NAACP, COMMON CAUSE, AND BLACK VOTERS MATTER PLAINTIFFS'**
**<u>RENEWED MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

I. Plaintiffs Have Standing. ....................................................................................1

A. The Rule Has Directly Upended Plaintiffs' Core Voter-Services Programs. ........................................................................................1

B. NAACP and Common Cause Have Associational Standing. ..........5

C. Plaintiffs' Injuries are Traceable and Redressable to the Rule. .......7

II. Plaintiffs Are Likely to Succeed on the Merits. ..............................................................8

A. The Rule is Contrary to USPS's Statutory Authority and Reviewable ........................................................................................8

1. The Rule does not execute USPS's mail-delivery authority. .....................10

2. The Rule does not execute USPS's investigatory authority. .....................12

3. The Rule is inconsistent with the postal statutes .....................................14

4. The major questions doctrine removes any doubt the Rule is unlawful ....18

B. The Rule Violates the Separation of Powers. ...............................19

III. Plaintiffs Will Be Irreparably Harmed Absent an Injunction. ..........................................21

IV. The Equities and Public Interest Strongly Favor Plaintiffs. .............................................23

V. Plaintiffs' Requested Relief is Proper. ..................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aid Ass'n for Lutherans v. USPS*,
321 F.3d 1166 (D.C. Cir. 2003) .......... 9-10, 14

*Am. Oversight v. U.S. Dep't of Energy*,
2026 WL 2254433 (D.D.C. Aug. 5, 2026) .......... 2

*Ariz. All. for Retired Ams. v. Mayes*,
2026 WL 2277101 (9th Cir. Aug. 7, 2026) (en banc) .......... 2, 4

*California v. Trump*,
183 F.4th 52 (1st Cir. 2026) .......... 23

*California v. U.S. Postal Servs.*,
No. 1:26-cv-13917-IT (D. Mass. Aug. 26, 2026) (ECF Nos. 4-1-4-26) .......... 3

*Coal. for Indep. Tech. Rsch. v. Rubio*,
2026 WL 2030770 (D.D.C. July 14, 2026) .......... 2, 8

*Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*,
180 F.4th 1266 (10th Cir. 2026) .......... 2, 4

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) .......... 7

*Common Cause v. U.S. Dep't of Just.*,
No. 26-cv-1352 (D.D.C. May 19, 2026) (ECF No. 29-3) .......... 6

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 20

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 7

*DSCC v. Trump*,
2026 WL 2168617 (D.C. Cir. July 28, 2026) .......... 23

*Esteras v. United States*,
606 U.S. 185 (2025) .......... 17

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 2, 5

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .......... 7

*Foster v. Love*,
522 U.S. 67 (1997) .......... 20

*Get Loud Ark. v. Jester*,
171 F.4th 1058 (8th Cir. 2026) .......... 2

*Hannegan v. Esquire, Inc.*,
327 U.S. 146 (1946) .......... 16-18

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 6

*League of Women Voters of Mass. v. Trump*,
No. 26-cv-11549, ECF No. 285 (D. Mass. Sept. 4, 2026) .......... 3, 6, 22, 24

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .......... 22

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 2-3, 5, 21-24

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 9-10

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) .......... 18

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 18

*Loving v. Virginia*,
388 U.S. 1 (1967) .......... 15

*LULAC v. Exec. Off. of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 7, 24-25

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) .......... 2

*Merck & Co. v. HHS*,
962 F.3d 531 (D.C. Cir. 2020) .......... 19

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 20

*Mueller v. Syrian Arab Republic*,
656 F. Supp. 3d 58 (D.D.C. 2023) .......... 3

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025), *vacated on other grounds*, 2026 WL 1255781 (5th Cir. May 7, 2026) .......... 5

*Nat'l Ass'n for the Advancement of Colored People v. USPS*,
496 F. Supp. 3d 1 (D.D.C. 2020) .......... 5

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) .......... 9-10

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 9-10

*Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*,
793 F. Supp. 3d 19 (D.D.C. 2025) .......... 2

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) .......... 24

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 24-25

*United States v. King Cnty.*,
122 F.4th 740 (9th Cir. 2024) .......... 7

*USPS v. Postal Regulatory Commission*,
599 F.3d 705 (D.C. Cir. 2010) .......... 18

*Washington v. Trump*,
487 F. Supp. 3d 976 (E.D. Wash. 2020) .......... 11

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 18-19

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 20-21

**Constitutions**

U.S. Const. art. I, § 4, cl. 1 .......... 19

U.S. Const. art. II, § 1, cl. 2 .......... 19

**Statutes**

18 U.S.C.

§ 611 ..... 13

§ 1716 ..... 11

§ 3061 ..... 12-13

39 U.S.C.

§ 101 ..... 14, 24

§ 102 ..... 17

§ 401 ..... 8-10, 14, 19

§ 403 ..... 14-15

§ 404 ..... 8, 11-13, 17

§ 3001 ..... 16

§ 3002 ..... 16

§ 3005 ..... 13

§ 3007 ..... 13

§ 3010 ..... 16

§ 3014 ..... 16

§ 3018 ..... 16

52 U.S.C. § 20511 ..... 13

**Rules**

Fed. R. Evid. 201 ..... 3

**Regulations**

Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026) ..... 1, 3, 6-7, 10-11, 14-15, 17, 19, 21, 23-24

75 Fed. Reg. 30,300 (June 1, 2010) ..... 12

90 Fed. Reg. 9,843 (Feb. 19, 2025) ..... 11

**Other Authorities**

*Service, Merriam-Webster.com Dictionary, https://bit.ly/4zVVCHH*............................................*17*

U.S. Gov't Accountability Off., GAO-15-238, Healthcare.gov: CMS Has Taken Steps to Address Problems, but Needs to Further Implement System Development Best Practices 1-2 (2015), https://www.gao.gov/assets/gao-15-238.pdf 23

## INTRODUCTION

The Rule superimposes a new federal verification system over elections, effectuated by the U.S. Postal Service ("USPS"). *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966, 54,990-92 (Aug. 26, 2026) ("Rule"). The Rule requires states to submit voter-specific information and ballot-envelope barcodes through a federal portal and subjects each mailing to USPS verification. Defendants and Intervenor States identify no congressional authorization for that unprecedented federal gatekeeping regime; neither opposition even tries. The Rule disrupts Plaintiffs' established voter services programs, disenfranchises their members solely dependent on mail voting, burdens other members' planned use of mail voting, and imposes late-breaking changes that 23 states and the District of Columbia have attested are impossible to implement on the Rule's reckless timetable. An injunction would redress these injuries, preserve the longstanding system under which USPS transmits state-authorized ballot mail, and prevent mail-ballot chaos in the November election—which is now less than two months away. The motion should be granted.

## ARGUMENT

### I. Plaintiffs Have Standing.

#### A. The Rule Has Directly Upended Plaintiffs' Core Voter-Services Programs.

Federal Defendants and the Intervenor States portray Plaintiffs' injuries as "voluntary" expenditures to "educate voters" about a disfavored policy. *See* ECF No. 184 at 9-11 ("Gov't Opp."); ECF No. 183 at 7-9 ("Intervenor Opp."). That characterization fundamentally misstates the purpose and history of Plaintiffs' voter-assistance programs, the governing standard, and the record. Plaintiffs have long operated voter-assistance, turnout, and election protection programs—key components of which help voters obtain and cast mail ballots; these services are part of each organization's established field programs, not a litigation-driven response to the Rule. *See* ECF

No. 172-3 ¶¶ 3-6, 9-11 ("Sterling 2d Decl."); ECF No. 173-4 ¶¶ 5-14 ("Nunez 2d Decl."); ECF No. 54-9 ¶¶ 4-7 ("Albright 1st Decl."). The Rule directly interferes with Plaintiffs' "core business activities" by making it impossible for many jurisdictions to conduct mail voting and by making it harder to help voters obtain mail ballots and resolve obstacles to casting them. *Food & Drug Admin. v. All. for Hippocratic Med.* ("*AHM*"), 602 U.S. 367, 395 (2024); *LULAC v. Exec. Off. of the President* ("*LULAC III*"), 818 F. Supp. 3d 34, 95 (D.D.C. 2026).

*AHM* did not disturb the settled rule that an organization is injured when government conduct makes its established direct services more difficult to provide. 602 U.S. at 394-95; *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). Following *AHM*, courts have found sufficient Article III injury where government action makes voter-service organizations modify outreach, answer new voter questions, and revise volunteer training.[1] Courts in this District have applied *AHM* to the same effect.[2]

Before the Rule, Plaintiffs assisted voters by helping them satisfy the applicable state mail-ballot requirements and, if a problem arose, used established state procedures to identify and resolve it. Sterling 2d Decl. ¶¶ 14-18; Nunez 2d Decl. ¶¶ 16-20; Albright 2d Decl. ¶¶ 5-6, 17-18. Plaintiffs' voter-assistance tools, training materials, volunteer operations, and election protection programs were tailored to those processes in each State. Sterling 2d Decl. ¶ 18; Nunez 2d Decl. ¶ 18; Albright 2d Decl. ¶ 18; *cf. Get Loud Ark.*, 171 F.4th at 1064-65 (holding that a policy requiring wet signatures on applications injured an organization by making its preexisting, online tool

[1] *Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026); *Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1275-76 (10th Cir. 2026); *Ariz. All. for Retired Ams. v. Mayes*, 2026 WL 2277101, at *8-9 (9th Cir. Aug. 7, 2026) (en banc).
[2] *See Am. Oversight v. U.S. Dep't of Energy*, 2026 WL 2254433, at *7 (D.D.C. Aug. 5, 2026); *Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 67-69 (D.D.C. 2025); *Coal. for Indep. Tech. Rsch. v. Rubio*, 2026 WL 2030770, at *9-10 (D.D.C. July 14, 2026).

unavailable to voters). Now, the Rule gives USPS an opaque federal veto over state-authorized ballot mail: it is uncertain whether mail ballot programs in every state or jurisdiction will satisfy USPS's new requirements—23 states and the District of Columbia say they cannot.[3] And USPS will not accept an outbound ballot unless USPS verifies it. *See* 91 Fed. Reg. at 54,978, 54,981-82, 54,990-92. A missing or inaccurate Portal entry, barcode error, or verification failure may therefore prevent a registered voter's ballot from being mailed—even though neither the voter nor Plaintiffs can see, challenge, or cure the failure. *See* 91 Fed. Reg. at 54,990-91.

For Plaintiffs to continue providing direct assistance to mail voters under the Rule, each voter's jurisdiction has to be approved by USPS to use mail ballots. The District of Massachusetts meticulously documented, based on unrebutted declarations from states and local election officials, that complying with the Rule for the 2026 election is "impossible" for many jurisdictions. Mem. and Order at 23 n.29, 43-44, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass. Sept. 4, 2026) (ECF No. 285) ("PI Order"). For jurisdictions that cannot obtain approval, USPS will not accept ballots at all, *see* 91 Fed. Reg. at 54,990-91, obviating Plaintiffs' existing mail programs. Plaintiffs have had to reallocate resources to address jurisdictions that will not be able to send ballots through USPS. Nunez 2d Decl. ¶¶ 18-21; Sterling 2d Decl. ¶¶ 15-18; Albright 2d Decl. ¶¶ 5-7, 13. This uncertainty and "confusion" is not an abstract interest, *see* Intervenor Opp. 8; the Rule causes injury by requiring Plaintiffs to waste resources to restructure their organizing and field operations to address the contingency that USPS will not permit mail voting in certain jurisdictions during the most time-sensitive period of the election cycle. *See Newby*, 838 F.3d at 8-9.

[3] This Court may take judicial notice of the 26 declarations in the District of Massachusetts, attesting to 23 states' and the District of Columbia's inability to implement the Rule. *California v. U.S. Postal Servs.*, No. 1:26-cv-13917-IT (D. Mass. Aug. 26, 2026) (ECF Nos. 4-1-4-26); *see also* Fed. R. Evid. 201; *Mueller v. Syrian Arab Republic*, 656 F. Supp. 3d 58, 65 (D.D.C. 2023).

For jurisdictions that USPS approves, where voters encounter problems, Plaintiffs must investigate voter-specific ballot problems, communicate with state and local election officials, help obtain replacement ballots, and identify alternative means of voting before the applicable state deadlines. Sterling 2d Decl. ¶¶ 17-18, 22-24; Nunez 2d Decl. ¶¶ 16-21; Albright 2d Decl. ¶¶ 17-18. A recent whistleblower complaint reports that under USPS's failure and sampling protocol, one failed verification can cause USPS to reject an entire batch of ballots. ECF No. 174-1 ¶¶ 25-28, 35 ("Whistleblower Disclosure"). Because those batches may contain thousands of ballots, an error can reject ballots from large swaths of voters, *id.* ¶¶ 27-28, exponentially increasing the demand for Plaintiffs' voter-assistance services from members and voters. And because the Portal requirements are superimposed on top of distinct state laws and local practices, a solution for one voter or jurisdiction will not necessarily resolve another's problem. The Rule therefore directly impairs Plaintiffs' ability to provide services that have long been central to their missions. *See, e.g., Colo. Mont. Wyo. State Area Conf. of the NAACP*, 180 F.4th 1266, 1275-76 (10th Cir. 2026) (finding standing where investigations required voter organizations to modify materials, field questions, and revise training interfered with their core operations).[4]

Because of the Rule, Plaintiffs' existing mail program infrastructure must pivot to address large-scale ballot rejections, as well as the unavailability of USPS mail-ballot service in

[4] The Intervenor States counter (at 7) with *Arizona Alliance for Retired Americans v. Mayes*, but that case is inapposite. 2026 WL 2277101 (9th Cir. 2026) (en banc). *Mayes*'s standing analysis concerned the distinction between cancelling a voter's *old* registration after the voter applied for a *new* registration in a different county. *Id.* at *5. The plaintiffs conceded that there was "no evidence in the record of the state canceling a voter's new registration." *Id.* at *8. The court thus found no injury to the organizations' voter-registration activities. *Id.* Here, the Rule expressly provides that mailings that fail USPS's verification requirements "will not be accepted," 91 Fed. Reg. at 54,991, and the Whistleblower Disclosure reports that a single failed scan can cause USPS to reject an entire mailing containing tens of thousands of otherwise compliant ballots. Whistleblower Disclosure ¶¶ 25-28, 30, 35. That distinction "results in a real harm that is specific to [Plaintiffs]." 2026 WL 2277101, at *6.

jurisdictions unable to comply. As such, the Rule's impairment of Plaintiffs' services has already produced concrete operational burdens on Plaintiffs' field programs. NAACP Br. 20-25; Nunez 2d Decl. ¶¶ 16-27; Sterling 2d Decl. ¶¶ 14-18, 24; Albright 2d Decl. ¶¶ 15, 17-21. The reallocation of capacity to counteract the Rule's impairment of Plaintiffs' core services is the kind of diversion courts have found cognizable in voting-rights cases. *See Nairne v. Landry*, 151 F.4th 666, 680-82 (5th Cir. 2025), *vacated on other grounds*, 2026 WL 1255781 (5th Cir. May 7, 2026) (affirming standing for the NAACP and BVM where the challenged action directly interfered with their core mission and forced them to reallocate staff and launch new initiatives, and rejecting the contention that *AHM* barred the resource-diversion theory as manufactured). These are concrete injuries to Plaintiffs' organizing and field operations, not mere efforts to "oppos[e] [the government's] policies" on voting—the same distinction drawn by *AHM*. 602 U.S. at 395; *see also Nat'l Ass'n for the Advancement of Colored People v. USPS*, 496 F. Supp. 3d 1, 12 (D.D.C. 2020) ("Plaintiff's provision of services through its civic engagement program demonstrates that it does not engage solely in pure issue-advocacy." (cleaned up)).[5]

**B. NAACP and Common Cause Have Associational Standing.**

NAACP and Common Cause have standing to represent members who will be directly burdened by the Rule's curtailment of mail voting.[6] Plaintiffs have members in every state. *See*

[5] Nor do Plaintiffs seek to vindicate an abstract interest in avoiding "confusion." Intervenor Opp. 8. The uncertainty created by the Rule matters because it prevents Plaintiffs from determining how to restructure their organizing and field operations to provide effective voter-assistance services and forces them to reallocate finite organizational resources during the most time-sensitive period of the election cycle. *See Newby*, 838 F.3d at 8-9.

[6] The Intervenor States' contention (at 11) that Plaintiffs point to "zero" injured members is false. NAACP and Common Cause identified five named members, along with many others, in their opening brief: NAACP members Alphonso Braggs, Foster Bates, and over 100 Maine State Prison Branch members; and Common Cause members Jill Howard, Catherine Balan, and Brian Freeman. *See* NAACP Br. 22-25; Sterling 2d Decl. ¶ 21.

Sterling 2d Decl. ¶¶ 4-5; ECF No. 54-3 ¶¶ 5, 11-12 ("Nunez 1st Decl.") (explaining Common Cause has members "nationwide" who regularly vote by mail and to whom it conducts outreach "in each state").[7] The Rule burdens their members' planned mail voting; protecting members' ability to vote is germane to Plaintiffs' missions; and Plaintiffs seek prospective relief that does not require individualized member participation. *See* NAACP Br. 20-25; *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The injuries to NAACP's and Common Cause's members are not "speculative." *See* Gov't Opp. 11, 31; Intervenor Opp. 11-12. Both have members in the jurisdictions attesting that timely compliance with the Rule is *impossible*. Many of Plaintiffs' members in these jurisdictions are elderly, have disabilities, or are incarcerated and will be significantly burdened or disenfranchised if they cannot vote by mail. PI Order 23 n.29, 43-44; Sterling 2d Decl. ¶¶ 19-24; Nunez 2d Decl. ¶¶ 13, 18-19; ECF No. 54-2 ¶¶ 3-4, 7, 14-15 ("Braggs Decl."); ECF No. 54-6 ¶¶ 1-11, 14 ("Howard Decl."); ECF No. 54-7 ¶¶ 1-12 ("Balan Decl."); ECF No. 54-8 ¶¶ 1-12 ("Freeman Decl."). NAACP and Common Cause also have members in other states that will be subject to arbitrary denials of their mail ballots due to their states' or local registrar's inability to meet the Rule's technological and logistical requirements and USPS's opaque and reportedly arbitrary verification process. *See* Sterling 2d Decl. ¶¶ 19-24; Nunez 2d Decl. ¶¶ 16-19; Fed. Reg. at 54,981-82, 54,990-92; Whistleblower Disclosure ¶¶ 25-28; ECF 171-5 ¶¶ 17-30 (Declaration of Travis County, Texas Clerk Dyana Limon-Mercado). Absent an injunction, these voters will not be able to vote by mail, despite being lawfully entitled to do so, and without extraordinary measures will be disenfranchised.

[7] The Court may also take judicial notice that "Common Cause has members in every state in the country." *See supra* note 3; Decl. of Elena Nunez ¶ 7, *Common Cause v. U.S. Dep't of Just.*, No. 26-cv-1352 (D.D.C. May 19, 2026) (ECF No. 29-3).

Nor does it matter that the Rule regulates States and election officials. *See* Gov't Opp. 11; Intervenor Opp. 11-12. The Rule makes those parties' compliance a mandatory precondition to USPS's transmission of ballot mail. 91 Fed. Reg. at 54,990-92. State officials cannot waive USPS's redesign requirements, design approval, Portal, barcode, or verification requirements, and they cannot require USPS to accept a mailing that fails them. *Id.* And the Rule provides no process for rejected voters. Instead, the Rule subjects NAACP and Common Cause members' planned mail voting to a black box federal submission and verification process that neither voters nor Plaintiffs can access, with no notice of a rejected mailing, and requiring extraordinary efforts to cure. Nunez 2d Decl. ¶¶ 16-19; 91 Fed. Reg. at 54,981-82. Plaintiffs need not prove now that USPS has ultimately rejected their members' mail ballots or await the complete denial of the franchise to suffer a cognizable voting injury; a new condition on the exercise of the right to vote is itself a present injury. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009); *Fish v. Schwab*, 957 F.3d 1105, 1119-20 (10th Cir. 2020).

**C. Plaintiffs' Injuries are Traceable and Redressable to the Rule.**

Plaintiffs' organizational and associational injuries are fairly traceable to the Rule, NAACP Br. 25-27, and the involvement of election officials does not sever causation, Gov't Opp. 11; Intervenor Opp. 11. The relevant question is whether the injury follows predictably from the challenged federal action, not whether USPS is the final actor in the causal chain. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *LULAC v. Exec. Off. of the President* ("*LULAC II*"), 808 F. Supp. 3d 29, 62-63 (D.D.C. 2025); *United States v. King Cnty.*, 122 F.4th 740, 751 (9th Cir. 2024). Here, the Rule superimposes USPS's opaque and flawed approval structure on top of existing state requirements to determine mail ballot eligibility. *See* 91 Fed. Reg. at 54,990-92. Plaintiffs' operational injuries flow directly from that new federal gatekeeping system: the Rule makes Plaintiffs' existing mail voter-assistance services inadequate or (for jurisdictions whose

mail programs are not approved) irrelevant, while withholding the information necessary to identify and resolve the problems. *Id.* at 54,991. And members' injuries flow directly from the same USPS superstructure, which conditions their planned receipt of State-authorized mail ballots on successful approval of their jurisdiction's mail programs, Portal enrollment, voter-specific data submission, barcode verification, and USPS acceptance. *Id.* Enjoining the Rule would maintain the pre-Rule processes around which Plaintiffs built their programs and members voted by mail—thus relieving these ongoing injuries. *See Coal. for Indep. Tech. Rsch. v. Rubio*, 2026 WL 2030770, at *11 (D.D.C. July 14, 2026) (injury redressable where staying the policy would allow organization's chilled operations to resume).

## II. Plaintiffs Are Likely to Succeed on the Merits.

### A. The Rule is Contrary to USPS's Statutory Authority and Reviewable

The oppositions confirm the postal statutes do not authorize the Rule. USPS has authority only to execute the postal "functions" Congress assigned it and must do so in a manner consistent with the postal statutes. Gov't Opp. 3; Intervenor Opp. 2. The Rule fails both requirements. Its voter-enrollment, verification, and database regime executes no postal function, and it is inconsistent with multiple congressionally enacted statutes, including the universal-service mandate, nondiscrimination command, mailability architecture, and nonpostal service ban. Moreover, the major questions doctrine forecloses USPS's claim to dramatic political power it has never before purported to exercise. The Rule plainly exceeds the Postal Service's statutory powers.

USPS's rulemaking authority is strictly confined to carrying out its "specific powers." 39 U.S.C. § 404(a). The limit on that power is expressly defined. USPS may "provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail," and may "investigate postal offenses and civil matters relating to the Postal Service." *Id.* §§ 404(a)(1), (6). USPS's rulemaking power is limited to the

exercise of those postal "functions." *Id.* §§ 401(2), (10). The rulemaking authorities Defendants cite make this limitation explicit. Section 401(2) permits the Postal Service to issue rules "not inconsistent with" the postal statutes and that "may be necessary in the execution of its functions" under those or other statutes, while § 401(10) limits USPS power to steps "incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." USPS's power is cabined to executing the limited postal functions Congress assigned.

*Aid Association for Lutherans v. USPS* reviewed the precise claim of authority Defendants invoke here—§ 401(2). 321 F.3d 1166, 1169 (D.C. Cir. 2003). USPS argued its new rule restricting nonprofit mailings eligible for reduced rates was "necessary to accomplish the objectives" of the postal laws. *Id.* USPS argued that a court could consider only whether a statutory provision "expressly foreclose[d] the construction advanced by the agency." *Id.* at 1174. The D.C. Circuit "reject[ed] this position as entirely untenable," and then examined USPS's rule and affirmed its invalidation because it "exceeded the Postal Service's delegated authority." *Id.* at 1174-75. The same goes here: The postal statutes permit USPS to carry out only the specific postal functions Congress assigned; they do not authorize rules in service of new functions it seeks to undertake.

The Defendants' suggestion that review of USPS actions is limited, Gov't Opp. 12-13, ignores reams of authority. "It is well established that judicial review of Postal Service actions is available to determine whether the agency has acted ultra vires—that is, whether it has exceeded its statutory authority." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 966 (D.C. Cir. 2022) ("*NAPS*") (cleaned up); *Aid Ass'n*, 321 F.3d at 1172 (similar). The D.C. Circuit has "repeatedly" emphasized this. *NAPS*, 26 F.4th at 970; *see Aid Ass'n,* 321 F.3d at 1173 (claim USPS acted in ways Congress did not authorize "clearly admit[ted] of judicial review").

Defendants rely on *NRC v. Texas*, Gov't Opp. 12, but that case does not disturb these settled precedents. *NRC* simply applied the longstanding rule of *Leedom v. Kyne*, 358 U.S. 184 (1958), that ultra vires review is warranted when an agency acts "in excess of its delegated powers and contrary to a specific prohibition" and no alternate relief is available. 605 U.S. 665, 681 (2025) (cleaned up). *NRC* addressed a challenge for which the APA provided a specific review procedure (so alternative review was available) to the application of a regulatory authority the D.C. Circuit had already long-sustained (so did not exceed a specific prohibition). *Id.*

The *Leedom* rule was the explicit premise of *Aid Association* and *NAPS*, both of which cited *Leedom* before holding statutory limits on USPS enforceable. *Aid Ass'n*, 321 F.3d at 1173; *NAPS*, 26 F.4th at 970-71. Those cases make clear that Congress may place a "specific" prohibition on agency authority by imposing limits on "positive statutory commands" just as readily as it can through an express negative command. *NAPS*, 26 F.4th at 971. And regardless, this case involves specific negative commands: Congress prohibited USPS from exercising its authority "inconsistent with" the postal statutes, but the Rule does precisely that. 39 U.S.C. § 401(2). Under *Leedom*, *Aid Association*, and *NAPS*, ultra vires review is warranted in this context because no APA remedies are available and the postal statutes clearly limit USPS's authority.

**1. The Rule does not execute USPS's mail-delivery authority.**

USPS's mail-delivery duties do not authorize the Rule's conditions on mail voting. Defendants downplay the Rule's impact as "modest," Gov't Opp. 3, but the Rule creates a novel mail ballot design and review program, adopts a new certification requirement, creates a Federal Ballot Mail Portal, requires state and local election officials to register for that portal, requires the advance "enrollment" of every voter who will receive a mail ballot; links each voter to unique outbound and return-envelope barcodes; and compiles that information into state-specific Participation Lists, which USPS will retain for five years. 91 Fed. Reg. at 54,991. Any ballot USPS

fails to verify "will not be accepted." *Id.* These features impose substantive preconditions on mail-voting—but serve no postal function.

The Rule's scope exposes the point. The Rule excludes ballots used in primary and state-only elections. *Id.* at 54,990. Yet the postal characteristics of those ballots are identical. An envelope does not become more difficult to sort or deliver because it contains a general-election ballot rather than a primary ballot. Indeed, USPS has never before needed an advance list of mail recipients before it could deliver mail. The Rule's distinction tracks the Executive Order's federal election integrity objectives, not mail-handling functions. 91 Fed. Reg. at 54,966-72.

Defendants' election-related examples confirm the limited scope of USPS's authority over ballots. Gov't Opp. 17-18. The Official Election Mail logo, address-formatting requirements, and ballot-specific barcodes enable USPS to identify, route, and track mail pieces within its network; special-handling and priority-transportation rules govern how USPS sorts and moves those pieces; and the instruction to deliver postage-deficient absentee ballots governs how carriers complete delivery. *Washington v. Trump* likewise concerned operational changes that left mail behind, eliminated extra trips, and delayed election mail. 487 F. Supp. 3d 976, 980-81, 983-84 (E.D. Wash. 2020). Every cited example thus falls squarely within the functions Congress specified in § 404(a)(1): the "collection, handling, transportation, delivery, forwarding, [and] returning" of mail. 39 U.S.C. § 404(a)(1). Defendants' cited practices confirm the limits of USPS's authority.

Defendants' far-fetched analogies to cremated remains and replica explosives backfire too. Gov't Opp. 14-15. Congress expressly made material that may "injure the mails or other property" nonmailable and authorized USPS to permit its transmission under regulations governing "preparation and packing." 18 U.S.C. §§ 1716(a)-(b). Consistent with that express congressional authority, USPS regulates cremated remains alongside powders whose escape may cause "soiling,

damage, discomfort or destruction," requiring sift-proof containers and specialized packaging. 90 Fed. Reg. 9,843, 9,843-44 (Feb. 19, 2025). Replica explosives present a similar operational problem: their realistic appearance has caused postal-facility evacuations that resulted in disrupted service. 75 Fed. Reg. 30,300, 30,300-01 (June 1, 2010). These requirements are grounded in the Postal Service's specific authority to protect the mail delivery system; Defendants concede ballot mail "does not present the same operational issues." Gov't Opp. 14.

Defendants' postage analogy has the same problem. Gov't Opp. 22. USPS does not impose postage requirements under undefined authority to condition use of the mail system. Congress expressly authorizes USPS "to prescribe, in accordance with this title, the amount of postage and the manner in which it is to be paid," and "to provide and sell postage stamps" and other evidence of payment. 39 U.S.C. §§ 404(a)(2), (4); *see also id.* § 404(b). The differential treatment of stamped and unstamped envelopes reflects an express statutory distinction, as it should. No statutory postal function licenses the differential treatment of enrolled and unenrolled ballots.

**2. The Rule does not execute USPS's investigatory authority.**

The Postal Service's limited investigatory power "to investigate postal offenses and civil matters relating to the Postal Service," 39 U.S.C. § 404(a)(6), confirms the Rule is outside any statutory basis. The Postal Service's law enforcement authority is limited in two explicit ways: the power is investigatory, and, as far as criminal offenses are concerned, it accrues only for postal offenses. The Rule exceeds both limits.

Congress has defined Postal Inspectors' investigative powers: Postal Inspectors may "serve warrants and subpoenas"; "make arrests"; and "make seizures" based on the requisite level of suspicion. 18 U.S.C. § 3061(a). Congress nowhere authorized USPS to take sweeping prospective measures in hopes of detecting possible future criminal violations Defendants admit may be "uncommon." Gov't Opp. 5. The postal investigation statute expressly distinguishes laws

concerning postal property, "the use of the mails, and other postal offenses" from "other laws of the United States." 18 U.S.C. § 3061(b). Nor did Congress authorize imposing substantive obligations on state officials nationwide or conditioning postal services on participation in a USPS-managed law-enforcement database.

The Rule likewise has nothing to do with "postal offenses." 39 U.S.C. § 404(a)(6). The government gestures to notions of preventing voter fraud but has not identified and cannot identify a specific voter-fraud statute USPS is purportedly empowered to investigate. Intervenors' citations (at 15) to 18 U.S.C. § 611, which prohibits voting by noncitizens, and 52 U.S.C. § 20511, which prohibits specified election-related intimidation and fraud, prove the point: Neither statute mentions USPS, regulates the mails, or makes use of the mails an element of the offense. And in any event, the Rule governs delivery of properly addressed mail *from* States *to* their registered voters. There is nothing unlawful or fraudulent about those States' actions, and the government does not contend otherwise.

Defendants' analogies again expose their disregard for statutory grounding. Defendants posit that, if retirement communities were targeted by scams, USPS could impose "special design and registration rules" on solicitations sent to those communities. Gov't Opp. 10. But Congress has specifically addressed fraudulent schemes conducted through the mail. *See* 39 U.S.C. §§ 3005, 3007. Those statutes show that Congress knows how to act when it believes the Postal Service should conduct measures to combat fraud. If Defendants could cite comparable USPS authority over elections, they would have. They have not and cannot.

Defendants' assertion that the Rule serves a postal function claims a virtually limitless power to impose conditions on use of the mail. That is at odds with the limits Congress imposed: a condition must execute a function statutorily assigned to USPS. Defendants' contrary theory

erases that boundary and affords USPS the "virtually limitless hegemony" the D.C. Circuit has squarely rejected. *Aid Ass'n*, 321 F.3d at 1175 (citation omitted).

**3. The Rule is inconsistent with the postal statutes**

The Rule independently transgresses USPS's authority because it is flatly "inconsistent with" the postal statutes. 39 U.S.C. § 401(2). The Postal Service is expressly forbidden from executing its "general powers" inconsistently with those statutory limitations. *Id.* § 401. The Rule contradicts at least four specific constraints on USPS's power: It must offer universal service, provide nondiscriminatory services, handle nonmailable matter according to Congressional design, and execute only postal services. The Rule exceeds USPS's authority for each reason.

***Universal service.*** Neither Defendant addressed the inconsistency of the Rule with USPS's universal service mandate. Congress established USPS "to bind the Nation together" by providing "prompt, reliable, and efficient services to patrons in all areas" and "postal services to all communities." 39 U.S.C. § 101(a). It accordingly requires USPS to "receive, transmit, and deliver throughout the United States" the mail entrusted to it. *Id.* § 403(a). The Rule does the opposite. It conditions whether particular states or jurisdictions may use ordinary ballot-mail service on the USPS's approval of their participation in a federal enrollment and data-collection program. USPS's response—that States "do not have to use the U.S. mail to conduct their elections," 91 Fed. Reg. at 54,969—only underscores the direct conflict with the universal service mandate.

***Nondiscrimination***. The Rule is equally inconsistent with the Postal Service's nondiscrimination mandate, which prohibits USPS from making any "undue or unreasonable discrimination among users of the mails." 39 U.S.C. § 403(c). The Rule does exactly that. USPS will accept and deliver ballots tendered by election officials in jurisdictions that satisfy its enrollment and verification requirements, while refusing otherwise mailable ballots tendered by officials in jurisdictions that do not, even when both are properly addressed, bear sufficient

postage, and present identical physical and operational characteristics. Similarly, USPS will transmit a ballot to one eligible voter but refuse an identical ballot destined for another solely because the latter voter has not been entered into USPS's database—a factor entirely out of voters' control. The Rule thus provides materially different postal service to similarly situated users based on compliance with the Rule. No postal function justifies the underlying distinction: The Rule exempts physically identical ballots mailed for primary and state-only elections, confirming that its classification turns on election-related objectives rather than any characteristic relevant to delivering the mail. 91 Fed. Reg. 54,976.

Defendants answer that the Rule "applies equally to anyone" and any difference in service results from "their jurisdiction's failure to comply." Gov't Opp. 24. But "the notion that the mere 'equal application' of a statute containing [a] classification[] is enough to remove" the classification's discriminatory effect has been thoroughly repudiated. *Loving v. Virginia*, 388 U.S. 1, 8 (1967). Congress prohibited undue or unreasonable distinctions "among users of the mail." 39 U.S.C. § 403(c). Defendants' answer simply begs the question: A jurisdiction's purported "failure to comply" identifies the classification along which the Rule discriminates; it does not establish that conditioning postal service on that criterion is reasonable or nondiscriminatory.

The Rule does not establish transparent or objective standards for deciding whether a jurisdiction has complied. It requires states' submissions to satisfy unspecified "technical specifications," provides that failed mailings "will not be accepted," and permits "further review" without identifying the governing standard or procedure. 91 Fed. Reg. at 54,991-92. According to the Whistleblower disclosure, USPS filled that gap with an undisclosed "zero percent failure rate" and sampling under which a single failed scan among the sampled ballots causes the entire mailing to be rejected—even if the mailing contains tens of thousands of compliant ballots. Whistleblower

Disclosure ¶¶ 25-28, 30, 35. Thus, service may turn on a single scanning or clerical error under standards USPS neither published nor explained.

***Nonmailable matter.*** The nonmailable matter statutes compel the same result. The power to exclude matter from the mail has always been "strictly confined." *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 152, 156 n.18 (1946). The postal laws identify particular matter that may not be mailed and prescribe specific conditions on accepting particular categories of mail. *See, e.g.*, 39 U.S.C. §§ 3001(d)(2), (g)(2), (h)(1)(B), (i)(1)(B), (n)(1), 3002(b), 3010(a), 3014(c), 3018(a)-(b)(1). These provisions are remarkably specific, yet Congress nowhere conditioned acceptance of ballot mail on design approval, certification, advance voter enrollment and verification, participation in a federal portal, or the submission and retention of voter-specific election records. If § 401 can be converted to a general authority to create additional acceptance conditions divorced from Congress's limitations, this series of carefully defined categories would be superfluous.

Defendants claim the Rule "does not create any new category of 'nonmailable matter'" at all. Gov't Opp. 14-15, 21-22; Intervenor Opp. 13-14. But making mail ballots nonmailable is exactly what the Rule does: It requires USPS to verify ballot mailings against the Portal and directs that non-compliant ballots "will not be accepted." 91 Fed. Reg at 54,991. That is true whether the rule is characterized as a condition or an outright ban—the mailability statutes address conditional nonmailability with equal vigor. 39 U.S.C. § 3001(d); *see, e.g.*, *id.* §§ 3001(g)(2), (h)(1)(B), (i)(1)(B), (n)(1), 3002(b), 3010(a), 3014(c), 3018(a)-(b)(1).

Nor must the mailability statutes be expressly designated exclusive to show the Rule is inconsistent with the congressional design. Gov't Opp. 22. The negative-implication canon has "particular force" when Congress creates a statutory series because an "omission" from it "bespeaks a negative implication." *Esteras v. United States*, 606 U.S. 185, 195 (2025) (cleaned

up). The nonmailability statutes are a paradigmatic example: Congress addressed nonmailable matter comprehensively, identifying both material categorically excluded from the mail and material that becomes mailable only upon satisfaction of specified conditions. Ballot mail is absent. The postal laws make a "clear-cut division" between mailable and nonmailable matter that has been "zealously watched and strictly confined." *Hannegan*, 327 U.S. at 152, 156 n.18.

***Nonpostal services***. The Rule is inconsistent with USPS's obligation to provide only postal services. USPS's "specific powers" do not "permit" the Postal Service to "provide any nonpostal service." 39 U.S.C. § 404(e). A "service" is "useful labor that does not produce a tangible commodity" and "a facility supplying some public demand."[8] And a nonpostal service is a service other than "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5); *see* 39 U.S.C. § 404(e)(1). The Rule implements an entirely nonpostal service.

The Rule is self-evidently nonpostal: its design approval, certification, voter enrollment and validation, Participation Lists, and five-year retention scheme are completely unrelated to delivering the mail; it does not even apply to primary or state elections and the Participation Lists are delivered to States after the ballot-mail is transmitted. The Portal likewise provides a nonpostal "service": it is an online facility through which USPS ingests voter data, verifies ballot mailings against those data, and generates and stores Participation Lists. USPS describes this as a service, emphasizing the Portal and Lists are "primarily intended to assist election officials and law enforcement." 91 Fed. Reg. at 54,982. These are "services" in every ordinary sense.

Defendants' definition of a "service" as only those "commercial activities offered to the public for the purpose of financial gain" has no basis in the statute—and would come as a surprise

---

[8] *Service*, Merriam-Webster.com Dictionary, https://bit.ly/4zVVCHH.

to free legal, social, and emergency service providers and the like. Gov't Opp. 22-23; Intervenor Opp. 18. The D.C. Circuit in *USPS v. Postal Regulatory Commission* acknowledged USPS's definition of "service" might be "suspect," but concluded that the term was "ambiguous" enough to defer to the Commission's definition under *Chevron*. 599 F.3d 705, 710 (D.C. Cir. 2010). But courts may no longer "defer to an agency interpretation of the law," and must instead "exercise their independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). An independent analysis makes clear that the Portal's enrollment, verification, and database functions are nonpostal "services" under the plain meaning of that term, and at minimum, are inconsistent with Congress's unambiguous direction to USPS to focus on getting mail delivered.

**4. The major questions doctrine removes any doubt the Rule is unlawful**

Congress does not ordinarily delegate "highly consequential power" through ambiguous language. *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 243 (2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 724 (2022)). "Clear congressional authorization" is required when the "history," "breadth," and "economic and political significance" of an agency's asserted authority supply "reason to hesitate" before concluding that Congress conferred it. *West Virginia*, 597 U.S. at 721, 723 (citations omitted). Relevant considerations include the novelty and transformative character of the asserted power, its fit with the agency's statutory mission and expertise, and its intrusion into an area traditionally regulated by another sovereign. *Id.* at 721-24. "[E]xplicit" authority is required "once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever." *Hannegan*, 327 U.S. at 156.

This case is tailor-made for the major questions doctrine. The Rule stands to deny ballot mail to millions of voters in States that will not be able to comply, and has obvious "political significance." *West Virginia*, 597 U.S. at 721 (citation omitted). It is entirely unprecedented, superimposing requirements on state and local election officials USPS has never before attempted

to administer. Its election integrity functions are untethered from USPS's mail-delivery mission. And it intrudes upon the election-administration domain the Elections Clause explicitly assigns Congress and the States. U.S. Const. art. I, § 4, cl. 1. A claim to a novel power to prevent millions from receiving mail ballots cannot be inferred from USPS's "general powers." 39 U.S.C. § 401.

Defendants' attempts to elide the doctrine are meritless. Gov't Opp. 16-17, Intervenor Opp. 17. The doctrine applies to questions of "political significance." *Merck & Co. v. HHS*, 962 F.3d 531, 540 (D.C. Cir. 2020) (citation omitted). Few governmental actions are more politically consequential than conditioning millions of citizens' ballots on their States' compliance with a new and untested federal program immediately before an election. Regardless, the Rule is also economically significant because it threatens to obviate the costly infrastructure that state and local officials and organizations like the Plaintiffs have built around existing election systems. USPS acknowledges that the Rule will require "significant modifications" to existing election systems and impose unbudgeted costs. 91 Fed. Reg. at 54,984. Imposing "significant modifications" to costly nationwide election infrastructure is economically significant by any measure.

**B. The Rule Violates the Separation of Powers.**

The Rule is also unconstitutional. The Elections Clause directs state legislatures to prescribe the "Times, Places and Manner" of congressional elections and permits Congress to "make or alter" state regulations "by Law." U.S. Const. art. I, § 4, cl. 1. The Electors Clause similarly directs each State to appoint presidential electors "in such Manner as the Legislature thereof may direct." *Id.* art. II, § 1, cl. 2. Those assignments encompass the "mechanics" of elections, *Foster v. Love*, 522 U.S. 67, 69 (1997), including the "supervision of voting," "prevention of fraud," and "duties of inspectors," *Moore v. Harper*, 600 U.S. 1, 29 (2023) (citation omitted). The President's role is to execute the laws those constitutionally authorized actors adopt. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-87 (1952).

The Rule nevertheless carries into effect the President's attempt to "be a lawmaker" himself. *Id.* The Rule adopts the precise elements that the President's Executive Order mandated: envelope markings, voter-specific barcodes, state submission of mail-voter records, and USPS Participation Lists—all culminating in the rejection of ballots that do not comply. The Rule regulates elections by adding a federal precondition to a State's chosen method of distributing ballots and applies it to ballots mailed in federal general, special, and runoff elections, but not physically identical ballots mailed for primary or state-only elections, thus expressly turning on election-based considerations. *Id.* at 54,976. That is why USPS justified the Rule as a means of enforcing federal election laws, reducing fraud, and protecting confidence in federal elections—not as necessary to deliver the mail. *Id.* at 54,966-69. As the Rule acknowledges, the Order "began the deliberative process that is now resulting in this rule" and USPS adopted the Rule "to help achieve the goals articulated by the Order." *Id.* at 54,976.

Nor does *Dalton v. Specter* resolve the unconstitutional nature of this Executive power-grab. 511 U.S. 462 (1994); Gov't Opp. 21. *Dalton* holds that an allegation that an official violated a statute does not, without more, establish a constitutional violation. 511 U.S. at 472. But Plaintiffs allege more: the Executive Branch has imposed election policy in an area the Constitution assigns to the States and Congress. The constitutional defect is that usurpation of authority, not the statutory violation standing alone.

The President has no authority to compel that result. His power "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The Executive Branch has no authority to impose election policy. The Constitution commits election administration to the States and Congress, and Congress has not authorized the Rule. When the

Executive Branch usurps authority the Constitution assigns elsewhere, it violates the separation of powers. That is what this Rule does.

## III. Plaintiffs Will Be Irreparably Harmed Absent an Injunction.

The Rule has upended Plaintiffs' core voter-services programs during the most consequential period of the election cycle and significantly burdens their members' right to vote. Plaintiffs no longer know whether or when any particular jurisdiction will apply to have their mail-ballot process approved, nor do they know whether or when they will be approved by USPS. Plaintiffs must overhaul their organizing and field programs to accommodate a spectrum of competing possibilities: mass voter-specific failures at best (a scenario that would interfere with Plaintiffs' core missions); the complete unavailability of mail voting at worst (a scenario that would render Plaintiffs' core missions unachievable). Even if the mail-ballot program for particular states is approved, the Rule adds separate federal conditions that Plaintiffs' existing services cannot satisfy or address: for each properly registered voter who is entitled to receive a mail ballot, USPS will refuse the election official's outbound ballot mailing unless the responsible election office has timely submitted the voter's name, address, and ballot-envelope barcodes through the Portal, and the mailing satisfies USPS's verification requirements. *See* 91 Fed. Reg. at 54,990-92. The irreparable harms are the disruptions to Plaintiffs' organizing and field programs that impair their capacity to serve voters at the time their services matter most. *Newby*, 838 F.3d at 8-9 ("new obstacles" making it "more difficult" for organizations to accomplish their mission of registering voters "provide injury for purposes both of standing and irreparable harm").

The Rule also threatens immediate and irreparable harm to NAACP's and Common Cause's members. USPS may refuse an individual outbound ballot mailing when the jurisdiction or mailer has not satisfied the Rule's Portal, barcode, and verification requirements. *See* 91 Fed.

Reg. at 54,990-92. USPS gives affected voters neither access to the Portal nor a mechanism to inspect, correct, or appeal a rejected mailing. Instead, USPS acknowledges that any cure "rests not with the voter" and disclaims responsibility for delays before it accepts the ballot mailing. *Id.* at 54,981-82. That harm is especially serious for members such as Ms. Howard, Ms. Balan, and Mr. Freeman, who intend to vote by mail and cannot readily substitute in-person voting because of age, health, caregiving obligations, or transportation barriers. Howard Decl. ¶¶ 1-11, 14; Balan Decl. ¶¶ 1-12; Freeman Decl. ¶¶ 1-12. A voter may learn that USPS prevented their ballot's transmission only when it fails to arrive—when time to obtain and cast a replacement ballot may be short or exhausted. Balan Decl. ¶ 12; Freeman Decl. ¶¶ 11-12; Sterling 2d Decl. ¶ 24; Nunez 2d Decl. ¶¶ 17-19. And numerous states have asserted that compliance with the Rule for the November 3, 2026 election is not possible, meaning that NAACP and Common Cause members in those states who rely on mail voting will be severely burdened or disenfranchised. PI Order 32-35, 38-43; Sterling 2d Decl. ¶¶ 19-24; Nunez 2d Decl. ¶¶ 13, 18-19; Howard Decl. ¶¶ 1-11, 14; Balan Decl. ¶¶ 1-12; Freeman Decl. ¶¶ 1-12. The loss or impairment of the opportunity to vote is a paradigmatic irreparable injury. *Newby*, 838 F.3d at 8-9; *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

The federal government's own experience with the launch of Healthcare.gov confirms that the risk of portal and verification errors is not speculative. Inadequate capacity planning, uncorrected software-coding errors, and incomplete functionality led to "widespread performance issues" for users attempting to create accounts and enroll. GAO further found that the systems were "not fully tested prior to launch."[9] These same predictable risks are *more* acute here: USPS

[9] U.S. Gov't Accountability Off., GAO-15-238, *Healthcare.gov: CMS Has Taken Steps to Address Problems, but Needs to Further Implement System Development Best Practices* 1-2 (2015), https://www.gao.gov/assets/gao-15-238.pdf.

is deploying a new system on a faster timeline that depends on exact matching of voter-level data and ballot barcodes across multiple actors, while the whistleblower disclosure reports both inadequate testing and a protocol under which one scanning failure may stop an entire ballot-mail batch. And unlike a delayed enrollment transaction, a delayed or rejected ballot mailing may leave a voter without any meaningful opportunity to vote in the election at issue.

Plaintiffs need not wait for USPS to reject a particular member's ballot mailing before seeking relief. *Newby*, 838 F.3d at 9. The Rule is effective immediately, and USPS adopted that effective date because delaying implementation would jeopardize its rushed application to the November 2026 election. 91 Fed. Reg. at 54,966-67. Plaintiffs must respond now, while their election-year field programs are underway, or lose the opportunity to prevent the Rule's effects on this election—including the disenfranchisement of their members.

## IV. The Equities and Public Interest Strongly Favor Plaintiffs.

The equities and public interest heavily favor an injunction. With USPS finalization of its Rule has come "massive changes on the States' voting systems on the threshold of the upcoming election." *DSCC v. Trump*, 2026 WL 2168617, at *6 (D.C. Cir. July 28, 2026). The chaos ensuing from the Rule's short timeline is already "sow[ing] confusion and threaten[ing] disenfranchisement of many eligible voters." *California v. Trump*, 183 F.4th 52, 73 (1st Cir. 2026). Indeed, USPS's own personnel describe the Rule's implementation as "risky and haphazard" and warn of "catastrophic failure." Whistleblower Disclosure ¶ 8.

USPS has no cognizable interest in enforcing an unlawful Rule. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102-03 (D.C. Cir. 2021); *Newby*, 838 F.3d at 12. USPS possesses an interest in delivering the mail, *see* 39 U.S.C. § 101(a)—not in supervising elections. Nor has USPS identified any problem that the Rule solves. In fact, the Rule itself disclaims the Rule's premise: Although the Rule is intended to "reduce the risk of fraud," 91 Fed. Reg. at 54,966, USPS

simultaneously admits it does not know "[w]hether or not voter fraud is common or uncommon." *Id.* at 54,969. As in *Newby*, there is "little record evidence" of the fraud upon which the Rule is predicated, undermining any argument that an injunction would injure USPS. 838 F.3d at 13-14.

The Intervenor States' preferences do not change the analysis. Missouri's chief election officer asks that States retain the "option to fully comply" with the Rule, but acknowledges Missouri is not yet ready and is "still figuring out some details of implementation." ECF No. 151-1 ¶¶ 5, 9. A State's interest in experimenting with an untested federal system—in the middle of an election, no less—cannot outweigh the mass disenfranchisement a failed experiment risks. Put simply, the Intervenor States' position is difficult to square with the "chaos" that the Rule will create for Plaintiffs, their members, and the jurisdictions that maintain that the Rule is "impossible" to implement before the November elections. Nunez 2d Decl. ¶ 19; PI Order 23 n.29, 43-45.

## V. Plaintiffs' Requested Relief is Proper.

Enjoining the Rule in all jurisdictions is the "only one feasible option" to completely alleviate Plaintiffs' and their members' injuries. *Trump v. CASA, Inc.*, 606 U.S. 831, 850-51 (2025); *LULAC II*, 808 F. Supp. 3d at 84-86. Plaintiffs conduct their civic engagement work nationally, with NAACP and Common Cause working in every state and D.C. Sterling 2d Decl. ¶¶ 4, 8-11; Nunez 2d Decl. ¶¶ 8, 11-14; Albright 1st Decl. ¶¶ 6-7. Combined, they have hundreds of thousands of members across all jurisdictions, many of whom plan to vote by mail in the 2026 General Election. Sterling 2d Decl. ¶¶ 4-5; Nunez 2d Decl. ¶ 6. Many members are voters residing in the Intervenor States, *see* Sterling 2d Decl. ¶¶ 4-5; Nunez 2d Decl. ¶¶ 22, 24, and in states that plan to voluntarily comply with the Rule, *see, e.g.*, Gov't Opp. 31 (discussing North Carolina's compliance); Sterling 2d Decl. ¶ 16 (discussing NAACP's Ride to the Poll program for voters and members in North Carolina).

States' voluntary compliance with the Rule will not alleviate Plaintiffs' injuries. Any implementation of the Rule risks disenfranchisement of Plaintiffs' members and only amplifies confusion among voters, while further draining and diverting Plaintiffs' resources. NAACP Br. 12-16. Plaintiffs must update each complying state's programs, voter education materials, and volunteer trainings "if [the policy] is implemented anywhere." *LULAC II*, 808 F. Supp. 3d at 85. Even if a state announces its participation, Plaintiffs still must conduct local investigations to determine how compliance or noncompliance by county election officials will impact a person's mail ballot. NAACP Br. 14. Plaintiffs anticipate disenfranchisement of members and voters who reside in local jurisdictions that are bound by their respective state's decision to participate despite the infeasibility of local implementation. *See*, *e.g.,* Limon-Mercado Decl. ¶¶ 15, 17-30; Nunez 2d Decl. ¶ 24. Ultimately, "there is no way to peel off just the portion of the nuisance that harmed" Plaintiffs without enjoining the Rule in full. *CASA*, 606 U.S. at 852.

**CONCLUSION**

The Court should grant the preliminary injunction.

Dated: September 8, 2026

By: */s/ John A. Freedman*

John A. Freedman (Bar No. 453075)
Jeremy C. Karpatkin (Bar No. 980263)
Elisabeth S. Theodore (Bar No. 1021029)
Orion de Nevers (Bar No. 90001065)
Nicholas Casmier Anway (Bar No. 90020410)
Connor Morgan (Bar No. 90038559)*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: 202.942.5000
Fax: 202.942.5999
john.freedman@arnoldporter.com

jeremy.karpatkin@arnoldporter.com
orion.denevers@arnoldporter.com
elisabeth.theodore@arnoldporter.com
nicholas.casmier.anway@arnoldporter.com

Sydney Lopes (Bar No. 61389)
ARNOLD & PORTER KAYE SCHOLER LLP
U.S. Bank Center
1420 5th Ave., Suite 1400
Seattle, WA 98101
Telephone: 206.208.0108
sydney.lopes@arnoldporter.com

Edward G. Caspar (Bar No. 1644168)
Robert N. Weiner (Bar No. 298133)
Jeffrey Blumberg (Bar No. 432928)
M. David Rollins-Boyd (Bar No. 90010714)*
Catherine Meza (Bar No. 1045688)*
Javon Davis (Bar No. 90017436)*
Grace Thomas (Bar No. 90018667)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St., NW Suite 900
Washington, DC 20005
Telephone: 202.662.8600
ecaspar@lawyerscommittee.org
rweiner@lawyerscommittee.org
jblumberg@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
cmeza@lawyerscommittee.org
jdavis@lawyerscommittee.org
gthomas@lawyerscommittee.org

Deanna Kitamura (*pro hac vice*)
Kimberly Leung (*pro hac vice*)
ASIAN LAW CAUCUS
55 Columbus Ave.
San Francisco, CA 94111
Telephone: 415.896.1701
Deannak@asianlawcaucus.org
Kimberlyl@asianlawcaucus.org

*Counsel for Plaintiffs National Association for the Advancement of Colored People, Common Cause, Common Cause Education Fund, Black*

*Voters Matter Fund, Inc., and BVM Capacity Building Institute, Inc.*

Kristen M. Clarke (Bar No. 973885)
Anthony P. Ashton (Bar No. MD25220)*
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215
Telephone: 202.463.2940
kclarke@naacpnet.org
aashton@naacpnet.org

*Counsel for Plaintiffs National Association for the Advancement of Colored People*

**Motion for Pro Hac Vice or Court Admission Forthcoming*