# Exhibit 10

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**DECLARATION OF STUART HOLMES**

I, Stuart Holmes, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below and attached either through personal knowledge, consultation with Office of the Secretary of State ("OSOS") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Director of Elections in Washington. I work for the Secretary of State, Steve Hobbs, and support him in his official capacity as the Chief Election Officer for the State of Washington. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3. Attached here to as Exhibit A is a true and correct copy of the declaration that I submitted in the *California v. U.S. Postal Service*, No. 1:26-cv-13917, a case in the District of Massachusetts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2026, at Olympia Washington.

Stuart Holmes
Director of Elections
Office of the Secretary of State

# Exhibit A

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; et al.,<br>*Plaintiffs,*<br>v.<br>UNITED STATES POSTAL SERVICE, et al.,<br>*Defendants.* | Case No. _______________ |

**DECLARATION OF STUART HOLMES**

I, Stuart Holmes, declare as follows:

1. I am a resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office of the Secretary of State ("OSOS") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Director of Elections in Washington. I work for the Secretary of State, Steve Hobbs, and support him in his official capacity as the Chief Election Officer for the State of Washington. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Director of Elections since November 2021. I've worked in the Elections Division of the OSOS since September 2014 and, prior to that, worked in the Benton County Auditor's Office Election Department between May 2005 and September 2014.

4. Washington and its subdivisions are responsible for administering state and federal elections in Washington. These responsibilities encompass maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for state and federal office, among numerous other tasks. OSOS is responsible for training and certification programs for state and county elections administration officials; review of county election procedures; administration of a local government grant programs designed to help the county election offices comply with the requirements of the Help America Vote Act ("HAVA"); making rules consistent with state and federal election laws to facilitate the execution of such laws in an orderly, timely, and uniform manner; publication of the state voters' pamphlet; testing, approval, and certification of voting systems; administration of the statewide voter registration list required by HAVA; canvassing and certifying general election returns; serving as the state liaison with the United States Census Bureau; receiving filings for proposed measures; receiving filings and/or signature petitions for candidates and electors for federal office; and providing a voter hotline and web page designed to allow voter communication.

5. The Secretary of State is the state's Chief Election Officer, responsible for executing and enforcing all state and federal laws relating to elections within the state. *See* Wash. Rev. Code § 29A.04.230. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections. Washington law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. *See* Wash. Rev. Code §§ 29A.04.206; 29A.92.005.

6. Elections are administered as a collaboration between the Secretary of State and the local election officials in each county. Local election officials—generally county auditors—maintain the voter registration roll in a statewide system administered by the OSOS. The OSOS

has data authority over all voter registration data, and the voter registration database must comply with HAVA. The OSOS provides support, as needed, to enable each county auditor to enter and maintain voter registration information in the state database. *See* Wash. Rev. Code § 29A.08.125(7). Additionally, the OSOS is required to adopt procedures for new or updated voter registrations to be recorded on an expedited basis. *See* Wash. Rev. Code § 29A.08.110. Each county auditor issues and receives ballots in this same statewide system. Each county canvasses and certifies their election results and transmits those to the OSOS. The OSOS then canvasses and certifies the combined state results.

7. In my role as Director of Elections, I am responsible for overseeing all elections conducted in the state to ensure they comply with federal and state laws to maintain public trust and confidence in our electoral processes. These oversight responsibilities cover all aspects of election activities, including: list maintenance activities to remove ineligible individuals from the voter roll as required under the National Voter Registration Act ("NVRA"); the State's program for detecting dual registration or voting; county election procedure reviews; local grant programs; development of guidance regarding relevant legislation and judicial decisions affecting election administration; the voting system, and/or supporting technology certification or approval; election training and certification of election administrators; candidate filing; the state voters' pamphlet; state regulations governing all aspects of the electoral process, including vote-by-mail processes; and certification of election results. In my over 20 years of Washington election administration experience at both the state and county level, I've been involved with all levels of election administration. This includes providing voter registration assistance, issuing and receiving ballots, canvassing returned ballots, maintaining voter registration roll lists, testing and certifying voting systems, training elections officials, administering election recounts,

developing policy and guidance to implement legislative changes, and developing enhancements to the statewide voter registration database.

8. My office and counties statewide are currently preparing to administer the November 2026 general election, which will include state, federal, and local races. For example, the OSOS recently published an election law book to ensure that each county auditor has in their possession the most recent version of the election laws of the state. These publications include a law enforcement reference guide that can be provided to election officials, organizations, and law enforcement agencies as a tool to ensure laws are enforced consistently across that state. The OSOS also has partnered with cyber-security experts to evaluate our critical systems for any necessary updates or improvements that they recommend be implemented to further secure our systems. The OSOS is facilitating ballot measure committees who are required by law to prepare and submit materials for their inclusion in the State Voters' Pamphlet. The OSOS is in the final preparations of the election officials orientation ("E101") that is required by state law for all new election administrations. This training is attended by new and long-time election administrators to support their preparation for the election. County auditors are preparing to notify their local jurisdictions about the publication of the Local Voters' Pamphlet so that those jurisdictions can opt-out of the pamphlet by contacting the county legislative authority. The deadline for jurisdictions to submit and place a ballot measure on the ballot for inclusion in the Local Voters' Pamphlet was August 4. County auditors are also finalizing any vacancies in local offices that would require a special filing period to be included on the General Election ballot.

9. Washington is primarily a vote-by-mail state and mails a ballot to every active registered Washington voter through the United States Postal Service ("USPS"). In the 2024 general election, election officials mailed ballots to 5,013,112 voters. The vast majority of the

voters return their ballot either through USPS or at drop boxes located throughout the State. In the 2024 general election, 1,317,684 voters returned their ballots through USPS. Because Washington's elections are designed as primarily vote-by-mail, and have long operated this way, the State no longer has large-scale election-day infrastructure in place to accommodate a significant shift away from vote-by-mail.

10. Washington anticipates mailing ballots to approximately 5.1 million voters during the 2026 general election during the period from September 19, 2026, to October 27, 2026.

11. In Washington, ballots are designed and mailed by county election offices or vendors that they hire. Washington law contains certain requirements related to ballot envelopes (such as a requirement for prepaid postage and prominently displaying the date of the election) but does not require that ballot envelopes include Intelligent Mail barcodes. Wash. Rev. Code § 29A.40.091. County election officials must mail ballots to service and overseas voters at least 45 days before a primary or general election and, for other voters, at least 18 days before the election. Wash. Rev. Code § 29A.40.070(1)-(2). Our office encourages counties to mail ballots earlier, when possible.

12. Washington currently has over 5.1 million registered voters, and the precise number fluctuates by the day as individuals move to and from the State, residents become newly qualified to vote, and citizens decide to register. As such, Washington's statewide voter registration list changes up to and on Election Day to comply with state and federal law. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election and beyond. Requiring coordination of the State's constantly evolving voter lists through USPS would make it virtually

impossible to ensure that all eligible voters registered to vote in Washington can receive and return a ballot.

13. Hundreds of thousands of individuals register to vote within the 60-day period before a federal election and both state and federal law specifically require the State to register these voters. For example, the NVRA requires states to allow voters to register to vote in a federal election at least 30 days before the election. 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) likewise allows uniformed and overseas voters to register for a federal election if their registration application is received at least 30 days before that election. 52 U.S.C. § 20302(a)(2).

14. Washington has even more generous voter registration periods, allowing qualified individuals to register by mail or online up to eight days before Election Day and in-person through Election Day. *See* Wash. Rev. Code § 29A.08.140. Washington also exempts service and overseas voters from the voter registration deadline and allows them to sign the declaration on their return envelope with their ballot as a voter registration application. *See* Wash. Rev. Code §§ 29A.04.210; 29A.40.091. To register, individuals must attest to their citizenship and show proof of identity, among other requirements. Wash. Rev. Code § 29A.08.010. Washington citizens can register to vote online, at their county auditor's office, at various state social service agencies, and through Washington's Department of Licensing when they submit sufficient information about their voter qualifications (including citizenship) through their transaction.

15. Election offices often see an uptick in voter registrations in the 60 days leading up to an election, including by individuals who move into the state or otherwise become eligible to vote within that time period. For example, in September 2024, Washington election officials

received 144,404 voter registration transactions, including new registrations and updates to existing voter registrations. In October 2024, Washington election officials received 172,182 voter registration transactions. Voter registrations are updated continuously throughout the election. And counties continue to send mail ballots as additional voters register to vote or request a replacement or reissued ballot, and they continue to mail ballots until seven days before the election—or up to October 27, 2026 for this year's general election.

16. I am familiar with the Notice of Proposed Rulemaking issued by the United States Postal Service (USPS) that was published in the Federal Register on June 2, 2026. Our office submitted a comment on the Proposed Rule expressing opposition and identifying, among other things, that "there is insufficient time to implement the rule" and that "few counties would be capable of generating unique barcodes for both outbound and return ballot mailings without significant, costly systematic changes." The letter also documented out office's observation of about "a significant degradation of the USPS services over the last few elections" and a resulting increase in the number of ballots being rejected for having an untimely postmark. A true and correct copy of that comment letter is attached to this declaration as Exhibit A.

17. I am also familiar with USPS's recent regulation entitled "Ballot Mail for Federal Elections" ("Rule"), made available for public preview at [https://public-inspection.federalregister.gov/2026-17238.pdf](https://public-inspection.federalregister.gov/2026-17238.pdf) prior to its scheduled publication in the Federal Register on August 26, 2026. That Rule has already and will continue to imminently cause significant harm, confusion, and disruption in Washington election administration, and will impose unrecoverable costs on Washington.

18. For the reasons discussed throughout this declaration, I must act now to align Washington's administration of mail voting with the requirements of the Rule. Given the very

Case 1:26-cv-01139-CJN Document 18-3 Filed 03/26/26 Page 8 of 32

short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting, including in the November 2026 general election. My office will strive to ensure that voters have an opportunity to vote, and the Rule imposes significant costs on doing so.

19. Following the issuance of the EO, the OSOS surveyed all counties regarding the status of their ballot envelope packet materials. At that time, 17 of Washington's 39 counties had already printed their ballot packet materials for both the Primary and General Election, including their ballot envelopes. Many other counties reported a June 1, 2026 deadline imposed by their vendors to submit their order quantities and designs to ensure their ballot packet materials would be ready for the 2026 General Election. That survey demonstrated an average ballot packet cost of $0.39 per voter. For the approximately 5.1 million voters in Washington, the total estimated cost to reprint all envelopes for the November 2026 federal election is $1,963,739 million.

20. It is my understanding that the Rule requires that every voter who will receive a mail-in ballot must be enrolled with USPS. To enroll voters, elections officials or other authorized personnel must access the USPS Ballot Portal to enter each voter's name, address, unique Intelligent Mail barcode from the outbound ballot envelope, unique Intelligent Mail barcode from the return ballot envelope, and the originating election office state. The information would have to be provided at least 30 days before the date of the federal election or by the date by which ballots may begin to be mailed to voters under state law, although supplemental submissions can be made until the last day that ballots may be mailed out to voters under state law. In Washington, we would have to provide that information by October 4, 2026 (30 days before the election), and we would thereafter have to update the information multiple times per day to include eligible voters who registered, update their registration, or requested a

mail ballot after that date. Currently, only the county or their vendor who prepares the election ballot packets for delivery has access to the unique Intelligent Mail barcode from the outbound ballot envelope. This means that each county or their authorized representative would have to update their information prior to mailing any ballot packets. This Intelligent Mail barcode data is not currently reported into a centralized system. The Rule requires "[a] separate submission . . . in connection with each Outbound Federal Ballot mailing." The Rule provides that USPS "will provide a state-specific Mail-In and Absentee Participant List" ("US Mail Ballot List") to States' chief election officials "[o]n or about the date of the federal election." I further understand that if a voter is not enrolled with USPS or if the data is incomplete, USPS will not accept the outbound mail ballot envelopes for mailing and will be returned to the mailer. And *before* election officials can even begin enrolling voters in the process above, they must certify that they have submitted outbound/return envelopes for Mailpiece Design Analyst review and received feedback from USPS. This sequencing provides additional time pressure, especially given how many jurisdictions will be simultaneously submitting envelopes for review.

21. These requirements impose significant financial costs on my office and threaten to disenfranchise voters in Washington.

22. I have concerns about the feasibility of USPS implementing this system in a timely and accurate fashion in the limited time remaining before the November 2026 general election. As documented in our office's comment letter on the Proposed Rule, our office has observed a significant degradation of existing USPS services over the last few elections. Changes to postmarking practices have increased the number of returned ballots that are rejected due to a late postmark. Through sample mail delivery testing, one county auditor in Washington found significant inconsistencies in USPS processing of election mail. Of 15 ballot return envelopes

deposited in the mail before 9:00am on election day, only seven were postmarked the same day. Seven others were postmarked the following day, and another was not received as of two days after the election. When USPS is already experiencing significant difficulties in timely delivering election mail, I have profound concerns about its ability to design and implement a reliable system at the scale required to handle all election mail. Technological or implementation failure may lead to the inability of county election officials in Washington to deliver mail ballots to voters and conduct the election in accordance with state and federal law.

23. In my experience, implementing new election technology is highly complicated and takes time to get right. But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which seems unlikely given the short development and implementation window—enrolling all 5.1 million voters with USPS will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months, weeks, and days before any election. In the 30 days before the 2024 general election, Washington election officials processed more than 170,000 voter registration transactions, and, in my experience, it is very common for registration numbers to increase as election day approaches.

24. Before election officials can even become authorized to use the Ballot Portal, they must be approved by the Chief Election Official of the State, which itself requires advance coordination among state and county election offices to determine which staff throughout the state will become authorized and trained to use the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 14.[1] Once election officials become authorized users—a process

---

[1] Page citations to the Rule use the numbering from the preview document. *See* https://public-inspection.federalregister.gov/2026-17238.pdf.

that may also create delay and administrative burden—the officials cannot enroll voters with USPS in bulk. Instead, elections officials must enroll voters separately for each mailing. Sometimes, a mailing contains only a single piece of ballot mail, such as when elections officials mail a replacement ballot. Elections officials will not only be required to process these registration updates within their own systems, but they will bear the added burden of processing registration updates in an entirely new system operated by USPS—about which officials currently have no concrete operational information.

25. Washington State law allows a voter to request a replacement or reissued ballot through election day. *See* Wash. Rev. Code § 29A.40.070(3). To ensure that voters receive and are able to return these ballots to which they are entitled under state law, the information associated with these new ballots also would need to be provided to USPS.

26. Based on the information currently available, I estimate that 70 state and county election officials would need to be trained and that it would take approximately 2500 hours for elections staff to become authorized users of the USPS Ballot Portal, enroll all voters, and update the portal on a daily basis. This estimate includes the time to onboard state and county election officials with a reasonable amount of pre-election testing to ensure that file formats are standardized and consistent. Then, on a daily basis, election officials would need to conduct a coordinated update of the USPS Ballot Portal in each of the 39 counties, with the OSOS overseeing that update and providing technical assistance. My staffing estimate includes the need to train a secondary staff member on all of these processes to handle overflow needs or staffing absences for the approximately 19 counties that may have the staffing resources to designate an alternate. I estimate that the remaining 20 counties in Washington would not have the capacity for a second staff member to become trained as an alternate due to staffing limitations and

competing federally required mandates. The state database would need to be updated to ensure that individual ballot issuances, such as those ballots requested via telephone, email, or through our state's online voter portal, have the required Intelligent Mail barcode for both the outbound and return envelope. Currently, the system only prints a single label, without any Intelligent Mail barcode, that is placed on the return envelope. The envelope design allows for the mailing address to appear through a window on the mailing envelope. This design is intentional to ensure a fast and efficient process for replacement ballots. It is not yet known if these labels, even if the required barcodes are included, would be an automation-compatible envelope design. These individual issuances are commonly sent by the county, not by a vendor or other commercial mailing provider. The USPS proposed in their Rule that the county may create Intelligent Mail barcodes by manually entering this information into the Intelligent Mail Small Business (IMsb) Tool that is available on the USPS Business Customer Gateway (BCG). This solution is not reasonable and would result in significant delays in issuing replacement ballots to voters. The most efficient solution, to utilize staff time and reduce costs, is to implement an automated solution that is available to all county election offices through the state database.

27. My estimate also assumes there are no delays caused by technical or processing difficulties. But technical and processing delays are common, especially with implementing a new, untested technology and process. Given the scale of the effort, any unexpected technological and processing difficulties could increase the practical and financial burden on Washington and its counties exponentially. And if the system fails, Washington may be unable to mail ballots to voters at all. As an entirely vote-by-mail state, this would be catastrophic.

28. In Washington, counties process voter registration applications and make necessary and appropriate changes. Washington law requires that county auditors must request

Case 2:26-cv-01134-JN Document 48-3 Filed 03/06/26 Page 17 of 36

change-of-address information from USPS for all mail ballots and must update the voters' registrations accordingly. Wash. Rev. Code § 29A.08.620. County auditors also continue to make regular updates to voter registration files based on updates from voters. This substantially complicates compliance with the USPS Rule because it will require numerous supplemental updates, which requires significant time.

29. In Washington, USPS delivery is the only way in which the vast majority of voters receive a ballot. Beginning in 2005, counties were given the option to conduct elections entirely by mail, and two-thirds of Washington counties chose to do so. Since 2011, Washington law has provided for elections entirely by mail in *all* counties. Throughout this time, Washington has relied on—and closely partnered with—USPS to deliver ballots to all participating voters. Particularly given the short timeframe between now and the 2026 general election, there are no viable realistic alternatives to delivering ballots through USPS. Following USPS's release of the Proposed Rule, our office explored alternative possibilities for the delivery of mail ballots, but could not identify any reasonable alternatives due to cost and, for example, the complexity of using a private shipping service. Even if a private shipping service could manage the sudden increase in the volume of mail, we would incur significant increases in shipping costs and need significant upgrades to our election management system to accommodate such a change. Systemic changes would be required to accommodate the ability to print shipping labels, interface with one or more shipping providers, coordinate with current vendors who prepare the election ballot packets for delivery, communicate with voters, media, and other stakeholders, and redesign the ballot issuance and return processes and workflows for all 39 counties. This challenge is further complicated for domestic voters who need a replacement ballot, receive one electronically, and are unable to use a ballot drop box or voting center. Access to mail-in voting

is especially important for low-income, rural, and vulnerable populations, including voters with disabilities, who may lack access to transportation to either vote in-person or to receive and return their ballot through some other means. It is also important for military and overseas voters because there is no uniform alternative solution available for such voters who request to receive their ballot electronically and choose to return their ballot by mail.

30. I am particularly concerned that USPS is only preparing for a seamless transition and that it has not prepared contingency plans if the Ballot Portal does not work as intended or other errors impede the process. For example, USPS has not provided any information about how it will help election administrators facing technical difficulties in uploading information to the Ballot Portal. Nor has it provided any information about how errors by USPS will be corrected. USPS states only that it will inform Authorized Ballot Mailers of "escalation procedures" if they decide to challenge USPS's rejection of ballot mail. *See* 39 CFR Part 111, Supplementary Information at 58. USPS also says it will not develop any new appeal procedures for election mail, but USPS's standard processes won't work in the election context, where time is of the essence, and any errors must be resolved quickly to prevent voters from losing the fundamental right to vote.

31. The risks of error are heightened here because USPS has not committed to providing any training to election administrators regarding the Ballot Portal or any other aspect of the process changes. While the Rule contemplates that States and local election offices will soon begin registering tens of millions of voters into the Ballot Portal, USPS has provided virtually no information on what the Ballot Portal will look like, how it will operate, how users become authorized to use it, or how long it will take to upload voter information into the Ballot Portal. In fact, USPS explicitly "declines to conduct, publish, or otherwise disclose any

additional analysis or information concerning the rule or Portal." *See* 39 CFR Part 111, Supplementary Information at 81. And while USPS indicates that it is still developing training for internal Postal Service employees on such topics as mail ballot design and verification of ballot mail, it has not committed to providing any training to state and local election officials. Nor does USPS indicate when the Ballot Portal will become accessible for authorized users so that they can begin learning the system before they are required to start adding registered voters into the Ballot Portal under the pressure of election deadlines.

32. USPS claims that the changes imposed by the Rule are modest and have been issued as "best practices" guidance in the past. But that is wrong. The Rule imposes dramatic changes with sweeping impacts. USPS has never required the Chief Election Officer of each state to authorize individual election workers to handle election mail, to require ballot design review before election mail can be sent, or to register each voter into a Ballot Portal before the voter can be mailed a ballot. Nor has it ever transmitted information about every mail-in voter in the country to unspecified law enforcement officials for vague and unsubstantiated reasons. The threat of disclosing such information to law enforcement officials itself could suppress voter participation. And each of the process changes create delay and administrative burden at each step, creating dangerous bottlenecks in the short time before elections that increase the risks of cascading impacts and disenfranchisement at an alarming scale. USPS claims it will make further guidance documents available to explain in detail how to use the Portal "shortly," 39 CFR Part 111, Supplementary Information at 55, but election officials must begin work now.

33. It is far too late in the election cycle to introduce such dramatic changes. USPS itself encourages the Chief Election Official in each State to provide USPS 90 days advance notice if the State plans to send federal election ballots, claiming such notice is "logistically

beneficial" so that USPS can "conduct outreach on mail preparation, provide resources related to IMbs, and offer guidance on how [to] access and use the Federal Mail Ballot Portal." *See* 39 CFR Part 111, Supplementary Information at 45. But that 90-day window has already passed, and there is virtually no time for either USPS or States to prepare for such a dramatic change in election mailing. And USPS has done no advance work with States to begin educating election officials about any of these changes.

34. These risks are compounded by USPS's lack of prior experience in the type of election administration duties it will assume under the Rule, and uncertainty over whether USPS will devote sufficient resources to process the massive amount of data it will receive from all 50 states in a condensed timeframe. USPS has confirmed that it does not expect "to require additional staff" or for implementation of the Rule to impose "a significant burden on employees." *See* 39 CFR Part 111, Supplementary Information at 74. This does not inspire confidence. It suggests that USPS is not adequately preparing for all possible contingencies and will not have adequate staffing to address technical failures in the Ballot Portal or to timely address appeals related to rejected election mail. The stakes are incredibly high, with any systemic errors, technological difficulties, or improper staffing threatening to disenfranchise voters at a massive scale.

35. I understand that the federal government has represented that it cannot adopt the Rule in some states and not others and that it instead needs a uniform process in place for all states. In light of these representations, if USPS were to attempt to adopt the Rule in some subset of states, but not in Washington, I have strong concerns that USPS could not ensure that all of Washington's election mail would be timely delivered to Washington residents around the country, or that ballots mailed into those states would be returned to Washington election

officials. Each election, Washington mails ballots to hundreds of thousands of residents who are temporarily located in another state, but remain residents of Washington State, as is common for members of the military, students, or retirees who are temporarily visiting other states. In this upcoming election, Washington is on track to deliver over 225,000 ballots to Washinton residents in each of the fifty states, as set forth in the table below.

| **Mail State** | **Count** |
|---|---|
| Alabama | 1,940 |
| Alaska | 2,077 |
| Arizona | 20,044 |
| Arkansas | 1,357 |
| California | 27,670 |
| Colorado | 8,664 |
| Connecticut | 1,242 |
| Delaware | 318 |
| District of Columbia | 798 |
| Florida | 10,260 |
| Georgia | 5,679 |
| Hawaii | 3,239 |
| Idaho | 13,464 |
| Illinois | 4,957 |
| Indiana | 1,897 |
| Iowa | 1,109 |
| Kansas | 1,703 |
| Kentucky | 1,750 |
| Louisiana | 1,057 |
| Maine | 708 |

| | |
|---|---|
| Maryland | 3,105 |
| Massachusetts | 3,409 |
| Michigan | 3,304 |
| Minnesota | 3,267 |
| Mississippi | 774 |
| Missouri | 2,826 |
| Montana | 2,353 |
| Nebraska | 818 |
| Nevada | 6,922 |
| New Hampshire | 440 |
| New Jersey | 2,474 |
| New Mexico | 1,195 |
| New York | 4,913 |
| North Carolina | 5,591 |
| North Dakota | 658 |
| Ohio | 2,892 |
| Oklahoma | 2,222 |
| Oregon | 25,036 |
| Pennsylvania | 3,298 |
| Rhode Island | 466 |
| South Carolina | 3,362 |
| South Dakota | 493 |
| Tennessee | 3,249 |
| Texas | 17,744 |
| Utah | 5,605 |
| Vermont | 359 |
| Virginia | 5,550 |

| | |
|---|---|
| West Virginia | 376 |
| Wisconsin | 2,360 |
| Wyoming | 782 |
| **TOTAL** | **225,776** |

36. As a result of the Rule, and to mitigate the impact of all this uncertainty and turmoil, my office must immediately prepare and update guidance for local elections offices to ensure a consistent approach across Washington's 39 counties. This guidance will have to address topics such as using the USPS Ballot Portal, ensuring timely enrollment of new mail voters leading up to the election, cybersecurity protection, protecting the confidentiality of voters enrolled in Washington's Address Confidentiality program (e.g., survivors of domestic violence sexual assault, stalking, or trafficking), and how to process election mail. These preparations and updates will require significant time, personnel, and money.

37. Under Washington law, the State also reimburses counties for a proportionate share of expenses incurred for any election in which a federal office, state office, or state measure will appear on the ballots, including a share of the costs for voter outreach. Counties will need to spend significant time, personnel, and money to train local elections officials and their staff. Elections staff would need to be trained on the USPS processes and technology. Training materials would have to specifically detail what steps they must take to access the USPS Ballot Portal, enroll voters in the Portal, and manage voters who appear on Washington's voter registration list and are eligible to receive a mail ballot under Washington law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the Rule that will necessarily divert no fewer than a half-dozen staff that are already committed to other election administration tasks that are required by federal or state law.

38. It is my understanding that the Rule requires that any mail containing a mail-in ballot for a federal election sent to or from voters must include the official Election Mail logo, be automation compatible, bear a unique Intelligent Mail barcode with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier, and have undergone USPS review.

39. These requirements of the Rule necessitate immediate action from the OSOS and county election officials.

40. I anticipate that local election officials in Washington will have to mail approximately 5.1 million ballots to voters during the 2026 general election.

41. The OSOS and county election officials have consistently relied upon election mail guidance from USPS to design and mail ballots and relied on that guidance in preparations that have already been taken for the November 2026 general election.

42. Many counties in Washington have already ordered mail ballot envelopes for the 2026 general election. USPS confirms that States or localities that have already printed their ballots cannot use those envelopes under the Rule and will need to order new envelopes and submit them for design review. *See* 39 CFR Part 111, Supplementary Information at 71. Requiring these counties to order replacement ballot envelopes would significantly increase costs to the State and counties. Wash. Rev. Code § 29A.04.420. As detailed above, I estimate that the cost to reprint all 5.1 million voters ballot packets would cost at least $1,963,739 ($0.39 per envelope) based on estimates provided by 26 Washington counties. After publication of the Rule, I immediately began contacting the vendors that Washington counties use to print election materials. Of those three vendors, one vendor indicated that it could not reprint ballot envelopes after August 27, 2026 and another vendor indicated that it did not have capacity to reprint ballot envelopes at all. I have not heard back from the third vendor, but it would be very unlikely that

the printer could reprint all ballot envelopes for the entire State. In my experience, these types of large-volume printing projects are scheduled months in advance. If the Rule goes into effect, I am gravely concerned that Washington State would not be able to reprint its ballot envelopes to comply with the requirements of the Rule and would be prevented by the Rule from sending ballots to any of Washington's residents. This would be catastrophic for Washington elections because Washington is an entirely vote-by-mail state and the State no longer has the infrastructure to accommodate a last-minute reversion to in-person voting.

43. All 39 counties in Washington currently use Intelligent Mail barcodes on ballot mail. These Intelligent Mail barcodes are required to obtain the lowest possible outbound postage rate. These barcodes are also included in return ballot envelopes but are not unique to the individual voter. The state would need to make updates to the election management system so that the counties or their vendors could transmit the Intelligent Mail barcodes to the centralized election management system. Once in the election management system, the state or county election administrator would be able to include that information in the necessary reports, such as those required by the USPS Rule. These changes would be necessary to ensure that a voter can register and receive a ballot at any voting center or auditors office in the state, not just their registered county. USPS suggests that small businesses can create Intelligent Mail barcodes free on USPS's website, but that tool is only available for mailings with fewer than 50,000 pieces of mail.[2] The largest counties in the State would not be able to use that tool for election mail. And USPS itself acknowledges that the current tool has technical impediments that would prevent creation of Intelligent Mail barcodes for certain voters, such as when the voter's address cannot be verified using Delivery Point Verification. *See* 39 CFR Part 111, Supplementary Information

---

*See Intelligent Mail® for Small Business (IMsb) Fact Sheet* (June 1, 2023).

at 48. While USPS says it anticipates modifying this tool, it has not committed to doing so before the November 2026 general election, or at any specific time. Thus, election officials' concern about the feasibility of applying IMbs to all outbound and return envelopes that have already been ordered, do not simply reflect "confus[ion]" as USPS asserts. *See* 39 CFR Part 111, Supplementary Information at 47. And using unique Intelligent Mail barcodes would not increase election security in Washington. Washington verifies ballots through signature verification, ensuring that only eligible voters are able to cast ballots. In addition, voters can sign up for text message notifications that allow the voter to know whether their ballot has been received and accepted. And if it is not, voters can cast a replacement ballot up until 8:00pm on election day.

44. All 39 counties in Washington currently submit ballot envelopes to USPS for design review. The Secretary of State organized a work group that established a standard ballot envelope design that is intended, but not required, to be used by all counties. The USPS and other mailing experts were included in the work group.

45. In Washington, as in much of the country, ballot envelopes vary by county. I am deeply concerned about the length of time it would take for USPS to conduct ballot design review for thousands of jurisdictions. While USPS indicates that Mail Design Analysts generally aim to provide feedback to mailers within two business days, this estimate was before implementation of the Rule, and USPS does not indicate that final approval of all election mail envelope designs will occur in similar timeframes. In fact, USPS has disclaimed the need for additional staffing, even though thousands of jurisdictions nationwide are newly required to submit their outbound and return mail ballot envelopes for USPS inspection and approval. Nor does USPS specify how disputes regarding the design review process will be resolved. All of this

creates a potential chokepoint in the entire mailing process because the ballot envelope design must be approved by USPS before any information can even begin to be uploaded into the Ballot Portal. *See* 39 CFR Part 111, Supplementary Information at 47, 49-51, 74. Waiting on USPS to approve ballot design has the potential to seriously disrupt and delay carefully timed steps necessary to deliver mail ballots to Washington voters. Indeed, delays in the approval process will literally prevent enrollment of voters on the USPS Mail Ballot List, foreclosing delivery of ballots. Managing the fallout from such a delay would force my office and local elections officials to divert critical time and money from other elections administration duties to expedite other steps in the mail ballot process, educate the public about the status of mail ballots, and otherwise mitigate the harm from delays in the process.

46. I am particularly concerned about the Rule's statement that ballot mailings that do not comply with the Rule "will not be accepted and will be returned." This means that USPS will refuse to deliver ballots to citizens who are properly registered to vote and entitled to vote by mail-in ballot under state law.

47. Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible Washingtonians as possible can exercise their right to vote. In the 2024 general election, nearly 99.25% of Washingtonians participating in the election cast a ballot that they had received by mail, and over 1.3 million Washingtonians relied on USPS to return their ballot.

48. The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all. For example, the USPS Ballot Portal does not currently exist and has not faced the test of elections officials across the country attempting to concurrently enter tens of millions of voters' names and other information in a short window of time. If the

Ballot Portal fails, the Rule would prevent **any** voters from receiving ballots. Moreover, if there are typographical or inadvertent administrative errors by USPS or elections officials, eligible voters will not timely receive mail ballots to which they are entitled under state law. And if USPS does not complete the review of ballot mail envelopes required by the Rule, that would also prevent voters from receiving absentee or mail-in ballots.

49. Even if the USPS Ballot Portal and enrollment system works as intended, the Rule still risks voter confusion and disenfranchisement. In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause significant voter confusion. The Rule's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use a mail ballot. Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters decide to cast a ballot.

50. The Rule also requires the expenditure of considerable staff time to address voter concerns and proactively engage in public education about the Rule's changes. In my experience, significant changes in election processes typically trigger voter concern and confusion. Given that this Rule was ordered by the President in an Executive Order that has already been legally determined to be unconstitutional, I anticipate even more inquiries from voters as a result of the Rule. Fielding these questions requires staff time that would otherwise be spent preparing for the 2026 general election.

51. In addition, the Rule will require a wide-ranging public education campaign to ensure that eligible voters understand the Rule's requirements, and how they may impact a citizen's ability to vote by mail.

52. I estimate public education efforts specifically related to the EO will involve engagement with media, a strategic messaging campaign, and utilizing social media. It will also involve mailings, if possible, and advertising, such as billboards, newspapers, and electronic ads. We would need to hire a vendor to assist and provide deliverables. Based on our recent experience with the "Mark the Ballot" public education campaign, I estimate that the public education campaign required as a result of the EO would cost approximately $1,800,000 and involve approximately 800 hours of staff time. These funds would also be used to provide county auditors with publications and other resources to inform voters in their county. Wherever possible, funds would also be used to assist counties with any cost increases related to purchasing, replacing or updating equipment in order to process the new ballot envelope packet designs.

53. Finally, confusion stemming from the Rule and any issues with its implementation that compromise the timely delivery of mail ballots are likely to severely harm the reputation of my office. In my experience, voters tend to blame state and local elections officials for administrative issues, even if fault may belong to a third party like USPS. This can reduce trust in our electoral system and cause reputational harms that are difficult to reverse.

54. The harms that stem from the Rule are particularly acute because the requirements take effect while my office is busy taking other steps to prepare for the 2026 general election.

55. Election officials in Washington have just completed a primary election. The primary election was on August 4, 2026, and election officials are still engaged in post-election work, such as conducting post-election audits.

56. County auditors in Washington must begin mailing ballots for the 2026 general election in the coming weeks. Consistent with federal law, agencies mail ballots to military and

overseas voters by September 19, 2026, 45 days before the general election. 52 U.S.C. § 20302(a)(1)-(3), (8)(A). In addition, state law requires that county auditors begin mailing ballots to all other eligible voters no later than October 16. Wash. Rev. Code § 29A.40.070. County auditors will continue mailing ballots through October 27, 2026, consistent with state law.

57. Additionally, my office will need to continue to register those who are eligible to vote in Washington. Washington allows qualified individuals to register up through Election Day and. Wash. Rev. Code § 29A.08.140(1); *see also* 52 U.S.C. § 20507(a)(1) (requiring states to permit registration up to 30 days before a federal election). Washingtonians can register to vote online, at their county clerk's office, at various state social service agencies, and through the Washington Department of Licensing when they submit sufficient information of their voter qualifications (including citizenship) through their transaction. During the weeks and months leading up to an election, we see a high volume of voters registering or updating their registration, resulting in flux in voter rolls and requiring time from election officials.

58. In compliance with the NVRA "quiet period" for voter registration, Washington does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). Washington does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled.

59. In sum, staff in our office must continue to process voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 election.

60. Staff are also preparing for required training for election officials to ensure that they are informed about any changes in state election laws, as well as reiteration of state and federal election laws that have not changed. Many election officials have contacted my office with confusion related to various proposed changes to federal election laws and these have required significant investment to ensure that election officials are able to timely respond to questions and concerns they receive from the public. Staff are also facilitating the content required for the State Voters' Pamphlet as well as other outreach plans and strategic messaging. These efforts ensure that voters are aware of their rights, eligibility requirements, and how they may participate in the election. Mid-term elections, such as those in 2026, generally have lower turnout than in presidential election years. Further, this year also lacks a U.S. Senator contest on the Washington ballot. The absence of these two federal offices on the ballot generally results in lower turnout. To increase turnout in the populations that have historically not participated in mid-term elections requires planning, and an investment of resources to engage with those populations to increase turnout and ensure their representation in the democratic process.

61. The steps necessary to comply with the Rule will divert time and attention from these other critical election preparations. For example, just depositing the election mail at the post office will become an exorbitantly time-consuming task. Before election mail is even brought to the post office, election staff "must segregate Outbound Federal Ballot Mail from other types of ballot mail, such as primary ballots, UOCAVA ballots, or ballots for state or local elections only." *See* 39 CFR Part 111, Supplementary Information at 56. And once at the post office, each piece of election mail will need to be individually scanned and processed by a postal service agent to "confirm the presence of scanned barcodes in the Federal Mail Ballot Portal." USPS estimates that such scanning alone could take a minute per piece of mail and that election

staff will have to "remain at the postal retail location during the verification process." The amount of staff time spent processing election mail will increase exponentially. *See* 39 CFR Part 111, Supplementary Information at 57-58. If these preparations are delayed or not completed, that can have significant impacts on the conduct of the election and opportunities for voters. To implement this rule would require reassigning staff that would otherwise be conducting reviews of county election procedures for compliance with election laws, providing physical security assessments and recommendations, creating and distributing voter education materials to county election officials, responding to requests for assistance with the election management and voter registration system, attending voting system pre-election day testing, reviewing county election certification and reconciliation reports, and providing training to election officials.

62. I am also deeply concerned about harms to the morale of election officials in my office and statewide resulting from the implementation of the Rule. USPS waves away serious concerns about implementation and compliance with state law by stating, "States can easily avoid any effects on their state elections by either complying with the rule's requirements or by separating their federal ballots to exclude any non-federal elections." 39 C.F.R. Part 111, Supp. Info. at 78. This ignores both the serious concerns with the practical ability for USPS to carry out the requirements of the rule, and the fact that separating federal and non-federal elections, which are printed on the same ballot, is functionally impossible. USPS then asserts, despite the extensive evidence of compliance challenges provided in comments on the Proposed Rule, that implementation and compliance are completely feasible so long as states "make a good faith effort to comply with the rule." 39 C.F.R. Part 111, Supp. Info. at 70. As demonstrated above, this is not the case at all. And my colleagues and I are acutely aware that the Rule's requirements to enable tracking of mail ballots sent to and returned by voters comes in the context of an

Executive Order that directed federal agencies to prioritize the investigation and prosecution "of State and local officials . . . who issue Federal ballots to individuals not eligible to vote in a Federal election." Ex. Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125, § 2(b) (March 31, 2026); *see also id.* § 5 (providing that "State or local election officials . . . [and] individuals involved in the administration of Federal elections; or public [] entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under" various federal criminal laws). USPS made clear the primary purpose of the Portal Data and the Lists is "to provide valuable insight" to law enforcement, specifically though disclosing "a list of individuals to whom states planned to mail a ballot (and who may potentially use the mail to vote), along with the associated barcode data," which in turn can purportedly "identify potentially anomalous incidents that may merit further investigation." *See* 39 C.F.R. Part 111, Supp. Info. at 60, 61. USPS claims that "*law enforcement lacks such information regarding the use of the mail*." However, my office already makes available to the public a complete list of ballots issued, including those by mail. Wash. Rev. Code § 29A.40.130. This new list does not provide any new information that is not already publicly available and retained for the entire federal retention period. The Executive Order also requires USPS to coordinate with its own Office of Inspector General and the Department of Justice "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(c). In a letter to Washington Secretary of State Steve Hobbs dated July 7, 2026, U.S. DOJ specifically threatened to prosecute election officials if noncitizens cast any ballots.

63. My colleagues and I are also acutely aware that President Trump has repeatedly claimed that there is widespread fraud allowing noncitizens to vote, even though in our experience as election officials noncitizen registration and voting are both extraordinarily rare.

64. I am worried that myself and other election officials could be targeted for federal investigation and even prosecution as a result of the Rule's mail ballot tracking system if the federal government believes, even incorrectly, that any of Washington's registered voters are not citizens.

65. In conclusion, I estimate that the requirements of the Rule will require an increase of approximately $4,000,000 to the Washington Secretary of State's budget. Given recent economic pressures across the state and country, I have been trying to keep my office's budgetary needs as low as possible. The Elections Division has recently experienced over $6 million in expenditure reductions. Following the most recent state legislative session, an additional budget reduction of $70,325 is required for the Elections Division. To cover the costs of complying with the USPS Rule, I will either need to go back to the Legislature and ask for additional funds, which I am far from assured to receive, or will need to identify equivalent cuts elsewhere in my office—a very difficult and maybe impossible task. With the reductions experienced so far, any additional cuts would have a high probability of eliminating staff positions or programs in their entirety.

66. Based on the most recent round of funding loss, our office has already eliminated nearly all discretionary projects and limited staffing levels to the minimum necessary to complete all constitutional, federal, and state election law requirements. The State currently has a small, dedicated staff that assists me in overseeing elections. Preparation for the November 2026 general election is already well underway. This staff is already at capacity focusing on a

multitude of responsibilities, including ensuring security and maintenance of the voter registration database, training of election administrators to ensure compliance with federal and state laws, responding to public record requests, reviewing county election procedures, and providing voting information to eligible voters. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and challenges to voter registrations.

67. Implementing the Rule will necessarily divert the attention of my small staff from all of these critical functions at a time when election administration is already under profound threat due to concerted misinformation campaigns and violent acts by foreign and local actors. For example, in 2024, there were multiple incidents that required unprecedented action, including the physical destruction of ballot drop boxes and multiple envelopes sent to election offices that contained white powder. Washington is preparing to respond to similar types of incidents and must stay informed about new emerging threats to election officials and voters. Implementing the Rule will detract from and weaken these efforts.

68. In addition to adding staffing, the State will also need to expend significant resources training local election officials about process changes required by the Rule. The OSOS provides local elections administrators hundreds of hours of election training, including a required orientation training called "Elections 101." *See* https://www.sos.wa.gov/elections/administrators/certification-training/elections-101. These trainings are provided in live events, written materials, checklists, best practices, frequently asked questions, guides, virtual events, and videos. The OSOS also provides training to county canvassing boards tasked with the responsibility to canvass election results.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 24, 2026, at Olympia Washington.

Stuart Holmes
Director of Elections
Office of the Secretary of State