**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**DEMOCRATIC PARTY PLAINTIFFS' REPLY IN SUPPORT OF THEIR RENEWED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I. The Democratic Party Plaintiffs are substantially likely to succeed on the merits............ 2

A. Section 3(b) and the Ballot Mail Rule violate the separation of powers. ............... 2

B. Section 3(b) and the Ballot Mail Rule are *ultra vires*. ........................................... 4

1. Judicial review is available where USPS exceeds its statutory authority... 4

2. Title 39 prohibits USPS from implementing the Ballot Mail Rule. ........... 5

3. No other statutory provision authorizes the Ballot Mail Rule. ................... 7

4. Other USPS regulations—real and imagined—are not analogous. .......... 10

C. Section 3(b) and the Ballot Mail Rule violate the Privacy Act............................ 13

II. Democratic Party Plaintiffs' injuries warrant relief. ....................................................... 15

III. The remaining preliminary injunction factors favor immediate relief............................. 23

IV. *CASA* does not limit relief.............................................................................................. 25

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*AFGE v. OPM*,
786 F. Supp. 3d 647 (S.D.N.Y. 2025)............................................................... 21, 22, 23

*AFL-CIO v. DOL*,
No. 25-CV-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026)................................. 15

*Am. Sch. of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)........................................................................................................ 4, 9

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)............................................................................................................ 2

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin.*,
502 U.S. 32 (1991).......................................................................................................... 4

**Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026)...................................................................................................... 3, 16

*California v. Trump*,
183 F.4th 73 (1st Cir. 2026)......................................................................................... 24

*Conte & Co. v. Stephan*,
713 F. Supp. 1382 (D. Kan. 1989)................................................................................... 5

*CSX Transp., Inc. v. Com. Union Ins. Co.*,
82 F.3d 478 (D.C. Cir. 1996)........................................................................................ 14

*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025).............................................................................. 22, 23

**Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sept. 8, 2026)..................................... *passim*

*Doe v. Chao*,
540 U.S. 614 (2004)...................................................................................................... 15

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)..................................................................................... 15

*DSCC v. Trump*,
No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026)............................... 2, 3, 16, 24

*Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*,
966 F.2d 747 (3d Cir. 1992)........................................................................ 23

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003)................................................................ 25

*Gardner v. Henderson*,
No. 2:26-CV-00084, 2026 WL 496448 (D. Utah Feb. 23, 2026)........................................ 16

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)...................................................................... 23

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)........................................................................................ 5

**League of Women Voters of Mass. v. Trump*,
No. 1:26-cv-11549-IT, 2026 WL 2620871 (D. Mass. Sept. 4, 2026)........................ *passim*

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........................................................................ 17

*League of Women Voters v. DHS*,
No. 25-CV-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026) ............................. 15

*League of Women Voters v. DHS*,
No. 26-5243 (D.C. Cir. Sept. 4, 2026) (slip op.) ............................................. 14, 15

**League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)................................................................... 16, 21, 23

**Loper Bright v. Raimondo*,
603 U.S. 396 (2024)........................................................................... 7, 10, 15

*N. Air Cargo v. USPS*,
674 F.3d 852 (D.C. Cir. 2012)........................................................................ 4

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022)..................................................................... 4, 5

*Nat'l Retired Teachers Ass'n v. USPS*,
593 F.2d 1360 (D.C. Cir. 1979)...................................................................... 4

*NFIB v. OSHA*,
595 U.S. 109 (2022)........................................................................................ 2

*Sears, Roebuck & Co. v. USPS*,
844 F.3d 260 (D.C. Cir. 2016) ..... 4

*Stanley v. Brown Cnty. Election Bd.*,
829 F. Supp. 3d 506 (S.D. Ind. 2026) ..... 16

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ..... 3

*TransUnion, LLC v. Ramirez*,
594 U.S. 413 (2021) ..... 21

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..... 25

*USPS v. Postal Regul. Comm'n*,
599 F.3d 705 (D.C. Cir. 2010) ..... 7

*Watson v. Republican Nat'l Comm.*,
146 S. Ct. 2165 (2026) ..... 24

*Wooley v. Maynard*,
430 U.S. 705 (1977) ..... 11

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ..... 9

**STATUTES**

5 U.S.C. § 552a ..... 13, 14, 25

5 U.S.C. § 701 ..... 14

18 U.S.C. § 1716 ..... 11

39 U.S.C. § 101 ..... 5, 12

39 U.S.C. § 102 ..... 6

39 U.S.C. § 401 ..... *passim*

39 U.S.C. § 404 ..... *passim*

39 U.S.C. § 410 ..... 14

39 U.S.C. § 3001 ..... 5, 8

39 U.S.C. § 3017 .......... 12

39 U.S.C. § 3018 .......... 11

**REGULATIONS**

Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) .......... *passim*

Cremated Remains Packaging Requirements, 90 Fed. Reg. 9843 (Feb. 19, 2025) .......... 10

Restricting the Mailing of Replica Inert Explosive Devices,
75 Fed. Reg. 282 (Jan. 5, 2010) .......... 10, 11

System of Records Notice, 91 Fed. Reg. 56368 (Sept. 1, 2026) .......... 21

**OTHER AUTHORITIES**

@NewsHour, X (Aug. 27, 2026, at 3:09 p.m. ET),
https://x.com/NewsHour/status/2093053274546930170?s=46&t=jPiFFuiIksn
OJo_ryRpnRg .......... 17

Eileen Sullivan, *Postal Service Is Building Ballot Screening System Despite Ongoing Court Fight*, N.Y. Times (Sept. 2, 2026),
https://www.nytimes.com/2026/09/02/us/politics/postal-service-ballot-screening-system.html .......... 19

Fed. Reserve Bank of St. Louis, *Gross Domestic Product* (updated Aug. 26, 2026),
https://perma.cc/AB4V-6V8B .......... 9

States United Democracy Center, *Reports: Nearly 1 in 3 Americans From Across the Aisle Voted by Mail in 2024 and 2022* (Sept. 4, 2025) (updated Sept. 3, 2026),
https://perma.cc/RK9J-GY2N .......... 10

## INTRODUCTION

Now that they have conceded Democratic Party Plaintiffs' standing to challenge Section 3(b) and the Ballot Mail Rule, Defendants can no longer avoid the merits. Yet they still cannot identify *any* source of authority for USPS to refuse to deliver properly postaged ballot mail.

Defendants gesture at USPS's general authorization to make rules necessary to the exercise of its assigned statutory "functions," 39 U.S.C. § 401(2), but that begs the fundamental question rather than answering it—where has Congress *ever* tasked USPS with protecting the integrity of federal elections (Defendants' framing), let alone with gatekeeping which voters may receive their ballot by mail (a truer reading)? Congress has done none of these things, and any assertion otherwise remains unsubstantiated *ipse dixit*.

Lacking any on-point authority, Defendants instead repeatedly point to the only two regulations in postal history that they seem to deem analogous: those governing *cremated human remains* and *replica explosives*. Ballots are neither of these things. Indeed, one struggles to think of mail items that are even *less* like a ballot. Defendants' remaining arguments are no better. USPS envelope-design *recommendations* and ballot-prioritizing *guidance* that *ensure* ballot mail is timely delivered do not justify *requirements* that would *prohibit* ballot mail from being delivered. A purely *hypothetical* regulation about retirement-home mail does not justify any *final rule* regulating elections. And it makes no sense to *defend* the Ballot Mail Rule as necessary to election integrity while *disclaiming* that the Rule has anything to do with elections at all.

The Intervenors add little to the analysis. They continue to contest standing, but Supreme Court and D.C. Circuit precedent foreclose those arguments, as Defendants concede. And equitable considerations overwhelmingly favor an injunction. As the D.C. Circuit recognized, the Ballot Mail Rule, as contemplated by Section 3(b) of the E.O., "involve[s] the President, whom the Constitution vests with no express authority over the conduct of elections, undertaking a

substantial and unfunded overhaul of election procedures—including the implementation of a nationwide reform to Postal Service mail-handling processes—on the threshold of the November election." *DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026). Such an undertaking is flagrantly unlawful, and an injunction is needed immediately to mitigate further irreparable harm to Democratic Party Plaintiffs and the public.

## ARGUMENT

### I. The Democratic Party Plaintiffs are substantially likely to succeed on the merits.

Section 3(b) of the Executive Order and the Ballot Mail Rule exceed any authority afforded to the Executive Branch by Congress or the Constitution, and the challenged provisions independently violate the Privacy Act. Defendants and Intervenors fail to show otherwise.

#### A. Section 3(b) and the Ballot Mail Rule violate the separation of powers.

Because Section 3(b) and the Ballot Mail Rule exceed the authority granted by Congress, they are unconstitutional. The Ballot Mail Rule violates the horizontal separation of powers between the Executive and Legislative branches—only Congress can "pre-empt state regulations governing . . . congressional elections," *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 8 (2013), and only Congress can authorize USPS to take action, *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). Defendants do not and cannot claim that Congress has delegated any Elections Clause authority to USPS. *See League of Women Voters of Mass. v. Trump*, No. 1:26-cv-11549-IT, 2026 WL 2620871, at *14 (D. Mass. Sept. 4, 2026) ("*LOWVMA*") ("Congress has never explicitly delegated its Elections Clause power to the USPS, and Defendants and Intervenor-Defendants do not claim otherwise."). The Rule further violates the vertical separation of powers between the federal government and the States by infringing upon States' exclusive constitutional authority to set voter qualifications and to administer elections except in

the narrow areas where Congress has affirmatively acted. *See* PI Br. 22–24; *see LOWVMA*, 2026 WL 2620871, at *14.

To avoid the constitutional problem, Defendants consistently deny that the Ballot Mail Rule is an *election* rule, insisting instead that it is a mere *postal* regulation. Def. Br. 11, 17–18. The D.C. Circuit has already indicated the opposite, *DSCC*, 2026 WL 2168617, at *5, as did the *LOWVMA* court, 2026 WL 2620871, at *14. Defendants' construction also conflicts with their concession that Plaintiffs have standing under *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71 (2026), which "held that candidates have a concrete and particularized interest in the 'process' of elections sufficient on its own to challenge an extant election rule," *DSCC*, 2026 WL 2168617, at *4 n.8. And it defies the text and stated goals of the Rule itself, which repeatedly adopts the federal-election-focused purposes expressed in the E.O. and states on its face that noncompliant ballot mail will not be delivered by USPS. Ballot Mail for Federal Elections, 91 Fed. Reg. 54966, 54981 (Aug. 26, 2026); *see also, e.g.*, *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 105 (D.D.C. 2020) (Nichols, J.) (holding courts must determine whether a policy regulates in a certain arena by reviewing the text, "primary purpose," and "stated goals" of the policy (collecting authority)).[1]

[1] The E.O.'s title is "Ensuring Citizenship Verification and Integrity in Federal Elections." Its stated goal and purpose is to ensure "only citizens receive and cast ballots." E.O. § 1. The Rule's title is "*Ballot Mail for Federal Elections*," and it similarly and repeatedly states "Federal election" policy aims, 91 Fed. Reg. 54966 (setting policy "regarding the transmission of mail-in or absentee ballots for federal elections"); *e.g.*, *id.* (expressing purpose of "ensur[ing] the faithful execution of federal law in connection with federal elections," and tying effective date to "election" calendar); *id.* at 54967 (reiterating purpose of "enhancing election security by improving the visibility of Federal Ballot Mail"); *see also* E.O. § 3(b) (further reiterating purpose of "protect[ing] the integrity of the mail as a medium for transmitting Federal election ballots"); *id.* § 3(b)(v) (tying policy goal to "Federal election" calendar); *id.* § 3(c) (mandating "investigation of suspected unlawful use of the mail involving Federal election materials").

### B. Section 3(b) and the Ballot Mail Rule are *ultra vires*.

#### 1. Judicial review is available where USPS exceeds its statutory authority.

Defendants' argument about USPS's statutory authority begins inauspiciously with a misstatement of the standard of review. While conceding that USPS's actions are subject to *ultra vires* causes of action, Defendants claim that Plaintiffs must identify "an agency violation of a specific prohibition in a statute that is clear and mandatory." Def. Br. 12 (citations omitted). In their view, it seems, courts would have no authority to enjoin USPS rulemakings that are so extreme in their unlawfulness (such as a rule permitting USPS to euthanize obstructive pets) that Congress never contemplated the need for an explicit proscription.[2]

D.C. Circuit precedent rejects Defendants' argument that judicial review can simply be evaded through increasingly innovative lawbreaking. In *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960 (D.C. Cir. 2022), the D.C. Circuit's most recent statement on *ultra vires* review of USPS actions, the court made clear that, "[s]o long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review," courts can review (and invalidate) action that falls outside those "outer limits." *Id.* at 971; *see also* 39 U.S.C. §§ 401–04, 3001–18. Indeed, as the D.C. Circuit explained in *Sears, Roebuck & Co. v. USPS*, 844 F.3d 260 (D.C. Cir. 2016), determining whether "a regulation in the [Domestic Mail] Manual was a valid exercise of the Postal Service's authority" is a paradigmatic case for *ultra vires* review. *Id*. at 265 (citing *Nat'l Retired Teachers Ass'n v. USPS*, 593 F.2d 1360, 1363 (D.C. Cir. 1979)). And because agencies have "literally . . . no power to act" absent congressional

[2] While evocatively phrased, Defendants' "Hail Mary pass" analogy is inapposite. Def. Br. 12 (quoting *NRC v. Texas*, 605 U.S. 665, 681-82 (2025)). Defendants' preferred standard of review does not apply because Congress did not embed independently adequate review within statutes governing USPS. *See Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin.*, 502 U.S. 32, 43–44 (1991); *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 970 (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)); *N. Air Cargo v. USPS*, 674 F.3d 852, 858 (D.C. Cir. 2012).

authorization, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), a USPS regulation that exceeds its Title 39 powers violates the clear command not to issue a regulation "inconsistent with th[at] title," 39 U.S.C. § 401(2).

**2. Title 39 prohibits USPS from implementing the Ballot Mail Rule.**

Democratic Party Plaintiffs identified several statutory provisions that "set the outer limits" of USPS's authority, *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971, and preclude Defendants from restricting ballot mail as Section 3(b) and the Ballot Mail Rule attempt to do, PI Br. 16–22. Defendants have no persuasive response.

*First*, the Ballot Mail Rule simply has nothing to do with the functions that Congress has assigned to USPS. USPS's governing statute authorizes it to "provide postal services," 39 U.S.C. § 101(a), to "provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," *id*. § 404(a)(1), and to make regulations "necessary" to carry out these functions, *id*. § 401(2). The Rule does not involve the provision of "postal services"—instead, it imposes a bevy of *non-postal* obligations on third parties, including requiring States to submit to USPS (1) their envelopes for design review and (2) lists of mail-ballot-eligible voters. The Ballot Mail Rule also requires action by USPS that has nothing to do with providing "postal services," including (1) the operation of an online portal for States to submit lists of voters, (2) the provision of such lists to the states, and (3) the implementation of an envelope-by-envelope verification process for ballot mail. There is simply no statutory support for these directives.

*Second*, Title 39 provides an exhaustive list of categories of "nonmailable matter" that USPS may not process or transmit. *See* 39 U.S.C. §§ 3001–18. Defendants respond that the federal statutory scheme for mail processing is not comprehensive. *See* Def. Br. 21–22 (arguing statutory categories are not "*exclusive*"). They are wrong. *See Conte & Co. v. Stephan*, 713 F. Supp. 1382, 1386 (D. Kan. 1989) ("There is little doubt that the federal statutory scheme for handling,

delivering and sorting the mails is comprehensive. The United States Postal Service may determine whether matter is nonmailable *under statutory guidelines*, and may return any nonmailable matter to the sender." (emphasis added)). Defendants also propose that the Ballot Mail Rule does not create a new category of nonmailable matter because USPS may deliver mailpieces within that category if certain conditions are satisfied. *See* Def. Br. 21. But whether something is nonmailable does not turn on whether the entire category is prohibited. Title 39 defines many nonmailable categories conditionally, providing that certain mail shall not be delivered "unless" a condition is satisfied. *See LOWVMA*, 2026 WL 2620871, at *16 (explaining there is "no distinction between the USPS's refusal to accept noncompliant mail ballots and other conditionally nonmailable materials"); *see also* Amicus Br. of the Society for the Rule of Law at 10–11, ECF No. 170 (assessing specific provisions). What makes a category "nonmailable" is that USPS may not ultimately carry it, in an exception to USPS's general mandate to provide universal service.

*Third*, USPS's governing statute forbids it from performing "any nonpostal service." 39 U.S.C. § 404(e)(1)–(2). Defendants deny that the Ballot Mail Rule relates to "nonpostal" matters because it involves the delivery of mail. Def. Br. 23. But housing State voter lists in a custom portal and adopting rules that restrict who may receive a mail ballot, all to advance a contentious view of election integrity, have nothing to do with the "delivery of letters" and are not "ancillary to" mail delivery. 39 U.S.C. § 102(5); *see also id.* § 404(e)(1) (defining "nonpostal service" as "any service that is not a postal service"). By Defendants' logic, USPS could require anything of users of the mail—from providing USPS with lists of voters to installing residential solar panels—so long as it conditioned mail delivery on compliance. Defendants also deny that the Rule contemplates "services" because Defendants define that term to refer only to commercial activities offered to the public for financial gain. Def. Br. 22–23. But the only authority Defendants cite for

this proposition deferred to USPS's own definition of the term. *See USPS v. Postal Regul. Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010) ("Here we grant readily petitioner's contention that the term 'service,' which is not defined in the statute, is unquestionably ambiguous. But as we have just observed, the Commission is entitled to *Chevron* deference as to its construction."). That definition is mistaken, *see Loper Bright v. Raimondo*, 603 U.S. 396, 403 (2024); if the maintenance of a system by a federal agency is not a "service," it is unclear what would be.

**3. No other statutory provision authorizes the Ballot Mail Rule.**

The Ballot Mail Rule is not authorized by any of the three statutory sections Defendants offer as justification. *See* Def. Br. 13 (citing 39 U.S.C. §§ 401(2), 401(10), and 404(a)(1)).

*First*, Section 401(2) authorizes USPS "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of *its functions under this title* and such other functions as may be assigned to the Postal Service *under any provisions of law outside of this title*." 39 U.S.C. § 401(2) (emphasis added). This language does not assign USPS any functions at all, let alone functions related to mail ballots—it merely creates rulemaking power for USPS to execute functions that are assigned by *some other* statutory provision. *LOWVMA*, 2026 WL 2620871, at *14, 16 (discussing 39 U.S.C. § 401(2) and concluding that "Congress has not authorized the USPS to make requirements of States before permitting use of the USPS for mailing their ballots").[3]

[3] In a footnote, Defendants admit that the cases upon which their expansive theory of regulatory authority is built have been superseded by statute, and respond only by trying to frame the "amendments" as "minor." Def. Br. 13 n.6 (citing 39 U.S.C. § 401(2)). Nonsense. Defendants again read out of the statute the exact words that Congress added—and ignore the implications of Congress's deletions. *See* PI Br. at 17; *compare* 39 U.S.C. § 401(2)) ("[T]he Postal Service shall have the following general powers: to adopt, amend, and repeal such rules and regulations, *not inconsistent with this title*, as may be necessary in the execution of its functions *under this title* and such other functions as may be *assigned to the Postal Service* under any *provisions of law* outside

*Second*, Section 401(10) grants USPS "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." 39 U.S.C. § 401(10). Again, this language allows USPS to regulate mail ballots *only* if some *other* statutory section assigns USPS a "specific power" related to mail balloting. *Id.* Because Defendants have not identified any such statute, the search continues.

*Third*, Section 404(a)(1) authorizes USPS "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." 39 U.S.C. § 404(a)(1). But the Ballot Mail Rule does nothing to effectuate mail delivery; it commandeers States into uploading voter information into a new Portal that will be used to *prevent* mail delivery for reasons that, still, have no statutory basis.[4]

Beyond Defendants' three unsuccessful cites, Intervenors alone cite 39 U.S.C. § 3001(b), which provides that USPS shall direct the disposal of "nonmailable matter [that] may be seized or detained for violation of law." Interv. Br. 14. This provision does them no good, however, because *USPS* "*expressly disclaimed* 'creat[ing] a new category of "nonmailable matter" into which Federal Ballot Mail as a class may generally fall.'" Def. Br. 21 (quoting 91 Fed. Reg. 54973) (emphasis added). Besides, whether a ballot envelope deemed noncompliant with the Ballot Mail Rule violates any law is, again, question-begging. What law does a State violate when it mails a

---

of this title"), *with* Def. Br. 13 n.6 ("the current statutes authorize the issuance of regulations 'as *may* be necessary in the execution of [the Postal Service's] functions,' and also delegate 'all other powers incidental, necessary, *or* appropriate to the carrying on of its functions or the exercise of its specific powers,'" (emphases by Defendants, citations omitted)).

[4] Intervenors cite 39 U.S.C. § 404(a)(6), which authorizes USPS "to investigate postal offenses and civil matters relating to the Postal Service." But Intervenors have not identified any "postal offenses" that the Ballot Mail Rule might mitigate. While they refer vaguely to the specter of "fraudulent voting through the mail," Interv. Br. 14, they do not explain how the Rule advances that interest. Because USPS has pledged to deliver ballot mail to anyone included in the voter lists that States submit, it is up to Intervenors themselves to ensure that voters requesting mail ballots are qualified.

ballot envelope to a voter who was not entered into USPS's portal? And what law does a State violate when its mail ballot envelope lacks USPS's preferred bar code? Intervenors cannot answer these questions, and they still have not found a source of law authorizing the challenged provisions of Section 3(b) or the Ballot Mail Rule. *See Am. Sch. of Magnetic Healing*, 187 U.S. at 109 ("[The] right to exclude letters, or to refuse . . . delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then [USPS] cannot exclude or refuse to deliver them.").

The lack of clear statutory authority further confirms that the Ballot Mail Rule runs afoul of the major questions doctrine, which relates to the "economic and political significance" of the regulatory authority that an agency claims. Def. Br. 17 (*quoting Learning Res., Inc. v. Trump*, 607 U.S. 229, 246 (2026)). Defendants protest that the "'economic significance' of the Rule is not remotely comparable to any prior major-questions case." *Id.*; *see also* Interv. Br. 16 ("The Supreme Court has previously suggested that a rule implicates a major question if it imposes an 'economic impact' of around $50 billion."). But Plaintiffs have never claimed that the Ballot Mail Rule is an economic regulation. It is a *political regulation*, of enormous significance.

"Few of Congress's powers" are of greater consequence "than its supervisory authority to regulate elections, because voting is 'preservative of all rights.'" *LOWVMA*, 2026 WL 2620871, at *15 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)); *see id.* (explaining Congress does not make "sweeping delegation[s]" of its authority (quoting *Learning Resources*, 607 U.S. at 248)). A $50 billion economic impact would translate to approximately 0.167% of the United States' gross domestic product.[5] By comparison, more than 48 million voters cast their ballots by mail in

[5] The gross domestic product in 2024 was approximately $30 trillion. *See* Fed. Reserve Bank of St. Louis, *Gross Domestic Product* (updated Aug. 26, 2026), https://perma.cc/AB4V-6V8B.

2024, accounting for 31% of the electorate.[6] The political significance of the Ballot Mail Rule far exceeds any minimum the Supreme Court has set for the major questions doctrine and confirms that Congress would not have delegated such massive power to USPS only by implication.

**4. Other USPS regulations—real and imagined—are not analogous.**

With nothing helpful from Congress, Defendants turn to their own regulatory history for support. *But see Loper Bright*, 603 U.S. at 396 (holding courts may not defer to agency interpretations of their governing statutes). First, Defendants assert the authority to regulate mail "raising unique operational concerns—such as cremated remains or replica explosives." Def. Br. 2; *see also* Interv. Br. 14–15 (claiming USPS has a "long history" of imposing conditions on types of mail "not specifically enumerated in Title 39," but identifying only these two examples). For reasons that ought to be obvious, mail ballots do not create operational concerns that are in any way analogous to the ash of cremated human bodies or look-alike bombs in the mailstream.

Cremated remains must be labeled as such, and they must be sent in secure, sift-proof containers with cushioning to prevent breakage. *See* Cremated Remains Packaging Requirements, 90 Fed. Reg. 9843 (Feb. 19, 2025). These measures ensure that postal services are not halted for safety concerns every time a powdery substance is identified in a mail item; that postal services are not obstructed or contaminated by leaking ashes; and that any cremated remains placed in the mail will be handled respectfully. Replica explosives, in turn, must be labeled as such in large font. *See* Restricting the Mailing of Replica or Inert Explosive Devices, 75 Fed. Reg. 282 (Jan. 5, 2010). This is because, as USPS explained in its rulemaking, "In the past, postal operations have been disrupted and facilities have been evacuated when replica or inert explosive devices have been

[6] States United Democracy Center, *Reports: Nearly 1 in 3 Americans From Across the Aisle Voted by Mail in 2024 and 2022* (Sept. 4, 2025) (updated Sept. 3, 2026), https://perma.cc/RK9J-GY2N.

discovered in the mail." *Id.* at 283. "Such evacuations result in unnecessary expense and loss of productivity to the Postal Service and can jeopardize USPS service commitments." *Id.*

Defendants do not suggest that mail ballots have disrupted mail operations at all. Nowhere do they even attempt to defend the Ballot Mail Rule as necessary to 1) protect the safety of USPS employees, 2) prevent the contamination of other mail, 3) honor voters' expectations of how their ballot will be handled, or 4) avoid unnecessary evacuations that reduce productivity. They do not connect the Rule to *any* operational considerations whatsoever. Nor do they argue that ballot mail will regularly appear indistinguishable from materials that Congress identified as nonmailable. *See* 18 U.S.C. § 1716(a) (labeling "all explosives [and] hazardous materials" as "nonmailable matter [that] shall not be conveyed in the mails or delivered from any post office").[7] Without rules on cremated remains and replica explosives, USPS cannot collect, handle, transport, and deliver mail effectively. *See* 39 U.S.C. § 404(a)(1). Ballot mail obviously does not pose any similar operational obstacles—it can be collected, handled, transported, and delivered just like other envelope mail.[8]

Finding no analogy in adopted rules, Defendants turn to examples that are not rules. For example, they note that USPS "has recommended that federal ballot mail envelopes use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing." Def. Br. 4. But the difference between an optional procedure and a final rule that prohibits the delivery of noncompliant ballot mail is the difference between lawful and lawless. *Cf. Wooley v. Maynard*, 430 U.S. 705 (1977) (holding state could

[7] Notably, Congress explicitly instructed USPS to regulate the manner in which hazardous material is to be mailed, 39 U.S.C. § 3018(a) (USPS "shall prescribe regulations"), and determined that hazardous materials would be nonmailable absent compliance with those conditions, *see id.* § 3018(b)(2). USPS's interpretation of Sections 401 and 404 as giving it limitless rulemaking authority to condition mailing would render the detailed hazardous materials statutes surplusage.

[8] To the extent *States* might have reasons to restrict forwarding of ballot mail—unrelated to USPS operational capacity—it is their own prerogative to label ballot envelopes accordingly.

offer, but not require, license plates displaying state motto).

Similarly, agency guidance that directs USPS to "prioritiz[e]" the delivery of ballots, Def. Br. 17–18 (citing "Kit 600"), is different in every relevant way from a rule that prohibits the delivery of noncompliant ballots. Congress instructed USPS to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). A policy to expedite the delivery of important ballot mail complies with this instruction in a way that the Ballot Mail Rule does not.

Defendants also imagine a rule "impos[ing] special design and registration rules for envelopes used to send solicitations" to retirement communities, which Defendants propose could mitigate elder-abuse mail scams, Def. Br. 15, but that hypothetical does them no good. First, this made-up rule would need to be justified by some statutory function, and—as with the Ballot Mail Rule—Defendants fail to identify one. There is, however, a plausible statutory hook: The Deceptive Mail Prevention and Enforcement Act requires "skill contest or sweepstakes" mail to include a "conspicuously displayed" statement on how to opt out from all such future mailings. 39 U.S.C. § 3017. Congress specifically enacted this legislation "because of the deep concern regarding the need to protect recipients, particularly the elderly, who fall prey to the deceptive information transmitted in the mailings," H.R. Rep. No. 106-431 at 13 (1999). To the extent Defendants believe this statute would *not* authorize the vague hypothetical they have in mind (hence their failure to cite it), then the hypothetical rule would, like the Ballot Mail Rule, be unlawful. And if Defendants *do* believe this statute provides the relevant authority, then that distinguishes it from the Rule here, which has nothing to do with skill contests or sweepstakes.

Even if Defendants could identify a generic anti-fraud function vested in the USPS by Congress, their attempted retirement-home hypothetical would still fail. The hypothetical rule

would presumably mitigate fraud by warning retirees that an envelope contains a commercial solicitation and perhaps by banning violators from the registry of permitted mailers. The Ballot Mail Rule, in contrast, is entirely untethered to the supposed anti-fraud interests. *See LOWVMA*, 2026 WL 2620871, at *25 (finding "no evidence relating to fraudulent mail voting to support the rushed implementation of the Final Rule"). Defendants insist that States retain "complete control" over election administration, "including decisions about who is eligible to vote by mail," and that the Rule "should not prevent a single voter from voting by mail." *E.g.*, Def. Br. 1, 23. But if States enjoy the same discretion to mail ballots to voters under the Ballot Mail Rule as they would absent the Rule, then the Rule cannot prevent States from mailing ballots to unauthorized voters.

The anti-fraud rationale is intelligible *only if* Defendants intend to take action in some future election to restrict mail voting in States that are deemed to have sent ballots to unauthorized voters. Defendants cannot admit that is their plan, however, because such an extraordinary action would contradict their protestations that States' authority to administer their own elections is entirely undisturbed. The decision to proceed by inference and innuendo, however, severs the Rule from its only proffered justification. Section 3(b) and the Ballot Mail Rule represent an aggressive expansion of USPS authority into entirely new domains that Congress has never authorized.

### C. Section 3(b) and the Ballot Mail Rule violate the Privacy Act.

The relevant provision of the Privacy Act is straightforward: Agencies must "maintain *no record* describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7) (emphasis added). The Ballot Mail Rule violates this express command. Under the Rule, USPS must collect and maintain information about voters who receive and transmit mail ballots. That is plainly an exercise of "rights guaranteed by the First Amendment." *Id.*

In arguing otherwise, Defendants assert that the Rule is "not about collecting information on how individuals exercise their First Amendment rights at all." Def. Br. 27; *see also* 91 Fed. Reg. 54970. But they cite nothing—literally nothing—to support this bald assertion. *See* Def. Br. 27. They do not attempt to refute Plaintiffs' explanation that voting itself (including the choice to vote by mail) is an exercise of First Amendment rights. *See* PI Br. 24–25 (collecting cases). Nor do Defendants argue that the Rule's collection of voter records is allowable because it is "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). That means Defendants waive, or at minimum forfeit, the issue for purposes of this motion. *See CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482-83 (D.C. Cir. 1996); *League of Women Voters v. DHS*, No. 26-5243 (D.C. Cir. Sept. 4, 2026) ("*DHS II*"), slip op. at 14–15 (discussing forfeiture in context of interim relief and declining to consider forfeited counterarguments).

With no room to argue the statute's text, Defendants retreat to procedure. *See* Def. Br. 27. They argue that straightforward *de novo* APA review is foreclosed by 39 U.S.C. § 410(a), which conditionally exempts USPS from "chapters 5 [which includes the Privacy Act] and 7 [which provides for judicial review]" of the APA. Defendants ignore, however, that Section 410(a) is conditional on Section 410(b). *See* 39 U.S.C. § 410(a) ("Except as provided by subsection (b) of this section . . . ."). Section 410(b), in turn, provides that "section 552a (records about individuals)"—that is, the section that Democratic Party Plaintiffs seek to enjoin Defendants from violating—"shall apply to the Postal Service." *Id.* § 410(b)(1). Defendants fail to explain how "shall apply," as the text says, can mean "shall not apply," as they interpret it.

The APA's judicial review provisions in chapter 7 also apply to this action. That chapter provides that review is withdrawn only "to the extent [an agency's] statutes preclude" it. 5 U.S.C. § 701(a)(1). As explained, the USPS statute does not preclude judicial review of violations of

Section 552a. Defendants' purported "longstanding position" to the contrary, Def. Br. 27, is entirely irrelevant because it conflicts with the text, *see Loper Bright*, 603 U.S. at 386 (holding that "longstanding" executive-agency views do not "supersede" judicial interpretations).

Democratic Party Plaintiffs' reading follows the growing body of post-*Loper* case law, which relies on the text of the Privacy Act and APA rather than past agency interpretations that depart from them. And the Privacy Act is *itself* part of the APA, Def. Br. 26–27, so it makes no sense to divorce the two in contravention of Section 410(a)'s text. *See League of Women Voters v. DHS* ("*DHS I*"), No. 25-CV-3501 (SLS), 2026 WL 1784297, at *22 (D.D.C. June 22, 2026) (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)), *stay denied*, *DHS II*, No. 26-5243 (D.C. Cir. Sept. 4, 2026). Defendants also ignore that the Privacy Act's apparent "inattention" to "equitable relief" is "explained by [the APA's] general provisions" for such relief. *Doe v. Chao*, 540 U.S. 614, 619 (2004). Thus, the Privacy Act "authorize[s]" the entry of "*prospective*" "equitable relief," even where such relief is not expressly referenced within the individual subdivisions of Section 552a. *DHS II*, slip op. at 48 (Katsas, J., dissenting); *see AFL-CIO v. DOL*, No. 25-CV-339 (JDB), 2026 WL 879518, at *20 (D.D.C. Mar. 31, 2026); *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC III*"), 818 F. Supp. 3d 34, 115 (D.D.C. 2026).

Even if Defendants were right about USPS's relationship with the Privacy Act and APA review (they are not), they do not dispute that injunctive relief against USPS is otherwise available through *ultra vires* review. Suppl. Compl. ¶ 214 (pleading this alternative); *see* Def. Br. 26–27. Whether through an APA stay or a preliminary injunction, Democratic Party Plaintiffs are entitled to the "equitable relief" that they have requested under the Privacy Act.

## II. Democratic Party Plaintiffs' injuries warrant relief.

Plaintiffs' injuries suffice for standing under five distinct bodies of precedent, and the record establishes irreparable harm as to each of them.

**A. *Bost* harm.** Defendants "do not dispute" that Plaintiffs have standing under *Bost*. *See* Def. Br. 8. The Ballot Mail Rule "departs from the law," which inflicts an injury-in-fact regardless of whether it ultimately "harm[s] their electoral prospects" or increases campaign costs. *Bost*, 607 U.S. at 77, 82; *see DSCC*, 2026 WL 2168617, at *5 n.9. Any suggestion otherwise necessarily fails. Intervenors, for their part, read *Bost* far too narrowly: they object that *Bost* does not apply because the Ballot Mail Rule "does not pertain to the counting of votes," Interv. Br. 12. They are wrong. *Bost*'s reasoning extends beyond the mere counting of votes to reach candidates' interest in "a fair process" overall. *Bost*, 607 U.S. at 77. Indeed, multiple courts have already held that *Bost*'s logic applies to other parts of the elections process. *See, e.g.*, *Gardner v. Henderson*, No. 2:26-CV-00084, 2026 WL 496448, at *5 (D. Utah Feb. 23, 2026) (three-judge court holding that "the same interest . . . applies equally to challenges to redistricting"); *Stanley v. Brown Cnty. Election Bd.*, 829 F. Supp. 3d 506, 515 (S.D. Ind. 2026) (holding that *Bost* applies to decisions excluding candidates "from access to a ballot"). And here, the Rule controls which ballots are sent to voters, returned, and ultimately counted, and the prospect that lawful mail ballots will not be delivered due to the Rule accordingly "erodes public confidence that the election results reflect the people's will." *Bost*, 607 U.S. at 78; *infra* § II.C.

**B. Competitor harm.** Separately from *Bost*, Democratic Party Plaintiffs have competitor standing because the Ballot Mail Rule disadvantages them relative to their opponents. PI Br. 9–11, 27. Defendants contend that the competitive injury is speculative, but there is no dispute that the Rule applies to mail voting, that noncompliant ballots will not be delivered, and that Democratic voters cast mail ballots at a higher rate than Republican voters. *See id.* at 10. It necessarily follows that Democratic Party Plaintiffs have the most to lose, and that any such losses would be irreparable. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (once

an election occurs, "there can be no do over" (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). Indeed, Defendant President Trump praised the Supreme Court's stay of another court's injunction blocking his Executive Order precisely because "[i]t was a great ruling for the Republican Party."[9]

**C. Member harm: voting rights.** Further, the Party Organizations have associational standing on behalf of their voter members, who suffer voting rights injuries from the Ballot Mail Rule. PI Br. 11–12 (collecting cases); *DHS II*, slip op. at 10 (holding voter members are cognizably injured when registration is conditioned on proof of citizenship requirement); *id.* at 52 (Katsas, J., dissenting) (agreeing). Threatened harms to these rights are also irreparable: "there are no do-overs for voters entitled to participate in elections[.]" *Ctr. for Taxpayer Rts. v. IRS* ("*CTR II*"), No. 26-5006, 2026 WL 2635380, at *13 (D.C. Cir. Sept. 8, 2026); *League of Women Voters of N.C.*, 769 F.3d at 247 (noting courts "routinely deem" imminent injury to voting rights irreparable).

Defendants suggest these harms are "speculative," *e.g.*, Interv. Br. 8–9, yet there is overwhelming evidence that the Rule will make it more difficult to vote by mail—and in many cases, will prevent individuals from voting altogether. It will be exceptionally difficult for many States and localities to comply with the Rule's envelope requirements, as they simply do not have the time and resources to design new envelopes with Intelligent Mail Barcodes ("IMbs"), wait for USPS design review, and print those ballots. *See* Ex. 9 ("Earley Decl.") ¶¶ 12–15, 20–22; Ex. 10 ("Holmes Decl.") ¶¶ 38–45; Ex. 11 ("Fontes Decl.") ¶¶ 34–39; *LOWVMA*, 2026 WL 2620871, at *18–20 (collecting declarations from state election officials).[10] Election officials must then navigate several steps through USPS's untested "portal" to enter voter information, hope the

---

[9] @NewsHour, X (Aug. 27, 2026, at 3:09 p.m. ET), https://x.com/NewsHour/status/2093053274546930170?s=46&t=jPiFFuiIksnOJo_ryRpnRg.

[10] For the Holmes and Fontes declarations, paragraph citations refer to their Exhibit A.

information is accurately and securely sent to USPS locations, and wait for verification before USPS might accept them for transmission. *See, e.g.*, Earley Decl. ¶¶ 19, 23–26; Holmes Decl. ¶¶ 23, 61; Fontes Decl. ¶¶ 21, 53; *LOWVMA*, 2026 WL 2620871, at *20–22. The record further confirms serious operational risks at every point in this process, severely threatening voting rights. *See, e.g.*, Earley Decl. ¶ 24 (discussing Portal's potential capacity and cybersecurity problems); *id.* ¶ 26 (describing risk that election officials will run out of time when attempting to fix purported errors in rejected ballots); Holmes Decl. ¶¶ 65–66 (explaining that Washington election officials do not have the budget to comply with the Ballot Mail Rule); Fontes Decl. ¶ 57 (same for Arizona); *see also LOWVMA*, 2026 WL 2620871, at *23 (noting States are exceptionally busy "administering elections" even without the Ballot Mail Rule).

These threats are heightened by "alarming" reported implementation procedures Defendants had never disclosed until days ago, including a zero-tolerance "batch" standard that has been advanced behind the scenes, where a single problematic barcode will cause USPS to refuse an entire mailing, so that one defect in a submission of 10,000 ballots could disenfranchise 9,999 other voters. *See* Br. of Amicus Curiae Whistleblower Aid ("Whistleblower Amicus") 5–8, 17, *USPS v. California*, No. 26A305 (U.S. Sept. 8, 2026); Whistleblower Disclosure (Aug. 30, 2026) at 7–9, 16–18, ECF No. 174-1. This evidence further confirms that ballots will be treated disparately based on the USPS location in which they are processed, something entirely out of a voter's control: some facilities will scan all ballots, some will scan only a small "sample," and others may do something between. *See* Whistleblower Amicus 7; Whistleblower Disclosure 17–18; *accord* Earley Decl. ¶ 25 (describing scanning differences between business mail entry unit and retail locations). And according to Jonathan Smith, President of the American Postal Workers Union, "no postal clerk, either in a business mail entry unit or at a post office retail location, has

been trained on how they will be expected to accept, validate or reject any election mail consistent with the [Ballot Mail Rule]," which will inescapably lead to further administrative errors.[11]

It is simply inevitable that USPS will refuse or be unable to transmit some of the tens of millions of ballots that States intend to mail for the 2026 midterm elections, *see LOWVMA*, 2026 WL 2620871, at *17 n.37 (collecting figures from declarants on the number of ballots), including ballots intended for Plaintiffs' members, *see, e.g.*, Earley Decl. ¶ 29 ("[W]ithout a doubt, if the Ballot Mail Rule is in effect for the 2026 elections, it will disenfranchise a large number of eligible voters."); Holmes Decl. ¶ 48 ("The Rule creates a very substantial risk that at least some ballot mailings will be delayed or not be transmitted at all."); Fontes Decl. ¶ 42 (same). And because many voters "depend on mail ballots to vote" and "cannot realistically vote in person," these voters will be disenfranchised altogether. Remmel Decl. ¶ 17.

USPS's only response, despite hundreds of comments (including from Democratic Party Plaintiffs) documenting the severe risks of disenfranchisement and harms to voters, was to "decline[] to conduct, publish, or otherwise disclose any additional analysis or information concerning the rule or Portal," including any anticipated rate of rejection. 91 Fed. Reg. 54988.[12] There is nothing in the record that even begins to dispute the mountains of evidence that the Rule will result in the non-delivery of qualified voters' ballots. At most, Defendants point to a statement from certain North Carolina election officials that expressed confidence in their ability to send out

[11] Eileen Sullivan, *Postal Service Is Building Ballot Screening System Despite Ongoing Court Fight*, N.Y. Times (Sept. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/postal-service-ballot-screening-system.html.

[12] The Ballot Mail Rule also ignores that some voters "obtain their ballots through an online portal that accommodates voters under the Americans with Disabilities Act (ADA)." Earley Decl. ¶ 16. These voters "cannot self-generate return envelopes with the requisite individualized IMbs." *Id.*; *LOWVMA*, 2026 WL 2620871, at *19 & n.44 (describing how Hawaii and Maryland "issue mail ballots via email or online and have no way to include a barcode in that format").

absentee ballots on September 4—unsurprising, given that the Rule's envelope, scanning and rejection requirements were blocked on that day. *See* Def. Br. 31. And the *12* Intervenor States offer just one declaration, from a Missouri election official. He concedes that "staff are still figuring out some details of implementation" and fails to explain *how* Missouri could comply with the Ballot Mail Rule. Hoskins Decl. ¶ 5, ECF 183-1. Missouri's flat "generality," *LOWVMA*, 2026 WL 2620871, at *12 & n.29, and the other 11 Intervenors' *total silence* are all the starker when compared with the declarations submitted by each of 23 States and the District of Columbia in the Massachusetts litigation, each of which explains in "granular detail" why compliance with the Ballot Mail Rule is infeasible, *id.* at *12 n.29.

Defendants and Intervenors nevertheless argue that any voting rights injury from USPS rejecting ballots for non-compliance with the Rule is somehow "not traceable" to USPS, Interv. Br. 11–12, because it would stem from "state governments' unwillingness or inability to facilitate mail-in voting in accordance with the Final Rule," Def. Br. 11. But even election officials who *have tried* to comply with the Rule have been unable to do so; USPS has rejected envelopes submitted for review without providing clarity on how to proceed, and election officials cannot access the Portal. Earley Decl. ¶¶ 21, 23. More importantly, "the intervening role of state officials does not defeat causation" for a voting rights injury; that "injury remains fairly traceable to federal action when third parties 'will likely react' to it 'in predictable ways.'" *DHS II*, slip op. at 11 (quoting *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025)). Here, no prediction is necessary, as officials have attested that they are unable to comply with the Ballot Mail Rule's requirements—which USPS has repeatedly admitted means no ballot delivery.

**D. Organizational harm.** All of that, of course, means Democratic Party Plaintiffs must take action to attempt to ameliorate the severe injuries the Rule imposes on their core business

activities—ensuring that Democratic voters' ballots are cast and counted—at the precise moment they matter most. As a result, Democratic Party Plaintiffs have been forced to remake their voter turnout and voter protection efforts to account for a new legal regime where voters may suddenly no longer receive a mail ballot. PI Br. 10–11. As the D.C. Circuit reemphasized in a decision released today, that is sufficient to establish standing and irreparable harm under "binding law." *CTR II*, 2026 WL 2635380, at *4–5, *13 (citing *Newby*, 838 F.3d at 9); *accord LOWVMA*, 2026 WL 2620871, at *11–12. Indeed, as the undisputed record shows, the Ballot Mail Rule has massively disrupted Democratic Party Plaintiffs' budgets, programming, and strategies for the 2026 elections. *See* PI Br. 10–11 (citing declarations). Again, as the *LOWVMA* court found, election officials in approximately half the States believe it is "likely impossible to comply with the Final Rule for the midterms." *LOWVMA*, 2026 WL 2620871, at *12.

**E. Member harm: privacy rights.** By requiring USPS to compile and maintain federal records containing protected information of millions of Americans who vote by mail—and then purporting to authorize handing over those records to law enforcement, 91 Fed. Reg. 56368 (Sept. 1, 2026) (system of records notice)—the Rule compels the paradigm of harms that *TransUnion* identified as traditionally actionable: "reputational harms, disclosure of private information, and intrusion upon seclusion," *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *see LULAC III*, 818 F. Supp. 3d at 111–120 (holding federal compilation and disclosure of protected records inflicts concrete injury on Democratic Party Plaintiff members whose information is implicated, and declining to issue injunction only because of mootness); PI Br. 14–16, 28–29.

Contrary to Defendants' unsupported arguments, courts have recognized these privacy injuries as irreparable. In *AFGE v. OPM*, 786 F. Supp. 3d 647 (S.D.N.Y. 2025), for example, the court granted injunctive relief to a union challenging a federal agency's unauthorized access of its

members' records, recognizing that resulting harms could not be adequately remedied after-the-fact, *id.* at 694 (emphasizing that "an improper disclosure within the Government is a serious and cognizable harm" (collecting authority)); *accord Ctr. for Taxpayer Rts. v. IRS* ("*CTR I*"), 815 F. Supp. 3d 1, 59 (D.D.C. 2025) (holding that threatened disclosures of address information from IRS to DHS in violation of federal privacy law constituted irreparable harm), *aff'd*, *CTR II*, 2026 WL 2635380. The features supporting injunctive relief in those cases are also present here: the action is an admitted federal compilation of records that are, in turn, made available to federal "law enforcement," a term the Rule defines with a particularly breathtaking scope. *See* PI Br. 24–26.

The case for interim relief on privacy grounds here is even *stronger* because the records to be compiled show how Plaintiffs' members exercise rights protected by the First Amendment. *Contra* Interv. Br. 22–23; Def. Br. 27. When USPS "maintains" the facts of a member's name and address and intent to vote by mail, additional information about how the member votes becomes immediately deducible. *See DHS II*, slip op. at 21–26 (holding that when the government compares two pieces of information about an individual to derive another, it creates another "record"). The Rule is designed to enable such deductions. *See* 91 Fed. Reg. 54969–54972; *see also* Jeffries Decl. ¶ 17 (explaining the Rule is chilling Plaintiffs' members because it makes information newly accessible to a growing number of federal officials). From a name, address, and ballot request alone, officials become positioned to confirm additional facts like the *kind* of ballot a voter used (i.e., based on jurisdiction), and *where*, for example, the voter may be required to show up in-person if their ballot is not delivered. *See* Ex. 12 ("Thompson Decl.") ¶ 10; PI Br. 14–15 (citing declarations). Thus, the imminent consequences here are further "dangerous" and "chilling" for Plaintiffs' members. *E.g.*, Jeffries Decl. ¶ 17; Thompson Decl. ¶¶ 6–17.

Congress subjected records to heightened regulation precisely because federal systems

became capable of "massing strands of information rapidly and unbeknownst to the individual," to the detriment of their ability to protect themselves. *Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*, 966 F.2d 747, 754 (3d Cir. 1992) (holding Privacy Act bolstered "the individual's privacy interest"); *AFGE*, 786 F. Supp. 3d at 694 (similar). The Rule "eviscerates the statutory privacy rights on which [Plaintiffs' members] depend" when exercising their rights. *CTR II,* 2026 WL 2635380, at *14. And because the Act's damages provisions cannot adequately remediate prospective harm, the only opportunity to meaningfully prevent the compilations of sensitive data the Rule compels is to enjoin USPS's actions now. *See CTR I*, 815 F. Supp. 3d at 55–60 (discussing relevant authority); *CTR II*, 2026 WL 2635380, at *13 (explaining importance of preventing "unlawful" data sharing because it is likely "difficult or impossible to remedy"); PI Br. 28–29.

## III. The remaining preliminary injunction factors favor immediate relief.

In evaluating the balance of the equities and the public interest, the Court "weigh[s] the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024). The scales tip decidedly in favor of Plaintiffs' right to injunctive relief.

First, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12; *DHS II*, slip op. at 31 (holding that the "public interest does not favor" allowing the federal government to implement a system that "it has not made a strong showing it may lawfully operate"); *CTR II*, 2026 WL 2635380, at *13 (holding there is no public interest in "unlawful disclosures"). USPS's actions are unlawful: they are unauthorized by Congress, run afoul of the constitutional separation of powers, and violate the Privacy Act.

Second, Defendants' rank speculation that the Rule might "strengthen public confidence" in mail voting, Def. Br. 29 (quoting 91 Fed. Reg. 54986), is entirely unsupported. The unrebutted evidence shows the opposite, as voters, political parties, election officials, and others have

repeatedly detailed why the Rule will inevitably result in catastrophe. *Supra* § II.C. States must now conform to a verification regime imposed on them without consultation, in the middle of an election, at great cost. *See DSCC*, 2026 WL 2168617, at *5 (describing "a substantial and unfunded overhaul of election procedures"); *accord California v. Trump*, 183 F.4th 52, 59 (1st Cir. 2026) (similar). USPS has not explained how it will avoid the serious risk of disenfranchisement. *See* 91 Fed. Reg. 54988. Nor has it trained its workers or local officials on entirely new responsibilities. Whistleblower Amicus 10; *supra* n.11; Earley Decl. ¶¶ 21–24. The First Circuit aptly summarized the consequences at stake: If no injunction is in place, the Rule will inescapably "sow confusion and threaten disenfranchisement of many eligible voters." *California v. Trump*, 183 F.4th at 73.

Defendants' claim that USPS should be permitted to attempt the implementation of an unprecedented, technologically complex Rule on a rushed timeline *because* "[b]allot mail presents unique considerations" borders on the absurd. Def. Br. 28 (quoting 91 Fed. Reg. 54968). The Rule is *not* operationally necessary, *see* PI Br. 21–22 (discussing 91 Fed. Reg. 54985), and Defendants fail to account for the fact that States used USPS's existing procedures to conduct mail voting for decades without suffering any of the problems that the Rule purports to solve, *id.* at 18 (citing *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2170–71 (2026)); *see also, e.g.*, Snyder Decl. ¶¶ 15, 21–24 (describing upended expectations under longstanding rules).

Nor can the Rule be justified by "law enforcement" interests. *Contra* Def. Br. 29. Defendants fail to explain how USPS's review of envelope design would facilitate any law enforcement efforts. They also fail to explain how this new regime could possibly mitigate voter fraud if USPS is relying on information submitted by States. *See, e.g.*, Earley Decl. ¶¶ 18–19 (explaining that the Ballot Mail Rule adds "literally no validation" to well-functioning State procedures for determining voter eligibility and thus "can achieve nothing other than preventing

. . . eligible voters from receiving their mail ballots.”). Instead, USPS *concedes* that elections conducted prior to the Rule were successful, *see* 91 Fed. Reg. 54985, and that it did not even assess whether the Rule would actually prevent voter fraud, *id.* at 54988. Nor do Intervenors prevent any evidence—or even logical explanation—of how the Rule could “preserv[e] the integrity of [the] election process[].” Interv. Br. 23. Merely invoking abstract interests in law enforcement and election integrity, without any effort to explain how the challenged policy advances those interests, are not sufficient to defeat a preliminary injunction. *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 223 (D.D.C. 2003) (holding that a change in the “ease of carrying out” even a legitimate government interest does not “rise to the level of irreparable or even substantial harm”).

## IV. *CASA* does not limit relief.

Defendants’ last-ditch argument that certain parts of the Ballot Mail Rule should be “severed” to prevent “overbroad” relief, Def. Br. 32 (citing *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)), is a nonstarter. Plaintiffs are harmed nationwide and Defendants “fail[] to explain” how “narrower relief” is “capable of redressing [P]laintiffs’ irreparable injuries”—including *Bost* harm and the severe injury to their members’ voting rights—which “stem from the very existence of” the Ballot Mail Rule. *CTR II*, 2026 WL 2635380, at *14. Plaintiffs have also challenged the Ballot Mail Rule as entirely *ultra vires*; completely lawless action cannot go into effect at all, anywhere. Defendants propose that USPS should be permitted to “operat[e] the Federal Ballot Mail Portal” to store voter information that States provide voluntarily, Def. Br. 33, but the Privacy Act conditions such a database on permission “by the individual about whom the record is maintained,” 5 U.S.C. § 552a(e)(7). States may not supply that permission by proxy.

## CONCLUSION

The Court should grant Democratic Party Plaintiffs’ motion for a preliminary injunction barring Defendants’ enforcement of Section 3(b) of E.O. 14,399 and the Ballot Mail Rule.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Max Accardi (DC 90021259)
Kevin R. Kowalewski (DC 90045467)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 948-1135
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (202) 948-1135
tbishop@elias.law

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*