**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants*.

Civil Action No. 26-cv-01114 (CJN)

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,

*Plaintiffs*,

v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

*Defendants*.

Civil Action No. 26-cv-01132 (CJN)

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants*.

Civil Action No. 26-cv-01151 (CJN)

# MEMORANDUM OPINION

Less than three weeks ago, the United States Postal Service adopted a Final Rule requiring that all absentee and mail-in ballots for federal elections—including for the elections occurring in less than sixty days—be transmitted only in envelopes satisfying new design requirements and be transmitted only to voters who are verified by the Postal Service to have been enrolled in a newly created "Federal Ballot Mail Portal." As the Government concedes, the Postal Service could issue (and enforce) the Rule only if Congress gave it the authority to do so, but here no statute grants the Postal Service the power to issue key parts of the Rule. Plaintiffs have therefore demonstrated that they are likely to succeed on their claim that the issuance of the Rule was *ultra vires*, and the record otherwise weighs in favor of preliminary injunctive relief. Accordingly, and for the reasons discussed in more detail below, Plaintiffs' Renewed Motions for Preliminary Injunction against the Rule are granted. *See* ECF Nos. 163, 171, 172.

## I. BACKGROUND

On March 31, 2026, President Trump issued Executive Order No. 14,399, Ensuring Citizenship Verification and Integrity in Federal Elections, 91 Fed. Reg. 17,125 (April 3, 2026), which stated that it sought to "prevent[] violations of Federal criminal law and maintain[] public confidence in election outcomes." Order § 1. As most relevant here, Section 3 of the Executive Order directed the United States Postal Service to initiate a proposed rulemaking to address certain issues concerning absentee and mail-in voting. *Id.* § 3(b). Specifically, the Executive Order obligated the Postal Service to issue a "notice of proposed rulemaking" that would include (1) a requirement that mail-in ballots for federal elections conform to certain design requirements (*e.g.*, unique Intelligent Mail barcode and designated markings) and (2) a process for individuals to be enrolled on a "State-specific Mail-In and Absentee Participation List." *Id.* § 3(b)(i)–(iv). Another

part of the Executive Order less relevant to the present motions directed federal agencies to prepare, and disseminate to States, so-called "State Citizenship List[s]." *Id.* § 2(a).

The next day, Plaintiffs filed these now-consolidated actions challenging those provisions of the Executive Order, among others. *See, e.g.*, ECF No. 1 ¶¶ 11–23. Plaintiffs also filed motions for preliminary injunctive relief. Following briefing and argument, the Court denied those motions, holding that Plaintiffs had at that time "not established a likelihood of Article III standing or that their claims . . . [were] ripe." *DSCC v. Trump*, 834 F. Supp. 3d 19, 38 (D.D.C. 2026). The Court recognized, however, that those jurisdictional flaws might not exist if the Postal Service ultimately issued a final rule as required by Section 3 of the Executive Order or if the Government developed State Citizenship Lists as required by Section 2. *Id.* at 27. Plaintiffs in one of these three cases appealed that decision, and the Court of Appeals affirmed on ripeness grounds. *DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *1 (D.C. Cir. July 28, 2026) (per curiam). And the Supreme Court reached much the same result—on both standing and ripeness grounds—with respect to injunctive relief issued in parallel challenges to the Executive Order in the District of Massachusetts. *See Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026).

On June 2, 2026, the Postal Service issued a Notice of Proposed Rulemaking as directed by the Executive Order, *see* Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026), and after receiving more than 200,000 comments, it published a Final Rule on August 21, *see* Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026). The Final Rule amends the Mailing Standards in what is known as the Domestic Mail Manual ("DMM"), by adding DMM

§ 705.24, "Ballot Mail for Federal Elections."[1] 91 Fed. Reg. at 54,990–92. The Rule applies to mail related to federal ballots and has four principal components.

*First*, the Rule establishes new envelope-design requirements for federal ballot mail. "Outbound Federal Ballot Mail" is mail enclosing a federal ballot that is transmitted by an "Authorized Ballot Mailer"—that is, a state or local election official who is responsible for sending mail-in or absentee ballots to eligible voters, or an entity or individual who is authorized to do so—through the U.S. mail *to* an absentee or mail-in voter. DMM § 705.24.1. "Return Federal Ballot Mail" is, in turn, mail transmitted *by* ("returned" by) such a voter that includes a completed federal ballot. *See id.* The Rule requires that both Outbound and Return Ballot Mail envelopes include "the official Election Mail logo," be "automation compatible," and bear the voter's unique Intelligent Mail barcode ("IMb") with specified information embedded in it. *Id.* §§ 705.24.3.1–.2. Under the Rule, Authorized Ballot Mailers are obligated to create Rule-compliant barcodes and to design and print Rule-compliant envelopes. *Id.* § 705.24.3.3. And the Rule requires that Outbound and Return envelopes "be submitted to the Postal Service for mailpiece design review and feedback." *Id.* §§ 705.24.3.1–.2.

*Second*, the Rule creates a new "Federal Ballot Mail Portal" through which state and local election officials must ensure that individual voters who wish to receive federal ballots via mail have been enrolled with the Postal Service. *See id.* § 705.24.4. To enroll a voter, a "Federal Ballot Mail Portal User"—that is, a state or local chief election official or an entity or individual that an election official has authorized to mail federal ballots, *id.* § 705.24.1(b)—must submit to the Federal Ballot Mail Portal each absentee and mail-in voter's name and address, the unique IMb on

[1] All of the provisions of the Rule can be found in Volume 91 of the *Federal Register* on pages 54,990 through 54,992, but when the Court discusses the specific provisions, it cites them to DMM § 705.24.

each voter's Outbound and Return Ballot Mail envelopes, and the state of each voter's original election office. *Id.* § 705.24.4.2(b). That information must be submitted to the Portal "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law." *Id.* § 705.24.4.2(d). But Portal Users cannot submit that information until they have first certified that the Outbound and Return envelopes they intend to use have been submitted for Postal Service design review. *See id.* § 705.24.4.2(d), (f). The Rule also requires the Postal Service to provide, on or about the date of the federal election, to each state's chief election official the name and address of each individual in that state who was enrolled through this process, along with the unique IMb associated with the Outbound and Return Federal Ballot Mail sent to each such individual. *Id.* § 705.24.4.3. The Rule calls these "state-specific Mail-In and Absentee Participant List[s]." *Id.*

*Third*, the Rule requires the Postal Service to verify that each piece of Outbound Federal Ballot Mail both satisfies the Rule's envelope-design requirements and is being sent to a voter enrolled on the Mail-In or Absentee Participant List. *Id.* § 705.24.5.1–.2. The Rule contemplates that this verification will be achieved in part by scanning the IMb on the outside of an Outbound envelope and confirming that it corresponds to an IMb in the Portal. 91 Fed. Reg. at 54,981. That verification must be done when the Outbound mailing is presented to the Postal Service for acceptance, and Outbound Federal Ballot Mail must be presented at a Postal Service facility that performs business-mail acceptance functions or at a Postal Service retail counter. *See* DMM § 705.24.5.2. The Rule does not require this verification process for Return Federal Ballot Mail. *Id.* § 705.24.5.4.

*Fourth*, the Rule establishes procedures governing noncompliance. When a piece of Outbound Federal Ballot Mail cannot be verified as complying with the foregoing requirements,

it "will not be accepted" and must be returned to the Authorized Ballot Mailer. *Id.* § 705.24.5.3(a). At that point, either the Authorized Ballot Mailer or Federal Ballot Mail Portal User is required to fix the identified errors before resubmitting the ballot for verification. *Id.* An Authorized Ballot Mailer may also request further review. *Id.* § 705.24.5.3(b).

The entire Rule became effective on August 21, 2026, a little more than two months before the upcoming federal election, and a couple of weeks before some states would start mailing their first ballots to absentee voters. *See, e.g.*, ECF No. 171, Ex. 1 ¶ 36, Declaration of Tammy Patrick ("Patrick Decl.") (stating that North Carolina would start mailing ballots on September 4, 2026); ECF No. 171, Ex. 2 ¶ 12, Declaration of Lydia McComas ("McComas Decl.") ("For a November general election . . . ballots are required to be mailed out to all voters with a valid request on file 47 days before the election."). Within the next several days, all Plaintiffs in these consolidated cases filed renewed motions for preliminary injunctions directed at the Rule (and the DSCC Plaintiffs also moved again to enjoin Section 3 of the Executive Order). *See* ECF Nos. 163, 171, 172.[2] Those motions are now fully briefed.

## II. ANALYSIS

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To obtain that remedy, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[2] All Plaintiffs also filed Supplemental Complaints asserting various claims against the Rule. ECF Nos. 175, 176, 177.

"[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Two factors, however, are key to the analysis: likelihood of success on the merits and irreparable harm. "When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). And "failure to show a likelihood of irreparable harm [is], standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that "failure to show any irreparable harm" alone is reason enough to deny a preliminary injunction).

**A. Plaintiffs Are Likely to Succeed on the Merits**

**1. At Least Some Plaintiffs Likely Have Article III Standing**

To "establish[] a likelihood of success on the merits, [Plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020). As the Court of Appeals has put it, "[t]he affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (alteration adopted) (citation and internal quotation marks omitted). "In the context of a preliminary injunction motion," a plaintiff must "show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation and internal quotation marks omitted). Although the Federal Defendants (but not the State Intervenor Defendants) concede that various Plaintiffs have standing, *see* ECF No.

184 at 8 n.3, the Court must independently assess whether it likely has jurisdiction over Plaintiffs' challenge to the Rule, *see Beyond Nuclear, Inc. v. U.S. Nuclear Regul. Comm'n*, 182 F.4th 977, 982 (D.C. Cir. 2026) ("[W]e have an independent obligation to ensure we have jurisdiction.").

To establish Article III standing, of course, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). "[T]raditional tangible harms, such as physical harms and monetary harms," will "readily qualify as concrete injuries under Article III." *Id.* at 425. And "[a]n actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural or hypothetical." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (citation and internal quotation marks omitted). "[A]llegations of *possible* future injury" are not sufficient to establish injury in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration adopted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

"At the preliminary-injunction stage," a plaintiff "must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation and internal quotation marks omitted). And "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.

Different types of plaintiffs may, of course, have Article III standing for different reasons. Organizations, in particular, "may have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). Or they can sue on behalf of their members—provided that the organization can "demonstrate [that] 'its members would otherwise have

standing to sue in their own right.'" *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 181 (2000)).[3] In those circumstances, the organization must identify at least one member who would have standing to sue in her own right. *See Chamber of Commerce v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011) (explaining that, to successfully allege associational standing, a plaintiff organization "must specifically identify members who have suffered the requisite harm"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations" must "make specific allegations establishing that at least one identified member had suffered or would suffer harm.").

Plaintiffs assert that they have standing under at least five independent doctrines. *See, e.g.*, ECF No. 163-1 at 8–15 (asserting candidate standing under *Bost*, candidate standing due to uneven competition, associational standing because of members' voting rights, associational standing because of members' privacy rights, and organizational harm). Because "only one plaintiff needs standing for [the] suit to proceed," *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026), the Court addresses only their strongest theories.

*Political Candidates*. The DSCC Plaintiffs argue that political candidates (some of whom are named Plaintiffs, and others of whom are members of the DSCC, DCCC, DNC, and DGA Plaintiff organizations)[4] have standing under *Bost*. ECF No. 163-1 at 9. There, the Supreme Court held that a political candidate "ha[d] standing to challenge the rules that govern the counting of

---

[3] An organization must also show that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club*, 926 F.3d at 848 (internal quotation marks omitted) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 181).

[4] Two DSCC Plaintiffs are political candidates: Chuck Schumer and Hakeem Jeffries. The injury-in-fact analysis is the same for those named Plaintiffs as it is for those members of Plaintiffs' organizations who are candidates.

votes in his election." *Bost*, 607 U.S. at 83. The Court reasoned that "[a]n unlawful election rule can injure a candidate in several ways," such as causing "him to lose the election," requiring "him to expend additional resources," or by decreasing "his vote share and damage[ing] his reputation." *Id.* at 77. Here, Plaintiffs allege that candidates are currently harmed by the Rule because it deprives them of a fair process, risks inaccurate election results, and undermines the campaign investments they made based on the preexisting State legal regimes. *See e.g.*, ECF No. 163, Ex. 6, 2d Declaration of Hakeem S. Jeffries ("Jeffries Decl.") ¶¶ 8, 12. Because "candidates have a concrete and particularized interest in the 'process' of elections sufficient on its own to challenge an extant election rule," *DSCC*, 2026 WL 2168617, at *4 n.8 (citing *Bost*, 607 U.S. at 76–80), the DSCC Plaintiffs—which again include individual candidate Plaintiffs and organizations with candidate members—likely have standing to challenging the Ballot Mail Rule.

Intervenor State Defendants (but not the Federal Defendants) contend that *Bost* is inapplicable because the Ballot Mail Rule "does not pertain to the counting of votes." ECF No. 183 at 12. To be sure, the challenge in *Bost* was to the rules governing the counting of votes in a particular election, 607 U.S. at 83, and the Postal Service Rule here does not address vote counting, *see generally* DMM § 705.24. But *Bost*'s reasoning was not limited only to that context; as noted above, the Court recognized that candidates can suffer different injuries related to their interest in "a fair [electoral] process"—such as by losing an election, requiring the expenditure of additional resources, or decreasing the vote share and damaging the candidate's reputation. *Bost*, 607 U.S. at 77. Other courts have therefore applied *Bost* in challenges to aspects of the electoral process beyond just vote counting. *See, e.g.*, *Stanley v. Brown Cnty. Election Bd.*, 829 F. Supp. 3d 506, 515 (S.D. Ind. 2026) (holding that, under *Bost*'s reasoning, Plaintiffs, who had announced their candidacy in an election, had standing to challenge "decisions excluding them from access to a

ballot"). And the political candidates here allege precisely the types of candidate-specific injuries recognized in *Bost*.

In addition to "*Bost* standing," the candidates currently running for office likely have competitor standing. Those candidates contend that the Rule will harm their chances in the upcoming election cycle, and the Court of Appeals has held that this type of injury is cognizable under Article III. *See Shays v. FEC*, 414 F.3d 76, 82 (D.C. Cir. 2005) (holding that candidates had competitor standing to challenge an FEC regulation that would allegedly harm the candidates' chances in the upcoming election); *see* Jeffries Decl. ¶ 12 ("[B]y restructuring election rules . . . the Ballot Mail Rule [ ] harm[s] the electoral prospects of Democratic House candidates, including myself."). Again, the Federal Defendants do not argue to the contrary, and other than the argument about *Bost* discussed above, the Intervenor State Defendants do not appear to contest Plaintiffs' argument that the Rule will harm candidates' chances in the upcoming elections.

*Voters*. Each of the Plaintiff Organizations contends that it has members who intend to vote by absentee or mail-in ballot, and that the Final Rule will impair those efforts. *See* ECF No. 163-1 at 12–13; ECF No. 171-1 at 16–17; ECF No. 172-1 at 20–21. The Supreme Court has "long recognized that a person's right to vote is individual and personal in nature," so "voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Gill v. Whitford*, 585 U.S. 48, 65–66 (2018) (internal quotation marks omitted); *see also Gray v. Sanders*, 372 U.S. 368, 375 (1963) ("We also agree that appellee, like any person whose right to vote is impaired has standing to sue." (internal citations omitted)). Here, for example, Jessica Mendoza (a member of Plaintiff Arizona Students' Association), claims that, as a registered voter who plans to vote by mail in the 2026 elections, she is harmed by the Rule because it "causes confusion and uncertainty about whether [she] will be able to vote by mail in the upcoming elections." ECF No. 171, Ex. 6

¶¶ 21–22, Declaration of Jessica Mendoza. Similarly, Hakeem Jeffries alleges that the Rule harms him as a voter because he now faces the additional hurdle of Postal Service verification of his ballot mail this election, "despite the fact that [New York State] has already determined" his eligibility. Jeffries Decl. ¶ 16. He also claims that the Rule might greatly delay, or make it completely impossible, for him to cast a mail ballot like he has done in the past. *Id.* And members of NAACP and Common Cause who intend to vote by mail in the upcoming election allege that the Executive Order impedes their ability to vote, because it impacts when ballots can be transported through the mail. *See, e.g.*, ECF No. 54-6 ¶¶ 4–5, Declaration of Jill Howard.

Defendants argue that these alleged harms are "speculative," *see* ECF No. 183 at 8–9; ECF No. 184 at 11, but the record demonstrates that the Rule will make voting by mail more difficult and, for some voters, effectively foreclose that option altogether. *See, e.g.*, ECF No. 188, Ex. 9 ¶ 26, Declaration of Mark Earley ("Earley Decl.") (explaining that election officials may not have time to fix a rejected ballot's purported errors and get the voter a ballot in time to cast it); *id.* ¶ 13 ("The Ballot Mail Rule's last-minute requirement to implement these changes will without a doubt result in mistakes that will disrupt election administration and the timely, efficient, and accurate distribution of mail ballots to eligible voters."); ECF No. 188, Ex. 10 ¶ 18, Declaration of Stuart Holmes ("Given the very short time available and the untested technology that the Rule relies on, I have profound concerns that the Rule will prevent eligible voters from voting."). And the Court of Appeals has explained that an increased risk of disenfranchisement in an upcoming election can make that injury "sufficiently imminent for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (internal quotation marks omitted) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)).

*Election Officials*. The Election Official Plaintiffs—the City of Madison, Travis County Clerk Dyana Limon-Mercado, and Travis County—contend that they have standing because the Rule directly regulates them, requires them to expend additional effort, and causes them to suffer financial harms. ECF No. 171-1 at 20–21. For example, one Election Official states that her jurisdiction has already purchased ballot envelopes and now must spend over $10,000 to purchase new ones. McComas Decl. ¶ 22; *see also* ECF No. 171, Ex. 3 ¶¶ 17, 22, Declaration of Dyana Limon-Mercado (explaining that Travis County and the Travis County Clerk purchased noncompliant envelopes months ago, at a cost of $21,349). These officials are also required by the Rule to prepare and upload to the Federal Ballot Mail Portal information about each absentee or mail-in voter who intends to vote by mail. Here, again, the Federal Defendants "do *not* dispute the standing of the City of Madison, Wisconsin; Travis County, Texas; or the Travis County Clerk (in her official capacity), as political subdivisions of States with election administration responsibilities that are directly regulated by the Rule." ECF No. 184 at 9 n.4 (emphasis added). The Intervenor State Defendants, for their part, do not appear to address this issue at all. *See generally* ECF No. 183. In any event, because these Plaintiffs have election administration responsibilities that are directly regulated by the Rule, and because they will have to expend additional resources (that is, suffer a "monetary injury") if the Rule is enforced, they likely have Article III standing.[5] *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).[6]

[5] Various Plaintiffs also claim that they have organizational standing to challenge the Rule. *See, e.g.*, ECF No. 171-1 at 18–19. Because it is likely that each set of Plaintiffs has standing under another theory, the Court need not decide whether the claimed organizational harms are sufficient under Article III. But the Court has doubts that the Organizational Plaintiffs would have organizational standing here because the alleged injuries are similar to those that the Supreme Court held were insufficient in *Alliance for Hippocratic Medicine*. *See* 602 U.S. at 394 (holding that organizational plaintiffs lacked standing even though the challenged governmental action had caused them "to conduct their own studies on [a drug] so that the[y] [could] better inform their members and the public about [the drug]'s risks" and "to expend considerable time, energy, and

### 2. Plaintiffs Are Likely to Succeed on Their *Ultra Vires* Claim

Turning to the merits, Plaintiffs raise various claims against the Final Rule, but the Court need only reach one of them: that issuance of the Final Rule was *ultra vires*. *See, e.g.*, ECF No. 163-1 at 16. Plaintiffs are likely to succeed on that claim.

The Postal Service is generally "exempt from review under the Administrative Procedure Act." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012). But "judicial review is available when" the Postal Service "acts *ultra vires*, or outside of the authority Congress granted." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (internal quotation marks omitted) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)). "Review for *ultra vires* acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which the agency assumes to act,' the agency has 'violated the law' and 'the courts generally have jurisdiction to grant relief.'" *Id.* (alterations adopted) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)).

"Although there is little doubt about the availability of judicial review in this case, a question remains regarding the *scope* of review." *Aid Ass'n for Lutherans*, 321 F.3d at 1173. Defendants contend that Plaintiffs must identify a statutory provision that expressly prohibits the exact conduct challenged here. *See, e.g.*, ECF No. 184 at 12 (An "ultra vires claim requires identification of an agency violation of 'a specific prohibition' in a statute that 'is clear and

---

resources drafting citizen petitions to [the agency], as well as engaging in public advocacy and public education.").

[6] The DSCC Plaintiffs, but not Plaintiffs in the other consolidated actions, seek to preliminarily enjoin Section 3 of the Executive Order. But for reasons similar to those stated in the Court's prior decision, the DSCC Plaintiffs have failed to establish that they likely had standing to challenge the Executive Order when the suit was filed, and they have failed to establish that their present injuries are caused by the Executive Order, rather than the Rule. *See DSCC*, 834 F. Supp. at 37.

mandatory.'" (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958))). That position misstates the standard, at least in this Circuit. The Court of Appeals has "construed the scope of non-APA review to include: (1) a straightforward question of statutory interpretation; (2) a question concerning whether a regulation in the [Domestic Mail] Manual was a valid exercise of the Postal Service's authority; and (3) a question focusing on whether a Postal Service decision was supported by the agency's contemporaneous justification or, instead, reflected counsel's *post hoc* rationalization." *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016) (internal citations and quotation marks omitted). Accordingly, the Court reviews the Final Rule to determine whether "a statutory provision plainly delineates the outer limits of [Postal Service] authority" and the Service has "clearly violate[d]" its bounds. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971.

As to that question, "Congress established the Postal Service as an independent agency under the Executive Branch in the Postal Reorganization Act of 1970." *Id.* at 966. And as most relevant here, that Act grants the Postal Service certain specific powers, including the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." 39 U.S.C. § 404(a)(1). It further grants the Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). And it authorizes the Postal Service "to adopt, amend and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions" assigned to it by law. *Id.* § 401(2).

The key portions of the Rule exceed any conception of the outer bounds of these authorities. Take Sections 705.24.4 and 705.24.5, for example. Together those provisions establish a federal

enrollment and recordkeeping system (the Federal Ballot Mail Portal), mandate that state election officials input voter and ballot-identification information into that system, require the creation and dissemination of a State-specific Mail-in and Absentee Participant List, and make the distribution of Outbound Federal Ballot Mail contingent on compliance with the entire regulatory regime. *See* DMM §§ 705.24.4–.5. Nothing in the Postal Reorganization Act authorizes the Postal Service to impose new election procedures on state election officials, to create a data collection system for mail-in and absentee voters, or to refuse the transmission of lawful mail *because* it fails to meet these data collection requirements. To be sure, the Act gives the Postal Service "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." 39 U.S.C. § 401(10). But Defendants have not shown how the creation of State-specific Mail-in and Absentee Participant Lists or the refusal to mail envelopes not registered on those lists are "necessary" or "incidental" to the "specific powers" delineated in the Act, all of which relate to the processing and delivery of mail.[7] *See id.* §§102(5), 401(a)(1) (describing the Postal Service's basic functions and specific powers to all relate to mail delivery).[8]

[7] It is less clear that the Rule's envelope design requirements, without more, exceed the Postal Service's rulemaking authority. The Postal Service has broad authority to regulate the preparation, handling, and delivery of mail, including through envelope and labeling design and tracking requirements. *See* 39 U.S.C. § 404(a)(1); *U. S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122–23 (1981) (explaining that "the Postal Service is broadly empowered to adopt rules and regulations designed to" aid its execution of its Congressionally assigned functions). The fact that design requirements apply specifically to election mail does not, alone, make it *ultra vires*.

[8] The absence of any provision in the Postal Reorganization Act having anything to do with mail voting stands in sharp contrast with other statutes governing exactly that. In different contexts, Congress has specifically assigned voter-list management, federal election-information collection, and recordkeeping functions to other federal and state entities. For example, the Help America Vote Act of 2002 ("HAVA") directs *States* to maintain a single, statewide voter-registration list and assign "a unique identifier to each legally registered voter." 52 U.S.C. § 21083(a)(1)(A). Congress also created the Election Assistance Commission to serve as a central source for federal-election administration information. *See id.* §§ 20921–22. Thus, Congress has demonstrated that it knows how to make an express delegation of authority to collect and maintain voter-specific election information when it wants to, and it chose not to do so here. *Cf. Learning Res., Inc. v.*

Defendants argue that the Rule "regulates only the process by which the States design, label, and send [ballot] envelopes through the U.S. mail," ECF No. 184 at 16, and it therefore falls within the Postal Service's "general rulemaking power," *id.* at 13. But the Rule does far more than prescribe how ballot envelopes must be designed and processed. *See* DMM §§ 705.24.4–.5 (requiring state election officials to enroll voters into a federal Portal, create and maintain State-specific Mail-in and Absentee Participant lists with individual voter data, and refuse to mail absentee ballots that do not conform to the Rule's mandates). Indeed, the Rule itself identifies objectives such as "ensur[ing] election integrity" and preventing fraud. 91 Fed. Reg. at 55,984. Because most of the Rule's provisions impose substantive preconditions on mail-voting that do not aid the Postal Service in "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," *id.* § 404(a)(1), Defendants' characterization of the Rule is unpersuasive.

Defendants' analogies to Postal Service regulations for the mailing of cremated remains and replica explosives do not help their case. In particular, Defendants argue that those rules demonstrate that the Service has the authority to impose special conditions on certain sensitive categories of mail. ECF No. 184 at 14. But those regulations concern how particular items are packaged, shipped, and tracked while moving through the postal system. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9,843, 9,843–44 (Feb. 19, 2025) (requiring cremated remains to be labeled as such and sent in specified secure packaging); *See Restricting the Mailing of Replica or Inert Explosive Devices*, 75 Fed. Reg. 282, 283 (Jan. 5, 2010) (requiring replica explosives to be labeled as such in large font and shipped via Registered Mail). Most of the Ballot

---

*Trump*, 607 U.S. 229, 248–49 (2026) ("[H]ad Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly—as it consistently has in other tariff statutes.").

Mail Rule, on the other hand, concerns the maintenance of absentee and mail-in voter information through the Federal Ballot Mail Portal and the vetting of Outbound Federal Ballot Mail for compliance with the entire regulatory regime—not steps that aid in the transmission of mail.

* * *

In sum, Plaintiffs have shown that they will imminently suffer concrete harms traceable to the Rule. They have also established that the Postal Service's enactment of the Rule was *ultra vires*. For those reasons, Plaintiffs are likely to succeed on the merits.

**B. Irreparable Harm**

Turning to irreparable harm, Plaintiffs must demonstrate that, absent a preliminary injunction, they will suffer an imminent irreparable injury. *See Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025). The standard for "irreparable" harm is "high," but Plaintiffs meet it here. *Chaplaincy*, 454 F.3d at 297.

In particular, Plaintiffs have proffered substantial (and essentially uncontested) evidence that it will be close to impossible for at least some States to design and reprint Rule-compliant envelopes, *see, e.g.*, Patrick Decl. ¶ 84 ("Redesigning and reordering envelopes for any reason is not feasible for a local election office this close to a general election."); that there will likely be delays in the Postal Service's review of the States' proposed envelopes—which must occur before any Federal Ballot Mail Portal User may upload voters' information into the Federal Ballot Mail Portal, *see, e.g.*, *id.* ¶ 85 (explaining that ballot redesign is time-intensive and therefore is usually only done "in odd-numbered years, off cycle from federal elections"); that there will be delays (and ultimately mistakes) as the Postal Service attempts to finalize the Portal, *see, e.g.*, Earley Decl. ¶¶ 23–24 (expressing "significant concerns about the technological integrity" of the "Ballot Portal" and noting a lack of "training on how to use" it); and that there will likely be delays and

mistakes in the Postal Service's scanning and review of all Outbound Ballots for compliance with the new envelope requirements and confirming that each absentee and mail-in voter matches information in the Portal, *see, e.g.*, Patrick Decl. ¶¶ 109–11 (explaining that the requirement that Outbound Return Ballots be taken to one of two specific locations for verification "places enormous burdens on" election officials and can result "in delays for the voter"). As a result, Plaintiffs have demonstrated that there is an increased risk that a significant number of absentee or mail-in ballots will ultimately not be counted. In fact, there will likely be more than fifty million pieces of federal ballot mail transmitted by the Postal Service during this election cycle; in connection with the 2022 midterm elections, the Postal Service reported that it delivered at least 54.4 million[9] ballots to and from voters.[10] U.S. POSTAL SERV., *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections* 3 (2022), https://about.usps.com/what/government-services/election-mail/pdf/usps-2022-post-election-analysis.pdf. The harm of untransmitted ballots—both to voters and candidates—is irreversible, because "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also League of Women*

[9] The total number of ballots delivered during the 2022 midterm election may have exceed 54.4 million. That figure includes only ballots that were properly identified electronically as ballots and excludes many ballots that the Postal Service handled outside of its ordinary process. U.S. POSTAL SERV., *2022 Post-Election Analysis: Successfully Delivering the Nation's Election Mail During the 2022 Midterm Elections* (2022), https://about.usps.com/what/government-services/election-mail/pdf/usps-2022-post-election-analysis.pdf.

[10] The U.S. Election Assistance Commission reported that in 2022 approximately 61 million ballots were transmitted to non-UOCAVA voters, and 36.6 million of those ballots were returned to States, but not all transmissions were through the U.S. mail. U.S. ELECTION ASSISTANCE COMM'N, *Election Administration and Voting Survey 2022 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 118th Congress*, 12 (2023), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf. States reported that 35.3 million ballots "were cast by mail and counted." *Id.*

*Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding the same); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury.").

**C. Balance of Equities and Public Interest**

The other two preliminary injunction factors—the balance of equities and the public interest—also cut in favor of preliminary relief. "A party seeking a preliminary injunction must show that the balance of equities favors preliminary relief and that an injunction is in the public interest." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (citation and internal quotation marks omitted). In considering those factors, the Court will "weigh[] the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Id.*

Because Plaintiffs have shown that the Ballot Mail Rule likely exceeds the authority Congress conferred on the Postal Service, a preliminary injunction serves the public interest. *See Newby*, 838 F.3d at 12. After all, there is "generally no public interest in the perpetuation of unlawful agency action." *Id.* Instead, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Beyond that, the public has a "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted). For the reasons discussed above, Plaintiffs have demonstrated that, absent an injunction, there is an increased risk that a significant number of otherwise appropriate absentee or mail-in ballots will ultimately not be counted in the upcoming elections. *Supra* Section II.B. The public has a strong interest in ensuring that doesn't happen.

On the other side of the ledger, the Federal Government does not point to any record evidence that there will be significant fraud in the upcoming elections in the event the Court enters preliminary injunctive relief. That's perhaps not surprising, since the Government's position is that the Final Rule is just a "regulation of the U.S. mail, and a *modest* one at that." ECF No. 184 at 11 (emphasis added); *see also id.* at 3 (Rule "imposes *modest* reporting and design requirements on federal ballot mail envelopes."). To be sure, the Government points to the purposes for the Final Rule as stated in the preamble and makes the general argument that "[t]o thwart the Postal Service from uniformly implementing these beneficial practices . . . necessarily harms the interests furthered by the Final Rule." *Id.* at 28. The Defendants—and the public—certainly have an interest in "strengthening public confidence in mail voting," *Id.* at 29 (quoting 91 Fed. Reg. at 54,986), and "enhancing the efficiency of postal operations," *id.* at 28 (quoting 91 Fed. Reg. at 54,968–69). But there is no indication in the record before the Court that preliminarily enjoining the Ballot Mail Rule would actually harm those interests.[11] And those harms are significantly outweighed by the risks of disenfranchisement to absentee and mail-in voters identified by Plaintiffs.

But would a preliminary injunction now, with less than two months to go before the elections, violate the so-called "*Purcell* principle"? That principle, at least in general, "counsels federal courts against entering injunctive relief on the eve of an election 'when candidates, election officials, and voters have relied on the rules in place at that time.'" *DSCC*, 2026 WL 2168617, at

[11] Defendants also argue that the Rule's "data reporting and mail-preparation requirements" further their "law enforcement" interests. ECF No. 184 at 29 (quoting 91 Fed. Reg. at 54,985). But they fail to explain exactly how the Rule puts "law enforcement in a better position to identify . . . potential issues regarding compliance with federal law," nor do they show that an injunction would harm law enforcement's ability to identify noncompliance with federal law. *Cf. Newby*, 838 F.3d at 13 ("What is disputable is whether an injunction would actually do much, if any, harm to that interest.").

*5 (quoting *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring in grant of stay)). Neither the Federal Defendants nor the Intervenor Defendants make this argument, however; in any event, the Court concludes that the *Purcell* principle does not counsel against entering injunctive relief. As the Court of Appeals put it in this case just last month: "*If* the federal agencies were to take the actions the Plaintiffs fear and *if* they were to attempt to impose those massive changes on the States' voting systems on the threshold of the upcoming election, then those actions (*if* found unlawful) could be enjoined without implicating any federalism or reliance interests *because the injunction would preserve the States' existing electoral status quo*." *Id.* at *6 (last emphasis added). That is precisely the situation here. If anything, the extremely short timeframe between issuance of the Final Rule and the midterm elections cuts strongly in favor of preliminary injunctive relief.

**D. Scope of the Injunction**

As for the scope of the injunction, it must not be "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Defendants argue that any preliminary injunction must provide relief only to those Plaintiffs who have Article III standing. *See, e.g.*, ECF No. 184 at 32–33. Here, however, the Plaintiff Organizations together have members who are absentee or mail-in voters in essentially all fifty states, and together have members who are candidates in all fifty states. *See, e.g.*, ECF No. 163, Ex. 3 ¶ 5, Declaration of Caitlin Remmel ("As of today, DCCC has members who are Democratic candidates for the U.S. House in all 50 states."). Enjoining Federal Defendants from enforcing the Rule, in its entirety, is therefore a "party-specific" remedy consistent with *CASA*'s command. *CASA*, 606 U.S. at 851. That such an injunction might also confer relief on nonparties, or on Plaintiffs without Article III standing, does not mean a narrower injunction is warranted. *Id.*

("While party-specific injunctions sometimes advantage nonparties, they do so only incidentally." (alterations adopted) (internal citation and quotation marks omitted)).

Defendants also argue that a preliminary injunction should be directed only at DMM § 705.24.5.3, which is the portion of the Rule that precludes the Postal Service from accepting Outbound Ballot Mail for noncompliance reasons. ECF No. 184 at 33. Under such an injunction, the Ballot Mail Rule would largely go into effect, but the Postal Service would not be able to refuse Outbound Ballot Mail even if it was noncompliant with the Rule's other provisions. In the Government's view, enjoining just that provision would remedy all of Plaintiffs' claimed harms. *Id.*

The Court disagrees. As an initial matter, such an injunction would not solve the likely delays on the eve of an election as States attempt to design and reprint Rule-compliant envelopes, as the Postal Service reviews and approves those redesigned proposed envelopes, and as the Postal Service attempts to finalize the Portal—all steps that the Rule would still require under the Government's proposed narrower injunction. It also seems likely that such a partial injunction would create even more confusion and misunderstanding (and thus delays and mistakes).

The Government's argument is really that the Rule can be severed—or at least that DMM § 705.24.5.3, can be severed from the rest. In evaluating whether the Rule "can be severed in that kind of fashion," the Court asks "whether the agency would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted," *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 224 (D.C. Cir. 2025) (alteration adopted) (citation and internal quotation marks omitted), and "whether the remaining parts of the Rule would 'function sensibly without the stricken provision,'" *id.* at 225 (quoting S*orenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014)). Here, the answer to both questions

appears to be no. It seems highly unlikely that the Postal Service would have adopted the Rule's design and Portal requirements if it could not require that Outbound Federal Ballot Mail comply with them. And for essentially the same reason, while those other provisions could function on their own, they would not "function sensibly" without DMM § 705.24.5.3. *Id.*

## III. Conclusion

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the DSCC Plaintiffs' Renewed Motion for a Preliminary Injunction, ECF No. 163; GRANTS the LULAC Plaintiffs' Renewed Motion for a Preliminary Injunction, ECF No. 171; and GRANTS the NACCP Plaintiffs' Renewed Motion for a Preliminary Injunction, ECF No. 172. The Court will issue an order contemporaneously with this decision.

DATE: September 13, 2026

CARL J. NICHOLS
United States District Judge